RECEIVED

2012 AUG 20 ℗ 6: 46

U S DISTRICT COURT SDNY

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                :   Civil Action No. 1:11-cv-07866-VM

IN RE MF GLOBAL HOLDINGS        :
LIMITED SECURITIES LITIGATION    :   **CONSOLIDATED AMENDED**
                :   **SECURITIES CLASS ACTION**
                :   **COMPLAINT**
                :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x  **JURY TRIAL DEMANDED**
                :

THIS DOCUMENT RELATES TO:      :   **ECF CASE**
                :

All Securities Actions           :
(*DeAngelis v. Corzine*)          :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

# TABLE OF CONTENTS

**Page**

I.  NATURE AND SUMMARY OF THE ACTION ............................................................. 2

II.  JURISDICTION AND VENUE .......................................................................... 7

III.  PARTIES ................................................................................................. 8

    A.  Plaintiffs .......................................................................................... 8

    B.  Individual Defendants ..................................................................... 10

        1.  Officer Defendants ................................................................. 10

        2.  Director Defendants ............................................................... 11

    C.  Underwriter Defendants .................................................................. 14

IV.  FACTUAL BACKGROUND ........................................................................ 17

    A.  The Formation Of MF Global And Its Subsidiaries ............................. 17

    B.  Corzine Spearheads A "Transformative Effort" Toward Profitability ................ 20

    C.  MF Global's DTA Was Materially Overstated During The Class Period ........... 24

        1.  Background On MF Global's DTA ......................................... 24

        2.  GAAP Accounting For DTA ................................................. 26

        3.  MF Global Violates GAAP By Failing To Record A Timely
            Valuation Allowance Against Its U.S. DTA.............................. 30

            (i)  MF Global Did Not Have Evidence Of "Sufficient Quality And
                Quantity" That It Was "More Likely Than Not" To Realize A
                Benefit From Its U.S. DTA..........................................35

            (ii)  Compensation Structure Changes Were Not Sufficient Positive
                Evidence To Offset MF Global's U.S. DTA ................................37

            (iii)  Purported Tax Planning Strategies Were Neither "Prudent" Nor
                "Feasible"..................................................................41

    D.  MF Global Launches A Euro Sovereign Debt Trading Strategy Using
        Repo And RTM Transactions ........................................................... 44

        1.  Background Regarding Repo And RTM Transactions........................... 44

2.      The Impetus For The Corzine Trade........................................................ 46

3.      The Mechanics Of The Corzine Trade..................................................... 47

4.      After The Corzine Trade Temporarily Boosts Profits, Substantial
        Undisclosed Liquidity Risks Trigger Massive Margin Calls.................... 49

E.     MF Global's Ineffective Risk Management And Internal Controls ..................... 57

1.      The Board Dismisses Myriad Red Flags And Corzine
        Exponentially Increases Euro Sovereign Debt Trading Limits ............... 57

2.      Dozens Of Gaps In Risk Management Are Presented To,
        But Ignored By, The MF Global Board ..................................... 67

F.     Belated, Inadequate Disclosures About The Corzine Trade Prompt
        Regulatory Inquiries That Help Shut Down The Corzine Trade ......................... 71

1.      The FINRA And FSA Investigations........................................................ 72

2.      The SEC Comment Letters ..................................................................... 79

G.     MF Global's Liquidity Crisis Is Masked By Intraday (And Overnight)
        Transfers, Including Unlawful Transfers From Customer Accounts.................... 82

1.      Background On Segregated Customer Accounts And The Use Of
        Intraday Transfers At MF Global ............................................. 82

2.      MF Global's Most Senior Executives Use Inter-Company
        Transfers To Meet Increasing Daily Liquidity Needs ............................. 86

3.      Inter-Company Transfers Become A "Shell Game"................................. 88

4.      Liquidity Monitoring During The Class Period....................................... 90

H.     The Truth Begins To Emerge In MF Global's Frenetic Final Days .................... 94

1.      October 17, 2011-October 27, 2011 ..................................................... 94

2.      October 28, 2011-November 21, 2011 .................................................. 99

V.   MATERIAL MISSTATEMENTS AND OMISSIONS................................................. 104

A.     The Fourth Fiscal Quarter Of 2010 And Full Fiscal 2010 Year ........................ 104

1.      Net Income And DTA............................................................................ 104

2.      Risk Appetite, Internal Controls And Liquidity Management................ 108

B.     The First Fiscal Quarter Of 2011 ....................................................... 112

       1.     Net Income And DTA.............................................................. 112

       2.     Risk Appetite, Internal Controls And Liquidity Management............... 114

C.     The Second Fiscal Quarter Of 2011................................................... 118

       1.     Net Income And DTA.............................................................. 118

       2.     Risk Appetite, Internal Controls And Liquidity Management............... 119

D.     The Third Fiscal Quarter Of 2011 ..................................................... 124

       1.     Net Income And DTA.............................................................. 124

       2.     Risk Appetite, Internal Controls And Liquidity Management............... 125

E.     The Fourth Fiscal Quarter Of 2011 And Full Fiscal 2011 Year ........................ 130

       1.     Net Income And DTA.............................................................. 130

       2.     Risk Appetite, Internal Controls And Liquidity Management............... 132

F.     The First Fiscal Quarter Of 2012 ....................................................... 140

       1.     Net Income And DTA.............................................................. 140

       2.     Risk Appetite, Internal Controls And Liquidity Management............... 143

G.     The Second Fiscal Quarter of 2012 ................................................... 149

       1.     Risk Appetite, Internal Controls And Liquidity Management............... 149

VI.    THE OFFICER DEFENDANTS ACTED WITH SCIENTER ..................................... 154

A.     The Officer Defendants Closely Monitored Core Operations ........................... 155

B.     The Officer Defendants Were Aware Of, Or Recklessly Disregarded, The Abandonment Of Risk Management Practices........................................... 156

C.     The Officer Defendants Were Aware Of, Or Recklessly Disregarded, GAAP Violations And Reporting Of False Financial Statements ...................... 159

VII.   LOSS CAUSATION.............................................................................. 161

VIII.  CLASS ACTION ALLEGATIONS ............................................................. 171

IX.   THE INAPPLICABILITY OF THE STATUTORY SAFE HARBOR......................... 174

X.      THE PRESUMPTION OF RELIANCE WITH RESPECT
        TO EXCHANGE ACT CLAIMS ................................................................ 175

XI.     CLAIMS FOR RELIEF UNDER THE EXCHANGE ACT .......................... 177

XII.    ADDITIONAL ALLEGATIONS RELATING TO SECURITIES ACT CLAIMS ....... 180

        A.      The Secondary Offering ...................................................................... 181

        B.      The 2016 Notes Offering .................................................................... 182

        C.      The 2018 Notes Offering .................................................................... 183

        D.      The 6.25% Senior Notes Offering ...................................................... 184

        E.      The Defendants' Failure To Exercise Reasonable Care Or To Conduct
                A Reasonable Investigation In Connection With The Offerings ........................ 185

XIII.   CLAIMS FOR RELIEF UNDER THE SECURITIES ACT .......................... 188

XIV.    JURY DEMAND ...................................................................................... 216

XV.     PRAYER FOR RELIEF ............................................................................ 216

1.      This action is brought by securities class action Lead Plaintiffs The Virginia Retirement System and Her Majesty The Queen In Right Of Alberta and additional named plaintiffs identified below (collectively, "Plaintiffs"), individually and on behalf of a proposed class of all persons and entities who purchased or otherwise acquired: (1) any of the publicly traded securities of MF Global Holdings Limited ("MF Global" or the "Company") between May 20, 2010 and November 21, 2011, inclusive (the "Class Period"), including without limitation MF Global's common stock and 9% Convertible Senior Notes due June 20, 2038 (the "2038 Notes"); (2) MF Global's common stock in the secondary offering that occurred on or about June 1, 2010 (the "Secondary Offering"); (3) MF Global's 1.875% Convertible Senior Notes due February 1, 2016 (the "2016 Notes") issued on or about February 7, 2011 under the Registration Statement (as defined in ¶ 29); (4) MF Global's 3.375% Convertible Senior Notes due August 1, 2018 (the "2018 Notes") issued on or about July 28, 2011 under the Registration Statement; or (5) MF Global's 6.25% Senior Notes due August 8, 2016 (the "6.25% Senior Notes") issued on or about August 1, 2011 under the Registration Statement, and were damaged thereby (collectively, the "Class"). Additional individual plaintiffs named below seek to represent, as part of the Class, former MF Global employees who acquired MF Global securities pursuant to employee benefit plans during the Class Period.

2.      Plaintiffs, by their undersigned counsel, allege the following upon personal knowledge as to themselves and their own acts, and upon information and belief as to all other matters. Plaintiffs' information and belief as to allegations concerning matters other than themselves and their own acts is based upon, among other things: (1) review and analysis of documents filed publicly by MF Global and its subsidiaries with the Securities and Exchange Commission (the "SEC"); (2) research reports by financial analysts; (3) transcripts of investor

conference calls; (4) publicly available presentations by MF Global; (5) press releases and media reports; (6) publicly available filings in legal actions arising out of MF Global's collapse; (7) recent public material, including sworn testimony, obtained in connection with continuing investigations of MF Global by the U.S. House of Representatives Committee on Agriculture (the "House Agriculture Committee"), the U.S. Senate Committee on Agriculture, Nutrition and Forestry (the "Senate Agriculture Committee"), the U.S. House of Representatives Financial Services Subcommittee on Oversight and Investigation (the "Financial Services Subcommittee"), the Department of Justice, the Federal Bureau of Investigation and other regulatory agencies; (8) detailed reports filed by the trustees in MF Global-related bankruptcy proceedings based on interviews of over one hundred witnesses and reviews and forensic investigations of hundreds of thousands of documents; and (9) documents and information obtained by Co-Lead Counsel from former MF Global employees throughout the course of counsel's investigation. Co-Lead Counsel's investigation into the factual allegations contained herein is continuing, and many of the relevant facts are known only by the Defendants or are exclusively within their custody or control. Plaintiffs believe that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for further investigation or discovery.

## I.     NATURE AND SUMMARY OF THE ACTION

3.     This federal securities class action involves a series of material misstatements and omissions about MF Global, formerly a leading brokerage firm offering customized solutions in global cash, derivatives and related markets. The revelation of these material misstatements and omissions culminated in MF Global's collapse – the eighth-largest bankruptcy in the history of the United States – and massive investor losses.

4.     In this Complaint, Plaintiffs assert two different sets of claims. First, Plaintiffs assert scienter-based claims (Counts 1-2) under the Securities Exchange Act of 1934 (the

"Exchange Act") against three MF Global Officer Defendants (as defined in ¶ 31) who are alleged to have knowingly or recklessly made material misstatements and omissions about MF Global's financial results, operations and internal controls throughout the Class Period. Pursuant to the Court's directive, Plaintiffs have entered into tolling agreements with other potential Exchange Act Defendants who agreed to Plaintiffs' request to streamline the litigation at this stage, and Plaintiffs reserve the right to sue additional Defendants for Exchange Act violations.

5.     Second, Plaintiffs assert strict liability, negligence and non-fraud-based claims (Counts 3-14) under the Securities Act of 1933 (the "Securities Act"). These claims are asserted against those Defendants who are statutorily responsible for the material misstatements of facts and omissions in the Registration Statement and prospectuses by which MF Global's common stock, 2016 Notes, 2018 Notes and 6.25% Senior Notes were offered to the public in June 2010, February 2011, July 2011 and August 2011 (collectively, the "Offerings"). Securities Act Defendants include MF Global's Board of Directors (the "Board") and the underwriters of the Offerings. Pursuant to the Court's directive, Plaintiffs have entered into tolling agreements with other potential Securities Act Defendants who agreed to Plaintiffs' request to streamline the litigation at this stage, and Plaintiffs reserve the right to sue additional Defendants for Securities Act violations. Plaintiffs expressly disclaim any allegations of fraud or intentional misconduct in connection with these non-fraud claims, which are pleaded separately in this Complaint from Plaintiffs' Exchange Act claims, except that any challenged statements of opinion or belief made in connection with the Offerings are alleged to have been materially misstated statements of opinion or belief when made and at the time of the respective Offerings.

6.     Central to these claims is the reality that, at all relevant times during the Class Period, the Company's financial statements were materially misstated and not presented in

accordance with Generally Accepted Accounting Principles ("GAAP") because the Company failed to properly account for its enormous Deferred Tax Assets ("DTA"). MF Global was required to record a valuation allowance against its U.S. DTA by no later than the start of the Class Period, but failed to do so in violation of GAAP. Only on October 25, 2011 did MF Global finally record a $119.4 million valuation allowance against all of its U.S. (and Japanese) DTA, which caused MF Global to report a $191.6 million loss for the second fiscal quarter of 2012 ended September 30, 2011 ("Q2'12"),[1] prompted credit rating downgrades and led to the Company's bankruptcy.

7.     MF Global's SEC filings and Defendants' other public statements also materially misstated and failed to disclose the significant liquidity risks posed by the Company's proprietary investments in Euro sovereign debt through repurchase-to-maturity transactions (also known as "repo-to-maturity" or "RTM" transactions) – a strategy designed to prop up the Company's profitability. During the Class Period, at the personal direction of MF Global's Chairman and Chief Executive Officer, Defendant Jon S. Corzine, MF Global's net long position in Euro sovereign debt RTM transactions grew to over $6.3 billion, a staggering amount that was well beyond MF Global's ability to finance the transactions.

8.     Yet, throughout the Class Period, Defendants repeatedly emphasized that MF Global's "risk management framework had been tightened considerably," misrepresenting and failing to disclose material weaknesses in internal controls, including those noted by the Company's outside auditor, PricewaterhouseCoopers LLP ("PwC"). Indeed, MF Global's massive Euro sovereign debt RTM exposure was built by Defendant Corzine in **repeated breaches of specific limits** set by MF Global's Board.

---

[1] During the Class Period, MF Global operated on a fiscal year that ended March 31; with the first fiscal quarter ended June 30; the second fiscal quarter ended September 30; and the third fiscal quarter ended December 31.

9.      At the same time, in the face of growing funding demands created by the Company's new trading strategy, MF Global also failed to address reported weaknesses in internal controls necessary to reliably forecast liquidity. Contrary to Defendants' repeated public statements of increased controls, no responsibility was assigned to remediate these internally reported control issues on the grounds that "***the business accepts this risk***."[2] As a result, certain employees were forced to play what was referred to as a daily "***shell game***" of asset transfers from MF Global's regulatory accounts – including at times ***customer funds*** – to meet the greatly increased liquidity demands of the Company's Euro sovereign debt RTM transactions.

10.      When the true facts were revealed at the end of the Class Period, the prices of MF Global's securities declined precipitously. On October 25, 2011, MF Global announced the unexpected loss of $191.6 million for Q2'12, including the $119.4 million DTA valuation allowance. In the same announcement, at the insistence of its regulators, MF Global also finally provided additional disclosure about its Euro sovereign debt exposure. As explained by Richard Cantor, the Chief Credit Officer of Moody's Investors Service ("Moody's") in testimony before the Financial Services Subcommittee on February 2, 2012, MF Global made clear "for the first time" in its October 25, 2011 announcement that its Euro sovereign debt RTM transactions "were ***not client-driven*** transactions, but instead were ***purely proprietary*** trading positions." Mr. Cantor further testified:

> Moody's had [previously] understood that MF Global was expanding its principal trading activity for the primary purpose of facilitating customer transactions, as opposed to generating trading profits. That understanding was developed over time through numerous meetings and discussions with MF Global management, and a review of information provided by the company and public filings. In Moody's view, MF Global's decision to assume large credit exposures that were not client-driven and represented a multiple of the company's outstanding

---

[2] All emphasis in this Complaint is added unless otherwise indicated.

common equity highlighted MF Global's increased risk appetite – in the absence of a parallel increase in capital.

11.    Following the corrective disclosures on October 25, 2011, the price of MF Global's common stock declined in one trading day by approximately 48%. Similarly, the prices of MF Global's 2016 Notes, 2018 Notes, 6.25% Senior Notes and 2038 Notes declined by approximately 22%, 31%, 27% and 29%, respectively.

12.    Thereafter, MF Global faced an increasing liquidity crisis as its counterparties, creditors and customers reacted to the Company's poor earnings and DTA valuation allowance, ratings downgrades and growing concerns about Euro sovereign debt exposure. Over the next 72 hours, MF Global's financial position rapidly deteriorated, although the Company continued to state publicly that its capital position and liquidity were "sound."

13.    But on Monday, October 31, 2011, MF Global disclosed that it filed for Chapter 11 bankruptcy and, in the following three weeks, additional information was reported about a shocking shortfall in customer funds – ***reported to be a $1.2 billion shortfall on the last day of the Class Period*** – an event without precedent in the history of the futures industry, which further revealed the Company's liquidity crisis and material weaknesses in internal controls.

14.    As set forth herein, because of the "missing" customer funds, MF Global's eleventh-hour agreement to sell the Company's assets for approximately $1 billion to Interactive Brokers LLC ("Interactive Brokers") fell apart shortly after the agreement was reached late on Sunday, October 30, 2011, causing Class members to suffer further losses. As additional information about the nature and size of the customer funds shortfall was revealed, the prices of MF Global securities continued to decline through the end of the Class Period.

15.    Following MF Global's bankruptcy, numerous governmental and regulatory bodies commenced ongoing civil or criminal investigations into the statements and conduct

underlying this action. For instance, the Financial Services Subcommittee called Edith O'Brien, an Assistant Treasurer in MF Global's brokerage arm, to testify at a hearing called "The Collapse of MF Global." But Edith O'Brien, who directed a $200 million transfer of customer funds on October 28, 2011 to cover an overdraft at the request of Defendant Corzine, invoked her Fifth Amendment rights against self-incrimination.

16.     Though the investigations into MF Global's collapse are ongoing, Congressman Spencer Bachus, the Chairman of the House Committee on Financial Services and ex officio member of its Subcommittee, has said that even preliminary findings leave "little doubt" that Defendant Corzine ran the Company as his "alter ego" and "readily short-circuited" internal controls. Similarly, the U.S. Treasury Department's Office of Financial Research (the "OFR") has reported that "significant failures of risk governance at MF Global . . . contributed to its collapse," and that "[a] firm with better internal controls and governance could have avoided MF Global's fate and protected customer assets."

## II.    <u>JURISDICTION AND VENUE</u>

17.     This Complaint asserts claims under: (1) Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a), and the rules and regulations promulgated thereunder, including SEC Rule 10b-5, 17 C.F.R. § 240.10b-5 ("Rule 10b-5"); and, separately, (2) Sections 11, 12(a)(2) and 15(a) of the Securities Act, 15 U.S.C. §§ 77k, 77l(a)(2) and 77o(a).

18.     This Court has jurisdiction over the subject matter of this action under Section 27 of the Exchange Act, 15 U.S.C. § 78aa, Section 22 of the Securities Act, 15 U.S.C. § 77v and 28 U.S.C. § 1331, because this is a civil action arising under the laws of the United States.

19.     Venue is proper in this District under Section 27 of the Exchange Act, 15 U.S.C. § 78aa, Section 22(a) of the Securities Act, 15 U.S.C. § 77v(a) and 28 U.S.C. § 1391(b), (c) and

(d). Many of the acts and transactions that constitute the alleged violations of law, including the dissemination to the public of untrue statements of material facts, occurred in this District.

20.     In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the United States mail, interstate telephone communications and the facilities of national securities exchanges.

## III.   PARTIES

### A.   Plaintiffs

21.     The Virginia Retirement System ("VRS"), a Court-appointed securities Lead Plaintiff in this action, is a public pension fund based in Richmond, Virginia. As of June 30, 2011, VRS had approximately $56 billion in assets under management, serving the needs of approximately 600,000 current and retired public employees within the Commonwealth of Virginia. VRS administers a variety of retirement and benefit plans and programs, including defined-benefit retirement plans, optional defined-contribution retirement plans, Commonwealth of Virginia 457 deferred-compensation and cash-match plans, group life-insurance programs, retiree health-insurance credit programs, sickness and disability and long-term care plans and voluntary group long-term-care insurance programs. As set forth in the chart attached hereto as Exhibit A, Lead Plaintiff VRS purchased MF Global's common stock on the New York Stock Exchange ("NYSE"), as well as MF Global's 2016 Notes, 2018 Notes and 2038 Notes during the Class Period, and was damaged thereby.

22.     Her Majesty The Queen In Right Of Alberta ("Alberta"), a Court-appointed securities Lead Plaintiff in this action, legally owns assets of approximately Canadian $70 billion on behalf of itself, public pension funds and endowment and government funds of the Province of Alberta, and those assets are managed by its wholly owned subsidiary Alberta Investment

Management Corporation. These funds are used for Albertans' priorities such as health care, education, infrastructure and social programs, and to meet the retirement-income needs of nearly 310,000 active and retired public-sector employees. As set forth in the chart attached hereto as Exhibit B, Alberta purchased MF Global's common stock during the Class Period on the NYSE, and was damaged thereby.

23. The Government Of Guam Retirement Fund ("Guam") is a public pension fund. As set forth in the chart attached hereto as Exhibit C, Plaintiff Guam purchased MF Global's common stock on the NYSE and MF Global's 6.25% Senior Notes during the Class Period, and was damaged thereby.

24. The West Virginia Laborers' Pension Trust Fund ("WV Laborers") is a self-insured, qualified Taft-Hartley defined-benefit plan that receives direct employer fringe contributions required under local, collectively bargained agreements with the Laborers' District Council of West Virginia and each of its affiliated local unions. As set forth in the chart attached hereto as Exhibit D, Plaintiff WV Laborers purchased MF Global's common stock in the Secondary Offering that occurred on or about June 1, 2010, and was damaged thereby.

25. LRI Invest S.A. ("LRI Invest") is a Luxembourgian investment company based in Munsbach, Luxembourg, that has managed mutual and specialized funds since 1988 with approximately $13 billion of assets under management. As set forth in the chart attached hereto as Exhibit E, on behalf of the W & W International Funds, a Luxembourgian fonds common de placement, Plaintiff LRI Invest purchased MF Global's 2016 Notes and 2018 Notes, and was damaged thereby.

26. Monica Rodriguez ("Rodriguez") is a former MF Global employee who acquired MF Global securities during the Class Period pursuant to the MF Global Ltd. Amended And

Restated 2007 Long Term Incentive Plan (the "LTIP") and MF Global Ltd. Employee Stock Purchase Plan (the "ESPP"), and was damaged thereby.

27.     Jerome Vrabel ("Vrabel") is a former MF Global employee who acquired MF Global securities during the Class Period pursuant to the LTIP, and was damaged thereby.

**B.     Individual Defendants**

**1.     Officer Defendants**

28.     Defendant Jon S. Corzine ("Corzine") served as Chairman of the MF Global Board and Chief Executive Officer ("CEO") of both MF Global and the Company's primary broker-dealer subsidiary, MF Global Inc., from March 23, 2010 until November 4, 2011, when he resigned. Before joining MF Global, Corzine served as New Jersey's Governor from January 2006 to 2010, a U.S. Senator from New Jersey from 2000 until January 2006, and CEO and Co-Chairman of The Goldman Sachs Group, Inc. ("Goldman Sachs") from 1994 to 1999. Corzine was a director of MF Global and Chairman of the Board at the time of the Offerings.

29.     Defendant J. Randy MacDonald ("MacDonald") served as MF Global's Chief Financial Officer ("CFO") from April 2008 through April 2011 and as Global Head of Retail thereafter. During the Class Period, MacDonald oversaw the Company's financial operations, including finance, tax, treasury, marketing, investor relations and corporate communications. Before September 2010, MacDonald also oversaw corporate strategy, human resources, procurement and facilities management. Before joining MF Global, MacDonald worked as an auditor for Ernst & Young LLP ("E&Y") and Deloitte & Touche LLP ("Deloitte"). MacDonald signed the Company's Post-Effective Amendment No. 1 to Registration Statement No. 333-162119, dated February 24, 2010 (the "Registration Statement").

30.     Defendant Henri J. Steenkamp ("Steenkamp") served as MF Global's CFO from April 2011 through the end of the Class Period, with responsibility for treasury, accounting and

10

all global financial control and reporting functions. Steenkamp was also responsible for aligning MF Global's finance and capital structures to support the Company's strategy. Before becoming CFO in April 2011, Steenkamp was MF Global's Chief Accounting Officer and Global Controller for four years. Before joining MF Global, Steenkamp worked for eight years at PwC, the Company's outside auditor. Steenkamp signed the Registration Statement.

31.     Defendants Corzine, MacDonald and Steenkamp are collectively referred to in this Complaint as the "Officer Defendants."

32.     Because of the Officer Defendants' senior executive positions with the Company, they each had access at the time they held their positions to the adverse undisclosed information about MF Global's financial results, operations and internal controls as alleged below. Each Officer Defendant, by virtue of his high-level positions with the Company, directly participated in the management of the Company, including its financial reporting. These individuals were all involved in drafting, producing, reviewing and disseminating the financial statements and other reports at issue in this case during their tenure with the Company.

33.     The Officer Defendants, because of their positions of control and authority as senior officers of MF Global, were able to and did control the content of MF Global's various press releases, SEC filings and other public statements during the Class Period. Each of these individuals was provided with copies of the statements at issue in this action before they were issued to the public and had the ability to prevent their issuance or cause them to be corrected. Accordingly, each of these individuals is responsible for the accuracy of the public statements detailed in this Complaint.

### 2.     Director Defendants

34.     Defendant David P. Bolger ("Bolger") was a member of MF Global's Board from February 1, 2010 through the end of the Class Period. Bolger was also a member of the Board's

11

Audit and Risk Committee and Nominating and Corporate Governance Committee. Prior to joining MF Global, Bolger served as CFO and Executive Vice President of Aon Corporation, and in various capacities with Bank One Corporation and its predecessors, including as President of the American National Bank & Trust Company of Chicago and Treasurer of First Chicago Corporation. Bolger signed the Registration Statement.

35.    Defendant Eileen S. Fusco ("Fusco") was a member of MF Global's Board from September 19, 2007 through the end of the Class Period. Fusco was also the Chair of the Board's Audit and Risk Committee and a member of the Executive Committee and Nominating and Corporate Governance Committee. Fusco previously was a senior partner of Financial Services at Deloitte, a tax partner at E&Y, regional tax counsel for the Americas at UBS AG, CFO of Twenty-First Securities Corp., and Managing Director of Global Tax at Kidder, Peabody & Co. According to MF Global's September 19, 2007 press release, Fusco is "a financial expert for the SEC and related Sarbanes-Oxley purposes." Fusco signed the Registration Statement.

36.    Defendant David Gelber ("Gelber") was a member of MF Global's Board from February 1, 2010 through the end of the Class Period. Gelber was also the Chair of the Board's Compensation Committee and a member of the Executive Committee and Audit and Risk Committee. Prior to joining MF Global, Gelber was a director and Chief Operating Officer ("COO") of ICAP plc, and also held a variety of senior trading positions in the foreign exchange and derivatives businesses at Citibank N.A., Chemical Bank and HSBC, where he also served as the COO of HSBC Global Markets. According to MF Global's February 1, 2010 press release, Gelber possessed "in-depth knowledge of virtually all financial products ranging from traditional cash products to cutting-edge derivatives, both from the trading and risk management perspectives." Gelber signed the Registration Statement.

37.     Defendant Martin J. Glynn ("Glynn") was a member of MF Global's Board from June 17, 2008 through the end of the Class Period. Glynn was also a member of the Board's Audit and Risk Committee and Compensation Committee. Prior to joining MF Global, Glynn was CEO of HSBC Bank USA N.A., Chairman and CEO of HSBC Bank Canada, and Group General Manager of HSBC Holdings plc. Glynn signed the Registration Statement.

38.     Defendant Edward L. Goldberg ("Goldberg") was a member of MF Global's Board from July 12, 2007 through the end of the Class Period. Goldberg was also the Company's lead independent director, Chair of the Board's Nominating and Corporate Governance Committee and a member of the Board's Executive Committee and Compensation Committee. Prior to joining MF Global, Goldberg held various titles at Merrill Lynch, Pierce, Fenner & Smith Incorporated, including Executive Vice President of the Operations Services Group, Chairman of the Professional Securities Services Group, Chairman of the Securities Services Division, and Deputy Chairman and Interim CEO of Merrill Lynch HSBC Ltd. Goldberg has also served as a Director of the Depository Trust Company, an Advisory Director for Bloomberg, L.P., a member of the NASDAQ Board of Directors and a member of the NYSE's Financial and Operational Surveillance Committee. Goldberg signed the Registration Statement.

39.     Defendant David I. Schamis ("Schamis") was a member of MF Global's Board from July 29, 2008 through the end of the Class Period. Schamis was also a member of the Board's Audit and Risk Committee and Compensation Committee. During the Class Period, Schamis was a managing director at J.C. Flowers & Co. LLC, which was granted the right to appoint one MF Global Board member pursuant to an investment agreement with the Company announced on May 20, 2008. Schamis signed the Registration Statement.

40.     Defendant Robert S. Sloan ("Sloan") was a member of MF Global's Board from September 19, 2007 through the end of the Class Period. Prior to joining MF Global, Sloan was a Managing Director at Credit Suisse First Boston ("CSFB"), Chairman of the CSFB/Tremont Hedge Fund Index Co., Co-Head of OTC derivatives marketing for CSFB Americas, and Global Head of CSFB's prime brokerage, equity finance, managed lending and equity swaps groups. Sloan signed the Registration Statement.

41.     Defendants Bolger, Fusco, Gelber, Glynn, Goldberg, Schamis and Sloan are collectively referred to in this Complaint as the "Director Defendants."

42.     The Director Defendants signed the Registration Statement and, by virtue of their position as directors of the Company, had access to the adverse undisclosed information about MF Global's financial results, operations and internal controls, as alleged below.

43.     The Officer Defendants and Director Defendants are collectively referred to in this Complaint as the "Individual Defendants."

44.     As officers or directors of a publicly held company whose common stock and other debt securities were registered with the SEC under the Securities Act, publicly traded and governed by the federal securities laws, the Individual Defendants each had a duty to promptly disseminate accurate information about the Company's business, operations, financial statements and internal controls and to correct any previously issued statements that had become materially misstated or untrue, so that the market prices of the Company's publicly traded securities would be based upon accurate information. These Individual Defendants violated these requirements and obligations during the Class Period.

C.     **Underwriter Defendants**

45.     Defendant BMO Capital Markets Corp. ("BMO Capital") is a North American financial services provider offering equity and debt underwriting, corporate lending and project

14

financing, merger and acquisitions advisory services, securitization, treasury management, market risk management, debt and equity research and institutional sales and trading. BMO Capital underwrote MF Global's public offering of the 6.25% Senior Notes.

46.     Defendant Citigroup Global Markets Inc. ("Citigroup") is a large financial services institution that provides commercial and investment banking services, commercial loans and underwriting services. Citigroup underwrote MF Global's public Secondary Offering and public offerings of the 2016 Notes and 2018 Notes.

47.     Defendant Commerz Markets LLC ("Commerz") provides security brokerage services. Commerz was formerly known as Dresdner Kleinwort Securities LLC. As a result of the acquisition of Dresdner Kleinwort Securities LLC by Commerzbank AG, Dresdner Kleinwort Securities LLC's name was changed in April 2010. Commerz underwrote MF Global's public offering of the 6.25% Senior Notes.

48.     Defendant Deutsche Bank Securities Inc. ("Deutsche Bank") is the U.S. investment banking and securities arm of Deutsche Bank AG. Deutsche Bank provides investment banking products and services. Deutsche Bank underwrote MF Global's public Secondary Offering and public offerings of the 2016 Notes and 2018 Notes.

49.     Defendant Goldman, Sachs & Co. ("Goldman") provides investment banking, securities and investment management services. Goldman underwrote MF Global's public offerings of the 2016 Notes and 2018 Notes.

50.     Defendant Jefferies & Company, Inc. ("Jefferies") is a global investment bank and institutional securities firm. Jefferies provides clients with capital markets and financial advisory services, institutional brokerage, securities research and asset management. Jefferies underwrote MF Global's public offering of the 6.25% Senior Notes.

51.     Defendant J.P. Morgan Securities LLC ("J.P. Morgan") is the investment banking arm of financial services giant J.P. Morgan Chase & Co. J.P. Morgan provides debt and equity underwriting, M&A and corporate restructuring advisory services, securities dealing and brokerage services, and trade execution services. J.P. Morgan underwrote MF Global's public Secondary Offering and public offerings of the 2016 Notes and 2018 Notes.

52.     Defendant Lebenthal & Co., LLC ("Lebenthal") is a New York-based brokerage services firm that provides consulting and underwriting services. Lebenthal underwrote MF Global's public offering of the 6.25% Senior Notes.

53.     Defendant Merrill Lynch, Pierce, Fenner & Smith Incorporated ("Merrill") is the marketing name for the global banking and global markets businesses of Bank of America Corporation. Merrill offers trading and brokerage services, debt and securities underwriting, debt and equity research, and advice on public offerings, leveraged buyouts and mergers and acquisitions. Merrill underwrote MF Global's public offerings of the 2016 Notes, 2018 Notes and 6.25% Senior Notes.

54.     Defendant Natixis Securities North America Inc. ("Natixis") is a New York-based registered broker-dealer that offers securities direct to the broker-dealer community and equity risk management products. On October 1, 2011, Natixis was merged into Natixis Bleichroeder Inc. Natixis was formerly known as IXIS Securities North America, Inc. Natixis underwrote MF Global's public offering of the 6.25% Senior Notes.

55.     Defendant RBS Securities Inc. ("RBS") is an indirect wholly owned subsidiary of The Royal Bank of Scotland Group plc. RBS is a U.S. investment bank/broker-dealer and a leading capital markets firm, underwriter, trader, and distributor of fixed income investment

products providing debt financing, risk management and investment services. RBS underwrote MF Global's public offerings of the 2016 Notes and 2018 Notes.

56.      Defendant Sandler O'Neill + Partners, L.P ("Sandler O'Neill") is a full-service investment banking firm and broker-dealer focused on the financial services sector. Sandler O'Neill underwrote MF Global's public offerings of the 2016 Notes and 6.25% Senior Notes.

57.      Defendant U.S. Bancorp Investments, Inc. ("U.S. Bancorp"), a subsidiary of U.S. Bancorp, is a full-service brokerage firm. U.S. Bancorp underwrote MF Global's public offering of the 6.25% Senior Notes.

58.      Defendants BMO Capital, Citigroup, Commerz, Deutsche Bank, Goldman, Jefferies, J.P. Morgan, Lebenthal, Merrill, Natixis, RBS, Sandler O'Neill and U.S. Bancorp are collectively referred to in this Complaint as the "Underwriter Defendants."

## IV.      FACTUAL BACKGROUND

### A.      The Formation Of MF Global And Its Subsidiaries

59.      MF Global traces its roots to a sugar trading business called ED&F Man, which was founded by James Man in England in 1783. ED&F Man evolved into a broader business trading cash commodities and commodity futures and eventually diversified into the financial services business in 1981. ED&F Man operated as a partnership until 1994, when it was listed on the London Stock Exchange.

60.      In 2000, ED&F Man changed its name to Man Group plc and called its brokerage division Man Financial. Over the next five years, Man Financial embarked on an acquisition spree that culminated in the acquisition of the client assets and accounts left behind by Refco, Inc. ("Refco") – the largest broker of commodities and futures contracts on the Chicago Mercantile Exchange (the "CME") before its bankruptcy in October 2005. The Refco acquisition boosted Man Financial's scale in retail and institutional business.

61.     In 2007, Man Group plc spun off Man Financial in an initial public offering ("IPO") on the NYSE. Once it became a public corporation, Man Financial was renamed "MF Global Ltd."

62.     After the IPO, MF Global Ltd. operated in a highly regulated industry in the United States and numerous foreign jurisdictions. In the U.S. alone, MF Global was regulated by the SEC, the Financial Industry Regulatory Authority ("FINRA"), the Commodity Futures Trading Commission ("CFTC"), the CME, the National Futures Association (the "NFA") and the Chicago Board Options Exchange ("CBOE").

63.     Nonetheless, in February 2008, just seven months after its IPO, MF Global announced that one of its U.S. brokers, Evan Dooley, had engaged in the unauthorized trading of wheat futures from his home and had lost $141 million overnight. MF Global explained that the "internal controls [that] could have stopped Mr. Dooley's trades from being processed" were "turned off" at the time. Upon disclosure that MF Global would have to clear the unauthorized trades and absorb the $141 million loss in its U.S. operations, the CFTC and CME fined MF Global $10 million and $495,000, respectively.

64.     To resolve the CFTC's and CME's charges of violations after MF Global's rogue-trading incident in February 2008, MF Global hired Chief Risk Officer ("CRO") Michael Roseman and outside risk management experts (from Quadrant Consultants and later Promontory Financial Services) to help overhaul the Company's internal controls and revamp its public image. In the spring of 2009, following strategic reviews by its outside risk management experts, the Company adopted comprehensive risk management policies, including an "Enterprise Risk Policy" and an "Enterprise Risk Management Escalation Policy" (collectively, the "Enterprise Risk Policy"), both of which purportedly were in effect during the Class Period.

65.     According to an internal MF Global "Promontory 2011 Update" presentation, the Company's Enterprise Risk Policy was an "umbrella document" that included "Enterprise Risk Governance, Capital-At-Risk Management, Liquidity Risk Management, Credit Risk Policy, Market Risk Policy, Exposure Measurement, Margin and Monitoring Policy, Operational Risk Policy, Compliance Policy, Other Risk, and Risk Reporting." This internal presentation also described MF Global's Enterprise Risk Management Escalation Policy as one that "provid[ed] a general framework and set[] specific escalation triggers in key areas."

66.     The Enterprise Risk Policy included an explicit recognition that segregated client funds were not available for MF Global to use for liquidity purposes. It stated:

> In the major jurisdictions in which it operates, MF Global is forbidden to use segregated funds for any purpose other than as directed by the client. ***Therefore, as a matter of policy MF Global considers that segregated funds are not available to it for liquidity purposes***.

67.     The Company's Enterprise Risk Policy purported to enhance internal controls and to remedy the weaknesses that allowed the February 2008 U.S. rogue-trading incident.

68.     On January 4, 2010, MF Global Ltd. solidified the re-invention of its corporate image by reincorporating as a Delaware corporation (from Bermuda) and changing its name to "MF Global Holdings Limited" – referred to herein as MF Global, the now bankrupt, non-defendant issuer in this action.

69.     During the Class Period, in the course of its daily operations, MF Global had extensive interactions and inter-company dealings with certain of its affiliates and subsidiaries, in particular MF Global Inc. ("MFGI"), a Delaware corporation, through which MF Global primarily conducted its trading business. MFGI was the Company's North American broker-dealer ("BD") arm and was registered as a futures commission merchant ("FCM") with the CFTC. When MF Global filed for bankruptcy on October 31, 2011, MFGI commenced

19

liquidation proceedings under procedures established by the Securities Investor Protection Act of 1970 (the "SIPA"). James W. Giddens is the trustee for MFGI's SIPA liquidation (the "SIPA Trustee"). The SIPA Trustee reports that MFGI was "by far the predominant part of the MF Global enterprise."

70.     MF Global also conducted business during the Class Period with an affiliate called MF Global U.K. Limited ("MFG-UK"), through which the Company traded Euro sovereign debt as detailed below in Section IV.D. MFG-UK was regulated by the United Kingdom's Financial Services Authority (the "FSA") and, following MF Global's bankruptcy, was placed into special administration, the U.K. equivalent of bankruptcy.

71.     MF Global also engaged in transactions during the Class Period with an affiliate called MF Global Finance USA Inc. ("FINCO"). FINCO was used as a conduit of funds to carry out the Company's Euro sovereign debt RTM transactions, including by providing hundreds of millions of dollars in margin loans described herein. Shortly after MF Global filed for bankruptcy on October 31, 2011, FINCO also filed for Chapter 11 bankruptcy.

## B.      Corzine Spearheads A "Transformative Effort" Toward Profitability

72.     On March 23, 2010, MF Global announced that Defendant Corzine was joining the Company as CEO and Chairman of the Board. Corzine's prominence was undeniable – with an autograph signing at his first annual meeting – and his star power was well-received by the market. As described in a Moody's report issued the day Corzine's appointment was announced, any "[p]otential concerns about the unexpected nature of the leadership change [at MF Global] are tempered by Mr. Corzine's decades of first-rate industry and leadership experience, as well as the reputational 'cache' [sic] and potential industry connections he would bring to MF." Indeed, given Corzine's prestige, during his nineteen-month tenure as CEO and Board Chairman,

the other members of the MF Global Board abdicated any effective oversight and allowed Corzine to run the Company as he saw fit, as discussed below.

73.     Before Corzine joined the Company, MF Global primarily provided commodity-related, client-based services. It did not engage in substantial proprietary trading. As stated in MF Global's Form 10-K for the fiscal year ended March 31, 2009, the Company's revenues derived principally from: (1) commission fees generated from execution and clearing services; and (2) interest income on cash held in customer accounts. The advent of online brokerages catering to high-frequency traders, however, put pressure on MF Global's commissions. In addition, interest income was down because interest rates were at historic lows following the 2008 financial crisis, and interest rates were expected to remain low for an extended period per the policy of the Board of Governors of the Federal Reserve System (the "Fed"). As a consequence, MF Global's revenues were in substantial decline before the Class Period.

74.     Significantly, the Company, including its U.S. operations, had lost money in the **three consecutive years** preceding the Class Period – including in the 2010 fiscal year ended March 31, 2010 – and reported losses for five consecutive quarters before Corzine arrived. In fact, Corzine later testified before Congress that he joined MF Global because he was drawn to "the possibility of taking part in the transformation of a challenged company." As reported in a December 11, 2011 *New York Times* article entitled "A Romance With Risk That Brought on a Panic" based on dozens of interviews with former MF Global employees (the "December 11 *NYT* Article"), Corzine was "convinced that he could quickly turn the money-losing firm into a miniature Goldman Sachs."

75.     Indeed, as soon as Corzine arrived, he sought to bolster profits by transforming MF Global into a full-service investment bank. He initiated a strategic review of the Company's

business with the Board. He also engaged an outside consultant, the Boston Consulting Group, to help define a new business strategy to try to lead MF Global to profitability. The new business plan provided that, over the course of ***three to five years***, MF Global would evolve into an investment bank. As reported in a February 2012 *Vanity Fair* article entitled "Jon Corzine's Riskiest Business," Corzine's attitude was "[i]f you build it, they will come," and his response to criticism was "I've seen this before. I know it can work."

76.     Just one week into his tenure, analysts from Macquarie (USA) Equities Research reported that Corzine was emphasizing a sense of "increased urgency on near-term profits" and stressing the importance of "improving profitability" by taking more risk. As was only later reported, Corzine immediately fashioned new trading desks, including a separate trading unit in June 2010 called the Principal Strategies Group (the "PSG"), which used the Company's own capital to trade, as well as a trading desk for mortgage-related securities.

77.     As described in the June 4, 2012 Report of the SIPA Trustee's Investigation and Recommendation, which is based on "counsel's interviews [with] more than one hundred people along with [a] review of hundreds of thousands of documents, and an extensive forensic investigation conducted with the assistance of forensic accountants" (the "SIPA Report"), the Company's nascent PSG included just six senior traders, three junior traders and one trading assistant, and relied on existing middle and back office support staff for account setup and management processes, as well as any clearing and settlement processes.[3] Additionally, as reported in the December 11 *NYT* Article – and corroborated by the SIPA Report – Corzine himself became a core member of the PSG, with his "profits and losses appearing on a separate line in documents with his initials: JSC."

---

[3] The SIPA Report reveals numerous contemporaneous facts and circumstances – many of which are contained in internal documents and emails directly quoted – that are consistent with the facts uncovered by other sources identified by Plaintiffs and referred to throughout this Complaint.

78.     Corzine also made personnel changes to implement his new business plan. He fired 1,400 people only to hire 1,000 others, most of whom were more highly paid employees from bigger Wall Street firms. Corzine also installed a tight-knit group of "Chief-level" employees with whom he had longstanding relationships from his days in government or Goldman Sachs. Included in Corzine's inner circle was Bradley I. Abelow ("Abelow"), who joined MF Global in September 2010 as COO and assumed the additional position of President in March 2011. Before joining MF Global, Abelow was Chief of Staff to Defendant Corzine during Corzine's tenure as New Jersey's Governor, and was a partner and managing director at Goldman Sachs. Also part of Corzine's inner circle was Michael G. Stockman ("Stockman"), another Goldman Sachs alumnus whom Corzine hired as CRO after dismissing his predecessor, as discussed in detail in Section IV.E.1.

79.     Two months into the job, on May 20, 2010, Corzine told investors in a press release that he was already "taking decisive action to fundamentally improve" financial results. He also reassured investors that day – and repeatedly throughout the Class Period – that he was not adopting a profits-at-all-costs strategy at the expense of the Company's risk management and internal controls.

80.     For instance, on May 20, 2010, Corzine emphasized that he would "ensure the appropriate controls are in place" in order to "deliver . . . greater value to shareholders." Again, at a June 3, 2010 investor conference, Corzine stressed his commitment to risk management:

> *I want to stress risk management* because my predecessor did a good job of addressing historical rearview mirror problems, but I think we have to implement the human element of risk management on top of the systems that have been put in place. *This is something that I've worked on most of my life and I think that we can bring both the operations, the systems, the technology to managing risk*.

81.     One year later, on a May 19, 2011 investor conference call, Corzine again reassured investors that "*measured risk-taking* will be part of our build-out to an investment

23

bank." Three weeks later, at a Sandler O'Neill conference on June 9, 2011, Corzine went so far as to claim that one of his "most important jobs is to be the Chief Risk Officer," even though that title was technically held by Stockman.

82.     These representations about risk management were critical to the market's perception that the new Corzine-led MF Global was on track for a turnaround. As noted in a September 12, 2011 Credit Suisse analyst report entitled "Earning to Grow":

> ***Re-emphasizing Risk Management***. A key feature of our discussion with MF Global management was the firm's risk management framework – we view this as ***a critical element of the turnaround*** given the firm's desire to move into more dealer-based businesses and historical track record. . . . ***[M]anagement emphasized that MF Global's risk management framework has been tightened considerably over the past year***.

83.     In reality, however, MF Global had two faces during the Class Period: a public face, shown by what the Officer Defendants told investors about the Company's risk management practices and initiatives; and an internal face, reflected in what they and others at MF Global actually did and did not do with regard to risk management. Internally, as demonstrated below, MF Global was run by Corzine and the Individual Defendants as a Company that disregarded risk management in favor of an unsustainable profits-at-all-costs approach. This led to grave consequences for investors in a remarkably short period of time.

**C.     MF Global's DTA Was Materially Overstated During The Class Period**

**1.     Background On MF Global's DTA**

84.     Deferred Tax Assets are losses, credits and other tax deductions that may be used to offset taxable income in future years. Deferred Tax Assets are recorded as "assets" under GAAP because they may be used in the future to reduce a company's tax payments by offsetting future taxable income. As set forth herein, GAAP requires companies to record valuation allowances against DTA to reduce the asset to the amount that is "***more likely than not***" to be

realized in the future under specific GAAP criteria. Throughout the Class Period, however, MF Global failed to record required valuation allowances against its U.S. DTA in violation of GAAP.

85.    On the morning of October 25, 2011, MF Global issued a press release announcing a Q2'12 loss of $191.6 million. The press release stated that over half of the loss was caused by "[s]ignificant charges in the quarter includ[ing] valuation allowances against deferred tax assets of $119.4 million."

86.    During an investor conference call later that day, Corzine further noted: "This quarter, we recorded [a] valuation allowance against previously booked deferred tax assets in the United States and Japan. . . . So going forward, we will not be recording additional deferred tax assets in these countries *until we start consistently generating income within these jurisdictions*." As further explained by Defendant Steenkamp on that call, "*the U.S. was the bulk*" of the $119.4 million DTA valuation allowance, and the only DTA remaining was $11 million in connection with the Company's U.K. operations.

87.    MF Global's disclosure of its (long overdue) valuation allowance against its U.S. DTA significantly contributed to the Company's collapse. An article entitled "Why MF Global Really Went Bankrupt," published by *Forbes* on December 16, 2011, summarized the implications of the Company's DTA valuation allowance as follows:

> What caused investors to lose confidence in MF in late October? There's a simple, sensible explanation. Six days before it filed for bankruptcy, MF reported a large quarterly loss, the details of which contained a message: *Don't expect this company ever to be profitable again. The markets responded accordingly*.
>
> MF's main business was executing and clearing trades for clients. The company was a dinosaur. It still took most of its orders over the phone, long after the industry had shifted to electronic trading. Not surprisingly, MF reported net losses *for each of the past four fiscal years*. Its $186.6 [sic] million loss last quarter was its biggest.

Most of the quarter's red ink came from writing down something called deferred-tax assets. Basically this item represented the money MF had thought it would save on taxes in the future, assuming it would be profitable. Net deferred taxes stood at $108.3 million as of March 31, according to MF's 2011 annual report, which was the last time the company provided a detailed tax footnote. MF wrote down that figure entirely last quarter. ***In essence, MF's executives were admitting they couldn't figure out how to make money***. . . .

If the executives of a firm are writing off the deferred tax assets then that does look very much like they're saying that there aren't going to be any future profits. . . . Why stay in a company, whether with debt or equity financing, with a company that itself is saying that it won't make a profit again? . . . Management writing off those assets were in effect saying that we were going to remain in a low interest environment for the foreseeable future, thus meaning that there was no real likelihood of using those deferred-tax assets.

## 2.   GAAP Accounting For DTA

88.    GAAP is the official standard for accounting accepted by the SEC and is promulgated in part by the Financial Accounting Standards Board ("FASB") and American Institute of Certified Public Accountants ("AICPA"). GAAP consists of a hierarchy of authoritative literature. The highest authority consists of the Accounting Standards Codification ("ASC"). GAAP is recognized by the accounting profession as conventions, rules and procedures necessary to define accepted accounting practices at a particular time. SEC Regulation S-X Item 4-01(a)(1) (17 C.F.R. § 210.4-01(a)(1)) provides that financial statements filed with the SEC that are not presented in accordance with GAAP will be presumed to be misleading, despite footnotes or other disclosures.

89.    At all times throughout the Class Period, MF Global asserted that the Company's "consolidated financial statements are prepared in accordance with accounting principles generally accepted in the United States of America ('GAAP')."

90.    GAAP standards for DTA accounting are set forth in ASC No. 740, "Accounting for Income Taxes" ("ASC 740"). ASC 740 "addresses financial accounting and reporting

standards for the effects of income taxes that result from an enterprise's activities for financial accounting and reporting for income taxes." ASC 740-10-05-1.

91. ASC 740-10-30-5 provides that a company must:

> [R]educe deferred tax assets by a valuation allowance if, based on the weight of available evidence, it is more likely than not (a likelihood of more than 50 percent) that some portion or all of the deferred tax assets will not be realized. *The valuation allowance shall be sufficient to reduce the deferred tax asset to the amount that is more likely than not to be realized*.

92. "All available evidence, both positive and negative, shall be considered to determine whether, based on the weight of that evidence, a valuation allowance is needed." ASC 740-10-30-17. This test for the realizability of DTA is stricter than GAAP measurements for the realizability of certain other assets. As E&Y's interpretative guidance for DTA accounting standards explains:

> Noteworthy, however, is that ACS 740 does have instances that are *more restrictive* than other standards in which it is appropriate to rely on projections of future taxable income. That is, ASC 740 requires the weight of all available evidence, both positive and negative, be considered when evaluating the realizability of deferred tax assets. That means that while a company's projections have not changed, negative evidence may be substantive enough such that projections cannot be relied upon as a source of future taxable income.

93. In addition to this more restrictive standard, the assessment of DTA under GAAP is also more objective than the assessment of other asset categories, because DTA can be measured directly. This is in contrast to the measurement of assets such as goodwill, which involves a greater degree of subjective judgment because "goodwill can be measured only as a residual and cannot be measured directly." ASC 350-20-35-2.

94. Important evidence to consider in determining whether a valuation allowance is required includes an enterprise's results for recent prior years and its current financial position. Cumulative losses by an enterprise in prior years are *significant negative evidence* that a valuation allowance is necessary under ASC 740 (*i.e.*, it is more difficult to conclude that a

valuation allowance is not necessary when the entity has a recent history of losses). For example, ASC 740-10-30-21 provides that "*[f]orming a conclusion that a valuation allowance is not needed is difficult when there is negative evidence such as cumulative losses in recent years*."

95.     Similarly, GAAP provides that "a cumulative pre-tax loss for financial reporting for the current and two preceding years" is "*significant negative evidence* about an enterprise's profitability that creates significant uncertainty about an enterprise's ability to earn taxable income and realize tax benefits in future years." ASC 740-10-30-23 adds: "A cumulative loss in recent years is a *significant piece of negative evidence that is difficult to overcome*."

96.     Where there is such significant negative evidence, such as cumulative prior-year losses, an enterprise must record a valuation allowance unless it provides positive evidence "*of sufficient quality and quantity to counteract negative evidence*" and "support a conclusion that a valuation allowance is not needed." ASC 740-10-30-23. Such positive evidence must be specific and reliable, including, for example: (1) "existing contracts or firm sales backlog that will produce more than enough taxable income to realize a deferred tax asset based on existing sales prices and cost structures"; (2) "an excess of appreciated asset value over the tax basis for the entity's net assets in an amount sufficient to realize the deferred tax asset"; or (3) "a strong earnings history exclusive of the loss that created the future deductible amount . . . coupled with evidence indicating that the loss . . . is an aberration rather than a continuing condition." ASC 740-10-30-22.

97.     Accordingly, ASC 740-10-30-23 warns that overcoming significant negative evidence in the form of cumulative prior-year losses is a heavy burden:

> The weight given to the potential effect of negative and positive evidence shall be commensurate with the extent to which it can be objectively verified. The more negative evidence that exists the more positive evidence is necessary and the more

difficult it is to support a conclusion that a valuation allowance is not needed for some portion or all of the deferred tax asset.

98.    Notably, MF Global's outside auditor, PwC, observed in its own 2007 "Guide to Accounting for Income Taxes" that a projection of future income is generally insufficient to avoid a valuation allowance when a corporation has cumulative losses in recent years, and a history of recent losses is "*very difficult*" to overcome:

> A projection of future taxable income is inherently subjective and generally will not be sufficient to overcome negative evidence that includes cumulative losses in recent years, *particularly if the projected future taxable income is dependent on an anticipated turnaround to operating profitability that has not yet been demonstrated*.
>
> *        *        *
>
> *An enterprise with significant negative evidence, such as a history of recent losses, normally will find it very difficult to demonstrate that even an implemented exit plan provides sufficient objective evidence that the enterprise will be restored to profitability, prior to the time that it actually becomes profitable*. In these circumstances, it would be that much more difficult to demonstrate that an unimplemented exit plan provides sufficient evidence to overcome the negative evidence present.

99.    ASC 740-10-30-21 also provides that "[u]nsettled circumstances that, if unfavorably resolved, would adversely affect future operations and profit levels on a continuing basis in future years" is further "negative evidence."

100.    In determining the amount of a valuation allowance when presented with significant negative evidence such as cumulative prior-year losses, an enterprise may take into account "tax planning strategies." ASC 740-10-30-18. But tax planning strategies must meet specified standards to legitimately avoid a valuation allowance. They must be actions that: "(a) are prudent and feasible; (b) an entity ordinarily might not take, but would take to prevent an operating loss or tax credit carryforward from expiring unused; and (c) would result in realization of deferred tax assets." ASC 740-10-30-19. ASC 740-10-30-19 further explains that

for a tax planning strategy to be feasible it "shall be primarily within the control of management."

101.    As discussed below, GAAP required MF Global to report a valuation allowance against the Company's U.S. DTA by no later than May 20, 2010, when the Company filed a Form 8-K with the SEC including its financial results for the 2010 fiscal year, because: (1) MF Global's U.S. operations were operating at a three-year cumulative loss as of March 31, 2010; (2) MF Global did not have evidence "of sufficient quality and quantity to counteract [that] negative evidence"; and (3) MF Global did not have "prudent" and "feasible" tax strategies sufficient to avoid recording a full valuation allowance against its U.S. DTA.

### 3.    MF Global Violates GAAP By Failing To Record A Timely Valuation Allowance Against Its U.S. DTA

102.    Although not separately reported by MF Global at the time, by the start of the Class Period, MF Global's U.S. operations already were in a ***three-year cumulative pre-tax loss position*** as of the fiscal 2010 year (ended March 31, 2010), and had suffered significant losses including for the fiscal 2008 year (ended March 31, 2008). Similarly, MF Global reported consolidated (worldwide) corporate losses over that same three-year time period.

103.    Corzine later highlighted MF Global's (consolidated) three-year loss through March 31, 2010 in testimony before Congress, noting, "***before I arrived, [MF Global] had lost money in each of the previous three years, including the fiscal year that ended on March 31, 2010***, for which the company posted a net loss to common shareholders of $167.7 million." Corzine further explained to Congress that MF Global's DTA "had been created by years of (non-RTM) tax losses cumulated (mostly before I arrived at MF Global) in the firm's United States and Japanese subsidiaries."

104.    A primary cause of MF Global's lost profitability was the low interest rate environment, which was not expected to change in the near future. As described by John Brady, a Senior Vice President of Interest Rate Products who worked in MF Global's Chicago office from April 2002 through October 2011 – including as Co-Head of MF Global's Chicago office from May 2011 through October 2011 – MF Global's business "really started to decline" three or four years before 2011, when the Fed drastically reduced interest rates. Brady explained that, "with the implosion of Lehman, Merrill Lynch, Fannie and Freddie, the Fed took the interest rate down to zero," so the amount that MF Global was "able to receive from cash on deposit collapsed." Similarly, as explained by Defendant MacDonald on a May 21, 2009 investor conference call, MF Global was suffering a "huge decrease in net interest income" as a result of the "near zero rate environment."

105.    In fact, as set forth in the SIPA Report:

> Although the Federal Funds interest rate had been gradually declining since 2007, the Federal Reserve cut the rate to essentially zero following the financial crisis in the fall of 2008. MF Global had historically generated a substantial portion of its income from interest generated from repurchase agreements, government securities in inventory or held for commodities customers, and failed transaction fees. ***The drop in the Fed Funds rate caused a dramatic decline in MF Global's interest income; [MF Global's] interest income decreased by nearly 90% from 2007 to [October 31, 2011] and MFGI's interest income decreased by more than 80% over the same period***.

106.    Even before the Class Period, MF Global executives recognized that the "near zero rate environment" was not expected to improve in the near future. For example, on August 6, 2009, then-MF Global CEO Bernard Dan ("Dan") acknowledged on a conference call that "interest rates still [we]re near zero, industry balances in the quarter were at their lowest level since December of 2007, and volumes remain[ed] well below peak levels." Again, on February 2, 2010, Dan explained that the "interest rate and spread environment remained extremely

challenging," and that the Company's net revenues were "impacted by near-zero interest rates and spreads narrowing significantly."

107.   Indeed, well into the Class Period, Defendants continued to recognize that the macroeconomic environment had not – and was not expected to – improve MF Global's profitability. At a June 3, 2011 Sandler O'Neill industry conference, Corzine noted that "we are at low interest rates, maybe the lowest that are conceivable certainly in the United States . . . *[a]nd we may not be in a rising interest rate environment*." Moreover, Corzine also recognized the effects that low interest rates were having not only on MF Global's bottom line, but also on its capital position. On a November 4, 2010 investor conference call, for example, Corzine stated, "[i]n a higher interest rate environment, we'd expect that the net interest margin earned on these [client] balances would self-generate the necessary capital. However, the timing is extended because of such low interest rates."

108.   Again, on October 25, 2011, Corzine further recognized the impacts of the "near zero rate environment" on the Company in response to a question from a Calyon Securities analyst, which is set forth as follows:

> Rob Rutschow: The DTAs I guess presumes that your U.S. business has been in a loss position for three years. And so I'm trying to figure out if the FCM is at these interest rate levels as profitable as a standalone entity.
>
> Corzine: I tried to make this point in my remarks and I'll say it again, is that, the low interest rate environment for a long period of time makes the FCM on a stand-alone basis a much harder business to be successful.

109.   Under GAAP, as discussed above in Section IV.C.2, MF Global's cumulative U.S. losses in the three-year period preceding the Class Period were "*a significant piece of negative evidence* that is difficult to overcome." ASC 740-10-30-23. Indeed, as later described in a *Bloomberg* article published on December 14, 2011, MF Global "*had been dying for years*"

before it collapsed and thus the Company "***should have written down the [deferred tax] assets sooner***."

110.    Due to MF Global's cumulative prior-year loss position in the U.S. as of the start of the Class Period, MF Global was required under GAAP to record a valuation allowance for the full value of its U.S. DTA unless it could point to significant and objectively verifiable positive evidence that the Company's U.S. operations were more likely than not to realize a substantial profit.

111.    Nevertheless, MF Global failed even to ***acknowledge*** or report its three-year U.S. cumulative loss position in its Form 10-K for the fiscal 2010 year (the "2010 Form 10-K"), which was filed with the SEC on May 28, 2010. It was only more than one year later, in the Company's Form 10-K for the fiscal 2011 year (the "2011 Form 10-K"), which was filed with the SEC on May 20, 2011, that MF Global acknowledged for the first time that it was in a three-year cumulative pre-tax loss position. The 2011 Form 10-K stated in part as follows:

> Realization of deferred tax assets is dependent upon multiple variables including available loss carrybacks, future taxable income projections, the reversal of current temporary differences, and tax planning strategies. U.S. GAAP requires that [the Company] continually assess the need for a valuation allowance against all or a portion of its deferred tax assets. ***The Company is in a three-year cumulative pre-tax loss position at March 31, 2011 in many jurisdictions in which it does business***.

112.    The above-quoted May 20, 2011 disclosure failed, however, to specify that those "many jurisdictions" specifically included the United States, where the bulk of MF Global's revenues had always been derived and the bulk of MF Global's DTA was recorded. In fact, the Company's U.S. operations were actually in a ***four-year*** cumulative pre-tax loss position by the time of this disclosure and on March 31, 2011, given the significant losses that MF Global's U.S. operations incurred for the fiscal 2008 year.

113.    Nor did the 2011 Form 10-K specify that those "many jurisdictions" included Japan – where the Company first commenced operations in September 2009 – even though Japan was admittedly "not a growth market," as stated by then-Managing Director Tom Harte on September 16, 2009. In fact, MF Global was not even registered to do business on the relevant Japanese exchanges until at least September 13, 2010 – and then closed its Japanese securities business approximately one year later, which cost another $10 million in "restructuring charges," as described in Corzine's December 8, 2011 testimony before the House Agriculture Committee.

114.    Moreover, the Company further stated in the 2011 Form 10-K that it was still **not** recording a DTA valuation allowance in the foregoing "many jurisdictions." Specifically, the 2011 Form 10-K noted that, while a "cumulative loss position is considered negative evidence in assessing the realization of deferred tax assets," MF Global "concluded that the weight given to this negative evidence is diminished due to significant **non-recurring** loss and expense items recognized during the three prior years, including IPO-related costs, asset impairments and costs related to exiting unprofitable business lines." But MF Global's non-recurring losses were not the only reason it was not profitable. In fact, MF Global's losses were expected to continue in the face of near-zero interest rates absent some (yet to be successful) turnaround, as set forth below.

115.    The 2011 Form 10-K further stated that the Company "also concluded that there [wa]s sufficient positive evidence to overcome this negative evidence." This supposedly "sufficient positive evidence" was described in the 2011 Form 10-K as follows:

> The positive evidence includes three means by which the Company is able to fully realize its deferred tax assets.
>
> First is the reversal of existing taxable temporary differences.
>
> ***Second, the Company [is] forecast[ing] sufficient taxable income in the carry forward period. The Company believes that future projections of income can be relied upon because the [expected] income is based on key drivers of profitability that it began to see evidence of in fiscal 2011***. Most notable in this

34

regard are plans and assumptions relating to the **significant changes to the Company's compensation structure** implemented in fiscal 2011, increased trading volumes, and other macro-economic conditions.

Third, in certain of its key operating jurisdictions, **the Company has a sufficient tax planning strategy which includes potential shifts in investment policies**, which should permit realization of its deferred tax assets. Management believes [these] strategies [are both] prudent and feasible.

116.    Thereafter, on August 3, 2011, MF Global filed a Form 10-Q for the first fiscal quarter of 2012 ended June 30, 2011, which was the last quarterly report filed (as amended) before MF Global's bankruptcy (the "Q1'12 Form 10-Q"). The Q1'12 Form 10-Q substantially repeated the above-quoted disclosure from the 2011 Form 10-K and proffered the same purportedly positive evidence to avoid taking a full valuation allowance for MF Global's U.S. (and Japanese) DTA.

> **(i)      MF Global Did Not Have Evidence Of "Sufficient Quality And Quantity" That It Was "More Likely Than Not" To Realize A Benefit From Its U.S. DTA**

117.    As described in the 2011 Form 10-K and Q1'12 Form 10-Q, MF Global was primarily relying on projections of future income to support its DTA.[4] But projections, as acknowledged by GAAP, are "inherently subjective" and generally are not "sufficient to overcome negative evidence that includes cumulative losses in recent years." This is particularly so, as explained by PwC in its own DTA guide, when a company's projections of future income are "dependent on an anticipated turnaround to operating profitability that has not yet been demonstrated." In this case, MF Global's forecasts were premised on its transformation into an investment bank, an effort that was planned to take **three to five years**. During the Class Period, this transformative effort was high risk, in its early stages and had not yet been demonstrated.

---

[4] While MF Global also stated that it was, in the first instance, relying upon "the reversal of existing taxable temporary differences," that language is boilerplate in this context, provides no supporting facts and is thus devoid of any significance.

118. Indeed, although not specified in the 2011 Form 10-K, the growing revenue source that MF Global purportedly "began to see evidence of in fiscal 2011" was the Company's new trading business in the PSG. Unlike MF Global's pre-existing trading platforms, the PSG required substantially larger daily liquidity to fund trade settlements. Even under ideal circumstances, the SIPA Trustee estimated that it could take as long as "six to nine months for even a highly-successful new product group [like the PSG] to become self-sustaining, *i.e.*, to generate enough cash on its own to fund its daily liquidity needs." Thus, even assuming that the new PSG would become a "highly-successful" product group, MF Global still had to come up with funds to support the PSG's daily operations in the interim, creating a severe liquidity strain.

119. Moreover, the PSG's profits were driven by investments in Euro sovereign debt structured as RTM transactions discussed in detail in Section IV.D below. In short, these transactions were unreliable and unsustainable. As an initial matter, they were unsustainable because (as discussed further in Section IV.D.4) they were premised on the existence of the soon-to-expire European Financial Stability Facility (the "EFSF"), and thus the Company could not properly rely on profits from those transactions after the expiration of the EFSF as a way to realize its DTA in accordance with GAAP.

120. In addition, the Company's Euro sovereign debt RTM transactions were inherently unsustainable because, by design, they required MF Global to continuously increase its exposure to keep the revenue stream flowing to the point where exposure reached an amount many times greater than MF Global's total asset base – ***a leverage ratio of 40:1*** – and the Company did not have sufficient capital or liquidity to support the transactions. Indeed, as set forth in Section IV.F below, MF Global was forced to cease its Euro sovereign debt RTM trading strategy in August 2011 immediately after regulators required the Company to start holding

additional capital against those transactions – and MF Global did not have sufficient liquidity to continue the RTM transactions in the face of massive margin calls. Just two months earlier, in June 2011, MF Global even sought to transfer the PSG out of its regulated operations due to the drain that the Euro sovereign debt RTM transactions were having on the Company's overall liquidity, as discussed further in Sections IV.D-G below.

121.    At the very least, the Company's PSG, Euro sovereign debt RTM transactions and plans to transform into a full-service investment bank rendered MF Global's ability to benefit from its material and growing DTA "unsettled" under ASC 740-10-30-21. Thus, MF Global's projections of future income were not sufficient "positive evidence" to avoid taking a full valuation allowance against the Company's U.S. DTA in the face of the significant negative evidence of MF Global's cumulative multi-year loss position as of the start of the Class Period.[5] Moreover, MF Global's claim that its cumulative three-year fiscal loss (which, by then, was actually a cumulative *four-year* fiscal loss) was the result of purported "non-recurring loss and expense items during the three prior years" was directly contradicted by the above-described facts regarding the adverse impacts of electronic trading and the low interest rate environment on MF Global's financial results, which continued unabated throughout the Class Period.

### (ii)    Compensation Structure Changes Were Not Sufficient Positive Evidence To Offset MF Global's U.S. DTA

122.    In addition to projections of future income, as described in the 2011 Form 10-K and Q1'12 Form 10-Q, MF Global was also purportedly relying on "significant changes to [its] compensation structure" to avoid recording a DTA valuation allowance. However, the expected

---

[5] At $117.9 million, the size of the Company's net DTA at the start of the Class Period was not materially different from what it was when the valuation allowance was finally recorded near the end of the Class Period.

benefits of MF Global's anticipated compensation structure changes during the Class Period were unreliable and, more importantly, could not have offset the Company's DTA.

123.    By way of background, before the Class Period, in the third fiscal quarter of 2010 ended December 31, 2009 ("Q3'10"), MF Global sought to "streamline [its] compensation structure by extending participation in equity-based incentives globally and across all product lines." As a result, MF Global's Q3'10 compensation-to-net-revenue ratio dropped from 65% to 60%. On February 4, 2010, then-CEO Dan described this declining ratio as a step toward "evolving the culture" at MF Global to better "align [the Company's] employees with the interest of [its] key constituencies." Nevertheless, there were also negative "impacts associated with broadening equity-based incentive participation," which Dan likewise acknowledged that day. These negative impacts included increased volatility to financial results for several years.

124.    Indeed, on February 5, 2010, analysts at Macquarie (USA) Equities Research reported on the negative impacts of MF Global's compensation changes, noting: "We would note *the shift in comp. policy* to include more deferred comp., while in line with industry trends, *is likely to increase volatility to results over the next few years*." Despite the "increase in volatility to [MF Global's] results over the next few years," when Defendant Corzine took the reins from Dan, he continued Dan's efforts to realign MF Global's compensation structure and said that he would take additional steps to try to reduce operating costs further.

125.    Specifically, on May 20, 2010, MF Global issued a press release entitled "Company Commences Strategic Realignment of Cost Structure." The press release announced that, in an effort to improve MF Global's earnings profile, the Company: (1) "implemented a global hiring freeze"; (2) intended "to reduce its workforce by 10 to 15 percent in an effort to

reduce operating costs"; and (3) "set compensation targets (compensation to net revenues) for each business area."

126.    Corzine elaborated on this strategy on an investor conference call later in the day on May 20, 2010, emphasizing a "marked shift" from MF Global's prior compensation philosophy:

> Going forward, each business unit will have a compensation to net revenue ratio objective, prescribed in their business plans as well as the firm's total budget. Compensation will be tied to both Company-wide results and individual performance. This is a marked shift from an individual production philosophy that does not adequately provide for shareholder returns.

127.    Corzine also detailed the Company's new compensation-to-net-revenue ratio objectives on that same call, stating that "[o]ur efforts will also put us on a pathway to align our compensation ratios with better practices in our industry which in my experience is ***below 50% of net revenues***."

128.    A few months later, in a slide deck used on the Company's August 5, 2010 conference call announcing results for the first fiscal quarter of 2011 ended June 30, 2010 ("Q1'11"), MF Global reported that "compensation to net revenue targets" had been established in each product group, as planned. Significantly, this slide deck estimated annualized costs savings of between ***$43-50 million*** for all "headcount reduction and compensation targets."

129.    However, MF Global never implemented a hiring freeze or meaningfully reduced Company-wide headcount, because Corzine started hiring highly paid professionals immediately upon appointment and continued to do so throughout the Class Period in an attempt to transform MF Global into a "mini Goldman Sachs." As referenced in ¶ 78 above, although Corzine fired 1,400 people, ***he also hired 1,000 more*** – most of whom were higher-priced talent. In fact, as described in the 2011 Form 10-K, any reductions in compensation and employee benefits expenses due to workforce cutbacks were "partially offset by increases in payroll expenses due

to increased professional headcount." As further explained in the 2011 Form 10-K, to the extent the Company "reduced headcount overall as compared to fiscal 2010, [it] also strategically hired personnel in anticipation of fully implementing [its] new business model."

130.    Moreover, as illustrated below, MF Global never meaningfully reduced its compensation-to-net revenue ratio during the Class Period, nor did it achieve its stated goal of accruing a compensation-to-net revenue ratio below 50%:

| Fiscal Period | Q1'11 | Q2'11 | Q3'11 | Q4'11 | Q1'12 | Q2'12 |
|---|---|---|---|---|---|---|
| **Compensation & Benefits (Excluding Non-Recurring IPO Awards) As A Percentage Of Net Revenue** | 53.7% | 58.0% | — | 62.7% | 54.4% | 64.9% |
| **Adjusted Compensation & Benefits (Excluding Severance Expense) As A Percentage Of Net Revenue** | 53.0% | 56.3% | 55.5% | 60.0% | 54.0% | 62.3% |

131.    Indeed, by the fall of 2011, Defendants Corzine and Steenkamp admitted that "plans and assumptions relating to the significant changes to the Company's compensation structure implemented in fiscal 2011" would not come to fruition in the near term. Specifically, Credit Suisse analysts issued a report on September 12, 2011 after meeting with Corzine and Steenkamp in which the analysts noted that MF Global was "unlikely to see a meaningful decline in compensation accrual rates" ***until at least 2013***:

> Last week we had the opportunity to meet with MF Global Chairman and CEO Jon Corzine and CFO Henri Steenkamp. . . . Management reiterated its goal of achieving a 50% compensation-to-net revenue ratio, ***but expects that given current business mix and levels of revenue production that it will remain in the mid-50% range near-term***. . . .

> While MF has made significant progress here and there's more to go, our sense is that we're unlikely to see a meaningful decline in compensation accrual rates from here without a step-up in revenue contribution from higher margin businesses (principal trading, interest income) – our estimates embed a 54% comp ratio for fiscal 2012, ***before declining to the 50-51% range in 2013-2014***.

40

132.     Accordingly, MF Global's plans to realize costs savings from changing the Company's compensation structure were unreliable and, at best, "unsettled" under ASC 740-10-30-21. Regardless, even if MF Global's compensation-related costs savings were realized during the Class Period, they were still insufficient to return MF Global's U.S. operations to profitability. Thus, the Company's "plans and assumptions relating to the significant changes to the Company's compensation structure implemented in fiscal 2011" were insufficient positive evidence to avoid recording a DTA valuation allowance given its cumulative three-year U.S. loss as of the start of the Class Period and cumulative four-year loss as of the following fiscal year.

(iii)  **Purported Tax Planning Strategies<br>Were Neither "Prudent" Nor "Feasible"**

133.     In addition to projections of future income and changes to the Company's compensation structure, as described in the 2011 Form 10-K and Q1'12 Form 10-Q, MF Global was also relying on purported tax planning strategies to avoid recording a DTA valuation allowance in the face of its three-year (and four-year) cumulative U.S. loss position. As set forth above, GAAP provides that tax planning strategies must be both "prudent and feasible" and within management's control to implement in order to legitimately avoid a valuation allowance.

134.     Evidencing that these purported tax strategies were not within management's control (as required by GAAP), MF Global conceded in its SEC disclosures that: "The amount of the deferred tax assets considered realizable, however, could be significantly reduced in the near term if the Company's actual results are significantly less than forecast. If this were to occur, it is likely that the Company would record a material increase in its valuation allowance." Accordingly, the adequacy of these purported tax strategies, themselves, also were tied to the success of MF Global's forecasts which, as GAAP states (and PwC's Guide notes), are not "sufficient to overcome negative evidence that includes cumulative losses in recent years."

41

135.     MF Global cryptically described its purported tax planning strategies in the 2011 Form 10-K and Q1'12 Form 10-Q only as including "potential shifts in investment policies." However, for the same reasons discussed above in ¶¶ 117-21, to the extent the Company's tax planning strategies were premised on the PSG's undemonstrated success and/or unsustainable revenues from Euro sovereign debt RTM transactions, they were neither "prudent" nor "feasible" positive evidence sufficient to justify failing to record a DTA valuation allowance because MF Global did not have the liquidity to carry them out over time. This was also true if the purported strategies were premised on "potential shifts in investment policies" away from the Company's Euro sovereign debt RTM transactions. Given MF Global's already concentrated exposure to Euro sovereign debt and the resulting increased liquidity demands as described herein, the Company was simply unable to engage in any "shifts in investment policies" without first incurring significant additional liquidity strains or losses necessary to unwind the transactions prior to expiration, neither of which was "prudent" or "feasible."

136.     Despite the dearth of reported detail about MF Global's purported tax planning strategies, an internal MF Global document (made public only after MF Global's bankruptcy) entitled "Stress Scenario Analysis – Downgrade: Potential Impact on MF Global" (the "Break-the-Glass-Document") reveals that, whatever the Company's purported tax planning strategies entailed, they were not sufficient to justify failing to record a DTA valuation allowance. Thus, the Break-the-Glass-Document reveals that, when MF Global was forced to curtail its RTM transactions as a result of FINRA's increased capital reserve requirements and the lack of necessary liquidity discussed in Sections IV.D-G, the Company began preparing itself for a large DTA valuation allowance in the next fiscal quarter (and for the ratings downgrades which were expected to follow). In fact, the purported tax planning strategies were not even mentioned in the

Break-the-Glass-Document as a way to avoid the massive DTA valuation allowance (or the ratings downgrades or increased liquidity crisis which were expected to follow).

137.   The Break-the-Glass-Document was created by MF Global's Finance and Treasury personnel in response to a request from the Board's Audit and Risk Committee in early September 2011 for an analysis of the potential impact of an expected Q2'12 loss (as a result of the expected DTA valuation allowance). It was presented to the MF Global Board on October 19, 2011, before the disclosure of MF Global's Q2'12 results. The Break-the-Glass-Document evaluated all known and expected stressors of liquidity on MF Global, and also all sources of liquidity that could be used to offset those stressors in the event of a credit rating downgrade following the reporting of MF Global's Q2'12 results (which would report, for the first time, MF Global's large DTA valuation allowance and resulting losses).

138.   The Break-the-Glass-Document specifically identified Euro sovereign debt RTM transactions as the Company's largest liquidity stressor. It also recognized that MF Global would likely be forced to unwind its Euro sovereign debt RTM portfolio prior to expiration in the event of a downgrade to help generate liquidity and, significantly, would suffer *further large losses* upon doing so:

> Immediate Decision-Making Required
>
> ***RTMs – biggest draw on cash today; loss today less the margins posted; generate liquidity with large P&L loss*** – decisions: hedge fully, hedge for a short term (2-3 months and then unwind after the storm), novate? . . . Need a clear strategy and plan for RTM portfolio. . . .
>
> Timeline . . . Impact of a Downgrade – What Happens?
>
> *       *       *
>
> ✓  Unwind European RTM book to release margin. . . .
>
> ✓  Unwind UN-matched book if repo lines are lost

    ✓  Move repo positions to CCPs [central counterparty clearinghouse] where possible (higher haircut[6] + financing cost) . . . .

    ✓  Continue unwinding reverse repos. . . .

139. While the Break-the-Glass-Document contains a thorough analysis of various scenarios, nowhere is there any mention of the Company's "tax planning strategies" as a means of avoiding the DTA valuation allowance and the increased liquidity stress expected to follow in the event of a Q2'12 loss and credit rating downgrade. Moreover, the document makes clear that shifting MF Global's investment policies away from the Euro sovereign debt RTM transactions prior to expiration could only take place by incurring a "***large P&L loss***."

140. Accordingly, none of the purported reasons eventually offered by MF Global justified the Company's failure to record a full U.S. DTA valuation allowance by the start of the Class Period, and the Company's financial results were materially misstated and presented in violation of GAAP at all relevant times.

    **D.**    **MF Global Launches A Euro Sovereign Debt Trading Strategy Using Repo And RTM Transactions**

    **1.**    <u>**Background Regarding Repo And RTM Transactions**</u>

141. Repurchase or "repo" transactions are typically used by banks to increase leverage and involve the sale and repurchase of a security to and from a counterparty. In such a transaction, in return for selling a security, the seller receives cash and incurs an obligation to repurchase the security at a later date.

142. These transactions can be structured as a "repo" or a "repo-to-maturity." The following example details the structure of both a repo and a repo-to-maturity transaction:

---

[6] The term "haircut" is described in SEC Rule 15c3-1(c)(2)(v)(A)-(M) as follows: "[H]aircuts are designed to discount the firm's own positions to account for adverse market movements and other risks faced by the firms, including liquidity and operational risks. . . . [The] percentage amount of the haircut varies depending on the type of security, the maturity date, the quality, and the marketability."

- Firm A sells Treasury notes with a face value of $1 million to Firm B. The price paid by Firm B to Firm A is called the "repo principal."

- At the same time, Firm A contracts with Firm B to buy the notes back at the same price at an agreed future date – *e.g.*, 30 or 60 days – which is earlier than the maturity date of the notes.

- On that future date, Firm B returns the notes to Firm A, and Firm A repays the repo principal and "repo interest." The repo interest is a sum negotiated along with the repo principal at the outset of the transaction, and is based on the short-term interest rate for loans for the time period covered by the transaction.

- The extent to which the repo turns out to be financially advantageous to Firm A depends on what happens during the course of the transaction to (1) the market value of the notes, and (2) short-term interest rates.

- The repo just described terminates on a date that is earlier than the maturity date of the securities. Such a transaction is called a "repo."

- If, however, the termination date is the same as the maturity date, the transaction is called a "repo-to-maturity."

143.    Repo and repo-to-maturity transactions have different accounting treatments. While a repo is typically accounted for on a balance sheet as a collateralized financing (increasing reported balance sheet leverage), a repo-to-maturity is typically accounted for as a sale. When repo-to-maturity transactions qualify for sales accounting treatment, they are "de-recognized," *i.e.*, not recognized on a company's balance sheet.

144.    Significantly, repo-to-maturity transactions allow for the early recognition of revenue. Gains are recorded at the time of the sale, which takes place at the outset of an RTM transaction even though the underlying securities must eventually be repurchased (even at a loss) upon maturity by the seller – in this case, MF Global.

145.    Moreover, because these immediately recordable gains have no corresponding assets or liabilities on a company's balance sheet, the underlying collateral is not accounted for in any value-at-risk ("VAR") calculations. VAR is a widely used measure of the risk of loss on a

portfolio of financial assets. VAR was a key metric for MF Global during the Class Period because it was used to allocate capital, assess solvency and measure profitability.

146.    In short, by investing in Euro sovereign debt using RTM transactions, MF Global was able to invest in high-risk assets while keeping them off its balance sheet, frontload gains and tout misleading VAR metrics – all of which created the artificial appearance of a turnaround in the Company's ailing business.

## 2.    The Impetus For The Corzine Trade

147.    When Corzine joined MF Global in March 2010, one of the most significant threats facing the Company was the risk of a ratings downgrade. At the time, Moody's and Fitch rated MF Global just two notches above junk status (Baa2 and BBB, respectively), and Standard & Poor's ("S&P") rated MF Global just one notch above junk status (BBB-). Concerned with MF Global's lack of core profitability, according to an article entitled "The Unraveling of MF Global" published in *The Wall Street Journal* on December 31, 2011 (the "December 31 *WSJ* Article"), the rating agencies told Corzine as soon as he started in March 2010 that he needed to "rev up profits fast or face downgrades." Moody's, for example, indicated that to maintain its Baa2 rating, MF Global would need to generate $200-300 million in annual pre-tax profits ***and reduce leverage***.

148.    To this end, in the early summer of 2010, according to Corzine's December 15, 2011 testimony before the Financial Services Subcommittee, Corzine met with MF Global's senior traders to discuss ways to improve profitability and address the short-term pressures from the rating agencies. One of the ways was for MF Global to purchase Euro sovereign debt using RTM transactions, which involved taking advantage of the difference in the spread between the higher coupon payment from a Euro sovereign bond, and the lower rate at which the same bond could be loaned back out as collateral. This strategy sought profits by targeting arbitrage

opportunities based on yield curve fluctuations in the price of Euro sovereign debt resulting from differences in market perceptions about the risk of default, changing supply and demand, interest rate futures and foreign exchange rates.

149.    Corzine, according to his own December 15, 2011 testimony before the Financial Services Subcommittee, "strongly advocated" for the Euro sovereign debt RTM trading strategy, in part because of the high yield it offered. As later reported in the December 31 *WSJ* Article, Corzine told a colleague that he believed the "European bet was 'a way to answer the [rating agencies'] demands while buying time to transform the business.'" Corzine reportedly referred to the RTM transactions' "up-front profits" as a "bridge" between the Company's current problems and a glorious future. According to a *ZeroHedge* report published on March 8, 2012, Corzine's single-minded obsession with purchasing Euro sovereign debt in this fashion came to be known within MF Global as the "Corzine Trade." Indeed, in his Congressional testimony on December 15, 2011, Corzine "accept[ed] responsibility for the RTM trades that MF Global engaged in from the time that [he] arrived at MF Global until [his] departure."

### 3.    The Mechanics Of The Corzine Trade

150.    On July 1, 2010, to facilitate the Corzine Trade, MFGI and MFG-UK entered into an investment management agreement ("IMA"). In the IMA, MFG-UK, which had relationships with the London Clearing House (the "LCH"), agreed to execute the Euro sovereign debt RTM transactions for MF Global so long as they were kept on MFGI's books – not MFG-UK's books – because (according to the SIPA Report) MFG-UK was unwilling to accept the risk of issuer

default or debt restructuring. The IMA further provided that MFG-UK would receive 80% of the consolidated net revenues from each RTM transaction, while MFGI would receive 20%.[7]

151.    According to the SIPA Report, the complex structure of the Corzine Trade was as follows: MFG-UK purchased Euro sovereign debt securities from counterparties in trades that settled primarily on the LCH. MFG-UK then sold the securities to MFGI, although the securities actually remained in MFG-UK's LCH account. MFGI then recorded the sovereign debt on its books (typically classifying the bonds as securities owned in MFGI's long inventory book). Subsequently, MFGI entered into an inter-company repo transaction with MFG-UK (which showed a reverse repo to MFGI).[8] Each inter-company repo was governed by a global master repurchase agreement between MFG-UK and MFGI dated July 19, 2004, as amended (the "GMRA"). Upon completion of each RTM transaction with MFGI, MFG-UK then entered into a further RTM with another counterparty that also settled through the LCH.

152.    On a given trade date, (1) MFGI recognized a gain in the amount of the difference between the original purchase price of the underlying security and the RTM sale price of those securities to the LCH, and (2) MFG-UK recognized a gain in the amount of the mark-up for its role as intermediary between MFGI and the LCH.

153.    According to the SIPA Report, the RTM transactions between MFG-UK and the LCH were only until two days short of maturity because the LCH refused to bear the risk of default. As a result, the LCH expected MFG-UK to fund these so-called "RTM minus two" positions for the remaining two days until the securities matured so that MFG-UK (not the LCH)

---

[7] This allowed for more revenue to flow to MF Global's already profitable U.K. operations, and less revenue to flow to MF Global's loss-producing U.S. operations, further demonstrating MF Global's need to record a valuation allowance against its U.S. DTA.

[8] According to the SIPA Report, MFGI consistently priced the securities underlying the repos and reverse repo transactions several dollars higher than quoted industry prices (*e.g.*, prices quoted by Bloomberg).

bore the risk of default during that period. MFG-UK, in turn, looked to MFGI to fund the two-day breaks, which (as set forth below) significantly increased the amount of liquidity that MFGI needed to maintain the RTM portfolio.

154.    Margin calls (which are sometimes called "collateral calls") were also a major component of the Corzine Trade. Margin calls from the LCH, for example, went to MFG-UK, which relayed the calls to MFGI. Under the GMRA, in anticipation of a margin call from the LCH, MFG-UK could also demand advance margin from MFGI. MFGI would transfer collateral (usually U.S. Treasury bills ("T-bills")) to MFG-UK to meet the margin calls. However, MFG-UK did not provide MFGI with any cash or collateral in exchange for the T-bills, so MFGI was "out-of-pocket" for several days until MFG-UK returned the T-bills.

155.    As detailed in the SIPA Report, Defendant Corzine "was very hands-on" and communicated with MFGI and MFG-UK personnel directly to carry out these RTM transactions, "*instructing them when to enter and exit various positions*." MFG-UK traders booked these trades on the MFGI trading desk, although the MFGI traders and operations personnel typically did not learn about the trades until they appeared on MFGI's books the following day.

**4.      After The Corzine Trade Temporarily Boosts Profits, Substantial Undisclosed Liquidity Risks Trigger Massive Margin Calls**

156.    When the Corzine Trade was launched, Europe was in the midst of a spiraling debt crisis – hence, there were high yields on Euro sovereign bonds. As described in an article published at around that time (on April 29, 2010) in the *Economist*, entitled "Europe's Sovereign Debt Crisis: Acropolis Now," Europe's sovereign debt crisis was "spiral[ing] out of control":

> There comes a moment in many debt crises when events spiral out of control. As panic sets in, bond yields lurch sickeningly upwards and fear spreads to shares and currencies. In September 2008 the failure of once-stellar Lehman Brothers almost brought down the world's banking system. . . . When the unthinkable

49

suddenly becomes the inevitable, without pausing in the realm of the improbable, then you have contagion.

The Greek crisis – or more properly Europe's sovereign-debt crisis – looks dangerously close to that. . . . Portugal's borrowing costs jumped. Spain's debt was downgraded, along with Portugal's and Greece's, and Italy came worryingly close to a failed debt auction. European stock markets have slumped and the euro itself fell to its lowest level in a year against the dollar.

157.    The investing community was initially most concerned with the financial stability of Portugal, Italy, Greece and Spain. But within a few months, the debts of Belgium and Ireland were also at risk. As *The Wall Street Journal* reported on November 26, 2010 in an article entitled "Belgian Debt and Contagion":

Belgium's borrowing costs are rising as high levels of public debt, the continuing political crisis and bailouts for Eurozone peers make investors nervous. . . . Belgian public debt will reach 100.2% of its gross domestic product this year. . . .

"We're in the middle of a financial crisis which is spreading to more and more countries, and if the crisis continues due to unresolved government issues in Belgium this could create a problem," said Laurent Bilke, global head of inflation strategy at Nomura in London. . . . The sovereign debt crisis has roiled markets across Europe, with Ireland the second country to take an EU bailout after euro zone governments agreed to assist Greece in May.

158.    The Euro sovereign bonds in the most peril were the very instruments that MF Global purchased, *i.e.*, the sovereign debt of Portugal, Italy, Ireland, Spain and Belgium. Within MF Global, according to Confidential Witness 1 ("CW 1"), a Senior Vice President and the Head of Credit Derivative Trading in MF Global's New York office from November 2009 through October 2011, the sovereign bonds of **P**ortugal, **I**taly, **I**reland, **G**reece and **S**pain were known collectively as "PIIGS." CW 1 further noted that when "everyone was reducing their exposure to 'PIIGS,' and getting it out in the media that they were reducing exposure, ***MF was not doubling down, not tripling down, but quadrupling down***."

159.    Recognizing the risks presented by the deepening debt crisis in Europe, MF Global invested only in Euro sovereign bonds maturing before June 2013 because they were

guaranteed by the EFSF – which was established in May 2010 and scheduled to expire in June 2013. Specifically, all of the debt of Belgium, Italy and Spain that MF Global purchased matured no later than December 2012, and all of the Irish and Portuguese debt that MF Global purchased matured no later than June 2012. Thus, Corzine interpreted the EFSF as a license to increase off-balance sheet leverage to unmanageable levels, notwithstanding Moody's mandate to **_reduce leverage_** in order to avoid a credit rating downgrade.

160.    But while the EFSF may have provided a safety net if the Euro sovereign bonds actually defaulted, it did not prevent MF Global's exposure to market risk, liquidity risk and capital risk – including margin calls and additional net capital reserves that were demanded by MF Global's counterparties and regulators when the transactions began to be disclosed.

161.    With respect to market risk (also referred to as "credit risk"), even though the lion's share of MF Global's Euro sovereign debt purchases were off-balance sheet, the Company still retained risk that the debt securities might default or be restructured. Indeed, this is why MFG-UK did not carry the trades on its own books. Corzine admitted he was aware of this risk in his December 15, 2011 testimony before the Financial Services Subcommittee:

> MF Global retained, however, the risk that the debt securities might default or be restructured. If the debt securities defaulted or were restructured, then MF Global would not be paid in full at their maturity, even though MF Global would still have the obligation to buy back the debt securities from the Counterparty in full (at par).

162.    MF Global also retained substantial capital and liquidity risks due to the possibility of additional margin requirements from counterparties and additional net capital reserve requirements from regulators. Critically, the clearing house through which an RTM transaction was executed – typically the LCH – was able to demand that MF Global increase its margin under certain circumstances. As described by Corzine in his December 15, 2011 testimony before the Financial Services Subcommittee, a clearing house could require additional

margin for at least two reasons: "(a) if it determined that MF Global itself was not credit-worthy, or (b) if it determined that underlying debt security – which was the collateral for the loan from the Counterparty to MF Global – decreased in value." Corzine also admitted that he was aware that "the possibility of such margin calls from [the] LCH meant that MF Global retained liquidity risk." Accordingly, decreases in the value of MF Global's Euro sovereign debt RTM portfolio triggered margin calls and strained liquidity. For example, in November 2010, the LCH demanded more collateral from MFG-UK after a 15% haircut was imposed on certain Irish bonds, and MFG-UK, in turn, called for more collateral from MFGI.

163.    Indeed, as Corzine testified on December 13, 2011 before the Senate Agriculture Committee, MF Global faced massive margin calls twice a day near the end of the Class Period. For instance, on September 28, 2011, according to the SIPA Report, in response to a margin call from the LCH to MFG-UK with respect to certain maturing Irish and Portuguese securities, MFG-UK requested $440 million from MFGI to cover the default risk in the two-day period before maturity. MFGI met the call with a $440 million wire transfer that day. One month later, by the close of business on October 28, 2011, according to an internal MF Global memo produced to the Financial Services Subcommittee, MF Global was required to post approximately $945 million in margin calls. On Monday, October 31, 2011 – the same day the Company filed for bankruptcy – MF Global's London staff requested an additional $310 million to cover more margin demanded by counterparties against the RTM portfolio. But as discussed further in ¶ 313 below, Edith O'Brien ("O'Brien"), MFGI's Assistant Treasurer, responded to this last October 31 demand with an e-mail sent with high importance to MF Global staff, stating "PLEASE DO NOT RELEASE THIS COLLATERAL."

164.     A failure to post additional margin can result in a default on an RTM and obligate a party to liquidate the transaction. During times of distress, margin calls can cripple a thinly capitalized firm, and the ensuing liquidity crisis can force a company into bankruptcy – which, in fact, occurred at MF Global in the final days of October 2011, as detailed below.

165.     Equally problematic for MF Global was the risk that its regulators would demand additional capital reserves when presented with the extent of MF Global's off-balance sheet Euro sovereign debt RTM transactions. Indeed, as discussed in Section IV.F.1 below, once MF Global's Euro sovereign debt RTM transactions were disclosed, FINRA (and the SEC) demanded additional net capital reserves which, in combination with increasing liquidity demands, quickly ended the ability to keep profiting from the Corzine Trade – and triggered other grave consequences.

166.     The enormous leverage used by MF Global exposed it to risk that significantly exceeded its asset base, including costs for carrying transactions with such high leverage. As detailed in the SIPA Report:

> As the Board and management were aware, the exposure from this [RTM] portfolio was the equivalent of ***14% of MF Global's assets as of September 30, 2011, and was more than four-and-a-half times MF Global's total equity, a level that was orders of magnitude greater than the relative exposure at other, larger financial institutions***.
>
> * * *
>
> ***The size of the RTM portfolio, in comparison to MF Global's size, was staggering***.

167.     As described by CW 1, while "significantly bigger companies with access to unlimited capital [we]re reducing exposure in this region, Corzine – operating within a more highly levered and capitally constrained firm – [wa]s ***betting the farm***."

168.     This phenomenon was further described in a November 10, 2011 Thomson Reuters' article, "MF Global Slayed By the Grim Repo," as follows:

Like Wall Street cocaine, leveraging amplifies the ups and downs of an investment; increasing the returns but also amplifying the costs. With MF Global's leverage reaching *40-to-1* by the time of its collapse, it didn't need a Eurozone default to trigger its downfall – all it needed was for these amplified costs to outstrip its asset base. . . . With its balance sheet delicately teetering on the edge of a leverage cliff, all MF Global needed was a shove to fall to its financial ruin.

169.    In fact, the Company's massive leverage and exposure to Euro sovereign debt through RTM transactions did cause a liquidity crisis that depleted MF Global's already-minimal amount of available capital and liquidity. As detailed below in Sections IV.F.1 and IV.G, contrary to repeated statements by the Officer Defendants throughout the Class Period that MF Global was amply capitalized and had sufficient liquidity, MF Global lacked adequate capital and liquidity to cover its Euro sovereign debt RTM transactions with Company resources and was forced to rely on intraday borrowings from its FCM operations, including *customer assets*.

170.    As of September 30, 2011, MF Global's net long position in short-term Euro sovereign debt had grown to approximately $6.3 billion, and the amount of margin posted exceeded $400 million. In October 2011, as reported by the SIPA Trustee, MF Global's net investment in Euro sovereign debt peaked at nearly $7 billion. Some of these positions were acquired as late as the end of July 2011 – just prior to FINRA announcing the required net capital charges discussed below – and Corzine had actually planned to continue building new positions into November 2011. Accordingly, as noted in the SIPA Report, "*as the MF Global Board and management were aware, MF Global's appetite for Euro sovereign debt had taken the Company to a precarious position*."

171.    In fact, according to the SIPA Report, MF Global risk personnel focused on these liquidity risks during the Class Period and brought several risk scenarios to the attention of CRO Stockman and other senior management. One was the possibility that the Company would be unable to execute margin-reducing reverse RTM transactions. If a counterparty refused, the

Company could be faced with an 80% margin call from the LCH, which could amount to $602 million. In another scenario, if MF Global were downgraded below investment grade, that event would trigger a margin call as high as 200% under the LCH rules, and higher margin calls at other exchanges like the Eurex. Indeed, by August 2011, as reported to MF Global's Board, the Company anticipated the need for as much as $930 million in additional funding to meet margin calls on the RTM portfolio. As the SIPA Trustee reported: "***Very simply, however, the fact was that the sovereign RTM portfolio had grown beyond even MF Global's moderate risk profile***." As further detailed in the SIPA Report, in June 2011, the Company even began to try to move the PSG out of MFGI altogether and into a non-regulated entity called MF Global Special Investor, LLC ("Special Investor"), because the PSG "use[d] too much reg[ulatory] capital and the cost of reg[ulatory] capital [wa]s more than the cost of funding capital."

172.     While these material undisclosed risks were mounting, the Corzine Trade produced revenues and mitigated losses in MF Global's core operations for a short while. For instance, as reported by Credit Suisse analysts following the filing of the Company's Form 10-Q for the third fiscal quarter of 2011 on February 3, 2011 (the "Q3'11 Form 10-Q"), MF Global's "dealer-based principal facilitation businesses continue[d] to show progress," with "total principal facilitation revenues of $67 million . . . increased 13% from last year and 4% from last quarter." As was only later reported in the December 31 *WSJ* Article, approximately $39 million of this $67 million came from the Corzine Trade.

173.     Thereafter, in the Company's 2011 Form 10-K, which was filed on May 20, 2011, MF Global announced a GAAP loss of $0.31 per share and non-GAAP adjusted earnings per share ("EPS") of $0.05 for the year ended March 31, 2011. Again, Deutsche Bank analysts observed that MF Global's "dealer-based principal facilitation businesses continue[d] to show

progress"; "total principal facilitation revenues of $109 million nearly doubled year-over-year (+97%)" and were "up sharply quarter-over-quarter as well (+67%)." As was only later reported in an October 25, 2011 Credit Suisse analyst report, the "progress" in MF Global's principal facilitation business was due almost exclusively to Euro sovereign debt RTM transactions.

174.    Consistent with the above (after-the-fact) reports of the Corzine Trade's contribution to the Company's financial results, additional profit and loss ("P&L") detail first publicly reported in Annex F of the SIPA Report shows that – unbeknownst to investors – MF Global consistently boosted reported revenue from its Euro sovereign debt RTM trading strategy in the final month of each of the fiscal quarters ended December 31, 2010, March 31, 2011 and June 30 2011.[9]

175.    As noted in the SIPA Report, the cumulative P&L impact of the Corzine Trade from inception to bankruptcy was over $103 million and, on a quarterly basis, amounted to as much as 16% of net revenues. However, as alleged herein, the better-than-expected revenue booked as a part of MF Global's supposedly burgeoning "dealer-based principal facilitation business" ultimately destroyed the Company and caused massive investor losses as MF Global accumulated greater and greater exposure to the Corzine Trade, ultimately to shocking and unsustainable levels.

---

[9] Moreover, as reported by the OFR, based on Roseman's Congressional testimony, MF Global also engaged in another form of "window dressing," "presenting the firm favorably in its public financial statements – by reducing leverage at reporting dates." That is, in direct contrast to the de-recognized RTM transactions which *increased* in the final month of each quarter, MF Global repos accounted for as collateralized financings consistently *decreased* at quarter-end. As reported in article entitled "MF Global Masked Debt Risks" published in *The Wall Street Journal* on November 4, 2011: "For the past two years, [MF Global] may have disguised its debt levels to investors by temporarily slashing the debt it was carrying before publicly reporting its finances each quarter. . . . The activity, referred to in the financial industry as 'window dressing,' suggests that the troubled financial firm was shouldering more risk and using more borrowed funds to facilitate its trading than investors could easily detect from the firm's regulatory filings." According to its analysis of seven quarters from late 2009 to mid-2011, *The Wall Street Journal* reported that MF Global's borrowings at quarter-ends were, on average, 16% lower than the quarterly averages. By contrast, as revealed by Annex F of the SIPA Report, the Euro sovereign debt RTM end-of-quarter balances were consistently higher, allowing for more revenue to flow to MF Global in the final month of each quarter while at the same time reducing reported leverage. In June 2011, the SEC inquired about these quarterly variations, as set forth below in Section IV.F.2.

E.    **MF Global's Ineffective Risk Management And Internal Controls**

176.    Throughout the Class Period, as detailed herein, Corzine side-lined the Company's risk officers, cancelled key projects in the risk department and systematically circumvented internal controls to increase MF Global's exposure to the Euro sovereign debt. At the same time, MF Global failed to address repeatedly reported gaps in internal controls necessary to reliably forecast liquidity, especially in the face of the Corzine Trade's greatly increased liquidity demands. All the while, Defendants stated publicly to investors that the appropriate controls were in place.

1.    **The Board Dismisses Myriad Red Flags And Corzine Exponentially Increases Euro Sovereign Debt Trading Limits**

177.    Within his first eight months at MF Global, over the repeated objections of then-CRO Roseman, Corzine overrode risk management processes to increase Euro sovereign debt trading limits **by 950%** in 2010 – from approximately $500 million in March 2010 to $4.75 billion in November 2010 – and to $6.6 billion in the first six months of 2011. As reported by the SIPA Trustee, Roseman began expressing his concerns about the RTM portfolio's liquidity risks as early as May 2010.

178.    Roseman, who served as MF Global's CRO from August 2008 until January 2011, testified before the Financial Services Subcommittee on February 2, 2012 that, by no later than July 2010, Corzine sought to materially increase MF Global's existing Euro sovereign debt trading limits. In response, Roseman "reviewed the positions and limits in detail" with Corzine and others. During these internal discussions, Roseman warned of the "potential capital risk implied by the credit default swap ('CDS') market, along with the continued political and financial uncertainty in the relevant countries." Roseman continued to caution Corzine on the potential capital risk, but in or around July/August 2010, after taking into account the EFSF

established in May 2010, Corzine succeeded in convincing Roseman to set a $1 billion total gross limit across certain European countries.

179.    Despite the $1 billion limit, only one month later in mid-September 2010, MF Global's Euro sovereign positions exceeded $1 billion. ***Only after making purchases in excess of the new $1 billion limit*** did Corzine seek another overall limit increase from the Board. This time, to meet the existing exposure, Corzine sought to increase the limit to $1.5 billion. In response, according to his February 2, 2012 testimony before the Financial Services Subcommittee, Roseman expressed "increasing concerns with regard to the potential capital risk associated with the growing positions and began to express caution on the growing liquidity risk" as well. Roseman's account is corroborated by the December 11 *NYT* Article, which reported that Roseman gave a PowerPoint presentation to MF Global's Board by late 2010 making clear that investments in Euro sovereign debt could impose "a cash squeeze" on the Company.

180.    Henri Feuga ("Feuga"), who reported directly to CRO Roseman (and later to CRO Stockman) as a Senior Vice President in the Company's Global Risk and Compliance Systems Department from October 2008 through October 2011, also corroborated this account. Feuga stated that Roseman was not comfortable with Corzine's request to increase the Euro sovereign debt trading limit from $1 billion to $1.5 billion. Feuga recalled that, in discussions with Corzine, Roseman explained that the portion of Euro sovereign debt investments already above the $1 billion limit was "excess," and should therefore be managed as excess. But Feuga stated that Corzine disagreed, and referred to the excess investment simply as a new limit. On this point, Feuga noted, "If you move the limit and at the same time you move the exposure, ***there is no limit***, which is clearly the way Corzine behaved. ***He was a guy with no limits***."

181.    Indeed, the new $1.5 billion limit was still not high enough for Corzine. While discussions about risk management were ongoing, he had already built positions in Euro sovereign debt up to approximately $2 billion. Again, Corzine asked Roseman to increase the overall limit ***only after the fact***.

182.    Up until mid-September 2010, MF Global's Euro sovereign debt investments were conducted only through on-balance sheet transactions. But according to Roseman's testimony before the Financial Services Subcommittee on February 2, 2012, by mid-September 2010, Corzine was strategizing to add significantly to these positions through off-balance sheet RTM transactions. This worried Roseman even more.

183.    According to Roseman's Congressional testimony, he "indicated to Mr. Corzine that [they] would need to consult the Board for approval for increased sovereign limits given the increasing materiality of the risks as they related to the Board's approved risk appetite." Roseman further testified that the "decision was made to consult with the Board to discuss the strategy, the risks, and the sovereign limits, and subsequently sovereign limits were presented to, and approved by, the Board."

184.    By late October 2010, Roseman recalled that "the positions were approaching $3.5 to $4.0 billion." Around this same time, Roseman "was asked to present another request to the Board on behalf of Executive Management to increase the total sovereign limit to $4.75 billion." Roseman testified on February 2, 2012 before the Financial Services Subcommittee on this point as follows:

> At this point, not only was I concerned with the capital risk, but given the size, I was now concerned with the liquidity risk relative to the risk appetite and taking into account the liquidity risks presented by other positions held by the company. I discussed my concerns about the positions and the risk scenarios with Mr. Corzine and others. However, the risk scenarios I presented were challenged as being implausible.

185.     Consequently, at a November 2010 MF Global Board meeting, Roseman presented Corzine's new $4.75 billion Euro sovereign debt limit request. He also presented a "detailed analysis of the potential liquidity risk stress scenarios." These scenarios "included potential variation margin requirements from price changes of the securities," and "potential initial margin calls from the repo counterparties." Roseman also provided "an analysis on the CDS market, and highlighted the significant capital risk given the sovereign default risk associated with the unresolved financial issues in Europe." Nevertheless, over Roseman's concerns and recommendation, the Board approved Corzine's $4.75 billion request.

186.     After the November 2010 Board meeting, Roseman continued to warn the Board of the increasing capital, liquidity and concentration risks associated with the Corzine Trade. Feuga stated that Roseman did everything he could to stop Corzine from further increasing risk exposure to Euro sovereign debt, but that "Corzine refused to listen to any advice given to him from the risk department," noting that "[y]ou can have the best seatbelt on a car but if you don't put your seatbelt on, it won't help you in a crash."

187.     Before Roseman had another chance to advise the Board of the mounting risks in early 2011, he was dismissed from the Company. According to Feuga, "Roseman was clearly forced out because he was not in agreement with the amount of risk that Corzine was taking." John Brady, a Senior Vice President of Interest Rate Products who worked in MF Global's Chicago office from April 2002 through October 2011 – including as Co-Head of MF Global's Chicago office from May 2011 through October 2011 – also confirmed that Roseman was fired because he warned senior management that the Company was taking on too much risk. Brady stated that Roseman "said these bets were too dangerous," so "Corzine or someone at Corzine's

level" fired him. The SIPA Report provides a consistent account of Roseman's termination in January 2011.

188.    Roseman's concerns about the Euro sovereign debt portfolio exceeding previously set risk limits were shared by other employees across the MF Global enterprise, even though those concerns were dismissed as "implausible." As later reported by the December 31 *WSJ* Article, numerous MF Global employees "saw red flags that worried them as Mr. Corzine ramped up risk-taking and tried to return MF Global to profitability."

189.    For instance, Munir Javeri, who was hired in early 2011 as the Company's Global Head of Trading to oversee the new PSG, soon grew concerned that the Corzine Trade had become too important to MF Global's results. The December 31 *WSJ* Article explained:

> A Big Hire Bolts
>
> As Mr. Corzine continued to accumulate the bonds, some people inside MF Global started questioning the trade. Munir Javeri, a former Soros Fund Management official hired in early 2011 to be Mr. Corzine's global head of trading, soon grew concerned that the European bet had become too important to MF Global's results, according to people familiar with the matter.
>
> **Mr. Javeri had little influence over Mr. Corzine's big trading bet**, even though a former UBS AG interest-rate swaps trader who reported to Mr. Javeri, Lauren Cantor, was tapped by Mr. Corzine to help execute many of the European trades, these people said.
>
> Mr. Javeri soon left the firm to return to a hedge fund, according to people familiar with the matter.

190.    CW 1 – who was employed as a Senior Vice President and the Head of Credit Derivative Trading in MF Global's New York office from November 2009 through October 2011 – further stated that a number of "smart people" within MF Global's risk and trading groups were also "concerned" about the Corzine Trade. CW 1 noted that "[i]t wasn't a big secret" within MF Global that the risk department "was very concerned with the exposures

61

[Corzine] was amassing." There were "maybe 10 people who formally expressed concerns about the size of those [sovereign debt] positions."

191.   In particular, CW 1 stated that Stephen Hood (the Company's Head of Market Risk/Risk Monitoring during the Class Period) and Talha Chaudhry (Chief Risk Officer of the Americas and Global Head of Market Risk during the Class Period), both of whom reported directly first to CRO Roseman and later to CRO Stockman, were among the "concerned" employees: "I knew [Hood and Chaudhry] were uncomfortable [and] very concerned with the size of the exposures that were built up." CW 1 further stated that, in approximately early 2011, Hood and Chaudhry began requesting information from him in connection with the "credit derivative market." Hood and Chaudhry asked for "spreads and credit curves in reference countries where [Corzine] had put on these RTMs." CW 1 stated that the "frequency and urgency" of these requests "increased throughout the year." He added, "[i]f you subpoenaed emails, you'd see urgency and panic in emails. I knew [Hood and Chaudhry] were concerned about the size of the positions." In addition to information about the size and scope of the Company's Euro sovereign debt positions, Hood and Chaudhry also sought information from CW 1 about the cost of hedging them.

192.   CW 1 further stated that there were "whispers going on internally" about "what [Corzine] was doing." He said, "I think the reality is that if you asked anyone at the firm what [Corzine] could or couldn't do, in terms of trading, [they would say] *he could and was doing just about anything, largely unchecked*." He added, "I don't have any reason to throw [Corzine] under the bus, but that's asinine to be taking risk in all those areas in an unchecked manner," because the "limits are there for a reason." According to CW 1, notwithstanding the Company's established risk procedures, *Corzine was not subject to any real risk management oversight*.

193.     Likewise, CW 2, who worked as an Energy Business Controller in MF Global's New York office from March 2006 through October 2011, said, "[i]f Corzine wanted it, he got it. If he didn't want it, it didn't happen." CW 2 added that he believed the "levels of risk that were being taken were exorbitant" and that "anybody getting an MBA would say, 'what, are you an idiot?' And here was a former Senator and Governor deciding this is what we are doing and this is how we are doing it."

194.     After Roseman's dismissal, on February 3, 2011, MF Global announced that Stockman, who had worked as a senior trader at Goldman Sachs with Corzine, was taking over as CRO. Unlike Roseman, as soon as Stockman joined MF Global, he publicly supported Corzine's risk-based strategy.

195.     For instance, in a *Risk Magazine* interview with Stockman published on March 31, 2011, Stockman said, "[w]e are going to be actively and aggressively seeking to take risks in a broad fashion. ***In our client-facilitating businesses*** – this is no surprise as we build out – I would suggest we are not taking enough risk." Significantly, this article went on to highlight the importance of risk management given MF Global's new strategy. The article stated that "[t]he main challenge will be ensuring the risk management is able to keep up with the expansion plans – but Stockman says this is well understood. 'If there is a relevant risk, we will have a relevant measure and limits around that risk.'"

196.     Notwithstanding Stockman's public statements about the importance of risk limits, Corzine was afforded ever more leeway with Stockman as CRO. As described by CW 1, "Roseman, the most vocal person opposed to what Corzine was doing, was removed from the firm. So you get someone in there [*i.e.*, Stockman] who's more kowtow-ish."

197.    For instance, according to Feuga, Stockman received and complied with a clear mandate from Corzine not to invest in risk management. Feuga explained that, once Stockman became CRO, all risk-related projects were stalled. The stalled projects included a new Company-wide VAR system to enhance technical infrastructure. Feuga, who presented the final VAR system project proposal to Stockman, was particularly amazed that Stockman would not lead the new project since Roseman previously advocated for it. Feuga concluded that Stockman was hired to be a "Chief Yes Officer," not a Chief Risk Officer.

198.    Feuga's account is corroborated by the December 11 *NYT* Article, which reported that, "soon after joining MF Global, Mr. Corzine torpedoed an effort to build a new risk system, a much-needed overhaul, according to former employees." While the December 11 *NYT* Article noted that a "person familiar with Mr. Corzine's thinking said that he saw the need to upgrade, but that the system being proposed was 'unduly expensive' and was focused in part on things the firm didn't trade," Feuga explained that the first phase of the project would have cost just $700,000, with the remaining phases costing only several million dollars over three years. Feuga added that, even if such a VAR system was considered relatively expensive, "if you want to take very large risks, it's the cost of doing business." In short, with Stockman in place, as described by CW 1, Corzine "operated with an immunity" that was "insane."

199.    Indeed, even though the MF Global Board directed in mid-January 2011 that the Company's Euro sovereign debt portfolio should be run down with no additional positions unless Corzine obtained further approval, shortly after Stockman became CRO, ***Corzine ignored the Board's mandate***. As described in the SIPA Report, Corzine again breached and exceeded the existing limits on February 3, 2011, ***and although the breach was brought to Corzine's attention, he did not inform the Board***.

200.     Thereafter, in mid-February 2011, Corzine had Stockman prepare a request to the Board to increase the Euro sovereign limit from $4.75 billion to $5 billion. The request noted that the liquidity risk associated with the RTM portfolio was the impact of an increase of 100 to 500 basis points in the spreads, a commensurate increase in funding requirements, and the fact that MFGI would have to fund any collateral calls due to the variation margin and the increased haircuts required by counterparties resulting from restructurings, downgrades and liquidity events. As described in the SIPA Report, certain Board members expressed concerns about the level of exposure and the consequences of increased haircuts, and warned Stockman that he would face "tremendous pressure" to seek higher risk limits to compensate for the Company's declining earnings.

201.     Nonetheless, in March 2011, Stockman again supported Corzine's Euro sovereign debt limit increase request – an aggregate increase from $4.75 billion to $5.0 billion and a temporary increase to $5.8 billion until March 31, 2011. Stockman identified for the Board the market risks that, under certain scenarios of changes in yields and haircuts, could produce additional funding needs of as much as $761 million. Once again, the Board approved the limit increase.[10]

202.     By mid-March 2011, the Company's Euro sovereign debt portfolio had grown to $5.219 billion within the "temporary" limit increase. But with the temporary increase set to expire at the end of March 2011, Corzine told Stockman to prepare another Board request to increase the limit permanently to approximately $5.8 billion. In response, the Board approved the request to extend the "temporary" increase to $5.8 billion until September 2011, at which time the limit was to revert to $5.0 billion.

---

[10] At one point, Corzine even threatened the MF Global Board with his resignation if the Board refused to agree to his request to increase the size of the Euro sovereign debt risk limits.

203.    Within one month, as shown in an April 27, 2011 portfolio report that Stockman provided to Corzine, ***these limits were breached again***. According to the SIPA Report, this breach finally prompted Stockman to confront Corzine. After conferring with Corzine on the latest breach, Stockman commented to his colleagues in the Risk Department: "Good news is he is now aware of gross limits, agrees with concept. . . ."

204.    But Corzine did not agree with the concept. Just weeks later on June 5, 2011, at Corzine's direction, Stockman prepared yet another request to the Board to increase the Euro sovereign limits. This time the request sought an increase from $5.8 billion to as much as $9.75 billion, and added Belgium to the countries that comprised the global limit. To rally support for the approval of this latest limit increase request, Corzine asked Defendant Steenkamp to explain what, if any, impact the Corzine Trade would have on liquidity in the event of a credit rating downgrade. On June 6, 2011, in response to Corzine's question, Steenkamp explained the impact of a credit rating downgrade as follows:

> There would be no impact on RTM's from a ratings downgrade, as the legal analysis of sale is independent of credit rating until maturity. However, there could be an impact on the reverse RTM netting trades as these are to different maturities than the original RTM's. The potential issue is whether some counterparties will choose not to roll over transactions or the trading counterpart can't trade with us due to our rating. If this were to happen, then [MFGI] could lose its netting benefit on these reverses and thus be subject to higher margins, thereby increasing liquidity needs for the BD.

205.    Thereafter, following MF Global's addition of €200 million of Italian bonds in mid-July 2011, Stockman privately told Corzine in a July 30, 2011 email, "I am not currently supportive of buying more sovereigns" because of concerns about MF Global's ability "to comfortably post initial and variation margin in light and heavier stress scenarios."

206.    Accordingly, Corzine was informed of, but disregarded, the negative impacts that the Corzine Trade would have on the Company in the event of a credit rating downgrade given

its liquidity risks, but, nonetheless, he continued to increase MF Global's overall exposure to Euro sovereign debt through RTM transactions in repeated breaches of specific Board risk limits. Against this backdrop, it is not surprising that: (1) the SIPA Report concluded that MF Global's Risk Department struggled to keep up with the changes at the Company during the Class Period, in particular in the PSG's new operations; (2) PwC's 2011 non-public audit work-papers "identified the management override of internal controls as a risk to MF Global"; and (3) Congressman Bachus has stated there is "little doubt" Corzine ran the Company as his "alter ego" and "readily short-circuited" internal controls.

### 2. Dozens Of Gaps In Risk Management Are Presented To, But Ignored By, The MF Global Board

207. According to the SIPA Report, by the spring of 2010, "dozens of gaps" in internal controls were apparent, identified and reported to the Board. In fact, during the Class Period, the MF Global Board received at least six presentations and reports identifying critical "gaps" in risk management. These internal, non-public reports directly contradicted the Officer Defendants' public statements about internal controls and risk management throughout the Class Period.

208. First, in April 2010, MF Global's Internal Audit Department ("Internal Audit"), which was charged with being "a professional objective provider of risk, internal control and related advisory services," created a Board presentation that identified "dozens of gaps in policies, procedures, and technology" in various risk areas. During this presentation, the Board specifically discussed the need to have a "Global Head of Capital and Liquidity Risk" and to establish new policies in this area. The April 2010 Board presentation also reported that "*gaps in technology made the data needed for forecasting liquidity risks inadequate and unreliable*."

209.     Second, a May 2010 Internal Audit report identified MF Global's risk policies as

"***not congruent with the changes to its broker-dealer business***." "***Liquidity risk reporting***" was

one of the specific gaps identified in this May 2010 report.

210.     Third, an October 2010 follow-up report to the April 2010 Board presentation

"continued to reflect ***many critical or high risk gaps in risk policies***." The October 2010 follow-

up report noted:

> ***Existing liquidity monitoring and forecasting is manual and limited. Reporting
> capabilities to evaluate liquidity needs for transactions that are booked but not
> yet settled have not been fully developed.***

211.     Fourth, also in October 2010, an Internal Audit report on "Market and Credit Risk

Management" identified "***High Risk***" areas arising from the lack of controls over risk reporting.

The report emphasized that market risk policies had not been updated to reflect MF Global's

then-current operating environment. This report also expressed concern that the absence of

reliable liquidity reporting tools and dependence on O'Brien's knowledge of liquidity issues

might represent a "key man risk," because the processes supporting the composition of the

liquidity forecast were not documented and mainly based on O'Brien's personal experience.

212.     Fifth, an Internal Audit report dated March 31, 2011 concluded:

> The Regulatory Reporting group handles numerous daily, weekly and monthly
> reporting responsibilities. ***The vast majority of the calculations underlying these
> reports are done via spreadsheet.*** The group performs various checks and
> balances to ensure the information utilized is complete and accurate; however, in
> a variety of instances, ***the controls are not in place or not all aspects of these
> controls are documented as evidence that they have been performed.
> Additionally, these spreadsheets are typically not secure and are susceptible to
> human error***. . . .

213.     Sixth, as follow-up to the May 2010 Internal Audit report, a June 20, 2011 Global

Liquidity and Capital Management Internal Audit report noted "***numerous and significant gaps

between the policy and existing practices***." Although, as noted above, the gaps had been

escalated to the Board in May 2010, the control issues had still not been resolved. For example, Internal Audit noted that "*[e]xisting liquidity monitoring and forecasting is manual and limited*." The June 2011 Internal Audit report also noted that MF Global relied on "ad hoc tools" and the individual experience of key personnel (like O'Brien) to manage liquidity, but warned that "[t]he complexity of capital and liquidity demands have increased with the addition of principal trading." Yet, according to the SIPA Report, no responsibility was assigned to remediate this issue on the grounds that "*the business accepts this risk*."

214.   Furthermore, MF Global's risk policies tasked MF Global's Treasury Department with overall responsibility for monitoring liquidity, including regulatory compliance, and ensuring that investments and the use of customer segregated accounts complied with CFTC rules. However, as set forth in the SIPA Report, in August 2011 when Vinay Mahajan ("Mahajan") assumed his new position as Global Treasurer (shortly after MF Global completed two separate $325 million debt offerings of the 2018 Notes and 6.25% Senior Notes), he concluded that the Treasury Department "*needed lots of help*" and that its infrastructure "needed a 180." Nevertheless, Mahajan further reported that, by the time he was hired, it was "*too late*" to fix the Treasury Department because the focus had already shifted to "maximizing liquidity."

215.   As stated in the SIPA Report:

Notwithstanding the increased demands on global money management and liquidity, the [Company's] Treasury Department, which was involved in implementing the transfers of funds, did not expand or modernize. Likewise, the technology for recording and tracking transactions and liquidity did not materially change. These critical functions remained essentially as they had been prior to Mr. Corzine's arrival, with the [Company] often tracking liquidity and ability to transfer funds by informal means that were derived from a number of different reports, both computerized and oral.

\* \* \*

The underlying liquidity problems at MF Global . . . did not commence in the fall of 2011. Rather, liquidity had been a cause for concern before and throughout Mr.

Corzine's tenure at MF Global, ***yet systems and tools that would enable accurate real time monitoring of liquidity were never implemented***.

\* \* \*

The resulting gaps in record-keeping, combined with the fragmented chain of reporting and staff turnover within Treasury, Treasury Operations, and Finance described above, ***contributed to the chain of events that led to the shortfall of customer property***.

\* \* \*

Had customer funds been properly protected, the customer property in Customer Accounts should have been largely if not completely unaffected by the liquidity crisis at MF Global.

216. Similarly, the U.S. Treasury Department's OFR – which was established by the Dodd-Frank Wall Street Reform Act – reported on the "Lessons Learned From The Collapse of MF Global" in its 2012 Annual Report. The OFR's findings included:

***Compliance and Corporate Governance***. Following its failure, MF Global was unable to account for over $1.6 billion in customer funds amid allegations that the firm used customer assets to cover its losses. ***The apparent failure to properly segregate customer funds followed a pattern of lapses in compliance and governance***.

According to Congressional testimony, as the firm raised its limits on European sovereign debt exposure from $1 billion to $4.75 billion between September 2010 and January 2011, the chief risk officer (CRO) voiced concerns to the chief executive and the board of directors. His concerns went unheeded and he was replaced by a new CRO in January 2011 (Roseman, 2012a). The position was effectively demoted, as the new CRO reported to the chief operating officer rather than to the chief executive officer, and projects to enhance risk management were shelved (Stockman, 2012). ***All of this should have been a red flag, signaling a culture in which the CRO position was not sufficiently independent and empowered to restrain decisions by senior management that put the firm at risk***.

\* \* \*

Taken together, these and related incidents indicate an environment with a weak culture of compliance and risk management. ***A firm with better internal controls and governance could have avoided MF Global's fate and protected customer assets. Better management is a necessary element of proper risk control***.

\* \* \*

Different investors can reasonably have different views on whether to buy particular assets, in this case European bonds. ***But sound risk management requires anticipating the liquidity needed to sustain an investment strategy and avoiding excessive and opaque leverage***. MF Global was ultimately undone by poor liquidity management of a concentrated bet on European sovereign debt.

217.    Most recently, in testifying before Congress on August 1, 2012, the SIPA Trustee stated that MF Global's internal controls "***were obviously ineffective or ignored***," and that the 275-page SIPA Report "***makes clear our conclusion that there was knowledge that segregated funds were being improperly moved***." The SIPA Trustee further testified: "***I think the preponderance of the evidence indicates that management – senior management at MF Global was aware of the liquidity crisis and was aware that customer funds, toward the end were – were being utilized to cover other costs in the firm***."[11]

218.    Notwithstanding the (non-public) internal Board presentations and Internal Audit reports described above identifying significant gaps in risk management throughout the Class Period, Corzine and the other Officer Defendants continued to tout publicly MF Global's purportedly tightened risk management and internal controls, and did so, even as late as September 2011, just one month before MF Global collapsed.

**F.    Belated, Inadequate Disclosures About The Corzine Trade Prompt Regulatory Inquiries That Help Shut Down The Corzine Trade**

219.    In late 2010, MF Global's outside auditor, PwC, asked MF Global to publicly disclose its off-balance sheet exposure to Euro sovereign debt through RTM transactions. According to the December 11 *NYT* Article, in response to PwC's request, Corzine personally met with PwC in December 2010 to discuss this issue. Corzine and PwC agreed that the transactions would be mentioned in the Company's next annual report.

---

[11] The Officer Defendants' awareness of the use of intraday transfers from the Company's FCM operations (including customer funds) to cover liquidity demands at non-FCM operations is detailed below in Sections IV.G-H.

220.    Five months later, on May 20, 2011, MF Global filed the 2011 Form 10-K. The 2011 Form 10-K stated that MF Global maintained exposure to the sovereign debt of Portugal, Ireland, Italy, Spain and Belgium. The Company disclosed in a footnote that, at March 31, 2011, "securities . . . sold under agreements to repurchase of $14,520,341[,000] at contract value, were de-recognized, of which 52.6% were collateralized with European sovereign debt." The Company also reported that approximately $1.5 billion of the securities purchased under agreements to resell were de-recognized.

### 1.    The FINRA And FSA Investigations

221.    FINRA was both concerned and surprised by the footnote disclosure in the 2011 Form 10-K. According to the December 15, 2011 testimony of FINRA CEO Richard Ketchum before the Financial Services Subcommittee, MF Global had previously told FINRA in late September 2010 – in response to an informal survey – that it did *not* have any exposure to Euro sovereign debt. However, as FINRA (and the investing public) later learned, MF Global had in fact already started to build the Corzine Trade before responding to FINRA's survey.

222.    Ketchum further testified that, "[w]hile the [Company's] response was consistent with GAAP accounting rules that [RTM] transactions are treated as a sale for accounting purposes, *the lack of a complete response* delayed [FINRA] in detecting the [Company's] exposure." Ketchum added that FINRA therefore did not know about MF Global's Euro sovereign debt RTM transactions until FINRA raised questions on May 31, 2011 about the footnote in the 2011 Form 10-K, by which time the Company's exposure had already reached massive proportions. Indeed, the footnote disclosure in the 2011 Form 10-K troubled FINRA because, as explained by Ketchum, even though RTM transactions are treated as sales under GAAP, thereby removing them from the Company's balance sheet, MF Global still "remained subject to market and credit risk throughout the life of the repo."

72

223.   On this point, before the Financial Services Subcommittee on March 28, 2012,

FASB's Technical Director, Susan Cosper, testified as follows:

> [W]hether the transaction is a repo or a repo to maturity, companies are required under GAAP to make extensive disclosures about assets that have been transferred, including both quantitative and qualitative information about the transferor's continuing involvement, the risk that the transferor continues to be exposed to, **including credit and liquidity risk, the amount to be recognized and gains or losses on transferred assets**.

224.   Consequently, in June 2011, just days after the 2011 Form 10-K was filed,

FINRA and the CBOE began to hold discussions with MF Global's senior executives about the

proper capital treatment for Euro sovereign debt RTM transactions. According to Ketchum's

Congressional testimony, FINRA asserted in those discussions that "not enough capital was

reserved against the RTM." Ketchum further testified that, "[w]hile the SEC has issued guidance

clarifying that RTM transactions collateralized by U.S. Treasury debt do not require capital to be

reserved, there is **no** such relief for RTMs collateralized by debt of non-U.S. governments."

225.   Consistent with Ketchum's account, in his December 15, 2011 Congressional

testimony, Corzine stated that he discussed the Company's Euro sovereign debt RTM

transactions with officials from the SEC, CFTC, FINRA and perhaps other regulators at a

meeting at MF Global's offices on or about June 14, 2011. Corzine further testified that he

recalled becoming aware by approximately the first week of August 2011 that FINRA officials

were considering whether to require MF Global to modify the Corzine Trade's capital treatment

under SEC Rule 15c3-1, which is commonly referred to as the "Net Capital Rule."

226.   In his testimony before the Financial Services Subcommittee on December 15,

2011, Ketchum explained the Net Capital Rule as follows:

> The primary purpose of the SEC's net capital rule, 15c3-1, is to protect customers and creditors of a registered broker-dealer from monetary losses and delays that can occur if that broker-dealer fails. It requires firms to maintain sufficient liquid assets to satisfy customer and creditor claims. . . . The net capital rule is intended

to provide an extra buffer of protection, beyond rules requiring segregation of customer funds, so that if a firm cannot continue business and needs to liquidate, resources will be available for them to do so.

227.     Accordingly, while recording RTM transactions as "sales" was consistent with GAAP, FINRA concluded that, to comply with the Net Capital Rule, the value of those assets would have to be discounted for risk – or subject to "haircuts" – because the Euro sovereign debt RTM transactions were more analogous to long positions in sovereign debt, which are treated as non-convertible debt (that have a risk charge), than they are to RTM transactions involving U.S. Treasuries (that do not have a risk charge).

228.     Consequently, FINRA asked MF Global to provide a "Proposed Default Risk Charge" on the collateral supporting the Corzine Trade. In response, MF Global employees Mike Bolan (another MFGI Assistant Controller, like O'Brien) and Matthew Hughey (Head of MF Global's Financial Regulatory Group) assembled and circulated for internal consideration five possible computations for the Proposed Default Risk Charge, ranging from $7.6 million to $98.2 million. On August 11, 2011, MF Global sent a memo to FINRA setting forth a Proposed Default Risk Charge of $55.8 million, which was within the range calculated by Bolan and Hughey. This memo to FINRA also reiterated MF Global's objection to any such charge.

229.     Thereafter, anticipating that FINRA would assess a capital charge that would impact the Company's August 2011 net capital requirements, internal discussions about transferring the Corzine Trade to Special Investor, FINCO, MFG-UK or another third party gained traction. However, as explained in the SIPA Report, none of the transfer options were suitable because each involved posting additional capital, recognizing substantial immediate economic losses or overcoming regulatory opposition.

230.     Rather than promptly reserving this additional capital, however, MF Global initially resisted FINRA's pressure and commenced a lobbying effort. MF Global executives

held more than a dozen meetings and calls with regulators, including an in-person appeal by Corzine to the SEC. On or about August 15, 2011, according to his subsequent testimony before Congress, Corzine met with an SEC official to question FINRA's interpretation of the Net Capital Rule. But the SEC sided with FINRA despite Corzine's pleas. Within days of Corzine's August 15 meeting, the SEC told MF Global that it had to reserve the requisite capital and, as a result, MF Global was forced to set aside $60 million of additional capital.

231.    Around this same time in mid-August 2011, the FSA began to express heightened concern about MFG-UK's role in the Corzine Trade and ordered MFG-UK to provide a contingency plan for liquidity stress. In response to the FSA's mandate, MF Global personnel acknowledged in internal communications cited in the SIPA Report that, if MFG-UK faced a $900 million margin call on Euro sovereign debt RTM positions, "*there is no way we could support [it]*." Despite this internal recognition, MFG-UK represented to the FSA that it had "sufficient intraday liquidity" to meet a stressed liquidity need of $841 million without disrupting its business.

232.    Back in the U.S., on August 24, 2011, FINRA informed MF Global that, by the close of business the next day, MF Global was required to take a charge of approximately $257 million on all of its Euro sovereign debt RTM transactions as "securities owned haircuts." In preparation for the impact of this capital charge on its August 2011 FOCUS report,[12] the Company took steps to increase excess net capital by $183 million to $287 million. But a few days later, FINRA advised that, rather than applying new capital charges only prospectively, MF

---

[12] "FOCUS" is the acronym for a "Financial and Operational Combined Uniform Single" report. FINRA member firms are required to submit periodic FOCUS reports to FINRA under SEC Rule 17a-5. A FOCUS report consists of a balance sheet, income statement, statement of changes in ownership equity and a complete Net Capital Rule calculation. FINRA staff reviews a FOCUS report to monitor a broker-dealer's financial trends and to determine if a firm has maintained Net Capital Rule compliance. FOCUS reports are submitted quarterly or monthly, depending on the broker-dealer.

Global would also be required to **restate** its July 2011 FOCUS report to retrospectively reflect the modified capital treatment. The retrospective application of the capital charge to the July FOCUS report resulted in a regulatory net capital deficiency of $150.6 million as of July 31, 2011 (as compared to the previously reported excess of $104.3 million).

233.   On August 31, 2011, MF Global filed an amended July FOCUS Report to disclose its $150.6 million regulatory capital deficiency. Pursuant to SEC Rule 17a-11 and CFTC Rule 1.12, the Company also notified the SEC, CBOE and FINRA of its capital deficiency. Thereafter, FINRA placed MF Global on "alert reporting," a heightened monitoring regime under which FINRA requires firms to provide weekly information on net capital, inventory and P&L and reserve formula computations.

234.   On September 1, 2011, the Company amended its previously filed Q1'12 Form 10-Q to identify the change in the Corzine Trade's net capital treatment (the "Q1'12 Form 10-Q/A"). The Q1'12 Form 10-Q/A stated in part:

> The Company was recently informed by [FINRA] that its regulated U.S. operating subsidiary, MF Global Inc., is required to modify its capital treatment of certain repurchase transactions to maturity collateralized with European sovereign debt and thus increase its required net capital pursuant to SEC Rule 15c3-1. MF Global Inc. has increased its net capital and currently has net capital sufficient to exceed both the required minimum level and FINRA's early-warning notification level. *The Company does not believe that the increase in net capital will have a material adverse impact on its business, liquidity or strategic plans*. In addition, the Company expects that its regulatory capital requirements will continue to decrease as the portfolio of these investments matures, which currently has a weighted average maturity of April 2012 and a final maturity of December 2012.

235.   Significantly, as described in the June 4, 2012 First Report of Chapter 11 Trustee Louis J. Freeh, which is based on "a review of internal documents, interviews with current and former employees, and discussions with third parties with knowledge of the situation" (the "Freeh Report"), the above-quoted disclosure in the Q1'12 Form 10-Q/A did not disclose that MF Global was only able to meet its new capital requirements by engaging in inter-company

transfers. Specifically, in late August 2011, MF Global entered into what the Freeh Report calls "'back-to-back' reverse RTM" transactions with FINCO. These reverse RTM transactions effectively made FINCO the beneficial holder of €2.925 billion of Italian bonds, and allowed MF Global to transfer the economic risks from one of its regulated entities – MFGI – to one of its unregulated entities – FINCO – thereby reducing its regulatory capital requirements.

236.    But even with MF Global's representation in the Q1'12 Form 10-Q/A that it was able to meet and exceed its regulatory capital requirements, the FINRA ruling still had a devastating (but undisclosed) impact on the Company's already-existing liquidity problems (with the Company relying upon intraday transfers from its FCM, including at times **customer funds**, to meet increasing liquidity demands, which are further detailed below in Sections IV.G-H).

237.    As described by Corzine in his December 15, 2011 testimony before the Financial Services Subcommittee:

> On October 17, 2011, *The Wall Street Journal* published an article that described the FINRA ruling that MF Global had disclosed on September 1. Other news stories followed and some of MF Global's counterparties decided to reduce their exposure to the company, requiring some adjustment in our financing.

238.    In fact, following FINRA's ruling, other regulators and exchanges also increased their focus on MF Global's financial condition, including the following adverse developments: (1) excess margin for Company house accounts was no longer automatically returned, and margin requirements were otherwise increased; (2) the Depository Trust & Clearing Corporation ("DTCC") imposed a margin premium of 25% for ninety days; (3) FINRA limited MF Global's underwriting activities to "Best Efforts"-based transactions only, and instructed MF Global that it could not conduct any "Firm Commitment" underwritings until the perceived risk of the Euro sovereign debt collateralizing the RTM portfolio was sufficiently reduced; (4) on September 9, 2011, a representative from the Office of the Comptroller of the Currency ("OCC") asked MF

Global to explain why it failed to provide the OCC with an "Early Warning Notice" about FINRA's decision to increase its net capital requirement; and (5) the New York Federal Reserve Bank raised questions about FINRA's net capital decision, the RTM positions and the Company's net capital requirement.

239.    Meanwhile, in the U.K., on September 23, 2011, MFG-UK executives met with FSA officials because, according to the SIPA Report, the FSA was still "uncomfortable with [MFG-UK's] liquidity position and . . . [its] intraday liquidity position." As noted in the SIPA Report, a key topic of discussion between the FSA and MFG-UK was the possibility of an intraday margin call from the LCH, and what would happen if MFGI failed to fund MFG-UK to meet such a margin call.

240.    Notwithstanding the chain of additional adverse events set in motion by the filing of the Q1'12 Form 10-Q/A, the disclosure therein was still materially inadequate. According to Abelow's October 31, 2011 declaration in the U.S. Bankruptcy Court for the Southern District of New York:

> Dissatisfied with the September announcement of [MF Global's and MFGI's] position in European sovereign debt, FINRA demanded that [MF Global] announce that [MFGI] held a long position of $6.3 billion in a short-duration European sovereign portfolio financed to maturity, including Belgium, Italy, Spain, Portugal and Ireland. MF [Global] made such announcement on October 25, 2011. . . . These concerns ultimately led last week to downgrades by various ratings agencies of MF Global's ratings to "junk" status. This sparked an increase in margin calls against MFGI, threatening overall liquidity.

241.    Accordingly, as set forth below in greater detail, none of MF Global's pre-October 25, 2011 disclosures was sufficient to fully inform the investing public about the substantial risks associated with the Corzine Trade, including that those risks were assumed on a purely proprietary (rather than customer-driven) basis. Moreover, once regulators required MF Global to reserve additional capital against the Corzine Trade and liquidity demands from the

Corzine Trade continued to increase, the Company no longer had the ability to continue with its Euro sovereign debt RTM trading strategy, and the Company's massive DTA valuation allowance and ratings downgrades followed.

## 2.    The SEC Comment Letters

242.    While FINRA was pushing MF Global to disclose material information associated with the Corzine Trade, the SEC was also informally investigating MF Global's related disclosures.

243.    On March 16, 2011, the SEC's Division of Corporation Finance sent a comment letter to Defendant MacDonald concerning the 2010 Form 10-K (the "First Comment Letter"). The First Comment Letter addressed the 2010 Form 10-K's footnote 2, headed "Summary Of Significant Accounting Policies, Securities Purchased Under Agreements To Resell And Securities Sold Under Agreements To Repurchase." The First Comment Letter asked MF Global to justify its accounting for RTM transactions as "sales" and also asked MF Global to describe the reasons for structuring repo agreements as sales rather than as collateralized financings.

244.    On March 30, 2011, Defendant Steenkamp sent a letter to the SEC in response to the First Comment Letter (the "First Response"). The First Response addressed the terms that resulted in RTM transactions qualifying as sales rather than collateralized financings and explained that the "rationale for structuring repurchase agreements as off-balance sheet sales is to take advantage of opportunities in the market and lock in the return on a transaction for the duration of the security," and also to take advantage of "arbitrage opportunities."

245.    The First Comment Letter also asked MF Global to explain the extent to which the RTM transactions qualifying for off-balance sheet sales accounting were concentrated with certain counterparties or within certain countries. In the First Response, MF Global stated that "*[t]he underlying collateral for these repo-to-maturity agreements was U.S. Treasury*

**securities, and as such we had concentration risk with the U.S. as an issuer, which we did not consider a significant exposure**." Accordingly, MF Global's First Response addressed only RTM transactions collateralized by U.S. Treasuries disclosed in the 2010 Form 10-K. The First Response therefore did not address the Corzine Trade.

246.   Dissatisfied with the Company's First Response, the SEC continued to investigate. On May 26, 2011, just six days after the 2011 Form 10-K (for the fiscal year ended March 31, 2011) was filed, the SEC's Division of Corporation Finance sent a second comment letter to Defendant MacDonald (the "Second Comment Letter"). The Second Comment Letter also concerned RTM transactions, but this time the SEC asked questions about the 2011 Form 10-K, not the 2010 Form 10-K. The Second Comment Letter specifically sought a more "robust explanation" of the "significant variations" between the average levels of MF Global's repos and the amounts outstanding at each quarter end. The Second Comment Letter also asked for an example of future disclosure on this issue.[13]

247.   On June 10, 2011, Defendant Steenkamp responded to the SEC's May 2011 comment letter (the "Second Response"). MF Global's Second Response devoted one paragraph to repo transactions accounted for as collateralized financings (which consistently decreased near quarter-end), and another paragraph to off-balance sheet – referred to as "de-recognized" – RTM transactions (which, unreported to investors, consistently increased near quarter-end). With respect to off-balance sheet RTM transactions, the Second Response stated:

> As of March 31, 2011, the ending balance of our repurchase agreements qualifying for sales accounting was $14.5 billion, which was 28% higher than the quarterly average balance of repurchase agreements qualifying for sales accounting of $11.3 billion. This difference is principally attributable to our increased trading in repurchase agreements qualifying for sales accounting with

---

[13] As discussed above in ¶ 174, MF Global's increased use of RTM transactions near the end of a quarter to boost reported quarterly revenue is known as "window dressing."

respect to opportunities available in the European fixed income market. Credit uncertainty in the Sovereign debt markets increased the interest spread between the cash and repurchase market. During fiscal 2011, this created arbitrage opportunities in interest spreads, which increased the balances of our repurchase agreements qualifying for sales accounting.

248.    Shortly after the Second Comment Letter, and with Corzine still continuing to add to MF Global's Euro sovereign debt RTM portfolio in July 2011 – including €200 million of Italian bonds acquired in mid-July 2011 – even Stockman stopped supporting Corzine. In a July 30, 2011 email cited in the SIPA Report (and noted in ¶ 205 above), Stockman told Corzine, "I am not currently supportive of buying more sovereigns" because of concerns about MF Global's ability "to comfortably post initial and variation margin in light and heavier stress scenarios."

249.    As a result, MF Global's July Euro sovereign RTM-generated revenues plummeted by ***approximately 97%***, to $1.1 million from over $39.6 million in June 2011. Shortly thereafter, in August 2011, according to Stockman's Congressional testimony, MF Global stopped adding to its long position in Euro sovereign debt and allowed its existing positions to roll off as the underlying securities matured. Because the stream of revenues from the Corzine Trade suddenly stopped flowing and therefore MF Global needed to record a massive DTA valuation allowance, MF Global could no longer avoid a credit ratings downgrade. The DTA valuation allowance, credit rating agency downgrades and expected "run on the bank" all followed, and the Individual Defendants began planning for catastrophe.

250.    For instance, according to the December 31 *WSJ* Article, MF Global's management circulated a memo to employees in September 2011 with suggestions on ways to be frugal, including a directive to print on both sides of sheets of paper. Earlier that same month, as set forth above in ¶¶ 136-37, the MF Global Board requested the Break-the-Glass-Document to plan for a "storm" of various stress scenarios following a negative market reaction to the Company's upcoming financial report. On October 13, 2011, the Break-the-Glass-Document was

presented to the Board. As set forth therein, a credit rating downgrade was expected to cause "significant disruption" to the Company's ability to finance daily operations. The circumstances that triggered MF Global's collapse were thus fully anticipated by the Individual Defendants.

### G. MF Global's Liquidity Crisis Is Masked By Intraday (And Overnight) Transfers, Including Unlawful Transfers From Customer Accounts

251. While the liquidity crisis that led to MF Global's demise reached its fatal climax during the Company's last week of operations, MF Global had actually been suffering a severe liquidity crisis for quite some time. The risks from the Company's lack of liquidity were evident to insiders but masked – at the direction of MF Global's senior executives – by intraday transfers and the unlawful use of segregated customer funds.

### 1. Background On Segregated Customer Accounts And The Use Of Intraday Transfers At MF Global

252. FCMs like MFGI are required to segregate and protect customer cash and may not use customer cash for their own purposes. But FCMs are permitted to, and in the ordinary course do, deposit non-customer funds into segregated customer accounts; and FCMs may use those funds for their own purposes under certain circumstances.

253. As described in the SIPA Report, MF Global executives referred to Company funds kept in customer accounts as "Firm Invested in Excess." This Firm Invested in Excess amount acted as a cushion to prevent shortfalls in customer funds owing to changing margin requirements resulting from daily market movements. The benefit of having such Company funds as a cushion are achieved, however, only when funds removed from those accounts for proprietary use are limited to the Firm Invested in Excess, *i.e.*, the amount above the level needed to satisfy customer obligations on a net basis.

254.     The regulations for segregated customer accounts require a daily accounting of the net liquidation value of all ***domestic*** customer funds using the "Net Liquidating Method."[14] CFTC regulations during the Class Period, however, did not require that all customer funds necessarily be maintained on a dollar-by-dollar basis in ***foreign*** secured accounts. Unlike domestic segregated customer accounts, CFTC regulations during the Class Period allowed an "Alternative Method" of calculating whether foreign secured accounts were in regulatory compliance – even though less than all customer funds deposited for trading on foreign exchanges might actually be deposited in foreign secured accounts.[15] According to the SIPA Report, MFGI used this Alternative Method to calculate "Regulatory Excess" funds, or customer funds purportedly in excess of those required to be segregated. The SIPA Trustee has reported that using the Alternative Method, as compared to the Net Liquidating Method, resulted in a significantly lower amount of customer funds being secured – "***and contributed significantly to the eventual shortfall in customer funds***."[16]

255.     According to the SIPA Report, because the CFTC required these calculations to be performed "as of the close of business each day," there were differing views as to whether segregated customer funds had to be "locked up" for the benefit of customers on an ***intraday*** basis. Ultimately, MF Global's most senior executives considered Regulatory Excess funds an appropriate source for intraday transfers to fund proprietary activities, even though others were of the (correct) view that Regulatory Excess funds had to be "locked up" for the benefit of the

---

[14] The Net Liquidating Method is calculated from the sum of the net liquidating value of customer accounts plus any customer securities held. *See* Foreign Futures and Options Guide, The Joint Audit Committee, Dec. 2001, at 5-5.

[15] The Alternative Method is the sum of an account's risk maintenance margin requirement, open trade equity, securities and net options value. *See* 17 C.F.R. § 1.3(rr); Foreign Futures and Options Guide, The Joint Audit Committee, Dec. 2001, at 5-6.

[16] Following MF Global's collapse, on July 13, 2012, the CFTC prohibited FCMs from using the Alternative Method to calculate Regulatory Excess funds.

Company's customers, even on an intraday basis.[17] The SIPA Report confirms that Regulatory Excess funds were used for intraday funding of the Company's non-FCM business (and Firm Invested in Excess funds at the FCM were used both for intraday and overnight funding of the non-FCM business).

256.     As set forth above, Corzine's efforts to make MF Global profitable by seeking to transform it into an investment bank led to dramatically increased liquidity needs as a result of increased proprietary trading, including Euro sovereign debt RTM trading. The then-existing available sources of non-customer funds included: (1) a $1.2 billion unsecured revolving credit facility with a bank syndicate, for which J.P. Morgan Chase ("JPMC") – which had multiple business relationships with MF Global, including clearing bank, custodian for segregated customer funds – was agent; (2) a $300 million secured revolving credit facility with a bank syndicate, for which JPMC was agent; (3) other sources of proprietary funds, such as debt offering proceeds; and (4) Company funds in the domestic segregated customer and foreign secured accounts, *i.e.*, Firm Invested in Excess amounts. As MF Global faced increasing pressures to generate liquidity while simultaneously experiencing a decrease in available counterparty financing, Defendants Corzine and Steenkamp increasingly looked to Regulatory Excess funds – which included customer funds – as an additional source of liquidity for its non-FCM operations, although they were advised that Regulatory Excess (or customer) funds could not be used overnight by the Company.

257.     As detailed in the SIPA Report, for at least one year before MF Global's bankruptcy – approximately the same time as the Corzine Trade was launched in the fall of 2010 – the Company's FCM operations, which operated out of Chicago, provided intraday "loans" or

---

[17] According to the August 1, 2012 Congressional testimony of CFTC Chairman Gary Gensler, CFTC rules forbid even intraday transfers of FCM customer funds.

transfers to the Company's non-FCM operations in New York. These intraday transfers were usually in the range of $50-100 million and were typically repaid the same day, but sometimes remained outstanding overnight or longer. There were no terms or interest, but simply an expectation that the funds would be returned.

258.    When requests for intraday transfers were made from MF Global's non-FCM operations in New York to the Company's Treasury department in Chicago, O'Brien – or personnel reporting to her, including Jason Chenoweth and Joseph Cranston – would approve the transfers and then direct from which account to send them. Critically, according to the SIPA Report, despite the fact that MFGI operated in a world of fast-paced electronic transactions, the tracking of the intraday "loans" and corresponding repayments was done manually on spreadsheets and journal entries – and was not performed consistently. In addition, the members of MF Global's Financial Regulatory Group, who were responsible for tracking regulatory balances and preparing regulatory reports, were not involved at all in the intraday transfer approval process.

259.    Moreover, while the Company's Treasury department in Chicago was responsible for funding the liquidity of the non-FCM business in New York, there was limited communication about the basis for intraday funding requests or the intended or actual use of those funds. As described in the SIPA Report, employees in MF Global's Treasury department grew increasingly frustrated that MF Global's FCM business was being used to fund its non-FCM business, and were particularly concerned that there was no transparency as to where the funds were going. Indeed, as further detailed below, documents cited in the SIPA Report reflect that O'Brien and MFGI's CFO, Christine Serwinski ("Serwinski"), were acutely aware of and concerned about regulatory compliance issues concerning customer funds. To wit, an October

26, 2011 email from O'Brien cited in the SIPA Report states: "We cannot afford a SEG issue." Another email cited in the SIPA Report sent by Serwinski on October 27, 2011 states: "I am concerned that the fcm lent the bd 200mil. Is that correct and that the firm deficit in excess is **_neg 300+ mil_**?"

### 2. MF Global's Most Senior Executives Use Inter-Company Transfers To Meet Increasing Daily Liquidity Needs

260. In July 2011, as detailed in the SIPA Report, Defendant Steenkamp asked Serwinski to review trends in customer accounts to consider whether $250 million in Regulatory Excess (or customer) funds could be "loaned" overnight on a more regular basis from FCM to non-FCM operations. This proposal was a dramatic change from the Company's then-current practice, which was limited to using Company funds (or Firm Invested in Excess amounts at the FCM) for overnight funding. On July 19, 2011, Serwinski wrote an email that is cited in the SIPA Report, stating: "It did not sound like they were just looking for the firm invested amount in excess but more such that the **_customers funds_** not required from a secured regulatory computation would be tapped into."

261. In response to Steenkamp's request, Serwinski undertook a trend analysis and reviewed the balances in domestic segregated customer accounts and foreign secured accounts from July 1, 2010 to July 18, 2011. The results showed that Regulatory Excess funds in the domestic customer accounts ranged from a low of approximately $20 million to a high of over $700 million, and that Regulatory Excess funds in foreign secured accounts, under the Alternative Method, ranged from a low of over $340 million to a high of over $800 million. When the excess was calculated using the Net Liquidating Method, however, according to the SIPA Report, "the resulting Firm Invested in Excess in the combined accounts was much lower: it ranged from a low of approximately **_negative $98 million_** on October 11, 2010 to a high of

over $600 million on October 13, 2010." When Matthew Hughey, Head of MF Global's Financial Regulatory Group, further reviewed the records for the same one-year period, he concluded that there were actually five days when the Firm Invested in Excess amount was *negative*.

262.    On July 27, 2011, Serwinski forwarded her trend analysis to Steenkamp and others, noting her concerns that "FCM client assets may be put at risk even if for overnight. . . . Utilizing the FCM client asset [base] should not be a BD working capital source strategy to be relied upon." She also asked: "In the event of a financial crisis, are we guaranteed that we could draw down on the RCF [revolving credit facility] to meet the firm liquidity needs and return the FCM *client assets* to meet any requirements in the seg/secured environment?" After reviewing the trend data, Steenkamp responded that they should look to the "lower end of the range" of the Regulatory Excess – which he identified as $433 million – as the maximum client excess liquidity available to the non-FCM business. According to the SIPA Report, that amount was "vastly greater than the low end or even the average range of Firm Invested in Excess."

263.    In response, Serwinski prepared a written memorandum, dated July 28, 2011, to address management's proposal to tap into Regulatory Excess funds to fund the Company's proprietary trading (the "Serwinski Memo"). The Serwinski Memo concluded that, based on FINRA's interpretations of SEC Rule 15c3-3 (which is commonly referred to as the "Customer Protection Rule"), to the extent customer balances on deposit in domestic and foreign customer accounts were less than the amount required to be secured under the Net Liquidating Method, the difference would have to be included in the lock-up requirement of the Rule 15c3-3 calculation, performed as of the close of business every Friday and at month end. The Serwinski Memo also stated that overnight "loans" needed to be limited to the amount of Firm Invested in Excess;

otherwise, if the calculation of Firm Invested in Excess was negative, the deficiency amount would need to be locked up in the Company's 15c3-3 calculation the next time it was required.

264.    On August 3, 2011, Steenkamp advised Serwinski that he had "walked Jon [Corzine] through" the regulatory requirements, and confirmed that they both understood the concept of the lock-up and agreed that the Company had to comply with it. But Corzine still wanted to know how, on a daily basis, MF Global could use: (1) all of the surplus (even if it was only $50 million) to "maximize it through daily liquidity management"; and (2) other securities to fund the lock-up.

### 3.    Inter-Company Transfers Become A "Shell Game"

265.    MF Global employees have reported that, during the summer of 2011, the intraday transfers that had commenced intermittently the year before became a ***daily occurrence***. In addition to the intraday transfers described above, the SIPA Report details other inter-company transfers from the FCM that were kept overnight or longer.

266.    For example, on July 26, 2011, after O'Brien approved a $100 million overnight transfer from FCM to non-FCM operations, she reported to Mathew Besgen (Senior Vice President in Treasury, with responsibility for short-term funding and investments) and David Dunne (Chair of the Company's Assets and Liability Committee ("ALCO"))[18] that "Christine [Serwinski] was not pleased about the late hour borrow or the size. The borrow is $100mm and the Seg excess is currently $127mm." Serwinski proceeded to ask O'Brien: "What if I say no? What if they needed $150mm and I only gave them $100mm?" O'Brien's response was that

---

[18]  As detailed in the SIPA Report, MF Global's ALCO consisted of MF Global senior personnel from the Finance, Treasury and Risk Departments and various product groups that were charged with "overseeing and influencing the management of capital, liquidity and investment related risks throughout the Company in accordance with the Risk Policy, Risk Appetite Statement, and Delegations of Authority." Among the liquidity responsibilities assigned to the ALCO were: "Overseeing the day-to-day activities related to the management of liquidity throughout the Treasury and related operations within the Company"; and "[c]onsidering the results of liquidity adverse scenarios, drawing conclusions and recommending appropriate action."

"Bob Lyons would need to go to Brad [Abelow] saying they were . . . short and . . . Brad [Abelow] would have to address with Finance." A few days later, on Friday, August 5, 2011, $226 million was transferred from the FCM accounts and only $155 million was returned, leaving a deficit balance of some $71 million owed to the FCM. This deficit remained until October 7, 2011, when it was reduced to $53 million, although it was later increased and never repaid.

267.    In addition, during the period August 1 through October 25, 2011, the FCM made transfers to clearing accounts, some of which remained unpaid overnight or for several days. For example, on October 11, 2011, a $50 million transfer from MF Global's FCM operations was not returned by its non-FCM operations, with the result that the Firm Invested in Excess was *negative* that day.

268.    Further, while the majority of the intraday transfers from MF Global's FCM went to support proprietary trading activities, FCM funds were also transferred on a weekly basis to fund securities customers' account withdrawals. The SIPA Report describes in detail how securities customer withdrawals were approved by the Company's Margin Department:

> Treasury Operations sent wires to securities customers from the JPM BD Wire Account, but if there were insufficient funds available, Treasury Operations would first transfer funds from the JPM Foreign Secured Trust Account to the JPM BD Wire Account. Treasury Operations was to "bill" Operations in New York via email for the advance funds. Each Tuesday, after the Rule 15c3-3 calculation was performed and excess funds could be released, funds to repay the FCM were supposed to be transferred back to [a] JPM[C] Foreign Secured Trust Account.

269.    Given the flurry of intra-company fund transfers described above, on August 11, 2011, in an email exchange between O'Brien and a Global Treasury employee at MF Global Hong Kong, O'Brien reflected on the Company's liquidity crisis as follows: "Henri [Steenkamp] says to me today . . . 'we have plenty of cash.' I was rendered speechless, and wanted to say

'*Really, then why is it I need to spend hours every day shuffling cash and loans from entity to entity?*'" – a process that she described as a "*shell game*."

### 4. Liquidity Monitoring During The Class Period

270. As referenced above, MF Global's Financial Regulatory Group was responsible for preparing the daily domestic customer funds "Segregation Statements," foreign customer funds "Secured Statements" and "Net Capital Reports" that MF Global was required to file with regulators. Before the finalization and filing of these reports, as explained in the SIPA Report, internal versions with additional information not included in the filed versions were widely distributed within the Company on a *daily basis*. These internal versions showed the amount of Firm Invested in Excess and calculations under both the Net Liquidating Method and the Alternative Method. Reports filed with the CFTC, however, showed only the Alternative Method for the foreign customer funds Secured Statement and not the foreign customer funds under the Net Liquidating Method or MF Global's Firm Invested in Excess.

271. According to the SIPA Report, these internal Segregation and Secured Statements were sent to MF Global's Treasury and Treasury Operations Departments, as well as the Financial Regulatory Group. Balances in domestic customer segregated and foreign secured accounts and Firm Invested in Excess amounts also were included on the Daily Estimated Net Capital summary that was *circulated daily* to more senior management, including Defendants Corzine and Steenkamp (and others including Abelow, Mahajan, Serwinski and O'Brien).

272. As described above in Section IV.E.2, MF Global Internal Audit reported that formal processes, reporting, forecasting and monitoring capabilities to manage liquidity and capital globally had not been fully established during the Class Period. Instead, the Company relied on ad hoc tools and individual experience to guide liquidity management. As a result, liquidity reporting was manually performed, with limited forecasting. Indeed, the SIPA Report

states that many MF Global employees "had long been requesting the IT department to automate the analysis of liquidity" because the "complexity of liquidity demands increased with the addition of principal trading across the [Company's] customer facing desks, the PSG, and other new business lines." But no such automation or monitoring solution was ever delivered. Instead, a daily (but inexact and unaudited) liquidity report was developed at some point in calendar 2010. This report was called the "Liquidity Dashboard."

273.   Liquidity Dashboards were used at MF Global to estimate daily cash needs and to identify sources and uses of liquidity. According to the SIPA Report, Liquidity Dashboards were shared with senior management, including Corzine and Steenkamp, *daily*. The Liquidity Dashboard showed Corzine and Steenkamp that, during the month of October 2011, and for some time before, liquidity in MF Global's BD operations was ***uniformly negative*** before applying funding from other sources – namely, funding from FCM operations or FINCO.

274.   On August 26, 2011, Mathew Besgen (Senior Vice President in Treasury) reported to the Financial Regulatory Group that he was "being asked on a daily basis to update Jon Corzine on the Daily Seg and Secured Excess and the drivers of the changes day over day." On September 1, 2011, Besgen emailed O'Brien to inquire about a decrease in the Firm Invested in Excess number by $50 million to $69 million, and asking for a "preliminary snapshot" as to what the excess balance may be "so he could project what funds may be available to the BD if they needed to have funds transferred (over and above the funds from FINCO)." On September 16, 2011, O'Brien advised that the FCM had identified a "lower than usual 'seg excess' which is the liquidity figure $25 million versus $70 million average."

275.   As the liquidity stress increased in October, senior MF Global executives became increasingly engaged in monitoring liquidity and remained aware of reliance on FCM funds to

help fund other operations. For example, on October 6, 2011, Steenkamp addressed an email to

Corzine, stating:

> *Jon . . . we need to address the sustained [liquidity] stress.* In summary, we have three pools of liquidity for Inc. - (1) finco cash which is real and permanent, (2) *FCM excess cash which is temporary and volatile*, [and] depends on how customers post margin, and (3) the situation of our broker-dealer that is currently unable to fund itself, and more worrying continues to need more cash than we have [from] finco, thereby having us dip into FCM excess every day. *This should be temporary but is becoming permanent, and the FCM cash is not reliable. Why is the BD unable to fund itself? Part of it is the permanent pool of liquidity needed for RTM's, but we also see continued haircut increases in fixed income, increased funding needed PSG and box size being permanently large*.[19]

276.     Following Corzine's receipt of this email, as described in the SIPA Report,

Steenkamp confirmed for Corzine that the dangers of "dip[ping] into the FCM excess every day"

were corroborated by the Liquidity Dashboards.

277.     Thereafter, on October 14, 2011, Mathew Besgen wrote to Steenkamp and others

that liquidity was so strained that the BD would be relying upon a "$53mm FCM balance" plus

$16mm of "FCM buffer," noting that this was the "[f]irst time that the B/D has relied upon the

FCM buffer." The SIPA Report states that this "FCM Buffer" consisted of a portion of

Regulatory Excess that was previously considered but rejected in late July 2011 as a source of

liquidity per the Serwinski Memo. Accordingly, Mahajan advised Steenkamp and Stockman as

follows: "[T]he B/D is leaning on FINCO and FCM's cash pool. We now require $16mm of the

FCM's buffer as well. This leaves us with $24mm of liquidity, and no buffer for the U.S. going

into the weekend."

278.     As of Friday, October 14, 2011, internal statements cited in the SIPA Report

showed a Firm Invested in Excess *deficit* of more than $68.4 million. To cover this deficit,

---

[19] According to the SIPA Report, "box size" refers to the amount of securities held in the clearance box at depositories. Because of MF Global's historically weak credit rating as well as the deteriorating quality of certain fixed income securities in its inventory, those securities were harder to finance in the repo market, and so remained in inventory overnight.

Serwinski advised Steenkamp and others that the Rule 15c3-3 computation being prepared as of the close of business that day would need to include a lock-up of approximately $70 million. When the calculation was made, to meet the deficit, the Company used a majority of the buffer in the Rule 15c3-3 account and locked up an additional $28 million. MF Global then did a "special" Rule 15c3-3 calculation on Tuesday, October 18, 2011 (instead of waiting to perform the calculation as of the close of business on Friday, October 21, 2011), which resulted in a decreased reserve requirement and allowed funds to be released from the account.

279.    In addition, as described in the SIPA Report, Mahajan also communicated on October 14, 2011 that "***Jon [Corzine] wants to know the details of the cash movements between yesterday and today***." In response, O'Brien explained that "[i]t is critical to note that FCM liquidity is driven from the Daily Segregation calculation, not cash movements." Three days later, on October 17, 2011, Mahajan wrote to Defendant MacDonald with a copy to Defendant Steenkamp stating, "Henri [Steenkamp] gets it. He has talked to both Jon [Corzine] and Brad [Abelow] telling them that we cannot rely on FCM cash to meet our daily operational needs." Nevertheless, MF Global continued to do so.

280.    As described in the SIPA Report, when the Daily Estimated Net Capital summary as of the close of business on October 26 was shared with Corzine, Steenkamp and others, it showed Firm Invested in Excess of ***negative $341 million*** and excess segregated funds of $116 million. The Company had failed, however, to deduct $415 million of outgoing wires from the customer segregated assets, thus overstating the customer balances that day by $415 million. When that difference is taken into account, there was a ***deficiency*** of segregated customer funds in the amount of $299 million on October 26, 2011. This deficiency continued and increased throughout the week.

281.   On October 31, 2011, the date MF Global filed for bankruptcy, the deficit in the customer segregated accounts was shown to be more than *$589 million*.

### H.   The Truth Begins To Emerge In MF Global's Frenetic Final Days

#### 1.   October 17, 2011-October 27, 2011

282.   During the week of October 17, 2011, according to the March 28, 2012 testimony of MFGI's CFO Serwinski before the Financial Services Subcommittee, MF Global senior management informed all three rating agencies that the Company expected to report a substantial Q2'12 loss. As set forth above, the largest component of this loss was driven by MF Global's (belated) DTA valuation allowance.

283.   On Thursday, October 20, 2011, according to the February 2, 2012 testimony of S&P's Craig Parmalee before the Financial Services Subcommittee, S&P analysts met with MF Global management to obtain additional information about the Company's upcoming earnings release, Euro sovereign debt RTM portfolio and strategic plan of action in the event of a downgrade. During this meeting, according to Parmalee's testimony, MF Global executives stated that the Company's "*financial condition was strong*." As a result, S&P told MF Global that it did not plan to downgrade the Company's credit rating, according to the March 28, 2012 Congressional testimony of MF Global General Counsel Laurie Ferber ("Ferber").

284.   The next day, on Friday, October 21, 2011, Corzine and other MF Global senior executives met with Moody's analytical team to discuss the Company's upcoming Q2'12 earnings release. According to the Congressional testimony of Moody's Chief Credit Officer, Richard Cantor, Moody's was told at this meeting that MF Global expected to report a significant Q2'12 loss and that gross leverage had increased. Cantor further testified that this information showed MF Global was not satisfying the criteria necessary to avoid a downgrade.

285.    Moreover, during this October 21 meeting, Moody's learned for the first time that MF Global's RTM transactions were purely proprietary, not client-driven trading positions. Cantor testified on this point as follows:

> During the meeting, MF Global made clear to Moody's for the first time that MF Global's repurchase-to-maturity transactions were not client-driven transactions, but instead were purely proprietary trading positions. Moody's had [previously] understood that MF Global was expanding its principal trading activity for the primary purpose of facilitating customer transactions, as opposed to generating trading profits. That understanding was developed over time through numerous meetings and discussions with MF Global management, and a review of information provided by the company and public filings.

> In Moody's view, MF Global's decision to assume large credit exposures that were not client-driven and represented a multiple of the company's outstanding common equity highlighted MF Global's increased risk appetite – in the absence of a parallel increase in capital.

286.    On Monday, October 24, 2011, the first business day after Moody's meeting with MF Global senior executives, Moody's downgraded the Company's long-term debt by one ratings notch to Baa3. This placed MF Global one notch above junk status, and brought Moody's rating in line with S&P's and Fitch's ratings. Moody's also announced that the Company's rating remained under review for possible further downgrade. As noted by the SIPA Report, Moody's viewed MF Global's increased Euro sovereign debt exposure and the fact that it had to inject capital as an indication of problems with the Company's risk appetite and risk governance.

287.    That same day, on October 24, 2011, to ward off fallout, Defendant Steenkamp sent an e-mail to S&P stating that MF Global's "***capital and liquidity has never been stronger***," and that "MF Global is in its ***strongest position ever*** as [a] public entity." To the contrary, however, the Break-the-Glass-Document had already been circulated within the Company, and an internal memo dated October 24, 2011 entitled "Intraday Liquidity Issues" – which had been circulated to Corzine and other MF Global personnel – identified "the greatest liquidity concern" to be the possibility that the LCH might impose increased margin requirements on Spanish and

Italian RTM positions (further noting that these requirements needed to be met on a same-day basis). The Intraday Liquidity Issues memo also explained that, "[u]nder these circumstances[,] MFGUK would have to honour its obligation to the clearing house before MFGI could fulfill its obligation to MFGUK." This memo further noted uncertainty as to whether the LCH would be able to use its automatic protected payment system to satisfy a margin call on a same-day basis and, assuming that it could do so, recommended that "some form of intercompany pre-margining" be put in place to protect MFG-UK from intraday shortfalls.

288.    The next day, in the morning on October 25, 2011, MF Global released its Q2'12 earnings report and announced a loss of $191.6 million. As discussed above, that loss was mostly the result of the $119.4 million DTA valuation allowance. During an investor conference call later that day, Corzine stated that MF Global's Euro sovereign debt RTM positions continued to have "relatively little underlying principal risk in the timeframe of our exposure," and that "the structure of the transactions themselves *essentially eliminates* market and financing risk." An accompanying presentation similarly stated:

> *Risk is limited . . . Solid risk management* – For any relevant risk, measures and limits are set and monitored which include: stress scenarios, concentration evaluation, credit exposure and liquidity analysis.

289.    Nevertheless, analysts reacted negatively to the Company's October 25, 2011 disclosures. For instance, on October 25, 2011, a Macquarie (USA) Equities Research analyst report highlighted troubling issues with MF Global's balance sheet:

> *Severe miss of adj. EPS, GAAP loss meaningfully reduces TBV*.

> \* \* \*

> *More critical to the stock story than the earnings picture is the balance sheet story, where $6.3b in Euro sovereign exposure has become a wildcard, worrying investors & rating agencies about potential losses & capital adequacy*.

Capital raise risk? Mr. Corzine's "4-6 qrtr" turnaround (which is 5-qtrs old), prioritized an improved credit profile, and with MF on negative outlook at rating agencies, additional capital raises could be a near-term headwind.

MF already had a weak EPS story but shares enjoyed support from TBV. ***Now, Euro sovereign exposure has introduced valuation uncertainty into the balance sheet*** and MF has apparently lost its best valuation support.

290.   Consequently, by the close of trading on October 25, 2011, MF Global's common stock declined by 48% from the prior day's close.

291.   The next day, on October 26, 2011, an analyst from J.P. Morgan issued a report raising the risk management implications of the Company's new disclosures:

MF Global has re-entered the distressed zone, with its stock down nearly 50% today. . . . ***Sovereign positions the focus. MF entered into a series of sovereign transactions that it describes as 'repo-to-maturity'. While the $6.4bn does not reside on MF's balance sheet, MF does take on the credit risk and does mark-to-market gains/losses based on the financing/repo spread***.

\* \* \*

Sovereign risk, an issue of risk management and judgment, but bigger issue is the risk within FCM. The obvious risk to sovereign exposure is default and losses associated with default given limited capital at MF. ***The risk management that allows such a position given MF's balance sheet is also worthy of discussion***.

292.   Furthermore, on the heels of the Moody's downgrade and the October 25, 2011 disclosure, counterparties to MF Global's Euro sovereign debt RTM transactions demanded additional margin and deeper haircuts on collateral. By the close of business on October 28, 2011, according to a document produced to the Financial Services Subcommittee, MF Global was required to post ***an additional $945 million*** in margin calls on RTM and other transactions.

293.   As a result of increased margin calls, according to Serwinski's testimony before the Financial Services Subcommittee, MF Global also started to receive and respond to increased inquiries about the Company's financial condition from the CME, other exchanges and regulators. Serwinski further testified that, by Wednesday, October 26, 2011, MF Global's Legal

Department was responding to an increased variety and number of legal questions from regulators, and several Board update calls were held throughout the day. Serwinski also testified that an SEC representative contacted Ferber to request a meeting with Company management and the CFTC the next day to discuss various issues, including liquidity, funding and segregated customer fund calculations.

294.    In the evening of October 26, 2011, MF Global formally retained Evercore Partners, Inc. to assist with efforts to sell all or part of the Company. MF Global also spoke with outside counsel about preparing for a possible sale or bankruptcy of the Company.

295.    Also on October 26, 2011, S&P issued a report putting MF Global's BBB- rating on "CreditWatch with negative implications." The report discussed MF Global's Euro sovereign debt RTM exposure and resulting increased risk profile, and concluded by stating that S&P could soon lower MF Global's rating to junk depending on the Company's balance sheet management, plans for future proprietary trading activity and execution of strategic plans.

296.    On Thursday, October 27, 2011, Moody's and Fitch downgraded MF Global's debt rating to junk status. In particular, Moody's stated:

> [T]he downgrade reflects our view that MF Global's weak core profitability contributed to it taking on substantial risk in the form of its exposure to European sovereign debt in peripheral countries. At the end of the second quarter, ***MF Global's $6.3 billion sovereign risk exposure represented 5 times the company's tangible common equity***.

297.    These downgrades prompted negative market reaction. For instance, Deutsche Bank issued an analyst report on October 27, 2011 noting that MF Global needed to act quickly to avoid client defections:

> Moody's and S&P have downgraded MF Global to one notch from junk status, while keeping the firm on negative watch, and Fitch has gone to junk. Each firm points to the Euro sovereign exposure, the high gross leverage, and the lack of profitability as the issue. While the expanded EFSF this morning can help to contain fears on the sovereign front and gross leverage can be reduced fairly

quickly (given the liquid repo book), profitability could take some time (as with most financial firms this quarter). Given the uncertainty around timing of the agencies next move, mgmt needs to move quickly in order to avoid client defections and either work on strategic options or work with the agencies to get back to stable status.

298.   Also on October 27, 2011, according to a March 23, 2012 memorandum published by the Financial Services Subcommittee (the "Subcommittee Memo"), some of MF Global's creditors moved to end their relationships with the Company altogether. In addition, JPMC terminated its customary $432 million intraday credit extension and dispatched a team to MF Global's New York headquarters to monitor and report on MF Global's liquidity.

299.   Further, as set forth in the SIPA Report, during the final week of MF Global's operations, the LCH, DTCC and the Fixed Income Clearing Corporation ("FICC"), among others, increased their margin requirements as follows: (1) RTM margin posted at the LCH increased by $211 million to $663 million; (2) the DTCC reduced its "Debit Cap" – a credit provided to MF Global – by more than $200 million; (3) the FICC imposed additional penalties to MF Global's margin requirement by approximately $20 million, increased MF Global's clearing requirements and began withholding (*i.e.*, not returning) excess margin for MF Global accounts at its affiliated clearing corporations; and (4) the Intercontinental Exchange, Inc. put MF Global on its watch list and increased margin restrictions, limiting the return of excess margin from MFGI's customer accounts as well as its "house account."

300.   The loss of counterparties and increased haircut demands further exacerbated liquidity strains at the Company.

### 2.   October 28, 2011-November 21, 2011

301.   On Friday, October 28, 2011, there was a $175 million overdraft in one of MF Global's accounts at JPMC in London. After JPMC called Defendant Corzine and MF Global Treasurer Mahajan about the overdraft, Mahajan e-mailed that the overdrawn account must be

"fully funded ASAP" because JPMC was "holding up vital business in the U.S. as a result." According to the Subcommittee Memo, MF Global transferred $200 million later that day from a segregated customer account at JPMC to cover the overdraft. In authorizing this transfer, O'Brien, MFGI's Assistant Treasurer, wrote in an October 28, 2011 e-mail that the transfer was "***Per JC's [Jon Corzine's] direct instructions***."

302.   Recognizing the liquidity stress under which MF Global was operating, JPMC sought to confirm that the above-described transfer was appropriate. According to the Subcommittee Memo, JPMC Chief Risk Officer Barry Zubrow called Corzine on October 28, 2011 to seek assurances that the funds transferred to cover the overdraft were "excess funds" belonging to MF Global, not customer funds. JPMC then sent Corzine a draft letter for O'Brien to sign, broadly assuring that all transfers from MF Global's JPMC segregated customer accounts complied with applicable CFTC segregation rules. But Ferber thought the letter was too broad and sought to restrict it to the October 28 transfer only.

303.   As further described in the Subcommittee Memo, MF Global drafted several revised versions of the JPMC letter on Saturday, October 29, 2011, but never delivered the letter to JPMC. A series of e-mails sent by O'Brien, Ferber and others reveal that O'Brien refused to sign the letter. Tellingly, as referenced above, when the Financial Services Subcommittee subpoenaed O'Brien to testify about these issues, ***she invoked her Fifth Amendment right not to testify***.

304.   Later in the day on Saturday, October 29, 2011, MF Global senior management attempted to resolve the Company's liquidity problems by trying to sell off assets, including the Euro sovereign debt RTM portfolio. At 5:30 P.M. on October 29, 2011, Corzine updated

regulators about negotiations with potential purchasers, identifying Interactive Brokers and JPMC as the parties most interested in purchasing MF Global.

305.    By then, MF Global's regulators had grown increasingly concerned that the Company had a customer funds shortfall. The Subcommittee Memo describes how, throughout the afternoon and evening that Saturday, MF Global's regulators and in-house staff worked to get more information on the shortfall. E-mails sent by regulators to MF Global reveal that the Company was not forthcoming. When MF Global missed a 2:00 P.M. October 29, 2011 deadline to provide the CFTC and CME with requested customer fund information, the CFTC's Chief Counsel for Clearing and Risk e-mailed Ferber and MF Global's Treasury staff to inform them that the lack of data and supporting documentation was "driving adverse inferences."

306.    At approximately 6:00 P.M. on October 29, 2011, MF Global staff discussed the customer funds' deficiency with CFTC and CME officials and attributed it to an accounting error. But just five hours later, at approximately 11:00 P.M. on October 29, 2011, neither the CME, CFTC nor MF Global staff was able to actually identify any accounting error. Then, at 11:40 P.M., a CME audit team member e-mailed colleagues that Serwinski would "look into coming up with additional funds to transfer into segregation as a contingency" if the accounting error was not identified.

307.    The next morning, on Sunday, October 30, 2011, according to a CME timeline provided to the Financial Services Subcommittee, CFTC staff in MF Global's Chicago office saw a draft of MF Global's October 28 customer segregated funds statement that showed customer funds were, in fact, missing. Indeed, in an interview with the Financial Services Subcommittee, Serwinski explained that O'Brien had told her on Sunday evening, October 30, 2011, that the customer funds shortfall was real, not an accounting error. O'Brien also provided

Serwinski with a document that showed the deficiency resulted from three types of transactions: (1) intraday loans between MF Global's FCM and non-FCM operations; (2) the funding of outgoing client funds; and (3) the above-described $200 million transfer, which included the $175 million transfer to MF Global's London office on October 28, 2011. Together, these three types of transactions totaled **$909 million**.

308.    Also on Sunday, October 30, 2011, Interactive Brokers, which was not aware of the Company's missing customer funds, reached an agreement to acquire the Company's assets for approximately $1 billion. The CME held several calls with Interactive Brokers throughout the day to discuss the prospective sale. A draft term sheet provided that: (1) MF Global would file for Chapter 11 and obtain $800 million in debtor-in-possession financing from Interactive Brokers secured by proprietary assets; (2) MF Global customer accounts would be transferred to Interactive Brokers subject to regulatory approvals; and (3) Interactive Brokers would agree to purchase substantially all of MF Global's remaining assets for $1 billion, or approximately $6.04 per share. MF Global personnel continued to have telephone calls with Interactive Brokers' executives, and to circulate drafts of the agreements and press releases well into the night on Sunday, October 30, 2011. At 7:43 P.M. that Sunday night, MF Global circulated to the SEC, the CME and the FSA an outline of a proposed agreement with Interactive Brokers.

309.    According to Plaintiff Vrabel, at approximately 9:00 P.M. Eastern time on Sunday, October 30, 2011, the agreement with Interactive Brokers to sell the Company's assets was announced internally on an MF Global conference call with officers from the Company's New York, London and Far East offices. But the deal fell through later that night at approximately 1:00 A.M. (on Monday, October 31) as a result of the missing customer funds.

310.    Defendant Steenkamp's December 13, 2011 testimony before Congress is consistent with Plaintiff Vrabel's account. Steenkamp testified that MF Global was "about to execute a deal for an acquisition" before the missing customer funds were discovered "pretty late on Sunday night." Steenkamp similarly testified again before Congress on March 28, 2012, stating that "efforts to reconcile the segregation calculations were not successful and the deal [with Interactive Brokers] fell through." Likewise, on December 15, 2011, Corzine testified before the Financial Services Subcommittee that "[t]he sale [to Interactive Brokers] did not take place when it was discovered that customer accounts could not be reconciled at that time." In addition, on February 2, 2012, Moody's Chief Credit Officer Cantor testified before the Financial Services Subcommittee that, "[w]hen the last-minute revelation of substantial missing customer assets appeared to derail an otherwise done deal, MF Global was forced to file for bankruptcy."

311.    At 1:00 A.M. on Monday, October 31, 2011, O'Brien and Serwinski informed the CME that there was a real deficiency in the Company's segregated customer accounts. One hour later, at approximately 2:00 A.M. on October 31, MF Global senior management, including Defendant Steenkamp, informed regulators of the customer funds shortfall. Consequently, according to the sources noted above, Interactive Brokers called off its agreement to purchase the Company's assets for $6.04 per share, and MF Global continued to search for sources of liquidity.

312.    At 6:25 A.M. on October 31, 2011, Serwinski circulated a schedule of available assets to Steenkamp. The document listed an excess of approximately $220 million in a broker-dealer customer reserve account. According to the Financial Services Subcommittee's interviews with SEC staff, the SEC expressed concern to MF Global about the calculation of excess funds

in this account and cautioned MF Global against transferring the funds. Notwithstanding the SEC's admonition, MF Global transferred the funds.

313.     Later that morning on October 31, 2011, MF Global's London staff requested yet another $310 million to cover the additional margin demanded by counterparties. This time, however, as referenced above, O'Brien responded with an e-mail, "PLEASE DO NOT RELEASE THIS COLLATERAL." MF Global filed for bankruptcy later that day.

314.     Thereafter, as set forth below in Section VII, news about missing customer funds at MF Global emerged in a series of conflicting reports. On November 21, 2011, the last day of the Class Period, the SIPA Trustee reported that he had raised a preliminary quantification of MF Global's customer funds shortfall to "*$1.2 billion or more*." As was only later revealed by the SIPA Trustee, in total, the Company actually had a *$1.6 billion shortfall* in customer funds, including a deficiency of approximately *$900 million* in domestic customer segregated accounts and a deficiency of approximately *$700 million* in foreign secured accounts.

## V.      MATERIAL MISSTATEMENTS AND OMISSIONS

### A.      The Fourth Fiscal Quarter Of 2010 And Full Fiscal 2010 Year

#### 1.      Net Income And DTA

315.     Throughout the Class Period, MF Global reported material DTA in its financial statements, which the Individual Defendants repeatedly represented were prepared in accordance with GAAP. Notwithstanding those representations, and the fact that GAAP required MF Global to report a full valuation allowance against its U.S. DTA by the start of the Class Period as set forth in Section IV.C above, MF Global did not record a full DTA valuation allowance until it reported Q2'12 financial results on October 25, 2011.

316.     On May 20, 2010, the first day of the Class Period, MF Global issued a press release announcing its financial results for the fiscal 2010 year and fourth fiscal quarter of 2010.

The press release, which quoted Defendants Corzine and MacDonald, was filed with the SEC as an exhibit to a Form 8-K signed by MacDonald. In the press release, MF Global reported a net loss for the quarter of $96.5 million, or $0.78 per basic and diluted common share, and a net loss for fiscal 2010 of $167.7 million, or $1.36 per basic and diluted share. The press release also contained fiscal 2010 highlights, consolidated statements of operations and consolidated balance sheets, purporting to reflect MF Global's financial performance in accordance with GAAP.

317.    That same day, on May 20, 2010, MF Global hosted an investor conference call. During the call, Corzine and MacDonald reviewed MF Global's financial results and Defendant MacDonald specifically discussed the Company's DTA:

> As we've mentioned in previous calls, since the IPO in July of 2007, we've recorded deferred tax assets on our balance sheet of approximately $61 million related to our equity awards and about half of this asset relates to the restricted stock units that were issued at the IPO and at a fair value of $30 per share. The vast majority of these rewards vest in the September quarter of fiscal year 2011, so the $60 million will accrete to $70 million by that time. Now, if for example the stock price is $10 this coming September, then about two-thirds of those deferred tax assets related to the IPO RSUs will be written off for about $22 million in a non-cash charge. ***Now, the rest of the deferred tax assets are other equity awards that have longer vesting periods and lower issuance prices and therefor[e], they aren't at risk***.

318.    Later during the May 20, 2010 conference call, a Ticonderoga Securities analyst asked whether, with respect "to the deferred tax asset, if there's anything else we need to be thinking about there," and also asked a separate question about MF Global's capital structure. Corzine responded to the analyst's question about capital, but he failed to answer the question about the Company's DTA.

319.    On May 28, 2010, MF Global filed the 2010 Form 10-K with the SEC, signed by Defendants Corzine, MacDonald, Steenkamp, Bolger, Fusco, Gelber, Glynn, Goldberg, Schamis and Sloan. In addition to reiterating the financial results reported in the Company's May 20, 2010 press release, the 2010 Form 10-K also contained consolidated balance sheets and

consolidated statements of comprehensive income, which purported to reflect MF Global's financial performance and assets and liabilities for the full fiscal 2010 year. The 2010 Form 10-K stated: "The audited consolidated and combined financial statements are prepared in conformity with U.S. generally accepted accounting principles ('U.S. GAAP') and include the consolidated accounts of MF Global Holdings Ltd. and its subsidiaries."

320.    The 2010 Form 10-K reported total DTA of $171.7 million, a valuation allowance of $19.7 million and net DTA (less the valuation allowance and tax liabilities) of $117.9 million as of March 31, 2010. With respect to DTA, the 2010 Form 10-K stated:

> We have recorded significant deferred tax assets reflecting our expectation of carrying certain losses forward against future income in certain jurisdictions. If we are unable to generate positive earnings in such jurisdictions, we may be forced to record valuation allowances against previously-booked deferred tax assets, which could have a significant adverse impact on our financial results. In certain jurisdictions, we have generated pre-tax losses that, in accordance with applicable tax law, we expect to be able to carry forward and offset against future profits to reduce relevant taxes going forward. ***We have recorded significant deferred tax assets reflecting our expectation of using these loss carryforwards against future income***. If we are not able to generate profits in these jurisdictions in future periods, we may be required to record valuation allowances against these deferred tax assets. Recording valuation allowances against these deferred tax assets could have a significant adverse impact on our financial results.

321.    The 2010 Form 10-K further stated:

> ***We account for income taxes under the asset and liability method prescribed by US GAAP***. Under this method, deferred income taxes reflect the net tax effects of temporary differences between the carrying amount of assets and liabilities for financial statement and income tax purposes, as determined under applicable tax laws and rates. ***A valuation allowance is provided for deferred tax assets when it is more likely than not that some portion of the deferred tax assets will not be realized***. Any increase or decrease in a valuation allowance could have a material adverse or beneficial impact on our income tax benefit or provision and net income or loss in the period in which the determination is made.

322.    Likewise, when discussing MF Global's accounting for income taxes, the 2010 Form 10-K stated that "[a] valuation allowance is provided for deferred tax assets when it is

more likely than not (likelihood of greater than 50%) that the benefits of net deductible temporary differences and net operating loss carryforwards will not be realized."

323.    For the full fiscal 2010 year, MF Global recorded a total DTA valuation allowance of $19.7 million, which the 2010 Form 10-K stated "relate[d] principally to uncertainty of the utilization of tax loss carryforwards in various jurisdictions." The 2010 Form 10-K further stated that "*the valuation allowance was calculated in accordance with US GAAP rules*, which require[] that a valuation allowance be established or maintained when it is 'more likely than not' that all or a portion of deferred tax assets will not be realized."

324.    The above-referenced statements about MF Global's net income and DTA were materially misstated and omitted material facts necessary to make the statements therein not misleading, because, *inter alia*, as set forth above in Section IV.C, the Company failed to timely record a valuation allowance against its U.S. DTA in violation of GAAP given that: (1) MF Global's U.S. operations were operating at a three-year cumulative loss as of March 31, 2010; (2) MF Global did not have evidence "of sufficient quality and quantity to counteract [that] negative evidence" since it was relying on, at best, "unsettled" events dependent on future market conditions that had not yet been demonstrated; (3) MF Global's projections of income were unreliable and dependent on the undisclosed, unsustainable and high-risk Corzine Trade (and only 20% of the profits from the Corzine Trade could be recorded as revenues in connection with the Company's U.S. operations); (4) MF Global's plans to realize costs savings from changes to the Company's compensation structure were unreliable and insufficient to offset losses and benefit from the Company's U.S. DTA, especially since any costs savings were partially offset by increases in payroll expenses due to increased professional headcount; and (5)

MF Global did not have "prudent" and "feasible" tax strategies that would have enabled it to avoid recording a full valuation allowance against its U.S. DTA.

## 2. Risk Appetite, Internal Controls And Liquidity Management

325.    In the May 20, 2010 press release that was filed with the SEC as an exhibit to MF Global's Form 8-K, Defendant Corzine stated that the Company would increase its risk-taking only with a commensurate increase in risk controls: "As profitability improves *and we ensure the appropriate controls are in place*, we will look to enhance our revenue potential *by supporting our client activities with more principal risk taking*."

326.    During MF Global's May 20, 2010 conference call, Corzine also discussed extending MF Global's "client facilitation efforts" to include "principal risk taking," reassuring the public that MF Global would "enhance and reconfirm" internal controls accordingly:

> [A] natural extension of our existing approach to client services, which has traditionally been organized around an agency brokerage model, *over the near term will extend our client facilitation efforts to include principal risk taking across most product lines*. Our fixed income and U.S. Treasury businesses already incorporate this approach. It's clear to me that we can expand revenues meaningfully by this extension. We'll provide our clients with better market execution which in time will facilitate growth of client balances, derivative commissions and trading profits. *As we grow these activities, we will be mindful of the necessity to enhance and reconfirm our operational and control functions and to secure the talent necessary to manage attend[ant] market risks*.

327.    Corzine further stated during the May 20, 2010 conference call, "I want to be clear. I don't anticipate increasing our current risk appetite in the near term but we will encourage facilitation desks to operate more aggressively *within our existing limits*."

328.    Also on the May 20, 2010 conference call, a J.P. Morgan analyst asked how much risk MF Global would take and whether MF Global's risk systems would prevent significant losses: "What are the risks in the strategy? . . . [W]here would you expect VAR to go and what are the chances that you could incur some sort of loss that's big enough to cause rating agency

action here, or is that really almost an impossibility given your risk systems?" In response, Defendant Corzine stated: "It's not risk systems that will determine whether we have losses. It will be mistaken judgments in the first instance *that go beyond limits* which I don't intend to allow to happen." Corzine further stated that the Company's goals and risk-taking were within the *existing* business strategy, and MF Global would not shift to "*prop trader*" activity without informing the market:

> *We have a VAR that reflects that there would not be a material impact on earnings.* That doesn't mean that we're not going to have losses because operating costs don't have revenues to match against them which should occur, in part, because we are increasing our principal risk taking activities. *But the goal here is not to be a prop trader. And if we change that view, we'll speak to it directly.* But we're of the view that I think the greatest risk is that it undermines revenues in a given quarter or given time frame but *I don't think that we will be in a risk taking position, substantial enough to have it be the kind of thing that the rating agencies would say, holy cow these guys have got a different business strategy than what we told them we had.*

329.    The next day, on May 21, 2010, J.P. Morgan issued an analyst report describing the Company as "a solid risk/reward investment," and emphasizing that MF Global's management did not "expect VAR to increase materially" and that the Company planned to enhance internal controls, stating: "We think success will necessitate getting the right people and risk systems in place, something Corzine will address."

330.    The 2010 Form 10-K also stated that MF Global's new client-driven trading strategy would be developed within the Company's "current risk appetite" and risk limits set by the Board, noting:

> On a limited basis, we may also enter into unhedged principal transactions in order to monetize our market views. *We expect to increasingly recognize trading income as part of our ongoing activity for our clients* in various markets, and to selectively increase our risk taking, generally making fuller use of our current risk appetite and *operating within the authority delegated by our board of directors.*

331.    The 2010 Form 10-K also set forth an extensive description of the Company's purported internal controls, highlighting MF Global's supposedly "robust risk-management" and "strong governance":

> *We believe that effective risk management is critical to the success of our business.* Consequently, we have established – and continue to evolve and improve – a global enterprise wide risk management framework to manage all aspects of our risks. *The risk management framework globally embeds a robust risk-management environment through a strong governance structure that (i) clearly defines roles and responsibilities, (ii) delegates authority for risk control and risk taking to specific individuals, and (iii) documents approved methodologies for the identification, measurement, control and mitigation of risk.* We believe that risk management is the responsibility of all of our employees. We seek to consistently and comprehensively identify, assess, monitor and control all financial, operational, compliance and business risks across all of our businesses in a coordinated manner. *Business areas, pursuant to delegated authority, have primary responsibility for risk management by balancing our ability to profit from our revenue-generating activities with our exposure to potential losses. Specialist teams in the risk department monitor our risk exposures globally.*

332.    The 2010 Form 10-K further stated that a global "risk management framework" was in place to mitigate operational risks:

> Operational risk is defined as the risk of loss or other adverse consequence arising from inadequate or failed internal processes, people and systems or from external events. . . . *To mitigate operational risks, the Operational Risk Department ensures the application of a globally consistent operational risk management framework.* The framework includes firm-wide policies, standards and processes for risk identification, assessment, mitigation and reporting in order to create a more transparent and accountable operational risk environment. Operational risk is inherent in each of our businesses, support and control activities; therefore, the primary day-to-day responsibility for managing operational risk rests with these areas. Each area has established processes, systems and controls to manage operational risk and is responsible for reporting incidents, issues, and control and performance metrics. These reports are summarized for senior management and governance committees. *Additionally, we consider the inherent operational risk in new products, systems, and business activities as they are developed or modified.*

333.    The 2010 Form 10-K also stated that "[w]e generally maintain total regulatory capital in excess of the minimum requirements in order to meet our internal risk management

guidelines," "[w]e currently maintain regulatory capital in excess of all applicable requirements,"

and "[w]e also maintain excess regulatory capital to accommodate periods of unusual or

unforeseen market volatility, and we intend to continue to follow this policy."

334.   The 2010 Form 10-K further represented that, in order to manage MF Global's

liquidity risk, the Company had adequate liquidity policies in place:

> We have established a liquidity policy designed to ensure that we maintain access
> to sufficient, readily available liquid assets and committed liquidity facilities. . . .
> We also evaluate the impact of adverse market conditions on our liquidity risk
> and adjust our liquid assets appropriately. ***Our policy requires us to have
> sufficient liquidity to satisfy all of our expected cash needs for at least one year
> without access to the capital markets***.

335.   Attached as Exhibits to the 2010 Form 10-K were certifications signed by

Defendants Corzine and MacDonald stating that the 2010 Form 10-K fairly presented, in all

material respects, MF Global's financial condition and operational results and did not contain

any untrue statement of material fact or omit to state a material fact necessary to make the

statements made not misleading. These certifications further stated that MF Global's disclosure

controls and procedures were designed to ensure that all material information was made known

to the certifying Officer Defendants, and that MF Global's internal controls over financial

reporting were designed to provide reasonable assurance regarding the reliability of financial

reporting in accordance with GAAP. The certifying Officer Defendants further stated that they

had evaluated the effectiveness of such controls and procedures, and the 2010 Form 10-K

reported that these disclosure controls and procedures were effective.

336.   The above-referenced statements about MF Global's risk appetite, internal

controls and liquidity management were materially misstated and omitted material facts

necessary to make the statements therein not misleading for the reasons set forth in Sections

IV.D-G above, including, *inter alia*, because: (1) the Officer Defendants' strategic plan to

increase principal risk-taking also materially increased liquidity risks without the necessary corresponding increase in capital, liquidity risk management or internal controls; (2) the primary purpose of the Company's increased principal trading activity was not to facilitate customer transactions but to engage in non-client-related speculative transactions; (3) Defendants' representations about available capital and liquidity were unreliable given that: (a) the Company's liquidity monitoring systems were outdated, (b) the Company had no real-time liquidity monitoring system, and (c) the Company tracked liquidity using informal, manual means compiled from spreadsheets and oral reports; (4) even though the Company's transformation plan did not involve increasing VAR, the plan involved materially increasing off-balance sheet liquidity risks and leverage levels in connection with investments in Euro sovereign debt through RTM transactions; and (5) MF Global exposed client funds to significant risk by relying on regular inter-company transfers from MF Global's FCM operations to meet the daily liquidity needs of non-FCM operations.

### B.  The First Fiscal Quarter Of 2011

#### 1.  Net Income And DTA

337.  On August 5, 2010, MF Global issued a press release announcing its Q1'11 financial results. The press release, which quoted Defendants Corzine and MacDonald, was filed with the SEC as an exhibit to a Form 8-K signed by MacDonald. In the press release, MF Global reported net income of $0.8 million, or $0.01 per basic and diluted share. The press release also contained Q1'11 highlights, consolidated statements of operations and consolidated balance sheets, which purported to reflect the Company's financial performance in accordance with GAAP.

338.  In the August 5, 2010 press release, Corzine touted the Company's purported return to GAAP profitability: "While our results this quarter reflect initial progress and *I'm*

***pleased the company has delivered GAAP profitability***, I believe this is only a first step toward realizing MF Global's full potential."

339. That same day, on August 5, 2010, MF Global hosted a conference call with analysts and investors to discuss the Company's Q1'11 financial performance. Defendants Corzine and MacDonald reviewed MF Global's financial results and Corzine again highlighted that the Company "***returned to profitability*** for the first time in six quarters ***on a GAAP basis***."

340. During the August 5, 2010 conference call, Corzine and MacDonald further emphasized that the Company's DTA write-offs were limited, one-time adjustments, rather than a larger problem affecting all of MF Global's U.S. DTA. During the call, Corzine stated: "[W]e will have in the September quarter, a large one-time adjustment associated with our tender offer, as well as a significant final write-down of the deferred tax asset associated with IPO awards." Likewise, MacDonald emphasized that the write-off was an isolated incident: "In July, those options vested when the stock price was $6.22. Therefore, we wrote off approximately $27 million of the $37 million of deferred tax asset." Significantly, MacDonald also reassured investors that "***[t]he rest of the deferred tax assets*** are other equity awards with longer vesting periods and lower issuance prices, and ***therefore are not as at risk***."

341. On August 6, 2010, MF Global filed its Form 10-Q for the first fiscal quarter of 2011 ended June 30, 2010 (the "Q1'11 Form 10-Q"), signed by Defendants Corzine and MacDonald. In addition to reiterating the financial results reported in MF Global's August 5, 2010 press release, the Q1'11 Form 10-Q contained unaudited consolidated balance sheets and consolidated statements of comprehensive income purporting to reflect MF Global's financial performance and assets and liabilities, specifically stating: "The unaudited consolidated financial

statements are prepared in conformity with U.S. generally accepted accounting principles ('U.S. GAAP') and include the consolidated accounts of MF Global Holdings Ltd. and its subsidiaries."

342.    The above-referenced statements about MF Global's net income and DTA were materially misstated and omitted material facts necessary to make the statements therein not misleading, because, *inter alia*, as set forth above in Section IV.C, the Company failed to timely record a valuation allowance against its U.S. DTA in violation of GAAP given that: (1) MF Global's U.S. operations were operating at a three-year cumulative loss as of March 31, 2010; (2) MF Global did not have evidence "of sufficient quality and quantity to counteract [that] negative evidence" since it was relying on, at best, "unsettled" events dependent on future market conditions that had not yet been demonstrated; (3) MF Global's projections of income were unreliable and dependent on the undisclosed, unsustainable and high-risk Corzine Trade (and only 20% of the profits from the Corzine Trade could be recorded as revenues in connection with the Company's U.S. operations); (4) MF Global's plans to realize costs savings from changes to the Company's compensation structure were unreliable and insufficient to offset losses and benefit from the Company's U.S. DTA, especially since any costs savings were partially offset by increases in payroll expenses due to increased professional headcount; and (5) MF Global did not have "prudent" and "feasible" tax strategies that would have enabled it to avoid recording a full valuation allowance against its U.S. DTA.

### 2.    Risk Appetite, Internal Controls And Liquidity Management

343.    On June 3, 2010, Defendant Corzine participated in Sandler O'Neill's Global Exchange and Brokerage Conference. At the conference, Corzine emphasized the Company's purported commitment to risk management, stating:

> *I want to stress risk management* because my predecessor did a good job of addressing historical rearview mirror problems, *but I think we have to implement the human element of risk management on top of the systems that have been*

***put in place.*** This is something that I've worked on most of my life and I think that we can bring both the operations, the systems, the technology to managing risk, but we need to have the right people to take that risk and manage it day to day.

344.    The written presentation accompanying Corzine's June 3, 2010 remarks also highlighted MF Global's supposedly "strong compliance and control procedures," stating:

> ***Global risk management***
>
> ***Integrated and centrally managed risk framework***
>
> ***Strong compliance and control procedures*** – all employees responsible for managing market, credit, liquidity, reputational and operating risks.

345.    On the Company's August 5, 2010 Q1'11 earnings conference call, Corzine again highlighted MF Global's purportedly cautious approach to MF Global's "client facilitation" risk-taking: "We also began last quarter the fundamental and incremental process of embedding ***client facilitation risk-taking*** in all of our core product lines, with emphasis on incremental. ***We've taken this initiative without a significant build-up in our measured value at risk.***" Corzine also represented that risk-taking was well under authorized limits, stating that, "[o]n a day-to-day basis, ***we are generally using less than half of our Board-authorized risk authority, which remains unchanged since I joined MF Global***." Corzine further emphasized the following: "Let me repeat – we've added a revenue-generating capacity ***that serves our clients' interests without substantially increasing measured risks or use of regulatory capital or balance sheet***."

346.    MacDonald also discussed the Company's capital and liquidity management on the August 5, 2010 Q1'11 conference call, stating that MF Global would be able to generate the capital it needed to grow and expand: "Now, as I've stated in the past, when growing, ***this business generates the capital it needs to fund expansion of the business***. So, said another way,

it is self-funding even at these extraordinary low levels of interest." MacDonald further stated

that "***the Company maintains a strong liquidity position***."

347.    Analysts on the August 5 conference call sought to capture an accurate picture of

MF Global's risk appetite and risk exposures. For instance, a Sandler O'Neill analyst asked:

> [T]his increased customer facilitation, it's amazing the results you're getting with
> a lower balance sheet, lower VAR, or equal VAR, let's say. And I guess my
> question is, are there any other risk metrics – because there are certain – are the
> VAR, lower balance sheet, in your opinion, capturing the risk picture, or are there
> any other metrics that you could offer investors?

348.    Corzine responded by emphasizing the Company's liquidity risk management and

low-risk profile trading positions:

> ***We are very keen at this stage to make sure that we are only operating in the***
> ***most liquid markets***, foreign exchange, and actually not very much in our
> emerging market activities yet, in U.S. treasuries, all the exchange-traded
> derivatives, the commodity markets where – well, there's a lot of price volatility.
> There's actually fairly deep markets for entry and exit. . . . ***So we're keeping a***
> ***very liquid balance sheet***.

349.    When another analyst on the August 5, 2010 conference call – this time an analyst

from Credit Suisse – asked how much of MF Global's quarterly progress was "improvement

from the principal side," Corzine again emphasized that, though the Company planned to "move

up over trading contribution to the overall revenues, . . . ***we're not taking enormous market risk***

***in executing our strategy***, and I don't see that changing dramatically in the next quarter."

350.    MF Global's Q1'11 Form 10-Q also suggested that liquidity risks were unlikely,

stating that MF Global's "core business, providing execution and clearing brokerage services,

***does not generally present a substantial cash liquidity risk***."[20] The Q1'11 Form 10-Q further

stated that, in the event of an unexpected liquidity event, the Company's liquidity policy "was

---

[20] MF Global filed an amended Q1'11 Form 10-Q on September 2, 2010. The sole purpose of the amendment was to
furnish Exhibit 101, which did not amend any of the statements alleged herein as materially misstated or omitting
material information.

designed to ensure that we maintain access to sufficient, readily available liquid assets and committed liquidity facilities." Moreover, the Q1'11 Form 10-Q explained that MF Global had "also evaluate[d] the impact of adverse market conditions on [the Company's] liquidity risk and adjust[ed] [the Company's] liquid assets appropriately." The policy "require[d] [MF Global] *to have sufficient liquidity to satisfy all of [its] expected cash needs for at least one year without access to the capital markets*."

351.    The Q1'11 Form 10-Q also represented that MF Global would "continuously evaluate the levels of regulatory capital at each of our operating subsidiaries . . . to ensure compliance with all regulatory capital requirements," and would "maintain excess regulatory capital to accommodate periods of unusual or unforeseen market volatility," stating that the Company "intend[s] to continue to follow this policy."

352.    The Q1'11 Form 10-Q repeated the same disclosures about operational risk management that were included in the 2010 Form 10-K as set forth in ¶ 332 above.

353.    The Q1'11 Form 10-Q also contained as exhibits certifications signed by Defendants Corzine and MacDonald in the same form as those referred to in ¶ 335 above.

354.    The above-referenced statements about MF Global's risk appetite, internal controls and liquidity management were materially misstated and omitted material facts necessary to make the statements therein not misleading for the reasons set forth in Sections IV.D-G above, including, *inter alia*, because: (1) the Officer Defendants' strategic plan to increase principal risk-taking also materially increased liquidity risks without the necessary corresponding increase in capital, liquidity risk management or internal controls; (2) the primary purpose of the Company's increased principal trading activity was not to facilitate customer transactions but to engage in non-client-related speculative transactions; (3) Defendants'

representations about available capital and liquidity were unreliable given that: (a) the Company's liquidity monitoring systems were outdated, (b) the Company had no real-time liquidity monitoring system, and (c) the Company tracked liquidity using informal, manual means compiled from spreadsheets and oral reports; (4) even though the Company's transformation plan did not involve increasing VAR, the plan involved materially increasing off-balance sheet liquidity risks and leverage levels in connection with investments in Euro sovereign debt through RTM transactions; and (5) MF Global exposed client funds to significant risk by relying on regular inter-company transfers from MF Global's FCM operations to meet the daily liquidity needs of non-FCM operations.

### C.  The Second Fiscal Quarter Of 2011

#### 1.  Net Income And DTA

355.   On November 4, 2010, MF Global issued a press release announcing its financial results for the second fiscal quarter of 2011 ended September 30, 2010 ("Q2'11"). The press release, which quoted Defendants Corzine and MacDonald, was filed with the SEC as an exhibit to a Form 8-K that was signed by MacDonald. In the press release, MF Global reported a net loss of $94.3 million, or $0.59 per basic and diluted share. The press release also contained Q2'11 highlights, consolidated statements of operations and consolidated balance sheets, which purported to reflect the Company's financial performance in accordance with GAAP.

356.   On November 5, 2010, MF Global filed its Form 10-Q for the second fiscal quarter of 2011 ended September 30, 2010 (the "Q2'11 Form 10-Q"), which was signed by Defendants Corzine and MacDonald. The Q2'11 Form 10-Q contained unaudited consolidated balance sheets, consolidated statements of operations and consolidated statements of comprehensive income purporting to reflect the Company's financial performance and assets and liabilities in accordance with GAAP. The Q2'11 Form 10-Q specifically stated: "The unaudited

consolidated financial statements are prepared in conformity with U.S. generally accepted accounting principles ('U.S. GAAP') and include the consolidated accounts of MF Global Holdings Ltd. and its subsidiaries."

357.    The above-referenced statements about MF Global's net income and financial performance were materially misstated and omitted material facts necessary to make the statements therein not misleading, because, *inter alia*, as set forth above in Section IV.C, the Company failed to timely record a valuation allowance against its U.S. DTA in violation of GAAP given that: (1) MF Global's U.S. operations were operating at a three-year cumulative loss as of March 31, 2010; (2) MF Global did not have evidence "of sufficient quality and quantity to counteract [that] negative evidence" since it was relying on, at best, "unsettled" events dependent on future market conditions that had not yet been demonstrated; (3) MF Global's projections of income were unreliable and dependent on the undisclosed, unsustainable and high-risk Corzine Trade (and only 20% of the profits from the Corzine Trade could be recorded as revenues in connection with the Company's U.S. operations); (4) MF Global's plans to realize costs savings from changes to the Company's compensation structure were unreliable and insufficient to offset losses and benefit from the Company's U.S. DTA, especially since any costs savings were partially offset by increases in payroll expenses due to increased professional headcount; and (5) MF Global did not have "prudent" and "feasible" tax strategies that would have enabled it to avoid recording a full valuation allowance against its U.S. DTA.

### 2.    Risk Appetite, Internal Controls And Liquidity Management

358.    During a September 13, 2010 Barclays Capital Financial Services Conference, Defendant Corzine discussed MF Global's "client-driven" principal trading and risk appetite:

> First of all, [a] lot of folks, including me, have spoken about extending our ***client-driven principal trading***. We've begun that on a step-by-step basis in the most liquid markets. It's not overwhelming our earnings at this stage ***because we want***

*to grow into that in a way that we manage the risks. It will be focused on liquid markets at least for the next 12 months.*

359.    Corzine expanded on this statement during the September 13, 2010 conference, representing that MF Global was focused on managing risks related to expanding principal trading in its "client facilitation business":

> *We are expanding our client facilitation business*, [and] I have talked about trading a number of times. It will have some volatility to it over time, but we don't expect it to become such a large proportion that it will overwhelm other activities in our business.
>
> *We intend to control and manage risk. I think I said at the last earnings call, we hadn't increased the VAR exposure nor the stress exposure, nor the regulatory capital exposure*, but we had improved 2% or 3% the amount of trading income that we have been able to produce.

360.    Corzine continued to emphasize MF Global's focus on risk management during the September 13, 2010 conference, stating: "Our strategic review is not just about our retail business, not just about how we organize our institutional sales or our trading activities, but *it's also about how we maintain proper control and compliance as we go forward.*" Specifically addressing liquidity, Corzine further stated at the conference: "*We don't have credit risks. We're not carrying carried positions for purposes of finance and spread. So we have a very, very strong and liquid balance sheet, improved our capital structure*."

361.    Also during the September 13, 2010 conference, an audience member asked about MF Global's risk management systems:

> Can you talk a bit about your sense . . . in terms of the risk management systems at the firm, if you're going to be dialing up a little bit of risk. *I assume everything isn't done on a spreadsheet, but you came from the best in the world, how does it compare and do you feel you need to reinvest*?

362.    In response, Corzine emphasized that MF Global would not increase risks beyond its risk management systems and would be "very disciplined" in this regard:

120

One of the reasons that I emphasize that we will stay in liquid markets is that I don't think we're prepared yet to be in some of the other marketplaces with the kinds of systems that we have today. I don't think they're that . . . far off from us being able to produce. But I think they're focused more on liquid markets and credit risks as focused on our clients and I think we have some work to do on stress testing and clearly on credit-related activities.

**But I think they're adequate for where we are today, they need to constantly be strengthened and the thing that I would say is the most important ingredient with regard to risk for us is to make sure that we have the people on the desks that extremely understand what it is the risks that they're taking and so until we have those people in place, we're going to grow more slowly in this principal trading activity than I would probably like, than I'm accustomed to, given the size of our organization. So we will be very disciplined about it**.

363.    On November 4, 2010 MF Global hosted a conference call with analysts and investors to discuss the Company's Q2'11 financial performance. During the call, a Sandler O'Neill analyst asked about MF Global's trading strategy, and Corzine responded that the Company would be cautious in this regard:

**We want to stay in high turnover mode within our proprietary activities. We will be in the - in the liquid in for the most part of our activities. Don't expect it to have dramatic impact on our earnings in the near term**. Although we do look to steadily grow the book.

364.    Defendant Corzine further stated that the Company's lack of experience with risk in trading activities required a careful approach to risk taking:

**Believe me, we are going to go slow. I chose my words very carefully. We're going to know the people, and we're going to know the risk appetites in addition to the metrics that are necessary, and [I am] very closely involved with this myself**.

365.    During the same call, a Keefe, Bruyette & Woods analyst asked about the tension between operating an FCM and a trading desk. Corzine responded that activities would be separated and that clients' interests would "come first" in a "disciplined" approach:

First of all, it will be – **the unit will be separated from the trading areas where client activity flows**, and we think that we have a long standing culture that is focused on client activities. **And we're enhancing all of the compliance and control activities on that**, and we feel like we can manage this. And I am very

familiar with trading activities in a market making book as you interface with clients.

*And so I just - I don't think there has to be as long as you're very disciplined and you make it clear to individuals that clients interests come first and they're separated from the day to day activities of what our clients are doing with our market making and brokerage activities.*

366.   With respect to potential liquidity events, the Q2'11 Form 10-Q stated that MF Global's policy of maintaining excess capital would ensure the availability of sufficient liquidity: "As a matter of policy, we maintain excess capital to provide liquidity during periods of unusual market volatility, which has been sufficient historically to absorb the impact of volatile market events." The Q2'11 Form 10-Q also suggested that liquidity risks were unlikely because MF Global's "core business, providing execution and clearing brokerage services, *does not generally present a substantial cash liquidity risk*." The Q2'11 Form 10-Q further stated that, in the event of an unexpected event, the Company's liquidity policy was "designed to ensure that we maintain access to sufficient, readily available liquid assets and committed liquidity facilities."

367.   Further, the Q2'11 Form 10-Q explained that MF Global "also evaluate[d] the impact of adverse market conditions on [the Company's] liquidity risk and adjust[ed] [the Company's] liquid assets appropriately." The policy "require[d] [MF Global] *to have sufficient liquidity to satisfy all of [its] expected cash needs for at least one year without access to the capital markets*." The Q2'11 Form 10-Q further stated that MF Global would "continuously evaluate the levels of regulatory capital at each of our operating subsidiaries . . . to ensure compliance with all regulatory capital requirements," and that the Company "also maintain[s] excess regulatory capital to accommodate periods of unusual or unforeseen market volatility, and we intend to continue to follow this policy."

368.   MF Global's Q2'11 Form 10-Q reiterated MF Global's purported commitment to operational risk management, as set forth above in ¶ 332.

369.   The Q2'11 Form 10-Q also contained as exhibits certifications signed by Defendants Corzine and MacDonald in the same form as those referred to in ¶ 335 above.

370.   The above-referenced statements about MF Global's risk appetite, internal controls and liquidity management were materially misstated and omitted material facts necessary to make the statements therein not misleading for the reasons set forth in Sections IV.D-G above, including, *inter alia*, because: (1) the Officer Defendants had significantly increased principal risk-taking and risk limits in connection with Defendants' strategic plan and the corresponding proprietary trading (by October 2010, net Euro sovereign debt RTM exposure was $3.5-4 billion) without the necessary corresponding increase in capital, liquidity risk management or internal controls; (2) the primary purpose of the Company's increased principal trading activity was not to facilitate customer transactions but to engage in non-client-related speculative transactions; (3) Defendants' representations about available capital and liquidity were unreliable given that: (a) the Company's liquidity monitoring systems were outdated, (b) the Company had no real-time liquidity monitoring system, and (c) the Company tracked liquidity using informal, manual means compiled from spreadsheets and oral reports; (4) even though the Company's transformation plan did not involve increasing VAR, the plan involved materially increasing off-balance sheet liquidity risks and leverage levels in connection with investments in Euro sovereign debt through RTM transactions; and (5) MF Global exposed client funds to significant risk by relying on regular inter-company transfers from MF Global's FCM operations to meet the daily liquidity needs of non-FCM operations.

### D.      The Third Fiscal Quarter Of 2011

#### 1.      Net Income And DTA

371.    On February 3, 2011, MF Global issued a press release announcing its financial results for the third fiscal quarter of 2011 ended December 31, 2010 ("Q3'11"). The press release, which quoted Defendants Corzine and MacDonald, was filed with the SEC as an exhibit to a Form 8-K that was signed by MacDonald. In the press release, the Company reported a Q3'11 net loss of $9.7 million, or $0.06 per basic and diluted share. This press release also reported Q3'11 highlights, consolidated statements of operation and consolidated balance sheets, purporting to reflect MF Global's financial performance in accordance with GAAP.

372.    Also on February 3, 2011, MF Global filed the Q3'11 Form 10-Q signed by Defendants Corzine and MacDonald. The Q3'11 Form 10-Q contained unaudited consolidated balance sheets, consolidated statements of operations and consolidated statements of comprehensive income purporting to reflect the Company's financial performance and assets and liabilities in accordance with GAAP. The Q3'11 Form 10-Q also stated: "The unaudited consolidated financial statements are prepared in conformity with U.S. generally accepted accounting principles ('U.S. GAAP') and include the consolidated accounts of MF Global Holdings Ltd. and its subsidiaries."

373.    Additionally, the Q3'11 Form 10-Q specifically discussed the GAAP standard for assessing the need for a DTA valuation allowance and MF Global's "significant" deferred tax assets, stating:

> Realization of the Company's deferred tax assets is dependent upon multiple variables including available loss carry-backs, the timing of future earnings, the reversal of current timing differences, and planning. US GAAP requires that the Company continually assess the need for a valuation allowance against all or a portion of its deferred tax assets. ***As of December 31, 2010, the Company had significant deferred tax assets that it does not have a valuation allowance against because the Company believes that it is more likely than not that these***

*deferred tax assets will be realized in the future. Although realization is not assured, the Company anticipates that realization of these assets will occur.*

374.   The above-referenced statements about MF Global's net income and DTA were materially misstated and omitted material facts necessary to make the statements therein not misleading, because, *inter alia*, as set forth above in Section IV.C, the Company failed to timely record a valuation allowance against its U.S. DTA in violation of GAAP given that: (1) MF Global's U.S. operations were operating at a three-year cumulative loss as of March 31, 2010; (2) MF Global did not have evidence "of sufficient quality and quantity to counteract [that] negative evidence" since it was relying on, at best, "unsettled" events dependent on future market conditions that had not yet been demonstrated; (3) MF Global's projections of income were unreliable and dependent on the undisclosed, unsustainable and high-risk Corzine Trade (and only 20% of the profits from the Corzine Trade could be recorded as revenues in connection with the Company's U.S. operations); (4) MF Global's plans to realize costs savings from changes to the Company's compensation structure were unreliable and insufficient to offset losses and benefit from the Company's U.S. DTA, especially since any costs savings were partially offset by increases in payroll expenses due to increased professional headcount; and (5) MF Global did not have "prudent" and "feasible" tax strategies that would have enabled it to avoid recording a full valuation allowance against its U.S. DTA.

## 2.   Risk Appetite, Internal Controls And Liquidity Management

375.   On February 3, 2011, MF Global hosted a conference call with analysts and investors to discuss the Company's Q3'11 financial performance. During the call, Corzine and MacDonald reviewed MF Global's Q3'11 financial results, and Corzine emphasized MF Global's purportedly cautious approach to risk-taking. Specifically, Corzine stated: "*VAR measurements have remained relatively unchanged and well below Board-delegated*

*authorizations*." Corzine added that spikes in VAR would be of little concern because the Company's trading philosophy limited risk and ensured liquidity: "I would note that we have seen higher spikes in VAR usage in [Q3'11], and I would expect, within limits, that pattern will continue. We expect to follow a trading philosophy, however, emphasizing high turnover."

376.    During the same conference call on February 3, 2011, a J.P. Morgan analyst asked "[w]hich products and services worked particularly well this quarter." In response, Corzine emphasized purported improvements in various areas and risk management, stating "[w]e had a quarter where there was pretty good balance across our businesses. *As I noted in my remarks, we have not dramatically increased – we haven't even substantially increased our VAR except on very short duration bases*."

377.    Another analyst on the February 3, 2011 conference call – this time a Barclays Capital analyst – asked about the impact of the regulatory environment on MF Global's strategy. In response, Corzine explained that, though MF Global was not yet subject to the Dodd-Frank Wall Street Reform Act or its "Volcker Rule," MF Global's internal standards purportedly prevented the taking of unwarranted risks:

> All that said, the kind of question . . . with regard to how we take on leverage, how we manage our liquidity, how we manage risk, how we look at turnover of assets, how we manage our business, we don't feel any less responsible for what is our requirement. And I think we are trying to demonstrate that to the marketplace. *While we've made very clear that we are interested in offering risk intermediation services [of] our clients, we have done that on a very measured basis and intend to continue to do that*.

378.    During the same February 3, 2011 conference call, MacDonald also touted the Company's reduced leverage ratio and liquidity, stating that "the raw calculation of gross leverage is 28 times. This is magnified by our matchbook, which grosses up our balance sheet with *very liquid low risk assets*." Additionally, offering a purportedly better picture of the Company's leverage and liquidity, MacDonald presented an alternative calculation that

"excluded all government backed and centrally cleared securities from the calculation," which included "the majority of our repo book." According to MacDonald, "[c]alculated in this manner, MF Global leverage is five times, *which is consistent with how we view our balance sheet and comparable to the best capitalized banks in the industry*." The written presentation accompanying MacDonald's remarks also described MF Global's supposedly "*Strong Liquidity Position*."

379.     MF Global's Q3'11 Form 10-Q described the Company's risk appetite with respect to principal transactions, representing that a small increase was possible in the future: "As we increase our client facilitation activities and engage in more proprietary transactions, *our risk profile may incrementally increase* as we are exposed to more market and credit risk in certain areas."

380.     With respect to potential liquidity risks, the Q3'11 Form 10-Q again explained that MF Global's capital management should ensure the availability of sufficient liquidity: "As a matter of policy, we maintain excess capital to provide liquidity during periods of unusual market volatility, which has been sufficient historically to absorb the impact of volatile market events." The Q3'11 Form 10-Q also suggested that liquidity risks were unlikely because MF Global's "core business, providing execution and clearing brokerage services, *does not generally present a substantial cash liquidity risk*." In the event of an unexpected liquidity event, the Form 10-Q stated that the Company's liquidity policy "was designed to ensure that we maintain access to sufficient, readily available liquid assets and committed liquidity facilities."

381.     Further, the Q3'11 Form 10-Q explained that MF Global "also evaluate[d] the impact of adverse market conditions on [the Company's] liquidity risk and adjust[ed] [the Company's] liquid assets appropriately." The policy "require[d] [MF Global] *to have sufficient*

***liquidity to satisfy all of [its] expected cash needs for at least one year without access to the capital markets***." The Q3'11 Form 10-Q also stated that MF Global would "continuously evaluate the levels of regulatory capital at each of our operating subsidiaries . . . to ensure compliance with all regulatory capital requirements," and "[w]e also maintain excess regulatory capital to accommodate periods of unusual or unforeseen market volatility, and we intend to continue to follow this policy."

382.    The Q3'11 Form 10-Q also repeated MF Global's previously described commitment to operational risk management as set forth above in ¶ 332.

383.    The Q3'11 Form 10-Q also contained as exhibits certifications signed by Defendants Corzine and MacDonald in the same form as those referred to in ¶ 335.

384.    Following Corzine's above-described December 2010 private discussion with PwC (discussed above in ¶ 219), the Q3'11 Form 10-Q also reported for the first time that MF Global retained some (unspecified) exposure to the risk of default of underlying Euro sovereign debt through RTM transactions:

> The Company also enters into securities financing transactions that mature on the same date as the underlying collateral. The Company accounts for these transactions in accordance with the accounting standard for transfers and servicing and recognizes a gain or loss on the sale/purchase of the collateral assets, and records a forward commitment. ***The Company derecognizes the collateral assets as sold when the transactions are accounted for as sales, and recognizes the collateral assets as purchased when the transactions are accounted for as purchases. In these transactions, the Company has exposure to the risk of default of the issuer of the underlying collateral assets, such as U.S. government securities or European sovereign debt***.

385.    According to the Q3'11 Form 10-Q, as of December 31, 2010, total U.S. and European government securities sold under agreements to repurchase of $7.56 billion, at contract value, were derecognized. The Q3'11 Form 10-Q did not further detail the Company's specific Euro sovereign (versus U.S. government) debt RTM exposure. This disclosure was inadequate

because it omitted what FASB Technical Director Susan Cosper described in her March 28, 2012 Congressional testimony as the "extensive disclosures" that are "required under GAAP" for RTM transactions, "including both quantitative and qualitative information about the transferor's continuing involvement, the risk that the transferor continues to be exposed to, including credit and liquidity risk, the amount to be recognized, and gains or losses on transferred assets."

386.   The above-referenced statements about MF Global's risk appetite, internal controls and liquidity management were materially misstated and omitted material facts necessary to make the statements therein not misleading for the reasons set forth in Sections IV.D-G above, including, *inter alia*, because: (1) the Officer Defendants had significantly increased principal risk-taking and risk limits in connection with their strategic plan and the corresponding proprietary trading (by February 2011, net Euro sovereign debt exposure RTM was nearly $5 billion) without the necessary corresponding increase in capital, liquidity risk management or internal controls; (2) MF Global failed to maintain reliable internal controls related to Euro sovereign debt RTM transactions and repeatedly breached specific Board limits established for those transactions; (3) the primary purpose of the Company's increased principal trading activity was not to facilitate customer transactions but to engage in non-client-related speculative transactions; (4) Defendants' representations about available capital and liquidity were unreliable given that: (a) the Company's liquidity monitoring systems were outdated, (b) the Company had no real-time liquidity monitoring system, and (c) the Company tracked liquidity using informal, manual means compiled from spreadsheets and oral reports; (5) even though the Company's transformation plan did not involve increasing VAR, the plan involved materially increasing off-balance sheet liquidity risks and leverage levels in connection with investments in Euro sovereign debt through RTM transactions; and (6) MF Global exposed client

funds to significant risk by relying on regular inter-company transfers from MF Global's FCM operations to meet the daily liquidity needs of non-FCM operations.

### E.     The Fourth Fiscal Quarter Of 2011 And Full Fiscal 2011 Year

#### 1.     Net Income And DTA

387.     On May 19, 2011, MF Global issued a press release reporting its financial results for the fourth fiscal quarter of 2011 and the full fiscal 2011 year (both ended March 31, 2011). The press release, which quoted Defendants Corzine and Steenkamp, was filed with the SEC as an exhibit to a Form 8-K signed by Steenkamp. In the press release, MF Global reported a quarterly net loss of $51.5 million, or $0.31 per basic and diluted share, and an annual net loss of $154.4 million, or $1.00 per basic and diluted share. The press release also contained quarter and fiscal year highlights, consolidated statements of operations and consolidated balance sheets, which purported to reflect MF Global's financial performance in accordance with GAAP.

388.     On May 20, 2011, MF Global filed the 2011 Form 10-K, signed by Defendants Corzine, Steenkamp, Bolger, Fusco, Gelber, Glynn, Goldberg, Schamis and Sloan. The 2011 Form 10-K contained the financial results reported in the May 19, 2011 press release, as well as consolidated balance sheets and consolidated statements of comprehensive income purporting to reflect MF Global's financial performance and assets and liabilities for the full fiscal 2011 year. The 2011 Form 10-K specifically stated: "The audited consolidated financial statements are prepared in conformity with U.S. generally accepted accounting principles ('U.S. GAAP'") and include the consolidated accounts of MF Global Holdings Ltd. and its subsidiaries."

389.     The 2011 Form 10-K further reported total DTA of $169.2 million, a valuation allowance of $19.5 million and net DTA of $108.3 million as of March 31, 2011. The 2011 Form 10-K described the valuation allowance as "relate[d] principally to uncertainty of the utilization of tax loss carryforwards in various jurisdictions," and asserted that "[t]he valuation allowance

*was calculated in accordance with U.S. GAAP rules*, which require[] that a valuation allowance be established or maintained when it is 'more likely than not' that all or a portion of the deferred tax assets will not be realized."

390.    With regard to DTA, the 2011 Form 10-K further stated:

> In certain jurisdictions, we have generated pre-tax losses that, in accordance with applicable tax law, we expect to be able to carry forward and offset against future profits to reduce relevant taxes going forward. *We have recorded significant deferred tax assets reflecting our expectation of using these loss carryforwards against future income*. If we are not able to generate profits in these jurisdictions in future periods, we may be required to record valuations allowances against these deferred tax assets. Recording valuation allowances against these deferred tax assets could have a significant adverse impact on our financial results.

391.    The 2011 Form 10-K also provided a purported justification for maintaining the DTA on the balance sheet –instead of recording a valuation allowance – despite being in a three-year (really four-year) cumulative loss position as of March 31, 2011. The 2011 Form 10-K stated:

> Realization of deferred tax assets is dependent upon multiple variables including available loss carrybacks, future taxable income projections, the reversal of current temporary differences, and tax planning strategies. U.S. GAAP requires that we continually assess the need for a valuation allowance against all or a portion of our deferred tax assets. *We are in a three-year cumulative pre-tax loss position at March 31, 2011 in many jurisdictions in which we do business. A cumulative loss position is considered negative evidence in assessing the realizability of deferred tax assets. We have concluded that the weight given this negative evidence is diminished due to significant non-recurring loss and expense items recognized during the prior three years, including IPO-related costs, asset impairments and costs related to exiting unprofitable business lines*.

392.    The 2011 Form 10-K also identified "positive evidence" purportedly supporting the decision not to take a valuation allowance:

> *We have also concluded that there is sufficient positive evidence to overcome this negative evidence*. The positive evidence includes three means by which we are able to fully realize our deferred tax assets. The first is the reversal of existing taxable temporary differences. *Second, we forecast sufficient taxable income in the carry forward period. We believe that future projections of income can be relied upon because the income forecasted is based on key drivers of*

***profitability that we began to see evidenced in fiscal 2011***. Most notable in this regard are plans and assumptions relating to the ***significant changes to our compensation structure implemented in fiscal 2011***, increased trading volumes, and other macro-economic conditions. Third, in certain of our key operating jurisdictions, we have a sufficient tax planning strategy which includes potential shifts in investment policies, which should permit realization of our deferred tax assets. Management believes this strategy is both prudent and feasible.

393.    The above-referenced statements about MF Global's net income and DTA were materially misstated and omitted material facts necessary to make the statements therein not misleading, because, *inter alia*, as set forth above in Section IV.C, the Company failed to timely record a valuation allowance against its U.S. DTA in violation of GAAP given that: (1) MF Global's U.S. operations were operating at a three-year (in fact, four-year) cumulative loss as of March 31, 2011; (2) MF Global did not have evidence "of sufficient quality and quantity to counteract [that] negative evidence" since it was relying on, at best, "unsettled" events dependent on future market conditions that had not yet been demonstrated; (3) MF Global's projections of income were unreliable and dependent on the undisclosed, unsustainable and high-risk Corzine Trade (and only 20% of the profits from the Corzine Trade could be recorded as revenues in connection with the Company's U.S. operations); (4) MF Global's plans to realize costs savings from changes to the Company's compensation structure were unreliable and insufficient to offset losses and benefit from the Company's U.S. DTA, especially since any costs savings were partially offset by increases in payroll expenses due to increased professional headcount; and (5) MF Global did not have "prudent" and "feasible" tax strategies that would have enabled it to avoid recording a full valuation allowance against its U.S. DTA.

### 2.    Risk Appetite, Internal Controls And Liquidity Management

394.    During the Company's May 19, 2011 quarterly earnings conference call, Defendant Corzine continued to emphasize the Company's purportedly "measured" approach to risk: "As we execute our plans and continue expanding our sales and trading operations, we

would expect our capital commitments to increase. ***Undoubtedly, measured risk taking will be a part of our build-out to an investment bank***."

395.    Defendant Steenkamp also addressed MF Global's liquidity during the May 19, 2011 conference call, asserting that the Company had "$1.5 billion of required and nearly $400 million of excess capital, sitting in regulated entities," as well as additional available funds adding up "to total available liquidity of nearly $3 billion, ***which is very consistent for the past year***." The written presentation accompanying Steenkamp's remarks stated that MF Global's "***Liquidity Position Remains Strong***."

396.    Analysts on the May 19, 2011 conference call focused on how MF Global was increasing revenues without materially increasing the Company's risk profile. For instance, a Sandler O'Neill analyst asked:

> My question is, revenues grew nicely and you're attributing it to the principal trading customer facilitation. And the question is, I'm looking at your VAR, it really didn't change. How were you able to accomplish it? And then going forward, it looks like the expenses are going to be slightly higher. Where are we in the process? Is there a lot more growth in revenue to be generated from customer facilitation principal trading?

397.    Defendant Corzine responded that growth would be controlled by the Company's risk systems and would not change the Company's risk appetite:

> First of all . . . as it relates to the VAR, it is, on the report, relatively stable. But if you look at the spikes inter quarter, it's moved up and down. We have a high turnover philosophy with regard to our trading positions. If you look at the correlations within the portfolio, as we build it out, there are offsets that our risk metric systems and risk systems would offset. ***So it is a growing book but it is not necessarily exposing us, at least at this point. I believe there is substantial ability to grow that without really changing our risk appetite, as opposed to our risk participation***.

398.    Also during the May 19, 2011 conference call, an analyst from Credit Agricole asked about the costs related to trading errors, which had historically been about "1.5% of revenue," and how MF Global was managing that risk in light of its increased trading activities.

In response, Corzine praised the Company's risk management, stating: "We spend a lot of time on operational risk management in the firm. . . . *I think you will see that we are taking very real steps to address this issue*." Corzine further stated:

> But we're absolutely dedicated to making sure that we minimize those numbers. We're not going to have perfection but [sic] minimizing those numbers. And like every financial institution, making certain that you don't have the kind of car crash that this organization experienced back 3, 4 years ago, *is essentially by having tight controls, tight compliance and making it part of the culture. And that's the kind of people we're hiring and that's the kind of culture we're building and attendant to*.

399.     During the same May 19, 2011 conference call, Steenkamp described the purportedly "minimal" risk related to the Company's Euro sovereign debt RTM transactions:

> As Jon mentioned, we saw principal trading opportunities in European sovereigns this quarter. By entering into resell and repurchase transactions to maturity, as we do in US government securities, we are able to capture arbitrage opportunities in these markets. *We believe the market risk to these trades is minimal, as these are held to maturity*. While we retain exposure to the underlying credit throughout the maturity period, the duration of these trades is short-term in nature. Additionally, we continue to reshape the balance sheet to capture higher margin opportunities, and as such, our matched repo and stockpile loan book continues to move lower.

400.     The 2011 Form 10-K also described MF Global's strategic plan to "selectively increase risk taking" "within" Board limits as follows:

> As part of our strategic plan, we expect to significantly increase our proprietary activities and to recognize more trading income as part of our ongoing activity for our clients in various markets, *and to selectively increase our risk taking, while operating within the authority delegated by our Board of Directors*. Principal transactions generally yield higher profit margins than commissions that we earn by executing client trades, but also subject us to greater risk.

401.     The 2011 Form 10-K also stated that MF Global maintained exposure to the sovereign debt of Portugal, Ireland, Italy, Spain and Belgium. The 2011 Form 10-K disclosed in a footnote that, at March 31, 2011, "securities . . . sold under agreements to repurchase of $14,520,341[,000] at contract value, were de-recognized, of which 52.6% were collateralized

with European sovereign debt." But even this footnote disclosure – which followed Corzine's December 2010 meeting with PwC referenced above in ¶ 219 – was inadequate, as it omitted what FASB Technical Director Susan Cosper described in her March 28, 2012 Congressional testimony as the "extensive disclosures" that are "required under GAAP" for RTM transactions, "including both quantitative and qualitative information about the transferor's continuing involvement, the risk that the transferor continues to be exposed to, including credit and liquidity risk, the amount to be recognized, and gains or losses on transferred assets." Indeed, the 2011 Form 10-K failed to disclose the liquidity risk of the Euro Sovereign debt RTM transactions, including the Company's reliance upon inadequate liquidity controls, as set forth herein.

402.    The 2011 Form 10-K also described MF Global's supposedly "comprehensive" risk management:

> We are exposed to numerous risks in the ordinary course of our business, and effective risk management is critical to the success of our business. ***We have a comprehensive risk governance structure and management processes designed to monitor, evaluate, and manage the risks we assume in conducting our business.*** The principal risks we face include market risk (within which we include issuer default risk), credit risk, capital risk, liquidity risk and operational risk.

403.    Explaining the Company's approach to controlling risk, the 2011 Form 10-K stated that the "enterprise risk governance framework" would ensure that MF Global operated within approved "risk tolerances":

> Our enterprise risk governance framework involves the oversight of our Board of Directors together with our management committees, policies, and procedures, and defined delegation of authority. ***Our Board-approved risk appetite and strategic objectives translate to defined risk tolerances and oversight processes and, subsequently, strictly enforced delegations of authority and concomitant controls to ensure our operation within those risk tolerances.***

404.    The 2011 Form 10-K further represented that the Company had "clearly define[d] roles and responsibilities for risk taking, processing, reporting, and control":

The enterprise risk management framework employs this governance structure to *embed a strong risk culture and clearly define roles and responsibilities for risk taking, processing, reporting, and control. The enterprise risk management framework comprises the activities and methods through which we maintain risk within acceptable risk tolerances*. Business areas, pursuant to delegated authority, have primary responsibility for risk management.

405.    In addition to tasking individual business areas with responsibility for risk management, the Company purportedly deployed its risk department and internal auditing procedures to ensure compliance with risk-management limits. In this regard, the 2011 Form 10-K stated:

> Working with the business areas, the Risk department seeks to identify, assess, measure, monitor and limit the risks consistently across our businesses. *The internal audit department and audit committee further provide independent control and assurance of the risk-management process*.

406.    The 2011 Form 10-K also stated that MF Global employed multiple tools to establish and enforce risk limits and to address breaches:

> Processes and procedures are key components of our risk management. We engage in risk-taking activities to the extent of our risk appetite. *We establish limits for each of our businesses based on our risk appetite as set by the Board*. Business areas, pursuant to delegated authority, have primary responsibility for risk management by balancing our ability to profit from our revenue-generating activities with our exposure to potential losses. *Working with the business areas, the Risk department established a suite of limit techniques including, but not limited to, mandate limits applicable to specific businesses and risk types, value-at-risk, and stress scenario testing*.

> We have established and documented mandates for market risk assumed by our revenue-generating areas. For certain revenue-generating areas the risk mandates are supplemented with intra-day and overnight monitoring against the prescribed limits, both by the business areas and the Risk department. *The Market Risk department quantifies and assesses risks, and escalates breaches to risk limits*.

407.    With regard to operational risk, the 2011 Form 10-K stated that MF Global had an "Operational Risk department designed to identify, assess, measure and manage operational risk," and "[e]ach business area has established processes, systems, and controls to manage operational risk and is responsible for escalating incidents, issues and control indicators." The

2011 Form 10-K further described MF Global's Operational Risk Management Framework as an "effective environment" "independent of the revenue-generating areas" intended to "identify, assess, measure, monitor and mitigate operational risk:"

> *We maintain a continuous and collaborative Operational Risk Management Framework which establishes an effective environment [that] is designed to identify, assess, measure, monitor and mitigate operational risk across all of our business areas*. The Operational Risk Committee, which is chaired by the Global Head of Operational Risk and is a key component of the Enterprise Risk Management Governance structure, provides oversight of the Operational Risk Management Framework and provides a forum for senior management to assess the operational risk profile of the organization. The Global Head of Operational Risk reports to the Chief Risk Officer. *The Operational Risk department is a risk management and assurance function that is independent of the revenue-generating areas. The Operational Risk department's primary objective is to develop, implement, and maintain our Operational Risk Management Framework. The Operational Risk department works with all business areas to help ensure transparency, awareness, and accountability of risks*.

408.    The 2011 Form 10-K further stated that "[w]e continually seek to improve our technology and processes" and "strive to build a strong risk management team, which works closely with our management and business areas to deliver effective risk management."

409.    The 2011 Form 10-K also claimed that the Company carefully managed market exposure risks "*by limiting the size and concentration of positions held in accordance with our risk appetite and the delegated authorities, both approved by the Board*." The risk taken by MF Global's business areas, particularly its revenue-generating segments, was purportedly "*approved in defined risk mandates as delegated by the CRO."* The 2011 Form 10-K went on to explain: "Our business areas are responsible for these risks and are expected to operate *within these prescribed mandates*. Business areas are also responsible for managing our risk-revenue expectations in collaboration with the Risk department. *End-of-day and for certain businesses, intra-day monitoring processes mitigates risk taking in excess of our risk appetite*."

410.    Focusing on risk assessment, the 2011 Form 10-K stated that "[o]ur assessment programs are designed to assess the current state in order to project future risks and impacts." The 2011 Form 10-K also described MF Global's risk management as a tool to detect "expected and unexpected exposures," stating:

> By considering the inherent and residual operational risks, all available and relevant data, and the results of the core Operational Risk Management Framework programs, ***we measure both the potential expected and unexpected exposures***. The qualitative and quantitative measures are used to establish an operational risk profile for the organization, escalate risks that may be exceeding agreed tolerances, prioritize the remedial actions and identify other mitigating options.

411.    With respect to risk mitigation, the 2011 Form 10-K stated that, by utilizing MF Global's "top-down assessment program to identify extreme but plausible risk scenarios, we are able to extrapolate a capital measure with an expected confidence level" and that "[w]e may choose to calculate and hold economic capital to meet regulatory expectations or mitigate our potential exposure to extreme but unexpected scenarios."

412.    With respect to potential liquidity events, the 2011 Form 10-K explained that MF Global's liquidity policy should ensure the availability of sufficient liquidity: "As a matter of policy, we maintain excess capital to provide liquidity during periods of unusual market volatility, which has been sufficient historically to absorb the impact of volatile market events." The 2011 Form 10-K suggested, however, that liquidity events were unlikely because MF Global's "core business, providing execution and clearing brokerage services, ***does not generally present a substantial cash liquidity risk***." In case of an unexpected event, the 2011 Form 10-K stated that the Company's liquidity policy was "designed to ensure that we maintain access to sufficient, readily available liquid assets and committed liquidity facilities." The 2011 Form 10-K also stated that the liquidity policy, "require[d] [MF Global] ***to have sufficient liquidity to***

*satisfy all of [its] expected cash needs for at least one year without access to the capital markets*."

413.     The 2011 Form 10-K further stated that MF Global would "continuously evaluate the levels of regulatory capital at each of our operating subsidiaries . . . to ensure compliance with all regulatory capital requirements," and that MF Global "also maintain[s] internal early warning levels and excess regulatory capital to accommodate periods of unusual or unforeseen market volatility, and . . . intend[s] to continue to follow this policy."

414.     The 2011 Form 10-K also contained as exhibits certifications signed by Defendants Corzine and Steenkamp in the same form as those referred to in ¶ 335 above.

415.     On May 20, 2011, J.P. Morgan issued an analyst report relying on the Individual Defendants' representations that MF Global had increased revenues without raising risk exposure, noting: "Most importantly, VAR for the quarter was rather stable at $3.3M for the quarter, meaning MF was able to generate the principal revenue without raising the risk exposure."

416.     The above-referenced statements about MF Global's risk appetite, internal controls and liquidity management were materially misstated and omitted material facts necessary to make the statements therein not misleading for the reasons set forth in Sections IV.D-G above, including, *inter alia*, because: (1) The Officer Defendants' strategic plan to increase principal risk-taking also materially increased liquidity risks without the necessary corresponding increase in capital, liquidity risk management or internal controls; (2) MF Global failed to maintain reliable internal controls related to Euro sovereign debt RTM transactions and repeatedly breached specific Board limits established for those transactions; (3) the primary purpose of the Company's increased principal trading activity was not to facilitate customer

transactions but to engage in non-client-related speculative transactions; (4) Defendants' representations about available capital and liquidity were unreliable given that: (a) the Company's liquidity monitoring systems were outdated, (b) the Company had no real-time liquidity monitoring system, and (c) the Company tracked liquidity using informal, manual means compiled from spreadsheets and oral reports; (5) even though the Company's transformation plan did not involve increasing VAR, the plan involved materially increasing off-balance sheet liquidity risks and leverage levels in connection with investments in Euro sovereign debt through RTM transactions; and (6) MF Global exposed client funds to significant risk by relying on regular inter-company transfers from MF Global's FCM operations to meet the daily liquidity needs of non-FCM operations.

### F.       The First Fiscal Quarter Of 2012

#### 1.       Net Income And DTA

417.    On July 28, 2011, MF Global issued a press release reporting its financial results for its first fiscal quarter of 2012 ended June 30, 2011 ("Q1'12"). The press release, which quoted Defendants Corzine and Steenkamp, was filed with the SEC as an exhibit to a Form 8-K that was signed by Steenkamp. The Company reported Q1'12 net income of $7.7 million, or $0.05 per basic and diluted share. The press release contained Q1'12 highlights, consolidated statements of operations and consolidated balance sheets, which purported to reflect MF Global's financial performance in accordance with GAAP. The press release quoted Corzine describing MF Global's "net revenue **and GAAP net income at their highest levels in nearly three years**."

418.   On August 3, 2011, MF Global filed its Q1'12 Form 10-Q, signed by Defendants Corzine and Steenkamp.[21] The Q1'12 Form 10-Q repeated the financial results announced in the July 28, 2011 press release and also contained consolidated balance sheets and consolidated statements of comprehensive income purporting to reflect MF Global's financial performance and assets and liabilities. According to this Form 10-Q, "[t]he unaudited consolidated financial statements [were] prepared in conformity with U.S. generally accepted accounting principles ('U.S. GAAP') and include[d] the consolidated accounts of MF Global Holdings Ltd. and its subsidiaries."

419.   As to DTA, the Q1'12 Form 10-Q reported that the Company remained in a three-year cumulative loss position and stated that, "[w]hile the Company was profitable for the quarter ended June 30, 2011, the Company was nonetheless in a three-year cumulative pre-tax loss position as of June 30, 2011 in many jurisdictions in which it does business." The Q1'12 Form 10-Q further stated that "[r]ealization of deferred tax assets is dependent upon multiple variables including available loss carrybacks, future taxable income projections, the reversal of current temporary differences, and tax planning strategies. U.S. GAAP requires that the Company continually assess the need for a valuation allowance against all or a portion of its deferred tax assets." Purportedly applying the GAAP analysis, the Q1'12 Form 10-Q noted that "[a] cumulative loss position is considered negative evidence in assessing the realization of deferred tax assets," and that "[t]he Company has concluded that the weight given to this negative evidence is diminished due to significant non-recurring loss and expense items recognized during the three prior years, including IPO-related costs, asset impairments and costs related to exiting unprofitable business lines."

---

[21] MF Global's September 1, 2011 Q1'12 Form 10-Q/A did not amend any of the statements alleged herein as materially misstated or omitting material information.

420.    Additionally, the Q1'12 Form 10-Q explained the purported positive evidence weighing against a valuation allowance:

> ***The Company has also concluded that there is sufficient positive evidence to overcome this negative evidence***. The positive evidence includes three means by which the Company is able to fully realize its deferred tax assets. First is the reversal of existing taxable temporary differences. ***Second, the Company is forecasting sufficient taxable income in the carry forward period. The Company believes that future projections of income can be relied upon because the income expected is based on key drivers of profitability that it began to see evidence of in fiscal 2011***. Most notable in this regard are plans and assumptions relating to the ***significant changes to the Company's compensation structure implemented in fiscal 2011***, increased trading volumes, and other macro-economic conditions. Third, in certain of its key operating jurisdictions, the Company has sufficient tax planning strategies, which should permit realization of its deferred tax assets. Management believes these strategies are both prudent and feasible.

421.    The above-referenced statements about MF Global's net income and DTA were materially misstated and omitted material facts necessary to make the statements therein not misleading, because, *inter alia*, as set forth above in Section IV.C, the Company failed to timely record a valuation allowance against its U.S. DTA in violation of GAAP given that: (1) MF Global's U.S. operations were operating at a three-year (in fact, four-year) cumulative loss as of March 31, 2011; (2) MF Global did not have evidence "of sufficient quality and quantity to counteract [that] negative evidence" since it was relying on, at best, "unsettled" events dependent on future market conditions that had not yet been demonstrated; (3) MF Global's projections of income were unreliable and dependent on the undisclosed, unsustainable and high-risk Corzine Trade (and only 20% of the profits from the Corzine Trade could be recorded as revenues in connection with the Company's U.S. operations); (4) MF Global's plans to realize costs savings from changes to the Company's compensation structure were unreliable and insufficient to offset losses and benefit from the Company's U.S. DTA, especially since any costs savings were partially offset by increases in payroll expenses due to increased professional headcount; and (5)

MF Global did not have "prudent" and "feasible" tax strategies that would have enabled it to avoid recording a full valuation allowance against its U.S. DTA.

### 2.     Risk Appetite, Internal Controls And Liquidity Management

422.    On June 9, 2011, Corzine participated in Sandler O'Neill's Global Exchange & Brokerage Conference. At the conference, Corzine touted his role in risk management, stating, "*I consider one of my most important jobs is to be the Chief Risk Officer of our firm so that I wrestle with those [market concerns] as much as anybody*." Remarkably, Corzine went on to state that MF Global's expansion into principal trading activities "*actually makes us less risky*."

423.    On the Company's July 28, 2011 earnings conference call with analysts and investors, Corzine again highlighted risk management in MF Global's "client dealing and principal trading" business: "[D]iversifying into *client dealing and principal trading* works to reduce dependence on a single line of business, and it allowed us to grow revenues even in a difficult environment. *We obviously understand that trading carries attended risks, but it was also subject to diversification and focused risk management*."

424.    Also during the July 28, 2011 call, Defendant Steenkamp again touted the purportedly minimal market risks related to the Company's Euro sovereign debt portfolio:

> As mentioned last quarter, we continue to enter into resell and repurchase transactions to maturity in U.S. government securities and European sovereigns. This enables us to capture arbitrage opportunities in these markets, and *we continue to believe market risk to these trades is minimal as these are held to maturity*. While we retain exposure to the underlying credit throughout the maturity period, the duration of trade is short-term in nature.

425.    A Barclays Capital analyst on the July 28, 2011 conference call inquired about the concentration of different products in principal transactions, and asked the following: "[H]ow . . . [does] the business break[] down today, maybe rough percentages, both looking at just on a principal basis and then also including really agency like riskless principal in the business?" In

response, Corzine emphasized the Company's focus on maintaining liquid assets, stating: "And I would expect . . . *our overall leverage will come down or certainly not grow* . . . ."

426.   With respect to liquidity, during the same call, Steenkamp highlighted the Company's excess capital and available liquidity:

> The company has $2.2 billion in total capital. We have $1.6 billion of required and nearly $342 million of excess capital sitting in regulated entities. . . . We also have $1.6 billion of intraday liquidity in non-segregated client payables and collateral, and this adds up to total available liquidity of $3.2 billion, up significantly from March 31, 2011.

427.   The written presentation accompanying Steenkamp's remarks further stated that MF Global's "*Liquidity Position Remains Strong*."

428.   Another analyst on the July 28, 2011 conference call – this time an analyst from J.P. Morgan – inquired about the impact of the U.S. "debt-ceiling debate" on MF Global. In response, Corzine assured investors that MF Global had sufficient liquidity to withstand ensuing stress on the market, stating: "*We have warehoused the liquidity and we are aware that generally in these stress periods, margin requirements change*. So you have to be prepared for that kind of event. We have sort of *more than planned and are prepared for generally those kinds of conditions*."

429.   MF Global's Q1'12 Form 10-Q stated that the Company's internal controls were "strictly enforced" as follows:

> The Company's enterprise risk governance framework involves the oversight of its Board of Directors together with the Company's risk oversight committees, policies and procedures, and defined delegation of authority. *The Company's Board-approved risk appetite and strategic objectives translate to defined risk tolerances and oversight processes and, subsequently, strictly enforced delegations of authority and concomitant controls, which are designed to ensure its operation within those risk tolerances*.

430.   The Q1'12 Form 10-Q again described MF Global's purported "strong risk culture:"

144

The enterprise risk management framework employs this governance structure, which is intended to embed a strong risk culture and clearly define roles and responsibilities for risk taking, processing, reporting, and control. The enterprise risk management framework comprises the activities and methods through which the Company maintains risk within acceptable risk tolerances. Business areas, pursuant to delegated authority, have primary responsibility for risk management. Working with the business areas, the Risk department seeks to identify, assess, measure, monitor and limit the risks consistently across the Company's businesses. *The internal audit department and audit committee further provide independent control and assurance of the risk-management process*.

431.   Addressing risk management, the Q1'12 Form 10-Q stated that MF Global employed multiple tools to establish risk limits and address breaches:

Processes and procedures are key components of the Company's risk management. *The basis for its culture regarding risk-taking activities is the risk appetite*. *The Company establishes limits for each of its businesses based on its risk appetite, which is set by the Board.* Business areas, pursuant to delegated authority, have primary responsibility for risk management by balancing their ability to profit from revenue generating activities with their exposure to potential losses. *Working with the business areas, the Risk department established a suite of limit techniques including, but not limited to, mandate limits applicable to specific businesses and risk types, value-at-risk, and stress scenario testing*.

The Company has established and documented mandates for market risk assumed by its revenue-generating areas. For certain revenue generating areas the risk mandates are supplemented with intra-day and overnight monitoring against the prescribed limits, both by the business areas and the Risk department. *The Market Risk department quantifies and assesses risks, and escalates breaches to risk limits*.

432.   In the Q1'12 Form 10-Q, MF Global again noted that the Company had an "Operational Risk department to identify, assess, measure and manage operational risk," and "[e]ach business area has established processes, systems, and controls to manage operational risk and is responsible for escalating incidents, issues and control indicators." The Q1'12 Form 10-Q also described MF Global's "continuous and collaborative Operational Risk Management Framework, which ensures that an effective environment is in place to identify, assess, measure, monitor and mitigate operational risk across all of its business areas." Accordingly, "[t]he Company continually seeks to improve its technology and processes," and "strives to build a

145

strong risk management team, which works closely with its management and business areas to deliver effective risk management."

433.    Addressing market risk, the Q1'12 Form 10-Q described the Company's management of exposure "*by limiting the size and concentration of positions that it holds in accordance with its risk appetite and in accordance with [its] instructions from the delegated authorities, both approved by the Board*."

434.    The Q1'12 Form 10-Q also stated that the CRO established "defined risk mandates":

> The risk taken by [the Company's] business areas, especially its revenue-generating areas, *is approved in defined risk mandates as delegated by the CRO. The Company's business areas are responsible for these risks and are expected to operate within these prescribed mandates*. Business areas are also responsible for managing their risk-revenue expectations in collaboration with the Risk department. *End-of-day, and for certain businesses, intra-day monitoring processes mitigate risk taking in excess of the Company's risk appetite*.

435.    With respect to risk assessment, the Q1'12 Form 10-Q reiterated MF Global's assessment and projection commitment that "[t]he Company's assessment programs are designed to assess the current state in order to project future risks and impacts," and touted risk management as a tool to detect "expected and unexpected exposures," stating:

> By considering the inherent and residual operational risks, all available and relevant data, and the results of the core Operational Risk Management Framework programs, *the Company measures both the potential expected and unexpected exposures*. The qualitative and quantitative measures are used to establish an operational risk profile for the organization, escalate risks that may be exceeding agreed tolerances, prioritize the remedial actions and identify other mitigating options.

436.    The Company also addressed risk mitigation in the Q1'12 Form 10-Q, stating that MF Global utilized its "top-down assessment program to identify extreme but plausible risk scenarios . . . to extrapolate a capital measure with an expected confidence level" and that "[t]he

Company may choose to calculate and hold economic capital to meet regulatory expectations or mitigate its potential exposure to extreme but unexpected scenarios."

437.    The Q1'12 Form 10-Q further stated that MF Global "continuously evaluates the levels of regulatory capital at each of its operating subsidiaries and adjusts the amounts of regulatory capital as necessary to ensure compliance with all regulatory capital requirements," and that MF Global "also maintain[s] internal early warning levels and excess regulatory capital to accommodate periods of unusual or unforeseen market volatility, and . . . intend[s] to continue to follow this policy."

438.    With respect to potential liquidity events, the Q1'12 Form 10-Q explained that MF Global's liquidity policy should ensure the availability of sufficient liquidity, noting:

> *As a matter of policy, the Company maintains excess capital to provide liquidity during periods of unusual market volatility, which has been sufficient historically to absorb the impact of volatile market events*.

439.    The Q1'12 Form 10-Q also stated that liquidity events were unlikely because MF Global's "core business, providing execution and clearing brokerage services, ***does not generally present a substantial cash liquidity risk***." In the event of an unexpected event, the Q1'12 Form 10-Q stated that MF Global's "liquidity policy [was] designed to ensure that the Company maintains access to sufficient, readily available liquid assets and committed liquidity facilities." This liquidity policy, according to the Q1'12 Form 10-Q, required the Company "***to have sufficient liquidity to satisfy all of its expected cash needs for at least one year without access to the capital markets***."

440.    The Q1'12 Form 10-Q further stated that, "[a]t June 30 and March 31 2011, securities sold under agreements to repurchase of $16,548,450 and $14,520,341, respectively, at contract value, were de-recognized, of which 69.3% and 52.6%, respectively, were collateralized with European sovereign debt, consisting of Italy, Spain, Belgium, Portugal and Ireland." But

this disclosure – which followed Corzine's December 2010 meeting with PwC referenced above in ¶ 219 – was still inadequate, as it omitted what FASB Technical Director Susan Cosper described in her March 28, 2012 Congressional testimony as the "extensive disclosures" that are "required under GAAP" for RTM transactions, "including both quantitative and qualitative information about the transferor's continuing involvement, the risk that the transferor continues to be exposed to, including credit and liquidity risk, the amount to be recognized, and gains or losses on transferred assets."

441.    The Q1'12 Form 10-Q also contained as exhibits certifications signed by Defendants Corzine and Steenkamp in the same form as those referred to in ¶ 335 above.

442.    On September 1, 2011, MF Global issued the Q1'12 Form 10-Q/A. The Q1'12 Form 10-Q/A provided "additional information" related to the Company's regulatory capital requirements. Specifically, the filing stated:

> As previously disclosed, the Company is required to maintain specific minimum levels of regulatory capital in its operating subsidiaries that conduct its futures and securities business, which levels its regulators monitor closely. The Company was recently informed by the Financial Industry Regulatory Authority, or FINRA, that its regulated U.S. operating subsidiary, MF Global Inc., is required to modify its capital treatment of certain repurchase transactions to maturity collateralized with European sovereign debt and thus increase its required net capital pursuant to SEC Rule 15c3-1. *MF Global Inc. has increased its net capital and currently has net capital sufficient to exceed both the required minimum level and FINRA's early-warning notification level. The Company does not believe that the increase in net capital will have a material adverse impact on its business, liquidity or strategic plans.* In addition, the Company expects that its regulatory capital requirements will continue to decrease as the portfolio of these investments matures, which currently has a weighted average maturity of April 2012 and a final maturity of December 2012.

443.    The above-referenced statements related to risk appetite, internal controls and liquidity management were materially misstated and omitted material facts necessary to make the statements therein not misleading for the reasons set forth in Sections IV.D-G above, including, *inter alia*, because: (1) the Officer Defendants' strategic plan to increase principal risk-taking

also materially increased liquidity risks without the necessary corresponding increase in capital, liquidity risk management or internal controls; (2) MF Global failed to maintain reliable internal controls related to Euro sovereign debt RTM transactions and repeatedly breached specific Board limits established for those transactions; (3) the primary purpose of the Company's increased principal trading activity was not to facilitate customer transactions but to engage in non-client-related speculative transactions; (4) Defendants' representations about available capital and liquidity were unreliable given that: (a) the Company's liquidity monitoring systems were outdated, (b) the Company had no real-time liquidity monitoring system, and (c) the Company tracked liquidity using informal, manual means compiled from spreadsheets and oral reports; (5) even though the Company's transformation plan did not involve increasing VAR, the plan involved materially increasing off-balance sheet liquidity risks and leverage levels in connection with investments in Euro sovereign debt through RTM transactions; and (6) MF Global exposed client funds to significant risk by relying on regular inter-company transfers from MF Global's FCM operations to meet the daily liquidity needs of non-FCM operations.

> G.     **The Second Fiscal Quarter of 2012**

>> 1.     <u>**Risk Appetite, Internal Controls And Liquidity Management**</u>

444.     On September 12, 2011, Corzine participated in the Barclays Global Financial Services Conference. At the conference, Corzine emphasized MF Global's purported focus on risk management, stating:

> *[W]e are continually assessing risk and adjusted returns on all significant positions in conjunction with risk and stress management*. . . . *In fact, I have to say at this point in time, this is the central focus of my day-to-day job.* Recognizing the environment is demanding is also a time filled with opportunity, however, *as long as we maintain our substantive risk capacities*.

445.     Also during the call, Corzine touted MF Global's "historically high levels" of capital and liquidity, stating "we have been working assiduously to build our capacities in both

capital and liquidity. Standard historically high levels for the firm, $2.6 billion in capital and $3.7 billion in liquidity." Corzine further stated during the conference that "we've improved our capital and liquidity position. . . . **We are deeply focused on making sure our liquidity and capital positions are strong**. That was the case before we got into the hypervolatility environment we're in today, and it will continue[.]" Additionally, Corzine stated, "at the end of the day right now, as we go through this very challenging time **addressing liquidity and capital and preservation . . . is our number one priority**."

446.    During the conference, an audience member asked about how MF Global was handling a market in which "there's less capital available," particularly "how you're balancing the objective of running a conservative balance sheet, apply liquidity here, and meeting those . . . less facilitation and [sic] in the meantime." Corzine responded that the firm focused on "high turnover" and also that "**we believe very seriously that we have to make sure that every position is examined in its liquidity and capital usage, so risk-adjusted basis**."

447.    On October 24, 2011, in response to Moody's downgrade (*see* ¶ 286), MF Global issued a letter from Defendant Steenkamp and an accompanying presentation on its Euro sovereign debt RTM portfolio. Steenkamp's letter stated that Moody's action bore "no implications for our clients or the strategic direction of MF Global" and that MF Global remained in a "**strong liquidity position**"; operated within "**a defined risk appetite**"; and the RTMs had "**limited market risk**." An accompanying presentation further downplayed the risk of the RTM portfolio and stated that "**[m]arket risk is limited**" and the "[o]nly risk of loss is upon default of the issuer of the underlying securities." The presentation also described "worst case scenario" write-downs related to the RTM portfolio, representing that the worst case scenario was $219 million risk and the worst case scenario potential write-down was $131 million.

448.   With respect to risk management, Steenkamp's October 24, 2011 letter and presentation further represented that MF Global had "*[s]olid risk management*," including "*liquidity analysis*," and noted that "*[f]or any relevant risk, measures and limits are set and monitored*," including "[s]tress scenarios."

449.   On October 25, 2011, MF Global issued a press release reporting its Q2'12 financial results. The press release, which quoted Defendants Corzine and Steenkamp, was filed with the SEC as an exhibit to a Form 8-K signed by Steenkamp.

450.   With respect to the Corzine Trade, Corzine stated in the press release that "[o]ver the course of the past year, we have seen opportunities in short-dated European sovereign credit markets and built a fully financed, laddered maturity portfolio that we actively manage. *We remain confident that we have the resources and expertise to continue to successfully manage these exposures to what we believe will be a positive conclusion in December 2012.*"

451.   In the October 25, 2011 press release, MF Global also claimed that it was in a "*[s]trengthened capital and liquidity position*" as of September 30, 2011. Corzine was quoted as stating that, "[r]eflecting the stressed markets in the quarter, we deliberately chose to reduce overall market exposure in most principal trading activities and focused on preserving capital and liquidity." Steenkamp similarly was quoted as stating that "the steps we've taken over the past year to improve our capital and liquidity positions are of immense value in periods of uncertainty and volatility. *As a result, we are a stronger firm today with more flexibility to focus on our strategy.*"

452.   On October 25, 2011, MF Global hosted a conference call with analysts and investors to discuss the Company's Q2'12 financial performance. During the call, Corzine and Steenkamp reviewed MF Global's quarterly financial results, and Corzine also discussed the

Euro sovereign debt RTM portfolio, stating that "the structure of the transaction themselves *essentially eliminates market and financing risk*." Additionally, Corzine stated that "our judgment is that our positions have relatively little underlying principal risk in the timeframe of our exposure." An accompanying presentation similarly stated:

> *Risk is limited . . . Solid risk management* – For any relevant risk, measures and limits are set and monitored which include: stress scenarios, concentration evaluation, credit exposure and liquidity analysis.

453.    A Barclays Capital analyst on the call inquired about the "discount . . . being applied in repo transactions in these sovereign securities right now." Steenkamp responded that FINRA's capital charge related to the debt was a "regulatory reinterpretation of the haircuts that they apply to these positions" and "we look at it as if the regulatory interpretation had been applied prior to July, our July position could and would have been in excess." Corzine also responded that "we were operating against a different interpretation of what those capital charges were, *not because we didn't have the capital, we just organized differently*."

454.    During the October 25, 2011 earnings call with investors and analysts, Corzine also highlighted the Company's purportedly "improved" liquidity position, stating that "*[w]e've substantially improved our capital and liquidity positions*." He continued, representing that, despite the "stressful" economic conditions, "*we've husbanded our capital and strengthened our liquidity*." With respect to the Company's liquidity, Steenkamp also stated, "[w]e have $1.5 billion of required and nearly $500 million of excess capital sitting in regulated entities. We also have over $260 million of free cash in our financial holding company. . . . [W]e have $1.3 billion in available cash funds from liquidity facilities and we also have $1.7 billion of intraday liquidity in non-segregated client payables and collateral. This adds up to total available liquidity of $3.7 billion, up significantly from June 30, 2011." Steenkamp further stated that "*we feel good about our capital structure and liquidity position*."

455.     Addressing the Company's risk management, Corzine reiterated his role in "risk mitigation" and stated, "our positions and the judgment about risk mitigation steps are my personal responsibility and a prime focus of my attention." Steenkamp also highlighted the Company's risk management during the call, stating "I can tell you with confidence that our functional areas, including risk, operations and treasury performed exceptionally well."

456.     During the call, a Keefe, Bruyette and Woods analyst asked whether MF Global would "need to raise equity." Steenkamp responded, in part, that "*[w]e felt good about having the liquidity in these volatile times, especially going over quarter-end. And we consistently, on a day-to-day basis, assess liquidity needs and sort of be more cautious in our approach. . . .*" Corzine added, "*we're in a much, much stronger liquidity position*."

457.     A J.P. Morgan analyst on the call also specifically asked about the Company's capital, noting that "you reported excess capital of $342 million at the end of last quarter" and asking "why were you not able to kind of use that capital to meet the FINRA, the change[d] FINRA requirements? And I guess how should we interpret your concept to the concept of excess capital going forward?" In response, Corzine said "that is actually exactly what I suggested in my answer and how we've responded to the changed interpretation that we were required to meet by FINRA. *We had excess capital in many different other locations*." Steenkamp added, "That's exactly right. It's location . . . . So FINRA was very specific to ink to our U.S. broker-dealer. The excess is spread all around the world and in various entities . . . and they can't go back in time and change the location back in time[.]"

458.     Corzine further stated that "I think all financial institutions will have to go through a re-optimization of how they allocate both capital and liquidity in the new world that

we are evolving to on regulation not only within countries but across the globe. And we were able to really quite [facilitate] to be able to move the capital within the group to meet the needs."

459.    The above-referenced statements about MF Global's risk appetite, internal controls and liquidity management were materially misstated and omitted material facts necessary to make the statements therein not misleading for the reasons set forth in Sections IV.D-G above, including, *inter alia*, because: (1) the Officer Defendants' strategic plan to increase principal risk-taking also materially increased liquidity risks without the necessary corresponding increase in capital, liquidity risk management or internal controls; (2) MF Global failed to maintain reliable internal controls related to Euro sovereign debt RTM transactions and repeatedly breached specific Board limits established for those transactions; (3) Defendants' representations about available capital and liquidity were unreliable given that: (a) the Company's liquidity monitoring systems were outdated, (b) the Company had no real-time liquidity monitoring system, and (c) the Company tracked liquidity using informal, manual means compiled from spreadsheets and oral reports; (4) even though the Company's transformation plan did not involve increasing VAR, the plan involved materially increasing off-balance sheet liquidity risks and leverage levels in connection with investments in Euro sovereign debt through RTM transactions; and (5) MF Global exposed client funds to significant risk by relying on regular inter-company transfers from MF Global's FCM operations to meet the daily liquidity needs of non-FCM operations.

## VI.    THE OFFICER DEFENDANTS ACTED WITH SCIENTER

460.    At all relevant times during the Class Period, Officer Defendants Corzine, MacDonald and Steenkamp acted with scienter in making materially false and misleading statements. Each Officer Defendant had actual knowledge that the statements made by him were materially false and misleading when made, or acted with reckless disregard for the truth or

falsity of those statements. Each Officer Defendant's intent to deceive, or reckless disregard for the truth, is demonstrated by substantial direct and circumstantial facts and evidence supporting a strong inference of scienter.

### A. The Officer Defendants Closely Monitored Core Operations

461. The Officer Defendants were deeply involved in the daily management of all aspects of MF Global's core operations, including the Company's policies, procedures and standards for the management of capital, liquidity and market risks.

462. Moreover, as set forth more fully above in Sections IV.B and IV.D, Corzine "was very hands-on" in his role as Chairman and CEO. Soon after joining the Company, Corzine became a core member of MF Global's new proprietary trading unit, the PSG, which put on the enormous Euro sovereign debt RTM transactions. As such, Corzine communicated with MFGI and MFG-UK personnel directly to carry out these RTM transactions, instructing them when to enter and exit various positions. Internal emails cited in the SIPA Report and set forth above in Sections IV.D-H further establish that MF Global's senior management and Board, including the Officer Defendants, were consistently aware of the extent – and implications – of the Corzine Trade. The Officer Defendants therefore knew that: (1) MF Global's exposure to Euro sovereign debt through RTM transactions had grown to shocking levels beyond the Company's risk and liquidity profile; (2) by the summer of 2011, as reported to MF Global's Board, the Company anticipated the need for nearly one billion dollars' worth of additional funding to meet related margin calls; and (3) despite the risks associated with exposure to Euro sovereign debt through off-balance sheet RTM transactions, which were not included in any of the Company's VAR calculations, the Officer Defendants repeatedly touted VAR metrics to misleadingly reassure the public about MF Global's financial well-being.

463.    As a result of these regular and ongoing activities, Defendants Corzine, MacDonald and Steenkamp, at a minimum, were made aware of the facts alleged herein involving the Company's capital position, liquidity and risk management as they arose during the Class Period as well as the Company's, at best, "unsettled" attempt to turn MF Global's history of losses in its U.S. operations into profitability in the face of near-zero interest rates.

### B.    The Officer Defendants Were Aware Of, Or Recklessly Disregarded, The Abandonment Of Risk Management Practices

464.    The Officer Defendants publicly described MF Global as having "solid risk management" throughout the Class Period and repeatedly emphasized publicly the importance of risk controls and limits. Indeed, Corzine held himself out as a unique type of CEO, who considered "one of [his] *most important jobs . . . to be the Chief Risk Officer*" and, as such, kept close tabs on risk management practices. Consistent with his purportedly "hands-on" approach, Corzine was well aware of the Company's risk limits, policies and procedures and the many perilous changes made to them at his insistence during the Class Period. While Corzine publicly represented and emphasized to investors that he would "ensure the appropriate controls are in place" and that "MF Global's risk management framework ha[d] been tightened considerably" since he took the reins as Chairman and CEO, he and the other Officer Defendants knew otherwise.

465.    As alleged above, the Officer Defendants were intentionally misstating the facts, or acting in a deliberately reckless manner in making their repeated public statements regarding purportedly strong risk management practices in view of what was actually happening at the Company, which, at the very least, provided no basis for – and in fact contradicted – their repeated statements. In particular, as detailed in Section IV.E above, the Officer Defendants were aware that: (1) Corzine side-lined the Company's risk officers; (2) Corzine cancelled key

projects in the risk department; (3) Corzine systematically circumvented internal controls to increase Euro sovereign debt trading limits *by 950%* in 2010 – from approximately $500 million in March 2010 to $4.75 billion in November 2010 – and to $6.6 billion in the first six months of 2011; and (4) PwC's non-public audit work-papers "identified the management override over internal controls as a risk to MF Global." In addition, as detailed above in Section IV.E.1, Corzine was aware that the Company was in breach of then-existing risk limits – such as they were – on more than one occasion and sought Board approval *only after the fact*.

466.    Moreover, the Company's Chief Risk Officers repeatedly warned the Officer Defendants of the increasing capital, liquidity and concentration risks associated with the Corzine Trade, but the Officer Defendants ignored the risks and fired CRO Roseman for resisting their insistence on increasing the size of the Corzine Trade. *See* Section IV.E. Numerous other MF Global employees also saw and raised red flags during the Class Period, but the Officer Defendants ignored those warnings too. *See* Section IV.E.

467.    In fact, the Officer Defendants disregarded dozens of critical gaps in internal controls that were apparent, identified and even reported to MF Global's Board. As detailed in Section IV.E.2 above, the Officer Defendants knew or recklessly disregarded that, among other things: (1) an April 2010 Board presentation identified gaps in technology that made the data needed for forecasting MF Global's liquidity risks inadequate and unreliable; (2) a May 2010 Internal Audit report noted that MF Global's risk policies, including liquidity risk reporting, were "not congruent with the changes to its broker-dealer business"; (3) an October 2010 Internal Audit report on "Market and Credit Risk Management" identified "High Risk" areas arising from the lack of controls over risk reporting and liquidity monitoring; (4) a March 31, 2011 Internal Audit report 2011 concluded that MF Global's Regulatory Reporting group did not

have controls or automated systems in place to document compliance-related performance; (5) a follow-up report that was presented to the Board noted that MF Global was dependent on O'Brien's personal knowledge of liquidity issues, which threatened a "key man risk," because the processes supporting the composition of the liquidity forecast were not documented and were mainly based on O'Brien's personal experience in lieu of reliable liquidity reporting tools; and (6) a June 20, 2011 Global Liquidity and Capital Management Internal Audit report continued to warn of the "numerous and significant gaps between the policy and existing practices" that had not been remedied for more than one year on the grounds that "*the business accepts this risk*."

468.    Accordingly, the Officer Defendants were on notice that the Company's internal controls were at risk of having significant deficiencies and were aware of, or recklessly disregarded, what the OFR describes as "a pattern of lapses in compliance and governance" during the Class Period.

469.    Moreover, the Officer Defendants closely monitored the Company's capital and liquidity positions through daily reports. As detailed above in Section IV.G.4, Liquidity Dashboards were shared with senior management, including Defendants Corzine and Steenkamp, on a daily basis starting at some point in 2010. These Liquidity Dashboards showed that, during the month of October 2011 and for some time before, liquidity in MF Global's broker-dealer operations was *uniformly negative* before applying funding from other sources – namely, funding from FINCO or FCM funds, including customer funds. In addition, as further detailed above in Section IV.G.4, senior management, including the Officer Defendants, also received Daily Estimated Net Capital summaries, which showed the amounts of the balances in MF Global's customer segregated and foreign secured accounts and the amount of the Firm Invested in Excess on any given day during the Class Period.

### C. The Officer Defendants Were Aware Of, Or Recklessly Disregarded, GAAP Violations And Reporting Of False Financial Statements

470.     The Officer Defendants repeatedly signed the Company's SEC filings that described the controlling GAAP requirements for recording DTA. Thus, they were aware of those requirements, including the need to record DTA valuation allowances when required under GAAP, and MF Global's SEC filings stated that the Company had established accounting policies that provided for the application of GAAP in the preparation of its financial statements. At the same time, the Officer Defendants repeatedly failed to follow these GAAP requirements and the Company's own accounting policies.

471.     Each of the Officer Defendants also has substantial educational, financial and industry experience, including the application of these specific GAAP requirements. Defendant MacDonald worked as an auditor for E&Y and Deloitte before joining MF Global. Defendant Steenkamp was MF Global's Chief Accounting Officer and Global Controller for four years before becoming CFO in April 2011 and, before joining MF Global, worked for eight years at PwC. Defendant Corzine, before serving as New Jersey's U.S. Senator and then Governor, was the CEO and Co-Chairman of Goldman Sachs for five years.

472.     Defendant MacDonald also specifically discussed the Company's DTA accounting on the first day of the Class Period during an investor conference call, as set forth in ¶ 317 above. Defendant Corzine also later discussed the Company's DTA accounting before Congress, as set forth in ¶ 103 above, and personally recognized in that discussion the Company's history of losses as a result of near-zero interest rates that were not expected to increase throughout the Class Period. Indeed, all of the Officer Defendants knew, at all relevant times, that the Company's return to profitability in the face of near-zero interest rates was, at best, an "unsettled" proposition.

473.    Accordingly, by virtue of their high-level positions and their prior professional experience and training, as alleged in detail above in Section IV.C.3, by the start of the Class Period, the Officer Defendants knew or recklessly disregarded that: (1) MF Global's U.S. operations were operating at a three-year cumulative loss as of March 31, 2010; (2) MF Global did not have evidence of sufficient quality and quantity to counteract that negative evidence; and (3) MF Global did not have "prudent" and "feasible" tax strategies that would have enabled it to avoid recording a full valuation allowance against its U.S. DTA. Accordingly, the Officer Defendants knew that GAAP required MF Global to report a valuation allowance against the Company's U.S. DTA by no later than May 20, 2010, when the Company filed a Form 8-K attaching its financial results for the fiscal quarter and year ended March 31, 2010.

474.    The Officer Defendants further analyzed the need for a valuation allowance against the Company's U.S. DTA, at the very least, at the time of the Company's fiscal 2011 year-end results. However, the Company's 2011 Form 10-K purported to detail reasons why a full valuation allowance was not recorded against the Company's U.S. DTA, even though, as alleged in detail above in Section IV.C.3, the Officer Defendants knew or recklessly disregarded that: (1) MF Global's U.S. operations were operating at a four-year cumulative loss as of March 31, 2011; (2) MF Global did not have evidence of sufficient quality and quantity to counteract that negative evidence; and (3) MF Global did not have "prudent" and "feasible" tax strategies that would have enabled it to avoid recording a full valuation allowance against its U.S. DTA.

475.    The sworn certifications made by Defendants Corzine, MacDonald and Steenkamp during the Class Period also support a strong inference of scienter. These Officer Defendants repeatedly signed certifications attesting to MF Global's compliance with GAAP and the adequacy of MF Global's internal controls, and reaffirming that they had designed sufficient

disclosure controls and procedures to ensure that "material information" concerning the Company was made known to them. The facts set forth herein, as well as MF Global's admissions on and after October 25, 2011, reveal the falsity of these repeated certifications. The undisclosed facts concerning MF Global's deteriorating liquidity and capital positions and inadequate risk management processes constituted "material information," the disclosure of which would have affected, and did affect, the fair presentation of MF Global's financial statements in compliance with GAAP and which was contrary to the disclosures in MF Global's annual and quarterly reports. These Officer Defendants acted intentionally or in a deliberately reckless manner in repeatedly issuing sworn certifications attesting to the Company's compliance with GAAP, when MF Global's financial results were not presented in accordance with GAAP, and as to the adequacy of MF Global's internal controls when the Company suffered from material weaknesses in its internal controls as alleged herein.

## VII.   LOSS CAUSATION

476.    The market prices of MF Global's publicly traded securities were artificially inflated by the material misstatements and omissions complained of herein, including the misstatements and omissions about MF Global's net income, DTA, Euro sovereign debt RTM transactions, risk management, internal controls and regulatory compliance.

477.    The artificial inflation in MF Global's securities prices was removed when the conditions and risks misstated and omitted by Defendants were revealed to the market. The information was disseminated through several partial disclosures that revealed the nature and extent of MF Global's financial condition, internal controls and risk exposures during the Class Period. These disclosures, more particularly described below, reduced the prices of MF Global's publicly traded securities, causing economic injury to Plaintiffs and other members of the Class.

478.    None of the disclosures was sufficient on its own to fully remove the inflation from MF Global's securities prices, because each only partially revealed the risks and conditions that had been concealed from investors.

479.    The corrective impact of the disclosures alleged herein was, however, tempered by Defendants' continued misstatements and omissions about MF Global's regulatory compliance and the soundness of its operations. These continued misrepresentations continued to maintain the prices of MF Global's publicly traded securities at levels that were artificially inflated, inducing members of the Class to continue purchasing MF Global securities even after the truth began to partially enter into the market. Further price declines that caused additional injury to the Class occurred upon the disclosure of additional information about the true condition of MF Global's operations, including the nature and amount of its customer funds shortfall.

480.    The disclosures that corrected the market prices to reduce the artificial inflation caused by Defendants' material misstatements and omissions are detailed below and summarized in the following chart, which identifies each corrective event, the price declines in the relevant MF Global securities resulting from the event, and, for purposes of comparison, the percentage change in the S&P 500 Index during the same time period:

| Date | Corrective Event | Stock Price | Stock Price Change | 2016 Notes Price | 2016 Notes Price Change | 2018 Notes Price | 2018 Notes Price Change | 6.25% Senior Price | 6.25% Senior Price Change | 2038 Notes Price | 2038 Notes Price Change | S&P 500 Price Change |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 10/24/11 | Moody's downgraded MF Global's rating to Baa3, citing exposure to European debt, related capital implications and increasing risk management concerns. | $3.55 | **(3.53%)** | $65.74 | **(9.01%)** | $69.75 | 3.80% | $87.40 | **(2.07%)** | $98.51[1] | N/A[2] | 1.29% |
| 10/25/11 | MF Global announced a quarterly loss of $191.6 million, largely the result of a $119.4 million DTA valuation allowance for U.S. and Japanese operations. | $1.86 | **(47.61%)** | $51.00 | **(22.42%)** | $48.13 | **(31.00%)** | $63.75 | **(27.06%)** | $70.00 | **(28.94%)**[3] | (2.00%) |
| 10/26/11 | *The Wall Street Journal* reported that MF Global hired investment bankers to explore strategic options; KBW analysts downgraded MF Global from "outperform" to "market perform." | $1.70 | **(8.60%)** | $58.00 | 13.73% | $51.00 | 5.97% | $65.00 | 1.96% | $58.00 | **(17.14%)** | 1.05% |
| 10/27/11 | Moody's and Fitch downgraded MF Global's rating to junk. The downgrade reflected Moody's "view that MF Global's weak core profitability contributed to it taking on substantial risk in the form of its exposure to European sovereign…." | $1.43 | **(15.88%)** | $57.50 | (0.86%) | $55.00 | 7.84% | $73.00 | 12.31% | $83.60 | 44.14% | 3.43% |
| 10/28/11 | *The Wall Street Journal* and other news outlets reported that MF Global intended to sell itself. | $1.20 | **(16.08%)** | $45.00 | **(21.74%)** | $48.00 | **(12.73%)** | $50.00 | **(31.51%)** | $52.50 | **(37.20%)** | 0.04% |
| 10/31/11 | MF Global filed Chapter 11 bankruptcy. | No Trading | N/A | $46.50 | 3.33% | $41.00 | **(14.58%)** | $50.00 | 0% | $49.13 | **(6.43)** | (2.47%) |
| 11/01/11 | Media reported "less than $700 million" of missing customer funds' at MF Global. | No Trading | N/A | $44.00 | **(5.38%)** | $44.50 | 8.54% | $45.50 | **(9.0%)** | $40.00 | **(18.58%)** | (2.79%) |
| 11/02/11 | MF Global common stock resumes trading. | $0.25 | **(79.18%)**[4] | $48.50 | 10.23% | $48.50 | 8.99% | $48.19 | 5.91% | $48.63 | 21.56% | 1.62% |
| 11/03/11 | Media reported that a CME audit revealed a "$633 million" customer funds shortfall. | $0.28 | 11.25% | $45.00 | **(7.22%)** | $45.19 | **(6.83%)** | $45.50 | **(5.58%)** | $47.50 | **(2.31%)** | 1.90% |
| 11/04/11 | The resignation of Jon S. Corzine is announced. | $0.26 | **(7.87%)** | $41.50 | **(7.78%)** | $45.00 | (0.42%) | $41.50 | **(8.79%)** | $44.00 | **(7.37%)** | (0.63%) |
| 11/21/11 | The SIPA Trustee issued a statement quantifying MF Global's customer funds shortfall at "$1.2 billion or more." | $0.125 | **(3.85%)**[5] | $30.00 | **(18.37%)**[6] | $32.00 | **(11.11%)**[7] | $31.00 | **(10.40%)**[8] | $30.00 | **(5.14%)**[9] | (1.86%) |

[1] There is no available price or return data on 10/24/11; the price listed is carried forward from 10/20/11, the last reported trading price.

[2] There is no available price or return data on 10/24/11.

[3] The return is calculated based on the last reported trading price on 10/20/11 of $98.51.

[4] Change determined in relation to the closing price on 10/28/2011.

[5] Change determined in relation to 11/18/11 price of $0.13 for MFGLQ.

[6] Change determined in relation to 11/18/11 price of $36.75 for the 2016 Notes.

[7] Change determined in relation to 11/18/11 price of $36.00 for the 2018 Notes.

[8] Change determined in relation to 11/18/11 price of $34.60 for the 6.25% Senior Notes.

[9] Change determined in relation to 11/15/11 price of $31.625 for the 2038 Notes. There is no available price or return data from 11/16/11-11/18/11.

481.    As discussed above, on Monday, October 24, 2011, Moody's downgraded MF Global's long-term debt by one notch to Baa3. This placed MF Global one notch above junk status, and brought Moody's rating in line with the ratings by S&P and Fitch. Moody's also kept the rating under review for possible further downgrade. The Moody's report describing the "Ratings Rationale" behind the downgrade explained in part:

> The rating action reflects Moody's view that the current low interest environment and volatile capital markets conditions make it unlikely that MF Global, in the near term, will be able to achieve the financial targets that Moody's had previously specified were required for it to maintain a Baa2 rating. *These included generating $200-$300 million in annual pre-tax earnings and managing its balance sheet leverage in the 20x range, a level that would be consistent with other similarly rated broker-dealer peers*.

> *Moody's also said that it has become increasingly concerned with MF Global's risk management and management's ability to prudently balance risk and reward as it undergoes a substantial re-engineering of the firm*.

> "*MF Global's increased exposure to European sovereign debt in peripheral countries and its need to inject capital into its broker-dealer subsidiary to rectify a regulatory capital shortfall highlights the firm's increased risk appetite and raises questions about the firm's risk governance*," said Moody's senior analyst Al Bush.

482.    Significantly, this Moody's report was based on information that Moody's received at the October 21, 2011 meeting with MF Global executives detailed above in ¶¶ 284-85, including the Company's need to record an enormous DTA valuation allowance for its U.S. and Japanese operations.

483.    As a result of the Moody's downgrade, the price of MF Global common stock dropped by approximately 3.5% to close at $3.55, down $0.13 from the prior day's close of $3.68, on heavy trading volume. In addition, the 2016 Notes fell 9.01% and the 6.25% Senior Notes fell 2.07%.

484.    The next day, October 25, 2011, MF Global released its Q2'12 earnings report (for the fiscal quarter ended September 30, 2011), announcing a quarterly loss of $191.6 million.

The loss was largely the result of the $119.4 million DTA valuation allowance in connection with the Company's U.S. and Japanese operations. The earnings release stated:

> Certain charges impact GAAP results. GAAP net loss applicable to common shareholders was $191.6 million, or $1.16 per basic and diluted share for the second quarter, compared with a loss of $94.3 million, or $0.59 per basic and diluted share for the same period last year.
>
> ***Significant charges in the quarter included valuation allowances against deferred tax assets of $119.4 million***, restructuring charges of $10.0 million and loss on extinguishment of debt of $16.1 million from retiring a portion of the firm's 9 percent senior notes due 2038.
>
> * * *
>
> As of September 30, 2011, MF Global maintained a net long position of $6.3 billion in a short-duration European sovereign portfolio financed to maturity (repo-to-maturity), including Belgium, Italy, Spain, Portugal and Ireland. The laddered portfolio has an average weighted maturity of October 2012 and an end date maturity of December 2012, well in advance of the expiration of the European Financial Stability Facility in June 2013. . . .
>
> * * *
>
> Revenue, net of interest and transaction-based expenses (net revenue), was $205.9 million for the second quarter, versus $240.3 million for the same period last year. ***The decrease in net revenue was primarily due to the contraction of proprietary principal activities***, particularly in equities and fixed income, as the company reduced its risk appetite amid volatile market conditions.
>
> * * *
>
> . . . . Mr. Steenkamp continued, "In addition, the steps we've taken over the past year to improve our capital and liquidity positions are of immense value in periods of uncertainty and volatility. ***As a result, we are a stronger firm today with more flexibility to focus on our strategy***."

485.    Analysts reacted negatively to the Company's October 25, 2011 disclosures, as set forth in ¶ 289-90 above.

486.    By the close of market trading on Tuesday, October 25, 2011, MF Global's common stock declined ***by approximately 48%*** to close at $1.86, down $1.69 from the prior day's close of $3.55, on extremely heavy trading volume. In addition, the prices of MF Global's

2016 Notes, 2018 Notes, 6.25% Senior Notes and 2038 Notes declined by approximately 22%, 31%, 27% and 29%, respectively.

487.    On October 26, 2011 at 10:15 A.M., *The Wall Street Journal* published an article entitled "Corzine's MF Global to Explore Possible Sale." The article explained:

> Usually, when a company hires bankers to explore "strategic options" (code for: We might sell the company), the company's stock price will spike as investors bet on takeover riches. MF Global is experiencing the opposite effect.
>
> The brokerage firm's stock price was clobbered yesterday – down nearly 50% –as investors were spooked about MF Global's earnings results, exposure to European debt and a credit-rating downgrade from Moody's.
>
> This morning, our Journal colleague Aaron Lucchetti is reporting MF Global hired investment bankers to suss out a possible sale, mergers or other "strategic options." The news isn't helping the stock price.

488.    On the heels of this news, KBW analysts downgraded MF Global from "outperform" to "market perform," and margin calls continued to substantially drain MF Global's liquidity.

489.    As a result of this continuing adverse news, on October 26, 2011, MF Global's common stock declined by 8.6% to close at $1.70, down $0.16 from the prior day's close of $1.86, on extremely heavy trading volume. The price of MF Global's 2038 Notes also declined by approximately 17%, to close at $58.00, down $12.00 from the prior day's close of $70.00, on heavy trading volume.

490.    On Thursday, October 27, 2011, Moody's and Fitch downgraded MF Global's rating to junk status. The Fitch report cited as the rationale for its downgrade MF Global's "continued challenges in establishing a sustainable level of profitability and improving its leverage profile." Fitch further noted that "volatile capital markets present MF with significant headwinds in executing its strategic transformation from a pure broker to a broker-dealer and, longer term, to a full investment bank without outsized incremental risk."

491.    In addition, the Moody's "Ratings Rationale" provided the following:

Moody's Investors Service downgraded the long-term ratings of [MF Global] including its senior, unsecured debt rating to Ba2 from Baa3. The ratings remain under review for possible further downgrade.

Moody's said the downgrade reflects our view that **MF Global's weak core profitability contributed to it taking on substantial risk in the form of its exposure to European sovereign debt in peripheral countries**. At the end of the second quarter, MF Global's $6.3 billion sovereign risk exposure represented 5 times the company's tangible common equity, Moody's noted.

"**The tactical decision to assume this outsized proprietary position, highlights the core profitability challenges faced by MF Global and the scope of the re-engineering challenge facing the firm's management**," said Al Bush, a Moody's senior analyst.

**Moody's believes that the risk appetite revealed by this position, in tandem with the significant quarterly loss that MF Global reported, subjects the firm to a heightened risk of loss of client and counterparty confidence – and could thus further challenge the company's franchise**.

The review for downgrade will focus on MF Global's ability to manage its franchise risk, including its success in retaining customers, counterparties and employees during the current stressed environment.

492.    In response to these further downgrades, MF Global's common stock declined by approximately 16% to close at $1.43 on October 27, 2011, down $0.27 from the prior day's close of $1.70, on heavy trading volume.

493.    On October 28, 2011, *The Wall Street Journal* published an online article entitled "Potential Suitors Emerge for MF Global," reporting that the Company intended to sell itself. The article explained:

Goldman Sachs, State Street and Macquarie are among the companies considering an acquisition of MF Global or parts of the struggling company, people familiar with the matter said. . . .

Potential buyers for MF Global and its pieces are expected to decide on any move quickly, given MF Global's loss of some customer assets and its declining stock price. On Friday the stock was trading down about 12%.

> Earlier this week, MF Global fully tapped a $1.3 billion credit facility to build up its cash position, a person familiar with the matter said. The company's lenders include Bank of America Corp., J.P. Morgan Chase & Co. and Citigroup Inc., the person said.

494.    An article entitled "IFR: MF Global bonds tumble following downgrade" published by *Thompson Reuters* on October 28, 2011, further detailed the preceding days' developments:

> MF Global reported US $6.3bn of long credit exposure to shorter-term European sovereign debt, including US $3.2bn of exposure to Italy alone. ***The exposure spooked the market and regulators which have asked it to boost its capital***. Fitch Ratings cut the firm's credit rating to junk, BB+, early Thursday and was followed by Moody's Investors Service late Thursday evening, which cut the rating two notches to Ba3. The loss of its investment grade rating will hasten the exodus of customers away from the firm. In the current environment, the knee-jerk reaction is to get away from any failing entity as fast as possible, said Dick Bove, vice president of Rochdale Securities. Bove reported that he has received calls from people asking if they should pull their money out of MF Global. "I haven't had calls like that since Lehman Brothers."
>
> *          *          *
>
> ***The broker/dealer attempted to reassure the markets that its customers had not abandoned it, but the firm cannot survive the loss of its investment grade rating and will likely have to have a deal in place over the weekend said a restructuring investment banker***.
>
> MF Global's bonds collapsed Wednesday following a disastrous fiscal second quarter earnings report and news the firm tapped Evercore Partners to explore strategic alternatives. ***The market took the news as an admission that the firm was on the auction block***. The names of potential buyers included an opportunistic acquisition by Goldman Sachs, Citigroup was also mentioned as a potential acquirer, as was TD Bank, or another well capitalized Canadian bank looking to expand its presence in the US.

495.    As a result of this October 28, 2011 news, the price of MF Global's common stock dropped by approximately 16% to close at $1.20, down $0.23 from the prior day's close of $1.43, on heavy trading volume. In addition, the prices of MF Global 2016 Notes, 2018 Notes, 6.25% Senior Notes and 2038 Notes declined by approximately 22%, 13%, 32% and 37%, respectively.

496.     On Sunday, October 30, 2011, the night before the Company filed for bankruptcy, *The Wall Street Journal* reported that MF Global was nearing a deal to sell its assets to Interactive Brokers. As set forth above in ¶¶ 308-10, a deal was reached to sell the Company's assets for $6.04 per MF Global share, or $ 1 billion, to Interactive Brokers, but it fell through later that night as a result of the missing customer funds. Consequently, Class members incurred significant additional losses as the true facts concerning the missing funds continued to be revealed in November 2011.

497.     Beginning on November 1, 2011, the prices of MF Global's securities continued to decline as additional news was revealed about the nature and amount of the Company's customer funds shortfall. The news emerged in a series of conflicting reports, but was confirmed by the SIPA Trustee on November 21, 2011, the last day of the Class Period.

498.     For example, according to a joint statement issued by the SEC and CFTC after the close of trading on October 31, 2011, MF Global told U.S. regulators that there were potential "deficiencies" in some customer accounts, and the media reported that the amount of missing customer funds was "less than $700 million." But after the close of trading on November 1, 2011, the media reported that MF Global's attorneys had represented that there was no such shortfall, explaining: "To the best knowledge of [MF Global's] management, ***there is no shortfall***." Thereafter, after the close of trading on November 2, 2011, the media reversed course again, reporting that a CME audit had, in fact, revealed a $633 million shortfall.

499.     On November 21, 2011, the last day of the Class Period, the SIPA Trustee released a statement at approximately 11:00 A.M. noting that, "[a]t present, the Trustee believes that even if he recovers everything that is at US depositories, the apparent shortfall in what MF Global management should have segregated at US depositories ***may be as much as $1.2 billion***

*or more*." As a result of this disclosure, the price of MF Global's common stock declined by approximately 4%, and the prices of the 2016 Notes, 2018 Notes, 6.25% Senior Notes and 2038 Notes declined by approximately 18%, 11%, 10% and 5%, respectively.

500.    As was only later revealed by the SIPA Trustee after the Class Period, in total, the Company actually had a *$1.6 billion shortfall* in customer funds, including a deficiency of approximately *$900 million* in domestic customer segregated accounts and a deficiency of approximately *$700 million* in foreign secured funds.

## VIII.   CLASS ACTION ALLEGATIONS

501.    Plaintiffs bring this action on behalf of themselves and as a class action under Rules 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure on behalf of the Class of all persons and entities who purchased or otherwise acquired: (1) any of the publicly traded securities of MF Global, including without limitation MF Global's common stock and the 2038 Notes, during the Class Period; (2) MF Global's common stock issued on or about June 1, 2010 under the Registration Statement for the Secondary Offering; (3) the 2016 Notes issued on or about February 7, 2011 under the Registration Statement; (4) the 2018 Notes issued on or about July 28, 2011 under the Registration Statement; or (5) the 6.25% Senior Notes issued on or about August 1, 2011 under the Registration Statement, and were damaged thereby. Plaintiffs Rodriguez and Vrabel seek to represent, as part of the Class, MF Global employees who acquired MF Global securities pursuant to the above-defined LTIP and ESPP plans during the Class Period.

502.    Excluded from the Class are: (1) Defendants; (2) members of the immediate families of the Defendants; (3) the subsidiaries and affiliates of Defendants and MF Global; (4) any person or entity who is a partner, executive officer, director or controlling person of MF Global, or any of its subsidiaries or affiliates, or any Defendant; (5) any entity in which any

Defendant or MF Global has a controlling interest; (6) Defendants' liability insurance carriers, and any affiliates or subsidiaries thereof; and (7) the legal representatives, heirs, successors and assigns of any such excluded party.

503.    The members of the Class are so numerous that joinder of all members is impracticable. As of June 30, 2011, MF Global had 164,892,596 shares of common stock issued and outstanding. Throughout the Class Period, MF Global's common stock was actively traded on the NYSE, and MF Global's 2016 Notes, 2018 Notes, 6.25% Senior Notes and 2038 Notes were actively traded on the over-the-counter corporate bond market. While the exact number of purchasers of MF Global's common stock, 2016 Notes, 2018 Notes, 6.25% Senior Notes and 2038 Notes is unknown to Plaintiffs at this time, Plaintiffs believe that Class members number in the thousands.

504.    Plaintiffs' claims are typical of the claims of the members of the Class. Plaintiffs and the other members of the Class acquired MF Global securities in the Offerings, pursuant to the Registration Statement and prospectuses filed in connection therewith, or in the market, and sustained damages as a result of Defendants' conduct complained of herein.

505.    Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation. Plaintiffs have no interests that are adverse or antagonistic to the Class.

506.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy. Because the damages suffered by individual members of the Class may be relatively small, the expense and burden of individual litigation make it impracticable for Class members individually to seek redress for the wrongful conduct alleged herein.

507.    Common questions of law and fact exist as to all members of the Class, and predominate over any questions affecting solely individual members of the Class. Among the questions of law and fact common to the Class are:

    a.   Whether the Federal securities laws were violated by Defendants' conduct as alleged herein;

    b.   Whether the Registration Statement and prospectuses for the Company's Offerings contained material misstatements or omitted to state material information;

    c.   Whether Defendants' SEC filings, press releases and other public statements disseminated to the investing public during the Class Period contained material misstatements or omitted to state material information;

    d.   Whether and to what extent the Company's financial statements failed to comply with GAAP during the Class Period;

    e.   Whether and to what extent the market prices of MF Global securities were artificially inflated during the Class Period due to the non-disclosures and misstatements complained of herein;

    f.   Whether, with respect to Plaintiffs' claims under the Securities Act, the Defendants named in those claims can sustain their burden of establishing an affirmative defense under the applicable statute;

    g.   Whether, with respect to Plaintiffs' claims under the Exchange Act, the Defendants named in those claims acted with scienter;

h.   Whether, with respect to Plaintiffs' claims under Section 20(a) of the

Exchange Act and Section 15 of the Securities Act, the Defendants named in

those claims were controlling persons of MF Global during the Class Period;

i.   Whether, with respect to Plaintiffs' claims under the Exchange Act, reliance

may be presumed under the fraud-on-the-market doctrine; and

j.   Whether the members of the Class have sustained damages as a result of the

conduct complained of herein, and if so, the proper measure of damages.

508.    The names and addresses of those persons and entities that purchased or acquired

MF Global's common stock and debt securities during the Class Period and in the Offerings are

available from the Company's transfer agent(s) or from the Underwriter Defendants. Notice may

be provided to such purchasers and record owners via first-class mail using techniques and a

form of notice similar to those customarily used in securities class actions.

## IX.    THE INAPPLICABILITY OF THE STATUTORY SAFE HARBOR

509.    The statutory safe harbor applicable to forward-looking statements under certain

circumstances does not apply to any of the false or misleading statements pleaded in this

Complaint. First, many of the statements complained of herein were historical statements or

statements of current facts and conditions at the time the statements were made. Second, the

statutory safe harbor does not apply to statements included in financial statements that purport to

have been prepared in accordance with GAAP. Further, to the extent that any of the false or

misleading statements alleged herein can be construed as forward-looking, the statements were

not accompanied by any meaningful cautionary language identifying important facts that could

cause actual results to differ materially from those in the statements. For example, the only

cautionary language in MF Global's financial statements regarding its DTA was the generic

warning that "[t]he amount of the deferred tax assets considered realizable, however, could be

significantly reduced in the near term if the Company's actual results are significantly less than forecast. If this were to occur, it is likely that the Company would record a material increase in its valuation allowance." Such a generic risk disclosure was insufficient to provide meaningful cautionary language as to MF Global's materially misstated DTA.

510.    Alternatively, to the extent the statutory safe harbor otherwise would apply to any forward-looking statements pleaded herein, Defendants are liable for those false and misleading forward-looking statements because at the time each of those statements was made, the speakers knew the statement was false or misleading, or the statement was authorized or approved by an executive officer of MF Global who knew that the statement was materially false or misleading when made and at the time of the Offerings.

## X.    THE PRESUMPTION OF RELIANCE WITH RESPECT TO EXCHANGE ACT CLAIMS

511.    Plaintiffs are entitled to a presumption of reliance under *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the claims asserted herein against Defendants are predicated upon omissions of material fact which there was a duty to disclose.

512.    In the alternative, Plaintiffs are entitled to a presumption of reliance on Defendants' material misrepresentations and omissions pursuant to the fraud-on-the-market doctrine because:

> a.   MF Global's common stock was actively traded in an efficient market on the NYSE during the Class Period, and MF Global's 2016 Notes, 2018 Notes, 6.25% Senior Notes and 2038 Notes were actively and efficiently traded on the corporate bond market;
>
> b.   MF Global's common stock and 2016 Notes, 2018 Notes, 6.25% Senior Notes and 2038 Notes traded at high weekly volumes during the Class Period;

c.   As a regulated issuer, MF Global filed periodic public reports with the SEC;

d.   During the Class Period, MF Global was eligible to file registration statements with the SEC on Form S-3;

e.   MF Global regularly communicated with public investors by means of established market communication mechanisms, including through regular dissemination of press releases on the major news wire services and through other wide-ranging public disclosures, such as communications with the financial press, securities analysts and other similar reporting services;

f.   The market reacted promptly to public information disseminated by MF Global;

g.   MF Global securities were covered by numerous securities analysts employed by major brokerage firms who wrote reports that were distributed to the sales force and certain customers of their respective firms. Each of these reports was publicly available and entered the public marketplace;

h.   The material misrepresentations and omissions alleged herein would tend to induce a reasonable investor to misjudge the value of MF Global's securities; and

i.   Without knowledge of the misrepresented or omitted material facts alleged herein, Plaintiffs and other members of the Class purchased or acquired MF Global securities between the time Defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed.

513.   Accordingly, Plaintiffs and other members of the Class relied, and are entitled to have relied, upon the integrity of the market prices for MF Global's common stock, 2016 Notes,

2018 Notes, 6.25% Senior Notes and 2038 Notes, and to a presumption of reliance on Defendants' materially false and misleading statements and omissions during the Class Period.

## XI.    CLAIMS FOR RELIEF UNDER THE EXCHANGE ACT

### COUNT ONE
**For Violations Of Section 10(b) Of The Exchange Act And
Rule 10b-5 Promulgated Thereunder, On Behalf Of Purchasers Of MF Global's
Common Stock, 2016 Notes, 2018 Notes, 6.25% Senior Notes And 2038 Notes,
Asserted Against The Officer Defendants**

514.    Plaintiffs repeat and reallege each of the allegations set forth above as if fully set forth herein, except Plaintiffs expressly disclaim any claim of strict liability or negligence.

515.    This claim is brought under Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, on behalf of Plaintiffs and the other members of the Class against the Officer Defendants (Corzine, MacDonald and Steenkamp).

516.    As alleged herein, throughout the Class Period, the Officer Defendants, individually and in concert, directly and indirectly, by the use of the means or instrumentalities of interstate commerce, the mails and the facilities of national securities exchanges, made untrue statements of material fact and omitted to state material facts necessary to make their statements not misleading and carried out a plan, scheme, and course of conduct, in violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder. The Officer Defendants intended to and did, as alleged herein: (1) deceive the investing public, including Plaintiffs and the other members of the Class; (2) artificially inflate and maintain the prices of MF Global securities; and (3) cause Plaintiffs and the other members of the Class to purchase or acquire MF Global securities at artificially inflated prices.

517.    The Officer Defendants were individually and collectively responsible for making the material misstatements and omissions alleged herein and engaging in a plan, scheme, and course of conduct designed to deceive Plaintiffs and the other members of the Class, by virtue of

having prepared, approved, signed, and disseminated documents that contained untrue statements of material fact and omitted facts necessary to make the statements therein not misleading.

518.   As set forth above, the Officer Defendants made their false and misleading statements and omissions and engaged in the activity described herein knowingly and intentionally or in such a reckless manner as to constitute willful deceit and fraud upon Plaintiffs and the other members of the Class who purchased or acquired MF Global securities during the Class Period.

519.   In ignorance of the false and misleading nature of the Officer Defendants' statements and omissions, and relying directly or indirectly on those statements and omissions or upon the integrity of the market prices for MF Global securities, Plaintiffs and the other members of the Class purchased or acquired MF Global securities at artificially inflated prices during the Class Period. But for the material misstatements and omissions, Plaintiffs and the other members of the Class would not have purchased or acquired MF Global securities at artificially inflated prices. As set forth herein, when the true facts were subsequently disclosed, the prices of MF Global securities declined precipitously. Plaintiffs and the other members of the Class were harmed and damaged as a direct and proximate result of their purchases of MF Global securities at artificially inflated prices and the subsequent decline in the prices of MF Global securities when the truth was disclosed.

520.   By reason of the foregoing, the Officer Defendants are liable to Plaintiffs and the other members of the Class for violations of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

## COUNT TWO
### For Violations Of Section 20(a) Of The Exchange Act,
### Asserted Against The Officer Defendants

521.　Plaintiffs repeat and reallege each of the allegations set forth above as if fully set forth herein, except Plaintiffs expressly disclaim any claim of strict liability or negligence.

522.　This claim is brought under Section 20(a) of the Exchange Act against the Officer Defendants (Corzine, MacDonald and Steenkamp) on behalf of Plaintiffs and the other members of the Class.

523.　As alleged herein, the Officer Defendants caused MF Global to violate Section 10(b) and Rule 10b-5 promulgated thereunder by making material misstatements and omissions in connection with the purchase and sale of securities and by participating in a scheme and course of business or conduct throughout the Class Period. This conduct was undertaken with the scienter of the Officer Defendants who knew of or recklessly disregarded the falsity of the Company's statements and the nature of its scheme during the Class Period. The Company is not named as a defendant only because of its bankruptcy.

524.　The Officer Defendants were controlling persons of MF Global during the Class Period, due to their senior executive positions, direct involvement in its day-to-day operations, financial reporting, and accounting, and signatures on and participation in the preparation and dissemination of its public statements.

525.　By virtue of the foregoing, the Officer Defendants each had the power to influence and control, and did influence and control, directly or indirectly, the decision-making of MF Global, including the content of its financial statements and other public statements.

526.　As set forth above, the Officer Defendants acted knowingly and intentionally, or in such a reckless manner as to constitute willful deceit and fraud upon Plaintiffs and the other members of the Class who purchased or acquired MF Global securities during the Class Period.

527.     In ignorance of the false and misleading nature of the Company's statements and omissions, and relying directly or indirectly on those statements and omissions or upon the integrity of the market prices for MF Global securities, Plaintiffs and the other members of the Class purchased or acquired MF Global securities at artificially inflated prices during the Class Period. But for the material misstatements and omissions, Plaintiffs and the other members of the Class would not have purchased or acquired MF Global securities at artificially inflated prices. As set forth herein, when the true facts were subsequently disclosed, the prices of MF Global securities declined precipitously. Plaintiffs and the other members of the Class were harmed and damaged as a direct and proximate result of their purchases of MF Global securities at artificially inflated prices and the subsequent decline in the prices of those securities when the truth was disclosed.

528.     By reason of the foregoing, the Officer Defendants are liable to Plaintiffs and the other members of the Class for violations of Section 20(a) of the Exchange Act.

## XII.    ADDITIONAL ALLEGATIONS RELATING TO SECURITIES ACT CLAIMS

529.     In the allegations and claims set forth in this part of the Complaint, Plaintiffs assert claims under the Securities Act. These claims are asserted against the Individual Defendants who signed MF Global's Registration Statement; Defendant Corzine, who was a Director of MF Global at the time of the filing of the documents incorporated by reference in the Registration Statement and prospectuses for the Offerings; and the Underwriter Defendants.

530.     Each of these Defendants is statutorily liable under Section 11 of the Securities Act for the materially inaccurate statements contained in MF Global's Registration Statement and prospectuses for the Offerings, including MF Global's materially misstated financial statements incorporated therein. (MF Global also violated Section 11 and is not named as a defendant only because of its bankruptcy.)

531.     Plaintiffs also assert claims under Section 12(a)(2) of the Securities Act against the Underwriter Defendants and control person liability claims under Section 15(a) of the Securities Act against the Individual Defendants.

532.     Plaintiffs expressly disclaim any allegations of scienter in these non-fraud claims, which are pleaded separately in this Complaint from Plaintiffs' Exchange Act claims except that any challenged statements of opinion or belief made in connection with the Offerings are alleged to have been materially misstated statements of opinion or belief when made.

### A.     The Secondary Offering

533.     On June 1, 2010, MF Global announced the public Secondary Offering of common stock for gross proceeds of $150 million. MF Global's common stock was issued in the Secondary Offering at a price of $7.10 per share.

534.     The Secondary Offering was conducted pursuant to Post-Effective Amendment No. 1 to Registration Statement No. 333-162119, dated February 24, 2010 (the "Registration Statement," as defined in ¶ 29), a Preliminary Prospectus Supplement dated June 1, 2010, and a Final Prospectus Supplement dated June 3, 2010 (collectively, the "Secondary Offering Materials").

535.     The Secondary Offering was underwritten by J.P. Morgan, Citigroup and Deutsche Bank. These Underwriter Defendants were "underwriters," as defined in Section 2(11) of the Securities Act, of the Secondary Offering.

536.     The Registration Statement was signed by Defendants MacDonald, Steenkamp, Bolger, Fusco, Gelber, Glynn, Goldberg, Schamis and Sloan. Defendant Corzine was a director of MF Global at the times of the filing of the documents incorporated by reference in the Secondary Offering Materials.

537.    The Secondary Offering Materials specifically incorporated by reference MF Global's 2010 Form 10-K. The 2010 Form 10-K that was incorporated by reference, by which Plaintiff WV Laborers and other members of the Class were induced to purchase MF Global common stock in the Secondary Offering, contained untrue statements of material fact and omitted to state material facts required therein or necessary to make the statements therein not misleading, as set forth above in Section V.A.

### B.    The 2016 Notes Offering

538.    On February 11, 2011, MF Global completed a $287.5 million offering of the 2016 Notes, which included $37.5 million of notes sold pursuant to an overallotment option granted by the Company to certain underwriters (the "2016 Notes Offering").

539.    The 2016 Notes Offering was conducted pursuant to the Registration Statement, a Preliminary Prospectus Supplement and Pricing Term Sheet dated February 7, 2011, and a Final Prospectus Supplement dated February 7, 2011 (collectively, the "2016 Notes Offering Materials").

540.    The 2016 Notes Offering was underwritten by Goldman, Citigroup, Deutsche Bank, Merrill Lynch, J.P. Morgan, RBS and Sandler O'Neill. These Underwriter Defendants were "underwriters," as defined in Section 2(11) of the Securities Act, of the 2016 Notes Offering.

541.    The Registration Statement was signed by Defendants MacDonald, Steenkamp, Bolger, Fusco, Gelber, Glynn, Goldberg, Schamis and Sloan. Defendant Corzine was a director of MF Global at the times of the filing of the documents incorporated by reference in the 2016 Notes Offering Materials.

542.    The 2016 Notes Offering Materials specifically incorporated by reference MF Global's 2010 Form 10-K and Q1'11 Form 10-Q, Q2'11 Form 10-Q and Q3'11 Form 10-Q.

These documents, by which Lead Plaintiff VRS, Plaintiff LRI Invest and other members of the Class were induced to purchase MF Global's 2016 Notes, contained untrue statements of material fact and omitted to state material facts required therein or necessary to make the statements therein not misleading, as set forth above in Section V.A-D.

**C.**     **The 2018 Notes Offering**

543.    On July 28, 2011, MF Global announced a $325 million offering of the 2018 Notes (the "2018 Notes Offering").

544.    The 2018 Notes Offering was underwritten by Goldman, Citigroup, Merrill, J.P. Morgan, Deutsche Bank and RBS. These Underwriter Defendants were "underwriters," as defined in Section 2(11) of the Securities Act, of the 2018 Notes Offering.

545.    The 2018 Notes Offering was conducted pursuant to the Registration Statement, a Preliminary Prospectus Supplement and Pricing Term Sheet dated July 28, 2011, and a Final Prospectus Supplement, dated August 1, 2011 (collectively, the "2018 Notes Offering Materials").

546.    The Registration Statement was signed by Defendants MacDonald, Steenkamp, Bolger, Fusco, Gelber, Glynn, Goldberg, Schamis and Sloan. Defendant Corzine was a director of MF Global at the times of the filing of the documents incorporated by reference in the 2018 Notes Offering Materials.

547.    The 2018 Notes Offering Materials specifically incorporated by reference MF Global's 2011 Form 10-K. The 2011 Form 10-K, by which Lead Plaintiff VRS, Plaintiff LRI Invest and other members of the Class were induced to purchase MF Global's 2018 Notes, contained untrue statements of material fact and omitted to state material facts required therein or necessary to make the statements therein not misleading, as set forth above in Section V.E-F.

## D. The 6.25% Senior Notes Offering

548. On August 3, 2011, MF Global issued approximately $325 million of 6.250% Senior Notes (the "6.25% Senior Notes Offering").

549. The 6.25% Senior Notes Offering was underwritten by Jefferies, Merrill, BMO Capital Markets, Commerz, Natixis, Lebenthal, Sandler O'Neill, and U.S. Bancorp. These Underwriter Defendants were "underwriters," as defined in Section 2(11) of the Securities Act, of the 6.25% Senior Notes Offering.

550. The 6.25% Senior Notes Offering was conducted pursuant to the Registration Statement and a Prospectus Supplement and Free Writing Prospectus dated August 3, 2011 (collectively, the "6.25% Senior Notes Offering Materials").

551. The Registration Statement was signed by Defendants MacDonald, Steenkamp, Bolger, Fusco, Gelber, Glynn, Goldberg, Schamis and Sloan. Defendant Corzine was a director of MF Global at the times of the filing of the documents incorporated by reference in the 6.25% Senior Notes Offering Materials.

552. The 6.25% Senior Notes Offering Materials specifically incorporated by reference MF Global's 2011 Form 10-K and MF Global's Q1'12 Form 10-Q. These documents, by which Plaintiff Guam and other members of the Class were induced to purchase MF Global's 6.25% Senior Notes, contained untrue statements of material fact and omitted to state material facts required therein or necessary to make the statements therein not misleading, as set forth above in Sections V.E-F.

E.     **The Defendants' Failure To Exercise Reasonable Care Or To Conduct A Reasonable Investigation In Connection With The Offerings**

553.   None of the Securities Act Defendants made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Offering Materials were accurate and complete and not misstated in all material respects.

554.   Due diligence is a critical component of the issuing and underwriting process. Directors, officers, and underwriters are able to perform due diligence because of their expertise and access to the Company's non-public information. Underwriters must not rely on management statements; instead, they should play a devil's advocate role and conduct a verification process. At a minimum, due diligence for every public offering should involve: (1) interviews of upper and mid-level management; (2) a review of the auditor's management letters; (3) a review of items identified therein; (4) a review of the company's SEC filings (particularly those incorporated by reference); (5) a critical review of the company's financial statements, including an understanding of the company's accounting and conversations with the company's auditors without management present; (6) a review of the company's internal controls; (7) a review of negative facts and concerns within each underwriter's organization and within the underwriter syndicate; and (8) a review of critical non-public documents forming the basis for the company's assets, liabilities and earnings. Red flags uncovered through this process must be investigated. Officers and auditors must participate in the underwriters' due diligence, and non-officer directors are responsible for the integrity of the due diligence process in their capacity as the ultimate governing body of the issuer.

555.   Had Defendants exercised reasonable care, they would have known of the material misstatements and omissions alleged herein.

556.    The Underwriter Defendants did not conduct a reasonable investigation of the statements contained in and incorporated by reference in the Offering Materials and did not possess reasonable grounds for believing that the statements therein were true and not materially misstated. In particular, the Underwriter Defendants did not conduct a reasonable investigation into the accuracy of the statements regarding the Company's DTA and internal controls specified herein. The Underwriter Defendants could not simply rely on the work of MF Global's outside auditors because the investing public relies on the underwriters to obtain and verify relevant information and then make sure that essential facts are disclosed. Thus, the Underwriter Defendants must conduct their own, independent (and reasonable) investigation into the accuracy of the Company's financial statements and assessments of internal controls. Had the Underwriter Defendants conducted a reasonable investigation, they would have learned that the Company's disclosed justifications for maintaining its large U.S. DTA did not comply with GAAP; a valuation allowance was required; and the Offering Materials contained material misstatements and omissions about the Company's internal controls as specified herein. Indeed, even a cursory review of the Company's Internal Audit reports regarding MF Global's internal control deficiencies dating back to April 2010 and described above in Section IV.E.2 would have revealed the material misstatements and omissions alleged herein regarding MF Global's internal controls. Similarly, the Company's ability to turn around its three-year history of losses in the U.S. in the face of near-zero interest rates dating back to the fall of 2008 was understood by Company insiders to be, at best, an "unsettled" proposition, yet the Underwriter Defendants, which had special access to MF Global's purported justification for maintaining its U.S. DTA without a valuation allowance, failed to reasonably investigate the Company's DTA accounting under GAAP.

557.    Similarly, the Individual Defendants who signed the Registration Statement and Corzine failed to conduct a reasonable investigation of the statements contained in the Registration Statement and documents incorporated therein by reference and did not possess reasonable grounds for believing that the statements therein were true and not materially misstated. Had these Individual Defendants conducted a reasonable investigation, they would have learned that the Company's disclosed justifications for maintaining its large U.S. DTA did not comply with GAAP and a valuation allowance was required as set forth in Section IV.C above, and the Offering Materials contained material misstatements and omissions about the Company's internal controls as set forth in Section V above.

558.    These Individual Defendants were sophisticated in accounting and internal control issues given their collective industry experience and yet failed to reasonably inquire as to the Company's DTA accounting or internal controls notwithstanding numerous "red flags," including repeated Internal Audit reports made to them (dating back to April 2010) regarding weaknesses in the Company's internal controls (set forth in Section IV.E.2  above), as well as the Company's history of losses in its U.S. operations and, at best, "unsettled" attempt to return to profitability in the face of near-zero interest rates (dating back to the fall of 2008) through the Euro sovereign debt RTM trading strategy, whose risks they repeatedly discussed with the Board throughout the Class Period (as set forth in Section IV.E.1 above).

559.    Moreover, any challenged statements of opinion or belief made by any of the Officer Defendants in connection with the Offerings are alleged to have been materially misstated statements of opinion or belief when made and at the time of the Offerings, as set forth above.

## XIII.   CLAIMS FOR RELIEF UNDER THE SECURITIES ACT

### COUNT THREE
**For Violations Of Section 11 Of The Securities Act, On Behalf Of Purchasers Of MF Global's Common Stock In The Secondary Offering, Asserted Against Defendants Corzine, MacDonald, Steenkamp, Bolger, Fusco, Gelber, Glynn, Goldberg, Schamis, Sloan, J.P. Morgan, Citigroup And Deutsche Bank**

560.     Plaintiffs repeat and reallege each and every allegation above as if fully set forth herein, except that for purposes of this Count, Plaintiffs assert strict liability and negligence claims and expressly disclaim any allegation of fraud or intentional misconduct except that any challenged statements of opinion or belief made in connection with the Secondary Offering are alleged to have been materially misstated statements of opinion or belief when made and at the time of the Secondary Offering.

561.     This Count is brought under Section 11 of the Securities Act against Defendants Corzine, MacDonald, Steenkamp, Bolger, Fusco, Gelber, Glynn, Goldberg, Schamis, Sloan, J.P. Morgan, Citigroup and Deutsche Bank.

562.     This claim is brought on behalf of Plaintiff WV Laborers and other members of the Class who, during the Class Period, purchased or otherwise acquired MF Global's common stock issued pursuant to the Secondary Offering Materials.

563.     Individual Defendants MacDonald, Steenkamp, Bolger, Fusco, Gelber, Glynn, Goldberg, Schamis and Sloan each signed the Registration Statement.

564.     At the time the documents incorporated by reference in the Secondary Offering Materials were filed, Corzine was a director of MF Global.

565.     Underwriter Defendants J.P. Morgan, Citigroup and Deutsche Bank underwrote the Secondary Offering.

566.     As set forth above, the Secondary Offering Materials contained untrue statements of material fact, including the financial statements and internal controls of MF Global. In

addition, the Secondary Offering Materials omitted to state other facts required to be stated therein or necessary to make the statements therein not misleading, including MF Global's violations of GAAP and internal control deficiencies. The misstated and omitted facts would have been material to a reasonable person reviewing the Secondary Offering Materials.

567.    The Defendants named in this Count owed to Plaintiff WV Laborers and the other members of the Class the duty to make a reasonable and diligent investigation of the statements contained or incorporated by reference in the Secondary Offering Materials, to ensure that the statements contained or incorporated by reference therein were true and that there was no omission to state a material fact required to be stated therein or necessary to make the statements therein not misleading.

568.    These Defendants did not make a reasonable and diligent investigation of the statements contained or incorporated by reference in the Secondary Offering Materials, and did not possess reasonable grounds for believing that the Secondary Offering Materials did not contain an untrue statement or omit to state a material fact required to be stated therein or necessary to make the statements therein not misleading.

569.    The Underwriter Defendants named in this Count did not conduct a reasonable investigation of the statements contained in and incorporated by reference in the Secondary Offering Materials and did not possess reasonable grounds for believing that the statements therein were true and not materially misstated. In particular, these Underwriter Defendants did not conduct a reasonable investigation into the accuracy of the statements regarding MF Global's reported Deferred Tax Assets, financial performance, operations, or internal controls. These Underwriter Defendants could not simply rely on the work of MF Global's auditor because the investing public relies on the underwriters to obtain and verify relevant information and then

make sure that important facts are accurately disclosed. Thus, these Underwriter Defendants had a duty to conduct their own, independent and reasonable investigation into the accuracy of the Company's financial statements and assessments of internal controls, and they were negligent in failing to do so sufficiently in connection with the Secondary Offering.

570.   Similarly, the Individual Defendants named in this Count were negligent in failing to conduct a reasonable investigation of the statements contained or incorporated by reference in the Secondary Offering Materials regarding MF Global's financial performance, operations, and internal controls, and did not possess reasonable grounds for believing that the statements therein were true and not materially misstated.

571.   Plaintiffs WV Laborers and members of the Class purchased common stock in the Secondary Offering issued pursuant to the Secondary Offering Materials, and were damaged thereby.

572.   Plaintiffs WV Laborers and the Class did not know, nor in the exercise of reasonable diligence could they have known, of the untrue statements of material fact and omissions of material facts in the Secondary Offering Materials when they purchased or acquired their securities. Less than one year has elapsed between the time they discovered or reasonably could have discovered the facts upon which this Count is based and the time this claim was brought. Less than three years have elapsed between the time that the securities upon which this Count is brought were bona fide offered to the public and the time this action was commenced.

573.   By reason of the foregoing, the Defendants named in this Count are liable to Plaintiffs WV Laborers and Class members for violations of Section 11 of the Securities Act.

**COUNT FOUR**

**For Violations Of Section 12(a)(2) Of The Securities Act, On Behalf Of Purchasers In The Secondary Offering, Asserted Against Underwriter Defendants J.P. Morgan, Citigroup And Deutsche Bank**

574.     Plaintiffs repeat and reallege each and every allegation above as if fully set forth herein, except that for purposes of this Count Plaintiffs assert only strict liability and negligence claims and expressly disclaim any allegation of fraud or intentional misconduct except that any challenged statements of opinion or belief made in connection with the Secondary Offering are alleged to have been materially misstated statements of opinion or belief when made and at the time of the Secondary Offering.

575.     This Count is brought under Section 12(a)(2) of the Securities Act against Underwriter Defendants J.P. Morgan, Citigroup and Deutsche Bank.

576.     This claim is brought on behalf of Plaintiffs WV Laborers and other members of the Class who, during the Class Period, purchased or otherwise acquired MF Global common stock from Underwriter Defendants J.P. Morgan, Citigroup or Deutsche Bank pursuant to the Secondary Offering Materials.

577.     Underwriter Defendants J.P. Morgan, Citigroup and Deutsche Bank are sellers within the meaning of the Securities Act because they transferred title to Plaintiffs WV Laborers and other purchasers of MF Global Common Stock in the Secondary Offering. In particular, Deutsche Bank directly sold MF Global common stock in the Secondary Offering to Plaintiffs WV Laborers.

578.     As alleged herein, the Secondary Offering Materials contained untrue statements of material fact, including the financial statements and internal controls of MF Global. In addition, the Secondary Offering Materials omitted to state material facts required to be stated

191

therein or necessary to make the statements therein not misleading, including MF Global's violations of GAAP and internal control deficiencies.

579.   The misstated and omitted facts would have been material to a reasonable person reviewing the Secondary Offering Materials.

580.   Underwriter Defendants J.P. Morgan, Citigroup and Deutsche Bank owed to Plaintiffs WV Laborers and the Class the duty to make a reasonable and diligent investigation of the statements contained in the Secondary Offering Materials to ensure that the statements contained or incorporated by reference therein were true and that there was no omission to state a material fact required to be stated therein or necessary in order to make the statements therein not misleading.

581.   Underwriter Defendants J.P. Morgan, Citigroup and Deutsche Bank did not make a reasonable and diligent investigation of the statements contained or incorporated by reference in the Secondary Offering Materials and did not possess reasonable grounds for believing that the Secondary Offering Materials did not contain an untrue statement of material fact or omit to state a material fact required to be stated therein or necessary to make the statements therein not misleading.

582.   Plaintiffs WV Laborers and members of the Class purchased MF Global common stock in the Secondary Offering pursuant to the Secondary Offering Materials, and were damaged thereby.

583.   Plaintiffs WV Laborers and the Class did not know, nor in the exercise of reasonable diligence could they have known, of the untrue statements of material fact or omissions of material facts in the Secondary Offering Materials when they purchased or acquired the securities. Less than one year has elapsed between the time they discovered or reasonably

could have discovered the facts upon which this Count is based and the time this claim was brought. Less than three years have elapsed between the time that the securities upon which this Count is brought were bona fide offered to the public and the time this action was commenced.

584.    By reason of the foregoing, Underwriter Defendants J.P. Morgan, Citigroup and Deutsche Bank are liable to Plaintiffs WV Laborers and members of the Class for violations of Section 12(a)(2) of the Securities Act. Plaintiffs WV Laborers United and Class members hereby tender their securities to their respective sellers and seek rescission of their purchases to the extent that they continue to own such securities.

**COUNT FIVE**
**For Violations Of Section 15(a) Of The Securities Act,**
**On Behalf Of Purchasers In The Secondary Offering,**
**Asserted Against The Officer Defendants**

585.    Plaintiffs repeat and reallege each and every allegation above as if fully set forth herein, except that for purposes of this Count, Plaintiffs assert only strict liability and negligence claims and expressly disclaim any allegation of fraud or intentional misconduct except that any challenged statements of opinion or belief made in connection with the Secondary Offering are alleged to have been materially misstated statements of opinion or belief when made and at the time of the Secondary Offering.

586.    This Count is brought under Section 15(a) of the Securities Act against the Officer Defendants, on behalf of Plaintiffs WV Laborers and members of the Class who purchased or acquired MF Global Common Stock in the Secondary Offering pursuant to the Secondary Offering Materials.

587.    MF Global violated Section 11 of the Securities Act by issuing the Secondary Offering Materials, which contained untrue statements of material fact and omitted to state material facts required to be stated therein or necessary to make the statements therein not

misleading. The misstated and omitted facts would have been material to a reasonable person reviewing the Secondary Offering Materials. MF Global is not named as a defendant only because of its bankruptcy.

588.    The Officer Defendants were controlling persons of MF Global when the Secondary Offering Materials and documents incorporated therein by reference were filed and became effective, because of their senior executive positions with MF Global and direct involvement in the Company's day-to-day operations, including its financial reporting and accounting.

589.    By virtue of the foregoing, the Officer Defendants each had the power to influence and control, and did influence and control, directly or indirectly, the decision-making of MF Global, including the content of its financial statements and the Secondary Offering Materials.

590.    The Officer Defendants acted negligently and without reasonable care regarding the accuracy of the information contained and incorporated by reference in the Secondary Offering Materials and lacked reasonable grounds to believe that such information was accurate and complete in all material respects.

591.    Plaintiffs WV Laborers and members of the Class purchased MF Global Common Stock in the Secondary Offering pursuant to the Secondary Offering Materials, and were damaged thereby.

592.    By reason of the foregoing, the Officer Defendants are liable to Plaintiffs WV Laborers and members of the Class for violations of Section 15(a) of the Securities Act.

**COUNT SIX**
**For Violations Of Section 11 Of The Securities Act,**
**On Behalf Of Purchasers Of The 2016 Notes,**
**Asserted Against Defendants Corzine, MacDonald, Steenkamp, Bolger, Fusco, Gelber,**
**Glynn, Goldberg, Schamis, Sloan, Goldman, Citigroup, Deutsche Bank, Merrill Lynch, J.P.**
**Morgan, RBS And Sandler O'Neill**

593.     Plaintiffs repeat and reallege each and every allegation above as if fully set forth herein, except that for purposes of this Count, Plaintiffs assert only strict liability and negligence claims and expressly disclaim any allegation of fraud or intentional misconduct except that any challenged statements of opinion or belief made in connection with the 2016 Notes Offering are alleged to have been materially misstated statements of opinion or belief when made and at the time of the 2016 Notes Offering.

594.     This Count is brought under Section 11 of the Securities Act against Defendants Corzine, MacDonald, Steenkamp, Bolger, Fusco, Gelber, Glynn, Goldberg, Schamis, Sloan, Goldman, Citigroup, Deutsche Bank, Merrill Lynch, J.P. Morgan, RBS and Sandler O'Neill.

595.     This claim is brought on behalf of Lead Plaintiff VRS, Plaintiff LRI Invest and other members of the Class who, during the Class Period, purchased or otherwise acquired MF Global's 2016 Notes issued pursuant or traceable to the 2016 Notes Offering Materials.

596.     Individual Defendants MacDonald, Steenkamp, Bolger, Fusco, Gelber, Glynn, Goldberg, Schamis and Sloan each signed the Registration Statement.

597.     At the time the documents incorporated by reference in the 2016 Notes Offering Materials were filed, Corzine was a director of MF Global.

598.     Underwriter Defendants Goldman, Citigroup, Deutsche Bank, Merrill Lynch, J.P. Morgan, RBS and Sandler O'Neill underwrote the 2016 Notes Offering.

599.     As set forth above, the 2016 Notes Offering Materials contained untrue statements of material fact, including the financial statements and internal controls of MF Global. In

195

addition, the 2016 Notes Offering Materials omitted to state other facts required to be stated therein or necessary to make the statements therein not misleading, including MF Global's violations of GAAP and internal control deficiencies. The misstated and omitted facts would have been material to a reasonable person reviewing the 2016 Notes Offering Materials.

600.    The Defendants named in this Count owed to Lead Plaintiff VRS, Plaintiff LRI Invest and the Class the duty to make a reasonable and diligent investigation of the statements contained in the 2016 Notes Offering Materials, to ensure that the statements contained or incorporated by reference therein were true and that there was no omission to state a material fact required to be stated therein or necessary to make the statements therein not misleading.

601.    These Defendants did not make a reasonable and diligent investigation of the statements contained or incorporated by reference in the 2016 Notes Offering Materials, and did not possess reasonable grounds for believing that the 2016 Notes Offering Materials did not contain an untrue statement or omit to state a material fact required to be stated therein or necessary to make the statements therein not misleading.

602.    The Underwriter Defendants named in this Count did not conduct a reasonable investigation of the statements contained in and incorporated by reference in the 2016 Notes Offering Materials and did not possess reasonable grounds for believing that the statements therein were true and not materially misstated. In particular, these Underwriter Defendants did not conduct a reasonable investigation into the accuracy of the statements regarding MF Global's reported Deferred Tax Assets, financial performance, operations or internal controls. These Underwriter Defendants could not simply rely on the work of MF Global's auditor because the investing public relies on the underwriters to obtain and verify relevant information and then make sure that important facts are accurately disclosed. Thus, the Underwriter Defendants must

conduct their own, independent and reasonable investigation into the accuracy of the Company's financial statements, assessments of internal controls, and other disclosures, and they were negligent in failing to do so sufficiently in connection with the 2016 Notes Offering.

603.    Similarly, the Individual Defendants named in this Count were negligent in failing to conduct a reasonable investigation of the statements contained in the 2016 Notes Offering Materials regarding MF Global's financial performance, operations, and internal controls, and did not possess reasonable grounds for believing that the statements therein were true and not materially misstated.

604.    Lead Plaintiff VRS, Plaintiff LRI Invest and members of the Class purchased the 2016 Notes issued pursuant or traceable to the 2016 Notes Offering Materials, and were damaged thereby.

605.    Lead Plaintiff VRS, Plaintiff LRI Invest and the Class did not know, nor in the exercise of reasonable diligence could they have known, of the untrue statements of material fact or omissions of material facts in the 2016 Notes Offering Materials when they purchased or acquired their securities. Less than one year has elapsed between the time they discovered or reasonably could have discovered the facts upon which this Count is based and the time this claim was brought. Less than three years have elapsed between the time that the securities upon which this Count is brought were bona fide offered to the public and the time this action was commenced.

606.    By reason of the foregoing, the Defendants named in this Count are liable to Lead Plaintiff VRS, Plaintiff LRI Invest and members of the Class for violations of Section 11 of the Securities Act.

### COUNT SEVEN
**For Violations Of Section 12(a)(2) Of The Securities Act,
On Behalf Of Purchasers In The 2016 Notes Offering, Asserted Against
Underwriter Defendants Goldman, Citigroup, Deutsche Bank, Merrill Lynch,
J.P. Morgan, RBS And Sandler O'Neill**

607.    Plaintiffs repeat and reallege each and every allegation above as if fully set forth herein, except that for purposes of this Count, Plaintiffs assert only strict liability and negligence claims and expressly disclaim any allegation of fraud or intentional misconduct except that any challenged statements of opinion or belief made in connection with the 2016 Notes Offering are alleged to have been materially misstated statements of opinion or belief when made and at the time of the 2016 Notes Offering.

608.    This Count is brought under Section 12(a)(2) of the Securities Act against Underwriter Defendants Goldman, Citigroup, Deutsche Bank, Merrill Lynch, J.P. Morgan, RBS and Sandler O'Neill.

609.    This claim is brought on behalf of Lead Plaintiff VRS and other members of the Class who, during the Class Period, purchased or otherwise acquired MF Global's 2016 Notes in the 2016 Notes Offering.

610.    Underwriter Defendants Goldman, Citigroup, Deutsche Bank, Merrill Lynch, J.P. Morgan, RBS and Sandler O'Neill are sellers within the meaning of the Securities Act because they transferred title to Lead Plaintiff VRS and other purchasers of MF Global's 2016 Notes in the 2016 Notes Offering. In particular, Underwriter Defendant Merrill Lynch directly sold the 2016 Notes in the 2016 Notes Offering to Lead Plaintiff VRS.

611.    As alleged herein, the 2016 Notes Offering Materials contained untrue statements of material fact, including the financial statements and internal controls of MF Global. In addition, the 2016 Notes Offering Materials omitted to state material facts required to be stated

therein or necessary to make the statements therein not misleading, including MF Global's violations of GAAP and internal control deficiencies.

612.    The misstated and omitted facts would have been material to a reasonable person reviewing the 2016 Notes Offering Materials.

613.    Underwriter Defendants Goldman, Citigroup, Deutsche Bank, Merrill Lynch, J.P. Morgan, RBS and Sandler O'Neill owed to Lead Plaintiff VRS and the Class the duty to make a reasonable and diligent investigation of the statements contained in the 2016 Notes Offering Materials, to ensure that the statements contained or incorporated by reference therein were true and that there was no omission to state a material fact required to be stated therein or necessary to make the statements therein not misleading.

614.    Underwriter Defendants Goldman, Citigroup, Deutsche Bank, Merrill Lynch, J.P. Morgan, RBS and Sandler O'Neill did not make a reasonable and diligent investigation of the statements contained or incorporated by reference in the 2016 Notes Offering Materials and did not possess reasonable grounds for believing that the 2016 Notes Offering Materials did not contain an untrue statement of material fact or omit to state a material fact required to be stated therein or necessary to make the statements therein not misleading.

615.    Lead Plaintiff VRS and members of the Class purchased MF Global's 2016 Notes in the 2016 Notes Offering, and were damaged thereby.

616.    Lead Plaintiff VRS and the Class did not know, nor in the exercise of reasonable diligence could they have known, of the untrue statements of material fact or omissions of material facts in the 2016 Notes Offering Materials when they purchased or acquired the securities. Less than one year has elapsed between the time they discovered or reasonably could have discovered the facts upon which this Count is based and the time this claim was brought.

Less than three years have elapsed between the time that the securities upon which this Count is brought were bona fide offered to the public and the time this action was commenced.

617.    By reason of the foregoing, Underwriter Defendants Goldman, Citigroup, Deutsche Bank, Merrill Lynch, J.P. Morgan, RBS and Sandler O'Neill are liable to Lead Plaintiff VRS and members of the Class for violations of Section 12(a)(2) of the Securities Act. Lead Plaintiff VRS, Plaintiff LRI Invest and Class members hereby tender their 2016 Notes to their respective sellers and seek rescission of their purchases to the extent that they continue to own such securities.

## COUNT EIGHT
### For Violations Of Section 15(a) Of The Securities Act, On Behalf Of Purchasers Of The 2016 Notes, Asserted Against The Officer Defendants

618.    Plaintiffs repeat and reallege each and every allegation above as if fully set forth herein, except that for purposes of this Count Plaintiffs assert only strict liability and negligence claims and expressly disclaim any allegation of fraud or intentional misconduct, except that any challenged statements of opinion or belief made in connection with the 2016 Notes Offering are alleged to have been materially misstated statements of opinion or belief when made and at the time of the 2016 Notes Offering.

619.    This Count is brought under Section 15(a) of the Securities Act against the Officer Defendants, on behalf of Lead Plaintiff VRS, Plaintiff LRI Invest and members of the Class who purchased or acquired the 2016 Notes pursuant or traceable to the 2016 Notes Offering Materials.

620.    MF Global violated Section 11 of the Securities Act by issuing the 2016 Notes Offering Materials, which contained untrue statements of material fact and omitted to state material facts required to be stated therein or necessary to make the statements therein not

misleading. The misstated and omitted facts would have been material to a reasonable person reviewing the 2016 Notes Offering Materials. MF Global is not named as a defendant only because of its bankruptcy.

621.    The Officer Defendants were controlling persons of MF Global when the 2016 Notes Offering Materials were filed and became effective, because of their senior executive positions with MF Global and their direct involvement in the Company's day-to-day operations, including its financial reporting and accounting functions.

622.    By virtue of the foregoing, the Officer Defendants each had the power to influence and control, and did influence and control, directly or indirectly, the decision-making of MF Global, including the content of its financial statements and the 2016 Notes Offering Materials.

623.    The Officer Defendants acted negligently and without reasonable care regarding the accuracy of the information contained and incorporated by reference in the 2016 Notes Offering Materials and lacked reasonable grounds to believe that such information was accurate and complete in all material respects.

624.    Lead Plaintiff VRS, Plaintiff LRI Invest and members of the Class purchased MF Global's 2016 Notes pursuant or traceable to the 2016 Notes Offering Materials, and were damaged thereby.

625.    Lead Plaintiff VRS, Plaintiff LRI Invest and the Class did not know, nor in the exercise of reasonable diligence could they have known, of the untrue statements of material fact or omissions of material facts in the 2016 Notes Offering Materials when they purchased or acquired 2016 Notes. Less than one year has elapsed between the time they discovered or reasonably could have discovered the facts upon which this Count is based and the time this

claim was brought. Less than three years have elapsed between the time that the securities upon which this Count is brought were bona fide offered to the public and the time this action was commenced.

626.    By reason of the foregoing, the Officer Defendants are liable to Lead Plaintiff VRS, Plaintiff LRI Invest and members of the Class for violations of Section 15(a) of the Securities Act.

**COUNT NINE**
**For Violations Of Section 11 Of The Securities Act, On Behalf Of**
**Purchasers Of The 2018 Notes, Asserted Against Defendants**
**Corzine, MacDonald, Steenkamp, Bolger, Fusco, Gelber, Glynn,**
**Goldberg, Schamis, Sloan, Goldman, Citigroup, Merrill,**
**J.P. Morgan, Deutsche Bank And RBS**

627.    Plaintiffs repeat and reallege each and every allegation above as if fully set forth herein, except that for purposes of this Count, Plaintiffs assert only strict-liability and negligence claims and expressly disclaim any allegation of fraud or intentional misconduct, except that any challenged statements of opinion or belief made in connection with the 2018 Notes Offering are alleged to have been materially misstated statements of opinion or belief when made and at the time of the 2018 Notes Offering.

628.    This Count is brought under Section 11 of the Securities Act against Defendants Corzine, MacDonald, Steenkamp, Bolger, Fusco, Gelber, Glynn, Goldberg, Schamis, Sloan, Goldman, Citigroup, Merrill, J.P. Morgan, Deutsche Bank and RBS.

629.    This claim is brought on behalf of Lead Plaintiff VRS, Plaintiff LRI Invest and other members of the Class who, during the Class Period, purchased or otherwise acquired MF Global's 2018 Notes issued pursuant or traceable to the 2018 Notes Offering Materials.

630.    Individual Defendants MacDonald, Steenkamp, Bolger, Fusco, Gelber, Glynn, Goldberg, Schamis and Sloan each signed the Registration Statement.

631.    At the time the documents incorporated by reference in the 2018 Notes Offering Materials were filed, Corzine was a director of MF Global.

632.    Underwriter Defendants Goldman, Citigroup, Merrill, J.P. Morgan, Deutsche Bank and RBS underwrote the 2018 Notes Offering.

633.    As set forth above, the 2018 Notes Offering Materials contained untrue statements of material fact, including the financial statements and internal controls of MF Global. In addition, the 2018 Notes Offering Materials omitted to state other facts required to be stated therein or necessary to make the statements therein not misleading, including MF Global's violations of GAAP and internal control deficiencies. The misstated and omitted facts would have been material to a reasonable person reviewing the 2018 Notes Offering Materials.

634.    The Defendants named in this Count owed to Lead Plaintiff VRS, Plaintiff LRI Invest and the Class the duty to make a reasonable and diligent investigation of the statements contained in the 2018 Notes Offering Materials, to ensure that the statements contained or incorporated by reference therein were true and that there was no omission to state a material fact required to be stated therein or necessary to make the statements therein not misleading.

635.    These Defendants did not make a reasonable and diligent investigation of the statements contained or incorporated by reference in the 2018 Notes Offering Materials, and did not possess reasonable grounds for believing that the 2018 Notes Offering Materials did not contain an untrue statement of material fact or omit to state a material fact required to be stated therein or necessary to make the statements therein not misleading.

636.    The Underwriter Defendants named in this Count did not conduct a reasonable investigation of the statements contained in and incorporated by reference in the 2018 Notes Offering Materials and did not possess reasonable grounds for believing that the statements

therein were true and not materially misstated. In particular, these Underwriter Defendants did not conduct a reasonable investigation into the accuracy of the statements regarding MF Global's reported Deferred Tax Assets, financial performance, operations or internal controls. These Underwriter Defendants could not simply rely on the work of MF Global's auditor because the investing public relies on the underwriters to obtain and verify relevant information and then make sure that important facts are accurately disclosed. Thus, the Underwriter Defendants must conduct their own independent and reasonable investigation into the accuracy of the Company's financial statements and assessments of internal controls, and they were negligent in failing to do so sufficiently in connection with the 2018 Notes Offering.

637.    Similarly, the Individual Defendants named in this Count were negligent in failing to conduct a reasonable investigation of the statements contained in the 2018 Notes Offering Materials regarding MF Global's financial performance, operations, and internal controls, and did not possess reasonable grounds for believing that the statements therein were true and not materially misstated.

638.    Lead Plaintiff VRS, Plaintiff LRI Invest and members of the Class purchased the 2018 Notes issued pursuant or traceable to the 2018 Notes Offering Materials, and were damaged thereby.

639.    Lead Plaintiff VRS, Plaintiff LRI Invest and the Class did not know, nor in the exercise of reasonable diligence could they have known, of the untrue statements of material fact or omissions of material facts in the 2018 Notes Offering Materials when they purchased or acquired their securities. Less than one year has elapsed between the time they discovered or reasonably could have discovered the facts upon which this Count is based and the time this claim was brought. Less than three years have elapsed between the time that the securities upon

which this Count is brought were bona fide offered to the public and the time this action was commenced.

640.    By reason of the foregoing, the Defendants named in this Count are liable to Lead Plaintiff VRS, Plaintiff LRI Invest and members of the Class for violations of Section 11 of the Securities Act.

### COUNT TEN
**For Violations Of Section 12(a)(2) Of The Securities Act,
On Behalf Of Purchasers In The 2018 Notes Offering,
Asserted Against Underwriter Defendants Goldman,
Citigroup, Merrill, J.P. Morgan, Deutsche Bank And RBS**

641.    Plaintiffs repeat and reallege each and every allegation above as if fully set forth herein, except that for purposes of this Count, Plaintiffs assert only strict-liability and negligence claims and expressly disclaim any allegation of fraud or intentional misconduct except that any challenged statements of opinion or belief made in connection with the 2018 Notes Offering are alleged to have been materially misstated statements of opinion or belief when made and at the time of the 2018 Notes Offering.

642.    This Count is brought under Section 12(a)(2) of the Securities Act against Underwriter Defendants Goldman, Citigroup, Merrill, J.P. Morgan, Deutsche Bank and RBS.

643.    This claim is brought on behalf of Lead Plaintiff VRS, Plaintiff LRI Invest and other members of the Class who, during the Class Period, purchased or otherwise acquired MF Global's 2018 Notes in the 2018 Notes Offering.

644.    Underwriter Defendants Goldman, Citigroup, Merrill, J.P. Morgan, Deutsche Bank and RBS are sellers within the meaning of the Securities Act because they transferred title to Lead Plaintiff VRS, Plaintiff LRI Invest and other purchasers of MF Global's 2018 Notes in the 2018 Notes Offering. In particular, Underwriter Defendant Citigroup directly sold the 2018 Notes in the 2018 Notes Offering to Lead Plaintiff VRS and Plaintiff LRI Invest.

645.    As alleged herein, the 2018 Notes Offering Materials contained untrue statements of material fact, including the financial statements and internal controls of MF Global. In addition, the 2018 Notes Offering Materials omitted to state material facts required to be stated therein or necessary to make the statements therein not misleading, including MF Global's violations of GAAP and internal control deficiencies.

646.    The misstated and omitted facts would have been material to a reasonable person reviewing the 2018 Notes Offering Materials.

647.    Underwriter Defendants Goldman, Citigroup, Merrill, J.P. Morgan, Deutsche Bank and RBS owed to Lead Plaintiff VRS, Plaintiff LRI Invest and the Class the duty to make a reasonable and diligent investigation of the statements contained in the 2018 Notes Offering Materials, to ensure that the statements contained or incorporated by reference therein were true and that there was no omission to state a material fact required to be stated therein or necessary to make the statements therein not misleading.

648.    Underwriter Defendants Goldman, Citigroup, Merrill, J.P. Morgan, Deutsche Bank and RBS did not make a reasonable and diligent investigation of the statements contained or incorporated by reference in the 2018 Notes Offering Materials and did not possess reasonable grounds for believing that the 2018 Notes Offering Materials did not contain an untrue statement of material fact or omit to state a material fact required to be stated therein or necessary to make the statements therein not misleading.

649.    Lead Plaintiff VRS, Plaintiff LRI Invest and members of the Class purchased the 2018 Notes in the 2018 Notes Offering, and were damaged thereby.

650.    Lead Plaintiff VRS, Plaintiff LRI Invest and the Class did not know, nor in the exercise of reasonable diligence could they have known, of the untrue statements of material fact

or omissions of material facts in the 2018 Notes Offering Materials when they purchased or acquired the securities. Less than one year has elapsed between the time they discovered or reasonably could have discovered the facts upon which this Count is based and the time this claim was brought. Less than three years have elapsed between the time that the securities upon which this Count is brought were bona fide offered to the public and the time this action was commenced.

651. By reason of the foregoing, Underwriter Defendants Goldman, Citigroup, Merrill, J.P. Morgan, Deutsche Bank and RBS are liable to Lead Plaintiff VRS, Plaintiff LRI Invest and members of the Class for violations of Section 12(a)(2) of the Securities Act. Lead Plaintiff VRS, Plaintiff LRI Invest and Class members hereby tender their 2018 Notes to their respective sellers and seek rescission of their purchases to the extent that they continue to own such securities.

**COUNT ELEVEN**
**For Violations Of Section 15(a) Of The Securities Act,**
**On Behalf Of Purchasers Of The 2018 Notes,**
**Asserted Against The Officer Defendants**

652. Plaintiffs repeat and reallege each and every allegation above as if fully set forth herein, except that for purposes of this Count Plaintiffs assert only strict-liability and negligence claims and expressly disclaim any allegation of fraud or intentional misconduct except that any challenged statements of opinion or belief made in connection with the 2018 Notes Offering are alleged to have been materially misstated statements of opinion or belief when made and at the time of the 2018 Notes Offering.

653. This Count is brought under Section 15(a) of the Securities Act against the Officer Defendants, on behalf of Lead Plaintiff VRS, Plaintiff LRI Invest and members of the

Class who purchased or acquired the 2018 Notes pursuant or traceable to the 2018 Notes Offering Materials, and were damaged thereby.

654.     MF Global violated Section 11 of the Securities Act by issuing the 2018 Notes Offering Materials, which contained untrue statements of material fact and omitted to state material facts required to be stated therein or necessary in order to make the statements therein not misleading. The misstated and omitted facts would have been material to a reasonable person reviewing the 2018 Notes Offering Materials. MF Global is not named as a defendant only because of its bankruptcy.

655.     The Officer Defendants were controlling persons of MF Global when the 2018 Notes Offering Materials were filed and became effective, because of their senior executive positions with MF Global and their direct involvement in the Company's day-to-day operations, including its financial reporting and accounting functions.

656.     By virtue of the foregoing, the Officer Defendants each had the power to influence and control, and did influence and control, directly or indirectly, the decision-making of MF Global, including the content of its financial statements and the 2018 Notes Offering Materials.

657.     The Officer Defendants acted negligently and without reasonable care regarding the accuracy of the information contained and incorporated by reference in the 2018 Notes Offering Materials and lacked reasonable grounds to believe that such information was accurate and complete in all material respects.

658.     Lead Plaintiff VRS, Plaintiff LRI Invest and members of the Class purchased MF Global's 2018 Notes Offering pursuant or traceable to the 2018 Notes Offering Materials, and were damaged thereby.

659.     Lead Plaintiff VRS, Plaintiff LRI Invest and the Class did not know, nor in the exercise of reasonable diligence could they have known, of the untrue statements of material fact or omissions of material facts in the 2018 Notes Offering Materials when they purchased or acquired 2018 Notes. Less than one year has elapsed between the time they discovered or reasonably could have discovered the facts upon which this Count is based and the time this claim was brought. Less than three years have elapsed between the time that the securities upon which this Count is brought were bona fide offered to the public and the time this action was commenced.

660.     By reason of the foregoing, Defendants Corzine, MacDonald and Steenkamp and are liable to Lead Plaintiff VRS, Plaintiff LRI Invest and members of the Class for violations of Section 15(a) of the Securities Act.

**COUNT TWELVE**
**For Violations Of Section 11 Of The Securities Act, On Behalf Of Purchasers Of The 6.25% Senior Notes, Asserted Against Defendants Corzine, MacDonald, Steenkamp, Bolger, Fusco, Gelber, Glynn, Goldberg, Schamis, Sloan, Jefferies, Merrill, BMO Capital Markets, Commerz, Natixis, Lebenthal, Sandler O'Neill And U.S. Bancorp**

661.     Plaintiffs repeat and reallege each and every allegation above as if fully set forth herein, except that for purposes of this Count, Plaintiffs assert only strict-liability and negligence claims and expressly disclaim any allegation of fraud or intentional misconduct except that any challenged statements of opinion or belief made in connection with the 6.25% Senior Notes Offering are alleged to have been materially misstated statements of opinion or belief when made and at the time of the 6.25% Senior Notes Offering.

662.     This Count is brought under Section 11 of the Securities Act against Defendants Corzine, MacDonald, Steenkamp, Bolger, Fusco, Gelber, Glynn, Goldberg, Schamis, Sloan, Jefferies, Merrill, BMO Capital Markets, Commerz, Natixis, Lebenthal, Sandler O'Neill and U.S. Bancorp.

663.     This claim is brought on behalf of Plaintiff Guam and other members of the Class who, during the Class Period, purchased or otherwise acquired MF Global's 6.25% Senior Notes issued pursuant to the 6.25% Senior Notes Offering Materials.

664.     Individual Defendants MacDonald, Steenkamp, Bolger, Fusco, Gelber, Glynn, Goldberg, Schamis and Sloan each signed the Registration Statement.

665.     At the time documents incorporated by reference in the 6.25% Senior Notes Offering Materials were filed, Corzine was a director of MF Global.

666.     Underwriter Defendants Jefferies, Merrill, BMO Capital Markets, Commerz, Natixis, Lebenthal, Sandler O'Neill and U.S. Bancorp underwrote the 6.25% Senior Notes Offering.

667.     As set forth above, the 6.25% Senior Notes Offering Materials contained untrue statements of material fact, including the financial statements and internal controls of MF Global. In addition, the 6.25% Senior Notes Offering Materials omitted to state other facts required to be stated therein or necessary to make the statements therein not misleading, including MF Global's violations of GAAP and internal control deficiencies. The misstated and omitted facts would have been material to a reasonable person reviewing the 6.25% Senior Notes Offering Materials.

668.     The Defendants named in this Count owed to Plaintiff Guam and the Class the duty to make a reasonable and diligent investigation of the statements contained in the 6.25% Senior Notes Offering Materials, to ensure that the statements contained or incorporated by reference therein were true and that there was no omission to state a material fact required to be stated therein or necessary to make the statements therein not misleading.

669.    These Defendants did not make a reasonable and diligent investigation of the statements contained or incorporated by reference in the 6.25% Senior Notes Offering Materials, and did not possess reasonable grounds for believing that the 6.25% Senior Notes Offering Materials did not contain an untrue statement or omit to state a material fact required to be stated therein or necessary to make the statements therein not misleading.

670.    The Underwriter Defendants named in this Count did not conduct a reasonable investigation of the statements contained in and incorporated by reference in the 6.25% Senior Notes Offering Materials and did not possess reasonable grounds for believing that the statements therein were true and not materially misstated. In particular, these Underwriter Defendants did not conduct a reasonable investigation into the accuracy of the statements regarding MF Global's reported Deferred Tax Assets, financial performance, operations or internal controls. These Underwriter Defendants could not simply rely on the work of MF Global's auditor because the investing public relies on the underwriters to obtain and verify relevant information and then make sure that important facts are accurately disclosed. Thus, the Underwriter Defendants must conduct their own independent and reasonable investigation into the accuracy of the Company's financial statements and assessments of internal controls, and they were negligent in failing to do so sufficiently in connection with the 6.25% Senior Notes Offering.

671.    Similarly, the Individual Defendants named in this Count were negligent in failing to conduct a reasonable investigation of the statements contained in the 6.25% Senior Notes Offering Materials regarding MF Global's financial performance, operations, and internal controls, and did not possess reasonable grounds for believing that the statements therein were true and not materially misstated.

211

672.    Plaintiff Guam and members of the Class purchased the 6.25% Senior Notes issued in the 6.25% Senior Notes Offering, and were damaged thereby.

673.    Plaintiff Guam and the Class did not know, nor in the exercise of reasonable diligence could they have known, of the untrue statements of material fact or omissions of material facts in the 6.25% Senior Notes Offering Materials when they purchased or acquired their securities. Less than one year has elapsed between the time they discovered or reasonably could have discovered the facts upon which this Count is based and the time this claim was brought. Less than three years have elapsed between the time that the securities upon which this Count is brought were bona fide offered to the public and the time this action was commenced.

674.    By reason of the foregoing, the Defendants named in this Count are liable to Plaintiff Guam and members of the Class for violations of Section 11 of the Securities Act.

### COUNT THIRTEEN
**For Violations Of Section 12(a)(2) of the Securities Act, On Behalf Of Purchasers In The 6.25% Senior Notes Offering, Asserted Against Defendants Jefferies, Merrill, BMO Capital Markets, Commerz, Natixis, Lebenthal, Sandler O'Neill And U.S. Bancorp**

675.    Plaintiffs repeat and reallege each and every allegation above as if fully set forth herein, except that for purposes of this Count, Plaintiffs assert only strict-liability and negligence claims and expressly disclaim any allegation of fraud or intentional misconduct, except that any challenged statements of opinion or belief made in connection with the 6.25% Senior Notes Offering are alleged to have been materially misstated statements of opinion or belief when made and at the time of the 6.25% Senior Notes Offering.

676.    This Count is brought under Section 12(a)(2) of the Securities Act against Underwriter Defendants Jefferies, Merrill, BMO Capital Markets, Commerz, Natixis, Lebenthal, Sandler O'Neill and U.S. Bancorp.

677.     This claim is brought on behalf of Plaintiff Guam and other members of the Class who, during the Class Period, purchased or otherwise acquired MF Global's 6.25% Senior Notes issued in the 6.25% Senior Notes Offering.

678.     Underwriter Defendants Jefferies, Merrill, BMO Capital Markets, Commerz, Natixis, Lebenthal, Sandler O'Neill, and U.S. Bancorp are sellers within the meaning of the Securities Act because they transferred title to Plaintiff Guam and other purchasers of MF Global's 6.25% Senior Notes in the 6.25% Senior Notes Offering. In particular, Underwriter Defendant Jeffries directly sold the 6.25% Senior Notes to Plaintiff Guam.

679.     As alleged herein, the 6.25% Senior Notes Offering Materials contained untrue statements of material fact, including the financial statements and internal controls of MF Global. In addition, the 6.25% Senior Notes Offering Materials omitted to state material facts required to be stated therein or necessary to make the statements therein not misleading, including MF Global's violations of GAAP and internal control deficiencies.

680.     The misstated and omitted facts would have been material to a reasonable person reviewing the 6.25% Senior Notes Offering Materials.

681.     Underwriter Defendants Jefferies, Merrill, BMO Capital Markets, Commerz, Natixis, Lebenthal, Sandler O'Neill and U.S. Bancorp owed to Plaintiff Guam and the Class the duty to make a reasonable and diligent investigation of the statements contained in the 6.25% Senior Notes Offering Materials, to ensure that the statements contained or incorporated by reference therein were true and that there was no omission to state a material fact required to be stated therein or necessary to make the statements therein not misleading.

682.     Underwriter Defendants Jefferies, Merrill, BMO Capital Markets, Commerz, Natixis, Lebenthal, Sandler O'Neill and U.S. Bancorp did not make a reasonable and diligent

investigation of the statements contained or incorporated by reference in the 6.25% Senior Notes Offering Materials and did not possess reasonable grounds for believing that the 6.25% Senior Notes Offering Materials did not contain an untrue statement of material fact or omit to state a material fact required to be stated therein or necessary to make the statements therein not misleading.

683.    Plaintiff Guam and members of the Class purchased MF Global's 6.25% Senior Notes in the 6.25% Senior Notes Offering in the 6.25% Senior Notes Offering, and were damaged thereby.

684.    Plaintiff Guam and the Class did not know, nor in the exercise of reasonable diligence could they have known, of the untrue statements of material fact or omissions of material facts in the 6.25% Senior Notes Offering Materials when they purchased or acquired the securities. Less than one year has elapsed between the time they discovered or reasonably could have discovered the facts upon which this Count is based and the time this claim was brought. Less than three years have elapsed between the time that the securities upon which this Count is brought were bona fide offered to the public and the time this action was commenced.

685.    By reason of the foregoing, Underwriter Defendants Jefferies, Merrill, BMO Capital Markets, Commerz, Natixis, Lebenthal, Sandler O'Neill and U.S. Bancorp are liable to Plaintiff Guam and members of the Class for violations of Section 12(a)(2) of the Securities Act. Plaintiff Guam and Class members hereby tender their 6.25% Senior Notes to their respective sellers and seek rescission of their purchases to the extent that they continue to own such securities.

## COUNT FOURTEEN
### For Violations Of Section 15(a) Of The Securities Act, On Behalf Of Purchasers Of The 6.25% Senior Notes, Asserted Against The Officer Defendants

686.    Plaintiffs repeat and reallege each and every allegation above as if fully set forth herein, except that for purposes of this Count, Plaintiffs assert only strict-liability and negligence claims and expressly disclaim any allegation of fraud or intentional misconduct except that any challenged statements of opinion or belief made in connection with the 6.25% Senior Notes Offering are alleged to have been materially misstated statements of opinion or belief when made and at the time of the 6.25% Senior Notes Offering.

687.    This Count is brought under Section 15 of the Securities Act against the Officer Defendants, on behalf of Plaintiff Guam and members of the Class who purchased or acquired the 6.25% Senior Notes pursuant or traceable to the 6.25% Senior Notes Offering Materials.

688.    MF Global violated Section 11 of the Securities Act by issuing the 6.25% Senior Notes Offering Materials, which contained untrue statements of material fact and omitted to state material facts required to be stated therein or necessary to make the statements therein not misleading. The misstated and omitted facts would have been material to a reasonable person reviewing the 6.25% Senior Notes Offering Materials. MF Global is not named as a defendant only because of its bankruptcy.

689.    The Officer Defendants were controlling persons of MF Global when the 6.25% Senior Notes Offering Materials were filed and became effective, because of their senior executive positions with MF Global and their direct involvement in the Company's day-to-day operations, including its financial reporting and accounting functions.

690.    By virtue of the foregoing, Defendants Corzine, MacDonald and Steenkamp each had the power to influence and control, and did influence and control, directly or indirectly, the

decision-making of MF Global, including the content of its financial statements and the 6.25% Senior Notes Offering Materials.

691.    The Officer Defendants acted negligently and without reasonable care regarding the accuracy of the information contained and incorporated by reference in the 6.25% Senior Notes Offering Materials and lacked reasonable grounds to believe that such information was accurate and complete in all material respects.

692.    Plaintiff Guam and members of the Class purchased the 6.25% Senior Notes pursuant or traceable to the 6.25% Senior Notes Offering Materials, and were damaged thereby.

693.    Plaintiff Guam and the Class did not know, nor in the exercise of reasonable diligence could they have known, of the untrue statements of material fact or omissions of material facts in the 6.25% Senior Notes Offering Materials when they purchased or acquired 6.25% Senior Notes. Less than one year has elapsed between the time they discovered or reasonably could have discovered the facts upon which this Count is based and the time this claim was brought. Less than three years have elapsed between the time that the securities upon which this Count is brought were bona fide offered to the public and the time this action was commenced.

694.    By reason of the foregoing, Defendants Corzine, MacDonald and Steenkamp are liable to Plaintiff Guam and members of the Class for violations of Section 15(a) of the Securities Act.

## XIV.   **JURY DEMAND**

695.    Plaintiffs, on behalf of themselves and the Class, hereby demand a trial by jury.

## XV.   **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, on behalf of themselves and the Class, pray for relief and judgment as follows:

a.    Determining that this action is a proper class action and certifying Plaintiffs as class representatives under Rule 23 of the Federal Rules of Civil Procedure;

b.    Awarding compensatory damages in favor of Plaintiffs and the other members of the Class against all Defendants for all damages sustained as a result of Defendants' violations in an amount to be proven at trial, together with interest thereon;

c.    Awarding rescission or rescissory damages in favor of Plaintiffs and the other members of the Class;

d.    Awarding prejudgment interest or opportunity-cost damages in favor of Plaintiffs and the other members of the Class;

e.    Awarding Plaintiffs and the Class the fees and expenses incurred in the prosecution of this action, including attorneys' fees and expert fees; and

f.    Granting such other and further relief as the Court may deem just and proper.

Dated: August 20, 2012
        New York, New York

By: _____

**BERNSTEIN LITOWITZ BERGER &
GROSSMANN LLP**
Salvatore J. Graziano
Hannah G. Ross
1285 Avenue of the Americas
New York, NY 10019
(212) 554-1538
(212) 554-1444 (fax)

*Co-Lead Counsel For Lead Plaintiffs The
Virginia Retirement System And Her Majesty
The Queen In Right Of Alberta, And Counsel
For Named Plaintiffs Government Of Guam
Retirement Fund And West Virginia Laborers'
Pension Trust Fund*

**LABATON SUCHAROW LLP**
Jonathan M. Plasse
Javier Bleichmar
140 Broadway
New York, NY 10005
(212) 907-0863
(212) 883-7063 (fax)

*Co-Lead Counsel For Lead Plaintiffs*
*The Virginia Retirement System And Her*
*Majesty The Queen In Right Of Alberta*

**MOTLEY RICE LLC**
Ann Ritter
28 Bridgeside Boulevard
Mount Pleasant, SC 29464
(843) 216-9000
(843) 216-9450 (fax)

**ROBBINS GELLER RUDMAN &**
**DOWD LLP**
Darren J. Robbins
655 West Broadway, Ste. 1900
San Diego, CA 92101
(619) 231-1058
(619) 231-7423 (fax)

*Additional Counsel For*
*Named Plaintiff LRI Invest, S.A.*

**GIRARD GIBBS LLP**
Daniel C. Girard
601 California Street, Suite 1400
San Francisco, CA 94108
(415) 981-4800
(415) 981-4846 (fax)

**ZAMANSKY & ASSOCIATES, LLC**
Jacob H. Zamansky
Kevin D. Galbraith
50 Broadway
New York, NY 10004
(212) 742-1414
(212) 742-1177 (fax)

*Additional Counsel for Named Plaintiffs*
*Monica Rodriguez And Jerome Vrabel*

218

# EXHIBIT A

### THE VIRGINIA RETIREMENT SYSTEM
### MF GLOBAL HOLDINGS, LTD. TRANSACTIONS

**Common Stock**
**CUSIP:  55277J108**

| Transaction | Date | Shares | Price Per Share |
|---|---|---|---|
| Purchase | 04/27/2011 | 900 | $8.4311 |
| Sale | 06/10/2011 | (400) | $7.1700 |
| Sale | 06/10/2011 | (100) | $7.0300 |
| Sale | 06/10/2011 | (400) | $7.0863 |

**9% Convertible Senior Notes Due 2038**
**CUSIP:  55276YAB2**

| Transaction | Date | Face Amount | Par Value |
|---|---|---|---|
| Purchase | 08/25/2011 | 90,000 | $106.7500 |
| Purchase | 10/27/2011 | 850,000 | $79.0000 |
| Sale | 09/06/2011 | (90,000) | $108.0000 |

**1.875% Convertible Senior Notes Due 2016**
**CUSIP:  55277JAA6**

| Transaction | Date | Face Amount | Par Value |
|---|---|---|---|
| Purchase | 05/19/2011 | 320,000 | $101.8750 |
| Purchase | 10/26/2011 | 240,000 | $50.5000 |
| Purchase | 10/26/2011 | 480,000 | $45.0000 |
| Purchase | 10/26/2011 | 400,000 | $50.5000 |
| Purchase | 10/26/2011 | 800,000 | $45.0000 |
| Purchase | 10/27/2011 | 2,060,000 | $55.7500 |
| Purchase | 10/27/2011 | 2,045,000 | $59.5000 |
| Purchase | 10/27/2011 | 680,000 | $59.0000 |
| Purchase | 10/27/2011 | 1,705,000 | $59.5000 |
| Purchase | 10/27/2011 | 1,680,000 | $60.7900 |
| Purchase | 10/27/2011 | 1,705,000 | $59.0000 |
| Purchase | 10/27/2011 | 1,365,000 | $56.0000 |
| Purchase | 10/28/2011 | 1,150,000 | $48.0000 |
| Purchase | 10/28/2011 | 645,000 | $45.0000 |
| Purchase | 10/28/2011 | 460,000 | $48.0000 |
| Purchase | 10/28/2011 | 145,000 | $45.5000 |
| Purchase | 10/28/2011 | 345,000 | $45.5000 |
| Purchase | 10/28/2011 | 1,610,000 | $45.0000 |
| Sale | 06/22/2011 | (320,000) | $98.2500 |

**3.375% Convertible Senior Notes Due 2018**
**CUSIP:  55277JAB4**

| Transaction | Date | Face Amount | Par Value |
|---|---|---|---|
| Purchase | 07/28/2011 | 18,000 | $100.0000 |
| Purchase | 09/22/2011 | 1,210,000 | $81.5987 |
| Purchase | 09/22/2011 | 2,785,000 | $80.8278 |
| Purchase | 10/26/2011 | 405,000 | $54.5000 |
| Purchase | 10/26/2011 | 1,625,000 | $44.6250 |
| Purchase | 10/26/2011 | 950,000 | $44.6250 |
| Purchase | 10/26/2011 | 240,000 | $54.5000 |
| Purchase | 10/27/2011 | 3,515,000 | $54.5000 |
| Purchase | 10/27/2011 | 705,000 | $59.0000 |
| Purchase | 10/28/2011 | 460,000 | $44.5000 |
| Purchase | 10/28/2011 | 225,000 | $43.0000 |
| Purchase | 10/28/2011 | 295,000 | $44.5000 |
| Purchase | 10/28/2011 | 740,000 | $47.0000 |
| Purchase | 10/28/2011 | 145,000 | $43.0000 |
| Purchase | 10/28/2011 | 1,140,000 | $47.0000 |
| Sale | 10/27/2011 | (9,000) | $59.0000 |
| Sale | 10/31/2011 | (9,000) | $42.0000 |

# EXHIBIT B

**HER MAJESTY THE QUEEN IN RIGHT OF ALBERTA**
**MF GLOBAL HOLDINGS, LTD. TRANSACTIONS**

**Common Stock**
**CUSIP:  55277J108**

| Transaction | Date | Shares | Price Per Share |
|:---:|:---:|:---:|:---:|
| Purchase | 03/30/11 | 16,587 | $8.15 |
| Purchase | 03/30/11 | 22,646 | $8.15 |
| Purchase | 03/30/11 | 34,317 | $8.15 |
| Purchase | 03/31/11 | 27,100 | $8.28 |
| Purchase | 03/31/11 | 74,420 | $8.22 |
| Purchase | 04/01/11 | 14,600 | $8.89 |
| Purchase | 04/01/11 | 25,700 | $8.74 |
| Purchase | 04/01/11 | 31,300 | $8.65 |
| Purchase | 04/01/11 | 143,850 | $8.64 |
| Purchase | 04/12/11 | 3,700 | $8.51 |
| Purchase | 04/12/11 | 11,745 | $8.47 |
| Purchase | 04/12/11 | 36,375 | $8.46 |
| Purchase | 04/13/11 | 61,205 | $8.47 |
| Purchase | 04/14/11 | 7,700 | $8.31 |
| Purchase | 04/14/11 | 27,100 | $8.38 |
| Purchase | 04/14/11 | 50,390 | $8.30 |
| Purchase | 04/15/11 | 43,480 | $8.39 |
| Purchase | 04/18/11 | 4,370 | $8.29 |
| Purchase | 04/18/11 | 118,698 | $8.30 |
| Purchase | 04/19/11 | 54,532 | $8.30 |
| Purchase | 04/20/11 | 63,180 | $8.32 |
| Purchase | 04/21/11 | 18,865 | $8.35 |
| Purchase | 04/25/11 | 26,020 | $8.31 |
| Purchase | 04/25/11 | 36,357 | $8.33 |
| Purchase | 04/26/11 | 38,453 | $8.35 |
| Purchase | 06/20/11 | 29,146 | $7.54 |
| Purchase | 06/20/11 | 1,800 | $7.49 |
| Purchase | 06/21/11 | 63,810 | $7.69 |
| Purchase | 06/22/11 | 1,560 | $7.70 |
| Purchase | 06/22/11 | 41,260 | $7.80 |

| Transaction | Date | Shares | Price Per Share |
|---|---|---|---|
| Purchase | 06/22/11 | 70,250 | $7.74 |
| Purchase | 06/22/11 | 114,420 | $7.71 |
| Purchase | 06/23/11 | 40,250 | $7.52 |
| Purchase | 06/23/11 | 186,790 | $7.55 |
| Purchase | 06/24/11 | 84,294 | $7.51 |
| Purchase | 08/15/11 | 29,500 | $5.65 |
| Purchase | 08/15/11 | 88,890 | $5.73 |
| Purchase | 08/15/11 | 100,000 | $5.60 |
| Purchase | 08/16/11 | 19,820 | $5.67 |
| Sale | 10/21/11 | (5,140) | $3.75 |
| Sale | 10/21/11 | (53,460) | $3.72 |
| Sale | 10/24/11 | (30,028) | $3.58 |
| Sale | 10/24/11 | (44,586) | $3.73 |
| Sale | 10/24/11 | (48,480) | $3.74 |
| Sale | 10/25/11 | (20,100) | $2.01 |
| Sale | 10/25/11 | (120,852) | $2.57 |
| Sale | 10/26/11 | (15,394) | $1.15 |
| Sale | 10/26/11 | (18,500) | $1.43 |
| Sale | 10/26/11 | (308,170) | $1.20 |
| Sale | 10/26/11 | (1,199,770) | $1.22 |

# EXHIBIT C

# GOVERNMENT OF GUAM RETIREMENT FUND
## MF GLOBAL HOLDINGS LTD. TRANSACTIONS

**Common Stock**
**CUSIP:  55277J108**

| Transaction | Date | Shares | Price Per Share |
|---|---|---|---|
| Purchase | 10/01/2010 | 9,000 | $7.2116 |
| Purchase | 04/01/2011 | 41,960 | $8.7379 |
| Purchase | 04/04/2011 | 36,730 | $8.6961 |
| Purchase | 04/06/2011 | 22,460 | $8.7103 |
| Purchase | 05/20/2011 | 26,650 | $7.4500 |
| Purchase | 08/17/2011 | 5,430 | $5.5846 |
| Sale | 10/18/2010 | (2,400) | $7.9801 |
| Sale | 11/02/2010 | (2,700) | $7.9585 |
| Sale | 01/03/2011 | (2,300) | $8.4066 |
| Sale | 01/04/2011 | (1,600) | $8.3922 |
| Sale | 10/25/2011 | (133,230) | $2.1276 |

**6.25% Senior Notes Due 2016**
**CUSIP:  55277JAC2**

| Transaction | Date | Face Amount | Par Value |
|---|---|---|---|
| Purchase | 08/03/2011 | 630,000 | $100.0000 |
| Sale | 11/09/2011 | (29,000) | $36.0000 |
| Sale | 11/09/2011 | (28,000) | $36.5000 |
| Sale | 11/09/2011 | (143,000) | $36.0000 |
| Sale | 11/10/2011 | (85,000) | $34.7500 |
| Sale | 11/10/2011 | (261,000) | $34.7500 |
| Sale | 11/10/2011 | (84,000) | $34.7500 |

# EXHIBIT D

**WEST VIRGINIA LABORERS' PENSION TRUST FUND**
**MF GLOBAL HOLDINGS LTD. TRANSACTIONS**

**Common Stock**
**CUSIP:  55277J108**

| Transaction | Date | Shares | Price Per Share |
|---|---|---|---|
| Purchase | 06/03/2010 | 1,300 | $7.1000 |
| Purchase | 06/09/2010 | 7,100 | $7.2532 |
| Purchase | 02/03/2011 | 5,100 | $8.2957 |
| Purchase | 04/26/2011 | 1,400 | $8.3823 |
| Purchase | 07/14/2011 | 1,800 | $7.3882 |
| Sale | 10/27/2011 | (4,700) | $1.8001 |
| Sale | 10/27/2011 | (3,000) | $1.7480 |
| Sale | 10/27/2011 | (3,000) | $1.6926 |
| Sale | 10/27/2011 | (3,000) | $1.6824 |
| Sale | 10/27/2011 | (3,000) | $1.6309 |

# EXHIBIT E

**LRI INVEST S.A.**
**MF GLOBAL HOLDINGS LTD. TRANSACTIONS**

**1.875% Convertible Senior Notes Due 2016**
**CUSIP:  55277JAA6**

| Transaction | Date | Shares | Par Value |
|---|---|---|---|
| Purchase | 02/09/2011 | 2,000,000 | $101.4500 |
| Purchase | 02/15/2011 | 1,000,000 | $104.5600 |
| Purchase | 02/17/2011 | 2,000,000 | $105.7500 |
| Sale | 11/02/2011 | (5,000,000) | $44.5000 |

**3.375% Convertible Senior Notes Due 2018**
**CUSIP:  55277JAB4**

| Transaction | Date | Shares | Par Value |
|---|---|---|---|
| Purchase | 07/28/2011 | 500,000 | $100.0000 |
| Sale | 11/02/2011 | (500,000) | $44.5000 |

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - x

IN RE MF GLOBAL HOLDINGS
LIMITED SECURITIES LITIGATION

- - - - - - - - - - - - - - - - - - - - - - - - - - x

THIS DOCUMENT RELATES TO:

The Consolidated Securities Action

- - - - - - - - - - - - - - - - - - - - - - - - - - x

:  Civil Action No. 1:11-cv-07866-VM
:
:  **CERTIFICATE OF SERVICE**
:
:
:
:
:  **JURY TRIAL DEMANDED**
:
:  **ECF CASE**
:
:
:

I hereby certify that on August 20, 2012, I caused copies of the foregoing

**CONSOLIDATED AMENDED SECURITIES CLASS ACTION COMPLAINT**

to be delivered to the parties listed on the attached service list, via hand delivery or Fed Ex, as

stated therein.


Dated:  August 20, 2012

Stefanie J. Sundel

# SERVICE LIST

Benjamin E. Rosenberg
Dechert LLP
1095 Avenue of the Americas
New York, NY  10036-6797
Tel: (212) 698-3606
Fax: (212) 698-3599
Email:  Benjamin.rosenberg@dechert.com
**Counsel for Defendant Jon Corzine**

Robert Hotz, Esq.
Akin Gump Strauss Hauer & Feld
One Bryant Park
New York, NY  10036
Tel: (212) 872-1028
Fax: (212) 872-1002
Email:  rhotz@AkinBump.com
**Counsel for Defendant R. Randy MacDonald**

Neil S. Binder, Esq.
Richards Kibbe & Orbe LLP
One World Financial Center
New York, NY  10281-1003
Tel: (212) 530-1809
Fax: (917) 344-8809
Email: nbinder@rkollp.com
**Counsel for Defendant Henri J. Steenkamp**

Edmund Polubinski, III, Esq.
Davis, Polk & Wardwell
450 Lexington Avenue
New York, NY  10017
Tel: (212) 450-4000
Fax: (212) 701-5800
Email:  polubinski@davispolk.com
**Counsel for Defendants David P. Bolger, Eileen S. Fusco, David Gelbe, Martin J. Glynn,**
**Edward L. Goldberg, David I. Schamis and Robert S. Sloan**

Mark A. Kirsch, Esq.
Gibson Dunn & Crutcher
200 Park Avenue
New York, NY  10166-0193
Tel: (212) 351-2662
Fax: (212) 351-6362
Email:  mkirsch@gibsondunn.com
**Counsel for Defendants Bank of America Corp., Citigroup Global Market Inc., Deutsche Bank Securities Inc., Goldman Sachs & Co., J.P. Morgan Securities Inc., Merrill Lynch Pierce Fenner & Smith Inc., RBS Securities Inc.**


Adam S. Hakki, Esq.
Shearman & Sterling LLP
599 Lexington Avenue
New York, NY  10022
Tel: (212) 848-4000
Fax: (212) 848-7179
Email:  ahakki@shearman.com
**Counsel for Defendants Jeffries & Col, BMO Capital. Markets Corp., Commerz Markets LLC, Natixis Securities North America Inc., Lebenthal & Co. LLC, and Sandler O'Neill & Partners L.P.**