# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN RE MF GLOBAL HOLDINGS LTD. INVESTMENT LITIGATION | Case No. 12-MD-2338 (VM) |
| JOSEPH DEANGELIS, et al., <br><br> Plaintiffs, <br><br> - against - <br><br> JON S. CORZINE, et al. <br><br> Defendants. | Case No. 11-Civ-7866 (VM) <br><br> **JURY TRIAL DEMANDED** |
| THIS DOCUMENTS RELATES TO: <br><br> The Commodity Customer Class Actions | |

## CONSOLIDATED AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE COMMODITY EXCHANGE ACT AND COMMON LAW



## TABLE OF CONTENTS

I.    STATEMENT OF THE CASE ................................................................................3

II.   JURISDICTION AND VENUE ..........................................................................19

III.  THE PARTIES AND SIGNIFICANT NON-PARTIES...................................20

    A.    Plaintiffs and Proposed Class Representatives ......................................20

    B.    The D&O Defendants ..............................................................................23

        1.    Jon S. Corzine ............................................................... 24

        2.    Henri J. Steenkamp ....................................................... 27

        3.    Bradley I. Abelow .......................................................... 29

        4.    Laurie R. Ferber ............................................................ 30

        5.    Edith O'Brien ................................................................ 31

        6.    Christine A. Serwinski ................................................... 33

        7.    David Dunne .................................................................. 34

        8.    Vinay Mahajan .............................................................. 36

    C.    The Third-Party Defendants ...................................................................39

        1.    PwC...............................................................................39

        2.    CME Defendants ............................................................41

    D.    MFGI and MFG Holdings .......................................................................43

IV.   FACTUAL BACKGROUND ..............................................................................46

    A.    The Commodity Exchange Act Has Ironclad Segregation and Investment
        Requirements Designed to Protect Commodities Customers ...............................46

    B.    MFGI's Various Responsible Departments Lacked Meaningful Controls Over
        Customer Funds or the Framework for Evaluating the Company's Liquidity ......52

    D.    MFGI Aggressively Accessed Customer Funds in 2009 .......................................59

    E.    Defendant Corzine Assumes Control of MF Global: The Failed Attempt to
        Transform MF Global From a Futures Brokerage to an Investment Bank............60

        1.    Risk Management and MF Global's New Direction .................................64

        2.    Defendant Corzine Eliminates Risk Oversight In Order to Implement
            His Strategy...........................................................................................66

        3.    The Sovereign Debt RTM Portfolio .........................................................72

        a.    The RTM Strategy ......................................................... 72

        b.    Risk and Growth of the RTM Portfolio .................................... 74

i

V.    THE LIQUIDITY CRISES AT MF GLOBAL ESCALATED DURING THE
      SUMMER OF 2011 WHILE VIRTUALLY NO CONTROLS WERE IN PLACE
      OVER CUSTOMER FUNDS ........................................................................................76

      A.    Senior Management Proposes To Use Excess Segregated Funds to Meet the
            Growing Liquidity Needs of MFGI ......................................................................76

      B.    By July 2011 Senior Management Was Already Requesting and Authorizing
            Transfers from Customer Funds ..........................................................................78

      C.    Defendant Serwinski Raised Concerns About Using Customer Funds Even
            Overnight .............................................................................................................79

      D.    Defendant Corzine Was Warned Against Purchasing Additional Foreign
            Sovereign Debt Given The Company's Liquidity ................................................81

      E.    Despite Defendant Serwinski's Report Concerning the Rule 15c3-3 "Lock
            Up" Requirements, Transfers From Customer Funds Continued Virtually
            Unabated ...............................................................................................................82

      F.    FINRA and FSA Inquire About MG Global's RTM Exposure and
            Contemplate "A Default Risk Charge" ...............................................................83

      G.    Defendant Mahajan, New Global Treasurer, Immediately Recognized
            Problems With The Company's Treasury Functions ...........................................85

      H.    FINRA Informs MFGI Of Required Write-Downs Relating To RTMs ...............87

      I.    Amidst All The Regulator Scrutiny, Senior Management Was Monitoring and
            Acutely Aware of Falling Liquidity and "Everyday" Reliance on Customer
            Excess As A Source To Fund MF Global's Proprietary Operations. ...................91

      J.    Events During The Penultimate Week That Foretold MFGI's Collapse .............95

            1.    The Market Focuses On FINRA's August Demand to MFGI ..................95

            2.    MFGI Management Knew It Had A Regulatory Excess Deficiency of
                  Almost $70 Million ...............................................................................96

            3.    MFGI Loses Counterparties, Thereby Removing Major Sources of
                  Liquidity ................................................................................................97

            4.    CME Group Issues a Warning Letter Reminding MF Global of Its
                  Obligations to Adequately Segregate Customer Funds ...........................97

            5.    Defendant Mahajan Advised Defendant O'Brien Not To Borrow From
                  FINCO To Repay Customer Funds .........................................................98

            6.    Senior Management Meets With Moody's In An Attempt to Prevent a
                  Downgrade .............................................................................................99

VI.   EVENTS DURING MF GLOBAL'S FINAL WEEK OF OPERATIONS ......................99

      A.    Moody's Downgrade and MF Global's Disastrous Financial Results .................99

      B.    MF Global Repeatedly Meets With its Regulators –Including CME –
            Concerning Its Precarious Position .................................................................100

ii

C. Ratings Agencies Downgrade MFG Holdings Again...........................................103

D. CME Remains at MFGI on October 28 But Does Not Prevent Any Unlawful Transfers ...................................................................................................................103

VII. MFGI AND THE D&O DEFENDANTS IMPROPERLY CAUSED, AUTHORIZED, AND/OR DIRECTED UNLAWFUL TRANSFERS OF CUSTOMER FUNDS DURING THE FINAL WEEK OF OPERATIONS........................................................104

VIII. THE UNEXPLAINED SHORTFALL IN SEGREGATED CUSTOMER FUNDS DERAILS THE $1 BILLION SALE OF MFGI TO INTERACTIVE BROKERS AS MF GLOBAL FINALLY ADMITS IT VIOLATED SEGREGATION REQUIRMENTS ......................................................................................................113

X. THE T-BILL SWAP PROGRAM AND FAILURE TO PROTECT 30.7 FUNDS ........125

XI. PWC FAILED ADEQUATELY TO AUDIT THE INTERNAL CONTROLS OVER CUSTOMER FUNDS AS REQUIRED BY APPLICABLE LAW AND THE ENGAGEMENT LETTERS.........................................................................................127

XII. CME FAILED ADEQUATELY TO REGULATE MFGI – A MATERIAL SOURCE OF ITS REVENUE..................................................................................................135

XIII. CLASS ACTION ALLEGATIONS .........................................................................145

XIV. TRUSTEE'S STANDING AND ASSIGNMENT........................................................148

XV. CAUSES OF ACTION .............................................................................................149

COUNT I: Direct Violations Of The Commodity Exchange Act........................150

COUNT II: Aiding And Abetting Violations Of The Commodity Exchange Act 152

COUNT III: Breach Of Fiduciary Duty................................................................154

COUNT IV: Aiding And Abetting Breach Of Fiduciary Duty.............................157

COUNT V: Breach Of Fiduciary Duty: Mismanagement....................................161

COUNT VI: Negligence ........................................................................................164

COUNT VII: Negligence ........................................................................................167

COUNT VIII: Tortious Interference With Contract And Business Advantage ........168

COUNT IX: Conversion ........................................................................................171

COUNT X: Aiding And Abetting Conversion .....................................................173

COUNT XI: Breach Of Fiduciary Duty................................................................174

COUNT XII: Aiding And Abetting Breach Of Bailment ......................................176

COUNT XIII: Professional Negligence By PwC ....................................................177

COUNT XIV: Breach Of Fiduciary Duty By PwC .................................................181

COUNT XV: Direct Violations Of The Commodity Exchange Act........................183

COUNT XVI: Aiding And Abetting Violations Of The Commodity Exchange Act 189

iii

COUNT XVII:      Aiding And Abetting Violations Of The Commodity Exchange Act 192

COUNT XVIII:    Aiding And Abetting Breach Of Fiduciary Duty .............................. 194

XVI.   PRAYER FOR RELIEF ............................................................................. 196

XVII.  JURY TRIAL DEMAND ........................................................................... 197

## TABLE OF IMPORTANT DEFINED TERMS AND INDIVIDUALS

4d.............................................................Provision of the Commodity Exchange Act
mandating that futures commission
merchants such as MFGI segregate all
money, securities and property, *i.e.*, the
"segregated amount," in separate accounts
on behalf of customers trading on domestic
commodity exchanges

30.7..........................................................Commodity Futures Trading Commission
regulation mandating that futures
commission merchants such as MFGI secure
money, securities and property, *i.e.*, the
"secured amount", in a separate account on
behalf of customers trading on foreign
commodity exchanges

Abelow, Bradley .......................................Chief Operating Officer of MFG Holdings
and board member of MFGI,  responsible
for overseeing operations, information
technology, human resources, risk
management, procurement and facilities
management globally, and ensuring
compliance with all applicable laws
governing MFGI's handling of customer
funds

Alternative Method ..................................CFTC compliant daily accounting method
for determining the secured requirement for
customer funds in 30.7 accounts, which does
not require that FCMs maintain funds in
such accounts on a dollar-by-dollar basis;
*Compare* "Net Liquidation Method"

Broker-Dealer ..........................................MFGI's broker-dealer unit through which
investors engaged in securities transactions
and through which MF Global engaged in
proprietary trading

CEA..........................................................Commodity Exchange Act of 1936; see also
"Commodity Exchange Act"

CFTC........................................................Commodity Futures Trading Commission

CME..........................................................Chicago Mercantile Exchange, Inc., MFGI's
designated self-regulatory organization

i

CME Group..............................................................CME's parent company

Commodity Customers ..............................................Customer who deposited cash or other assets at MFGI for use in commodity transactions

Company..................................................................MF Global Holdings Inc. or MFGI

Corzine, Jon ...........................................................President of MFGI and board member until October 8, 2010.  CEO and board member of parent MF Global Holdings Ltd., responsible for the key decisions of the businesses

Customer Accounts...................................................Collective reference to 4d (Customer Segregated) and 30.7 (Foreign Secured) accounts

Customer Segregated Accounts .................................Segregated accounts ostensibly designated to hold 4d funds

D&O Defendants  ....................................................Jon Corzine, Henri Steenkamp, Bradley Abelow, Laurie Ferber, Edith O'Brien, Christine Serwinski, David Dunne, and Vinay Mahajan

Daily Seg Funds Statement ......................................Daily Statement of Segregation Requirement and Funds in Segregation report required by CFTC Regulations and the CME that MFGI prepare and submit each day

Defendants  ...........................................................Collectively, the D&O Defendants, PwC, and the CME Group Defendants

Dunne, David ..........................................................Global Treasurer of MF Global from September 2008 to August 2011, responsible for balance sheet management and liquidity monitoring and for ensuring that the use of Customer Accounts complied with applicable laws and regulations and for approving all funding requests company-wide

Exchange Rules ......................................................Rules adopted by CME in compliance with its statutory duty as an self-regulatory organization ("SRO") to regulate, monitor and audit its FCM members

FCM ........................................................MFGI's futures commission merchant unit through which investors engaged in commodity transactions

Ferber, Laurie............................................General Counsel and board member of MFGI and General Counsel of MFG Holdings, responsible for legal and compliance functions, including compliance with all applicable laws governing custody of customer funds and property, and operational and administrative responsibility for MFG Holdings' Internal Audit function

Foreign Secured Accounts .........................Segregated accounts ostensibly designated to hold 30.7 funds

Interactive ................................................Interactive Brokers Group, Inc., the potential purchaser of MFGI prior to the discovery of missing customer funds

Internal Audit............................................The department charged with providing objective evaluations of risk and internal controls at MF Global which issued internal reports during 2011 questioning the Company's liquidity management and account controls

JSAs ........................................................Certain partners of KPMG in London appointed as the joint special administrators in the MFGUK Proceeding

LCH.........................................................LCH.Clearnet; previously known as the London Clearinghouse

Mahajan, Vinay........................................Global Treasurer of MFG Holdings beginning in August 2011, responsible for monitoring liquidity and ensuring compliance with all applicable laws governing the companies' handling of customer funds

MF Global Holdings USA Inc. ..................Subsidiary of MFG Holdings, and parent of MFGI

MFG Holdings ........................................MF Global Holdings Ltd., MFGI's ultimate parent

MFGI...........................................................MF Global Inc.

MFGUK ......................................................MFG Holdings UK Ltd.

MFGUK Proceeding ................................Insolvency proceedings commenced on Oct. 31, 2011, for MFGUK in London

Net Liquidation Method............................Required daily accounting of the net liquidation value of customer funds in 4d accounts

O'Brien, Edith...........................................Assistant Treasurer of MFGI: controlled MF Global's accounts; with her staff was responsible for approving all intra- and inter-company transfers and monitoring the effects of those transfers on the regulated accounts; and directed hundreds of millions in transfers of customer funds during the final week of MFGI's operations

PSG ...........................................................Principal Strategies Group within MFGI's Broker-Dealer unit created in June 2010 to engage in proprietary trading

PwC...........................................................PricewaterhouseCoopers LLP, MFGI's outside auditors responsible for reviewing the company's controls over customer funds

RTM...........................................................Repurchase to maturity transactions, which were resale and repurchase transactions that mature on the same date as underlying debt and are accounted for as sales purchases that allowed MFG Holdings to book revenue up front and not take a default use charge

SEC ...........................................................Securities and Exchange Commission

Secured Statement....................................MFGI's daily statement purportedly demonstrating that assets on deposit in Foreign Secured Accounts were in compliance with CFTC Regulation 1.20

Segregation Statement ..............................MFGI's daily statement purportedly demonstrating that assets on deposit in Customer Segregated Accounts were in compliance with CFTC Regulation 4d

iv

Serwinski, Christine...................................................Chief Financial Officer of MFGI (North America), responsible for the financial and operational reporting of MFGI to regulatory authorities and ensuring compliance with all applicable laws governing the companies' handling of customer funds and supervised the accounting for North American Operations

SIPA Proceeding......................................................Liquidation action commenced by the Securities Investor Protection Corporation Oct. 31, 2011, against MFGI in the United States District Court for the Southern District of New York

Steenkamp, Henri.....................................................Chief Financial Officer of MFG Holdings, responsible for overseeing MFG Holdings' financial operations, including treasury, accounting and all global financial control and reporting functions

T-Bills ....................................................................U.S. Treasuries

T-Bill Swap Program ................................................Management's program, implemented in 2009, to swap surplus T-Bills held at MFGI with 30.7 Funds held in segregated accounts at MFGUK to allow MFGI to invest those funds or utilize them as a source of liquidity

Trustee....................................................................James W. Giddens, the trustee appointed in the liquidation of MFGI

Plaintiffs, former commodity customers of MF Global Inc. ("MFGI" or "the Company")
acting as interim class representatives (the "Plaintiffs" or "Class Representatives"), by and
through undersigned counsel appointed by the Court to represent the customer class, bring this
action:

(i)     On their own behalf and on behalf of commodity investors who held money,

        property and/or securities (referred to hereinafter as "Customer Funds") at MFGI,

        which the Company and its senior management were required by law to segregate

        and/or secure[1] in dedicated accounts for the benefit of such customers, and which

        remains missing and/or unavailable to be returned following the Company's

        collapse on October 31, 2011 (the "Class" or "Class Members");[2] and

(ii)    As assignees of certain claims of James W. Giddens, the trustee (the "Trustee")

        for the liquidation of MFGI pursuant to the Securities Investor Protection Act of

        1970 ("SIPA"), 15 U.S.C. §§78aaa *et seq.*, as successor-in-interest to MFGI,

        including claims on behalf of Commodity Customers, securities investors who

        transacted through of MFGI ("Securities Customers") with unreturned funds, the

        MFGI Estate, and MFGI in its corporate capacity, and on behalf of MFGI's

        general creditors.[3]

---

[1]  Unless otherwise specified or suggested by the context, the term "segregate" as used in this Complaint
is intended to mean both "segregated" in the context of CFTC Regulation 4d and "secured" in the context
of CFTC Regulation 30.7 as those terms relate to Customer Funds.

[2]  The Class and/or Class Members exclude any defendant named in this Consolidated Amended
Complaint ("Complaint"), including their immediate family members and any parent, subsidiary or
affiliate of any defendants, and any parent, subsidiary or affiliate of MFGI that held cash or property on
deposit at company or that would otherwise fall into the current class definition or any future definition,
or could otherwise deemed to be a customer of MFGI.

[3]  On October 19 and October 11, 2012, respectively, this Court and the Honorable James Glenn, United
States Bankruptcy Judge for the Southern District of New York, approved an Amended and Restated
Continuing Cooperation and Assignment Agreement, dated September 10, 2012 (the "Assignment

Plaintiffs bring this action on their own behalf, on behalf of the Class and Class Members, and on behalf of MFGI's Securities Customers, MFGI's general creditors and the Trustee, pursuant to the Assignment Agreement against:

(i)     Former directors and officers of MFGI and/or its parent MF Global Holdings Ltd. ("MFG Holdings") (together with its affiliates and subsidiaries, including MFGI, "MF Global" or the "Firm"), Jon Corzine, Henri Steenkamp, Bradley Abelow, Laurie Ferber, Edith O'Brien, Christine Serwinski, David Dunne and Vinay Mahajan (the "D&O Defendants");

(ii)    MFGI's former auditor PricewaterhouseCoopers LLP ("PwC"); and

(iii)   MFGI's former designated self-regulatory organization ("DSRO"),  the Chicago Mercantile Exchange, Inc. (the "CME"), and its parent the CME Group Inc. (the "CME Group) (the "CME Defendants") (collectively, and with the D&O Defendants and PwC, the "Defendants").

As demonstrated in detail herein, each of the foregoing Defendants failed in one or more of their statutory, regulatory, common-law, express, implied and/or other duty owed to Plaintiffs, the Class, Class Members, Commodities Customers, Securities Customers and/or MFGI and its general creditors, which failures resulted in injuries-in-fact compensable through the Counts set forth in Section XV of this Complaint.

The Counts set forth herein, and the allegations supporting liability thereunder, do not depend or arise from the anti-fraud provisions of the federal securities laws or any misstatement

---

Agreement"), pursuant to which the Trustee assigned to the Class Representatives as successor-in-interest of MFGI all his "rights, remedies, title and interest" in all "claims against former directors, officers and/or employees of MFGI and/or its parent corporation MF Global Holdings, Ltd. and against MFGI's former independent auditor PricewaterhouseCoopers LLP, including claims on behalf of commodities customers, securities customers, and the estate and MFGI in its corporate capacity" related to the failure of former directors, officers and/or employees of MFGI to segregate customer funds as required by federal statute and state common law (the "Trustee's Assigned Claims").

or omission by the D&O Defendants.  This Complaint, and Defendants' demonstrable liability for the wrongful conduct alleged herein, is based solely on Defendants' breaches of duties under the Commodity Exchange Act and common law concerning the protection of customer-owned property, of which up to $1.6 billion is currently missing or unavailable to return to Customers.

## I.    STATEMENT OF THE CASE

1.    This case concerns the shortfall of customer money and property, which applicable law required MFGI and its senior management to hold in segregated accounts for the protection of customers.  This shortfall was caused by the D&O Defendants unlawful conduct, and the additional harms caused to MFGI and the customers and creditors of MFGI by the shortfall and the D&O Defendants' breaches of duties, including the collapse of the Company and added cost of the liquidations that followed the collapse and the fees paid by MFGI to defendant PwC.  .  The SIPA Trustee estimated the shortfall to be $1.6 billion after reviewing possible claims against available segregated assets across all pools of Customer Funds, and, on information and belief still amounts to many hundreds of millions of dollars.  Defendants PwC and CME enabled the D&O Defendants' unlawful conduct and the resulting loss of customer funds by breaching their duties as MFGI's outside auditor and primary regulator (as DSRO), respectively, thereby causing or compounding severe damages to MFGI, MFGI's estate and the Class.

2.    During the workweek ending on October 28, 2011, as MFGI faced bankruptcy caused by massive liquidity shortages and management could find a buyer for the Company, the D&O Defendants directed, caused, authorized or allowed transfers of over $900 million in cash and property that legally belonged to the proposed Class of Commodity Customers of MFGI, together with the property of Security Customers, to be transferred from putatively segregated

accounts and used by MFGI and other MF Global affiliates for their own purposes, including to address liquidity shortfalls in the Company's proprietary businesses.

3.      These unlawful transfers—which violated the strict requirements of a decades-old regulatory scheme and fundamental common-law—were possible due to senior management's ongoing decision to employ recklessly permissive procedures (and concomitant lack of appropriate controls) regarding intra- and inter-Company transfers.  Management and the Company failed to ensure that property belonging to customers who deposited it for commodity futures and securities trading was lawfully segregated on their behalf and would be protected in the event, as happened, the Company's financial strains escalated and it faced a grievous liquidity crisis.  By and through their conduct or lack of conduct, including a lengthy pattern of commingling customer and Firm operating funds, each of the D&O Defendants either expressly directed or substantially assisted these unlawful transfers.

4.      The liquidity crisis that caused the demise of MFGI and led to the defalcations of Customer Funds by the D&O Defendants resulted from an ill-conceived business model devised by Defendant Jon Corzine and implemented by the D&O Defendants.  The loss of Customer Funds was the foreseeable result of a risky business strategy, undertaken with inadequate capital resources and outside the exercise of appropriate business judgment, and which the D&O Defendants knew would require them to invade segregated and secured Customer Accounts holding 4d and 30.7 funds, respectively ("Customer Accounts"), as a liquidity backstop.  Yet, the D&O Defendants failed to put even perfunctory controls in place despite internal reports illustrating the need.

5.      As a consequence of the D&O Defendants' long-term failures of duties, during MFGI's final week of operations the D&O Defendants exhausted the capital and borrowing

capacity of MFGI and MFG Holdings and were able to knowingly use customer funds to fund the proprietary needs of MFGI in a futile attempt to keep the Company alive if only long enough to sell it in order to avoid bankruptcy.  At bare minimum, the D&O Defendants intentionally disregarded or were willfully blind to the fact that the liquidity crisis at MFGI was putting customer funds at serious risk, and, once detected, would make a sale of the enterprise impossible.  Yet the D&O Defendants took no steps to protect or even internally to inquire about the safety of customer property *even as* regulators and the CME as its DSRO were coming to MFGI's headquarters to ostensibly inquire about  the Company's liquidity and the safety of Customer Funds; nor did the D&O Defendants even inquire about the safety of Customer Funds even after they learned that the firm's liquidity was negative.  In this way, the D&O Defendants failed twice:  they engaged in a risky underfunded business strategy for more than a year while failing to repair MFGI's controls over customer cash that they knew from internal reports were inadequate, and then failed to protect Customer Funds in the final days as MF Global faced imminent failure absent a sale of the Company.

6.      On Sunday, October 30, 2011, employees of MF Global were preparing for the potential sale of MFGI for $1 billion – the only option that would preserve value for shareholders and creditors of MF Global and avert filing for bankruptcy.  However, as the due diligence necessary to effectuate the transaction was nearly complete, the Company was forced to acknowledge to the buyer and MFGI's regulators and the CME that at least $900 million in cash and other assets belonging to Commodity Customers and Securities Customers was missing. Remarkably, this missing property did not even include the shortfall in foreign secured customer deposits – presently estimated to be approximately $700 million – caused in part by an aggressive plan, as described below, implemented in 2009 (against the advice of outside counsel)

to replace such foreign secured cash deposits with U.S. Treasury Bills in order to use the customer cash as a source of much needed liquidity., which provided less protection to customers due to the different treatment of cash and collateral under U.K. law.

7.     Thus, in addition to preventing MFGI from returning cash and property to its customers, the over $900 million shortfall in domestic customer segregated funds – caused by a strategy designed by Defendant Corzine and implemented by the D&O Defendants using funding from daily invasions of customer funds held at MFGI – derailed the potential sale being negotiated during the weekend before its collapse.  The D &O Defendants conduct destroyed value at MF Global causing harm to MFGI's customers and creditors, including the cost of the current liquidation proceedings.  Instead of a sale, on October 31, 2011, MFG Holdings and certain affiliates (the "Chapter 11 Debtors") commenced the bankruptcy (the "Chapter 11 Proceedings").

8.     Following an October 31, 2011 application by the Securities Investor Protection Corporation ("SIPC"), the Honorable Paul A. Engelmayer of this Court entered an order commencing the SPIA liquidation of MFGI based on a determination that the customers were in need of the protection afforded by SIPA.  In the ensuing months, the Trustee determined that the shortfall consists of hundreds of millions of dollars in "4d Funds" belonging to customers who maintained domestic commodity accounts with MFGI and approximately $700 million in "30.7 Funds" belonging to customers who maintained foreign commodity accounts with MFGI.  In addition to harming Commodity Customers, the shortfall will result in a reduction of assets in MFGI's general estate to the detriment of MFGI's general creditors.  Moreover, improper transfers from the accounts of Securities Customer have meant that the Trustee has not been able to satisfy Securities Customer claims.

9.     Plaintiffs allege causes of action on behalf of the prospective Class, and as assignee of the Trustee's Assigned Claims, against the D&O Defendants for failure to segregate and protect for return to Customer Funds as required by the Commodity Exchange Act ("CEA"), by the applicable Commodity Futures Trading Commission ("CFTC") regulations and by duties owed to customers at common-law. Plaintiffs also allege common-law claims on behalf of the Class for the D&O Defendants' failures of duty to institute or ensure adequate controls over customer funds for a year prior to MFGI's collapse despite internal reports that alerted them to deficiencies.

10.     Plaintiffs also allege claims on behalf of the MFGI estate, its Securities Customers and its general creditors, for the D&O Defendants' breach of the duties they owed to the Company by causing MFGI to engage in or support proprietary trading when they knew, no later than July 2011, that the Company could not fund the trades without daily invasion of customer funds, and for the foreseeable effects that this strategy would have on MFGI and the customers and creditors of MFGI.  Finally, Plaintiffs allege claims of the Class and Trustee against PwC for professional negligence and breach of fiduciary duty by failing to adequately audit MFGI's internal controls over customer funds and Class claims against CME and its parent CME Group for failure in their duties as DSRO of MFGI's commodity/futures business in its capacity as an FCM.

*      *      *

11.     MF Global collapsed due to:  (i) vastly escalating liquidity requirements that MFG Holdings' 2010 annual report predicted would be the result of the proprietary investments at the center of Defendant Corzine's strategy to transform MF Global into a full-service investment bank; (ii) purposeful transfers of segregated Customer Funds to meet proprietary

liquidity needs which, when discovered, destroyed any possible sale of MFGI; (iii) long-running

company-wide recklessness and negligence in liquidity monitoring and management; and (iv)

long-running company-wide recklessness and negligence in failing to establish internal controls

over ubiquitous daily cash transfers intra-company within MFGI and inter-company to MFG

Holdings and other subsidiaries – a practice Defendant Edith O'Brien (MFGI's Assistant

Treasurer) described in an internal email as a "shell game."

12.     MFGI was the most important subsidiary of MFG Holdings and accounted for

approximately 56.6% of company-wide revenues in 2010-2011.  MFGI operated as both a

futures commission merchant (the "FCM") that facilitated transactions for commodities investors

and as a broker-dealer for investors engaging in securities transactions (the "Broker-Dealer).  As

an integral part of its FCM operations, MFGI held billions of dollars in Commodity Customer

funds and property which MFGI and the D&O Defendants were required to segregate for the

protection of customers under applicable laws and regulations.  Notably, such laws and

regulations also, among other things, expressly prohibited MFGI and the D&O Defendants from

utilizing Customer Funds to fund operations of MFGI, MFG Holdings, or any other subsidiary.

13.     Specifically, senior management of MFGI and MFG Holdings, led by the D&O

Defendants, were legally required, pursuant to Section 4d of the CEA, to ensure that the

Customer Funds of Commodity Customers  held by the FCM for trading on domestic exchanges

was "separately accounted for and [ ] not be commingled with the funds of such commission

merchant or be used to margin or guarantee the trades or contracts, or to secure or extend the

credit, of any customer or person other than the one for whom the same are held" ("4d

Customers").  Similarly, under 17 C.F.R. § 30.7(a), the FCM unit and senior management led by

the D&O Defendants were required to ensure that MFGI (through its foreign affiliates)

8

maintained Commodity Customers' Customer Funds in separate, secured accounts held for customers trading on foreign exchanges (the "30.7 Customers").

14.     CFTC regulations authorized the FCM unit to deposit its own funds in the Customer Accounts as a safety measure to prevent the accounts from becoming under-segregated, and conversely, to withdraw its own funds for proprietary reasons.  MFGI referred to such proprietary funds deposited in the Customer Accounts as the "Firm Invested in Excess."[4] However, MFGI, with the knowledge of the D&O Defendants, totally defeated the intent of the CFTC regulations.  Rather than depositing certain of its own funds in Customer Accounts on a limited basis to create a buffer to prevent under-segregation as contemplated by the regulations, MFGI actually used its putative segregated and secured Customer Accounts as the ***central operating accounts*** for the whole Company.  Instead of segregating accounts, the Company commingled its proprietary funds and customer funds in the same accounts as a matter of course in its everyday operations.

15.     At the end of every day, all cash Company-wide was swept into the Customer Accounts.  Also throughout the day, as approved by Defendant O'Brien, all transfers to fund the

---

[4]  There are three buckets of money at issue in this case (all of which were deposited in the same accounts and ended up being used by the D&O Defendants for MFGI's proprietary purposes).  First, "Firm Invested in Excess" was ostensibly MFGI money the company deposited in customer segregated accounts to prevent undersegregation, and which management used on a daily basis to fund MFGI's activities even though CFTC regulations viewed that money as a safety measure or buffer.  Second, "Regulatory Excess" was money that consisted of actual customer funds on deposit at MFGI that the Company used for proprietary purposes by calculating 30.7 funds required to be secured utilizing the Alternative method, which the D&O Defendants knew resulted in protection of significantly less than the dollar-for-dollar amount of customer funds held in Customer Accounts.  Finally, there are customer funds that were never part of any "Excess" under any calculation.  As set forth in more detail herein, MFGI commingled all these funds in Customer Accounts it was using as daily operating accounts without any controls in place to distinguish the source or permissible uses of any funds.  During at least five instances in 2010, at other times on information and belief, and during the final catastrophic week preceding its collapse, MFGI used all three buckets to fund its proprietary activities.

Company operations and proprietary trading within the Company, any inter-Firm transfers to affiliates, and all transfers to third-parties came from the Customer Accounts.  At the same time, there were no structural or other controls in place to distinguish "Firm Invested in Excess" from customer funds in the mixed accounts, except for the informal tracking, on an ad hoc basis, through the internal daily Statement of Segregation Requirements and Funds in Segregation and Statement of Secured Amounts and Funds Held in Separate Accounts.

16.     However, even if the dollar amount of Firm Invested in Excess to actual customer funds could have been accurately determined, the distinction was meaningless because MFGI did not segregate foreign secured funds on a dollar-for-dollar basis.  While the CFTC regulations required a daily accounting of the net liquidation value of the 4d Funds for customers trading in the U.S., they allowed MFGI to use and submit an "Alternative Method" daily calculation of the amount of 30.7 Funds the Company was required to secure for customers trading on foreign exchanges.  The Alternative Method consistently resulted in the calculation of a significantly lesser amount that the Company had to secure (of as much as $1 billion) than if management used the net liquidation method.  Internally, senior management referred to the difference as the "Regulatory Excess" and viewed it as a source of liquidity.  In reality, this Regulatory Excess was not an "excess" at all but was actual customer money that was "freed up" as a source of liquidity only by management's use of the more aggressive method for calculating segregation requirements.

17.     Spurred on by the increasing liquidity needs of its proprietary businesses, beginning no later than the summer of 2011 senior management was aware it had to "dip into" the Firm Invested in Excess funds held by the FCM almost daily to fund the proprietary activities of the Broker-Dealer.  Moreover, the liquidity crisis became so severe that in late-July 2011,

senior management, including Defendant Corzine, proposed a program to "borrow" $250 million from actual customer funds (not Firm Invested in Excess funds) daily through overnight "loans." Defendant Corzine's proposal was an attempt to unlawfully use customer funds as a liquidity backstop stretching back to a March 2009 plan to swap excess securities for customer cash. Unfortunately, as the final events unfolded, the D&O Defendants ultimately went even beyond mere "loans."

18.     By the time MFGI collapsed – when it ostensibly held billions of dollars in cash and other assets belonging to Commodities Customers that should have been maintained in segregated accounts as required by federal statutes and regulations – hundreds of millions of dollars in Customer Funds was missing or unavailable for return to customers.  It is now evident that this property was missing or unavailable for return to customers because during the final week of the Company's operations the D&O Defendants directed, induced, procured, authorized and/or allowed MFGI to do that which applicable rules, statutes and regulations specifically prohibited:  use customer funds for its own purposes, namely to satisfy liquidity shortfalls caused by MFGI's proprietary activities.  These unlawful transfers were possible because for more than a year prior to the final week of operations, the D&O Defendants employed recklessly permissive procedures over intra-Company and inter-company transfers and failed to institute virtually any controls over segregated customer funds despite internal reports that alerted them to such problems.

19.     The D&O Defendants' egregious actions and inactions extend beyond improper transfers from Customer Accounts of Commodity Customer, to also include improper transfers between the accounts of Securities Customers and proprietary accounts and improper transfers of assets between the accounts of Securities Customers and the Customer Accounts of Commodity

11

Customers.  The failure to effectively safeguard customer assets, including assets MFGI was required to segregate for the protection of Securities Customers pursuant to Rule 15c3-3 promulgated pursuant to the Exchange Act ("SEC Rule 15c3-3"), the failure to properly supervise regulatory compliance, and the extended operation of MFGI without appropriate liquidity and risk infrastructure to protect customer funds, caused a shortfall in the Securities Customer estate in the MFGI liquidation. And this shortfall, along with the shortfall in the Commodity Customers' Customer Funds, will result in a reduction of assets in MFGI's general estate to the detriment of MFGI's general creditors.

*     *     *

20.     The implementation of Defendant Corzine's proprietary investment strategy to transform MFGI from its traditional commission-based commodities and securities brokerage model into a full service investment bank put a constant cash strain on the Broker-Dealer and MFG Holdings, which needed considerable liquidity to fund its proprietary trades, transactions, margin, settlements and general operations.  Remarkably, the D&O Defendants proceeded with Defendant Corzine's strategy despite a long-history of liquidity shortages in existing business lines that caused management, including Defendants Steenkamp and Dunne, as far back as 2009 to implement and thereafter continued to pursue a program to aggressively swap customer cash held in Customer Accounts in London with U.S. T-Bills, against the advice of outside counsel, so that MFGI could use the 30.7 Customer Funds as a source of liquidity.

21.     Due to Defendant Corzine's strategy, beginning no later than July 2011, MFGI's Broker-Dealer unit and MFG Holdings faced almost daily liquidity shortages despite access to $1.5 billion in revolving credit facilities.  To meet the escalating liquidity demands of the Broker-Dealer, the D&O Defendants acknowledged internally could not "fund itself" due in part

to "repo to maturity" ("RTM") transactions, the D&O Defendants elected, as Defendant Henri

Steenkamp characterized it, to "dip into" FCM funds consisting of customer "excess" everyday –

the availability of which was "unreliable" because it "depend[ed] on how customers post

margin."

22.    At the same time, the D&O Defendants knowingly failed to implement adequate

controls to ensure that the FCM funds they intentionally invaded daily did not include segregated

Customer Funds, and would not include customer funds in the future if liquidity needs further

escalated.  Indeed, for all practical purposes, the requirement of obtaining the consent of

Defendant O'Brien or her staff was the only "control" in place to distinguish customer funds

from MFGI's proprietary funds.  By and through their conduct or lack of conduct, each of the

D&O Defendants substantially assisted the unlawful transfers.

23.    As set forth in more detail below, the D&O Defendants:  (i) knew from internal

reports about deficiencies and inadequacies in the liquidity monitoring and treasury functions at

MFGI and MFG Holdings; (ii) knew from internal reports that MFGI had no formalized controls

to protect Customer Funds or central recordkeeping and accounting for intra-Company transfers;

(iii) consulted internally regarding the propriety, permissibility, wisdom and potential risks of

institutional reliance on daily intra-company transfers from Customer Funds to fund Broker-

Dealer operations, yet continued to engage in proprietary strategies that required such "loans"

without putting controls in place; (iv) received daily reports that reflected escalating liquidity

problems at the Company and the increasing use of Customer Funds to fund operations, but

again failed to take steps to correct problems with proprietary trading at the Broker-Dealer that

made it "unable to fund itself"; (v) communicated internally and with regulators and the CME

regarding the Company's obligations to segregate Customer Funds during the days immediately

13

preceding MFGI's collapse, but nevertheless contemporaneously caused, authorized and/or allowed personnel to transfer Customer Funds to meet liquidity shortfalls; (vi) communicated internally and with foreign affiliates regarding obligations to create and maintain separate accounts containing money, securities and property in an amount at least sufficient to satisfy MFGI's current obligations to 30.7 Customers, but nevertheless failed to ensure that adequate steps were being taken with respect to 30.7 Customers; (vii) failed to ensure that Customer Funds was secure when it became clear that MFGI and MFG Holdings were facing fatal liquidity crises; and (viii) falsely advised Commodities and Securities Customers during the final week of operations that their funds were adequately protected.

24.     By failing to institute controls over Customer Funds, allowing the funds of MFGI's commodities customers to be used to meet the liquidity crisis confronted by MFG Holdings and MFGI during and before their final week of operations, and failing to exercise supervision and control over segregated funds, the D&O Defendants violated and aided and abetted MFGI's violations of the CEA.  Additionally, the D&O Defendants' conduct constituted breaches of fiduciary duty (and aiding and abetting breaches of fiduciary duty) and duties of care owed to customers and to MFGI during the final days of MFGI's operations and throughout the preceding year when the D&O Defendants failed to institute controls to protect Customer Funds.

25.     Unlike holders of the common stock of MFG Holdings, Class Members were not investors in MFG Holdings who accepted business risk and would have reaped rewards had the Company performed well.  Nor are Plaintiffs' claims on behalf of the Class or MFGI based on public statements by MFGI or the D&O Defendants and/or the adequacy of the risk disclosures, if any, concerning, among other things, MF Global's sovereign debt exposure, liquidity or internal controls over financial reporting.  The investing public's perception of the Company was

14

irrelevant to the statutory and common law duties owed to Customers and to MFGI by the D&O Defendants to safeguard customer deposits. The Class's claims are based on the fact that its members entrusted their Customer Funds to MFGI to facilitate their commodity investments. By law, MFGI was required to hold Customer Funds in segregated accounts and senior management was required to ensure such security. Had the D&O Defendants fulfilled their duties to customers, the collapse of MF Global – while unfortunate for shareholders – would not have resulted in the disappearance of Customer Funds and the sale of MFGI would have proceeded, avoiding the cost and losses caused to customers and creditors by MFGI's forced liquidation.

26.    The D&O Defendants' conduct is not excused by their inevitable (and not credible) assertions that they did not intend to invade customer-owned funds. Any such defense is hollow. They were aware from an internal report of instances in 2010 where the Firm Invested in Excess was negative and the firm was being "funded by clients," but failed to investigate how they occurred. It is uncontroverted that the D&O Defendants knew from internal reports and communications about deficiencies and inadequacies in the treasury and liquidity monitoring functions of MFG Holdings, yet decided not to implement improvements for more than a year because MFGI "accept[ed] this risk." They were acutely aware of massive and continuing liquidity shortages at MFGI and MFG Holdings (including that the Broker-Dealer was "unable to fund itself"), yet used the aggressive Alternative Method as a justification for invading customer "excess" on a daily basis to fund Broker-Dealer operations and meet the obligations of MFGI and MFG Holdings without adequately implementing controls. The D&O Defendants also repeatedly discussed internally the inherent problems with relying on Customer Funds as a source of liquidity for proprietary trading of the Company, yet arrogantly did so anyway. The

15

D&O Defendants continued to fail to safeguard customer funds as they became aware that MF Global was facing collapse, despite contemporaneous warnings from regulators.

27.     The D&O Defendants' subtle publicity campaign to blame "chaos" caused by liquidity demands in the final days of MFGI for the missing Customer Funds is similarly hollow. It was the D&O Defendants who created the purported chaos by willfully neglecting daily liquidity crises for months while continuing to engage MFGI in proprietary transactions that it could not fund.  Moreover, the purported chaos would have been irrelevant to Commodity Customers had the D&O Defendants implemented adequate controls over customer funds – indeed, adequate controls *are designed* to prevent losses during stress events.

28.     The D&O Defendants' rationalizations ultimately fail in light of the fact beyond dispute:  MF Global utilized hundreds of millions of dollars in Customer Funds for its own purposes in violation of decades-old regulations while the D&O Defendants were in charge of the Company and had direct control over Customer Funds.  Commodity Customers deposited billions of dollars at MFGI, and one day $1.6 billion of it was no longer available for return to its customers.

29.     The D&O Defendants' misconduct is particularly stark given the fact that, while there have been other failures of futures commission merchants in the seventy-five years since the Commodity Exchange Act was enacted, this is the first, according to the CME, in which the Customers' Funds were misused.  Indeed, during his December 2011 Congressional testimony, Defendant Terrence A. Duffy, Executive Chairman of the Defendant CME Group Inc. (MFGI's primary regulator as its DSRO) acknowledged the "unprecedented" nature of MFGI's "improper handling of customer funds:

> [T]he MFG bankruptcy is unprecedented in that it is the first time (i) there has been a
> shortfall in customer segregated funds held by one of our clearing members as a result

16

of the clearing member's improper handling of customer funds and (ii) our clearing house was unable to transfer all customer positions and property in an FCM bankruptcy due to missing customer funds in a segregated customer account under the control of the FCM.  Indeed, this is the first time in the industry's history that a customer has suffered a loss as a result of a clearing members' improper handling of customer funds."[5]

Speaking of the events at MF Global, Mr. Duffy recently added: "You can't raid customer accounts and get a slap on the wrists.  There needs to be stiffer penalties."

30.    Even in the infamous collapses of Lehman Brothers, management properly segregated customer funds as the company faced liquidity shortfalls and was able to promptly return such property to customers.  As Duffy recognized, the D&O Defendants' misconduct is particularly stark given the fact that, while there have been other failures of futures commission merchants in the seventy-five years since CEA was enacted, this is the first in which the customers' segregated and/or secured funds were misused.

31.    By virtue of their senior roles at MFG Holdings and MFGI, the insolvency of MFGI, and in certain cases because of their express responsibility for insuring compliance with the laws and regulations concerning segregation and limits on the use of customer funds, the D&O Defendants owed fiduciary duties and duties of care to Class Members who were entitled to rely on the regulatory scheme put in place to safeguard their deposited property.  The D&O Defendants' conduct constituted violations of multiple provisions of the CEA, as well as violations of their fiduciary duties, duty of care, duty not to aid and abet breaches of fiduciary duties, and other provisions of law.  The D&O Defendants' conduct similarly violated duties to Securities Customers.

---

[5]   Testimony of Terrence A. Duffy, Executive Chairman, CME Group Inc., before the House Committee on Agriculture, December 8, 2011; before the Senate Committee on Agriculture, Nutrition & Forestry, December 13, 2011; and before the House Committee on Financial Services Subcommittee on Oversight & Investigations, December 15, 2011.

*     *     *

32.     PwC served as the independent auditor of MFGI and MFG Holdings during 2010-2011.  In addition to PwC's professional obligations as an auditor, PwC was obligated, because MFGI acted as a futures commission merchant under the CEA, to examine MFGI's procedures for safeguarding customer assets in accordance with the provisions of the CEA in a manner sufficient to provide reasonable assurance that "any material inadequacies in the procedures for safeguarding customer assets, including segregation requirements, will be discovered and included in the auditor's report."

33.     As set forth herein, MFGI's internal controls with respect to protection of segregated and/or secured customer funds were woefully deficient, and had been so prior to PwC's last audit opinion approving MFGI's controls on or about March 31, 2011.[6]  MFGI's procedures and controls over Customer Funds did not materially change from 2010 to 2011, and during the entire period PwC was copied on reports from the Company's internal audit department reflecting deficiencies in MFGI's controls—including an internal audit report that found "Above Risk Appetite" on MFGI's "Execution Delivery and Process Management." During 2010, MFGI's controls were so deficient that there were at least five instances where MFGI invaded customer funds to a degree that—according to an internal email from the head of

---

[6] On May 12, 2011, Promontory Financial Group LLC ("Promontory") presented a report to the Audit and Risk Committee of MFG Holdings' Board of Directors concerning "MF Global's internal controls related to compliance, risk management processes, IT infrastructure, and corporate governance."  MF Global retained Promontory as part of a settlement with the CFTC – which also required MF Global to pay a $10 million fine – related to an incident in which a trader in a branch in Memphis, Tennessee engaged in unauthorized futures transactions that cost the Firm $141 million.  Notably, in addition to being almost comically sanguine concerning MF Global's purported improvements over controls in certain areas – controls that, as it is now evident, prevented branch traders from taking on reckless trades but did not prevent Defendant Corzine from doing so – neither the reports nor recommendations therein had anything to do with evaluating controls over customer property, which was the responsibility of PwC as set forth in the CFTC regulations.

18

MFGI's Financial Regulatory Group—"***the firm was funded by clients*** (*i.e.*, the excess contributed by firm was negative)."  PwC's failure to examine and opine on MFGI procedures and controls over Customer Funds constituted professional malpractice and breaches of its legal and regulatory duties to MFGI and the Class of customers that had a direct consequence to MFGI and to customers.  If PwC had properly executed its duties and evaluated and reported on MFGI's control problems in March 2011, there would have been ample time for management to institute proper controls over customer funds.

34.     Defendant CME was the DSRO for MFGI.  In this regard, Defendant CME was responsible for, among other things, reporting any concerns or deficiencies in MFGI's compliance with CFTC regulations, including its obligations to segregate and/or secure customer funds.  Defendant CME failed in its duties to customers and MFGI during the weeks leading up to the collapse of MFGI, including during MFGI's final week when Defendant CME's personnel was at MFGI's offices but did nothing to safeguard Customer Funds.  Remarkably, in the late afternoon on October 27, 2011, CME advised Defendants Serwinski and Ferber that MFGI was prohibited from making additional equity transfers without written authorization from the CME, but stood by and did nothing as hundreds of millions of dollars were transferred the following day.

## II.  JURISDICTION AND VENUE

35.     This Court has original jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1334(b) and 1337, and 7 U.S.C. §§ 1, et seq., and has supplemental jurisdiction pursuant to 28 U.S.C. § 1367.

36.     Venue is proper in this district pursuant to 28 U.S.C. §§ 1391(a) and 1391(b) and 7 U.S.C. § 25(c) because Defendants' unlawful conduct occurred substantially in this district.

### III. THE PARTIES AND SIGNIFICANT NON-PARTIES

### A.     Plaintiffs and Proposed Class Representatives

37.     Plaintiffs and proposed Class Representatives set forth below each were, as of the October 31, 2011 collapse of MF Global, commodities customers of MFGI who deposited cash or other assets at MFGI that the Company and the D&O Defendants were required to segregate and/or to secure under CFTC regulations "4d accounts" (for domestic transactions) or "30.7 accounts" (for foreign transactions) and the CEA.  Each proposed Class Representative has suffered an injury-in-fact resulting from the wrongful conduct of the D&O Defendants in failing to do so, and from the failures of Defendants PwC, CME and CME Group in their duties as set forth in this Complaint.

38.     Plaintiffs, who include the following entities and individuals, bring this action collectively and on behalf of all other Class Members, and as assignees of claims from the Trustee and/or MFGI.

39.     Augustus International Master Fund L.P. ("Augustus") is a limited liability company organized under the laws of the Bahamas with its principal place of business in Harrison, New York. At all relevant times hereto, Augustus was an investment fund which maintained an account at MFGI through a sub-advisory agreement that it used to invest in commodity futures and futures options.

40.     Plaintiff Bearing Fund LP ("Bearing") is a limited partnership organized pursuant to the laws of the state of Texas with its principal place of business in Dallas, Texas.  At all relevant times hereto, Bearing maintained a segregated cash account at MFGI owned by it and titled in its name that it used to invest in commodity futures and futures options for hedging

purposes, including both domestic transactions using 4d funds and foreign transactions using 30.7 funds.

41.     Plaintiff Kay P. Tee, LLC ("Kay P. Tee") is a limited liability corporation organized pursuant to the laws of the state of Nevada with its principal place of business in Las Vegas, Nevada.  At all relevant times hereto, Kay P. Tee maintained a segregated cash account at MFGI owned by it and titled in its name that it used to invest in commodity futures and futures options.

42.     Plaintiff Mark Kennedy ("Kennedy") is a private individual who resides in Murphysboro, Illinois.  At all times relevant hereto, Kennedy maintained a personal account at MFGI which he used for investment via speculation and hedging on the commodities markets through MF Global.  Kennedy's account at MFGI was self-funded for personal investment purposes.

43.     Robert Marcin ("Marcin") is an individual residing in Flourtown, PA.  At all relevant times hereto, Mr. Marcin maintained on deposit at MFGI a cash account owned by him and titled in his name for the purpose of purchasing futures to take physical delivery (for investment) of precious metals.

44.     Plaintiff Thomas G. Moran ("Moran") is an individual residing in Atlanta, Georgia.  At all relevant times hereto, Moran and his family members maintained segregated cash accounts at MFGI owned by him and titled in his name that he used to invest in commodity futures and futures options.

45.     Paradigm Global Fund I Ltd. ("Paradigm Global") is an international business company organized under the laws of the British Virgin Islands with its principal place of business in Scarsdale, New York.  At all relevant times hereto, Paradigm Global was an

investment fund that maintained an account at MFGI through a sub-advisory agreement that it used to invest in commodity futures and futures options, including both domestic transactions using 4d funds and foreign transactions using 30.7 funds.

46.     Paradigm Equities Ltd. ("Paradigm Equities") was an international business company organized under the laws of the British Virgin Islands with its principal place of business in Scarsdale, New York.  At all relevant times hereto, Paradigm Equities was an investment fund that maintained an account at MFGI through a sub-advisory agreement that it used to invest in commodity futures and futures options.

47.     Paradigm Asia Fund Ltd. ("Paradigm Asia") is an international business company organized under the laws of the British Virgin Islands with its principal place of business in Scarsdale, New York.  At all relevant times hereto, Paradigm Asia was an investment fund that maintained an account at MFGI through a sub-advisory agreement that it used to invest in commodity futures and futures options.[7]

48.     Plaintiff PS Energy Group, Inc. ("PS Energy") is a corporation organized under the laws of the state of Georgia with its principal place of business in Dunwoody, Georgia.  At all relevant times hereto, PS Energy maintained a segregated cash account at MFGI owned by it and titled in its name that it used to invest in commodity futures and futures options for hedging purposes.

49.     Plaintiff Summit Trust Company ("Summit") is a corporation formed under the laws of the State of Nevada with its principal headquarters in Las Vegas, Nevada.  Summit also maintains significant marketing operations in Colmar, Pennsylvania.  During the relevant time

---

[7]  Paradigm Global, Paradigm Equities and Paradigm Asia are currently in the process of orderly liquidation.

period Summit directly purchased and sold commodity futures contracts through MF Global.  At all times relevant hereto, Summit directly maintained an account at MF Global, and it lost money and other assets deposited at MF Global as a result of the wrongful conduct alleged herein.

50.     Henry Rogers Varner Jr. ("Varner") is an individual citizen residing in Cleveland, Mississippi.  At all relevant times hereto, Varner maintained two cash accounts at MFGI used to invest in commodities futures and futures options and to hedge cotton prices, respectively.

51.     Thomas S. Wacker ("Wacker") is an individual residing in Brooklyn, New York. At all relevant times Mr. Wacker maintained an account at MFGI that he used to invest in commodity futures, futures options, and other securities.

52.     Plaintiffs include individuals and entities that engaged in commodity transactions and/or maintained commodities accounts through MFGI's FCM unit for myriad purposes, including  investments such as trading options and hedging and/or speculating in commodities such as agricultural, energy, and  metals, and financial instruments. Plaintiffs are a representative sample of Class Members who suffered injuries-in-fact due to the Defendants' conduct alleged herein and thus will effectively and adequately represent the Class with respect to the issues set forth in this Complaint, as well as the interests of the Trustee and MFGI with respect to the claims covered by the Assignment Agreement, including claims on behalf of Commodity Customers, Securities Customers, the MFGI Estate, and MFGI in its corporate capacity and on behalf of MFGI's general creditors.

**B.      The D&O Defendants**

53.     Each of the following D&O Defendants was, as of the October 31, 2011, a board member, officer and/or member of senior management of MFGI or MFG Holdings, with responsibility and control over the day-to-day oversight and management of one or both

companies.  Due to their positions at MFGI and MFG Holdings and their specific respective

duties regarding the treatment of Customer Funds, the D&O Defendants owed statutory and

common-law duties to customers to protect their property and to ensure that MFGI complied

with its segregation obligations under applicable law, and owed common law duties to MFGI

and MFG Holdings to ensure their compliance with applicable law.  Despite these duties, as

detailed herein, through their control and management of MFGI and MFG Holdings, the D&O

Defendants directed, caused, authorized and/or allowed MFG Holdings and MFGI improperly to

transfer funds that MFGI was required to segregate on behalf of customers for the companies'

own use, and failed to ensure that adequate steps were being taken to secure property sufficient

to satisfy MFGI's obligations to 4d and 30.7 Commodity Customers and to Securities

Customers.

> ### 1.  Jon S. Corzine

54.     Beginning in March 2010, Defendant Jon S. Corzine served as President of MFGI

and, for several months, as a member of its board of directors.  Defendant Corzine was also CEO

of MFG Holdings, the Chairman of its board of directors, and the board's only inside director.

Defendant Corzine initiated and was the chief architect of the strategy to reposition MFGI (and

its parent MFG Holdings) from a futures commission merchant and broker-dealer conducting a

customer and proprietary futures and securities businesses into a full-service global investment

bank.  This strategy placed massive liquidity strains on MF Global without the corresponding

infrastructure to address it.

55.     As President of MFGI and a board member of MFGI (briefly) and MFG

Holdings, Defendant Corzine was responsible for the key decisions of the businesses, including

the expansion of MFGI's proprietary businesses, its investments in sovereign debt, and its risk

and liquidity polices.  Under Defendant Corzine's leadership, MFGI Holdings made the
decisions that led to the liquidity crisis that put customer funds at risk, including saddling MFGI
with billions of dollars in European sovereign debt investments that generated unsustainable
margin demands, expanding MFGI's proprietary businesses into new and risky products
requiring increased liquidity, and failing to provide the resources or technology to protect MFGI
customer funds.  In the final week of MFGI's operations, when these decisions resulted in a
classic run on the bank, Defendant Corzine and the other D&O Defendants by their actions or
inactions intentionally, recklessly, or negligently caused MFGI's Treasury and Treasury
Operations departments to unlawfully transfer Customer Funds to fund the liquidity crisis at MF
Holdings, notwithstanding rules and regulations prohibiting such conduct.  Defendant Corzine
was also aware of the program to replace 30.7 customer cash margin held at MF Global UK Ltd.
("MFGUK") with U.S. Treasuries ("T-Bills") (the "T-Bill Swap Program") initiated by
Defendant Steenkamp and others as Defendant Steenkamp reported directly to Defendant
Corzine and Defendant Corzine was ultimately responsible for the program.

    56.    Because of his position, Defendant Corzine was also responsible for the conduct
of all other officers and managers of MFGI and MFG Holdings and for ensuring that those
individuals complied with their regulatory and fiduciary duties, including their duty to adhere to
applicable laws.  At all relevant times, Defendant Corzine was aware of MFGI's liquidity
shortages.  No later than August 3, 2011, Defendant Corzine was aware of MFGI's regulatory
obligations to segregate customer funds, but nonetheless directed Defendants O'Brien and
Serwinski to "maximize" the use of any daily surplus of customer segregated funds.

    57.    At all relevant times, Defendant Corzine received internal daily reports that
presented MFGI's segregation obligations under both the Net Liquidating Method and

Alternative Method, which often differed by more than $1 billion. At his request, Defendant

Corzine also received ad hoc liquidity reports which estimated the daily uses and sources of

liquidity for MFGI's Broker-Dealer unit, but which he was advised and knew were imperfect

approximations based on incomplete information. Throughout October 2011, the reports

reflected negative liquidity at the Broker-Dealer, often numbering in the hundreds of millions of

dollars. On or about October 16, 2011, as MFGI's liquidity problems escalated, Defendant

Corzine personally "h[eld] Treasury responsible for reporting daily cash balances, explaining

day-over-day variances and forecasting T+1 cash balances." Defendant Corzine received

liquidity and cash reports up to and including the critical final week before the collapse, when

senior personnel unlawfully transferred hundreds of millions of dollars in Customer Funds out of

segregated accounts.

58.     During the final week of MFGI's operations, Defendant Corzine also personally

directed and/or authorized transfers of hundreds of millions of dollars to JP Morgan Chase & Co.

("JPM") that consisted of customer funds. Defendant Corzine was also aware that senior

personnel were meeting with regulators and the CME during the final week before the collapse

of MFGI concerning, among other things, segregation requirements for customer funds.

59.     In addition to his senior role at and dominion over the day-to-day activities of

MFGI, including responsibility for ensuring the Company's compliance with applicable laws and

regulations concerning segregation of customer funds, Defendant Corzine was registered with

the National futures Association ("NFA") as a Principal of MFGI, Associated Person to MFGI,

and a NFA Associate Member, each of which carried attendant professional standards and responsibilities.[8]

### 2.   Henri J. Steenkamp

60.     Defendant Henri J. Steenkamp was, at all times relevant hereto, the Chief Financial Officer of MFG Holdings.  Defendant Steenkamp reported to Defendant Corzine and was responsible for overseeing MFG Holdings' financial operations, including Treasury, accounting and all global financial control and reporting functions.  As CFO of MFG Holdings and Defendant Corzine's second-in-command, Steenkamp continuously exercised actual authority over the operations of MFGI and closely supervised MFGI's financial operations including its handling of Customer Funds.

61.     Beginning no later than 2009, Defendant Steenkamp was aware of MFGI's liquidity strains.  In 2009, Defendant Steenkamp was privy to numerous discussions about aggressive steps that senior management was taking to utilize Customer Accounts as a source of liquidity.  For example, Defendant Steenkamp was a member of and was present at meetings of MF Global's Investment Committee ("GIC") in 2009, during which the GIC discussed and implemented the "T-Bill Swap Program," against the advice of UK outside counsel, in order to utilize the customer cash as a source of much-needed liquidity.[9]  Defendant Steenkamp was also a member of MF Global's Treasury Operations Committee, which along with the GIC was

---

[8]   For example, under the NFA's definition, an Associated Person meant that Defendant Corzine was "[a]n individual who solicits orders, customers or customer funds (or who supervises persons so engaged) on behalf of a futures commission merchant, a retail foreign exchange dealer, an introducing broker, a commodity trading advisor or a commodity pool operator and who is registered with the CFTC. An AP is, in effect, anyone who is a salesperson or who supervises salespersons for any of these categories of individuals or firms."

[9]   As set forth below in Section X, because UK law treats the title to collateral different than the ownership of cash, the T-Bills Swap Program has resulted in unreturned property in the UK that comprises part of the shortfall of funds available to repay 30.7 Customers.

involved in overseeing the manner in which MFGI and its foreign affiliates maintained secured accounts with respect to 30.7 Customers.  Defendant Steenkamp was also a member of the Asset and Liability Committee ("ALCO"), which was responsible for "overseeing and influencing the management of capital liquidity and investment related risks throughout the Company in accordance with the Risk Policy, Risk Appetite Statement, and Delegations of Authority" over risk management.

62.     Defendant Steenkamp was acutely aware of MFGI's growing liquidity crisis in 2011.  In July 2011, Defendant Steenkamp requested that Defendant Serwinski examine Defendant Corzine's proposal to "loan" the Broker-Dealer $250 million daily from "excess" customer funds at the FCM as a source of liquidity to fund other proprietary operations at MFGI and MFG Holdings.  Defendant Steenkamp received the July 28, 2011 internal report that summarized MFGI's segregation obligations and criticized the proposal for "loans" from the FCM to fund the Broker-Dealer (the "July 28 Report").

63.     Throughout the relevant period, Defendant Steenkamp was aware of and central to the decision to use FCM funds as a source of liquidity for MFGI's proprietary activities.  For example, on October 6, 2011, Defendant Steenkamp emailed Defendant Corzine, copying Defendants Abelow and Mahajan, to discuss the fact that the Broker-Dealer was "unable to fund itself" and that management had to "dip into FCM excess every day" for RTM liquidity and to fund proprietary trading.  Defendant Steenkamp acknowledged that "[t]here remain[ed] a significant stress on liquidity" and pointed out the "sustained levels of stress and the lack of signs this will reduce soon."  Defendant Steenkamp received the internal daily net capital summary and the imperfect liquidity reports the demonstrated negative liquidity throughout October 2011, including during the critical final week before the collapse when senior personnel unlawfully

took hundreds of millions of dollars in Customer Funds out of segregated accounts.  Defendant Steenkamp was in contact and met with regulators and the CME as its DSRO during the final week before the collapse of MFG Holdings and MFGI, and was aware of or was willfully blind to unlawful transfers of Customer funds totaling hundreds of millions of dollars during the final week before the collapse.

### 3.  Bradley I. Abelow

64.     Defendant Bradley I. Abelow was, at all relevant times hereto, a member of MFGI's board of directors and the President and Chief Operating Officer of MFG Holdings. Upon joining MFG Holdings, Defendant Abelow was responsible for overseeing the day-to-day execution of the MF Global's strategy and had direct responsibility for operations, information technology, human resources, risk management, procurement and facilities management globally.  Therefore, Defendant Abelow was responsible for ensuring compliance with all applicable laws governing MFGI's handling of customer funds and maintenance of separate accounts containing Customer funds that were supposed to protect 4d Customers and 30.7 Customers and Securities Customers.   Upon his appointment as President, Defendant Abelow assumed the additional responsibility of further developing and executing the MFGI's new strategic direction.

65.     Throughout the relevant period, Defendant Abelow was aware from internal emails than the Broker-Dealer could not fund itself and that senior management was dipping into FCM funds to finance proprietary operations.  Defendant Abelow was aware that senior personnel were meeting with regulators and the CME during the final week before the collapse of MF Global, and was aware of or was willfully blind to unlawful transfers of Customer funds totaling hundreds of millions of dollars during the final week before the collapse.

29

66.     In addition to his senior role at and dominion over the day-to-day activities of MFGI, including responsibility for ensuring the Company's compliance with applicable laws and regulations concerning segregation of customer funds, Defendant Abelow was registered with the NFA as a Principal of MFGI, which carried with it attendant professional standards and responsibilities.

### 4.     Laurie R. Ferber

67.     Defendant Laurie R. Ferber was, at all relevant times hereto, a member of MFGI's board of directors and General Counsel of both MFG Holdings and MFGI.  As MFGI's General Counsel, Defendant Ferber was responsible for legal and compliance functions, including compliance with all applicable laws governing custody of customer funds and property.  She also had operational and administrative responsibility for MFG Holdings' Internal Audit Department, which issued internal reports during 2011 which alerted management to deficiencies in the Company's liquidity monitoring and management and in its controls over customer funds, and was responsible for monitoring remediation measures.  Defendant Ferber's functions rendered her ultimately responsible for overseeing the regulatory and compliance functions that were supposed to protect Commodities Customers and Securities Customers.

68.     On October 27, 2011, as the D&O Defendants directed, caused, authorized or allowed hundreds of millions of dollars in Customer Funds to be transferred for use by MFGI for its own corporate purposes, Defendant Ferber was copied on a letter from CME, MFGI's DSRO, stating that MFGI was not permitted to make any additional equity withdrawals from MFGI without prior approval in writing from CME.  Aside from forwarding the letter to an underling, however, Defendant Ferber basically ignored the letter and did nothing to ensure MFGI's

compliance with this directive, and hundreds of millions in additional transfers of Customer Funds occurred thereafter.

69.     Defendant Ferber was in contact with and met with regulators and the CME during the final week before the collapse of MFG Holdings and MFGI, and was aware of or was willfully blind to unlawful transfers totaling hundreds of millions of dollars of Customer funds during the final week before the collapse.  On October 28, 2011, Defendant Ferber was also – at Defendant Corzine's instruction – in direct contact with the legal department at JPM regarding the alleged impropriety of certain transfers from Customer Accounts MFGI was using as operating accounts.

70.      In addition to her senior role at and dominion over the day-to-day activities of MFGI, including responsibility for ensuring the Company's compliance with applicable laws and regulations concerning segregation of customer funds, Defendant Ferber was registered with the NFA as a Principal of MFGI, which carried with it attendant professional standards and responsibilities.

**5.     Edith O'Brien**

71.     Defendant Edith O'Brien was, at all relevant times hereto, the Assistant Treasurer of MFGI.  Defendant O'Brien's role was to approve both intra- and inter-company transfers, moving funds as needed through the MF Global enterprise, and to monitor the effects of those transfers on the regulated accounts.  Defendant O'Brien effectively controlled all of the cash at MFGI and MFG Holdings, because although Treasury Operations needed to execute transfers approved by Ms. O'Brien, they routinely executed approved transfers.

72.     Defendant O'Brien was the person responsible for approving transfers between the FCM and Operations and New York and, ostensibly, monitoring the effect of those transfers

in the regulated accounts. Defendant O'Brien failed to do so, and her failure was particularly egregious as she was purportedly an expert on the protection of customer funds, having appeared at panel discussions and meetings at the CFTC and elsewhere on the topic of safeguarding customer funds at futures commission merchants such as MFGI. The requirement for Defendant O'Brien's or her staff's approval of transfers – requests for which they typically received via email and were not consistently recorded or tracked in any internal system – was for all intents and purposes the primary control over customer funds.

73.     Defendant O'Brien was at all times aware of liquidity stresses at MFGI and efforts by Defendants Steenkamp and Corzine aggressively to access customer funds as a source of liquidity. For example, Defendant O'Brien was privy to extensive email communications during the summer of 2011 regarding large intra-company "loans" from Customer Accounts, and sent an email to Defendant Dunne on July 26, 2011 reflecting Defendant Serwinski's displeasure with the overnight "loan" of $100 million from FCM "excess" to MFGI's fixed income operations that left only $27 million in the excess pool. Defendant O'Brien also received the July 28 Report questioning the proposal by Defendants Steenkamp and Corzine to loan the Broker-Dealer $250 million daily from FCM customer excess.

74.     Defendant O'Brien, along with other members of her group, prepared the ad hoc liquidity reports. Defendant O'Brien was among the members of senior management who received the internal daily net capital reports, and the daily segregated and secured statements, including during the critical final week before the collapse when she unlawfully transferred hundreds of millions in Customer Funds. Defendant O'Brien was in contact with and met with regulators and the CME during the final week before the collapse of MF Global.

6.     **Christine A. Serwinski**

75.     Defendant Christine A. Serwinski was, at all relevant times hereto, the Chief Financial Officer of MFGI (North America).  Defendant Serwinski was directly responsible for the financial and operational reporting of MFGI to regulatory authorities, and supervised the accounting for North American Operations.  According to the December 8, 2011 testimony of Defendant Corzine before the U.S. House Agriculture Committee, Defendant Serwinski oversaw the movement of customers' segregated account funds in North America.  Defendant Serwinski, along with Defendant O'Brien, was the person responsible for ensuring compliance with all applicable laws governing the companies' handling of customer funds.

76.     Defendant Serwinski was at all times aware of liquidity stresses at MFGI and efforts by Defendants Corzine and Steenkamp to aggressively access customer funds as a source of liquidity.  Defendant Serwinski was aware of and received email communications concerning the T-Bills Swap Program.  In July 2011, Defendant Steenkamp asked Defendant Serwinski to examine the proposal to loan the Broker-Dealer $250 million daily from FCM customer excess, and Defendant Serwinski drafted the July 28 Report criticizing the scheme.

77.     Defendant Serwinski was among the members of senior management who received the internal version of the daily net capital reports that reflected negative liquidity throughout October 2011, including during the critical final week before the collapse when Defendant O'Brien unlawfully transferred billions of dollars in Customer Funds from segregated accounts.  While Defendant Serwinski was on vacation during some or all of the final week before the collapse of MFG Holdings and MFGI, she was in contact with Defendant O'Brien, and on October 27, 2011 Defendant Serwinski was aware or was willfully blind that Customer

funds were being unlawfully transferred from Customer Accounts and not repaid, and therefore that the Customer Accounts had deficits as of October 26, 2011.

78.    On October 27, 2011, as the D&O Defendants directed, caused, authorized or allowed hundreds of millions of dollars in Customer Funds to be unlawfully transferred for use by MFGI for its own corporate purposes, the CME addressed a letter to Defendant Serwinski stating that MFGI was not permitted to make any additional equity withdrawals from MFGI without prior approval in writing from CME.  Defendant Serwinski did nothing to ensure MFGI's compliance with the CME's directive—nor did the CME enforce its directive or otherwise ensure compliance.  Meanwhile, hundreds of millions in additional transfers of Customer Funds occurred thereafter.

79.     In addition to her senior role at and dominion over the day-to-day activities of MFGI, including responsibility for ensuring the Company's compliance with applicable laws and regulations concerning segregation of customer funds, Defendant Serwinski was registered with the NFA as a Principal of MFGI, which carried with it attendant professional standards and responsibilities.

**7.    David Dunne**

80.    Defendant David Dunne was Global Treasurer of MF Global from September 2008 to August 2011.  Pursuant to MF Global's risk policies, as Global Treasurer Defendant Dunne was responsible for, among other things, balance sheet management and liquidity monitoring.  In addition, the Treasury Department, headed by Defendant Dunne, was responsible for ensuring that the use of Customer Accounts complied with applicable laws and regulations and for approving all funding requests companywide.  After he was replaced by Defendant

Mahajan, Defendant Dunne continued to have responsibility for liquidity as head of Treasury for MFGI's capital markets division.

81.     Defendant Dunne chaired ALCO, which was comprised of senior personnel from Finance, Treasury and Risk and various product groups and was in charge of overseeing day-to-day liquidity management and risk within the Company.  Defendant Dunne was acutely aware of MFGI's liquidity problems beginning no later than 2009, and was privy to numerous discussions about aggressive steps senior management took to utilize Customer Accounts as a source of liquidity.  For example, Defendant Dunne was present at meetings of the GIC in 2009 during which the GIC discussed the T-Bill Swap Program.  Defendant Dunne also participated in extensive email communications with MFGI's former Treasurer during 2009 concerning implementing the T-Bill Swap Program, including emails discussing the advice of MFGUK's counsel against the scheme.

82.     Defendant Dunne also received emails during the summer of 2011 questioning management's practice of authorizing large intra-company "loans" from Customer Accounts, including an email on June 26, 2011 reflecting Defendant Serwinski's displeasure with the overnight "loan" of $100 million from FCM purported "excess" to MFGI's fixed income operations that left only $27 million in the excess pool.  Defendant Dunne also received the July 28, 2011 report criticizing the proposal by Defendants Corzine and Steenkamp to use $250 million in intra-day loans from excess customer funds as a source of liquidity.  Defendant Dunne also was one of five senior officers to whom the June 2011 internal audit report was distributed. That report criticized MF Global's inadequate liquidity tracking infrastructure, and charged Dunne with carrying out contingency liquidity planning that was still untested in October 2011.

83.     Defendant Dunne received the internal daily net capital summary and the ad hoc liquidity reports that showed negative liquidity at the Broker-Dealer throughout October 2011, including during the critical final week before the collapse.  Under Defendant Dunne's stewardship, the Treasury Department's infrastructure was so inadequate that when Defendant Mahajan replaced Defendant Dunne in August 2011 he immediately concluded that the department "needed lots of help" and "needed a 180."

**8.     Vinay Mahajan**

84.     Defendant Vinay Mahajan replaced Defendant Dunne as Global Treasurer of MFG Holdings beginning in August 2011, and assumed the responsibility for financing, capital structure, balance sheet, liquidity, investments, and banking.  Defendant Mahajan also became responsible for monitoring liquidity and assuring regulatory compliance, and was therefore responsible for ensuring compliance with all applicable laws governing the companies' handling of customer funds.  Defendant Mahajan has acknowledged that upon joining MFG Holdings he was immediately aware of deficiencies in MFG Holdings' liquidity monitoring and Treasury functions.

85.     Defendant Mahajan was among the members of senior management who received the internal daily net capital and liquidity reports that reflected negative liquidity throughout October 2011, including during the critical final week before the collapse when Defendant Corzine and Treasury unlawfully directed the transfer hundreds of millions of dollars in Customer Funds from segregated accounts.  By no later than mid-October 2011, Defendant Mahajan was aware that MFGI's broker-dealer operation was relying on Customer Funds from the FCM to generate liquidity, and on at least one occasion he gave instructions that funds not be immediately repaid.  Defendant Mahajan was in contact and met with regulators and the CME

36

during the final week before the collapse of MFG Holdings and MFGI, and was or should have

been aware as Global Treasurer that Defendant O'Brien was unlawfully transferring billions of

dollars of Customer funds during the final week before the collapse.

*   *   *

86.     At all times relevant to the allegations in this Complaint, Defendants Corzine,

Steenkamp, Abelow, Ferber, O'Brien, Serwinski, Dunne and Mahajan were members of senior

management of MFG Holdings and MFGI.  As senior management of MFG Holdings and MFGI

in charge of assuring, among other things, that MF Global properly segregated and protected the

Customer Funds of Commodity Customers and the property of Securities Customers as required

by federal and common law, the Defendants owed customers, among other things, duties of care

and fiduciary duties.

87.     As set forth herein, the D&O Defendants breached their duties to Class Members

by, among other things:

- Failing to establish adequate liquidity management and monitoring and formalized Treasury functions at MFG Holdings and MFGI to ensure that the companies were segregating Customer Funds at all times, including during liquidity stress scenarios, even though internal reports acknowledged that liquidity management and monitoring and control processes at MFG Holdings and MFGI were inadequate, antiquated, and relied on Treasury personnel to use ad-hoc tools such as inaccurate and ad hoc Liquidity Dashboards;

- Allowing, and indeed relying on, intra-day and overnight transfers from the FCM as a source of liquidity to fund other operations at MF Global, and then failing to formalize processes to ensure controls and record-keeping for such loans and prompt repayment;

- Failing to ensure that customer funds were properly segregated and/or secured as they became increasingly aware, from internal reports such as Daily Estimated Net Capital summaries and Liquidity Dashboards, that the MFGI was facing escalating liquidity problems from, among

37

other things, loss of counterparties and "haircuts"[10] related to RTMs, as well as the acknowledged inability of the MFGI broker-dealer operations to fund itself;

- Intentionally, recklessly, negligently, or with willful blindness directing or allowing senior personnel to unlawfully transfer Customer Funds from Customer Accounts during the final week of operations in an effort to stave off the catastrophic liquidity crises at MFG Holdings and MFGI, even after repeated meetings with and reminders from regulators concerning, among other things, MFGI's absolute duty to segregate Customer Funds;

- Authorizing transfers to clearing banks or counterparties during the final week of operations even though they knew or should have known, based on the known liquidity crisis, that such transfers would consist of property in Customer Accounts; and

- Failing to properly maintain in separate accounts at MFGI and/or through its foreign affiliates, money, securities, and property in an amount sufficient to satisfy MFGI's current obligations to 30.7 Customers.

88.     The D&O Defendants' breaches of their duties to customer Class Members caused injuries-in-fact that, on the date of this Complaint, consist of well over many hundreds of millions of dollars of Customer Funds that remains unreturned to Commodities Customers and Securities Customers.  In addition to breaching their common-law duties to Class Members, the D&O Defendants' conduct also constituted violations of the CEA and the CFTC Regulations. In addition, the D&O Defendants breached their duties to the MFGI estate and its Securities Customers and general creditors.  The D&O Defendants' failure to effectively safeguard customer assets, failure to properly supervise regulatory compliance, and the extended operation of MFGI without appropriate liquidity and risk infrastructure to protect customer funds caused

---

[10]  The percentage by which an asset's market value is reduced for the purpose of calculating capital requirement, margin and collateral levels.

the shortfall.  The shortfall in the Commodities and Securities Customer estates may result in a reduction of assets in MFGI's general estate to the detriment of MFGI's general creditors. To the extent it is ultimately determined that any portion of the shortfall in customer property is attributable to the Securities Customer estate, the Plaintiffs assert claims to recover on behalf of MFGI's  Securities Customers for damages caused by the D&O Defendants.

89.     Finally, the D&O Defendants breached their fiduciary duties to MFGI by causing the Company to engage in proprietary transactions that they knew would require unlawful invasions, based on conditions at MFGI at the time, would require invasion of Customer funds from the FCM, thereby exceeding the normal limits of business judgment.  Moreover, the failure of the D&O Defendants to repair the known deficiencies in their internal controls over Customer funds, and then later to cause, authorize or approve transfers from Customer funds, prevented the third-party purchase of MFGI which would have provided value to MF Global creditors and avoided the cost of liquidation.

### C.     The Third-Party Defendants

#### 1.     PwC

90.     Defendant PwC served as the independent auditor of MFGI and MFG Holdings during the period from 2010-2011.  Defendant PwC audited MFGI's financial statements, which were filed with regulators including the CFTC, the Securities and Exchange Commission (the "SEC"), and the Financial Industry Regulatory Authority ("FINRA").  As part of Defendant PwC's audit of MFGI for the fiscal year ended March 31, 2011, the PwC audit team should have performed tests to understand and evaluate internal controls over financial reporting as a basis for designing its audit procedures, including steps to understand and test the practices and

procedures followed by MFGI with respect to control activities for safeguarding Customer Funds as required by 17 C.F.R. 1.16, which provides:

> The scope of the audit and review of the accounting system, ***the internal controls, and procedures for safeguarding customer and firm assets*** must be sufficient to provide reasonable assurance that any material inadequacies existing at the date of the examination in (i) the accounting system, (ii) the internal accounting controls, and (iii) ***the procedures for safeguarding customer and firm assets (including, in the case of a futures commission merchant, the segregation requirements of section 4d(a)(2) of the Act and these regulations and the secured amount requirements of the Act and these regulations) will be discovered***. Additionally, as specified objectives the audit must include reviews of the practices and procedures followed by the registrant in making (A) periodic computations of the minimum financial requirements pursuant to § 1.17 and (B) in the case of a futures commission merchant, daily computations of the segregation requirements of section 4d(a)(2) of the Act and these regulations and the secured amount requirements of the Act and these regulations.

91.    In violation of the foregoing section, Defendant PwC failed to adequately examine and evaluate MFGI's procedures and controls for protecting Customer Funds and failed to adequately test segregation calculations during the audit period and at fiscal year end. Defendant PwC's failure to meet its obligations under applicable law and regulations constituted professional malpractice and breaches of duties owed to MFGI and to customers, causing injuries-in-fact to MFGI and Class Members.  Had Defendant PwC properly reported on MFGI's control deficiencies over customer funds in March 2011, the D&O Defendants would have been forced to implement controls.  Because of Defendant PwC's failure in its duties under 17 C.F.R. 1.16 and the applicable engagement letter, MFGI's inadequate controls over customer funds went unaddressed following the issuance of PwC's Reports of Independent Auditors on Internal Controls Required by SEC Rule 17a-5 and CFTC Regulation 1.16 dated May 27, 2010 and May 26, 2011.

### 2.    CME Defendants

92.    Defendant CME was the DSRO responsible for auditing, monitoring and ensuring MFGI's compliance with all capital and customer protection requirements imposed under the CEA, the CFTC Regulations and rules promulgated by CME Exchanges (the "Exchange Rules"). In order to serve its own self-interests, and those of its parent and sister exchanges, Defendant CME failed in its duties to adequately regulate and supervise MFGI.[11]

93.    Among other things, during the months leading up to MFGI's collapse, Defendant CME knew that MFGI was not complying with its obligations regarding the customer segregated funds, but elected not to take any action to ensure compliance, other than advising MFGI in a letter that compliance was required.  During the final few days of MFGI's operations, Defendant CME was aware that MFGI was under extreme financial stress due to overwhelming liquidity problems and was considering a sale of its assets to satisfy its growing liquidity needs.

94.    Defendant CME also knew that, at the same time, neither MFGI nor Defendant CME's own auditors could reconcile MFGI's daily customer funds segregation and secured funds reports which are required to accurately reflect the amount of Customer Funds MFGI was to hold in segregation each day.  MFGI's extreme liquidity pressures and its inability to produce accurate, reconcilable daily segregated and secured funds reports should have alerted Defendant CME to the actual misappropriations of customer funds which were then occurring at MFGI. Despite this knowledge, and although Defendant CME had its own auditors on site at MFGI's Chicago offices purportedly reviewing MFGI's segregated and secured funds reports at the very same time the D&O Defendants were causing MFGI to improperly transfer hundreds of millions

---

[11]  The Plaintiffs assert Class Claims against Defendant CME.  The Trustee is party to a Limited Agreement and Reservation Rights with CME (Case No. 11-2790, Docket No. 2029), and accordingly, any claims by and between the Trustee and CME are reserved pursuant to that agreement, and such claims were not assigned to the Plaintiffs in the Assignment Agreement.

in Customer Funds, Defendant CME did nothing to prevent the transfers and allowed its auditors to leave MFGI's offices without reconciling MFGI's segregated and secured funds reports at 5:00 p.m. on the very day that a substantial number of the unlawful transfers were made.  On February 2, 2012 Defendant CME Group, Inc. acknowledged in a press release that "[MF Global] violated CFTC regulations and misused customer monies that should have been kept segregated."

95.     Defendant CME Group, Inc. ("CME Group") is a publicly traded New York stock exchange company that is the parent company of Defendant CME and the Board of Trade of the City of Chicago, Inc. ("CBOT"), New York Mercantile Exchange, Inc. ("NYMEX") and the Commodity Exchange, Inc. ("COMEX") commodity exchanges (collectively the "CME Exchanges").  MFGI was a futures commission merchant clearing member of CME Exchanges.

96.     MFGI was an FCM clearing member of the CME Exchanges.  Defendant CME Group earns a substantial portion of its clearing and transaction revenue from its clearing members.  MFGI was one of the largest, if not the largest, FCM clearing member of the CME Exchanges.  Defendant CME Group, through the CME Exchanges, realized as much as 10% or more of annual income from the high volume of trading activity by MFGI and its customers.

97.     Defendant CME Group directed and controlled the manner in which the CME Exchanges performed their own self-regulatory functions, including the review and oversight of MFGI.  Defendant CME Group's significant financial interest in maintaining and maximizing MFGI's trading volume and related clearing and transaction revenue, while at the same time the CME Exchanges were purporting to act as their own "self-regulators," created a substantial conflict of interest that resulted in the lax and ineffective oversight of MFGI by  Defendant CME that ultimately led to MFGI's collapse and the loss of customer funds.

42

### D.  MFGI and MFG Holdings

98.    MFG Holdings was a Delaware holding company and parent of nearly fifty subsidiaries that comprised MF Global, the most significant of which was MFGI.  Management and employees of MFG Holdings, including Defendants Corzine, Steenkamp, Ferber, Abelow, Dunne and Mahajan, generally operated out of the company's principal place of business in New York.  In early February 2011, MFG Holdings achieved a long-sought designation as a Primary Dealer in U.S. Treasury securities by the Federal Reserve Bank of New York ("the NY Fed").  MFG Holdings applied for the designation more than two years earlier, but the NY Fed refrained from approving the application because of concerns about pending enforcement and compliance issues relating to a February 2008 incident in which an MFGI trader, trading for his own account, improperly caused a direct loss to the Company of $141 million.  As one of the select group of twenty primary dealers, MFG Holdings served as a counter-party to the NY Fed in open market operations, participated in Treasury auctions, and provided analysis and market information to the NY Fed's trading desks.

99.    During 2010-2011, MFGI, a Delaware corporation, was by far the largest part of MFG Holdings business, generating approximately 56.6% of all MFG Holdings revenue.  Defendants Serwinski and O'Brien generally operated from the Company's principal place of business in Chicago, while senior management were located in New York.  Although MFGI nominally had its own board of directors, the reality was that MFG Holdings dictated MFGI's actions.  The five members of MFGI's board, including Defendants Corzine (from March to October 2010), Abelow (beginning in October 2010) and Ferber (beginning in December 2009), were all officers of MFG Holdings.  There is no available record of formal MFGI Board meetings, but only unanimous consents addressing certain corporate formalities, and never

undertaking to ensure that MFGI was complying with all its regulatory obligations or that the Company had procedures in place to do so.

100.    MFGI consisted at all relevant times of both the FCM unit that facilitated transactions for commodities investors and the Broker-Dealer unit through which securities investors could engage in equity transactions.  In addition to these traditional commission-based operations which necessitated that MFGI hold billions of dollars in assets that belonged to Commodity and Securities Customers; MFGI also included the Principal Strategies Group ("PSG"), which was the unit created by Defendant Corzine in June 2010 to engage in proprietary trading on behalf of MF Global.  The PSG was a principal component of management's new strategy, initiated by Defendant Corzine, to transform MFGI from its traditional commission-based commodities and securities brokerage model into a full-service investment bank.

101.    Formed in June 2010, the PSG unit engaged in principal trading of various products, including fixed income, equities, commodities (such as energy, agriculture and metals), and foreign exchange.  The PSG team added a dozen trading personnel, but relied on MFGI's existing middle and back office support staff for account setup and management processes, as well as the clearing and settlement processes.[12]

102.    A similar pattern was repeated elsewhere within MFGI and MFG Holdings, as the company added or expanded proprietary trading while cutting personnel and resources in other departments.  Indeed, internal reports describe a "disconnect" between the approval of new businesses and allocation of resources to support them.  This mismatch between Defendant Corzine's ambition to replicate the Goldman Sachs & Co. model without its resources, and the

---

[12]  A year after it was created in June 2011, management began the process to move the PSG from MFGI to a newly-created non-regulated affiliate because PSG "use[d] too much reg capital and the cost of reg capital [was] more than the cost of funding capital."

simultaneous failure to build up the technology, organization, liquidity, and risk protections for the changed risk profile of the Company had grave consequences for customers in MFGI's final days.

103.     The effects of Defendant Corzine's new strategy were not unknown to the D&O Defendants.  The lack of adequate liquidity and risk infrastructure for MFG Holdings' expanded proprietary trading under the new business model was described in detail by MFG Holdings' Internal Audit department, which reported to Defendant Ferber, in reports throughout 2010 and 2011.  The reports assigned responsibility to senior management, including the D&O Defendants, to remediate these problems, but virtually all of them were unresolved because the D&O Defendants determined that the Company "accepts the risk."

104.     One important component of Defendant Corzine's strategy to transform MFGI was a bet placed on European sovereign debt, in which MFGI  built up a portfolio in the form of "repo to maturity" ("RTMs") allowing MFG Holdings to recognize immediate revenue without reflecting exposure to default or other associated risks on its books.  At Defendant Corzine's insistence, the RTM portfolio quickly grew, reaching $4.0 billion in September 2010, $4.75 billion by November of 2010, and over $5.0 billion by March of 2011.  The exposure peaked at $7 billion in early October 2011, and still stood at over $6 billion as of the October 31, 2011 collapse of MF Global.

105.     The size of the RTM portfolio, in comparison to the size of MFGI and MFG Holdings, was staggering, and constituted the equivalent of almost 14% of MFG Holdings total assets, and was more than four and a half times total equity.  Indeed, the sovereign debt portfolio was, as a percentage of quarter-end equity or assets, orders of magnitude greater than that of other, far larger Wall Street banks.

45

106.    When the U.S. regulators, principally FINRA, inquired about MF Global's exposure to sovereign debt, MF Global initially maintained that it need not take a capital charge because of the RTM structure, which placed the debt off-balance-sheet.  After several weeks of discussion, the regulators nonetheless required MFGI in August 2011 to increase its capital by $183 million in recognition of the RTM exposure.  When *The Wall Street Journal* emphasized this capital charge in an article on October 17, along with other unfavorable financial developments, the run on the bank and ensuing liquidity crisis began in earnest.

107.    In the final week of MFGI's operations, the margin demands to support the RTM portfolio overwhelmed MFGI's resources.  MFGI had approximately $450 million of collateral posted to support RTM margin requirements as of Friday October 21.  During the next week, an additional $210 million was provided by MFGI to meet margin calls, while on Monday October 31, an additional $310 million margin call simply was not met.

## IV. FACTUAL BACKGROUND

### A.    The Commodity Exchange Act Has Ironclad Segregation and Investment Requirements Designed to Protect Commodities Customers

108.    The proper and efficient functioning of markets for commodities and futures is important to many industries in the United States such as farming, energy, metals, food processing and even the financial services industry itself.  Risk control, price stability and predictability in these industries can be managed through, among other things, futures contracts. In the wake of the financial panic that led to the Great Depression and the staggering losses suffered by commodity account holders and those investing in commodities contracts at that time, Congress enacted the CEA in 1936.

109.    In 1974 Congress established the CFTC, a federal regulatory agency with jurisdiction over futures trading, and authorized the creation of "registered futures associations,"

giving the futures industry the opportunity to create a nationwide self-regulatory organization. The CFTC provides government oversight for the futures industry. Each U.S. futures exchange operates as a self-regulatory organization, governing its floor brokers, traders and member firms. Pursuant to that legislative grant of authority, the futures industry created the NFA, which regulates every firm or individual conducting futures trading business with public customers.

110.    With certain exceptions, all persons and organizations that intend to do business as futures professionals must register under the CEA. In addition, all individuals and firms that wish to conduct futures-related business with the public must apply for NFA Membership or Associate status.

111.    At all relevant times, MFGI was a registered futures commission merchant by virtue of its FCM unit. A futures commission merchant is an individual or organization that, among other things: (i) solicits or accepts orders to buy or sell futures contracts or options on futures contracts; and (ii) accepts money or other assets from customers to support such orders. As such, futures commission merchants are agents or intermediaries for their customers.

112.    As a registered futures commission merchant, MFGI was subject to the requirements of the CEA and to the CFTC's oversight and regulation. Most notably, this included Section 4d(2)(a) of the CEA, which requires in no uncertain terms that Customer Funds "shall be separately accounted for and shall not be commingled with the funds of such commission merchant or be used to margin or guarantee the trades or contracts, or to secure or extend the credit, of any customer or person other than the one for whom the same are held."

113.    In response to the allegations regarding misappropriation of client funds at MFGI, Gary Gensler, Chairman of the CFTC, said that the segregation of customer funds – a practice initiated in the 1930s for futures trades – is the "heart of our regulatory regime." The purpose,

intent and effect of the CEA's strict segregation requirement is to prevent any risk of loss of customer funds even in the event that a commodities firm fails, as MFGI did. As a result, for the past 75 years commodities account holders (including Plaintiffs and Class Members) had relied on the CEA's regulatory scheme to protect their assets and have generally not viewed the financial peril of brokerage firms as a risk to the funds in their customers accounts.

114.   The CFTC requires that commodities customer funds be kept in "Customer Segregated" or "Foreign Secured" accounts (collectively, "Customer Accounts").  CFTC regulations provide that Customer Segregated Accounts, also known as "4d accounts," hold the property of customers trading on domestic exchanges, and that Foreign Secured Accounts, or "30.7 accounts," hold Customer Funds of customers trading on foreign exchanges.

115.   The "4d funds" and "30.7 funds" are not, with a few minor exceptions (which are not applicable here), permitted to be used by futures commission merchants for other purposes. Indeed, in a February 2011 statement entitled "Safeguarding Customers Through Segregated Funds," the CME outlined the purported stringent daily oversight of customer funds held at futures commission merchants design:

**Investment Risk and Firm Risk**

Although first-time managed futures investors might assume they're depositing money directly with the commodity trading advisor (CTA) running the fund, in fact, customers open an account in their own name at an FCM. The CTA is then given the authority to trade per the fund's investment strategy. Segregated funds possess a separate identity from FCM funds in the firm's bank account. Once funds are deposited, the bank signs a written acknowledgement stating it will not use the funds for anyone other than the customer. Also, the FCM is required to use these funds only in certain pre-defined instruments. The end result is that, in the event of a crash or FCM bankruptcy, customer funds can be more easily recovered.

**FCM Reporting Requirements**

> ***Segregated funds are subject to stringent daily, monthly, and annual monitoring by industry regulatory agencies. Every day, FCMs must submit a report to the National Futures Association (NFA) detailing the breakdown of their customer funds. This "Segregated Investment Detail Report" (SIDR) lists the actual and expected segregated funds in the FCM's accounts.*** In addition, every FCM must file monthly financial reports with the Commodity Futures Trading Commission's (CFTC) Division of Clearing and Intermediary Oversight (DCIO) within 17 business days after the end of the month. Finally, the FCM is subject to a yearly audit by the Joint Audit Committee, a consortium of U.S. futures exchanges and regulatory organizations.[13]

116.   The strict reporting criteria incumbent upon futures commission merchants such as MFGI was explained during the December 13, 2011 Senate committee testimony of Jill E. Sommers, Commissioner of the CFTC, before the United States Senate Committee on Agriculture, Nutrition and Forestry:

> ***FCMs are subject to CFTC-approved minimum financial and reporting requirements that are enforced in the first instance by a designated self-regulatory organization ("DSRO"), for example, the Chicago Mercantile Exchange*** or the National Futures Association. DSROs also conduct periodic compliance examinations on a risk-based cycle every 9 to 15 months. The requirements of DSRO examinations are contained in Financial and Segregation Interpretations 4-1 and 4-2, which are specified as application guidance to Core Principle 11 (Financial Integrity) for Designated Contract Markets.

> *        *        *

> An examination of segregation compliance is mandatory in each examination (certain other components need not be included in every examination). This examination includes a review of the depository acknowledgement letters and the account titles of segregated accounts (unless unchanged from the prior examination); verifying account balances, and ensuring that investment of customer funds is done in accordance with Commission Regulation 1.25.

117.   In her Senate committee testimony, Commissioner Sommers also explained the duties and obligations of futures commission merchants such as MFGI when investing segregated customer funds in one of few permitted investments:

---

[13]  Bold or italics in quoted materials in this Complaint are intended to provide emphasis and, unless otherwise indicated, do not appear in the original.

An FCM is authorized to invest funds that are in customer segregated accounts. This authorization is found in Section 4d of the CEA and in Commission Regulation 1.25 (***). Regulation 1.25 only relates to how an FCM can invest customer funds. Moreover, any losses that may occur as a result of those permissible investments are the responsibility of the FCM, not the customer. Prior to last week, Regulation 1.25 allowed an FCM to invest customer funds in highly-rated foreign sovereign debt, but the investment was strictly limited to the amount of that nation's foreign currency a customer posted to the FCM. Regulation 1.25 does not, and has never, had anything to do with investments that an SEC/FINRA-regulated BD makes for its own account.

While an FCM is permitted to invest customer funds, it is important to note that if an FCM does so, the value of the customer segregated account must remain intact at all times. ***In other words, when an FCM invests customer funds, that actual investment, or collateral equal in value to the investment, must remain in the customer segregated account at all times.*** If customer funds are transferred out of the segregated account to be invested by the FCM, the FCM must make a simultaneous transfer of assets into the segregated account. ***An FCM cannot take money out of a segregated account, invest it, and then return the money to the segregated account at some later time.***

118.   Futures commission merchants are thus "bound by their fiduciary obligations to customers and the requirement that the secured amount required to be set aside be at all times liquid and sufficient to cover all obligations to such customers."  76 Fed. Reg. 78776-01, 78777 (Dec. 19, 2011).

119.   Notably, CFTC regulations allow FCMs to add the funds of a firm to Customer Accounts, with the objective that these excess funds will *further* protect customers in a volatile market.  A futures commission merchant is only permitted to withdraw funds for its own use to the extent of its actual interest.  17 C.F.R. § 1.23.  That means only the "Firm Invested in Excess" was available to MFGI to fund firm proprietary activities. FCMs are always required to meet the fundamental requirement that the amounts in Customer Accounts could satisfy all obligations to customers.

120.   The investment of customer funds by an FCM is similar to those made of customer deposits by traditional savings banks, but there are critical safeguards and restrictions

placed on FCMs.  However, unlike traditional savings accounts and brokerage accounts the accounts of commodities customers are not protected through insurance as under FDIC or a fund for cash advances for allowed claims as under SIPA.   The safety of commodities customer funds is dependent upon the FCM's compliance with applicable regulatory and legal duties – in conjunction with regulators and the FCM's DSRO and auditor - designed to protect such funds.  Section 4d of the CEA and Commission Regulation 1.25 list the only permissible investments an FCM can make with customer funds.  Regulation 1.25 establishes a general prudential standard by requiring that all permitted investments be "consistent with the objectives of preserving principal and maintaining liquidity."

121.    In the period leading up to the Filing Date, MFGI, at the D&O Defendants' direction, or due to their intentional, reckless or negligent willful actions or inactions, violated the fundamental protections established in the CEA and Commission Regulations.  MFGI, at the D&O Defendants' direction, or due to their intentional, reckless or negligent willful actions or inactions, failed to segregate or otherwise secure the funds of Plaintiffs and the Class and/or improperly and in violation of the law borrowed, pledged, repledged, transferred, hypothecated, re-hypothecated, loaned, failed to properly secure, or invested (including to purchase or sell securities pursuant to repurchase agreements or reverse repurchase agreements) customer funds.

122.    Bankruptcies of large FCMs such as MFGI's are exceedingly rare, but not unprecedented. Lehman Brothers, for example, is the most recent and significant such bankruptcy.  The Lehman Brothers bankruptcy was monumental in scale.  However, management at Lehman Brothers did not fail to segregate or otherwise secure commodities customer funds; the accounts of commodity customers remained intact, maintaining all open positions and associated segregated collateral.  As a result, despite its bankruptcy, all of the funds

and property in the accounts of commodity customers held at Lehman Brothers were quickly

transferred to other FCMs.  According to Executive Chairman Terrence A. Duffy of CME

Group, one of MFGI's principal overseers, "the MFG bankruptcy is unprecedented . . . . this is

the first time in the industry's history that a customer has suffered a loss as a result of a clearing

members' improper handling of customer funds."

**B.    MFGI's Various Responsible Departments Lacked Meaningful Controls Over Customer Funds or the Framework for Evaluating the Company's Liquidity**

123.    MF Global's August 2010 "Futures Compliance and Supervisory Procedures

Manual" (the "Compliance Manual") expressly set forth MFGI's absolute obligation to segregate

Customer Funds:

> THE ASSETS HELD IN SEGREGATED OR SECURED AMOUNT
> ACCOUNTS MUST BE STRICTLY LIMITED TO THOSE DEPOSITED BY
> CUSTOMERS. NO FUNDS OR SECURITIES BELONGING TO MFG OR
> ANY PROPRIETARY ACCOUNT MAY BE DEPOSITED IN MFG'S
> SEGREGATED ACCOUNTS OR SECURED AMOUNT ACCOUNTS UNDER
> ANY CIRCUMSTANCES (PROVIDED THAT, PURSUANT TO CFTC
> REGULATION 1.23, MFG MAY DEPOSIT ITS OWN FUNDS OR
> UNENCUMBERED SECURITIES AS IT MAY DEEM NECESSARY TO
> ENSURE THAT ANY SEGREGATED ACCOUNT OR SECURED AMOUNT
> ACCOUNT DOES NOT BECOME UNDER¬ SEGREGATED OR
> UNDERSECURED AT ANY TIME). IN ADDITION, MFG MAY NOT
> COMMINGLE CUSTOMER SEGREGATED AND SECURED AMOUNT
> FUNDS OR ACCOUNTS.

124.    The Compliance Manual dictated that the "Treasury Department will be

responsible for ensuring that investments of customer funds, and the use of customer securities,

are being conducted in accordance with applicable laws and regulations."  ***However, the***

***Compliance Manual otherwise provided virtually no details or other instruction concerning***

***controls over customer funds.***

125.     Instead, the responsibilities for monitoring the balances in the Customer Accounts and approving and transferring funds among MF Global's accounts were, along with monitoring liquidity, divided on an informal basis among Treasury, Treasury Operations, Operations, Finance, and the Financial Regulatory Group.  Because these various departments reporting capabilities and duties were fractured and underdeveloped, as well as separately located in New York and Chicago, the resulting controls over liquidity and customer funds were woefully inadequate, if indeed they were present at all.

126.     As stated, during all relevant times, MFG Holdings' Treasury department had responsibility over all funds company-wide.  As MFG Holdings' Global Treasurer, Defendant Mahajan headed the Treasury department from New York.  Defendant Edith O'Brien was the Assistant Treasurer, employed by MFGI at its offices in Chicago along with the majority of Treasury personnel.

127.     Defendant O'Brien was the senior person to which employees company-wide directed virtually all funding requests.  Although perhaps not formally designated given the lack of formal controls in Treasury, Defendant O'Brien, or her staff, was responsible for approving all funding transfers, including transfers from FCM accounts to the Broker-Dealer, MFG Holdings and/or third-parties.  For example, on any given day, if third-party funding options were exhausted and the Broker-Dealer was unable to generate sufficient financing to cover cash shortages in accounts at clearing banks, Operations in New York would contact Defendant O'Brien, or individuals who reported to her, who would approve and direct transfers (often from FCM funds) to cover overdrafts.

128.     Often, Defendant O'Brien or her employees would approve such transfers virtually immediately, without confirming segregation balances.  For example, in the afternoon

of July 26, 2011, an Operations Vice President emailed a request "to borrow 100 million overnight at BNYM."  Defendant O'Brien approved the transfer by email in a matter of minutes and directed Treasury Operations to "please expedite."  About an hour later, Defendant O'Brien informed Defendant Dunne that Defendant Serwinski was "not pleased about the late hour borrow, nor the size," acknowledging that she did not "yet have clarity on the drivers of" the loan request.  Put another way, Defendant O'Brien approved a $100 million transfer virtually immediately against the wishes of Defendant Serwinski without even inquiring with Mr. Delucia concerning the reason for the transfer.  Despite this remarkably reckless attitude toward fund transfers that caused Defendant Serwinski displeasure on at least one occasion, the D&O Defendants failed to alter or implement additional procedures or controls over transfers.  Indeed, Defendant O'Brien was still approving hastily transmitted email funding requests on October 28.

129.    Unfortunately, requests like that made by Mr. Delucia became commonplace. MFGI had previously been able to fund the non-FCM operations from the profits generated by its low risk matched book repurchase agreements.  For the new proprietary trading businesses conceived of by Defendant Corzine, however, this was insufficient.  Accordingly, when MFGI's proprietary trading (through the PSG or otherwise) resulted in greater liquidity demands, Operations in New York would request what they referred to colloquially as an intraday "loan" from Treasury.[14]  These requests increased and became more unpredictable during the summer of 2011 – and became completely out of control during MF Global's final week of operations – as the trading units repeatedly exceeded liquidity thresholds set by the Risk Department.

---

[14]  These intraday "loans" were not loans at all since they were simply temporary transfers within the same consolidated entity.  There were no repayment terms or interest, but simply an expectation that the funds would be returned each day.

130.    Notably, there were virtually no controls, formal or otherwise, in place over the approval of transfers.  There was no formal procedure for confirming regulatory compliance before issuing approval of a funding request by Treasury, and upon approval from Treasury, "formal" controls merely consisted of a system of varying levels of operational approvals required from mid and junior-level employees in Treasury Operations, without any evaluation of the legality or propriety of transfers.  Nor was any central system for inputting, reporting or recording intra-company transfers utilized.  Requests from the Broker-Dealer for funding were made via email, and Treasury would direct funding for the "loan" from the Customer Accounts on the assumption that the Broker-Dealer would repay the FCM by the end of the day.  Put another way, despite the fact that MFGI operated in a world of virtually instantaneous electronic transactions, intercompany transfers were principally tracked, if at all, by recording manually on spreadsheets and journal entries input into the back office or Treasury systems, neither of which occurred consistently.  As discussed below, no later than October 26, 2011, the Broker-Dealer was unable to repay the "loans" in full.

131.    In addition to approving Company-wide funding requests, Treasury was also responsible for monitoring and reporting on MFGI's liquidity.  Treasury, with help from employees in Operations in New York, also compiled a daily report known internally as "Liquidity Dashboards."  The Liquidity Dashboards attempted to estimate the actual and projected sources and uses of cash each day, and calculated "B/D Liquidity," which, during the month of October, and for some time before, was uniformly negative prior to the application of funding from other sources.  However, both the Treasury and Operations personnel who prepared the Liquidity Dashboards and the D&O Defendants who received the dashboards knew they were imprecise and inaccurate estimates, based on incomplete information.

132.   Senior management, including most of the D&O Defendants, received the Liquidity Dashboards in one form or another, but the reports were inexact and did not always tie or agree to what purported to be underlying support.  Indeed, such ad-hoc reports were needed because of a lack of formalized or systematic reporting or tracking – "regional groups" provided some of the information via email but other information Treasury had to "guess at" other information.

133.   Following Defendant O'Brien's approval of transfers, Treasury Operations would execute the actual transfers.  Treasury Operations, located in Chicago, was primarily responsible for performing daily bank reconciliations and executing wire transfers and other money movements at the direction of Treasury.  However, Treasury Operations was not responsible for evaluating the legality or propriety of transfers directed by Treasury.  Additionally, Treasury Operations prepared daily recommendations of reallocation of excess funds between Customer Segregated and Foreign Secured Accounts.  The recommendations were sent to the Financial Regulatory Group (discussed below) in an effort to keep the targeted cushion of excess funds in the Customer Segregated Accounts.

134.   The Financial Regulatory Group, which prepared the regulatory filings, reported to Defendant Serwinski who was responsible for monitoring the regulatory balances.  The Financial Regulatory Group was responsible for: (i) preparation of regulatory reports, including the daily statement demonstrating that assets on deposit in Customer Segregated Accounts were in compliance with CFTC Regulation 4d (the "Segregation Statement") and the daily statement demonstrating that assets on deposit in Foreign Secured Accounts were in compliance with CFTC Regulation 1.20 (the "Secured Statement"); (ii) computation of daily compliance with net capital requirements pursuant to CFTC Rule 1.17 (the "Estimated Daily Net Capital Report");

56

and (iii) weekly and end-of-month reports regarding compliance with SEC segregation requirements pursuant to SEC Rule 15c3-3 (the "15c3-3 Report").

135.    Notably, however, it does not appear there was any control in place to ensure that Treasury or Treasury Operations – or Defendant O'Brien herself – reviewed or consulted the statements and reports regarding, among other things, segregated accounts, compiled by the Financial Regulatory Group before hastily approving funding and transfer requests.

### C.    The D&O Defendants Received Internal Reports Reflecting Control Deficiencies

136.    Beyond the internal emails that reflect control problems over fund transfers, the D&O Defendants were aware from internal reports of the insufficient and inadequate controls and record-keeping at Treasury and Treasury Operations that ultimately allowed the shortfall of Customer Funds for at least a year prior to the collapse.  For example, on October 18, 2010, Internal Audit circulated an "INTERNAL AUDIT REPORT" concerning "US Treasury Investments and Treasury Operations" to, among others, Defendants Corzine, Abelow, Dunne, Ferber and PwC.  Among other things, the report concluded that the "[w]hile overall control environment *is adequate* to manage associated risks, Treasury Investments and Treasury Operations *could benefit from more formalized procedures* to minimize the risks in the day to day processing of client payments."  The report also concluded that risks associated with "Execution Delivery and Process Management" were "Above Risk Appetite," and identified issues such as the "[l]ack of formal authorization requirements for check and wire requests" and a "Control Failure" with respect to back-office access to the system utilized to perform financial transactions.  The report assigned personnel to "action plans" with respect to the items identified in the report, but there is no evidence any meaningful changes were implemented.

57

137.    Similarly, in May 2011, Internal Audit issued an INTERNAL AUDIT REPORT"
dated March 31, 2011 concerning "US Financial Regulatory Reporting" ─ the group that bore
the critical responsibility for ensuring MFGI accurately tracked and reported Customer
Segregated and Secured Accounts.  The report, which was distributed to, among others,
Defendants Corzine, Abelow, Ferber, Steenkamp, Serwinski and PwC, concluded that MFGI's
process lacked controls and was susceptible to human error due to a number of "Control Gaps"
and "Control Design" defects.  Defendant Steenkamp was the "global issue owner" charged with
responsibility for the problems identified in the report, and Defendant Serwinski was assigned
responsibility for resolving several high risk issues, including assuring that regulatory inputs
were accurate and complete.  Once again, meaningful steps were not taken in response to the
report.

138.    On June 20, 2011, Internal Audit at MFG Holdings issued an internal report
entitled the "Global Liquidity and Capital Management Internal Audit Report" to, among others,
Defendants Corzine, Abelow, Steenkamp. Ferber, Dunne and PwC.  Like the other reports, the
June 20 report sounded similar alarms regarding the inadequacies of MFGI's internal controls.
Troublingly, the report found the existence of "numerous significant gaps between the policy and
existing practices" regarding management of capital-at-risk and liquidity-at-risk.  Notably, the
report acknowledged that the Risk department "previously identified and escalated these gaps
and remediation plans to the Board of Directors in May, 2010," and "prioritized the revision of
the existing methodology and requisite processes."  However, more than a year after these
deficiencies were discovered the "work [was] not yet underway," and there is no indication
remedial controls were ever completed.

139.    The report also noted the limits of the Firm's liquidity monitoring and forecasting capabilities, including the ability accurately to gauge liquidity between the time transactions were booked and settled:

> Existing liquidity monitoring and forecasting is manual and limited.  Reporting capabilities to evaluate liquidity needs for transactions that are booked but not yet settled have not been fully developed.

140.    In addition, instead of an organized framework, the report revealed that the Firm was relying on imprecise "ad hoc tools" by its Treasury professionals to manage liquidity despite the fact that "[t]he complexity of capital and liquidity demands have increased with the addition of principal trading" and other new businesses.  However, more than a year after these deficiencies were detected, there was no indication that remedial controls were implemented, especially to protect Customer Funds.

**D.    MFGI Aggressively Accessed Customer Funds in 2009**

141.    Spurred on by a constant thirst for liquidity that would be exacerbated upon Defendant Corzine's arrival, MFGI and certain of the D&O Defendants had a history of aggressive exploitation of customer segregated funds as a source of liquidity stretching back to 2007.

142.    In late 2007, MFGI's newly appointed Treasurer raised the prospect of swapping surplus T-Bills held at MFGI with 30.7 Funds held in secured accounts at MFGUK – the T-Bill Swap Program – to allow MFGI to invest those funds or utilize them as a source of liquidity.  At the time, there was discussion about whether collateral received the same segregated treatment as cash under the Financial Service Authority ("FSA") rules in the U.K.  MFGI and MFGUK consulted outside counsel, who opined against the plan due to concerns about sub-optimal protection of customer funds.  Nevertheless, from the end of 2007 through the beginning of

2009, personnel at MFGI and MFGUK—including Defendant Dunne—continued to explore potential steps for implementing the T-Bill Swap Program.

143.     Beginning in September 2008, Defendant Steenkamp attended meetings of the CIC, during which the committee discussed liquidity concerns and the T-Bill Swap Program. Presciently, at approximately the same time, Dennis Klejna, an assistant general counsel at MFGI who would ultimately report to Defendant Ferber upon her employment in June 2009, was preparing an internal script concerning the segregation requirements of the CEA and CFTC regulations for brokers and the sales desks to use to assure customers their property was safe.

144.     During the fall of 2008 and early spring of 2009, Defendant Dunne and Mr. Klejna actively participated in efforts along with MFGI's Treasurer to implement the T-Bill Swap Program, including again seeking the advice of outside counsel who concluded that the program was not compatible with 30.7's requirement to obtain the best available protection for customer assets.  Defendant O'Brien was included on a number of emails discussing the program, outside counsel's conclusions, the transfer of property between segregated and non-segregated accounts, and the list of UK accounts included in the program.

145.     The first swap of T-Bills for customer cash held in the UK occurred on or about March 4, 2009, when MFGI Treasury sent $200 million in T-Bills to London in exchange for $200 million in customer cash.  As set forth in Part X below, the T-Bill Swap Program has been an impediment to the return of approximately $700 million in Customer Funds currently subject to liquidation proceedings of MFGUK.

> **E.     Defendant Corzine Assumes Control of MF Global: The Failed Attempt to Transform MF Global From a Futures Brokerage to an Investment Bank**

146.     When Defendant Corzine assumed control of MFG Holdings and MFGI in March 2010, the companies' main businesses consisted of executing commodities and securities

transactions for clients of the FCM and Broker-Dealer, respectively.  During the last few years, however, MFGI's business was imperiled due, in part, to persistent near zero-percent interest rates and thin commissions. The Company was unprofitable and its operations outmoded.

147.     The execution of trades on behalf of commodities customers such as Plaintiffs and the Class, traditionally MFGI's primary business, was not the primary means by which it generated profits. Rather, the Company's profits (or potential profits) traditionally derived largely from modest interest income it derived from investing the vast sums of money that flowed through the Company's segregated accounts from customer deposits for margin calls in regulatory compliant investments, and other requirements associated with the trades by customers such as Plaintiffs.  Under certain conditions, such segregated funds could be and were invested by MFGI in discrete assets and the income on such investments – e.g., interest – was retained by the Company.  Because the majority of customer funds that flowed through MFGI were associated with commodities accounts, the Company was required to invest such funds in a narrow and defined class of ultra-safe instruments, such as Treasury Bills issued and backed by the United States Treasury.

148.     Traditionally, the risk of default associated with such investments is so low that they are commonly referred to as "cash-equivalents."  The security offered by such investments is at the expense of returns.  For example, Treasury Bills pay relatively low interest rates because they carry little risk; however, MFGI had safely used customer funds to generate profits. Beginning in 2009, interest rates on Treasury Bills and the other "cash-equivalent" investments in which MFGI was permitted to invest commodity customer funds had been persistently near zero.  Thus, as interest rates declined sharply in recent years, so did MFGI's net interest income, from $1.8 billion in its fiscal 2007 second quarter to just $113 million four years later.

149.     As a publicly-traded company, MFG Holdings continued to struggle to achieve profitability.  When Defendant Corzine was appointed Chairman and President, MFGI had reported net losses for each of the past three fiscal years – and would do so each quarter thereafter until it was placed into liquidation in October 2011.  Six days before it filed for bankruptcy, MFG Holdings reported its largest quarterly loss ever, $186.6 million in the third quarter of 2011 alone.

150.     In an attempt to make MF Global into a profitable enterprise, shortly after Defendant Corzine joined MF Global, he announced his strategy to transform MFGI from a Company deriving profits from its FCM and Broker Dealer units into a full-service investment bank.  The transformation included bringing in groups of traders and retooling internal practices to focus on specific areas, including institutional capital markets, retail services, transaction services, and asset management, while reducing MF Global's overall workforce by 10% to 14%.  Unlike the Company's existing proprietary trading, each of these groups required substantially larger daily liquidity to fund settlements.

151.     The PSG was created as a central feature of the attempted transition.  The PSG team included six senior traders, three junior traders and a trading assistant.  PSG relied on the existing middle and back office support staff for account setup and management processes, as well as the clearing and settlement processes.  Within PSG, Defendant Corzine maintained his own portfolio for the Company in an account that bore his initials (JSC) and consisted of proprietary trades that he himself executed or instructed others to execute on his behalf.

152.     The fact that Defendant Corzine's strategic plan to generate profits would expose MFGI to increased risk and potential liquidity problems was well known to the Defendants, including CME.  In its Form 10-K filed with the SEC on May 20, 2011, MFG Holdings

62

acknowledged that its transformation plan was intended to increase the Company's profitability, but would increase the firm's risk profile. MFG Holdings stated that "exposure to market, credit and operational risk will increase as [the firm] expand[s its] principal trading activities relating to client facilitation, market-making and proprietary activities. Among other things, these developments may lead to greater uncertainty and volatility in [the firm's] results of operations and require [it] to increase [its] capital."

153.    Despite his plan and the associated risks, Defendant Corzine and MFGI could not wait years to achieve profitability. Unable to make MF Global profitable through more traditional and less risky means in a time frame that would appease credit rating agencies and shareholders, Defendant Corzine exposed MF Global to greater risk.

154.    For example, on May 20, 2011, MF Global disclosed in its 2011 Form 10-K that it had purchased high-yielding European sovereign debt. These purchases of European sovereign debt took the form of RTMs, which allowed MFG Holdings to book the profits on the European bond trades up front and keep its purchase of the European bonds, as well as the loans it used to buy them, off of the Company's balance sheet. One MFG executive was quoted as saying that Defendant Corzine viewed the European bet as "a way to answer the…demands [of MF Global's credit rating agencies] while buying time to transform the business."

155.    Defendant Corzine's European bond trades had the intended effect – initially. In the second half of 2010, MF Global realized approximately $39 million in revenue as a result of the trade. That revenue helped to reduce MF Global's 2010 net loss – temporarily alleviating the pressures placed on MF Global by its credit rating agencies and investors.

### 1.      Risk Management and MF Global's New Direction

156.     The Risk Department struggled to keep up with MFG Holdings' strategic changes.  By the Spring of 2010, the changes in MFG Holdings' business had progressed ahead of the risk policies and practices in place, and gaps became apparent and were identified to the Board.  In a presentation to the Board of MFG Holdings in April 2010, dozens of gaps in policies, procedures, and technology were identified in the various risk areas.  Among the key gaps discussed were the need to have a Global Head of Capital and Liquidity Risk and to establish policies in this area. This report also recognized that gaps in technology made the data needed for forecasting liquidity risks inadequate and unreliable.  A follow-up report to the MFG Holdings Board in October 2010 continued to reflect many critical or high risk gaps in risk policies.

157.     Similar concerns surfaced in internal audit reviews.  A Corporate Governance internal audit issued in May 2010 identified MF Global's risk policies as not congruent with the changes to its broker-dealer business.  Among the specific gaps identified by Internal Audit was liquidity risk reporting.  Similarly, an Internal Audit report on Market and Credit Risk Management in October 2010 identified "High Risk" areas arising from the lack of controls over risk reporting.  The report also reiterated that market risk policies had not been updated to reflect the current operating environment.  The report attributed the failures to remediate gaps to staffing and budget constraints.  Thereafter, during 2011, Internal Audit expressed concern that the absence of reliable liquidity reporting tools and dependence on Defendant O'Brien's comprehensive knowledge of liquidity issues might represent a "key man risk," because the processes supporting the composition of the liquidity forecast were not documented and were mainly based on Defendant O'Brien's expertise and experience.

158.    Other reports by Internal Audit also highlighted problems in other areas relevant to MF Global's demise.  This included an internal audit of U.S. Financial Regulatory Reporting that was conducted beginning in the Fall of 2010.  Internal Audit had not conducted any prior audits of this function.  This audit did not include review of MFGI's segregation computation or secured account records.  The U.S. Financial Regulatory Reporting audit also excluded the Rule 15c3-3 reserve requirements from its scope, based on CBOE annual reviews of this area that did not report any significant issues.  In the absence of any issues identified by the regulators, Internal Audit excluded these areas from the audit.

159.    Even with this limited scope, some of the findings suggested problems in MFG Holdings' regulatory reporting.  The Internal Audit final report dated March 31, 2011 (and issued in May 2011) concluded:

> The Regulatory Reporting group handles numerous daily, weekly and monthly reporting responsibilities.  The vast majority of the calculations underlying these reports are done via spreadsheet. The group performs various checks and balances to ensure the information utilized is complete and accurate; however, in a variety of instances, the controls are not in place or not all aspects of these controls are documented as evidence that they have been performed. Additionally, these spreadsheets are typically not secure and are susceptible to human error, although at 9/30/10 no material errors were noted.

Internal Audit designated regulatory reporting inputs as an area for regular monitoring by management, but this issue was still unresolved at the time MFGI filed for bankruptcy protection.

160.    By the late fall of 2010, the Audit and Risk Committee was discussing changes to MF Global's risk policies and risk limits to take into account the changes in the business since Defendant Corzine's arrival.  Risk and Treasury personnel worked on proposing changes to the key risk policy documents for Board consideration.  As early as May 2010, the Chief Risk Officer at the time, Michael Roseman, began expressing concerns regarding liquidity risk of the

65

RTM portfolio.  In January 2011, MF Global replaced Roseman after he repeatedly clashed with Defendant Corzine over the Company's purchases of European sovereign debt.  Michael Stockman was hired and Mr. Roseman was subsequently advised that he was being replaced. When he started, Mr. Stockman understood that MFG Holdings was "in the process of transitioning its business model from a traditional commodities broker to a full-scale investment bank, and that the company was seeking a new Chief Risk Officer with the experience and skill-set to assist in that transition."

**2.    Defendant Corzine Eliminates Risk Oversight In Order to Implement His Strategy**

161.    Defendant Corzine's increased risk taking was not without controversy at MF Global.  For example, Munir Javeri, a former Soros Fund Management official hired in early 2011 to serve as Defendant Corzine's global head of trading, quickly grew concerned that the European Sovereign debt trades had become too important to MF Global's overall results. Despite his role as the Company's global head of trading, a trader who reported to Mr. Javeri was called upon by Defendant Corzine to execute many of the European debt trades and Mr. Javeri had little influence over the trades.  Mr. Javeri soon left MF Global.

162.    Defendant Corzine was very hands-on with respect to the sovereign debt trades. He communicated with MFGI and foreign affiliate MFGUK personnel directly regarding the trades, instructing them when to enter and exit various positions. The MFGUK traders booked the trades on the MFGI proprietary trading desk, although the MFGI traders and operations personnel typically did not learn about the trades until they appeared on MFGI's books the following day.

163.    When Defendant Corzine first indicated that he wanted to place the trades himself, there was concern at MFG Holdings about whether such trading was in compliance with

66

FINRA rules and other regulations requiring supervision of trades by senior officers.  Under the Company's Securities Compliance and Supervisory Procedures Manual, an officer could only trade if there was a more senior officer who could review and approve the trade.  Because Defendant Corzine was the CEO, there was no officer senior to him.  A compromise was reached pursuant to which, among other things, a subcommittee of the Board reviewed both the trades by Defendant Corzine himself and those he placed through others.

164.    In addition to concerns expressed by MF Global's former Chief Risk Officer, a senior risk officer at MF Global also questioned Defendant Corzine's European debt trades. Prior to his removal, Mr. Roseman and the senior risk officer requested that Defendant Corzine seek approval of the Board of Directors before expanding the trades.

165.    In August 2011, some of Directors of MFG Holdings questioned Defendant Corzine, asking him to reduce the size of the overall European debt position.  Defendant Corzine assured them they had little to fear. "If you want a smaller or different position, maybe you don't have the right guy here," he reportedly told them, according to a person familiar with the matter. Defendant Corzine also reportedly told one senior board member that he would "be willing to step down" if the Board of MFG Holdings "had lost confidence in [him]." MF Holdings Board relented.

166.    Meanwhile, the European trade initiated by Defendant Corzine late in the summer of 2010, grew from $1.5 billion to $6.3 billion.

167.    According to Defendant Corzine's December 8, 2011 testimony before the U.S. House Agriculture Committee, he and the board of directors, senior managers and traders of MF Global — which includes the other D&O Defendants, individually and collectively — decided and agreed that MF Global should enter, on a highly leveraged basis (according to Defendant

Corzine's Congressional testimony), into risky transactions. These included off-balance sheet transactions in derivatives sometimes known as total-return swap-to-maturity and/or repo-to-maturity transactions in Euro-denominated bonds of distressed European countries. The decision and agreement implemented a business plan pursuant to which certain of the D&O Defendants had agreed to transform MF Global from an FCM and Broker-Dealer into an investment bank, which would provide broker, dealer, underwriting, advisory and investment management services.

168.    These risky transactions included international transactions whereby MFGI "bought," approximately $11 billion or more of Euro-denominated bonds of European countries in economic distress to be "repurchased" by counterparties at maturity, upon information and belief around December 2012. The transactions were discussed among certain of the D&O Defendants and with senior traders of MFGI and approved by certain of the D&O Defendants.

169.    The D&O Defendants had a plan and purpose – which included generating revenues through highly leveraged transactions that exceeded MF Global's resources to carry them – to be continued into the future to contrast its' prior years of declining earnings (declining since 2007). The plan would last at least from some time prior to August 2011 through at least December 2012, and would continue and be renewed as long as possible so as to generate continuing, significant reportable earnings for MF Global.

170.    MFGI lacked the capacity to carry the transactions with its own resources. For example, as explained in a November 10, 2011 Thomson Reuters article, "MF Global Slayed By the Grim Repo," the enormous leverage used by MF Global created a risk exposure that exceeded many times over the asset base of MF Global, including transaction costs for carrying transactions with such high leverage:  Defendants knew this.  For example, Defendant Corzine

and the other members of the Directors of MFG Holdings were even warned from about September 2010 and thereafter that MF Global lacked the necessary cash.  They discussed this at the highest levels of the company, including with their chief risk officer, according to a December 6, 2011 report in *The Wall Street Journal*.

171.    The firm's new risk officer, Mr. Stockman, took over the European debt position in early 2011 with one significant difference: unlike his predecessor, he was not allowed to weigh in on the broader implications the trades might have on the firm, including whether they might undermine investor confidence.

172.    In fact, Defendant Corzine, speaking at the Sandler O'Neill Financial Services Conference in June 2011, told the audience, "I consider one of my most important jobs to be chief risk officer of our firm." Nonetheless, in Defendant Corzine's tenure at MF Global a long-planned new risk management system, reportedly a much-needed overhaul, never materialized.

173.    Following the collapse of MF Global, Defendant Corzine acknowledged under oath that "As the chief executive officer of MF Global, I ultimately had overall responsibility for the firm." As the CEO, Defendant Corzine acknowledged that it was his responsibility to make sure that measures were in place to prevent the commingling of funds: "The buck stops here on that score," Corzine testified.

174.    In a section entitled, "Risk Management," Defendants Corzine and Steenkamp represented and acknowledged in MF Global's Form 10-K dated May 20, 2011, signed by them:

> We believe that effective risk management is critical to the success of our business and is the responsibility of all of our employees. All of our employees are risk managers. Employees are expected and encouraged to escalate incidents and any matters of concern to management and to our compliance and risk departments in order to effectively manage risk. Consequently, we have established—and continue to evolve and improve—a global enterprise wide risk management framework that is intended to manage all aspects of our risks. The risk-management framework is designed to establish a global, robust risk-

69

management environment through a strong governance structure that (i) defines roles and responsibilities, (ii) delegates authority for risk control and risk taking to specific businesses and risk managers, and (iii) documents approved methodologies for the identification, measurement, control and mitigation of risk.

We seek to identify, assess, measure, monitor and limit market, credit and operational risks across our businesses. Business areas, pursuant to delegated authority, have primary responsibility for risk management by balancing our ability to profit from our revenue-generating activities with our exposure to potential losses. Working with the business areas, the Risk department serves as an advisor and facilitates operation within established risk tolerances while seeking to provide acceptable risk-adjusted returns in a controlled manner. Risk-department teams also regularly communicate with our regional officers and to local decision-making bodies to allow us to react rapidly to address any developing risks.

Our Chief Risk Officer [Stockman], who reports to our President and Chief Operating Officer [Abelow], leads the risk department and monitors and reports on our risk matters, including regular reports to our Board of Directors [including Corzine] and Audit and Risk Committee. The Chief Risk Officer promotes company-wide adherence to MF Global's enterprise risk management framework and has global responsibility for monitoring and facilitating control of market, credit and operational risks.

Senior management takes an active role in the risk management process and expects employees to understand and comply with their delegated risk responsibilities, relevant risk policies, and compliance requirements. Additionally, employees are expected and encouraged to escalate risk incidents and any matters of concern to management in accordance with our internal escalation policy to promote timely risk-mitigation action by the appropriate personnel.

Reports detail global risk exposures and escalate risks that exceed defined thresholds. Our risk reporting process is designed to enable us to assess the levels of risk present throughout our operating environment and to take any necessary remedial action in a timely manner. As part of this reporting process, risk reports detailing global risk exposures and escalating risks that exceed defined thresholds are regularly generated.

175.    As further represented and acknowledged in MF Global's Schedule 14A Proxy

Statement, dated July 7, 2011, under a section entitled "Board Role in Risk Oversight":

The Board has responsibility for providing direction and oversight for management of the Company's business and affairs, establishing the Company's long-term objectives and strategy while overseeing the Company's business performance and management, including risk management. The Company's

enterprise risk management approach flows from the Board, which determines the Company's risk appetite, and permeates through the Company via a culture that expects all employees to function as risk managers. This approach involves a strong governance structure that clearly defines responsibilities, delegated authorities for risk control as well as risk-taking and documented policies designed to identify, measure, control and mitigate risk.

The Company's risk appetite, as defined by the Board, recognizes the need for purposeful and appropriate risk-taking in the Company's efforts to execute its strategy and subsequently achieve its objectives. The risk appetite translates to defined risk tolerances and, subsequently, delegations of authority and concomitant controls designed to ensure Company operation within those risk tolerances.

While the Audit and Risk Committee maintains primary risk management oversight, the full Board has retained responsibility for general oversight and reviews full reports from the Chairman of the Audit and Risk Committee regarding the committee's considerations and actions. The full Board has responsibility for reviewing and approving the Company's enterprise risk management policy, based on a recommendation from the Audit and Risk Committee, and also receives regular reports directly from officers responsible for oversight of particular risks within the Company, including the Company's Chief Risk Officer. Audit and Risk Committee meeting agendas include review and discussion of quarterly reports prepared by the Chief Risk Officer, the Company's enterprise risk management framework and governance model, enterprise risk management policy and related processes, the enterprise risk management committee charter, and risk management resources and training programs. Senior management reviews and discusses the Company's risk issues at meetings of the enterprise risk management committee, which is chaired by the Chief Risk Officer.

176.    That Proxy Statement also made clear that each of the firm's employees,

including the D&O Defendants, were responsible for controlling risk:

The Company's risk management framework is an integral part of our control structure. Our risk management approach emphasizes compliance with our risk management policies and practices and each employee's responsibility to function as a risk manager. Moreover, a culture of compliance is emphasized top-down. Management has communicated to every employee the importance of upholding the firm's core values, including their individual obligation to demonstrate and support a strong compliance culture, and to be sensitive to reputational risk issues and act in accordance with the highest ethical standards.

### 3.    The Sovereign Debt RTM Portfolio

177.    In embarking on the mission to transform MFG Holdings into a full-service investment bank, Defendant Corzine was faced with the need to satisfy the rating agencies' calls for revenues, as well as the need to finance the new product groups.  To meet these needs, Defendant Corzine decided to turn, among other things, to trading in the sovereign debt issued by economically distressed European nations.  These trades were structured in the form of repos-to-maturity ("RTMs").[15]  The sovereign debt trades were expected to produce greater yields than U.S. Treasury Securities, and therefore greater profits on an immediate basis because of the RTM accounting treatment, described in greater detail *infra* at ¶¶ 211-213, 224, 225.  Use of the RTM mechanism had historically been a part of MFG Holdings' business, primarily at MFGI through U.S. Treasury and Agency bonds.

### a.    The RTM Strategy

178.    MFG Holdings' sovereign debt strategy involved taking advantage of the difference in the spread between the coupon payment from a European sovereign bond, and the rate at which the same bond could be loaned back out as collateral.  The strategy sought profits by targeting arbitrage opportunities based on fluctuations in the yield curve of the sovereign debt resulting from differences in market view about the risk of the countries' default, changing supply and demand of the securities, interest rate futures, and foreign exchange rates.  In simplest terms, the gain was to be derived from the difference between the original price at which MFGUK purchased the sovereign debt securities and the RTM price at which MFGUK sold the securities back to the LCH.Clearnet (previously known as the London Clearinghouse ("LCH")).

---

[15]  In an RTM, the resale date is the same as the maturity date of the underlying security.  Under MFG Holdings' accounting policy, the underlying sovereign debt securities were therefore "de-recognized" from the balance sheet, and the gain on sale was recorded as of the trade date.

179.     Margin calls on the portfolio from LCH went to MFGUK, which relayed the calls to MFGI.  Pursuant to an agreement between MFGI and MFGUK, in anticipation of a margin call from LCH, MFGUK could also demand advance margin funding from MFGI.  MFGI would transfer collateral, usually U.S. Treasury bills, to MFGUK to meet the margin calls; MFGUK, however, did not provide to MFGI any cash or collateral in exchange for the T-bills, so MFGI was "out-of-pocket" for several days until MFGUK returned the T-bills.

180.     MFGI's senior executives, including the D&O Defendants, failed to prepare for the margin demands that could arise should certain market events occur.  For example, when the portfolio was first established starting in June 2010, the initial margin and variation margin were not onerous and thus were not a deterrent to doing the trades.  But that situation changed, for example, in November 2010 when a 15% haircut was imposed on certain Irish bonds, as a result of which the LCH demanded more collateral from MFGUK, which in turn called for more collateral from MFGI.  Another large margin call came on September 28, 2011, when, in response to a margin call by LCH to MFGUK with respect to certain Irish and Portuguese bonds that were maturing, MFGUK requested $440 million from MFGI to cover the default risk in the two-day period before maturity.  MFGI met the call with a $440 million wire transfer to MFGUK the same day.

181.     As part of its oversight role, the Holdings Board placed limits on the RTM portfolio as a whole and individual limits as to positions in the long-term debt of particular countries; however, in order to circumvent these limits, MF Global may have used short term positions that were not subject to Board review.

### b.      Risk and Growth of the RTM Portfolio

182.     Within a few months, the RTM portfolio quickly grew, and on September 22,

2010, in response to Defendant Corzine's request, the Executive Committee of the Board of

Directors approved an increase in the limit to $4.0 billion.  Less than two months later,

Defendant Corzine requested and the Board approved another increase, to $4.75 billion.  The

Board also imposed limits on particular countries and restricted additional new purchases of Irish

and Portuguese debt to €200 million each.  No increases were approved at the December 2010

Board meeting, although the Board did consider stress testing, worst-case scenarios in the event

of a sovereign failure, risk profiles of certain sovereigns, and accounting treatment of RTMs.

183.     At the Audit and Risk Committee Meeting in mid-January, just after Mr.

Stockman was hired and Mr. Roseman was terminated, the Board confirmed that the European

sovereign debt portfolio would run down as planned with no additional positions placed unless

Defendant Corzine obtained further approval from the Board of Directors.

184.     The Board's limits were exceeded on February 3, 2011, and although the breach

was brought to Defendant Corzine's attention, it does not appear that the Board was informed.

In mid- February, Defendant Corzine had Mr. Stockman prepare a request to the Board to

increase the Global Sovereign Limit from $4.75 billion to $5 billion, which was the number that

risk personnel had convinced Defendant Corzine, when he pressed for an even larger increase,

was "big enough."  The request noted that the liquidity risk associated with the RTM portfolio

was both the impact of an increase of 100 to 500 basis points in the spreads and a commensurate

increase in funding requirements, as well as the fact that MFGI would have to fund both the

variation margin for these transactions and the increased haircuts required by the counterparties.

The total funding risk associated with the increased limit ranged from $347 million to as much as

74

$765 million.  Some members of the MFG Holdings' Board expressed concerns at this point about the level of European sovereign debt exposure and the consequences of increased haircuts resulting from restructurings, downgrades, liquidity events, counterparty issues, or collateral calls.  Mr. Stockman was warned that he would face "tremendous pressure" to approve higher risk limits to compensate for declining earnings in certain lines of MFG Holdings' business.

185.    In March 2011, Mr. Stockman supported Defendant Corzine's European sovereign debt limit increase request, involving an aggregate increase from $4.75 billion to $5.0 billion, as well as a temporary increase to $5.8 billion until March 31, 2011.  Mr. Stockman identified to the Board the market risks that, under certain scenarios of changes in yields and haircuts could produce funding needs of as much as $761 million.  The Board again approved the increases.  Settling for the $5 billion limit on sovereign debt RTMs, however, merely resulted in Defendant Corzine setting his sights elsewhere, such as seeking an increase in the risk appetite for US agency debt, to $10 billion, which would have its own issues and risks.

186.    By mid-March, the portfolio had grown to $5.219 billion, within the "temporary" limit increases.  With the temporary increase set to expire at the end of March, Defendant Corzine told Mr. Stockman to prepare a request to the Board to increase the limit to approximately $6 billion.  The Executive Committee of the Board approved the request to extend until September 2011 the "temporary" increase to $5.8 billion, at which time the limit was to revert to $5 billion, provided maturities were no later than December 2012.

187.    Within a month these limits were breached again, as shown in an April 27 sovereign debt portfolio report that Mr. Stockman provided to Defendant Corzine.  After conferring with Defendant Corzine, Mr. Stockman commented to others in the Risk Department, "Good news is he is now aware of gross limits, agrees with concept …." Several weeks later,

however, on June 5, Mr. Stockman prepared, at Defendant Corzine's direction, a request to the

Board to increase the limits from $5.8 billion to as much as $9.75 billion, adding Belgium to the

countries that comprised the global limit.  The next day, in response to a question from

Defendant Corzine, Henri Steenkamp explained the impact of a ratings downgrade below

investment grade on liquidity:

> There would be no impact on RTMs from a ratings downgrade, as the legal
> analysis of sale is independent of credit rating until maturity.  However, there
> could be an impact on the reverse RTM netting trades as these are to different
> maturities than the original RTMs.  The potential issue is whether some
> counterparties will choose not to roll over transactions or the trading counterparty
> can't trade with us due to our rating. If this were to happen, then MFG Inc. could
> lose its netting benefit on these reverses and thus be subject to higher margins,
> thereby increasing liquidity needs for the BD.

188.    At a meeting the same day, the Board approved Defendant Corzine's request in

part, increasing European sovereign debt limits to $6.6 billion, with increased sub-limits for

individual countries other than Portugal, the limit for which was to remain $1.3 billion.

## V.    THE LIQUIDITY CRISES AT MF GLOBAL ESCALATED DURING THE SUMMER OF 2011 WHILE VIRTUALLY NO CONTROLS WERE IN PLACE OVER CUSTOMER FUNDS

### A.    Senior Management Proposes To Use Excess Segregated Funds to Meet the Growing Liquidity Needs of MFGI

189.    As MFG Holdings predicted in its 2010 Form 10-K, by mid-summer 2011 MFG

Holdings' principal trading had caused an escalation of the Company's liquidity needs.  Indeed,

by July 2011, the increasing liquidity needs brought on by principal trading – compounded by

deficiencies in MFG Holdings' liquidity management – was causing a growing liquidity crisis at

the Company.  As a result, in July 2011, senior management proposed to use customer

segregated property to provide short-term liquidity in the form of overnight "loans" to fund MF

Global proprietary operations.

190.    Specifically, on or about July 19, 2011, Defendant Steenkamp requested that Defendant Serwinski review the cash flow trends in MFGI's Customer Accounts to determine whether $250.0 million in Customer Funds could regularly be "loaned" overnight from MFGI to fund operations in New York.

191.    MFGI's Firm Invested in Excess acted as a cushion to prevent shortfalls in customer funds from changing margin requirements caused by daily market movements. However, this cushion would be present only if the Company maintained a balance in the accounts above the level needed to satisfy obligations of customers on a net basis.

192.    Notably, according to a July 19, 2011 email from Defendant Serwinski, Defendant Steenkamp's proposal to use customer excess to fund operations on a short-term basis was not limited to Firm Invested in Excess amounts:

> It did not sound like they were just looking for the firm invested amount in excess but more such that the customers [sic] funds not required from a secured regulatory computation would be tapped into.

193.    Thus, according to Defendant Serwinski's July 19, 2011 email, beyond merely seeking inter-company "loans" from MFGI's Firm Invested in Excess, senior management was actually seeking to use any funds the Company referred to as "Regulatory Excess."

194.    At Defendant Steenkamp's request, Defendant Serwinski reviewed balances in the Customer Accounts since July 2010.  She learned that Regulatory Excess in the Customer Segregated Accounts ranged from $20.0 million to over $700.0 million in the prior year, and that the Regulatory Excess in the Foreign Secured Accounts using the Alternative Method ranged from approximately $340.0 million and $800.0 million.  However, when Regulatory Excess was calculated for the combined Customer Accounts using the more conservative Net Liquidation

Method it was much lower, ranging from a low of ***negative $98.0 million*** to a high of approximately $600.0 million.

195.    On July 20, 2011, in connection with her review of Customer Accounts "at the request of Henri [Steenkamp]", Defendant Serwinski emailed Defendant O'Brien and Matthew Hughey, head of MFG Holdings' Financial Regulatory Group, requesting comments on the materials Defendant Serwinski was providing to Defendant Steenkamp.  As a "sanity check," Mr. Hughey re-calculated the excess amounts over the past year and agreed with Defendant Serwinski's computations, while noting that in October and December of 2010, "there were five instances where the firm was funded by clients (*i.e.*, the excess contributed by the firm was negative)"—including the negative $98 million discussed above.  Notably, Mr. Hughey inquired whether "we have any idea what happened in October and December to cause there?  I would think Henri would ask that question."

**B.     By July 2011 Senior Management Was Already Requesting and Authorizing Transfers from Customer Funds**

196.    At virtually the same time Defendant Serwinski was conducting her analysis of the balances in the Customer Accounts, senior management was already "loaning" Customer Funds to MF Global.  For example, as discussed above, on July 26, 2011, Defendant O'Brien approved a $100 million overnight transfer at the request of Mr. Delucia to fund MF Global's proprietary operations.  Given the task she was performing at Defendant Steenkamp's request, Defendant Serwinski was understandably troubled by the size and timing of the transfer.  In an email to David Dunne, then the Global Treasurer of MF Global, and Matthew Besgen, Senior Vice President in Treasury, Defendant O'Brien reported that "Christine was not pleased about the late hour or the size [of the transfer].  The borrow is $100mm and the Seg excess is currently $127mm."

197.    In other words, by no later than July 26, 2011, Defendants O'Brien and
Serwinski, as well as senior management in Global Treasury, knew that MFGI was making loans
from Customer Segregated Accounts in an amount approaching the Firm Invested in Excess – as
well as that Defendant Serwinski was troubled by the transfers.  Indeed, Defendant Serwinski
asked Defendant O'Brien "What if I say no?  What if they needed $150mm and I only gave them
$100mm?"  Defendant O'Brien responded that, in that event, "Bob Lyons [in Operations] would
need to go to Brad saying they were . . . short and . . . Brad would have to address it with
Finance."

C.    **Defendant Serwinski Raised Concerns About Using Customer Funds Even
Overnight**

198.    Defendant Serwinski provided her analysis to Defendants Steenkamp and Dunne
and to Mr. Besgen on July 27, 2011.  Defendant Serwinski stated that she "under[stood] the
working capital situation the firm [was] facing" and that she was "not aware of any regulatory
rules prohibiting the proposal," but was clear that the use of client property for liquidity raised
concerns about the risk to such property:

> FCM client assets may be put at risk even if for overnight . . . Utilizing the FCM
> client asset [base] should not be a BD working capital source strategy to be relied
> upon. . . . [i]n the event of a financial crisis, are we guaranteed that we could draw
> down on the RCF to meet the firm liquidity needs and return the FCM client
> assets to meet any requirements in the seg/secured environment?"

199.    Based on Defendant Serwinski's analysis, Defendant Steenkamp commented that
they should consider only the low-end of the range of Regulatory Excess calculated by
Defendant Serwinski as available liquidity for operations:  "So . . . technically speaking, the low
of $433m is probably what we should max out as available client excess liquidity available [to
the Broker-Dealer]."  In response to Defendant Serwinski's request that Defendant Steenkamp
approve a consultation with Mr. Klejna and outside counsel, Defendant Steenkamp approved the

request but noted that "if this is a current issue, we probably have bigger issues – as you know from the capital/liquidity training I did about 3 weeks ago, we have always communicated to the street that excess client collateral is liquidity available for use to use.  I am doing so again tomorrow.  Ultimately, the amount identified by Defendant Steenkamp as the low end, $433 million, was actually much greater than both the low-end and average range of Firm Invested in Excess.

200.    Defendant Steenkamp's reaction to Defendant Serwinski's analysis caused her to prepare a written memorandum concerning the proposal.  Defendant Serwinski's July 28, 2011 memorandum presented a current instance where the secured requirement calculated under the Alternative Method was approximately $750 million less than the Net Liquidating Method, which Defendant Serwinski described as "more of a dollar for dollar deposit and owed."

201.    In her report, Defendant Serwinski questioned whether the proposal would cause MFGI "to violate any fiduciary obligations to the clients" and opined that "FCM client assets may be put at risk, even if only overnight."  Defendant Serwinski concluded that any "loans" from customer segregated property needed to be limited to the amount of Firm Invested in Excess (although as set forth below, no such limit was established or enforced).  In addition, while preparing the report, Defendant Serwinski concluded that FINRA's interpretation of Rule 15c3-3, the rule promulgated under the Exchange Act to protect securities customer funds, mandated that, if the balances deposited in the accounts of Securities Customers meant that the accounts were under-segregated using the Net Liquidation Method, the amount by which they were under-segregated would have to be included in the lock-up requirement of Rule 15c3-3, as calculated every Friday and at the end of each month.[16]

---

[16]  Rule 15c3-3e3 promulgated pursuant to the Exchange Act provides in relevant part:

202.     Following the July 28 Report, Defendant Steenkamp informed Defendant Serwinski on August 3, 2011 that he had "walked" Defendant Corzine through the regulatory requirements and they both understood the concept of the lock-up and agreed that the MFGI had to comply.  In other words, by no later than early August, Defendants Serwinski, Steenkamp and Corzine were at all times aware of and acknowledged the limits on uses of customer segregated property.

### D.     Defendant Corzine Was Warned Against Purchasing Additional Foreign Sovereign Debt Given The Company's Liquidity

203.     On July 30, 2011, Mr. Stockman sent Defendant Corzine, copying Defendant Abelow, an email in which he recommended that MFG Holdings "hold off buying more long RTMs until we get a better picture of ability to proactively manage IM's down and our capital raising efforts."  Mr. Stockman, referring to a previous discussion, summarized the reasons why he did not support buying more sovereigns.

204.     Mr. Stockman's email demonstrates, among other things, that MFG Holdings' liquidity problems were infecting every part of MFG Holdings and MFGI.  Notably, the liquidity situation was also exacerbated by the fact that July RTM revenues plummeted over $38.5 million, to $1.1 million, from over $39.6 million in June.

---

Computations necessary to determine the amount required to be deposited . . . shall be made weekly, as of the close of the last business day of the week . . .  provided, however, a broker or dealer which has aggregate indebtedness not exceeding 800 percent of net capital ( ) and which carries aggregate customer funds ( ), as computed at the last required computation pursuant to this section, not exceeding $1 million, may in the alternative make the computation monthly, as of the close of the last business day of the month, and, in such event, shall deposit not less than 105 percent of the amount so computed no later than 1 hour after the opening of banking business on the second following business day. If a broker or dealer, computing on a monthly basis, has, at the time of any required computation, aggregate indebtedness in excess of 800 percent of net capital, such broker or dealer shall thereafter compute weekly as aforesaid until four successive weekly computations are made, none of which were made at a time when his aggregate indebtedness exceeded 800 percent of his net capital.

E.      **Despite Defendant Serwinski's Report Concerning the Rule 15c3-3 "Lock Up" Requirements, Transfers From Customer Funds Continued Virtually Unabated**

205.     As set forth below, in spite of Defendant Serwinski's analysis and report to Defendant Steenkamp – as well as her overt concern about the transfers – and Defendant Steenkamp's conversations with Defendant Corzine concerning the lock-up requirements, transfers of Customer Funds to fund MF Global proprietary operations continued virtually unabated.

206.     For example, on August 5, 2011, $226.0 million was transferred from MFGI to a JPM Clearing account to fund proprietary operations and only $155.0 million was returned, leaving a deficit of $71.0 million.  The deficit was reduced to $53.0 million in October, but it was later increased again and never repaid.  Similarly, from August 1 to October 25, transfers of Customer Funds were also made to clearing accounts at Bank of New York Mellon ("BNYM") that remained unpaid for days.  On October 11, a $50 million transfer to BNYM which caused Firm Invested in Excess to be negative by more than $20 million on that day remained unpaid.

207.     During this time, MFGI also began to transfer Customer Funds to fund account withdrawals by Securities Customers.  During the week, the Margin Department in New York approved Securities Customer withdrawals and a list of wires was generated.  Treasury Operations would send wires to Securities Customers from the JPM Broker-Dealer Wire account.  If the account had insufficient funds, Treasury Operations would first transfer funds from the JPM Foreign Secured Trust Account – the account where regulatory excess was calculated using the more flexible Alterative Method.  After the Rule 15c3-3 calculation was performed each Tuesday and excess funds could be released, such funds were supposed to be transferred back to the JPM account.

82

208.    As is now abundantly clear, by late July 2011, the MF Global enterprise was relying heavily on the putatively segregated Customer Funds in the Customer Accounts to cover short-term liquidity shortfalls caused by the Company's new principal trading activities. Significantly, the repeated and frequent "loans" from Customer Funds in the Customer Accounts were being authorized and made at a time when senior management was aware the Company's liquidity management and monitoring was imprecise, "manual and limited" and depended on an imperfect "ad hoc" system.

### F.    FINRA and FSA Inquire About MG Global's RTM Exposure and Contemplate "A Default Risk Charge"

209.    On August 2, 2011, FINRA informed MFGI that it potentially needed to take a "default risk charge" on its sovereign RTMs.  A default risk charge is the requirement for banks to measure and hold capital against default risk that is incremental to any default risk captured in the bank's value at risk model.  Default risk charges respond to increasing amounts of exposure in banks' trading books to credit-risk related and often illiquid products.

210.    FINRA's notification to MFGI concerning the potential default risk charge was the result of months of discussions between FINRA and MFGI concerning its RTMs that began in February 2011 and escalated after MFGI's May 2011 FOCUS filing reflecting RTMs as of March 31, 2011.

211.    For example, MFGI and FINRA held a conference call in May 2011 during which MFGI explained its RTM transactions and the potential impact on profits and losses.  Following the call, MFGI notified FINRA that it was not taking a charge on its RTMs.  FINRA and MFGI communicated again later in May about MFGI's RTMs reflected in the FOCUS Report for April and, in Mid-June, MFGI met with FINRA and the SEC and walked them through the RTM transactions.  Moreover, following Moody's July 5, 2011 downgrade of Portugal's sovereign

debt to "junk" status, regulators contacted MFGI to inquire into, among other things, the Company's regulatory net capital levels.  MFGI gave assurances such levels were adequate.

212.    In the weeks following FINRA's August 2, 2011 notification to MFGI, MFGI and FINRA had several communications about the potential default risk charge and MFGI personnel discussed and prepared responses to FINRA.  For example, in early August FINRA asked MFGI to provide a "Proposed Default Risk Charge" as to the collateral supporting the RTM positions. FINRA's position was that, although sovereign RTMs were not specifically addressed within the FINRA rules, these positions were more closely analogized to long positions in sovereign debt, which are treated as nonconvertible debt (that have a charge), than they are to RTMs of U.S. Treasuries or Agencies (that do not have a charge).  In response to FINRA's request, Mike Bolan and Matt Hughey assembled and circulated for internal consideration five possible computations for the proposed charge, reflecting a range of possible amounts from $7.6 million to $98.2 million.

213.    On August 11, MFGI provided to FINRA a memo setting forth the Company's objection to a potential default risk charge, but, as requested, proposed a regulatory capital charge with respect to the sovereign debt RTM transactions of $55.8 million.  An additional $60 million was injected into MFGI, to increase the Company's excess capital to $135 million in anticipation that FINRA would assess a charge that would impact the August net capital requirement.  Internal discussions then began about transferring MFGI's RTM positions to FINCO, MFGUK, or a third party.  None of the transfer options were ideal, because each would involve posting additional capital, recognizing substantial immediate economic losses, or overcoming regulatory opposition.

84

214.     At the same time, in the United Kingdom, the FSA began to express heightened concern about the RTM positions and required MFGUK to provide a contingency plan for liquidity stress arising from the sovereign RTM portfolio.  Although in internal communications, MFG Holdings personnel acknowledged that, if MFGUK faced a $900 million margin call on sovereign RTM positions, "there is no way we could support" it, MFGUK represented to the FSA that it had "sufficient intraday liquidity" to be able to meet a stress liquidity need of $841 million without disrupting its business.[17]

### G.     Defendant Mahajan, New Global Treasurer, Immediately Recognized Problems With The Company's Treasury Functions

215.     On August 17, 2011, MFG Holdings announced that Vinay Mahajan had joined MFG Holdings effective immediately as its global treasurer, replacing Defendant Dunne who had served in that capacity since 2008.  According to the press release, Defendant Mahajan had recently served as Treasurer of Fortress Investment Group, and brought more than 20 years of treasury and capital markets experience to MFG Holdings following senior treasury and capital markets roles at Citigroup Inc., General Electric Capital Corporation, PepsiCo, Inc. and Atlantic Richfield Chemical Company.

216.     In addition, Defendant Steenkamp stated in the press release specifically that Defendant Mahajan had been hired to, among other things, shore up liquidity in light of MFG Holdings' new businesses (notably, principal trading):

> As we move forward on our strategic plan to transform our firm into a global investment bank, we remain focused on continuing to optimize our capital structure and enhance our liquidity profile.  Vinay brings considerable experience and expertise to this important role and will be instrumental in identifying and

---

[17]  By this time, the European sovereign RTM portfolio stood at $5.7 billion net and current margin funding was $550 million (up from$170 million in May 2011).

assessing corporate finance options to accelerate and support our strategic objectives.

217.    As global treasurer Defendant Mahajan was responsible for financing, capital structure, balance sheet, liquidity, investments, banking, and the overall responsibility for monitoring liquidity, which included regulatory compliance.  According to MFG Holdings' 2011 Form 10-K, the Company's treasury– headed by Defendant Mahajan – was responsible for all aspects of capital management:

> Because our treasury …[function]…involves the management of our capital, including investments made for cash and asset-liability management, we consider these investments to be principal transactions . . .  In connection with our treasury operations we may, at our discretion, take positions for asset-liability management, including yield enhancement and investments made in our held-to-maturity portfolio, and to hedge our exposure to changes in foreign currency exchange rates and interest rate risks arising from the global character and financial focus of our operations.

218.    Treasury was also responsible for ensuring that the investments and use of Customer Segregated and Foreign Secured Accounts complied with CFTC rules.

219.    Upon his appointment as global treasurer, Defendant Mahajan recognized very quickly that MFG Holdings' treasury procedures and controls were woefully inadequate.  As the June 20 Internal Report had concluded with respect to liquidity management, Defendant Mahajan concluded that the Treasury Department "needed lots of help" and infrastructure "needed a 180."  However, Defendant Mahajan reported that by the time he became global treasurer it was "too late" to fix the Treasury Department because at that point the focus was on "maximizing liquidity."

220.    In other words, by mid-August 2011, senior personnel were aware that MF Global's "liquidity monitoring and forecasting [was] manual and limited" in light of increased principal trading and that there were "significant gaps between the policy and existing practices."

Senior personnel were also aware that the treasury department, which was in charge of capital, asset-liability and liquidity management, "needed lots of help" and "needed a 180."

221.    In addition to ignoring obvious deficiencies in MF Global's liquidity and capital management infrastructure, senior management was in deliberate denial about the liquidity problems at the Company.  For example, in an email from Defendant O'Brien to a global treasury employee at MFG Holdings Hong Kong, she wrote incredulously that Defendant Steenkamp "says to me today . . . 'we have plenty of cash.'  I was rendered speechless – and wanted to say 'really, then why is it I need to spend hours every day shuffling cash and loans from entity to entity?'"  Defendant O'Brien called the process of shuffling cash between MFG Holdings entities a "shell game."

222.    Defendant Steenkamp and other members of senior management were willfully blind or disregarded MF Global's liquidity crises.  It was Defendant Steenkamp in particular who requested in July that Defendant Serwinski examine the possibility of regular $250.0 million "loans" from customer funds, and he and other senior management at MFG Holdings received the daily internal liquidity reports.

### H.    FINRA Informs MFGI Of Required Write-Downs Relating To RTMs

223.    On August 24, FINRA informed MFGI of its decision that, as of the close of business the next day, MFGI was required to take a full haircut, approximately $257 million, on all sovereign RTMs as "securities owned haircuts." MF Global continued to note its disagreement with what it perceived as FINRA's re-interpretation of the Net Capital Rule, but took immediate steps to further increase its excess net capital by $183 million, to $287 million (in preparation for the impact of the capital charge to its August 2011 FOCUS report), up from

$104 million as of July 31, 2011.  The net impact on MFGI was an increased capital requirement of $255 million.

224.    A few days later, FINRA notified MFGI that rather than applying the new capital charges only prospectively, MFGI was required to restate the July 2011 FOCUS Report to retrospectively reflect the modified capital treatment of the RTM transactions.  This retrospective application of the charge to the July FOCUS Report resulted in a regulatory net capital deficiency of $150.6 million as of July 31, 2011 (as compared to the previously-reported excess of $104.3 million).  In an amended Form 10-Q filed on September 1, 2011, MFG Holdings disclosed that the net capital infusion had been made.[18]

225.    After the FINRA net capital charge, other regulators and exchanges also increased their focus on MFG Holdings' financial condition:

- MFGI's disclosures were evaluated by certain exchanges, and in some instances resulted in additional requests for information;

- Excess margin for MFGI's house accounts at certain exchanges were no longer automatically returned or margin requirements were otherwise increased;

- DTCC imposed a margin premium of 25% for 90 days;

---

[18]   The Form10-Q/A stated: "As previously disclosed, the Company is required to maintain specific minimum levels of regulatory capital in its operating subsidiaries that conduct its futures and securities business, which levels its regulators monitor closely. The Company was recently informed by the Financial Industry Regulatory Authority, or FINRA, that its regulated U.S. operating subsidiary, MFG Holdings Inc., is required to modify its capital treatment of certain repurchase transactions to maturity collateralized with European sovereign debt and thus increase its required net capital pursuant to SEC Rule15c3-1. MFG Holdings Inc. has increased its net capital and currently has net capital sufficient to exceed both the required minimum level and FINRA's early-warning notification level.  The Company does not believe that the increase in net capital will have a material adverse impact on its business, liquidity or strategic plans. In addition, the Company expects that its regulatory capital requirements will continue to decrease as the portfolio of these investments matures, which currently has a weighted average maturity of April 2012 and a final maturity of December 2012."(MFG Holdings Form10-Q/A dated September 1, 2011.)

- FINRA limited MFGI's underwriting activities to "Best Efforts"-based transactions only, and instructed MFGI that it could not conduct any "Firm Commitment" underwritings until the perceived risk of the European sovereign debt securities collateralizing the RTMs was sufficiently reduced in FINRA's view;

- On September 9, 2011, an OCC representative asked MFGI to explain why it failed to provide to OCC an Early Warning Notice regarding FINRA's decision to increase its net capital requirement; and

- The NY Fed raised questions regarding FINRA's net capital decision, the RTM positions and MFGI's net capital requirement.

226.   On September 19, 2011, FINRA wrote to Defendant Corzine, in his capacity as President of MFGI, that "the overall risk undertaken by the Firm in maintaining the inventory levels in [RTM Sovereign Debt] would meet the criteria for subjecting [MFGI] to special surveillance."   As a result, FINRA notified the SEC, SIPC and other SROs and clearing organizations, and requested MFGI to provide certain financial information on a weekly basis.

227.   Meanwhile in the United Kingdom, on September 23, MFGUK again met with the FSA, which announced that it was "uncomfortable with [MFGUK's] liquidity position and uncomfortable with [its] intraday liquidity position."   A key topic of discussion was the possibility of an intraday margin call from the LCH, and what would happen if MFGI failed to fund MFGUK to meet the margin call.

228.   At the end of September, as certain of MFGI's positions in Portuguese and Irish debt were due to mature, LCH issued a margin call to MFGUK of over €400 million to cover the default risk over the weekend.   To cover the margin call, MFGUK looked to MFGI, which wired $440 million to MFGUK.   After the trades settled, LCH credited the additional margin back to MFGUK, which then returned the funds to MFGI the following week.

229.   As of September 30, 2011, MFGI's net long position had grown over the quarter by $1.23 billion to approximately $6.3 billion in short-term European sovereign debt, including

bonds from Belgium, Italy, Spain, Portugal and Ireland, and the amount of margin posted exceeded $400 million.  Some of these positions were acquired as late as the end of July — just prior to FINRA announcing the required net capital charge — and Defendant Corzine planned to continue taking on new positions into November 2011.  The cumulative P&L impact of the RTM trades from inception to bankruptcy was over $103 million.  On a quarterly basis, the P&L on the RTM trades amounted to as much as 16% of net revenues.

230.    The size of the RTM portfolio, in comparison to MF Global's size, was staggering. As set forth in an October 2011 memo to the Board of MFG Holdings, as of the end of September 2011, this RTM exposure was the equivalent of almost 14% of MFG Holdings' assets, and was more than four and a half times total equity.  Moreover, the memo to the Board revealed that the sovereign debt portfolio as a percentage of quarter-end equity or assets, was orders of magnitude greater than other, even far larger Wall Street banks.  Thus, as the Board and management were aware, MF Global's appetite for sovereign debt had taken the Company to a very precarious position.

231.    Risk personnel remained focused on the liquidity risks posed by the RTM portfolio, and during this period brought several risk scenarios to the attention of Mr. Stockman and other senior management.  One was the possibility that MF Global would be unable to roll margin-reducing reverse RTMs.  If a counterparty refused, MF Global could be faced with an 80% margin call from the LCH, which could amount to $602 million.  In another scenario, if MFG Holdings were downgraded below investment grade, that event would trigger a margin call as high as 200% under LCH rules and higher margin at other exchanges like Eurex. As a possible source of additional liquidity to meet LCH margin calls, the Risk Department identified the "FCM 30.7 Seg. Excess," and Treasury personnel reportedly agreed that part of this could be

moved to the UK, although "from UK Seg rules perspective," they were uncertain whether that would be permissible.  Very simply, however, the fact was that the sovereign RTM portfolio had grown beyond even MFG Holdings' moderate risk profile.

> I.    **Amidst All The Regulator Scrutiny, Senior Management Was Monitoring and Acutely Aware of Falling Liquidity and "Everyday" Reliance on Customer Excess As A Source To Fund MF Global's Proprietary Operations.**

232.    As the liquidity stresses at MF Global increased in the late-summer of 2011, senior management increasingly monitored the availability of customer "excess" funds as a source of liquidity to fund broker-dealer operations.  Indeed, as senior management became increasingly  reliant on customer funds to finance operations, Defendant Corzine specifically requested that Treasury provide him with daily updates concerning the customer "excess."  Also during the period, though used to fund operations and incremental debits customer "excess" funds gradually declined from their "normal" levels into negative territory.

233.    On Friday, August 26, 2011, Mr. Besgen informed certain members of the Financial Regulatory Group and Defendants Serwinski, O'Brien and Mahajan that he was "being asked on a daily basis to update Jon Corzine on the Daily Seg and Secured Excess and the drivers of the changes day over day."  He requested that when the Financial Regulatory Group circulated the daily Segregation Reports and Secured Reports, that the Group provide details regarding the increase or decrease of the amounts reported.  Mr. Hughey responded that the Financial Regulatory Group did not perform an analysis of "the drivers of either the Daily Segregated or the Daily Secured Computation."

234.    The following Thursday, September 1, 2011, Mr. Besgen emailed Defendant O'Brien to inquire about a $50 million decrease in the Firm Invested in Excess number down to $69 million at close of business Tuesday.  Mr. Besgen asked Defendant O'Brien for a

91

"preliminary snapshot" as to what the excess balance may be at the close of business on September 1 "so he could project what funds may be available to the BD if they needed to have funds transferred (over and above the funds from FINCO)."

235.    On September 16, 2011, excess customer segregated funds were again "lower than usual."  On that day, Defendant O'Brien emailed Mr. Cranston, a member of her staff in Chicago who was among the employees who approved transfers, in all capital letters stating "FCM LIQUIDITY – LOWER THAN USUAL 'SEG EXCESS' WHICH IS THE LIQUIDITY FIGURE $25MM VERSUS $70MM AVERAGE."  In other words, as of September 1, 2011, although $69 million in "excess" prompted an inquiry from Mr. Besgen, by September 16, $70 million was "average."

236.    At the same time "average" customer excess continued to fall, liquidity stresses at MFG Holdings and MFGI increased in October and senior management became even more reliant on customer excess to fund operations.  In this regard, on Thursday, October 6, 2011, Defendant Steenkamp emailed Defendant Corzine, copying Defendants Abelow and Mahajan and Mr. Besgen, concerning the fact that "there remain[ed] a significant stress on liquidity." Defendant Steenkamp expressed particular concern about "the sustained levels of stress and the lack of signs this will reduce soon."  Notably, Defendant Steenkamp concern focused on the fact the Broker Dealer was unable to fund itself and utilizing customer excess was troublingly moving from temporary to permanent:

> Jon. . . we need to address the sustained [liquidity] stress.  In summary, we have three pools of liquidity for Inc.  - (1) finco cash which is real and permanent, (2) FCM excess cash which is temporary and volatile, [and] depends on how customers post margin, and (3) the situation of our broker-dealer that is currently unable to fund itself, and more worrying continues to need more cash than we have [from] finco, ***thereby having us dip into FCM excess every day.  This should be temporary but is becoming permanent, and the FCM cash is not reliable***.  Why is the BD unable to fund itself? Part of it is the

92

permanent pool of liquidity needed for RTMs, but we also see continued haircut increases in fixed income, increased funding needed PSG and box size being permanently large.

237.    With regard to short term needs, Defendant Steenkamp stated that liquidity remained under $100 million with the expectation that it could continue to fall to below $50 million.  Defendant Steenkamp noted that Defendant Mahajan and Mr.  Besgen would present a menu of options early the following week on immediate steps management "can/must take."

238.    Mr. Besgen forwarded the email to the Head of European Treasury with the instruction "do not forward" revealing that he and Defendant Mahajan had engaged in "long conversations" with Defendants Corzine and Steenkamp on the liquidity issues.

239.    Thus, by not later than October 6, 2011, the D&O Defendants were aware that the liquidity stresses at MFG Holdings and MFGI throughout the Summer of 2011 had become critical and that the Company's broker dealer operations could not fund itself.  Moreover, management knew that such stresses would not alleviate in the short term, that dipping into customer excess funds "everyday" was becoming "permanent" and that management needed to explore other actions.

240.    In the short period from July 19, 2011 to October 6, 2011 use of FCM to fund operations had evolved from a potential possibility that senior management asked Defendant Serwinski to explore, to "everyday" and "permanent."  As is now known, the liquidity source available from funds held in Customer Accounts had become so vital to the continued survival of MF Global that management never acted to ensure that such customer funds were safe and segregated for the benefit of customers.

241.    In spite of Defendant Steenkamp's acknowledgement to Defendant Corzine and others that the Company needed to take other actions, a week later the liquidity stresses escalated.

242.    On October 14, 2011, at approximately 5:50 p.m., Mr. Besgen circulated the daily Liquidity Dashboard via email to, among others, Defendants Steenkamp, Abelow, Corzine, Mahajan and O'Brien.  The dashboard reflected the fact that the liquidity crisis had worsened, that all the customer "excess" was used to fund operations, including for the first time a so-called "buffer."  The Liquidity Dashboard listed broker-dealer liquidity at negative $318 million and FINCO available cash at $249 million, leaving a negative $69 million.  It also listed available customer excess at only $53 million.  The "buffer" appears to have consisted of a portion of the excess that was rejected as a liquidity source in late July 2011.  Accordingly, there was a liquidity deficiency of $16 million.

243.    The Liquidity Dashboard stated that it was the "First time the B/D has relied on the FCM buffer" to close the liquidity gap.  The Liquidity Dashboard further explained that the customer excess cash balance had fallen to $53 million and the previous excess had turned into a deficit of $16 million that required access to the cash from the "FCM buffer."  October 14, 2011 was the first instance a daily Liquidity Dashboard had mentioned the "buffer" putatively available as a source of liquidity.

244.    Later that day, further addressing liquidity stresses, Defendant Mahajan notified Defendant Steenkamp that "the B/D is leaning on FINCO and FCM's cash pool.  We now require $16mm of the FCM's buffer as well.  This leaves us with $24mm of liquidity -- and no buffer – for the U.S. going into the weekend."  This was shockingly little liquidity given that the

Company reported publicly that it had access to $1.5 billion in revolving credit facilities and approximately $1 billion in excess.

245.    MFGI's plunging liquidity finally prompted action by Defendant Corzine.  That day, Defendant Mahajan circulated an email to, among others, Defendants Steenkamp, O'Brien, Serwinski stating that "Jon wants to know details of the cash movements between yesterday and today."  On October 16, Defendant O'Brien responded, explaining that "[i]t is critical to note that FCM liquidity is driven from the Daily Segregation calculation not cash movements."

246.    Later that day, Defendant Mahajan suggested to Defendant O'Brien that they "should put [their] heads together to implement . . . process changes as relates to B/D and FCM cash management given that Jon C. [was] holding Treasury responsible for reporting daily cash balances, explaining day-over-day variances and forecasting T+1 cash balances."  Among these changes, Defendant Mahajan suggested a "daily B/D bank reconciliation process" and a "daily bank reconciliation from the FCM."  These and other procedures were designed to provide Defendant Corzine more information on daily cash balances and details of increases and decreases in client funds

### J.    Events During The Penultimate Week That Foretold MFGI's Collapse

#### 1.    The Market Focuses On FINRA's August Demand to MFGI

247.    On October 17, 2011, a number of articles appeared in the financial press concerning FINRA's demand in August that MFG Holdings "increase its required net capital." An article in *The Wall Street Journal* quoted an MFG Holdings statement that "[o]nce it was clear that FINRA was going to require a different capital treatment, we reallocated capital to the broker-dealer entity without delay."  According to the article, FINRA's demand underscored

regulators' growing concerns about the exposure of MFG Holdings and other financial firms to sovereign debt seen as vulnerable to restructuring or default.[19]

248.    MFG Holdings' common share price closed at a 52-week low.

### 2.    MFGI Management Knew It Had A Regulatory Excess Deficiency of Almost $70 Million

249.    Early in the afternoon of October 17, the same day as *The Wall Street Journal* article, Stacey Campbell of the Financial Regulatory Group circulated the internal Segregated Statement and Secured Statement as of October 14 to, among others, Defendants Mahajan and Serwinski and Mr. Besgen.  The segregated Statement showed a deficit of $68,411,341 in Firm Invested in Excess.

250.    In response to learning of the deficit, Defendant Serwinski emailed Defendant Steenkamp and Kemper Cagney, a senior financial executive based in London to whom she reported, informing them that because the applicable SEC rules required the 15c3-3 computation to be performed as of the close of business October 14, MFGI would need to include a lock-up of $70 million to cover the deficit.  In other words, MFGI would need to lock up $70 million of much needed liquidity to protect customers.  Ultimately, when the calculation was made, to meet the deficit New York Operations used the majority of a 10% cushion typically maintained in the Company's Rule 15c3-3 account and locked up only an additional $28 million.

251.    Late in the day on October 17, Defendant Mahajan emailed Global Head of Retail and MFGI Board member Randy MacDonald, copying Defendant Steenkamp, concerning the practice of using customer excess to close gaps.  Defendant Mahajan wrote that "Henri gets it. He has talked to both Jon and Brad telling them that we cannot rely on FCM cash to meet our

---

[19]  As discussed above, MFG Holdings disclosed FINRA's demand in an SEC filing on September 1, 2011, but the news initially garnered very little attention.

daily operational needs."  Defendant Mahajan also discussed options for generating cash from existing sources to combat immediate shortfalls.  Defendant Mahajan also stated that Defendant Abelow asked him to prepare a list of options "to generate a quick $100mm from existing cash uses" because if Defendant Serwinski "decides not [sic] do a 15c3-3 recalc, we would need a minimum of $70mm through next Monday."[20]

### 3.   MFGI Loses Counterparties, Thereby Removing Major Sources of Liquidity

252.   Late in the day on October 17, State Street Bank, which had been a major repo counterparty, advised MFG Holdings that – in light of the recent news – State Street's risk management department had decided to reduce its exposure to MFG Holdings in the repo market and would cease conducting significant business with MFGI.  Senior management was notified early the next day that this integral source of MFGI's daily funding – which was at least $800 million in daily loans – would be cut off.

253.   To make matters worse, two other counterparties announced that they were closing out another $270 million of agreements that had provided additional sources of liquidity.

### 4.   CME Group Issues a Warning Letter Reminding MF Global of Its Obligations to Adequately Segregate Customer Funds

254.   On October 17, 2011, CME Group sent a letter to Defendant Corzine, copying, among others, Defendants Ferber and Serwinski, reminding them of their obligations to segregate customer funds.

255.   The letter concerned CME's review of MFGI's August 4, 2011 audit report and MFGI's response to CME's initial inquiry letter on August 4 concerning potential violations of

---

[20] The following day, the Financial Regulatory Group did perform a special Rule 15c3-3 recalculation (rather than waiting to perform the calculation on the following Monday as of the close of business the prior Friday) which resulted in a decreased Rule 15c3-3 reserve requirement and allowed funds to be released from the account.

CME Rule 971.A, which requires, among other things, that all clearing members must be in compliance with CFTC segregation rules.  CME's August 4, 2011 letter had informed Defendants Corzine, Ferber and Serwinski that the Company had violated CFTC Regulation 1.25, including investing customer funds in "investments which were not readily marketable or highly liquid" and "which were not properly rated."  Remarkably, the letter informed senior management that CME Group's Clearing House Risk Committee nevertheless "decided not to charge the firm with a violation of CME Rule 971.A."  The letter also advised Defendants Corzine, Ferber and Serwinski that, while MFGI was not being charged, the Committee "directed that [MFGI] be warned in writing that future violations could result in disciplinary action."

### 5.    Defendant Mahajan Advised Defendant O'Brien Not To Borrow From FINCO To Repay Customer Funds

256.    Remarkably, even as they were discussing daily the need to halt the usage of customer excess to fund operations and CME was reminding them of their segregation obligations, senior management was in no hurry to ensure that deficits in customer funds were repaid in light of MF Global's liquidity problems.  For example, on October 18, 2011, Defendant O'Brien emailed Defendant Mahajan regarding the customer funds owed by the Broker-Dealer. Defendant O'Brien advised Defendant Mahajan that the Broker-Dealer had an outstanding "inter-co balance with the FCM in the amount of $66 million" and asked him to confirm that the Broker-Dealer "should repay these funds in full and borrow from the Finance Entity (utilizing the $125mm RCF Draw)."

257.    Rather than order that the funds in question be repaid, Defendant Mahajan responded that "to the extent it is not creating a regulatory or funding issue for the FCM, I would

leave the inter-company in place until we find a more permanent source of liquidity for the B/D."[21]

### 6.    Senior Management Meets With Moody's In An Attempt to Prevent a Downgrade

258.    On Friday, October 21, 2011, members of senior management – including, on information and belief, Defendants Steenkamp and Mahajan – met with Moody's in advance of Moody's consideration of a downgrade of MF Global.  The following day Defendant Steenkamp contacted Moody's to highlight certain aspects of the previous day's discussions.  Among other things, Defendant Steenkamp raised the possibility of a strategic business combination and, remarkably, reported that MFG Holdings' "[c]apital and liquidity have never been stronger."

## VI. EVENTS DURING MF GLOBAL'S FINAL WEEK OF OPERATIONS

### A.    Moody's Downgrade and MF Global's Disastrous Financial Results

259.    Despite Defendant Steenkamp's reassurances, on October 24, 2011, Moody's downgraded MFG Holdings' credit rating from Baa2 to Baa3 – just above a "junk" rating – and stated it was keeping the company on review for further downgrades.  Moody's reported that MFG Holdings was unable "to achieve the financial targets that Moody's had previously specified were required for it to maintain a Baa2 rating."  Moreover, an agency senior analyst stated that "MFG Holdings' increased exposure to European sovereign debt . . . and its need to inject capital into its broker-dealer subsidiary to rectify a regulatory capital shortfall highlights the firm's increased risk appetite and raises questions about the firm's risk governance."

---

[21]  This was evidently not an isolated incident.  According to the June 4, 2012, Report of the SIPA Trustee's Investigation and Recommendations, MFGI's combined assets in Customer Accounts exceeded the requirements under the Net Liquidating Method (as opposed to the Alternative Method) on only 13 of the 21 business days in October.  Thus, there were only thirteen days when there was a Firm Invested in Excess, which ranged from only $10.8 million to $132 million.  In other words, on at least eight days during the month of October, some customer funds were used for MFGI's liquidity purposes.

260.    The following day, October 25, 2011, MFG Holdings issued a press release on SEC Form 8-K announcing the Company's third-quarter 2011 results, from which investors learned the basis for Moody's downgrade.  The press release announced a GAAP net loss of $191.6 million, compared with a loss of $94.3 million for the same quarter in 2010.  Notably, the release also announced a write-down of "deferred tax assets of $119.4 million."  Later the same day, during an earnings call, Defendant Steenkamp also acknowledged "the reversal of deferred tax assets of $119 million."

261.    These deferred tax assets were previous operating losses carried forward and represented the money MFG Holdings anticipated it would save on future income taxes in the future, assuming it would be profitable.  Critically, the write-downs of those assets signaled that MFG Holdings did not expect to be profitable in the near future.  Defendant Steenkamp acknowledged as much when he stated that and that MFG Holdings would "not be recording additional deferred tax assets in [the U.S. and Japan] until we start consistently generating income within these jurisdictions."

262.    MFG Holdings' common share price fell almost 48% on October 25 to close at an all-time low of $1.86 per share.

**B.     MF Global Repeatedly Meets With its Regulators –Including CME – Concerning Its Precarious Position**

263.    On the same day that MFG Holdings issued its press release and held an earnings call announcing its losses and the deferred tax asset write-down (October 25, 2011), the CME Group informed MFGI that a MFGI customer had advised CME Clearing of rumors circulating about problems at MFGI relating to OTC activity.  Accordingly, CME indicated that it "wanted to discuss the events of the past two days and asked more specifically about a rumored OTC group that was causing the losses at MF Global."  Shortly thereafter, the CME spoke to

Defendant Ferber and another MF Global employee who told the CME that the rumors about problems at MF Global from OTC activity were not accurate.[22]  CME was "also concerned about liquidity particularly in the FCM and asked if we had a plan if we were further downgraded below investment grade."  MFGI told the CME that the Company was "prepared for such an event."  Later the same day, the Associate Director of Risk Management at CME Group requested a meeting with MFGI's Risk Management department on October 27.

264.    Also on October 25, 2011, the Associate Director of the Office of Risk Management & Control, Division of Trading and Markets for the SEC notified Defendants Steenkamp and Ferber that "3 or 4 regulators" were coming to MFGI in Chicago the next day, including one or two from the Division of Trading and Markets, and probably someone from the CME.  In addition, the SEC indicated it was told that the CBOE was already on site.

265.    On Wednesday October 26, the SEC advised MF Global's senior management that it wanted to meet the following day, and that the CFTC would also attend the meeting.  On Wednesday afternoon, Defendant Ferber sent an email concerning the meeting to, among others, Defendants Corzine, Steenkamp, O'Brien, Mahajan and Abelow indicating that the SEC wanted to get a better understanding of the Company's liquidity, funding, financial statement condition, and regulatory computations for customer segregated and secured funds.

266.    Later the same afternoon, October 26, MFGI's senior management held a call with FINRA and CBOE.  Defendants Ferber, Stockman, Mahajan and O'Brien were "Required Attendees" and Defendants Steenkamp and Serwinski were "Optional Attendees."  The purpose of the call was to discuss, among other things, "anything that may impact the funding of the

---

[22]  Defendant Ferber spoke with the CME again at approximately 1:30 p.m., informing the exchange that MFGI did not have any large losses attributable to OTC activity.

broker dealer," including the "$600 in sub-loans with [ ] affiliates," whether there has been a "run by customers," and "whether counterparties have lowered limits or left."

267.    They also considered developing talking points on MF Global's European sovereign debt exposure in preparation for the meeting with the SEC the following day:

> As far as issues -- the SEC clearly was focused on our exposure to European sovereigns Firm-wide and did not appear to be particularly impressed that we reduced our exposure in the [Broker-Dealer].  We may want to develop a few things to say about that specific issue in time for tomorrow's meeting with the SEC.

268.    Later in the evening on October 26, Defendants Ferber and Steenkamp participated in a call with the CME.  On information and belief, during that call Defendants Ferber and Steenkamp indicated to the CME that MFGI was actively engaged in conversations with customers in an attempt to preserve the business.  Later in the evening, the CME indicated to Defendant Ferber that it was interested in helping "to ensure a good outcome for MF and your customers.  You and your clients are important to us, and ***the clients' continued protection is paramount***."

269.    The next day, Thursday, October 27, 2011, members of CME's Risk and Audit Departments met with, among others, Defendant Steenkamp and Mr. Stockman, concerning MFGI's liquidity due to CME's concerns that liquidity was drying up.  Upon information and belief, following the meeting the CME continued to have concerns about MFGI's ability to continue normal operations without the sale of all or part of its business, in spite of MFGI's assurances otherwise.  Shortly thereafter, the CME decided to send members of its Audit Department to MFGI in Chicago to review the Segregation and Secured Statements as of the close of business on October 26, 2011.  At the time, the CFTC was also present at MFGI and,

upon CME's arrival, personnel dispatched from the CME's Audit Department and the CFTC requested all documents supporting the Segregation and Secured Statements.

270.    Also on October 27, in the early afternoon, MFGI's senior management met with the SEC and CFTC as requested by the SEC on the previous day to discuss, among other things, MFGI's liquidity and regulatory segregation computations.  At virtually the same time, the CME contacted Defendant Ferber asking for an update on certain subjects discussed during their briefing the previous evening.

271.    At approximately 4:00 p.m., a Director in the Audit Department at the CME emailed a letter to, among others, Defendants Ferber and Serwinski, advising them that, effective immediately, MFGI personnel were not permitted to make any equity withdrawals from MFGI without prior approval in writing from the CME's Audit Department.  Remarkably, amidst all the turmoil, personnel from the CME's Audit Department on-site at MF Global at the time left for the day a short time later, just after 5:00 p.m. Chicago time.

### C.    Ratings Agencies Downgrade MFG Holdings Again

272.    Late in the day on Thursday, October 27, Moody's again downgraded MFG Holdings by two notches to junk status, from Baa3 to Ba2.  Moody's cited "weak core profitability" that had "contributed to [MFG Holdings] taking on substantial risk in the form of its exposure to European sovereign debt in peripheral countries."  Fitch also announced a two-notch downgrade, citing "increased risk taking activities" that left MFG Holdings "vulnerable to potential credit deterioration and/or significant margin calls."

### D.    CME Remains at MFGI on October 28 But Does Not Prevent Any Unlawful Transfers

273.    On Friday, October 28, 2011, personnel from Defendant CME's Audit Department return to MFGI in the morning to attempt to reconcile the Segregation and Secured

Statements as of the close of business on October 26, 2011.  However, MFGI had evidently not yet provided the supporting documents.  Also that day, Defendant CME also reportedly participated in another call with, among others, Defendants Ferber and Steenkamp during which they purportedly told the CME that MFG Holdings had drawn down substantially all of its line of credit but was not yet using the money.  At approximately 6:00 p.m. Chicago time, Defendant CME's Audit Department personnel left MFGI for the weekend, reportedly expecting to return on Monday to finish reconciling the Segregation and Secured Statements as of the close of business on October 26, 2011.  MF Global collapsed before Defendant CME returned to complete the reconciliation.

## VII.   MFGI AND THE D&O DEFENDANTS IMPROPERLY CAUSED, AUTHORIZED, AND/OR DIRECTED UNLAWFUL TRANSFERS OF CUSTOMER FUNDS DURING THE FINAL WEEK OF OPERATIONS

274.    By October 24, 2011, one week prior to the collapse of MFG Holdings and MFGI, years of poor cash management and monitoring, willful blindness by senior management to the Company's liquidity "shell game" carried out by Defendant O'Brien, and increasing demands from counter parties and Securities Customers that had elevated the liquidity crises at MFG Holdings and MFGI to fatal levels.  Indeed, as of the close of business on October 24, the internal Segregated and Secured Statement for the close of business on October 21 showed a regulatory excess of $1.2 billion in segregated and secured customer funds, based on the "Alternative Method," but *under the Net Liquidating Method the Firm Invested in Excess was only* $44,815,475.  The Liquidity Dashboard for the close of business as of October 24 showed liquidity at the broker-dealer of negative $338 million and available FCM funds at $30 million (notably, these numbers seem to contrast with the reports filed with regulators listing more than $1.2 billion in excess liquidity at MFGI).

275.    The Defendants were acutely aware of the financial condition of MFG Holdings and MGFI – at the very least, Defendants Corzine, Steenkamp, Serwinski, O'Brien, Dunne and Mahajan received the Daily Estimated Net Capital summaries and/or the Liquidity Dashboards – and the events preceding it.  Indeed, as set forth above, in the year leading up to the final week of operations, the Defendants were aware that:

- Internal reports by the Audit Department revealed that no later than June 20, 2011 the liquidity monitoring and management functions at MFG Holdings and MFGI were informal, antiquated and inadequate given MFG Holdings' growing needs in light of principle trading activities;

- Liquidity management and monitoring at MFGI largely consisted of ad-hoc tools, including the Liquidity Dashboards that were nothing more than imprecise estimates of current available liquidity.  Treasury had no reporting capabilities to evaluate liquidity needs for transactions that were booked but not yet settled;

- MFGI's broker-dealer operations had long been unable to fund its own operations;

- Defendant Serwinski submitted a report in August 2011 making it clear that – even to the extent that overnight "loans" were permitted from Customer Accounts to fund operations – there were severe regulatory limits on such activity;

- Regulators had required a default risk charge and increased capital requirement due to RTM exposure;

- Increasingly, MFGI was losing counterparties or counterparties were requiring additional margin;

- CME had warned MFGI concerning segregation requirements; and

- On October 17, 2011, MFGI already had a regulatory deficiency of approximately $70 million.

Moreover, during the week of October 24, 2011, the Defendants repeatedly met with regulators and the CME about, among other things, liquidity stresses and, notably, customer segregation requirements.  On October 27, 2011, Defendant CME advised Defendants Ferber and Serwinski

105

that, effective immediately, MFGI personnel were not permitted to make any equity

withdrawals from MFGI without prior approval in writing from the Defendant CME's Audit

Department.

276.    Given the recent and persistent pattern of reliance on the FCM for funding,

Defendants were well aware that the liquidity crunch put FCM customer funds at risk.  At the

end of the day on October 25, Defendant O'Brien sent a Liquidity Dashboard to Defendants

Steenkamp, Abelow, Corzine, Mahajan and others that showed available liquidity at the FCM of

$60 million and projected an increase in FCM liquidity of $5 million on the next day.  Defendant

O'Brien predicted that the Broker-Dealer liquidity needs for the following day would be $150

million, which could only be met by drawing the full $300 million remaining balance on MF

Global's unsecured revolving credit facility.

277.    During the course of the day on October 26, with Defendant O'Brien's

authorization, a record amount of approximately $615 million ─ multiples of any prior intraday

loans ─ was wrongfully transferred from the FCM to meet Broker-Dealer funding needs.  Even

though this amount exceeded by multiples the projections, which Defendants had seen, that

would have exhausted the firm's excess funds in the Customer Accounts.  Defendant Serwinski

was the only Defendant to make any inquiry to Defendant O'Brien or anyone else regarding this

unprecedented transfer of customer funds; unfortunately, Defendant Serwinski accepted

Defendant O'Brien's explanation with no further inquiry or supporting documentation.[23]  No

other Defendant inquired with Defendant O'Brien or anyone else regarding these transfers.

---

[23]  Of this amount, $325 million was locked up in a cash repo at the BNYM; some but not all of these
funds were returned to the FCM the next day.

278.    The $615 million in transfers from the FCM on October 26 consisted of the following:

- At 8:02 a.m., Defendant O'Brien approved a transfer of $125 million;

- At 9:41 a.m., Defendant O'Brien approved a transfer of $75 million;

- At 10:06 a.m., Defendant O'Brien approved the transfer of $200 while noting that the intraday "loan" balance owed to the FCM was already $400 million; and

- At 10:32 a.m., the Broker-Dealer requested and Defendant O'Brien approved a $50 million intraday transfer; and

- At 5:53 p.m., Mr. Joseph Cranston, who reported to Defendant O'Brien, approved a $165 million transfer from FINCO. Due to inadequate controls the money was instead transferred from Customer Accounts.

279.    The funds were applied to non-FCM proprietary settlement and clearance obligations at the respective institutions to which they were ultimately transferred.

280.    The failure of New York Operations to return these funds to the FCM by the close of business caused a panic within Treasury regarding the Company's segregation compliance. Defendant O'Brien emailed Messrs. Gill, Lyons, and Simons in Operations in New York at 6:24 p.m., stating "I need to know how much is being return[ed] – from where to where," and again at 6:25 p.m., stating, "I NEED TO KNOW NOW – TO PRE-ADVISE FUNDING AND AVOID A SEG ISSUE." Operations, however, failed to return any funds before the Fed Wire closed. Despite this stated awareness of the danger posed to customer funds, no notification was made to regulators, some of whom were already on-site.

281.    Instead, because there was $325 million in cash available in the BNYM Clearing Account, Mr. DeLucia arranged, at Treasury's request, for the cash to be locked up in a shell account at BNYM designated for "Customer CFTC 1.25." The amount deposited in the shell account was thus eligible to be included as an asset in the Segregation Statement prepared as of

107

the close of business on October 26. It was treated on the Segregation Statement as if the funds

on deposit in the shell account had been invested in a CFTC Regulation 1.25 compliant tri-party

repurchase transaction.  At 7:36 p.m., Mr. Cranston emailed Messrs. Gill, DeLucia and Cleere

with a copy to others in Treasury, stating that the FCM "need[ed] to have the $325 million closed

out in Tri-Party and return[ed] to us as soon as possible" the following day.

282.    Shortly after midnight, Defendant O'Brien circulated a "Liquidity Recap" to

Defendants Steenkamp, Abelow, Corzine, Mahajan and others showing that Broker-Dealer

liquidity demands had increased $446 million during October 26, three times the amount

predicted.  She reported zero available liquidity at the FCM, and predicted zero increase in FCM

liquidity for the next day.

283.    Following her unprecedented transfers during October 26 and her early morning

October 27 reports to Defendants Corzine, Steenkamp and Mahajan regarding "Liquidity on

hand" of "$00 mm" at the FCM entity, at approximately 7:00 a.m. on October 27, Defendant

O'Brien requested from the Regulatory Group the internal segregation statements via an email

with the subject line "*******I need to see SEGS after completed - before distributed."

Defendant O'Brien's explanation for wanting a preview of the segregation information before it

was distributed was the cryptic "[w]e had significant moving parts."

284.    The Financial Regulatory Group provided a draft to Defendant O'Brien reflecting

that, as of close of business on October 26, 2011, excess funds under the Net Liquidating Method

was a negative $457,906,41 and Firm Invested in Excess was negative $341, 744,278.  Put

another way, this information, which was circulated internally in another form to, among others,

Defendants Corzine, Steenkamp and Mahajan, meant that more than $340 million in Customer

Funds had been removed from Customer Accounts to meet other obligations.  A final version of

the segregation statements – containing only calculations via the Alternative Method which reflected positive excess and omitting the negative Firm Invested in Excess – was filed with, among others, the CFTC and Defendant CME.

285.    Notwithstanding the massive negative liquidity and negative Firm Invested in Excess, as well has the "significant moving parts" she referenced when asking for the segregation statements, Defendant O'Brien continued to direct transfers from the FCM.  For example, late in the afternoon on October 27, Defendant O'Brien asked one of the analysts in her group to confirm a transfer of $200 million that day of $200 million from the FCM to the Broker-Dealer to fund proprietary operations.  Remarkably, Defendant O'Brien's uncertainty given the fact she had been directing a large number of transfer prompted her to ask "CAN YOU CONFIRM?", and, "PLEASE DOUBLE CHECK,"  "I THINK I HAVE SENT THE FOLLOWING TO THE B/D TODAY".   The analyst confirmed the transfer, and a number of others also occurring that day.

286.    A few hours later, Defendant Serwinski, who was out of town on vacation, received a copy of the information and requested an explanation for the large negative Firm Invested in Excess balance reported to the regulators and management and expressed concern about the $200 million "loan" from the FCM.  Defendant O'Brien responded that "Lent is a strong word-I would state-Fail to return intraday funding compounded by Funding B/D Customer Wires."  Defendant O'Brien also informed Defendant Serwinski that she estimated the Firm Invested in Excess would be negative $167 million as of close of business on October 27, 2011.

287.    On October 27, the CME and the CFTC requested all documentation supporting the segregated and secured assets as of the day before.  Later in the afternoon, the CME advised

Defendants Serwinski and Ferber that no equity withdrawals were permitted from the FCM without the consent of CME's Audit Department.

288.    From the reports circulated internally, the D&O Defendants were either aware of the unlawful transfers from the FCM or were willfully blind to their existence and/or implications.  The October 27, a Net Estimated Net Capital Summary circulated to senior executives, including Defendants Corzine, Abelow, Steenkamp, and Mahajan reflected the deficit of over $341 million in Customer Accounts (using the Net Liquidating Method that had been the subject of discussion during the summer of 2011) and defendant O'Brien had projected another deficit of $167 million as of October 27, 2011.

289.    Notwithstanding the Defendants' awareness of the risks to Customer Funds posed by these deficits, Defendants took no steps to prevent the defalcation and wrongful taking of Customer Funds.  No D&O Defendant took any step or made any inquiry regarding the protection or sanctity of customer property and ignored the implications for customer segregated funds caused by the further deterioration in the firm position.  Moreover, the D&O Defendants made no disclosure regarding these issues to the regulators.  Indeed, some Defendants, including Defendant O'Brien, reported to customers throughout the week of October 24 that their funds were fully protected even though they knew this to be false.

290.    Compounding the ongoing threat to Customer Funds, outgoing wires in the amount of $415 million were not properly deducted from MFGI's accounting for Customer Segregated funds on October 26.  Thus, in the liquidity crisis, the deficiencies in MFGI's protection of customer funds caught up with the firm.  As of the close of business on October 26, MFGI had a deficiency of Customer Segregated funds in the amount of $298,835,867.

291.    MFGI—whose ability to continue as a going concern had long since been compromised—was insolvent by October 26 at the latest, and in violation of the most fundamental of the CEA protections for customer funds by then, even using the more liberal (and rarely employed) "Alternative Method" for calculating segregation requirements.

292.    The next day, on October 28, even as MFGI continued to "shuffle cash and loans from entity to entity" when the Financial Regulatory Group reviewed the end of day figures for October 27, the deficit in the Segregated Accounts was approximately $300 million.

293.    During the course of the day, personnel in Treasury, Treasury Operations and the Financial Group Regulatory, in consultation with Defendant O'Brien purport to have assumed that the deficit had been caused by a booking error, and before the close of business MFGI personnel attempted to find the "error," eventually purporting to conclude (wrongly) that some $540 million in wires had been mistakenly excluded.  They executed a manual adjustment, without any documentation to support the supposed error, that returned the customer segregated funds balance to a positive $200,178,912 thereby avoiding, in their view, the need to report the shortfall to MFGI's regulators.

294.    The Segregation and Secured Report was normally circulated to regulators in the early afternoon, but on October 28, because of the $300 million 4d shortfall, the report was not issued until nearly 5:00 p.m.  No Defendant took any step or made any inquiry regarding this delay, or the protection of Customer Funds.

295.    MF Global continued to drain customer funds in the final day of operations.  On October 28, MFGI transferred $175 million from MFGI's Treasury House Account to a MFGUK account in satisfaction of an MFGUK overdraft balance in that account at JPM in London.

These funds were part of $200 million that was almost simultaneously transferred from Customer Segregated Accounts.

296.    This $175 million transfer occurred as a result of an early morning call between JPM representatives and MFGI's executives including Defendant Corzine.  Thereafter, senior management, including Defendants Corzine and Mahajan, instructed Defendant O'Brien to wire $175 million to MFGUK's account at JPM even though the firm's excess in the Customer Accounts was reported as a deficit of $341 million using the Net Liquidating Method.

297.    Defendants Corzine and Mahajan, and other senior management who knew of the transfer knew or should have known, or were willfully blind to the fact that the funds transfer consisted of segregated Customer Funds.  By this time, the Liquidity Dashboard was replaced with a new document named Liquidity Recap which was even less precise and, on information and belief, contained materially incorrect information.

298.    When JPM raised concerns and sought assurances that the transfers complied with regulatory requirements, Defendant O'Brien provided Defendant Ferber with on-screen shots of the $175 million and $200 million transfers, which clearly showed the source was Customer Accounts.  Despite the unfolding liquidity crisis and the fact that JPM was able to identify the need to ensure that the Company's transfers complied with regulatory requirements, the CME, MFGI's DSRO did not request such assurances.  That same day, she also provided to Defendant Corzine the screen shot of the $175 million transfer, and Defendant Corzine was aware of or disregarded the fact that the source of those funds was segregated Customer Accounts. Defendant O'Brien refused, however, to provide the written assurances requested by JPM, as some or all of the Defendants were aware.

299.    At Defendants' direction or under their supervision, further transfers of funds originating in Customer Accounts occurred in the final days of MFGI's operations to cover demands for cash or collateral arising from MFGI's proprietary trading, including, without limitation, transfers of $165 million, $75 million, and $50 million on October 26, and transfers of $200 million, $135 million, $62.5 million, $50 million, $14.7 million and $31.2 million on October 28.

## VIII.   THE UNEXPLAINED SHORTFALL IN SEGREGATED CUSTOMER FUNDS DERAILS THE $1 BILLION SALE OF MFGI TO INTERACTIVE BROKERS AS MF FINALLY ADMITS IT VIOLATED SEGREGATION REQUIRMENTS

300.    As alleged above, during the week of October 24, 2011, MF Global announced losses and suffered credit rating downgrades, which sparked rumors of its efforts to sell its brokerage business.

301.    The downgrade sent MF Global into free fall on October 25th. As MF Global's stock price plunged, trading partners and lenders demanded more capital to continue doing business with the firm.  Despite Defendant Corzine's assurances to employees, the individual D&O Defendants knew that the firm had just two options to avoid bankruptcy:  sell itself or sell its assets.  Cognizant of MF Global's limited options for survival, Defendant Corzine organized two teams: Defendant Abelow began searching for a buyer of the firm; and Defendant Corzine assumed responsibility for selling MF Global's assets.

302.    On October 26, 2011, MF Global's Board of Directors voted to explore strategic options and the firm hired investment bank Evercore Partners Inc. and at least one other bank (Blackrock) to help determine whether it should sell itself to another company, pursue mergers, or pursue other strategic options such as asset sales.  Evercore Partners contacted Interactive Brokers to assess whether it was interested in a transaction involving MF Global.  During the

113

trading day on October 26, 2011, the ratings agency S&P threatened to reduce the Company's credit-rating to junk status.

303.     On Friday evening, October 28th, regulators and top executives, including Mary L. Schapiro, chairwoman of the SEC participated in a conference call in which Defendant Corzine expressed confidence that a deal would be reached with one of the firm's potential buyers, which included Interactive Brokers, JPMorgan Chase, the Jefferies Group and the Macquarie Group. Such a deal became crucial as trading partners and lenders placed increasing demands on MF Global. For example, at that time, LCH, the firm responsible for clearing the vast majority of MF Global's European sovereign debt trades, was also demanding $200 million to maintain those positions, atop $100 million it had claimed from MF Global earlier in the week.

304.     Meanwhile, a due diligence team from Jeffries Group, a brokerage firm, arrived at MF Global's headquarters on Friday the 28th, leaving Saturday, October 29.  The purpose of their visit was to review documents and MF Global's operations in connection with a possible acquisition of the firm. The Jeffries Group employees concluded that they required additional time to complete their review. Meanwhile, another due diligence group from Interactive Brokers had also arrived at MF Global and was attempting to make a similar evaluation.

305.     On Saturday, October 28, CME personnel emailed the CFTC to advise that MFGI had a "very motivated buyer" and needed to get approvals from the SEC, FINRA and CFTC.

CME personnel then forwarded to the CFTC a Bloomberg news report stating that the Holdings Board would be meeting regarding options to sell the Company.[24]

306.    During this time, CFTC Chairman Gensler reportedly developed concerns that MF Global had not kept company funds segregated from Customer Accounts as required by the CEA. On October 29, 2011, Gensler contacted H. Rodgin Cohen, a partner a Sullivan & Cromwell, counsel to MF Global, regarding the possible failure to segregate. Cohen reportedly told Gensler that additional documents were needed; thereafter, a "scramble" for documentation ensued.

307.    At Defendant Serwinski's request, the Financial Regulatory Group reported to the office on Saturday, October 29 to prepare the Segregation Statement and the Secured Statement as of close of business Friday, October 28.  The SEC had also asked MFGI to prepare the Rule 15c3-3 calculation for the regulator's review by Sunday, October 30.  Treasury and Treasury Operations personnel were also in the office preparing the necessary bank reconciliations and responding to inquiries from New York in connection with a potential sale of the business, as well as inquiries from CME and CFTC personnel who continued to be on-site throughout the weekend.

308.    Meanwhile, MF Global's prospective buyers  were raising concerns about bookkeeping.  Thomas Peterffy, CEO of Interactive Brokers, later said that MF Global's "records were in a shambles."  According to Peterffy, "[MF Global was] strong in sales and they had no technology."  Because MF Global's books were so poorly kept, potential buyers of MF

---

[24]  Potential purchasers participating in discussions with Evercore were granted access to a data room that identified the contents and mark to market pricing of MFGI's RTM sovereign debt portfolio, asset holdings and matched repo book.  In addition the data room contained MFGI's September 30 FOCUS Report.

Global "couldn't get a good sense of what was on the balance sheet."  Routine information about assets and positions that should have been accessible instantly took hours, or longer, to produce.

309.    At 4:30 p.m. on October 29, CME personnel communicated with representatives of the CFTC who recounted hearing from the SEC that the FSA "might be starting to panic." CME advised that if the FSA put MFGUK into administration, the U.S. regulators would have little choice but to follow.  Defendant Ferber reported that she briefed CME, and that she and Defendant Abelow briefed the CFTC about their plans for an orderly transfer or liquidation of the RTMs.

310.    As bidders dropped out one by one, only Interactive Brokers was left as of Sunday, October 30 when Defendant Corzine informed regulators at 2:00 p.m., that a sale looked likely to go through.  During this time, MF Global was working with Interactive Brokers on an arrangement to transfer Customer Accounts.

311.    By Sunday, Interactive Brokers had emerged as the likely buyer.  CME had several calls with Interactive Brokers throughout the day to discuss the prospective sale.  A draft term sheet provided that:  (i) Holdings would file under Chapter 11 of the Bankruptcy Code and obtain $800 million in debtor-in-possession financing from Interactive secured by proprietary assets; (ii) MFGI Customer Accounts would be transferred to Interactive Brokers, subject to regulatory approvals; and (iii) Interactive Brokers would agree to purchase substantially all of Holdings' remaining assets for $1 billion.  MFG Holdings personnel continued to have telephone calls with Interactive Brokers, and to circulate drafts of the agreements and press releases well into the night on Sunday. On Sunday, October 30, MFGI also had a conference call with the CFTC regarding its bankruptcy contingency plans.

312.     The CFTC had again requested the segregated and secured numbers, with a deadline of noon (Central).  Mr. Hughey received a call to come in and complete the computation, so he, Mr. Cooley and Ms. Campbell each reported to the office in Chicago.

313.     At 12:35 p.m., Mr. Hughey and his colleagues reported that the segregated and secured computations would be delayed while they were "awaiting notification by Treasury as they rebalance the books for the last couple of days."  The preliminary computation continued to reflect a deficit of over $952 million in the Customer Segregated Accounts.  CME has said that at approximately 2:00 p.m., a CME representative learned that the CFTC had seen a draft of the segregation statement as of October 28 and that it showed a deficit.  At 2:59 p.m., Mr. Chenoweth advised Mr. Hughey that Treasury had reconciled all the bank statements and had not identified a problem with the segregated assets.  As a result, the Financial Regulatory Group concluded that any explanation for the deficit had to be on the "liability side," and they continued to consult with Treasury to attempt to identify the source of the deficit in segregated property.

314.     Later in the day, after continued review and audit of the bank reconciliations, Treasury identified an item that they believed might offset the deficit.  Treasury enlisted an Assistant Controller to review their findings.  At 6:06 p.m., Defendant O'Brien reported to Defendant Ferber and others that, "there has been an item(s) identified that may offset the Seg debit.  The figure appears to be @ 900 million.  Matt and I shared this with both CME and CFTC…Jason is proving this out …."[25]  All involved parties knew or should have known there

---

[25]  CME reported that Defendant O'Brien held a meeting with the CFTC and CME at approximately 6:00 p.m., and advised that MFGI had a potentially huge deficiency in the segregated account due to an unidentified accounting mistake.

was no reasonable basis for the statement that MFGI had identified an offsetting adjustment of the deficit.

315.     Upon completing their review, however, Mr. Chenoweth and another MFGI employee determined there was in fact no offsetting item.  They concluded with some degree of certainty that the Segregation Statement was accurate and there was in fact a deficit of $952,047,822. They also concluded that the $540 million adjustment that had been made on October 28 was wrong and, therefore, there had been a deficit of $339,821,088 on Thursday, October 27.  Defendant Serwinski returned to the office Sunday night and reviewed all of these findings.

316.     According to the CME, between 6:00 and 7:00 p.m. on October 30, Defendant O'Brien "confirm[ed] that [MF Global Inc.] has a potentially huge deficiency in the segregated account due to what [MF Global Inc.] states is an unidentified accounting mistake." At this time or shortly thereafter, according to Defendant CME, it learned that the shortfall could be as large as $900 million.  Despite its status as MF Global's DSRO, who was responsible for ensuring MF Global's compliance with its segregation obligations, and Defendant O'Brien's admission, Defendant CME took no additional action to protect the funds of Plaintiffs and the Class.

317.     At 7:43 p.m., MFG Holdings circulated to the SEC, CME and the FSA an outline of a proposed agreement with Interactive Brokers.

318.     Defendant Steenkamp testified that he also was aware of the shortfall in MF Global customer funds on October 30, 2011:

> On Sunday night (October 30th), when a deal for the acquisition of all or part of the company appeared to be close at hand, I first learned of a serious issue with MFGI's segregated fund calculations. (I was told earlier that day there appeared to be a deficit in the segregation calculation and then shortly thereafter was told it had been resolved). For the next two hours or so, there was a collective effort to reconcile the unexplained deficit in the segregation calculation – a complex

118

calculation requiring expertise to generate and reconcile. This reconciliation effort included assistance from both the investment bank assisting in the sale process and the remaining potential purchaser. (My subsequent understanding is that the regulators were also assisting in this reconciliation earlier in the day.) Unfortunately, as the Committee is aware, the efforts to reconcile the segregation calculation were not successful. Around midnight, with time to complete a deal having run out, a conference call with many participants was conducted in which the potential purchaser was formally told that the calculations showed a large under-segregation of customer funds.[26]

319.    During the evening of October 30, Interactive Brokers learned of the apparent shortfall in customer funds and, as a result, the potential transaction to save or sell MF Global collapsed in the ensuing hours.  When it became clear that the segregated money shortfall had not been resolved, Interactive Brokers withdrew from the proposed deal, leaving MF Global with no alternative buyer.  According to Hans Stoll, an Interactive Brokers director, discrepancies over missing customer funds used to back futures trades doomed the potential acquisition of MF Global by Interactive Brokers.  The deal could have averted the panicky bankruptcy filing and the cost associated with the liquidation.  On November 1, 2011, Stoll said "The [Interactive] board certainly considered that purchase [of MF Global] and stepped away from it at a point where it became clear there were lots of uncertainties about the accounts and segregated funds."

320.    Despite the apparent efforts of the CME, at approximately 3:00 p.m. on October 30 – approximately one hour after Defendant Corzine's representations to regulators that the sale looked likely to go through – the CFTC informed the CME that a draft of MF Global's October 28, 2011 "Daily Statement of Segregation Requirement and Funds In Segregation for Customers trading on U.S. Commodities Exchanges" showed a deficiency in the segregated funds of members of the Class.

---

[26]    Testimony of Henri J. Steenkamp, Chief Financial Officer of MF Global Holdings Ltd., before the United States Senate Committee on Agriculture, Nutrition and Forestry, December 13, 2011.

321. In the early morning hours of Monday, October 31, the deficit in the segregated funds was confirmed to the CFTC and CME, among others.

322. At approximately 5:00 a.m. on October 31st, the Board of Directors of MF Global voted to seek bankruptcy protection.

323. Despite the loss of the Interactive Brokers' deal, in an attempt to remedy the deficit, Defendant Serwinski, who had returned to the office the prior evening, in consultation with Treasury personnel, sought to identify potential sources of funds to move into the Customer Segregated accounts. These sources included house funds, 15c3-3 funds, and funds or collateral on deposit at clearing organizations. At 6:46 a.m., Defendant Serwinski and Defendant O'Brien were informed that "[i]n conjunction with the SEC, CFTC and other US regulator[s], MFG Holdings will [r]equest Firm excess to be moved to Seg funds only at this time." At approximately 7:30 a.m. (Eastern) on October 31, MFGI moved approximately $220 million in what was perceived to be excess funds in the 15c3-3 account at JPM to the JPM Customer Seg Account; this transfer was completed by 10 a.m. (Eastern). This represented what MFGI perceived to be all of the excess in the account, without leaving even the 10% cushion that MFGI customarily kept above the regulatory requirement. The Rule 15c3-3 reserve calculation prepared on November 1 (as of October 31) reflects this withdrawal of $220,338,722.

324. At 8:05 a.m., Defendant O'Brien instructed: "Please move ALL DTCC AND BOX COLLATERAL to MFGI Seg. Delivery should be free of payment." At 8:40 a.m., a New York Operations employee forwarded Defendant O'Brien's instructions, stating that "[w]e will also need to be able to release ALL collateral held at BNYM and RCF."

325. MFGI personnel input wire transfer instructions in an attempt to move approximately $500 million from Harris Bank, JPM and BNYM into the Customer Segregated

Accounts.  Only three wires totaling approximately $15 million from JPMorgan and a small amount from Harris were permitted to move due to bank liens.  Around 10:30 a.m., MFG Holdings filed a petition for reorganization under Chapter 11 of the Bankruptcy Code.  At 10:51 a.m., MFGI in-house counsel informed Defendant Ferber, "I'm here in Edith O'Brien's office with Serwinski, CFTC and CME.  No wires out of any sort from MF firms.  We are ordered to move as much from the BD to the FCM immediately, without regard to CFTC 1.25."

326.   At 3:07 p.m., CME advised MFGI that it had ordered that all trading of MFGI and its customers be for liquidation only.  At 3:48 p.m., CME advised MFGI not to add any further exposure to its house account.  At 6:30 p.m., CME ordered MFGI to liquidate all of its house positions.

327.   At 3:58 p.m. (Eastern), SIPC initiated a liquidation proceeding against MFGI, which then ceased operating as a broker-dealer.  At 8:03 p.m., Ms. Campbell circulated the Segregation and Secured Statements, as of the close of business on October 28, to MF Global personnel as well as ICE, CBOE, OCC, DTCC, and FINRA.  The Segregation Statement showed a deficit of $891,465,649 and the Secured Statement showed an excess of $615,092,609 (using the Alternative Method).  The Segregation and Secured Statements were also filed via WinJammer, a regulatory on-line filing system.

328.   In addition, the Financial Regulatory Group prepared amended internal Segregation and Secured Statements, for the close of business on October 27, 2011, which eliminated the mistaken $540 million adjustment and then showed the following balances:

| | |
|---|---|
| Excess segregated funds | ($213,062,967) |
| Excess secured funds under Alternative Method | $533,418,865 |
| Excess secured funds under Net Liquidating Method | ($49,798,971) |

Firm Invested in Excess                                  ($262,861,938)

329.   When the calculations were redone on November 1 to reflect the transfers on

October 31, they showed a deficit of $589,344,008 in the Segregation Statement and an excess of

$4,220,335 in the Secured Statement under the Net Liquidating Method. Mr. Cooley filed the

Segregation and Secured Statements, prepared as of the close of business on October 31, 2011,

via WinJammer with CFTC, CME, and NFA and sent it by email to MFG Holdings employees,

as well as ICE, CBOE, OCC, DTCC, and FINRA.  The final Segregation and Secured Statement

showed a deficiency of $589,344,008,[27] and the Secured Statement showed an excess of

$531,400,668 (again using the Alternative Method).

330.   On April 24, 2012, Defendant Duffy, Executive Chairman, Defendant CME

Group Inc.—MF Global's DSRO—testified before the Senate Committee on Banking regarding

the events at MF Global that "MF Global's unlawful transfers of customer segregated funds were

a very serious violation of the CEA and exchange rules" and that "MF Global's misconduct was

the cause of the shortfall in customer segregated funds[.]"

IX.    THE BANKRUPTCY AND SIPA PROCEEDINGS

   A.    MFGI and the Chapter 11 Debtors

331.   On October 31, 2011, MFG Holdings filed a voluntary chapter 11 bankruptcy

case in the United States Bankruptcy Court for the Southern District of New York.

332.   On October 31, 2011, the SIPC commenced a liquidation action against MFGI in

the United States District Court for the Southern District of New York (the "SIPA Proceeding")

pursuant to the provisions of the Securities Investor Protection Act ("SIPA"), 15 U.S.C. §§ 78aaa

---

[27]  This figure does not include any figures for transfers from the 15c3-3 Account nor for unavailable
funds in the 30.7 account.  .

*et seq.*, *Securities Investor Protection Corporation v. MF Global, Inc.*, Case No. 11-CIV-7750 (PAE). The Court entered an order that day commencing the liquidation of MFGI pursuant to the provisions of SIPA (the "MFGI Liquidation Order").

333. The MFGI Liquidation Order, among other things: (i) appointed James W. Giddens as Trustee for the liquidation of the business of MFGI pursuant to SIPA section 78eee(b)(3); and (ii) removed the SIPA Proceeding to the United States Bankruptcy Court for the Southern District of New York as required for SIPA cases by SIPA section 78eee(b)(4), *Securities Investor Protection Corporation v. MF Global, Inc.*, Case No. 11-2790 (MG) SIPA.

334. In the weeks following the commencement of the SIPA Proceeding, the Trustee effectuated the bulk transfer of tens of thousands of MFGI Customer Accounts to new FCMs. The Trustee also transferred approximately $4 billion in Customer Funds, on a pro rata basis, to nearly all MFGI commodity customers who had engaged in commodity futures trading on domestic exchanges.

335. The Trustee also implemented a customer claims process in accordance with SIPA in order to determine the "net equity claims" of each MFGI commodity customer. As part of the claims process, each MFGI customer seeking to recover funds or other property deposited with MFGI in order to engage in commodity futures or options trading was required to submit a claim form (the "Customer Claim") to the Trustee on or before January 31, 2012. The Trustee has reported that he received more than 26,000 Customer Claims from MFGI's commodity customers, in values that will far exceed available funds. *See* Testimony For the Record of James W. Giddens before the Senate Agricultural Committee, Hearing August 1, 2012 at 2. The Trustee has also reported that he has received more than 6,000 general creditor claims whose asserted value exceed available funds for distribution from the general estate. *See Id.* As a result,

the Trustee estimated that there would be a shortfall in segregated funds available for distribution to MFGI customers.  *See Id.*

336.    Funds deposited with MFGI by customers for trading commodity futures and options trading on foreign exchanges are largely being held by foreign affiliates of MFGI and subject to foreign insolvency and bankruptcy proceedings.

**B.    MFG Holdings UK Ltd.**

337.    MFGUK was the principal European broker-dealer within the MFG Holdings network of companies.  MFGI's U.S. customers traded commodity futures and option contracts outside the United States and Canada through MFGUK.  Prior to the commencement of the SIPA Proceedings, MFGUK and MFGI had extensive dealings regarding, among other things, their respective customers' commodity futures and options trading.

338.    On October 31, 2011, insolvency proceedings were commenced for MFGUK in London (the "MFGUK Proceeding").  Certain partners of KPMG in London were appointed as the joint special administrators (the "JSAs") in the MFGUK Proceeding.

339.    Subsequent to the commencement of the MFGUK Proceeding, the Trustee determined that approximately $700 million in property belonging to MFGI's U.S. customers that should have been segregated and secured for such customers pursuant to CFTC regulation 17 C.F.R. § 30.7 (the "30.7 Property"), was in the possession of the JSAs and would not be returned by the JSAs to MFGI's U.S. customers.

340.    On March 30, 2012, the Trustee submitted a "client claim" with the Joint Special Administrators in the MFGUK Proceedings seeking to recover, among other things, the $700 million in MFGI U.S. Customer Funds, i.e., 30.7 Funds, being held by the JSAs.  The Trustee's "client claim" also included an additional $175 million transferred from MFGI to MFGUK on

124

October 28, 2011.  These transferred funds had originated from segregated MFGI customer accounts maintained in the U.S. for the benefit of MFGI's U.S. customers and should not have been transferred to MFGUK.

341.    The JSAs disputed the Trustee's "client claim" asserting that any property in their possession was the property of MFGUK and available for distribution to MFGUK creditors.  The Trustee disputed the JSAs' claim and, on May 3, 2012, the JSAs made application to the English High Court seeking directions concerning whether the property belonging to MFGI's U.S. customers in their possession should have been segregated under English law for the exclusive benefit of the MFGI's U.S. customers.  The trial on the JSAs' application is expected to commence in April 2013.

## X.  THE T-BILL SWAP PROGRAM AND FAILURE TO PROTECT 30.7 FUNDS

342.    Defendants' failure to protect customer funds was not limited to the domestic 4d accounts. MFGI's 30.7 Customers deposited cash for margin for these trades into MFGI's 30.7 accounts.  Where MFGUK was to act as carrying broker for such trades (all foreign exchanges except those in Canada), MFGI transferred the margin to segregated 30.7 accounts at MFGUK. Beginning in March 2009, MFGI, which had historically transferred cash in respect of its customers' margin obligations on foreign exchanges, instead instituted the T-Bill Swap Program that replaced its customers' cash margin with securities (mostly T-Bills) in order to use the cash as a source of much needed liquidity.

343.    MFGUK external counsel advised that CFTC Regulation 30.7 prevented MFGUK from accepting the T-Bills on an absolute title transfer basis, and that Regulation 30.7 required that all cash and collateral deposited into a 30.7 account must be segregated and secured to the maximum extent provided for under local law.

125

344.     Against the advice of MFGUK external counsel, the GIC, with the consent of Defendant Steenkamp and MFGI's legal department (reporting to Defendant Ferber) decided to begin replacing customer cash margin with T-Bills.

345.     MFGUK repeatedly certified to MFGI that the account holding the T-Bills was segregated.

346.     Officers of both MFGUK and MFGI repeatedly stated their understanding that the account holding the T-Bills was held by MFGUK on a segregated basis.

347.     On June 1, 2011, MFGUK's Head of European Operations certified in writing to CME auditors that the T-Bills were being held by MFGUK in a "safekeeping account" and were not being used for proprietary purposes.

348.     MFGUK's internal systems, as of July 2011, reflected that the account holding the T-Bills was held on a "SEG" (segregated) as opposed to "ATT" (absolute title transfer) basis.

349.     On October 28, 2011, MFGUK's Chief Compliance Officer and its Head of European Operations each wrote to MFGI's North American Treasurer assuring her that the account that held the T-Bills was held by MFGUK on a segregated basis under both Regulation 30.7 and applicable UK FSA regulations.  Further, these MFGUK officers stated in unambiguous terms that MFGUK had not operated absolute title transfer on this account.

350.     Notwithstanding the foregoing, MFGUK utilized more than $200 million of 30.7 property to margin house trades.  This fact was well-known to senior executives of MF Global, including Defendants.

351.     Notwithstanding the foregoing, MFGUK represented to the FSA that the T-Bills had passed to MFGUK on an absolute title transfer basis and therefore could be used to margin

house trading.  This fact was well-known to senior executives of MF Global, including

Defendants.

352.    As of October 31, 2011, the T-Bills posted to this account had a value of

$639,918,174.

353.    Failure to properly segregate 30.7 property is a violation of CFTC rules.

354.    Responsibility for any such failure lies with the responsible officers of MF

Global, including Defendants.  The decision of senior management, the Global Investment

Committee, with the consent of Defendant Steenkamp, MFGI's legal department (reporting to

Defendant Ferber), and MFGI's other senior executives, to substitute T-Bills for cash margin

deposits that MFGI was obligated to protect under Rule 30.7 was a contributing factor to the

shortfall of funds available to return to 30.7 Customers.  Senior management, including

Defendants Corzine, Steenkamp, Ferber and Abelow, knew or should have known that the

substitution put at risk the funds of 30.7 Customers that were on deposit at MFGUK, which has

now refused to return those funds to MFGI, such that MFGI has sustained direct losses of more

than $700 million.

355.    If the U.K. court courts determine that the 30.7 Funds were not segregated under

UK law, or if there is otherwise a shortfall in 30.7 funds, Defendants should be held liable for

any shortfall in recovery of 30.7 Customers.

## XI.  PWC FAILED ADEQUATELY TO AUDIT THE INTERNAL CONTROLS OVER CUSTOMER FUNDS AS REQUIRED BY APPLICABLE LAW AND THE ENGAGEMENT LETTERS

356.    Defendant PwC served as independent auditor for MFGI and MFG Holdings

during the period from 2010-2011.

357.   Defendant PwC audited MFGI's financial statements, which were filed with various regulatory agencies including the CFTC, SEC, CFTC, and FINRA.  Defendant PwC's failure to meet its obligations under applicable law and regulations constituted professional malpractice and breaches of duties owed to MFGI and its customers, causing injuries-in-fact to MFGI and the Class by: failing to adequately examine and evaluate MFGI's procedures and controls for protecting Customer Funds; failing to adequately test segregation calculations during the audit period and at fiscal year end 2010 and 2011; failing to identify MFGI's inability to continue as a going concern as a consequence of its audit for the period at fiscal year end 2010; and/or failing to issue a report and/or warning regarding MFGI's inability to continue as a going concern as a consequence of its audit for the period at fiscal year end 2011.

358.   Pursuant to the CFTC Regulation 1.16, as the auditor of an FCM, PwC was also required to examine MFGI's internal controls over the segregation of customer funds.

359.   On April 16, 2010, Defendant Serwinski executed an engagement letter with PwC (dated January 18, 2010) ("April 2010 PwC Engagement Letter"), on behalf of MFGI, MF Global Capital LLC, MF Global Market Services LLC, and MF Global FX Clear LLC.

360.   Regarding MFGI, the April 2010 PwC Engagement Letter provided, in part, as follows:

> Services and related report(s) with respect to MF Global Inc.
>
> We will audit the financial statements of MF Global Inc. at March 31, 2010 and for the year ending that you are filing pursuant to Rule 17a-5 under the Securities and Exchange Act of 1934 and Regulation 1.10 of the Commodity Exchange Act. Upon completion of our audit, we will provide the Company with our audit report on the financial statement referred to above. Our audit also will address the supplementary schedule required by the Securities and Exchange Commission, to the extent appropriate. If, for any reasons caused by or relating to the affairs or management of the Company, we are unable to complete the audit, we may decline to issue a report as a result of this engagement.

128

*In addition, we will provide you with a report on internal control as required by . . . Regulation 1.16 of the Commodities Futures Trading Commission.*

361.    On May 27, 2010, PwC issued a "Report of Independent Auditors on Internal Control Required by . . . CFTC Regulation 1.16" to the Board of Directors of MFGI and MFG Holdings as the stockholder of MFGI in which PwC purported it had made a study of the practices and procedures followed by the Company, including consideration of control activities for safeguarding customer and firm assets and in doing so, tested MFGI's compliance with the practices and procedures that PwC considered relevant to the objectives of Regulation 1.16. As a result of PwC's purported study and consideration, it represented to the MFGI Board that the Company's practices and procedures were adequate, at March 31, 2010, to meet the SEC's and CFTC's objectives, stating, in part:

> In addition, as required by Regulation 1.16 of the Commodity Futures Trading Commission (the "CFTC"), we have made a study of the practices and procedures followed by the Company, including consideration of control activities for safeguarding customer and firm assets. This study included tests of compliance with such practices and procedures that we considered relevant to the objectives stated in Regulation 1.16, in making the following:
>
> 1.    The periodic computations of minimum financial requirements pursuant to Regulation 1.17;
>
> 2.    The daily computations of the segregation requirements of Section 4d(a)(2) of the Commodity Exchange Act and the regulations there under, and the segregation of funds based upon such computations; and
>
> 3.    The daily computations of the foreign futures and foreign options secured amount requirements pursuant to Regulation 30.7 of the CFTC.
>
> *        *        *
>
> Based on this understanding and on our study, we believe that the Company's practices and procedures were adequate at March 31, 2010 to meet the SEC's and CFTC's objectives.

362.    On December 21, 2010, Defendant Serwinski again executed an engagement letter with PwC (dated June 24, 2010) ("December 2010 PwC Engagement Letter"), on behalf of

MFGI, MF Global Capital LLC, MF Global Market Services LLC, MF Global FX Clear LLC, and MF Global FX LLC.

363.    Regarding MFGI, the December 2010 PwC Engagement Letter provided, in part, as follows:

> Services and related report(s) with respect to MF Global Inc. and MF Global FX LLC
>
> We will audit the financial statements of MF Global Inc.  and MF Global FX LLC (collectively, the "Companies") at March 31, 2010 and for the year ending that you are filing pursuant to Rule 17a-5 under the Securities and Exchange Act of 1934 and Regulation 1.10 of the Commodity Exchange Act. Upon completion of our audit, we will provide the Companies with our audit report on the financial statements referred to above. Our audit also will address the supplementary schedules required by the Securities and Exchange Commission and the Commodities Futures Exchange Commission, to the extent appropriate. If, for any reasons caused by or relating to the affairs or management of the Companies, we are unable to complete the audit, we may decline to issue a report as a result of this engagement.
>
> In addition, we will provide you with a report on internal control as required by . . . Regulation 1.16 of the Commodities Futures Trading Commission.

364.    On May 26, 2011, PwC issued a "Report of Independent Auditors on Internal Control Required by . . . CFTC Regulation 1.16" to the Board of Directors of MFGI and MFG Holdings as the stockholder of MFGI in which PwC purported it had made a study of the practices and procedures followed by the Company, including consideration of control activities for safeguarding customer and firm assets and in doing so, tested MFGI's compliance with the practices and procedures that PwC considered relevant to the objectives of Regulation 1.16. As a result of PwC's purported study and consideration, it represented to the MFGI Board that the Company's practices and procedures were adequate, at March 31, 2011, to meet the SEC's and CFTC's objectives stating, in part:

> In addition, as required by Regulation 1.16 of the Commodity Futures Trading Commission (the "CFTC"), we have made a study of the practices and procedures

followed by the Company, including consideration of control activities for safeguarding customer and firm assets.  This study included tests of compliance with such practices and procedures that we considered relevant to the objectives stated in Regulation 1.16, in making the following:

1.      The periodic computations of minimum financial requirements pursuant to Regulation 1.17;

2.      The daily computations of the segregation requirements of Section 4d(a)(2) of the Commodity Exchange Act and the regulations thereunder, and the segregation of funds based upon such computations; and

3.      The daily computations of the foreign futures and foreign options secured amount requirements pursuant to Regulation 30.7 of the CFTC.

*       *       *

Based on this understanding and on our study, we believe that the Company's practices and procedures were adequate at March 31, 2011 to meet the SEC's and CFTC's objectives.

365.    CFTC Regulation 1.16 requires, among other things:

The scope of the audit and review of the accounting system, **_the internal controls, and procedures for safeguarding customer and firm assets_** must be sufficient to provide reasonable assurance that any material inadequacies existing at the date of the examination in (i) the accounting system, *(ii) the internal accounting controls, and* **_(iii) the procedures for safeguarding customer and firm assets (including, in the case of a futures commission merchant, the segregation requirements of section 4d(a)(2) of the Act and these regulations and the secured amount requirements of the Act and these regulations) will be discovered_**.

Regulation 1.16 also requires that:

as specified objectives **_the audit must include reviews of the practices and procedures followed by the registrant in making_** (A) periodic computations of the minimum financial requirements pursuant to § 1.17 and (B) in the case of a futures commission merchant, **_daily computations of the segregation requirements of section 4d(a)(2) of the Act_** and these regulations and the secured amount requirements of the Act and these regulations

366.    According to the AICPA:

**_Under CFTC Regulation 1.16d, an audit must include a review and appropriate tests of the accounting system, the internal accounting controls, and the procedures for safeguarding customer and firm assets in accordance with the CEA Act and the CFTC's regulations._** An audit must also include all procedures

131

necessary to enable the accountant to express an opinion on the financial statements and schedules. For an FCM, schedules included in the Form 1-FR-FCM must be covered by the audit opinion. The scope of the audit must be sufficient to provide reasonable assurance that any material inadequacies existing at the examination date in the accounting system, the internal accounting controls, or the procedures for safeguarding customer and firm assets will be discovered. *The audit of an FCM or IB must also include reviews of the practices and procedures used by the client to produce the following:*

- Periodic computations by the FCM or IB of its adjusted net capital and minimum financial requirements pursuant to CFTC Regulation 1.17

- *Daily computations by the FCM of its Section 4d(a)(2) customer segregation and Part 30 secured amount requirements*

367.    Further, according to the AICPA:

Pursuant to CFTC Regulation 1.16d, *the auditor should obtain an understanding of the FCM's practices and procedures, and controls regarding compliance with the CFTC's segregation regulations and Section 4d(a)(2) of the CEA Act.* The auditor should perform those tests that the auditor considers necessary to gain satisfaction that the FCM's procedures and controls for segregation of Section 4d(a)(2) customers' assets provide reasonable assurance that the FCM is in compliance with the CFTC's regulations for segregation under Section 4d(a)(2) of the CEA Act.

368.    Also according to the AICPA:

Typically, certain control and monitoring activities are associated with the collateral safekeeping function and include the following: *** Maintaining controls over proper location and transfers among customer and noncustomer accounts, segregated and secured accounts, and speculative and hedge accounts. *** Segregating customer owned collateral and assets from firm or noncustomer collateral.

369.    As part of PwC's audit of MFGI for the fiscal year ended March 31, 2011, PwC

audit team members should have taken measures to understand the practices and procedures and

internal controls over financial reporting as a basis for designing its audit procedures, including

steps to understand and test the practices and procedures followed by MFGI with respect to

MFGI's control activities for safeguarding, among other things, Customer Funds as required by

17 C.F.R. 1.16.

370.   CFTC Regulation 1.16d-2 defines a "material inadequacy" in an FCM's or IB's accounting system, internal accounting control, and procedures for safeguarding customer and firm assets as any condition that contributed substantially to or, if appropriate corrective action is not taken, could reasonably be expected to:

> *d.* result in violations of the CFTC's segregation, secured amount, recordkeeping, or financial reporting requirements to an extent that could reasonably be expected to result in any of the preceding conditions described previously.

371.   Section 4d(a)(2) of the CEA and CFTC Regulation 1.20, *Customer funds to be segregated and separately accounted for,* stipulate that an FCM shall treat and address all money, securities, and property received by the FCM to margin, guarantee, or secure the commodity futures and options trades of commodities customers as belonging to such customers. Further, Section 4d(a)(2) of the CEA and CFTC Regulation 1.20 require an FCM to account separately for (and segregate) such money, securities, and property and not to commingle such customers' assets with the proprietary assets of the FCM or funds held by the FCM for noncustomers. Customers' segregated assets shall not be used to secure or guarantee the trades, contracts, or commodity options, or to secure or extend the credit of any person other than the customers for whom the assets are held.

372.   The CFTC requires an FCM to make and maintain, pursuant to Regulation 1.31, records showing the following computations:

- Regulation 1.32, *Segregated account; daily computation and record*, a daily computation of the total amount of funds required to be segregated for customers under Section 4d(a)(2) of the Commodity Exchange Act and the CFTC's Regulation 1.20, the total amount of funds on deposit in segregated accounts for such customers, and the total amount of the FCM's residual interest in such customer funds (excess funds in segregation). (Separate segregation statements are required for customers transacting business on U.S. domestic exchanges with settlement denominated in a foreign currency. A separate segregation is required for each foreign currency.)

- Regulation 30.7, a daily computation of the total amount of funds required to be set aside in separate accounts for U.S.-based customers trading foreign commodity futures and options-on-futures (the secured amount), the total amount of funds on deposit in separate Part 30 accounts (set-aside funds), and the amount of the FCM's residual interest in such funds. (However, the rule allows the FCM to elect to commingle the assets of U.S. and foreign customers, if segregation is provided for all.)

373.    The CFTC adopted Regulations 1.20–1.30, 1.32, and 1.49 under the Commodity Exchange Act to accomplish the following objectives:

- To ensure that customers' assets are properly safeguarded.

- To segregate and separately account for Section 4d(a)(2) customers' assets and commodity futures and options trading accounts from the assets, operations, and trading activities of the FCM and the FCM's noncustomers.

- To ensure that FCMs monitor, at least daily, their segregation requirements and total segregated assets available, and maintain adequate funds in segregated accounts to cover the overall amounts required to be held in segregated accounts and on a currency-by-currency basis as is required by CFTC Regulation 1.49.

- To require an FCM to document compliance by computing and preparing a daily record showing the total amount required to be segregated by the FCM under Section 4d(a)(2) of the Commodity Exchange Act, the total amount of funds on deposit in Section 4d(a)(2) segregated accounts, and the excess or deficiency in segregated assets on deposit to cover the segregation requirement.

- To protect customer assets in case of the liquidation of an insolvent FCM.

374.    From at least as early as April 26, 2010, MFGI did not maintain adequate practices and procedures and/or internal controls to ensure compliance with the segregation requirements of the CEA during times of foreseeable financial stress and/or heightened activity as occurred during October 2011. The absence of sufficiently adequate practices and procedures and/or internal control necessary to ensure compliance with the segregation requirements of the CEA was a direct and proximate result of MFGI's collapse and allowed over a billion dollars of

134

segregated customers funds to become unsegregated in violation of the most fundamental and sacrosanct requirements of the CEA and CFTC Regulations.

375.    In violation of the CEA and its professional duties and responsibilities as MFGI's auditor, PwC failed adequately to examine and evaluate MFGI's procedures and controls for protecting Customer Funds and failed adequately to test segregation calculations during the audit period and at fiscal year end.  PwC's failure to meet its obligations under applicable law and regulations constituted professional malpractice and breaches of duties owed to MFGI and its customers, causing injuries-in-fact to MFGI and the Class.  PwC's failure to meet its obligations under applicable laws and regulations constituted professional malpractice and breaches of duties owed to MFGI and its customers, causing injuries-in-fact to MFGI and the Class by failing to identify MFGI's inability to continue as a going concern and/or to issue a report and/or warning MFGI's inability to continue as a going concern.

## XII.    CME FAILED ADEQUATELY TO REGULATE MFGI – A MATERIAL SOURCE OF ITS REVENUE

376.    Self-regulation is the hallmark of the commodity futures industry in the United States.  Permitting commodity exchanges to serve as their own "front-line" regulators purportedly allows those most knowledgeable about the industry to monitor and control of the conduct of the exchange members who execute trades on behalf of public market participants, such as MFGI's customers.

377.    In 2000, the commodity exchange business was substantially deregulated by the passage of the Commodity Futures Modernization Act which amended the Commodity Exchange Act.  The 2000 amendments to the Commodity Exchange Act were promoted heavily by CME Exchanges and others in the financial industry, and were intended to and had the effect

of limiting the powers of the CFTC and giving even more freedom to the individual exchanges to self-regulate.

378.    As federal regulation of the commodity exchange industry was being diminished, trading volume in the futures markets was increasing exponentially.  Between 2000 and 2010, the U.S. futures and options industry grew five-fold.  By 2010, more than 7 billion futures and options contracts, representing trillions of dollars in notional value, were being traded on U.S. exchanges.  During this same period, through further aggressive lobbying efforts by CME Exchanges and others, the staff of the CFTC was being reduced for budgetary reasons, and the direct oversight of the commodities exchange business became even more vested in the exchanges themselves.

379.    Historically, ever since the Chicago Board of Trade was founded in 1848, the commodity exchange industry had been organized as independent not-for-profit membership cooperatives.  In 2000, that changed.  CME abandoned its not-for-profit cooperative structure and became a for-profit public company traded on the New York Stock Exchange.  In 2007, CME formed CME Group, merged with the CBOT, and in 2008 acquired the NYMEX and COMEX, making CME Group the largest for-profit commodity exchange operator in the U.S., and one of the largest in the world.

380.    The recent transformation of CME Group's commodity exchange business, from what once was a non-profit cooperative model, to a for-profit commercial enterprise, created an inherent conflict of interest that pitted CME Group's desire to maximize shareholder value by increasing trading volume against CME Exchanges' self-regulatory  requirement.  Not surprisingly, as CME Group's trading volume grew, CME Exchanges' oversight function suffered.

381.    During the period of rapid growth in trading volume and increasing complexity of financial products offered on the Exchanges, CME Group, seeking to maximize profits and minimize costs, consolidated market regulation functions and reduced the market regulation staff for CME and CBOT.  In a September 2010 report by the CFTC's Division of Market Oversight concerning its Rule Enforcement Review of CME and CBOT, the CFTC found that the 18% staff cuts implemented by CME Group were detrimental to the self-regulatory model stating: "The Division is concerned that compliance staff cuts of these proportions, accompanying significant increases in volume and number of products traded, could impair the effectiveness of an exchange's compliance program and impede enforcement."

382.    CME Group's desire to maximize profits by reducing compliance staff was also coupled with an aggressive corporate culture that actively promoted the notion that regulation was bad for business.  This regulatory animus permeates CME Group's entire business organization and has fostered an attitude within the regulatory staff that is lacking in the rigor, strictness and firmness necessary for effective self-regulation.  The consequences of this attitude proved to be a disaster for MFGI's customers.

383.    Contrary to its own Exchange Rules and statutory responsibilities, when CME knew or should have known that MFGI was under severe financial stress caused by rapidly escalating liquidity demands, CME knowingly failed to take action to properly and adequately supervise and regulate MFGI's activities and instead either failed to recognize or ignored obvious "red flags" that would have lead an otherwise unbiased and effective regulator to undertake the necessary prophylactic and remedial steps to detect and prevent the massive misappropriation of customer funds which occurred.  This failure to act by CME led directly to the loss suffered by MFGI's customers.

137

384.     Defendant Corzine's decision to change the principal focus of MF Global from a commission-based FCM and broker/dealer to an investment bank which would engage in extensive proprietary trading, which ultimately led to the firm's demise, was well-publicized and known to CME.  CME also knew, or should have known, that this change in focus would have a material impact on MF Global's capital and liquidity needs as it proceeded to implement its new strategic plan.  Indeed, in MF Global's 2010 SEC Form 10-K filed in May 2011, the company expressly stated "[a]s we proceed to implement our strategic plan, our liquidity needs and sources are likely to change significantly from what they historically have been."

385.     As early as February 2011, FINRA, the independent, disinterested self-regulatory organization appointed by the SEC to oversee, monitor and audit securities firms' financial and reporting compliance under the federal securities laws, was acutely aware of the financial and liquidity risks posed by MF Global's new strategic plan and increased proprietary trading activities.   FINRA began closely monitoring MFGI's financial status and began questioning MFGI's risk exposure in European sovereign debt.  CME, on the other hand, was apparently unaware or unconcerned about MFGI's new strategic plan, and took no enhanced interest in or action with respect to MFGI, one of its largest customers, even as FINRA stepped up its self-regulatory surveillance of the firm.

386.     In May 2011, and again in mid-June, 2011, after receiving MFGI's April FOCUS report, FINRA held a conference call and met with MFGI to discuss its concerns regarding MFGI's exposure to European sovereign debt and related RTM transactions as disclosed in the FOCUS Report.  Following Moody's July 5, 2011 downgrade of Portugal's sovereign debt to "junk" status, FINRA again contacted MFGI to discuss its financial status and the impact of the downgrade.  CME, which had also been provided a copy of the same April FOCUS report which

caused FINRA concern, and which was or should have been aware of the downgrade of Portugal's sovereign debt, did not appear not take any action in response to the FOCUS report to oversee and monitor MFGI's financial condition in light of these events.

387.    On August 2, 2011, FINRA informed MFGI that it would likely have to take a "default risk charge" for its foreign debt RTM position.  In the weeks following, FINRA had several communications with MFGI personnel about the potential default risk and asked MFGI to provide a "Proposed Default Risk Charge" calculation.  On August 11, 2011, recognizing FINRA's legitimate concerns about MFGI's growing exposure to risky European sovereign debt, MF Holdings provided MFGI with $60 million in additional capital to avoid the anticipated "default risk charge."   At the same time that FINRA was expressing concern about MFGI's financial status, the FSA in the United Kingdom also began to express heightened concern and required MFGUK to provide a contingency plan for liquidity stress arising from the RTM portfolio.  Although FINRA and the FSA felt such enhanced oversight was required, CME expressed no similar concerns and took no action with respect to MFGI.

388.    On August 24, FINRA informed MFGI of its decision that, as of the close of business the next day, MFGI was required to take a write-down of approximately $257 million on all sovereign RTM positions as a "securities owned haircut." A few days later, FINRA notified MFGI that rather than applying the new capital charges only prospectively, the firm was required to restate its July 2011 FOCUS report to retrospectively reflect the modified capital treatment of the RTM transactions.  This retrospective application of the charge to the July FOCUS report resulted in a regulatory net capital deficiency of $150.6 million as of July 31, 2011 (as compared to the previously-reported excess of $104.3 million).  FINRA's decision to impose a net capital charge on MFGI's proprietary RTM positions was motivated in part by its

concerns about MFGI's liquidity and by FINRA's regulatory responsibility to ensure that MFGI would have sufficient capital and not invade Securities Customer funds in the event of a liquidity crisis.

389.    CME knew or should have known that MFGI was facing increasing liquidity needs and that there was a potential that MFGI would invade customer segregated and secured funds in a liquidity crisis.  CME was aware of FINRA's investigation of and decision to increase MFGI's capital requirements.  Similar action could have and should have been considered and undertaken by CME.  Nevertheless, even though MFGI's FCM commodities business dwarfed the firm's securities broker/dealer business, it was FINRA, MFGI's broker/dealer self-regulator, and not CME, that performed the critical analysis of MFGI's RTM portfolio, and acted in August 2011 to minimize the risk to the firm and its customers by requiring an immediate capital adjustment.

390.    On September 19, 2011, FINRA wrote to Defendant Corzine, in his capacity as President of MFGI, notifying him that "the overall risk undertaken by the Firm in maintaining the inventory levels in [RTM Sovereign Debt] would meet the criteria for subjecting [MFGI] to special surveillance."  As a result, FINRA requested MFGI to begin providing certain financial information on a weekly basis.  No similar action was taken by CME.

391.    On October 17, 2011, after a number of articles had appeared in the financial press concerning FINRA's demand in August that MFG Holdings "increase its required net capital," and as a result MFG Holdings' common share price fell 6.3% to a 52-week low, CME finally took some affirmative action with respect to MFGI.

392.    On the same day the adverse articles concerning MFGI appeared, Defendant CME Group sent a letter to Defendant Corzine, copying, among others, Defendants Ferber and

140

Serwinski, concerning an earlier August 4, 2011 letter which had been sent by CME Group concerning the results of CME Audit Department's review of MFGI's January 31, 2011 Computation of Net Capital Requirements, Statement of Segregation Requirements and Funds in Segregation, and Statement of Secured Accounts and Funds Held in Separate Accounts.  In the earlier August 4, 2011 letter, CME Group notified Defendant Corzine that it had identified a number of problems with MFGI's investments of customer segregated funds and segregation calculations.

393.    The next substantive action taken by CME occurred on Tuesday, October 25, 2011, less than a week prior to MFGI's eventual collapse and a day after Moody's downgraded MF Global' s credit rating to one level above "junk" status.

394.    On October 25, 2011, MF Global announced a third-quarter loss of $191.6 million compared with a loss of only $94.3 million for the same quarter in 2010.  At the time MF Global announced these results, CME and CME Group's senior management were attending an industry conference at the Boca Raton Resort and Beach Club in Boca Raton, Florida.

395.    That morning, a senior management CME official who was in Boca Raton, received a call from a MFGI customer informing her of rumors circulating about problems at MF Global stemming from OTC activity.  Apparently CME was unaware of these rumors.  Prompted by the call from the MFGI customer, CME called Defendant Ferber at MF Global who advised her that the rumors were untrue.  Although an effort was made by CME Group senior officers in Boca Raton to contact Defendant Corzine that same day, the officers apparently did not reach him and did not speak with him or anyone else at MF Global that day.  Instead, an employee in CME Audit Department in Chicago sent an email to FINRA, to see if FINRA had any additional concerns or was imposing any additional requirements.

396.     The next evening, Wednesday October 26, 2011, CME Group senior

management, and several other CME employees in Chicago, participated in a conference call

regarding MFGI.  During this call, CME spoke with Defendants Steenkamp and Ferber who gave

them the sense that MFGI was actively engaged in conversations with their customers in an

attempt to preserve their business.  Following the call, CME sent an e-mail to Defendant Ferber

assuring her that CME would help "to ensure a good outcome for MF and your customers" and

stating that "You and your clients are important to us, and the client's continued protection is

paramount."  By the time this e-mail was sent, MFGI had already begun its wholesale

misappropriation of its commodity customers' funds.

397.     On Thursday, October 27, 2011, MF Global was downgraded by Moody's to junk

status and its share value continued to collapse.  That same day, members of CME Audit and

Risk Department attended a pre-arranged meeting with MFGI employees in New York to

perform a regularly scheduled risk review.  CME has admitted that this is the first time it began

to recognize and have concerns about MFGI's liquidity.  At the conclusion of the October 27,

2011 meeting, CME representatives felt that, in light of the firm's liquidity issues, the company

was in such a perilous condition that it might not be able to continue normal operations without

the sale of all or part of its business.

398.     During the afternoon on October 27, 2011, CME finally decided to send members

of its Audit Department to MFGI Chicago office in order to examine MFGI's segregated funds

compliance.  Each day MFGI was required to prepare and submit to CME a "Daily Statement of

Segregation Requirement and Funds in Segregation" ("Daily Seg Funds Statement").  MFGI's

Daily Seg Fund Statements were required to be prepared in accordance with CFTC Regulation

1.32 and CME Rule 971, and provide a complete and accurate calculation of the amount of

Customer Funds which the firm was required to have in segregation as of the close of business that day.

399.    On October 27, 2011, two of CME's audit staff members arrived at MFGI's Chicago office, where all the accounting for the FCM business was conducted.  When CME auditors arrived at MFGI's offices sometime after 1:00 pm (CST) on October 27, 2011, representatives of the CFTC are already on site.  CME's Audit representatives, requested and were provided with a copy of MFGI's Daily Seg Funds Statement, and the supporting data, which had been prepared by MFGI as of the close of business on October 26, 2011, the day prior when MFGI began its massive misappropriation of customers' funds.   When CME's Audit Representatives attempted to reconcile the Daily Seg Fund Statement from the prior day, they were unable to do so.  Rather than alerting more senior management, who were all still in Boca Raton, at 5:30 p.m. CME's Audit Representatives decide to leave for the day, without having verified or determining the accuracy of the October 26, 2011 Daily Seg Funds Statement.

400.    CME's Audit Representatives returned to MFGI's offices on Friday, October 28, 2011, where they continued their efforts to reconcile the October 26, 2011 Daily Seg Funds Statement, but still were unable to do so because they claim they had not been provided with the necessary underlying supporting data.

401.    On Friday, October 28, 2011, CME's Audit Representatives also attempted to reconcile and tie-out MFGI's October 26, 2011 "Daily Statement of Secured Amounts and Funds Held in Separate Accounts for Foreign Futures and Foreign Options Customers Pursuant to CFTC Regulation 30.7" (the "30.7 Customer Funds Statement"), but were unable to reconcile that statement.  Without having reconciled or tied-out either MFGI's October 26, 2011 Daily Seg

143

Funds Statement, or its October 26, 2011 30.7 Customer Funds Statement, CME's Audit

Representatives decided to leave MFGI's offices at 6:00 p.m. that day.

402.     On Sunday, October 30, 2011 at approximately 2:00 p.m., a representative of the

CFTC who was on site at MFGI's Chicago office, called an employee of CME Audit Department

to inform him that she had a reviewed a draft of MFGI's October 28, 2012 Daily Seg Funds

Statement and that the Statement showed a deficiency of approximately $900 million in

segregated funds.  CME's Audit Representatives were then sent back to MFGI's offices to

investigate the October 28 Customer Segregated Funds Statement.  Despite being told that the

$900 million deficiency was the result of an "accounting error," neither of CME's Audit

Representatives were able to locate the error or reconcile the October 28, 2011 Daily Seg Funds

Statement.

403.     At approximately 1:00 a.m. on Monday, October 31, 2011, CME was advised by

representatives of MFGI that the $900 million deficiencies in customer segregated funds was

real, and that the funds were improperly transferred out of MFGI's Customer Segregated

Accounts to cover securities transactions on the broker/dealer side of the business on Thursday

and Friday, October 27, 2011 and October 28, 2011.

404.     At the time many of these illegal transfers were made, CME's Audit

Representatives were physically present on site at MFGI's Chicago offices and were allegedly

attempting to verify MFGI's compliance with the Commodity Exchange Act and CFTC's

customer funds segregation requirements.  However, even their physical presence did not cause

MFGI sufficient concern to stop the illegal transfers, as MFGI's employees apparently realized

by their actions that CME staff was not aggressively or competently pursuing MFGI's regulatory

compliance, and were more focused on MFGI achieving a "good outcome" for MFGI which was

"important" to CME and its pecuniary interests.   As a result, literally under the noses of CME audit staff, approximately $900 million of customer owned funds was illegally transferred out of segregation by MFGI employees in the Chicago office and misappropriated by the D&O Defendants.

## XIII.      CLASS ACTION ALLEGATIONS

405.     The Class Action Plaintiffs bring this action on behalf of themselves and the members of the proposed Class pursuant to Rules 23(a), 23(b)(1)(B) and 23(b)(3) of the Federal Rules of Civil Procedure individually and on behalf of all persons and entities defined in this Complaint as Commodity Customers, who had not received a return of 100% of their Customer Funds as of the close of business on October 31, 2011, provided such Customer Funds:  (i) have not been transferred to another FCM on behalf of such proposed Class member or returned to such proposed Class member by MFGI or by the Trustee; and (ii) is not hereinafter transferred or returned.  Excluded from the Class are all Defendants, all members of the immediate families of the Defendants, all of the officers, directors, and managing agents of the Defendants, all of the officers, directors, and managing agents of MFGI, MFG Holdings, MFGUK and each of their affiliates and subsidiaries.  The four requisites for class certification in Federal Rule of Civil Procedure 23(a) have been satisfied, as have the requirements of Federal Rule of Civil Procedure 23(b)(1)(B) and 23(b)(3).

406.     The members of the Class are so numerous that joinder of all members is impracticable.  Although the exact number of Class Members is presently unknown and can only be ascertained through appropriate notice and discovery, the Class Action Plaintiffs reasonably believe that there are tens of thousands of members of the proposed Class.

407.    The Class Action Plaintiffs' claims are typical of the claims of the members of the proposed Class as all members of the proposed Class were similarly affected by the Defendants' unlawful conduct as alleged in this Consolidated Amended Complaint.

408.    The Class Action Plaintiffs will fairly and adequately protect and represent the interests of the members of the proposed Class and have retained counsel competent and experienced in federal class action litigation, complex financial litigation and commodities related litigation.

409.    Common questions of law and fact exist as to all members of the proposed Class and predominate over any questions solely affecting individual members of the Class.  Among the many questions of law and fact common to the proposed Class are:

(a)    whether the funds of the members of the proposed Class were improperly commingled with the funds of MFGI;

(b)    whether the Defendants violated the Commodity Exchange Act;

(c)    whether the cash or cash equivalents of the members of the proposed Class were unlawfully borrowed, pledged, repledged, transferred, hypothecated, rehypothecated, loaned, or invested, or used to purchase or sell securities pursuant to repurchase agreements or reverse repurchase agreements;

(d)    the amount of money diverted out of 4d and 30.7Customer Accounts by Defendants;

(e)    whether Defendants are responsible for failing to maintain in separate accounts at MFGI (through its affiliates) money, securities and property sufficient to satisfy MFGI's current obligations to 30.7 Customers; and

(f)    the proper measure of damages.

410.     Moreover, to date, members of the proposed Class have received *pro rata* distributions of funds recovered by the Trustee.  Common questions appropriate for adjudication on a Class-wide basis include the extent of damages sustained by the Class Action Plaintiffs and the members of the proposed Class.

411.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual members of the proposed Class may be relatively small, the expense and burden of individual litigation make it impossible for members of the proposed Class to obtain individual redress.

412.     There will be no difficulty in the management of this action as a class action.

413.     The Class should be certified under Fed. R. Civ. P. 23(b)(1)(B).The prosecution of separate actions by individual customers of MFGI would create a risk of adjudications with respect to individual Class members that, as a practical matter, would be dispositive of the interests of other customers who are not parties to the individual adjudications, or would substantially impair or impede their ability to protect their interests.

414.     The Class should also be certified under Fed. R. Civ. P. 23(b)(3).  Questions of law or fact common to Class members predominate over any questions affecting only individual members.  Additionally, a class action under Fed. R. Civ. P. 23(b)(3) is superior to all other available methods for the fair and efficient adjudication of this controversy. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no unusual difficulty in the management of this action as a class action.

147

## XIV.      TRUSTEE'S STANDING AND ASSIGNMENT

415.     Prior to the Petition Date, the Commodities Customers and Securities Customers entrusted money, property and securities to MFGI.  Under SIPA, the CFTC regulations, the Bankruptcy Code, and other applicable law, the entrustment of cash, securities and other property by the former securities and commodities customers of MFGI creates a bailment and a fiduciary relationship between Commodities Customers and Securities Customers and MFGI. Accordingly, MFGI and the D&O Defendants had fiduciary duties to safeguard and preserve the property entrusted by the MFGI's Commodities Customers and Securities Customers and the failure to fulfill those duties has resulted in damages to MFGI's customers and to MFGI itself. Additionally, the D&O Defendants failure to fulfill their duties to MFGI's customers has caused, or will cause, a loss of general estate property damaging the general creditors of the MFGI estate.

416.     MFGI and the D&O Defendants also owed fiduciary duties to MFGI's general creditors in view of among other things, MFGI's insolvency.

417.     As successor to the interest of MFGI, as a bailee of "customer property" as defined under SIPA and section 761 of the Bankruptcy Code and as a customer representative suited to assert the general claims of MFGI's customers, the Trustee has the ability to recover against the Defendants for the loss of bailed property and for any other loss of customer property or other harms to MFGI's general estate caused by the D&O Defendants' failure to fulfill their fiduciary duties to MFGI Commodities Customers and Securities Customers.

418.     Additionally, as the successor to the interest of MFGI, the Trustee has the ability to recover for any damages to MFGI's general creditors caused by the D&O Defendants' failure to fulfill their duties to MFGI and MFGI's general creditors at a time of insolvency, including damages to MFGI's equity, net worth and going concern value and the cost of liquidation caused

148

by the shortfall in customer funds that caused Interactive to abandon its efforts to acquire MF Global.

419.   On October 19 and October 11, 2012, respectively, this Court and the Honorable James Glenn, United States Bankruptcy Judge for the Southern District of New York, approved an the Assignment Agreement, pursuant to which the Trustee, as successor-in-interest of MFGI, assigned to Interim Lead Plaintiffs his "rights, remedies, title and interest" in all "claims against former directors, officers and/or employees of MFGI and/or its parent corporation MF Global Holdings, Ltd., including claims on behalf of commodities customers, securities customers, and the estate and MFGI in its corporate capacity."  The claims assigned to the Plaintiff's through the Assignment Agreement include claims to recover for damages caused by the D&O Defendants' failure to fulfill their duties to the Commodities Customers and Securities Customers who entrusted property with MFGI and claims to recover for damages caused by the D&O Defendants for their failure to fulfill their duties to the general creditors of MFGI.

## XV.   CAUSES OF ACTION

420.   The Counts set forth herein, and the allegations supporting liability thereunder, do not depend or arise from the anti-fraud provisions of the federal securities laws or any misstatement or omission by the D&O Defendants.  This Complaint, and Defendants' demonstrable liability for the wrongful conduct alleged herein, is based solely on Defendants' breaches of duties under the Commodity Exchange Act and common law concerning the protection of customer-owned property, of which many hundreds of millions of dollars are missing or unavailable to return to Customers.

## COUNT I:  Direct Violations of the Commodity Exchange Act
### (Against Defendants Corzine and O'Brien)

421.    Plaintiffs incorporate and re-allege each of their previous allegations as though fully set forth herein.

422.    Plaintiffs bring this Count on behalf of themselves and the Class, and pursuant to the Assignment Agreement, on behalf of the Trustee as bailee of Commodity Customers' Customer Funds deposited at MFGI, against Defendants Corzine and O'Brien for direct violations of Section 4d of the CEA (7 U.S.C. § 6d) and Sections 1.20(a), 1.20(c) and 30.7(a) of CFTC regulations regarding the segregation and maintenance of customer funds and CFTC Regulation 166.3 for failure to properly supervise persons or entities under their direction and control.[28]

423.    Defendants Corzine and O'Brien each directly violated Section 4d of the Commodity Exchange Act and applicable CFTC regulations by, among other things, expressly directing the transfer of Commodity Customers' Customer Funds for the proprietary use of MF Global – including but not limited to closing overdrafts in JPM accounts – in direct violation of the CEA's prohibition against utilizing customer funds other than for the benefit of customers.

424.    At the time Defendants Corzine and O'Brien specifically directed the transfers of Commodity Customers' Customer Funds, they had complete control and dominion over such Customer Funds and were acting on behalf of MFGI's FCM unit, which was engaged in

---

[28]  17 C.F.R. § 166.3 provides that:

> Each Commission registrant, except an associated person who has no supervisory duties, must diligently supervise the handling by its partners, officers, employees and agents (or persons occupying a similar status or performing a similar function) of all commodity interest accounts carried, operated, advised or introduced by the registrant and all other activities of its partners, officers, employees and agents (or persons occupying a similar status or performing a similar function) relating to its business as a Commission registrant.

transactions with Commodities Customers as set forth in Section 22 of the CEA (7 U.S.C. § 25). Defendants Corzine and O'Brien, while both acting on behalf of and directing the actions of MFGI with respect to Commodity Customers' Customer Funds, directed MFGI to transfer such funds in a manner that caused the use of the funds of MFGI's Commodity Customers to margin or guarantee the trades or contracts, or to secure or extend the credit, of MFGI or its affiliates, and/or any other customer or person other than the MFGI customer for whom the property was held.

425.   Section 22 of the CEA (7 U.S.C. § 25 ("Section 25")) expressly provides private rights of action for violations of the CEA, including violations of Section 4d (7 U.S.C. § 6d) of the act and Sections 1.20(a), 1.20(c) and 30.7(a) of CFTC regulations regarding the segregation and maintenance of customer funds.

426.   MFGI at a time Defendants Corzine and O'Brien were both acting on behalf of and directing the actions of MFGI with respect to Commodity Customers' commodities transactions by receiving deposits, money, securities, or property from the Plaintiffs and the Class in connection with or with the expectation of a contract of sale of commodities for future delivery and otherwise participated in the transactions set forth in Section 25 of the Commodity Exchange Act (7 U.S.C. § 25(a)(1)(A)-(D)).

427.   MFGI was capable of operating and meeting its obligations under the CEA and CFTC regulations only through its senior management, including Defendants Corzine and O'Brien who had dominion over MFGI and direct supervisory responsibility and authority to ensure that MFGI properly implemented and carried out the customer segregation requirements and related obligations imposed under the CEA and CFTC regulations.

428.    As a direct and proximate consequence of the misconduct of Defendants Corzine and O'Brien as described in this Complaint, Plaintiffs and the members of the Class have lost a significant portion of the money, securities, and property they paid and delivered to MFGI to margin, guarantee, or secure their commodity or options trading, have been denied the use of their assets since no later than October 31, 2011, and have been damaged thereby at an amount to be determined at trial.

### COUNT II:  Aiding and Abetting Violations of the Commodity Exchange Act
### (Against the D&O Defendants)

429.    Plaintiffs incorporate and re-allege each of their previous allegations as though fully set forth herein.

430.    Plaintiffs bring this Count on behalf of themselves and the Class, and pursuant to the Assignment Agreement, on behalf of the Trustee as bailee of Commodity Customers' Customer Funds deposited at MFGI, against the D&O Defendants under Sections 13 and 25(a) of the CEA (7 U.S.C. §§ 13c, 25(a)) for aiding and abetting direct violations of the CEA and applicable CFTC Regulations by the other D&O Defendants and/or by MFGI.

431.    Each of the D&O Defendants, in order to support the proprietary plans and activities of MFGI and MFG Holdings and its leader Defendant Corzine, willfully aided, abetted, counseled, induced, and/or procured MFGI's and the D&O Defendants' violations Section 4d of the CEA (7 U.S.C. § 6d) and Sections 1.20(a), 1.20(c), and 30.7(a) of the CFTC Regulations regarding the segregation and maintenance of customer funds, and acted in concert and combination with MFGI and each other in such violations by, among other things, intentionally, knowingly, recklessly, or willfully:

(a)    Using, or directing, authorizing, or causing the use of, the Customer Funds of MFGI's Commodity Customers to margin or guarantee the trades or contracts, or to secure or

extend the credit, of MFGI or its affiliates, and/or any other customer or person other than the MFGI customer for whom the property was held;

(b)     Commingling the Customer Funds of MFGI's Commodity Customers with the funds of MFGI and its affiliates, MFGI's Securities Customers and/or third-parties;

(c)     Employing procedures at MFGI that did not ensure that Customer Funds, deposited for commodity futures trading, including 4d and 30.7 funds, would be treated as belonging exclusively to Commodity Customers;

(d)     Obligating MFGI customer funds for purposes other than to purchase, margin, guarantee, secure, transfer, adjust or settle trades, contracts or commodity option transactions of such customers;

(e)     Maintaining in a separate account or accounts money, securities and property in an amount not sufficient to cover or satisfy all of MFGI's current obligations to its foreign futures or foreign options customers; and

(f)     Commingling foreign futures or foreign options Customer Funds with the money, securities or property of MFGI, with proprietary accounts of MFGI and its affiliates, and/or using such funds to secure or guarantee the obligations of, or extend credit to, MFGI or its affiliates or the proprietary accounts of MFGI or its affiliates.

432.    MFGI and the D&O Defendants participated in commodities transactions by receiving deposits, money, securities, or property from the Plaintiffs and the Class in connection with or with the expectation of a contract of sale of commodities for future delivery and otherwise participated in the transactions set forth in Section 25 of the CEA (7 U.S.C. § 25(a)(1)(A)-(D)).

433.    MFGI was capable of operating and meeting its obligations under the CEA and CFTC regulations only through its senior management, including the D&O Defendants who had control over MFGI and direct supervisory responsibility and authority to ensure that MFGI properly implemented and carried out the customer segregation requirements imposed under the CEA and CFTC regulations.

434.    As a direct and proximate consequence of the D&O Defendants' conduct as described in this Complaint, Plaintiffs and the members of the Class have lost a significant portion of the money, securities, and property they paid and delivered to MFGI to margin, guarantee, or secure their commodity or options trading, have been denied the use of their Customer Funds since no later than October 31, 2011, and have been damaged thereby at an amount to be determined at trial.

### COUNT III:  Breach of Fiduciary Duty
**(Against the D&O Defendants)**

435.    Plaintiffs incorporate and re-allege each of their previous allegations as though fully set forth herein.

436.    Plaintiffs bring this Count on behalf of themselves and the Class, and pursuant to the Assignment Agreement, on behalf of the Trustee as bailee of the Commodity Customers' Customer Funds and the Securities Customers' property deposited at MFGI, against the D&O Defendants for breach of their fiduciary duties owed to Commodity Customers and separately to Securities Customers.

437.    As senior officers and/or directors of MFGI and/or MFG Holdings, the D&O Defendants were responsible for preserving the safety and security of monies, securities and property that Plaintiffs and the members of the Class had paid, delivered and entrusted to MFGI

154

to allow such customers to trade commodity futures and options contracts through MFGI and to engage in securities transactions through MFGI.

438.    As senior officers and/or directors of MFGI and/or MFG Holdings, each of the D&O Defendants exercised dominion and control over MFGI's Commodity Customers' Customer Funds and property and were charged with the duty and responsibility to adopt, implement and enforce stringent rules and procedures to segregate and separately maintain such property and to ensure that those assets were not used or applied for any improper purpose, including to fulfill or satisfy the financial obligations and liabilities of MFGI or its affiliates.

439.    As such, the D&O Defendants owed MFGI's Commodity Customers, including Plaintiffs and the members of the Class, as well as Securities Customers, a fiduciary duty to preserve and protect their Customer Funds and property, to segregate and separately maintain these assets (including 4d and 30.7 funds), to act solely in the customer's best interests in connection with its custody and control of their assets, and to avoid any self-dealing or conduct on behalf of MFGI to the detriment of customers.

440.    Further, as officers of MFG Holdings, Defendants Corzine, Steenkamp, Abelow, Ferber and Mahajan also owed MFGI and its customer and creditors additional fiduciary duties arising from MFG Holdings effective control of MFGI and from the insolvency of MFGI.

441.    The D&O Defendants breached their fiduciary duties to Plaintiffs and the members of the Class by, among other things, intentionally, knowingly, recklessly, willfully or negligently:

(a)    Using, or directing, authorizing, or causing the use of, the Commodity Customers' Customer Funds to margin or guarantee the trades or contracts, or to secure or extend

the credit, of MFGI or its affiliates, and/or any other customer or person other than the MFGI

customer for whom the property was held;

       (b)    Commingling the funds of MFGI's Commodity Customers with the funds

of MFGI and its affiliates, MFGI's Securities Customers and/or third-parties;

       (c)    Employing procedures at MFGI that did not ensure that Customer Funds,

deposited for commodity futures trading, including 4d and 30.7 funds, would be treated as

belonging exclusively to customers;

       (d)    Obligating MFGI customer funds for purposes other than to purchase,

margin, guarantee, secure, transfer, adjust or settle trades, contracts or commodity option

transactions of such customers;

       (e)    Maintaining in a separate account or accounts money, securities and

property in an amount not sufficient to cover or satisfy all of MFGI's current obligations to its

foreign futures or foreign options customers;

       (f)    Commingling foreign futures or foreign options customer funds with the

money, securities or property of MFGI, with proprietary accounts of MFGI and its affiliates,

and/or using such funds to secure or guarantee the obligations of, or extend credit to, MFGI or its

affiliates or the proprietary accounts of MFGI or its affiliates; and

       (g)    Failing to properly safeguard and segregate Securities Customer property

and to otherwise comply with regulatory requirements imposed on broker-dealers by Rule 15c3-

3 and other applicable securities laws and regulations.

      442.    As a direct and proximate consequence of the D&O Defendants' conduct as

described in this Complaint, Plaintiffs and the members of the Class have lost a significant

portion of the money, securities, and property they paid and delivered to MFGI to margin,

guarantee, or secure their commodity or options trading or to support securities transactions, have been denied the use of their Customer Funds and property since no later than October 31, 2011, and have been damaged thereby at an amount to be determined at trial.

## COUNT IV:  Aiding and Abetting Breach of Fiduciary Duty
### (Against the D&O Defendants)

443.   Plaintiffs incorporate and re-allege each of their previous allegations as though fully set forth herein.

444.   Plaintiffs bring this Count on behalf of themselves and the Class, and pursuant to the Assignment Agreement, on behalf of the Trustee as bailee of the Commodity Customers' Customer Funds and the Securities Customers' property deposited at MFGI, against the D&O Defendants for aiding and abetting breaches of the fiduciary duties owed to Commodity Customers and Securities Customers by MFGI, MFG Holdings, and the other D&O Defendants.

445.   MFGI was responsible for preserving the safety and security of cash, securities, or other property that customers deposited with and entrusted to MFGI to allow them to trade commodity futures contracts through MFGI or to conduct securities transactions, and MFGI and its senior management exercised complete dominion and control over these assets deposited by customers.

446.   MFGI, which could only act through its senior management including the D&O Defendants, promised its customers it would preserve the safety and security of their property by adopting internal safeguard policies designed to ensure the preservation of such property.  MFGI also promised that, in order to ensure the integrity of its customers' funds, it would follow stringent rules to separate its customers' assets from those used to fulfill MFGI's own obligations and liabilities, and would hold its Commodity Customers' Customer Funds in a separate account

that would be legally and physically distinct from MFGI's own accounts, and subject to rigorous accounting processes as well as regulatory reporting and auditing.

447.    As such, MFGI and the D&O Defendants owed Commodity Customers, including Plaintiffs and the members of the Class, and Securities Customers a fiduciary duty to preserve and protect their assets, to act solely in their customers' best interests in connection with its custody and control of their assets, and to avoid any self-dealing or conduct on behalf of MFGI to the detriment of customers.

448.    Additionally, MFG Holdings and Defendants Corzine, Steenkamp, Abelow, Ferber and Mahajan also owed MFGI and its customers and creditors additional fiduciary duties arising from MFG Holdings' effective control of MFGI and from the insolvency of MFGI.

449.    As senior officers and/or directors of MFGI and/or MFG Holdings, the D&O Defendants were also responsible for preserving the safety and security of cash, securities and property that Plaintiffs and the members of the Class had paid, delivered and entrusted to MFGI to allow such customers to trade commodity futures and options contracts through MFGI and to engage in securities transactions through MFGI.

450.    As senior officers and/or directors of MFGI and/or MFG Holdings, each of the D&O Defendants exercised dominion and control over MFGI's customers' property and were charged with the duty and responsibility to adopt, implement and enforce stringent rules and procedures to segregate and separately maintain such property and to ensure that those assets were not used or applied for any improper purpose, including to fulfill or satisfy the financial obligations and liabilities of MFGI or its affiliates.

451.    As such, the D&O Defendants also owed MFGI's Commodity Customers, including Plaintiffs and the Class, and MFGI's Securities Customers a fiduciary duty to preserve

and protect their Customer Funds and property, to segregate and separately maintain these assets

(including 4d, 30.7 and 15c3-3 funds), to act solely in the customer's best interests in connection

with its custody and control of their assets, and to avoid any self-dealing.

452.    MFGI, the D&O Defendants and MFG Holdings breached their fiduciary duty to

Plaintiffs and the members of the Class by, among other things:

> (a)  Failing to preserve the safety and security of Plaintiffs' Customer Funds and
> property;

> (b)  Adopting internal policies that were not designed to preserve their Customer
> Funds and property;

> (c)  Causing customer assets to be co-mingled with those used to fulfill MFGI's
> own obligations and liabilities;

> (d)  Transferring Customer Funds and property out of separate accounts into
> MFGI's own accounts;

> (e)  Failing to subject MFGI's Customer Accounts to rigorous accounting
> processes which would insure the integrity of the funds in such accounts;

> (f)  Using Plaintiffs' and Class members' Customer Funds and property for the
> payment and satisfaction of MFGI and its affiliates' financial obligations and liabilities; and

> (g)  Failing to comply with applicable segregation requirements including, but not
> limited to, Rule 15c3-3.

453.    The D&O Defendants had a direct or constructive knowledge of MFGI's and

MFG Holding's breach of fiduciary duties to Plaintiffs and the Class, and to Securities

Customers.

454.    D&O Defendants, who had the duty and responsibility for ensuring MFGI's compliance with its own internal policies and procedures and the performance of its fiduciary duties to its customers, provided substantial assistance to and aided and abetted MFGI's, MFG Holding's and the other D&O Defendants' breach of their fiduciary duties to Plaintiffs and the members of the Class, and to Securities Customers, by, among other things, intentionally, knowingly, recklessly, willfully or negligently:

(a)   Using, or directing, authorizing, or causing the use of, the funds of MFGI's Commodity Customers to margin or guarantee the trades or contracts, or to secure or extend the credit, of MFGI or its affiliates, and/or any other customer or person other than the MFGI customer for whom the Customer Funds was held;

(b)   Commingling the Customer Funds of MFGI's Commodity Customers with the funds of MFGI and its affiliates, MFGI's Securities Customers and/or third-parties;

(c)   Employing procedures at MFGI that did not ensure that Customer Funds, deposited for commodity futures trading, including 4d and 30.7 funds, would be treated as belonging exclusively to customers;

(d)   Obligating MFGI Customer Funds for purposes other than to purchase, margin, guarantee, secure, transfer, adjust or settle trades, contracts or commodity option transactions of such customers;

(e)   Maintaining in a separate account or accounts money, securities and property in an amount not sufficient to cover or satisfy all of MFGI's current obligations to its foreign futures or foreign options Commodity Customers;

(f)   Commingling foreign futures or foreign options Commodity Customers' Customer Funds with the money, securities or property of MFGI, with proprietary accounts of

MFGI and its affiliates, and/or using such funds to secure or guarantee the obligations of, or extend credit to, MFGI or its affiliates or the proprietary accounts of MFGI or its affiliates; and

(g) Failing to properly safeguard and segregate customer assets and to otherwise comply with the regulatory requirements imposed on broker-dealers by Rule 15c3-3 and other applicable securities laws and regulations.

455. As a direct and proximate consequence of the D&O Defendants' conduct as described in this Complaint, Plaintiffs and the members of the Class have lost a significant portion of the money, securities, and property they paid and delivered to MFGI to margin, guarantee, or secure their commodity, options and securities trading, have been denied the use of their assets since no later than October 31, 2011, and have been damaged thereby at an amount to be determined at trial.

## COUNT V:  Breach of Fiduciary Duty: Mismanagement
### (Against the D&O Defendants)

456. Plaintiffs incorporate and re-allege each of their previous allegations as though fully set forth herein.

457. Plaintiffs bring this Count on behalf of the Trustee, pursuant to the Assignment Agreement, as bailee of the Commodity Customers' Customer Funds and the Securities Customers' property deposited at MFGI, and on behalf of the Trustee as successor to MFGI and on behalf of its general creditors against the D&O Defendants for breach of their fiduciary duties to MFGI not to mismanage the Company.

458. As senior officers and/or directors of MFGI and/or MFG Holdings, the D&O Defendants were responsible for preserving the safety and security of monies, securities and property that Plaintiffs and the members of the Class had paid, delivered and entrusted to MFGI

to allow such customers to trade commodity futures and options contracts through MFGI and to engage in securities transactions through MFGI.

459.    As senior officers and/or directors of MFGI and/or MFG Holdings, each of the D&O Defendants exercised dominion and control over MFGI's Commodity Customers' Customer Funds and property and were charged with the duty and responsibility to adopt, implement and enforce stringent rules and procedures to segregate and separately maintain such property and to ensure that those assets were not used or applied for any improper purpose, including to fulfill or satisfy the financial obligations and liabilities of MFGI or its affiliates.

460.    As such, the D&O Defendants owed MFGI a fiduciary duty to preserve and protect their Customer Funds and property, to segregate and separately maintain such Customer Funds and property (including 4d and 30.7 funds), to act solely in the customers' best interest in connection with its custody and control of their assets, and to avoid any self-dealing or conduct on behalf of MFGI to the detriment of customers.

461.    Further, as officers of MFG Holdings, Defendants Corzine, Steenkamp, Abelow, Ferber and Mahajan also owed MFGI and its customer and creditors additional fiduciary duties arising from MFG Holdings effective control of MFGI and from the insolvency of MFGI.

462.    The D&O Defendants intentionally, knowingly, recklessly, willfully or negligently:

(a)    Used, directed, authorized, or caused the use of, the Customer Funds of MFGI's Commodity Customers to margin or guarantee the trades or contracts, or to secure or extend the credit, of MFGI or its affiliates, and/or any other customer or person other than the MFGI customer for whom the property was held;

162

(b)      Commingled the Customer Funds of MFGI's Commodity Customers with the funds of MFGI and its affiliates, MFGI's Securities Customers and/or third-parties;

(c)      Employed procedures at MFGI that did not ensure that Customer Funds, deposited for commodity futures trading, including 4d and 30.7 funds, would be treated as belonging exclusively to customers;

(d)      Obligated MFGI Customer Funds for purposes other than to purchase, margin, guarantee, secure, transfer, adjust or settle trades, contracts or commodity option transactions of such customers;

(e)      Maintained in a separate account or accounts money, securities and property in an amount not sufficient to cover or satisfy all of MFGI's current obligations to its foreign futures or foreign options Commodity Customers;

(f)      Commingled foreign futures or foreign options customer funds with the money, securities or property of MFGI, with proprietary accounts of MFGI and its affiliates, and/or using such funds to secure or guarantee the obligations of, or extend credit to, MFGI or its affiliates or the proprietary accounts of MFGI or its affiliates; and

(g)      Failed to properly safeguard and segregate Securities Customer assets and to otherwise comply with regulatory requirements imposed on broker-dealers by Rule 15c3-3 and other applicable securities laws and regulations.

463.     The misuse of Customer Funds and property, as alleged above, were the result of the mismanagement of the Debtor's corporate affairs including:  (i) the unsustainable escalation of the liquidity requirements resulting from the proprietary investments at the center of Defendant Corzine's strategy to transform MF Global into a full-service investment bank; (ii) purposeful transfers of Customer Funds to meet proprietary liquidity needs which, when

discovered, destroyed any possible sale of MFGI; (iii) the recklessness and negligent monitoring and management of liquidity requirements; and (iv) the failure to establish internal controls over daily cash transfers intra-company within MFGI and inter-company to MFG Holdings and other subsidiaries.

464.    As a direct and proximate consequence of the D&O Defendants' conduct as described in this Complaint, the entire going concern value of MFGI was lost and MFGI's general creditors have suffered additional damages as a result of the forced liquidation of MFGI including the cost associated with the liquidation.  Plaintiffs and the members of the Class have lost a significant portion of the money, securities, and property they paid and delivered to MFGI to margin, guarantee, or secure their commodity or options trading or to support securities transactions, have been denied the use of their Customer Funds and property since no later than October 31, 2011, and have been damaged thereby at an amount to be determined at trial.

## COUNT VI:  Negligence
### (Against the D&O Defendants)

465.    Plaintiffs incorporate and re-allege each of their previous allegations as though fully set forth herein.

466.    Plaintiffs bring this Count on behalf of themselves and the Class, and pursuant to the Assignment Agreement, on behalf of the Trustee as bailee of the Commodity Customers' Customer Funds and the Securities Customers' property deposited at MFGI, and on behalf of the Trustee as successor to MFGI and on behalf of its general creditors against the D&O Defendants for negligence.

467.    At all times relevant hereto, the D&O Defendants exercised dominion and control over and jointly had custodial responsibility for Customer Funds and property required to be held in segregated accounts at MFGI.

164

468.     At all times relevant hereto, the D&O Defendants, by reason of their managerial responsibilities at and dominion and control over MFGI, owed Plaintiffs and Class Members, and Securities Customers, a duty of care in the handling of Customer Funds and property held in segregated accounts at MFGI.

469.     Each of the D&O Defendants was in near privity with Plaintiffs and Class Members, and with Securities Customers, because they were aware that Plaintiffs and Class Members, and Securities Customers, were reliant on the proper handling of segregated accounts to preserve Customer Funds and property, because Plaintiffs and Class Members, and Securities Customers, were a discrete group, and because the Defendants intended that Plaintiffs and Class Members, and Securities Customers. rely upon the continuing segregation of customer-owned assets to assure the return of their property.

470.     MFGI and the D&O Defendants breached their duty to the Plaintiffs and the Class Members, and to Securities Customers, to exercise due care in the handling of customer-owned funds by, among other things, intentionally, knowingly, recklessly, willfully or negligently:

(a)     Using, or directing, authorizing, or causing the use of, the funds of MFGI's Commodity Customers to margin or guarantee the trades or contracts, or to secure or extend the credit, of MFGI or its affiliates, and/or any other customer or person other than the MFGI customer for whom the property was held;

(b)     Commingling the funds of MFGI's Commodity Customers with the funds of MFGI and its affiliates, MFGI's Securities Customers and/or third-parties;

(c)     Employing procedures at MFGI that did not ensure that Customer Funds, deposited for commodity futures trading, including 4d and 30.7 funds, would be treated as belonging exclusively to customers;

(d)      Obligating MFGI Customer Funds for purposes other than to purchase, margin, guarantee, secure, transfer, adjust or settle trades, contracts or commodity option transactions of such customers;

(e)      Maintaining in a separate account or accounts money, securities and property in an amount not sufficient to cover or satisfy all of MFGI's current obligations to its foreign futures or foreign options customers;

(f)      Commingling foreign futures or foreign options Customer Funds with the money, securities or property of MFGI, with proprietary accounts of MFGI and its affiliates, and/or using such funds to secure or guarantee the obligations of, or extend credit to, MFGI or its affiliates or the proprietary accounts of MFGI or its affiliates; and

(g)      Failing to properly safeguard and segregate Customer Funds and property and to otherwise comply with the regulatory requirements imposed on broker-dealers by Rule 15c3-3 and other applicable securities laws and regulations.

471.    In addition, the D&O Defendants directed, caused, authorized or participated in MFGI's negligent handling of Customer Funds and property.

472.    Accordingly the D&O Defendants are liable to Plaintiffs and the Class for the loss of all Customer Funds and property in the segregated accounts at MFGI that were transferred and not returned.

473.    As a direct and proximate consequence of the D&O Defendants' conduct as described in this Complaint, Plaintiffs and the members of the Class have lost a significant portion of the money, securities, and property they paid and delivered to MFGI to margin, guarantee, or secure their commodity, options or securities trading, have been denied the use of

their assets since no later than October 31, 2011, and have been damaged thereby at an amount to be determined at trial.

## COUNT VII:  Negligence
### (Against the D&O Defendants)

474.    Plaintiffs incorporate and re-allege each of their previous allegations as though fully set forth herein.

475.    Plaintiffs bring this Count against the D&O Defendants, pursuant to the Assignment Agreement, on behalf of the Trustee as successor-in-interest to and on behalf of MFGI and the general creditors of MFGI.

476.    The D&O Defendants owed MFGI and its creditors obligations to perform their duties as officers and directors in good faith and with appropriate care, including their duties to ensure that MFGI was complying with all applicable regulations concerning safeguarding and supervising the segregation of Customer Funds.

477.    As set forth above, the D&O Defendants breached their obligations to MFGI and its creditors by causing a $900 million shortfall in Customer Funds that caused Interactive Brokers  to abandon its efforts to acquire MF Global, thereby leaving MFGI no option but to commence a SIPA liquidation and incur the cost associated with the liquidation.

478.    The shortfall and ensuing collapse of MFGI was due to the D&O Defendants breaching their duties to MFGI and its creditors by, among other things:

(a)     Causing, authorizing, approving, participating in, facilitating, or failing to prevent unlawful transfers of Customer Funds and property during the final days before the Filing Date;

(b)     Causing MFGI to operate without appropriate liquidity and risk infrastructure to protect Customer Funds and property;

167

(c)     Permitting and causing MFGI to rely on intra-day "loans", as alleged, from the FCM as a source of liquidity to fund other operations at MFG Holdings and MFGI, when they knew or should have reasonably known that the FCM could not support the level of intra-day "loans" without unlawfully using Customer Funds and property in a time of financial stress as Defendants ultimately did.

(d)     Approving or facilitating the reckless expansion of MFGI's proprietary trading activities, including growing MFGI's RTM sovereign debt portfolio despite the exposure to ruinous margin calls; and

(e)     Failing to ensure that the 30.7 accounts were protected and liquid, which has resulted in the inability to access and return 30.7 customer funds.

479.     The D&O Defendants' conduct set forth in subparagraphs (a) through (e) was not undertaken as an appropriate exercise of their business judgment.

480.     Defendants' misconduct and violations of duties directly caused damages to MFGI and to the creditors of MFGI, including but not limited to the damages and loss of value caused by the collapse of MF Global and the cost of liquidation.

### COUNT VIII:  Tortious Interference with Contract and Business Advantage
**(Against the D&O Defendants)**

481.     Plaintiffs incorporate and re-allege each of their previous allegations as though fully set forth herein.

482.     Plaintiffs bring this Count on behalf of themselves and the Class, and pursuant to the Assignment Agreement, on behalf of the Trustee as bailee of the Commodity Customers' Customer Funds and the Securities Customers' property deposited at MFGI, against the D&O Defendants for tortious interference with contract and business advantage.

483.    Plaintiffs, every member of the Class, and the Securities Customers entered into an account-agreement and/or contract with MFGI that included an express or implied term that MFGI would comply with the requirements of the Commodities Act and the CFTC regulations, including all of the segregation requirements in the Commodities Act and CFTC regulations applicable to Customer Funds and property, or the requirements of the Exchange Act and Rule 15c3-3, and any applicable regulations, as appropriate.

484.    The D&O Defendants knew that Commodities Customers and Securities Customers entered into account agreements and/or contracts and that the relationship created by such agreements required that MFGI segregate Customer Funds and property.

485.    MFGI violated the segregation requirements of the Commodities Exchange Act and CFTC Regulations, and the requirements of the Exchange Act and Rule 15c3-3, by removing Customer Funds and property from segregated accounts for purposes other than to purchase, margin, guarantee, secure, transfer, adjust or settle trades, contracts or commodity option transactions of such customers, or by failing to segregate Securities Customer assets.

486.    Each of the D&O Defendants, in order to support the proprietary plans and activities of MF Global and Defendant Corzine, willfully aided, abetted, counseled, induced, and/or procured MFGI's breach of its contracts with Plaintiffs, Class Members and Securities Customers by, among other things, intentionally, knowingly, recklessly, willfully or negligently:

(a)    Using, or directing, authorizing, or causing the use of, the funds of MFGI's Commodity Customers to margin or guarantee the trades or contracts, or to secure or extend the credit, of MFGI or its affiliates, and/or any other customer or person other than the MFGI customer for whom the property was held;

(b)      Commingling the funds of MFGI's Commodity Customers with the funds of MFGI and its affiliates, MFGI's Securities Customers and/or third-parties;

(c)      Employing procedures at MFGI that did not ensure that Customer Funds and property, deposited for commodity futures trading, would be treated as belonging exclusively to customers;

(d)      Obligating MFGI Customer Funds and property for purposes other than to purchase, margin, guarantee, secure, transfer, adjust or settle trades, contracts or commodity option transactions of such customers;

(e)      Maintaining in a separate account or accounts money, securities and property in an amount not sufficient to cover or satisfy all of MFGI's current obligations to its foreign futures or foreign options Commodity Customers;

(f)      Commingling foreign futures or foreign options Commodity Customers' Customer Funds with the money, securities or property of MFGI, with proprietary accounts of MFGI and its affiliates, and/or using such funds to secure or guarantee the obligations of, or extend credit to, MFGI or its affiliates or the proprietary accounts of MFGI or its affiliates; and

(g)      Failing to properly safeguard and segregate Customer Funds and property and to otherwise comply with the regulatory requirements imposed on broker-dealers by Rule 15c3-3 and other applicable securities laws and regulations.

487.   Independent of the mutual obligations under the account agreements and/or contracts, every Commodity Customer-member of the Class and Securities Customer was in a business relationship with MFGI.  The D&O Defendants knew about such business relationships and interfered with such relationships by using dishonest, unfair or improper means as set forth in subparagraphs (a) through (f) immediately above.

170

488.    As a direct and proximate consequence of the D&O Defendants' conduct as described in this Complaint, Plaintiffs and the Class Members, and Securities Customers, have lost a significant portion of the money, securities, and property they paid and delivered to MFGI to margin, guarantee, or secure their commodity or options trading or securities trading, have been denied the use of their assets since no later than October 31, 2011, and have been damaged thereby at an amount to be determined at trial.

## COUNT IX:  Conversion
### (Against Defendants Corzine and O'Brien)

489.    Plaintiffs incorporate and re-allege each of their previous allegations as though fully set forth herein.

490.    Plaintiffs bring this Count on behalf of themselves and the Class, and pursuant to the Assignment Agreement, on behalf of the Trustee as bailee of the Commodity Customers' Customer Funds and the Securities Customers' property deposited at MFGI, against Defendants Corzine and O'Brien for conversion.

491.    At all times prior to MFGI's bankruptcy, MFGI's Commodity Customers, including Plaintiffs and the Class, retained title to the property they deposited with MFGI and the right to withdraw the funds they deposited at MFGI at all times.  Defendants Corzine and O'Brien exercised dominion and control over such Customer Funds and property deposited at MFGI, and/or interfered with the possessory rights of Plaintiffs and the Class to their property, in derogation of those rights.

492.    Between October 24, 2011 and October 28, 2011, Defendants Corzine and O'Brien authorized and directed the delivery of hundreds of millions of dollars of specifically identifiable Customer Funds out of segregated accounts to meet MFGI's obligations and not for any purpose for which these Defendants were authorized to transfer Customer Funds.  By way of

171

example only, on or about October 28, 2011, Defendants Corzine and O'Brien authorized and directed the delivery of $175 million in specifically identifiable Customer Funds that belonged to Plaintiffs and Class Members (hereinafter "the Customers' $175 million") to MFGUK for the purpose of paying down an MFGUK bank overdraft. The delivery of the Customers' $175 million to MFGUK was not done for any purpose for which MFGI and Defendants Corzine and O'Brien were authorized to transfer Customer Funds.

493.    Between October 24, 2011 and October 28, 2011, Defendants Corzine and O'Brien unlawfully converted hundreds of millions of dollars in Customer Funds as aforesaid, including by way of example only, the Customers' $175 million.

494.    By transferring the hundreds of million in Customer Funds without the consent of MFGI's Commodity Customers, Defendants Corzine and O'Brien exercised unauthorized dominion and control over the Customer Funds at MFGI, and/or interfered with the possessory rights of Plaintiffs and the Class, in violation of the CEA, the CFTC rules and other relevant rules and regulations.

495.    As a direct and proximate consequence of the conduct of Defendants Corzine and O'Brien as described in this Complaint, Plaintiffs and the members of the Class have lost a significant portion of the money, securities, and property they paid and delivered to MFGI to margin, guarantee, or secure their commodity or options trading, have been denied the use of their assets since no later than October 31, 2011, and have been damaged thereby at an amount to be determined at trial.

## COUNT X:  Aiding and Abetting Conversion
### (Against Defendants Corzine and O'Brien)

496.    Plaintiffs incorporate and re-allege each of their previous allegations as though fully set forth herein.

497.    Plaintiffs bring this Count on behalf of themselves and the Class, and pursuant to the Assignment Agreement, on behalf of the Trustee as bailee of Commodity Customers' Customer Funds deposited at MFGI, against Defendants Corzine and O'Brien for aiding and abetting conversion by MFGI.

498.    Between October 24, 2011 and October 28, 2011, MFGI delivered hundreds of millions of dollars of specifically identifiable Customer Funds out of segregated accounts to meet MFGI's obligations and not for any purpose for which MFGI was authorized to transfer Customer Funds.  By way of example only, on or about October 28, 2011, MFGI transferred the Customers' $175 million to MFGUK for the purpose of paying down an MFGUK bank overdraft.  The delivery of the Customers' $175 million to MFGUK was not done for any purpose for which MFGI was authorized to transfer Customer Funds.

499.    The aforesaid transfers constituted unlawful conversions of Customer Funds.

500.    Through their dominion and control over Customer Funds, and/or by reason of the daily segregation and liquidity reports provided to them, Defendants Corzine and O'Brien knew, or were grossly reckless in not knowing, that the aforesaid improper transfers consisted of Customer Funds held by the FCM.

501.    Defendants Corzine and O'Brien substantially assisted in the conversion of Customer Funds and property by MFGI by directing that monies be removed from accounts containing segregated Customer Funds and property.  Among other things, Defendants Corzine

173

and O'Brien ordered a transfer of Customer Funds to JPM Chase for the purpose of reducing an MFGI loan obligation to JPM Chase Bank.

502.    As a direct and proximate consequence of the conduct of Defendants Corzine and O'Brien as described in this Complaint, Plaintiffs and the members of the Class have lost a significant portion of the money, securities, and property they paid and delivered to MFGI to margin, guarantee, or secure their commodity or options trading, have been denied the use of their assets since no later than October 31, 2011, and have been damaged thereby at an amount to be determined at trial.

## COUNT XI:  Breach of Fiduciary Duty
### (Against D&O Defendants)

503.    Plaintiffs incorporate and re-allege each of their previous allegations as though fully set forth herein.

504.    Plaintiffs bring this Count against the D&O Defendants, pursuant to the Assignment Agreement, on behalf of the Trustee as successor-in-interest to and on behalf of MFGI and the general creditors of MFGI.

505.    The D&O Defendants owed MFGI and its creditors a fiduciary duty to perform their duties as officers and directors in good faith and with appropriate care, including their duties to ensure that MFGI was complying with all applicable regulations concerning safeguarding and supervising the segregation of Customer Funds and property.

506.    As officers of MFG Holdings, Defendants Corzine, Steenkamp, Abelow, Ferber and Mahajan also owed MFGI and its creditors fiduciary duties arising from MFG Holdings' effective control of MFGI, and from the insolvency of MFGI.

507.    As set forth above, the D&O Defendants breached their fiduciary obligations to MFGI and its creditors by causing a $900 million shortfall in Customer Funds that caused

174

Interactive to abandon its efforts to acquire MF Global, thereby leaving MFGI no option but to commence a SIPA liquidation (and incur the cost associated with the liquidation).

508.    The shortfall and ensuing collapse of MFGI was due to the D&O Defendants breaching their fiduciary duties to MFGI and its creditors by, among other things:

(a)    Causing, authorizing, approving, participating in, facilitating, or failing to prevent unlawful transfers of Customer Funds during the final days before the Filing Date;

(b)    Causing MFGI to operate without appropriate liquidity and risk infrastructure to protect Customer Funds;

(c)    Permitting and causing MFGI to rely on intra-day "loans", as alleged, from the FCM as a source of liquidity to fund other operations at MFG Holdings and MFGI, when they knew or should have reasonably known that the FCM could not support the level of intra-day "loans" without unlawfully using Customer Funds in a time of financial stress as Defendants ultimately did.

(d)    Approving or facilitating the reckless expansion of MFGI's proprietary trading activities, including growing MFGI's RTM sovereign debt portfolio despite the exposure to ruinous margin calls; and

(e)    Failing to ensure that the 30.7 accounts were protected and liquid, which has resulted in the inability to access and return 30.7 customer funds.

509.    The D&O Defendants' unlawful and reckless conduct set forth in subparagraphs (a) through (e) was not undertaken as an appropriate exercise of their business judgment.

510.    Defendants' misconduct and violations of fiduciary duties at a time of insolvency directly caused damages to MFGI and to the creditors of MFGI, including but not limited to the damages and loss of value caused by the collapse of MF Global and the cost of the liquidation.

175

## COUNT XII:  Aiding and Abetting Breach of Bailment
### (Against the D&O Defendants)

511.    Plaintiffs incorporate and re-allege each of their previous allegations as though fully set forth herein.

512.    Plaintiffs bring this Count against the D&O Plaintiffs, pursuant to the Assignment Agreement, on behalf of the Trustee as successor-in-interest to and on behalf of MFGI.

513.    The requirements of Rule 15c3-3 and the Securities Customers entrustment of property to MFGI to support their securities transactions creates an express bailment between MFGI and the Securities Customers by operation of law.  As a bailee of the property of Securities Customers, MFGI had a legal obligation to exercise care in the custody of the Securities Customers' property and to ensure that the property was segregated and readily available to be returned to the Securities Customers.

514.    MFGI breached the bailment between itself and MFGI by failing to properly safeguard and segregates Securities Customers' assets and otherwise comply with the regulatory requirements imposed on a broker-dealer by Rule 15c3-3 and the other applicable securities laws and regulations.

515.    The D&O Defendants were aware of MFGI's breach of the bailment relationship between itself and the Securities Customers and provided substantial assistance to MFGI in committing that breach by, among other things, by:

(a)    Using, or directing, authorizing, or causing the use, of the funds of MFGI's Securities Customers to margin or guarantee the trades or contracts, or to secure or extend the credit, of MFGI or its affiliates;

(b)    Commingling the funds of MFGI's Securities Customers with the funds of MFGI's Commodities Customers and MFGI and its affiliates, MFGI's and/or other third-parties;

176

(c)     Employing procedures at MFGI that did not ensure that Securities Customer property would be treated as belonging exclusively to Securities Customers;

(d)     Otherwise failing to properly safeguard and segregate Securities Customer assets and otherwise comply with the regulatory requirements imposed on a broker-dealer by Rule 15c3-3 and the other applicable securities laws and regulations.

516.   As a direct and proximate consequence of the D&O Defendants' conduct as described in this Complaint, MFGI Securities Customers may have lost a significant portion of the money, securities, and property they paid and delivered to MFGI to support the securities transactions they conducted through MFGI, have been denied the use of their assets since no later than October 31, 2011, and have been damaged thereby at an amount to be determined at trial.

## COUNT XIII:  Professional Negligence by PwC
### (Against Defendant PwC)

517.   Plaintiffs incorporate and re-allege each of their previous allegations as though fully set forth herein.

518.   Plaintiffs bring this Count against PwC on behalf of the Trustee, as successor-in-interest to and on behalf of MFGI, and/or derivatively on behalf of and with the Trustee's consent, pursuant to the Assignment Agreement.

519.   Plaintiffs also bring this Count on their own behalf and on behalf of the Class as depositors of property at MFGI and thus beneficiaries, in quasi-privity with PwC, of PwC's duty to review MFGI's controls over Customer Funds and property.

520.   As alleged above, MFGI hired PwC on multiple occasions to perform an audit of MFGI's financial statements and internal controls in accordance with Commodity Exchange Act Sections 4d and 4f, 7 U.S.C. §§ 6d, 6f; Sections 1.10, 1.12, 1.14-1.18, and 1.20-1.37 of the

CFTC Regulations, 17 C.F.R. §§ 1.10, 1.12, 1.14-1.18, 1.20-1.37; SEC Rule 17a-5; the rules of all relevant DSROs and/or exchanges; the generally accepted auditing standards ("GAAS"); auditing standards set forth by the American Institute of Certified Public Accountants ("AICPA"); and all other relevant and applicable law, rules, and administrative interpretative guidance.  At all times pertinent hereto, PwC owed a professional duty of care to MFGI, and to Commodity Customers, to conduct the audits in accordance with the aforementioned statutes, regulations, rules, and standards.

521.    PwC breached its duty to MFGI and to Commodity Customers to exercise the requisite due care by failing to conduct the audit in accordance with appropriate professional standards by:

(a)     Failing to exercise the requisite professional skepticism;

(b)     failing to understand MFGI's operations and business environment, and failing to account for the size and complexity of MFGI's operations, in planning and implementing the audit procedures;

(c)     failing to understand and/or investigate the likely impact of MFGI's plans to increase risk exposure through proprietary trading activity;

(d)     failing to investigate the commingling of MFGI's and Customer Funds and property to ensure that Customer Funds and property were not being misappropriated or otherwise improperly accounted for;

(e)     failing to investigate MFGI's use of or investment of Customer Funds and property to ensure that MFGI was not misuse or inappropriately investing Customer Funds and property; and

178

(f)    failing to review and conduct appropriate tests of MFGI's accounting system, internal controls, and procedures for accounting for, safeguarding, and segregating Customer Funds and property from the firm's assets.

522.    PwC failed to investigate, identify and/or report material inadequacies in MFGI's accounting systems, internal controls, procedures for safeguarding customer and firm assets, and practices and procedures for producing required financial statements, computations, and schedules.  Upon information and belief, PwC failed to investigate, identify, and/or report:

(a)    materially inadequate accounting and information technology systems, staffing, procedures, and internal controls for tracking, accounting for, and/or reconciling trading activity, Customer Funds and property, and firm assets;

(b)    materially inadequate systems for providing accurate and timely computations necessary to satisfy MFGI's regulatory requirements, including computations of segregated Customer Funds as required by the Commodity Exchange Act and CFTC Regulations;

(c)    materially inadequate internal controls for ensuring that Customer Funds and property were not utilized or invested inappropriately by MFGI, its senior management and/or MFGI;

(d)    materially inadequate internal controls for ensuring the Customer Funds and property were not inappropriately commingled with MFGI's assets;

(e)    materially inadequate systems for assessing and reporting capital and liquidity risks, and ensuring that such risks did not affect, and would not likely affect, the safety of customer or firm assets, or the accuracy or timeliness of financial statements or schedules;

(f)     materially inadequate systems for controlling, verifying, and tracking intrafirm funds transfers and transfers of funds to third parties;

(g)     materially inadequate systems and procedures for management and the board of directors to monitor compliance with applicable regulations, including those relating to the segregation and safeguarding of Customer Funds and property; and

(h)     materially inadequate systems and procedures for the board of directors to monitor and assess capital and liquidity risks generated by MFGI's increased proprietary trading activity, and the affect of such risks on MFGI's operations and ability to safeguard customer and firm assets.

523.    The foregoing inadequacies were material, individually and collectively.  The foregoing inadequacies contributed substantially to, and could have reasonably been expected to inhibit, MFGI's inability to discharge its responsibilities to customers.  The foregoing inadequacies contributed to material financial loss both to customers and to MFGI; resulted in material misstatements of required financial statements and schedules, including MFGI's calculation of segregated funds pursuant to the Commodity Exchange Act and CFTC Regulations; and resulted in violations of the CFTC's segregation or secured amount, recordkeeping or financial reporting requirements.  The foregoing material inadequacies could have been investigated, identified, and reported by PwC, had PwC exercised due care in planning and performing the audits.

524.    Through the actions and inaction alleged above, PwC breached its duty by failing to exercise due care in performing the audits.

525.    As a direct and proximate consequence of PwC's failure to exercise due care, as described above, MFGI, and to Commodity Customers, incurred substantial damages.

180

## COUNT XIV:  Breach of Fiduciary Duty by PwC
### (Against Defendant PwC)

526.    Plaintiffs incorporate and re-allege each of their previous allegations as though fully set forth herein.

527.    Plaintiffs bring this Count against PwC on behalf of the Trustee, as successor-in-interest to and on behalf of MFGI, and/or derivatively on behalf of and with the Trustee's consent, pursuant to the Assignment Agreement.

528.    As MFGI's auditor, PwC had a legal duty to MFGI to, among other things, conduct "a review and appropriate tests of the accounting system, the internal accounting control, and the procedures for safeguarding customer and firm assets in accordance with the provisions of the Act and the regulations thereunder."  17 C.F.R. § 1.16(d)(1).  This audit was required to "include all procedures necessary under the circumstances to enable the independent licensed or certified public accountant to express an opinion on the financial statements and schedules."  *Id.*  Additionally:

> The scope of the audit and review of the accounting system, the internal controls, and procedures for safeguarding customer and firm assets must be sufficient to provide reasonable assurance that any material inadequacies existing at the date of the examination in (i) the accounting system, (ii) the internal accounting controls, and (iii) the procedures for safeguarding customer and firm assets (including, in the case of a futures commission merchant, the segregation requirements of section 4d(a)(2) of the Act and these regulations and the secured amount requirements of the Act and these regulations) will be discovered. Additionally, as specified objectives the audit must include reviews of the practices and procedures followed by the registrant in making (A) periodic computations of the minimum financial requirements pursuant to § 1.17 and (B) in the case of a futures commission merchant, daily computations of the segregation requirements of section 4d(a)(2) of the Act and these regulations and the secured amount requirements of the Act and these regulations. *Id.*

529.    If during the course of its audit or in performing any interim work, PwC encountered any "material inadequacies" in MFGI's accounting systems, internal controls,

and/or procedures for safeguarding customer or firm assets, PwC was obligated to report such material inadequacies to MFGI. *Id.* § 1.16(g). (Additionally, if MFGI did not then report such findings to the CFTC and its DSRO and provide proof to PwC of having done so, PwC was required to report such material inadequacies to the CFTC and MFGI's designated DSRO. *Id.*)

530.   MFGI entrusted PwC to investigate, identify, and report any material inadequacies in its accounting systems, internal controls, and procedures for safeguarding customer or firm assets. As such, PwC owed MFGI a fiduciary duty to preserve and protect its assets and business operations.

531.   PwC knowingly breached its fiduciary duties to MFGI, and to Commodity Customers, by, among other things:

(a)   failing to investigate, identify, and/or report material inadequacies in MFGI's accounting systems and internal controls, by which MFGI failed to ensure that Customer Funds were properly accounted for and segregated, as required by the Commodity Exchange Act and CFTC Regulations;

(b)   failing to investigate, identify, and/or report material inadequacies in MFGI's accounting systems and internal controls, by which MFGI failed to ensure that its financial statements, computations, and schedules, particularly with respect to the segregation of Customer Funds, complied with the Commodity Exchange Act and CFTC Regulations;

(c)   failing to investigate, identify, and/or report evidence of inappropriate commingling of Customer Funds with MFGI's funds;

(d)   failing to investigate, identify, and/or report evidence of inappropriate investment of by MFGI; and

(e)      issuing "internal controls letters" falsely and erroneously stating that PwC conducted an audit in accordance with applicable law, regulations, and professional standards, and that PwC had identified no material weaknesses in MFGI's internal controls for safeguarding securities and certain regulated commodity customer and firm assets.

532.    As a direct and proximate consequence of the PwC's conduct, MFGI, and Commodity Customers, incurred substantial damages.

## COUNT XV:  Direct Violations of the Commodity Exchange Act
### (Against Defendant CME)

533.    Plaintiffs[29] incorporate and re-allege each of their previous allegations as though fully set forth herein.

534.    Plaintiffs bring this Count on behalf of themselves and the Class against Defendant CME for violations of the Commodity Exchange Act.

535.    Section 25(b)(1) of the Commodity Exchange Act provides in relevant part:

A registered entity that fails to enforce any bylaw, rule, regulation, or resolution that it is required to enforce by section 7, 7a-1, 7a-2, 7b-3, or 24a of this title, (B) a licensed board of trade that fails to enforce any bylaw, rule, regulation, or resolution that it is required to enforce by the Commission, or (C) any registered entity that in enforcing any such bylaw, rule, regulation, or resolution violates this chapter or any Commission rule, regulation, or order, shall be liable for actual damages sustained by a person who engaged in any transaction on or subject to the rules of such registered entity to the extent of such person's actual losses that resulted from such transaction and were caused by such failure to enforce or enforcement of such bylaws, rules, regulations, or resolutions.

7 U.S.C. § 25(b)(1).

536.    Defendant CME is a "board of trade," "designated contract market" and "registered entity" as those terms are used and defined in the Commodity Exchange Act.

---

[29] The Plaintiffs do not assert any claims against Defendant CME, in their capacity as assignee of claims of the Trustee.  *See infra* n.11.

537.    As a board of trade and designated contract market, Defendant CME was required, under Section 7 of the Commodity Exchange Act to, among other things, establish and enforce rules to:

    (i)    ensure the financial integrity of any FCM utilizing its market and the protection of customer funds; and

    (ii)    protect market participants from abusive practices by, among others, FCM members acting on their customers' behalf.

7 U.S.C. § 7(d)(11) and (12).

538.    Defendant CME is also a "self-regulatory organization" ("SRO") as that term is used and defined in CFTC Regulations.  17 C.F.R. 1.3(ee).  As an SRO, Defendant CME was required to adopt and enforce minimum financial and reporting requirements for its FCM members, and to oversee, monitor and audit the FCMs to ensure their compliance with their statutory and regulatory requirements and exchange rules.

539.    MFGI was an FCM member of each of the CME Exchanges, as well as other U.S. commodity exchanges.  Where an FCM is a member of multiple SRO exchanges, one exchange is appointed and functions as the DSRO for the FCM, with primary responsibility for supervising, monitoring and auditing the FCM to ensure compliance with the CFTC's capital and customer protection requirements.  MFGI's DSRO was the CME.

540.    The CME, in compliance with its statutory duty as SROs to regulate, monitor and audit its FCM members, adopted rules (i) to ensure the financial integrity of the FCMs utilizing their markets; (ii) to protect market participants from abusive practices by FCMs acting on their behalf; (iii) to establish and enforce minimum financial and reporting requirements; and (iv) to enforce compliance with the FCMs' financial and reporting requirements and exchange rules (collectively the "Exchange Rules").

541.     Among the Exchange Rules Defendant CME adopted in order to comply with its statutory duties as SROs was Rule 971 which provides:

A.     All clearing members must comply with the requirements set forth in CFTC Regulations 1.20 through 1.30, 1.32, and 30.7, and CME Rules 8F100 through 8F136. This includes, but is not limited to, the following:

1.   Maintaining sufficient funds at all times in segregation, secured 30.7 and sequestered accounts;

2.   Computing, recording and reporting completely and accurately the balances in the:

a.     Statement of Segregation Requirements and Funds in Segregation;

b.     Statement of Secured Amounts and Funds Held in Separate Accounts; and

c.     Statement of Sequestration Requirements and Funds Held in Sequestered Accounts.

3.   Obtaining satisfactory segregation, secured 30.7 and sequestered account acknowledgment letters and identifying segregated, secured 30.7 and sequestered accounts as such; and

4.   Preparing complete and materially accurate daily segregation, secured 30.7 and sequestered amount computations in a timely manner.

B.     All FCM clearing members must submit a daily segregated, secured 30.7 and sequestered amount statement, as applicable, through Exchange-approved electronic transmissions by 12:00 noon on the following business day.

C.     All FCM clearing members must submit a report of investments in a manner as prescribed through Exchange-approved electronic transmissions as of the 15th of the month (or the following business day if the 15th is a holiday or weekend) and last business day of the month by the close of business on the following business day. The report of investments shall be prepared and shall identify separately for segregated, secured 30.7 and sequestered funds held:

1.   The dollar amount of funds held in cash and each permitted investment identified in CFTC Regulation 1.25(a); and

2.   The identity of each depository holding funds and the dollar amount held at each depository.

D.      [RESERVED]

E.      All clearing members must provide written notice to the Audit Department of a failure to maintain sufficient funds in segregation, secured 30.7 or sequestered accounts. The Audit Department must receive immediate written notification when a clearing member knows or should have known of such failure.

F.      Each statement and report filing required under this Rule must be submitted by the Chief Executive Officer, Chief Financial Officer or their authorized representative as approved by CME using their assigned User Identification ("User ID"). The User ID will constitute and become a substitute for the manual signature of the authorized signer to the electronically submitted daily segregated, secured 30.7 and sequestered amount statements. The User ID is a representation by the authorized signer that, to the best of his or her knowledge, all information contained in the statement being transmitted under the User ID is true, correct and complete. The unauthorized use of a User ID for electronic attestation by  an unauthorized party is expressly prohibited.

G.       Exchange staff may prescribe additional segregation, secured 30.7 and sequestered amount requirements.

542.    CFTC Regulation 1.20(c) which is incorporated in Exchange Rule 971 provides in

relevant part:

(c)      Each futures commission merchant shall treat and deal with the customer funds of a commodity customer or of an option customer as belonging to such commodity or option customer. All customer funds shall be separately accounted for, and shall not be commingled with the money, securities or property of a futures commission merchant or of any other person, or be used to secure or guarantee the trades, contracts or commodity options, or to secure or extend the credit, of any person other than the one for whom the same are held . . .

17 C.F.R. § 1.20(c).

543.    CFTC Regulation 1.32 which is incorporated in Exchange Rule 971 provides:

(a)      Each futures commission merchant must compute as of the close of each business day, on a currency-by-currency basis:

(1) The total amount of customer funds on deposit in segregated accounts on behalf of commodity and option customers;

(2) the amount of such customer funds required by the Act and these regulations to be on deposit in segregated accounts on behalf of such

186

commodity and option customers; and

(3) the amount of the futures commission merchant's residual interest in such customer funds.

(b)     In computing the amount of funds required to be in segregated accounts, a futures commission merchant may offset any net deficit in a particular customer's account against the current market value of readily marketable securities, less applicable percentage deductions (*i.e.*, "securities haircuts") as set forth in Rule 15c3–1(c)(2)(vi) of the Securities and Exchange Commission (17 CFR 241.15c3–1(c)(2)(vi)), held for the same customer's account. The futures commission merchant must maintain a security interest in the securities, including a written authorization to liquidate the securities at the futures commission merchant's discretion, and must segregate the securities in a safekeeping account with a bank, trust company, clearing organization of a contract market, or another futures commission merchant.  For purposes of this section, a security will be considered readily marketable if it is traded on a "ready market" as defined in Rule 15c3–1(c)(11)(i) of the Securities and Exchange Commission (17 CFR 240.15c3–1(c)(11)(i)).

(c)     The daily computations required by this section must be completed by the futures commission merchant prior to noon on the next business day and must be kept, together with all supporting data, in accordance with the requirements of § 1.31.

17 C.F.R. § 1.32,

544.   CFTC Regulation 30.7(a) which is incorporated in Exchange Rule 971 provides:

(a)     Except as provided in this section, a futures commission merchant must maintain in a separate account or accounts money, securities and property in an amount at least sufficient to cover or satisfy all of its current obligations to foreign futures or foreign options customers denominated as the foreign futures or foreign options secured amount.  Such money, securities and property may not be commingled with the money, securities or property of such futures commission merchant, with any proprietary account of such futures commission merchant, or used to secure or guarantee the obligations of, or extend credit to, such futures commission merchant or any proprietary account of such futures commission merchant.

17 C.F.R. 30.7(a).

545.   Defendant CME, as MFGI's DSRO, had primary regulatory responsibility for

overseeing, monitoring and auditing MFGI to ensure its compliance with its financial and

187

customer protection requirements, including Exchange Rule 971 and CFTC Regulations 1.20(c), 1.32 and 30.7(a), on all SRO exchanges of which MFGI was a member.

546.     Defendant CME, as the DSRO for MFGI, knowingly, and with sole or dominant intent to promote its own, the CME Group's financial and other self-interests, failed to adequately perform its self-regulatory role and failed to enforce the Exchange Rules and CFTCs regulations which would have prevented the spectacular and tragic failure of MFGI, and/or in enforcing such rules and regulations violated the CEA and CFTC regulations.

547.     Plaintiffs and the members of the Class, who were engaged in transactions on or subject to the rules of Defendant CME and the other contract markets for which it served as DSRO, suffered significant and unprecedented actual losses that resulted from such transactions and were caused directly by the failure of Defendant CME to adequately perform its self-regulatory responsibility by failing to enforce or by the inadequate enforcement of its own and the CFTC's rules and regulations.

548.     Had Defendant CME acted promptly and effectively to protect MFGI Commodity Customers' interests at the first signs of MFGI's financial troubles, and vigorously monitored and enforced MFGI's statutory and regulatory obligations in the handling of Customer Funds, as Defendant CME was required to do as MFGI's DSRO, the losses suffered by MFGI's Commodity Customers would not have occurred or would have been substantially minimized. As a result of Defendant CME's ineffective performance of its self-regulatory function, MFGI's Commodity Customers have suffered substantial losses and been damaged thereby.

549.     In failing to perform its self-regulatory function in a proper and adequate manner, Defendant CME acted in bad faith and was motivated primarily by its own pecuniary self-

interests, seeking to maximize profits at the expense of effective regulation, and by its general disdain for any form of regulation that might inhibit its own, and its FCM customers' businesses.

550.    As a direct and proximate consequence of the conduct of Defendant CME, as described in this Complaint, Plaintiffs and the members of the Class have lost a significant portion of the money, securities, and property they paid and delivered to MFGI to margin, guarantee, or secure their commodity or options trading, have been denied the use of their assets since no later than October 31, 2011, and have been damaged thereby at an amount to be determined at trial.

## COUNT XVI:  Aiding and Abetting Violations of the Commodity Exchange Act
### (Against Defendant CME Group)

551.    Plaintiffs incorporate and re-allege each of their previous allegations as though fully set forth herein.

552.    Plaintiffs bring this Count on behalf of themselves and the Class against Defendant CME Group for aiding and abetting CME's violations of the Commodity Exchange Act.

553.    Defendant CME Group is a publicly traded company.  Defendant CME Group is not a "board of trade," "contract market" or "registered entity" as those terms are used and defined in the CEA.  Nevertheless, Defendant CME Group acts and holds itself out as the entity that directs and controls the actions and conduct of CME Group Exchanges, including the Exchanges' self-regulatory responsibilities.

554.    In written sworn testimony submitted to the Senate Committee on Banking on April 24, 2012 following the MF Global bankruptcy, Terrence Duffy, the Executive Director of Defendant CME Group, stated as follows:

**CME Group Regulation**

As discussed above, no one has a greater interest than CME Group in ensuring that its industry-leading markets are perceived as -- and in fact are -- safe, open and fair. CME Group does so by vigorously regulating the users of our markets. There is substantial evidence that such private regulation has served the markets and market participants very well. We have established a robust set of safeguards designed to ensure these functions operate free from conflicts of interest or inappropriate influence:

- Our ability to attract and retain business fundamentally depends on our customers' confidence in the integrity of our markets, and exceeding our customers' expectations in that regard is one of the cornerstones of our business model. Ensuring that our markets are defined by effective and appropriately balanced regulation is a competitive advantage that draws institutional, commercial and individual customers to CME Group.

- As a public company, it is only by performing our regulatory functions well that we avoid the severe reputational repercussions and associated impacts to shareholder value that would arise if lax regulation or improper conflicts were to compromise our commitment to fair, transparent and financially sound markets.

- CME Group's own capital is first at risk if a failed clearing firm's capital and collateral posted to CME is insufficient to cover a default at the clearing house, giving us the strongest possible economic incentive to ensure robust oversight of our clearing firms' compliance with our rules and CFTC regulations.

- In addition to strong economic and reputational self-interest, CME Group is subject to robust regulatory oversight, as further detailed in the next section, creating powerful regulatory incentives for CME Group to effectively regulate its markets.

Testimony of Terrence A. Duffy, Executive Chairman, CME Group, Inc., Before the Senate Committee on Banking, April 24, 2012.

555.   Defendant CME Group, in order to serve its own pecuniary self-interests, willfully aided, abetted, counseled, induced, and/or procured the CME's violations of the CEA and CFTC regulations regarding the proper segregation and maintenance of Customer Funds, and acted in concert and combination with Defendant CME in such violations by, among other things:

(a)   Acting in lieu of and as MFGI's designated DSRO;

190

(b)     Exerting undue influence and directed decisions by the Defendant CME in performing its responsibilities as MFGI's allegedly independent DSRO;

(c)     Creating, promoting and fostering an anti-regulatory animus that encouraged lax and ineffective performance by Defendant CME of its regulatory responsibilities as MFGI's DSRO;

(d)     Directing a "hands-off" approach to strict oversight and monitoring of MFGI, one of Defendant CME Group's largest single customers;

(e)     While paying lip service to strict self-regulation, failing to require the CME Group Exchanges, including the CME, to develop and maintain an audit and risk management staff which was trained to anticipate and take prompt and effective actions when potential regulatory violations such as those present at MFGI were discovered or should have been anticipated;

(f)     Allowing and encouraging Defendant CME to defer to FINRA to perform any self-regulation of MFGI in order not to offend or alienate MFGI and its principals;

(g)     In order to accommodate MFGI to the greatest extent possible, encouraging Defendant CME not to take prompt and effective action when it was clear that there were serious issues with respect to MFGI's compliance with requirements regarding Customer Funds; and

(h)     Affirmatively advising MFGI on October 25, 2011, when its business was collapsing, that Defendant CME Group would work "to ensure a good outcome for MF" and that "You and your clients are important to us" - comments which only served to embolden MFGI and confirmed for MFGI that, as in the past, the CME Group and CME would not be aggressively scrutinizing its business.  As a result, on October 25, 2011, MFGI began to divert

191

hundreds of millions of Customer Funds for illegal and improper purposes while Defendants

CME Group and CME ignored obvious warning signs and sat idly by.

556.    Each Plaintiff and member of the Class engaged in deposits, purchase, sales,

transactions or trades with MFGI that satisfied at least subsections (B) and/or (C) of Section 25

of the Commodity Exchange Act, which provides a private right of actions for violations of the

act.

557.    As a direct and proximate consequence of Defendant CME Group's knowing and

willful acts, Plaintiffs and the members of the Class have lost a significant portion of the money,

securities and property they paid and delivered to MFGI to margin, guarantee, or secure their

commodity or options trading, have been denied the use of their assets, and have been damaged

thereby in an amount to be determined at trial.

### COUNT XVII:  Aiding and Abetting Violations of the Commodity Exchange Act
### (Against Defendant CME)

558.    Plaintiffs incorporate and re-allege each of their previous allegations as though

fully set forth herein.

559.    Plaintiffs bring this Count on behalf of themselves and the Class against

Defendant CME for aiding and abetting direct violations of the Commodity Exchange Act and

applicable CFTC Regulations by Defendants Corzine and O'Brien and/or MFGI.

560.    Defendant CME was the DSRO responsible for auditing, monitoring and ensuring

MFGI's compliance with all capital and customer protection requirements imposed under the

CEA, the CFTC Regulations and rules promulgated by CME Exchanges (the "Exchange Rules").

561.    During the months leading up to MFGI's collapse, Defendant CME knew that

MFGI was not complying with its obligations regarding the customer segregated funds, but

elected not to take any action to ensure compliance, other than advising MFGI in a letter that

192

compliance was required.  During the final few days of MFGI's operations, Defendant CME was aware that MFGI was under extreme financial stress due to overwhelming liquidity problems and was considering a sale of its assets to satisfy its growing liquidity needs.

562.    During the final few days of MFGI's operations, Defendant CME also knew that neither MFGI nor Defendant CME's own auditors could reconcile MFGI's daily customer funds segregation and secured funds reports which are required to accurately reflect the amount of Customer Funds MFGI was to hold in segregation each day.  MFGI's extreme liquidity pressures and its inability to produce accurate, reconcilable daily segregated and secured funds reports should have alerted Defendant CME to the actual misappropriations of Customer Funds which were then occurring at MFGI.

563.    Despite this knowledge, and although Defendant CME had its own auditors on site at MFGI's Chicago offices purportedly reviewing MFGI's segregated and secured funds reports at the very same time the D&O Defendants were causing MFGI to improperly transfer hundreds of millions in Customer Funds, Defendant CME did nothing to prevent the transfers and allowed its auditors to leave MFGI's offices without reconciling MFGI's segregated and secured funds reports before 5:00 p.m. on the very day that a substantial number of the unlawful transfers were made.

564.    MFGI was among Defendant CME's largest customer and a material source of its revenue.  During the weeks and days leading up to MFGI's collapse, while senior personnel were communicating and meeting with senior personnel at MFGI, Defendant CME failed in its duties to review and ensure MFGI's compliance with applicable regulations, and permitted MFGI leeway to continue its activities to the detriment of Commodity Customers.

565.    On February 2, 2012 Defendant CME Group, Inc. acknowledged in a press release that "[MF Global] violated CFTC regulations and misused customer monies that should have been kept segregated."

566.    As a direct and proximate consequence of Defendant CME's failures of its duties as MFGI's DSRO,  Plaintiffs and the members of the Class have lost a significant portion of the money, securities, and property they paid and delivered to MFGI to margin, guarantee, or secure their commodity or options trading, have been denied the use of their assets since no later than October 31, 2011, and have been damaged thereby at an amount to be determined at trial.

<u>COUNT XVIII:  Aiding and Abetting Breach of Fiduciary Duty</u>
**(Against Defendant CME)**

567.    Plaintiffs incorporate and re-allege each of their previous allegations as though fully set forth herein.

568.    Plaintiffs bring this Count on behalf of themselves and the Class against Defendant CME for aiding and abetting breaches of the fiduciary duties owed to Commodity Customers and Securities Customers by MFGI, MFG Holdings, and the other D&O Defendants.

569.    MFGI was responsible for preserving the safety and security of cash, securities, or other property that Commodity Customers deposited with and entrusted to MFGI to allow them to trade commodity futures contracts through MFGI or to conduct securities transactions, and MFGI and its senior management exercised complete dominion and control over these assets deposited by Commodity Customers.

570.    Defendant CME was the DSRO responsible for auditing, monitoring and ensuring MFGI's compliance with all capital and customer protection requirements imposed under the CEA, the CFTC Regulations and rules promulgated by CME Exchanges (the "Exchange Rules").

571.    During the months leading up to MFGI's collapse, Defendant CME knew that MFGI was not complying with its obligations regarding the Customer Funds, but elected not to take any action to ensure compliance, other than advising MFGI in a letter that compliance was required.  During the final few days of MFGI's operations, Defendant CME was aware that MFGI was under extreme financial stress due to overwhelming liquidity problems and was considering a sale of its assets to satisfy its growing liquidity needs.

572.    The D&O Defendants had a direct or constructive knowledge of MFGI's and MFG Holding's breach of fiduciary duties to Plaintiffs and the Class, and to Securities Customers.  During the final few days of MFGI's operations, Defendant CME also knew that neither MFGI nor Defendant CME's own auditors could reconcile MFGI's daily customer funds segregation and secured funds reports which are required to accurately reflect the amount of Customer Funds MFGI was to hold in segregation each day.  MFGI's extreme liquidity pressures and its inability to produce accurate, reconcilable daily segregated and secured funds reports should have alerted Defendant CME to the actual misappropriations of Customer Funds which were then occurring at MFGI.

573.    Despite this knowledge, and although Defendant CME had its own auditors on site at MFGI's Chicago offices purportedly reviewing MFGI's segregated and secured funds reports at the very same time the D&O Defendants were causing MFGI to improperly transfer hundreds of millions in Customer Funds, Defendant CME did nothing to prevent the transfers and allowed its auditors to leave MFGI's offices without reconciling MFGI's segregated and secured funds reports before 5:00 p.m. on the very day that a substantial number of the unlawful transfers were made.

195

574.    MFGI was among Defendant CME's largest customers and a material source of its revenue.  During the weeks and days leading up to MFGI's collapse, while senior personnel were communicating and meeting with senior personnel at MFGI, Defendant CME failed in its duties to review and ensure MFGI's compliance with applicable regulations, and permitted MFGI leeway to continue its activities to the detriment of Commodity Customers.

575.    On February 2, 2012 Defendant CME Group, Inc. acknowledged in a press release that "[MF Global] violated CFTC regulations and misused customer monies that should have been kept segregated."

576.    As a direct and proximate consequence of Defendant CME's failures of its duties as MFGI's DSRO.  Plaintiffs and the members of the Class have lost a significant portion of the money, securities, and property they paid and delivered to MFGI to margin, guarantee, or secure their commodity or options trading, have been denied the use of their assets since no later than October 31, 2011, and have been damaged thereby at an amount to be determined at trial.

## XVI.    PRAYER FOR RELIEF

**WHEREFORE,** Plaintiffs, on their own behalf, on behalf of the Class, and on behalf of the Securities Customers and other creditors of MFGI pursuant to the Assignment Agreement pray for relief and judgment, as follows:

A.    Determining that this action is a proper class action and certifying Plaintiffs as Class Representatives under Rule 23(a), 23(b)(1)(B) and (b)(3) of the Federal Rules of Civil Procedure on behalf of the Class defined herein;

B.    Awarding compensatory damages in favor of Plaintiffs and other Class members against all Defendants, jointly and severally, for all of the damages sustained by MFGI, MFGI's Commodity Customers, Securities Customers and general creditors as a result of the

wrongdoings of Defendants, in an amount to be proved at trial, including interest thereon and such exemplary damages as are authorized by law;

        C.      Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

        D.      Granting such other and further relief as the Court may deem just and proper.

**XVII.**    **JURY TRIAL DEMAND**

Plaintiffs hereby demand a trial by jury of all issues so triable.

Dated:  November 2, 2012

**ENTWISTLE & CAPPUCCI LLP**

_____

Andrew J. Entwistle
Robert Cappuci
Joshua K. Porter
Marc X. LoPresti
280 Park Avenue, 26th Floor West
New York, New York 10017
Telephone:  (212) 894-7200
Facsimile:  (212) 894-7272

**BERGER & MONTAGUE, P.C.**

_____

Merrill G. Davidoff
Michael Dell'Angelo
Daniel Walker
1622 Locust Street
Philadelphia, Pennsylvania 19103
Telephone:  (215) 875-3000
Facsimile:  (215) 875-4604

*Court-Appointed Co-Lead Counsel for the Class*

**SUSMAN GODFREY L.L.P.**
William Christopher Carmody
Charles Eskridge
Jacob W. Buchdahl
560 Lexington Avenue, 15th Floor
New York, New York 10022
Telephone:  (212) 336-8330
Facsimile:  (212) 336-8340

Marc M. Seltzer
1901 Avenue of the Stars, Suite 950
Los Angeles, California 90067-6029
Telephone:  (310) 789-3100
Facsimile:  (310) 789-3150

**NISEN & ELLIOT, LLC**
Michael H. Moirano
Claire E. Gorman
Brittany E. Kirk
200 West Adams Street
Chicago, Illinois
Telephone:  (312) 346-7800
Facsimile:  (312) 346-9316

**GRANT & EISENHOFER P.A.**
Jay W. Eisenhofer
Linda P. Nussbaum
Matthew P. Morris
Shelly L. Friedland
485 Lexington Avenue
New York, New York 10017
Telephone:  (646) 722-8500
Facsimile:  (646) 722-8501

**FLEISCHMAN LAW FIRM PLLC**
Keith M. Fleischman
Francis Karam
565 Fifth Avenue, Seventh Floor
New York, New York 10017
Telephone: (212) 880-9567
Facsimile: (917) 591-5245

*Court-Appointed Executive Committee with Interim Co-Lead Counsel*

198