# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN RE MF GLOBAL HOLDINGS LIMITED SECURITIES LITIGATION | : <br> :   Civil Action No. 1:11-CV-07866-VM <br> : |
| THIS DOCUMENT RELATES TO: | : <br> : |
| All Securities Actions <br> (*DeAngelis v. Corzine*) | : <br> : <br> : |

## PLAINTIFFS' OMNIBUS OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS

**LABATON SUCHAROW LLP**
Jonathan M. Plasse
Javier Bleichmar
Dominic J. Auld
140 Broadway
New York, NY 10005
(212) 907-0863 (phone)
(212) 883-7063 (fax)

*Co-Lead Counsel For Lead Plaintiffs Her Majesty The Queen In Right Of Alberta And The Virginia Retirement System*

**BERNSTEIN LITOWITZ BERGER & GROSSMANN LLP**
Salvatore J. Graziano
Hannah G. Ross
1285 Avenue of the Americas
New York, NY 10019
(212) 554-1538 (phone)
(212) 554-1444 (fax)

*Co-Lead Counsel For Lead Plaintiffs Her Majesty The Queen In Right Of Alberta And The Virginia Retirement System, And Counsel For Named Plaintiffs Government Of Guam Retirement Fund And West Virginia Laborers' Pension Trust Fund*

*Additional Counsel Listed On Signature Page*

### TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ........................................................................... iv

GLOSSARY OF ABBREVIATED TERMS .......................................................... xiv

I.     PRELIMINARY STATEMENT ............................................................... 1

II.    ARGUMENT ........................................................................................ 3

     A.    Plaintiffs Adequately Plead False And Misleading Statements ............................ 3

          1.    False And Misleading Statements Relating To MF Global's DTA ........................ 4

              (a)    The DTA Was Materially False Throughout The Class Period ........................ 4

              (b)    DTA Accounting Was Not A Matter Of Opinion ......................... 12

              (c)    Even If DTA Statements Were Matters Of Opinion, Plaintiffs Sufficiently Plead Objective And Subjective Falsity ........................... 16

          2.    False And Misleading Statements Relating To Risk Management ........................ 18

              (a)    The Board Knew Of Gaps In Risk Management While Defendants Falsely Stated That Risk Controls Were Adequate ........................ 18

                  (i)    The 2010 Internal Audit Reports ..................................... 19

                  (ii)    The 2011 Internal Audit Reports ..................................... 22

               (b)    Defendants' Arguments That Statements About Risk Management Were Not False And Misleading Are Unavailing ........................ 24

              (c)    Defendants Falsely Stated That Trading Limits Were Enforced ........................ 26

          3.    False Statements Regarding The RTMs And Risk Appetite ................... 27

               (a)    The RTMs Were Purely Proprietary And Not For "Client Facilitation" ........................ 27

(i)    Corzine Falsely Denied MF Global Was A "Prop Trader" ........................................................................... 29

(ii)    Despite The Massive Increase In Risk, MF Global Misleadingly Said It "Might" Increase Risk In 2011 ........ 31

(b)    Defendants' RTM-Related Arguments Are Unavailing ...................................................................................34

(i)    MF Global Did Not Disclose It Was A "Prop Trader" ............................................................................ 34

(ii)    The Failure To Disclose The Prop Desk Was Not A Forward Looking Statement, Nor Was It Protected By The Bespeaks Caution Doctrine .................................. 37

(iii)    The Statements Relating To VAR Were Misleading ........ 38

4.    False And Misleading Statements Relating To Capital And Liquidity ...................................................................................40

(a)    Defendants Concealed Liquidity Management Problems ...........................................................................40

(b)    Defendants Mischaracterize The Allegations About Liquidity ...........................................................................43

B.    Plaintiffs Raise A Strong Inference Of Scienter ...................................46

1.    The Standard For Evaluating Scienter On A Motion To Dismiss .....................................................................................46

2.    Plaintiffs Have Adequately Alleged Scienter With Respect To DTA .....................................................................................47

3.    Plaintiffs Have Adequately Alleged Scienter With Respect To Misstatements Of Risk Appetite, Internal Controls, And Liquidity Management ...............................................................50

(a)    The Officers Received Reports About Internal Controls And Liquidity Management That Belied Their Public Statements ................................................50

(b)    The Officers' Failure To Comply With Risk Controls Is Further Evidence Of Scienter ......................54

(c)    The Officers' Concealment Of The Corzine Trade And Its Liquidity Risks Further Supports Scienter .......................57

(d)    Recent Investigations Further Support Scienter ...........................58

4.    The Officers' Remaining Arguments Do Not Defeat The Adequacy Of Plaintiffs' Scienter Allegations.............................................59

(a)    The Officers' Stock Holdings Are Irrelevant................................59

(b)    The Competing Inferences Proffered By The Officers Fall Woefully Short Of Their *Tellabs* Burden...............................................................................61

(c)    The CAC Adequately Alleges Each Officer's Scienter .......................................................................62

C.    Plaintiffs' Securities Act Claims Do Not Sound in Fraud ....................................63

D.    The Individual Defendants Are Liable For The Incorporated 10-Qs ...................66

E.    The Underwriters' Reliance On Audited Financial Statements Does Not Insulate Them From Liability..................................................................68

F.    Plaintiffs Have Standing Under §12(a)(2) Against The Underwriters ...........................................................................................................70

G.    The CAC Sufficiently Alleges Control Person Liability ......................................71

H.    The CAC Satisfies Rule 8(a), And It Is Not A "Puzzle Pleading" ......................72

III.    CONCLUSION............................................................................................................74

APPENDIX A ...........................................................................................................................76

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*In re 2007 Novastar Fin., Inc. Sec. Litig.*,
   2008 WL 2354367 (W.D. Mo. June 4, 2008) ..................................................8, 18

*Abu Dhabi Commercial Bank v. Morgan Stanley & Co.*,
   2012 WL 3584278 (S.D.N.Y. Aug. 17, 2012) ................................................16, 18

*In re Adelphia Commc'ns Corp. Sec. & Deriv. Litig.*,
   2007 WL 2615928 (S.D.N.Y. Sept. 10, 2007) ........................................................65

*In re AFC Enter. Sec. Litig.*,
   348 F. Supp. 2d 1363 (N.D. Ga. 2004) ..................................................................18

*In re AIG, Inc. 2008 Sec. Litig.*,
   741 F. Supp. 2d 511 (S.D.N.Y. 2010) ............................................................ *passim*

*In re Alcatel Sec. Litig.*,
   382 F. Supp. 2d 513 (S.D.N.Y. 2005) ....................................................................73

*Aldridge v. A.T. Cross*,
   284 F.3d 72 (1st Cir. 2002) ....................................................................................18

*In re Alstom S.A.*,
   406 F. Supp. 2d 433 (S.D.N.Y. 2005) ............................................................ *passim*

*In re Am. Bank Note Holographics, Inc. Sec. Litig.*,
   93 F. Supp. 2d 424 (S.D.N.Y. 2000) ......................................................................62

*In re Ambac Fin. Grp., Inc. Sec. Litig.*,
   693 F. Supp. 2d 241 (S.D.N.Y. 2010) ....................................................................66

*In re AOL Time Warner, Inc. Sec. & ERISA Litig.*,
   381 F. Supp. 2d 192 (S.D.N.Y. 2004) ..............................................................37, 46

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009) ...............................................................................................17

*In re Atlas Air Worldwide Holdings, Inc. Sec. Litig.*,
   324 F. Supp. 2d 474 (S.D.N.Y. 2004) ............................................................ *passim*

*Bank of Am. Corp. Sec., Deriv. & ERISA Litig.*,
   2011 WL 3211472 (S.D.N.Y. Jul. 29, 2011) ..........................................................56

*In re Bank of Am. Corp. Sec., Deriv. & ERISA Litig.,*
    757 F. Supp. 2d 260 (S.D.N.Y. 2010)..................................................................29

*In re Barclays Bank PLC Sec. Litig.,*
    2011 WL 2150477 (S.D.N.Y. May 31, 2011) ......................................................65

*Bd. of Trs. of City of Ft. Lauderdale Gen. Emp. Ret. Sys. v. Mechel OAO,*
    811 F. Supp. 2d 853 (S.D.N.Y. 2011)..................................................................48

*In re Bear Stearns Cos., Inc. Sec., Deriv. & ERISA Litig.,*
    763 F. Supp. 2d 423 (S.D.N.Y. 2011)............................................................ *passim*

*In re Bear Stearns Mortg. Pass-Through Certificates Litig.,*
    851 F. Supp. 2d 746 (S.D.N.Y. 2012)..................................................................71

*Bell Atl. Corp. v. Twombly,*
    550 U.S. 544 (2007)................................................................................................3

*In re Bristol Myers Squibb Co. Sec. Litig.,*
    586 F. Supp. 2d 148 (S.D.N.Y. 2008)..............................................................3, 4

*In re Bristol-Myers Squibb Sec. Litig.,*
    312 F. Supp. 2d 549 (S.D.N.Y. 2004)..................................................................59

*In re Burlington Coat Factory Sec. Litig.,*
    114 F.3d 1410 (3d Cir. 1997)...............................................................................15

*In re CINAR Corp. Sec. Litig.,*
    186 F. Supp. 2d 279 (E.D.N.Y. 2002) .................................................................46

*In re Citigroup, Inc. Bond Litig.,*
    723 F. Supp. 2d 568 (S.D.N.Y. 2010)..................................................................67

*In re Citigroup, Inc. Sec. Litig.,*
    330 F. Supp. 2d 367 (S.D.N.Y. 2004)............................................................25, 48

*City of Pontiac Gen. Emp. Ret. Sys. v. Lockheed Martin Corp.,*
    2012 WL 2866425 (S.D.N.Y. July 13, 2012) ..............................................9, 56, 59

*City of Sterling Heights Police & Fire Ret. Sys. v. Abbey Nat., PLC,*
    423 F. Supp. 2d 348 (S.D.N.Y. 2006)..................................................................22

*Cornwell v. Credit Suisse Grp.,*
    689 F. Supp. 2d 629 (S.D.N.Y. 2010)..................................................................24

*Coronel v. Quanta Capital Hold.,*
    2009 WL 174656 (S.D.N.Y. Jan. 26, 2009) ........................................................11

*Cortec Indus., Inc. v. Sum Holding L.P.*,
  949 F.2d 42 (2d Cir. 1991)......................................................................................22

*In re Countrywide Fin. Corp. Sec. Litig.*,
  588 F. Supp. 2d 1132 (C.D. Cal. 2008) ............................................................ *passim*

*DeMaria v. Anderson*,
  153 F. Supp. 2d 300 (S.D.N.Y. 2001)......................................................................70

*In re Deutsche Bank AG Sec. Litig.*,
  2012 WL 3297730 (S.D.N.Y. Aug. 10, 2012)..........................................................18

*Dobina v. Weatherford Int'l Ltd.*,
  2012 WL 5458148 (S.D.N.Y. Nov. 7, 2012)......................................................53, 59

*Dodona I, LLC v. Goldman Sachs & Co.*,
  847 F. Supp. 2d 624 (S.D.N.Y. 2012)..........................................................39, 46, 59

*In re DRDGOLD Ltd. Sec. Litig.*,
  472 F. Supp. 2d 562 (S.D.N.Y. 2007)......................................................................54

*In re Dynex Capital, Inc. Sec. Litig.*,
  2009 WL 3380621 (S.D.N.Y. Oct. 9, 2009)..............................................................52

*ECA Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase*,
  553 F.3d 187 (2d Cir. 2009)..............................................................................11, 19

*In re EVCI Colleges Holding Corp. Sec. Litig.*,
  469 F. Supp. 2d 88 (S.D.N.Y. 2006)........................................................................23

*Fait v. Regions Fin. Corp.*,
  655 F.3d 105 (2d Cir. 2011)............................................................................ *passim*

*In re Fannie Mae 2008 Sec. Litig.*,
  742 F. Supp. 2d 382 (S.D.N.Y. 2010)..........................................................8, 15, 18

*Fed. Housing Fin. Agency v. UBS Am., Inc.*,
  858 F. Supp. 2d 306 (S.D.N.Y. 2012)......................................................................12

*Feiner v. SS&C Techs., Inc.*,
  11 F. Supp. 2d 204 (D. Conn. 1998)........................................................................18

*Fla. State Bd. of Admin. v. Green Tree Fin. Corp.*,
  270 F.3d 645 (8th Cir. 2001) ..................................................................................60

*In re Flag Telecom Hold., Ltd. Sec. Litig.*,
  618 F. Supp. 2d 311 (S.D.N.Y. 2009)......................................................................10

*Forest Park Pictures v. Universal TV Network*,
  683 F.3d 424 (2d Cir. 2012)........................................................................17, 18

*Freudenberg v. E\*Trade Fin. Corp.*,
  712 F. Supp. 2d 171 (S.D.N.Y. 2010)............................................................ *passim*

*In re Fuwei Films Sec. Litig.*,
  634 F. Supp. 2d 419 (S.D.N.Y. 2009)...................................................................3

*Ganino v. Citizens Utilities*,
  228 F.3d 154 (2d Cir. 2000).................................................................................36

*In re GE Sec. Litig.*,
  856 F. Supp. 2d 645 (S.D.N.Y. 2012)..............................................................13, 15

*Glaser v. The9, Ltd.*,
  772 F. Supp. 2d 573 (S.D.N.Y. 2011)..................................................................56

*In re Global Crossing Ltd. Sec. Litig.*,
  313 F. Supp. 2d 189 (S.D.N.Y. 2003)..............................................................68, 69

*Hall v. The Children's Place Retail Stores, Inc.*,
  580 F. Supp. 2d 212 (S.D.N.Y. 2008)........................................................37, 41, 44

*Halperin v. eBanker USA.com*,
  295 F.3d 352 (2d Cir. 2002)................................................................................11

*Heller v. Goldin Restructuring Fund, L.P.*,
  590 F. Supp. 2d 603 (S.D.N.Y. 2008)...................................................................3

*Herman & MacLean v. Huddleston*,
  459 U.S. 375 (1983)............................................................................................63

*Hoff v. Popular Inc.*,
  727 F. Supp. 2d 77 (D.P.R. 2010)................................................................ *passim*

*Holmes v. Baker*,
  166 F. Supp. 2d 1362 (S.D. Fla. 2001) ................................................................59

*In re Huffy Corp. Sec. Litig.*,
  577 F. Supp. 2d 968 (S.D. Ohio 2008) ..................................................................8

*Int'l Fund Mgmt S.A. v. Citigroup, Inc.*,
  822 F. Supp. 2d 368 (S.D.N.Y. 2011)..................................................................64

*Iowa Pub. Emp. Ret. Sys. v. MF Global, Inc.*,
  620 F.3d 137 (2d Cir. 2010)................................................................................20

*In re ITT Educ. Servs. Sec. & Deriv. Litig.*,
　859 F. Supp. 2d 572 (S.D.N.Y. 2012) (Marrero, J.) .........................................22, 73

*Kreysar v. Syron* (*In re Fed. Home Loan Mortg. Corp.(Freddie Mac) Sec. Litig.*),
　No. 09-cv-832 (MGC), slip op. (S.D.N.Y. Jan. 20, 2011) ...........................................8

*Kuriakose v. Fed. Home Loan Mortg. Corp.*,
　2012 WL 4364344 (S.D.N.Y. Sept. 24, 2012)...................................8, 15, 18, 40

*Ladmen Partners, Inc. v. Globalstar, Inc.*,
　2008 WL 4449280 (S.D.N.Y. Sept. 30, 2008)................................................65, 66

*Lapin v. Goldman Sachs Grp.*,
　506 F. Supp. 2d 221 (S.D.N.Y. 2006)............................................................26, 36

*In re Lehman Bros. Sec. & ERISA Litig.*,
　799 F. Supp. 2d 258 (S.D.N.Y. 2011)............................................................ *passim*

*Lewy v. SkyPeople Fruit Juice, Inc.*,
　2012 WL 3957916 (S.D.N.Y. Sept. 10, 2012).........................................................3

*Limantour v. Cray, Inc.*,
　432 F. Supp. 2d 1129 (W.D. Wash. 2006)...................................................8, 15, 18

*Litwin v. Blackstone Grp., L.P.*,
　634 F.3d 706 (2d Cir. 2011)..........................................................................3, 71

*In re Livent, Inc. Noteholders Sec. Litig.*,
　151 F. Supp. 2d 371 (S.D.N.Y. 2001)..................................................................11

*Local 295/Local 851 IBT Emp. Grp. Pension Trust & Welfare Fund v. Fifth Third Bancorp.*,
　731 F. Supp. 2d 689 (S.D. Ohio 2010) ................................................................70

*McGuire v. Dendreon Corp.*,
　688 F. Supp. 2d 1239 (W.D. Wash. 2009)......................................................16, 17

*McKenna v. SMART Techs.*,
　2012 WL 1131935 (S.D.N.Y. Apr. 3, 2012).........................................................72

*In re Metro. Sec. Litig.*,
　2010 WL 424625 (E.D. Wash. Jan. 28, 2010)......................................................69

*Morgan v. Kobrin Sec., Inc.*,
　649 F. Supp. 1023 (N.D. Ill. 1986) ....................................................................73

*Morgens Waterfall Holds. v. Donaldson Lufkin & Jenrette Sec. Corp.*,
　198 F.R.D. 608 (S.D.N.Y. 2001) .......................................................................73

*Morrison v. Nat'l Austl. Bank Ltd.*,
    130 S. Ct. 2869 (2010)..............................................................................70

*NECA-IBEW Health & Wellfare Fund v. Goldman Sachs & Co.*,
    693 F.3d 145 (2d Cir. 2012)...............................................................67, 70

*NECA-IBEW Pension Trust Fund v. Bank of Am.*,
    2012 WL 3191860 (S.D.N.Y. Feb. 9, 2012).........................................70

*In re Netbank, Inc. Sec. Litig.*,
    2009 WL 2432359 (N.D. Ga. Jan. 29, 2009).......................................60

*In re New Century*,
    588 F. Supp. 2d 1206 (C.D. Cal. 2008) .....................................11, 19, 74

*New Orleans Emp. Ret. Sys. v. Celestica, Inc.*,
    455 F. App'x 10 (2d Cir. 2011) .............................................................56

*In re NovaGold Res. Inc. Sec. Litig.*,
    629 F. Supp. 2d 272 (S.D.N.Y. 2009)...................................................59

*Novak v. Kasaks*,
    216 F.3d 300 (2d Cir. 2000)....................................................31, 43, 47

*In re NTL, Inc. Sec. Litig.*,
    347 F. Supp. 2d 15 (S.D.N.Y. 2004).....................................................73

*In re Nuko Info. Sys., Inc. Sec. Litig.*,
    199 F.R.D. 338 (N.D. Cal. 2000)..........................................................60

*Olkey v. Hyperion 1999 Term Trust*,
    98 F.3d 2 (2d Cir. 1996)........................................................................10

*In re Openwave Sys. Sec. Litig.*,
    528 F. Supp. 2d 236 (S.D.N.Y. 2007)...................................................53

*Operating Local 649 Annuity Trust Fund v. Smith Barney Fund Mgmt.*,
    595 F.3d 86 (2d Cir. 2010)......................................................12, 40, 45

*P. Stolz Family P'ship L.P. v. Daum*,
    355 F.3d 92 (2d Cir. 2004).......................................................................9

*Pa. Pub. Sch. Emp. Ret. Sys. v. Bank of Am.*,
    2012 WL 2847732 (S.D.N.Y. July 11, 2012) ........................................4

*Plumbers' Union Local No. 12 Pension Fund v. Swiss Reins. Co.*,
    753 F. Supp. 2d 166 (S.D.N.Y. 2010)..............................................37, 38

*In re ProShares Trust Sec. Litig.*,
   2012 WL 3878141 (S.D.N.Y. Sept. 7, 2012) ........................................................65

*In re Prudential Inc. Sec. Litig.*,
   930 F. Supp. 68 (S.D.N.Y. 1996) ..................................................................37, 44

*In re Refco Inc. Sec. Litig.*,
   2012 WL 996910 (S.D.N.Y. Jan. 17, 2012) ........................................................58

*In re Refco Sec. Litig.*,
   503 F. Supp. 2d 611 (S.D.N.Y. 2007) ......................................................62, 64, 65

*Richard v. Nw. Pipe Co.*,
   2011 WL 3813073 (W.D. Wash. Aug. 26, 2011) ................................................56

*Richman v. Goldman Sachs Grp. Inc.*,
   868 F. Supp. 2d 261 (S.D.N.Y. 2012) ................................................................22

*Rombach v. Chang*,
   355 F.3d 164 (2d Cir. 2004) ................................................................10, 63, 66

*Rothman v. Gregor*,
   220 F.3d 81 (2d Cir. 2000) ................................................................................49

*Rubke v. Capitol Bancorp Ltd.*,
   551 F.3d 1156 (9th Cir. 2009) ..........................................................................16

*In re Sadia, S.A. Sec. Litig.*,
   643 F. Supp. 2d 521 (S.D.N.Y. 2009) ................................................................54

*Santa Fe Indus., Inc. v. Green*,
   430 U.S. 462 (1977) ..........................................................................................25

*Sawabeh Info. Servs. Co. v. Brody*,
   832 F. Supp. 2d. 280 (S.D.N.Y. 2011) ..............................................................52

*Schnall v. Annuity & Life Re (Hold.)*,
   2004 WL 367644 (D. Conn. Feb. 22, 2004) ......................................................9

*In re Scholastic Corp. Sec. Litig.*,
   252 F.3d 63 (2d Cir. 2001) ..........................................................50, 52, 53, 63

*In re Scottish Re Grp. Sec. Litig.*,
   524 F. Supp. 2d 370 (S.D.N.Y. 2007) .................................................... *passim*

*SEC v. Espuelas*,
   698 F. Supp. 2d 415 (S.D.N.Y. 2010) ................................................................48

*SEC v. PIMCO Advisors Fund Mgmt. LLC*,
  341 F. Supp. 2d 454 (S.D.N.Y. 2004) .......................................................36

*In re Security Capital Assurance Ltd. Sec. Litig.*,
  729 F. Supp. 2d 569 (S.D.N.Y. 2010) .......................................................59

*Sgalambo v. McKenzie*,
  739 F. Supp. 2d 453 (S.D.N.Y. 2010) .......................................................71

*Slayton v. Am. Exp. Co.*,
  604 F.3d 758 (2d Cir. 2010) ...............................................................9, 10

*In re Software Toolworks, Inc. Sec. Litig.*,
  50 F.3d 615 (9th Cir. 1994) ...................................................................69

*In re Stac Elecs. Sec. Litig.*,
  89 F.3d 1399 (9th Cir. 1996) .................................................................66

*Stephenson v. Deutsche Bank AG*,
  282 F. Supp. 2d 1032 (D. Minn. 2003) ....................................................73

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
  513 F.3d 702 (7th Cir. 2007) .............................................................58, 60

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
  551 U.S. 308 (2007) ...........................................................46, 47, 59, 61

*Thor Power Tool Co. v. Comm'r of Internal Revenue*,
  439 U.S. 522 (1979) ..............................................................................8

*In re Thornburg Mortg., Inc. Sec. Litig.*,
  695 F. Supp. 2d 1165 (D.N.M. 2010) ......................................................60

*In re Time Warner Sec. Litig.*,
  9 F.3d 259 (2d Cir. 1993) ....................................................................29

*In re Veeco Instr. Inc. Sec. Litig.*,
  235 F.R.D. 220 (S.D.N.Y. 2006) .......................................................37, 54

*Virginia Bankshares v. Sandberg*,
  501 U.S. 1083 (1991) .........................................................16, 17, 19, 33

*In re Vivendi Universal, S.A.*,
  381 F. Supp. 2d 158 (S.D.N.Y. 2003) .....................................................72

*VTech Holdings Ltd. v. PwC LLP*,
  2003 WL 21756623 (S.D.N.Y. July 30, 2003) ...........................................73

*In re Wachovia Equity Sec. Litig.,*
    753 F. Supp. 2d 326 (S.D.N.Y. 2011)...................................................56, 63, 64, 70

*In re Wet Seal, Inc. Sec. Litig.,*
    518 F. Supp. 2d 1148 (C.D. Cal. 2007) .........................................................8, 18

*In re Williams Sec. Litig.,*
    339 F. Supp. 2d 1242 (N.D. Okla. 2003) .............................................................72

*In re Winstar Commc'n,*
    2006 WL 473885 (S.D.N.Y. Feb. 27, 2006).........................................................73

*In re WorldCom, Inc. Sec. Litig.,*
    346 F. Supp. 2d 628 (S.D.N.Y. 2004).............................................................68, 69

*In re Xerox Corp. Sec. Litig.,*
    165 F. Supp. 2d 208 (D. Conn. 2001).................................................................25

## STATUTES

15 U.S.C. § 77b(8)...........................................................................................67

15 U.S.C. § 77k ......................................................................................... *passim*

15 U.S.C. § 77l.....................................................................................3, 63, 70

15 U.S.C. § 77o.........................................................................................71, 72

15 U.S.C. § 78j .......................................................................................... *passim*

15 U.S.C. § 78t..........................................................................................71, 72

15 U.S.C. § 78u-5(i)............................................................................................9

## OTHER AUTHORITIES

17 C.F.R. § 210.4-01(a)(1).................................................................................9

17 C.F.R. § 210.5-01(a)(1)..................................................................................4

17 C.F.R. § 229.512(a)(2).................................................................................67

17 C.F.R. § 229.512(b) ....................................................................................68

17 C.F.R. § 239.430B(f) ...................................................................................67

Fed. R. Civ. P. 8 ...................................................................................... *passim*

Fed. R. Civ. P. 9 ...................................................................................... *passim*

Int'l Capital Mkts. & Sec. Reg. § 1:129 (2012) ........................................................68

5 Jacobs, Disclosure & Remedies Under the Sec. Laws § 3:16 (2012) ..................68

Securities Offering Reform, Securities Act Rel. No. 8591, Exchange Act Rel. No. 75,
   2005 WL 1692642 (Aug. 3, 2005) ...............................................................67

## GLOSSARY OF ABBREVIATED TERMS

| Abbreviated Term | Meaning |
|---|---|
| "¶ _" | All citations in the form "¶ _" refer to the CAC |
| 2010 10-K/<br>2010 Form 10-K | MF Global's annual report on Form 10-K for the fiscal 2010 year ended March 31, 2010 (¶111) |
| 2011 10-K/<br>2011 Form 10-K | MF Global's annual report on Form 10-K for the fiscal 2011 year ended March 31, 2011 (¶111) |
| 2016 Notes/<br>2016 Notes Offering | MF Global's 1.875% Convertible Senior Notes due February 1, 2016, issued on or about February 7, 2011 (¶¶1, 538) |
| 2018 Notes/<br>2018 Notes Offering | MF Global's 3.375% Convertible Senior Notes due August 1, 2018, issued on or about July 28, 2011 (¶¶ 1, 543) |
| 6.25% Senior Notes/<br>6.25% Senior Notes Offering | MF Global's 6.25% Senior Notes due August 8, 2016, issued on or about August 1, 2011 (¶¶1, 548) |
| Alternative Method | The Alternative Method is a method for calculating whether Foreign Secured customer accounts were in regulatory compliance during the Class Period. (¶254, n.15) |
| ASC 740 | Accounting Standards Codification No. 740, Accounting for Income Taxes (¶90) |
| Board | MF Global's Board of Directors (¶5) |
| Break-the-Glass Document | An internal MF Global document entitled "Stress Scenario Analysis – Downgrade: Potential Impact on MF Global" (¶136) |
| CAC | Consolidated Amended Securities Class Action Complaint filed August 20, 2012 |
| CAO | Chief Accounting Officer |

| Abbreviated Term | Meaning |
|---|---|
| CEO | Chief Executive Officer (¶28) |
| CFO | Chief Financial Officer (¶29) |
| CFTC | Commodity Futures Trading Commission (¶62) |
| Class Period | May 20, 2010 – November 21, 2011, inclusive (¶1) |
| Company | MF Global Holdings Limited (¶1) |
| "Corzine _" | Memorandum Of Law In Support Of Jon S. Corzine's Motion To Dismiss |
| Corzine Trade | Repurchase-to-maturity transactions collateralized by Euro sovereign debt (¶149) |
| CRO | Chief Risk Officer (¶64) |
| CW | Confidential Witness (¶158) |
| Deloitte | Deloitte & Touche LLP (¶29) |
| Dem. Add. | Democratic Addendum To The Majority Staff Report On MF Global, dated December 3, 2012, Ross Ex. 2 |
| Director Defendants/ Independent Directors/ Directors | Defendants Bolger, Fusco, Gelber, Glynn, Goldberg, Schamis, and Sloan (¶41) |
| DTA | Deferred Tax Assets (¶6) |
| E&Y | Ernst & Young LLP (¶29) |
| EFSF | European Financial Stability Facility (¶119) |
| Exchange Act | Securities Exchange Act of 1934 (¶4) |
| FCM | Futures Commission Merchant (¶69) |

| Abbreviated Term | Meaning |
|---|---|
| FINRA | Financial Industry Regulatory Authority(¶62) |
| Firm Invested in Excess | Term used at MF Global to refer to proprietary funds kept in FCM customer accounts (¶253) |
| FSA | United Kingdom's Financial Services Authority (¶70) |
| GAAP | Generally Accepted Accounting Principles (¶6) |
| Guam | The Government Of Guam Retirement Fund (¶23) |
| House Report | Staff Report Prepared For Representative Randy Neugebauer, Chairman, Subcommittee On Oversight & Investigations Committee On Financial Services, dated November 15, 2012, Ross Ex. 1 |
| "ID _" | Memorandum Of Law In Support Of The Independent Directors' Motion To Dismiss |
| Individual Defendants | Defendants Corzine, Bolger, Fusco, Gelber, Glynn, Goldberg, MacDonald, Schamis, Sloan, and Steenkamp (¶43) |
| Internal Audit | MF Global's Internal Audit Department (¶208) |
| JPMC | JP Morgan Chase (¶ 256) |
| Lead Plaintiffs | The Virginia Retirement System; Her Majesty The Queen In Right Of Alberta (¶1) |
| LRI Invest | LRI Invest S.A. (¶25) |
| "MacDonald _" | Memorandum Of Law In Support Of J. Randy Macdonald's Motion To Dismiss |
| MF Global | MF Global Holdings Limited (¶1) |
| MFGI | MF Global Inc. (¶69) |

| Abbreviated Term | Meaning |
|---|---|
| MFG-UK | MF Global U.K. Limited (¶70) |
| Net Capital Rule | SEC Rule 15c3-1 (¶225) |
| Offering Materials | The Registration Statement and prospectuses pursuant to which MF Global's common stock, 2016 Notes, 2018 Notes, and 6.25% Senior Notes were offered to the public (¶534, 539, 545, 550) |
| Offerings | MF Global's common stock, 2016 Notes, 2018 Notes and 6.25% Senior Notes offered to the public in June 2010, and February, July, and August 2011, respectively (¶5) |
| Officer Defendants/ Officers | Defendants Corzine, MacDonald, and Steenkamp (¶31) |
| OFR | U.S. Treasury Department's Office of Financial Research (¶16) |
| Plaintiffs | The Virginia Retirement System; Her Majesty The Queen In Right Of Alberta; The Government Of Guam Retirement Fund; West Virginia Laborers' Pension Trust Fund; LRI Invest S.A.; Monica Rodriguez; and Jerome Vrabel (¶1) |
| PSG | MF Global's Principal Strategies Group, established in June 2010 (¶76) |
| PSLRA | Private Securities Litigation Reform Act of 1995 |
| PwC | PricewaterhouseCoopers LLP (¶8) |
| Q1'12 Form 10-Q | MF Global quarterly report on Form 10-Q for the first fiscal quarter of 2012 ended June 30, 2011, filed August 3, 2011 (¶116) |
| Q1'12 Form 10-Q/A | MF Global's amended Q1'12 Form 10-Q, filed September 1, 2011 (¶234) |

| Abbreviated Term | Meaning |
|---|---|
| Q3'11 Form 10-Q | MF Global's quarterly report on Form 10-Q for the third fiscal quarter of 2011, filed February 3, 2011 (¶172) |
| Registration Statement | MF Global's Post-Effective Amendment No. 1 to Registration Statement No. 333-162119, dated February 24, 2010 (¶29) |
| Regulatory Excess | The amount of customer funds in excess of the regulatory requirement, calculated using the Alternative Method (¶254) |
| "Ross Ex. _" | Exhibits To The Declaration Of Hannah G. Ross In Opposition To Defendants' Motions To Dismiss |
| RTMs | Repurchase-to-maturity transactions (¶7) |
| SEC | U.S. Securities and Exchange Commission (¶2) |
| Secondary Offering | MF Global's offering of common stock on or about June 1, 2010 (¶1) |
| Securities Act | Securities Act of 1933 (¶5) |
| SFAS 109 | Statement of Financial Accounting Standards No. 109, Accounting for Income Taxes |
| SIPA Report | The June 4, 2012 Report of the SIPA Trustee's Investigation and Recommendation (¶72) |
| SIPA Trustee | James W. Giddens (¶69) |
| "SNU _" | Memorandum Of Law In Support Of Senior Notes Underwriters' Motion To Dismiss |
| "Steenkamp _" | Memorandum Of Law In Support Of Henri Steenkamp's Motion To Dismiss |

| Abbreviated Term | Meaning |
|---|---|
| "Tosc. Ex. _" | Exhibits To The Declaration Of David B. Toscano In Support Of The Independent Directors' Motion To Dismiss |
| Underwriter Defendants/ Underwriters | Defendants BMO Capital, Citigroup, Commerz, Deutsche Bank, Goldman, Jefferies, J.P. Morgan, Lebenthal, Merrill, Natixis, RBS, Sandler O'Neill and U.S. Bancorp (¶ 58) |
| "UW _" | Memorandum Of Law In Support Of The Underwriters' Motion To Dismiss |
| VAR | Value-at-Risk (¶145) |
| VRS | The Virginia Retirement System (¶21) |
| WV Laborers | West Virginia Laborers' Pension Trust Fund (¶24) |

## I.    PRELIMINARY STATEMENT

Numerous facts uncovered by the SIPA Trustee, the OFR, Congress, and Lead Plaintiffs demonstrate that MF Global's bankruptcy was not merely the result of a last-minute liquidity crisis.[1] Quite to the contrary, from the day of Corzine's arrival immediately before the beginning of the Class Period, the internal conditions at MF Global materially differed from Defendants' public disclosures. Six presentations made to the Board of Directors during the Class Period identified "dozens of gaps" in risk controls. ¶ 208. Chief among these was the gap in liquidity controls. The Board knew in April 2010 that MF Global's liquidity data was "inadequate" and "unreliable," leading the SIPA Report to conclude that "[t]he underlying liquidity problems at MF Global . . . did not commence in the fall of 2011. Rather, liquidity had been a cause for concern before and throughout Corzine's tenure at MF Global, yet [remedial measures] were **never implemented**."[2] ¶ 215.

Defendants not only made false statements about MF Global's internal controls, but also about the Company's profitability. Investors were falsely told that MF Global's financials complied with GAAP, even though MF Global improperly failed to record a required valuation allowance against its DTA as of the first day of the Class Period.

Defendants also falsely represented MF Global's risk appetite. Corzine told analysts that "the goal here is not to be a prop trader. And if we change that view, we'll speak to it directly." ¶ 328. Yet being a "prop trader" is precisely what led to MF Global's demise. Unbeknownst to investors, Corzine instituted a high-risk proprietary trading strategy involving RTMs. Defendants, however, repeatedly disclaimed the purely proprietary nature of the RTMs. These

---

[1] All capitalized terms herein have the meanings assigned to them in the CAC.  Plaintiffs respectfully refer the Court to the "Glossary of Abbreviated Terms" included herein.
[2] All emphasis in quotations is added, and all internal quotation marks and citations are omitted, unless otherwise indicated.

false statements were compounded by MF Global's poor risk management and internal controls, which Defendants also concealed. All the while, MF Global raised over $1 billion from investors in four separate offerings.

Defendants do not even attempt to refute these facts. Instead, they minimize the alleged wrongdoing by casting their actions as simply mismanagement or generic optimism that proved incorrect. But Defendants cannot avoid accountability with these arguments. The legal framework for evaluating each of Defendants' responses is well-established, and none of their defenses is availing. For example, they argue that DTA valuation allowances are merely matters of opinion, but courts repeatedly have confirmed that the failure to accurately account for DTA in accordance with GAAP is actionable. Defendants also fail to confront the reality that MF Global's U.S. operations were in a three-year loss position as of March 31, 2010, which constituted objective, negative evidence under GAAP that should have been disclosed. This disclosure obligation was not overcome by **any** objectively verifiable positive evidence, certainly not evidence of sufficient quality or quantity to justify continued maintenance of the DTA.

Similarly, Defendants attempt to frame the proprietary RTMs and their extreme risks as simply a business strategy gone awry. This could not be further from the truth. Defendants' repeated statements that the trading strategy was merely for "client facilitation" and involved "minimal" risk were ultimately contradicted by the revelation that it was purely proprietary and so extreme that it far exceeded MF Global's ability to sustain it. ¶¶ 285, 326, 399.

Each of Defendants' rejoinders similarly fail. Defendants were central figures in a scheme that unraveled in full public view, leaving MF Global in bankruptcy, and its investors with massive losses. Plaintiffs have more than adequately pled securities claims against all Defendants.

## II.    ARGUMENT

Sections 11 and 12(a)(2) of the Securities Act allow Plaintiffs to recover damages resulting from untrue statements in connection with the offering and registration of securities even in the absence of fraud. *See Litwin v. Blackstone Grp., L.P.*, 634 F.3d 706, 715 (2d Cir. 2011). Plaintiffs need only allege the "materiality of the alleged misrepresentation or omission" under §§ 11 and 12(a)(2), "not scienter, reliance, or causation." *In re Fuwei Films Sec. Litig.*, 634 F. Supp. 2d 419, 434 (S.D.N.Y. 2009). Because fraud is not an element of these claims, Plaintiffs must satisfy only the "short and plain statement requirements" of Fed. R. Civ. P. 8. *Litwin*, 634 F.3d at 715. Section 10(b) of the Exchange Act requires Plaintiffs to plead materiality, falsity, scienter, reliance, loss causation, and economic loss. *Heller v. Goldin Restructuring Fund, L.P.*, 590 F. Supp. 2d 603, 613 (S.D.N.Y. 2008). Defendants only challenge falsity for the Securities Act and Exchange Act claims, and scienter for the Exchange Act claims.

### A.    Plaintiffs Adequately Plead False And Misleading Statements

The standard for pleading falsity for Securities Act claims is plausibility. *Lewy v. SkyPeople Fruit Juice, Inc.*, 2012 WL 3957916, at *10 (S.D.N.Y. Sept. 10, 2012). For Exchange Act claims under § 10(b), Plaintiffs must satisfy the particularity requirement of Fed. R. Civ. P. 9(b) and the PSLRA, but the falsity standard is still plausibility. *See In re Bristol Myers Squibb Co. Sec. Litig.*, 586 F. Supp. 2d 148, 162 (S.D.N.Y. 2008) ("*BMS*") ("[T]he Court must merely decide whether Plaintiffs have pleaded their claims with sufficient particularity and whether it is plausible that the use of such terms in [defendants'] public disclosures . . . [misled] the securities market"). Accordingly, the issue here is whether the alleged statements are plausibly false, not whether there are competing scenarios in which the statements may be true. So long as the allegations of falsity rise "above the speculative level," *Bell Atl. Corp. v. Twombly*, 550 U.S.

544, 555 (2007), even if the statements may likely be true, Plaintiffs have established that falsity

is plausible. *See BMS*, 586 F. Supp. 2d at 162.

       1.       **False And Misleading Statements Relating To MF Global's DTA[3]**

       (a)       **The DTA Was Materially False Throughout The Class Period**

     Plaintiffs allege that GAAP required MF Global to record a valuation allowance against

its U.S. DTA at the start of the Class Period. MF Global had powerful negative evidence based

on MF Global's three (and four) year cumulative U.S. loss history and the "unsettled"

circumstances surrounding whether it could become profitable again. MF Global also lacked

sufficient countervailing objective and reliable positive evidence. Nonetheless, in violation of

GAAP, Defendants failed to record the required allowance. ¶¶ 10, 86-87. MF Global's financial

reports – and Defendants' statements discussing those results – were therefore presumptively

false when issued. *See* SEC Reg. S-X, 17 C.F.R. § 210.5-01(a)(1); *Pa. Pub. Sch. Emp. Ret. Sys.

v. Bank of Am.*, 2012 WL 2847732, at *11 (S.D.N.Y. July 11, 2012). *See also In re Scottish Re

Grp. Sec. Litig.*, 524 F. Supp. 2d 370, 390 (S.D.N.Y. 2007) (failure to record DTA valuation

allowance was misstatement); *Hoff v. Popular Inc.*, 727 F. Supp. 2d 77, 91 (D.P.R. 2010) (same).

     Cumulative losses constitute strong negative evidence that a DTA valuation allowance is

required by GAAP because they are objective facts that are "very difficult" to overcome. ¶¶ 94-

98; *Scottish Re*, 524 F. Supp. 2d at 389-90; *Hoff*, 727 F. Supp. 2d at 90. Objective positive

evidence of equal or greater strength is required to overcome such objective negative evidence.

¶¶ 97-98; *Hoff*, 727 F. Supp. 2d at 90. Indeed, because of these circumstances, MF Global's

failure to even disclose its U.S. operations' three-year cumulative loss position in its 2010 10-K

was materially misleading. ¶¶ 96, 317-24.

---

[3] For the convenience of the Court, Plaintiffs attach an Appendix listing all of the alleged false statements in the CAC by paragraph numbers in the same four categories as described herein.

GAAP provides strict examples of objective evidence that may be used to offset the heavy weight of a cumulative loss history, such as "existing contracts," a "firm sales backlog," or "a strong earnings history exclusive of the loss" if accompanied by evidence that the loss is "an aberration rather than a continuing condition." ¶ 96. Mere forecasts of an anticipated turnaround or subjective hopes are insufficient positive evidence. *See Hoff*, 727 F. Supp. 2d at 90. Even PwC's own tax guide states that a history of recent losses makes it "**very difficult**" to demonstrate that even an implemented turnaround plan will lead to profitability, before profitability is realized. ¶ 98. The burden is heightened further and "**much more difficult**" where there is an unimplemented plan, as was the case here. *Id*. Moreover, "unsettled circumstances" concerning future operations are considered further "negative evidence." ¶ 99.

Applying these standards, Defendants violated GAAP by failing to offset MF Global's U.S. DTA with a valuation allowance throughout the Class Period. First, MF Global's U.S. operations were in a three-year loss position as of March 31, 2010. ¶¶ 102-03, 109. But the three-year cumulative U.S. loss was not disclosed in MF Global's 2010 10-K, nor was any justification for avoiding a valuation allowance. ¶¶ 111, 321. Moreover, according to the 2010 10-K, profitability depended primarily on rising interest rates. ¶¶ 104-08. Yet rates were historically low and not expected to improve in the near-term. *Id*. This significant negative evidence was not overcome by any positive evidence, much less objective evidence of a "sufficient quality and quantity" to support the DTA. ¶ 101. Thus, at the outset of the Class Period, no evidence justified avoiding a valuation allowance. *See Hoff*, 727 F. Supp. 2d at 90.

Second, although MF Global belatedly disclosed its three-year cumulative pre-tax loss position "in many jurisdictions" in the 2011 10-K (failing to disclose what was actually a four-

year cumulative U.S. loss position),[4] ¶¶ 111-12, MF Global falsely stated it still did not need to record a DTA valuation allowance. The 2011 10-K claimed the weight of the negative evidence was diminished due to "non-recurring" losses, and outweighed by profitability "projections" that Defendants "began to see evidence of in fiscal 2011" from "key drivers of profitability," including "compensation structure" changes. ¶¶ 114-15. In reality, neither of these rationales justified avoiding a valuation allowance. To the contrary, prevailing low interest rates caused MF Global's losses, and this lack of profitability was expected to continue in the near-zero rate environment. ¶¶ 104-08, 114. *See Hoff*, 727 F. Supp. 2d at 90. Moreover, none of the "positive evidence" was objective, let alone sufficient to outweigh a history of cumulative losses. ¶ 96. Any "positive evidence" in the form of "projections" **assumed** an untested business plan's success, ¶¶ 118-21, was "inherently **subjective**," "unsettled," and thus insufficient to overcome years of cumulative U.S. losses. ¶¶ 98, 121. *See Scottish Re*, 524 F. Supp. 2d at 389.

Further, at the time MF Global filed its 2011 10-K, its purported return to profitability was driven by the unsustainable Corzine Trade. ¶¶ 119, 172-75. The strategy was only possible for a short time because it depended on the availability of the EFSF, set to expire in June 2013. ¶¶ 119, 159. The financing required for the Corzine Trade also limited its upside and longevity. Because the accounting treatment for RTMs allowed MF Global to recognize profits in the quarter in which the RTMs were booked, maintaining a steady revenue stream depended on continually increasing MF Global's exposure, and MF Global had neither the capital nor the

---

[4] MF Global's failure to disclose that its U.S. operations were in a four-year cumulative loss position was materially misleading as to the true risk that GAAP required MF Global to record a valuation allowance. ¶¶ 317-24, 393.

liquidity to support such "enormous leverage."[5] ¶¶ 120, 166-75. Accordingly, any expected profits from the Corzine Trade were not sufficient to avoid a valuation allowance. ¶¶ 117-21.

As to projections relating to compensation-structure changes, those changes also could not outweigh the losses, and Defendants knew that those changes would result in years of earnings volatility. ¶¶ 123-24. Again, these circumstances were, at best, "unsettled" and not sufficiently reliable under GAAP. ¶¶ 129-32.

Likewise, while the 2011 10-K cryptically mentioned "tax planning strategies," they, too, were insufficient to avoid a valuation allowance. GAAP permits consideration of tax strategies only if they are "prudent and feasible," will "result in realization of deferred tax assets," and are "primarily within the control of management." ¶ 100. Here, none of these requirements were satisfied. ¶ 133. Indeed, the supposed tax strategies were described only as including "potential shifts in investment policies." ¶ 135. But the potential shifts were not "feasible" since MF Global lacked sufficient liquidity to execute them. *Id.* This is confirmed by the Break-the-Glass Document, which demonstrates that even if shifts in RTM policies could have provided liquidity, they would have led to further **large losses**. ¶¶ 136-39. Moreover, MF Global's SEC filings admitted the realizable portion of the DTA "could be significantly reduced in the near term if . . . actual results are significantly less than forecast." ¶ 134. This confirmed that any tax planning strategies were of limited benefit and outside management's control. *Cf. Hoff*, 727 F. Supp. 2d at 90. In sum, unbeknownst to investors, the "positive" evidence in the 2011 10-K was insufficient under GAAP to overcome the "significant" negative evidence of MF Global's four-year cumulative U.S. loss history, and thus its financial results were misstated. ¶ 115.

---

[5] As was later reported, Corzine knew the strategy's limitations and considered it to be "a way to answer the [rating agencies'] demands while buying time to transform the business," not a long-term source of profitability. ¶ 149.

Despite these allegations, Defendants nonetheless argue that DTA valuation allowances are a matter of judgment and Plaintiffs' allegations amount to "fraud by hindsight." *See* UW 21; MacDonald 6. But courts repeatedly have held that the failure to record DTA in accordance with GAAP constitutes an actionable misstatement. *See Hoff*, 727 F. Supp. 2d at 89; *Kreysar v. Syron* (*In re Fed. Home Loan Mortg. Corp.(Freddie Mac) Sec. Litig.*), No. 09-cv-832 (MGC), slip op. at 43:3-5 (S.D.N.Y. Jan. 20, 2011), Ross Ex. 3; *Scottish Re*, 524 F. Supp. at 389; *In re Huffy Corp. Sec. Litig.*, 577 F. Supp. 2d 968, 1016-17 (S.D. Ohio 2008). Although accounting generally requires some judgment, GAAP provides specific, objective, and demanding criteria for DTA, which did not exist here.[6]

Defendants' citations are not to the contrary. In the majority of cases they cite, the companies were **not** in a three-year cumulative loss position. *See In re Fannie Mae 2008 Sec. Litig.*, 742 F. Supp. 2d 382, 409 (S.D.N.Y. 2010); *Kuriakose v. Fed. Home Loan Mortg. Corp.*, 2012 WL 4364344, at *9-10 (S.D.N.Y. Sept. 24, 2012).[7] The **only** case cited by Defendants concerning a three-year cumulative loss position is *Limantour v. Cray, Inc.*, 432 F. Supp. 2d 1129, 1157 (W.D. Wash. 2006), which has been distinguished repeatedly because there were no allegations of contemporaneous falsity. *See Hoff*, 727 F. Supp. at 91 n.8; *Scottish Re*, 524 F. Supp. 2d at 390 n.150. In fact, when *Limantour* was decided, no court had held that DTA statements were actionable. *See* 432 F. Supp. 2d at 1157. Now, multiple courts have done so.

Next, Defendants contend that their DTA statements were accompanied by "extensive" risk disclosures, and thus are protected by the bespeaks-caution doctrine. Corzine 7; UW 22-24; SNU 23-24. They are wrong. That doctrine is limited to forward-looking statements, and does

---

[6] GAAP's DTA rules are far more restrictive and objective than other rules, such as those for goodwill. ¶¶ 93-94.

[7] Defendants' citations to *Thor Power Tool Co. v. Comm'r of Internal Revenue*, 439 U.S. 522 (1979), *In re 2007 Novastar Fin., Inc. Sec. Litig.*, 2008 WL 2354367 (W.D. Mo. June 4, 2008), and *In re Wet Seal, Inc. Sec. Litig.*, 518 F. Supp. 2d 1148, 1152-53 (C.D. Cal. 2007) are unavailing, as none of these cases involved DTA.

not apply to GAAP financial statements because they are not forward-looking, but rather reflect a **present** assessment of an asset's value. *See P. Stolz Family P'ship L.P. v. Daum*, 355 F.3d 92, 97 (2d Cir. 2004). Thus, DTA calculations are grounded in "present fact-knowledge within the grasp of the offeror." *Id*. at 97. Indeed, DTA accounting must be based on present objective facts, not projections.[8] For this reason, GAAP financial statements are not "forward-looking," even where an asset is valued in light of expected future events. *See, e.g.*, *Schnall v. Annuity & Life Re (Hold.)*, 2004 WL 367644, at *7-8 (D. Conn. Feb. 22, 2004) ("Statements regarding loss reserves are not projections, they are directed to the then-present . . . financial condition.").

Congress recognized as much in the PSLRA, which codifies the bespeaks-caution doctrine in a "safe harbor" for forward-looking statements, but provides that the safe harbor does not apply to GAAP financial statements. *See* 15 U.S.C. § 78u-5(i). The SEC also recognizes this, providing that financial statements that do not comply with GAAP are presumptively misleading, regardless of any footnotes or disclaimers. *See* SEC Regulation S-X, 17 C.F.R. § 210.4-01(a)(1).

Moreover, even if the bespeaks-caution doctrine could apply to GAAP financial statements (which it cannot), Defendants' misleading DTA accounting would only be immunized if the cautionary language was "substantive and tailored to the specific" risks posed. *Slayton v. Am. Exp. Co*., 604 F.3d 758, 772 (2d Cir. 2010). Such "[c]autionary language must be extensive and . . . [a] vague or blanket (boilerplate) disclaimer which merely warns the reader that the investment has risks will ordinarily be inadequate to prevent misinformation." *Id. See also City of Pontiac Gen. Emp. Ret. Sys. v. Lockheed Martin Corp.*, 2012 WL 2866425, at *6 (S.D.N.Y. July 13, 2012) (alleged misstatements could not "be disclaimed except by far more specific

---

[8] E&Y's and PwC's accounting guides state that "projections cannot be relied upon as a source of future taxable income" in the face of negative evidence such as a history of losses. ¶¶ 92, 98.

9

descriptions"). Here, Defendants' disclosures did not identify specific risks and problems faced by MF Global, but simply reflected the general definition of DTA.[9]

The additional warnings Defendants cite likewise fail to describe the risks with sufficient specificity such that no reasonable investor would be justified in relying on the Company's DTA. Although Defendants identified potential risks relating to interest rates, restructuring plans, and compensation adjustments (*see* UW 23; SNU 24 n.16), when "taken together and in context" with the representations about DTA and GAAP compliance, a reasonable investor still would have believed Defendants had sufficient objective evidence of profitability required by GAAP. *See In re Flag Telecom Hold., Ltd. Sec. Litig.*, 618 F. Supp. 2d 311, 320-21 (S.D.N.Y. 2009).[10]

Moreover, where defendants are aware that the very risks of which they warn are **already** transpiring, warnings that such risks are "possible" will not render their statements immaterial as a matter of law. *See Slayton*, 604 F.3d 758 at 770 (cautionary language that is misleading in light of historical fact cannot be meaningful); *Rombach v. Chang*, 355 F.3d 164, 173 (2d Cir. 2004) (cautionary language about risks that have already transpired is akin to "someone who warns his hiking companion to walk slowly because there might be a ditch ahead when he knows with near certainty that the Grand Canyon lies one foot away."). Here, while Defendants warned of "unexpected events" and "overlooked or unknown contingencies," (SNU 16 n.9; UW 23), they never disclosed then-existing facts known by them that ultimately contributed to MF Global's demise, including the liquidity risks attendant to the Corzine Trade, which rendered MF Global's

---

[9] *E.g.*, UW 23 (DTA "reflect[s] our expectation of using . . . loss carryforwards against future income" and if MF Global is not "able to generate profits . . . in future periods, [it] may be required to record valuation allowances," which "could have a significant adverse impact on our financial results."); SNU 23-24 (similar).

[10] Defendants' cite to *Olkey v. Hyperion 1999 Term Trust*, 98 F.3d 2, 5 (2d Cir. 1996) is inapposite. There, alleged misstatements only expressed defendants' "belie[f]" they could offset interest-rate losses with interest-rate gains, and were qualified by specific warnings that interest-rate changes would affect mortgage-backed securities more than other securities. *Id.* Here, by contrast, GAAP required DTA to be reported using specific, **objective** criteria.

ability to benefit from the DTA "unsettled," requiring a valuation allowance (¶ 121).

The cases cited by Defendants are inapposite. *Coronel v. Quanta Capital Hold.*, 2009 WL 174656, at *17-18 (S.D.N.Y. Jan. 26, 2009), involved hurricane-loss estimates, which are not subject to demanding GAAP criteria like those applicable to DTA, and the risk disclosures included far more detailed warnings that the estimates were "preliminary," "inherently difficult to predict," and subject to a "high level of uncertainty." Similarly, *Halperin v. eBanker USA.com*, 295 F.3d 352, 360 (2d Cir. 2002), involved mere "hortatory" language, such as the defendant "intend[ed] to endeavor" to register the shares, that was "surrounded by" explicit warnings that registration was not assured. And *ECA Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase*, 553 F.3d 187, 204-05 (2d Cir. 2009), involved a technical GAAP misclassification between two asset classes (loans and trading assets). By contrast, the failure to record a valuation allowance here caused net income to be overstated by over $100 million.[11]

Corzine and MacDonald also incorrectly argue that their oral DTA statements are not actionable because they "track" public filings. *See* Corzine 6-7; MacDonald at 6. They cite no support for this assertion, and courts routinely hold defendants liable for false statements that appear in both SEC filings and conference calls. *See, e.g.*, *In re Bear Stearns Cos., Inc. Sec., Deriv. & ERISA Litig.*, 763 F. Supp. 2d 423, 494 (S.D.N.Y. 2011); *In re AIG, Inc., 2008 Sec. Litig.*, 741 F. Supp. 2d 511, 525-26 (S.D.N.Y. 2010); *In re New Century*, 588 F. Supp. 2d 1206, 1222 n.14, 1225-27 (C.D. Cal. 2008). MacDonald also contends that his statements that certain

---

[11] The Securities Act Defendants argue that MF Global's DTA-related misstatements were not material. SNU 23-24. "Because materiality is generally a question of fact, it is unlikely that a cause of action turning on materiality would be dismissed as a matter of law." *In re Livent, Inc. Noteholders Sec. Litig.*, 151 F. Supp. 2d 371, 408 (S.D.N.Y. 2001). "[A] § 11 claim may not properly be dismissed pursuant to Rule 12(b)(6) on the ground that the alleged misstatements or omissions are not material unless they are so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance." *Id.* The failure to disclose that MF Global's U.S. operations were in a three- and four-year cumulative loss position as of March 31, 2010 and 2011, respectively, was material because the omissions concealed that MF Global's DTA analysis violated GAAP. ¶¶ 87, 108-09.

subsets of the DTA were "not as at risk" as others were literally true. MacDonald 6-7. MacDonald's statements were misleading, however, because the cumulative U.S. loss history and other negative evidence required a valuation allowance at the start of the Class Period for **all of the U.S. DTA**, which was the "bulk" of the overall DTA. ¶ 86. The securities laws forbid misleading statements as well as outright falsehoods. *See Operating Local 649 Annuity Trust Fund v. Smith Barney Fund Mgmt.*, 595 F.3d 86, 92 (2d Cir. 2010); *Hoff*, 727 F. Supp. 2d at 91 (small, early DTA valuation allowance may have misled investors as to the appropriateness of the remaining DTA); *Scottish Re*, 524 F. Supp. 3d at 390 (same).

### (b)    DTA Accounting Was Not A Matter Of Opinion

The Underwriters and the Directors argue that DTA accounting is a matter of "opinion," and, therefore, Plaintiffs must plead that the statements were both "objectively false" and "subjectively disbelieved" by Defendants. ID 2-3, 14, 19-20; UW 2, 17, 20. This is wrong.[12]

In *Fait v. Regions Fin. Corp.*, 655 F.3d 105 (2d Cir. 2011), plaintiff alleged that defendants had falsely accounted for goodwill and loan-loss reserves. *Fait* held that these items were matters of "opinion" because they depended heavily on management's judgment, and because plaintiff failed to allege any "objective standard" by which the accounting's correctness could be evaluated. *See Fait*, 655 F.3d at 110-11, 113. The Court therefore held that both items could be deemed "false" only if plaintiff pled objective **and** subjective falsity. *See id.* at 110.

Here, unlike in *Fait*, Plaintiffs allege in detail the objective standard by which the DTA was required to be tested and which strictly limited management's judgment: When an entity has

---

[12] Defendants advance this argument solely with respect to the § 11 claims because it is irrelevant under § 10(b). Section 10(b) requires Plaintiffs to plead scienter, a requirement that, if met, satisfies "subjective falsity." Scienter, however, is not required under § 11. But even if subjective disbelief is required, Plaintiffs need only plead it as to MF Global's Officers (all of whom are alleged to have acted with scienter), and not the subjective disbelief of each Director. *See Fed. Housing Fin. Agency v. UBS Am., Inc.*, 858 F. Supp. 2d 306, 326-27 (S.D.N.Y. 2012) ("under the Securities Act the plaintiff need only allege subjective falsity as to the originator of the opinion expressed in the offering documents."). In any event, Plaintiffs plead the Directors' subjective disbelief as well. *See, e.g.*, ¶ 558.

three years of cumulative losses, it may avoid a valuation allowance to offset its DTA only if it has positive, **objectively verifiable** evidence that it will earn sufficient profits to use the DTA. ¶ 97. Thus, there are explicit limits placed on the exercise of any judgment. Management is **not** permitted to use speculative forecasts to offset objectively verifiable negative evidence such as three years of cumulative losses. *Id.* And if a company violates specific accounting requirements, the resulting misstatements are matters of fact, not opinion – even if the item in question is also subject to management judgment. *See In re GE Sec. Litig.*, 856 F. Supp. 2d 645, 658 n.2 (S.D.N.Y. 2012) ("[Plaintiff] claims not that GE estimated the value of its assets incorrectly, but that its valuation **must** be false because the company engaged in improper accounting practices. Thus, the truth or falsity of this statement is not a matter of opinion, it is an objective fact and plaintiffs need not plead subjective falsity.") (citing *Fait*, 655 F.3d at 110-11).

Moreover, MF Global had **no** objectively verifiable positive evidence sufficient to offset its three years of cumulative losses when it issued the 2010 10-K. At that time, MF Global's business model was unable to generate profits in the foreseeable future due to declining interest rates, and even the Corzine Trade, which was the only hope for even short-term profitability, had not yet begun. Thus, there was no objectively verifiable positive evidence at all. Even after the Corzine Trade began, the **only** positive evidence of future profitability that MF Global possessed was speculative profit from a new, high risk, untested business model, which depended on an unsustainable strategy and continued to generate losses in all but one quarter of the Class Period. Accordingly, at best, the circumstances remained "unsettled" under GAAP.

MF Global also may have hoped that it could improve its performance by reducing compensation costs. Yet even if Defendants had **completely met** all of their goals, they would not have saved enough to offset the DTA. ¶¶ 128, 132. More importantly, as Defendants

themselves admitted, the cost reductions, as well, were speculative and thus not sufficient to avoid a valuation allowance.[13] Indeed, former CEO Dan even admitted that far from representing "objective[]" positive evidence of future profitability, the planned changes to MF Global's compensation policy would **negatively** affect the Company. ¶¶ 123-24.[14]

In MF Global's 2011 10-K, Defendants stated that the Company had "tax planning strategies" via "shifts in investment policies" that could generate sufficient profits to offset the U.S. DTA. ¶ 135. But, as noted above, the Break-the-Glass Document shows that, given MF Global's severe liquidity constraints, any investment shifts would generate further **losses**, not **profits**. ¶¶ 134-39. And in fact, even MF Global admitted in its 2011 10-K that any "tax planning strategies" it had were entirely dependent on the Corzine Trade's success, ¶ 134, which is directly contrary to GAAP's requirements that positive evidence be **objective** and that tax strategies be "primarily within the control of management." ¶ 100.

Thus, the only positive evidence MF Global had was, at best, management's belief that the Corzine Trade and the changes to compensation might succeed. Hope and forecasts, however, are not enough under GAAP. By identifying an "objective standard," Plaintiffs have demonstrated that the DTA misstatements here were not misguided "opinions" under *Fait*, but violations of controlling accounting rules. This is not a case of failed projections; it is a case where projections were improperly used when not permitted.

Ignoring these specific allegations, the Underwriters and Directors simply argue that, because a valuation allowance is a matter of management judgment, it is necessarily an opinion under *Fait*. UW 18-19; ID 14. But *Fait* does not hold that if a particular balance-sheet item

---

[13] *See* Tosc. Ex. 1 (2010 10-K) at 51-52 ("we cannot offer any assurance that all of these savings will be successfully realized as there may be unexpected events or overlooked or unknown contingencies that may cause us to alter our plans or reassess our estimates"); Tosc. Ex. 5 (2011 10-K) at 45 (similar).

[14] E&Y's guidance notes that the further out a projection extends, the less reliable it is. *See* Tosc. Ex. 13 at 6.5.2.

involves management judgment (but explicitly excludes mere forecasts), then that item must always be considered a matter of opinion. Instead, *Fait* focuses on whether the plaintiff identifies a particular objective standard against which management's accounting judgment can be assessed, which the *Fait* plaintiff did not. *See* 655 F.3d at 113.

Indeed, if Defendants are correct that any balance-sheet item that relies in any way on judgment is **always** a statement of opinion, then **all financial statements** are opinions. As the Underwriters point out, **all of GAAP** is subject to management judgment. *See* UW 20-21; *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1421 n.10 (3d Cir. 1997) ("GAAP is not a set of rigid rules ensuring identical treatment of identical transactions, but rather characterizes the range of reasonable alternatives that management can use."). It cannot seriously be argued that this is the standard by which § 11 claims are to be evaluated and that no financial statements could be relied upon as facts for any purpose.[15]

*Fait* simply did not go so far. A statement's treatment as a matter of opinion, or a matter of objective fact, depends on the nature of the alleged misstatement. Where the misstatement is management's subjective forecast, then it is opinion; where the misstatement arises from a violation of an objective standard, then it is factual. Here, because MF Global had no positive evidence that could even **arguably** be classified as "objectively verifiable," MF Global violated an objective accounting standard, and its DTA accounting misstatements are factual.[16]

---

[15] This is consistent with *GE*'s reading of *Fait*: even though the court recognized that asset valuation is subject to management judgment, *GE* held that because the specific valuation error alleged – misclassification of assets – was not part of that judgment, the resulting statements were factual. *See* 856 F. Supp. 2d. at 657-58.

[16] The mere fact that some cases have described DTA as based on management judgment does not change this result. *See, e.g.*, *Fannie Mae*, 742 F. Supp. 2d at 409; *Limantour*, 432 F. Supp. 2d at 1156; *Kuriakose*, 2012 WL 4364344, at *9-10. Two of these cases pre-date *Fait*, and the third does not even cite *Fait*; thus, none distinguish between factual statements and opinions under *Fait*. Also, all three were brought under § 10(b), which requires scienter, making the distinction between subjective and objective falsity irrelevant. And most importantly, the issue is not whether DTA accounting involves judgment, but whether the particular alleged misstatements involved the violation of an objective standard. *See GE*, 856 F. Supp. 2d at 658 n.2.

### (c) Even If DTA Statements Were Matters Of Opinion, Plaintiffs Sufficiently Plead Objective And Subjective Falsity

Under *Fait*, Plaintiffs must establish that statements of opinion are both objectively and subjectively misstated. *See* 655 F.3d at 111-12. *Fait* held that under § 11, Plaintiffs would only be required to "plausibly allege" that defendants misstated their beliefs, *id.* at 112 n.5, a reference to Rule 8(a) pleading standards. Here, Plaintiffs have pled falsity under Rule 8(a).

Although scienter allegations are sufficient to plead subjective falsity, they are not necessary. *See Fait*, 655 F.3d at 112 n.5 ("the standard applied here does not amount to a requirement of scienter."). Thus, in *McGuire v. Dendreon Corp.*, 688 F. Supp. 2d 1239 (W.D. Wash. 2009), the court reasoned that to allege subjective falsity it is sufficient "that the speaker (whether or not he personally believed his opinion to be true) would be in possession of facts that he knew or should know would lead someone else to a different opinion." *Id.* at 1244-45.[17] This reasoning is predicated on *Virginia Bankshares v. Sandberg*, 501 U.S. 1083 (1991), which concluded that the evidence submitted was sufficient to support a jury verdict that the defendants' "opinions" were false. *See id.* at 1094-98. In so doing, the Court relied on evidence demonstrating the opinion's **objective** falsity, coupled with the defendants' access to that information. *Id.* Because evidence sufficient to **prove** subjective falsity at trial must be sufficient to **plead** subjective falsity, subjective falsity may be pled under *Virginia Bankshares* by alleging facts demonstrating objective falsity, and defendants' possession of those facts. *See Abu Dhabi Commercial Bank v. Morgan Stanley & Co.*, 2012 WL 3584278, at *10 (S.D.N.Y. Aug. 17, 2012) (subjective falsity exists where the speaker knowingly issues an opinion "that is either unsupported by reasoned analysis or without a factual foundation").

---

[17] Though *Dendreon* was decided before *Fait*, it was interpreting *Rubke v. Capitol Bancorp Ltd.*, 551 F.3d 1156 (9th Cir. 2009), on which *Fait* heavily relied. *See Fait*, 655 F.3d at 111.

Here, this standard is met. First, there is no dispute that MF Global's Officers were aware of the relevant accounting standard, and the "positive evidence" on which they relied to avoid taking a valuation allowance consisted entirely of the sort of speculative projections that GAAP **explicitly** states are insufficient. *See Scottish Re*, 524 F. Supp. 2d at 393 (inferring scienter under § 10(b) from defendants' awareness of the relevant DTA standards); *Hoff*, 727 F. Supp. 2d at 93 (same). Written guidance by MF Global's own auditor warned that "[m]anagement's belief that the tax assets will be realized is not by itself sufficient, objective positive evidence to overcome objective negative evidence, such as recent losses." Tosc. Ex. 12 at 5.1.3.1. Not only did MF Global not have objective "positive evidence," but some of its plans – such as changes to compensation – would result in earnings volatility for several years, which is not objective "positive evidence." ¶¶ 110, 123-24. Thus, even if Defendants believed that the unsustainable Corzine Trade (which did not even begin until after the 2010 10-K was filed) and the planned compensation cuts could restore MF Global to profitability, they could not avoid a valuation allowance under these at-best "unsettled" circumstances. ¶ 132.

Moreover, while MF Global only later told investors that it was relying in part on "tax planning strategies" involving "shifts in investment policies" to avoid a valuation allowance, the Break-the-Glass Document reveals that potential "shifts" in investments would only aggravate MF Global's losses. ¶¶ 100, 133-40. In sum, Plaintiffs have demonstrated that the Officers were aware of the precise facts that rendered their accounting objectively false. *See Va. Bankshares*, 501 U.S. at 1094-98; *Dendreon*, 688 F. Supp. 2d at 1245. This is more than sufficient "'factual content that allows the court to draw the reasonable inference that the defendant[s are] liable for the misconduct.'" *Forest Park Pictures v. Universal TV Network*, 683 F.3d 424, 429 (2d Cir. 2012) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).

17

Defendants' cases are not to the contrary. Most of them were brought under § 10(b) (and most before *Fait*). The plaintiffs were therefore required to plead scienter under the PSLRA and Rule 9(b), rather than subjective falsity under Rule 8(a).[18] And in *In re Deutsche Bank AG Sec. Litig.*, 2012 WL 3297730 (S.D.N.Y. Aug. 10, 2012), the only § 11 case cited by Defendants, the court held that the plaintiffs could not allege subjective falsity on a negligence theory. *See id.* at *2. As explained, this is contrary to *Fait*, which explicitly stated subjective falsity allegations need not plead scienter. *See* 655 F.3d at 112 n.5; *Abu Dhabi*, 2012 WL 3584278, at *11 n.142.[19]

### 2.    False And Misleading Statements Relating To Risk Management

#### (a)    The Board Knew Of Gaps In Risk Management While Defendants Falsely Stated That Risk Controls Were Adequate

The Board received at least six presentations and reports identifying critical "gaps" in risk management during the Class Period. ¶¶ 207-18. These internal, non-public reports contradicted Defendants' repeated public statements about effective internal controls and risk management. *See, e.g.*, ¶¶ 325, 331-35, 344-45, 402-14, 429-36. Defendants' primary response here is that these statements were mere puffery. Corzine 14; Steenkamp 12. Not so – the same or virtually identical statements have regularly been found actionable, as set forth below.

But Defendants' puffery defense also fails more broadly. Plaintiffs allege that risk management was ineffective not only "because MF Global failed to maintain reliable internal controls," but also because senior management "repeatedly breached specific Board limits." *See,*

---

[18] *See, e.g.*, *Fannie Mae*, 742 F. Supp. 2d at 395-97; *Limantour*, 432 F. Supp. 2d at 1144-45; *Kuriakose*, 2012 WL 4364344, at *1; *Novastar*, 2008 WL 2354367, at *4; *Wet Seal*, 518 F. Supp. 2d at 1152.

[19] As described below in Section B.4(a), some Defendants' stock purchases during the Class Period do not negate scienter even under the heightened pleading standards applicable to § 10(b); thus, for Rule 8(a) purposes, stock purchases do not prevent Plaintiffs from "stat[ing] a claim that is plausible on its face." *Forest Park Pictures*, 683 F.3d at 429. Additionally, the Directors' claim that they relied on auditor certifications is inappropriate on a motion to dismiss. *See, e.g.*, *In re AFC Enter. Sec. Litig.*, 348 F. Supp. 2d 1363, 1380 (N.D. Ga. 2004). This is particularly so given that many of the false statements here appeared in quarterly reports, which were not certified by any auditor. Nor is a restatement required to show falsity. *See, e.g*., *Aldridge v. A.T. Cross*, 284 F.3d 72, 82 (1st Cir. 2002); *Feiner v. SS&C Techs., Inc*., 11 F. Supp. 2d 204, 209 (D. Conn. 1998).

*e.g.*, ¶ 416. Indeed, the OFR specifically concluded that a "firm with better internal controls and governance could have avoided MF Global's fate and protected customer assets." ¶ 216. This is not a case in which risk management was marginally ineffective. When the chasm between the public statements and the truth is so vast, statements that may at times be considered puffery, such as "high," "high quality," or "strong" have real meaning and are actionable. *New Century*, 588 F. Supp. 2d at 1215, 1225-26. As the Supreme Court stated in *Virginia Bankshares*:

> It is no answer to argue . . . that the quoted statement . . . did not express a reason in dollars and cents, but focused instead on the "indefinite and unverifiable" term, "high" value . . . The objection ignores the fact that such conclusory terms in a commercial context are reasonably understood to rest on a factual basis that justifies them as accurate, the absence of which renders them misleading.

501 U.S. at 1093.

Indeed, context is everything. This principle is recognized by a Second Circuit case cited by all Defendants, *ECA*, 553 F.3d 187. Plaintiffs sued JP Morgan for facilitating a sham transaction by Enron that represented less than 0.1% of JP Morgan's revenues, and challenged the veracity of statements about JP Morgan's integrity and reputation. *Id.* at 204. The court described these generic statements (*e.g.*, "set[ting] the standard for integrity") as "routine representations made by investment institutions," and refused to attach liability. *Id.* at 206. *ECA* specifically noted that the transactions, which "must be placed in context," were relatively minute, and that the connection was too attenuated to general statements about JP Morgan's integrity, which applied to the remaining 99.9% of the company's revenues. *Id.* at 204, 206. Thus, the facts in *ECA* were completely different than those here where Plaintiffs allege system-wide deficiencies and endemic governance failures. ¶¶ 177, 179, 181, 192, 199, 203, 207-18.

### (i)     The 2010 Internal Audit Reports

One month before the start of the Class Period, in April 2010, Internal Audit identified "**dozens of gaps** in policies, procedures, and technology" in various risk areas. ¶ 208. The

presentation also found "gaps in technology [that] made the data needed for forecasting liquidity risks **inadequate and unreliable**." *Id.* The next month, another Internal Audit report described the risk policies, including "[l]**iquidity risk reporting**," as "not congruent with the changes to its broker-dealer business," ¶ 209, *see also* ¶¶ 210-11. Indeed, notwithstanding Defendants' public statements, "liquidity had been a cause for concern before and throughout Mr. Corzine's tenure at MF Global**, yet systems and tools that would enable accurate real time monitoring of liquidity were never implemented**." ¶¶ 215-18.

MF Global did not disclose these facts. Instead, a month after those two Internal Audit reports were issued, MF Global filed its 2010 10-K which falsely stated risk management was "critical" to its business, ¶ 331, "robust," *id.*, and "effective." ¶ 335. These statements are actionable because they painted a picture of effective controls despite knowledge to the contrary. *See Iowa Pub. Emp. Ret. Sys. v. MF Global, Inc.*, 620 F.3d 137, 144 (2d Cir. 2010) ("characterizations of MF Global's risk management system" as "robust" are actionable); *AIG*, 741 F. Supp. 2d at 526, 530-31 ("strong risk management processes" was actionable); *In re Lehman Bros. Sec. & ERISA Litig.*, 799 F. Supp. 2d 258, 297 (S.D.N.Y. 2011)) (statements regarding Lehman's "strong," "conservative" risk management actionable).

MF Global also did not disclose that its liquidity controls were "inadequate and unreliable" or that it could not adequately monitor liquidity as of April 2010. ¶ 208. Instead, the 2010 10-K falsely said: "We have established a liquidity policy designed to **ensure** that we maintain access to sufficient, readily available liquid assets . . . We also **evaluate** the impact of adverse market conditions on our liquidity risk and adjust our liquid assets appropriately." ¶ 334. Corzine also repeatedly emphasized that MF Global had "strong compliance and control procedures" surrounding liquidity management. ¶ 344. But the opposite was true. MF Global

could not "ensure" access to "sufficient" liquidity nor "evaluate" "liquidity risk" to "adjust"

"liquid assets appropriately," and the Company's own internal reports stated that its data on

liquidity risk was "inadequate and unreliable," not "strong." ¶¶ 208-09, 212, 334. These

statements are not mere puffery, but "misrepresentations of existing facts" of MF Global's risk-

management capabilities at the time. *Freudenberg v. E\*Trade Fin. Corp.*, 712 F. Supp. 2d 171,

189 (S.D.N.Y. 2010) ("misstatements regarding risk management, discipline, monitoring and

credit quality are not 'puffery' where, as alleged here, they were 'misrepresentations of existing

facts'"); *see also In re Countrywide Fin. Corp. Sec. Litig.*, 588 F. Supp. 2d 1132, 1144 (C.D. Cal.

2008) ("the CAC adequately alleges that Countrywide's practices so departed from its public

statements that even 'high quality' became materially false or misleading; and that to apply the

puffery rule to such allegations would deny that 'high quality' has any meaning.").

     Corzine made similarly false statements at investor conferences in June and September

2010. ¶¶ 344, 362. For example, when asked about MF Global's risk management systems,

Corzine falsely responded: "I think they're **adequate** for where we are today." ¶ 362. Yet

months earlier, Internal Audit had identified "dozens of gaps" in various risk areas and found the

liquidity data "inadequate" and "unreliable." ¶¶ 207-08, 362. Given this contradictory internal

assessment, Corzine's statements characterizing MF Global's risk management as adequate are

actionable. *See AIG*, 741 F. Supp. 2d at 530-32. A follow up report by Internal Audit in October

2010 "continued to reflect many critical or high risk gaps in risk policies," and highlighted more

liquidity management concerns: "**Existing liquidity monitoring and forecasting is manual**

**and limited**." ¶¶ 210-11. A second October 2010 report identified "**High Risk**" areas due to lack

of controls over risk reporting. ¶ 211. Yet Defendants continued to describe internal controls as "strong" and "effective."[20]

### (ii)   The 2011 Internal Audit Reports

On March 31, 2011, Internal Audit issued yet another report, concluding that "[t]he Regulatory Reporting Group handles…[t]he vast majority of the calculations underlying [its] reports . . . via spreadsheet . . . .**[T]he controls are not in place or not all aspects of these controls are documented as evidence that they have been performed**." ¶ 212.[21] Despite this internal assessment that controls were not in place or documented, the 2011 10-K issued on May 20, 2011, said: "We have a comprehensive risk governance structure and management processes designed to monitor, evaluate, and manage the risks we assume in conducting our business." ¶ 402. This was false, as MF Global did not have the processes in place, let alone "comprehensive" processes. *Id. See Richman v. Goldman Sachs Grp. Inc.*, 868 F. Supp. 2d 261, 277 (S.D.N.Y. 2012) ("extensive procedures and controls" found actionable); *Bear Stearns*, 763 F. Supp. 2d at 494 ("[c]omprehensive risk management procedures have been established to identify, monitor and control each of [the] major risks" found actionable).[22]

---

[20] Defendants' reliance on *In re ITT Educ. Servs. Sec. & Deriv. Litig.*, 859 F. Supp. 2d 572, 580 (S.D.N.Y. 2012) (Marrero, J.), is inapposite. Corzine 5. Plaintiffs challenged a college's claim that it was "focused" on high-quality education, including: "We're very focused on the outcomes for the students." 859 F. Supp. 2d at 580. Plaintiffs claimed that these statements were false because the college was actually focused on increasing enrollment, but these statements were so general that investors were not deceived. *Cf. City of Sterling Heights Police & Fire Ret. Sys. v. Abbey Nat., PLC*, 423 F. Supp. 2d 348, 359-61 (S.D.N.Y. 2006) (statement that business would continue to be a "growth proposition" was actionable and not mere puffery).

[21] At one point in the Class Period, Corzine was specifically asked to compare MF Global's internal controls to those of his prior company Goldman Sachs during which the questioner stated: "I assume everything isn't done on a spreadsheet, but . . . how does it compare . . ." ¶ 361.

[22] The Individual Defendants dispute these facts and contend MF Global "**dramatically improved** its internal controls." Steenkamp 18; Corzine 22-24; ID 7, 20. (citing Tosc. Decl. Ex. 10). They rely on a document entitled "2011 CFTC Order Review" (the "CFTC Presentation") (Tosc. Decl. Ex. 10). *Id.* Although the Defendants assert the CFTC Presentation "is referenced in the Complaint," Tosc. Decl. at 3, it is not. The CAC refers to a presentation entitled "Promontory 2011 Update." ¶ 65. Thus, the Individual Defendants impermissibly base their motion on evidence outside the pleadings. *See Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42, 47 (2d Cir. 1991).

Perhaps even more glaringly misleading was the 2011 10-K's false reassurance that the "internal audit department and audit committee further provide independent control and **assurance** of the risk-management process," ¶ 405, and the description of the Operational Risk Management Framework as an "**effective environment** [which] is designed to identify, assess, measure, monitor and mitigate operational risk across all of our business areas." ¶¶ 407, 414. In fact, Internal Audit had not provided "assurances" on risk management, nor did the Risk Management Framework provide an "effective environment" that could monitor or mitigate risks. To the contrary, Internal Audit had issued repeated reports documenting the multiple areas in MF Global's risk management system that were "limited," ¶ 210, "inadequate," ¶ 208, "unreliable," ¶ 208, not "documented," ¶ 212, and "manual[ly]," ¶ 210 implemented by "spreadsheets," ¶ 212, including "high risk" areas arising from lack of controls, ¶ 211 – all leading to the inescapable conclusion that "dozens of gaps" existed. ¶ 208.

Nothing improved thereafter. Another Internal Audit report, issued on June 20, 2011, reiterated that "**numerous and significant gaps between the policy and existing practices**" remained, yet MF Global "accept[ed] this risk." ¶ 213. These facts led the OFR to conclude that MF Global's lack of internal controls caused its "fate." ¶ 216. Contrary to MF Global's continued false statements that it had a "strong risk culture," ¶¶ 404, 430, the OFR found a "pattern of lapses in compliance and governance" that "indicate an environment with a **weak**

---

Moreover, the CFTC Presentation is not even relevant. It relates only to the February 2008 Dooley rogue-trading incident, not the fraud at issue here. ¶¶ 63-64. But even if the CFTC Presentation addressed **relevant** controls, it is unpersuasive given the "numerous and significant gaps between the policy and existing practices" that had not been remedied for more than one year, among the other red flags discussed above. ¶ 213. In any event, even "under the PSLRA…the well-pleaded allegations of the complaint are deemed true and all inferences are drawn in favor of the pleader." *In re EVCI Colleges Holding Corp. Sec. Litig.*, 469 F. Supp. 2d 88, 92 (S.D.N.Y. 2006). Further, even assuming that the risk-related statements are statements of opinion (which Defendants do not concede), Defendants suggest that the CFTC Presentation "makes the inference that Defendants believed the stated opinions decisively more compelling than any contrary inference." ID 20. But this comparative standard applies only to scienter. With regard to the objective falsity of such statements, the standard is plausibility, and Plaintiffs have plausibly pled that the Board could not reasonably have had that belief. *See Fait*, 655 F.3d at 112 n.5.

**culture** of compliance and risk management." ¶ 216. This ultimately precipitated the $1.6 billion shortfall in customer assets and MF Global's bankruptcy. The OFR concluded as much: "A firm with better internal controls and governance could have avoided MF Global's fate and protected customer assets." *Id.*[23]

      **(b)**      **Defendants' Arguments That Statements About Risk Management Were Not False And Misleading Are Unavailing**

Defendants assert that the alleged false statements relating to risk management and internal controls amount to a claim of "mismanagement," not securities fraud. UW 14-16; Corzine 13; Steenkamp 18; SNU 1; ID 23. That is incorrect. Plaintiffs' claims are predicated on the juxtaposition of Internal Audit's assessment that risk management was neither adequate nor reliable with MF Global's and Corzine's public statements that risk management was "strong," ¶ 404, "comprehensive," ¶ 402, "effective," ¶ 407, and "strictly enforced," ¶ 403.

MF Global's collapse may have involved mismanagement, but this securities case arises out of the concealment of MF Global's true internal state of affairs, which Defendants contemporaneously misstated. "The mere fact that the conduct . . . arguably constitutes mismanagement will not preclude a claim . . . if the defendant made a statement of material fact wholly inconsistent with known existing mismanagement or failed to disclose a specific material fact resulting from that mismanagement." *Freudenberg*, 712 F. Supp. 2d at 192. Indeed, the seminal case *Santa Fe Industries* establishes that where the conduct involves deception related to

---

[23] This Court has found actionable similarly positive, but false, statements about risk management. *See Cornwell v. Credit Suisse Grp.*, 689 F. Supp. 2d 629, 636-38 (S.D.N.Y. 2010); No. 08-cv-03758, Proposed Sec. Am. Compl. ¶¶ 10, 127, 248, 253) (Dkt. No. 36-2). As here, plaintiffs alleged that internal reports had identified "inadequate" "internal controls" and "risk management practices," while the company contemporaneously claimed that "internal controls and risk management were functioning so well" that it had not suffered losses from the mortgage crisis. *Cornwell*, 689 F. Supp. 2d at 638. The false statements alleged in the complaint were nearly identical to those here. *See* Proposed Sec. Am. Compl. ¶¶ 248, 253, 261, 262, 278 ("**strong emphasis on risk management**"; "such a **strong risk management** platform"; "**a disciplined approach to risk**"; "a **strong risk management framework in governance**. We have an independent risk function that reports to the CEO, with **strong senior oversight**"; and "risk management techniques and policies are regularly reviewed to **ensure** that they remain appropriate").

the mismanagement – not mismanagement alone – federal securities claims are actionable. *Santa Fe Indus., Inc. v. Green*, 430 U.S. 462, 476 (1977).[24]

Defendants also argue that Plaintiffs' claims about risk management constitute fraud by hindsight and characterize the claims as "not alleg[ing] that the challenged [risk-management] descriptions were inaccurate, only that [they] proved inadequate." SNU 17; ID 17-18. In fact, Plaintiffs allege that the challenged descriptions were false when made. The "incantation of fraud-by-hindsight will not defeat an allegation of misrepresentations and omissions that were misleading and false at the time they were made." *Bear Stearns*, 763 F. Supp. 2d at 487. In fact, Internal Audit had determined **before** the beginning of the Class Period that MF Global's risk management was "inadequate" and "unreliable." ¶ 208. Internal Audit then issued four more reports during the Class Period further evidencing that the risk-management systems remained deficient. ¶¶ 209-30. By June 20, 2011, Internal Audit issued its last report on "Global Liquidity and Capital Management," and concluded that "**numerous and significant gaps between the policy and existing practices**" remained. ¶ 213.

The Senior Notes Underwriters similarly argue that their offering took place on August 3, 2011, before the demise of MF Global, and therefore that they cannot be liable for subsequent events. SNU 1, 8; *see also* ID 17, 23. But by August 3, MF Global's offering statements had already been contradicted by contemporaneous internal documents. *See In re Xerox Corp. Sec. Litig.*, 165 F. Supp. 2d 208, 218 (D. Conn. 2001) (fraud by hindsight "argument fails to properly characterize the [] complaint," which alleged that defendants made fraudulent statements

---

[24] *In re Citigroup, Inc. Sec. Litig.*, 330 F. Supp. 2d 367, 376 (S.D.N.Y. 2004), is distinguishable, where "[p]laintiff's claims [were] qualitative, focusing not on specific factual or opinion disclosures alleged to have been false or misleading, or on omissions of specific facts, but rather on Plaintiff's contention that Citigroup's business would have been conducted differently had the company adhered to the management principles disclosed in its public filings." Those are different circumstances than here, where Defendants misstated material facts: the proprietary nature of the Corzine Trade, risk-management weaknesses, and unreliable and inaccurate liquidity monitoring.

simultaneously with their knowledge of problems); *see also Lapin v. Goldman Sachs Grp.*, 506

F. Supp. 2d 221, 240 (S.D.N.Y. 2006) (rejecting fraud by hindsight argument when plaintiffs

"actually allege[d] that Goldman knew about the pervasive conflicts and the effect they had . . .

yet, they allegedly failed to disclose such material information"). Put differently, the subsequent

demise of MF Global is not the basis for the statements' falsity, as Defendants would like this

Court to believe, so Plaintiffs are not pleading fraud by hindsight.[25]

The Independent Directors separately contend that MF Global had no duty to "describe

[its] risk systems as 'informal,' 'manual,' 'not in real-time,' and 'outdated.'" ID 17. But the issue

is not Defendants' use of particular magic words, but rather the impermissibility of MF Global

repeatedly describing its internal controls and risk-management systems in ways that were

contradicted by the facts that existed at that time. *See Bear Stearns*, 763 F. Supp. 2d at 490-91

("[A] duty to speak the full truth arises when a defendant undertakes a duty to say anything.").

### (c)   Defendants Falsely Stated That Trading Limits Were Enforced

Throughout the Class Period, Corzine repeatedly violated established trading limits for

the RTM trades, only to belatedly obtain approval, as set forth below in Sections A.3(b)(i) and

B.3(b). The OFR concluded that Corzine's imperious trading constituted a breakdown in internal

controls, and was part of the "pattern of lapses in compliance and governance." ¶ 216. As

specifically alleged, these lapses included repeatedly exceeding Board limits, ¶¶ 179, 181, 199,

203, threatening to resign, ¶ 201 n.10, and terminating MF Global's CRO ¶ 187.

---

[25] Corzine contends that MF Global disclosed the risk that internal controls might not always work. Corzine 13. The Independent Directors also point to the general disclosures that the risk systems were "subject to error and potential failure," and that the information "may not in all cases be accurate, complete." ID 17. But boilerplate risk disclosures are not enough when Internal Audit had already specifically warned the Board of concrete and specific shortcomings in risk controls. *AIG*, 741 F. Supp. 2d at 531 ("[G]eneric risk disclosures are inadequate to shield defendants from liability for failing to disclose known specific risks.").

Contrary to these facts, Defendants falsely stated that internal controls were strictly enforced. *See, e.g.*, ¶¶ 325, 327, 330, 398, 400, 429, 433. For example, the 2011 10-K stated: "Our Board-approved risk appetite and strategic objectives translate to defined risk tolerances and oversight processes and, subsequently, **strictly enforced delegations** of authority and concomitant controls to ensure our operation within those risk tolerances." ¶ 403. It added, "[w]e establish limits for each of our businesses based on our risk appetite as set by the Board." ¶ 406.

Similarly the Q1 2012 10-Q, filed on August 3, 2011, created the false impression that the Board and the CRO really set limits: "The risk taken by [the Company's] business areas, especially its revenue-generating areas, is approved in defined risk mandates as delegated by the CRO. The **Company's business areas are responsible for these risks and are expected to operate within these prescribed mandates**." ¶ 434. These statements are all actionable. *Freudenberg*, 712 F. Supp. 2d at 185 (defendants' statements about "strict discipline with respect to credit quality" and "risk mitigation" were actionable). *Cf. Bear Stearns*, 763 F. Supp. 2d at 451, 494 (risk management statements found actionable where, *inter alia*, "trading desks had gained ascendancy over the Company's risk managers").

### 3. False Statements Regarding The RTMs And Risk Appetite

#### (a) The RTMs Were Purely Proprietary And Not For "Client Facilitation"

The fundamental falsity of Defendants' RTM-related statements was the failure to disclose that these transactions were purely proprietary, not agency-related trades. ¶¶ 148-49, 156-75. Defendants repeatedly insisted, however, that the RTMs were primarily for "client facilitation" that generated broker fees, as opposed to proprietary trading profits. ¶ 285. This was simply untrue. MF Global had started a highly risky trade seeking to generate trading profits, tightly controlled by Corzine, and concealed by Corzine even when confronted directly by

regulators and Wall Street analysts. ¶¶ 241, 327-28, 345, 349, 358-59, 362-64, 377, 397.[26] The significance of this strategy to MF Global, and the extreme divergence of Defendants' statements from reality, overwhelmingly support a reasonable inference of falsity. *See Countrywide*, 588 F. Supp. 2d at 1144 ("where a company's essential operations were so at odds with the company's public statements . . . many statements that would not be actionable in the vast majority of cases are rendered cognizable to the securities laws").

This critical revelation at the end of the Class Period, that Corzine was essentially running a hedge fund-type trade that far exceeded MF Global's liquidity capacity, revealed to Moody's and investors that they had been deceived. According to Moody's, MF Global admitted "for the first time" on October 21, 2011, that its Euro sovereign debt RTMs "were **not client-driven** transactions, but instead were **purely proprietary** trading positions." ¶ 285. *See In re Alstom S.A.*, 406 F. Supp. 2d 433, 453 (S.D.N.Y. 2005) (sustaining allegations that "financial professionals were taken by surprise following [defendant's] initial press release explaining its exposure in the aftermath of [a third party] bankruptcy").

FINRA also concluded that MF Global had misled investors about the proprietary nature of the RTM transactions. According to MF Global's President, Bradley Abelow:

> **Dissatisfied with the September [2011] announcement of [MF Global's and MFGI's] position in European sovereign debt, FINRA demanded** that [MF Global] announce that [MFGI] **held a long position** of $6.3 billion in a short duration European sovereign portfolio. . . . These concerns ultimately led [in October 2011] to downgrades by various rating agencies of MF Global's ratings to "junk" status. This sparked an increase in margin calls against MFGI, threatening overall liquidity.

¶ 240.[27]

---

[26] Defendants also repeatedly pointed investors to reported VAR, which was misleading because the RTMs were off-balance-sheet and, thus, not included in VAR, as discussed in Section A.3(b)(iii). ¶¶ 328, 345, 359, 375-76, 397.

[27] In response to these detailed allegations, Corzine asserts that the CAC "does not suggest why the distinction

        **(i)**       **Corzine Falsely Denied MF Global Was A "Prop Trader"**

Defendants specifically created the false impression that they were not running a proprietary trading operation. On the first day of the Class Period, May 20, 2010, Corzine said in a conference call: **"the goal here is not to be a prop trader. And if we change that view, we'll speak to it directly**." ¶ 328. Corzine then added, " . . . I don't think we will be in a risk taking position, substantial enough to have it be the kind of thing that the rating agencies would say, holy cow these guys have got a different business strategy than what we told them we had." *Id.* Corzine could hardly have been more duplicitous in light of Moody's Congressional testimony that this is exactly how Corzine misled the public. ¶¶ 10, 285. A duty to update exists when a "statement, reasonable at the time it is made, becomes misleading because of a subsequent event." *In re Bank of Am. Corp. Sec., Deriv. & ERISA Litig.*, 757 F. Supp. 2d 260, 313 (S.D.N.Y. 2010). Such a duty exists where, as here, Defendants' statements "remain[ed] 'alive' in the minds of investors as [] continuing representation[s]" were made about MF Global's new business strategy. *Id.*; *see also In re Time Warner Sec. Litig.*, 9 F.3d 259, 267 (2d Cir. 1993) (duty to update statements that become "misleading as the result of intervening events").

Instead, Defendants continued to conceal that they were running a high-risk hedge fund-type trade throughout the Class Period, even though the RTM transactions continued to grow and were used to boost profitability at quarter-end or for "window dressing." ¶¶ 173, 174 n.9, 177-206. On the Company's August 5, 2010 conference call, Corzine again claimed that the "client

---

[between proprietary trading and client-facilitation]" would make any difference to a reasonable investor. Corzine 11 n.4. But he ignores that MF Global's credit rating was downgraded in direct response to disclosures that the Corzine Trade was purely proprietary and that, "[i]n Moody's view, MF Global's decision to assume large credit exposures that were not client-driven and represented a multiple of the company's outstanding common equity highlighted MF Global's increased risk appetite – in the absence of a parallel increase in capital." ¶ 285. Corzine cannot credibly contend that risk appetites and credit ratings make no "difference" to "reasonable investors," especially where disclosure of these facts sparked a "run" on the Company resulting in bankruptcy. ¶¶ 290-300.

facilitation" business did not increase risk: "We also began last quarter the fundamental and incremental process of embedding **client facilitation risk-taking** in all of our core product lines, **with emphasis on incremental. We've taken this initiative without a significant build-up in our measured value at risk**." ¶ 345. Corzine then continued: "Let me repeat – we've added a revenue-generating capacity **that serves our clients' interests without substantially increasing measured risks or use of regulatory capital or balance sheet**." ¶ 345. *See Freudenberg*, 712 F. Supp. 2d at 189 (sustaining claims where defendant "continued to understate exposure to risk" and "continued to assure the market of the Company's high quality MBS and ABS portfolio").

Despite these false assurances, analysts on the call asked whether principal trading had increased the Company's risk in any way. Defendants described the new strategy as "client facilitation efforts to include principal risk taking," so analysts asked about the nature and magnitude of the "principal" aspect of the strategy. ¶ 326. A Credit Suisse analyst asked how much of MF Global's earnings increase arose from "improvement from the principal side." ¶ 349. Corzine quashed any concern of increased risk exposure by falsely minimizing the risk impact and future expansion: "we're not taking enormous market risk in executing our strategy, and **I don't see that changing dramatically** in the next quarter." *Id.*

But at the same time Corzine was publicly denying any "dramatic change" to market risk in August 2010, he was internally pressing for massive increases in proprietary trading limits for RTMs – from about $500 million in mid-2010 to $4.75 billion in November 2010, a **950% increase**. ¶ 177. Corzine first sought an increase in the summer of 2010, from $500 million to $1 billion. ¶ 178. Despite this enormous increase, in mid-September 2010, Corzine had exceeded the new limit and belatedly sought another new limit of $1.5 billion. ¶ 179. CRO Roseman expressed "increasing concerns with regard to the potential capital risk associated with the

growing positions and began to express caution on the growing liquidity risk." *Id*. Corzine did

not heed Roseman's warnings and again built unauthorized positions of about $2 billion. ¶ 181.

Once again, Corzine only sought Roseman's approval after the fact. *Id*. The divergence between

this massive increase in trading limits, that was only known internally, and the public statements

that risks had not increased is a classic instance of fraud. *See Freudenberg*, 712 F. Supp. 2d at

190 (statements are false, "where, as here, the statements are belied by conditions internally

known by defendants") (citing *Novak v. Kasaks*, 216 F.3d 300, 315 (2d Cir. 2000)).

      Corzine continued to misleadingly deny that the RTM transactions increased risk on

September 13, 2010, saying: "**We don't have credit risks. We're not carrying carried**

**positions for purposes of finance and spread**." ¶ 360. This was blatantly false, as the RTM

transactions were primarily, if not entirely, based on the spread arbitrage between the "repo rate"

and the interest rate on the European sovereign debt. ¶ 148. Statements such as these, falsely

minimizing risk by claiming that the trades were somehow structured safely, or "hedged," are

actionable. *See Freudenberg*, 712 F. Supp. 2d at 188-89 (finding actionable statement that

"denied credit exposure, stating that a lot of the growth in Q1 [mortgage-backed securities] was

'simply a **fully hedged-out MBS**'"). In light of this systematic pattern of deception carried out in

the fall of 2010, and consistent with Plaintiffs' allegations, members of Congress recently

concluded that "**MF Global blatantly misled FINRA** in September 2010 when it responded to

FINRA's inquiry about having exposure to European sovereign debt by saying it did not have

any such exposure." Ross Ex. 2 at 7. *See* ¶¶ 221-22.

               **(ii)**      **Despite The Massive Increase In Risk, MF Global**
                            **Misleadingly Said It "Might" Increase Risk In 2011**

      Defendants did not disclose the enormous increase in proprietary trading risk from $500

million in mid-2010 to $4.75 billion in November 2010 or that such exposure was built in

repeated breaches of existing risk limits. Instead, Defendants represented that the Company operated "within [MF Global's] existing limits," ¶327, "within the authority delegated by [MF Global's] Board of Directors," ¶ 330, and, moreover, that MF Global was "generally using less than half of [its] Board-authorized risk authority, which remain[ed] unchanged since [Corzine] joined MF Global," ¶ 345. MF Global's Q3'11 10-Q filed in February 2011 also falsely claimed that this risk was only subject to a **possible** "incremental" increase in the future, when in fact MF Global's risk exposure already had surged by nearly a factor of ten: "As we increase our client facilitation activities and engage in more proprietary transactions, our risk profile **may incrementally** increase as we are exposed to more market and credit risk in certain areas." ¶ 379. In reality, this supposedly "incremental increase" in risk profile had already happened. ¶¶ 187, 199-200. Defendants' failure to disclose this existing exposure violates the securities laws. *See Bear Stearns*, 763 F. Supp. 2d at 490 ("[A] duty to speak the full truth arises when a defendant undertakes a duty to say anything. Although such a defendant is under no duty to disclose every fact or assumption underlying a prediction, he must disclose material, firm-specific adverse facts that affect the validity or plausibility of that prediction.").

The next quarter was no different. MF Global reported its financial results for fiscal 2011 on May 19, 2011. On the conference call, Steenkamp falsely minimized the risk posed by the RTM transactions: "As Jon [Corzine] mentioned, we saw principal trading opportunities in European sovereigns this quarter . . . . We believe **the market risk to these trades is minimal**, as these are held to maturity." ¶ 399. The failure to disclose the risks to which MF Global was already vulnerable is actionable. *See Freudenberg*, 712 F. Supp. 2d at 190 (denial that the "real

estate loan portfolio had become more risky" was false and misleading when "it is alleged that the risks had increased").[28]

MF Global and the Officer Defendants continued to falsely minimize the trading risks in the summer of 2011. On June 9, Corzine spoke at a conference and said MF Global's expansion into principal trading activities "**actually makes us less risky**." ¶ 422. On the July 28, 2011 conference call, Steenkamp specifically addressed the RTMs and falsely reiterated, "we continue to believe the market risk to these trades is **minimal** as these are held to maturity." ¶ 424.

Indeed, MF Global and the Officers continued to misleadingly minimize the impending doom caused by the Euro sovereign RTM trades until the end. On October 24, 2011, only one week before the bankruptcy, when the Company faced an unprecedented liquidity crisis, MF Global issued a letter by Steenkamp that falsely represented that MF Global had a "strong liquidity position" and that the RTMs had "limited market risk" because the **"[o]nly risk of loss is upon default of the issuer of the underlying securities.**" ¶ 447. This was undeniably false, as MF Global was in the midst of a liquidity crisis that could – and soon did – bankrupt it, even though none of the "underlying securities" defaulted. *Id. See Freudenberg*, 712 F. Supp. 2d at 189 (statement that "losses on mortgage backed securities are attributable to changes in interest rates and are not reflective of deterioration in the credit quality of the issuer and/or securitization," was false because three months later company sold portfolio at a massive loss).

Critically, MF Global also obfuscated the fact that its proprietary trading and the RTM transactions were one and the same. The 2011 10-K disclosed the notional value of the RTM transactions, but not the profits or losses. ¶¶ 172-75. Thus, while the 2011 10-K, as Defendants

---

[28]  Nor is it a defense to argue Defendants' statements were literally true as they were limited to "market" and not liquidity risks. Steenkamp 8-9; Corzine 9. Half-truths that mislead are actionable. *See Va. Bankshares*, 501 U.S. at 1098.

point out, disclosed the existence and amount of the RTM transactions, it was silent on the

profits derived from them. The market could not fully understand the connection based on

Defendants' incomplete, misleading disclosures, and only after October 25, 2011 were the profits

derived from the RTM transactions disclosed. ¶¶ 172-73.[29]

     In sum, the disconnect between the massive and continuous increase in proprietary risk

and Defendants' public statements falsely denying any significant increase in risk exposure could

not be starker. At the onset of the Class Period, Corzine had vowed that if MF Global became "a

prop trader," he would say so. ¶ 328. Instead, Defendants went to great lengths to conceal that

Corzine was running a high-risk hedge-fund-type trade at MF Global. Their emphasis on "client

facilitation" further obscured the true nature of the proprietary trades and misled investors.

     **(b)**     **Defendants' RTM-Related Arguments Are Unavailing**

     **(i)**     **MF Global Did Not Disclose It Was A "Prop Trader"**

     Defendants attempt to avoid liability for the Corzine Trade by claiming it was disclosed,

pointing to a footnote in the 2011 10-K which set forth the size of the RTM transactions, the

European countries involved, and a boilerplate disclaimer about potential liquidity risk. Corzine

9; Steenkamp 8-9. But neither that May 2011 footnote, nor any other statement thereafter, fully

revealed the falsity alleged here, that "the primary purpose of the Company's increased principal

---

[29]  The extreme lengths to which MF Global went to conceal the risk of its RTM transactions are evident from another aspect of the 2011 10-K (at 100). Immediately after the disclosure of the RTMs, MF Global also disclosed the size of its separate repo transactions kept on its balance sheet, which excluded the RTM trades. The value of the on-balance-sheet repo transactions and off-balance-sheet RTMs were roughly equivalent, $12 billion and $14.5 billion, respectively. But the profits on the repo transactions were disclosed, amounting to only $174,000 in 2010 and $1 million in 2011. The profits on the RTM trades were not disclosed, but any reasonable investor would have extrapolated from the minimal profits of $1 million on $12 billion of on-balance-sheet repos (not RTMs) and reasonably concluded that the RTM profits were similarly immaterial. The RTM profits, however, were significant – an indicator of substantial risk concealed from investors. Defendants' intentional failure to disclose the profits of the RTMs while also concealing that the RTMs constituted a proprietary trading position, together, further explain Moody's shock at the end of the Class Period in discovering that the RTMs were a massive proprietary bet.

trading activity was not to facilitate customer transactions but to engage in non-client related speculative transactions." ¶¶ 336, 354, 370, 386, 416, 443.[30]

The footnote Defendants highlight, and Defendants' other statements about the RTMs, were false and misleading given Defendants' (i) explicit disavowals of "prop trading," (ii) continued minimization of increased risk,[31] and (iii) intentional conflation of proprietary trading with "client facilitation."[32] Simply put, MF Global concealed the true nature of its business, and that deception is actionable. *See Countrywide*, 588 F. Supp. 2d at 1144; *Alstom*, 406 F. Supp. 2d at 453 n.11 ("An investor should not be called upon to piece together buried information from distinct parts of financial statements in order to understand basic aspects.").

This conclusion is undeniable given Moody's and the market's surprise in October 2011 that MF Global's RTM transactions actually constituted massive proprietary bets. ¶¶ 285, 289, 291. Moody's immediately downgraded MF Global upon the October 2011 revelation, explaining that the RTM transactions constituted an "outsized proprietary position," with "exposure represent[ing] 5 times the company's tangible common equity," and reflecting a materially different and increased "risk appetite" than previously disclosed. ¶ 491. Defendants do not, and simply cannot, contend that MF Global had previously disclosed it had become a proprietary trader, betting huge multiples of its own equity. Defendants had publicly insisted throughout the entire previous year that the Company was not taking more risk and was not a proprietary trader, and that, to the extent it was engaging in trading, it was only "incremental" and for purposes of "client facilitation." ¶ 345. Defendants do not contest these false statements,

---

[30] Moreover, the footnote in the 2011 10-K (and every other Class Period statement until MF Global filed the Q1'12 10-Q/A on Sept. 1, 2011) also failed to disclose that the RTMs did not comply with the Net Capital Rule. ¶¶ 225-30.

[31] *See, e.g.*, "We believe the market risk to these trades is minimal," ¶ 399; "we're not taking enormous market risk in executing our strategy." ¶¶ 345, 349.

[32] *See, e.g.*, "[O]ver the near term [we] will extend our client facilitation efforts to include principal risk taking." ¶ 326; *see also* ¶¶ 359, 377.

which clearly overpowered any possible corrective disclosure in a footnote. *Ganino v. Citizens Utilities*, 228 F.3d 154, 167 (2d Cir. 2000) ("corrective information must be conveyed to the public with a degree of intensity and credibility sufficient to counter-balance effectively any misleading information created by the alleged misstatements").

Indeed, Defendants' repeated explicit and implicit denials that MF Global was a prop trader nullify the potential revelatory nature (if any) of the footnote on the RTM transactions. ¶¶ 328, 345, 347-48, 358-59, 377, 396-97. Where "[d]efendants' misleading Class Period statements are alleged to have contradicted . . . any risk disclosures," the false statements "nullif[y]" the corrective nature of risk disclosures. *Freudenberg*, 712 F. Supp. 2d at 194. *See also Lapin*, 506 F. Supp. 2d at 238 (disclosures did not counterbalance misleading statements).

This Court's decision in *SEC v. PIMCO Advisors Fund Mgmt. LLC*, 341 F. Supp. 2d 454 (S.D.N.Y. 2004), is also instructive. There, mutual fund prospectuses represented that PIMCO intended to minimize market timing in its funds, but without specifically prohibiting market timing. Two PIMCO officers, however, entered into a contract with an investor allowing limited market timing. The Court sustained the SEC's Rule 10b-5 claims stating:

> [E]ven if [the market timing] arrangement was not strictly prohibited by the alleged disclosures, the disclosures were clearly misleading **under the circumstances** because they informed investors that the management of the PIMCO Funds would act to protect the interests of long-term investors from market timers at the same time that the Funds were, under the direction of [defendants], allegedly facilitating an undisclosed market timing arrangement.

*Id.* at 464. Defendants' deception in the context of their other communications in that case is precisely the same type of deception that occurred here.

Finally, even if the footnote were a full corrective disclosure of MF Global's prop trading in May 2011 (it was not), Defendants' argument is then predicated on the "truth-on-the-market" doctrine. But a "truth-on-the-market" defense "is a fact-intensive query that cannot be disposed

36

of on a motion to dismiss." *Hall v. The Children's Place Retail Stores, Inc.*, 580 F. Supp. 2d 212,

229 (S.D.N.Y. 2008). Moody's reaction alone demonstrates this is an issue of fact.

(ii)    **The Failure To Disclose The Prop Desk Was Not A
Forward Looking Statement, Nor Was It Protected By
The Bespeaks Caution Doctrine**

Defendants also argue that their misstatements are forward-looking statements and are

protected under the "bespeaks-caution" doctrine. Corzine 10; Steenkamp 9; McDonald 2. Not so.

MF Global concealed that it was running an enormous proprietary trade that put the Company's

very existence at risk throughout nearly the entire Class Period (until late October 2011). These

were not statements about the future, but about the present – directly pertaining to already-

existing risk. "[C]autionary words about future risk cannot insulate from liability the failure to

disclose that the risk has transpired." *In re AOL Time Warner, Inc. Sec. & ERISA Litig.*, 381 F.

Supp. 2d 192, 223 (S.D.N.Y. 2004).[33]

Relatedly, Corzine argues that his statements about the risks of the RTMs were

statements of "judgment, opinion, and belief." Corzine 10-11. This contention is equally infirm,

as Corzine's failure to disclose his proprietary trading is a factual matter. Accordingly, Corzine's

statements were inherently misleading because "undisclosed hard facts critical to appreciating

the magnitude of the risks described" were omitted. *AIG*, 741 F. Supp. 2d at 532. Notably, even

if Corzine's statements about risk could be considered opinions, they remain actionable, because

the "hard facts" surrounding his trading "warrant the inference that the [Officers] could not have

reasonably believed the alleged misstatements." *Id.*[34]

---

[33] *See In re Veeco Instr. Inc.  Sec. Litig.*, 235 F.R.D. 220, 236 (S.D.N.Y. 2006) (bespeaks-caution doctrine does not
protect statements of historical fact); *In re Prudential Inc. Sec. Litig.*, 930 F. Supp. 68, 72 (S.D.N.Y. 1996).

[34] Corzine (11) cites *Plumbers' Union Local No. 12 Pension Fund v. Swiss Reins. Co.*, 753 F. Supp. 2d 166, 182
(S.D.N.Y. 2010), which found that statements about the relative risk of different sub-prime investments were
statements of opinion. But the falsity of Corzine's RTM risk-related statements does not hinge on his belief of the

37

### (iii)    The Statements Relating To VAR Were Misleading

Corzine's argument about the VAR statements fundamentally misapprehends Plaintiffs' allegations. Corzine contends that MF Global disclosed that the RTM transactions were not included in the VAR calculation, and later disclosed their notional value. Corzine 8-9. But Plaintiffs nowhere allege the VAR numbers were incorrect. Rather, Plaintiffs allege Corzine misleadingly concealed the risk he was incurring through his proprietary trading, in part by emphasizing to the market the absence of an increase in VAR when he knew RTMs were not included in VAR. ¶¶ 328, 345, 359, 375-76, 397.[35] Thus, VAR was one of many smokescreens used to mislead the market. Disclosures such as Defendants' VAR statements, which concealed the true nature of the Company's risk, because they were inaccurate or incomplete, are materially misleading. *See AIG*, 741 F. Supp. 2d at 531 ("Each of these allegations of misstatements and omissions plausibly and with particularity frames a claim of concealment of either a significant decision taken by the Company to expose itself to risk or a significant weakness in the Company's risk controls that would have been viewed by the reasonable investor as having significantly altered the total mix of information made available.").

Defendants' statements about VAR, in context, confirm this is the case. For example, on the first day of the Class Period, analysts questioned Corzine about the potential risks posed by the new, so-called "client facilitation" strategy. "**What are the risks in the strategy?** . . . [W]here would you expect VAR to go and what are the chances that you could incur some sort of loss that's big enough to cause rating agency action here, or is that really almost an

---

**amount** of risk already disclosed, but rather the failure to disclose altogether the risk that the so-called client-facilitation business was entirely proprietary. *See* ¶¶ 171, 206, 285, 443.

[35] Additionally, the Independent Director argue that the 2011 10-K "provided, as a substitute, figures showing the size of the RTM portfolio under present and potential future market conditions, thus depicting the amount MF Global could lose in the event of a default." ID 16 n.12. But the "substitute figures" depicted only the amount MF Global could lose due to "**issuer default risk**," not exposure to market, liquidity, and capital risks – including margin calls and additional net capital reserves. *See, e.g.*, ¶¶160, 162-70

impossibility given your risk systems?" ¶ 328. Corzine then pointed to VAR to misleadingly

minimize risk: "We have a VAR that reflects that there would not be a material impact on

earnings." *Id.* Corzine hid the fact that VAR was an improper metric to measure the proprietary

trading risk he was embarking upon (and about which the analysts inquired), an omission that is

again actionable "in light of the circumstances under which [it was] made." Rule 10b-5. *See also*

*AIG*, 741 F. Supp. 2d at 529.

The next month, on September 13, 2010, Corzine falsely reiterated the point, as follows:

"We are expanding our client facilitation business, [and] I have talked about trading a number of

times . . . I think I said at the last earnings call, we hadn't increased the VAR exposure nor the

stress exposures, nor the regulatory capital exposure." ¶ 359. Unbeknownst to investors,

however, "the Company's transformation plan did not involve increasing VAR, [but rather] the

plan involved materially increasing off-balance sheet liquidity risks and leverage." ¶ 386.

*Dodona I, LLC v. Goldman Sachs & Co.*, 847 F. Supp. 2d 624, 647 (S.D.N.Y. 2012)

(Marrero, J.) ("[R]isk disclosures must accurately characterize the scope and specificity of the

risk, as understood at the time the statements are made.").

As MF Global increased its risk exposure to over $5 billion in early 2011, Defendants

continued to misleadingly emphasize VAR as evidence they were not increasing risk. On a May

19, 2011 conference call, an analyst asked: "revenues grew nicely and **you're attributing it to**

**the principal trading customer facilitation. And the question is, I'm looking at your VAR, it**

**really didn't change**. How were you able to accomplish it?" ¶ 396. Corzine misleadingly

responded that, despite revenue growth, risk remained stable: "as it [related] to the VAR, it is, on

the report, relatively stable. But if you look at the spikes inter quarter, it's moved up and down

. . . it is a growing book but it is not necessarily exposing us, at least at this point." ¶ 397.

Corzine never explained to the analyst, who connected "principal trading customer facilitation" and VAR, that VAR did not include proprietary risk. Instead, Corzine deceptively pointed to VAR to indicate MF Global was not incurring more risk. These statements are actionable given their deceptiveness. ¶ 396. *Operating Local 649*, 595 F.3d at 92 ("The veracity of a statement or omission is measured not by its literal truth, but by its ability to accurately inform rather than mislead prospective buyers").[36]

### 4.   False And Misleading Statements Relating To Capital And Liquidity

#### (a)   Defendants Concealed Liquidity Management Problems

While MF Global's liquidity crisis became acute in the summer of 2011, "[t]he **underlying liquidity problems at MF Global . . . did not commence in the fall of 2011**. Rather, liquidity had been a cause for concern **before and throughout** Mr. Corzine's tenure at MF Global." ¶ 215. Indeed, the liquidity stress had been so severe that MF Global relied upon intraday transfers of Regulatory Excess or customer funds to fund its non-FCM business. ¶¶ 252-59. This was a daily occurrence, ¶¶ 265-69, known to the Officer Defendants, ¶¶ 270-81.

MF Global never disclosed, however, that it faced liquidity issues severely aggravated by the RTM trades, and falsely touted its "strong liquidity" repeatedly throughout the Class Period. *See, e.g.*, ¶¶ 334, 346, 348, 350, 366-67, 378, 380-81, 395, 412, 427, 445, 447. On an August 5, 2010 conference call, MacDonald said that "**the Company maintain[ed] a strong liquidity position**." ¶ 346.[37] On February 3, 2011, a written presentation distributed in connection with a

---

[36]  Defendants' reliance on *Kuriakose*, 2012 WL 4364344, is misplaced. Corzine 9. Unlike the disclosures in *Kuriakose*, from which investors could determine through "simple arithmetic" the percentage of "Freddie Mac's [loan] purchases [that] involved [subprime] credit scores less than 660," *id.* at *11, the data that MF Global disclosed during the Class Period did not provide investors with sufficient information to calculate what the Company's VAR would be if it included MF Global's proprietary RTMs.

[37]  MacDonald incorrectly contends his August 5, 2010 statements are not actionable, because "the liquidity issues . . . encountered in the fall of 2011 in connection with [MF Global's] investments in European sovereign debt" had not yet begun. MacDonald 7. But MacDonald ignores that the SIPA Report noted "liquidity had been a cause for

similar call and MacDonald's discussion of liquidity also falsely described MF Global's supposedly "**Strong Liquidity Position.**"[38] ¶ 378. And again in the Company's May 19 and July 28, 2011 conference calls, the written presentations falsely repeated that the "**Liquidity Position Remain[ed] Strong.**" ¶¶ 395, 427.

On August 11, 2011, O'Brien sent an internal email that said: "[Steenkamp] says to me today . . . 'we have plenty of cash.' I was rendered speechless, and wanted to say, 'Really, then why is it I need to spend hours **every day shuffling cash and loans** from entity to entity?" – a process she described as a "**shell game.**" ¶ 269. Nonetheless, on September 12, 2011, Corzine falsely stated "we've improved our capital and liquidity position . . . We are deeply focused on making sure our liquidity and capital positions are strong." ¶ 445. Steenkamp similarly said MF Global had a "strong liquidity position." ¶ 447. This was false because undisclosed contemporaneous facts directly contradicted those public statements. *See Hall*, 580 F. Supp. 2d at 229; *Bear Stearns*, 763 F. Supp. 2d at 497 ("We don't see any pressure on our liquidity, let alone a liquidity crisis," found actionable given that "Bear Stearns was leveraged at a ratio of more than 35-to-1 and relied on overnight repo lending . . . to keep the business functioning.").

Defendants continued to conceal the liquidity crisis as it intensified throughout October 2011. For example, on October 6, 2011 Steenkamp emailed Corzine explaining that the broker-dealer was out of funds and that the RTMs were exacerbating the problem (¶ 276), and on

---

concern before and throughout Mr. Corzine's tenure at MF Global," which began at the start of the Class Period. ¶ 215.

[38] MacDonald again contends incorrectly that his February 3, 2011 statement about "gross leverage" was not misleading, because it concerned only on "balance sheet" calculations, which explicitly excluded "government-backed" securities in MF Global's "repo book." MacDonald 8-9. But it was not possible for MF Global investors to understand the supposedly "proper context" required to make this statement not misleading (MacDonald 9), because MF Global had not disclosed any exposure to Euro sovereign debt through RTMs when this statement was made (and did not do so until the 2011 10-K was filed on May 20, 2011). MacDonald further argues that his other statements on February 3, 2011 are not actionable, because they were literally true since MF Global's balance sheet did contain "very liquid low risk assets" like government-backed securities. MacDonald 8. But MacDonald ignores the presentation accompanying his remarks touting MF Global's overall "strong liquidity position." ¶ 378.

October 24, 2011, an internal memorandum circulated to Corzine outlined several liquidity concerns, including the possibility of increased margin requirements that would result in intraday shortfalls (¶ 287). Yet on October 24 and 25, 2011, Steenkamp and Corzine insisted MF Global's liquidity was "strong." ¶¶ 287 ("capital and liquidity has never been stronger"); 454 ("[w]e've substantially improved our capital and liquidity positions").

Despite the reassurances, analysts still asked about liquidity and whether MF Global would "need to raise equity." ¶ 456. Steenkamp falsely reassured them that "[w]e felt good about having the liquidity in these volatile times, especially over quarter-end." *Id.* Corzine added, "we're in a much, much stronger liquidity position." *Id.* Analysts then asked: "[Y]ou reported excess capital of $342 million at the end of last quarter, . . . why were you not able to kind of use that capital to meet the . . . change[d] FINRA requirements." ¶ 457. Flatly misrepresenting the shell game MF Global was playing with customer funds that last week of October, Corzine said: "[T]hat is actually exactly what I suggested in my answer . . . . We had excess capital in many different other locations." *Id. See also* ¶¶ 235-36.

In truth, however, liquidity had all but disappeared, and MF Global remained afloat by illegally taking customer funds. On October 27, 2011, Serwinski sent an email stating, "I am concerned that the [FCM] lent the [broker-dealer] 200mil. Is that correct and that the firm deficit in excess is neg[ative] 300+ mil?" ¶ 259. The next day, October 28, 2011, there was a $175 million overdraft in one of MF Global's accounts at JPMC. ¶ 301. JPMC called Corzine about the overdraft, and MF Global transferred $200 million immediately from a segregated customer account. In authorizing the transfer, O'Brien wrote in an email that the transfer was "[p]er JC's [Jon Corzine's] direct instructions." *Id.*

These facts establish that Corzine and Steenkamp knew that MF Global had taken customer funds to improperly fund its own operations. The SIPA Trustee reached the same conclusion. In his testimony before Congress, he said that his Report "**makes clear our conclusion that there was knowledge that segregated funds were being improperly moved**." ¶ 217. He added: "I think the preponderance of the evidence indicates that management – senior management at MF Global was aware of the liquidity crisis and was aware that customer funds, toward the end were – were being utilized to cover other costs in the firm." *Id.*

        **(b)**        **Defendants Mischaracterize The Allegations About Liquidity**

Defendants fundamentally misconstrue the CAC's liquidity allegations, narrowing the issue to the final liquidity event that caused MF Global's bankruptcy. Defendants then rely on the same grab bag of arguments to contest the alleged false statements – appropriate risk disclosures (Corzine 9-10), puffery (Corzine 11-12, ), fraud by hindsight (Steenkamp 10-11), and mismanagement (SNU 16-18, UW 14-16). All these arguments fail essentially for the same reasons set forth above.[39]

Defendants' characterization of Plaintiffs' liquidity claim as "based on the liquidity issues the Company encountered in the fall of 2011" is an unpersuasive attempt to decouple the ultimate liquidity crisis from Defendants' misstatements throughout the Class Period. MacDonald 7. *See Freudenberg*, 712 F. Supp. 2d at 192 ("The 'current financial crisis' is not necessarily an absolute defense if it is alleged that defendants have misled the public as to the

---

[39] Defendant Corzine also claims that his liquidity statements were matters of opinion. Corzine 12. This is simply not true; an opinion defense does not encompass statements of existing facts. *See Novak*, 216 F.3d at 315. And even if it were an opinion, Corzine did not have a reasonable basis for holding that opinion. *Fait*, 655 F.3d at 112 n.5. Corzine's reliance on *Lehman* is also misplaced. In that case, "[t]he complaint [did] not allege any facts contradicting the statements that Lehman's liquidity position was sufficient to cover its liquidity needs at the time any particular statement was issued." 799 F. Supp. 2d. at 289. Here, Plaintiffs allege specific internal assessments that liquidity was a problem throughout the Class Period. Defendants' concurrent statements about liquidity were not future projections, but rather false statements about existing facts.

quality of their holdings."). Plaintiffs' liquidity claim is not predicated only on the materialization of the liquidity risk in October 2011. Rather, Plaintiffs allege in detail how Defendants' statements that liquidity remained "strong" (and the other incantations) were false when each statement was made. *See, e.g.*, ¶¶ 208-15, 251, 257, 260-61, 265-67.[40]

Indeed, "liquidity had been a cause for concern before and throughout Mr. Corzine's tenure at MF Global," from March 2010 through November 2011. ¶ 215. Internal Audit issued reports to the Board six times, before and during the Class Period, specifically focusing on the Company's liquidity management as "inadequate" and "unreliable." ¶¶ 207-15. Corzine then exacerbated the liquidity risk when, as Steenkamp concedes, "[t]he key component of [his] strategic shift was a significant expansion in proprietary trading . . . that demanded additional capital and liquidity." Steenkamp 3. Accordingly, Plaintiffs have more than adequately alleged falsity. *See Hall*, 580 F. Supp. 2d at 229.

Defendants' argument predicated on the supposed disclosure of the liquidity risk falls squarely within the late Judge Milton Pollack's warning that such risk disclosures "provide[] no protection to someone who warns his hiking companion to walk slowly because there might be a ditch ahead, when he knows with near certainty that the Grand Canyon lies one foot away." *Prudential*, 930 F. Supp. at 72. The liquidity risk disclosures that Defendants cite all simply reference a potential, hypothetical liquidity risk without disclosing the concealed facts set forth above. *See, e.g.*, ID 7 (MF Global "warned that it **might** 'fail to properly evaluate the impact of adverse market conditions on [its] liquidity risk'"; "it '**may** not meet [its] financial obligations as they become due under normal or adverse market conditions'"; "it '**may** not hold sufficient capital or liquidity to cover [its] needs'").

---

[40] *See supra* A.2(a)(i) for cases sustaining "strong" and similar adjectives as false, and rejecting puffery arguments.

Next, Defendants raise an issue of fact and argue that the disclosed liquidity figures were accurate. Corzine goes so far as to submit new "charts listing the sources and amounts of available capital and liquidity," nowhere alleged in the CAC. Corzine 12-13. Based on his own facts, Corzine argues that Plaintiffs do not allege that "th[ose] figures [are] wrong." Corzine 13. But Corzine is not entitled to rewrite the CAC so he can then argue it is defective.[41]

Moreover, Corzine misses the point. The CAC alleges that the liquidity disclosures were misleading because, even as MF Global's undisclosed liquidity crisis escalated to catastrophic proportions, Defendants represented that MF Global had sufficient liquidity. *See* ¶¶ 251, 260-62, 265-69, 282-87. For example, on October 25, 2011, Corzine represented that MF Global had "substantially improved [its] capital and liquidity positions," and Steenkamp misleadingly told investors, "we feel good about our capital structure and liquidity position." ¶ 454. Yet, almost three weeks earlier, on October 6, 2011, Steenkamp had emailed Corzine saying that "we need to address the **sustained [liquidity] stress** . . . This should be temporary but is becoming permanent." ¶ 275. And on October 19, 2011, the Board received the Break-the-Glass Document, which recognized that MF Global was under severe liquidity stress and set forth an emergency contingency plan. ¶ 138. Accordingly, Steenkamp's further claim on October 25, 2011, that he "felt good about . . . liquidity," was false. ¶¶ 456, 459.

Furthermore, given this context in which by October 25, 2011 MF Global was experiencing a severe liquidity crisis, Corzine's statement expressing "confidence" also was

---

[41] Relatedly, Defendants argue that certain alleged false statements are literally accurate "descriptions of…various risk systems and policies" or accurate "descri[ptions of] risk controls, such as the enterprise risk governance or operational risk framework." ID 18; SNU 17-18. But literally accurate statements can be misleading. *See Operating Local 649*, 595 F.3d at 92. For example, the Directors point to a statement about liquidity policy that said: "We have established a liquidity policy designed to ensure that we maintain access to sufficient, readily available liquid assets and committed liquidity facilities." ¶ 334. Literal design is not the point. The statement is misleading because Internal Audit had concluded two months earlier that the liquidity data was "unreliable" and "inadequate." Accordingly, MF Global did not implement the policy to ensure sufficient liquidity, rendering the statement false.

false. Specifically, Corzine said, "we remain confident that we have the resources and expertise to successfully manage [the RTMs] to what we believe will be a positive conclusion in December 2012." ¶ 450. Even setting aside the reality that MF Global had to illegally access customer funds on a daily basis at that point because it did not have sufficient cash of its own, the Break-the-Glass Document directly contradicted any such "confidence," as it specifically contemplated the immediate liquidation of the RTM portfolio with a "large P&L loss." ¶ 138.

Nevertheless, Corzine argues his liquidity statement is "triply protected" because it is forward looking, reflects mere corporate optimism, and was subjectively believed. Corzine 15. Corzine is not entitled to any protection because he knew the statement was false. *See AOL Time Warner*, 381 F. Supp. 2d at 223 ("[N]o degree of cautionary language will protect material misrepresentations or omissions where defendants knew their statements were false when made."). His statement also was not puffery, but a false statement of existing fact. *In re CINAR Corp. Sec. Litig.*, 186 F. Supp. 2d 279, 319 n. 33 (E.D.N.Y. 2002) ("puffery is innocuous only if "the company's disclosures [are not] inconsistent with current data." (brackets in original)). That Corzine believed his statement is not credible. And even if that assertion had any validity, Plaintiffs have more than plausibly alleged Corzine could not have reasonably believed it.

### B.    Plaintiffs Raise A Strong Inference Of Scienter

#### 1.    The Standard For Evaluating Scienter On A Motion To Dismiss

Scienter is "a mental state embracing intent to deceive, manipulate, or defraud." *Dodona I*, 847 F. Supp. 2d at 638. On a motion to dismiss, a court must "accept all factual allegations in the complaint as true" and determine "whether **all** of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 309, 323 (2007) (emphasis in original). An inference of scienter is "strong" when it is **at least as**

**likely** as any other inference. *Id.* at 324. In addition, Plaintiffs may plead recklessness by alleging that defendants "knew facts or had access to information suggesting that their public statements were not accurate." *Novak*, 216 F. 3d at 311. Plaintiffs need only plead a strong inference of scienter against the Officers because only they are subject to § 10(b) claims.

2. **Plaintiffs Have Adequately Alleged Scienter With Respect To DTA**

Numerous facts give rise to a strong inference that the Officers acted with scienter by violating GAAP and not recording a valuation allowance. The Officers were aware of the GAAP requirements governing DTA and that MF Global's U.S. operations had three years of cumulative losses at the start of the Class Period – and did not reasonably believe the losses were an aberration given the low interest rates. *See* ¶¶ 74, 102-08, 324. In addition, the CAC demonstrates that the Officers did not even disclose MF Global's three-year cumulative U.S. loss position at the start of the Class Period or identify any positive evidence to justify not recording a valuation allowance. *See* ¶¶ 111, 324. Thus, "plaintiffs' allegations, taken as true, adequately plead that the [Officers'] conduct, *i.e.*, not taking an earlier valuation allowance, was 'highly unreasonable' and 'an extreme departure from the standards of ordinary care.'" *Scottish Re*, 524 F. Supp. 2d at 393. More specifically, the facts supporting this strong inference of scienter include the following:

First, the Officers repeatedly quoted the strict DTA accounting rules in MF Global's SEC filings – all of which they signed or certified – and repeatedly claimed that MF Global's financial statements complied with GAAP. *See* ¶¶ 89, 115, 315-16, 321-23, 335, 337, 355-56, 371-73, 387, 389, 417, 470. MacDonald and Corzine further demonstrated their knowledge of DTA GAAP requirements by describing them publicly in oral statements. *See, e.g.*, ¶ 472. *See Scottish Re*, 524 F. Supp. 2d at 393 (scienter established where "Defendants knew that SFAS 109 [superseded by ASC 740] governed the application of [DTAs] and valuation allowances. Indeed,

they applied and quoted the standard in the Company's financial statements."); *Hoff*, 727 F.

Supp. 2d at 93.[42]

Second, each of the Officers had substantial educational and financial industry

experience, including MacDonald who worked as an auditor at E&Y and Deloitte before joining

MF Global, and Steenkamp who worked at PwC and as MF Global's CAO. *See* ¶ 471; *SEC v.*

*Espuelas*, 698 F. Supp. 2d 415, 426 (S.D.N.Y. 2010).

Third, the Officers were aware that MF Global's U.S. operations were operating at a

three-year loss as of March 31, 2010, and at a four-year loss as of March 31, 2011. *See* ¶¶ 74,

101-03, 324, 393. These facts demanded a valuation allowance at the start of the Class Period

absent additional objective evidence that did not exist here. *See* ¶¶ 92, 95, 109; *Hoff*, 727 F.

Supp. 2d at 81, 92-93 (scienter concerning DTA established where defendants knew that "at the

beginning of the class period, defendant Popular was at a three-year cumulative loss position").

Fourth, the Officers knew that any "positive evidence" purportedly justifying not

recording a DTA valuation allowance, which was set forth only in the 2011 10-K (and not in the

2010 10-K), was patently inadequate under GAAP. Specifically, they knew that: (i) prevailing

interest rates made it insufficiently likely that U.S. operations would achieve a near-term

turnaround, ¶¶ 104-08;[43] (ii) the U.S. operations' ability to achieve profitability therefore

---

[42] None of the Officers' cases preclude the consideration of "signatures" as evidence of scienter when accompanied by other particularized allegations, as here. Steenkamp 18-19; MacDonald 11; Corzine 19 (*citing, e.g.*, *Citigroup*, 330 F. Supp. 2d at 382 ("position as [CFO] **alone**" insufficient); *Bd. of Trs. of City of Ft. Lauderdale Gen. Emp. Ret. Sys. v. Mechel OAO*, 811 F. Supp. 2d 853, 873 (S.D.N.Y. 2011) ("accusations founded **on nothing more** than defendant's corporate position" insufficient)). In fact, Officers' signatures on SEC filings support knowledge of the content of these documents. *See Alstom*, 406 F. Supp. 2d at 459.

[43] Corzine concedes his knowledge of these facts but contends they "merely explain[] why he *believed* MF Global could not expect to become profitable without" a "new" plan. Corzine 19-20. This argument ignores that the "new" multi-year plan was insufficient to justify not taking a valuation allowance because the plan was, at best, unsettled and depended on the unsustainable Corzine Trade. Moreover, PwC's Income Tax Guide states that "[m]anagement's **belief** that the tax assets will be realized **is not by itself sufficient**, objective positive evidence to overcome objective negative evidence, such as recent losses." Tosc. Ex. 12 at 5.1.3.1.

depended upon a transformation plan that hinged on the high-risk, unsustainable Corzine Trade, ¶¶ 75, 117-21;[44] (iii) cost savings from compensation changes could not have offset the U.S. DTA even if fully implemented during the Class Period (which they were not), ¶¶ 122-32; and (iv) "tax strategies" concerning shifts in investment policies were illusory, not described in SEC filings and not even mentioned in the Break-the-Glass Document as a source of liquidity. Instead, as noted above, that document reveals that any shifts in investment policies would only cause further **losses**, ¶¶ 133-40. *See Scottish Re*, 524 F. Supp. 2d at 394 (tax strategies in support of DTA inadequate). Defendants thus "were not entitled to . . . ignore reasonably available data that would have indicated that [their] statements were materially false or misleading." *In re Atlas Air Worldwide Holdings, Inc. Sec. Litig.*, 324 F. Supp. 2d 474, 491 (S.D.N.Y. 2004).

Fifth, the Officers were highly motivated to avoid recording a valuation allowance that would immediately reduce current-year income and cause further losses in excess of $100 million. They knew that in March 2010 the rating agencies warned MF Global to "rev up profits fast or face downgrades" to junk status that would jeopardize overall liquidity and survival. ¶¶ 147-49. Similarly, the Officers also sought to avoid any meaningful disclosure of the RTM exposure until forced to do so by outside parties, and then desperately sought to avoid a downgrade by describing MF Global's financial condition as "strong" as late as October 24, 2011. ¶ 447. *See also* ¶¶ 172-73, 219-35, 240-50, 282-88, 448-59 (describing the Officers' efforts to make MF Global seem profitable through "window dressing" and reluctance to disclose true facts). These facts support a strong inference of scienter. *See Rothman v. Gregor*, 220 F.3d 81, 92 (2d Cir. 2000) (magnitude of write-off supported scienter); *Scottish Re*, 524 F.

---

[44] The Corzine Trade increased leverage in violation of the ratings agencies' demand that MF Global reduce leverage, ¶¶ 120, 143, 147, 159, 169, 297, 481, 490; required reserving capital MF Global could not afford without violating the Net Capital Rule, ¶¶ 225-30; only allowed MFGI's operations to record 20% of the profits while retaining 100% of the risks, ¶¶ 150-53; and could not continue after the EFSF expired in June 2013, ¶¶ 119, 159.

Supp. 2d at 394 (same); *Alstom*, 406 F. Supp. 2d at 459-60 & n.20 (scienter inferred where "the favorable perception" of an "extremely important" "division allowed Alstom to borrow money it needed to finance its other business," and "to minimize the risks associated with its liquidity"); *Atlas Air*, 324 F. Supp. 2d at 496 (concealment sufficient to establish scienter because revelation caused company to declare bankruptcy).

In response to these detailed allegations, the Officers argue only that the CAC pleads "GAAP violations based on generalized factors." Steenkamp 18-19; MacDonald 11; Corzine 19. They are wrong. As set forth above, Plaintiffs allege specific evidence that raises a strong inference that the Officers acted with scienter by violating GAAP and failing to record a timely DTA allowance. "It is simply not a plausible opposing inference that the Company's officers – sophisticated executives actively engaged in the planning of these transactions – were ignorant of the . . . consequences on the Company's deferred tax assets . . . The 'unsettled circumstances' . . . were staring them in the face." *Scottish Re*, 524 F. Supp. 2d at 394. These scienter allegations are even stronger when viewed collectively with the additional facts set forth below.

### 3. Plaintiffs Have Adequately Alleged Scienter With Respect To Misstatements Of Risk Appetite, Internal Controls, And Liquidity Management

#### (a) The Officers Received Reports About Internal Controls And Liquidity Management That Belied Their Public Statements

"Where the complaint alleges that defendants knew facts or had access to non-public information contradicting their public statements, recklessness is adequately pled for defendants who knew or should have known they were misrepresenting material facts with respect to the corporate business." *In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 76 (2d Cir. 2001). The CAC details a series of internal reports and communications before and throughout the Class Period

identifying numerous significant gaps in risk and liquidity management that remained throughout the Class Period and starkly contradicted the Officers' repeated public statements.

First, in April 2010, Corzine – and presumably MacDonald as the Company's CFO – received Board presentations that identified "**dozens of gaps** in policies, procedures, and technology" in various risk areas, which "made the data needed for forecasting liquidity risks **inadequate and unreliable**." ¶¶ 208, 467. Significantly, an October 2010 follow-up report to the Board "continued to reflect many critical or high risk gaps in risk policies," including the fact that "[e]xisting liquidity monitoring and forecasting is manual and limited." ¶¶ 210, 467.

Second, Internal Audit reports in May and October 2010 and March and June 2011 identified severe capital- and liquidity-management issues that went unremedied for at least thirteen months. The May 2010 report noted that "[l]iquidity risk reporting" was "not congruent with the changes to [MF Global's] broker-dealer business," ¶¶ 209, 467, and the October 2010 report identified the absence of reliable liquidity-reporting tools and a "key man risk," ¶¶ 211, 467. Similarly, the March 2011 report concluded that the Regulatory Reporting group did not have adequate systems or controls to document compliance. *See* ¶¶ 212, 467.[45] And the June 2011 report noted "numerous and significant gaps between the policy and existing [liquidity- and capital-management] practices" that had not been remedied for more than one year, but no one was assigned to remediate these issues because "**the business accepts this risk**." ¶¶ 213, 467.

---

[45] Corzine incorrectly suggests that the Complaint "selectively and misleadingly" quotes this report by omitting a "key conclusion" that "at 9/30/10, no material errors were noted." Corzine 23 n.9. But the report's full sentence states that no errors were noted **only** as to certain spreadsheets, not that the controls were adequate or reliable. Corzine also quotes the SIPA Report's statement that "controls were generally designed to mitigate the risks identified" but ignores the very next line, which states that "Internal Audit designated regulatory reporting inputs as an area for regular monitoring by management, **but this issue was unresolved as of the Filing Date**." SIPA Report at 62 (emphasis added). Corzine criticizes Plaintiffs for not quoting the entire SIPA Report, but also complains the CAC is too long, Corzine 22 n.8. In fact, the CAC is not excessively lengthy given the complexity of the fraud (note that the SIPA Report is 275 pages) and all allegations were fairly stated from the sources relied upon.

Third, the Officers closely monitored MF Global's capital and liquidity on a daily basis starting at some point in 2010 through Liquidity Dashboards and Daily Estimated Net Capital reports. *See* ¶¶ 271-73, 469. The Liquidity Dashboards showed that "during the month of October 2011, **and for some time before**," liquidity in MF Global's broker-dealer operations was uniformly negative before applying unlawful customer-fund and other intercompany "shell" transfers. ¶¶ 269, 273, 469.[46] Nonetheless, the Officers disregarded MF Global's critical lack of sufficient liquidity controls and "**accept[ed] th[e] risk**." ¶¶ 213, 276. *See Scholastic*, 252 F.3d at 72, 76; *In re Dynex Capital, Inc. Sec. Litig.*, 2009 WL 3380621, at *4, *14 (S.D.N.Y. Oct. 9, 2009) (scienter established where defendants recklessly disregarded internal reports).

Fourth, the Officers sent or received emails demonstrating that they closely monitored MF Global's liquidity and capital management, including the unlawful use of customer funds and other intercompany transfers to support the proprietary-trading business:

- In an October 6, 2011 email, Steenkamp explained to Corzine the dire "need to address the sustained [liquidity] stress," because the broker-dealer was "currently unable to fund itself" because of "the permanent pool of liquidity needed for RTMs," "continued haircut increases in fixed income," "increased funding needed [in] PSG" and the dangers of "dip[ping] into FCM excess every day." ¶¶ 275-76.[47]

- In an October 14, 2011 email, Steenkamp was told that liquidity was so strained that the broker-dealer would rely on a "$53mm FCM balance" plus $16mm of "FCM

---

[46] Steenkamp incorrectly asserts that Plaintiffs do not allege "customer funds [were] improperly [used] prior to October 26, 2011." Steenkamp 16 n.15. The CAC, however, alleges that Regulatory Excess funds were improperly used for intra-day funding of non-FCM business before then. ¶¶ 255, 265-69, 273-81. Indeed, on October 6, 2011, Steenkamp himself wrote an email demonstrating that he knew MF Global was "dip[ping] into FCM excess every day," even though CFTC rules forbid it. ¶ 276. Moreover, MF Global's lack of reliable internal controls created the risk that customer funds would be used improperly during this entire period, as eventually did occur. ¶¶ 354, 370.

[47] Steenkamp contends this email "reflect[s] discussions regarding . . . cash management issues within the corporate group," not MF Global at large. Steenkamp 16. But Steenkamp ignores Plaintiffs' allegations describing how "the permanent pool of liquidity needed for RTMs" created a **Company-wide** "sustained [liquidity] stress" such that employees played a "shell game" with customer and other funds to keep MF Global afloat on a daily basis, while being told of the Company's inadequate and unreliable liquidity controls. Moreover, MF Global's bankruptcy just weeks after this email belies any assertion that "cash management" issues were limited to a certain group. *See* ¶¶ 269, 275. In any event, "[t]o the extent that defendants contest this characterization . . . , a motion to dismiss is not the proper place to do so." *Sawabeh Info. Servs. Co. v. Brody*, 832 F. Supp. 2d 280, 304 (S.D.N.Y. 2011).

buffer" to operate and that this was the "[f]irst time that the B/D has relied upon the FCM buffer," which consisted of a portion of Regulatory Excess that the Serwinski Memo had rejected even as a temporary liquidity source. ¶ 277.[48]

- In an October 14, 2011 email, Mahajan wrote that "Jon [Corzine] wants to know the details of the cash movements between yesterday and today." ¶ 279.

- In an October 17, 2011 email, Mahajan wrote to MacDonald and Steenkamp: "[Steenkamp] gets it. He has talked to both [Corzine] and [Abelow] telling them that we cannot rely on FCM cash to meet our daily operational needs." ¶ 279.[49]

- In an October 28, 2011 e-mail, O'Brien authorized a $200 million transfer from customer funds "[p]er JC's [Jon Corzine's] direct instructions." ¶ 301.

Given these facts, the Officers could not have been unaware of the "many critical or high risk gaps in [MF Global's] risk policies," ¶210, or, at the very least, recklessly disregarded these gaps in the face of so much "reasonably available data that would have indicated" their statements regarding adequate internal controls and liquidity management were false. *Atlas Air*, 324 F. Supp. 2d at 491. *See also Scholastic*, 252 F.3d at 72-73, 76-77.[50] In response, the Officers

---

[48] Steenkamp suggests that Plaintiffs concede the "use of 'Regulatory Excess' was consistent with all applicable law at that time." Steenkamp 16 n.15 (citing ¶ 254). The cited allegation, however, provides that the "Alternative Method to calculate Regulatory Excess" was permissibly used, not that Regulatory Excess was permissibly used to fund non-FCM operations. The CAC is clear that regulators required Regulatory Excess to be "locked up" at all times – prohibiting the use of FCM funds for non-FCM purposes, even intra-day. ¶¶ 254-55, 263.

[49] MacDonald argues this email does not support scienter because it was sent after he "left the role of CFO" and "does not indicate that [he] had control over how . . . daily cash requirements were being met." MacDonald 13 n.14. But he ignores that the email demonstrates that he was apprised of the details of cash movements within MF Global regardless of his title. MacDonald's further contention that the problems discussed in Mahajan's email "appeared to be resolved" is absurd. *Id.* The CAC details how the improper use of customer funds actually **increased** between October 17 and MF Global's bankruptcy two weeks later. ¶¶ 278, 280-81.

[50] Indeed, the Officers signed the SEC filings at issue and repeatedly certified that internal controls were "effective." ¶¶ 335, 353, 369, 383, 414.  As Judge Kaplan recently explained, "[i]n light of the personal involvement of [the Officers] in designing and evaluating" disclosure and internal controls and "the stark realities about the inadequacies of the controls," the CAC sufficiently alleges scienter with regard to the Officers' statements in their Sarbanes-Oxley certifications. *Dobina v. Weatherford Int'l Ltd.*, 2012 WL 5458148, at *9 (S.D.N.Y. Nov. 7, 2012). The inference that the Officers' "certifications were made with reckless disregard for the truth is [thus] at least as compelling as any opposing, nonculpable inference." *Id. See also In re Openwave Sys. Sec. Litig.*, 528 F. Supp. 2d 236, 249 (S.D.N.Y. 2007) (false Sarbanes-Oxley certifications support scienter inference).

contend that MF Global improved its internal controls during the Class Period, citing the

improperly introduced CFTC Order Review (Tosc. Decl. Ex. 10). *See* n. 22, *supra*.[51]

### (b)    The Officers' Failure To Comply With Risk Controls Is Further Evidence Of Scienter

"[A] failure to maintain sufficient internal controls to avoid fraud is sufficiently

indicative of scienter." *Veeco*, 235 F.R.D. at 232. Here, Corzine repeatedly breached MF

Global's internal risk limits and made after-the-fact requests to raise the already-breached limits.

¶¶ 8, 179, 181, 199, 203, 465. In fact, Corzine's risk-limit breaches were so systemic that other

high-level employees "saw red flags" and protested accordingly. ¶¶ 178, 180, 182-98, 200-06,

466. Foremost among them was CRO Roseman, whose repeated alarms led to his termination.

¶ 187. Other concerned employees included Munir Jahari (Global Head of Accounting), Stephen

Hood (Head of Market Risk/Risk Monitoring), and Talha Chaudhry (CRO of the Americas and

Global Head of Market Risk). ¶¶ 189-93. Similarly, PwC's 2011 audit work-papers "identified

the management override of internal controls as a risk to MF Global." ¶¶ 206, 465. Corzine's

repeated violations of internal controls further support a strong inference of scienter. *See Lehman

Bros.*, 799 F. Supp. 2d at 297. Indeed, "there is considerable authority for the proposition that a

company's failure to follow an internal policy can form the basis for an inference of

recklessness." *In re Sadia, S.A. Sec. Litig.*, 643 F. Supp. 2d 521, 532 (S.D.N.Y. 2009).

Against this backdrop, the Officers' arguments all fail. Corzine concedes his risk-limit

breaches. He nevertheless argues those "breaches . . . were subsequently ratified by the board,"

---

[51] Furthermore, Defendants' reliance on this Court's holding in *In re DRDGOLD Ltd. Sec. Litig.*, 472 F. Supp. 2d 562 (S.D.N.Y. 2007), is misplaced. Corzine 19; Steenkamp 18. *DRDGOLD* concerned optimistic (but ultimately inaccurate) statements about the progress of one subsidiary's restructuring effort. But this is not a case of failed projections, and the mere fact that MF Global sought to transform itself at the start of the Class Period does not make this case analogous. Moreover, the scienter allegations in *DRDGOLD* were premised only on "ambiguous and conclusory" CW accounts, and the complaint did not allege that the defendants received "any actual data" contradicting their public statements. *Id.* at 571-72. Here, by contrast, the Officers received a litany of "actual data" that demonstrated the falsity of their statements about DTA, risk appetite, controls, and liquidity management.

negating "any inference" that he "intended to circumvent" internal controls. Corzine 23. But the risk management policies do not contemplate this type of *post hoc* approval, and he ignores the CAC's allegation that he **never** informed the Board of his February 3, 2011 breach. ¶ 199. He also ignores that by the time he sought approval to increase already-breached limits it was too late for the Board to refuse. Indeed, on the one occasion when the Board considered declining, Corzine threatened to resign if they did so. *See* ¶ 201 n.10.

Similarly, Steenkamp concedes that risk limits were breached during the Class Period but nevertheless argues that breaches "on occasion" do not support a finding of recklessness. Steenkamp 18. He is wrong. Corzine's **routine** breaches of stated risk limits and *post hoc* limit increases squarely support a strong inference of scienter. *See Lehman*, 799 F. Supp. 2d at 285-87 (scienter established where defendants "routinely exceeded" risk limits and "revised the established risk limits to permit these excesses"). Steenkamp also contends that allegations of "trading limit breaches raised by . . . Roseman and other employees . . . were made before [he] became the CFO," and thus do not pertain to him. Steenkamp 17. But the CAC alleges that similar warnings were issued **after** March 31, 2011 and occurred with increasing "frequency and urgency" throughout 2011 when Steenkamp was CFO. ¶¶ 191, 204-05. Moreover, Steenkamp served as MF Global's CAO and Global Controller for four years before becoming CFO and, as such, cannot credibly claim that he was insulated from such significant facts. *See* ¶ 30.

Roseman's concerns were directly conveyed to Corzine and MacDonald at Board meetings, and thus support a strong inference of scienter. *See Freudenberg*, 712 F. Supp. 2d at 191-92. During Roseman's tenure, Steenkamp was the CAO, and this important information is therefore also "properly ascribable" to him. *Id.* at 199. Moreover, Roseman's termination suggests a desire to conceal the risks he raised and further supports a finding of scienter. *See*

*Bank of Am. Corp. Sec., Deriv. & ERISA Litig.*, 2011 WL 3211472, at *5-9 (S.D.N.Y. Jul. 29,

2011) (general counsel's firing supported scienter).[52] Corzine's contention that Roseman's

departure had nothing to do with the concerns he voiced – and that accounts of his firing are

"speculation" by "disgruntled" employees – is sheer fiction. Corzine 22. Plaintiffs' allegations

about Roseman's termination are based on his Congressional testimony and are corroborated by

numerous reliable sources, including the SIPA Report, the OFR, senior-level executives, and

CW 1. ¶¶ 187, 196, 216.[53]

Thereafter, Corzine continued to be admittedly hands-on and said that one of his "most

important jobs [was] the Chief Risk Officer," ¶¶ 81, 422, 464, and all of the Officers were deeply

involved in all aspects of MF Global's core operations, including its policies for managing

capital, liquidity, and risks. ¶¶ 80-83, 177-206; 260-80. These Officers thus knew the difference

between their public statements regarding risk controls and the true state of affairs internally

within the Company. *See Alstom*, 406 F. Supp. 2d at 459 (defendants "ha[d] a duty to familiarize

themselves with the facts relevant to the core operations of [the company]").[54]

---

[52] Indeed, Roseman was initially hired to "overhaul" internal controls, and MF Global had previously touted his credentials. ¶ 64. *See Richard v. Nw. Pipe Co.*, 2011 WL 3813073, at *5 (W.D. Wash. Aug. 26, 2011) ("changes in management" added "one more piece to the scienter puzzle," especially since "departure was suspicious because the company had previously touted [executive] as essential.").

[53] The Officers wrongly contend that CW accounts do not support scienter. *See* Corzine 21; Steenkamp 17 n.18; MacDonald 13-14. The Second Circuit has unequivocally held that a plaintiff may rely on confidential witnesses to plead securities fraud. *See New Orleans Emp. Ret. Sys. v. Celestica, Inc.*, 455 F. App'x 10, 13-14 (2d Cir. 2011). Here, the CAC's scienter allegations rely only in limited part on averments from two CWs and all other sources named. Moreover, the CWs are "described . . . with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged." *Atlas Air*, 324 F. Supp. 2d at 493. *See* ¶¶ 158, 190. Defendants' authorities are inapposite. *See* MacDonald 13-14; Steenkamp 17 n.18 (citing *Glaser v. The9, Ltd.*, 772 F. Supp. 2d 573, 594 (S.D.N.Y. 2011) (CWs did not work for defendant corporation and plaintiffs did not allege CWs had "any contact with anyone at [defendant corporation]"); *In re Wachovia Equity Sec. Litig.*, 753 F. Supp. 2d 326, 352 (S.D.N.Y. 2011) (CW allegations were "undated or pegged to an indefinite time period")).

[54] The Officers argue that core-operations allegations cannot support scienter. Steenkamp 15 n.13; MacDonald 11 n.12. They are wrong. While "the Second Circuit has not expressly ruled on whether the core-operations doctrine survives the PSLRA, it has very recently endorsed the idea behind the core operations doctrine as enhancing, if not independently supporting, an inference of scienter." *Pontiac*, 2012 WL 2866425, at *11.

### (c)   The Officers' Concealment Of The Corzine Trade
### And Its Liquidity Risks Further Supports Scienter

The CAC also alleges that the Officers actively concealed the Corzine Trade, which strongly suggests that they knew that it was highly risky and jeopardized MF Global's very existence. Indeed, MF Global used "window dressing" to boost earnings at quarter-end with additional RTM trades, causing an eventual SEC inquiry. ¶¶ 174, 246 n.13.

First, in late September 2010, MF Global falsely informed FINRA that it did not have any exposure to Euro sovereign debt. *See* ¶¶ 221-22. Second, the Officers affirmatively misled Moody's and investors into believing "that MF Global was expanding its principal trading activity for the primary purpose of facilitating customer transactions, as opposed to generating trading profits." ¶¶ 10, 285. Third, MF Global disclosed its Euro sovereign debt exposure only five months after PwC asked the Company to do so. *See* ¶ 219. Fourth, even after the 2011 10-K disclosed MF Global's Euro sovereign debt exposure at March 31, 2011, the true credit and liquidity risks associated with the Corzine Trade remained concealed. *See* ¶ 401. In fact, according to FINRA, even the Q1'12 10-Q/A – filed on September 1, 2011 to identify the need to adjust the Corzine Trade to comply with the Net Capital Rule – was still materially inadequate. *See* ¶¶ 235, 240-41. Fifth, the Officers even tried to transfer the Corzine Trade off the Company's books before investors could learn the truth. *See* ¶ 229. Sixth, even when MF Global was faced with a severe liquidity crisis following its disclosures, these Defendants continued to insist that MF Global's financial condition had never been "stronger" and risk was "limited." ¶¶ 283, 287-88.

In sum, the Officers knew the risks from the Corzine Trade endangered MF Global and tried to hide it from investors, hoping they might succeed in their gamble to turn the Company

around. This fact further supports a strong inference of scienter. *See Tellabs*, *Inc. v. Makor Issues & Rights, Ltd.*, 513 F.3d 702, 711 (7th Cir. 2007).[55]

#### (d)    Recent Investigations Further Support Scienter

As the CAC alleges, the SIPA Report and the OFR Report are full of factual findings that support Plaintiffs' claims. The SIPA Report concluded that the "underlying liquidity problems at MF Global . . . did not commence in the fall of 2011," and that "liquidity had been a cause for concern before and throughout Mr. Corzine's tenure," but that "systems and tools that would enable accurate real time monitoring of liquidity were never implemented." ¶ 215. The SIPA Trustee also testified that MF Global's internal controls "were obviously ineffective or ignored," that "there was knowledge that segregated funds were being improperly moved," and that "the preponderance of the evidence indicates that . . . senior management . . . was aware of the liquidity crisis and . . . that customer funds . . . were being utilized to cover other costs in the firm." ¶ 217.[56] Likewise, the OFR found that the "apparent failure to properly segregate customer funds followed a pattern of lapses in compliance and governance," and that "[a] firm with better internal controls and governance could have avoided MF Global's fate." The OFR also concluded that Roseman's unheeded warnings "should have been a red flag." ¶ 216. Thus, these reports further support a finding of scienter. *See In re Refco Inc. Sec. Litig.*, 2012 WL 996910, at *7 (S.D.N.Y. Jan. 17, 2012); *Lehman*, 799 F. Supp. 2d at 295; (both relying on facts revealed by bankruptcy examiners' reports to find strong inference of scienter).

\*         \*         \*

---

[55] Surprisingly, Corzine contends that "there is no allegation that MF Global did not have sufficient liquidity to meet the anticipated margin calls" of "as much as $930 million . . . on the RTM portfolio" in August 2011. Corzine 21. But he ignores the CAC's allegation that, in mid-August 2011, when the FSA ordered MFG-UK to provide a contingency plan for liquidity stress, MF Global personnel explained internally that, if MFG-UK faced a $900 million margin call on Euro sovereign debt RTMs, "there is no way we could support [it]." ¶ 231.

[56] These findings contradict the contention that the SIPA report "undermines any inference of fraud." Corzine 22.

Considered together, as they must be, all of these allegations collectively – and the "whole factual picture painted by the" CAC (*Dodona I*, 847 F. Supp. 2d at 645) – give rise to a strong inference that the Officers either consciously intended to defraud or acted with a high degree of recklessness. Given that even a "tie" goes to the plaintiff, *Pontiac*, 2012 WL 2866425, at *12, Plaintiffs have more than adequately pleaded scienter at this stage.

### 4.    The Officers' Remaining Arguments Do Not Defeat The Adequacy Of Plaintiffs' Scienter Allegations

#### (a)    The Officers' Stock Holdings Are Irrelevant

The Officers argue that lack of stock sales is fatal to Plaintiffs' §10(b) claims. *See* Corzine 17; Steenkamp 14 n.11; MacDonald 15. But the Supreme Court takes a different view. *See Tellabs*, 551 U.S. at 325 ("the absence of a motive allegation is not fatal"). Indeed, courts often sustain complaints despite a lack of insider trading. *See, e.g.*, *Dobina*, 2012 WL 5458148, at *4; *In re NovaGold Res. Inc. Sec. Litig.*, 629 F. Supp. 2d 272, 296 (S.D.N.Y. 2009); *Scottish Re*, 524 F. Supp. 2d at 385.[57]

Additionally, Corzine and MacDonald argue that they lacked scienter because they purchased MF Global common stock during the Class Period. *See* Corzine 17; MacDonald 15-16. Those arguments are not proper at this stage.[58] The "pitfalls with adopting Defendants' argument, as a blanket rule, are clear. Corporate officers would be inclined, or perhaps instructed by counsel, to purchase stock after the initiation of a securities fraud lawsuit to negate any possible inference of fraud." *Holmes v. Baker*, 166 F. Supp. 2d 1362, 1378 (S.D. Fla. 2001). *See*

---

[57] The Officers' cited authorities are inapposite. *See* Corzine 17-18; MacDonald 15. The plaintiffs in *In re Bristol-Myers Squibb Sec. Litig.*, 312 F. Supp. 2d 549, 561 (S.D.N.Y. 2004), actually sought to establish scienter through insider stock sales. In *In re Security Capital Assurance Ltd. Sec. Litig.*, 729 F. Supp. 2d 569, 576, 596 (S.D.N.Y. 2010), the plaintiffs attempted to plead scienter based only on "popular news" about "housing market" problems.

[58] Director Goldberg also purchased MF Global shares during the Class Period. *See* ID 15 n.10. To the extent the Directors seek to use this purchase to support their argument the "only plausible inference to draw . . . is a **firm belief** on their part that the Company would become profitable," ID 15, their argument fails for the same reasons set forth herein in response to the Officers' scienter arguments and because scienter is not required under § 11.

*also In re Netbank, Inc. Sec. Litig.*, 2009 WL 2432359, at *12-13 (N.D. Ga. Jan. 29, 2009)

(scienter pleaded where defendants acquired stock during class period); *In re Nuko Info. Sys.,*

*Inc. Sec. Litig.*, 199 F.R.D. 338, 344-45 (N.D. Cal. 2000) (same). In fact, the court in *In re*

*Thornburg Mortg., Inc. Sec. Litig.*, 695 F. Supp. 2d 1165, 1194 (D.N.M. 2010), rejected this

same argument – where defendants bought more than $25 million of securities during an alleged

fraud:

> A lack of motive is not fatal to an allegation of scienter under the PSLRA and,
> even if it were, there is not a lack of motive in this case. . . . [T]he Defendants
> [had] another motive that adequately fills the gap left by a lack of suspicious
> insider-trading activity: **survival**.

> Here, too, survival motivated the Officers. The "fact that a gamble − concealing bad news

in the hope that it will be overtaken by good news − fails is not inconsistent with its having been

a considered though . . . reckless [] gamble." *Tellabs*, 513 F.3d at 710. Thus, "concealing bad

news in the hope that it will be overtaken by good news" is consistent with a strong inference of

scienter. *Id. See also Fla. State Bd. of Admin. v. Green Tree Fin. Corp.*, 270 F.3d 645, 662 (8th

Cir. 2001) ("the allegations provide powerful support for the idea that defendants hoped that the

prepayment problem would come out in the wash – why else would they have waited . . . to

reveal and remedy the problem?"). In short, a lack of insider sales or the presence of purchases

does not weaken the inference of scienter at the pleading stage.[59]

---

[59] Furthermore, this argument is premature at the motion to dismiss stage, especially in light of the fact that not all of the facts concerning Corzine's compensation package are public. For example, in the 100-page House Report recently released on November 15, 2012, Congress noted "J.C. Flowers & Co. offered Corzine a 3.5% carried interest in the fund's profits" as part of his compensation to join MF Global. *See* Ross Ex. 1 (at 21 n.93). At this stage, the value of that additional compensation, in comparison to any MF Global stock Corzine purchased, is not known. Indeed, Corzine's purported $300,000 stock purchase was likely immaterial to his personal wealth.

**(b)** **The Competing Inferences Proffered By The Officers Fall Woefully Short Of Their *Tellabs* Burden**

The Officers assert that MF Global's historic collapse and the misuse of approximately $1.6 billion in customer funds were the "simple" result of an unanticipated "run on the bank" and "mismanagement." Steenkamp 19-21; MacDonald 15-16; Corzine 23-24.[60] But even assuming *arguendo* that the "speed and severity" of MF Global's collapse resulted from a "run on the bank," that fact does not undermine the strong inference of scienter established by Plaintiffs' particularized allegations that Defendants knowingly or recklessly misstated the facts throughout the Class Period. The "run on the bank" foreseeably followed partial revelation of the truth and cannot excuse Defendants' misstatements. Indeed, the CAC further alleges that the Officers expected and feared a run on the bank in the event that the truth was revealed. *See* ¶¶ 137-39, 249-50.

Even if MF Global fell faster than the Officers expected when the truth began to be revealed, that is beside the point. These Officers were well aware that MF Global could not afford to continue the Corzine Trade and also maintain sufficient liquidity and that when the rating agencies got wind of the true facts, they would downgrade MF Global, causing the ensuing cascade of devastating events. The Officers tried to move the Corzine Trade off the Company's books, and when those efforts failed, they began to implement the Break-the-Glass Document's plan, ordering desperate cost-saving plans (*e.g.*, "print[ing] on both sides of sheets of paper"). ¶ 250; *see also* ¶¶ 136-39. It is not plausible that the Officers were as clueless as they now claim. A "run on the bank" is not a defense against liability for violations of the federal

---

[60] The Officers also assert that "[t]he amount of public information pertaining to the subject matter of the alleged misrepresentations weakens any inference that" they "acted with scienter." MacDonald 14-15; Steenkamp 14-15; Corzine 20. This "truth-on-the-market" defense dressed up as a scienter argument is without merit, and is addressed in Section A.3(b)(i).

securities laws, as such events frequently occur following corrective disclosures of fraud. *See Freudenberg*, 712 F. Supp. 2d at 203 (corrective disclosures "resulted in a 58.67% one day drop in share price, and a multi-billion dollar 'run on the bank' . . . resulting from the public learning of the scope and severity of E*TRADE's risky investments and losses"); *In re Refco Sec. Litig.*, 503 F. Supp. 2d 611, 657 (S.D.N.Y. 2007) ("[defendant] is free to make such arguments to the factfinder, but it seems more than plausible to argue, as plaintiffs do, that the exodus of Refco's customers was due, in part, to the allegedly false statements by . . . defendants").

Moreover, the Officers' "mismanagement" argument also fails for the reasons set forth above in Section A.2(b). Corzine 13-14; Steenkamp 18. *See Freudenberg*, 712 F. Supp. 2d at 192. Plaintiffs do not simply allege mismanagement or poor decisions. Rather, the CAC alleges that the Officers affirmatively misled investors about DTA accounting and internal controls. These allegations, describing material contradictions between public disclosures and the facts then known or recklessly disregarded within the Company, plainly are actionable under the federal securities laws. *See Lehman*, 799 F. Supp. 2d at 297 ("it is more plausible, in all the circumstances, that [defendants] knew that Lehman routinely altered or knowingly tolerated alteration of Lehman's risk management policies even as the company stated it would monitor and enforce them."). Moreover, the magnitude of the fraudulent conduct alleged in the CAC "removes the action[] from the sphere of mere corporate mismanagement to the realm of reckless behavior." *In re Am. Bank Note Holographics, Inc. Sec. Litig.*, 93 F. Supp. 2d 424, 448 (S.D.N.Y. 2000).

### (c)     The CAC Adequately Alleges Each Officer's Scienter

The Officers assert that the CAC improperly relies on "group pleading" to establish scienter. *See* MacDonald 12-13; Corzine 17. But that is not the case. Each Officer is alleged to have signed false certifications attesting to the adequacy of the Company's internal controls,

¶¶ 335, 353, 369, 383; received Liquidity Dashboards and Daily Estimated Net Capital reports, ¶¶ 272-80, 469; participated in or received internal communications discussing critical liquidity issues and the misuse of customer funds, ¶ 279 (MacDonald), ¶ 277 (Steenkamp), ¶ 279 (Corzine); been aware of GAAP's requirements, ¶¶ 89, 115, 315-16, 321-23, 335, 337, 355-56, 371-73, 387, 389, 417; and been aware of MF Global's multi-year loss position as of March 31, 2010 and 2011, ¶¶ 74, 101-03. Additionally, MacDonald and Corzine admitted they were aware that low interest rates limited MF Global's U.S operations' ability to generate revenue, ¶¶ 104-08, and Steenkamp and Corzine both recognized that compensation-expense savings would not come to fruition during the Class Period, ¶¶ 75, 117.[61] The CAC does not merely treat these three individuals as one group, but specifies information showing a strong inference of their knowledge or recklessness individually (as well as their individual statements). Accordingly, the CAC raises a strong inference of scienter as to each of the Officers. *See Scholastic*, 252 F.3d at 72-73, 76-77; *Atlas Air*, 324 F. Supp. 2d at 491; *Alstom*, 406 F. Supp. 2d at 459.

## C.     Plaintiffs' Securities Act Claims Do Not Sound in Fraud

As set forth above, §§ 11 and 12(a)(2) of the Securities Act must only meet Rule 8(a)'s notice pleading standard – liability is "virtually absolute," subject to certain good-faith affirmative defenses. *Herman & MacLean v. Huddleston*, 459 U.S. 375, 382 (1983). The mere fact that a complaint also contains fraud allegations under § 10(b) of the Exchange Act "does not strip plaintiffs of the right to plead" non-fraud claims under §§ 11 and 12(a)(2) in accordance with Rule 8(a). *Wachovia*, 753 F. Supp. 2d at 374-75.

In certain circumstances – where "the gravamen of the complaint is plainly fraud" – Securities Act claims may "sound in fraud." *See Rombach*, 355 F.3d at 172, 176. Determining

---

[61] Moreover, Corzine was a member of the Board and therefore received – or had access to – all of the Internal Audit reports discussed above, and, presumably, the CFOs also participated in Board meetings and received those reports.

whether such claims "sound in fraud . . . necessarily requires a case-by-case analysis." *Refco*, 503 F. Supp. 2d at 631-32. A complaint does not sound in fraud simply by employing such terms as "misrepresented," made "untrue statements," and "failed to disclose," because those terms merely track the text of §§ 11 and 12. *Int'l Fund Mgmt S.A. v. Citigroup, Inc.*, 822 F. Supp. 2d 368, 376-77 (S.D.N.Y. 2011); *Wachovia*, 753 F. Supp. 2d at 375. Similarly, a complaint does not sound in fraud when, like here, it distinguishes between the two sets of claims. *See Refco*, 503 F. Supp. 2d at 631-33; *see also* CAC Sections XII & XIII. Thus, Plaintiffs have crafted a "carefully structured" and separable two-part CAC. *Refco*, 503 F. Supp. 2d at 632-33.

Plaintiffs also explicitly aver in the CAC that each of the Securities Act claims –which are pleaded separately in Sections XII & XIII (Counts 3-14) – disclaim any allegation of fraud or intentional misconduct. Recognizing that *Fait* recently held that statements of opinion are only false if they are subjectively disbelieved by the speaker, the CAC also explains:

> Plaintiffs expressly disclaim any allegations of fraud or intentional misconduct in connection with these non-fraud claims, which are pleaded separately in this Complaint from Plaintiffs' Exchange Act claims, except that any challenged statements of opinion or belief made in connection with the Offerings are alleged to have been materially misstated statements of opinion or belief when made and at the time of the respective Offerings.

¶ 5.[62]

Nevertheless, Defendants contend that Plaintiffs' disclaimer is ineffective because it acknowledges that opinion statements are alleged to be subjectively false, even for Plaintiffs' Securities Act claims. *See* ID 9-10; UW 19 n.7. Defendants then assert that a plaintiff must either absolutely disclaim fraud (and fail under *Fait*) or satisfy Rule 9(b). They are wrong.

First, as discussed in Section A.1(c) *supra*, the Second Circuit expressly distinguished between scienter and subjective falsity in *Fait*, holding that where subjective falsity forms the

---

[62] *See also* ¶¶ 560, 574, 585, 593, 607, 618, 627, 641, 652, 661, 675,  686.

basis of a § 11 claim, a plaintiff need only "plausibly allege" the relevant facts under Rule 8.

*Fait*, 655 F.3d at 112 n. 5. Thus, § 11 claims do not sound in fraud merely because they allege

subjective falsity. Indeed, *Fait* directly contradicts Defendants' argument.

Second, Defendants' reliance on *In re Barclays Bank PLC Sec. Litig.*, 2011 WL 2150477

(S.D.N.Y. May 31, 2011), is inapposite. *Barclays* predates *Fait*, and did not have the benefit of

the Second Circuit's explicit holding that subjective falsity is not equivalent to scienter.

Moreover, the plaintiffs in *Barclays* employed an absolute fraud disclaimer without a carve-out

for opinion statements and relied on insufficient "general and conclusory" allegations. *See* 2011

WL 2150477, at *3 (noting that the plaintiffs were "attempting [to add a subjective falsity carve-

out] on allegations which are still general and conclusory"). Thus, *Barclays* is distinguishable,

and no court has rejected a fraud disclaimer with a similar carve-out after *Fait*.

Defendants' fallback contention that Plaintiffs' fraud disclaimer "fails for ambiguity"

because the CAC does not "clearly segregate its negligence and fraud claims" is baseless. ID 10.

Defendants liken the CAC here to the pleadings in *In re ProShares Trust Sec. Litig.*, 2012 WL

3878141 (S.D.N.Y. Sept. 7, 2012), and *In re Adelphia Commc'ns Corp. Sec. & Deriv. Litig.*,

2007 WL 2615928, (S.D.N.Y. Sept. 10, 2007). In *ProShares*, however, the plaintiffs had not

"specifically pled alternate theories of fraud and negligence." 2012 WL 3878141, at *6. And

unlike the "few paragraphs set aside" in the *Adelphia* complaint, 2007 WL 2615928, at *9, the

CAC here sets forth specific factual allegations that apply to all claims, and then separately

identifies the allegations applicable to the Securities Act claims. *See, e.g.*, ¶¶ 4-5; CAC §§ XII &

XIII. *See also Refco*, 503 F. Supp. 2d at 632-33.[63] Since the paragraphs applicable to Plaintiffs'

---

[63] The Underwriters' citation to *Ladmen Partners, Inc. v. Globalstar, Inc.*, 2008 WL 4449280 (S.D.N.Y. Sept. 30, 2008), is also inapposite. UW 19 n.7. That complaint made "no effort whatsoever to distinguish the Underwriter Defendants from . . . Individual Defendants." 2008 WL 4449280, at *12. By contrast, the CAC differentiates

Securities Act claims are specified (*see* ¶¶ 501-506, 507(a)-(f), 507(j), 508-10, 529-59, 560-94), Defendants can hardly claim that they were confused as to which allegations apply to them.

Yet even if the Court were to find that Plaintiffs' Securities Act claims sound in fraud, the CAC satisfies Rule 9(b). Under Rule 9(b), a plaintiff must specify the fraudulent statements, the speaker, where and when the statements were made, and why the statements were fraudulent. *See In re Ambac Fin. Grp., Inc. Sec. Litig.*, 693 F. Supp. 2d 241, 275 (S.D.N.Y. 2010). As explained in greater detail *supra* in Section A, the CAC alleges with particularity which statements were false and misleading and why. The CAC also explains with particularity how each Securities Act Defendant acted improperly or failed to conduct reasonable investigations in connection with materially false and misleading SEC filings incorporated by reference into the Offering Materials. *See* ¶¶ 554-56 (Underwriters); ¶¶ 28-44, 557-58 (Individual Defendants).[64]

### D.   The Individual Defendants Are Liable For The Incorporated 10-Qs

The Individual Defendants argue that they are not liable under § 11 for the Form 10-Qs incorporated by reference in the Registration Statement, but they do not cite one case in support of this novel and erroneous proposition. Corzine 5; ID 11-13; MacDonald 16; Steenkamp 6.

Section 11 imposes liability if "any **part** of the registration statement, **when such part became effective**" contained materially false statements or omissions. 15 U.S.C. § 77k(a). The

---

between the Officer, Individual, and Underwriter Defendants, with allegations of the Underwriter Defendants' failure to exercise reasonable care set forth separately. *Compare* ¶ 556 *with* ¶¶ 557-59. Furthermore, the *Ladmen* plaintiffs apparently alleged that the underwriters had "deliberately turned a blind eye" to information. 2008 WL 4449280, at *12. Here, the CAC alleges the "Underwriter Defendants did not conduct a reasonable investigation into the accuracy of the statements regarding the Company's DTA and internal controls"; if they "had . . . exercised reasonable care, they would have known of the material misstatements and omissions." ¶¶ 555-56. These allegations do not sound in fraud.

[64] Even if Securities Act claims are subject to Rule 9(b), Plaintiffs are not required to raise a strong inference of scienter. Securities Act claims do not require scienter; thus, even under Rule 9(b), they are not required to allege scienter. *See In re Stac Elecs. Sec. Litig.*, 89 F.3d 1399, 1404-05 n.3 (9th Cir. 1996) (even when a § 11 claim is deemed to "sound[] in fraud," it must only "set forth what is false or misleading about a statement, and why it is false." ). The Second Circuit favorably cited *Stac* in *Rombach*. *See Rombach*, 355 F.3d at 170-72.

Securities Act defines "registration statement" to include "any . . . report . . . incorporated [in a registration statement] by reference." 15 U.S.C. § 77b(8). Liability reaches "every person who signed the registration statement" and "every person who was a director." §77k(a)(1)-(2). Here, the Individual Defendants signed the Registration Statement, except Corzine who signed the 2010 and 2011 10-Ks and was a director. ¶529. The prospectus supplement for each Offering incorporated by reference the latest 10-K and subsequent 10-Qs. ¶¶ 537, 542, 547, 552. And the prospectus supplements established a new effective date as of the time of each Offering. *See NECA-IBEW Health & Wellfare Fund v. Goldman Sachs & Co.*, 693 F.3d 145, 150-51 (2d Cir. 2012) (quoting 17 C.F.R. § 229.512(a)(2) "[E]ach . . . post-effective amendment [to the shelf registration statement, such as a prospectus supplement] shall be deemed to be a new registration statement relating to the securities offered therein, and the offering of such securities at that time shall be deemed to be the initial bona fide offering thereof.") (brackets in original). The Individual Defendants are therefore liable under § 11 with respect to those 10-Qs. *See In re Citigroup, Inc. Bond Litig.*, 723 F. Supp. 2d 568, 594 (S.D.N.Y. 2010); *Scottish Re*, 524 F. Supp. 2d at 380, 398-99; *Atlas Air*, 324 F. Supp. 2d at 502 (all sustaining § 11 claims against directors based on incorporated 10-Qs).

The Individual Defendants nevertheless rely on two inapposite SEC Rules. First, Rule 430B(f), 17 C.F.R. § 239.430B(f), merely provides that if a director or officer who did not sign a registration statement signs an incorporated report, that person is not liable under § 11 simply because the report is incorporated. *See* Securities Offering Reform, Securities Act Rel. No. 8591, Exchange Act Rel. No. 75, 2005 WL 1692642, at *86 (Aug. 3, 2005). Rule 430B(f) does not and cannot exonerate signers of registration statements, as an SEC rule cannot amend § 11's text establishing liability for "every person who signed the registration statement." 15 U.S.C.

§ 77k(a)(1). *See Lehman*, 799 F. Supp. 2d at 316 n.399 ("Rule 430B . . . did not change the liability rules for registration statement signers").[65]

Second, Regulation S-K Item 512(b), 17 C.F.R. § 229.512(b), actually undermines Defendants' position by providing that an incorporated 10-K is deemed a new registration statement and thus creates liability for the 10-K's signers even if they did not sign the registration statement (like Corzine). *See Lehman*, 799 F. Supp.2d at 316. The rule does not state that signers of a registration statement are not liable for incorporated 10-Qs. Thus, Steenkamp's argument fails. Steenkamp 6 n.5. He is liable as a Registration Statement signatory.[66]

### E. The Underwriters' Reliance On Audited Financial Statements Does Not Insulate Them From Liability

The Underwriters argue that they cannot be liable for the false and misleading statements relating to the DTA incorporated from MF Global's 10-Ks into the Registration Statement because underwriters are permitted to rely on audited financial statements. *See* UW 24-25; SNU 20 n.13; ID 14-15. As an initial matter, the burden of proof is on the Underwriters under § 11(b)(3)(C) to establish that they "had no reasonable ground to believe and did not believe" that MF Global's audited financial statements contained material misstatements. *See In re WorldCom, Inc. Sec. Litig.*, 346 F. Supp. 2d 628, 672-74 (S.D.N.Y. 2004). "[P]laintiffs need not negate such an affirmative defense in their pleading." *In re Global Crossing Ltd. Sec. Litig.*, 313

---

[65] The treatise cited by Defendants addresses an irrelevant point – that under Rule 430B, a **prospectus supplement** creates a new effective date only for issuers and underwriters. *See* 10 Harold S. Bloomenthal *et al.*, INT'L CAPITAL MKTS. & SEC. REG. § 1:129 (2012). The same treatise acknowledges that under the 2005 securities offering reform that adopted Rule 430B, "the previous scheme of determining the Section 11 effective date . . . remains unchanged for other prospective Section 11 defendants from what is was before [the reform]." *Id.* § 1:124 at 1-355. A treatise that addresses the actual question at issue here squarely supports Plaintiffs' position, explaining that directors are liable under § 11 for an incorporated 10-Q as of the date the 10-Q is filed, because "[t]he directors . . . on that date have an opportunity to review the 1934 Act report (whether before or after its filing) and to require its correction." 5 Jacobs, DISCLOSURE & REMEDIES UNDER THE SEC. LAWS § 3:16 at 3-81 (2012).

[66] Even if the Court finds that the Individual Defendants are not liable for the 10-Qs (which it should not), the Individual Defendants concede that they are liable for the 10-Ks. *E.g.*, ID 11. And the Underwriters are liable for both the 10-Ks and the 10-Qs and do not contend otherwise.

F. Supp. 2d 189, 211 (S.D.N.Y. 2003). Courts therefore routinely reject such attempts to hide

behind the auditors on a motion to dismiss. *Id.* (citing cases); *WorldCom,* 346 F. Supp. 2d at 679

(denying defendants' summary judgment motion and holding that "what constitutes a red flag" is

an "**exquisitely fact intensive inquir[y]** that depend[s] on the circumstances surrounding a

particular issuer and the alleged misstatement.").[67]

Moreover, the "underwriters' reliance on audited financial statements may not be blind.

Rather, where 'red flags' regarding the reliability of an audited financial statement emerge, mere

reliance on an audit will not be sufficient to ward off liability." *WorldCom*, 346 F. Supp. 2d at

672 (denying summary judgment). "Any information that strips a defendant of his confidence in

the accuracy of those portions of a registration statement premised on audited financial

statements is a red flag, whether or not it relates to accounting fraud or an audit failure. What is

at stake under [§] 11 is not an auditor's scienter, but the accuracy and completeness of the

statements in the registration statement." *Id.* at 673.

Plaintiffs allege numerous red flags signaling the inaccuracy of MF Global's audited

financial statements such that the Underwriters could not have reasonably relied on them,

including Defendants' stated ability to turn around its three-year cumulative U.S. loss history in

the face of near-zero interest rates, ¶ 556; the potential negative impacts arising from

compensation-policy changes and that MF Global was unlikely to see a meaningful decline in

compensation accrual rates until 2013, ¶¶ 124, 131; and the fact that even a cursory review of

---

[67] Indeed, three of the four cases cited by the Underwriters, UW 24-25, to support that plaintiffs must allege red flags are **summary-judgment** cases – and demonstrate the inquiry is rarely appropriate even then. *See In re Software Toolworks, Inc. Sec. Litig.*, 50 F.3d 615, 621 (9th Cir. 1994); *In re Metro. Sec. Litig.*, 2010 WL 424625, at *4 (E.D. Wash. Jan. 28, 2010). The lone motion-to-dismiss opinion Underwriters cite, *Countrywide*, 588 F. Supp. 2d at 1175, acknowledged the affirmative defense of reliance can only support dismissal under Rule 12(b)(6) when the defense appears on the face of the complaint, which is not the case here. *See* ¶¶ 555-56. More importantly, even *Countrywide* permitted some claims against the underwriters based on audited financials in light of alleged red flags. *See id.* at 1182.

Internal Audit reports would have revealed severe internal control deficiencies that were unresolved for more than one year, ¶ 556. Therefore, the Underwriters' attempt to avoid liability at this stage based on their blind reliance on PwC must be rejected.

### F. Plaintiffs Have Standing Under §12(a)(2) Against The Underwriters

The CAC establishes Plaintiffs' § 12(a)(2) standing by alleging that WV Laborers purchased "**in**" the Secondary Offering "**directly**" from Deutsche, ¶ 577; VRS purchased "**in**" the 2016 Notes Offering "**directly**" from Merrill, ¶ 610; VRS and LRI Invest purchased "**in**" the 2018 Notes Offering "**directly**" from Citigroup, ¶ 644; and Guam purchased "**in**" the 6.25% Senior Notes Offering "**directly**" from Jefferies, ¶ 678. No more is required. *See NECA-IBEW Pension Trust Fund v. Bank of Am.*, 2012 WL 3191860, at *24 (S.D.N.Y. Feb. 9, 2012). Nevertheless, certain Underwriters argue that they are "entitled to dismissal of the [§] 12(a)(2) claims against them for failure to plead statutory standing," because the CAC does not allege that Plaintiffs purchased directly from **every** named Underwriter. UW 3-4 n.2; SNU 25. They are wrong. Defendants "cite no authority for the proposition that the immediate seller requirement demands such particularity in the pleadings," *Wachovia*, 753 F. Supp. 2d at 374,[68] and this Court "retains broad discretion" to make those types of standing determinations "after reviewing all of the Rule 23 factors" at class certification. *NECA*, 693 F.3d at 165. Accordingly, Plaintiffs have sufficiently pleaded statutory standing to pursue their § 12(a)(2) claims at this stage.[69]

---

[68] Defendants' cited cases are inapposite. In *Local 295/Local 851 IBT Emp. Grp. Pension Trust & Welfare Fund v. Fifth Third Bancorp.*, 731 F. Supp. 2d 689, 712-13 (S.D. Ohio 2010), the court dismissed 12(a)(2) claims because, *inter alia*, the plaintiffs "concede[d] that they purchased their shares on the open market." In *DeMaria v. Anderson*, 153 F. Supp. 2d 300, 307 (S.D.N.Y. 2001), the complaint did "not aver that any defendant was the immediate seller to any named plaintiff."

[69] Defendants' arguments concerning *Morrison v. Nat'l Austl. Bank Ltd.*, 130 S. Ct. 2869 (2010), are misplaced (UW 8 n.4), as MF Global's securities were all U.S. listed and did not trade on foreign exchanges.

### G.     The CAC Sufficiently Alleges Control Person Liability

Contrary to Defendants' assertions, (*see, e.g.*, MacDonald 17-18), the CAC establishes that MF Global violated §§ 11 and 10(b). First, Plaintiffs have sufficiently alleged that MF Global issued materially false and misleading statements in its SEC filings throughout the Class Period, and that those false and misleading documents were incorporated by reference into the Offering Materials. ¶¶ 530, 533, 552. As the issuer, MF Global is subject to "absolute" liability under § 11 for materially false and misleading statements in the Offering Materials; plaintiffs need not establish scienter. *See Litwin*, 634 F.3d at 716. With regard to Plaintiffs' Rule 10b-5 allegations, the CAC adequately alleges scienter as to the Officers, *see* Section B *supra*, and thus adequately alleges scienter as to MF Global. It is of no moment that Plaintiffs did not name MF Global as a defendant; that is not required to establish control person liability. *See Sgalambo v. McKenzie*, 739 F. Supp. 2d 453, 486 n.203 (S.D.N.Y. 2010).

Second, Plaintiffs have established control. The control components of §§ 15 and 20(a) "are essentially parallel" and "interpreted in the same manner." *Alstom*, 406 F. Supp. 2d at 487 n.49 (control "necessarily involves an individualized, fact-sensitive analysis"). As MF Global's top executives and directors, the Individual Defendants had the power, directly or indirectly, to control and influence the Company with respect to the activities that give rise to MF Global's primary liability. ¶¶ 28-44. *See In re Bear Stearns Mortg. Pass-Through Certificates Litig.*, 851 F. Supp. 2d 746, 773 (S.D.N.Y. 2012). Moreover, each Director and Officer signed the Registration Statement and was in a "position to approve [MF Global's] financial statements and thus ha[d] the power to direct or cause the direction of the management and policies of the corporation." *Alstom*, 406 F. Supp. 2d at 487-88. ¶¶ 28-31, 34-40. *See also Bear Stearns Mortg.*, 851 F. Supp. 2d at 773 (allegations that directors and officers signed the registration statements adequately pled control).

Finally, Plaintiffs have satisfied the applicable "culpable participation" standards. Although "[r]equiring 'culpable participation' in the context of the Securities Act's 'control person' statute, as opposed to the Exchange Act's – *i.e.*, [§] 20(a) – remains an open question in this Circuit," the "weight of the authority in this Circuit [has]decline[d] to impose the additional 'culpable participation' requirement." *McKenna v. SMART Techs.*, 2012 WL 1131935, at *20 (S.D.N.Y. Apr. 3, 2012). Thus, Plaintiffs have pled § 15 control person liability. As to § 20(a), the CAC establishes the Officers culpably participated in the fraud, as set forth in Section B.[70]

### H.  The CAC Satisfies Rule 8(a), And It Is Not A "Puzzle Pleading"

Corzine argues that the CAC fails to satisfy Rule 8(a) because it is a "puzzle" pleading. Corzine 3-5. This argument fails. The CAC is carefully organized; alleges each material misstatement, including the speaker or signatory thereof; and after each misstatement, provides the reasons why the statement was materially false and misleading when made.[71] *See In re Vivendi Universal, S.A.*, 381 F. Supp. 2d 158, 170-71 (S.D.N.Y. 2003) (refusing to dismiss complaint as "puzzle pleading"); *In re Williams Sec. Litig.*, 339 F. Supp. 2d 1242, 1261 (N.D. Okla. 2003) (rejecting "puzzle-style" argument where complaint "provides notice to each Defendant regarding the statements and omissions that Plaintiffs allege are misleading and the reasons why.").

Corzine wrongly asserts that the misstatements and allegations of falsehood do not "line up." Corzine 3. The CAC's allegations are sufficiently particularized to provide Defendants with

---

[70] MacDonald's argument that he had no "actual control" over MF Global because "he left the role of CFO on March 31, 2011" is of no moment. MacDonald 18. Indeed, this Court has stated that "officer or director status alone is not sufficient to constitute control." *Alstom*, 406 F. Supp. 2d at 488 n.51. Rather, a fact-intensive analysis of power to control and influence the Company governs. Here, even after MacDonald left his CFO job, he continued to be hands-on in the day-to-day management of MF Global at the top executive level. *See supra* B.3(a), (c). The CAC is thus sufficient to satisfy this "decidedly fact-based determination." *Alstom*, 406 F. Supp. 2d at 487.

[71] *See* ¶¶ 316-24, 325-36, 337-42, 343-54, 355-70, 371-74, 375-86, 387-93, 394-416, 417-21, 422-43, 444-59.

fair notice of the claims asserted against them. Indeed, Corzine's and the other Defendants' merits arguments demonstrate that they are not "puzzled" by the CAC. *See Stephenson v. Deutsche Bank AG*, 282 F. Supp. 2d 1032, 1075 (D. Minn. 2003) (refusing to dismiss complaint as "puzzle" pleading because it was "well-written, well-organized, and – if the motions to dismiss are any indication – effectively alerted Defendants of the claims against them"); *Morgan v. Kobrin Sec., Inc.*, 649 F. Supp. 1023, 1027 (N.D. Ill. 1986) (same).

Corzine's cited cases are all distinguishable. In *ITT Educational Services Inc.*, 859 F. Supp. 2d at 577-78, this Court dismissed a complaint with "76 pages of block quotes," where the plaintiff "highlight[ed] more than half of the text in the giant block quotes" and then "conced[ed] that it [wa]s not challenging many of the statements it ha[d] chosen to highlight." Similarly, the plaintiffs in *In re Alcatel Sec. Litig.*, 382 F. Supp. 2d 513, 534-35 (S.D.N.Y. 2005), "neglect[ed] to make it clear what portion" of certain "lengthy quotations" constituted a misrepresentation.[72] Here, by contrast, the CAC contains carefully selected quotations to provide context, and specifically emphasizes the alleged misrepresentations. The challenged statements are organized by topic and time period. The alleged reasons for falsity immediately follow each category of misrepresentation in a given time period, and include cross references to eliminate repetition. *See* CAC § V. *See also In re NTL, Inc. Sec. Litig.*, 347 F. Supp. 2d 15, 22 (S.D.N.Y. 2004) (rejecting puzzle argument where, "[f]or the most part, the complaint[] specifically identif[ied] the date, publication and speaker of each of the alleged misstatements or omissions."); *In re Winstar Commc'n*, 2006 WL 473885, at *8 n.8 (S.D.N.Y. Feb. 27, 2006) (same).

---

[72] *See also VTech Holdings Ltd. v. PwC LLP*, 2003 WL 21756623, at *1 (S.D.N.Y. July 30, 2003) ("repeating endlessly various stock phrases that convey[ed] no new meaning"); *Morgens Waterfall Holds. v. Donaldson Lufkin & Jenrette Sec. Corp.*, 198 F.R.D. 608, 610 (S.D.N.Y. 2001) ("hopelessly redundant" with "much irrelevancy").

Furthermore, courts have repeatedly rejected puzzle-pleading arguments in the context of complex securities actions, where plaintiffs are required to meet three separate pleading standards – Rule 8(a), Rule 9(b), and the PSLRA. *See Countrywide*, 588 F. Supp. 2d. at 1156 ("CAC is neither 'short' nor 'plain.' However, the Court declines to dismiss it on these grounds . . . given the extraordinary complexity of [the] factual allegations."); *New Century*, 588 F. Supp. 2d at 1219 ("Is the pleading still long? Yes. Is it still extremely detailed and complex? Yes. Is that by itself a reason to dismiss the complaint? No."). Here, the CAC satisfies all of these standards in the face of highly complex facts.

## III.   CONCLUSION

For the reasons discussed above, Defendants' motions to dismiss should be denied in their entirety. Should the Court determine that any of Plaintiffs' claims should be dismissed, dismissal should be without prejudice. Substantial additional information about Defendants' misrepresentations has been made public since Plaintiffs filed the CAC, including through a Congressional investigation and news reports, and Plaintiffs believe that they would be able to cure any pleading deficiencies the Court may identify in the CAC.

Dated: December 18, 2012

Respectfully submitted,

s/ _Javier Bleichmar____

**LABATON SUCHAROW LLP**
Jonathan M. Plasse
Javier Bleichmar
Dominic J. Auld
140 Broadway
New York, NY 10005
(212) 907-0863 (phone)
(212) 883-7063 (fax)


*Co-Lead Counsel for Lead Plaintiffs Her Majesty The Queen In Right Of Alberta and The Virginia Retirement System*

**BERNSTEIN LITOWITZ BERGER & GROSSMANN LLP**
Salvatore J. Graziano
Hannah G. Ross
1285 Avenue of the Americas
New York, NY 10019
(212) 554-1538 (phone)
(212) 554-1444 (fax)

*Co-Lead Counsel for Lead Plaintiffs Her Majesty The Queen In Right Of Alberta and The Virginia Retirement System, and Counsel for Named Plaintiffs Government Of Guam Retirement Fund and West Virginia Laborers' Pension Trust Fund*


**MOTLEY RICE LLC**
Ann Ritter
28 Bridgeside Boulevard
Mount Pleasant, SC 29464
(843) 216-9000
(843) 216-9450 (fax)

**ROBBINS GELLER RUDMAN & DOWD LLP**
Darren J. Robbins
655 West Broadway, Ste. 1900
San Diego, CA 92101
(619) 231-1058
(619) 231-7423 (fax)

*Additional Counsel for Named Plaintiff LRI Invest, S.A.*

**GIRARD GIBBS LLP**
Daniel C. Girard
601 California Street, Suite 1400
San Francisco, CA 94108
(415) 981-4800
(415) 981-4846 (fax)

**ZAMANSKY & ASSOCIATES, LLC**
Jacob H. Zamansky
Kevin D. Galbraith
50 Broadway
New York, NY 10004
(212) 742-1414
(212) 742-1177 (fax)

*Additional Counsel for Named Plaintiffs Monica Rodriguez and Jerome Vrabel*

## APPENDIX A

**Materially False and Misleading Statements and Omissions
Alleged in the Consolidated Amended Securities Class Action Complaint**

| STATEMENT CATEGORY[1] | COMPLAINT ALLEGATION |
|---|---|
| **Misstatements About DTA and Net Income** | ¶¶ 315-323, 337-41, 355-56, 371-73, 387-92, 417-20 |
| **Misstatements About Risk Appetite, Internal Controls, And Liquidity Management[2]** | |
| • **Internal Controls And Risk Management** | ¶¶ 325-332, 335, 343-45, 347-49, 352-53, 358-62, 364-65, 368-69, 375-77, 379, 382-85, 394, 396-411, 414-15, 422-24, 428-37, 440-42, 444, 446, 448-50, 452, 455, 464 |
| • **Proprietary Trading** | ¶¶ 325-26, 328, 330, 345, 349, 358-59, 365, 377, 385, 396-97, 400-01, 423, 440, 449-50 |
| • **Capital And Liquidity** | ¶¶ 333-34, 345-46, 348, 350-51, 359-60, 366-67, 377-78, 380-81, 383, 385, 395, 401, 411-13, 425-28, 436-40, 442, 445-47, 451, 453-54, 456-58 |

---

[1] Certain of the challenged statements in the CAC are asserted in connection with Plaintiffs' Exchange Act claims only, because they were not expressly incorporated by reference into the Offerings' Registration Statement or respective prospectuses. *See* ¶¶ 317-18, 326-29, 337-40, 343-49, 355, 358-65, 371, 375-78, 387, 394-99, 422-28, 444-58.

[2] Certain of the challenged statements in this category fall into more than one subcategory because they contain materially false and misleading representations and omissions about MF Global's internal controls and risk management; and/or proprietary trading; and/or capital and liquidity.

76

## CERTIFICATE OF SERVICE

I hereby certify that on the 18th day of December 2012, I electronically transmitted Plaintiffs' Omnibus Opposition to Defendants' Motions to Dismiss to the Clerk of the Court using the CM/ECF system, which will send a notification of such filing to all parties with an e-mail address of record who have appeared and consented to electronic service in this action.

In addition, copies of the same documents were served by Federal Express on those parties who have appeared but have not registered to receive electronic service via the CM/ECF system in this action.

s/ Javier Bleichmar
**LABATON SUCHAROW LLP**
Javier Bleichmar
140 Broadway
New York, NY 10005
(212) 907-0863 (phone)
(212) 883-7063 (fax)

*Co-Lead Counsel For Lead*
*Plaintiffs Her Majesty The Queen*
*In Right Of Alberta And*
*The Virginia Retirement System*