**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X
                                  :

| | |
|---|---|
| JOSEPH DEANGELIS, et al., : | Civil Action No. |
| : | 11 Civ. 7866 (VM) (JCF) |
| Plaintiffs, : | |
| : | ECF Case |
| -against- : | |
| : | |
| JON S. CORZINE, et al. : | |
| : | |
| Defendants. : | |
| : | |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

| | |
|---|---|
| : | |
| SAPERE CTA FUND, L.P., : | Civil Action No. |
| : | 11 Civ. 9114 (VM) |
| Plaintiff, : | |
| : | |
| -against- : | **AMENDED COMPLAINT** |
| : | |
| JON S. CORZINE, BRADLEY I. : | |
| ABELOW, HENRI J. STEENKAMP, : | |
| DAVID P. BOLGER, EILEEN S. FUSCO, : | Jury Trial Demanded |
| DAVID GELBER, MARTIN J. GLYNN, : | |
| EDWARD L. GOLDBERG, DAVID I. : | |
| SCHAMIS, ROBERT S. SLOAN, LAURIE : | |
| R. FERBER, JOHN RANALD : | |
| MacDONALD, CHRISTINE A. : | |
| SERWINSKI, MICHAEL G. STOCKMAN, : | |
| DENNIS A. KLEJNA, THOMAS F. : | |
| CONNOLLY, DAVID SIMONS, J.C. : | |
| FLOWERS & CO. LLC, CHRISTY : | |
| VAVRA, VINAY MAHAJAN, EDITH : | |
| O'BRIEN, ROBERT LYONS, DAVID : | |
| DUNNE, MATTHEW V. BESGEN, : | |
| SUMIT ADVANI, MATTHEW M. : | |
| HUGHEY, TIM MUNDT, : | |
| PRICEWATERHOUSECOOPERS LLP : | |
| : | |
| Defendants. : | |
| : | |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

Plaintiff, by its attorneys, complaining of the defendants, alleges.

**PARTIES AND JURISDICTION**

1.     Plaintiff Sapere CTA Fund, L.P. ("Sapere"), at all material times, maintained on deposit with the U.S. futures commission merchant ("FCM") business unit of the MF Global enterprise in segregated accounts owned by Sapere, titled in Sapere's name and specifically identifiable by unique account numbers associated with Sapere's ownership, cash, financial instruments and other assets that were solely owned by, and the property of, Sapere. Sapere's accounts included:

        a.     Cash in excess of $95 million; and

        b.     $125 million in United States Treasury Bills ("T-Bills").

2.     Each of the defendants owed duties to Sapere, which each defendant breached as hereinafter alleged.

3.     The "MF Global enterprise," at all material times, consisted of approximately forty-five corporations and other entities associated in fact and organized on a global basis to comprise an enterprise that consisted of one of the world's largest merchants/brokers in markets for commodities and listed derivatives, with access to more than seventy exchanges globally, a broker-dealer in markets for fixed income securities, equities, a broker/dealer/merchant in foreign exchange, and one of twenty primary dealers authorized to trade U.S. government securities with the Federal Reserve Bank of New York. Headquartered in New York, New York, the MF Global enterprise had global operations, including in the U.S., United Kingdom, Australia, Singapore, India, Canada, Hong Kong, Japan, India, Ireland, Dubai, Switzerland, Hungary and Mauritius. The MF Global enterprise dates back to 1783, to the firm of James Man, which evolved into ED&F Man (later known as the Man Group), from which MF Global, Ltd.

2

(now known as MF Global Holdings, Limited) spun off in 2007, to become the parent jural entity of numerous subsidiaries and affiliates that collectively comprise the MF Global enterprise.

4.     The "MFG Defendants," as identified below, at all material times, conducted and/or participated in, directly or indirectly, the affairs of the MF Global enterprise. Among other things:

a.     Defendant Jon S. Corzine (NFA ID: 0051145, CRD# 811812), at all material times, was a former United States Senator from New Jersey; a former Governor of New Jersey; a major fundraiser for President Barack Obama and the Democratic Party; the former Chairman and Chief Executive Officer of the Goldman Sachs investment bank in New York; and well-connected with influential people in the U.S. government's legislative and executive branches, including, among others, in the United States Department of the Treasury, Federal Reserve System, Federal Reserve Bank of New York, U.S. Commodity Futures Trading Commission ("CFTC"), and Financial Industry Regulatory Authority ("FINRA"). At all material times, these relationships made available to defendants additional capability to accomplish the acts hereinafter alleged. At all material times, Defendant Corzine was the Chairman, Chief Executive Officer, and a Director and Chairman of the Executive Committee of MF Global Holdings, Ltd. ("Holdings"), the top-level jural entity within the MF Global enterprise; the Chief Executive Officer and a Director of MF Global, Inc. ("MFGI") (NFA ID: 0326888, CRD# 6731, SEC# 8-18104), the FCM and broker-dealer ("BD") unit of the MF Global enterprise; an operating partner and advisor at J.C. Flowers & Co. LLC, which is an affiliate of one of Holdings' largest shareholders; and, upon information and belief, had

3

other titles and positions within the MF Global enterprise, including with other legal entities within the enterprise.

b.      Bradley I. Abelow (NFA ID: 0425977, CRD# 1983124), at all material times, was President and Chief Operating Officer of Holdings, who oversaw day-to-day operating and had direct responsibility for risk; a Director of MFGI; and a Member of the Board of Directors of MF Global Holdings USA, Inc. (NFA ID: 0408698), the direct parent company of MFGI. MF Global's Schedule 14A, July 7, 2011 Proxy Statement lists Defendant Abelow as one of the top five members of the Executive Team. Defendant Abelow is a long-time confidant of Defendant Corzine, having worked with Defendant Corzine at Goldman Sachs and having been appointed by Defendant Corzine to be State Treasurer and then Chief of Staff of the Governor's Office when Defendant Corzine was Governor of New Jersey.

c.      Henri J. Steenkamp, at all material times, was Chief Financial Officer of Holdings since April 2011, responsible for financial activities and financial reporting, including the false reports hereinafter alleged; a member of MF Global's Asset and Liabilities Committee ("ALCO"); and, prior to that, Chief Accounting Officer and Global Controller since April 2006. Defendant Steenkamp was also a Member of the Board of Directors of MF Global Holdings USA, Inc.

d.      David P. Bolger, at all material times, was a Member of the Board of Directors of Holdings and a Member of its Audit & Risk and Nominating & Corporate Governance Committees.

e.      Eileen S. Fusco, at all material times, was a Member of the Board of Directors of Holdings, Chairman of its Audit & Risk Committee and a Member of its Nominating & Corporate Governance and Executive Committees.

f.      David Gelber, at all material times, was a Member of the Board of Directors of Holdings, Chairman of its Compensation Committee and a Member of its Audit & Risk and Executive Committees.

g.      Martin J. Glynn, at all material times, was a Member of the Board of Directors of Holdings and a Member of its Audit & Risk and Compensation Committees.

h.      Edward L. Goldberg, at all material times, was a Member of the Board of Directors of Holdings and Chairman of its Nominating & Corporate Governance Committee and a Member of its Executive and Compensation Committees.

i.      David I. Schamis, at all material times, was a Member of the Board of Directors of Holdings and a Member of its Audit & Risk and Compensation Committees. Defendant Schamis was (and continues to be) a Partner and Managing Director of J.C. Flowers & Co. (a preferred shareholder and one of the largest owners of Holdings) and was the J.C. Flowers representative on the Board of Directors of Holdings.

j.      Robert S. Sloan, at all material times, was a Member of the Board of Directors of Holdings.

k.      Laurie R. Ferber (NFA ID: 0421040), at all material times, was a Director of MFGI; Executive Vice President of Holdings responsible for legal, internal audit, risk management and compliance for the MF Global enterprise; and a Member of the Board of Directors of MF Global Holdings USA, Inc. MF Global's Schedule 14A July 7, 2011

Proxy Statement lists Defendant Ferber as one of the top five members of the Executive Team.

l.      John Ranald "Randy" MacDonald (NFA ID: 0268954, CRD# 2540475), at all material times, was a Director of MFGI, Chief Financial Officer of Holdings and a member of Holdings' ALCO Committee until September 2010, after which he remained responsible for financial operations of Holdings and Global Head of Retail at Holdings. MF Global's Schedule 14A July 7, 2011 Proxy Statement lists Defendant MacDonald as one of the top five members of the Executive Team.

m.      Christine A. Serwinski (NFA ID: 0301508, CRD# 4169392), at all material times, was the Chief Financial Officer of MFGI directly responsible for its financial and operational reporting to self-regulatory and regulatory authorities, including the false reports hereinafter alleged. Defendant Serwinski was also the CFO for the North American Operations of Holdings. She was responsible for the Financial Regulatory Group of the MF Global enterprise, the head of which reported to her, and she reported to Defendant Steenkamp and prior to him to Defendant MacDonald, the CFOs of the MF Global enterprise. According to Defendant Corzine's December 8, 2011 testimony before the U.S. House Agriculture Committee, the CFO of North American Operations oversaw the movement of customers' segregated account funds in North America.

n.      Michael G. Stockman (CRD# 1407260), at all material times in 2011, was Chief Risk Officer of Holdings and a member of ALCO. Defendant Stockman reported to the COO of the MF Global enterprise, Defendant Abelow.

o.      Dennis A. Klejna, at all material times, was a Senior Vice President and Deputy General Counsel of MFGI responsible for legal and regulatory compliance. Defendant Klejna reported to Defendant Ferber.

p.      Thomas F. Connolly, at all material times, was a Senior Vice President of Holdings and, according to the Office of the New York Secretary of State, the Chief Executive Officer of MF Global Holdings USA, Inc. and, as such, a person who controlled MFGI. MF Global's Schedule 14A July 7, 2011 Proxy Statement lists Defendant Connolly as one of the top five members of the Executive Team.

q.      David Simons, at all material times, was a Senior Vice President and Head of Global Operations at Holdings. Defendant Simons reported to Defendant Abelow. According to the December 13, 2011 written statement by Defendant Steenkamp to the U.S. Senate Agriculture Committee, the Head of Global Operations had responsibility for handling customer funds.

r.      J.C. Flowers & Co. LLC ("J.C. Flowers") conducted and/or participated in the affairs of the MF Global enterprise and has liability, directly and/or vicariously, for its liability and that of its agents, for unlawful and tortious acts and omissions in which any of its agents participated and/or for that which either of them did or failed to do in collaboration with others at J.C. Flowers. Among other things:

      i.      Defendant Schamis, a managing director and partner/member in J.C. Flowers who was serving on the Holdings Board of Directors as the representative of J.C. Flowers, at all material times acted within the scope of his express, implied and apparent authority on behalf of J.C. Flowers. Upon

7

information and belief, Defendant Schamis reported to James Christopher Flowers.

ii.       Defendant Corzine, also a partner/member in J.C. Flowers (having been made an operating partner in the firm shortly after losing his 2009 re-election bid for Governor of New Jersey), at all material times, acted within the scope of his express, implied and apparent authority, which included his work at Holdings. J.C. Flowers, via its chief executive, James Christopher Flowers, and his assistant and representative, Defendant Schamis, selected Defendant Corzine to become Chairman and CEO of Holdings. Defendant Corzine's performance and recompense at J.C. Flowers have been reported as tied to Holdings. James Christopher Flowers has been a colleague and confidant of Defendant Corzine since the 1970s, both having worked together continuously at Goldman Sachs until 1998/99 when both left, and both having remained close thereafter including the management by James Christopher Flowers of Defendant Corzine's so-called blind-trust assets when he held elected office.

iii.      Upon information and belief, James Christopher Flowers, the CEO of J.C. Flowers, and others of the firm directed Defendant Schamis and directed and advised Defendant Corzine and others at Holdings about Holdings' business conduct; about its European repo-to-maturity strategy and implementation; about the plan to transform Holdings into an investment bank; about how to finance those plans; and about Holdings' business problems and how to solve them, including doing so in meetings in the offices of Holdings.

s.      Christy Vavra was an Assistant Vice President in the Treasury Operations Group within the Operations Department, was Manager of Treasury Bank Operations and was identified by Defendant Abelow in his December 13, 2011 testimony before the U.S. Senate Committee on Agriculture, Nutrition and Forestry as the MF Global employee responsible for Treasury Operations involving commodities customers' segregated account funds.

t.      Vinay Mahajan joined MF Global in August 2011 as the Global Treasurer responsible for the Treasury Department. Defendant Mahajan reported to Defendant Steenkamp and was a member of ALCO.

u.      Edith O'Brien, at all material times, was a member of the Treasury Department reporting to the Global Treasurer (Defendant Dunne and then Defendant Mahajan), was responsible for the investment and transfer (including intraday transfer) of segregated funds and held the title of Assistant Treasurer. Defendant O'Brien was identified as the person responsible for approving the transfers between the FCM and Operations in New York and monitoring the effect of those transfers on the regulated accounts. Defendant O'Brien was subpoenaed to testify before the House Financial Service subcommittee of the United States House of Representatives and refused to testify, invoking her Fifth Amendment right against self-incrimination.

v.      Robert Lyons, at all material times, was the MFGI North American Chief Operating Officer and also served as the head of Operations for the non-FCM business in New York, which initiated requests for funding from Treasury in Chicago.

w.      David Dunne, at all material times, was the Chair of Holdings' ALCO Committee, from September 2008 until August 2011 was Holdings' Global Treasurer in charge of the Treasury Department and was the Head of Treasury Capital Markets.

x.      Matthew V. Besgen (CRD# 2649119), at all material times, was a member of Holdings' ALCO Committee and was Holdings' Senior Vice President in Treasury and Co-Head of Global Funding and Investments.

y.      Sumit Advani, at all material times, was a member of Holdings' ALCO Committee.

z.      Matthew M. Hughey (CRD# 1938877), at all material times, was Regulatory Capital Controller in the Financial Regulatory Group of MFGI from and after May 2011.

aa.     Tim Mundt, at all material times, was Senior Vice President and supervised the Treasury Operations Group.

5.      PricewaterhouseCoopers ("PwC") at all material times served as the independent auditor of MFGI and Holdings.

6.      This action arises under 7 U.S.C. §§ 1, *et seq*. and 18 U.S.C. §§ 1961, *et seq*. This Court also has supplemental jurisdiction under 28 U.S.C. § 1367 and/or ancillary jurisdiction over the claims hereinafter alleged.

## FACTUAL BACKGROUND

7.      Sapere maintained its assets in its segregated accounts for future business with the FCM business unit of the MF Global enterprise to margin, guarantee and/or secure trades or contracts for the purchase or sale of commodities for future delivery, and/or involving contracts for sale of commodities for future delivery, on and/or subject to the rules of U.S. contract

markets and/or derivatives execution facilities. Sapere also authorized the U.S. FCM business unit of the MF Global enterprise to make limited use of Sapere's deposited funds to the extent that they were used solely for Sapere to margin, guarantee or secure Sapere's positions in commodities futures contracts on non-U.S. markets.

8.     Each MFG Defendant owed duties to Sapere and its property that included safeguarding the assets which Sapere entrusted to the MF Global enterprise. Each MFG Defendant's duties to Sapere included the duty to take reasonable and prudent, and/or in any event not intentionally and/or recklessly and/or negligently omit to take, actions available to him or her to safeguard commodities customers'—including Sapere's—property. Each MFG Defendant's duties included, without limitation, to report and/or stop and/or attempt to stop others from taking action that would put Sapere's property at risk for anything other than to margin, guarantee and/or secure trades or contracts for the purchase or sale of commodities for future delivery as instructed by Sapere. Each MFG Defendant breached his or her duties to Sapere as herein alleged.

9.     At all material times, the segregated funds of U.S. commodities customers of the MF Global enterprise included funds known within the MF Global enterprise as Customer Segregated Funds, funds known as Foreign Secured Funds and funds known as Regulatory Excess (collectively, "segregated funds"). As publicly announced by the MF Global enterprise, including in Holdings' Form 10-K, filed with the Securities Exchange Commission ("SEC"), and dated May 20, 2011:

> a.   "Employees [of the MF Global enterprise] are expected and encouraged to escalate incidents and any matters of concern to management and to our compliance and risk departments in order to effectively manage risk. Consequently, we have established—and continue to evolve and improve—a global enterprise wide risk management framework that is intended to manage all

aspects of our risks. The risk-management framework is designed to establish a global, robust risk-management environment through a strong governance structure that (i) defines roles and responsibilities, (ii) delegates authority for risk control and risk taking to specific businesses and risk managers, and (iii) documents approved methodologies for the identification, measurement, control and mitigation of risk."

b.    "Our Chief Risk Officer, who reports to our President and Chief Operating Officer, leads the risk department and monitors and reports on our risk matters, including regular reports to our Board of Directors and Audit and Risk Committee. The Chief Risk Officer promotes company-wide adherence to MF Global's enterprise risk management framework and has global responsibility for monitoring and facilitating control of market, credit and operational risks."

c.    "Senior management takes an active role in the risk management process and expects employees to understand and comply with their delegated risk responsibilities, relevant risk policies, and compliance requirements. Additionally, employees are expected and encouraged to escalate risk incidents and any matters of concern to management in accordance with our internal escalation policy to promote timely risk-mitigation action by the appropriate personnel."

10.    Holdings' 14A Proxy Statement, dated July 7, 2011, publicly announces similar

risk management considerations and guidelines and identifies policies and controls to be in effect

at all material times:

a.    "The Board has responsibility for providing direction and oversight for management of the Company's business and affairs, establishing the Company's long-term objectives and strategy while overseeing the Company's business performance and management, including risk management."

b.    "The Company's enterprise risk management approach flows from the Board, which determines the Company's risk appetite, and permeates through the Company via a culture that expects all employees to function as risk managers. This approach involves a strong governance structure that clearly defines responsibilities, delegated authorities for risk control as well as risk-taking and documented policies designed to identify, measure, control and mitigate risk."

c.    "While the Audit and Risk Committee maintains primary risk management oversight, the full Board has retained responsibility for general oversight. . . ."

d.    "Senior management reviews and discusses the Company's risk issues at meetings of the enterprise risk management committee, which is chaired by the Chief Risk Officer."

e.   "Management has communicated to every employee the importance of upholding the firm's core values, including their individual obligation to demonstrate and support a strong compliance culture, and to be sensitive to reputational risk issues and act in accordance with the highest ethical standards."

11.    The foregoing MF Global policies confirm that each MFG Defendant, at all material times, knew he or she had a personal obligation to assure the highest level of compliance with all applicable laws, regulations, standards and ethical obligations that safeguarded and protected the MF Global enterprise's commodities customers' segregated accounts; knew that those accounts could not be risked for the benefit of the MF Global enterprise; and knew that he or she had an obligation to act if such accounts were placed at risk by anyone within the MF Global enterprise.

12.    The duties owed by the members of the Holdings Boards of Directors, MF Global Holdings USA, Inc. and MFGI to U.S. commodities customers included establishing and maintaining policies, procedures and personnel suitable to safeguard the commodities customers' assets deposited with the MF Global enterprise. Upon information and belief, the individuals working at MFGI were all (or nearly all) employees of MF Global Holdings USA, Inc. assigned to work at MFGI. The duties owed by the officers and managers of Holdings, MF Global Holdings USA, Inc. and MFGI to U.S. commodities customers included implementing and enforcing policies and procedures suitable to safeguard commodities customers' assets; recommending changes and improvements to policies, procedures, personnel and human resources (including training) to safeguard commodities customers' assets; intervening to safeguard commodities customers' assets if they were threatened to be, or were, put at risk; and assigning, supervising, overseeing, correcting and disciplining personnel so as to safeguard the commodities customers' assets.

13

13.     At all material times, the MF Global enterprise also publicly and privately assured and reassured commodities customers of the integrity of the segregated funds. Such assurance included a live, twenty-four hours a day, seven days a week ("24/7") online portal called "eMidas" that displayed the then-current, detailed contents of a customer's account. In respect of Sapere, eMidas specifically disclosed to Sapere, among other things, continuously, every day, 365 days a year, a detailed accounting of what purported to be the exact dollars-and-cents physically present in Sapere's accounts in cash and in T-Bills. However, as herein alleged, the information displayed about the cash and T-Bills actually in commodities customers' accounts (including Sapere's account) was false. Each MFG Defendant knew and/or had reason to know, and disregarded the truth that the information provided to commodities customers via eMidas did not match the actual status of the customer-deposited cash and T-Bills and was false. Indeed, despite the $1.6 billion shortfall, eMidas continued to report 24/7 to Sapere that its cash, T-Bills and all other assets at the MF Global enterprise were intact and unaltered. Commodities customers reasonably relied on the truth of the eMidas system's 24/7 displays. Sapere reasonably relied on the truth of the eMidas system's 24/7 displays about cash and T-Bills. Had Sapere known the truth about the use and disposition of its cash and T-Bills, Sapere would have withdrawn its segregated funds from the MFG Defendants' dominion and control.

14.     Additionally, the MF Global website published information continuously assuring commodities customers—including Sapere—that segregated funds were being protected. Commodities customers reasonably relied on the truth of the online assurances. Those assurances were false. Each MFG Defendant knew and/or had reason to know, and disregarded the truth, that the assurances being provided were false.

14

15.     The assets that Sapere owned and entrusted to the MF Global enterprise were part of the segregated funds covered by the Enterprise Risk Policy adopted by Holdings' Board of Directors in April 2009, and continuously in force thereafter.

16.     The Enterprise Risk Policy explicitly prohibited the use of segregated funds for MF Global liquidity purposes. Among other things, it provides that:

> In the major jurisdictions in which it operates, MF Global is forbidden to use segregated funds for any purpose other than as directed by the client. Therefore, as a matter of policy MF Global considers that segregated funds are not available to it for liquidity purposes.

17.     The Enterprise Risk Policy designated the Chief Risk Officer ("CRO"), the Chief Financial Officer ("CFO"), the regional and global Treasurers, and the Asset and Liability Committee ("ALCO") as responsible for implementing the policy. ALCO was also charged with "overseeing and influencing the management of capital, liquidity and investment related risks throughout the Company in accordance with the Risk Policy, Risk Appetite Statement, and Delegations of Authority . . . ." Among the liquidity responsibilities assigned to this group were: "Overseeing the day-to-day activities related to the management of liquidity throughout the Treasury and related operations within the Company" and "[c]onsidering the results of liquidity adverse scenarios, drawing conclusions and recommending appropriate action." Each individual identified by the Enterprise Risk Policy, and every ALCO member, had a duty to commodities customers to act to prevent customer funds from being put at risk, but they did not fulfill their duty.

18.     Defendant Corzine became CEO and Chairman of the Holdings Board of Directors on March 23, 2010, and quickly implemented changes in personnel, lines of business and markets into which MF Global expanded in an effort to transform the MF Global enterprise

from an FCM in commodities into a BD in securities, and ultimately into a full-service investment bank.

19.     As herein alleged, from and after Defendant Corzine's arrival at MF Global, the Enterprise Risk Policy was repeatedly violated and segregated funds were used for liquidity purposes, putting segregated funds improperly at risk. The CRO, CFO, regional and global Treasurers and other ALCO members were each aware of the situation, deliberately ignored the truth, turned a blind eye to the situation and willfully and knowingly failed to take action to safeguard and stop the misuse and compromise of segregated funds, and misuse of segregated funds did not cease. Although aware that controls and risk management programs were inadequate to safeguard segregated funds, the directors, officers and managers of Holdings, MF Global Holdings USA, Inc. and MFGI deliberately disregarded the truth, turned a blind eye to the situation, either failed to take corrective action and to intervene to prevent inappropriate transfers funds and/or caused the misuse of segregated funds, and improperly gained advantage over commodities customers, including Sapere, whose segregated funds were misused. Commodities customers, including Sapere, were not told of this wrongful conduct and ongoing misuse of segregated funds occurred. By October 2011, the ongoing misuse had caused a shortfall in segregated funds of $1.6 billion.

20.     Soon after Defendant Corzine joined MF Global, he announced his strategic vision to transform the MF Global enterprise from a commissions-based BD/FCM into a full-service investment bank. Under this strategic plan, MF Global sought to transform its business into a commodities and capital markets-focused investment bank within three to five years. The strategic plan was designed to leverage MF Global's strengths, including its heritage and expertise in commodities trading and its broad global footprint. The business was then

reorganized into four categories: Capital Markets, Retail Services, Prime Services, and Asset Management. Significant personnel changes accompanied the new strategic plan. In the first quarter of fiscal 2011, MF Global planned to reduce its workforce by 10% to 15%. This reduction included nearly all of the personnel in certain departments. At the same time, Defendant Stockman became the CRO in January of 2011, Defendant Steenkamp was promoted to CFO in April of 2011, and Defendant Mahajan became Global Treasurer in August of 2011.

21.    In addition to the directors, officers and managers of Holdings, MF Global Holdings USA, Ltd., MFGI and the members of ALCO, the members of at least four internal units of the MF Global enterprise owed to commodities customers, including Sapere, a duty to safeguard segregated funds. Those internal units include the Treasury Department, the Financial Regulatory Group within the Finance Department, the Treasury Operations Group within the Operations Department and the Risk Department of the MF Global enterprise. The members of each unit owed and breached obligations to the MF Global enterprise's commodities customers, including Sapere, as herein alleged.

22.    Among other things:

a.    The responsibilities of members of the Treasury Department, headed at all material times by the Global Treasurer (Defendant Dunne and then his successor, Defendant Mahajan) included, among other things, assuring that investment and use of segregated funds complied with law and directing transfers of segregated funds in compliance with law. Among other things, Defendant Besgen of the Treasury Department was, on or before August 26, 2011, supervising and reporting to Defendants Corzine and Mahajan daily about segregated funds.

17

b.      Upon information and belief, MF Global's August 2010 "Futures Compliance and Supervisory Procedures Manual" (the "Compliance Manual") expressly set forth the absolute obligation to segregate Customer Funds:

> THE ASSETS HELD IN SEGREGATED OR SECURED AMOUNT ACCOUNTS MUST BE STRICTLY LIMITED TO THOSE DEPOSITED BY CUSTOMERS. NO FUNDS OR SECURITIES BELONGING TO MFG OR ANY PROPRIETARY ACCOUNT MAY BE DEPOSITED IN MFG'S SEGREGATED ACCOUNTS OR SECURED AMOUNT ACCOUNTS UNDER ANY CIRCUMSTANCES (PROVIDED THAT, PURSUANT TO CFTC REGULATION 1.23, MFG MAY DEPOSIT ITS OWN FUNDS OR UNENCUMBERED SECURITIES AS IT MAY DEEM NECESSARY TO ENSURE THAT ANY SEGREGATED ACCOUNT OR SECURED AMOUNT ACCOUNT DOES NOT BECOME UNDER SEGREGATED OR UNDERSECURED AT ANY TIME). IN ADDITION, MFG MAY NOT COMMINGLE CUSTOMER SEGREGATED AND SECURED AMOUNT FUNDS OR ACCOUNTS.

c.      Upon information and belief, the Compliance Manual stated that the "Treasury Department will be responsible for ensuring that investments of customer funds, and the use of customer securities, are being conducted in accordance with applicable laws and regulations."

d.      Upon information and belief, Treasury was also responsible for monitoring and reporting on MFGI's liquidity. Treasury and Operations compiled a daily report known internally as "Liquidity Dashboards." The Liquidity Dashboards attempted to estimate the actual and projected sources and uses of cash each day, and calculated "B/D Liquidity." The Treasury and Operations personnel who prepared the Liquidity Dashboards—Defendants Besgen and O'Brien—and the MFG Defendants who received the Liquidity Dashboards—Defendants Corzine, Abelow, Steenkamp and Mahajan—at

all material times knew that the Liquidity Dashboards were imprecise and inaccurate estimates, based on incomplete information.

23.     Among other things:

a.     The responsibilities of the members of the Financial Regulatory Group, headed at all material times by Defendant Serwinski, included, among other things, monitoring segregated funds balances, verifying that 4d and 30.7 funds were held so as to be properly safeguarded in conformity with applicable law, collaborating with MF Global executives and members of the Treasury Department and the Treasury Operations Group about segregated funds and their disposition, making recommendations about transferring segregated funds and preparing regulatory reports concerning segregated funds in compliance with law.

b.     Upon information and belief, the Financial Regulatory Group was responsible for: (i) preparation of regulatory reports, including the daily statement demonstrating that assets on deposit in Customer Segregated accounts were in compliance with CFTC Regulation 4d (the "Segregation Statement") and the daily statement demonstrating that assets on deposit in Foreign Secured accounts were in compliance with CFTC Regulation 1.20 (the "Secured Statement"); (ii) computation of daily compliance with net capital requirements pursuant to CFTC Rule 1.17 (the "Estimated Daily Net Capital Report"); and (iii) weekly and end-of-month reports regarding compliance with SEC segregation requirements pursuant to SEC Rule 15c3-3 (the "15c3-3 Report").

c.     At all material times, Defendant Serwinski in collaboration with Defendant Besgen also monitored and reported on the liquidity situation to Defendants Corzine, Abelow, Steenkamp and Mahajan (after his arrival) on a continuing basis.

24.     The responsibilities of the members of the Treasury Operations Group, headed at all material times by the COO Defendant Abelow and, subordinate to him, Defendants Simons and Lyons, included, among other things, monitoring segregated funds balances, making recommendations about transferring segregated funds, collaborating with MF Global executives and members of the Treasury Department and the Financial Regulatory Group about segregated funds and their disposition and actually transferring segregated funds as allowed by, and in compliance with, law. Once part of the Treasury function, the Treasury Operations group was moved in or about late 2009 or early 2010 to Operations under the overall supervision of Defendant Mundt. The Treasury Operations team consisted of ten individuals based in Chicago who ultimately reported to Defendant Lyons in New York. Treasury Operations was primarily responsible for performing daily bank reconciliations and executing wire transfers and other money movements at the request and direction of other departments, including Treasury. The Treasury Operations group, including Defendant Vavra and individuals who reported to her, was responsible for sending the wire transfers of funds from the FCM. Additionally, Treasury Operations prepared daily recommendations of reallocation of excess funds between Customer Segregated and Foreign Secured accounts that were forwarded each afternoon to the Financial Regulatory Group. Beginning in November 2010, Treasury Operations employees in Chicago became exclusively responsible for sending wires to securities customers as authorized by the Margin Department. Those wires transferred funds initially from an existing account used by

Operations personnel in New York, and later from a new account created for that purpose and overseen by personnel in Chicago.

25.     The responsibilities of the Risk Department, headed at all material times by CRO Defendant Stockman who reported to COO Defendant Abelow, included monitoring and controlling the risk of transitioning the MF Global enterprise's business model from a traditional commodities broker to a full-scale investment bank, including managing liquidity risk.

26.     The MFG Defendants who were members of the Treasury Department, the Financial Regulatory Group, the Treasury Operations Group and/or the Risk Department and their senior managers through and including Defendants Corzine, Abelow, Steenkamp and Ferber, were each aware that controls and risk management programs were inadequate to safeguard segregated funds and that segregated funds were not safeguarded. Each MFG Defendant deliberately ignored the truth, turned a blind eye to the situation and willfully and knowingly either failed to take action to safeguard and stop the misuse and compromise of segregated funds and/or caused the misuse of segregated funds; through the resulting inappropriate transfers of segregated funds, the MF Global enterprise improperly gained advantage over commodities customers, including Sapere. By October 2011, this had caused and substantially contributed to a shortfall in segregated funds of $1.6 billion.

27.     Defendant Corzine, the members of Holdings' Board of Directors, senior managers in the MF Global enterprise, and traders of the MF Global enterprise decided and agreed that MF Global should enter, on a highly leveraged basis, into highly risky transactions in futures, including off-balance sheet transactions in derivatives sometimes known as total-return swap-to-maturity and/or repo-to-maturity transactions in Euro-denominated bonds of distressed European countries.

28.    The MFG Defendants had a plan and purpose—which included generating revenues through highly leveraged futures transactions that exceeded the enterprise's resources to carry them—to be continued into the future to contrast the enterprise's prior years of declining earnings (declining since 2007). The plan would last at least from sometime prior to September 2010, through at least December 2012, and would continue and be renewed as long as could be so as to generate continuing, significant reportable earnings for the MF Global enterprise. This course of conduct included their agreement, tacit or express, to turn a blind eye to, and disregard the truth of, the absence of adequate controls for risky trades in distressed debt and/or liquidity requirements of the MF Global enterprise; to disregard the truth that segregated funds were not safeguarded; and/or to turn a blind eye to the situation despite having a duty to commodities customers to act under such circumstances to prevent customer funds from being put at risk and/or misused; and to risk and/or misuse segregated funds. The foregoing caused and/or substantially contributed to the MF Global enterprise improperly gaining advantage over commodities customers, including Sapere, whose segregated funds were used to fund the operations of the MF Global enterprise, resulting in a $1.6 billion shortfall in segregated funds.

29.    The MF Global enterprise lacked the capacity to carry the transactions with the enterprise's own resources. For example, as explained in a November 10, 2011 Thomson Reuters Accelus article, "MF Global Slayed by the Grim Repo," the enormous leverage used by MF Global created an exposure to risks that exceeded the asset base of the MF Global enterprise many times over, including transaction costs for carrying transactions with such high leverage. The MFG Defendants knew this. For example, Defendant Corzine and the other Members of the MF Global Board of Directors were even warned from about September 2010 and thereafter that the MF Global enterprise lacked the necessary cash. The MFG Defendants discussed this at the

22

highest levels, including with the Holdings CRO according to a December 6, 2011 report in the *Wall Street Journal*. Defendant Corzine and the other MFG Defendants forced the CRO who preceded Defendant Stockman out of the MF Global enterprise in or about March 2011.

30.     Upon information and belief, beginning after Defendant Corzine's arrival at MF Global, and continuing through at least August 2011, MF Global purchased $11 billion or more of distressed Euro-denominated bonds of European countries to be repurchased by counterparties at maturity, known as repo-to-maturity ("RTM") transactions. To finance the sovereign debt purchases, the UK business unit of the MF Global enterprise ("MFGUK") would enter into back-to-back repurchase transactions consisting of two legs—a "repurchase" leg with third parties to finance the acquisition and a "reverse repurchase" leg with MFGI to finance MFGI's long position. By entering into the two offsetting back-to-back repurchase transactions, the economic risk of ownership of the distressed Eurobonds was transferred from MFGUK to MFGI.

31.     The RTMs offered to Defendant Corzine, the members of Holdings' Board of Directors, senior managers in the MF Global enterprise, and traders of the MF Global enterprise the attractive accounting advantage of recording profits at the time of sale, irrespective of whether the RTM transactions would yield profits at maturity, but they posed significant risks, including liquidity risks, of which the MFG Defendants were aware, including:

> a.     The MF Global enterprise must maintain enough capital to conduct its business. Changing economic and other market conditions could require MF Global to raise additional capital, which it might be unable to raise. MF Global could also encounter conditions that would lead to a decision to liquidate RTM positions. That could require MF Global to reduce the size of positions it holds in various assets, including foreign sovereign debt and/or RTMs.

b.　　　The MF Global enterprise could also encounter conditions that would lead to a decision to liquidate RTM positions irrespective of whether MF Global were required to raise additional capital. For example, MF Global could encounter a liquidity problem, such as by running too low on available cash. In order to liquidate a position, MF Global might find itself required to make a payment to effectuate the liquidation and thus require additional funds to cover the shortfall from the liquidation, or MF Global might lose money as a result of the liquidation and need funds to cover its loss.

c.　　　The MF Global enterprise conducted business using "leverage," such as by buying securities on "margin." Defendant Corzine testified before the U.S. Senate Agriculture Committee on December 13, 2011, that MF Global faces margin calls twice a day. Margin calls could relate to MF Global's business generally (i.e., business not involving RTMs) or to RTM transactions themselves. As one example relating directly to RTMs, if MF Global required more than the amount of the counterparty's secured loan to buy the debt security, MF Global could borrow that additional amount from another party, or MF Global could be engaged in other transactions in which it borrowed money to buy things. Market changes could require MF Global to put up additional money as additional margin for a leveraged transaction. Also, failure to put up additional margin could result in liquidation of a transaction.

d.　　　The issuer of the debt security could default such that MF Global would need another source of funds to pay the repurchase price.

e.　　　The debt security could decline in value and become insufficient collateral for the secured loan made by the counterparty.

24

32.    Defendant Corzine and the other MFG Defendants' efforts to transform MF Global into an investment bank created increasing demands for liquidity. For example, upon information and belief, in June 2010, Defendant Corzine created the Principal Strategies Group ("PSG") to engage in proprietary trading on behalf of MF Global. The PSG was a principal component of management's new strategy, initiated by Defendant Corzine, to transform MFGI from its traditional commission based commodities and securities brokerage model into a full-service investment bank. The PSG unit engaged in principal trading of various products, including fixed income, equities, commodities (such as energy, agriculture and metals), and foreign exchange. The PSG team added a dozen trading personnel, but relied on MFGI's existing middle and back office support staff for account setup and management processes, as well as the clearing and settlement processes. Within PSG, Defendant Corzine maintained his own portfolio in an account that bore his initials (JSC) and consisted of proprietary trades that he himself executed or instructed others to execute on his behalf. Upon information and belief, a year after it was created, in June 2011, management began the process of moving the PSG from MFGI to a newly-created, non-regulated affiliate because PSG "use[d] too much reg capital and the cost of reg capital [was] more than the cost of funding capital." Defendant Corzine and the other MFG Defendants made substantial changes to MF Global's personnel, lines of business, and markets but ignored the ramshackle systems and procedures in the departments that tracked liquidity and the FCM's customer funds, including MF Global's Treasury Department, Financial Regulatory Group, Treasury Operations Group and Risk Department. Defendant Corzine and the others did not expand or modernize the Treasury Department, Financial Regulatory Group, Treasury Operations Group and/or Risk Department, and the MF Global enterprise continued to track liquidity by informal and insufficient means.

33.     Beginning not later than April 2010, audits and reports made to senior management and the Holdings Board of Directors showed that Defendant Corzine's changes to the MF Global business model had outpaced the risk policies in place at MF Global:

a.      An April 2010 report and presentation to the Board showed that shortcomings in MF Global's technology made the data needed for forecasting liquidity risks inadequate and unreliable. Upon information and belief, among the key gaps discussed were the needs to have a Global Head of Capital and Liquidity Risk and to establish policies in this area. This report also recognized that gaps in technology made the data needed for forecasting liquidity risks inadequate and unreliable.

b.      A May 2010 Corporate Governance internal audit identified MF Global's risk policies as incongruent with the changes that Defendant Corzine had implemented in MFGI's BD business, including specifically, that the formal processes, reporting, forecasting, and monitoring capabilities to manage liquidity and capital globally had not been fully established.

c.      In May 2010, then-CRO Michael Roseman expressed his concerns regarding the liquidity risk of the RTM portfolio, which led to his termination in January 2011.

d.      An October 2010 follow up to the April 2010 report and presentation to the Board showed that necessary changes had not been made and that gaps still existed in MF Global's risk policies as they related to the ongoing changes to MF Global's business model.

e.      Upon information and belief, on October 18, 2010, Internal Audit circulated an "INTERNAL AUDIT REPORT" concerning "U.S. Treasury Investments

26

and Treasury Operations" to, among others, Defendants Corzine, Abelow, Dunne, Ferber and PwC. Among other things, the report concluded that risks associated with "Execution Delivery and Process Management" were "Above Risk Appetite," and identified issues such as the "[l]ack of formal authorization requirements for check and wire requests" and a "Control Failure" with respect to back-office access to the system utilized to perform financial transactions. The report assigned personnel to "action plans" with respect to the items identified in the report. Upon information and belief no meaningful changes were implemented.

      f.     Upon information and belief, at the Audit and Risk Committee Meeting in mid-January 2011, just after Defendant Stockman was hired and Mr. Roseman was terminated, the Board of Directors confirmed that the European sovereign debt portfolio would run down as planned with no additional positions placed unless Defendant Corzine obtained further approval from the Board of Directors. The Board's limits were exceeded on February 3, 2011.

      g.     Upon information and belief, MFGI and FINRA had discussions in February 2011 concerning RTMs.

      h.     Upon information and belief, in mid-February, Defendant Corzine had Defendant Stockman prepare a request to the Board to increase the Global Sovereign Limit from $4.75 billion to $5 billion, which was the number that risk personnel had convinced Defendant Corzine, when he pressed for an even larger increase, was "big enough." The request noted that the liquidity risk associated with the RTM portfolio was both the impact of an increase of 100 to 500 basis points in the spreads and a commensurate increase in funding requirements, as well as the fact that MFGI would

have to fund both the variation margin for these transactions and the increased haircuts required by the counterparties. The total funding risk associated with the increased limit ranged from $347 million to as much as $765 million. Some members of the Holdings Board expressed concerns at this point about the level of European sovereign debt exposure and the consequences of increased haircuts resulting from restructurings, downgrades, liquidity events, counterparty issues, or collateral calls. Defendant Stockman was warned that he would face "tremendous pressure" to approve higher risk limits to compensate for declining earnings in certain lines of Holdings' business.

      i.     Upon information and belief, in March 2011, Defendant Stockman supported Defendant Corzine's European sovereign debt limit increase request, involving an aggregate increase from $4.75 billion to $5.0 billion, as well as a temporary increase to $5.8 billion until March 31, 2011. Defendant Stockman identified to the Board of Directors the market risks that, under certain scenarios of changes in yields and haircuts, could produce funding needs of as much as $761 million. The Board again approved the increases. Upon information and belief, by mid-March 2011, the portfolio had grown to $5.219 billion, within the "temporary" limit increases. With the temporary increase set to expire at the end of March, Defendant Corzine told Defendant Stockman to prepare a request to the Board to increase the limit to approximately $6 billion. The Executive Committee of the Board approved the request to extend the "temporary" increase to $5.8 billion until September 2011, at which time the limit was to revert to $5 billion, provided maturities were no later than December 2012. Within a month, these limits were breached again, as shown in an April 27, 2011 sovereign debt portfolio report that Defendant Stockman provided to Defendant Corzine. After conferring with Defendant Corzine,

Defendant Stockman commented to others in the Risk Department, "Good news is he is now aware of gross limits, agrees with concept …." Several weeks later, however, on June 5, Defendant Stockman prepared, at Defendant Corzine's direction, a request to the Board to increase the limits from $5.8 billion to as much as $9.75 billion, adding Belgium to the countries that comprised the global limit. Upon information and belief, the next day, in response to a question from Defendant Corzine, Defendant Steenkamp explained the impact of a ratings downgrade below investment grade on liquidity:

> There would be no impact on RTMs from a ratings downgrade, as the legal analysis of sale is independent of credit rating until maturity. However, there could be an impact on the reverse RTM netting trades as these are to different maturities than the original RTMs. The potential issue is whether some counterparties will choose not to roll over transactions or the trading counterparty can't trade with us due to our rating. If this were to happen, then MFG Inc. could lose its netting benefit on these reverses and thus be subject to higher margins, thereby increasing liquidity needs for the BD.

At a meeting the same day, the Board approved Defendant Corzine's request in part, increasing European sovereign debt limits to $6.6 billion, with increased sub-limits for individual countries other than Portugal, the limit for which was to remain $1.3 billion.

j.      Upon information and belief, in May 2011, Internal Audit issued an "INTERNAL AUDIT REPORT" the critical responsibility for ensuring MFGI accurately tracked and reported Customer Segregated and Secured Accounts. The report, which was distributed to, among others, Defendants Corzine, Abelow, Ferber, Steenkamp, Serwinski and PwC, concluded that MFGI's process lacked controls and was susceptible to human error due to a number of "Control Gaps" and "Control Design" defects. Defendant Steenkamp was the "global issue owner" charged with responsibility for the problems identified in the report, and Defendant Serwinski was assigned responsibility for

resolving several high risk issues, including assuring that regulatory inputs were accurate and complete. Upon information and belief, no meaningful steps were taken in response to the report.

       k.     Upon information and belief, MFGI and FINRA held a conference call in May 2011 during which MFGI explained its RTM transactions and the potential impact on profits and losses. Following the call, MFGI notified FINRA that it was not taking a charge on its RTMs. FINRA and MFGI communicated again later in May about MFGI's RTMs reflected in the FOCUS Report for April and, in mid-June, MFGI met with FINRA and the SEC and walked them through the RTM transactions.

       l.     Upon information and belief, on June 20, 2011, Internal Audit at Holdings issued an internal report entitled the "Global Liquidity and Capital Management Internal Audit Report" to, among others, Defendants Corzine, Abelow, Steenkamp, Ferber, Dunne and PwC. Like the other reports, the June 20 report sounded similar alarms regarding the inadequacies of MFGI's internal controls. The report found the existence of "numerous significant gaps between the policy and existing practices" regarding management of capital-at-risk and liquidity-at-risk. Notably, the report acknowledged that the Risk department "previously identified and escalated these gaps and remediation plans to the Board of Directors in May, 2010," and "prioritized the revision of the existing methodology and requisite processes." However, more than a year after these deficiencies were discovered the "work [was] not yet underway," and there is no indication remedial controls were ever completed. The report also noted the limits of the Firm's liquidity monitoring and forecasting capabilities, including the ability to accurately gauge liquidity between the time transactions were booked and settled:

> Existing liquidity monitoring and forecasting is manual and limited. Reporting capabilities to evaluate liquidity needs for transactions that are booked but not yet settled have not been fully developed.

The report went on to note that the Firm relied on "ad hoc tools" and the professional expertise of key personnel to manage liquidity but warned that "[t]he complexity of capital and liquidity demands have increased with the addition of principal trading" by the Firm and other new businesses. No responsibility was assigned to remediate this issue on the grounds that "the business accepts this risk." In addition, instead of an organized framework, the report revealed that the Firm was relying on imprecise "ad hoc tools" by its Treasury professionals to manage liquidity despite the fact that "[t]he complexity of capital and liquidity demands have increased with the addition of principal trading" and other new businesses. Upon information and belief, no remedial controls were implemented to protect Customer Funds.

m.      Upon information and belief, following Moody's July 5, 2011 downgrade of Portugal's sovereign debt to "junk" status, regulators contacted MFGI to inquire into, among other things, the Company's regulatory net capital levels. MFGI gave assurances such levels were adequate.

n.      Upon information and belief, in August 2011, Defendant Corzine told the Holdings Board of Directors, with respect to Holdings overall European debt position, that "If you want a smaller or different position, maybe you don't have the right guy here," according to a person familiar with the matter. Defendant Corzine also reportedly told one senior Board member that he would "be willing to step down" if Holdings' Board of Directors "had lost confidence in [him]."

o.     Upon information and belief, on August 2, 2011, FINRA informed MFGI that it potentially needed to take a "default risk charge" on its sovereign RTMs. A default risk charge is the requirement for banks to measure and hold capital against default risk that is incremental to any default risk captured in the bank's value at risk model. Default risk charges respond to increasing amounts of exposure in banks' trading books to credit-risk related and often illiquid products.

p.     Upon information and belief, in the weeks following FINRA's August 2, 2011 notification to MFGI, MFGI and FINRA had several communications about the potential default risk charge and MFGI personnel discussed and prepared responses to FINRA. For example, in early August FINRA asked MFGI to provide a "Proposed Default Risk Charge" as to the collateral supporting the RTM positions. FINRA's position was that, although sovereign RTMs were not specifically addressed within the FINRA rules, these positions were more closely analogized to long positions in sovereign debt, which are treated as nonconvertible debt (that have a charge), than they are to RTMs of U.S. Treasuries or Agencies (that do not have a charge). In response to FINRA's request, Mike Bolan and Defendant Hughey assembled and circulated for internal consideration five possible computations for the proposed charge, reflecting a range of possible amounts from $7.6 million to $98.2 million.

q.     Upon information and belief, on August 11, MFGI provided to FINRA a memo setting forth the Company's objection to a potential default risk charge, but, as requested, proposed a regulatory capital charge with respect to the sovereign debt RTM transactions of $55.8 million. An additional $60 million was injected into MFGI, to increase the Company's excess capital to $135 million in anticipation that FINRA would

assess a charge that would impact the August net capital requirement. Internal discussions then began about transferring MFGI's RTM positions to FINCO, MFGUK, or a third party. None of the transfer options were ideal, because each would involve posting additional capital, recognizing substantial immediate economic losses, or overcoming regulatory opposition.

r.     Upon information and belief, in August 2011, in the United Kingdom, the FSA began to express heightened concern about the RTM positions and required MFGUK to provide a contingency plan for liquidity stress arising from the sovereign RTM portfolio. Although in internal communications, Holdings personnel acknowledged that, if MFGUK faced a $900 million margin call on sovereign RTM positions, "there is no way we could support" it, MFGUK represented to the FSA that it had "sufficient intraday liquidity" to be able to meet a stress liquidity need of $841 million without disrupting its business.

s.     On August 17, 2011, Holdings announced that Defendant Mahajan had joined Holdings effective immediately as its Global Treasurer, replacing Defendant Dunne who had served in that capacity since 2008. According to the press release, Defendant Mahajan had recently served as Treasurer of Fortress Investment Group, and brought more than twenty years of treasury and capital markets experience to Holdings following senior treasury and capital markets roles at Citigroup Inc., General Electric Capital Corporation, PepsiCo, Inc. and Atlantic Richfield Chemical Company. In addition, Defendant Steenkamp stated in the press release specifically that Defendant Mahajan had been hired to, among other things, shore up liquidity in light of Holdings' new businesses (notably, principal trading):

33

> As we move forward on our strategic plan to transform our firm into a global investment bank, we remain focused on continuing to optimize our capital structure and enhance our liquidity profile. Vinay brings considerable experience and expertise to this important role and will be instrumental in identifying and assessing corporate finance options to accelerate and support our strategic objectives.

t.     As global treasurer, Defendant Mahajan was responsible for financing, capital structure, balance sheet, liquidity, investments, banking, and the overall responsibility for monitoring liquidity, which included regulatory compliance. According to Holdings' 2011 Form 10-K, the Company's Treasury Department—headed by Defendant Mahajan—was responsible for all aspects of capital management:

> Because our treasury . . . [function] . . . involves the management of our capital, including investments made for cash and asset-liability management, we consider these investments to be principal transactions . . . In connection with our treasury operations we may, at our discretion, take positions for asset-liability management, including yield enhancement and investments made in our held-to maturity portfolio, and to hedge our exposure to changes in foreign currency exchange rates and interest rate risks arising from the global character and financial focus of our operations.

u.     Upon his appointment as Global Treasurer, Defendant Mahajan recognized very quickly that Holdings' treasury procedures and controls were woefully inadequate. As the June 20 Internal Report had concluded with respect to liquidity management, Defendant Mahajan concluded that the Treasury Department "needed lots of help" and infrastructure "needed a 180." However, Defendant Mahajan reported that by the time he became Global Treasurer it was "too late" to fix the Treasury Department because at that point the focus was on "maximizing liquidity." Each turning a blind eye to the situation, Defendant Mahajan and the other MFG Defendants proceeded as herein alleged and caused and/or materially contributed to the misuse of commodities customers' segregated funds.

34

v.       On August 24, FINRA informed MFGI of its decision that, as of the close of business the next day, MFGI was required to take a full haircut, approximately $257 million, on all sovereign RTMs as "securities owned haircuts." MF Global continued to note its disagreement with what it perceived as FINRA's re-interpretation of the Net Capital Rule, but took immediate steps to further increase its excess net capital by $183 million, to $287 million (in preparation for the impact of the capital charge to its August 2011 FOCUS report), up from $104 million as of July 31, 2011. The net impact on MFGI was an increased capital requirement of $255 million. A few days later, FINRA notified MFGI that rather than applying the new capital charges only prospectively, MFGI was required to restate the July 2011 FOCUS Report to retrospectively reflect the modified capital treatment of the RTM transactions. This retrospective application of the charge to the July FOCUS Report resulted in a regulatory net capital deficiency of $150.6 million as of July 31, 2011 (as compared to the previously-reported excess of $104.3 million). In an amended Form 10-Q filed on September 1, 2011, Holdings disclosed that the net capital infusion had been made. The Form10-Q/A stated:

> As previously disclosed, the Company is required to maintain specific minimum levels of regulatory capital in its operating subsidiaries that conduct its futures and securities business, which levels its regulators monitor closely. The Company was recently informed by the Financial Industry Regulatory Authority, or FINRA, that its regulated U.S. operating subsidiary, MFG Holdings Inc., is required to modify its capital treatment of certain repurchase transactions to maturity collateralized with European sovereign debt and thus increase its required net capital pursuant to SEC Rule15c3-1. MFG Holdings Inc. has increased its net capital and currently has net capital sufficient to exceed both the required minimum level and FINRA's early-warning notification level. The Company does not believe that the increase in net capital will have a material adverse impact on its business, liquidity or strategic plans. In addition, the Company expects that its regulatory capital requirements will continue to decrease as the

portfolio of these investments matures, which currently has a weighted average maturity of April 2012 and a final maturity of December 2012.

w.      Upon information and belief, after the FINRA net capital charge, other regulators and exchanges also increased their focus on MF Global, including:

- MFGI's disclosures were evaluated by certain exchanges, and in some instances resulted in additional requests for information;

- Excess margin for MFGI's house accounts at certain exchanges were no longer automatically returned or margin requirements were otherwise increased;

- The Depository Trust & Clearing Corporation imposed a margin premium of 25% for 90 days;

- FINRA limited MFGI's underwriting activities to "Best Efforts"-based transactions only, and instructed MFGI that it could not conduct any "Firm Commitment" underwritings until the perceived risk of the European sovereign debt securities collateralizing the RTMs was sufficiently reduced in FINRA's view;

- On September 9, 2011, an Options Clearing Corporation ("OCC") representative asked MFGI to explain why it failed to provide to OCC an Early Warning Notice regarding FINRA's decision to increase its net capital requirement; and

- The Federal Reserve Bank of New York raised questions regarding FINRA's net capital decision, the RTM positions and MFGI's net capital requirement.

x.      Upon information and belief, on September 19, 2011, FINRA wrote to Defendant Corzine, in his capacity as President of MFGI, that "the overall risk undertaken by the Firm in maintaining the inventory levels in [RTM Sovereign Debt]

would meet the criteria for subjecting [MFGI] to special surveillance." As a result, FINRA notified the SEC, SIPC and other SROs and clearing organizations, and requested MFGI to provide certain financial information on a weekly basis.

      y.    Upon information and belief, on September 23, MFGUK again met with the FSA, which announced that it was "uncomfortable with [MFGUK's] liquidity position and uncomfortable with [its] intraday liquidity position." A key topic of discussion was the possibility of an intraday margin call from the LCH, and what would happen if MFGI failed to fund MFGUK to meet the margin call.

      z.    Upon information and belief, as of September 30, 2011, MFGI's net long position had grown over the quarter by $1.23 billion to approximately $6.3 billion in short-term European sovereign debt, including bonds from Belgium, Italy, Spain, Portugal and Ireland, and the amount of margin posted exceeded $400 million. Some of these positions were acquired as late as the end of July—just prior to FINRA announcing the required net capital charge—and Defendant Corzine planned to continue taking on new positions into November 2011. The cumulative Profits and Loss ("P&L") impact of the RTM trades from inception to bankruptcy was over $103 million. On a quarterly basis, the P&L on the RTM trades amounted to as much as 16% of net revenues.

      aa.    Upon information and belief, in an October 2011 memo to Holdings' Board of Directors, as of the end of September 2011, MF Global's RTM exposure was the equivalent of almost 14% of Holdings' assets, and was more than four and a half times total equity. Moreover, the memo to the Board revealed that the sovereign debt portfolio, as a percentage of quarter-end equity or assets, was orders of magnitude greater than other, even far larger, Wall Street banks.

bb.    Upon information and belief, during this period, MF Global Risk personnel brought several risk scenarios to the attention of Defendant Stockman and other senior management. One was the possibility that MF Global would be unable to roll margin-reducing reverse RTMs. If a counterparty refused, MF Global could be faced with an 80% margin call from the LCH, which could amount to $602 million. In another scenario, if Holdings were downgraded below investment grade, that event would trigger a margin call as high as 200% under LCH rules and higher margin at other exchanges like Eurex. As a possible source of additional liquidity to meet LCH margin calls, the Risk Department identified the "FCM 30.7 Seg. Excess and Treasury personnel reportedly agreed that part of this could be moved to the UK, although "from UK Seg rules perspective," they were uncertain whether that would be permissible.

cc.    On October 17, 2011, CME Group sent a letter to Defendant Corzine, copying, among others, Defendants Ferber and Serwinski, reminding them of their obligations to segregate customer funds. The letter concerned CME's review of MFGI's August 4, 2011 audit report and MFGI's response to CME's initial inquiry letter on August 4 concerning potential violations of CME Rule 971.A, which requires, among other things, that all clearing members must be in compliance with CFTC segregation rules. CME's August 4, 2011 letter had informed Defendants Corzine, Ferber and Serwinski that the Company had violated CFTC Regulation 1.25, including investing customer funds in "investments which were not readily marketable or highly liquid" and "which were not properly rated."

34.    The members of Holdings' Board of Directors knew of the liquidity risks and of the absence of adequate controls; disregarded the truth that segregated funds were not

safeguarded and were in serious jeopardy due to liquidity risk; turned a blind eye to the situation despite having a duty to commodities customers to act under such circumstances to prevent customer funds from being put at risk and/or misused; and improperly had the MF Global enterprise gain advantage over commodities customers, including Sapere. The members of Holdings' Board of Directors did not fulfill their duty. Moreover, aware of their obligations to commodities customers to act to safeguard their funds, the Holdings' Board of Directors disregarded the truth, turned a blind eye to and took no corrective action when the Enterprise Risk Policy prohibition against using segregated funds for liquidity purposes was ignored and such funds became an important source of liquidity for the MF Global enterprise and it improperly gained advantage over commodities customers, including Sapere. As revealed, for example, in media reports, such as the *New York Times* report on November 8, 2011, "A Board Complicit in MF Global's Bets, and Its Demise," the MF Global enterprise's Board of Directors and senior officials knew of and were complicit in the events at issue in this Complaint. As a result, by about October 28, 2011, the MF Global enterprise had a shortfall in the segregated funds of U.S. commodities customers, including Sapere, estimated at $1.6 billion.

35.     Despite multiple early warnings of growing concern for risk management, aware of the liquidity risks and without putting controls in place to protect segregated funds from being put at risk for liquidity purposes, MFGI and MFGUK, in July 2010, entered into an investment management agreement to facilitate RTM transactions in European sovereign debt securities as herein described:

a.     Because MFGUK had relationships with the LCH and other European clearing houses, it purchased the sovereign bonds from counterparties on the LCH and then sold the bonds to MFGI.

b.    The bonds remained in MFGUK's LCH account, but MFGI maintained the risk on its books because MFGUK was unwilling to bear the risk of issuer default or debt restructuring.

c.    LCH would make margin calls to MFGUK, as the securities remained in MFGUK's accounts, and MFGUK would then relay the margin calls to MFGI.

d.    MFGI would transfer collateral—often U.S. Treasury Bills—to MFGUK to meet the margin calls, but MFGUK would offer no collateral in return, leaving MFGI out-of-pocket with respect to the collateral that it posted.

36.    Defendant Corzine increased the highly risky bets on distressed foreign sovereign debt and the Holdings' Board of Directors repeatedly ratified those bets. As herein alleged, the highly risky bets on distressed foreign sovereign debt increasingly yielded liquidity demands which the MF Global enterprise met by accessing segregated funds in violation of the Enterprise Risk Policy, by making transfers from segregated funds knowing that controls were not in place to prevent the misuse of segregated funds, by unlawfully borrowing intraday and overnight from segregated funds, and by falsely computing "regulatory excess" funds as existing within segregated funds. As a result, by about October 28, 2011, the MF Global enterprise had a shortfall in the segregated funds of U.S. commodities customers, including Sapere, estimated at $1.6 billion.

37.    The MFG Defendants also relied substantially on segregated funds to fund the business operations of the MFGI BD business unit. This occurred through, among other things, a "hold to maturity" "internal repo" between the FCM business unit of MFGI and the BD business unit of MFGI and a further "repo" between Holdings and the BD business unit of MFGI, purportedly allowed by 17 CFR § 1.25.

38.     These transactions assumed that so long as the collateral was a "permissible investment," segregated funds could be moved out of segregation in substitution for the internal repo. The MFG Defendants did not conform here to the § 1.25(b) requirements of principal preservation and liquidity, as for example those requirements would obstruct the use of cash and T-Bills in exchange as if they were equal in terms of principal preservation and liquidity to other forms of "permissible securities" pledged under contracts with the increasingly-uncreditworthy MFGI BD business unit. Confirming the violation of the preservation of principal and liquidity requirements, the June 4, 2012 Chapter 11 Trustee's report discloses that, in order to meet the October 25, 2011 liquidity needs of the MF Global enterprise, $7.2 billion of "hold to maturity" transactions were liquidated and at substantial losses. However, if the transactions were equivalent to cash and T-Bills, as required by § 1.25, then a liquidation, whether supposedly precipitous or orderly, would not have resulted in such losses because cash and T-Bills are liquid and preserve capital. The losses put increasing pressure to use segregated funds to meet the liquidity needs of the MF Global enterprise.

39.     In any event, as of October 25, 2011, the HTM portfolio amounted to $8.644 billion. The creation of these "hold to maturity" repo transactions entailed taking assets out of commodities customers' accounts, such as Sapere's cash and T-Bills, and using those assets in the transactions, such that the customers' accounts no longer actually contained the cash and T-Bills that customers had deposited. However, the eMidas system continued falsely to reassure customers such as Sapere that their cash and their T-Bills were still held as segregated funds in the customer's accounts. Commodities customers reasonably relied on the truth of the eMidas system's 24/7 displays, Sapere reasonably relied on the truth of the eMidas system's 24/7 displays about cash and T-Bills. Had Sapere known the truth of what the MFG Defendants were

doing in the "hold to maturity" transactions, Sapere would have withdrawn its segregated funds from the MFG Defendants' dominion and control.

40.     As liquidity needs intensified, senior management looked increasingly to the FCM as a source of liquidity for the non-FCM business.

41.     In determining the amount of segregated funds to be reported to regulators, the MF Global enterprise purported to use for Customer Segregated accounts the calculation method known as the "Net Liquidating Method" and for Foreign Secured accounts the calculation method known as the "Alternative Method." Using those calculations, they determined for regulatory purposes the "Firm Invested in Excess" amount within the segregated accounts.

42.     Each of the MFG Defendants also knew that, even if rigorous safeguards were otherwise used to protect commodities customer funds, this method of computing Firm Invested in Excess yielded a volatile result that unpredictably changed drastically and was unsuitable to use for determining whether accounts holding customer funds also contained "excess" money belonging solely to the MF Global enterprise that MF Global could appropriately use to meet its liquidity needs. Turning a blind eye to the truth, the MFG Defendants misused the Firm Invested in Excess methodology and caused and/or substantially contributed to the misuse of commodities customers' segregated funds. The use of this method to extract funds to meet liquidity needs of the MF Global enterprise was a material fact; however, the MFG Defendants knowingly omitted to disclose this material fact to commodities customers, including Sapere. Had Sapere known the truth, Sapere would have withdrawn its segregated funds from the MFG Defendants' dominion and control.

43.     There were at least five days from July 1, 2010 to July 18, 2011, when the Firm Invested in Excess at MFGI was negative. However, no report was made that segregated funds

had been misused and compromised, misuse of segregated funds did not cease, commodities customers, including Sapere, were not told of these situations and corrective action to preclude recurrence was not taken. Had Sapere known the truth, Sapere would have withdrawn its segregated funds from the MFG Defendants' dominion and control.

44.     Moreover, the Firm Invested in Excess was overstated. The FCM unit of the MF Global enterprise held the bulk of its Foreign Secured Accounts at MFGUK pursuant to a 30.10 exemption from the CFTC that required those funds to be held in strict conformity with the requirements of the UK's Financial Services Administration ("FSA"). In making the calculations referenced in paragraph 41, the MF Global enterprise and the MFG Defendants involved in making and/or reporting the calculations disregarded the requirement that the "Alternative Method" had to take into account funds held in the UK the segregated amount required by the FSA's Client Asset Sourcebook ("CASS") including CASS rules 6 and 7 and use the CASS 6 and 7 amounts when greater that what the "Alternative Method" might otherwise yield. As a result, the Foreign Secured accounts and Firm Invested in Excess amounts were materially understated. However, this was not disclosed to commodities customers, including Sapere, segregated funds were misused, the misuse of segregated funds did not cease, and corrective action to preclude recurrence was not taken. Had Sapere known the truth, Sapere would have withdrawn its segregated funds from the MFG Defendants' dominion and control.

45.     When and as MF Global's proprietary trading gave rise to a need for additional liquidity, the Operations Department in New York would request what they referred to euphemistically as an intraday "loan," although it was not a true loan but simply a transfer of funds from the Treasury Department in Chicago to the Operations Department in New York for use by the BD business unit. These intraday "loans" had no repayment terms or interest. As

confirmed by the June 4, 2012, SIPA Trustee's report: the Customer Segregated and/or Foreign Secured accounts at the FCM were at times used to fund these transfers; so-called Firm Invested in Excess funds were used to fund MF Global enterprise's proprietary activities both overnight and during the day; so-called Regulatory Excess was also used for intraday funding of the non-FCM business; by the summer of 2011, intraday transfers from the FCM business unit to the BD business unit, became nearly a daily event in increasingly greater amounts; additionally, transfers from the FCM to Operations in New York were kept overnight or longer. The SIPA trustee's report identified Defendants Serwinski, O'Brien and Dunne as among the individuals knowledgeable of these so-called "intraday" loans. The MFG Defendants have superior knowledge to Sapere as to the dates and particulars of such misuses of segregated funds, which are presently unknown to Sapere. The truth of these events was a material fact which the MFG Defendants knowingly omitted to disclose to commodities customers; had Sapere known the truth, Sapere would have withdrawn its segregated funds from the MFG Defendants' dominion and control.

46.     Prior to MF Global's Chapter 11 filing on October 31, 2011, the MFG Defendants agreed and caused the MF Global enterprise to take wrongfully from customer accounts in the U.S. and elsewhere hundreds of millions of dollars or more in cash and other assets (including cash and T-bills from Sapere's account) and to use those customer assets as margin, capital and/or for other liquidity purposes.

47.     These acts included, and as herein alleged, moving hundreds of millions of dollars or more of cash and other assets in the segregated accounts of commodities customers of MF Global's FCM unit into MF Global's own proprietary accounts in its BD unit and/or transfers to third-parties other than the commodities customers to whom the funds belonged.

44

48.     As evidenced by the present estimated $1.6 billion shortfall in commodities customers segregated account funds, when causing commodities customers segregated account assets to be moved from the FCM business to the BD business and/or other entities within or outside the MF Global enterprise, the MFG Defendants caused the segregated account assets to be replaced with either inadequate or worthless and inappropriate collateral or no collateral at all.

49.     The Treasury Department in Chicago, which was responsible for ensuring that the investments and use of Customer Segregated and Foreign Secured accounts complied with CFTC rules, had limited and insufficient sources of funds to provide liquidity to the non-FCM operations in New York; the MFG Defendants knew of the insufficiencies, which were material facts, and the MFG Defendants knowingly omitted to disclose those facts to the commodities customers, including Sapere. Had Sapere known the truth, Sapere would have withdrawn its segregated funds from the MFG Defendants' dominion and control.

50.     Defendant Hughey reviewed for internal distribution the internal segregated funds reports and circulated them to the Treasury Department (including to Defendant Mahajan), Financial Regulatory Group and Treasury Operations Group. After internal circulation and comment, the Financial Regulatory Group would scrub information that the MF Global enterprise would not share with regulators and would prepare and submit reports about segregated funds to the CFTC, CME, NFA and CBOE.

51.     Upon information and belief, in July 2011, Defendant Corzine, proposed a program to "borrow" $250 million from actual customer funds (not Firm Invested in Excess funds) daily through overnight "loans." In July 2011, Defendant Steenkamp asked Defendant Serwinski to review trends in the FCM Customer Accounts to consider whether $250 million could be "loaned" overnight on a regular basis from the FCM to BD Operations in New York. In

regard to Defendant Steenkamp's request, Defendant Serwinski wrote that "it did not sound like they were just looking for the firm invested amount in excess but more such that the customer funds not required from a secured regulatory computation would be tapped into." Intraday transfers of this nature had begun the previous year, but following Defendant Steenkamp's request, they became a daily occurrence.

52. In July 2011, Defendants Serwinski and Hughey reviewed information concerning the so-called Firm Invested in Excess amounts over the past year and found that using the Net Liquidating Method (which is the method required also to be used for Secured Funds at MFGUK) the amount had been negative on one or more occasions, including negative $98 million on October 11, 2010.

53. Upon information and belief, on July 20, 2011, in connection with her review of Customer Accounts "at the request of Henri [Steenkamp]," Defendant Serwinski emailed Defendants O'Brien and Hughey, head of Holdings' Financial Regulatory Group, requesting comments on the materials Defendant Serwinski was providing to Defendant Steenkamp. As a "sanity check," Defendant Hughey re-calculated the excess amounts over the past year and agreed with Defendant Serwinski's computations, while noting that in October and December of 2010, "there were five instances where the firm was funded by clients (i.e., the excess contributed by the firm was negative)." Defendant Hughey inquired whether "we have any idea what happened in October and December to cause that? I would think Henri would ask that question."

54. Upon information and belief, Defendant Serwinski provided her analysis to Defendants Steenkamp and Dunne and to Defendant Besgen on July 27, 2011. Defendant Serwinski stated that she "under[stood] the working capital situation the firm [was] facing" and

that she was "not aware of any regulatory rules prohibiting the proposal," but was clear she knew client assets were at risk:

> FCM client assets may be put at risk even if for overnight . . . Utilizing the FCM client asset [base] should not be a BD working capital source strategy to be relied upon. . . . [i]n the event of a financial crisis, are we guaranteed that we could draw down on the RCF to meet the firm liquidity needs and return the FCM client assets to meet any requirements in the seg/secured environment?

55.     Upon information and belief, based on Defendant Serwinski's analysis, Defendant Steenkamp commented that they should consider only the low-end of the range of Regulatory Excess calculated by Defendant Serwinski as available liquidity for operations: "So . . . technically speaking, the low of $433m is probably what we should max out as available client excess liquidity available [to the BD]." In response to Defendant Serwinski's request that Defendant Steenkamp approve a consultation with Defendant Klejna and outside counsel, Defendant Steenkamp approved the request but noted that "if this is a current issue, we probably have bigger issues – as you know from the capital/liquidity training I did about 3 weeks ago, we have always communicated to the street that excess client collateral is liquidity available for use to use. I am doing so again tomorrow."

56.     Upon on information and belief, Defendant Steenkamp's reaction to Defendant Serwinski's analysis caused her to prepare a written memorandum concerning the proposal. Defendant Serwinski's July 28, 2011 memorandum presented a current instance where the secured requirement calculated under the Alternative Method was approximately $750 million less than the Net Liquidating Method, which Defendant Serwinski described as "more of a dollar for dollar deposit and owed."

57.     Upon information and belief, in her report, Defendant Serwinski questioned whether the proposal would cause MFGI "to violate any fiduciary obligations to the clients" and

stated that "FCM client assets may be put at risk, even if only overnight." Defendant Serwinski concluded that any "loans" from customer segregated property needed to be limited to the amount of Firm Invested in Excess. In addition, while preparing the report, Defendant Serwinski concluded that FINRA's interpretation of Rule 15c3-3, the rule promulgated under the Exchange Act to protect securities customer funds, mandated that, if the balances deposited in the accounts of Securities Customers meant that the accounts were under-segregated using the Net Liquidation Method, the amount by which they were under-segregated would have to be included in the lock-up requirement of Rule 15c3-3, as calculated every Friday and at the end of each month.

58.     Upon information and belief, following the July 28 Report, Defendant Steenkamp informed Defendant Serwinski on August 3, 2011 that he had "walked" Defendant Corzine through the regulatory requirements and they both understood the concept of the lock-up.

59.     Although Defendants Serwinski, Hughey, Steenkamp, Dunne and Besgen were aware that controls and risk management programs were inadequate and segregated funds were not safeguarded, they deliberately ignored the truth and Defendants Serwinski and Hughey prepared a memorandum that they did not see a legal obstacle for up to $250 million be "lent" overnight to the BD business unit out of the so-called Firm Invested in Excess in segregated funds using the Alternative Method computation; they did this even though aware that the controls over segregated funds and the volatility of this methodology made the computations unreliable for liquidity decisions and the Alternative Method could not be used because the MF Global enterprise held its secured funds at MFGUK. Likewise disregarding the truth, Defendants Steenkamp, Dunne and Besgen approved the making of such so-called "overnight 'loans.'"

60.     As a result of the recommendations of Defendants Serwinski and Hughey and approvals by Defendants Corzine, Steenkamp, Dunne and Besgen, the MF Global enterprise increasingly made unlawful "overnight 'loans'" out of segregated funds of the full amount of the so-called Firm Invested in Excess, disregarding the known truth that controls were inadequate to determine what amount (if any) actually constituted Firm Invested in Excess and disregarding that the Alternative Method could not be used in determining Firm Invested in Excess. The so-called Firm Invested in Excess computations were known to be unreliable and/or false and the MFG Defendants disregarded the truth of that fact and had "overnight 'loans'" made out of segregated funds to the BD business unit. Then the MF Global enterprise began making "overnight 'loans'" out of segregated funds beyond even the amount of the pretextual Firm Invested in Excess computations. The MFG Defendants have superior knowledge to Sapere as to the dates and particulars of such misuses of segregated funds, which are presently unknown to Sapere. The truth of these events was not disclosed to commodities customers. Had Sapere known the truth, Sapere would have withdrawn its segregated funds from the MFG Defendants' dominion and control.

61.     Defendant Corzine and the other MFG Defendants willfully ignored the warnings known to them, deliberately ignored the truth, turned a blind eye to the truth and declined to act to safeguard segregated funds, causing the disappearance of $1.6 billion out of segregated funds. For example:

    a.     On July 26, 2011, Defendant O'Brien approved an overnight transfer of $100 million from the FCM to Operations and admonished in an email to Defendants Dunne and Besgen, "[Serwinski] was not pleased about the late hour borrow or the size. The borrow is $100mm and the Seg excess is currently $127mm." Defendant Serwinski

later asked Defendant O'Brien "What if I say no? What if they needed $150mm and I only gave them $100mm?" Defendant O'Brien responded that, in that event, "Bob Lyons [in Operations] would need to go to Brad saying they were . . . short and . . . Brad would have to address it with Finance."

      b.      On August 5, 2011, MF Global transferred $226 million from the FCM to an account at JP Morgan with only $155 million being returned by the end of business, thereby leaving a deficit of $71 million that persisted until October 7, 2011.

      c.      Upon information and belief, MF Global combined assets in Customer Accounts failed to meet the requirements under the Net Liquidating Method (as opposed to the Alternative Method) on at least 8 of the 21 business days in October 2011.

      d.      On October 11, 2011, MF Global transferred $50 million from the FCM to an account at Bank of New York Mellon Bank that caused a negative Firm Invested in Excess of approximately $21.4 million.

      e.      Upon information and belief, on October 14, 2011, at approximately 5:50 p.m., Defendant Besgen circulated the daily Liquidity Dashboard via email to, among others, Defendants Steenkamp, Abelow, Corzine, Mahajan and O'Brien. The Liquidity Dashboard listed BD liquidity at negative $318 million and FINCO available cash at $249 million, leaving a negative $69 million. The Liquidity Dashboard further explained that the customer excess cash balance had fallen to $53 million and the previous excess had turned into a deficit of $16 million that required access to the cash from the "FCM buffer." Later that day, further addressing liquidity stresses, Defendant Mahajan notified Defendant Steenkamp that "the B/D is leaning on FINCO and FCM's cash pool. We now

require $16mm of the FCM's buffer as well. This leaves us with $24mm of liquidity – and no buffer – for the U.S. going into the weekend."

   f.  Upon information and belief, on October 14, 2011, Defendant Mahajan circulated an email to, among others, Defendants Steenkamp, O'Brien, and Serwinski stating that "Jon wants to know details of the cash movements between yesterday and today." On October 16, Defendant O'Brien responded, explaining that "[i]t is critical to note that FCM liquidity is driven from the Daily Segregation calculation not cash movements." Later that day, Defendant Mahajan suggested to Defendant O'Brien that they "should put [their] heads together to implement . . . process changes as relates to B/D and FCM cash management given that Jon C. [was] holding Treasury responsible for reporting daily cash balances, explaining day-over-day variances and forecasting T+1 cash balances." Among these changes, Defendant Mahajan suggested a "daily B/D bank reconciliation process" and a "daily bank reconciliation from the FCM."

   g.  Upon information and belief, early in the afternoon of October 17, Stacey Campbell of the Financial Regulatory Group circulated the internal Segregated Statement and Secured Statement as of October 14 to, among others, Defendants Mahajan, Serwinski and Besgen. The segregated Statement showed a deficit of $68,411,341 in Firm Invested in Excess.

   h.  Upon information and belief, in response to learning of the deficit, Defendant Serwinski emailed Defendant Steenkamp and Kemper Cagney, a senior financial executive based in London to whom she reported, informing them that because the applicable SEC rules required the 15c3-3 computation to be performed as of the close

of business October 14, MFGI would need to include a lock-up of $70 million to cover the deficit.

i.      Upon information and belief, late in the day on October 17, Defendant Mahajan emailed Global Head of Retail and MFGI Board member Defendant MacDonald, copying Defendant Steenkamp, concerning the practice of using customer excess to close gaps. Defendant Mahajan wrote that "Henri gets it. He has talked to both Jon and Brad telling them that we cannot rely on FCM cash to meet our daily operational needs." Defendant Mahajan also discussed options for generating cash from existing sources to combat immediate shortfalls. Defendant Mahajan also stated that Defendant Abelow asked him to prepare a list of options "to generate a quick $100mm from existing cash uses" because if Defendant Serwinski "decides not [sic] do a 15c3-3 recalc, we would need a minimum of $70mm through next Monday."

j.      On October 26, 2011, MF Global transferred $615 million from the FCM business to fund securities trading of the MF Global enterprise that was not returned by the end of the business day. Defendant O'Brien authorized the transfers of the $615 million in "intraday" loans knowing that even using the Alternative Method for computing the euphemistically-called Firm Invested in Excess that computation yielded a so-called "excess" of only $22 million.

k.      As part of the aforesaid October 26, 2011 "intraday" loans, Defendant O'Brien transferred $165 million in segregated funds to the MFGI's clearing account at JP Morgan, at a time when MFGI's other accounts had insufficient funds to make a transfer of that magnitude. Thereafter, the Treasury Operations Group instructed JP Morgan to transfer $165 million from an MFGI account into the segregated funds

account from which the prior transfer had been made, however, the MFGI account contained insufficient funds and no transfer occurred into the segregated funds account.

l.      On October 26, 2011, Defendants O'Brien, Lyons and Simons together with others falsely pretended that $325 million in a BD account at Bank of New York Mellon Bank comprised an investment of FCM segregated funds in compliance with 17 CFR § 1.25 knowing that the regulation had not been complied with. The MFG Defendants reported neither this violation nor the violations preceding it. Had they done so, Sapere would have withdrawn its funds from the MF Global enterprise and regulators would have stopped future transfers from segregated funds. Indeed, on October 26, 2011, Defendants Steenkamp, Ferber, Stockman and Klejna were in discussions with the CFTC and CME and failed even then to divulge even this violation. This wrongdoing of Defendants O'Brien, Lyons, Simons, Steenkamp, Ferber, Stockman and Klejna allowed wrongful transfers of segregated funds to continue to take place and substantially contributed to the $1.6 billion shortfall in segregated funds.

m.     On October 27, 2011, Defendant O'Brien transferred $123.2 million to the BD unit in segregated funds to allow the BD unit to pay securities customers.

n.      On October 28, 2011, Defendant O'Brien at the instruction of Defendant Corzine transferred $200 million in segregated funds to an MFGI house account so as to facilitate the payment by the MF Global enterprise of a $175 million overdraft situation at MFGUK. (This resulted in discussions between JP Morgan and Defendants Corzine, Ferber and Klejna, as herein also alleged, during which Defendants Ferber and Klejna had a duty to commodities customers to tell JP Morgan to treat the $175 million as

segregated funds but they disregarded the truth of the situation and deliberately did not do so.)

       o.     On October 28, 2011, Defendant O'Brien made $247 million in "intraday" transfers out of segregated funds.

       p.     On October 28, 2011, Defendant O'Brien transferred $163.8 million to the BD unit in segregated funds to allow the BD unit to pay securities customers.

       q.     As CFTC Commissioner Jill Sommers testified before the U.S. House Agriculture Committee on December 8, 2011, such transactions are unlawful unless, in limited circumstances not applicable here, the FCM replaces the moved funds with appropriate collateral of equal value.

       r.     The foregoing are known instances of improper transfers by the MFG Defendants of segregated funds. The details of all transfers are presently unknown to Sapere; the MFG Defendants have superior knowledge and the transfers are known and/or reasonably should be known to the MFG Defendants.

62.     The following communications further reveal that management at MF Global knew their actions and inactions wrongly jeopardized customer funds and did not comply with their obligations to safeguard customer accounts. For example:

       a.     In a June 6, 2011 email, Defendant Steenkamp admitted to Defendant Corzine that a rating downgrade would increase the need for liquidity and pose a serious risk to MFGI, further imposing a duty on Defendants Steenkamp and Corzine to commodities customers to safeguard segregated funds from being put at risk due to liquidity needs and increases in them:

There would be no impact on RTM's from a ratings downgrade, as the legal analysis of sale is independent of credit rating until maturity. However, there could be an impact on the reverse RTM netting trades as these are to different maturities than the original RTM's. The potential issue is whether some counterparties will choose not to roll over transactions or the trading counterpart can't trade with us due to our rating. If this were to happen, then MFG Inc could lose its netting benefit on these reverses and thus be subject to higher margins, thereby increasing liquidity needs for the BD.

b.      On July 27, 2011, accompanying her previously mentioned analysis of Customer Segregated and Foreign Secured fund accounts, Defendant Serwinski advised that "FCM client assets may be put at risk even if for overnight . . . Utilizing the FCM client asset base should not be a BD working capital source strategy to be relied upon." Defendant Serwinski had a duty to commodities customers to act to prevent customer funds from being put at risk, but she did not fulfill her duty and the FCM client base became the BD working capital strategy upon which the MF Global enterprise relied.

c.      In a July 28, 2011 memorandum that Defendant Serwinski sent to Defendants Steenkamp, Dunne, and Besgen in conjunction with her analysis of Customer Segregated and Foreign Secured fund accounts, she warned that overnight "loans" needed to be limited to the amount of Firm Invested in Excess.

d.      In a July 30, 2011 email, Defendant Stockman told Defendant Corzine, "I am not currently supportive of buying more sovereigns" because of MF Global's ability "to comfortably post initial and variation margin in light of heavier stress scenarios." Defendants Stockman and Corzine had a duty to commodities customers to act to prevent customer funds from being put at risk, but they did not fulfill this duty and the liquidity stress resulted in the misuse of segregated funds causing the ultimate loss of $1.6 billion in U.S. commodities customers' funds.

e.      A July 2011 internal audit concluded that the absence of reliable liquidity reporting tools and dependence on Defendant O'Brien's comprehensive knowledge of liquidity issues might represent a "key man risk" because the processes supporting the composition of the liquidity forecast were not documented and were mainly based on Defendant O'Brien's expertise and experience. Each director, officer and manager who became aware of the audit had a duty to commodities customers to act to prevent customer funds from being put at risk, but they did not fulfill this duty.

f.      On August 11, 2011, Defendant O'Brien wrote an email saying, "Henri [Steenkamp] says to me today . . . 'we have plenty of cash.' I was rendered speechless—and wanted to say 'Really, then why is it I need to spend hours every day shuffling cash and loans from entity to entity?'" Defendant O'Brien called the process of shuffling cash between MFG entities a "shell game." Defendant O'Brien had a duty to commodities customers to act to prevent customer funds from being put at risk, but she did not fulfill this duty and instead shuffled and facilitated shuffling cash and loans which substantially contributed to the ultimate shortfall of $1.6 billion in U.S. commodities customers' funds.

g.      Upon information and belief, on Friday, August 26, 2011, Defendant Besgen informed certain members of the Financial Regulatory Group and Defendants Serwinski, O'Brien and Mahajan that he was "being asked on a daily basis to update Jon Corzine on the Daily Seg and Secured Excess and the drivers of the changes day over day." He requested that when the Financial Regulatory Group circulated the daily Segregation Reports and Secured Reports, that the Group provide details regarding the increase or decrease of the amounts reported. Defendant Hughey responded that the

Financial Regulatory Group did not perform an analysis of "the drivers of either the Daily Segregated or the Daily Secured Computation."

h.      Upon information and belief, on September 1, 2011, Defendant Besgen emailed Defendant O'Brien to inquire about a $50 million decrease in the Firm Invested in Excess number down to $69 million at close of business Tuesday. Defendant Besgen asked Defendant O'Brien for a "preliminary snapshot" as to what the excess balance may be at the close of business on September 1 "so he could project what funds may be available to the BD if they needed to have funds transferred (over and above the funds from FINCO)."

i.      Upon information and belief, on September 16, 2011, excess customer segregated funds were again "lower than usual." On that day, Defendant O'Brien emailed Mr. Cranston, a member of her staff in Chicago who was among the employees who approved transfers, in all capital letters stating "FCM LIQUIDITY – LOWER THAN USUAL 'SEG EXCESS' WHICH IS THE LIQUIDITY FIGURE $25MM VERSUS $70MM AVERAGE."

j.      On October 6, 2011, Defendant Steenkamp emailed Defendant Corzine and other senior executives, including Defendants Abelow and Mahajan, summarizing the increasing liquidity risks and concerns, thereby imposing a duty on Defendants Steenkamp, Corzine, Abelow, Mahajan and the other executives to commodities customers to act to prevent customer funds from being put at risk, but they did not fulfill their duty:

> Jon . . . we need to address the sustained [liquidity] stress. In summary, we have three pools of liquidity for Inc. – (1) finco cash which is real and permanent, (2) FCM excess cash which is temporary and volatile, [and]

> depends on how customers post margin, and (3) the situation of our broker-dealer that is currently unable to fund itself, and more worrying continues to need more cash than we have [from] finco, thereby having us dip into FCM excess every day. This should be temporary but its becoming permanent, and the FCM cash is not reliable. Why is the BD unable to fund itself? Part of it is the permanent pool of liquidity needed for RTM's, but we also see continued haircut increases in fixed income, increased finding needed PSG and box size being permanently large.

Upon information and belief, with regard to short term needs, Defendant Steenkamp stated that liquidity remained under $100 million with the expectation that it could continue to fall to below $50 million. Defendant Steenkamp noted that Defendants Mahajan and Besgen would present a menu of options early the following week on immediate steps management "can/must take." Defendant Besgen forwarded the email to the Head of European Treasury with the instruction "do not forward" stating that he and Defendant Mahajan had engaged in "long conversations" with Defendants Corzine and Steenkamp on the liquidity issues.

k.    On October 17, 2011, Defendant Mahajan warned Defendants MacDonald and Steenkamp that "we cannot rely on FCM cash to meet our daily operational needs." Defendants Mahajan, MacDonald and Steenkamp each had a duty to commodities customers to act to prevent customer funds from being put at risk, but did not fulfill this duty and FCM cash was relied upon to meet daily operational needs, substantially contributing to the $1.6 billion shortfall in U.S. commodities customers' funds.

63.    Deliberately ignoring and turning a blind eye to the truth that the MF Global enterprise lacked safeguards for customers' funds, the MFG Defendants not only illegally looted funds from customer accounts, but they also improperly represented the status of those accounts

and of MF Global's business to customers, regulators, and the public as herein alleged, including that:

      a.    The MFG Defendants falsely depicted the customers' segregated account assets as being untouched by continually listing on customer-accessible, password-protected, digital account displays that the MF Global enterprise provided to the customers over the Internet, available online twenty-four hours a day, seven days a week, putatively providing then-current account information to the customer (colloquially, "24/7" and "live").

      b.    The MFG Defendants filed reports (a) with its Designated Self-Regulatory Organization, the CME Group, and/or the National Futures Association "Daily Segregation Reports," (b) monthly and material-change "Segregated Investment Detail Reports," and (c) monthly SEC FOCUS and/or CFTC Form 1-FR-FCM reports and the accompanying Statements of Segregation Requirements and Funds in Segregation, that in each instance falsely reported that none of the MF Global enterprise's FCM customer's segregated accounts had shortfalls when in fact they were deficient in the aggregate by hundreds of millions of dollars, from at least $600 million to $1.2 billion or more.

64.    Deliberately ignoring and turning a blind eye to the truth that the MF Global enterprise lacked safeguards for customers' funds, the MFG Defendants also touted, and caused the market, introducing brokers and MF Global's commodities customers to rely on the purported integrity of the segregated accounts by, among other things:

      a.    knowingly misleadingly issuing in February 2011 and distributing continually thereafter through and including October 31, 2011, online, via the mail and

in-person, a written document titled "Managed Futures Today February 2011 Safeguarding Customers Through Segregated Funds" that stated, for example, that:

        i.      "In recent years, many investors found out the hard way they have very little recourse to recover funds in the event of a financial firm's bankruptcy. Although the Bernie Madoff "hedge fund" was by far the highest profile case, there were numerous less publicized bankruptcies and defaults at other firms and investments (including legitimate ones), in which investors found recouping remaining funds difficult or impossible. Sometimes it's a case of being the last in line of a long list of creditors, a problem that's compounded when customer funds aren't separated from a firm's funds. Such 'commingled' funds might have been used to fund the firm's operating expenses or in its own trading. If a firm enters bankruptcy, it can be very difficult or impossible to recover customer funds that were commingled in such a fashion."

        ii.      "However, all futures trading accounts, including managed futures, have the advantage of specific industry rules that require the segregation of customer funds from the firm's own funds. The practice of segregating customer funds protects investors in the event of default at the Futures Clearing Merchant (FCM, the industry term for futures brokerage firms licensed to trade on futures exchanges in the U.S. holding their account."

        iii.      "While FCM bankruptcies are rare, they do occur. In 2005, Refco Inc. and 23 of its unregulated subsidiaries filed for Chapter 11 bankruptcy protection. However, Refco's regulated subsidiaries (where customers' futures trading and managed futures accounts resided) were unaffected and customers were able to continue trading and managing their accounts."

        b.      knowingly misleadingly issuing and distributing in October 2011, to customers, prospective customers and the public, online, via the mail and in-person, a document titled "MF Global ® October 2011 Financial Overview," stating: "SOLID RISK MANAGEMENT MF Global dramatically enhanced its risk operations personnel and technology in 2008, and since them we have continually strengthened our enterprise risk management framework."

c.     On October 21, 2011, Defendant Steenkamp knowingly and falsely told Moody's that "capital and liquidity has never been stronger" intending that such false information be provided to the public including commodities customers.

65.     By the last week of October 2011, the liquidity strain that caused the demise of the MF Global enterprise reached its breaking point. Credit events impacting MF Global throughout the week of October 24 to October 28 further escalated liquidity problems to crisis proportions. Aware of the growing crisis, each MFG Defendant had a duty to act to safeguard customer funds from being used to provide liquidity, but they did not take appropriate action, violating their duties to the commodities customers, including Sapere, and substantially contributing to the ultimate $1.6 billion shortfall in commodities customers' funds.

66.     An October 24, 2011 memo circulated to Defendant Corzine and other MF Global personnel in the UK and U.S. entitled "Intraday Liquidity Issues" identified "the greatest liquidity concern" to be the possibility that LCH might impose increased initial margin requirements on the Spanish and Italian RTM positions that needed to be met on a same-day basis. Defendant Corzine and the other MF Global personnel had a duty to commodities customers to act to prevent customer fund from being put at risk in meeting margin requirements and other liquidity issues, but they did not fulfill their duty and customer funds were used in meeting margin requirements, substantially contributing to the $1.6 billion shortfall in U.S. commodities customers' funds.

67.     Upon information and belief, on October 24, 2011, Moody's downgraded Holdings' credit rating from Baa2 to Baa3—just above a "junk" rating—and stated it was keeping the company on review for further downgrades. Moody's reported that Holdings was unable "to achieve the financial targets that Moody's had previously specified were required for

it to maintain a Baa2 rating." Moreover, an agency senior analyst stated that "MFG Holdings'

increased exposure to European sovereign debt . . . and its need to inject capital into its broker-

dealer subsidiary to rectify a regulatory capital shortfall highlights the firm's increased risk

appetite and raises questions about the firm's risk governance."

68.     Upon information and belief, Defendant Corzine resisted selling off any of the

European sovereign debt portfolio. It was not until after the ratings downgrade by Moody's

(October 24) that MFGI and Holdings began liquidating investments and assets. Although these

efforts resulted in billions of dollars of sales on a very short settlement cycle, the impact was

insufficient to relieve MF Global's dire liquidity situation.

69.     Upon information and belief, as of the close of business on October 24, the

internal Segregated and Secured Statement for the close of business on October 21 showed a

regulatory excess of $1.2 billion in segregated and secured customer funds, based on the

"Alternative Method," but under the Net Liquidating Method the Firm Invested in Excess was

only $44,815,475. The Liquidity Dashboard for the close of business as of October 24 showed

liquidity at the BD as negative $338 million and available FCM funds at $30 million.

70.     Upon information and belief, the following day, October 25, 2011, Holdings

issued a press release on SEC Form 8-K announcing the Company's third-quarter 2011 results,

from which investors learned the basis for Moody's downgrade. The press release announced a

GAAP net loss of $191.6 million, compared with a loss of $94.3 million for the same quarter in

2010. Notably, the release also announced a write-down of "deferred tax assets of $119.4

million." Later the same day, during an earnings call, Defendant Steenkamp also acknowledged

"the reversal of deferred tax assets of $119 million." These deferred tax assets were previous

operating losses carried forward and represented the money Holdings anticipated it would save

on future income taxes in the future, assuming it would be profitable. Defendant Steenkamp stated that Holdings would "not be recording additional deferred tax assets in [the U.S. and Japan] until we start consistently generating income within these jurisdictions." Holdings' common share price fell almost 48% on October 25 to close at an all-time low of $1.86 per share.

71.     Upon information and belief, on the same day that Holdings issued its press release and held an earnings call announcing its losses and the deferred tax asset write-down (October 25, 2011), the CME Group informed MFGI that a MFGI customer had advised CME Clearing of rumors circulating about problems at MFGI relating to OTC activity. Accordingly, CME indicated that it "wanted to discuss the events of the past two days and asked more specifically about a rumored OTC group that was causing the losses at MF Global." Shortly thereafter, the CME spoke to Defendant Ferber and another MF Global employee who told the CME that the rumors about problems at MF Global from OTC activity were not accurate. CME was "also concerned about liquidity particularly in the FCM and asked if we had a plan if we were further downgraded below investment grade." MFGI told the CME that the Company was "prepared for such an event." Later the same day, the Associate Director of Risk Management at CME Group requested a meeting with MFGI's Risk Management department on October 27.

72.     Upon information and belief, on October 25, 2011, the Associate Director of the Office of Risk Management & Control, Division of Trading and Markets for the SEC notified Defendants Steenkamp and Ferber that "3 or 4 regulators" were coming to MFGI in Chicago the next day, including one or two from the Division of Trading and Markets, and probably someone from the CME. In addition, the SEC indicated it was told that the CBOE was already on site.

73.     Upon information and belief, at the end of the day on October 25, Defendant O'Brien sent a Liquidity Dashboard to Defendants Steenkamp, Abelow, Corzine, Mahajan and

others that showed available liquidity at the FCM of $60 million and projected an increase in FCM liquidity of $5 million on the next day. Defendant O'Brien predicted that the BD liquidity needs for the following day would be $150 million, which could only be met by drawing the full $300 million remaining balance on MF Global's unsecured revolving credit facility.

74.     Defendant Mahajan wrote in an October 25 email that "[w]e took Jon [Corzine] through the [liquidity analysis] because he keeps speculating where the money has gone and sends Treasury in different directions to investigate." The Liquidity Dashboard delivered to senior management (including Defendants Corzine, Steenkamp, Abelow, Mahajan, and others) as of the close of business on October 25 reflected that the BD had negative liquidity of $433 million.

75.     Upon information and belief, on Wednesday October 26, the SEC advised MF Global's senior management that it wanted to meet the following day, and that the CFTC would also attend the meeting. On Wednesday afternoon, Defendant Ferber sent an email concerning the meeting to, among others, Defendants Corzine, Steenkamp, O'Brien, Mahajan and Abelow indicating that the SEC wanted to get a better understanding of the Company's liquidity, funding, financial statement condition, and regulatory computations for customer segregated and secured funds.

76.     Upon information and belief, later the same afternoon, October 26, MFGI's senior management held a call with FINRA and CBOE. Defendants Ferber, Stockman, Mahajan and O'Brien were "Required Attendees" and Defendants Steenkamp and Serwinski were "Optional Attendees." The purpose of the call was to discuss, among other things, "anything that may impact the funding of the broker dealer," including the "$600 [million] in sub-loans with [ ] affiliates," whether there has been a "run by customers," and "whether counterparties have

lowered limits or left." They also considered developing talking points on MF Global's European sovereign debt exposure in preparation for the meeting with the SEC the following day and wrote:

> As far as issues – the SEC clearly was focused on our exposure to European sovereigns Firm-wide and did not appear to be particularly impressed that we reduced our exposure in the [BD]. We may want to develop a few things to say about that specific issue in time for tomorrow's meeting with the SEC.

77.     Upon information and belief, later in the evening on October 26, Defendants Ferber and Steenkamp participated in a call with the CME. On information and belief, during that call Defendants Ferber and Steenkamp indicated to the CME that MFGI was actively engaged in conversations with customers in an attempt to preserve the business. Later in the evening, the CME indicated to Defendant Ferber that it was interested in helping "to ensure a good outcome for MF and your customers. You and your clients are important to us, and the clients' continued protection is paramount."

78.     On October 26, 2011, Defendant O'Brien sent an email to Defendants Lyons and Simons stating, "we cannot afford a SEG issue." This confirms that the MFG Defendants knew and understood that they needed to conceal the risks they took with customer segregated (SEG) funds from the customers and from the public. Defendant O'Brien also had a duty to take action to prevent segregated funds from being exposed to the MF Global enterprise's business and liquidity risks.

79.     On October 26, 2011, MF Global transferred $615 million from the FCM business to fund securities trading of the MF Global enterprise that was not returned by the end of the business day. Defendant O'Brien authorized the transfers of the $615 million in "intraday" loans knowing that even using the Alternative Method for computing the euphemistically-called Firm

Invested in Excess yielded a so-called "excess" of only $22 million. As part of the aforesaid October 26, 2011 "intraday" loans, Defendant O'Brien transferred $165 million in segregated funds to the MFGI's clearing account at JP Morgan, at a time when MFGI's other accounts had insufficient funds to make a transfer of that magnitude. Thereafter, the Treasury Operations Group instructed JP Morgan to transfer $165 million from an MFGI account into the segregated funds account from which the prior transfer had been made. However, the MFGI account contained insufficient funds and no transfer occurred into the segregated funds account. On October 26, 2011, Defendants O'Brien, Lyons and Simons together with others falsely pretended that $325 million in a BD account at Bank of New York Mellon Bank comprised an investment of FCM segregated funds in compliance with 17 CFR § 1.25 knowing that the regulation had not been complied with. The MFG Defendants reported neither this violation nor the violations preceding it. Had they done so, Sapere would have withdrawn its funds from the MF Global enterprise and regulators would have stopped future transfers from segregated funds. Indeed, on October 26, 2011, Defendants Steenkamp, Ferber, Stockman and Klejna were in discussions with the CFTC and CME and failed even then to divulge even this violation. This wrongdoing of Defendants O'Brien, Lyons, Simons, Steenkamp, Ferber, Stockman and Klejna allowed wrongful transfers of segregated funds to continue to take place and substantially contributed to the $1.6 billion shortfall in segregated funds.

80.     Upon information and belief, the $615 million in transfers from the FCM on October 26 consisted of the following:

- At 8:02 a.m., Defendant O'Brien approved a transfer of $125 million;

- At 9:41 a.m., Defendant O'Brien approved a transfer of $75 million;

- At 10:06 a.m., Defendant O'Brien approved the transfer of $200 while noting that the intraday "loan" balance owed to the FCM was already $400 million;

- At 10:32 a.m., the BD requested and Defendant O'Brien approved a $50 million intraday transfer; and

- At 5:53 p.m., Mr. Joseph Cranston, who reported to Defendant O'Brien, approved a $165 million transfer from FINCO. Due to inadequate controls the money was instead transferred from Customer Accounts.

Because the Firm Invested in Excess as of the close of business the day before was less than $22 million, these transfers came from customer funds.

81.     Upon information and belief, the funds were applied to non-FCM proprietary settlement and clearance obligations at the respective institutions to which they were ultimately transferred.

82.     Upon information and belief, outgoing wires in the amount of $415 million were not properly deducted from MFGI's accounting for Customer Segregated funds on October 26.

83.     Upon information and belief, as set forth in the SIPA Trustee's Investigative Report, as of the close of business on October 26, MFGI had a deficiency of Customer Segregated funds in the amount of $298,835,867.

84.     Shortly after midnight, Defendant O'Brien circulated a "Liquidity Recap" to Defendants Steenkamp, Abelow, Corzine, Mahajan and others showing that BD liquidity demands had increased $446 million during October 26, three times the amount predicted. She reported zero available liquidity at the FCM, and predicted zero increase in FCM liquidity for the next day.

85.     Upon information and belief, at approximately 7:00 a.m. on October 27, Defendant O'Brien requested from the Regulatory Group the internal segregation statements via an email with the subject line "*******I need to see SEGS after completed - before distributed." Defendant O'Brien's explanation for wanting a preview of the segregation information before it was distributed was that "[w]e had significant moving parts."

86.     Upon information and belief, the Financial Regulatory Group provided a draft to Defendant O'Brien reflecting that, as of close of business on October 26, 2011, excess funds under the Net Liquidating Method was a negative $457,906,41 and Firm Invested in Excess was negative $341,744,278.

87.     Upon information and belief, this information was circulated internally in another form to, among others, Defendants Corzine, Steenkamp and Mahajan.

88.     Upon information and belief, a final version of the segregation statements—containing only calculations via the Alternative Method which reflected positive excess and omitting the negative Firm Invested in Excess—was filed with, among others, the CFTC and CME.

89.     Upon information and belief, Defendant Serwinski, who was out of town on vacation, received a copy of the information and requested an explanation for the large negative Firm Invested in Excess balance reported to the regulators and management and expressed concern about the $200 million "loan" from the FCM. Defendant O'Brien responded that "Lent is a strong word-I would state-Fail to return intraday funding compounded by Funding B/D Customer Wires." Defendant O'Brien also informed Defendant Serwinski that she estimated the Firm Invested in Excess would be negative $167 million as of close of business on October 27, 2011.

90.     On Thursday, October 27, 2011, members of CME's Risk and Audit Departments met with, among others, Defendant Steenkamp and Defendant Stockman, concerning MFGI's liquidity due to CME's concerns that liquidity was drying up. Upon information and belief, following the meeting the CME continued to have concerns about MFGI's ability to continue normal operations without the sale of all or part of its business, in spite of MFGI's assurances otherwise. Shortly thereafter, the CME decided to send members of its Audit Department to MFGI in Chicago to review the Segregation and Secured Statements as of the close of business on October 26, 2011. At the time, the CFTC was also present at MFGI and, upon CME's arrival, personnel dispatched from the CME's Audit Department and the CFTC requested all documents supporting the Segregation and Secured Statements.

91.     Upon information and belief, on October 27, in the early afternoon, MFGI's senior management met with the SEC and CFTC as requested by the SEC on the previous day to discuss, among other things, MFGI's liquidity and regulatory segregation computations. At virtually the same time, the CME contacted Defendant Ferber asking for an update on certain subjects discussed during their briefing the previous evening. At approximately 4:00 p.m., a Director in the Audit Department at the CME emailed a letter to, among others, Defendants Ferber and Serwinski, advising them that, effective immediately, MFGI personnel were not permitted to make any equity withdrawals from MFGI without prior approval in writing from the CME's Audit Department.

92.     Upon information and belief, late in the day on Thursday, October 27, Moody's again downgraded Holdings by two notches to junk status, from Baa3 to Ba2. Moody's cited "weak core profitability" that had "contributed to [Holdings] taking on substantial risk in the form of its exposure to European sovereign debt in peripheral countries." Fitch also announced a

two notch downgrade, citing "increased risk taking activities" that left Holdings "vulnerable to potential credit deterioration and/or significant margin calls."

93.     On October 27, 2011, Defendant O'Brien transferred $123.2 million to the BD unit in segregated funds to allow the BD unit to pay securities customers.

94.     Upon information and belief, the October 27, a Net Estimated Net Capital Summary circulated to senior executives, including Defendants Corzine, Abelow, Steenkamp, and Mahajan reflected the deficit of over $341 million in Customer Accounts (using the Net Liquidating Method that had been the subject of discussion during the summer of 2011) and Defendant O'Brien had projected another deficit of $167 million as of October 27, 2011.

95.     Upon information and belief, when the Financial Regulatory Group reviewed the end of day figures for October 27, the deficit in the Segregated Accounts was approximately $300 million. Defendant Serwinski was acutely aware that this was unlawful and wrote "I am concerned that the fcm lent the bd 200mil. Is that correct and that the firm deficit in excess is neg 300+ mil?" in an email.

96.     Upon information and belief, on Friday, October 28, 2011, personnel from CME's Audit Department return to MFGI in the morning to attempt to reconcile the Segregation and Secured Statements as of the close of business on October 26, 2011. However, MFGI had evidently not yet provided the supporting documents. Also that day, CME also reportedly participated in another call with, among others, Defendants Ferber and Steenkamp during which they purportedly told the CME that Holdings had drawn down substantially all of its line of credit but was not yet using the money. MF Global collapsed before CME returned to complete the reconciliation. On October 28, 2011, JP Morgan detected an overdraft balance in certain MF Global foreign exchange clearing accounts. JP Morgan advised Defendants Corzine and Mahajan

that JP Morgan would not participate in the auction or sale of any MF Global assets unless this overdraft was resolved. Defendants Corzine and Mahajan instructed Defendant O'Brien to wire the necessary funds to resolve the overdraft issue. Defendants Corzine and Mahajan knew either that uncertainty existed whether customer funds would be used or that customer funds were being used. In either instance, both Defendants Corzine and Mahajan had a duty to tell Defendant O'Brien that no transfer should be made until she had verified that customer funds would not be put at risk. Neither fulfilled that duty. Instead, each deliberately disregarded the truth and turned a blind eye to the risk that customer funds were being misused and substantially contributed to the ultimate $1.6 billion shortfall in commodities customers' funds.

97.     On October 28, 2011, Defendant O'Brien arranged two wire transfers to clear the overdraft. The first transaction was a transfer of $200 million from a JP Morgan Customer Trust Account in the U.S. that was designated as holding customer funds to another JP Morgan account that was designated as a Treasury House Account and held MF Global's proprietary funds. The second transaction was from the MF Global Treasury House Account in the U.S. to a MFGUK account at JP Morgan in London in the amount of $175 million. Defendant O'Brien indicated that the transfer of $175 million was "per JC's direct instructions." However, irrespective of Defendant Corzine's direct instructions, Defendant O'Brien had an obligation to commodities customers, including Sapere, to not implement those instructions and to not arrange these wire transfers. Defendant O'Brien also had a duty to warn the Treasury Operations Group not to execute such wire transfers irrespective from whom they came. Defendant O'Brien did not do so, substantially contributing to the ultimate $1.6 billion shortfall in commodities customers' funds. Defendant Corzine also had a duty to commodities customers not to give the referenced instructions and if he gave them to rescind them.

71

98.     The MFG Defendants, aware of regulatory issues protecting customer segregated funds, had a duty to take the necessary measures to ensure that customer funds were not improperly desegregated. This included giving direct instructions to not execute wire transfers if uncertainty existed whether such transfers put customer funds at risk. No one within the MF Global enterprise—and specifically not Defendants O'Brien, Ferber, or Klejna—gave instructions or advice to not transfer funds, even though at a minimum uncertainty existed that customer segregated accounts held at JP Morgan that would be improperly used. Defendants Ferber and Klejna breached their duties to commodities customers, substantially contributing to the ultimate $1.6 billion shortfall in commodities customers' funds.

99.     On October 28, 2011, JP Morgan sought written assurance from MF Global executives that the transfer was in compliance with regulatory requirements and complied with the relevant regulations. Defendant Ferber was one such executive. Upon information and belief, Defendant O'Brien provided Defendant Ferber with on-screen shots of the $175 million and $200 million transfers that showed the source was customer accounts. Upon information and belief, Defendant O'Brien also provided a screen shot of the $175 million transfer to Defendant Corzine. Defendants Ferber and Klejna were each aware that controls and risk management programs were inadequate and segregated funds not safeguarded, deliberately ignored the truth, either knew that segregated funds had been improperly transferred and/or turned a blind eye to the situation and willfully and knowingly failed to take action to safeguard and to stop the misuse and compromise of segregated funds. At a minimum, Defendant Ferber had an obligation to advise JP Morgan to treat the funds as being customer funds unless and until Defendant Ferber verified that there did not include customer funds. She did not do so. Defendant Ferber instead informed JP Morgan that the language that JP Morgan sought to include in the letter was too

broad and requested that it was confined to this one specific transaction. However, even this one transaction did not comply with the segregation rules. JP Morgan sent a revised letter to Defendant Klejna that same day. At a minimum, Defendant Klejna had an obligation to advise JP Morgan to treat the funds as being customer funds unless and until Defendant Klejna verified that they did not include customer funds. He did not do so, substantially contributing to the ultimate $1.6 billion shortfall in commodities customers' funds. According to JP Morgan, he and Defendant Ferber assured JP Morgan that MFGI "understood the customer segregation rules and had complied with them." However, the segregation rules had not been complied with and JP Morgan retained the customer funds. Whether or not Defendant Ferber and/or Defendant Klejna orally gave the assurance cited by JP Morgan, it is undisputed that neither told JP Morgan to treat the $175 million as being customer funds unless and until verified that they did not include customer funds. Through inappropriate transfers of funds to JP Morgan, the MF Global enterprise improperly gained advantage over commodities customers, including Sapere, and JP Morgan retained those funds for itself, which would not have occurred if Defendant Ferber and/or Defendant Klejna had spoken up as they had a duty to do. Among other things, Defendants Ferber and Klejna caused at least $175 million of the $1.6 billion shortfall and had they fulfilled their duties to commodities customers, including Sapere, at least approximately $175 million of the $1.6 billion shortfall would not exist.

100.    Upon information and belief, Defendant O'Brien, Defendant Hughey and others in Treasury, Treasury Operations, and the Financial Regulatory Group discovered a deficit in the Segregation Statement of approximately $300 million. Upon information and belief, the Financial Regulatory Group made an erroneous $540 million manual adjustment to the Segregation Statement although no backup existed for such an adjustment. As a result of the

manual adjustment, the Segregation Statement that was filed with the CFTC, CME, NFA and CBOE, OCC, ICE, DTCC and FINRA showed a Firm Invested in Excess of $150,379,941. Defendants O'Brien and Hughey accepted this adjustment and deliberately ignored the truth, either knew that segregated funds had been improperly transferred and/or turned a blind eye to the situation and willfully and knowingly failed to take action to safeguard and to stop the misuse and compromise of segregated funds.

101.    The MFG Defendants' unlawful activities were interrupted when, in the last week of October 2011, auditors from CME Group began reviewing some of the MF Global enterprise's "Daily Segregation Reports." According to the November 8, 2011 testimony of CME Group's Executive Chairman Terrance A. Duffy to the U.S. House Agriculture Committee, the MF Global enterprise falsely reported on Friday, October 28, 2011, to the CFTC that a so-called "accounting error" would show a $900 million shortfall in commodities customers' segregated accounts. No such "accounting error" existed, as confirmed by auditing by the CFTC and CME Group over that weekend, about which Mr. Duffy testified.

102.    Upon information and belief, at the MFG Defendants' direction or under their supervision, further transfers of funds originating in Customer Accounts occurred in the final days of MFGI's operations to cover demands for cash or collateral arising from MF Global's proprietary trading, including, without limitation, transfers of $165 million, $75 million, and $50 million on October 26, and transfers of $200 million, $135 million, $62.5 million, $50 million, $14.7 million and $31.2 million on October 28.

103.    On October 30, 2011, MF Global's Global Head of Product Control informed Defendant Serwinski that the FCM was under segregated by almost $1 billion. The following

day, Defendant O'Brien identified three categories of transactions that accounted for the shortfall in the FCM's accounts and told Defendant Serwinski.

104.    Beginning at about 10:24 AM EDT on October 31, 2011, two U.S. jural entities within the MF Global enterprise (i.e. MF Global Holdings, Ltd. and MF Global Finance, Ltd.) were forced into Chapter 11 reorganization, one U.S. entity within the MF Global enterprise (MF Global Inc.) was forced into liquidation and other jural entities around the world within the MF Global enterprise were soon thereafter forced into liquidation-like administration in various countries (e.g., MF Global UK Ltd., MF Global Singapore Pte Limited, MF Global Australia Limited, MF Global Hong Kong Limited).

105.    Finally, at 7:18 PM EDT on October 31, 2011, Defendant Ferber announced to regulatory officials that the MF Global enterprise had "discovered" a then-unspecified and unexplained shortfall in the MF Global enterprise's commodities customers' segregated account funds, a shortfall that Defendant Ferber underplayed by merely calling it "significant."

106.    At all times, the MFG Defendants and the MF Global enterprise had an obligation to treat and deal with the commodities customers' funds solely as property belonging to the commodities customers, including Sapere. The MFG Defendants are individuals entrusted within the MF Global enterprise with oversight of, access to, and/or dominion and control over the commodities customers' funds. At all material times, the individual MFG Defendants had obligations to commodities customers, including Sapere, to act reasonably and responsibly as fiduciaries entrusted with safeguarding the customers' funds and to protect those funds from loss. The MFG Defendants knew that the MF Global enterprise lacked, and that they had not implemented, appropriate policies and procedures to safeguard customers' funds and to assure

the integrity of the financial and regulatory processes needed and used to safeguard customers' funds.

107.    As herein alleged, the MFG Defendants flouted their obligations; willfully allowed segregated funds to be transferred without appropriate controls against misuse and aware of the absence and/or inadequacy of such controls; willfully allowed segregated funds to be transferred without appropriately first assuring that the funds being transferred were allowed to be transferred; deliberately disregarded and turned a blind eye to risks of loss and misuse of segregated funds; willfully allowed accounts in which segregated funds were commingled to be used for liquidity purposes of the MF Global enterprise without verifying that segregated funds were not being so used; willfully failed to take correction action in circumstances in which they knew segregated funds were at risk; and willfully made false statements of material fact and omitted to disclose material facts doing so because the MFG Defendants knew and/or reasonably should have known that such disclosure would result in commodities customers' withdrawing their funds from the MF Global enterprise.

108.    Common sense alone dictates that hundreds of millions of dollars, much less $1.6+ billion, of segregated account assets do not vanish though inadvertence, clerical error or innocent mistake, going unnoticed and remaining undiscovered.

109.    At times not yet known, the MFG Defendants, as part of the plan and its purpose, decided, agreed and caused (in combination and conspiracy with one another) the MF Global enterprise to allow segregated funds in customers' accounts in the U.S. and elsewhere to be accessed and used knowing that requisite controls against misuse were absent and the segregated accounts were at risk of loss, deliberately disregarding the truth while commodities customers and the public were being falsely assured and reassured that the funds were safeguarded.

Hundreds of millions of dollars or more of customers' cash and other assets (including cash and T-Bills from Sapere's account) were thereby used as margin, capital, etc. for the transactions upon which the MFG Defendants had decided and agreed as hereinabove alleged, and in connection therewith to transport, transfer and transmit those assets (including cash and T-Bills), moving them across state and national borders in interstate and international transactions.

110.    The aggregate amount of commodities customers' cash and other assets (including cash and T-Bills from Sapere's account) moved from segregated funds elsewhere across state and national borders in interstate and international transactions yielded a shortfall in segregated funds estimated by the SIPA liquidation trustee of MFGI at $1.6 billion. The details of those transfers are presently unknown to Sapere, but the MFG Defendants have superior knowledge and the transfers are known and/or reasonably should be known to the MFG Defendants.

111.    Put plainly: Defendant Corzine and the other MFG Defendants engineered and implemented a scheme to take commodities customers' money from them unwittingly; to use customers' money to meet financial requirements attendant to risky trading for the benefit of Holdings; to pretend that the segregated funds were protected while deliberately disregarding the truth that they were not; to transform Holdings into an investment bank; and (using the customers' money to facilitate making risky bets) to emulate Goldman Sachs from which Defendant Corzine had been ousted as Co-CEO (before he became a full-time politician and party fund-raiser), so that Defendant Corzine and the MFG Defendants would be resurrected as investment banker "masters of the universe" and receive generous investment banker-level compensation generated from risky-bets they would make using the commodities customers' money. The scheme entailed deliberate disregard of the truth that the funds being used included

segregated funds and/or gaining advantage over commodities customers, including Sapere, false through false representations, suggestions or suppression of the truth and/or deliberate disregard for the truth, the truth being that commodities customers' funds were not being safeguarded.

112.    The MFG Defendants' acts included moving hundreds of millions of dollars or more of cash and other assets in the segregated accounts of commodities customers of the MF Global enterprise's FCM unit (including cash and T-Bills from Sapere's account) into the MF Global enterprise's "own" accounts in its BD unit. However, the segregated account assets in Sapere's segregated accounts belong to Sapere; they are Sapere's property; they do not belong to and are not the property of anyone else, including without limitation the MFG Defendants and/or the MF Global enterprise. Commodity Exchange Act § 4d(a)(2), 7 U.S.C. § 6d(a)(2) underscores that the property deposited by a commodities customer must be treated and dealt with "as belonging to such customer." 17 C.F.R. § 1.20(a) further underscores this fundamental precept:

> All customer funds shall be separately accounted for and segregated as belonging to commodity or option customers. Such customer funds when deposited with any bank, trust company, clearing organization or another futures commission merchant shall be deposited under an account name which clearly identifies them as such and shows that they are segregated as required by the [Commodities Exchange] Act and this part. . . . No person . . . that has received customer funds for a segregated account . . . may hold, dispose of or use such funds as belonging to any person other than the option or commodity customers of the futures commission merchant which deposited such funds.

113.    Additionally, the MFG Defendants caused hundreds of millions of dollars or more of U.S. customers' funds to be transferred around the world to meet various financial obligations of the MF Global enterprise. As an example, according to a November 29, 2011 report in the *New York Times*, this included transferring approximately $200 million from the MF Global enterprise's U.S. customer accounts to the MF Global enterprise's principal bank, JP Morgan, at its branch in the UK to cover a shortfall in the MF Global enterprise's foreign banking accounts.

114.     The transactions herein alleged included billions of dollars of funds being transported, transferred and/or transmitted between the MF Global enterprise in New York City and persons unknown in other states and/or in other countries, including funds purloined from Sapere and other customers of the MF Global enterprise as hereinafter alleged. Based upon reports about investigation into the accounts of the affected that have been investigated during the U.S. liquidation of the FCM unit of the MF Global enterprise, approximately 38,000 customers (including Sapere) were adversely impacted in the U.S. As CME Executive Chairman Terrence A. Duffy and CEO Craig S. Donohue stated on December 9, 2011: "The impact of MF Global's misconduct is significant for farmers, ranchers, grain cooperatives, miners and other commodity consumers, producers and end-users who use commodity price hedging as an integral part of their businesses." They also stated:

> The fact of the matter is that MF Global broke a number of rules and obligations to protect customer funds, resulting in customer losses. To be clear, transfers of customer funds, made by MF Global for the benefit of that firm, are very serious violations of our rules and of CFTC regulations.

Mr. Duffy also described the "unprecedented" nature of MFGI's "improper handling of customer funds":

> [T]he MFG bankruptcy is unprecedented in that it is the first time (i) there has been a shortfall in customer segregated funds held by one of our clearing members as a result of the clearing member's improper handling of customer funds and (ii) our clearing house was unable to transfer all customer positions and property in an FCM bankruptcy due to missing customer funds in a segregated customer account under the control of the FCM. Indeed, this is the first time in the industry's history that a customer has suffered a loss as a result of a clearing members' improper handling of customer funds.

115.     The total amount wrongfully looted from the MF Global enterprise's U.S. commodities customers' segregated accounts is not yet known publicly and the latest estimate from the SIPA Liquidation Trustee of MFGI is that they exceed $1.6 billion.

116.    The aforesaid wrongful takings were caused to be done by the MFG Defendants in secret and the dates, times and amounts corresponding to them are presently unknown to the plaintiff but, as the MFG Defendants caused them to be committed, are known to or knowable by the MFG Defendants and their representatives and they have knowledge superior to Sapere. The acts of particular MFG Defendants by which they gained advantage over U.S. commodities customers, including Sapere, in deliberate disregard of the truth insofar as presently known are alleged herein; the false and misleading statements made to Sapere about its cash and T-Bills occurred 24/7 via eMidas and included the assurances and reassurances about safeguarding segregated assets alleged herein. As with the wrongful takings, the specifics of the acts in deliberate disregard of the truth and of the false and misleading statements are known to or knowable by the MFG Defendants and their representatives, although the details are not yet know to Sapere, and they have knowledge superior to Sapere.

## COUNT I
(Breach of Common Law Duty of Care against MFG Defendants)

117.    Plaintiff repeats and realleges the allegations of paragraphs 1 through 116, above, as if fully set forth herein.

118.    At all material times, the common law has protected MF Global's commodities' customers' property, including Sapere's property, deposited with MF Global against loss or destruction, both intentional and unintentional.

119.    The transactions whereby Sapere deposited assets with MF Global, in connection with which various employees and other agents of MF Global obtained dominion and control over commodities' customers' property including Sapere's property, to-wit: assets deposited with MF Global, were transactions intended to benefit Sapere and other commodities customers.

120.    At all material times, it was foreseeable that commodities customers, including Sapere, would suffer harm if MF Global's employees and other agents having dominion and control over customer property failed to exercise due care, honestly and in good faith, in safeguarding, using and/or transferring such property to persons other than back to the commodities customers who had deposited the property with MF Global.

121.    At all material times, MF Global's employees and other agents having dominion and control over customer property had a duty to MF Global's commodities customers, including Sapere, to exercise due care, honestly and in good faith, in safeguarding and/or using such property and/or allowing it to be used and/or transferring such property to persons other than back to the commodities customers who had deposited the property with MF Global.

122.    MF Global employees regularly violated the Enterprise Risk Policy and used segregated funds for liquidity purposes. MF Global employees and other agents failed to implement adequate controls and systems to track liquidity and FCM funds. This lack of controls combined with efforts to transform MF Global into an investment bank created chaos.

123.    MF Global's employees and other agents failed as aforesaid to exercise due care and/or to act honestly and in good faith in respect of the safeguarding, using and/or transferring MF Global's commodities customers' including Sapere's property and such conduct was intentional, reckless, grossly negligent and/or negligent.

124.    The aforesaid conduct of MF Global's agents and employees directly invaded the legally protected interests of MF Global's commodities customers, including Sapere, in their property and directly caused and/or substantially contributed to the loss and destruction thereof, to wit: the shortfall in, commodities customers' property at MF Global including Sapere's resulting damages.

81

125.    The MFG Defendants' tortious misconduct is outrageous and a conscious and deliberate disregard of Sapere's rights. The MFG Defendants' tortious misconduct has also been a conscious and deliberate disregard of the rights of other commodities customers. The MFG Defendants' tortious misconduct has shaken the U.S. commodities marketplace to its core and jeopardized businesses statewide, nationwide and worldwide, from farmers in America's heartland to investors around the world. Punitive damages are required for such misconduct.

### COUNT II
(Conducting or Participating in the Affairs of a "Legitimate" RICO Enterprise through a Pattern of Racketeering Activity against MFG Defendants)

126.    Plaintiff repeats and realleges the allegations of paragraphs 1 through 116, above, as if fully set forth herein.

127.    The MFG Defendants have engaged in a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(1), including:

a.    Acts indictable under 18 U.S.C. § 1341 (mail fraud) including: Devising and/or intending to devise a scheme or artifice to defraud, the object of which included that the MF Global enterprise would gain advantage over commodities customers and loot customers' accounts of, among other things, cash and financial instruments (including cash and financial instruments belonging to Sapere), deliberately disregarding the truth that the customers' assets were being used and secretly use the looted assets as margin, capital, etc. for the enterprise's transactions as hereinabove alleged. For the purpose of executing such scheme or artifice or attempting so to do, the MFG Defendants placed and/or caused to be placed in one or more post office or authorized depository for mail matter, matter and/or things to be sent or delivered by the Postal Service, and/or deposited or caused to be deposited matter and/or things to be sent or delivered by any

private or commercial interstate carrier, and/or took or received therefrom, matter or things, and/or knowingly caused to be delivered by mail or such carrier according to the direction thereon, or at the place at which it is directed to be delivered by the person to whom it is addressed. The aforesaid matter or things included in the mailed communications described in paragraphs 63 and 64, above.

b.       Acts indictable under 18 U.S.C. § 1343 (wire fraud) including: Devising and/or intending to devise a scheme or artifice to defraud, the object of which included that the MF Global enterprise would loot customers' accounts of, among other things, cash and financial instruments (including cash and financial instruments belonging to Sapere) by deliberately disregarding the truth that the customers' assets were not being treated and were not being safeguarded and dealt with as the customers' property and were secretly used as margin, etc. for the enterprise's transactions as hereinabove alleged. For the purpose of executing such scheme or artifice or attempting so to do, the MFG Defendants transmitted or caused to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, writings, signs, signals, pictures, and/or sounds for the purpose of executing such scheme or artifice. The aforesaid writings, signs, signals, pictures, and/or sounds included:

i.       the digital online (false) account information hereinabove alleged that was provided to the affected customers (including Sapere) via the Internet, which being live 24/7, transmitted myriad signals numbering in the probably-uncountable millions;

ii.       the electronic transfers by which assets (including Sapere's cash and T-Bills) were transported, transferred and/or transmitted from the accounts of

83

the affected customers (including Sapere) of the MF Global enterprise to others when and as the MFG Defendants caused them to be so directed (n.b., the details of which the MFG Defendants kept secret such that they are not presently known to Sapere, but are or should be known to the MFG Defendants);

iii.     the MF Global enterprise's electronically-filed false Daily Segregation Reports, monthly and material-change "Segregated Investment Detail Reports," and monthly SEC FOCUS and/or CFTC Form 1-FR-FCM reports and the accompanying Statements of Segregation Requirements and Funds in Segregation for its FCM unit; and

iv.     the online communications described in paragraphs 63 and 64, above.

c.     Acts indictable under 18 U.S.C. § 1956 (laundering of monetary instruments) including:

i.     conducting and/or attempting to conduct transactions with property involving some form of unlawful activity (including the looted customers' financial instruments including Sapere's T-Bills, as hereinabove alleged), which involved the proceeds of specified unlawful activity, with the intent to promote the carrying on the specified unlawful activity, including acts indictable under 18 U.S.C. § 1961(1) as hereinabove alleged in subparagraphs a and b.

ii.     transporting, transmitting and/or transferring, and/or attempting to transport, transmit, or transfer a monetary instrument or funds from a place in the United States to or through a place outside the United States or to a place in the United States from or through a place outside the United States with the intent to

84

promote the carrying on of specified unlawful activity, including acts indictable under 18 U.S.C. § 1961(1) as hereinabove alleged in subparagraphs a and b.

d.      Acts indictable under 18 U.S.C. § 1957 (engaging in monetary transactions in property derived from specified unlawful activity) including: in the United States knowingly engaging or attempting to engage in a monetary transaction in criminally derived property of a value greater than $10,000 (meaning property constituting, or derived from, proceeds obtained from a criminal offense, including the looted customers' financial instruments including Sapere's T-Bills, as hereinabove alleged) that is derived from specified unlawful activity, including acts indictable under 18 U.S.C. § 1961(1) as hereinabove alleged in subparagraphs a, b and c.

e.      Acts indictable under 18 U.S.C. § 2314 (interstate transportation of stolen goods, securities, moneys, fraudulent state tax stamps, or articles used in counterfeiting) including transporting, transmitting and/or transferring in interstate or foreign commerce securities and/or money of the value of $5,000 or more knowing the same to have been stolen, converted and/or taken by fraud, including customers' cash and securities (including Sapere's cash and T-Bills) as hereinabove alleged.

f.      Acts indictable under 18 U.S.C. § 2315 (sale or receipt of stolen goods, moneys, or fraudulent state tax stamps) including receiving, possessing, concealing, storing, bartering, selling or disposing of goods, wares, or merchandise, securities, or money of the value of $5,000 or more, and/or pledging or accepting as security for a loan goods, wares, or merchandise, or securities, of the value of $500 or more, which have crossed a State or United States boundary after being stolen, unlawfully converted, or taken, knowing the same to have been stolen, unlawfully converted, or taken, including

85

customers' cash and securities (including Sapere's cash and T-Bills) as hereinabove alleged.

128.   The hereinabove alleged predicates were a regular way of conducting the MFG Defendants' ongoing legitimate business (in the sense that the MF Global enterprise is not a business that existed for criminal purposes) and were a regular way of conducting or participating in the MF Global enterprise, which was an ongoing and legitimate RICO "enterprise."

129.   As hereinabove alleged, the MFG Defendants had a purpose that would continue from sometime prior to August 2011, through at least about December 2012, and which would be continuing and renewed as long as could be to generate years of significant reportable earnings for the enterprise, relationships among those associated with the enterprise, and longevity sufficient to permit these associates to pursue the enterprise's purpose.

130.   As hereinabove alleged, the MFG Defendants, all of whom were employed by and/or associated with the MF Global enterprise, jointly and severally, conducted or participated, directly or indirectly, in the conduct of the affairs of the MF Global enterprise, through a pattern of racketeering activity as hereinabove alleged, indictable under 18 U.S.C. § 1962(c).

131.   As hereinabove alleged, Sapere has been injured in its business or property by reason of a violation of 18 U.S.C. § 1962(c).

132.   Sapere is entitled to recover threefold the damages it sustains and the cost of the suit, including a reasonable attorney's fee.

## COUNT III
(Civil RICO Conspiracy against MFG Defendants)

133.    Plaintiff repeats and realleges the allegations of paragraphs 1 through 116, above, as if fully set forth herein.

134.    As hereinabove alleged, the MFG Defendants conspired to violate 18 U.S.C. § 1962(c), indictable pursuant to 18 U.S.C. § 1962(d).

135.    As hereinabove alleged, Sapere has been injured in its business or property by reason of a violation of 18 U.S.C. § 1962(d).

136.     Sapere is entitled to recover threefold the damages it sustains and the cost of the suit, including a reasonable attorney's fee.

## COUNT IV
(Direct Violations of Commodity Exchange Act against Defendants Corzine, Abelow, Ferber, MacDonald, Serwinski, Mundt, PwC, O'Brien, Klejna)

137.    Plaintiff repeats and realleges the allegations of paragraphs 1 through 116, above, as if fully set forth herein.

138.    The Commodity Exchange Act, 7 U.S.C. § 13c(a), provides that any person who commits a violation of any of the provisions of this chapter, or any of the rules, regulations, or orders issued pursuant to this chapter may be held responsible for such violation as a principal.

139.    The Commodity Exchange Act, 7 U.S.C. § 25(a), also provides that any person (other than a registered entity or registered futures association) who violates this chapter shall be liable for actual damages caused by such violation to any other person.

140.    At all material times, Commodity Exchange Act §§ 4d(a) & 4f(a), 7 U.S.C. §§ 6d(a) & 6f(a), required that FCMs be registered with the CFTC.

141.    At all material times, Commodity Exchange Act § 4k, 7 U.S.C. § 6k, required that all persons associated with a futures commission merchant as a partner, officer, or employee (or any person occupying a similar status or performing similar functions), in any capacity that involves (i) the solicitation or acceptance of customers' orders (other than in a clerical capacity) or (ii) the supervision of any person or persons so engaged, be registered with the CFTC.

142.    At all material times, the CFTC delegated the registration of the aforesaid Commission Registrants to the National Futures Association.

143.    At all material times, MFGI was a Commission Registrant registered as an FCM.

144.    At all material times, the Commodity Exchange Act and 17 CFR § 166.3 thereunder required that each CFTC Registrant ("Commission Registrant"), except an associated person who has no supervisory duties, must diligently supervise the handling by its partners, officers, employees and agents (or persons occupying a similar status or performing a similar function) of all commodity interest accounts carried, operated, advised or introduced by the registrant and all other activities of its partners, officers, employees and agents (or persons occupying a similar status or performing a similar function) relating to its business as a Commission Registrant.

145.    At all material times, each individual MFG Defendant identified herein as having an NFA ID number was a Commission Registrant, was registered as associated with MFGI and was not an associated person who had no supervisory duties at MFGI. Among other things, at all material times:

      a.    Defendant Corzine supervised the entire MFGI workforce.

b.      Defendant Abelow assisted Defendant Corzine in supervising the entire MFGI workforce and Defendant Abelow supervised all Operations and Risk Management personnel of MFGI.

c.      Defendant Ferber assisted Defendant Corzine in supervising the entire MFGI workforce and Defendant Ferber supervised all Legal, Compliance and Internal Audit personnel of MFGI.

d.      Defendant MacDonald, a director of MFGI and senior member of the Executive Team, assisted Defendant Corzine in supervising the entire MFGI workforce, Defendant MacDonald as a member of ALCO supervised the implementation of the Enterprise Risk Policy and Defendant MacDonald supervised at material times the financial operations of MFGI.

e.      Defendant Serwinski supervised the finance and financial regulatory personnel of MFGI.

f.      Defendant Mundt supervised the Treasury Operations of MFGI's FCM business.

146.    Among other things, as herein alleged, each individual MFG Defendant having an NFA ID number:

a.      failed to reasonably discharge the duties imposed by the Enterprise Risk Management Procedure.

b.      failed to establish or maintain procedures for reasonably detecting and preventing use of customer Segregated Funds for MF Global liquidity purposes by persons subject to their supervision.

c. knew of specific incidents of use of customer Segregated Funds for MF Global liquidity purposes, yet failed to take reasonable steps to correct the problems.

d. failed to establish or maintain controls and risk management programs adequate to safeguard segregated funds by persons subject to their supervision.

e. aware that controls and risk management programs were inadequate to safeguard segregated funds by persons subject to their supervision, failed to establish or maintain procedures that would reasonably to prevent or detect wrongful conduct.

f. failed to establish or maintain meaningful controls or procedures for detecting misuse of customer Segregated Funds by persons subject to their supervision and turned a blind eye to such inadequacy and resulting misuse of customer Segregated Funds by persons subject to their supervision.

147. At all material times, each MFG Defendant having an NFA ID number violated the Commodity Exchange Act, including 7 U.S.C. § 13c(a), and 17 CFR § 166.3 by failing diligently to supervise the handling of commodity interest accounts carried, operated, advised or introduced by MFGI, including the accounts of Sapere.

148. At all material times, each individual MFG Defendant having an NFA ID number violated the Commodity Exchange Act, including 7 U.S.C. § 13c(a), and 17 CFR § 166.3 by failing diligently to supervise the other activities of its partners, officers, employees and agents (or persons occupying a similar status or performing a similar function) relating to its business as a Commission Registrant, including its business affecting commodities customers, including Sapere.

149. Upon information and belief, on April 16, 2012, Defendant PwC executed an engagement letter dated January 18, 2012, which provided in pertinent part:

> We will audit the financial statements of MF Global Inc. at March 31, 2010 and for the year ending that you are filing pursuant to Rule 17a-5 under the Securities and Exchange Act of 1934 and Regulation 1.10 of the Commodity Exchange Act. . . . . In addition, we will provide you with a report on internal controls as required by . . . Regulation 1.16 of the Commodities Futures Trading Commission.

150.   Upon information and belief, on December 21, 2010, Defendant PwC executed an engagement letter dated June 24, 2010, which provided in part:

> We will audit the financial statements of MF Global Inc. . . . at March 31, 2010 and for the year ending that you are filing pursuant to Rule 17a-5 under the Securities and Exchange Act of 1934 and Regulation 1.10 of the Commodity Exchange Act. . . . . In addition, we will provide you with a report on internal controls as required by . . . Regulation 1.16 of the Commodities Futures Trading Commission.

151.   At all material times, CFTC Regulation 1.16(d), 17 CFR 1.16(d), provided in pertinent part that:

> (1) The audit must be made in accordance with generally accepted auditing standards and must include a review and appropriate tests of the accounting system, the internal accounting control, and the procedures for safeguarding customer and firm assets in accordance with the provisions of the Act and the regulations thereunder, since the prior examination date. The audit must include all procedures necessary under the circumstances to enable the independent licensed or certified public accountant to express an opinion on the financial statements and schedules. The scope of the audit and review of the accounting system, the internal controls, and procedures for safeguarding customer and firm assets must be sufficient to provide reasonable assurance that any material inadequacies existing at the date of the examination in (i) the accounting system, (ii) the internal accounting controls, and (iii) the procedures for safeguarding customer and firm assets (including, in the case of a futures commission merchant, the segregation requirements of section 4d(a)(2) of the Act and these regulations and the secured amount requirements of the Act and these regulations) will be discovered. Additionally, as specified objectives the audit must include reviews of the practices and procedures followed by the registrant in making (A) periodic computations of the minimum financial requirements pursuant to § 1.17 and (B) in the case of a futures commission merchant, daily computations of the segregation requirements of section 4d(a)(2) of the Act and all applicable regulations and secured amount requirements.

152.   Defendant PwC violated CFTC Regulation 1.16, 17 CFR §1.16, and failed to conduct an audit of MFGI in respect of 2010 and/or 2011 as required by CFTC Regulation 1.16.

Among other things, Defendant PwC failed to include a review and appropriate tests of the accounting system, the internal accounting control, and the procedures for safeguarding customer and firm assets in accordance with the provisions of the Act and the regulations thereunder sufficient to provide reasonable assurance that any material inadequacies existing at the date of the examination in (i) the accounting system, (ii) the internal accounting controls, and (iii) the procedures for safeguarding customer and firm assets (including, in the case of a futures commission merchant, the segregation requirements of section 4d(a)(2) of the Act and these regulations and the secured amount requirements of the Act and these regulations) will be discovered.

153.    Among other things, Defendant PwC in violation of CFTC Regulation 1.16(d), 17 CFR § 1.16(d), also failed to conduct an audit sufficient to provide reasonable assurance that there were no conditions which contributed substantially to or, if appropriate corrective action is not taken, could reasonably be expected to: (i) Inhibit an applicant or registrant from promptly completing transactions or promptly discharging his responsibilities to customers or other creditors; (ii) Result in material financial loss; (iii) Result in material misstatement of the applicant's or registrant's financial statements and schedules; or (iv) Result in violations of the Commission's segregation or secured amount (in the case of a futures commission merchant), recordkeeping or financial reporting requirements to the extent that could reasonably be expected.

154.    As a result of Defendant PwC's violations of CFTC Regulation 1.16, 17 CFR § 1.16, Defendant PwC, upon information and belief on May 27, 2010, issued a "Report of Independent Auditors in Internal Controls Required by . . . CFTC Regulation 1.16" in which Defendant PwC falsely represented that it had made a study of the practices and procedures

followed by MFGI, including consideration of control activities for safeguarding customer and firm assets and in doing so, tested MFGI's compliance with the practices and procedures that Defendant PwC considered relevant to the objectives of Regulation 1.16 and represented that MFGI's practices and procedures were adequate, at March 31, 2010, when they were not.

155.     As a result of Defendant PwC's violations of CFTC Regulation 1.16, 17 CFR § 1.16, Defendant PwC, upon information and belief on May 26, 2011, issued a "Report of Independent Auditors in Internal Controls Required by . . . CFTC Regulation 1.16" in which Defendant PwC falsely represented that it had made a study of the practices and procedures followed by MFGI, including consideration of control activities for safeguarding customer and firm assets and in doing so, tested MFGI's compliance with the practices and procedures that Defendant PwC considered relevant to the objectives of Regulation 1.16 and represented that MFGI's practices and procedures were adequate, at March 31, 2011, when they were not.

156.     Sapere is among the U.S. commodities customers of MFGI that had deposited cash for use as margin on non-U.S. exchanges and which, upon information and belief, MFGI deposited with MF Global UK Ltd. pursuant to a CFTC exemption order issued in June 1989, that required MFGI to safeguard the U.S. commodities customers' assets in conformity with the UK's regime for safeguarding customer assets. At all material times, the UK's FSA CASS regulations were the UK regime for safeguarding customer assets including the U.S. commodities customers' cash placed with MFGI for use as margin and the CASS regulations required that such customer assets be fully secured at all times.

157.     According to Richard Heis, one of the Joint Special Administrators of MF Global UK Ltd.:

a.      as of October 21, 2011, MFGI had swapped out $615,690,000 of cash that MFGI's U.S. commodities customers had deposited with MFGI for use as margin for such U.S. customers' commodities futures transactions on non-U.S. exchanges.

b.      MFGI swapped out the customers' cash in order to use the cash to meet MFGI's liquidity demands.

c.      although the U.S. commodities customers had deposited the cash for use as margin and subject to safeguarding under CFTC regulations and orders, MFGI swapped out its U.S. commodities customers' cash for MFGI's T-Bills and/or Eurobonds on an "absolute title" basis and the T-Bills and/or Eurobonds were physically held at the Bank of New York.

d.      by swapping the commodities customers' cash out for T-Bills and/or Eurobonds on an absolute title basis, the T-Bills and/or Eurobonds ceased to secure MFGI's obligations to the U.S. commodities customers under the UK's CASS custody rules.

158.    Upon information and belief, the MFG Defendants who supervised, knew of and implemented the swap-outs include Defendants Steenkamp, Corzine, Abelow, Ferber, Serwinski, O'Brien and Klejna. If what Heis states is true, then Defendants Steenkamp, Corzine, Abelow, Ferber, Serwinski, O'Brien, Klejna and others whose identities are not yet known violated the commodities customer safeguard provisions of the Commodity Exchange Act, the CFTC regulations and the CFTC orders applicable to MFGI's placing commodities customers' funds with MF Global UK Ltd.

## COUNT V

(Liability as Principal for Violations of the Commodity Exchange Act Against Defendants
Corzine, Abelow, Steenkamp, Bolger, Fusco, Gelber, Glynn, Goldberg, Schamis, Sloan, and
Ferber )

159.   Plaintiff repeats and realleges the allegations of paragraphs 1 through 116 and 137
through 158, above, as if fully set forth herein.

160.   The Commodity Exchange Act, 7 U.S.C. § 13c(a), provides in pertinent part that:

> Any person . . . who willfully aids, abets, counsels, commands, induces, or
> procures the commission of, a violation of any of the provisions of this chapter, or
> any of the rules, regulations, or orders issued pursuant to this chapter, or who acts
> in combination or concert with any other person in any such violation, or who
> willfully causes an act to be done or omitted which if directly performed or
> omitted by him or another would be a violation of the provisions of this chapter or
> any of such rules, regulations, or orders may be held responsible for such
> violation as a principal.

161.   The Commodity Exchange Act, 17 U.S.C. § 25(a), also provides that any person
(other than a registered entity or registered futures association) who willfully aids, abets,
counsels, induces, or procures the commission of a violation of this chapter shall be liable for
actual damages caused by such violation to any other person.

162.   At all material times, Commodity Exchange Act § 4k, 7 U.S.C. § 6k, required that
all persons associated with a futures commission merchant as a partner, officer, or employee (or
any person occupying a similar status or performing similar functions), in any capacity that
involves (i) the solicitation or acceptance of customers' orders (other than in a clerical capacity)
or (ii) the supervision of any person or persons so engaged, be registered with the CFTC.

163.   At all material times, the CFTC delegated the registration of the aforesaid
Commission Registrants to the National Futures Association.

164.   At all material times, MFGI was a Commission Registrant registered as an FCM.

165.    At all material times, MF Global Holdings USA, Inc. was a CFTC registrant associated with MFGI, MF Global Holdings USA, Inc. was the sole shareholder of MFGI and MF Global Holdings USA, Inc. supervised the entire workforce of MFGI. Among other things, as herein alleged, MF global USA, Inc.:

a.      failed to reasonably discharge the duties imposed by the Enterprise Risk Management Procedure.

b.      failed to establish or maintain procedures for reasonably detecting and preventing use of customer Segregated Funds for MF Global liquidity purposes by persons subject to their supervision.

c.      knew of specific incidents of use of customer Segregated Funds for MF Global liquidity purposes, yet failed to take reasonable steps to correct the problems.

d.      failed to establish or maintain controls and risk management programs adequate to safeguard segregated funds by persons subject to their supervision.

e.      aware that controls and risk management programs were inadequate to safeguard segregated funds by persons subject to their supervision, failed to establish or maintain procedures that would reasonably to prevent or detect wrongful conduct.

f.      failed to establish or maintain meaningful controls or procedures for detecting misuse of customer Segregated Funds by persons subject to their supervision and turned a blind eye to such inadequacy and resulting misuse of customer Segregated Funds by persons subject to their supervision.

166.    At all material times, MF Global USA, Inc. violated the Commodity Exchange Act, including 7 U.S.C. § 13c(a), and 17 CFR § 166.3 by failing diligently to supervise the

handling of commodity interest accounts carried, operated, advised or introduced by MFGI, including the accounts of Sapere.

167.   At all material times, MF Global USA, Inc. violated the Commodity Exchange Act, including 7 U.S.C. § 13c(a), and 17 CFR § 166.3 by failing diligently to supervise the other activities of its partners, officers, employees and agents (or persons occupying a similar status or performing a similar function) relating to its business as a Commission Registrant, including its business affecting commodities customers, including Sapere.

168.   At all material times, Defendants Corzine, Abelow, Steenkamp, Bolger, Fusco, Gelber, Glynn, Goldberg, Schamis, Sloan, and Ferber, each as a director of MF Global Holdings, Ltd. the sole shareholder of MF Global Holdings USA, Inc. and/or as a director of MF Global Holdings USA, Inc., jointly and severally, violated the Commodity Exchange Act, including 7 U.S.C. § 13c(a), and 17 CFR § 166.3 by willfully causing acts to be done or omitted which if directly performed or omitted by another (including the members of the workforce of MFGI) would be a violation of the Commodities Exchange Act and/or the rules, regulations or orders of the CFTC.

169.   Additionally, Defendants Corzine, Abelow, Steenkamp, Bolger, Fusco, Gelber, Glynn, Goldberg, Schamis, Sloan, and Ferber, in allowing and/or turning a blind eye to the misuse and/or looting of commodities customers' funds as herein alleged, including to facilitate the liquidity needs of the MF Global enterprise, thereby violated CEA §§ 13(a) & 22(a)(1), 7 U.S.C. § 13c(a) & 25(a)(1).

170.   As a result of the foregoing, Defendants Corzine, Abelow, Steenkamp, Bolger, Fusco, Gelber, Glynn, Goldberg, Schamis, Sloan, and Ferber , jointly and severally, are liable as principal, pursuant to CEA §§ 13(a) & 22(a)(1), 7 U.S.C. §§ 13c(a) & 25(a)(1), to Sapere for

actual damages to Sapere resulting from its having deposited money, securities, and property in Sapere's accounts at MFGI, including access to the cash and T-Bills which Sapere has been deprived of by the aforesaid violation access and the cash and T-Bills looted as a consequence of the aforesaid violations from the accounts in which Sapere deposited them.

## COUNT VI

(Aiding and Abetting Violations of the Commodity Exchange Act against MFG Defendants)

171.    Plaintiff repeats and realleges the allegations of paragraphs 1 through 116 and 137 through 158, above, as if fully set forth herein.

172.    Sapere had deposited with the business unit of the MF Global enterprise that was registered with the CFTC as an FCM—i.e., MFGI—the money, securities and property in Sapere's accounts (including Sapere's cash and T-Bills) in connection with orders that Sapere was and would be making to MFGI to make for Sapere contracts of sale (and/or options on such contracts) for future delivery of commodities.

173.    The MFG Defendants also willfully aided, abetted, counseled, induced and/or procured the commission by MFGI of one or more violations of the Commodity Exchange Act, 7 U.S.C. §§ 1, *et seq*. The aforesaid violations included:

a.    Violation of CEA § 4d(a)(2), 7 U.S.C. § 6d(a)(2), which provides in pertinent part:

> such person [i.e., MFGI] shall, whether a member or nonmember of a contract market or derivatives transaction execution facility, treat and deal with all money, securities, and property received by such person to margin, guarantee, or secure the trades or contracts of any customer [i.e., Sapere] of such person [i.e., MFGI], or accruing to such customer [i.e., Sapere] as the result of such trades or contracts, as belonging to such customer [i.e., Sapere].

98

b.      Violation of CEA § 4d(a)(2), 7 U.S.C. § 6d(a)(2), which provides in pertinent part:

> Such money, securities, and property shall be separately accounted for and shall not be commingled with the funds of such commission merchant [i.e., MFGI] or be used to margin or guarantee the trades or contracts, or to secure or extend the credit, of any customer or person [e.g., the MF Global enterprise, any of the enterprise's constituent elements and/or any person with whom the MFG Defendants and/or the enterprise was transacting business] other than the one [i.e., Sapere] for whom the same are held. . . .

c.      Violation of CEA § 4d(a)(2), 7 U.S.C. § 6d(a)(2) and 17 CFR § 1.20(a), which provides that "All customer funds shall be separately accounted for and segregated as belonging to commodity or option customers."

d.      Violation of CEA § 4b(a)(1)(A), 7 U.S.C. § 6b(a). Sapere deposited money, securities, and property with MFGI in connection with making and with the future making of orders to MFGI to make contracts for the sale of commodities in interstate commerce and for future delivery on or subject to the rules of designated contract markets. The conduct hereinabove alleged cheated Sapere in connection therewith. This CEA section provides that:

> It shall be unlawful—(1) for any person, in or in connection with any order to make, or the making of, any contract of sale of any commodity in interstate commerce or for future delivery that is made, or to be made, on or subject to the rules of a designated contract market, for or on behalf of any other person; . . . . (A) to cheat or defraud or attempt to cheat or defraud the other person [i.e., Sapere]; . . . .

e.      Violation of CEA § 4b(a)(1)(C), 7 U.S.C. § 6b(a), Sapere deposited money, securities, and property with MFGI in connection with making and with the future making of orders to MFGI to make contracts for the sale of commodities in interstate commerce and for future delivery on or subject to the rules of designated

99

contract markets. The willful conduct hereinabove alleged deceived Sapere in connection therewith. This CEA section provides that:

> It shall be unlawful—(1) for any person, in or in connection with any order to make, or the making of, any contract of sale of any commodity in interstate commerce or for future delivery that is made, or to be made, on or subject to the rules of a designated contract market, for or on behalf of any other person; . . . . (C) willfully to deceive or attempt to deceive the other person by any means whatsoever in regard to any order or contract or the disposition or execution of any order or contract, or in regard to any act of agency performed, with respect to any order or contract for . . . the other person; . . . .

f.       Violation of CEA § 4(b), 7 U.S.C. § 6(b), CEA § 4d(a)(2), 7 U.S.C. § 6d(a)(2) and 17 CFR §§ 1.25(b) & 30.7(g) by purporting to invest cash and T-Bills that were part of segregated funds in repurchase transactions between MFGI's FCM business unit and its BD business unit that did not comply with the requirement that the investment be equivalent to the cash and T-Bills in preserving principal and liquidity, in addition to being on the permitted investment list and meeting the other requirements of § 1.25.

g.       Violation of CEA § 4(b), 7 U.S.C. § 6(b) and the rules and regulations thereunder requiring the safeguarding of customer funds by persons located in the United States who engages in the offer or sale of any contract of sale of a commodity for future delivery that is made or to be made on or subject to the rules of a board of trade, exchange, or market located outside the United States, its territories or possessions. CEA § 4(b), 7 U.S.C. § 6(b) and 17 CFR § 30.7 required that the MF Global enterprise maintain in a separate account or accounts money, securities and property in an amount at least sufficient to cover or satisfy all of its current obligations to foreign futures or foreign options customers denominated as the foreign futures or foreign options secured

amount. CEA § 4(b), 7 U.S.C. § 6(b) and 17 CFR § 30.7 required that such money, securities and property not be commingled with the money, securities or property of such futures commission merchant, with any proprietary account of such futures commission merchant, or used to secure or guarantee the obligations of, or extend credit to, such futures commission merchant or any proprietary account of such futures commission merchant. CEA § 4(b), 7 U.S.C. § 6(b) and 17 § CFR 30.10, pursuant to an exemption obtained by the MF Global enterprise thereunder to deposit customer funds with MFGUK, further required the MF Global enterprise to segregate and safeguard pursuant to CASS, including CASS rules 6 and 7, all U.S. customer funds placed with MFGUK. The willful conduct hereinabove alleged violated those requirements.

h.      Violation of CEA § 4(b), 7 U.S.C. § 6(b), and the rules and regulations thereunder proscribing fraud. Sapere deposited money, securities, and property with MFGI in connection the offer and sale of contracts of sale of a commodity for future delivery that is made or subject to the rules of a board of trade, exchange or market located outside the United States. The conduct hereinabove alleged cheated Sapere in connection therewith in violation of CEA § 4(b), 7 U.S.C. § 6(b), and 17 CFR § 30.9(a) which make it unlawful to "cheat or defraud or attempt to cheat or defraud any other person"; CEA § 4(b), 7 U.S.C. § 6(b), and 17 CFR § 30.9(b) which make it unlawful to "make or cause to be made to any other person any false report or statement thereof or to enter or to cause to be entered any false record"; and CEA § 4(b), 7 U.S.C. § 6(b), and 17 CFR § 30.9(c) which make it unlawful to "deceive or attempt to deceive any other person by any means whatsoever." The willful conduct hereinabove alleged violated those requirements.

i.      Violation of CEA § 4(b), 7 U.S.C. § 6(b) and 17 CFR § 30.7(c)(2), in respect of cash and T-Bills deposited at MFGUK by allowing them to be on deposit without obtaining an acknowledgment from such depository that it was informed that such money, securities or property are held for or on behalf of foreign futures and foreign options customers and are being held by the depository in accordance with the provisions of the CFTC's 30.7 regulations. Among other things, according to the May 3, 2012 statement of Richard Heis, instead of transferring customer funds to MFGUK as required by 17 CFR § 30.7(c)(2) and the 30.10 exemption that further subjected the deposits to the CASS segregation requirements, MFGI had as of October 31, 2011, transferred to MFGUK full ownership of U.S. commodities customer assets deposited at MFGUK.

174.    As a result of the foregoing, the MFG Defendants, jointly and severally, are liable pursuant to CEA § 22(a)(1), 7 U.S.C. § 25(a)(1), to Sapere for willfully aiding, abetting, counseling, inducing and/or procuring the commission by MFGI of one or more violations of the CEA and for actual damages to Sapere resulting from its having deposited money, securities, and property in Sapere's accounts at MFGI, including the cash and T-Bills to which Sapere has been deprived access and the cash and T-Bills looted from the accounts in which Sapere deposited them.

## COUNT VII
### (Breach of Fiduciary Duty against MFG Defendants)

175.    Plaintiff repeats and realleges the allegations of paragraphs 1 through 116, above, as if fully set forth herein.

176.    Each MFG Defendant owed to commodities customers, including Sapere, a fiduciary duty to maintain commodities customers' Segregated Funds as the sole property of

each commodities customer who deposited such funds and to allow such funds to be used solely as directed by such commodities customer.

177.    The MFG Defendants breached their fiduciary duties to commodities customers, including Sapere.

178.    The MFG Defendants, jointly and severally, are liable to Sapere for actual damages to Sapere resulting from its having deposited money, securities, and property in Sapere's accounts at MFGI, including the cash and T-Bills of access to which Sapere has been deprived.

<u>**COUNT VIII**</u>
(Constructive Fraud against MFG Defendants)

179.    Plaintiff repeats and realleges the allegations of paragraphs 1 through 116, above, as if fully set forth herein.

180.    Each MFG Defendant had superior knowledge to that of Sapere concerning the safeguarding of commodities customers' Segregated Funds.

181.    Each MFG Defendant also had a fiduciary relationship to Sapere as heretofore alleged.

182.    By allowing MFGI to represent 24/7 online, in account statements and in website and other publications that commodities customers' Segregated Funds were being safeguarded and that their accounts contained deposited assets which in fact were not there, which representations were material, false and untrue because such funds were not safeguarded and to the contrary were materially placed at risk, each MFG Defendant, jointly and severally, constructively defrauded Sapere.

183.     Sapere reasonably relied on such representations in continuing to allow MFGI to retain Sapere's deposited assets.

184.     The MFG Defendants, jointly and severally, are liable to Sapere for actual damages to Sapere resulting from its having deposited money, securities, and property in Sapere's accounts at MFGI, including the cash and T-Bills of access to which Sapere has been deprived.

185.     The MFG Defendants' fraud is of an egregious nature directed at the public generally and punitive damages are an appropriate remedy for such misconduct.

## COUNT IX
(Actual Fraud against MFG Defendants)

186.     Plaintiff repeats and realleges the allegations of paragraphs 1 through 116, above, as if fully set forth herein.

187.     Each MFG Defendant knowingly allowed MFGI to represent 24/7 online, in account statements and in website and other publications that commodities customers' Segregated Funds were being safeguarded and that their accounts contained assets which in fact were not there, which representations were false and untrue because such funds were not safeguarded and to the contrary were materially placed at risk.

188.     Sapere reasonably relied on such representations in continuing to allow MFGI to retain Sapere's deposited assets.

189.     Each MFG Defendant knew that the liquidity demands of MFGI were placing the commodities customers' Segregated Funds at risk and each MFG Defendant failed to cause such risk to be disclosed to the commodities customers, including Sapere.

190.     The aforesaid misrepresentations to commodities customers, including Sapere, were part of the means by which the MFG Defendants met the liquidity demands of the MF Global enterprise.

191.     The aforesaid acts and omissions of the MFG Defendants comprise actual fraud, as they constitute cunning and surprise means devised by the MFG Defendants to gain an advantage over commodities customers, including Sapere, by false suggestions and suppression of truth.

192.     The MFG Defendants, jointly and severally, are liable to Sapere for actual damages to Sapere resulting from its having deposited money, securities, and property in Sapere's accounts at MFGI, including the cash and T-Bills of access to which Sapere has been deprived.

193.     The MFG Defendants' fraud is of an egregious nature directed at the public generally and punitive damages are an appropriate remedy for such misconduct.

194.      The MFG Defendants, jointly and severally, are liable to Sapere for actual damages to Sapere resulting from its having deposited money, securities, and property in Sapere's accounts at MFGI, including the cash and T-Bills of access to which Sapere has been deprived.

## COUNT X
(Conversion against MFG Defendants)

195.     Plaintiff repeats and realleges the allegations of paragraphs 1 through 116, above, as if fully set forth herein.

196.     Sapere had the right to possess its accounts with the MF Global enterprise and the funds in them (including cash and T-Bills).

197.     The MFG Defendants, jointly and severally, interfered intentionally with Sapere's possession of its accounts with the MF Global enterprise and the funds in them.

198.     The MFG Defendants' interference deprived Sapere of possession and/or use of its accounts with the MF Global enterprise and the funds in them.

199.     The MFG Defendants' interference caused damage to Sapere.

200.     The MFG Defendants, jointly and severally, converted portions of Sapere's accounts, including cash and securities (to-wit: T-Bills) as hereinabove alleged.

201.     The MFG Defendants' tortious misconduct has shaken the U.S. commodities marketplace to its core and jeopardized businesses statewide, nationwide and worldwide, from farmers in America's heartland to investors around the world. The MFG Defendants' misconduct is outrageous, a conscious and deliberate disregard of Sapere's rights, a conscious and deliberate disregard of the rights of customers with cash, T-Bills and/or other items of value on deposit in their accounts and a fraud on the public generally. Punitive damages are required for such misconduct.

## COUNT XI
(Trespass to Chattels against MFG Defendants)

202.     Plaintiff repeats and realleges the allegations of paragraphs 1 through 116, above, as if fully set forth herein.

203.     Sapere's accounts at the MF Global enterprise and the funds in them (including cash and T-Bills) are chattels of which Sapere had and was and is entitled to possession.

204.     The MFG Defendants, jointly and severally, intentionally dispossessed Sapere of the chattels, used them and/or intermeddled with them for a substantial time.

205.    The MFG Defendants' trespass impaired the chattels in their condition, quality and/or value and caused damage to Sapere.

206.    The MFG Defendants' tortious misconduct has shaken the U.S. commodities marketplace to its core and jeopardized businesses statewide, nationwide and worldwide, from farmers in America's heartland to investors around the world. The MFG Defendants' misconduct is outrageous, a conscious and deliberate disregard of Sapere's rights, a conscious and deliberate disregard of the rights of customers with cash, T-Bills and/or other items of value on deposit in their accounts and a fraud on the public generally.

### COUNT XII
(Interference with Contract Rights against MFG Defendants)

207.    Plaintiff repeats and realleges the allegations of paragraphs 1 through 116, above, as if fully set forth herein.

208.    Sapere had deposited money, securities and property (including Sapere's cash and T-Bills) in the aforesaid accounts pursuant to a written contract originally entered into with MFGI's predecessor (Man Financial) to secure, margin and/or guarantee trades and/or contract of Sapere. Sapere had contract rights with MFGI that it would treat and deal with Sapere's money, securities and property in its accounts as belonging to Sapere. Sapere had contracts rights that the money, securities and property in its accounts would be separately accounted for and not commingled with or be used to margin or guarantee the trades or contracts, or to secure or extend the credit, of any person other than Sapere.

209.    The MFG Defendants, jointly and severally, intentionally interfered with Sapere's contract rights, directly and proximately causing damage to Sapere.

210.    The MFG Defendants' tortious interference with Sapere's contract rights is outrageous and a conscious and deliberate disregard of Sapere's rights. The MFG Defendants, jointly and severally, likewise interfered with the contract rights of others who had similar contracts with MF Global, Inc. The MFG Defendants' tortious interference has been a conscious and deliberate disregard of the rights of those customers with contract rights protecting money, securities and property in their accounts and a fraud on the public generally. The MFG Defendants' tortious misconduct has shaken the U.S. commodities marketplace to its core and jeopardized businesses statewide, nationwide and worldwide, from farmers in America's heartland to investors around the world. Punitive damages are required for such misconduct.

## COUNT XIII
### (Violation of N.Y.G.B.L. § 349 against MFG Defendants)

211.    Plaintiff repeats and realleges the allegations of paragraphs 1 through 116, above, as if fully set forth herein.

212.    As hereinabove alleged, the MFG Defendants engaged in deceptive acts or practices in the conduct of business, trade and/or commerce and/or in the furnishing of any service within the State of New York, willfully and/or knowingly violating Section 349 of the New York General Business Law.

213.    Sapere has been injured by reason of the violation of Section 349 and is entitled to recover its actual damages plus reasonable attorneys' fees.

## COUNT XIV
### (Aiding and Abetting Tortious Conduct Against MFG Defendants)

214.    Plaintiff repeats and realleges the allegations in Counts I and VII through XIII above.

215.    Additionally, the MF Global enterprise, and in particular MFGI as FCM, stood in a fiduciary relationship with Sapere. This status imposed on the MF Global enterprise, and MFGI in particular, an affirmative duty of utmost good faith, and full and fair disclosure of all material facts. MFGI breached this fiduciary duty.

216.    If and to the extent that a MFG Defendant did not commit an aforesaid tort as principal, such MFG Defendant caused harm to Sapere resulting from the tortious conduct of each other, MF Global Holdings, Ltd. and/or MF Global, Inc., as aforesaid, and each MFG Defendant aided and abetted such tortious conduct and is subject to liability because such MFG Defendant:

a.    did a tortious act in concert with other MFG Defendants and/or pursuant to a common design with them;

b.    knew and/or recklessly ignored that each other's, Holdings, MF Global Holdings USA, Inc.'s and/or MFGI's conduct constituted a breach of duty and/or gave substantial assistance or encouragement to the other so to conduct himself; and/or

c.    gave substantial assistance to each other, Holdings, MF Global Holdings USA, Inc. and/or MFGI in accomplishing a tortious result and such MFG Defendant's own conduct, separately considered, constituted a breach of duty to Sapere; among other things, each MFG Defendant approved and facilitated the aforesaid unlawful conduct and had he or she properly performed his or her legal responsibilities he or she could and would have prevented the unlawful conduct hereinabove alleged and each of them owed a fiduciary duty to Sapere which he or she breached as hereinabove alleged.

217.    The MFG Defendants' aiding and abetting of tortious conduct is outrageous and a conscious and deliberate disregard of Sapere's rights. The MFG Defendants' aiding and abetting

of tortious misconduct has also been a conscious and deliberate disregard of other commodities customers and has shaken the U.S. commodities marketplace to its core and jeopardized businesses statewide, nationwide and worldwide, from farmers in America's heartland to investors around the world. Punitive damages are required for such misconduct.

**WHEREFORE**, plaintiff demands judgment against defendants, jointly and severally:

a.    For compensatory damages of $100 million, or such other sum as may be established;

b.    For threefold damages;

c.    For punitive damages nine-fold the compensatory damages or in such other amount as shall be just and proper;

d.    For interest and costs of suit including attorneys' fees; and

e.    For such other and further relief as may be just and proper.

Dated: December 18, 2012
New York, New York

**FORD MARRIN ESPOSITO WITMEYER
& GLESER, L.L.P.**

By: /s/ John J. Witmeyer III
John J. Witmeyer III (JW 7442)
Jon R. Grabowski (JG 9845)
Ford Marrin Esposito Witmeyer & Gleser, L.L.P.
Wall Street Plaza
New York, New York 10005
Tel: (212) 269-4900
Fax: (212) 344-4294
Email: jjwitmeyer@fmew.com
        jrgrabowski@fmew.com

-and-

**HOWARD, STALLINGS, FROM
& HUTSON, P.A.**

110

Joseph H. Stallings (JS 5065)
5410 Trinity Road, Suite 210 (27607)
P.O. Box 12347
Raleigh, North Carolina 27605
Tel: 919-821-7700
Fax: 919-821-7703
Email: jstallings@hsfh.com

*Attorneys for Sapere CTA Fund L.P.*