USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 11/12/13

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------X

IN RE MF GLOBAL HOLDINGS LIMITED       :
SECURITIES LITIGATION                  :

------------------------------------:            11 Civ. 7866 (VM)
                                       :
                                       :         **DECISION AND ORDER**
This document relates to all           :
securities actions.                    :
                                       :
(*DeAngelis v. Corzine*)               :
                                       :
------------------------------------X

**VICTOR MARRERO, United States District Judge.**

## TABLE OF CONTENTS

I.   INTRODUCTION ........................................ 5

II.  BACKGROUND ......................................... 13

     A.   THE PARTIES ................................... 14
          1. Plaintiffs and the Class ................... 14
          2. Officer Defendants ......................... 15
          3. Independent Director Defendants ............ 16
          4. Underwriter Defendants and Senior Notes
             Underwriter Defendants ..................... 16

     B.   FACTUAL ALLEGATIONS ........................... 16
          1. DTA and Net Income ......................... 17
          2. RTM Strategy ............................... 24
          3. MF Global's Collapse ....................... 36

     C.   PROCEDURAL HISTORY ............................ 38

III. LEGAL STANDARD ..................................... 39

     A.   PLEADING STANDARDS: RULE 12(b)(6), RULE 8(a),
          RULE 9(b), AND THE PSLRA ...................... 40
     B.   THE EXCHANGE ACT .............................. 42
          1. Section 10(b) and Rule 10b-5 ............... 42
             a.  Misstatements or Omissions of Material
                 Fact .................................. 44
             b.  Scienter .............................. 51
          2. Section 20(a) .............................. 54

    C.   THE SECURITIES ACT ............................ 57
        1. Section 11 and Section 12(a)(2) ............ 57
        2. Section 15(a) ............................... 59

IV.  DISCUSSION ......................................... 60

    A.   PLEADING STANDARDS ........................... 60
        1. Exchange Act Claims ........................ 60
        2. Securities Act Claims ...................... 64

    B.   MATERIAL MISSTATEMENTS OR OMISSIONS ............ 67
        1. DTA and Net Income ......................... 67
            a.  Whether the Statements about DTA Are
               Opinion ............................... 68
            b.  Whether the CAC Pleads Subjective and
               Objective Falsity .................... 72
            c.  Bespeaks Caution ...................... 77
        2. RTM Strategy .............................. 80
            a.  False or Misleading Statements ....... 81
            b.  Bespeaks Caution / PSLRA Safe Harbor ..86

    C.   EXCHANGE ACT DEFENSES ......................... 87
        1. Strong Inference of Scienter .............. 87
        2. Control Persons Claims ..................... 93

    D.   SECURITIES ACT DEFENSES ....................... 94
        1. Liability for Forms 10-Q ................... 94
        2. Reliance on Audited Statements ............. 96
        3. Evidence of Purchase ....................... 99
        4. Control Persons Claims ....................103

V.   ORDER ............................................103

\* \* \*

Lead Plaintiffs The Virginia Retirement System and Her Majesty The Queen In Right Of Alberta, along with several other named plaintiffs (collectively, "Plaintiffs"), individually and on behalf of all others similarly situated (the "Class"), filed this Consolidated Amended Securities Class Action Complaint (the "CAC") against defendants Jon

S. Corzine ("Corzine"), J. Randy MacDonald ("MacDonald"), and Henri J. Steenkamp ("Steenkamp"; collectively, the "Officers" or the "Officer Defendants"); defendants David P. Bolger, Eileen S. Fusco, David Gelber, Martin J. Glynn, Edward L. Goldberg, David I. Schamis, and Robert S. Sloan (collectively, the "Independent Directors" or the "Independent Director Defendants");[1] defendants Citigroup Global Markets Inc., Deutsche Bank Securities Inc., Goldman Sachs & Co., J.P. Morgan Securities LLC, Merrill, Lynch, Pierce, Fenner & Smith Incorporated, and RBS Securities Inc. (collectively, the "Underwriters" or the "Underwriter Defendants"); and defendants BMO Capital Markets Corp., Commerz Markets LLC, Jefferies & Company, Inc., Lebenthal & Co., LLC, Natixis Securities North America Inc., Sandler O'Neill & Partners, L.P., and U.S. Bancorp Investments, Inc. (collectively, the "Senior Notes Underwriters" or the "Senior Notes Underwriter Defendants").[2]

Plaintiffs' fourteen-count CAC (Dkt. No. 330) asserts violations of Section 10(b) of the Securities Exchange Act

---

[1] The Officer Defendants and the Independent Director Defendants are, collectively, the "Individual Defendants."

[2] The Independent Director Defendants, the Underwriter Defendants, and the Senior Notes Underwriter Defendants are, collectively, the "Securities Act Defendants." All defendant groups -- the Officer Defendants, the Independent Director Defendants, the Underwriter Defendants, and the Senior Notes Underwriter Defendants -- are collectively referred to as "Defendants."

of 1934 (the "Exchange Act"), 15 U.S.C. § 78j(b) ("Section 10(b)"); Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5 ("Rule 10b-5"); Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a) ("Section 20(a)"); Section 11 of the Securities Act of 1933 (the "Securities Act"), 15 U.S.C. § 77k ("Section 11"); Section 12(a)(2) of the Securities Act, 15 U.S.C. § 77l(a)(2) ("Section 12(a)(2)"); and Section 15(a) of the Securities Act, 15 U.S.C. § 77o(a) ("Section 15(a)"). Defendants moved to dismiss all counts of the CAC (see Dkt. Nos. 357, 360, 364, 366, 368, 373), and the parties have fully briefed the motions.[3]

---

[3] The Court has reviewed the parties' filings in this matter: Memorandum of Law in Support of Defendant Jon S. Corzine's Motion to Dismiss the Consolidated Amended Securities Complaint, dated October 19, 2012 ("Corzine's Motion") (Dkt. No. 369); Memorandum of Law in Support of Defendant J. Randy MacDonald's Motion to Dismiss, dated October 19, 2012 ("MacDonald's Motion") (Dkt. No. 361); Memorandum of Law in Support of Henri Steenkamp's Motion to Dismiss the Consolidated Amended Securities Class Action Complaint, dated October 19, 2012 ("Steenkamp's Motion") (Dkt. No. 374); Memorandum of Law in Support of the Independent Directors' Motion to Dismiss the Consolidated Amended Securities Class Action Complaint, dated October 19, 2012 ("Independent Directors' Motion") (Dkt. No. 358); Memorandum of Law in Support of Underwriters' Motion to Dismiss, dated October 19, 2012 ("Underwriters' Motion") (Dkt. No. 365); Memorandum of Law in Support of the Senior Notes Underwriters' Motion to Dismiss the Consolidated Amended Securities Class Action Complaint, dated October 19, 2012 ("Senior Notes Underwriters' Motion") (Dkt. No. 367); Plaintiffs' Omnibus Opposition to Defendants' Motions to Dismiss, dated December 18, 2012 ("Plaintiffs' Opposition"); Reply Memorandum of Law in Support of the Officer Defendants' Motions to Dismiss the Consolidated Amended Securities Complaint, dated February 1, 2013 ("Officers' Reply") (Dkt. No. 454); Defendant Randy J. MacDonald's Reply Memorandum of Law in Further Support of His Motion to Dismiss the Amended Complaint, dated February 1, 2013 ("MacDonald's Reply") (Dkt. No. 448); Reply Memorandum of Law in Further Support of the Securities Act Defendants' Motions to Dismiss, dated February 1, 2013 ("Securities Act Defendants' Reply") (Dkt. No. 450); Supplemental Reply Memorandum of Law in Further Support of the Underwriters' and the Senior Notes Underwriters' Motion to

## I.   INTRODUCTION

If ever there was a federal securities fraud case that offered the parties a unique opportunity to depart from scripted litigation strategy and give Rule 1 of the Federal Rules of Civil Procedure a fair chance, this was it: an action that could have served as a prime candidate for litigants to test that exceedingly rare prospect.

At the initial conference on this matter, the Court likened the events surrounding the catastrophic collapse of MF Global Holdings Limited ("MF Global" or the "Company") in the closing days of October of 2011 to a massive train wreck in which thousands of people -- passengers, crew, bystanders, and others -- were seriously injured upon sudden impact with a force the victims could not see coming.   As Plaintiffs relate the events, at the culmination of what occurred at MF Global in the course of a few days, $1.6 <u>billion</u> had disappeared from the company. Cash from customer accounts could not be found.   Initially, no one could explain what happened to the money.   Much later on, its trail was traced through circuitous

Dismiss, dated February 1, 2013 ("Underwriters' and Senior Notes Underwriters' Reply") (Dkt. No. 451); and Reply Memorandum of Law in Further Support of the Independent Directors' Motion to Dismiss the Consolidated Amended Securities Class Action Complaint, dated February 1, 2013 ("Independent Directors' Reply") (Dkt. No. 452).

international channels to MF Global corporate accounts, where the funds had been improperly commingled and used to cover questionable company transactions.

The Court's train wreck analogy was meant as a hint giving a form of guidance. As the doctrine of res ipsa loquitur suggests, when an unusual accident strikes during the particular defendant's watch and control over the circumstances, especially in a case of immense magnitude such as the disaster at issue here, some facts about the calamity's proximate cause may be presumed: at minimum that someone somewhere did something wrong -- and presumably not anyone directly hurt by the misfortune. Bearing this premise in mind as a starting point, the Court's observation suggested a practical framework within which the parties could examine the legal issues the case raises and consider pursuing the exceptional route to the most speedy, economical, and just resolution possible. With the assumption up front that something here went terribly awry, the parties could more easily turn to the search for relevant evidence, thus enabling them much sooner to sort out legal issues and to apportion responsibility in a manner consistent with the fuller record. Unfortunately,

the suggestion of such an economical shortcut held no sway. Apparently, efficiency was not in the cards.

And so, before further investigation into Plaintiffs' claims as to what set in motion such an extraordinary chain of events, Defendants seem convinced that no one named in this lawsuit could possibly have done anything wrong.  So confident are they of the validity of this perception that, at what must have amounted to an enormous expenditure of money, time and energy,[4] they seek a court ruling dismissing the complaint in its entirety, thus barring any discovery that might shed light on remaining unknowns that bear momentous consequences for the victims who have suffered the losses.

MF Global's demise, however, is not a complete mystery.  In their CAC, Plaintiffs compiled an extensive factual recitation, which the Court must accept as true for the purposes of ruling on Defendants' motions, comprising 695 paragraphs, filling 218 pages, and pleading 14 claims of unlawful conduct arising from the events leading to the eventual disintegration and bankruptcy of MF Global on October 31, 2011.  As detailed below, Plaintiffs'

---

[4] Defendants' numerous motions and replies generated 184 pages of briefing memoranda, not counting the accompanying voluminous declarations and exhibits.

allegations suggest a long, knowing, and consistent course of action on the part of the various Defendants, wrongful conduct that cumulatively produced the harmful outcome that came to pass. Moreover, this account is not based on pure speculation or the traditional pleading foundation grounded primarily upon information and belief. Rather, Plaintiffs' portrayal of the facts possesses an added measure of reliability and plausibility. It draws heavily from the public record of information generated by various investigations performed by government regulators and congressional committees.[5]

As highlights of the most salient of Defendants' wrongful acts, Plaintiffs assert that MF Global: inflated its profits by recording deferred tax assets on its balance sheet even in light of evidence, known to the Officers, that the Company would never realize those assets; engaged in a high-risk strategy of investing in European sovereign

---

[5] Plaintiffs make use of reports issued by the Trustee for the SIPA Liquidation of MF Global Inc., the Trustee for the Chapter 11 Bankruptcy of MF Global Holdings Ltd., and the United States Treasury Department's Office of Financial Research, and of hearings conducted before the United States House of Representatives Committee on Agriculture, the United States Senate Committee on Agriculture, Nutrition, and Forestry, and the United States House of Representatives Financial Services Subcommittee on Oversight and Investigation. (See CAC ¶ 2.) In evaluating a motion to dismiss, the Court may consider any documents cited and relied upon or incorporated by reference in the complaint as the factual sources of the pleadings. See Chambers v. Time Warner, Inc., 282 F.3d 147, 152 (2d Cir. 2002).

debt while simultaneously concealing the size of and risk posed by those investments; repeatedly increased its European sovereign debt investments, in spite of concerns expressed on numerous occasions by its chief risk assessment officer and in violation of the company's own trading limits -- trading limits that started at $500 million and within 15 months exceeded $6 billion in exposure; undertook this risky investment strategy despite numerous internal reports that indicated a lack of sufficient internal controls to manage MF Global's liquidity and capital requirements; fired a chief risk officer who questioned whether MF Global's new investment strategy was prudent and replaced him with another officer who initially supported the new strategy, but who later also voiced similar warnings about the company's financial condition; and used intra-day transfers from various MF Global accounts, including those involving customer funds, to cover increasing liquidity demands.

Despite these dire signs of mounting crisis, MF Global continued to issue securities in public exchanges, repeatedly assuring investors that everything at the Company was running smoothly, that it possessed sufficient liquidity to cover its financial exposure, and that it had

put in place strong internal controls sufficient to check against any management failures.

Plaintiffs purchased MF Global securities issued while, unknown to them, these circumstances were internally unfolding and the company was unraveling. They brought suit against the numerous Defendants they claim were aware of the events and contributed to bringing them about, specifically the MF Global officers, directors, and underwriters -- all twenty-three of them.

Defendants, all twenty-three of them, now ask the Court to dismiss the complaint -- every claim in it. Curiously, they suggest that Plaintiffs' exhaustive pleadings give Defendants both too much detail and too little -- more information than necessary to present a concise statement of the facts, and yet not enough to give Defendants fair notice of why they are being sued. By Defendants' account, and giving a broad interpretation to the logic and end result of their theories, nothing happened at MF Global for which a single one of the twenty-three Defendants could possibly bear any legal responsibility. As Defendants read the complaint and construe the applicable statutes, nothing in law or legal theory now exists -- not even simple negligence principles

-- under which any of the individuals and entities involved in MF Global's management, or in its issuance of securities during the Company's destruction, can be held accountable for any of the wrongdoing that Plaintiffs claim.

The natural implications of this extreme perspective are far-reaching. Defendants' contentions would suggest that the fall of MF Global Plaintiffs portray either never happened, or, if it did occur, that -- since no one associated with the Company played a causal role in the events -- perhaps the debacle must have been the fateful work of supernatural forces, or else that the explanation for a spectacular multi-billion dollar crash of a global corporate giant is simply that "stuff happens" -- instantaneously, of its own accord, without any knowledge or causal agency whatsoever by any one of the many sophisticated business executives in charge of the company's day to day affairs. Perhaps worse yet, a fair inference that follows from the conception of the law Defendants advocate is that, even assuming the truth of everything Plaintiffs allege, what transpired at MG Global over the course of the year before the Company's collapse -- including the sudden unexplained disappearance of $1.6 billion of customer money -- represents the governing

industry standard for doing business, the acceptable model
for how corporate managers should be permitted to run a
company's affairs in the ordinary course, insulated from
accountability that not only Plaintiffs but also the public
should rightfully expect from issuers of securities.  Were
the Court to dismiss the CAC, it would effectively have to
find that even assuming the compelling facts pled here,
viewed against the applicable standard of review, there is
no viable construction of law under which Defendants'
actions would give rise to any plausible claim  that some
violation of the securities statutes occurred.   Such a
ruling would be tantamount to raising the pleading bar to
unattainable heights, in essence elevating the test so as
to demand levels of details and precision far surpassing
anything that the threshold of the federal securities laws,
or    even    the    Iqbal/Twombly    standard,    could    have
contemplated.   To end this prologue on a higher lyrical
note, if on this record as pled Plaintiffs cannot make out
a plausible claim here, they could not make it anywhere.

Accordingly, upon a review of Defendants' numerous
motions in the light of Plaintiffs' account of facts which
the Court accepts as true, the Court is  not  persuaded  by

Defendants' arguments.   In evaluating the application of
the law that Defendants argue would allow the outcome they
seek  at  this  stage  of  the  litigation,  the  Court's
assessment  may  be  simply  stated:  It  cannot  be.   Thus,  for
the reasons stated below, Defendants' motions are DENIED.

## II.   BACKGROUND[6]

Plaintiffs'  asserted  claims  arise  from  events  that  led
to  the  2011  collapse  of  MF  Global.[7]   Briefly  stated,
Plaintiffs  allege  that  MF  Global's  public  filings  and  the
public  statements  made  by  MF  Global's  officers  materially
misled  investors  in  two  ways.   First,  Plaintiffs  claim  that
MF  Global  failed  to  record  a  valuation  allowance  against
its  Deferred  Tax  Assets  ("DTA")  until  October  25,  2011,
even  though  Generally  Accepted  Accounting  Principles
("GAAP")[8]  required  MF  Global  to  take  that  valuation

---

[6] Except where otherwise noted explicitly, the factual summary below is
derived from the CAC and the documents cited or relied upon for the
facts pled therein, which the Court accepts as true for the purposes of
ruling on a motion to dismiss.  See Spool v. World Child Int'l Adoption
Agency, 520 F.3d 178, 180 (2d Cir. 2008) (citing GICC Capital Corp. v.
Technology Fin. Grp., Inc., 67 F.3d 463, 465 (2d Cir. 1995)); see also
Chambers, 282 F.3d at 152.   Except where specifically quoted, no
further citation will be made to the CAC or the documents referred to
in it.

[7] MF Global filed for bankruptcy on October 31, 2011 and is not a party
to this action.

[8] "GAAP is the official standard for accounting accepted by the SEC and
is promulgated in part by the Financial Accounting Standards Board
('FASB')  and  American  Institute  of  Certified  Public  Accountants
('AICPA')."   (CAC ¶ 88.)

allowance earlier.  Second, Plaintiffs fault MF Global and Defendants for misstatements and omissions related to the Company's proprietary investments in European sovereign debt through repurchase-to-maturity ("RTM") transactions (the "RTM Strategy").  According to Plaintiffs, MF Global and Defendants (1) purposefully concealed the proprietary nature of the RTM transactions, (2) materially misstated and failed to disclose how the RTM strategy posed significant liquidity risks to the Company, and (3) misrepresented and failed to disclose weaknesses in MF Global's ability to prevent a liquidity crisis of the kind that caused MF Global's eventual collapse.

A.    THE PARTIES

       1.    Plaintiffs and the Class

       Plaintiffs assert that they bring this action "individually and on behalf of a proposed class of persons and entities who purchased or otherwise acquired" certain interests in MF Global between May 20, 2010 and November 21, 2011 (the "Class Period").  (CAC ¶ 1.)  The Class consists of persons and entities who acquired, during the Class Period, (1) MF Global's publicly traded securities; (2) MF Global's common stock in a June 2010 secondary offering (the "Secondary Offering"); (3) MF Global's 1.875%

Convertible Senior Notes due February 1, 2016 (the "2016 Notes"), issued in February 2011; (4) MF Global's 3.375% Convertible Senior Notes due August 1, 2018 (the "2018 Notes"), issued in July 2011; (5) MF Global's 6.25% Senior Notes due August 8, 2016 (the "Senior Notes"), issued in August 2011; and (6) MF Global securities through employee benefit plans.

### 2.   Officer Defendants

Defendant Corzine served as Chairman of the MF Global Board of Directors (the "Board") and as Chief Executive Officer ("CEO") of both MF Global and MF Global's broker-dealer subsidiary, MF Global Inc. ("MFGI"), from March 23, 2010 to November 4, 2011. Defendant MacDonald served as MF Global's Chief Financial Officer ("CFO") from April 2008 through March 2011.[9] Defendant Steenkamp served as MF Global's CFO from April 2011 through the end of the Class Period. The CAC alleges that the Officer Defendants had access to information about MF Global that was not disclosed to the public, and that they "were all involved in drafting, producing, reviewing and disseminating the

---

[9] The CAC alleges that MacDonald served as CFO through April 2011, but MF Global's public filings with the SEC, of which the Court can take judicial notice, see In re Alstom SA Sec. Litig. (Alstom I), 406 F. Supp. 2d 346, 352 (S.D.N.Y. 2005), show that MacDonald left that position in March of 2011.

financial statements and other reports at issue in this case during their tenure with the Company." (CAC ¶ 32.) The CAC also claims that the Officer Defendants "were able to and did control the content of MF Global's various press releases, SEC filings and other public statements during the Class Period." (CAC ¶ 33.)

### 3.   Independent Director Defendants

The Independent Director Defendants each served on MF Global's Board during the Class Period. The CAC alleges that the Independent Directors had access to information about MF Global that was not disclosed to the public.

### 4.   Underwriter Defendants and Senior Notes Underwriter Defendants

The Underwriter Defendants and Senior Notes Underwriter Defendants each served as an underwriter for one or more of the public offerings at issue: the Secondary Offering, the 2016 Notes, the 2018 Notes, and the Senior Notes.

### B.   FACTUAL ALLEGATIONS

The CAC outlines two categories in which Defendants made material misstatements or omissions: (1) statements about MF Global's DTA and net income, and (2) statements about MF Global's risk appetite, internal controls, and

liquidity management, particularly in light of the RTM Strategy.

### 1.   DTA and Net Income

"Deferred Tax Assets are losses, credits and other tax deductions that may be used to offset taxable income in the future." (CAC ¶ 84.) GAAP permits a company to record DTA as assets on its balance sheet, but only to the extent the company is "more likely than not" to realize the DTA. (Id.) The company must take a valuation allowance against -- that is, not count as an asset on its balance sheet -- the amount of the DTA that the company is not likely to realize.

GAAP requires the company to weigh "all available evidence, both positive and negative," to determine whether the company should take a valuation allowance against its DTA. (CAC ¶ 92.) That a company suffered cumulative losses in recent prior years is significant negative evidence against recording DTA. In the face of such evidence, the company must have counteracting positive evidence in order to support its decision not to take a valuation allowance against its DTA. Such positive evidence can include tax planning strategies if those

- 17 -

strategies are prudent and feasible and would result in later realization of the company's DTA.

As of the 2010 fiscal year, which ended on March 31, 2010, MF Global had suffered cumulative losses over its previous three fiscal years, both in its U.S. operations and worldwide.   During that time, MF Global primarily performed client-based commodities broker services and earned income through commission fees and interest on client accounts.  As interest rates fell in the late 2000s, MF Global lost a substantial part of its income base.  New CEO Corzine sought to turn around the Company's fortunes by turning MF Global into an investment bank.   The Company implemented a plan to complete that conversion in three to five years.

On May 20, 2010 -- the first day of the Class Period -- MF Global issued a press release to report its financial results for both the fourth quarter of the 2010 fiscal year and for the full fiscal year.  The press release claimed that MF Global's financial statements were prepared in accordance with GAAP.  MF Global did not take a valuation allowance against its DTA.  In an investor conference call held that same day, MacDonald indicated that the DTAs in

issue were not "as at risk"[10] as other deferred tax assets that MF Global held.   (Decl. of Benjamin E. Rosenberg, Ex. 1 at 6, Dkt. No. 370.)   Corzine also failed to answer a question posed to him about MF Global's DTA.

In its 2010 Form 10-K, filed with the SEC on May 28, 2010 and signed by all Individual Defendants, MF Global again represented that its financial statements were in accordance with GAAP and did not record a valuation allowance for $117.9 million of MF Global's DTA.   MF Global provided the following disclosure: "We have recorded significant deferred tax assets reflecting our expectation of using these loss carryforwards against future income. If we are not able to generate profits in these jurisdictions in future periods, we may be required to record valuation allowances against these deferred tax assets."   (CAC ¶ 320.)   The 2010 Form 10-K acknowledged that, under GAAP, "[a] valuation allowance is provided for deferred tax assets when it is more likely than not that some portion of the deferred tax assets will not be realized."   (CAC ¶ 321.)   The 2010 Form 10-K did not disclose the positive and negative evidence that MF Global

---

[10] The CAC mistakenly quotes MacDonald as saying that the DTAs were not "at risk."   (CAC ¶ 317.)

weighed to conclude that a valuation allowance was not required.

On August 5, 2010, MF Global issued a press release with its financial results for the first quarter of the 2011 fiscal year. The results, which claimed to be in accordance with GAAP, showed a small profit. In a conference call held that same day, Corzine emphasized that MF Global had "returned to profitability for the first time in six quarters on a GAAP basis." (CAC ¶ 339.) While Corzine and MacDonald noted that MF Global would have to write down some of its DTA, MacDonald assured investors that the remaining DTA was "not as at risk." (CAC ¶ 340.) The next day, August 6, MF Global filed its Form 10-Q for the first quarter of the 2011 fiscal year with the SEC. The Form 10-Q was signed by Corzine and MacDonald and also contained the financial results in the press release, purportedly in accordance with GAAP.

MF Global made similar disclosures in November 2010 (for the second quarter of the fiscal year) and February 2011 (for the third quarter of the fiscal year). The Company continued not to record a valuation allowance against its DTA and to represent that its financial statements were in accordance with GAAP. MF Global's Form

- 20 -

10-Q for the third quarter of fiscal year 2011, filed with the SEC on February 3, 2011 and signed by Corzine and MacDonald, specifically noted that MF Global had not taken a valuation allowance against its DTA "because the Company believes that it is more likely than not that these deferred tax assets will be realized in the future. Although realization is not assured, the Company anticipates that realization of these assets will occur." (CAC ¶ 373.)

In May 2011, MF Global disclosed financial information for the fourth quarter of fiscal year 2011 and for the full fiscal year; again, the financial information was purportedly prepared in accordance with GAAP. On its 2011 Form 10-K, filed with the SEC on May 20, 2011 and signed by all Individual Defendants except MacDonald, MF Global reported a DTA valuation allowance of $19.5 million and a net DTA of $108.3 million. The 2011 Form 10-K included the following disclosure about DTA, identical to the disclosure on the 2010 Form 10-K: "We have recorded significant deferred tax assets reflecting our expectation of using these loss carryforwards against future income. If we are not able to generate profits in these jurisdictions in future periods, we may be required to record valuation

allowances against these deferred tax assets." (CAC ¶ 390.)

The 2011 Form 10-K, unlike the 2010 Form 10-K, offered a justification for MF Global's decision not to take a valuation allowance against the full DTA. The 2011 Form 10-K acknowledged that MF Global was "in a three-year cumulative pre-tax loss position at March 31, 2011 in many jurisdictions in which [it did] business," and that such a loss position "is considered negative evidence in assessing the realizability of deferred tax assets." (CAC ¶ 391.) But the Company "concluded that the weight given this negative evidence is diminished due to significant non-recurring loss and expense items recognized during the prior three years." (Id.) MF Global also identified "sufficient positive evidence to overcome this negative evidence" that fell into three categories:

> The first is the reversal of existing taxable temporary differences. Second, we forecast sufficient taxable income in the carry forward period. We believe that future projections of income can be relied upon because the income forecasted is based on key drivers of profitability that we began to see evidenced in fiscal 2011. Most notable in this regard are plans and assumptions relating to the significant changes to our compensation structure implemented in fiscal 2011, increased trading volumes, and other macro-economic conditions. Third, in certain of our key operating jurisdictions, we have a sufficient tax planning strategy which includes potential shifts in investment policies, which should permit realization

- 22 -

> of our deferred tax assets.  Management believes this
> strategy is both prudent and feasible.

(CAC ¶ 392.)  MF Global's Form 10-Q for the first quarter
of fiscal year 2012, filed with the SEC on August 3, 2011,
included substantially the same disclosures.

The CAC attacks the sufficiency of each category of
positive evidence.  According to the CAC, GAAP rules
generally do not permit projections of future income to
overcome the negative evidence from cumulative losses in
recent years.  The CAC also alleges that MF Global's new
investment strategy, described in detail below, was high-
risk and unsustainable, such that MF Global's "projections
of future income were not sufficient 'positive evidence' to
avoid taking a full valuation allowance against the
Company's U.S. DTA."  (CAC ¶ 121.)

The CAC also claims that projections of increased
income from MF Global's changes in compensation structure
"were unreliable and, more importantly, could not have
offset the Company's DTA."  (CAC ¶ 122.)  The CAC alleges
that MF Global's increased hiring in certain areas offset
layoffs in other areas, such that the Company did not
achieve its target compensation-to-revenue ratio.

Finally, the CAC notes that tying MF Global's tax
planning strategies to its "shifts in investment policies"

could not offset the Company's DTA.  To the contrary, the CAC claims, "the Company was simply unable to engage in any 'shifts in investment policies' without first incurring significant additional liquidity strains or losses . . . neither of which was 'prudent' or 'feasible.'"  (CAC ¶ 135.)[11]

Eventually, MF Global determined that it could no longer avoid taking a valuation allowance against its DTA. On October 25, 2011, MF Global issued a press release with its financial results for the second quarter of fiscal year 2012.  The Company reported a loss of $191.6 million.  A valuation allowance of $119.4 million against MF Global's DTA accounted for more than half of the loss.  According to Steenkamp, most of that valuation allowance was taken against the Company's U.S. DTA.  The CAC alleges that MF Global's "disclosure of its (long overdue) valuation allowance against its U.S. DTA significantly contributed to the Company's collapse."  (CAC ¶ 87.)

2.  RTM Strategy

When Corzine was named MF Global's CEO, he faced pressure from credit rating agencies to demonstrate that

---

[11] Further to the point, Plaintiffs claim, an MF Global internal document created in September 2011 and presented to the Board in October 2011 suggests that any shifts in investment policies would create large losses, rather than gains.  (CAC ¶ 138.)

the Company could be profitable in the future.   To achieve this goal, Corzine implemented the RTM Strategy, also known within MF Global as the "Corzine Trade," beginning in July 2010.   As MF Global began to implement the RTM Strategy, Corzine emphasized several times that the Company's new business plan was done to support the Company's client-based services.   The strategy involved coordination between MFGI and MF Global U.K. Limited ("MFG-UK"), which was MF Global's affiliate in the United Kingdom.   Plaintiffs allege that Corzine "communicated with MFGI and MFG-UK personnel directly to carry out these RTM transactions." (CAC ¶ 155.)

The RTM Strategy worked as follows: first, MFG-UK purchased European sovereign debt securities on the London Clearing House ("LCH") exchange.   MFG-UK then sold those securities to MFGI.   Next, MFGI and MFG-UK entered into an RTM agreement.   MFGI thus sold the securities to MFG-UK while the firms simultaneously entered a contract for MFGI to repurchase the securities on the securities' maturity dates, at the same price plus a pre-negotiated interest payment.   MFG-UK, which now owned the securities, then engaged in a similar repurchase transaction with a counterparty through the LCH.   The repurchase date on that

transaction was scheduled for two days before the securities' maturity date. MFG-UK thus bore the risk of default on the security, and MFGI was responsible for maintaining liquidity to cover the possible default. MFGI was also expected to provide MFG-UK with funds to cover margin calls or anticipated margin calls from the LCH.

The RTM Strategy provided MF Global with several accounting advantages. First, the RTM transactions could be counted as sales, rather than as loans, even though MFGI and MFG-UK were contractually obligated to repay the final counterparty for the securities. The obligation to repay was thus "de-recognized" -- it did not appear as a liability on MF Global's balance sheet. The RTM transactions also allowed MF Global to report the transactions as gains at the time of the sale, notwithstanding the subsequent obligation to repay the sale price. Finally, because no liability appeared on MF Global's balance sheet, the RTM transaction did not factor into MF Global's value-at-risk ("VAR") calculations. Plaintiffs allege that the RTM Strategy thus allowed MF Global "to invest in high-risk assets while keeping them off its balance sheet, frontload gains and tout misleading VAR metrics -- all of which created the artificial

- 26 -

appearance of a turnaround in the Company's ailing business." (CAC ¶ 146.)

The RTM Strategy also exposed MF Global "to market risk, liquidity risk and capital risk." (CAC ¶ 160.) Market risk existed due to the possibility that the securities might default or be restructured. MF Global also was subject to margin calls from counterparties and to regulatory capital reserve requirements. When the security traded in the RTM transaction fell in value, MFGI was subject to corresponding margin calls that strained liquidity. A failure to post the required margin could cause MFGI to default on the transaction and require MF Global to repurchase the security at that time.

As part of its risk management strategy, MF Global's Board imposed limits on trading of European sovereign debt. In March 2010, that trading limit was $500 million. Corzine sought to increase that limit, and his efforts were met with concern by then-Chief Risk Officer ("CRO") Michael Roseman ("Roseman"). Roseman eventually agreed to increase the trading limit to $1 billion in around July or August 2010.

By mid-September 2010, MF Global had breached that trading limit. Corzine sought to increase the trading

limit to $1.5 billion and also took steps to move the RTM transactions off of MF Global's balance sheet. Roseman again expressed concern over MF Global's exposure. But despite Roseman's concern, MF Global's exposure to sovereign debt continued to increase, reaching $3.5 to $4.0 billion in late October 2010 -- even though the trading limit had not yet been increased.

Corzine asked Roseman to request from the Board an increase in the trading limit to $4.75 billion. Roseman expressed concerns about the capital and liquidity risks associated with the increase, and he presented those concerns both to Corzine and to the Board. At a November 2010 meeting, the Board approved the request and increased the trading limit to $4.75 billion.

Even after the November 2010 Board meeting, Roseman continued to express his concerns to Corzine. MF Global eventually dismissed Roseman as CRO in early 2011. Several former MF Global employees believe "that Roseman was fired because he warned senior management that the Company was taking on too much risk." (CAC ¶ 187.) Other MF Global employees shared Roseman's concerns. But the person hired to replace Roseman, Michael Stockman ("Stockman"), publicly supported Corzine's risk management strategy.

In mid-January 2011, the MF Global Board forbade any increase in the European sovereign debt portfolio without express permission from the Board.   Yet on February 3, 2011, MF Global exceeded that limit; Corzine, though made aware of the breach, did not inform the Board.   Instead, in mid-February 2011, Corzine and Stockman sought an increase in the trading limit from $4.75 billion to $5 billion, with a temporary increase to $5.8 billion until March 31, 2011. Some Board members "expressed concerns about the level of exposure," but the Board approved the increase.   (CAC ¶ 200.)   In March 2011, the Board granted a request from Corzine and Stockman to extend the temporary $5.8 billion limit until September 2011.

By April 27, 2011, the trading limits had been breached yet again.   Corzine directed Stockman to prepare a request to increase the European sovereign debt trading limit to $9.75 billion.   Stockman, for the first time, expressed concerns to Corzine about MF Global's ability to support its RTM Strategy.   The Board approved the request only in part, increasing the trading limit to $6.6 billion.

The Board heard other concerns about MF Global's risk management during the Class Period.   An April 2010 report from the Company's Internal Audit Department (the "IAD")

noted that technological limitations prevented MF Global from accurately forecasting liquidity risks. A May 2010 report from the IAD expressed concerns with MF Global's ability to handle the risks associated with its expansion beyond its traditional client facilitation services. Months later, an October 2010 report from the IAD noted the same problems. The October 2010 report "expressed concern that the absence of reliable liquidity reporting tools" and the excessive dependence on assistant treasurer Edith O'Brien ("O'Brien") to manage liquidity issues represented risks to MF Global. (CAC ¶ 211.)

Technological concerns and limitations lasted into 2011. In March 2011, an IAD report noted that some regulatory reports were produced through spreadsheets that were "typically not secure and [were] susceptible to human error." (CAC ¶ 212.) A June 2011 IAD report referred to liquidity monitoring and forecasting as "manual and limited" and also identified "numerous and significant gaps between the policy and existing practices." (CAC ¶ 213.) Plaintiffs allege that these issues were not addressed[12] and

---

[12] Indeed, Plaintiffs allege that Stockman and Corzine refused to authorize an enhancement to MF Global's risk management system that would improve its technological infrastructure. (CAC ¶ 197-98.)

that failures in liquidity monitoring directly led to MF Global's downfall.

Plaintiffs allege that, in light of the risks that the RTM Strategy posed to MF Global and in light of the Company's risk management weaknesses, MF Global's public statements on those subjects were inadequate. In MF Global's May 20, 2010 press release, Corzine suggested that the Company would seek to expand its activities only after "ensur[ing] the appropriate controls [were] in place." (CAC ¶ 325.) Corzine made similar representations on a May 20, 2010 investor conference call.

MF Global's 2010 Form 10-K touted the Company's risk management. The form also recognized that any new strategies would be conducted within that risk management scheme:

> We expect to increasingly recognize trading income as part of our ongoing activity for our clients in various markets, and to selectively increase our risk taking, generally making fuller use of our current risk appetite and operating within the authority delegated by our board of directors.

(CAC ¶ 330.) The 2010 Form 10-K stated that MF Global would "consider the inherent operational risk in new products, systems, and business activities as they are developed or modified." (CAC ¶ 332.) Finally, the 2010 Form 10-K assured investors that MF Global would maintain

- 31 -

sufficient capital and liquidity to respond to the risks of market events.  The same disclosure appeared in several of MF Global's subsequent SEC filings.

MF Global's 2011 Form 10-K contained similar disclosures.  The form emphasized that MF Global's new investment strategies would take place "within the authority delegated by [its] Board of Directors."  (CAC ¶ 400.)  The 2011 Form 10-K discussed how MF Global's Operational Risk Management Framework "establishes an effective environment" to create risk controls and "to help ensure transparency, awareness, and accountability of risks."  (CAC ¶ 407.)  According to the 2011 Form 10-K, MF Global operated within "defined risk mandates as delegated by the CRO" and tracked compliance through end-of-day and intra-day monitoring.  (CAC ¶ 409.)

The Officer Defendants also stressed MF Global's commitment to risk management in various other public statements.  For example, in an August 5, 2010 earnings call, MacDonald stated that "the Company maintains a strong liquidity position."  (CAC ¶ 346.)  Corzine and MF Global also downplayed the risks that the Company faced.  Corzine told investors that the Company was "not taking enormous market risk in executing [its] strategy."  (CAC ¶ 349.)

MF Global's August 6, 2010 Form 10-Q similarly stated that MF Global's business "does not generally present a substantial cash liquidity risk" and that MF Global would "have sufficient liquidity to satisfy all of [its] expected cash needs for at least one year without access to the capital markets." (CAC ¶ 350.) The same disclosure appeared in all of MF Global's SEC filings for the remainder of the Class Period. The Officer Defendants made other public statements to the same effect -- that MF Global had sufficient liquidity to withstand potential stresses on its various investment positions.

MF Global did not openly acknowledge the exposure and risk resulting from the RTM Strategy until its February 3, 2011 Form 10-Q. The disclosure came in response to a request from MF Global's outside auditor, PricewaterhouseCoopers LLP, for the Company to publicly disclose its RTM exposure. That disclosure read as follows:

> The Company also enters into securities financing transactions that mature on the same date as the underlying collateral. The Company accounts for these transactions in accordance with the accounting standard for transfers and servicing and recognizes a gain or loss on the sale/purchase of the collateral assets, and records a forward commitment. The Company derecognizes the collateral assets as sold when the transactions are accounted for as sales, and recognizes the collateral assets as purchased when the

- 33 -

transactions are accounted for as purchases.  In these transactions, the Company has exposure to the risk of default of the issuer of the underlying collateral assets, such as U.S. government securities or European sovereign debt.

(CAC ¶ 384.)  The February 3, 2011 Form 10-Q identified $7.56 billion in derecognized RTM transactions, but contained no further discussions of the specific risks that the RTM Strategy posed.  Similarly, the 2011 10-K and the August 3, 2011 Form 10-Q identified the value of derecognized RTM transactions, but did not further disclose any risks from those transactions.

MF Global's disclosure in its 2011 Form 10-K garnered attention from federal regulators.  The Financial Industry Regulatory Authority ("FINRA") expressed its concern that, because the RTM transactions exposed MF Global to market and credit risks, MF Global might not have enough capital reserves to cover risks caused by the RTM Strategy and to comply with SEC rules.  MF Global resisted FINRA's attempts to change MF Global's capital requirements, and Corzine made a personal appeal to SEC regulators.  But the SEC accepted FINRA's interpretation of the SEC rules, and FINRA required MF Global to reserve further capital to cover the RTM transactions.  On September 1, 2011, MF Global filed a

- 34 -

Form 10-Q/A that amended its previous Form 10-Q to comply with FINRA's ruling.

What MF Global did not disclose, Plaintiffs allege, is that MF Global met those capital requirements only through intra-company transfers. Moreover, the CAC claims, the required change "had a devastating (but undisclosed) impact on the Company's already-existing liquidity problem" and forced MF Global to rely on more intra-day transfers to meet liquidity demands. (CAC ¶ 236.) The intra-day transfers included use of funds associated with MF Global's traditional futures commission merchant ("FCM") activities -- including from accounts involving customer funds.

At the same time, MF Global and its officers sought to assure investors that the RTM Strategy posed minimal risks. At a July 9, 2011 conference, Corzine suggested that MF Global's principal trading activities made the Company "less risky." (CAC ¶ 422.) In a July 28, 2011 earnings conference call, Steenkamp claimed that MF Global "believe[d] market risk to [the European sovereign debt] trades is minimal as these are held to maturity." (CAC ¶ 424.)

Indeed, Corzine and Steenkamp held firm on these claims even while MF Global was on the brink of collapse.

- 35 -

On October 24, 2011, MF Global issued a letter from Steenkamp that declared that MF Global's RTMs posed a "limited market risk." (CAC ¶ 447.) And on October 25, 2011, Corzine stated on an investor conference call that "the structure of the [RTM] transaction[s] themselves essentially eliminates market and financing risk." (CAC ¶ 452.)

### 3.  MF Global's Collapse

Just before MF Global filed its October 25, 2011 Form 10-Q -- in which the Company took the $119.4 million valuation allowance against its DTA -- MF Global's senior management informed credit rating agencies that it was about to report a substantial loss. As a result, Moody's downgraded MF Global's debt to just above junk status.[13] While Corzine and Steenkamp sought to assure investors that MF Global's financial position remained strong, the market reacted negatively. MF Global's stock fell by 48 percent on the day it filed the Form 10-Q.

Moreover, the RTM Strategy began to unravel. MF Global's counterparties demanded additional margin to cover

---

[13] At this meeting, Moody's also learned for the first time that the Company's RTM transactions were purely proprietary, rather than part of MF Global's client-facilitation business. Moody's Chief Credit Officer Richard Cantor later testified that this revelation reflected an "increased risk appetite" that was not accompanied by "a parallel increase in capital." (CAC ¶ 285.)

the transactions, which in turn raised eyebrows among investment exchanges and government regulators. The credit ratings agencies also downgraded MF Global's debt yet again, with Moody's and Fitch lowering MF Global's debt rating to junk status.

MF Global struggled to meet the increased liquidity demands. On October 28, 2011, the Company overdrafted one of its accounts with J.P. Morgan Chase & Co. MF Global transferred money from another account to compensate, but that transfer raised questions about whether MF Global had improperly used segregated customer funds from its FCM operations to cover the overdraft.[14] On October 29, 2011, MF Global discovered a shortfall in its customer funds account, but attributed the shortfall to an accounting error. However, by the early morning hours of October 31, 2011, MF Global instead informed regulators that the shortfall was accurate.

MF Global sought to sell off its assets to obtain the necessary liquidity. On October 30, 2011, the Company reached an agreement to sell its assets to another company, Interactive Brokers, for $1 billion. But that deal fell

---

[14] O'Brien, who executed the transfer at Corzine's direction, later invoked her Fifth Amendment privilege against self incrimination when she was subpoenaed to appear before a congressional subcommittee.

through when the customer funds shortfall came to light. MF Global declared bankruptcy on October 31. In the end, MF Global's FCM operations had a $1.6 billion shortfall in customer accounts -- $900 million in domestic accounts and $700 million in foreign accounts.

C.   PROCEDURAL HISTORY

On November 3, 2011, Joseph Deangelis brought the first action in this case. (Dkt. No. 1.) The Court has, as necessary, consolidated related actions under this docket. By Order dated January 20, 2012, the Court appointed The Virginia Retirement System and Her Majesty The Queen In Right Of Alberta as Lead Plaintiffs and approved the selection of Bernstein Litowitz Berger & Grossman LLP and Labaton Sucharow LLP as Co-Lead Counsel for all claims brought under the Exchange Act and the Securities Act.[15] (Dkt. No. 140.) Plaintiffs filed the CAC on August 20, 2012. These motions followed.[16]

---

[15] Pursuant to an April 24, 2012 order from the Panel on Multidistrict Legislation, separate but related actions for non-securities claims are proceeding under this docket.

[16] On February 6, 2013, at the request of all parties, Magistrate Judge James C. Francis IV ordered a stay of all proceedings in this action while the parties engaged in voluntary mediation. (Dkt. No. 456.) Magistrate Judge Francis lifted the stay on September 12, 2013. (Dkt. No. 538.)

## III. **LEGAL STANDARD**

Plaintiffs' fourteen-count CAC is divided into five sets of claims. Counts One and Two allege Exchange Act violations against the Officer Defendants; Count One alleges primary violations under Section 10(b) and Rule 10b-5, and Count Two alleges control person violations under Section 20(a).

Counts Three, Four, and Five bring Securities Act claims relating to the Secondary Notes. Count Three alleges Section 11(a) violations by the Individual Defendants and the Underwriter Defendants who underwrote the Secondary Notes. Count Four alleges violations of Section 12(a)(2) against those same Underwriter Defendants. Count Five alleges Section 15(a) control person violations by the Officer Defendants.

Counts Six, Seven, and Eight parallel Counts Three, Four, and Five with respect to the 2016 Notes; these counts allege Securities Act violations against the Individual Defendants and the Underwriter Defendants who underwrote the 2016 Notes.[17] Counts Nine, Ten, and Eleven similarly allege Securities Act Section 11, Section 12(a)(2), and Section 15(a) violations with respect to the 2018 Notes.

---

[17] Sandler O'Neill & Partners, L.P., one of the Senior Notes Underwriters, is also a defendant in Counts Six and Seven.

Finally, Counts Twelve, Thirteen, and Fourteen bring parallel claims with respect to the Senior Notes; the Senior Notes Underwriters are defendants in Counts Twelve and Thirteen.

A.   PLEADING STANDARDS: RULE 12(b)(6), RULE 8(a), RULE 9(b), AND THE PSLRA

Rule 12(b)(6) permits dismissal of a complaint for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). This standard is met "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. A court should not dismiss a complaint for failure to state a claim if the factual allegations sufficiently "raise a right to relief above the speculative level." Twombly, 550 U.S. at 555. The task of a court in ruling on a motion to dismiss is to "assess the legal feasibility of the complaint, not to assay the weight of the evidence which might be offered in support thereof." In re Initial Pub. Offering Sec. Litig.,

383 F. Supp. 2d 566, 574 (S.D.N.Y. 2005) (quoting Levitt v. Bear Stearns & Co., Inc., 340 F.3d 94, 101 (2d Cir. 2003)) (internal quotation marks omitted), aff'd sub nom., Tenney v. Credit Suisse First Boston Corp., Nos. 05-3430-CV, 05-4759-CV, 05-4760-CV, 2006 WL 1423785 (2d Cir. May 19, 2006).    A court must accept as true all well-pleaded factual allegations in the complaint, and draw all reasonable inferences in the plaintiff's favor.    See Chambers, 282 F.3d at 152.

Federal Rule of Civil Procedure 8(a) ("Rule 8(a)") requires only a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2).    Where Rule 8(a)'s pleading standard governs, dismissal is improper as long as the complaint furnishes adequate notice of the basis of the plaintiff's claim and "relief could be granted under [some] set of facts consistent with the allegations."    In re Global Crossing, Ltd. Sec. Litig., No. 02 Civ. 910, 2005 WL 2990646, at *8 (S.D.N.Y. Nov. 7, 2005) (alteration in original) (quoting Swierkewicz v. Sorema N.A., 534 U.S. 506, 512-14 (2002)) (internal quotation marks omitted).

However, plaintiffs claiming securities fraud under the Exchange Act must also satisfy the heightened pleading

requirements of Federal Rule of Civil Procedure 9(b) ("Rule 9(b)") by "stat[ing] with particularity the circumstances constituting fraud." Fed. R. Civ. P. 9(b); see ATSI Commc'ns, Inc. v. Shaar Fund, Ltd., 493 F.3d 87, 99 (2d Cir. 2007). Securities Acts claims that "are premised on allegations of fraud" also must satisfy Rule 9(b)'s particularity requirement. Rombach v. Chang, 355 F.3d 164, 171 (2d Cir. 2004).

Exchange Act complaints must also meet the pleading requirements of the Private Securities Litigation Reform Act of 1995 (the "PSLRA"). See Kalnit v. Eichler, 264 F.3d 131, 138 (2d Cir. 2001). The PSLRA requires that a complaint "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1).

B.   THE EXCHANGE ACT

   1.   Section 10(b) and Rule 10b-5

In pertinent part, Section 10(b) declares it unlawful for any person, directly or indirectly, by the use of any

means of interstate commerce, the mails, or a national
securities exchange,

> [t]o use or employ, in connection with the purchase or
> sale of any security registered on a national
> securities exchange or any security not so registered,
> . . . any manipulative or deceptive device or
> contrivance in contravention of such rules and
> regulations as the [Securities and Exchange]
> Commission may prescribe as necessary or appropriate
> in the public interest or for the protection of
> investors.

15 U.S.C. § 78j(b).

Rule 10b-5, promulgated by the SEC to implement

Section 10(b), "more specifically delineates what

constitutes a manipulative or deceptive device or

contrivance." Press v. Chemical Inv. Servs. Corp., 166

F.3d 529, 534 (2d Cir. 1999). Under Rule 10b-5, it is

unlawful for any person, directly or indirectly, by the use

of any means specified in Section 10(b):

> (a) To employ any device, scheme, or artifice to
> defraud, (b) To make any untrue statement of a
> material fact or to omit to state a material fact
> necessary in order to make the statements made, in the
> light of the circumstances under which they were made,
> not misleading, or (c) To engage in any act, practice,
> or course of business which operates or would operate
> as a fraud or deceit upon any person, in connection
> with the purchase or sale of any security.

17 C.F.R. § 240.10b-5. Section 10(b) operates as a broad

prohibition against manipulation, whether in the form of

false statements or market manipulation. See United States

- 43 -

v. Royer, 549 F.3d 886, 900 (2d Cir. 2008); ATSI Commc'ns,
493 F.3d at 99-100.

Plaintiffs in this case allege misrepresentations or
omissions of material fact.   To state a claim for
misrepresentations or omissions, a plaintiff must allege
that the defendant "(1) made misstatements or omissions of
material fact, (2) with scienter, (3) in connection with
the purchase or sale of securities, (4) upon which the
plaintiff relied, and (5) that the plaintiff's reliance was
the proximate cause of its injury."   ATSI Commc'ns, 493
F.3d at 105.[18]

### a.   Misstatements or Omissions of Material Fact

In order to satisfy Rule 9(b) and PSLRA pleading
requirements, "[a] securities fraud complaint based on
misstatements must (1) specify the statements that the
plaintiff contends were fraudulent, (2) identify the
speaker, (3) state where and when the statements were made,
and (4) explain why the statements were fraudulent."   Id.
at 99.   An omission is actionable "only when the
[defendant] is subject to a duty to disclose the omitted
facts."   In re Time Warner Inc. Sec. Litig., 9 F.3d 259,

---

[18] In their various motions to dismiss, no defendant in this action has
argued that Plaintiffs have failed to adequately allege reliance and
causation.   Therefore, the Court will not address these elements any
further.

267 (2d Cir. 1993).  Although "Rule 10b-5 imposes no duty
to disclose all material, nonpublic information, once a
party chooses to speak, it has a 'duty to be both accurate
and complete.'"  Plumbers' Union Local No. 12 Pension Fund
v. Swiss Reinsurance Co., 753 F. Supp. 2d 166, 180
(S.D.N.Y. 2010) (quoting Caiola v. Citibank, N.A., N.Y.,
295 F.3d 312, 331 (2d Cir. 2002)).

    i.  Materiality

    Whether a misstatement or omission is material is "an
inherently fact-specific finding that is satisfied when a
plaintiff alleges a statement or omission that a reasonable
investor would have considered significant in making
investment decisions."  Litwin v. Blackstone Grp. L.P., 634
F.3d 706, 716-17 (2d Cir. 2011) (citations and internal
quotation marks omitted); see also Basic Inc. v. Levinson,
485 U.S. 224, 231 (1988).  Since materiality is a mixed
question of law and fact, "a complaint may not properly be
dismissed . . . on the ground that the alleged
misrepresentations or omissions are not material unless
they are so obviously unimportant to a reasonable investor
that reasonable minds could not differ on the question of
their importance."  ECA & Local 134 IBEW Joint Pension
Trust of Chi. v. JP Morgan Chase Co., 553 F.3d 187, 197 (2d

Cir. 2009) (alteration in original) (internal quotation marks omitted).

### ii.   Bespeaks Caution and PSLRA Safe Harbor

Under the "bespeaks caution" doctrine, "[a] forward-looking statement accompanied by sufficient cautionary language is not actionable because no reasonable investor could have found the statement materially misleading." Iowa Pub. Emps.' Ret. Sys. v. MF Global, Ltd., 620 F.3d 137, 141 (2d Cir. 2010); see also Luce v. Edelstein, 802 F.2d 49, 56 (2d Cir. 1986) (applying bespeaks caution doctrine to Section 10(b) claim).  The doctrine thus "is a corollary of 'the well-established principle that a statement or omission must be considered in context.'" Iowa Pub. Emps.' Ret. Sys., 620 F.3d at 141 (quoting In re Donald J. Trump Casino Sec. Litig., 7 F.3d 357, 364 (3d Cir. 1993)).  Where sufficient cautionary statements about future risks are made, "it cannot be supposed by a reasonable investor that the future is settled, or unattended by contingency."  Id.

Vague disclosures of general risks will not protect defendants from liability.  Instead, the relevant cautionary language must be "prominent and specific," and must directly address "exactly the risk that plaintiffs

claim was not disclosed." Olkey v. Hyperion 1999 Term Trust, Inc., 98 F.3d 2, 5 (2d Cir. 1996). Since most, if not all, securities offerings contain cautionary words, a district court must pay close attention to the question of whether the language provided matches the risk addressed. See Halperin v. eBanker USA.com, Inc., 295 F.3d 352, 359 (2d Cir. 2002). Applying the bespeaks-caution doctrine requires a two-step analysis: (1) "identify the allegedly undisclosed risk"; and (2) "read the allegedly fraudulent materials -- including the cautionary language -- to determine if a reasonable investor could have been misled into thinking that the risk that materialized and resulted in his loss did not actually exist." Id.; accord Edison Fund v. Cogent Inv. Strategies Fund, Ltd., 551 F. Supp. 2d 210, 223 (S.D.N.Y. 2008) (citing Halperin, 295 F.3d at 359); In re FBR Inc. Sec. Litig., 544 F. Supp. 2d 346, 361 (S.D.N.Y. 2008) (same).

The bespeaks-caution doctrine applies only to forward-looking statements. See Iowa Pub. Emps.' Ret. Sys., 620 F.3d at 142; P. Stolz Family P'ship L.P. v. Daum, 355 F.3d 92, 96-97 (2d Cir. 2004). The doctrine does not apply where a statement "communicate[s] present or historical fact." Iowa Pub. Emps.' Ret. Sys., 620 F.3d at 144; see

- 47 -

also Rombach, 355 F.3d at 173 ("Cautionary words about future risk cannot insulate from liability the failure to disclose that the risk has transpired."). While "[a] statement may contain some elements that look forward and others that do not," a court should sever the statement's forward-looking elements from the non-forward-looking elements and apply the bespeaks-caution doctrine only to the former. Iowa Pub. Emps.' Ret. Sys., 620 F.3d at 144.

The PSLRA contains a safe harbor provision that is "closely related" to the bespeaks caution doctrine. In re General Elec. Co. Sec. Litig., 857 F. Supp. 2d 367, 385 (S.D.N.Y. 2012); see also 15 U.S.C. §§ 77z-2, 78u-5. Under the PSLRA safe harbor, "a defendant is not liable if the forward-looking statement is identified and accompanied by meaningful cautionary language or is immaterial or the plaintiff fails to prove that it was made with actual knowledge that it was false or misleading." Slayton v. American Express Co., 604 F.3d 758, 766 (2d Cir. 2010). "To avail themselves of safe harbor protection under the meaningful cautionary language prong, defendants must demonstrate that their cautionary language was not boilerplate and conveyed substantive information." Id. at 772. But the cautionary language itself also must not be

misleading; "cautionary language that is misleading in light of historical fact cannot be meaningful" under the statute. Id. at 770.

    iii. Puffery

    "Puffery is an optimistic statement that is so vague, broad, and non-specific that a reasonable investor would not rely on it, thereby rendering it immaterial as a matter of law." In re General Elec. Co., 857 F. Supp. 2d at 384 (citing ECA & Local 134, 553 F.3d at 206). This rule permits companies "to operate with a hopeful outlook," as corporate officers "are not required to take a gloomy, fearful or defeatist view of the future." Rombach, 355 F.3d at 174 (internal quotation marks omitted). But statements are not puffery where they are "misrepresentations of existing facts" made even though the speaker "knew that the contrary was true." Novak v. Kasaks, 216 F.3d 300, 315 (2d Cir. 2000) (rejecting puffery argument where plaintiffs pled facts to show that statement "that the inventory situation was 'in good shape' or 'under control'" was not true); see also In re Bank of Am. Corp. Sec., Derivative, & ERISA Litig., 757 F. Supp. 2d 260, 310 (S.D.N.Y. 2010) ("[T]here is a difference between enthusiastic statements amounting to general puffery and

opinion-based  statements  that  are  anchored  in 'misrepresentations  of  existing  facts.'" (quoting Novak, 216 F.3d at 315)).

### iv. Misstatements of Opinion

In  addition  to  misstatements  or  omissions  of  fact, statements  of  opinion  or  belief  are  also  actionable  under Section 10(b)  and  Rule 10b-5. See City of Omaha, Neb. Civilian Emps.' Ret. Sys. v. CBS Corp., 679 F.3d 64, 67-68 (2d Cir. 2012) (adopting standard of Fait v. Regions Fin. Corp, 655 F.3d 105 (2d Cir. 2011), for Section 10(b) claims). To plead a claim for such statements, a plaintiff "must  allege  that  [the]  defendant's  opinions  were  both false  and  not  honestly  believed  at  the  time  they  were made." Fait, 655 F.3d at 113 (citing Virginia Bankshares v. Sandberg, 501 U.S. 1083, 1095 (1991)); see also Oklahoma Firefighters Pension & Ret. Sys. v. Student Loan Corp., --- F. Supp. 2d ---, 2013 WL 3212297, at *13 (S.D.N.Y. June 25, 2013) (dismissing complaint where "plaintiffs allege[d] no facts whatsoever to support their argument that defendants did not honestly believe their [opinion] when made"). The plaintiff must do more than merely assert that "the opinion reached by [the] defendant[] was unreasonable." City of Monroe Emps.' Ret. Sys. v. Hartford Fin. Servs. Grp., Inc.,

No. 10 Civ. 2835, 2011 WL 4357368, at *13 (S.D.N.Y. Sept. 19, 2011). Instead, the complaint must allege "provable facts to demonstrate that the statement of opinion is both objectively and subjectively false." Podany v. Robertson Stephens, Inc., 318 F. Supp. 2d 146, 154 (S.D.N.Y. 2004) (internal quotation marks omitted).

b. Scienter

Scienter, "a mental state embracing intent to deceive, manipulate, or defraud," Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 319 (2007) (internal quotation marks omitted), is a required element of a claim under Section 10(b) and Rule 10b-5. In order to plead a "strong inference" of scienter, plaintiffs must allege with particularity either (a) "facts to show that the defendant had both motive and opportunity to commit fraud" or (b) "facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness." Kalnit, 264 F.3d at 138 (internal quotation marks omitted).

A complaint has sufficiently alleged "motive and opportunity to commit fraud" if it pleads facts showing that the defendant "benefitted in some concrete and personal way from the purported fraud." Novak, 216 F.3d at 307-08. "Motives that are common to most corporate

- 51 -

officers . . . do not constitute 'motive' for the purpose[]" of establishing scienter. ECA & Local 134, 553 F.3d at 198. Examples of general motives which fail to support a strong inference of scienter include "(1) the desire for the corporation to appear profitable and (2) the desire to keep stock prices high to increase officer compensation." Kalnit, 264 F.3d at 139. In order to plead opportunity, a plaintiff must "show that the individual defendants possessed 'the means and likely prospect of achieving concrete benefits by the means alleged.'" In re Take-Two Interactive Sec. Litig., 551 F. Supp. 2d 247, 297 (S.D.N.Y. 2008) (quoting Shields v. Citytrust Bancorp, Inc., 25 F.3d 1124, 1130 (2d Cir. 1994)). The opportunity to commit fraud is generally assumed where the defendant is a corporation or corporate officer. See, e.g., In re AstraZeneca Sec. Litig., 559 F. Supp. 2d 453, 468 (S.D.N.Y. 2008), aff'd sub nom., State Univs. Ret. Sys. of Ill. V. AstraZeneca PLC, 334 Fed. App'x 404 (2d Cir. 2009); Pension Comm. of Univ. of Montreal Pension Plan v. Banc of Am. Sec., LLC, 446 F. Supp. 2d 163, 181 (S.D.N.Y. 2006) ("Regarding the 'opportunity' prong, courts often assume that corporations, corporate officers, and corporate

directors would have the opportunity to commit fraud if they so desired.").

Where plaintiffs fail to allege scienter through motive and opportunity, the securities fraud claim may still be sufficiently stated by allegations demonstrating "strong circumstantial evidence of conscious misbehavior or recklessness," Kalnit, 264 F.3d at 138-39, but "the strength of the circumstantial allegations must be correspondingly greater," id. at 142 (internal quotation marks omitted). A plaintiff pleading the conscious misbehavior or recklessness theory of scienter must allege conduct which is "highly unreasonable and which represents an extreme departure from the standards of ordinary care to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it." Id. (quoting Honeyman v. Hoyt (In re Carter-Wallace, Inc. Sec. Litig.), 220 F.3d 36, 39 (2d Cir. 2000)). Specifically, a complaint sufficiently pleads scienter where it alleges defendants had "knowledge of facts or access to information contradicting their public statements." Id. (quoting Novak, 216 F.3d at 308). Sufficient evidence of recklessness exists if the factual allegations demonstrate that defendants (1) possessed

- 53 -