knowledge of facts or access to information contradicting their public statements, or (2) "failed to review or check information that they had a duty to monitor, or ignored obvious signs of fraud." Novak, 216 F.3d at 308.

Finally, "in determining whether the pleaded facts give rise to a 'strong' inference of scienter, the court must take into account plausible opposing inferences." Tellabs, 551 U.S. at 323. A strong inference of scienter "must be more than merely plausible or reasonable -- it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." Id. at 314.

2.   Section 20(a)

Section 20(a) of the Exchange Act provides:

> Every person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable . . . unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.

15 U.S.C. § 78t(a). Liability for Section 20(a) violations thus is derivative of liability for Section 10(b) violations. See Securities & Exchange Comm. v. First Jersey Sec., Inc., 101 F.3d 1450, 1472 (2d Cir. 1996). In order to establish a prima facie case of liability under §

- 54 -

20(a), a plaintiff must show: (1) "a primary violation by the controlled person"; (2) "control of the primary violator by the defendant"; and (3) that the controlling person "was, in some meaningful sense, a culpable participant in the controlled person's fraud." ATSI Commc'ns, 493 F.3d at 108 (internal citation omitted).

To establish the second element of control over the primary violator, a plaintiff must show that the defendant possessed "the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise." 17 C.F.R. § 240.12b-2; see also First Jersey, 101 F.3d at 1472-73. "To be liable as a control person, the defendant must actually possess, in fact, rather than in theory, the ability to direct the actions of the controlled person." In re Global Crossing, 2005 WL 1881514, at *12 (internal quotation marks omitted); see also Cohen v. Stevanovich, 722 F. Supp. 2d 416, 435 (S.D.N.Y. 2010). Moreover, a Section 20(a) defendant "must not only have actual control over the primary violator, but have 'actual control over the transaction in question.'" In re Alstom SA (Alstom III), 406 F. Supp. 2d 433, 487 (S.D.N.Y. 2005) (quoting In re Global Crossing, 2005 WL

- 55 -

1875445, at *12); see also Anwar v. Fairfield Greenwich Ltd., 728 F. Supp. 2d 372, 425 (S.D.N.Y. 2010).

Because fraud is not an essential element of a Section 20(a) claim, Plaintiffs need not plead control in accordance with the particularity required under Rule 9(b). See In re Bristol Myers Squibb Co. Sec. Litig., 586 F. Supp. 2d 148, 170-71 (S.D.N.Y. 2008); Hall v. The Children's Place Retail Stores, Inc., 580 F. Supp. 2d 212, 235 (S.D.N.Y. 2008). Instead, control may be pled in accordance with the notice pleading standard prescribed in Rule 8(a). See In re Alstom SA (Alstom IV), 454 F. Supp. 2d 187, 210 (S.D.N.Y. 2006). "Whether a person is a 'controlling person' is a fact-intensive inquiry, and generally should not be resolved on a motion to dismiss." Katz v. Image Innovations Holdings, Inc., 542 F. Supp. 2d 269, 276 (S.D.N.Y. 2008) (internal quotation marks omitted).

However, the heightened pleading standards of the PSLRA apply with respect to the third prong of a Section 20(a) claim, which requires plaintiffs to allege facts demonstrating that the defendant was a culpable participant. See Alstom III, 406 F. Supp. 2d at 491. In order to plead culpable participation, a plaintiff must

plead with particularity "facts giving rise to a strong inference that the defendant acted with the requisite state of mind," i.e., scienter.  Id.; see also In re Global Crossing, 2005 WL 1907005, at *12 (requiring that § 20(a) plaintiffs allege with particularity that the controlling person "knew or should have known" that the primary violator was engaging in fraudulent conduct).  In order to withstand a motion to dismiss, a Section 20(a) claim must allege, at a minimum, particularized facts of the controlling person's conscious misbehavior or recklessness. See In re Livent, Inc. Noteholders Sec. Litig., 151 F. Supp. 2d 371, 414-17 (S.D.N.Y. 2001) ("[R]ecklessness is the appropriate minimum standard of culpability that plaintiffs must plead under [Section] 20(a)."); Cohen, 722 F. Supp. 2d at 435.

C.   THE SECURITIES ACT

   1.   Section 11 and Section 12(a)(2)

   Section 11 imposes liability on issuers, directors of issuers, and other signers of a registration statement that contains an untrue statement of a material fact or omits to state a material fact necessary to make the statements therein not misleading.  See 15 U.S.C. § 77k(a).  Section 12(a)(2) similarly imposes liability for selling or

- 57 -

offering a security by means of a prospectus that includes an untrue statement of material fact or omits a material fact necessary to make such statements not misleading. See 15 U.S.C. § 77l(a)(2).  Under either section, "a plaintiff must show that the relevant communication either misstated or omitted a material fact."  Iowa Pub. Emps.' Ret. Sys., 620 F.3d at 141.  The two provisions "have roughly parallel elements," Fait, 655 F.3d at 109 (internal quotation marks omitted), such that "[a] plaintiff who fails to plead a [Section] 11 claim necessarily fails to plead a [Section] 12(a)(2) claim as well," In re Agria Corp. Sec. Litig., 672 F. Supp. 2d 520, 525 (S.D.N.Y. 2009) (internal quotation marks omitted).

The Court notes that its previous discussion about misstatements or omissions of material facts with respect to Exchange Act claims applies equally to Securities Act claims, see In re Morgan Stanley Info. Fund Sec. Litig., 592 F.3d 347, 360 (2d Cir. 2010), except that Securities Act claims do not need to be pled with particularity unless they sound in fraud, see Rombach, 355 F.3d at 171. Moreover, unlike claims under the Exchange Act, claims under the Securities Act "do not require allegations of scienter, reliance, or loss causation."  Fait, 655 F.3d at

- 58 -

109.   Instead, Section 11 imposes "'virtually absolute'" liability on issuers, and Section 11 and Section 12(a)(2) impose liability on other parties "for mere negligence." In re Morgan Stanley, 592 F.3d at 359 (quoting Herman & MacLean v. Huddleston, 459 U.S. 375, 382 (1983)).

   2.   Section 15(a)

   Section 15(a) of the Securities Act provides that a person who controls a person liable under Section 11 or Section 12

> shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person had no knowledge of or reasonable ground to believe in the existence of the facts by reason of which the liability of the controlled person is alleged to exist.

15 U.S.C. § 77o(a).   The provision thus requires proof of "a 'primary violation'" of the statute "and control of the primary violator by defendants."   In re Lehman Bros. Mortg.-Backed Sec. Litig., 650 F.3d 167, 185 (2d Cir. 2011) (quoting ECA & Local 134, 553 F.3d at 207.   "Control" for the purposes of Section 15(a) of the Securities Act is the same as "control" under Section 20(b) of the Exchange Act. Id. at 185-86; see also First Jersey, 101 F.3d at 1472-73.

   The Second Circuit has reserved decision on whether the proof of "culpable participation" required in Section

- 59 -

20(a) claims also applies to Section 15(a) claims.   In re
Lehman Bros., 650 F.3d at 186.   However, "a majority of
judges in this District . . . have held such an allegation
is not required."   In re Bear Stearns Mortg. Pass-Through
Certificates Litig., 851 F. Supp. 2d 746, 773 (S.D.N.Y.
2012) (collecting cases).

## IV.   DISCUSSION

### A.   PLEADING STANDARDS

#### 1.   Exchange Act Claims

Corzine alleges that Counts One and Two should be
dismissed for failure to meet the requirements of Rule
8(a), Rule 9(b), and the PSLRA.   According to Corzine, the
CAC is not "simple, concise, and direct."   (Corzine's
Motion, p. 3.)[19]   Corzine also claims that the CAC does not
adequately identify "which of the alleged misstatements are
meant to correspond to which of the alleged reasons for the
falsity of the alleged misstatements."   (Id.)

The CAC separates its list of alleged misstatements
into statements made in each fiscal quarter from the fourth
quarter of fiscal year 2010 to the second quarter of fiscal

---

[19] The Court notes that, to avoid unnecessary duplication, Defendants
have adopted each others' arguments where appropriate.   The Court
identifies arguments only by the party or parties who briefed the
argument, without intending to preclude other defendants from
preserving those arguments to the extent they apply to those
defendants.

year 2012.  Within the section for each fiscal quarter, the CAC separates out the statements made with respect to MF Global's DTA and net income and the statements made with respect to MF Global's risk appetite, internal controls, and liquidity management.  Then, each subsection lists the various alleged misstatements or omissions during that time period and category.  Each allegation contains the statement's source and, where appropriate, highlights through bold text the particular parts of the statement alleged to be inadequate.  Finally, each subsection concludes with a paragraph containing reasons why the preceding statements were false or misleading.

The Court finds that the CAC satisfies the particularity requirements of Rule 9(b) and the PSLRA.  The CAC "specifically identif[ies] the date, publication and speaker of each of the alleged misstatements or omissions" and "contain[s] facts supporting the existence and materiality of these problems."  In re NTL, Inc. Sec. Litig., 347 F. Supp. 2d 15, 22-23 (S.D.N.Y. 2004) (footnote omitted).  The CAC's use of bold text to highlight particular aspects of the statements alleged to be misleading further supports a finding of sufficient particularity.  Cf. In re ITT Educ. Servs., Inc. Sec. &

Shareholders Derivatives Litig., 859 F. Supp. 2d 572, 578 (S.D.N.Y. 2012) (faulting complaint for highlighting "more than half" of statements quoted "while simultaneously conceding that it is not challenging many of the statements it has chosen to highlight"); In re Alcatel Sec. Litig., 382 F. Supp. 2d 513, 534 (S.D.N.Y. 2005) (faulting complaint for "neglect[ing] to make it clear what portion of each quotation constitutes a false representation"). The CAC is thus not a complaint that is so "[v]ague and disorganized" as to fail to satisfy Rule 9(b) and the PSLRA. In re ITT Educ. Servs., 859 F. Supp. 2d at 578.

The Court also acknowledges that, in some respects, Plaintiffs are stuck between the proverbial rock of Rule 8(a) and the proverbial hard place of Rule 9(b) and the PSLRA. See In re Countrywide Fin. Corp. Sec. Litig., 588 F. Supp. 2d 1132, 1156 (C.D. Cal. 2008) (recognizing that "navigating and reconciling" Rule 8(a), Rule 9(b), and the PLSRA creates "an onerous task" for securities fraud plaintiffs). Corzine seeks to take advantage of Plaintiffs' predicament by claiming both that the complaint is too detailed (and thus fails Rule 8(a)) and that it is not detailed enough (and thus fails Rule 9(b) and the PLSRA). But in cases like this one, with particularly

complex facts, some flexibility is warranted.  See In re New Century, 588 F. Supp. 2d 1206, 1219 (C.D. Cal. 2008) ("The plaintiff has the responsibility to craft a clear and concise complaint, but the allegations that discharge this responsibility will depend on the type of action, the specific facts, the number of parties, and other variables.").

The Court is convinced that the CAC sufficiently achieves the goals embodied within Rule 8(a), Rule 9(b), and the PLSRA, which are "to provide a defendant with fair notice of a plaintiff's claim, safeguard his reputation from improvident charges of wrongdoing, and protect him against strike suits."  ATSI Commc'ns, 493 F.3d at 99. Indeed, Defendants' briefs in support of their motions to dismiss, which forcefully and directly attack Plaintiffs' allegations of wrongdoing, are themselves proof that Defendants have notice of the claims against them.  See Stephenson v. Deutsche Bank AG, 282 F. Supp. 2d 1032, 1075 (D. Minn. 2003) (relying on the defendants' motions to dismiss to find that complaint "effectively alerted Defendants of the claims against them").  Corzine is correct that the CAC could state more particularly which of the reasons the statements are alleged to be false applies

- 63 -

to which of the allegedly false statements.  But imposing that requirement on Plaintiffs would serve no valid purpose, and Rule 9(b) and the PSLRA do not require such an extreme level of particularity.  The Court thus finds that Plaintiffs have complied with the various pleading standards applicable their Exchange Act claims.

   2.   Securities Act Claims

While Exchange Act claims require proof of fraud and must always be pled with particularity, Securities Act claims must be pled with particularity only where "the gravamen of the complaint is plainly fraud."  Rombach, 355 F.3d at 172.  Plaintiffs attempt to distinguish their Securities Act claims from their Exchange Act claims.  The CAC states that, with respect to the Securities Act claims, "Plaintiffs expressly disclaim any allegations of scienter in these non-fraud claims."  (CAC ¶ 532.)  At the same time, Plaintiffs include a disclaimer: that "any challenged statements of opinion or belief" for which Defendants are liable under the Securities Act "are alleged to have been materially misstated statements of opinion or belief when made."  (Id.)  Plaintiffs' disclaimer is made in an effort to comply with the Second Circuit's decisions in Fait v. Regions Financial Corp., which held that statements of

- 64 -

opinion are not actionable under the Securities Act unless those opinions "were both false and not honestly believed at the time they were made." 655 F.3d at 113.

The Independent Director Defendants seize on this disclaimer to argue that the Securities Act claims do, in fact, sound in fraud and must be pled with particularity. (Independent Directors' Motion, p. 9-10.) The Independent Directors suggest that Plaintiffs' claim that any opinions were false when made turns the Securities Act claims into claims requiring proof of fraud, which in turn requires Plaintiffs to plead those claims with particularity under Rule 9(b). See In re Deutsche Bank AG Sec. Litig., No. 09 Civ. 1714, 2012 WL 3297730, at *2 (S.D.N.Y. Aug. 10, 2012) (finding that complaint cannot both disclaim allegations of fraud and also allege that defendants subjectively disbelieved their opinions when made). But the Second Circuit's recent decision in Freidus v. Barclays Bank PLC, --- F.3d ---, 2013 WL 4405291 (2d Cir. Aug. 19, 2013), directly undercuts the Independent Directors' argument.[20] There, the Second Circuit found that "the district court

---

[20] Indeed, the Independent Directors rely strongly on the district court opinion that Freidus reversed. (See Independent Directors' Motion, p. 10 (citing In re Barclays Bank PLC Sec. Litig., No. 09 Civ. 1989, 2011 WL 2150477, at *3 (S.D.N.Y. May 31, 2011), rev'd, Freidus, --- F. 3d ---, 2013 WL 4405291).)

erred in stating that claims of disbelief of subjective opinions must necessarily be brought as fraud claims." Id. at *6. To the contrary, to require proof that an opinion was subjectively disbelieved does not also require proof of fraudulent intent. Id.; see also Fait, 655 F.3d at 112 n.5 ("We do not view a requirement that a plaintiff plausibly allege that defendant misstated his truly held belief and an allegation that defendant did so with fraudulent intent as one and the same."). It is thus clear that Plaintiffs are correct to say that a complaint can plead that opinions were subjectively disbelieved when made while not also sounding in fraud.

In the alternative, the Independent Directors argue (Independent Directors' Motion, p. 10) that the CAC does not sufficiently separate its Exchange Act claims (which do allege fraud) from its Securities Act claims (which purport not to allege fraud). Compare In re Adelphia Commc'ns Corp. Sec. & Derivative Litig., No. 03 MD 1529, 2007 WL 2615928, at *9 (S.D.N.Y. Sept. 10, 2007) (finding that Securities Act claims sounded in fraud because complaint relied on same accusations of fraud for both Securities Act and Exchange Act claims), with In re Refco, Inc. Sec. Litig., 503 F. Supp. 2d 611, 613 (S.D.N.Y. 2007) (finding

that complaint "specifically pled alternate theories of fraud and negligence"). But the Court need not decide whether Plaintiffs' CAC sufficiently accomplishes the goal of separating its fraud-based Exchange Act claims from its non-fraud-based Securities Act claims. Even if the Independent Director Defendants are correct that the CAC's Securities Act claims sound in fraud, Plaintiffs have met Rule 9(b) particularity standard for the reasons described above. The Court finds that Plaintiffs have complied with all pleading standards applicable to their Securities Act claims.

B.   MATERIAL MISSTATEMENTS OR OMISSIONS

1.   DTA and Net Income

Plaintiffs allege that MF Global's public statements contained false or misleading statements or omissions about MF Global's DTA and net income because "the Company failed to timely record a valuation allowance against its U.S. DTA in violation of GAAP." (CAC ¶¶ 324, 342, 357, 374, 393, 421.) Plaintiffs claim that the valuation allowance should have been taken earlier because

> (1) MF Global's U.S. operations were operating at a
> three-year cumulative loss as of March 31, 2010; (2)
> MF Global did not have evidence "of sufficient quality
> and quantity to counteract [that] negative evidence"
> since it was relying on, at best, "unsettled" events
> dependent on future market conditions that had not yet

- 67 -

been demonstrated; (3) MF Global's projections of income were unreliable and dependent on the undisclosed, unsustainable and high-risk Corzine Trade (and only 20% of the profits from the Corzine Trade could be recorded as revenues in connection with the Company's U.S. operations); (4) MF Global's plans to realize costs savings from changes to the Company's compensation structure were unreliable and insufficient to offset losses and benefit from the Company's U.S. DTA, especially since any costs savings were partially offset by increases in payroll expenses due to increased professional headcount; and (5) MF Global did not have "prudent" and "feasible" tax strategies that would have enabled it to avoid recording a full valuation allowance against its U.S. DTA.

(CAC ¶¶ 324, 342, 357, 374, 393, 421.) Defendants claim that the statements made about DTA were not materially false or misleading and raise various arguments in support. The Court addresses these arguments in turn.

a. <u>Whether the Statements about DTA Are Opinion</u>

At the threshold, the Court must determine whether the statements made about MF Global's DTA were statements of opinion, as the Underwriters and Senior Notes Underwriters (joined by the other defendants) claim. (Underwriters' Motion, p. 17-19; Senior Notes Underwriters' Motion, p. 21.) If those statements are opinions, then they are actionable only if they "were both false and not honestly

believed at the time they were made." <u>Fait</u>, 655 F.3d at 113.[21]

While <u>Fait</u> explained the circumstances under which an opinion can be actionable, it did not comprehensively delineate the difference between a statement of opinion and a statement of fact. At issue in <u>Fait</u> was whether statements about the value of a company's "goodwill" constituted fact or opinion. <u>See id.</u> at 110. The Second Circuit noted that the value of the company's goodwill depended on a "determination of the 'fair value' of the assets acquired and liabilities assumed, which are not matters of objective fact." <u>Id.</u> The court also observed that the plaintiff did not identify an "objective standard" that the defendant "should have but failed to use in determining the value of" the company's goodwill. <u>Id.</u> The Second Circuit concluded that "the statements regarding goodwill at issue here are subjective ones rather than 'objective factual matters.'" <u>Id.</u> at 111 (quoting <u>I. Meyer Pincus & Assocs., P.C. v. Oppenheimer & Co., Inc.</u>, 936 F.2d 759, 762 (2d Cir. 1991)).

---

[21] Statements of opinion are also actionable when "stated as guarantees." <u>Fait</u>, 655 F.3d at 110 n.3. Plaintiffs do not argue that MF Global's statements about realizing its DTA constituted guarantees.

- 69 -

Fait also considered whether statements about the company's reserves to cover for potentially lost loans constituted statements of fact or opinion. See id. at 112-13. The Second Circuit noted that determinations of loan loss reserves, like determinations of goodwill, "reflect management's opinion or judgment about what, if any, portion of amounts due on the loans ultimately might not be collectible." Id. at 113. And the court noted that plaintiff again failed to identify "an objective standard for setting loan loss reserves." Id. Thus, the court ruled that statements about loan loss reserves are opinions, rather than statements of facts. Id.

The Court finds that, under Fait's reasoning, statements about the realization of DTA are statements of opinion, not of fact. The GAAP standard on which Plaintiffs rely required MF Global's management to weigh the available evidence and determine whether the DTA was "more likely than not to be realized." (CAC ¶ 91.) Determining whether to take a valuation allowance against DTA is thus subject to "a very subjective standard." In re Fannie Mae 2008 Sec. Litig., 742 F. Supp. 2d 382, 409 (S.D.N.Y. 2010); see also Kuriakose v. Federal Home Loan Mortg. Corp., 897 F. Supp. 2d 168, 181 (S.D.N.Y. 2012)

(noting that the "'more likely than not'" standard for writing down DTA is "nebulous"); Limantour v. Cray Inc., 432 F. Supp. 2d 1129, 1156 (W.D. Wash. 2006) (calling determination to take valuation allowance against DTA "a judgment call based on all available positive and negative evidence"). Determining the value of a company's DTA, like determining the value of goodwill, does not involve "matters of objective fact." Fait, 655 F.3d at 110.

Plaintiffs' arguments to the contrary (Plaintiffs' Opposition, p. 12-15) are unpersuasive. While Plaintiffs are correct that the GAAP standard references the presence of "objectively verified" evidence (CAC ¶ 97), the reference relates only to one factor that affects the subjective weighing of positive and negative evidence. The final decision of whether to take a valuation allowance against DTA still requires substantially subjective judgments. Cf. Compuware Corp. v. Moody's Investors Servs., Inc., 499 F.3d 520, 529 (6th Cir. 2007) ("A Moody's credit rating is a predictive opinion, dependent on a subjective and discretionary weighing of complex factors."). Plaintiffs have not identified an objective standard that should have been applied. See Fait, 655 F.3d at 110, 113. Moreover, contrary to Plaintiffs' argument,

this case is not one in which the complaint alleges that a company "engaged in improper accounting practices." In re General Elec. Co., 856 F. Supp. 2d at 658 n.2. This case is not about whether MF Global failed to apply the proper accounting practice, but instead is about whether the applicable accounting practice was applied correctly. Since in this case the applicable accounting practice involves "estimates of subjective values," Fait's standard applies. Id.

> b. Whether the CAC Pleads Subjective and Objective Falsity

Because the Court concludes that MF Global's statements about its DTA were opinions, it must next determine whether the statements "were both false and not honestly believed at the time they were made." Fait, 655 F.3d at 113. The Court finds that Plaintiffs have pled sufficient facts to meet this standard.

First, the Court finds that Plaintiffs plausibly allege that MF Global's statements about its DTA were objectively false. Most significantly, MF Global's United States operations were in a three-year loss position at the start of the Class Period, which served as significant negative evidence against recognizing the DTA. See Hoff v. Popular, Inc., 727 F. Supp. 2d 77, 90 (D.P.R. 2010)

(recognizing three-year loss position as "strong evidence that at the beginning of the class period it was more likely than not that the Company would not be able to realize" DTA); In re Scottish Re Grp. Sec. Litig., 524 F. Supp. 2d 370, 389-90 (S.D.N.Y. 2007) (same). Despite this, MF Global did not acknowledge its loss position as negative evidence until its 2011 Form 10-K. Disclosures made prior to the 2011 Form 10-K also failed to explain the positive evidence on which the Company relied to avoid taking a valuation allowance against its DTA.

The CAC further alleges weaknesses in the positive evidence that MF Global used to justify its DTA position. According to the CAC, MF Global's projections of increased income based on the RTM Strategy could not serve as sufficient positive evidence because it was high-risk and unsustainable. See Hoff, 727 F. Supp. 2d at 90 ("Popular U.S. did not have a strong earnings history, nor would it have been reasonable for Popular to interpret that the historical losses in its U.S. operations were an aberration or anything but a continuing condition."). The CAC also explains why MF Global's changes in compensation structure and tax planning strategies could not overcome its existing three-year loss position.

- 73 -

Finally, the fact that MF Global took some small valuation allowances against its DTA during the Class Period makes it more plausible that the Company's failure to take an allowance against the full value of its DTA was materially misleading. See In re Scottish Re, 524 F. Supp. 2d at 390 (noting that company's small valuation allowances "may have further misled investors to believe that the Company was properly reporting and evaluating its deferred tax assets and taking valuation allowances when needed"). Indeed, MacDonald went so far as to aver that the remainder of the DTA was not as at risk, thus amplifying the misleading nature of the valuation allowances. In sum, the allegations in the CAC, taken as a whole, give rise to a reasonable inference that MF Global made material misstatements with respect to its DTA.

To be sure, some courts have dismissed securities fraud complaints that were based on a company's failure to take a timely valuation allowance against its DTA. But in those cases, the facts pled did not support a plausible claim of falsity. See Kuriakose, 897 F. Supp. 2d at 181 ("Plaintiffs have alleged no specific facts from which the Court can conclude that Freddie Mac anticipated that it would not have any taxable income."); In re Fannie Mae, 742

- 74 -

F. Supp. 2d at 409 (company was not in three-year loss position prior to recording DTA); In re Wet Seal, Inc. Sec. Litig., 518 F. Supp. 2d 1148, 1162 (C.D. Cal. 2007) ("Plaintiffs do not allege any facts showing that the conclusion [that a valuation allowance should not be taken] . . . was improperly made . . . ."); Limantour, 432 F. Supp. 2d at 1157 (company reported profit in year prior to recording DTA). Here, by contrast, the CAC sufficiently alleges objective falsity.

The Court also finds that the CAC plausibly alleges that the Officer Defendants did not honestly believe their stated opinions.[22] According to the CAC, the Officers (1) were aware of the relevant GAAP accounting standard and (2) knew that the positive evidence on which they relied would not be sufficient for MF Global to realize its DTA. See Hoff, 727 F. Supp. 2d at 93 (finding such knowledge sufficient to raise a strong inference of scienter); In re

---

[22] The Court agrees with Plaintiffs (Plaintiffs' Opposition, p. 12 n.12) that the CAC must only allege subjective falsity as to the Officers, who are "the originator[s] of the opinions expressed in the offering documents." Federal Fin. Hous. Agency v. UBS Ams., Inc., 858 F. Supp. 2d 306, 327 (S.D.N.Y. 2012), aff'd, 712 F.3d 136 (2d Cir. 2013). The Independent Directors are incorrect when they allege (Independent Directors' Motion, p. 14; Independent Directors' Reply, p. 4 n.6) that the CAC must allege subjective falsity as to them. See UBS Ams., Inc., 858 F. Supp. 2d at 326 ("The Securities Act does not require a defendant-specific showing of subjective falsity in order to impose liability for opinion statements . . . .").

Scottish Re, 524 F. Supp. 2d at 393-94 (same).[23]   From there, Plaintiffs are entitled to a reasonable inference that the Officers subjectively believed that MF Global should take a valuation allowance against its DTA, despite their public statements to the contrary.   See Abu Dhabi Commercial Bank v. Morgan Stanley & Co. Inc., 651 F. Supp. 2d 155, 178-79 (S.D.N.Y. 2009) (finding knowledge of contrary information sufficient to plead subjective falsity of opinion); cf. In re Deutsche Bank AG, 2012 WL 3297730, at *2 (rejecting claim of subjective falsity where plaintiffs "specifically aver[red] that none of their claims [were] based on knowing misconduct").   The allegations thus go beyond claiming merely that the opinion was "unreasonable" or that it was "possible to reach a different opinion . . . based on the information available to [the Officers] at the time." Podany, 318 F. Supp. 2d at 154.   Rather, it can be "plausibly inferred" from the facts alleged that the Officers "knew they were disseminating false and misleading" opinions about MF Global's DTA.   Abu Dhabi Commercial Bank, 651 F. Supp. 2d at 179.

---

[23] If such knowledge is sufficient to plead fraudulent intent, then it necessarily must be sufficient to plead mere subjective falsity. See Podany, 318 F. Supp. 2d at 154.

Of course, a person's mere knowledge of facts that cut against his opinion does not conclusively prove subjective falsity. But at this stage of the proceedings, Plaintiffs need only allege facts giving rise to a reasonable inference of liability. The Court finds that Plaintiffs plausibly allege subjective falsity; a fact finder can later determine whether the evidence sufficiently proves subjective falsity. See Abu Dhabi Commercial Bank v. Morgan Stanley & Co. Inc., 888 F. Supp. 2d 431, 456-57 (S.D.N.Y. 2012) (denying summary judgment because "plaintiffs have offered sufficient evidence from which a jury could infer" objective and subjective falsity).

c. Bespeaks Caution

The Securities Act Defendants claim that the bespeaks-caution doctrine precludes liability for statements made about MF Global's DTA. (Underwriters' Motion, p. 22-24; Senior Notes Underwriters' Motion, p. 23-24; Securities Act Defendants' Reply, p. 15-16.) They point to various disclosures the Company made in which it warned investors that it might not return to profitability, that its cost-saving strategies might not be successful, and that it consequently might not realize its DTA.

The Court is not persuaded that these disclosures preclude the alleged misstatements from being material as a matter of law. Rather, the language highlighted by the Securities Act Defendants is "merely a boilerplate litany of generally applicable risk factors." Slayton, 604 F.3d at 772 (quoting Southland Sec. Corp. v. INSpire Ins. Solutions, Inc., 365 F.3d 353, 372 (5th Cir. 2004)). The disclosures refer generally to potential unexpected events or contingencies that might have prevented MF Global from realizing the full value of its DTA. But the CAC alleges specific information, known to the Officers, which Plaintiffs assert made the Officers' opinion that MF Global did not need to take a valuation allowance against its DTA subjectively false. The general statements of risk that accompanied MF Global's public disclosure were not sufficient to make those allegedly false opinions immaterial as a matter of law. See City of Pontiac Gen. Emps.' Ret. Sys. v. Lockheed Martin Corp., 875 F. Supp. 2d 359, 365 (S.D.N.Y. 2012) (finding cautionary language insufficient where it did not "speak[] to the substantive information that plaintiff alleges the defendants misrepresented"); In re American Int'l Grp., Inc. 2008 Sec. Litig., 741 F. Supp. 2d 511, 532 (S.D.N.Y. 2010) (finding

- 78 -

cautionary language insufficient "in light of the undisclosed hard facts critical to appreciating the magnitude of the risks described" (internal quotation marks omitted)).

The disclosures did not specifically reveal the particular risks allegedly known to MF Global and the Officers. See Slayton, 604 F.3d at 772 (noting that cautionary language is insufficient where it did not "convey[] substantive information" about the risk at issue). MF Global's cautionary language thus fell short of the more specific qualifications that courts have found sufficient under the bespeaks-caution doctrine. See, e.g., P. Stolz Family P'ship, 355 F.3d at 98 (granting motion to dismiss where offering documents "caution[ed] prospective investors that future financing was tenuous" and that they could suffer complete loss of investment); Olkey, 98 F.3d at 5-6 (granting motion to dismiss where prospectuses specifically warned that changes in interest rates could affect return on investment); Coronel v. Quanta Capital Holdings Ltd., No. 07 Civ. 1405, 2009 WL 174656, at *17 (S.D.N.Y. Jan. 26, 2009) (granting motion to dismiss where registration statement and prospectus warned that they gave "'preliminary' estimates that were 'inherently difficult to

predict'" and "were subject to a 'high level of uncertainty,'" which consequently could affect company's financial condition).

2.   RTM Strategy

Plaintiffs allege material misstatements and omissions with respect to MF Global's "risk appetite, internal controls and liquidity management" because

> (1) the Officer Defendants' strategic plan to increase principal risk-taking also materially increased liquidity risks without the necessary corresponding increase in capital, liquidity risk management or internal controls; (2) the primary purpose of the Company's increased principal trading activity was not to facilitate customer transactions but to engage in non-client-related speculative transactions; (3) Defendants' representations about available capital and liquidity were unreliable given that: (a) the Company's liquidity monitoring systems were outdated, (b) the Company had no real-time liquidity monitoring system, and (c) the Company tracked liquidity using informal, manual means compiled from spreadsheets and oral reports; (4) even though the Company's transformation plan did not involve increasing VAR, the plan involved materially increasing off-balance sheet liquidity risks and leverage levels in connection with investments in Euro sovereign debt through RTM transactions; and (5) MF Global exposed client funds to significant risk by relying on regular inter-company transfers from MF Global's FCM operations to meet the daily liquidity needs of non-FCM operations.

(CAC ¶¶ 336, 354, 370, 386, 416, 443, 459.)  Again, Defendants make various arguments to claim that the statements about the RTM Strategy were not materially false

- 80 -

or misleading.    The Court addresses these arguments in turn.

a.    <u>False or Misleading Statements</u>

Defendants suggest that the alleged misstatements were in fact not misstatements at all.    Rather, according to Defendants, MF Global fully disclosed the nature of and risks associated with the RTM Strategy, including the capital, liquidity, and risk management weaknesses that are the focus of the CAC.    Plaintiffs respond by highlighting particular disclosures and omissions that they claim to have materially misled investors.    The Court finds that CAC sufficiently pleads materially false or misleading statements to plausibly allege that Defendants have committed Securities Act and Exchange Act violations.

First, the CAC pleads actionable misstatements with respect to MF Global's assurances that the Company operated within specified risk limits.    Plaintiffs allege that, contrary to those assurances, Corzine and MF Global repeatedly breached the limits set on investments in European sovereign debt.    Under those circumstances, Plaintiffs have alleged material misstatements.    <u>See</u> <u>In re</u> <u>Lehman Bros. Sec. & ERISA Litig.</u>, 799 F. Supp. 2d 258, 284-85 (S.D.N.Y. 2011) (finding similar statement actionable in

light of allegations that company "routinely exceeded various risk limits it had created"). Contrary to Defendants' claims, that the Board later increased the trading limits does not refute a reasonable inference that the original statement materially misled investors. See id. at 285 (noting that later increase in previously breached limits "is at best in considerable tension with" claim that company adhered to limits).

Second, Plaintiffs plead actionable misstatements about MF Global's risk controls. MF Global's public filings and statements described the Company's internal controls as, among other things, "robust" (CAC ¶ 331), "effective" (id.), "adequate" (CAC ¶ 362), and "comprehensive" and "designed to monitor, evaluate, and manage the risks [MF Global] assume[d]" (CAC ¶ 402). The CAC pleads contrary information from MF Global's IAD that undermines the accuracy of those disclosures. For example, the IAD's reports to the Board reveal numerous weaknesses that undermine the accuracy of MF Global's public disclosures. See Cornwell v. Credit Suisse Grp., 689 F. Supp. 2d 629, 638 (S.D.N.Y. 2010) (noting that disclosures stating that internal controls and risk management mitigated risk are actionable where defendants have

- 82 -

information to the contrary). Plaintiffs have thus plausibly alleged material misstatements. See In re Lehman Bros., 799 F. Supp. 2d at 285 (finding actionable statements of company's confidence in risk controls); In re Bear Stearns Cos., Inc. Sec., Derivative, & ERISA Litig., 763 F. Supp. 2d 423, 494 (S.D.N.Y. 2011) (same); In re American Int'l Grp., 741 F. Supp. 2d at 530 (same).

Third, Plaintiffs plead actionable misstatements with respect to the risks posed by the RTM Strategy. MF Global's public statements consistently denied that the RTM Strategy posed a substantial risk to the Company. Among other disclosures, the Officers referred to the risk as "minimal" (CAC ¶¶ 399, 424) and "limited" (CAC ¶ 447), and Corzine told investors that the RTM Strategy "actually makes [MF Global] less risky" (CAC ¶ 422). The CAC simultaneously alleges that the RTM Strategy exposed MF Global to substantial risk and ultimately contributed to the Company's collapse. Plaintiffs have thus alleged facts giving rise to a reasonable inference that the statements made about the RTM Strategy's risks were material misstatements.

While Defendants argue that the CAC merely pleads inactionable fraud by hindsight, see Slayton, 604 F.3d at

- 83 -

776, the contemporaneous response to MF Global's disclosure of its risk exposure -- prior to the Company's collapse -- undermines this claim.  As described above, when MF Global disclosed its exposure to European sovereign debt, FINRA and the SEC took action to force MF Global to increase its capital reserves.  Moody's also reacted negatively to MF Global's revelation that the RTM transactions were proprietary, rather than client-driven.[24]  These reactions buttress a reasonable inference that MF Global's statements would have materially misled a reasonable investor.  See Litwin, 634 F.3d at 716-17.  In addition, the CAC's allegations survive a fraud-by-hindsight objection because Plaintiffs "have sufficiently pled that Defendants had present knowledge of the risk" that was not disclosed.  Freudenberg v. E*Trade Fin. Corp., 712 F. Supp. 2d 171, 192 (S.D.N.Y. 2010).

Finally, the CAC pleads actionable misstatements about MF Global's capital and liquidity management.  While MF Global and the Officers repeatedly represented that the Company had a "strong" liquidity position (see, e.g., CAC ¶ 334, 346, 348, 378, 445, 447), Plaintiffs allege that MF

---

[24] The Officer Defendants characterize Moody's reaction as confusing and incoherent.  (Officers' Reply, p. 2.)  But that does nothing more than to raise a question of fact as to whether MF Global's previous disclosures were inadequate.

- 84 -

Global faced substantial strain on its capital and liquidity and met its requirements only through daily intra-company transfers, and collapsed when RTM counterparties demanded additional margin. These facts plausibly allege material misstatements under the Exchange Act and the Securities Act.[25]

Defendants argue that the claimed misstatements were mere puffery and emphasize that MF Global was "not required to take a gloomy, fearful or defeatist view of the future." Rombach, 355 F.3d at 174. The Court is persuaded, for the reasons described above, that the CAC pleads "misrepresentations of existing fact" that are not puffery. Novak, 216 F.3d at 315; see Freudenberg, 712 F. Supp. 2d at 190 (rejecting puffery defense where "[d]efendants denied that E*TRADE's real estate loan portfolio had become more risky -- even though it is alleged that the risks had increased"). Put another way Plaintiffs' pleading survives an objection that the alleged misstatements were "so vague, broad, and non-specific that a reasonable investor would

---

[25] To the extent any of the statements described in this section constitute opinions, the CAC sufficiently pleads the speaker's knowledge of contrary information to give rise to a reasonable inference of subjective falsity. See Abu Dhabi Commercial Bank, 651 F. Supp. 2d at 178-79.

not rely on [them]."  In re General Elec. Co., 857 F. Supp. 2d at 384.

### b.  Bespeaks Caution / PSLRA Safe Harbor

Defendants suggest that the Company's alleged misstatements concerning the RTM Strategy are protected by the bespeaks-caution doctrine and the PSLRA safe harbor for forward-looking statements.  They point to disclosures that the Company might increase trading risk, or might not hold sufficient capital or liquidity to meet market demands, as statements that contain "sufficient cautionary language" to defeat any claim of materiality.  Iowa Pub. Emps.' Ret. Sys., 620 F.3d at 141.

The Court rejects this argument for reasons similar to those stated in the above analysis of the DTA statements: the CAC alleges specific information, known to the Officers, which made their disclosures about the risks of the RTM Strategy subjectively false.  The Company's public filings and statements were thus insufficient "in light of the undisclosed hard facts critical to appreciating the magnitude of the risks described."  In re American Int'l Grp., Inc., 741 F. Supp. 2d at 532 (internal quotation marks omitted).  By superficially warning of possible risks while failing to disclose critical facts, MF Global was

- 86 -

akin "to someone who warns his hiking companion to walk slowly because there might be a ditch ahead when he knows with near certainty that the Grand Canyon lies one foot away." In re Prudential Sec. Inc. Ltd. P'ships Litig., 930 F. Supp. 68, 72 (S.D.N.Y. 1996). The disclosures thus do not fall under the bespeaks-caution doctrine, see id., or the PSLRA safe harbor, see Slayton, 604 F.3d at 770 ("[C]autionary language that is misleading in light of historical fact cannot be meaningful.").

In sum, the Court finds that the CAC sufficiently pleads facts that plausibly allege material misstatements to survive dismissal at this stage.[26]

C.   EXCHANGE ACT DEFENSES

The Officer Defendants raise several arguments specific to the Exchange Act claims brought against them. The Court addresses these arguments in turn.

1.   Strong Inference of Scienter

To state a claim under the Exchange Act, Plaintiffs must plead facts that "give rise to a strong inference of

---

[26] The parties dispute exactly which of the many alleged misstatements in the CAC are sufficient to give rise to Exchange Act and Securities Act liability. The Court sees no need to resolve those disputes at this time; because the CAC pleads at least some misstatements sufficient to survive dismissal, "the Court can evaluate the exact parameters of those claims following discovery, either in connection with a motion for summary judgment or in advance of trial." Citiline Holdings, Inc. v. iStar Fin. Inc., 701 F. Supp. 2d 506, 515 n.2 (S.D.N.Y. 2010).

- 87 -

fraudulent intent." <u>Kalnit</u>, 264 F.3d at 138 (<u>quoting</u> <u>Novak</u>, 216 F.3d at 307). While Plaintiffs do not plead facts to show that the Officers had special motives to act fraudulently, that is not fatal to their claim. <u>See</u> <u>Tellabs</u>, 551 U.S. at 325 (noting that "the absence of a motive allegation is not fatal" to a claim of fraudulent intent). Plaintiffs instead claim (Plaintiffs' Opposition, p. 47-58) that the CAC demonstrates "facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness." <u>Kalnit</u>, 264 F.3d at 138. However, absent motive, "the strength of the circumstantial allegations [demonstrating conscious misbehavior or recklessness] must be correspondingly greater." <u>Id.</u> at 142 (citation and internal quotation mark omitted). The Officer Defendants counter that the CAC does not sufficiently plead scienter. (Corzine's Motion, p. 16-24; MacDonald's Motion, p. 9-16; Steenkamp's Motion, p. 13-19; Officers' Reply, p. 12-16.)

The Court finds that Plaintiffs have adequately pled scienter as to each of the Officer Defendants.[27] First, with respect to statements made about MF Global's DTA,

---

[27] The Court thus rejects the MacDonald's claim (MacDonald's Motion, p. 12-13; MacDonald's Reply, p. 1) that the CAC's scienter allegations are improper group pleading. <u>See</u> <u>In re CRM Holdings, Ltd. Sec. Litig.</u>, No. 10 Civ. 975, 2012 WL 1646888, at *30 (S.D.N.Y. May 10, 2012) (noting that scienter "cannot be satisfied by group pleading" because complaint must allege each individual defendant's fraudulent intent).

Plaintiffs plead either knowledge of or failure by each of the Officer Defendants to conduct a sufficient investigation into facts that would contradict the Officers' public statements. See Novak, 216 F.3d at 308. Each of the Officers demonstrated awareness of the GAAP standards for recognizing DTAs either through public statements or by signing MF Global's public filings that claimed compliance with the standards. See In re Scottish Re, 524 F. Supp. 2d at 393 (finding sufficient proof of knowledge of GAAP's DTA standards where defendants "applied and quoted the standard in the Company's financial statements both before and throughout the Class Period"). Those signatures created for the Officers "a 'duty to familiarize themselves with the facts relevant to the core operations of [MF Global].'" See Alstom III, 406 F. Supp. 2d at 459 (quoting Teamsters Local 445 Freight Div. Pension Fund v. Bombardier Inc., 05 Civ. 1898, 2005 WL 2148919, at *63 (S.D.N.Y. Sept. 6, 2005)). The CAC also pleads facts sufficient to demonstrate strong circumstantial evidence that, in light of the weaknesses in the positive evidence on which MF Global relied to avoid taking a valuation allowance against its DTA, the failure to take that valuation allowance was reckless. See Hoff, 727 F. Supp.

- 89 -

2d at 93 (finding sufficient evidence of scienter for failure to take valuation allowance against DTA "to the extent that the danger was either known to the defendants or so obvious that they must have been aware of it").

Second, Plaintiffs sufficiently plead a strong inference of scienter with respect to statements made about MF Global's internal controls and capital and liquidity risks. The CAC sufficiently pleads facts that each of the Officers knew or should have known about the weaknesses in MF Global's internal controls and capital and liquidity management. For example, the IAD issued several reports during the Class Period that criticized MF Global's existing policies and noted failures to follow those policies. Yet even in light of this information, the Officers made statements to the contrary and assured investors that MF Global's internal controls and capital and liquidity management were strong and adequate. "While a trier of fact might not ultimately agree," the Court finds that at this stage the CAC sufficiently pleads facts to give rise to a strong inference of scienter. <u>In re Lehman Bros.</u>, 799 F. Supp. 2d at 297.

Corzine and MacDonald suggest that their purchases of MF Global stock during the Class Period negate an inference

of scienter. (Corzine's Motion, p. 23-24; MacDonald's Motion, p. 15.) To be sure, under some circumstances such purchases might suggest a lack of fraudulent intent. See In re MRU Holdings Sec. Litig., 769 F. Supp. 2d 500, 516 (S.D.N.Y. 2011). But this possibility alone cannot counteract the circumstantial evidence of fraudulent intent described above; such a rule would create incentive for corporate officers to insulate themselves from liability by purchasing stock merely to negate an inference of fraud. See Holmes v. Baker, 166 F. Supp. 2d 1362, 1378 (S.D. Fla. 2001) (rejecting defendants' claim that insider purchases negated inference of fraudulent intent). Conceivably, as evidenced here, a relatively modest purchase in proportion to the loss amounts attributed to the alleged fraudulent conduct might be enough for officer defendants to claim the protection of such a rule -- even when they possess inside information about the true condition of the company and can control the timing of release of unfavorable information. Thus, even when courts note that insider trades suggest a lack of motive to commit fraud, they then proceed to consider whether the facts pled give rise to an inference of conscious misbehavior or recklessness. See, e.g., Avon Pension Fund v. GlaxoSmithKline PLC, 343 Fed. App'x 671,

673-74 (2d Cir. 2009); In re MRU Holdings, 769 F. Supp. 2d at 515-17; In re Bristol-Myers Squibb Sec. Litig., 312 F. Supp. 2d 549, 561-63 (S.D.N.Y. 2004). Here, for the reasons described above, the CAC meets that threshold.

The Officers also propose various other inferences about their intent, such as a genuine belief that MF Global would succeed and that the Company's collapse resulted merely from a flawed business plan. (Corzine's Motion, p. 23-24; MacDonald's Motion, p. 15;; Steenkamp's Motion, p. 20-21.) They argue that these inferences are "plausible, nonculpable explanations" that negate an inference of fraudulent intent. Tellabs, 551 U.S. at 324. But at this stage, Plaintiffs need not show that the inference of fraudulent intent is "irrefutable . . . or even the most plausible of competing inferences." Id. (citation and internal quotation marks omitted). Rather, Plaintiffs must only show that the inference of scienter is "at least as likely as any plausible opposing inference." Id. at 328 (emphasis in original); see also City of Pontiac Gen. Emps.' Ret. Sys., 875 F. Supp. 2d at 372 ("[A]t the motion to dismiss stage, a tie on scienter goes to the plaintiff."). Given the facts described above which give rise to an inference of scienter, Plaintiffs have met this

- 92 -

burden.   After discovery, a fact finder will determine whether Plaintiffs can "demonstrate that it is <u>more</u> <u>likely</u> than not that the defendant acted with scienter." <u>Tellabs</u>, 551 U.S. at 328 (emphasis in original).   In this regard, the Court notes that "[b]ecause discovery will be going forward in any case" on the Securities Act claims, dismissal at this stage is unwise because "a fact finder will be in a far better position to determine if [the Officers] acted with fraudulent intent following the close of discovery than the Court would be solely on the basis of the pleadings." <u>Citiline Holdings</u>, 701 F. Supp. 2d at 516 n.3.

    2.  <u>Control Persons Claims</u>

For the reasons stated above, the Court finds that the CAC sufficiently pleads a primary violation of Section 10(b) and the scienter required to establish culpable participation under Section 20(a).   See <u>Alstom III</u>, 406 F. Supp. 2d at 491.   The Court also finds that the CAC adequately alleges each Officers' involvement in MF Global's operations to demonstrate control in the alleged violations, particularly in light of the generous standard that applies at the pleading stage.   See <u>Katz</u>, 542 F. Supp.

2d at 276.   Thus, the Court finds that the CAC adequately
states a claim as to Count Two of the complaint.

D.   SECURITIES ACT DEFENSES

Defendants raise various other arguments in support of
their motions to dismiss the Securities Act claims.   The
Court addresses those arguments in turn.

1.   Liability for Forms 10-Q

Section 11 holds a party liable for statements or
omissions made in "any part of the registration statement,
when such part became effective."   15 U.S.C. § 77k(a)
(emphasis added).   A registration statement includes "any
. . . document . . . incorporated therein by reference."
15 U.S.C. § 77b(a)(8).   The Individual Defendants allege
that they are not liable under the Securities Act for
statements made in MF Global's Forms 10-Q because those
forms never became "effective" as to them.   (Independent
Directors' Motion, p. 11-13.)   Plaintiffs counter that the
Forms 10-Q became effective as to the Individual Defendants
when they were incorporated by reference into the
prospectuses that accompanied the offerings of the
Secondary Offering, the 2016 Notes, the 2018 Notes, and the
Senior Notes.   (Plaintiffs' Opposition, p. 66-68.)   The
Individual Defendants respond that "prospectus supplements

- 94 -

do not themselves become effective as to individuals," and thus the prospectuses (and the Forms 10-Q incorporated by reference in the prospectuses) did not become effective as to the Individual Defendants. (Independent Directors' Reply Motion, p. 1-2.)

Under SEC Rule 430B, a prospectus supplement "is deemed to be part of the registration statement" and, "for purposes of liability under [S]ection 11 of the [Securities] Act of the issuer and any underwriter at the time only," establishes "a new effective date of the part of such registration statement relating to the securities to which such form of prospectus relates." 17 C.F.R. § 230.430B(f)(2) (emphasis added). The prospectus creates a new effective date for a director or individual signer only under certain limited exceptions. See id. § 230.430B(f)(4). At least one court has read this language to prohibit imposing Section 11 liability on individual defendants for statements made in a prospectus. See In re Countrywide Fin. Corp. Mortg.-Backed Sec. Litig., 932 F. Supp. 2d 1095 (C.D. Cal. 2013). On the other hand, courts in this District have held individual defendants liable for statements incorporated by reference into a prospectus, see In re Lehman Bros., 799 F. Supp. 2d at 316 & n.399,

- 95 -

including those made in Forms 10-Q, see In re Citigroup, Inc. Bond Litig., 723 F. Supp. 2d 568, 580, 594 (S.D.N.Y. 2010).

The Court need not decide at this juncture whether the Individual Defendants are liable for statements in the Forms 10-Q.   No party disputes that the Individual Defendants are liable for statements in the Forms 10-K, and no party disputes that the Underwriters and Senior Notes Underwriters are liable for statements in the Forms 10-Q. In light of the Court's rulings, discovery on all counts against all Defendants and with respect to all filings will go forward.   The Court will have the opportunity to further define the contours of the claims after discovery.

    2.   Reliance on Audited Statements

Section 11 provides underwriters with an affirmative defense where they "had no reasonable ground to believe and did not believe" that the statements in a public filing misstated or omitted material facts.     15 U.S.C. § 77k(b)(3)(C); see also In re Global Crossing, Ltd. Sec. Litig., 313 F. Supp. 2d 189, 211 (S.D.N.Y. 2003) (noting statutory command that "the burden of proof is on defendants to establish this defense").   The Underwriters and the Senior Notes Underwriters claim that the CAC

insufficiently alleges that they were unreasonable in their reliance on audited financial statements. (Underwriters' Motion, p. 24-25; Senior Notes Underwriters' Motion, p. 20 n.13.)

Underwriters' reliance on audited financial statements is reasonable "absent red flags that the underwriters were in a position to see." In re Countrywide Fin. Corp., 588 F. Supp. 2d at 1175. In other words, an underwriter can take advantage of this defense only if its reliance on the audited financial statements was "reasonable under the circumstances." In re Software Toolworks, Inc., 50 F.3d 615, 624 (9th Cir. 1994). Where "red flags" make such reliance unreasonable, the underwriter must show that its investigation of those red flags was reasonable. Id.; In re WorldCom, Inc. Sec. Litig., 346 F. Supp. 2d 628, 679 (S.D.N.Y. 2004) ("[T]he existence of red flags can create a duty to investigate even audited financial statements."). "[T]he standard for determining what constitutes a reasonable investigation and reasonable ground for belief is the same: '[T]he standard of reasonableness shall be that required of a prudent man in the management of his own property.'" In re WorldCom, Inc., 346 F. Supp. 2d at 663

(second alteration in original) (quoting 15 U.S.C. §
77k(c)).

Because the affirmative defense turns on an evaluation
of reasonableness, whether the defense is available "is
generally a fact issue, rarely suitable for summary
judgment, let alone a motion to dismiss." In re
Countrywide Fin. Corp., 588 F. Supp. 2d at 1175; see also
In re Worldcom, Inc., 346 F. Supp. 2d at 673 ("It is
equally important to note that what constitutes a red flag
depends on the facts and context of a particular case.");
In re Enron Corp. Sec., Derivative & ERISA Litig., 258 F.
Supp. 2d 576, 597 (S.D.N.Y. 2003) ("[R]easonableness in
this context is not a question properly resolved on a
motion to dismiss." (internal quotation marks omitted)).
Unless the defense "appears on the face of the
[complaint]," In re Countrywide Fin. Corp., 588 F. Supp. 2d
at 1182, a court should not dismiss the complaint merely
for failure to "negate such an affirmative defense in their
pleading," In re Global Crossing, 313 F. Supp. 2d at 211.

Here, the affirmative defense does not appear on the
face of the CAC.  Indeed, though Plaintiffs need not allege
red flags in their complaint, the CAC alleges that a
reasonable investigation into the audited financial

- 98 -

statements would have revealed red flags and that a reasonable investigation into those red flags would have revealed MF Global's material misstatements and omissions. Plaintiffs also explain what a reasonable investigation would have revealed -- specifically, that MF Global did not have sufficient evidence to avoid taking a valuation allowance against its DTA and that MF Global did not have sufficient internal controls to protect itself against a liquidity crisis. The CAC would be sufficient even without pleading red flags. See In re OSG Sec. Litig., --- F. Supp. 2d ---, 2013 WL 4885890, at *7 (S.D.N.Y. Sept. 10, 2013) ("Plaintiffs are not required to additionally plead red flags or facts negating the Underwriters' [reasonable reliance] defense."). Given that Plaintiffs have pled red flags, the CAC should not be dismissed based on a reasonable reliance defense. Whether the Underwriters and Senior Notes Underwriters did, in fact, reasonably rely on audited financial statements is a question of fact to be resolved after discovery.

### 3.   Evidence of Purchase

Several of the Underwriters and Senior Notes Underwriters seek dismissal of the Section 12(a)(2) claims (Counts Four, Seven, Ten, and Thirteen) because the CAC

does not specifically allege that any named plaintiff purchased securities from those underwriters. (Underwriters' Motion, p. 3 n.2; Senior Notes Underwriters' Motion, p. 25; Underwriters' & Senior Notes Underwriters' Reply, p. 3-4.) "A plaintiff has standing to bring a Section 12 claim only against a 'statutory seller' from which it 'purchased' a security." In re Lehman Bros., 799 F. Supp. 2d at 310. To have standing against an underwriter, a plaintiff must allege that he "purchased securities 'pursuant to' the pertinent offering documents." Id. at 311; see also In re Alcatel Sec. Litig., 382 F. Supp. 2d 513, 530 n.8 (S.D.N.Y. 2005) (restricting standing under Section 12(a)(2) to plaintiffs who purchased shares "pursuant to (i.e., in)" relevant public offering). The mere ability to trace back securities to the offering, without allegations of direct purchase, are insufficient. In re Lehman Bros., 799 F. Supp. 2d at 311; see also Local 295/Local 851 IBT Emp'r Grp. Pension Trust & Welfare Fund v. Fifth Third Bancorp., 731 F. Supp. 2d 689, 712-13 (S.D. Ohio 2010) (dismissing Section 12(a)(2) claims against underwriters from whom plaintiffs did not allege that they purchased securities).

In Count Four, the CAC alleges that a named plaintiff "purchased or otherwise acquired stock _from_" the relevant underwriters "_pursuant_ _to_ the Secondary Offering Materials." (CAC ¶ 576 (emphasis added).) In Count Seven, the CAC alleges that a named plaintiff "purchased or otherwise acquired MF Global's 2016 Notes _in_ the 2016 Notes Offering." (CAC ¶ 609 (emphasis added).) In Count Ten, the CAC alleges that named plaintiffs "purchased or otherwise acquired MF Global's 2018 Notes _in_ the 2018 Notes Offering." (CAC ¶ 643 (emphasis added).) And in Count Thirteen, the CAC alleges that a named plaintiff received title to the 6.25% Senior Notes from the relevant underwriters "_in_ the 6.25% Senior Notes Offering." (CAC ¶ 678 (emphasis added).) These allegations are sufficient to establish standing against the Underwriters and the Senior Notes Underwriters for the purpose of withstanding a motion to dismiss. See In re Scottish Re, 524 F. Supp. 2d at 400 ("[T]he Complaint adequately alleges that defendants, including the Underwriter Defendants, sold the securities as part of the Offerings, and plaintiffs acquired securities in the Offerings. A reasonable inference is that plaintiffs acquired their securities from the Underwriter Defendants.").

The CAC does allege, more particularly, that Plaintiffs purchased certain securities directly from certain underwriters. But such particularity is not <u>required</u> at the pleading stage. See In re Wachovia Equity Sec. Litig., 753 F. Supp. 2d 326, 374 (S.D.N.Y. 2011) (declining to dismiss Section 12(a)(2) claims even though complaint failed "to identify which Underwriter Defendants sold particular securities to the named Plaintiffs"). It is enough, at this stage, for Plaintiffs to allege that they purchased securities "in" or "pursuant to" the relevant offerings. See In re Lehman Bros., 799 F. Supp. 2d at 310-11; In re Alcatel, 382 F. Supp. 2d at 530 n.8. Should it become apparent after a full factual record is established during discovery that Plaintiffs cannot prove direct purchases from certain individual underwriters, those underwriters will have the opportunity to seek judgment as a matter of law in a motion for summary judgment. See Emergent Capital Inv. Mgmt., LLC v. Stonepath Grp., Inc., 165 F. Supp. 2d 615, 622 (S.D.N.Y. 2001) (granting summary judgment on Section 12(a)(2) claim where undisputed facts showed that securities were not purchased through public offering).

4.   Control Persons Claims

For the reasons stated above, the Court finds that the CAC sufficiently pleads primary violations of Section 11. Even assuming that Plaintiffs must plead the Officers' culpable participation, but see In re Bear Stearns, 851 F. Supp. 2d at 773 (noting that most courts in this District do not require an allegation of culpable participation in respect of Section 15(a) claims), the CAC sufficiently alleges culpable participation for the same reasons that it sufficiently alleges scienter.

The CAC also sufficiently alleges control under Section 15(a) for the same reasons that Plaintiffs adequately pled control under Section 20(a).  See Alstom III, 406 F. Supp. 2d at 487 n.49 (noting that control under Section 20(a) and Section 15(a) are "interpreted in the same manner").  While MacDonald objects to certain counts on the grounds that he did not exercise control after he left the position of CFO, the fact-sensitive issue of control is better addressed after discovery has been completed.  See Katz, 542 F. Supp. 2d at 276.

## V.   ORDER

For the reasons discussed above, it is hereby

- 103 -

**ORDERED** that the motion (Dkt. No. 368) of defendant Jon S. Corzine to dismiss the Consolidated Amended Securities Class Action Complaint is **DENIED**; and it is further

**ORDERED** that the motion (Dkt. No. 360) of defendant J. Randy MacDonald to dismiss the Consolidated Amended Securities Class Action Complaint is **DENIED**; and it is further

**ORDERED** that the motion (Dkt. No. 373) of defendant Henri J. Steenkamp to dismiss the Consolidated Amended Securities Class Action Complaint is **DENIED**; and it is further

**ORDERED** that the motion (Dkt. No. 357) of defendants David P. Bolger, Eileen S. Fusco, David Gelber, Martin J. Glynn, Edward L. Goldberg, David I. Schamis, and Robert S. Sloan to dismiss the Consolidated Amended Securities Class Action Complaint is **DENIED**; and it is further

**ORDERED** that the motion (Dkt. No. 364) of defendants Citigroup Global Markets Inc., Deutsche Bank Securities Inc., Goldman Sachs & Co., J.P. Morgan Securities LLC, Merrill, Lynch, Pierce, Fenner & Smith Incorporated, and RBS Securities Inc. to dismiss the Consolidated Amended

Securities Class Action Complaint is **DENIED**; and it is finally

ORDERED that the motion (Dkt. No. 366) of defendants BMO Capital Markets Corp., Commerz Markets LLC, Jefferies & Company, Inc., Lebenthal & Co., LLC, Natixis Securities North America Inc., Sandler O'Neill & Partners, L.P., and U.S. Bancorp Investments, Inc. to dismiss the Consolidated Amended Securities Class Action Complaint is **DENIED**.

**SO ORDERED.**

Dated:    New York, New York
          12 November 2013

Victor Marrero
U.S.D.J.

- 105 -