**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **U.S. COMMODITY FUTURES TRADING COMMISSION,**<br><br>Plaintiff,<br><br>v.<br><br><br>**MF GLOBAL HOLDINGS LTD., JON S. CORZINE,** and **EDITH O'BRIEN,**<br><br>Defendants. | **CIVIL ACTION NO. 11 Civ. 7866 (VM) (USCFTC)**<br><br><br>**JURY TRIAL DEMANDED**<br><br>**ECF Case** |



**AMENDED COMPLAINT FOR INJUNCTIVE AND**
**OTHER EQUITABLE RELIEF**
**AND FOR CIVIL MONETARY PENALTIES UNDER**
**THE COMMODITY EXCHANGE ACT**

1

The U.S. Commodity Futures Trading Commission ("Commission" or "CFTC"), by and through its attorneys, alleges as follows:

## I. SUMMARY

1.      It has long been a cornerstone of customer protection laws that a commodity futures broker, known as a futures commission merchant ("FCM"), must at all times segregate customer funds intended for futures trading on U.S. exchanges ("customer segregated funds") and may never use these customer funds for the FCM's own purposes.  When an FCM knows or should know that accounts holding customer segregated funds ("customer segregated accounts") do not hold sufficient funds to meet the FCM's financial obligations to all customers, the FCM, through its responsible personnel, must immediately notify the CFTC and the applicable designated self-regulatory organization ("DSRO").  To safeguard customer funds further, CFTC regulations limit an FCM's ability to invest customer funds to certain authorized investments.  In this case, MF Global Inc. ("MF Global"), an FCM with deficient systems and controls, on the brink of failure and in desperate need of cash to survive, invaded its customer funds and violated these fundamental customer protections on a scale never previously seen in the U.S. futures markets, harming thousands of people.  As alleged below, Jon Corzine, the Chief Executive Officer ("CEO"), is legally responsible for MF Global's misuse of customer money.  Edith O'Brien, MF Global's Assistant Treasurer, is also liable.

2.      MF Global was an FCM registered with the Commission and was a subsidiary of MF Global Holdings Ltd. ("Holdings").  Holdings was the holding company and parent of almost fifty separate direct or indirect subsidiaries, including MF Global (MF Global, Holdings, and their subsidiaries and affiliates are collectively referred to herein as the "Firm").

3.      Defendant Jon S. Corzine ("Corzine") joined the Firm as the CEO for Holdings in March 2010.  He planned to grow and convert the Firm from a business that generated most of

2

its revenue from its FCM to a major Wall Street investment bank that generated revenue from proprietary trading and other business lines. As part of that plan, and to increase revenues, Corzine caused MF Global to make significant investments in various instruments, such as the sovereign debt of certain European countries. Over time, at Corzine's direction, these investments grew substantially and became a material portion of the Firm's balance sheet, even as the investments grew increasingly risky.

4.    By the latter half of 2011, these investments and other factors placed significant strains on the Firm's capital and liquidity. By late October 2011, the Firm's sources of cash were drying up, and the Firm was in desperate need of funding to survive. The Firm took steps to sell itself to another financial services company. Firm employees, including Corzine, communicated with one another, sometimes by email and sometimes on recorded telephone lines, concerning the Firm's dire situation.

5.    During the last week of October 2011, in violation of U.S. commodity laws, with virtually no other sources of cash to keep it afloat, MF Global unlawfully used nearly one billion dollars of customer segregated funds to support its own proprietary operations and the operations of its affiliates and to pay broker-dealer securities customers and pay FCM customers for withdrawals of secured customer funds (see paragraph 24). Thousands of customers were directly and indirectly harmed by these unlawful acts. On October 31, 2011, Holdings and certain other affiliated companies filed for bankruptcy protection.

6.    Corzine bears responsibility for MF Global's unlawful acts. He held and exercised direct or indirect control over MF Global and Holdings and either did not act in good faith or knowingly induced these violations. In violation of his legal obligations, he also failed to supervise diligently the activities of MF Global's officers, employees, and agents.

7.      Defendant Edith O'Brien ("O'Brien") was the Assistant Treasurer of MF Global and the head of liquidity management for the Firm.  O'Brien directed, approved, and/or caused numerous illegal transfers of customer segregated funds to the Firm's proprietary accounts, and otherwise aided and abetted MF Global's customer segregated funds violations.

8.      In addition, from at least January 2011 to May 2011, MF Global misused customer segregated funds by investing these funds in securities that were not considered readily marketable or highly liquid, in violation of a CFTC regulation.

9.      Holdings controlled the operations of MF Global and is liable as a principal for MF Global's violations of the Commodity Exchange Act (the "Act") and the regulations promulgated thereunder ("CFTC Regulations").

10.     Accordingly, pursuant to Section 6c of the Act, 7 U.S.C. § 13a-1, the CFTC brings this action to enjoin Defendants' unlawful acts and practices and compel Defendants' compliance with the provisions of the Act and CFTC Regulations, 17 C.F.R. §§ 1.1 *et seq*. In addition, the CFTC seeks restitution, disgorgement, civil monetary penalties, and such other equitable relief as the Court may deem necessary or appropriate.

## II. JURISDICTION AND VENUE

11.     This Court has jurisdiction over this action pursuant to Section 6c(a) of the Act, 7 U.S.C. § 13a-1(a), which provides that whenever it shall appear to the Commission that any person has engaged, is engaging, or is about to engage in any act or practice constituting a violation of any provision of the Act or any rule, regulation, or order promulgated thereunder, the CFTC may bring an action in the proper District Court of the United States against such person to enjoin such practice, or to enforce compliance with the Act, or any rule, regulation, or order thereunder.

4

12.     Venue properly lies with this Court pursuant to Section 6c(e) of the Act, 7 U.S.C. § 13a-1(e), because MF Global's and Holdings' principal place of business was in this District, Corzine was present in this District during the last week of October 2011, and the acts and practices in violation of the Act and CFTC Regulations have occurred within this District.

### III. THE PARTIES

13.     Plaintiff **U.S. Commodity Futures Trading Commission** (as defined above, "Commission" or "CFTC") is an independent federal regulatory agency that is charged with administering and enforcing the Act, 7 U.S.C. §§ 1 *et seq.*, and the CFTC Regulations, 17 C.F.R. §§ 1.1 *et seq.*

14.     **MF Global Inc.** (as defined above, "MF Global") is a Delaware corporation with its principal place of business in New York, New York. MF Global provided brokerage services to various individual, corporate, and institutional customers. MF Global has been registered as an FCM since 1996 and was regulated by the CFTC and its DSRO, the Chicago Mercantile Exchange, Inc. ("CME"). As an FCM, MF Global accepted customer funds and was required to protect them by keeping them in customer segregated accounts. Since 1996, MF Global also has been a member of the National Futures Association ("NFA"), a self-regulatory organization for the U.S. futures industry. MF Global also operated as a broker-dealer registered with the Securities and Exchange Commission. MF Global is currently the subject of a Securities Investor Protection Act ("SIPA") liquidation proceeding in the bankruptcy court for this District. *See In re MF Global Inc.*, Case No. 11-2790 (MG) SIPA, (Bankr. S.D.N.Y. 2011). On November 8, 2013, this Court entered a Final Consent Order of Restitution, Civil Monetary Penalty and Ancillary Relief against MF Global related to the charges filed by the Commission against MF Global in its initial Complaint, dated June 27, 2013, docket 13 CIV 4463, for MF Global's violations of the Act and CFTC Regulations.

15.     Defendant **MF Global Holdings Ltd.** (as defined above, "Holdings") is a Delaware corporation with its principal place of business in New York, New York.  Holdings filed for reorganization under Chapter 11 of the Bankruptcy Code on October 31, 2011.  *See In re MF Global Holdings Ltd., et al.*, Case No. 11-15059 (MG) (Bankr. S.D.N.Y. 2011).  Holdings' direct subsidiary and the holding company of its U.S. subsidiaries, including MF Global, was MF Global Holdings USA Inc., which was a listed principal of MF Global in MF Global's registration filings with the NFA.

16.     Defendant **Jon S. Corzine** (as defined above, "Corzine") became CEO and Chairman of the Board of Directors of Holdings in March 2010 and continued as such through the commencement of the bankruptcy proceedings on October 31, 2011.  He also was the CEO of MF Global from September 1, 2010 through the commencement of the liquidation proceedings on October 31, 2011.  In addition, Corzine was a member of the Board of Directors of MF Global.  The Firm's global Chief Financial Officer ("CFO"), Chief Operating Officer ("COO"), and General Counsel ("GC") reported directly to Corzine.  Corzine was registered with the CFTC as an Associated Person of MF Global from August 2010 to November 2011 and was listed as a Principal of MF Global from May 2010 to November 2011.

17.     As CEO for both Holdings and MF Global, Corzine, among other things:

     a.     had the power and ability to control cash transfers involving MF Global's accounts and controlled the employees responsible for making wire transfers involving its accounts;

     b.     made management and hiring decisions;

     c.     influenced how proprietary funds were invested;

     d.     issued instructions on day-to-day matters and operations;

e.      made and influenced corporate policy;

f.      acted as a regulatory liaison for MF Global; and

g.      supervised the activities of MF Global's officers, employees, and agents, including those individuals and groups responsible for liquidity, cash management, and protection of customer funds.

18.     From January 2006 to January 2010, Corzine was New Jersey's 54th Governor. From January 2001 to January 2006, he was United States Senator from New Jersey, serving as a member of the Senate Banking, Budget, Energy and Natural Resources, and Intelligence Committees. Prior to serving in the United States Senate, Corzine was the Chairman and Senior Partner of a major Wall Street investment bank, the Goldman Sachs Group, L.P., from December 1994 to June 1998, and its Co-Chairman and Co-Chief Executive Officer from June 1998 to January 1999.

19.     Defendant **Edith O'Brien** (as defined above, "O'Brien") was the Assistant Treasurer and functional head of MF Global's Treasury Department during October 2011. As the head of MF Global's Treasury Department, O'Brien among other things:

a.      supervised MF Global's Treasury Department, which handled the cash management of the Firm, and was responsible for directing, approving, and/or causing wire transfers and other payments into and out of MF Global's customer accounts;

b.      received and reviewed daily customer segregation reports and analyzed factors that affect the daily segregation calculation (see paragraphs 19c, 26, 62b, 63f-j and p, 64z and aa);

c.      tracked the amount of funds sent from MF Global's customer accounts during the day and communicated with other MF Global employees with respect to these

7

transfers and their effect on the customer segregated accounts.  As O'Brien said to another MF Global employee on a recorded telephone line on October 21, 2011: "I know exactly how much excess I have in customer balances, what could walk out the door on any given day;"

        d.     managed cash flow to satisfy MF Global's liquidity needs;

        e.     forecasted and projected the amount of cash available for the Firm's liquidity needs;

        f.     had responsibility for investing customer segregated funds pursuant to CFTC rules;

        g.     liaised with other MF Global departments regarding cash transfers; and

        h.     answered questions from other MF Global employees regarding customer segregation laws and rules, and requested that other MF Global employees direct customer questions regarding "customer segregation" to her.

      20.     O'Brien has referred to herself as the MF Global employee "best versed on Regulatory and Customer Protection."  Holdings' Global Treasurer appointed her to be the head of global liquidity in the weeks just before Holdings' bankruptcy and MF Global's liquidation proceedings.  As an employee of the Firm, O'Brien had a duty to notify management of any instances of non-compliance with any applicable laws or regulations or Firm compliance-related policies.  She has never been registered with the CFTC in any capacity.

## IV. FACTS

**A.      The Commodity Exchange Act and CFTC Regulations**
**Require FCMs to Protect Customer Funds**

21.     Pursuant to the regulations in effect during the period relevant to this Complaint,
customer funds are all money, securities, and property received by an FCM or by a clearing
organization from, for, or on behalf of futures customers or options customers.

22.     FCMs are required to account separately for and segregate customer funds at all
times.  Customer segregated funds are held in customer segregated accounts that are named so as
to identify the account clearly as one containing customer funds pursuant to the Act and CFTC
Regulations.

23.     An FCM must at all times have enough funds in customer segregated accounts to
satisfy the FCM's financial obligations to all of its customers who entrust the FCM with funds
for purposes of trading on U.S. futures exchanges.  This amount of funds is known as the "net
liquidating value" (or "NLV") and is calculated by the "NLV method."  An FCM is considered
"under-segregated" or "under-seg" and in violation of the law and CFTC Regulations if the
customer segregated account balances fall below the required NLV level.

24.     An FCM is also required at all times to have a certain minimum amount of funds
held in separate accounts to satisfy a portion of the FCM's financial obligations to its "foreign
futures customers," who entrust the FCM with funds for purposes of trading on foreign boards of
trade or exchanges ("secured customer funds").  Pursuant to the regulations in effect during the
period relevant to this Complaint, an FCM was permitted to use a certain amount of secured
customer funds for the FCM's own purposes and was permitted to keep in designated accounts
for the benefit of foreign futures customers ("customer secured accounts") an amount of funds
that was less than the FCM's total obligations to its customers trading on foreign boards of trade

9

or exchanges. The methodology for calculating the required balance of secured customer funds that the FCM was required to maintain was known as the "alternative method" or the "alternative calculation."

25.    An FCM is required to adhere to certain requirements relating to the proper handling of customer funds in both customer segregated accounts and customer secured accounts. These requirements include notifying the CFTC and the FCM's DSRO immediately whenever the FCM knows or should know that the amount in either the customer segregated or customer secured accounts is less than that required by the Act and CFTC Regulations.

26.    An FCM is required to calculate as of the close of each business day the total amount of customer funds on deposit in customer segregated and customer secured accounts, respectively, and to compare those amounts to the total amount of customer funds required to be on deposit under the Act and CFTC Regulations. These daily computations must be completed prior to noon on the next business day. With respect to customer segregated accounts, MF Global recorded this calculation (the "segregation calculation") in a report known as the "seg report" or "segregation report."

27.    An FCM's commodity futures customers generally hold futures positions that may fluctuate in value on a daily or intra-day basis. Each customer must pay to the FCM an amount of money known as "margin," which is a form of collateral, to account for potential changes in the value of that customer's futures position. When a customer's position deteriorates in value, the customer may be required to pay additional margin. Conversely, when a customer's position increases in value, the FCM's financial obligation to the customer increases. As a result of these and other factors, an FCM's combined obligation to all customers fluctuates throughout each business day.

28.     Due to the fluctuations in an FCM's obligations to customers, FCMs like MF Global typically deposit their own proprietary funds along with customer funds in the customer segregated accounts to ensure that there are sufficient funds in these accounts to be in compliance with the Act and CFTC Regulations at all times. The funds an FCM holds in customer segregated accounts above that which the Act and Regulations require it to maintain are known as "excess segregated funds," "excess seg," or simply "proprietary funds."

29.     Excess segregated funds can lawfully be used by an FCM for its own proprietary purposes. Customer segregated funds, in contrast, must be treated as only belonging to those FCM customers trading on U.S. futures exchanges and can never lawfully be used by an FCM for its own proprietary purposes, which proprietary purposes include, but are not limited to, paying margins on proprietary investments and satisfying customer demands from other business activities, such as broker-dealer securities trading and foreign futures trading.

30.     An FCM may invest customer segregated funds only if the investment is on the applicable CFTC Regulation's list of "permitted investments." This regulation is intended to control credit, liquidity, and market risk by requiring that investments satisfy certain rating requirements and concentration limits, and also that the investments be readily marketable and subject to prompt liquidation.

**B.    Corzine Implemented a Business Plan to Change MF Global into a Major Investment Bank Thereby Increasing the Firm's Need for Liquidity and Exacerbating Risks Arising from Deficiencies in the Firm's Internal Controls and Systems**

31.     In 2008, the Firm's FCM and broker-dealer business (the "broker-dealer") operations were merged into the single company MF Global. MF Global was one of the world's leading brokers for commodities and listed derivatives and provided access to more than seventy exchanges globally. MF Global was also an active broker-dealer in markets for fixed income

securities, equities, and foreign exchange, and became one of approximately twenty primary dealers authorized to trade U.S. government securities with the Federal Reserve Bank of New York. According to Holdings' annual report for the fiscal year ending March 31, 2011, and MF Global's financial statement for the fiscal year ending March 31, 2011, MF Global's revenue represented 57% of Holdings' worldwide revenue.

32.     When Corzine joined the Firm as its CEO in March 2010, MF Global was still principally a commodity brokerage firm that earned revenue primarily from interest income for servicing customers' deposits and from commissions on customer transactions. Corzine planned to change the Firm into a global investment bank that generated substantial revenues from proprietary trading activities. His plan included making increasingly larger and potentially riskier investments with MF Global's proprietary funds.

### The Investments in European Sovereign Bonds

33.     One of the proprietary trading strategies directed by Corzine was the investment in the sovereign debt (bonds) of certain European nations through repurchase-to-maturity transactions ("RTM(s)") with counterparties trading on the London Clearing House ("LCH"). Under this RTM strategy, an MF Global affiliate, MF Global UK, Ltd. (together with its subsidiaries, "MFGUK"), purchased bonds on behalf of MF Global. To finance the purchase of the bonds, MFGUK, on behalf of MF Global, entered into an RTM with a counterparty trading on the LCH. Under an RTM, MFGUK borrowed money to pay for the bond, simultaneously pledged the bond as collateral on that loan, and was obligated to pay back the loan when the bond eventually matured. MF Global benefited from an RTM because it recorded an immediate gain on its books driven, in part, by the interest that the bonds paid over time. The risks in this strategy, however, included the fact that if the European nation defaulted prior to the maturity of the bond, MF Global could ultimately be left with a virtually worthless bond but still have to pay

12

back the entire amount of the loan. MF Global also was responsible for making margin payments related to these transactions, which increased over time as a credit crisis in Europe worsened. As the RTMs directed by Corzine increased in risk, MF Global needed to use more liquidity to meet the rising margin payments on these transactions.

34.     In Fall 2010, Holdings' then-Chief Risk Officer (the "Former CRO") questioned Corzine's RTM strategy. He warned Corzine and Holdings' Board of Directors about the potential pitfalls of the strategy, including that the RTM positions could result in margin calls and more demands for cash, would be difficult to unwind, and posed a liquidity risk to the Firm. The Former CRO recommended that the Firm place limits on the investments. In November 2010, despite the increasing concerns expressed by the Former CRO about the liquidity risks posed by the positions, the Board approved the request of executive management, which included Corzine, to increase the total sovereign debt investment limit to $4.75 billion, conditioned on the limits being evaluated again early in 2011.

35.     Thereafter, Corzine informed the Former CRO that he would report to the COO rather than to Corzine himself. Corzine and others then decided to replace the Former CRO, who was notified in January 2011, ten months after Corzine joined MF Global, that he would be terminated. The Former CRO left MF Global in March 2011.

36.     As the risks associated with his RTM strategy grew from 2010 to 2011, Corzine repeatedly sought and received approval from Holdings' Board of Directors to increase the risk limits for these transactions and, as a result, also increased the size of the RTM positions during this period of time.

*Unwinding Violative Investments of Customer Segregated Funds*
*Further Increased the Firm's Liquidity Stress*

37.     In addition to the RTM portfolio, Holdings acquired a portfolio of securities that it classified as held-to-maturity ("HTM") assets on its balance sheet. Holdings originally financed this HTM portfolio by borrowing MF Global customer segregated funds and pledging the HTM securities to the customer segregated accounts as collateral. In May 2011, while conducting an examination of MF Global, CME auditors advised the Firm that $525 million of the collateral was not in legally permissible investments for customer segregated funds. As a consequence of this violation, the Firm was required to and did unwind the financing and removed the impermissible securities from the customer segregated accounts. Unable to use customer segregated funds to finance a portion of the HTM portfolio, the Firm was forced to obtain a more expensive form of financing from third parties, which increased the Firm's liquidity stresses.

*Deficiencies in the Firm's Internal Controls and Systems, of Which Corzine Was*
*Aware, Contributed to the Unlawful Use of Customer Funds*

38.     While Corzine was implementing his business plan for MF Global, he was aware that MF Global had inadequate controls and systems with regard to (a) regulatory reporting and (b) liquidity management, namely management of the Firm's liquid assets, such as cash, that could be and were used to fund the Firm's operations and investments. Corzine was informed that technology gaps existed that resulted in MF Global not producing accurate liquidity forecasts because the underlying data was inadequate and unreliable. Corzine failed to remedy these gaps.

39.     Further, Corzine was informed that MF Global was overly reliant on systems that required manual performance, were susceptible to human error, and/or created "an unnecessarily high reliance on key employees" for tasks in MF Global's Treasury and Finance departments, such as liquidity forecasting and regulatory calculations.

40.     Corzine received both written and verbal updates regarding MF Global's estimated liquidity position and forecasts on a daily basis. The written updates were summarized in a daily liquidity report that listed the sources and uses of the Firm's liquidity. The daily liquidity reports and verbal updates included information gathered in part from traders at MF Global. Corzine knew that due to the lack of real time liquidity data and lack of expertise of traders in gathering this information, these updates were only estimates of sources and uses of MF Global's liquidity. Corzine nevertheless relied on these liquidity estimates and forecasts.

41.     MF Global and Corzine failed to take sufficient steps to enhance MF Global's regulatory reporting and liquidity management systems, or to address adequately their dependence on unreliable liquidity data and the manual process of preparing regulatory reports and forecasting the Firm's liquidity position.

42.     The failure to enhance or otherwise upgrade MF Global's systems and controls contributed to the Firm's unlawful use of customer segregated funds.

43.     As further alleged below, Corzine directed, knew of, and permitted the Firm's use of funds held in customer segregated accounts and customer secured accounts even though he knew, or with due diligence should have known, that these and other deficiencies in the Firm's controls and systems increased the risks that the Firm would unlawfully use customer funds for proprietary purposes during the liquidity crunch of the Firm's final days.

C.      As Liquidity Stresses Increased in 2011, Corzine Directed the Firm
        To Explore Using Customer Funds

44.     During the summer of 2011, Corzine directed Holdings' CFO to explore all potential sources of funds and assets that could be used to meet the liquidity needs of MF Global's proprietary trading activities. This included the use of customer funds to satisfy, in

part, MF Global's need to increase its capital by hundreds of millions of dollars to meet its obligations related to the RTMs.

45.    As a result, MF Global's CFO was tasked with considering whether secured customer funds (intended for foreign trading) that exceeded the minimum balance determined by the alternative calculation (as described above in paragraph 24) could be used, along with excess segregated funds, for overnight funding of the Firm's operations. Even though she concluded that the law at the time permitted such use of secured customer funds, MF Global's CFO recommended a more conservative approach for purposes of protecting customer funds to avoid a situation where the Firm was unable to meet obligations to all of its foreign futures customers. The conservative approach, which the Firm adopted as its policy, required that the Firm not use the secured customer funds that exceeded the minimum balance determined by the alternative calculation for overnight funding of the Firm's operations unless the Firm had on hand a sufficient balance of excess funds (i.e., proprietary funds) in customer segregated accounts to cover its use of such secured customer funds. For example, the policy contemplated that if the Firm had on hand $400 million in excess segregated funds, then the Firm could use up to $400 million of secured customer funds for its own proprietary purposes. But, if the Firm used more than $400 million of such secured customer funds, then the policy was violated.

46.    Under the Firm's policy, in order to calculate the amount of secured customer funds that could be used overnight for Firm purposes, the Firm combined the balance of the excess funds in the customer segregated accounts with the available amount of funds in the customer secured accounts calculated under the NLV method. This combined amount was referred to as "Available FCM Cash" (also referred to in this Complaint as "FCM Excess Cash") and was included as a line item on the daily liquidity report circulated to Corzine and others. A

*negative* combined balance signified that the Firm had, at minimum, used for proprietary

purposes more secured customer funds than it held in excess segregated funds and thus had

violated the Firm's policy.  In other words, the policy required that Available FCM Cash be

maintained at a positive balance.  For example, if MF Global started the day with $400 million of

proprietary funds in customer segregated accounts and $200 million of proprietary funds in

customer secured accounts, and then used $700 million from the customer secured accounts for

Firm purposes, then the Available FCM Cash would be negative $100 million, signifying a

policy violation [$400 million + ($200 million - $700 million) = -$100 million].  This policy was

communicated at the time to Corzine and O'Brien, among others.

**D.    In October 2011, MF Global Was "Skating on the Edge" as Liquidity Stresses
       Increased the Firm's Need for Cash and the Firm Relied on Funds Held in
       Customer Accounts**

47.    In October 2011, Corzine and other officers and employees recognized that MF

Global faced significant liquidity stresses arising from the Firm's margin obligations and other

factors.

48.    For example, on Thursday, October 6, 2011, members of senior management

were concerned about the Firm's liquidity and ultimate viability.  O'Brien, her supervisor,

Holdings' Global Treasurer, and others discussed on a recorded telephone line that the Firm

expected to have to make a margin payment of $50 million to $75 million the next day for MF

Global's RTMs.  They agreed that this margin obligation would have to be paid from FCM

Excess Cash because the Firm had no other readily available source of cash that could cover that

amount.  At the time, the FCM Excess Cash balance was approximately $80 to $100 million.

Holdings' Global Treasurer expressed concern that even without the stress of this margin call,

the Firm was facing the loss of liquidity and that it was "skating on the edge" without "much ice

left."

49.     In October 2011, the Firm had access to an approximately $1.2 billion line of credit through an unsecured revolving credit facility (the "revolver" or "RCF") administered by JPMorgan Chase Bank, N.A. ("JPM" or "Chase").  Corzine wanted to avoid using the revolver in part to avoid giving the appearance that the Firm needed to borrow money and therefore was in financial trouble.  On October 6, 2011, in response to the Firm's liquidity stresses, Corzine told an MF Global Treasury Department employee that they were going to do all the things they could do to not draw on the revolver the next day, even if that meant "go[ing] negative" in the FCM customer accounts.  Corzine knew that "going negative" in the FCM customer accounts would be a violation of Firm policy.

50.     In another recorded conversation on October 6, the Global Treasurer relayed to Holdings' CFO and another MF Global employee ("Employee #1") that he had told Corzine that the Firm's liquidity situation was "not sustainable" and that "the situation is grave."  Later during this conversation, the Global Treasurer stated that "we have to tell Jon that enough is enough.  We need to take the keys away from him."  Corzine disparagingly nicknamed the Global Treasurer "the Gravedigger."

51.     The evening of October 6, Corzine received an email from Holdings' CFO that detailed the financial stresses on the Firm.  In the email, Holdings' CFO told Corzine that "[o]f most concern, is the sustained levels of stress and the lack of signs that this will reduce soon."  Holdings' CFO identified MF Global's three sources of liquidity: (1) cash from its subsidiary, MF Global Finance USA, Inc. ("Finco"); (2) FCM Excess Cash; and (3) MF Global's broker-dealer division.  Holdings' CFO warned Corzine that the Firm was becoming overly reliant on the cash in the FCM customer accounts because the other two sources of liquidity were insufficient: "the situation of our broker-dealer [is] that [it] is currently unable to fund itself, and

18

more worrying continues to need more cash than we have in finco [sic], thereby having us dip into FCM excess every day."

52.     The next day, October 7, 2011, Corzine remained determined to squeeze the MF Global's customer segregated accounts and customer secured accounts for cash. In a recorded conversation with another MF Global employee ("Employee #2"), Corzine pronounced: "We need to go through what that real number is at the FCM. You know, what's the drop dead amount. . . . You know, I'm sure there is a buffer in her thinking. We've got to find out what that is so that we have some ability to think about pulling it if we have to. Obviously, keep me posted."

53.     By October 17, 2011, Corzine was informed that, on the prior business day, October 14, 2011, the Firm had used approximately $70 million more than what was available of actual FCM Excess Cash for Firm purposes, which was a violation of the Firm's policy. That same day, he received an email from Holdings' CFO observing that, in addition to having used the $70 million for Firm purposes on October 14, the Firm had also used approximately $16 million more than what was available of actual FCM Excess Cash for Firm purposes on October 17, another violation of the Firm's policy.

54.     As a result of these events, the next day, on October 18, 2011, the Global Treasurer told O'Brien and other members of the Firm in a recorded conversation that senior management decided that the Firm would no longer use cash from the FCM, even excess cash, to fund the broker-dealer's needs.

55.     Also on October 18, when Corzine was told on a recorded line that the Global Treasurer had an interest in "tapping the revolver," Corzine agreed that the revolver should be used as a source of liquidity, acknowledging the problems from relying on FCM Excess Cash:

"yeah . . . we've got no buffer, you know, there's no room for a mistake . . . we already ended up getting very close yesterday by using the FCM." Thus, on October 18, 2011, Holdings drew $125 million from the revolver to meet the Firm's increasing liquidity demands.

56.    On October 19, 2011, Corzine received a report which showed that, despite the decision that cash from the FCM would no longer be used as a liquidity source, on October 18, 2011, the Firm had used approximately $55 million more than what was available of FCM Excess Cash, in violation of the Firm's policy.  This was the third day in a row that Corzine received information that the Firm had violated its policy with regard to using funds from the FCM customer accounts.

57.    Despite repeated warnings about the liquidity crisis, and despite his knowledge of the deficiencies in MF Global's systems and controls, Corzine did not take sufficient steps to ensure that the Firm's daily draws of cash from FCM customer accounts did not result in an unlawful use of customer funds.

**E.     Liquidity Stresses Intensified During the Last Week of October 2011**

58.    On Monday, October 24, 2011, credit rating agency Moody's Investor Services, Inc. ("Moody's") downgraded its rating of Holdings' credit.  Such credit downgrades can have a prompt negative impact on a firm's ability to borrow money to finance its operations and can quickly increase borrowing costs.  Often, such downgrades prompt a firm's trading counterparties to demand additional collateral.  All of this happened at MF Global in the last week of October 2011.

59.    Holdings, a publicly traded firm, made quarterly public announcements of its earnings on regularly scheduled dates.  For the quarter ending September 30, 2011, Holdings accelerated the timing of the announcement of its quarterly earnings to the morning of Tuesday,

October 25, 2011. On that day, Holdings announced net losses of over $191 million for the quarter.

60.    As a result of the rating agency downgrade and the negative earnings report, MF Global experienced increased and significant liquidity demands, as (a) both FCM and broker-dealer securities customers increasingly demanded return of funds from MF Global, (b) clearing organizations and counterparties increased margin calls on MF Global's proprietary trading positions, such as its RTMs, and (c) counterparties unwound transactions with MF Global, requiring MF Global to use cash for settlement.

61.    On Monday, October 24 and Tuesday, October 25, 2011, the Firm drew another $530 million from the revolver. Thus, by October 25, the Firm had drawn a total of $897 million, or roughly 75% of the revolver's limit, leaving $303 million available to draw, which was not enough to meet the Firm's ensuing cash requirements.

F.    **MF Global Unlawfully Used Customer Segregated Funds
for the Firm's Own Purposes**

*Customer Segregated Funds' Deficiencies on Wednesday, October 26, 2011*

62.    On Wednesday, October 26, 2011, MF Global became under-segregated, with a deficiency by the close of business of over $298 million in its customer segregated accounts. MF Global did not make the required immediate reports to the CFTC and the CME of the customer segregated account deficiency. The following events, among others, occurred on October 26:

a.    Corzine and Holdings' senior management requested that the remaining $303 million of the revolver be drawn. Corzine and O'Brien both understood that thereafter the revolver was no longer a source of liquidity for the Firm.

b.      At approximately 12:50 p.m. ET, O'Brien received an email sent to the Treasury Department with the segregation report attached showing that, as of the end of the prior business day (Tuesday, October 25), MF Global held almost $300 million of excess segregated funds. At approximately 1:12 p.m. ET, O'Brien indicated that she had reviewed and analyzed this segregation report by noting in an email that "This [the segregation report] is precisely as I projected. No issues."

c.      Later on Wednesday, October 26, Corzine received an email with an attachment listing this amount of "excess segregation" as of the end of the prior business day.

d.      O'Brien and her staff directed, approved, and/or caused transfers totaling more than the excess funds – over $500 million – from MF Global's customer segregated accounts to the Firm's proprietary accounts. These funds were used to help meet the Firm's liquidity needs, including payments to its broker-dealer customers. These transfers included customer segregated funds.

e.      O'Brien and her staff in MF Global's Treasury Department directed, approved, and/or caused funds to be transferred from customer segregated accounts at the request of MF Global's broker-dealer staff. O'Brien understood that any use of customer segregated funds for proprietary purposes was unlawful, even if these customer funds were later returned to the segregated accounts. At approximately 6:00 p.m. ET, O'Brien told broker-dealer staff in an email that she needed them to return funds from MF Global proprietary accounts at the Bank of New York Mellon ("BONY") to customer segregated accounts "ASAP," and that they could not afford a "SEG issue." BONY was one of MF

Global's primary banks, housing customer segregated accounts as well as MF Global proprietary accounts, among other Firm accounts.

      f.      Just prior to 6:30 p.m. ET, O'Brien told Employee #2 on a recorded telephone line that the Firm would not be in compliance with customer segregation rules because funds were not being returned to customer segregated accounts:

> O'BRIEN:    It is a total clusterfuck . . . . They have to move like a half a billion dollars out of BONY to pay me back . . . . Tell me how much money is coming in and I will make sure it gets posted. But if you don't tell me, then tomorrow morning I am going to have a seg problem . . . . I need the money back from the broker-dealer I already gave them cause I can't afford a seg problem.

      g.      At approximately 6:45 p.m. ET, O'Brien also told Employee #2 on a recorded telephone line that she was "on the phone with [BONY] trying to negotiate something right now. Otherwise we are going to be underseg."

      h.      O'Brien was able to get a portion of the customer segregated funds returned to customer segregated accounts, as BONY agreed to transfer $325 million of funds from MF Global's proprietary operating account at BONY to a customer segregated account that MF Global maintained at BONY.

      i.      O'Brien was aware that, as of the time of this BONY transfer, MF Global had been unlawfully under-segregated during the day. Even with the $325 million transfer back to a customer segregated account, MF Global remained under-segregated.

      j.      At approximately 11:30 p.m. ET, referring to transfers from customer segregated accounts to MF Global's broker-dealer division, O'Brien sent an email to an MF Global employee titled "Heads up my projection," which stated: "Due to large B/D client wires we could be negative seg tomorrow AM."

23

*Customer Segregated Funds' Deficiencies on Thursday, October 27, 2011*

63.     On Thursday, October 27, 2011, MF Global was under-segregated with a deficiency by the close of business of over $413 million in its customer segregated accounts. MF Global did not make the required immediate reports to the CFTC and the CME of the customer segregated account deficiency.  The following events, among others, occurred on October 27:

a.     At approximately 12:39 a.m. ET, O'Brien emailed a liquidity report to Corzine and other senior management stating that the FCM had $0 (zero) of liquidity on hand at the FCM as of Wednesday, October 26, and expected to have $0 (zero) of liquidity on hand as of Thursday, October 27.  Corzine and O'Brien understood that this meant there was no FCM Excess Cash available for MF Global to use for the Firm's proprietary purposes.

b.     At approximately 1:00 a.m. ET, one of O'Brien's staff in the Treasury Department sent her an email stating that having a "positive seg balance in the am are [*sic*] all we can hope for.  I think we need to be rather careful of that going forward."

c.     At approximately 8:00 a.m. ET, Corzine was informed in an email marked urgent that, as of 7:15 a.m. ET on Thursday, the Firm needed $365 million to use for proprietary purposes, driven in large part by margin calls on the RTM positions and demands for cash to use in supporting or unwinding repurchase transactions.

d.     MF Global relied on short-term extensions of credit from banks, such as BONY and JPM, acting like middlemen between MF Global and counterparties, to "clear" its proprietary securities transactions that it needed to conduct to raise cash.  But, at least as of the last week of October 2011, the banks were increasingly concerned about extending credit to MF Global without sufficient collateral and were becoming less

comfortable clearing for MF Global because of MF Global's deteriorating financial

situation.  On the afternoon of October 27, Corzine spoke to Employee #1 on a recorded

telephone line to strategize how they could use customer segregated funds to induce JPM

to clear MF Global's trades more quickly:

> Corzine:　　　We have a money management account at Chase, if my memory
> serves me.
>
> Employee #1: Yeah, it's the JP Morgan Trust account, but that's cash seg for
> clients -- it has nothing to do with greasing our wheels for Chase to
> move.
>
> Corzine:　　　I understand but you put it in a tri-party, and then once the
> securities have started moving, then you move, move it back to the,
> um -- this is the same thing we did last night, they left it in the tri-
> party, the seg money.

　　　　e.　　　Corzine participated in a Board of Directors meeting in which the Board

was informed that the Firm's margin obligations were growing and its credit rating was

likely going to be downgraded further, below investment grade, that day.  Corzine

understood that the ratings downgrade would trigger increased margin calls and other

demands on liquidity.

　　　　f.　　　At approximately 8:51 a.m. ET, O'Brien sent an email to the MF Global

staff responsible for preparing the segregation reports stating that she needed "to see

SEGS after completed – before distributed.  We had significant moving parts."

　　　　g.　　　Corzine and O'Brien received documents reflecting that, as of the close of

the prior business day (Wednesday, October 26), the Firm's excess funds in customer

segregated accounts totaled approximately $116 million, and the overall FCM Excess

Cash (combining segregated and secured balances) was negative $341 million.  The

negative figure signaled that the Firm had once again violated Firm policy.

h.      Specifically, by approximately 12:01 p.m. ET, O'Brien received an email with the subject line "seg estimate," and attached to this email was a segregation report showing that the Firm's excess funds in customer segregated accounts totaled approximately $116 million and the overall FCM Excess Cash was negative $341 million. After reviewing this segregation report, at approximately 12:16 p.m. ET, O'Brien stated in an email that it "Looks way too low. I expected @ 200mm – including debit swing . . . ."

i.      By 1:51 p.m. ET, both O'Brien and Corzine, as well as others at MF Global, received an email with a summary schedule attached to the email listing the Firm's "excess segregation" as approximately $116 million and the "total seg and secured excess over actual customer funds" as approximately negative $341 million as of Wednesday, October 26.

j.      At approximately 2:02 p.m. ET, a segregation report was attached to an email sent to the Treasury Department, including O'Brien, showing $116 million in excess segregated funds and negative $341 million in FCM Excess Cash. The segregation report also reflected that, although there was an excess in the customer secured accounts under the alternative calculation, there was only approximately $9.9 million of actual cash remaining in those customer secured accounts. Later in the day, another MF Global employee sent an email to Regulatory Reporting confirming that he and O'Brien had reviewed the segregation report attached to the 2:02 p.m. ET email and that they had "no adjustments to [the] presentation" and would "work from [that] point today."

k.      Actually, the true customer segregated balances were even lower than reflected on the documents sent to Corzine and O'Brien, because $415 million in wire transfers from customer segregated accounts had not been properly recorded on Wednesday, which meant that MF Global's customer segregated accounts, in fact, were under-segregated by more than $298 million.

l.      For example, O'Brien learned during the day on Thursday that a bookkeeping error that had occurred on Wednesday, October 26, resulted in the customer segregated account balance reflected on the segregation report for as of Wednesday as being overstated by at least $165 million and thus the customer segregated accounts were under-segregated.

m.      On Thursday, despite knowing that MF Global's customer segregated accounts were already under-segregated as a result of the bookkeeping error or otherwise would become under-segregated as a result of additional transfers, O'Brien directed, approved, and/or caused improper transfers, as discussed below in paragraphs 63n-r, from customer segregated accounts totaling hundreds of millions of dollars.

n.      O'Brien and her staff directed, approved, and/or caused the transfer of at least $525 million from customer segregated accounts to the Firm's proprietary accounts. For example, these transfers included a $325 million transfer from a customer segregated account at BONY to a proprietary account and an additional $200 million transfer from a customer segregated account at JPM to a proprietary account.  By this conduct, O'Brien caused and/or contributed to a deficiency in the customer segregated accounts. Accordingly, O'Brien took steps to aid and abet MF Global's segregation violations.

o.      Before BONY permitted the $325 million transfer, it inquired of MF Global broker-dealer staff by email whether the transfer would comply with CFTC Regulations if the $325 million were moved to a Firm account.  The broker-dealer staff then contacted O'Brien for assistance in having these funds released from the customer segregated account at BONY.  At approximately 12:44 p.m. ET, O'Brien replied to BONY by email stating "[p]lease consider this e-mail and [sic] authorization and instruction for an early unwind of the MFGI Tri-party funds in the amount of $325mm," and that the $325 million was unencumbered and not required to be segregated intra-day under CFTC or SEC rules."  She deliberately did not copy other MF Global Treasury Department employees on her email response to BONY because, as she explained to one of her colleagues in the Treasury Department on a recorded telephone line: "I don't want to take anyone down with me."

p.      O'Brien knew that the $325 million transfer would cause and/or contribute to a deficiency of customer segregated funds in the customer segregated accounts because she had previously been informed that MF Global's customer segregated accounts had only $116 million of excess segregated funds.  O'Brien knew that MF Global was required to have sufficient customer segregated balances at all times, including intra-day.

q.      O'Brien further knew that the additional $200 million transfer referred to in paragraph 63n above was also an improper use of customer segregated funds.  Specifically, at approximately 3:40 p.m. ET, she directed a Treasury Department employee to transfer $200 million from one proprietary account, i.e., a house account, to another proprietary account knowing that the $200 million would first have to be transferred from the customer segregated accounts.  Indeed, as O'Brien stated to a

colleague at MFGUK ("MFGUK Colleague #1") on a recorded telephone line on Saturday, October 29, 2011, "now I move money all the time . . . . from seg over to house and house over to the BD . . . . that's what we do all the time because we don't have enough capital . . . . We don't keep a lot of house money in the States . . . . we keep virtually nothing . . . ." O'Brien also knew from the segregation report she received earlier in the day on Thursday, October 27, that there was only approximately $9.9 million of actual cash available from the customer secured accounts, which was not enough to satisfy the Firm's proprietary needs.

       r.       Minutes after directing the $200 million transfer described above in paragraphs 63n and q, O'Brien received an email from the Treasury Department employee confirming that the $200 million was in fact first transferred from a customer segregated account, then to a MF Global house account, and then to another proprietary account for the broker-dealer. Furthermore, O'Brien directed this $200 million transfer after she sent the email to BONY authorizing the $325 million transfer and after she had received information that the customer segregated accounts held only $116 million in excess segregated funds as of the beginning of the day.

       s.       Later on Thursday, at approximately 5:13 p.m. ET, O'Brien asked MF Global broker-dealer staff in an email for the return of approximately $815 million that previously had been transferred on Wednesday and Thursday from customer segregated accounts and customer secured accounts to the Firm's proprietary accounts. On a hard copy of that email in O'Brien's files were handwritten notes that kept track of and broke down the $815 million in transfers as follows: "CCTRU $615 M" and "CFTRU $200 M." The "CCTRU $615 M" entry meant that $615 million was transferred from the customer

segregated accounts (coded "CCTRU" because it was a Chase Customer Trust account) and that these transfers were in fact made on Wednesday and Thursday. The "CFTRU $200 M" entry meant that the $200 million was transferred from the customer secured accounts (coded "CFTRU" because it was a Chase Foreign Trust account) and that this transfer was in fact made on Wednesday. Only approximately $525 million was returned to customer segregated accounts on Thursday.

t.      Corzine was aware of the worsening liquidity crisis and the need for cash to satisfy the firm's liquidity obligations. For example, at approximately 6:30 p.m. ET, Employee #2 told Corzine on a recorded telephone line, "Edith seems to think we are not in a significant excess cash position." Corzine replied, "It would be very dangerous if we are not."

u.      Corzine was aware, at least as of that night, that MF Global's expected sources of available cash had not yet materialized or were restricted. For example, he was told that JPM was not timely releasing cash to MF Global from a secured credit facility (the "secured revolver"), and that JPM and BONY were restricting MF Global's access to its cash and/or collateral held at those banks because of MF Global's credit problems.

v.      At approximately 8:45 p.m. ET, Employee #2 told Corzine on a recorded telephone line that some of the funds O'Brien had transferred from the FCM to help satisfy MF Global's proprietary obligations had not been returned. Corzine asked if she had received back "enough to be in compliance," and the employee responded, "no, she['s] indicating she's net short $106 million." Corzine thereafter instructed the employee to "raise hell" with JPM to obtain funds from the secured revolver to "cover

up" the gap left by transfers of funds that were not returned. Corzine did not receive assurances that the funds were returned.

w. In recorded telephone calls that evening, Corzine and others discussed the Firm's assets in anticipation of presenting such information to the Federal Reserve Bank of New York and JPM, who were making inquiries about the Firm's financial condition and viability. At least by the end of these calls, Corzine knew that the Firm had $82 million in cash that could be used immediately, but not more than that. He also knew that the Firm had $602 million of less liquid or restricted assets, namely assets consisting of: (i) $144 million worth of securities held at The Depository Trust Company; (ii) $214 million worth of securities held at JPM; (iii) $169 million in the form of a loan from the secured revolver that it was expecting from JPM but that JPM had not yet credited to its accounts; and (iv) $75 million in cash that BONY was holding to facilitate the Firm's securities transactions. Corzine knew that various encumbrances and impediments on these $602 million worth of assets made them not immediately available for the Firm to use to meet its cash needs. In fact, acknowledging that these assets were restricted or not as liquid as cash, Corzine, in a recorded conversation, referred to them euphemistically as the "moral equivalent" of cash.

x. Corzine failed to investigate and correct any deficiencies in customer segregated funds or secured customer funds or Firm policy violations, or to halt or examine further transfers of cash from customer segregated and customer secured accounts for proprietary purposes. As a result, MF Global made the illegal transfers described above in paragraphs 63n-r, as well as other illegal transfers from customer segregated accounts on Thursday, October 27, 2011, including: (1) at least five other

transfers to MF Global broker-dealer or other Firm accounts; (2) at least two transfers to customer secured accounts consisting of funds ultimately directed to broker-dealer securities customers; and (3) at least 43 transfers to FCM customers to fund withdrawals of secured customer funds.

       y.     MF Global filed with both the CFTC and the CME a false segregation report for the end of the day on Wednesday, showing excess segregated funds in the amount of $116,164,132 when, in fact, the Firm was under-segregated by over $298 million.

*Customer Segregated Funds' Deficiencies on Friday, October 28, 2011*

       64.     On Friday, October 28, 2011, MF Global was under-segregated with a deficiency by the close of business of approximately $900 million in its customer segregated accounts.  MF Global did not make the required immediate reports to the CFTC and the CME of the deficiency in the customer segregated accounts.  The following events, among others, occurred on Friday, October 28:

       a.     At or about 2:11 a.m. ET, a JPM Vice Chairman in the investment banking department sent an email to JPM's Chief Risk Officer stating that "by the way, MF expects to have approx. $82mm (that's not a typo) in free cash in the U.S. at the start of business tomorrow."

       b.     Consistent with information that Corzine learned Thursday night (see paragraphs 63t, u, v and w above), at approximately 2:40 a.m. ET, on a recorded telephone line, Holdings' CFO reported to MFGUK's senior executives in London that the Firm ended the day on Thursday in a "precarious situation" and that there was a "big concern" about "getting through" Friday, October 28:

Holdings' CFO:   So basically we had a pretty tough liquidity day here today, or yesterday . . . . Despite having, you know, a pretty good asset sale stream coming in, we basically ended the day at quite a, what we think's quite a precarious situation, and that's even before factoring in the fact that, you know, we got downgraded so severely today, or yesterday again.  We have about 600 million in liquidity, but one issue we're having is that we're really struggling to get funding from our counterparts, even the large banks, even JPMorgan.  They tend to take a long time to give us the cash . . . . So there's a big, I guess, tendency not to have cash flow.  So of the 600 and odd million liquidity we have, most of it is in the form of it not really being cash in our hands . . . . So there's quite a big concern around, you know, getting through today, from a liquidity perspective, effectively. . . .

c.      At or about 6:24 a.m. ET, Corzine learned that LCH made a margin call on the Firm for over $200 million related to RTM positions.  Corzine understood that MF Global was obligated to make this payment for the margin call.

d.      At or about 7:00 a.m. ET, Corzine participated in a telephonic meeting of Holdings' Board of Directors, in which the Board was informed that MF Global's liquidity situation had deteriorated overnight, in part, because the clearing banks were refusing to release MF Global's cash and other collateral.  The Board was also informed during this meeting that MF Global lacked sufficient cash to meet the liquidity demands that were expected that day and that, without the ability to obtain additional cash, the Firm would have to file for bankruptcy.

### The Firm Transferred Funds from Customer Segregated Accounts To Satisfy Its Overdrafts

c.      MF Global tried to raise cash by attempting to sell securities, unwind positions, and auction assets.  Corzine was personally involved in these efforts.  To engage in these critical transactions, however, MF Global needed JPM's help.

33

f.      Shortly after midnight in New York (i.e. early Friday morning), Corzine learned from Holdings' CFO and COO that MFGUK accounts held at JPM's London branch were overdrawn.

g.      JPM informed Corzine that before JPM would assist the Firm with unwinding its portfolio or auctioning assets, JPM would require MF Global to first transfer funds to JPM to cover the overdrafts. Corzine, who understood that MF Global's liquidity problems would worsen without JPM's assistance, quickly assured JPM that the overdrafts would be satisfied.

h.      At approximately 8:30 a.m. ET, Corzine received an email from JPM detailing twelve accounts that were overdrawn. The total sum of the overdrafts listed in the email was over $134 million.

i.      At approximately 8:49 a.m. ET, Corzine discussed the importance of covering the overdraft that day at JPM on a recorded telephone line with the CEO for MFGUK in London:

| | |
|---|---|
| Corzine: | This is Jon. |
| MFGUK CEO: | Oh, Jon. |
| Corzine: | The single most important thing to get done is that, that overdraft covered. |
| MFGUK CEO: | With JPMorgan? |
| Corzine: | Yeah . . . . If it doesn't get covered, we're not going to get cash bids on our securities. |
| MFGUK CEO: | Okay . . . . |
| Corzine: | And you know, that ends up being the straw that breaks the camel's back. |

When asked by the MFGUK CEO if Finco had $23 million or $30 million to send, Corzine responded that he thought it did but that for such funds, "[we] gotta get this money back into the U.S. though afterwards."

j.      At approximately 8:57 a.m. ET, the Global Treasurer for the Firm emailed O'Brien, Corzine, and others and stated that "Inc can fund UKL to cover the overdraft today at JPM . . . . Edith, if we don't hear from London in the next 5 minutes, please provide them with funds today to cover this overdraft position."

k.      Also at approximately 8:57 a.m. ET, Corzine called JPM's Chief Risk Officer, who described the call to another JPM colleague by email: "Corzine just called. He thinks it is only $23mm I told him he was wrong.  He said they will instruct $ in US to cover if they don't have sufficient in UK."

l.      At approximately 9:00 a.m. ET, Corzine instructed O'Brien to transfer funds to pay for the overdrafts.  Shortly thereafter, O'Brien stated on a recorded telephone line with MFGUK Colleague #1 that Corzine had just called her urgently –in her words, "not screaming, but screaming" – about a London issue.  O'Brien told her colleague to send her instructions and she will send the money.  The next day, O'Brien recounted again on a recorded telephone line to this same MFGUK colleague the importance Corzine had placed on her satisfying the overdrafts, stating that Corzine told O'Brien that it was "the most important thing" she can get done that day.  Corzine asked no questions to ascertain how O'Brien would find funds to pay for the overdrafts, notwithstanding his knowledge of the Firm's extremely limited sources of cash.  Nor did Corzine inquire of O'Brien how the Firm would fund its other needs for cash that day.

m.      At 9:26 a.m. ET, Corzine received an email from the Global Treasurer stating that $175 million would be transferred to fund the London overdraft, and then O'Brien informed Corzine by email one minute later that she was transferring $175 million "right now" to MFGUK to pay for the overdrafts.  She then forwarded the Global Treasurer's email to the European Treasurer at MFGUK with the note, "Per JC's direct instructions."  O'Brien completed that transfer in two steps: first, she directed a $200 million transfer from a customer segregated account at JPM to an MF Global proprietary account at JPM; and second, she directed a $175 million transfer from that proprietary account at JPM to an MFGUK proprietary account at JPM, which then was used to cover the overdrafts.  The two steps were completed by JPM, respectively, at 10:05 a.m. ET and 10:06 a.m. ET.

n.      Shortly after 1:00 p.m. ET on Friday, O'Brien was informed by MFGUK Colleague #1 on a recorded telephone line that MFGUK might not be in a position to return the $175 million that O'Brien had sent to them earlier that day.  O'Brien responded that that "leaves us with a problem – a big problem."

o.      Around 1:15 p.m. ET on Friday, O'Brien spoke again to MFGUK Colleague #1 on a recorded telephone line and suggested that a false book entry be made by the Firm to conceal the $175 million transfer that originally came from a customer segregated account to MFGUK's proprietary account:

> O'Brien:      If I wanted some cash out of MF Global Inc account on U.K.'s books, could I get any today? . . . . I wanted to get cash out.  Are you short cash or long cash? . . . .
>
> MFGUK
> Colleague #1:  . . . . without paying you back, we're short 50.

O'Brien:    OK, so then, then, here's a, here's a thought I have . . . . I paid you that money from Inc. . . .

MFGUK
Colleague #1: Yeah, yeah

O'Brien:    . . . . this morning.  If you could book it as if to my omnibus account, does that?  That would solve my problem and you don't have to send me any of the cash.

MFGUK
Colleague #1: But if we book it from your omnibus account, is it . . . .

O'Brien:    It's going to look like seg.

MFGUK
Colleague #1: It's going to look seg.

O'Brien:    OK.  Alright.  I'm just throwing out ideas . . . .

*JPM Asked Corzine for Written Assurances that the Transfers Covering the Overdrafts Complied with CFTC Regulations*

p.      JPM soon realized that the funds transferred to satisfy the overdrafts originated from a customer segregated account.  Shortly before 2:00 p.m. ET on Friday, October 28, 2011, JPM's Chief Risk Officer told Corzine that JPM wanted written assurances (the "JPM letter") that the transfers, among others, complied with CFTC Regulations.  JPM's Chief Risk Officer told Corzine in substance, among other things, that JPM was seeking assurances because the payment had been accomplished through two transfers, one of which had come from a customer segregated account.

q.      Corzine contacted O'Brien with respect to JPM's inquiry.  O'Brien then emailed Corzine documentation for the $175 million transfer from MF Global's proprietary account to MFGUK, but not for the original transfer from the customer segregated account.  Despite JPM informing Corzine that the funds were indeed transferred from a customer segregated account, other than his communications with

O'Brien, Corzine took no further steps to inquire or investigate whether funds had been transferred from customer segregated accounts to satisfy the overdrafts.

r.     At approximately 2:28 p.m. ET, JPM emailed Corzine the JPM letter for MF Global's signature to confirm the lawfulness of the transfers from the customer segregated account.  Corzine forwarded the JPM letter to Holdings' GC to have it signed. Holdings' GC forwarded the letter to O'Brien and to MF Global's Associate General Counsel, who was also MF Global's Chief U.S. Regulatory Counsel (the "AGC").  The letter carried a signature line for O'Brien and by 2:56 p.m. ET, O'Brien had reviewed the JPM letter.

s.     At approximately 3:35 p.m. ET, after having already reviewed the JPM letter, O'Brien misled Holdings' GC by email, stating that she was "continuing business as usual" until she has "an opportunity to review" the letter.  O'Brien further stated in this email that she had "numerous moving parts under critical deadlines, and will review this at close of business."

t.     At approximately 4:30 p.m. ET, Employee #2 told Corzine on a recorded telephone line that he spoke to personnel at MFGUK regarding whether MFGUK would be able to return the $175 million that had been used to pay for the overdrafts.  The employee told Corzine, "I don't think that situation is going to be resolved, I think [MFGUK is] going to have a fail there."  Corzine responded, "we really, really can't have that."

u.     The next day, Saturday, October 29, 2011, O'Brien stated on a recorded telephone line that she told the AGC on Friday that she did not want to sign the JPM

38

letter. She explained that she also had told the AGC during this conversation, among other things, that "no one has paid me back the money, I think we're underseg."

      v.     No one from MF Global, including O'Brien, ever signed the JPM letter.

      w.    Notwithstanding the request from JPM, Corzine did not direct Holdings' GC or anyone else to determine whether customer segregated funds had been used to cover the overdrafts. Corzine also failed to halt multiple subsequent transfers of funds from customer segregated accounts that were made for proprietary purposes. Customer segregated accounts also continued to be used to pay broker-dealer securities customers and to pay FCM customers for withdrawals of secured customer funds. Corzine failed to implement any controls or take any steps to ensure that customer segregated funds were not and would not be unlawfully used.

### O'Brien Directed, Approved, and/or Caused Multiple Unlawful Transfers from Customer Segregated Accounts

      x.     As alleged above, based upon O'Brien's knowledge: a) that the segregation report for as of Wednesday which reflected excess segregated funds in the amount of $116 million was overstated by at least $165 million, and thus that the true customer segregated account balances were deficient for that day; and b) of the volume of transfers from the customer segregated accounts on Thursday, O'Brien knew that MF Global's customer segregated accounts remained deficient on Thursday and MF Global was under-segregated at the start of the day on Friday.

      y.     Knowing that funds would be transferred from customer segregated accounts to the Firm's proprietary accounts, O'Brien directed, approved, and/or caused multiple transfers of funds from customer segregated accounts to the Firm's proprietary accounts throughout the day on Friday totaling hundreds of millions of dollars – far more

than the Firm had in excess funds, as O'Brien well knew.  These transfers included not only the Friday morning transfer of $200 million in connection with the JPM overdrafts as alleged above, but also additional transfers of $62.5 million, $2 million, $135 million, and $50 million.

      z.      Specifically, at approximately 8:51 a.m. ET, O'Brien sent an email approving the $62.5 million transfer; at approximately 9:12 a.m. ET, in a recorded conversation, O'Brien directed an MF Global Treasury employee to make the $2 million transfer; and at approximately 11:01 a.m. ET, O'Brien sent an email approving the $135 million transfer.  Between approximately 11:00 a.m. and 12:00 p.m. ET on Friday, O'Brien's knowledge of the deficiency was further confirmed when she learned from staff in MF Global's Regulatory Department that the segregation calculation as of the end of the prior business day (the Thursday seg calculation) showed that MF Global was under-segregated by hundreds of millions of dollars.  Then at approximately 3:20 p.m. ET, O'Brien sent another email approving the $50 million transfer.  For each of these transfers, O'Brien received a confirmatory email stating that the funds all were transferred from the customer segregated accounts.  O'Brien knew that each of these transfers was unlawful.  By this conduct, O'Brien caused and/or contributed to a deficiency in the customer segregated accounts.  Accordingly, O'Brien took steps to aid and abet MF Global's segregation violations.

      aa.      O'Brien directed her staff to consult with MF Global's Regulatory Reporting Department to deal with the deficiency in the segregation calculation.  Thereafter, a member of O'Brien's staff in MF Global's Treasury Department asserted that there should be a manual $540 million upward adjustment to the segregation report

to reflect a credit in that amount to the customer segregated accounts. The proposed adjustment was in fact unjustified. Although O'Brien's staff did not provide any documents to justify the adjustment, the Regulatory Reporting Department accepted the assertion and made a manual adjustment to the segregation report, erroneously increasing the reported balance of the customer segregated accounts as of Thursday by $540 million.

      bb.    O'Brien knew that the transfers from customer segregated accounts that day were unlawful. At about 6:00 p.m. ET in a recorded telephone call, O'Brien told Employees #1 and #2 that at least $530 million had been transferred from FCM customer segregated accounts and that it could be "game over" unless at least $355 million was returned:

> O'Brien:    Okay, so it's 249.5 today, it's 106 from, from Wednesday, actually, you guys, okay? Okay. 355. Okay. So, let's just be delirious and think [the broker-dealer division] ha[s] more than 355. Okay? If they have it, I need it, and let me tell you why. Shh. London failed to me on returning the 175 I pushed out to them this morning. Okay? *That could be game over, you guys.*

> Employee #2: From a regulatory perspective?

> O'BRIEN:    Yep. Yep, it could be.

>           * * *

> Employee #1: You need the 530 million bucks.

> O'BRIEN:    Yep. I don't care where you get it, quite frankly. If you can get 530 million dollars, I'm putting it back in the seg pool. Okay? I can maybe get by with this 175, but I can't get by without the whole 355, you guys.

      cc.    As of the close of business on Friday, only $177.5 million was returned to customer segregated accounts.

dd.     By 6:30 p.m. ET, Corzine was told that the broker-dealer division had used significant sums of FCM funds during the day that had not been returned to the FCM. Employee #2 told Corzine that that the Firm was not in a position "to pay Edith ...err... the FCM back for the 355 million that they [i.e., the FCM] lent us intraday." Notwithstanding this information, as well as other knowledge Corzine gained throughout the day as described above, Corzine did not at any time direct anyone to determine whether MF Global was under-segregated, or to halt or examine further transfers of cash from customer segregated accounts for proprietary purposes.  As a result, MF Global made the illegal transfers described above in paragraphs 64y-z, as well as other illegal transfers from customer segregated accounts on Friday, October 28, 2011, including: (1) at least three other transfers to MF Global broker-dealer or other Firm accounts; (2) at least three transfers to customer secured accounts consisting of funds ultimately directed to broker-dealer securities customers; and (3) at least 37 transfers to FCM customers to fund withdrawals of secured customer funds.

ee.     On Friday, MF Global filed with both the CFTC and the CME a false segregation report for the end of the day on Thursday, showing excess customer segregated funds of over $200 million when, in fact, MF Global was under-segregated by hundreds of millions of dollars.

**G.      MF Global Continues To Fail To Notify the CFTC and the CME of the Deficiency in Customer Segregated Accounts Over the Weekend of October 29-30, 2011**

65.     MF Global's AGC testified that, when he spoke with O'Brien on Saturday evening, October 29, regarding the JPM letter, he asked her whether the customer segregated accounts had been "topped off" throughout the day on Friday, [i.e., whether they had sufficient funds to satisfy MF Global's legal requirements], and O'Brien did not respond.  The AGC

42

further testified that he believed that the plausible reason for O'Brien's silence was that the customer segregated accounts had not been "topped off" all day on Friday.

66.     At about 12:45 p.m. ET on Sunday, October 30, 2011, the head of MF Global's Regulatory Reporting Department emailed the AGC, Holdings' GC, and others a segregation report showing a $952 million deficit in the customer segregated accounts and indicating that they were looking for an adjustment that would eliminate the deficit.

67.     Around 3:30 p.m. ET on Sunday, October 30, 2011, CFTC staff emailed the AGC, O'Brien, and the head of MF Global's Regulatory Reporting Department that the CFTC still had not been provided with MF Global's October 28 segregation report as promised.

68.     Around 3:40 p.m. ET on Sunday, October 30, 2011, CFTC staff emailed the AGC, Holdings' GC, O'Brien, and the head of MF Global's Regulatory Reporting Department that "the lack of data is driving adverse inferences.  We really need this information (i.e., the October 28 segregation report), and then underlying support, immediately and very shortly indeed."

### H.     MF Global and Corzine Failed to Supervise Diligently the Activities of Their Officers, Employees, and Agents

69.     Corzine was aware that the Firm, through its officers, employees and agents, was transferring funds from MF Global's customer segregated accounts while relying on manual tracking by individuals without having an automated system that had sufficient capability to determine, in real time, the exact portion of the account balance that represented excess segregated funds that the Firm was permitted to use for its own purposes, as distinct from customer segregated funds, which the Firm was not permitted to use.

70.     Among other things, Corzine also was aware, at the time when funds were transferred from the customer segregated accounts, that: (a) the Firm had inadequate controls and

systems with regard to liquidity management and regulatory reporting; (b) MF Global was experiencing a liquidity crisis, which had worsened during the last week of October; (c) JPM sought written assurances that the transfer of hundreds of millions of dollars from MF Global's customer segregated accounts was in compliance with CFTC Regulations; and (d) as described below in paragraph 71, MF Global had previously violated Firm policy by using more than what was available of FCM Excess Cash from the customer segregated and customer secured accounts to satisfy the Firm's proprietary liquidity needs. Additionally, Corzine knew on Friday morning that MF Global had transferred $175 million to MFGUK even though he thought MF Global had immediate access to only $82 million in proprietary cash. He further learned from JPM shortly before 2:00 p.m. ET on Friday that the funds were used to pay the overdraft referred to in paragraph 64 above and were in fact transferred from a customer segregated account.

71. Corzine knew that MF Global's own policy regarding the use of FCM Excess Cash was repeatedly violated to meet the liquidity demands on the Firm. In October 2011 alone, MF Global had violated its policy on at least five business days. Yet, Corzine did not take sufficient steps in response to ensure that proper controls were established and implemented to prevent any further violation of a Firm policy that was designed to protect customer funds.

**I. Holdings Controlled the Operations of MF Global**

72. Holdings was the parent company and sole shareholder, directly or indirectly, of MF Global and controlled the operations of MF Global. Holdings' control of MF Global's activities included that:

      a.     Holdings' senior management was responsible for the supervision, hiring, firing, and/or disciplining of MF Global employees;

      b.     MF Global and Holdings shared the same offices;

      c.     MF Global was capitalized by Holdings;

d.      Holdings determined the business activities and priorities of MF Global;

e.      Holdings helped determine how funds held in MF Global FCM customer accounts would be used for the liquidity needs of MF Global and of Holdings' other subsidiaries;

f.      Holdings borrowed money through its RCF and passed along the borrowings to MF Global;

g.      MF Global employees, including Corzine, held titles both at MF Global and Holdings, and individuals at MF Global and Holdings shared responsibilities;

h.      Holdings designed the investment management agreement that governed the structuring of MF Global's investments in the RTMs facilitated by MFGUK, and Holdings apportioned the revenue from these transactions among MF Global and MFGUK;

i.      Holdings' Board of Directors made determinations about the permissible size and parameters of MF Global's investments in RTMs; and

j.      The Internal Audit Department of Holdings, as well as MF Global's independent auditor, the broker-dealer's designated examining authority, and the CME, regularly reported the results of audits relating to MF Global's functions to the Board of Directors and/or senior management of Holdings.

## V. VIOLATIONS OF THE COMMODITY EXCHANGE ACT AND CFTC REGULATIONS

### COUNT ONE

#### VIOLATIONS OF SECTION 4d(a)(2) OF THE ACT AND CFTC REGULATIONS 1.20, 1.22, 1.23, and 1.25

#### FAILURE TO SEGREGATE AND MISUSE OF CUSTOMER FUNDS BY DEFENDANTS HOLDINGS, CORZINE, AND O'BRIEN

73.     Paragraphs 1 through 72 are re-alleged and incorporated herein by reference.

74.     Section 4d(a)(2) of the Act, 7 U.S.C. § 6d(a)(2), requires an FCM to treat and deal with all customer money, securities, and property as belonging to such customers and to account separately for such money, securities, and property. Section 4d(a)(2) of the Act further prohibits an FCM from: commingling customer money, securities, and property with its own funds; using customer money, securities, and property to margin or guarantee the trades or contracts of any customer or person other than those for whom the same are held; and/or using customer money, securities, and property to secure or extend the credit of any customer or person other than those for whom the same are held.

75.     CFTC Regulation 1.20, 17 C.F.R. § 1.20, requires that all customers' funds be separately accounted for, properly segregated, and treated as belonging to such customers, and not commingled with the funds of any other person.

76.     CFTC Regulation 1.22, 17 C.F.R. § 1.22, prohibits an FCM from using, or permitting the use of, the funds of one futures customer to purchase, margin, or settle the trades, contracts, or commodity options of, or to secure or extend the credit of, any person other than such futures customer [i.e., for the benefit of any person other than such futures customer].

77.     CFTC Regulation 1.23, 17 C.F.R. § 1.23, prohibits an FCM from withdrawing customer segregated funds beyond its actual interest therein, which would result in the funds of one futures customer being used for the benefit of any person other than such futures customer.

78.     CFTC Regulation 1.25, 17 C.F.R. § 1.25, requires that FCMs manage the investment of customer funds "consistent with the objectives of preserving principal and maintaining liquidity," and in accordance with further restrictions.

79.     During the last week of October 2011, on Wednesday, October 26, Thursday,

October 27, and Friday, October 28, 2011, MF Global violated Section 4d(a)(2) of the Act, 7

U.S.C. § 6d(a)(2), and CFTC Regulations 1.20, 1.22, and 1.23, 17 C.F.R. §§ 1.20, 1.22, and 1.23,

and from at least January 2011 until May 2011, MF Global violated CFTC Regulation 1.25,

17 C.F.R. § 1.25, by failing to treat, deal with, and account for its FCM customers' segregated

funds as belonging to such customers; failing to account separately for, properly segregate, and

treat its FCM customers' segregated funds as belonging to such customers; commingling its

FCM customers' segregated funds with the funds of any other person; using its FCM customers'

segregated funds to fund the operations of MF Global and its affiliates, thereby using or

permitting the use of the funds of one futures customer for the benefit of a person other than such

futures customer; withdrawing from its FCM customer segregated funds beyond MF Global's

actual interest therein; and investing customer segregated funds in prohibited instruments.

80.     At all times relevant to this Complaint, Holdings was the parent company of MF

Global and controlled the operations of MF Global, including the acts constituting the violations

described in this Count One.  Pursuant to Section 2(a)(1)(B) of the Act, 7 U.S.C. § 2(a)(1)(B),

and CFTC Regulation 1.2, 17 C.F.R. § 1.2, Holdings is liable for the violations described in this

Count One as a principal of MF Global.

81.     During the last week of October 2011, Corzine directly and indirectly controlled

MF Global and its employees and, on Thursday, October 27 and Friday, October 28, did not act

in good faith or knowingly induced, directly or indirectly, the acts constituting the violations of

Section 4d(a)(2) and CFTC Regulations 1.20, 1.22, and 1.23 described in this Count One.

Pursuant to Section 13(b) of the Act, 7 U.S.C. § 13c(b), Corzine is liable for the violations of

Section 4d(a)(2) of the Act and CFTC Regulations 1.20, 1.22, and 1.23 described in this Count One.

82.     During the last week of October 2011, on Thursday, October 27 and Friday, October 28, O'Brien willfully aided and abetted MF Global's wrongful conduct in violation of Section 4d(a)(2) of the Act and CFTC Regulations 1.20, 1.22, and 1.23 as described in this Count One. Pursuant to Section 13(a) of the Act, 7 U.S.C. § 13c(a), O'Brien is liable for the violations of Section 4d(a)(2) of the Act and CFTC Regulations 1.20, 1.22, and 1.23 described in this Count One.

83.     For Corzine, the violations described in paragraph 81 as well as each illegal transfer of customer segregated funds out of MF Global's FCM customer segregated accounts on Thursday, October 27 and Friday, October 28, 2011, are each alleged as a separate and distinct violation of Section 4d(a)(2) of the Act, 7 U.S.C. § 6d(a)(2), and CFTC Regulations 1.20, 1.22, and 1.23, 17 C.F.R. §§ 1.20, 1.22, and 1.23. These transfers include but are not limited to: (1) those transfers alleged above, – i.e., on Thursday, October 27, the transfers in the amounts of $325 million and $200 million, and on Friday, October 28, the transfers in the amounts of $62.5 million, $2 million, $200 million, $135 million, and $50 million; (2) at least eight other transfers to MF Global broker-dealer or other Firm accounts; (3) at least five transfers to customer secured accounts; and (4) at least 80 transfers to FCM customers for withdrawals of secured customer funds.

84.     For O'Brien, the violations described in paragraph 82 as well as each illegal transfer of customer segregated funds out of MF Global's FCM customer segregated accounts on Thursday, October 27 and Friday, October 28, 2011, including those alleged above, – i.e., on Thursday, October 27, the transfers in the amounts of $325 million and $200 million, and on

Friday, October 28, the transfers in the amounts of $62.5 million, $2 million, $200 million, $135 million, and $50 million - are alleged as a separate and distinct violation of Section 4d(a)(2) of the Act, 7 U.S.C. § 6d(a)(2), and CFTC Regulations 1.20, 1.22, and 1.23, 17 C.F.R. §§ 1.20, 1.22, and 1.23.

85.     For Holdings, the violations described in paragraphs 79 and 80 as well as each illegal transfer of customer segregated funds out of MF Global's FCM customer segregated accounts on Thursday, October 27 and Friday, October 28, 2011, are each alleged as a separate and distinct violation of Section 4d(a)(2) of the Act, 7 U.S.C. § 6d(a)(2), and CFTC Regulations 1.20, 1.22, and 1.23, 17 C.F.R. §§ 1.20, 1.22, and 1.23.  These transfers include but are not limited to: (1) those transfers alleged above, – i.e., on Thursday, October 27, the transfers in the amounts of $325 million and $200 million, and on Friday, October 28, the transfers in the amounts of $62.5 million, $2 million, $200 million, $135 million, and $50 million; (2) at least eight other transfers to MF Global broker-dealer or other Firm accounts; (3) at least five transfers to customer secured accounts; and (4) at least 80 transfers to FCM customers for withdrawals of secured customer funds.

86.     Each illegal investment of customer segregated funds in prohibited instruments, including, but not limited to, those specifically alleged herein, is alleged as a separate and distinct violation of CFTC Regulation 1.25, 17 C.F.R. § 1.25.

## COUNT TWO

### VIOLATIONS OF CFTC REGULATION 1.12(h)

#### FAILURE TO REPORT UNDER-SEGREGATION
#### BY DEFENDANT HOLDINGS

87.     Paragraphs 1 through 86 are re-alleged and incorporated herein by reference.

88.     CFTC Regulation 1.12(h), 17 C.F.R. § 1.12(h), requires an FCM to report to the CFTC and the FCM's DSRO any deficiencies in customer segregated accounts or customer secured accounts immediately by telephone notice, and confirmed immediately in writing by facsimile notice, whenever the FCM knows or should know that the total amount of its funds on deposit in customer segregated accounts or customer secured accounts on behalf of customers is less than the total amount of such funds required by the Act and CFTC rules to be on deposit in customer segregated accounts or customer secured accounts.

89.     During the last week of October 2011, MF Global violated Regulation 1.12(h), 17 C.F.R. § 1.12(h), by failing to notify the CFTC and CME immediately when it knew or should have known of the deficiencies in its FCM's customer segregated accounts.

90.     At all times relevant to this Complaint, Holdings was the parent company of MF Global and controlled the operations of MF Global, including the acts constituting the violations described in this Count Two.  Pursuant to Section 2(a)(1)(B) of the Act, 7 U.S.C. § 2(a)(1)(B), and CFTC Regulation 1.2, 17 C.F.R. § 1.2, Holdings is liable for the violations described in this Count Two as a principal of MF Global.

91.     During the last week of October 2011, each failure to report immediately to the CFTC and CME deficiencies in MF Global's FCM customer segregated accounts is alleged as a separate and distinct violation of CFTC Regulation 1.12(h), § 17 C.F.R. 1.12(h).

## COUNT THREE

### VIOLATIONS OF SECTION 6(c)(2) OF THE ACT

### SUBMISSION OF FALSE OR MISLEADING STATEMENTS IN A REPORT TO THE COMMISSION BY DEFENDANT HOLDINGS

92.     Paragraphs 1 through 91 are re-alleged and incorporated herein by reference.

93.    Section 6(c)(2) of the Act, 7 U.S.C. § 9(2), makes it unlawful for any person to make any false or misleading statement of a material fact to the Commission, including any report filed with the Commission, or to omit to state in any such statement any material fact that is necessary to make any statement of a material fact not misleading in any material respect, if the person knew or reasonably should have known the statement to be false or misleading.

94.    On Thursday, October 27, 2011, MF Global filed its segregation report with the CFTC for close of business Wednesday, October 26, 2011 (the "Wednesday segregation report"). The Wednesday segregation report claimed that MF Global had approximately $116 million in excess segregated funds as of the close of business on Wednesday, October 26, 2011. In fact, MF Global had a deficit in its customer segregated accounts of approximately $298 million as of the close of business on Wednesday, October 26, 2011.

95.    The Wednesday segregation report was a false or misleading statement of material fact to the Commission.

96.    MF Global knew or reasonably should have known that the Wednesday segregation report was false or misleading.

97.    On Friday, October 28, 2011, MF Global filed a segregation report with the CFTC that falsely stated the amount of excess segregated funds (the "Thursday segregation report"). The Thursday segregation report claimed that MF Global had approximately $200 million in excess segregated funds as of the close of business on Thursday, October 27, 2011. In fact, MF Global had a deficit in its FCM customer segregated accounts of approximately $413 million as of the close of business on Thursday, October 27, 2011.

98.    The Thursday segregation report was a false or misleading statement of material fact to the Commission.

99.     MF Global knew or reasonably should have known that the Thursday segregation report was false or misleading.

100.    During the last week of October 2011, MF Global violated Section 6(c)(2) of the Act, 7 U.S.C. § 9(2), by making these false or misleading statements of material fact to the Commission, when MF Global knew or reasonably should have known that the statements were false or misleading.

101.    At all times relevant to this Complaint, Holdings was the parent company of MF Global and controlled the operations of MF Global, including the acts constituting the violations described in this Count Three.  Pursuant to Section 2(a)(1)(B) of the Act, 7 U.S.C. § 2(a)(1)(B), and CFTC Regulation 1.2, 17 C.F.R. § 1.2, Holdings is liable for the violations described in this Count Three as a principal of MF Global.

## COUNT FOUR

## VIOLATIONS OF CFTC REGULATION 166.3

### FAILURE TO SUPERVISE DILIGENTLY
### BY DEFENDANT CORZINE

102.    Paragraphs 1 through 101 are re-alleged and incorporated herein by reference.

103.    CFTC Regulation 166.3, 17 C.F.R. § 166.3, requires each CFTC registrant, except an associated person who has no supervisory duties, to supervise diligently the handling of all commodity interest accounts carried, operated, advised, or introduced by the registrant and all other activities of its partners, officers, employees, and agents relating to its business as a Commission registrant.

104.    From at least August 2011 through October 31, 2011, Corzine failed to supervise diligently the activities of the officers, employees, and agents of the Firm.  By this conduct, Corzine violated CFTC Regulation 166.3, 17 C.F.R. § 166.3.

105.    Both the overarching failure to supervise diligently, and each illegal transfer of customer segregated funds out of MF Global's FCM customer segregated accounts on Thursday, October 27 and Friday, October 28, 2011, are alleged as separate and distinct violations of CFTC Regulation 166.3, 17 C.F.R. § 166.3.

## VI. RELIEF REQUESTED

WHEREFORE, Plaintiff respectfully requests that this Court, as authorized by Section 6c of the Act, 7 U.S.C. § 13a-1, and pursuant to its own equitable powers:

(1)    Find Holdings liable as a principal for MF Global's violations of Section 4d(a)(2) and 6(c)(2) of the Act, 7 U.S.C. § 6d(a)(2) and 9(2), and CFTC Regulations 1.12(h), 1.20, 1.22, 1.23, and 1.25, 17 C.F.R. §§ 1.12(h), 1.20, 1.22, 1.23, and 1.25.

(2)    Find Corzine liable as a controlling person for MF Global's violations of Section 4d(a)(2) of the Act, 7 U.S.C. § 6d(a)(2), and CFTC Regulations 1.20, 1.22, and 1.23, 17 C.F.R. §§ 1.20, 1.22, and 1.23.

(3)    Find Corzine liable for violating CFTC Regulation 166.3, 17 C.F.R. § 166.3.

(4)    Find O'Brien liable for aiding and abetting MF Global's violations of Section 4d(a)(2) of the Act, 7 U.S.C. § 6d(a)(2), and CFTC Regulations 1.20, 1.22, and 1.23, 17 C.F.R. §§ 1.20, 1.22, and 1.23.

(5)    Enter an order of permanent injunction enjoining Corzine and O'Brien and all persons insofar as they are acting in the capacity of Defendants' agents, servants, employees, successors, assigns, and attorneys, and all persons insofar as they are acting in active concert or participation with Defendants, who receive actual notice of such order by personal service or otherwise, from directly or indirectly:

(a)     engaging in conduct in violation of Sections 4d(a)(2) and 6(c)(2) of the Act, 7 U.S.C. §§ 6d(a)(2) and 9(2), and CFTC Regulations 1.12(h), 1.20, 1.22, 1.23, 1.25, and 166.3, 17 C.F.R. §§ 1.12(h), 1.20, 1.22, 1.23, 1.25, and 166.3;

(b)     applying for registration or claiming exemption from registration with the Commission in any capacity, and engaging in any activity requiring such registration or exemption from registration with the Commission, except as provided for in Regulation 4.14(a)(9), 17 C.F.R. § 4.14(a)(9);

(c)     acting as a principal (as that term is defined in CFTC Regulation 3.1(a), 17 C.F.R. § 3.1(a)), agent, officer, or employee of any person (as that term is defined in Section 1a(38) of the Act, 7 U.S.C. § 1a(38)) registered, required to be registered, or exempted from registration with the Commission, except as provided for in CFTC Regulation 4.14(a)(9), 17 C.F.R. § 4.14(a)(9);

(d)     trading on or subject to the rules of any registered entity, as that term is defined in Section 1a(40) of the Act, 7 U.S.C § 1a(40);

(e)     entering into any transactions involving commodity futures, options on commodity futures, commodity options (as that term is defined in CFTC Regulation 1.3(hh), 17 C.F.R. § 1.3(hh)) ("commodity options"), security futures products, swaps [as that term is defined in § 1a(47) of the Act, as amended, and as further defined by Commission Regulation 1.3(xxx), 17 CFR 1.3(xxx)], and/or foreign currency (as described in Sections 2(c)(2)(B) and 2(c)(2)(C)(i) of the Act, 7 U.S.C. §§ 2(c)(2)(B) and 2(c)(2)(C)(i)) ("forex contracts"), for their own personal accounts or for any account in which they have a direct or indirect interest;

(f)      having any commodity futures, options on commodity futures, commodity options, security futures products, swaps, and/or forex contracts traded on their behalves;

(g)      controlling or directing the trading for or on behalf of any other person or entity, whether by power of attorney or otherwise, in any account involving commodity futures, options on commodity futures, commodity options, security futures products, swaps, and/or forex contracts; and

(h)      soliciting, receiving, or accepting any funds from any person for the purpose of purchasing or selling any commodity futures, options on commodity futures, commodity options, security futures products, swaps, and/or forex contracts.

(6)      Enter an order requiring Defendants, as well as any of their successors, to disgorge, pursuant to such procedure as the Court may order, all benefits received, including, but not limited to, salaries, bonuses, commissions, loans, fees, revenues, and trading profits derived, directly or indirectly, from acts or practices that constitute violations of the Act as described herein, including pre- and post-judgment interest thereon from the date of such violations.

(7)      Enter an order directing Defendants and any of their successors to rescind, pursuant to such procedures as the Court may order, all contracts and agreements, whether implied or express, entered into between them and any of the customers whose funds were received by them as a result of the acts and practices that constituted violations of the Act, as described herein.

(8)      Enter an order directing Defendants to make full restitution to every customer whose funds were not returned as a result of the acts and practices that constituted violations of the Act and CFTC Regulations, as described herein, including pre- and post-judgment interest.

(9)     Enter an order directing Defendants each to pay a civil monetary penalty in the amount of the higher of (i) triple the monetary gain to that Defendant plus post-judgment interest or (ii) $140,000 for each violation of the Act and CFTC Regulations.

(10)    Enter an order requiring Defendants to pay costs and fees as permitted by 28 U.S.C. §§ 1920 and 2412(a)(2).

(11)    Enter an Order providing such other and further ancillary relief as the Court may deem appropriate.

## VII. DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial by jury.


Date: 12-6-13                          Respectfully submitted,

                                       Steven Ringer
                                       Chief Trial Attorney
                                       sringer@cftc.gov

                                       Manal Sultan
                                       Deputy Director

                                       Attorneys for Plaintiff
                                       U.S. Commodity Futures Trading Commission
                                       Division of Enforcement
                                       140 Broadway, 19th Floor
                                       New York, NY 10005
                                       646-746-9700 (office number)
                                       646-746-9898 (facsimile)