**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
|  | : | Civil Action No. 1:11-cv-07866-VM |
| IN RE MF GLOBAL HOLDINGS | : | |
| LIMITED SECURITIES LITIGATION | : | **PARTIALLY REDACTED** |
|  | : | **CONSOLIDATED SECOND** |
|  | : | **AMENDED SECURITIES CLASS** |
|  | : | **ACTION COMPLAINT** |
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x   **JURY TRIAL DEMANDED**
|  | : | |
| THIS DOCUMENT RELATES TO: | : | **ECF CASE** |
|  | : | |
| All Securities Actions | : | |
|  | : | |
| (*DeAngelis v. Corzine*) | : | |
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## TABLE OF CONTENTS

**Page**

I.  NATURE AND SUMMARY OF THE ACTION ................................................................. 3

II.  JURISDICTION AND VENUE ........................................................................................ 8

III.  PARTIES ......................................................................................................................... 9

    A.  Plaintiffs .................................................................................................................. 9

    B.  Individual Defendants ........................................................................................... 11

        1.  Officer Defendants ..................................................................................... 11

        2.  Director Defendants .................................................................................... 12

    C.  Auditor Defendant ................................................................................................. 15

    D.  Underwriter Defendants ......................................................................................... 16

IV.  FACTUAL BACKGROUND ........................................................................................... 19

    A.  The Formation Of MF Global And Its Subsidiaries ............................................. 19

    B.  Corzine Spearheads A "Transformative Effort" Toward Profitability ................. 22

    C.  MF Global's DTA Was Materially Overstated During The Class Period ............ 26

        1.  Background On MF Global's DTA ............................................................. 26

        2.  GAAP Accounting For DTA ...................................................................... 28

        3.  MF Global Violates GAAP By Failing To Record A Timely
            Valuation Allowance Against Its U.S. DTA ............................................... 32

            (i)  MF Global Did Not Have Evidence Of "Sufficient Quality
                And Quantity" That It Was "More Likely Than Not" To
                Realize A Benefit From Its U.S. DTA ........................................... 37

            (ii)  Compensation Structure Changes Were Not Sufficient
                Positive Evidence To Offset MF Global's U.S. DTA ................. 39

            (iii)  Purported Tax Planning Strategies Were Neither "Prudent"
                Nor "Feasible" .............................................................................. 43

    D.  MF Global Launches A Euro Sovereign Debt Trading Strategy Using
        Repo And RTM Transactions ................................................................................ 46

i

1.    Background Regarding Repo And RTM Transactions .............................. 46

2.    The Impetus For The Corzine Trade ........................................................ 48

3.    The Mechanics Of The Corzine Trade ...................................................... 49

4.    After The Corzine Trade Temporarily Boosts Profits, Substantial
Undisclosed Liquidity Risks Trigger Massive Margin Calls .................... 51

E.    MF Global's Ineffective Risk Management And Internal Controls ..................... 58

1.    The Board Dismisses Myriad Red Flags And Corzine
Exponentially Increases Euro Sovereign Debt Trading Limits ................ 59

2.    Dozens Of Gaps In Risk Management Are Presented To, But
Ignored By, The MF Global Board ............................................................ 69

F.    Belated, Inadequate Disclosures About The Corzine Trade Prompt
Regulatory Inquiries That Help Shut Down The Corzine Trade ......................... 74

1.    The FINRA And FSA Investigations ......................................................... 74

2.    The SEC Comment Letters ...................................................................... 81

G.    MF Global's Liquidity Crisis Is Masked By Intraday (And Overnight)
Transfers, Including Unlawful Transfers From Customer Accounts .................... 84

1.    Background On Segregated Customer Accounts And The Use Of
Intraday Transfers At MF Global .............................................................. 85

2.    MF Global's Most Senior Executives Use Inter-Company
Transfers To Meet Increasing Daily Liquidity Needs ............................... 88

3.    Inter-Company Transfers Become A "Shell Game" .................................. 90

4.    Liquidity Monitoring During The Class Period ........................................ 92

H.    The Truth Begins To Emerge In MF Global's Frenetic Final Days .................... 96

1.    October 17, 2011-October 27, 2011 ......................................................... 96

2.    October 28, 2011-November 21, 2011 .................................................... 102

V.    MATERIAL MISSTATEMENTS AND OMISSIONS ................................................. 107

A.    The Fourth Fiscal Quarter Of 2010 And Full Fiscal 2010 Year ....................... 107

1.    Net Income And DTA ............................................................................. 107

2. Risk Appetite, Internal Controls And Liquidity Management ............... 110

B. The First Fiscal Quarter Of 2011 ............................................................. 115

1. Net Income And DTA ............................................................................ 115

2. Risk Appetite, Internal Controls And Liquidity Management ............... 117

C. The Second Fiscal Quarter Of 2011 ......................................................... 121

1. Net Income And DTA ............................................................................ 121

2. Risk Appetite, Internal Controls And Liquidity Management ............... 122

D. The Third Fiscal Quarter Of 2011 ............................................................ 126

1. Net Income And DTA ............................................................................ 126

2. Risk Appetite, Internal Controls And Liquidity Management ............... 128

E. The Fourth Fiscal Quarter Of 2011 And Full Fiscal 2011 Year ................ 132

1. Net Income And DTA ............................................................................ 132

2. Risk Appetite, Internal Controls And Liquidity Management ............... 135

F. The First Fiscal Quarter Of 2012 ............................................................. 143

1. Net Income And DTA ............................................................................ 143

2. Risk Appetite, Internal Controls And Liquidity Management ............... 145

G. The Second Fiscal Quarter of 2012 .......................................................... 152

1. Risk Appetite, Internal Controls And Liquidity Management ............... 152

VI. THE OFFICER DEFENDANTS ACTED WITH SCIENTER ....................... 157

A. The Officer Defendants Closely Monitored Core Operations ............................ 157

B. The Officer Defendants Were Aware Of, Or Recklessly Disregarded, The
Abandonment Of Risk Management Practices .................................................. 159

C. The Officer Defendants Were Aware Of, Or Recklessly Disregarded,
GAAP Violations And Reporting Of False Financial Statements ...................... 161

VII. PWC FALSELY CERTIFIED THAT IT HAD AUDITED MF GLOBAL'S
FINANCIAL STATMENTS AND INTERNAL CONTROLS FOR THE FISCAL

YEARS ENDED MARCH 31, 2010 AND MARCH 31, 2011 IN
ACCORDANCE WITH CONTROLLING AUDITING STANDARDS...................... 164

A.    GAAS Auditing Standards................................................................ 166

    1.    GAAS Standards Pertaining To The Audit Of Financial Statements..... 167

B.    PwC Knowingly Or Recklessly Issued Materially False And Misleading
Statements In The 2010 Form 10-K Asserting That It Conducted Its 2010
Audit Of MF Global's Financial Statements In Accordance With PCAOB
Standards When It Failed To Comply With Its GAAS Obligations.................. 168

    1.    PwC Conducted No Audit At All Of MF Global's DTA As Part of
Its 2010 Audit ....................................................................... 168

    2.    PwC Retroactively Attempted To Justify Its Failure to Audit MF
Global's Fiscal Year 2010 U.S. DTA One Year Later In 2011,
After Its Unqualified Fiscal Year 2011 Audit Report Was Issued ......... 170

        (a)    PwC's Retroactive Fiscal Year 2010 DTA Analysis,
Performed One Year Later in 2011, Further Demonstrates
PwC's Failure To Meet GAAS In 2010...................................... 170

        (b)    Even If PwC Could Retroactively Audit MF Global's
Fiscal Year 2010 DTA, Its 2011 Retroactive Audit Of MF
Global's Fiscal Year 2010 DTA Violated Auditing
Standards.................................................................. 172

C.    PwC Knowingly Or Recklessly Issued Materially False And Misleading
Statements In The 2011 Form 10-K Asserting That It Conducted Its 2011
Audit Of MF Global's Financial Statements In Accordance With PCAOB
Standards When It Failed To Comply With Its GAAS Obligations.................. 181

    1.    PwC Knowingly Or Recklessly Violated Its GAAS Obligations In
Its Audit Of MF Global's Fiscal Year 2011 DTA ................................ 181

        (a)    In Its 2011 Audit, PwC Knew That MF Global's U.S.
Operations Were In A Three (And Four) Year Loss
Position .................................................................... 182

        (b)    PwC Did Not Obtain Positive Evidence of Sufficient
Quality And Quantity To Counteract The Significant
Negative Evidence Requiring A Valuation Allowance As
Of March 31, 2011, In Violation Of GAAS ............................... 183

D.    PwC Knowingly Or Recklessly Issued Materially False And Misleading
Statements In The 2010 and 2011 Forms 10-K, Asserting That It
Conducted Its Audits of MF Global's Internal Controls In Accordance

With PCAOB Standards When It Failed To Comply With Its GAAS Obligations ................................................................................. 195

    1.    GAAS Standards Specific To Internal Controls ..................................... 195

    2.    COSO Standards For Internal Controls ................................................... 198

    3.    PwC Knew Or Recklessly Disregarded That MF Global's Internal Controls Were Inadequate ......................................................................... 200

        (a)    PwC Received Internal Company Reports Identifying Internal Controls Weaknesses ..................................................... 200

        (b)    PwC Certified MF Global's Internal Controls In Violation Of Its GAAS Obligations ............................................................. 208

E.    Additional Evidence of PwC's Scienter ............................................................ 211

    1.    PwC Had Been Warned To Focus On DTA In Its Audits ..................... 211

    2.    PwC Warned MF Global That It Needed To Achieve Profitability ....... 213

    3.    PwC Feared Being Terminated As MF Global's Outside Auditor ......... 214

F.    PwC's Material Misstatements And Omissions During The Class Period ......... 216

    1.    PwC's Clean Audit Report For Fiscal Year 2010 .................................. 216

    2.    PwC's Clean Audit Report For Fiscal Year 2011 .................................. 218

VIII.    LOSS CAUSATION ........................................................................................... 219

IX.    CLASS ACTION ALLEGATIONS .................................................................. 229

X.    THE INAPPLICABILITY OF THE STATUTORY SAFE HARBOR .......................... 233

XI.    THE PRESUMPTION OF RELIANCE WITH RESPECT TO EXCHANGE ACT CLAIMS ............................................................................................................ 234

XII.    CLAIMS FOR RELIEF UNDER THE EXCHANGE ACT ............................................ 236

XIII.    ADDITIONAL ALLEGATIONS RELATING TO SECURITIES ACT CLAIMS ....... 241

A.    The Secondary Offering .................................................................................... 242

B.    The 2016 Notes Offering .................................................................................. 243

C.    The 2018 Notes Offering .................................................................................. 244

D.      The 6.25% Senior Notes Offering ...................................................................... 244

E.      The Defendants' Failure To Exercise Reasonable Care Or To Conduct A
        Reasonable Investigation In Connection With The Offerings ............................ 245

XIV.   CLAIMS FOR RELIEF UNDER THE SECURITIES ACT ........................................... 249

XV.    JURY DEMAND .............................................................................................. 279

XVI.   PRAYER FOR RELIEF ...................................................................................... 279

vi

1.   This action[1] is brought by securities class action Lead Plaintiffs The Virginia Retirement System and Her Majesty The Queen In Right Of Alberta and additional named plaintiffs identified below (collectively, "Plaintiffs"), individually and on behalf of the following proposed class:

(1) as to claims under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act"), all persons and entities who or which purchased or otherwise acquired the publicly traded securities of MF Global Holdings Ltd. ("MF Global" or the Company") during the period from May 20, 2010 through and including November 21, 2011 ("Class Period"), and were damaged thereby – *i.e.*, those persons and entities who or which purchased or otherwise acquired:

(i) common stock, whether acquired on the open market or through the MF Global Ltd. Amended And Restated 2007 Long Term Incentive Plan or the MF Global Ltd. Employee Stock Purchase Plan;

(ii) 9% Convertible Senior Notes due June 20, 2038 ("2038 Notes");

(iii) 1.875% Convertible Senior Notes due February 1, 2016 ("2016 Notes");

(iv) 3.375% Convertible Senior Notes due August 1, 2018 ("2018 Notes"); and

(v) 6.25% Senior Notes due August 8, 2016 (the "Senior Notes"); and

(2) as to claims under Sections 11, 12(a)(2), and 15 of the Securities Act of 1933 ("Securities Act"), all persons and entities who or which purchased or otherwise acquired under the Company's Post-Effective Amendment No. 1 to Registration Statement No. 333-162119, dated February 24, 2010, and prospectuses filed in connection therewith (collectively, the "Offering Documents") and were damaged thereby – *i.e.*, those persons and entities who or which purchased or otherwise acquired:

(i) common stock in or traceable to the secondary offering on or about June 1, 2010;

(ii) the 2016 Notes issued on or about February 7, 2011;

(iii) the 2018 Notes issued on or about July 28, 2011; and

(iv) the Senior Notes issued on or about August 1, 2011.[2]

---

[1] Plaintiffs filed a Consolidated Amended Complaint on August 20, 2012. This Consolidated Second Amended Complaint is identical, with three exceptions: (1) the addition of PricewaterhouseCoopers LLP ("PwC") as a named Defendant; (2) the revision of the Class definition to match Plaintiffs' Motion for Class Certification (ECF No. 764); and (3) typographical corrections, including clarifications to certain document sources identified during discovery.

[2] Excluded from the Class are: (a) MF Global and its estate in bankruptcy; (b) Defendants; (c) members of the immediate families of the Individual Defendants (that is, children, stepchildren, parents, stepparents, spouses, siblings, mothers-in-law, fathers-in-law, sons-in-law, daughters-in-law, brothers-in-law, and sisters-in-law (as used herein, "spouse" shall mean a husband, a wife, or a partner in a state-recognized domestic relationship or civil

Additional individual plaintiffs named below seek to represent, as part of the Class, former MF Global employees who acquired MF Global securities pursuant to employee benefit plans during the Class Period.

2.     Plaintiffs, by their undersigned counsel, allege the following upon personal knowledge as to themselves and their own acts, and upon information and belief as to all other matters. Plaintiffs' information and belief as to allegations concerning matters other than themselves and their own acts is based upon, among other things: (1) review and analysis of documents filed publicly by MF Global and its subsidiaries with the Securities and Exchange Commission (the "SEC"); (2) research reports by financial analysts; (3) transcripts of investor conference calls; (4) publicly available presentations by MF Global; (5) press releases and media reports; (6) publicly available filings in legal actions arising out of MF Global's collapse; (7) recent public material, including sworn testimony, obtained in connection with continuing investigations of MF Global by the U.S. House of Representatives Committee on Agriculture (the "House Agriculture Committee"), the U.S. Senate Committee on Agriculture, Nutrition and Forestry (the "Senate Agriculture Committee"), the U.S. House of Representatives Financial Services Subcommittee on Oversight and Investigation (the "Financial Services Subcommittee"), the Department of Justice, the Federal Bureau of Investigation and other regulatory agencies; (8) detailed reports filed by the trustees in MF Global-related bankruptcy proceedings based on interviews of over one hundred witnesses and reviews and forensic investigations of hundreds of

---

union)); (d) the subsidiaries and affiliates of Defendants and MF Global; (e) any person or entity who was during the Class Period and/or is a partner, executive officer, director or controlling person of MF Global or any of its subsidiaries or affiliates or of any Defendant or any of their subsidiaries or affiliates; (f) any entity in which any Defendant or MF Global had during the Class Period and/or has a controlling interest; (g) Defendants' liability insurance carriers, and any affiliates or subsidiaries thereof; and (h) the legal representatives, heirs, successors, and assigns of any such excluded person or entity. Should any settlements be achieved prior to the expiration of the time to request exclusion from the Class, also excluded from the Class are any persons and entities who pursuant to request were excluded from those settlement classes.

thousands of documents; and (9) documents and information obtained by Co-Lead Counsel from former MF Global employees throughout the course of counsel's investigation and through discovery. Co-Lead Counsel's investigation into the factual allegations contained herein is continuing, and many of the relevant facts are known only by the Defendants or are exclusively within their custody or control. Plaintiffs believe that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for further investigation or discovery.

## I.    NATURE AND SUMMARY OF THE ACTION

3.      This federal securities class action involves a series of material misstatements and omissions about MF Global, formerly a leading brokerage firm offering customized solutions in global cash, derivatives and related markets. The revelation of these material misstatements and omissions culminated in MF Global's collapse – the eighth-largest bankruptcy in the history of the United States – and massive investor losses.

4.      In this Complaint, Plaintiffs assert two different sets of claims. First, Plaintiffs assert scienter-based claims (Counts 1-3) under the Exchange Act against three MF Global Officer Defendants (as defined in ¶ 32) who are alleged to have knowingly or recklessly made material misstatements and omissions about MF Global's financial results, operations and internal controls throughout the Class Period and Defendant PwC, MF Global's outside audit firm who repeatedly certified falsely that it had audited MF Global's financial statements and internal controls during the Class Period in accordance with controlling auditing standards.

5.      Second, Plaintiffs assert strict liability, negligence and non-fraud-based claims (Counts 4-15) under the Securities Act. These claims are asserted against those Defendants who are statutorily responsible for the material misstatements of facts and omissions in the Registration Statement and prospectuses by which MF Global's common stock, 2016 Notes,

2018 Notes and 6.25% Senior Notes were offered to the public in June 2010, February 2011, July 2011 and August 2011 (collectively, the "Offerings"). Securities Act Defendants include MF Global's Board of Directors (the "Board"), PwC, and the underwriters of the Offerings. Plaintiffs expressly disclaim any allegations of fraud or intentional misconduct in connection with these non-fraud claims, which are pleaded separately in this Complaint from Plaintiffs' Exchange Act claims, except that any challenged statements of opinion or belief made in connection with the Offerings are alleged to have been materially misstated statements of opinion or belief when made and at the time of the respective Offerings.

6.      Central to these claims is the reality that, at all relevant times during the Class Period, the Company's financial statements were materially misstated and not presented in accordance with Generally Accepted Accounting Principles ("GAAP") because the Company failed to properly account for its enormous Deferred Tax Assets ("DTA"). MF Global was required to record a valuation allowance against its U.S. DTA by no later than the start of the Class Period, but failed to do so in violation of GAAP. Only on October 25, 2011 did MF Global finally record a $119.4 million valuation allowance against all of its U.S. (and Japanese) DTA, which caused MF Global to report a $191.6 million loss for the second fiscal quarter of 2012 ended September 30, 2011 ("Q2'12"),[3] prompted credit rating downgrades and led to the Company's bankruptcy.

7.      Relatedly, Defendant PwC's liability arises from its own Class Period statements certifying that it had audited MF Global's financial statements and internal controls for the fiscal years ended March 31, 2010 and March 31, 2011 in accordance with controlling auditing standards, which PwC knew, or was reckless in not knowing, were false and misleading when

---

[3] During the Class Period, MF Global operated on a fiscal year that ended March 31; with the first fiscal quarter ended June 30; the second fiscal quarter ended September 30; and the third fiscal quarter ended December 31.

made. Had PwC complied with controlling auditing standards, the only reasonable conclusions PwC could have drawn would have been that: (i) the Company's DTA valuation allowance was insufficient at each fiscal year-end and, consequently, that the Company had materially overstated its U.S. DTA in violation of GAAP; and (ii) the Company's internal controls were not effective.

8.     MF Global's SEC filings and Defendants' other public statements also materially misstated and failed to disclose the significant liquidity risks posed by the Company's proprietary investments in Euro sovereign debt through repurchase-to-maturity transactions (also known as "repo-to-maturity" or "RTM" transactions) – a strategy designed to prop up the Company's profitability. During the Class Period, at the personal direction of MF Global's Chairman and Chief Executive Officer, Defendant Jon S. Corzine, MF Global's net long position in Euro sovereign debt RTM transactions grew to over $6.3 billion, a staggering amount that was well beyond MF Global's ability to finance the transactions.

9.     Yet, throughout the Class Period, Defendants repeatedly emphasized that MF Global's "risk management framework had been tightened considerably," misrepresenting and failing to disclose material weaknesses in internal controls, including those noted by the Company's outside auditor, PwC. Indeed, MF Global's massive Euro sovereign debt RTM exposure was built by Defendant Corzine in *repeated breaches of specific limits* set by MF Global's Board.

10.     At the same time, in the face of growing funding demands created by the Company's new trading strategy, MF Global also failed to address reported weaknesses in internal controls necessary to reliably forecast liquidity. Contrary to Defendants' repeated public statements of increased controls, no responsibility was assigned to remediate these internally

reported control issues on the grounds that "*the business accepts this risk.*"[4] As a result, certain employees were forced to play what was referred to as a daily "*shell game*" of asset transfers from MF Global's regulatory accounts – including at times *customer funds* – to meet the greatly increased liquidity demands of the Company's Euro sovereign debt RTM transactions. Again, these control failures were ignored by Defendant PwC. Had PwC complied with controlling auditing standards, the only reasonable conclusion PwC could have drawn would have been that the Company's internal controls were not effective.

11.     When the true facts were revealed at the end of the Class Period, the prices of MF Global's securities declined precipitously. On October 25, 2011, MF Global announced the unexpected loss of $191.6 million for Q2'12, including the $119.4 million DTA valuation allowance. In the same announcement, at the insistence of its regulators, MF Global also finally provided additional disclosure about its Euro sovereign debt exposure. As explained by Richard Cantor, the Chief Credit Officer of Moody's Investors Service ("Moody's") in testimony before the Financial Services Subcommittee on February 2, 2012, MF Global made clear "for the first time" in its October 25, 2011 announcement that its Euro sovereign debt RTM transactions "were *not client-driven* transactions, but instead were *purely proprietary* trading positions." Mr. Cantor further testified:

> Moody's had [previously] understood that MF Global was expanding its principal trading activity for the primary purpose of facilitating customer transactions, as opposed to generating trading profits. That understanding was developed over time through numerous meetings and discussions with MF Global management, and a review of information provided by the company and public filings. In Moody's view, MF Global's decision to assume large credit exposures that were not client-driven and represented a multiple of the company's outstanding common equity highlighted MF Global's increased risk appetite – in the absence of a parallel increase in capital.

---

[4] All emphasis in this Complaint is added unless otherwise indicated.

12.     Following the corrective disclosures on October 25, 2011, the price of MF Global's common stock declined in one trading day by approximately 48%. Similarly, the prices of MF Global's 2016 Notes, 2018 Notes, 6.25% Senior Notes and 2038 Notes declined by approximately 22%, 31%, 27% and 29%, respectively.

13.     Thereafter, MF Global faced an increasing liquidity crisis as its counterparties, creditors and customers reacted to the Company's poor earnings and DTA valuation allowance, ratings downgrades and growing concerns about Euro sovereign debt exposure. Over the next 72 hours, MF Global's financial position rapidly deteriorated, although the Company continued to state publicly that its capital position and liquidity were "sound."

14.     But on Monday, October 31, 2011, MF Global disclosed that it filed for Chapter 11 bankruptcy and, in the following three weeks, additional information was reported about a shocking shortfall in customer funds – ***reported to be a $1.2 billion shortfall on the last day of the Class Period*** – an event without precedent in the history of the futures industry, which further revealed the Company's liquidity crisis and material weaknesses in internal controls.

15.     As set forth herein, because of the "missing" customer funds, MF Global's eleventh-hour agreement to sell the Company's assets for approximately $1 billion to Interactive Brokers LLC ("Interactive Brokers") fell apart shortly after the agreement was reached late on Sunday, October 30, 2011, causing Class members to suffer further losses. As additional information about the nature and size of the customer funds shortfall was revealed, the prices of MF Global securities continued to decline through the end of the Class Period.

16.     Following MF Global's bankruptcy, numerous governmental and regulatory bodies commenced ongoing civil or criminal investigations into the statements and conduct underlying this action. For instance, the Financial Services Subcommittee called Edith O'Brien,

7

an Assistant Treasurer in MF Global's brokerage arm, to testify at a hearing called "The Collapse of MF Global." But Edith O'Brien, who directed a $200 million transfer of customer funds on October 28, 2011 to cover an overdraft at the request of Defendant Corzine, invoked her Fifth Amendment rights against self-incrimination.

17.     Though the investigations into MF Global's collapse are ongoing, Congressman Spencer Bachus, the Chairman of the House Committee on Financial Services and ex officio member of its Subcommittee, has said that even preliminary findings leave "little doubt" that Defendant Corzine ran the Company as his "alter ego" and "readily short-circuited" internal controls. Similarly, the U.S. Treasury Department's Office of Financial Research (the "OFR") reported that "significant failures of risk governance at MF Global . . . contributed to its collapse," and that "[a] firm with better internal controls and governance could have avoided MF Global's fate and protected customer assets."

## II.     JURISDICTION AND VENUE

18.     This Complaint asserts claims under: (1) Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a), and the rules and regulations promulgated thereunder, including SEC Rule 10b-5, 17 C.F.R. § 240.10b-5 ("Rule 10b-5"); and, separately, (2) Sections 11, 12(a)(2) and 15(a) of the Securities Act, 15 U.S.C. §§ 77k, 77l(a)(2) and 77o(a).

19.     This Court has jurisdiction over the subject matter of this action under Section 27 of the Exchange Act, 15 U.S.C. § 78aa, Section 22 of the Securities Act, 15 U.S.C. § 77v and 28 U.S.C. § 1331, because this is a civil action arising under the laws of the United States.

20.     Venue is proper in this District under Section 27 of the Exchange Act, 15 U.S.C. § 78aa, Section 22(a) of the Securities Act, 15 U.S.C. § 77v(a) and 28 U.S.C. § 1391(b), (c) and (d). Many of the acts and transactions that constitute the alleged violations of law, including the dissemination to the public of untrue statements of material facts, occurred in this District.

21.     In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the United States mail, interstate telephone communications and the facilities of national securities exchanges.

## III.   PARTIES

### A.     Plaintiffs

22.     The Virginia Retirement System ("VRS"), a Court-appointed securities Lead Plaintiff in this action, is a public pension fund based in Richmond, Virginia. As of June 30, 2011, VRS had approximately $56 billion in assets under management, serving the needs of approximately 600,000 current and retired public employees within the Commonwealth of Virginia. VRS administers a variety of retirement and benefit plans and programs, including defined-benefit retirement plans, optional defined-contribution retirement plans, Commonwealth of Virginia 457 deferred-compensation and cash-match plans, group life-insurance programs, retiree health-insurance credit programs, sickness and disability and long-term care plans and voluntary group long-term-care insurance programs. As set forth in the chart attached hereto as Exhibit A, Lead Plaintiff VRS purchased MF Global's common stock on the New York Stock Exchange ("NYSE"), as well as MF Global's 2016 Notes, 2018 Notes and 2038 Notes during the Class Period, and was damaged thereby.

23.     Her Majesty The Queen In Right Of Alberta ("Alberta"), a Court-appointed securities Lead Plaintiff in this action, legally owns assets of approximately Canadian $70 billion on behalf of itself, public pension funds and endowment and government funds of the Province of Alberta, and those assets are managed by its wholly owned subsidiary Alberta Investment Management Corporation. These funds are used for Albertans' priorities such as health care, education, infrastructure and social programs, and to meet the retirement-income needs of nearly

310,000 active and retired public-sector employees. As set forth in the chart attached hereto as Exhibit B, Alberta purchased MF Global's common stock during the Class Period on the NYSE, and was damaged thereby.

24.      The Government Of Guam Retirement Fund ("Guam") is a public pension fund. As set forth in the chart attached hereto as Exhibit C, Plaintiff Guam purchased MF Global's common stock on the NYSE and MF Global's 6.25% Senior Notes during the Class Period, and was damaged thereby.

25.      The West Virginia Laborers' Pension Trust Fund ("WV Laborers") is a self-insured, qualified Taft-Hartley defined-benefit plan that receives direct employer fringe contributions required under local, collectively bargained agreements with the Laborers' District Council of West Virginia and each of its affiliated local unions. As set forth in the chart attached hereto as Exhibit D, Plaintiff WV Laborers purchased MF Global's common stock in the Secondary Offering that occurred on or about June 1, 2010, and was damaged thereby.

26.      LRI Invest S.A. ("LRI Invest") is a Luxembourgian investment company based in Munsbach, Luxembourg, that has managed mutual and specialized funds since 1988 with approximately $13 billion of assets under management. As set forth in the chart attached hereto as Exhibit E, on behalf of the W & W International Funds, a Luxembourgian fonds common de placement, Plaintiff LRI Invest purchased MF Global's 2016 Notes and 2018 Notes, and was damaged thereby.

27.      Monica Rodriguez ("Rodriguez") is a former MF Global employee who acquired MF Global securities during the Class Period pursuant to the MF Global Ltd. Amended And Restated 2007 Long Term Incentive Plan (the "LTIP") and MF Global Ltd. Employee Stock Purchase Plan (the "ESPP"), and was damaged thereby.

28.     Jerome Vrabel ("Vrabel") is a former MF Global employee who acquired MF Global securities during the Class Period pursuant to the LTIP, and was damaged thereby.

**B.     Individual Defendants**

**1.     Officer Defendants**

29.     Defendant Jon S. Corzine ("Corzine") served as Chairman of the MF Global Board and Chief Executive Officer ("CEO") of both MF Global and the Company's primary broker-dealer subsidiary, MF Global Inc., from March 23, 2010 until November 4, 2011, when he resigned. Before joining MF Global, Corzine served as New Jersey's Governor from January 2006 to 2010, a U.S. Senator from New Jersey from 2000 until January 2006, and CEO and Co-Chairman of The Goldman Sachs Group, Inc. ("Goldman Sachs") from 1994 to 1999. Corzine was a director of MF Global and Chairman of the Board at the time of the Offerings.

30.     Defendant J. Randy MacDonald ("MacDonald") served as MF Global's Chief Financial Officer ("CFO") from April 2008 through March 2011 and as Global Head of Retail thereafter. During the Class Period, MacDonald oversaw the Company's financial operations, including finance, tax, treasury, marketing, investor relations and corporate communications. Before September 2010, MacDonald also oversaw corporate strategy, human resources, procurement and facilities management. Before joining MF Global, MacDonald worked as an auditor for Ernst & Young LLP ("E&Y") and Deloitte & Touche LLP ("Deloitte"). MacDonald signed the Company's Post-Effective Amendment No. 1 to Registration Statement No. 333-162119, dated February 24, 2010 (the "Registration Statement").

31.     Defendant Henri J. Steenkamp ("Steenkamp") served as MF Global's CFO from April 2011 through the end of the Class Period, with responsibility for treasury, accounting and all global financial control and reporting functions. Steenkamp was also responsible for aligning MF Global's finance and capital structures to support the Company's strategy. Before becoming

11

CFO in April 2011, Steenkamp was MF Global's Chief Accounting Officer and Global Controller for four years. Before joining MF Global, Steenkamp worked for eight years at PwC, the Company's outside auditor. Steenkamp signed the Registration Statement.

32.     Defendants Corzine, MacDonald and Steenkamp are collectively referred to in this Complaint as the "Officer Defendants."

33.     Because of the Officer Defendants' senior executive positions with the Company, they each had access at the time they held their positions to the adverse undisclosed information about MF Global's financial results, operations and internal controls as alleged below. Each Officer Defendant, by virtue of his high-level positions with the Company, directly participated in the management of the Company, including its financial reporting. These individuals were all involved in drafting, producing, reviewing and disseminating the financial statements and other reports at issue in this case during their tenure with the Company.

34.     The Officer Defendants, because of their positions of control and authority as senior officers of MF Global, were able to and did control the content of MF Global's various press releases, SEC filings and other public statements during the Class Period. Each of these individuals was provided with copies of the statements at issue in this action before they were issued to the public and had the ability to prevent their issuance or cause them to be corrected. Accordingly, each of these individuals is responsible for the accuracy of the public statements detailed in this Complaint.

### 2.     Director Defendants

35.     Defendant David P. Bolger ("Bolger") was a member of MF Global's Board from February 1, 2010 through the end of the Class Period. Bolger was also a member of the Board's Audit and Risk Committee and Nominating and Corporate Governance Committee. Prior to joining MF Global, Bolger served as CFO and Executive Vice President of Aon Corporation, and

in various capacities with Bank One Corporation and its predecessors, including as President of the American National Bank & Trust Company of Chicago and Treasurer of First Chicago Corporation. Bolger signed the Registration Statement.

36.     Defendant Eileen S. Fusco ("Fusco") was a member of MF Global's Board from September 19, 2007 through the end of the Class Period. Fusco was also the Chair of the Board's Audit and Risk Committee and a member of the Executive Committee and Nominating and Corporate Governance Committee. Fusco previously was a senior partner of Financial Services at Deloitte, a tax partner at E&Y, regional tax counsel for the Americas at UBS AG, CFO of Twenty-First Securities Corp., and Managing Director of Global Tax at Kidder, Peabody & Co. According to MF Global's September 19, 2007 press release, Fusco is "a financial expert for the SEC and related Sarbanes-Oxley purposes." Fusco signed the Registration Statement.

37.     Defendant David Gelber ("Gelber") was a member of MF Global's Board from February 1, 2010 through the end of the Class Period. Gelber was also the Chair of the Board's Compensation Committee and a member of the Executive Committee and Audit and Risk Committee. Prior to joining MF Global, Gelber was a director and Chief Operating Officer ("COO") of ICAP plc, and also held a variety of senior trading positions in the foreign exchange and derivatives businesses at Citibank N.A., Chemical Bank and HSBC, where he also served as the COO of HSBC Global Markets. According to MF Global's February 1, 2010 press release, Gelber possessed "in-depth knowledge of virtually all financial products ranging from traditional cash products to cutting-edge derivatives, both from the trading and risk management perspectives." Gelber signed the Registration Statement.

38.     Defendant Martin J. Glynn ("Glynn") was a member of MF Global's Board from June 17, 2008 through the end of the Class Period. Glynn was also a member of the Board's

Audit and Risk Committee and Compensation Committee. Prior to joining MF Global, Glynn was CEO of HSBC Bank USA N.A., Chairman and CEO of HSBC Bank Canada, and Group General Manager of HSBC Holdings plc. Glynn signed the Registration Statement.

39.     Defendant Edward L. Goldberg ("Goldberg") was a member of MF Global's Board from July 12, 2007 through the end of the Class Period. Goldberg was also the Company's lead independent director, Chair of the Board's Nominating and Corporate Governance Committee and a member of the Board's Executive Committee and Compensation Committee. Prior to joining MF Global, Goldberg held various titles at Merrill Lynch, Pierce, Fenner & Smith Incorporated, including Executive Vice President of the Operations Services Group, Chairman of the Professional Securities Services Group, Chairman of the Securities Services Division, and Deputy Chairman and Interim CEO of Merrill Lynch HSBC Ltd. Goldberg has also served as a Director of the Depository Trust Company, an Advisory Director for Bloomberg, L.P., a member of the NASDAQ Board of Directors and a member of the NYSE's Financial and Operational Surveillance Committee. Goldberg signed the Registration Statement.

40.     Defendant David I. Schamis ("Schamis") was a member of MF Global's Board from July 29, 2008 through the end of the Class Period. Schamis was also a member of the Board's Audit and Risk Committee and Compensation Committee. During the Class Period, Schamis was a managing director at J.C. Flowers & Co. LLC, which was granted the right to appoint one MF Global Board member pursuant to an investment agreement with the Company announced on May 20, 2008. Schamis signed the Registration Statement.

41.     Defendant Robert S. Sloan ("Sloan") was a member of MF Global's Board from September 19, 2007 through the end of the Class Period. Prior to joining MF Global, Sloan was a Managing Director at Credit Suisse First Boston ("CSFB"), Chairman of the CSFB/Tremont

Hedge Fund Index Co., Co-Head of OTC derivatives marketing for CSFB Americas, and Global Head of CSFB's prime brokerage, equity finance, managed lending and equity swaps groups. Sloan signed the Registration Statement.

42.     Defendants Bolger, Fusco, Gelber, Glynn, Goldberg, Schamis and Sloan are collectively referred to in this Complaint as the "Director Defendants."

43.     The Director Defendants signed the Registration Statement and, by virtue of their position as directors of the Company, had access to the adverse undisclosed information about MF Global's financial results, operations and internal controls, as alleged below.

44.     The Officer Defendants and Director Defendants are collectively referred to in this Complaint as the "Individual Defendants."

45.     As officers or directors of a publicly held company whose common stock and other debt securities were registered with the SEC under the Securities Act, publicly traded and governed by the federal securities laws, the Individual Defendants each had a duty to promptly disseminate accurate information about the Company's business, operations, financial statements and internal controls and to correct any previously issued statements that had become materially misstated or untrue, so that the market prices of the Company's publicly traded securities would be based upon accurate information. These Individual Defendants violated these requirements and obligations during the Class Period.

## C.     Auditor Defendant

46.     Defendant PwC served as MF Global's outside auditor at all relevant times and provided audit and tax services to the Company before and throughout the Class Period. PwC issued unqualified audit reports on the Company's financial statements and internal controls for fiscal years 2010 and 2011 and stated that it conducted its 2010 and 2011 audits in accordance with controlling auditing standards. PwC consented to the incorporation by reference of its

unqualified audit reports on the Company's financial statements and on management's assessment of internal controls in the offering documents for the Offerings. PwC was highly compensated for the auditing services it provided to MF Global. For the 2010 fiscal year ended March 31, 2010, PwC was paid: (a) fees for audit and audit-related services of approximately $11,024,000; (b) tax fees of $238,000; and (c) unspecified "other fees" of $209,000. For the 2011 fiscal year ended March 31, 2011, PwC was paid: (a) fees for audit and audit-related services of approximately $11,009,000; (b) fees for other services of approximately $238,000; and (c) unspecified "other fees" of $558,000.

### D.   Underwriter Defendants

47.     Defendant BMO Capital Markets Corp. ("BMO Capital") is a North American financial services provider offering equity and debt underwriting, corporate lending and project financing, merger and acquisitions advisory services, securitization, treasury management, market risk management, debt and equity research and institutional sales and trading. BMO Capital underwrote MF Global's public offering of the 6.25% Senior Notes.

48.     Defendant Citigroup Global Markets Inc. ("Citigroup") is a large financial services institution that provides commercial and investment banking services, commercial loans and underwriting services. Citigroup underwrote MF Global's public Secondary Offering and public offerings of the 2016 Notes and 2018 Notes.

49.     Defendant Commerz Markets LLC ("Commerz") provides security brokerage services. Commerz was formerly known as Dresdner Kleinwort Securities LLC. As a result of the acquisition of Dresdner Kleinwort Securities LLC by Commerzbank AG, Dresdner Kleinwort Securities LLC's name was changed in April 2010. Commerz underwrote MF Global's public offering of the 6.25% Senior Notes.

16

50.     Defendant Deutsche Bank Securities Inc. ("Deutsche Bank") is the U.S. investment banking and securities arm of Deutsche Bank AG. Deutsche Bank provides investment banking products and services. Deutsche Bank underwrote MF Global's public Secondary Offering and public offerings of the 2016 Notes and 2018 Notes.

51.     Defendant Goldman, Sachs & Co. ("Goldman") provides investment banking, securities and investment management services. Goldman underwrote MF Global's public offerings of the 2016 Notes and 2018 Notes.

52.     Defendant Jefferies LLC (formerly, Jefferies & Company, Inc. ("Jefferies")) is a global investment bank and institutional securities firm. Jefferies provides clients with capital markets and financial advisory services, institutional brokerage, securities research and asset management. Jefferies underwrote MF Global's public offering of the 6.25% Senior Notes.

53.     Defendant J.P. Morgan Securities LLC ("J.P. Morgan") is the investment banking arm of financial services giant J.P. Morgan Chase & Co. J.P. Morgan provides debt and equity underwriting, M&A and corporate restructuring advisory services, securities dealing and brokerage services, and trade execution services. J.P. Morgan underwrote MF Global's public Secondary Offering and public offerings of the 2016 Notes and 2018 Notes.

54.     Defendant Lebenthal & Co., LLC ("Lebenthal") is a New York-based brokerage services firm that provides consulting and underwriting services. Lebenthal underwrote MF Global's public offering of the 6.25% Senior Notes.

55.     Defendant Merrill Lynch, Pierce, Fenner & Smith Incorporated ("Merrill") is the marketing name for the global banking and global markets businesses of Bank of America Corporation. Merrill offers trading and brokerage services, debt and securities underwriting, debt and equity research, and advice on public offerings, leveraged buyouts and mergers and

acquisitions. Merrill underwrote MF Global's public offerings of the 2016 Notes, 2018 Notes and 6.25% Senior Notes.

56.     Defendant Natixis Securities North America Inc. ("Natixis") is a New York-based registered broker-dealer that offers securities direct to the broker-dealer community and equity risk management products. On October 1, 2011, Natixis was merged into Natixis Bleichroeder Inc. Natixis was formerly known as IXIS Securities North America, Inc. Natixis underwrote MF Global's public offering of the 6.25% Senior Notes.

57.     Defendant RBS Securities Inc. ("RBS") is an indirect wholly owned subsidiary of The Royal Bank of Scotland Group plc. RBS is a U.S. investment bank/broker-dealer and a leading capital markets firm, underwriter, trader, and distributor of fixed income investment products providing debt financing, risk management and investment services. RBS underwrote MF Global's public offerings of the 2016 Notes and 2018 Notes.

58.     Defendant Sandler O'Neill + Partners, L.P ("Sandler O'Neill") is a full-service investment banking firm and broker-dealer focused on the financial services sector. Sandler O'Neill underwrote MF Global's public offerings of the 2016 Notes and 6.25% Senior Notes.

59.     Defendant U.S. Bancorp Investments, Inc. ("U.S. Bancorp"), a subsidiary of U.S. Bancorp, is a full-service brokerage firm. U.S. Bancorp underwrote MF Global's public offering of the 6.25% Senior Notes.

60.     Defendants BMO Capital, Citigroup, Commerz, Deutsche Bank, Goldman, Jefferies, J.P. Morgan, Lebenthal, Merrill, Natixis, RBS, Sandler O'Neill and U.S. Bancorp are collectively referred to in this Complaint as the "Underwriter Defendants."

## IV.     FACTUAL BACKGROUND

### A.     The Formation Of MF Global And Its Subsidiaries

61.     MF Global traces its roots to a sugar trading business called ED&F Man, which was founded by James Man in England in 1783. ED&F Man evolved into a broader business trading cash commodities and commodity futures and eventually diversified into the financial services business in 1981. ED&F Man operated as a partnership until 1994, when it was listed on the London Stock Exchange.

62.     In 2000, ED&F Man changed its name to Man Group plc and called its brokerage division Man Financial. Over the next five years, Man Financial embarked on an acquisition spree that culminated in the acquisition of the client assets and accounts left behind by Refco, Inc. ("Refco") – the largest broker of commodities and futures contracts on the Chicago Mercantile Exchange (the "CME") before its bankruptcy in October 2005. The Refco acquisition boosted Man Financial's scale in retail and institutional business.

63.     In 2007, Man Group plc spun off Man Financial in an initial public offering ("IPO") on the NYSE. Once it became a public corporation, Man Financial was renamed "MF Global Ltd."

64.     After the IPO, MF Global Ltd. operated in a highly regulated industry in the United States and numerous foreign jurisdictions. In the U.S. alone, MF Global was regulated by the SEC, the Financial Industry Regulatory Authority ("FINRA"), the Commodity Futures Trading Commission ("CFTC"), the CME, the National Futures Association (the "NFA") and the Chicago Board Options Exchange ("CBOE").

65.     Nonetheless, in February 2008, just seven months after its IPO, MF Global announced that one of its U.S. brokers, Evan Dooley, had engaged in the unauthorized trading of wheat futures from his home and had lost $141 million overnight. MF Global explained that the

19

"internal controls [that] could have stopped Mr. Dooley's trades from being processed" were "turned off" at the time. Upon disclosure that MF Global would have to clear the unauthorized trades and absorb the $141 million loss in its U.S. operations, the CFTC and CME fined MF Global $10 million and $495,000, respectively.

66.     To resolve the CFTC's and CME's charges of violations after MF Global's rogue-trading incident in February 2008, MF Global hired Chief Risk Officer ("CRO") Michael Roseman and outside risk management experts (from Quadrant Consultants and later Promontory Financial Services) to help overhaul the Company's internal controls and revamp its public image. In the spring of 2009, following strategic reviews by its outside risk management experts, the Company adopted comprehensive risk management policies, including an "Enterprise Risk Policy" and an "Enterprise Risk Management Escalation Policy" (collectively, the "Enterprise Risk Policy"), both of which purportedly were in effect during the Class Period.

67.     According to an internal MF Global "Promontory 2011 Update" presentation, the Company's Enterprise Risk Policy was an "umbrella document" that included "Enterprise Risk Governance, Capital-At-Risk Management, Liquidity Risk Management, Credit Risk Policy, Market Risk Policy, Exposure Measurement, Margin and Monitoring Policy, Operational Risk Policy, Compliance Policy, Other Risk, and Risk Reporting." This internal presentation also described MF Global's Enterprise Risk Management Escalation Policy as one that "provid[ed] a general framework and set[] specific escalation triggers in key areas."

68.     The Enterprise Risk Policy included an explicit recognition that segregated client funds were not available for MF Global to use for liquidity purposes. It stated:

> In the major jurisdictions in which it operates, MF Global is forbidden to use segregated funds for any purpose other than as directed by the client. *Therefore, as a matter of policy MF Global considers that segregated funds are not available to it for liquidity purposes.*

69.     The Company's Enterprise Risk Policy purported to enhance internal controls and to remedy the weaknesses that allowed the February 2008 U.S. rogue-trading incident.

70.     On January 4, 2010, MF Global Ltd. solidified the re-invention of its corporate image by reincorporating as a Delaware corporation (from Bermuda) and changing its name to "MF Global Holdings Limited" – referred to herein as MF Global, the now bankrupt, non-defendant issuer in this action.

71.     During the Class Period, in the course of its daily operations, MF Global had extensive interactions and inter-company dealings with certain of its affiliates and subsidiaries, in particular MF Global Inc. ("MFGI"), a Delaware corporation, through which MF Global primarily conducted its trading business. MFGI was the Company's North American broker-dealer ("BD") arm and was registered as a futures commission merchant ("FCM") with the CFTC. When MF Global filed for bankruptcy on October 31, 2011, MFGI commenced liquidation proceedings under procedures established by the Securities Investor Protection Act of 1970 (the "SIPA"). James W. Giddens is the trustee for MFGI's SIPA liquidation (the "SIPA Trustee"). The SIPA Trustee reports that MFGI was "by far the predominant part of the MF Global enterprise."

72.     MF Global also conducted business during the Class Period with an affiliate called MF Global U.K. Limited ("MFG-UK"), through which the Company traded Euro sovereign debt as detailed below in Section IV.D. MFG-UK was regulated by the United Kingdom's Financial Services Authority (the "FSA") and, following MF Global's bankruptcy, was placed into special administration, the U.K. equivalent of bankruptcy.

73.     MF Global also engaged in transactions during the Class Period with an affiliate called MF Global Finance USA Inc. ("FINCO"). FINCO was used as a conduit of funds to carry

out the Company's Euro sovereign debt RTM transactions, including by providing hundreds of millions of dollars in margin loans described herein. Shortly after MF Global filed for bankruptcy on October 31, 2011, FINCO also filed for Chapter 11 bankruptcy.

**B.      Corzine Spearheads A "Transformative Effort" Toward Profitability**

74.      On March 23, 2010, MF Global announced that Defendant Corzine was joining the Company as CEO and Chairman of the Board. Corzine's prominence was undeniable -- with an autograph signing at his first annual meeting – and his star power was well-received by the market. As described in a Moody's report issued the day Corzine's appointment was announced, any "[p]otential concerns about the unexpected nature of the leadership change [at MF Global] are tempered by Mr. Corzine's decades of first-rate industry and leadership experience, as well as the reputational 'cache' [sic] and potential industry connections he would bring to MF." Indeed, given Corzine's prestige, during his nineteen-month tenure as CEO and Board Chairman, the other members of the MF Global Board abdicated any effective oversight and allowed Corzine to run the Company as he saw fit, as discussed below.

75.      Before Corzine joined the Company, MF Global primarily provided commodity-related, client-based services. It did not engage in substantial proprietary trading. As stated in MF Global's Form 10-K for the fiscal year ended March 31, 2009, the Company's revenues derived principally from: (1) commission fees generated from execution and clearing services; and (2) interest income on cash held in customer accounts. The advent of online brokerages catering to high-frequency traders, however, put pressure on MF Global's commissions. In addition, interest income was down because interest rates were at historic lows following the 2008 financial crisis, and interest rates were expected to remain low for an extended period per the policy of the Board of Governors of the Federal Reserve System (the "Fed"). As a consequence, MF Global's revenues were in substantial decline before the Class Period.

76.     Significantly, the Company, including its U.S. operations, had lost money in the *three consecutive years* preceding the Class Period – including in the 2010 fiscal year ended March 31, 2010 – and reported losses for five consecutive quarters before Corzine arrived. In fact, Corzine later testified before Congress that he joined MF Global because he was drawn to "the possibility of taking part in the transformation of a challenged company." As reported in a December 11, 2011 *New York Times* article entitled "A Romance With Risk That Brought on a Panic" based on dozens of interviews with former MF Global employees (the "December 11 *NYT* Article"), Corzine was "convinced that he could quickly turn the money-losing firm into a miniature Goldman Sachs."

77.     Indeed, as soon as Corzine arrived, he sought to bolster profits by transforming MF Global into a full-service investment bank. He initiated a strategic review of the Company's business with the Board. He also engaged an outside consultant, the Boston Consulting Group, to help define a new business strategy to try to lead MF Global to profitability. The new business plan provided that, over the course of *three to five years*, MF Global would evolve into an investment bank. As reported in a February 2012 *Vanity Fair* article entitled "Jon Corzine's Riskiest Business," Corzine's attitude was "[i]f you build it, they will come," and his response to criticism was "I've seen this before. I know it can work."

78.     Just one week into his tenure, analysts from Macquarie (USA) Equities Research reported that Corzine was emphasizing a sense of "increased urgency on near-term profits" and stressing the importance of "improving profitability" by taking more risk. As was only later reported, Corzine immediately fashioned new trading desks, including a separate trading unit in June 2010 called the Principal Strategies Group (the "PSG"), which used the Company's own capital to trade, as well as a trading desk for mortgage-related securities.

79.     As described in the June 4, 2012 Report of the SIPA Trustee's Investigation and Recommendation, which is based on "counsel's interviews [with] more than one hundred people along with [a] review of hundreds of thousands of documents, and an extensive forensic investigation conducted with the assistance of forensic accountants at [E&Y]" (the "SIPA Report"), the Company's nascent PSG included just six senior traders, three junior traders and one trading assistant, and relied on existing middle and back office support staff for account setup and management processes, as well as any clearing and settlement processes.[5] Additionally, as reported in the December 11 *NYT* Article -- and corroborated by the SIPA Report – Corzine himself became a core member of the PSG, with his "profits and losses appearing on a separate line in documents with his initials: JSC."

80.     Corzine also made personnel changes to implement his new business plan. He fired 1,400 people only to hire 1,000 others, most of whom were more highly paid employees from bigger Wall Street firms. Corzine also installed a tight-knit group of "Chief-level" employees with whom he had longstanding relationships from his days in government or Goldman Sachs. Included in Corzine's inner circle was Bradley I. Abelow ("Abelow"), who joined MF Global in September 2010 as COO and assumed the additional position of President in March 2011. Before joining MF Global, Abelow was Chief of Staff to Defendant Corzine during Corzine's tenure as New Jersey's Governor, and was a partner and managing director at Goldman Sachs. Also part of Corzine's inner circle was Michael G. Stockman ("Stockman"), another Goldman Sachs alumnus whom Corzine hired as CRO after dismissing his predecessor, as discussed in detail in Section IV.E.1.

---

[5] The SIPA Report reveals numerous contemporaneous facts and circumstances – many of which are contained in internal documents and emails directly quoted – that are consistent with the facts uncovered by other sources identified.

81.     Two months into the job, on May 20, 2010, Corzine told investors in a press release that he was already "taking decisive action to fundamentally improve" financial results. He also reassured investors that day – and repeatedly throughout the Class Period – that he was not adopting a profits-at-all-costs strategy at the expense of the Company's risk management and internal controls.

82.     For instance, on May 20, 2010, Corzine emphasized that he would "ensure the appropriate controls are in place" in order to "deliver . . . greater value to shareholders." Again, at a June 3, 2010 investor conference, Corzine stressed his commitment to risk management:

> *I want to stress risk management* because my predecessor did a good job of addressing historical rearview mirror problems, but I think we have to implement the human element of risk management on top of the systems that have been put in place. *This is something that I've worked on most of my life and I think that we can bring both the operations, the systems, the technology to managing risk.*

83.     One year later, on a May 19, 2011 investor conference call, Corzine again reassured investors that "*measured risk-taking* will be part of our build-out to an investment bank." Three weeks later, at a Sandler O'Neill conference on June 9, 2011, Corzine went so far as to claim that one of his "most important jobs is to be the Chief Risk Officer," even though that title was technically held by Stockman.

84.     These representations about risk management were critical to the market's perception that the new Corzine-led MF Global was on track for a turnaround. As noted in a September 12, 2011 Credit Suisse analyst report entitled "Earning to Grow":

> *Re-emphasizing Risk Management.* A key feature of our discussion with MF Global management was the firm's risk management framework – we view this as *a critical element of the turnaround* given the firm's desire to move into more dealer-based businesses and historical track record. . . . *[M]anagement emphasized that MF Global's risk management framework has been tightened considerably over the past year.*

85.     In reality, however, MF Global had two faces during the Class Period: a public face, shown by what the Officer Defendants told investors about the Company's risk management practices and initiatives; and an internal face, reflected in what they and others at MF Global actually did and did not do with regard to risk management. Internally, as demonstrated below, MF Global was run by Corzine and the Individual Defendants as a Company that disregarded risk management in favor of an unsustainable profits-at-all-costs approach. This led to grave consequences for investors in a remarkably short period of time.

C.     **MF Global's DTA Was Materially Overstated During The Class Period**

1.     **Background On MF Global's DTA**

86.     Deferred Tax Assets are losses, credits and other tax deductions that may be used to offset taxable income in future years. Deferred Tax Assets are recorded as "assets" under GAAP because they may be used in the future to reduce a company's tax payments by offsetting future taxable income. As set forth herein, GAAP requires companies to record valuation allowances against DTA to reduce the asset to the amount that is "***more likely than not***" to be realized in the future under specific GAAP criteria. Throughout the Class Period, however, MF Global failed to record required valuation allowances against its U.S. DTA in violation of GAAP.

87.     On the morning of October 25, 2011, MF Global issued a press release announcing a Q2'12 loss of $191.6 million. The press release stated that over half of the loss was caused by "[s]ignificant charges in the quarter includ[ing] valuation allowances against deferred tax assets of $119.4 million."

88.     During an investor conference call later that day, Corzine further noted: "This quarter, we recorded [a] valuation allowance against previously booked deferred tax assets in the United States and Japan. . . . So going forward, we will not be recording additional deferred tax

assets in these countries *until we start consistently generating income within these jurisdictions*." As further explained by Defendant Steenkamp on that call, "*the U.S. was the bulk*" of the $119.4 million DTA valuation allowance, and the only DTA remaining was $11 million in connection with the Company's U.K. operations.

89.    MF Global's disclosure of its (long overdue) valuation allowance against its U.S. DTA significantly contributed to the Company's collapse. An article entitled "Why MF Global Really Went Bankrupt," published by *Forbes* on December 16, 2011, summarized the implications of the Company's DTA valuation allowance as follows:

> What caused investors to lose confidence in MF in late October? There's a simple, sensible explanation. Six days before it filed for bankruptcy, MF reported a large quarterly loss, the details of which contained a message: *Don't expect this company ever to be profitable again. The markets responded accordingly*.
>
> MF's main business was executing and clearing trades for clients. The company was a dinosaur. It still took most of its orders over the phone, long after the industry had shifted to electronic trading. Not surprisingly, MF reported net losses *for each of the past four fiscal years*. Its $186.6 [sic] million loss last quarter was its biggest.
>
> Most of the quarter's red ink came from writing down something called deferred-tax assets. Basically this item represented the money MF had thought it would save on taxes in the future, assuming it would be profitable. Net deferred taxes stood at $108.3 million as of March 31, according to MF's 2011 annual report, which was the last time the company provided a detailed tax footnote. MF wrote down that figure entirely last quarter. *In essence, MF's executives were admitting they couldn't figure out how to make money*. . . .
>
> If the executives of a firm are writing off the deferred tax assets then that does look very much like they're saying that there aren't going to be any future profits. . . . Why stay in a company, whether with debt or equity financing, with a company that itself is saying that it won't make a profit again? . . . Management writing off those assets were in effect saying that we were going to remain in a low interest environment for the foreseeable future, thus meaning that there was no real likelihood of using those deferred-tax assets.

### 2.    GAAP Accounting For DTA

90.    GAAP is the official standard for accounting accepted by the SEC and is promulgated in part by the Financial Accounting Standards Board ("FASB") and American Institute of Certified Public Accountants ("AICPA"). GAAP consists of a hierarchy of authoritative literature. The highest authority consists of the Accounting Standards Codification ("ASC"). GAAP is recognized by the accounting profession as conventions, rules and procedures necessary to define accepted accounting practices at a particular time. SEC Regulation S-X Item 4-01(a)(1) (17 C.F.R. § 210.4-01(a)(1)) provides that financial statements filed with the SEC that are not presented in accordance with GAAP will be presumed to be misleading, despite footnotes or other disclosures.

91.    At all times throughout the Class Period, MF Global asserted that the Company's "consolidated financial statements are prepared in accordance with accounting principles generally accepted in the United States of America ('GAAP')."

92.    GAAP standards for DTA accounting are set forth in ASC No. 740, "Accounting for Income Taxes" ("ASC 740"). ASC 740 "addresses financial accounting and reporting standards for the effects of income taxes that result from an enterprise's activities for financial accounting and reporting for income taxes." ASC 740-10-05-1.

93.    ASC 740-10-30-5 provides that a company must:

> [R]educe deferred tax assets by a valuation allowance if, based on the weight of available evidence, it is more likely than not (a likelihood of more than 50 percent) that some portion or all of the deferred tax assets will not be realized. *The valuation allowance shall be sufficient to reduce the deferred tax asset to the amount that is more likely than not to be realized*.

94.    "All available evidence, both positive and negative, shall be considered to determine whether, based on the weight of that evidence, a valuation allowance is needed." ASC 740-10-30-17. This test for the realizability of DTA is stricter than GAAP measurements for the

28

realizability of certain other assets. As E&Y's interpretative guidance for DTA accounting standards explains:

> Noteworthy, however, is that ACS 740 does have instances that are **more restrictive** than other standards in which it is appropriate to rely on projections of future taxable income. That is, ASC 740 requires the weight of all available evidence, both positive and negative, be considered when evaluating the realizability of deferred tax assets. That means that while a company's projections have not changed, negative evidence may be substantive enough such that projections cannot be relied upon as a source of future taxable income.

95.     In addition to this more restrictive standard, the assessment of DTA under GAAP is also more objective than the assessment of other asset categories, because DTA can be measured directly. This is in contrast to the measurement of assets such as goodwill, which involves a greater degree of subjective judgment because "goodwill can be measured only as a residual and cannot be measured directly." ASC 350-20-35-2.

96.     Important evidence to consider in determining whether a valuation allowance is required includes an enterprise's results for recent prior years and its current financial position. Cumulative losses by an enterprise in prior years are **significant negative evidence** that a valuation allowance is necessary under ASC 740 (*i.e.*, it is more difficult to conclude that a valuation allowance is not necessary when the entity has a recent history of losses). For example, ASC 740-10-30-21 provides that "*[f]orming a conclusion that a valuation allowance is not needed is difficult when there is negative evidence such as cumulative losses in recent years*."

97.     Similarly, GAAP provides that "a cumulative pre-tax loss for financial reporting for the current and two preceding years" is "*significant negative evidence* about an enterprise's profitability that creates significant uncertainty about an enterprise's ability to earn taxable income and realize tax benefits in future years." ASC 740-10-30-23 adds: "A cumulative loss in recent years is a *significant piece of negative evidence that is difficult to overcome*."

98.     Where there is such significant negative evidence, such as cumulative prior-year losses, an enterprise must record a valuation allowance unless it provides positive evidence *"of sufficient quality and quantity to counteract negative evidence"* and "support a conclusion that a valuation allowance is not needed." ASC 740-10-30-23. Such positive evidence must be specific and reliable, including, for example: (1) "existing contracts or firm sales backlog that will produce more than enough taxable income to realize a deferred tax asset based on existing sales prices and cost structures"; (2) "an excess of appreciated asset value over the tax basis for the entity's net assets in an amount sufficient to realize the deferred tax asset"; or (3) "a strong earnings history exclusive of the loss that created the future deductible amount . . . coupled with evidence indicating that the loss . . . is an aberration rather than a continuing condition." ASC 740-10-30-22.

99.     Accordingly, ASC 740-10-30-23 warns that overcoming significant negative evidence in the form of cumulative prior-year losses is a heavy burden:

> The weight given to the potential effect of negative and positive evidence shall be commensurate with the extent to which it can be objectively verified. The more negative evidence that exists the more positive evidence is necessary and the more difficult it is to support a conclusion that a valuation allowance is not needed for some portion or all of the deferred tax asset.

100.    Notably, MF Global's outside auditor, Defendant PwC, observed in its own 2007 "Guide to Accounting for Income Taxes" that a projection of future income is generally insufficient to avoid a valuation allowance when a corporation has cumulative losses in recent years, and a history of recent losses is *"very difficult"* to overcome:

> A projection of future taxable income is inherently subjective and generally will not be sufficient to overcome negative evidence that includes cumulative losses in recent years, *particularly if the projected future taxable income is dependent on an anticipated turnaround to operating profitability that has not yet been demonstrated.*

\*       \*       \*

> *An enterprise with significant negative evidence, such as a history of recent losses, normally will find it very difficult to demonstrate that even an implemented exit plan provides sufficient objective evidence that the enterprise will be restored to profitability, prior to the time that it actually becomes profitable.* In these circumstances, it would be that much more difficult to demonstrate that an unimplemented exit plan provides sufficient evidence to overcome the negative evidence present.

101.    ASC 740-10-30-21 also provides that "[u]nsettled circumstances that, if unfavorably resolved, would adversely affect future operations and profit levels on a continuing basis in future years" is further "negative evidence."

102.    In determining the amount of a valuation allowance when presented with significant negative evidence such as cumulative prior-year losses, an enterprise may take into account "tax planning strategies." ASC 740-10-30-18. But tax planning strategies must meet specified standards to legitimately avoid a valuation allowance. They must be actions that: "(a) are prudent and feasible; (b) an entity ordinarily might not take, but would take to prevent an operating loss or tax credit carryforward from expiring unused; and (c) would result in realization of deferred tax assets." ASC 740-10-30-19. ASC 740-10-30-19 further explains that for a tax planning strategy to be feasible it "shall be primarily within the control of management."

103.    As discussed below, GAAP required MF Global to report a valuation allowance against the Company's U.S. DTA by no later than May 20, 2010, when the Company filed a Form 8-K with the SEC including its financial results for the 2010 fiscal year because: (1) MF Global's U.S. operations were operating at a three-year cumulative loss as of March 31, 2010; (2) MF Global did not have evidence "of sufficient quality and quantity to counteract [that] negative evidence"; and (3) MF Global did not have "prudent" and "feasible" tax strategies sufficient to avoid recording a full valuation allowance against its U.S. DTA.

### 3. MF Global Violates GAAP By Failing To Record A Timely Valuation Allowance Against Its U.S. DTA

104. Although not separately reported by MF Global at the time, by the start of the Class Period, MF Global's U.S. operations already were in a *three-year cumulative pre-tax loss position* as of the fiscal 2010 year (ended March 31, 2010), and had suffered significant losses including for the fiscal 2008 year (ended March 31, 2008). Similarly, MF Global reported consolidated (worldwide) corporate losses over that same three-year time period.

105. Corzine later highlighted MF Global's (consolidated) three-year loss through March 31, 2010 in testimony before Congress, noting, "*before I arrived, [MF Global] had lost money in each of the previous three years, including the fiscal year that ended on March 31, 2010*, for which the company posted a net loss to common shareholders of $167.7 million." Corzine further explained to Congress that MF Global's DTA "had been created by years of (non-RTM) tax losses cumulated (mostly before I arrived at MF Global) in the firm's United States and Japanese subsidiaries."

106. A primary cause of MF Global's lost profitability was the low interest rate environment, which was not expected to change in the near future. As described by John Brady, a Senior Vice President of Interest Rate Products who worked in MF Global's Chicago office from April 2002 through October 2011 – including as Co-Head of MF Global's Chicago office from May 2011 through October 2011 – MF Global's business "really started to decline" three or four years before 2011, when the Fed drastically reduced interest rates. Brady explained that, "with the implosion of Lehman, Merrill Lynch, Fannie and Freddie, the Fed took the interest rate down to zero," so the amount that MF Global was "able to receive from cash on deposit collapsed." Similarly, as explained by Defendant MacDonald on a May 21, 2009 investor

conference call, MF Global was suffering a "huge decrease in net interest income" as a result of the "near zero rate environment."

107.     In fact, as set forth in the SIPA Report:

Although the Federal Funds interest rate had been gradually declining since 2007, the Federal Reserve cut the rate to essentially zero following the financial crisis in the fall of 2008. MF Global had historically generated a substantial portion of its income from interest generated from repurchase agreements, government securities in inventory or held for commodities customers, and failed transaction fees. *The drop in the Fed Funds rate caused a dramatic decline in MF Global's interest income; [MF Global's] interest income decreased by nearly 90% from 2007 to [October 31, 2011] and MFGI's interest income decreased by more than 80% over the same period.*

108.     Even before the Class Period, MF Global executives recognized that the "near zero rate environment" was not expected to improve in the near future. For example, on August 6, 2009, then-MF Global CEO Bernard Dan ("Dan") acknowledged on a conference call that "interest rates still [we]re near zero, industry balances in the quarter were at their lowest level since December of 2007, and volumes remain[ed] well below peak levels." Again, on February 2, 2010, Dan explained that the "interest rate and spread environment remained extremely challenging," and that the Company's net revenues were "impacted by near-zero interest rates and spreads narrowing significantly."

109.     Indeed, well into the Class Period, Defendants continued to recognize that the macroeconomic environment had not – and was not expected to – improve MF Global's profitability. At a June 3, 2011 Sandler O'Neill industry conference, Corzine noted that "we are at low interest rates, maybe the lowest that are conceivable certainly in the United States . . . *[a]nd we may not be in a rising interest rate environment*." Moreover, Corzine also recognized the effects that low interest rates were having not only on MF Global's bottom line, but also on its capital position. On a November 4, 2010 investor conference call, for example, Corzine stated, "[i]n a higher interest rate environment, we'd expect that the net interest margin earned on

these [client] balances would self-generate the necessary capital. However, the timing is extended because of such low interest rates."

110.    Again, on October 25, 2011, Corzine further recognized the impacts of the "near zero rate environment" on the Company in response to a question from a Calyon Securities analyst, which is set forth as follows:

> Rob Rutschow: The DTAs I guess presumes that your U.S. business has been in a loss position for three years. And so I'm trying to figure out if the FCM is at these interest rate levels as profitable as a standalone entity.

> Corzine: I tried to make this point in my remarks and I'll say it again, is that, the low interest rate environment for a long period of time makes the FCM on a stand-alone basis a much harder business to be successful.

111.    Under GAAP, as discussed above in Section IV.C.2., MF Global's cumulative U.S. losses in the three-year period preceding the Class Period were "*a significant piece of negative evidence* that is difficult to overcome." ASC 740-10-30-23. Indeed, as later described in a *Bloomberg* article published on December 14, 2011, MF Global "*had been dying for years*" before it collapsed and thus the Company "*should have written down the [deferred tax] assets sooner*."

112.    Due to MF Global's cumulative prior-year loss position in the U.S. as of the start of the Class Period, MF Global was required under GAAP to record a valuation allowance for the full value of its U.S. DTA unless it could point to significant and objectively verifiable positive evidence that the Company's U.S. operations were more likely than not to realize a substantial profit.

113.    Nevertheless, MF Global failed even to *acknowledge* or report its three-year U.S. cumulative loss position in its Form 10-K for the fiscal 2010 year (the "2010 Form 10-K"), which was filed with the SEC on May 28, 2010. It was only more than one year later, in the Company's Form 10-K for the fiscal 2011 year (the "2011 Form 10-K"), which was filed with

34

the SEC on May 20, 2011, that MF Global acknowledged for the first time that it was in a three-year cumulative pre-tax loss position. The 2011 Form 10-K stated in part as follows:

> Realization of deferred tax assets is dependent upon multiple variables including available loss carrybacks, future taxable income projections, the reversal of current temporary differences, and tax planning strategies. U.S. GAAP requires that [the Company] continually assess the need for a valuation allowance against all or a portion of its deferred tax assets. *The Company is in a three-year cumulative pre-tax loss position at March 31, 2011 in many jurisdictions in which it does business*.

114.     The above-quoted May 20, 2011 disclosure failed, however, to specify that those "many jurisdictions" specifically included the United States, where the bulk of MF Global's revenues had always been derived and the bulk of MF Global's DTA was recorded. In fact, the Company's U.S. operations were actually in a *four-year* cumulative pre-tax loss position by the time of this disclosure and on March 31, 2011, given the significant losses that MF Global's U.S. operations incurred for the fiscal 2008 year.

115.     Nor did the 2011 Form 10-K specify that those "many jurisdictions" included Japan – where the Company first commenced operations in September 2009 – even though Japan was admittedly "not a growth market," as stated by then-Managing Director Tom Harte on September 16, 2009. In fact, MF Global was not even registered to do business on the relevant Japanese exchanges until at least September 13, 2010 – and then closed its Japanese securities business approximately one year later, which cost another $10 million in "restructuring charges," as described in Corzine's December 8, 2011 testimony before the House Agriculture Committee.

116.     Moreover, the Company further stated in the 2011 Form 10-K that it was still *not* recording a DTA valuation allowance in the foregoing "many jurisdictions." Specifically, the 2011 Form 10-K noted that, while a "cumulative loss position is considered negative evidence in assessing the realization of deferred tax assets," MF Global "concluded that the weight given to this negative evidence is diminished due to significant *non-recurring* loss and expense items

35

recognized during the three prior years, including IPO-related costs, asset impairments and costs related to exiting unprofitable business lines." But MF Global's non-recurring losses were not the only reason it was not profitable. In fact, MF Global's losses were expected to continue in the face of near-zero interest rates absent some (yet to be successful) turnaround, as set forth below.

117.   The 2011 Form 10-K further stated that the Company "also concluded that there [wa]s sufficient positive evidence to overcome this negative evidence." This supposedly "sufficient positive evidence" was described in the 2011 Form 10-K as follows:

> The positive evidence includes three means by which the Company is able to fully realize its deferred tax assets.
>
> First is the reversal of existing taxable temporary differences.
>
> **Second, the Company [is] forecast[ing] sufficient taxable income in the carry forward period. The Company believes that future projections of income can be relied upon because the [expected] income is based on key drivers of profitability that it began to see evidence of in fiscal 2011.** Most notable in this regard are plans and assumptions relating to the **significant changes to the Company's compensation structure** implemented in fiscal 2011, increased trading volumes, and other macro-economic conditions.
>
> Third, in certain of its key operating jurisdictions, **the Company has a sufficient tax planning strategy which includes potential shifts in investment policies**, which should permit realization of its deferred tax assets. Management believes [these] strategies [are both] prudent and feasible.

118.   Thereafter, on August 3, 2011, MF Global filed a Form 10-Q for the first fiscal quarter of 2012 ended June 30, 2011, which was the last quarterly report filed (as amended) before MF Global's bankruptcy (the "Q1'12 Form 10-Q"). The Q1'12 Form 10-Q substantially repeated the above-quoted disclosure from the 2011 Form 10-K and proffered the same purportedly positive evidence to avoid taking a full valuation allowance for MF Global's U.S. (and Japanese) DTA.

        (i)    **MF Global Did Not Have Evidence Of "Sufficient Quality And Quantity" That It Was "More Likely Than Not" To Realize A Benefit From Its U.S. DTA**

119.    As described in the 2011 Form 10-K and Q1'12 Form 10-Q, MF Global was primarily relying on projections of future income to support its DTA.[6] But projections, as acknowledged by GAAP, are "inherently subjective" and generally are not "sufficient to overcome negative evidence that includes cumulative losses in recent years." This is particularly so, as explained by PwC in its own DTA guide, when a company's projections of future income are "dependent on an anticipated turnaround to operating profitability that has not yet been demonstrated." In this case, MF Global's forecasts were premised on its transformation into an investment bank, an effort that was planned to take *three to five years*. During the Class Period, this transformative effort was high risk, in its early stages and had not yet been demonstrated.

120.    Indeed, although not specified in the 2011 Form 10-K, the growing revenue source that MF Global purportedly "began to see evidence of in fiscal 2011" was the Company's new trading business in the PSG. Unlike MF Global's pre-existing trading platforms, the PSG required substantially larger daily liquidity to fund trade settlements. Even under ideal circumstances, the SIPA Trustee estimated that it could take as long as "six to nine months for even a highly-successful new product group [like the PSG] to become self-sustaining, *i.e.*, to generate enough cash on its own to fund its daily liquidity needs." Thus, even assuming that the new PSG would become a "highly-successful" product group, MF Global still had to come up with funds to support the PSG's daily operations in the interim, creating a severe liquidity strain.

121.    Moreover, the PSG's profits were driven by investments in Euro sovereign debt structured as RTM transactions discussed in detail in Section IV.D. below. In short, these

---

[6] While MF Global also stated that it was, in the first instance, relying upon "the reversal of existing taxable temporary differences," that language is boilerplate in this context, provides no supporting facts and is thus devoid of any significance.

transactions were unreliable and unsustainable. As an initial matter, they were unsustainable because (as discussed further in Section IV.D.4) they were premised on the existence of the soon-to-expire European Financial Stability Facility (the "EFSF"), and thus the Company could not properly rely on profits from those transactions after the expiration of the EFSF as a way to realize its DTA in accordance with GAAP.

122.   In addition, the Company's Euro sovereign debt RTM transactions were inherently unsustainable because, by design, they required MF Global to continuously increase its exposure to keep the revenue stream flowing to the point where exposure reached an amount many times greater than MF Global's total asset base – *a leverage ratio of 40:1* – and the Company did not have sufficient capital or liquidity to support the transactions. Indeed, as set forth in Section IV.F. below, MF Global was forced to cease its Euro sovereign debt RTM trading strategy in August 2011 immediately after regulators required the Company to start holding additional capital against those transactions -- and MF Global did not have sufficient liquidity to continue the RTM transactions in the face of massive margin calls. Just two months earlier, in June 2011, MF Global even sought to transfer the PSG out of its regulated operations due to the drain that the Euro sovereign debt RTM transactions were having on the Company's overall liquidity, as discussed further in Sections IV.D.-G. below.

123.   At the very least, the Company's PSG, Euro sovereign debt RTM transactions and plans to transform into a full-service investment bank rendered MF Global's ability to benefit from its material and growing DTA "unsettled" under ASC 740-10-30-21. Thus, MF Global's projections of future income were not sufficient "positive evidence" to avoid taking a full valuation allowance against the Company's U.S. DTA in the face of the significant negative

evidence of MF Global's cumulative multi-year loss position as of the start of the Class Period.[7] Moreover, MF Global's claim that its cumulative three-year fiscal loss (which, by then, was actually a cumulative *four-year* fiscal loss) was the result of purported "non-recurring loss and expense items during the three prior years" was directly contradicted by the above-described facts regarding the adverse impacts of electronic trading and the low interest rate environment on MF Global's financial results, which continued unabated throughout the Class Period.

### (ii) Compensation Structure Changes Were Not Sufficient Positive Evidence To Offset MF Global's U.S. DTA

124. In addition to projections of future income, as described in the 2011 Form 10-K and Q1'12 Form 10-Q, MF Global was also purportedly relying on "significant changes to [its] compensation structure" to avoid recording a DTA valuation allowance. However, the expected benefits of MF Global's anticipated compensation structure changes during the Class Period were unreliable and, more importantly, could not have offset the Company's DTA.

125. By way of background, before the Class Period, in the third fiscal quarter of 2010 ended December 31, 2009 ("Q3'10"), MF Global sought to "streamline [its] compensation structure by extending participation in equity-based incentives globally and across all product lines." As a result, MF Global's Q3'10 compensation-to-net-revenue ratio dropped from 65% to 60%. On February 4, 2010, then-CEO Dan described this declining ratio as a step toward "evolving the culture" at MF Global to better "align [the Company's] employees with the interest of [its] key constituencies." Nevertheless, there were also negative "impacts associated with broadening equity-based incentive participation," which Dan likewise acknowledged that day. These negative impacts included increased volatility to financial results for several years.

---

[7] At $117.9 million, the size of the Company's net DTA at the start of the Class Period was not materially different from what it was when the valuation allowance was finally recorded near the end of the Class Period.

126.     Indeed, on February 5, 2010, analysts at Macquarie (USA) Equities Research reported on the negative impacts of MF Global's compensation changes, noting: "We would note *the shift in comp. policy* to include more deferred comp., while in line with industry trends, *is likely to increase volatility to results over the next few years*." Despite the "increase in volatility to [MF Global's] results over the next few years," when Defendant Corzine took the reins from Dan, he continued Dan's efforts to realign MF Global's compensation structure and said that he would take additional steps to try to reduce operating costs further.

127.     Specifically, on May 20, 2010, MF Global issued a press release entitled "Company Commences Strategic Realignment of Cost Structure." The press release announced that, in an effort to improve MF Global's earnings profile, the Company: (1) "implemented a global hiring freeze"; (2) intended "to reduce its workforce by 10 to 15 percent in an effort to reduce operating costs"; and (3) "set compensation targets (compensation to net revenues) for each business area."

128.     Corzine elaborated on this strategy on an investor conference call later in the day on May 20, 2010, emphasizing a "marked shift" from MF Global's prior compensation philosophy:

> Going forward, each business unit will have a compensation to net revenue ratio objective, prescribed in their business plans as well as the firm's total budget. Compensation will be tied to both Company-wide results and individual performance. This is a marked shift from an individual production philosophy that does not adequately provide for shareholder returns.

129.     Corzine also detailed the Company's new compensation-to-net-revenue ratio objectives on that same call, stating that "[o]ur efforts will also put us on a pathway to align our compensation ratios with better practices in our industry which in my experience is below 50% of net revenues."

130.    A few months later, in a slide deck used on the Company's August 5, 2010 conference call announcing results for the first fiscal quarter of 2011 ended June 30, 2010 ("Q1'11"), MF Global reported that "compensation to net revenue targets" had been established in each product group, as planned. Significantly, this slide deck estimated annualized costs savings of between *$43-50 million* for all "headcount reduction and compensation targets."

131.    However, MF Global never implemented a hiring freeze or meaningfully reduced Company-wide headcount, because Corzine started hiring highly paid professionals immediately upon appointment and continued to do so throughout the Class Period in an attempt to transform MF Global into a "mini Goldman Sachs." As referenced in ¶ 80 above, although Corzine fired 1,400 people, *he also hired 1,000 more* – most of whom were higher-priced talent. In fact, as described in the 2011 Form 10-K, any reductions in compensation and employee benefits expenses due to workforce cutbacks were "partially offset by increases in payroll expenses due to increased professional headcount." As further explained in the 2011 Form 10-K, to the extent the Company "reduced headcount overall as compared to fiscal 2010, [it] also strategically hired personnel in anticipation of fully implementing [its] new business model."

132.    Moreover, as illustrated below, MF Global never meaningfully reduced its compensation-to-net revenue ratio during the Class Period nor did it achieve its stated goal of accruing a compensation-to-net revenue ratio below 50%:

| Fiscal Period | Q1'11 | Q2'11 | Q3'11 | Q4'11 | Q1'12 | Q2'12 |
|---|---|---|---|---|---|---|
| **Compensation & Benefits (Excluding Non-Recurring IPO Awards) As A Percentage Of Net Revenue** | 53.7% | 58.0% | — | 62.7% | 54.4% | 64.9% |
| **Adjusted Compensation & Benefits (Excluding Severance Expense) As A Percentage Of Net Revenue** | 53.0% | 56.3% | 55.5% | 60.0% | 54.0% | 62.3% |

133.    Indeed, by the fall of 2011, Defendants Corzine and Steenkamp admitted that "plans and assumptions relating to the significant changes to the Company's compensation structure implemented in fiscal 2011" would not come to fruition in the near term. Specifically, Credit Suisse analysts issued a report on September 12, 2011 after meeting with Corzine and Steenkamp in which the analysts noted that MF Global was "unlikely to see a meaningful decline in compensation accrual rates" *until at least 2013*:

> Last week we had the opportunity to meet with MF Global Chairman and CEO Jon Corzine and CFO Henri Steenkamp. . . . Management reiterated its goal of achieving a 50% compensation-to-net revenue ratio, *but expects that given current business mix and levels of revenue production that it will remain in the mid-50% range near-term.* . . .

> While MF has made significant progress here and there's more to go, our sense is that we're unlikely to see a meaningful decline in compensation accrual rates from here without a step-up in revenue contribution from higher margin businesses (principal trading, interest income) – our estimates embed a 54% comp ratio for fiscal 2012, *before declining to the 50-51% range in 2013-2014.*

134.    Accordingly, MF Global's plans to realize costs savings from changing the Company's compensation structure were unreliable and, at best, "unsettled" under ASC 740-10-30-21. Regardless, even if MF Global's compensation-related costs savings were realized during the Class Period, they were still insufficient to return MF Global's U.S. operations to profitability. Thus, the Company's "plans and assumptions relating to the significant changes to the Company's compensation structure implemented in fiscal 2011" were insufficient positive

evidence to avoid recording a DTA valuation allowance given its cumulative three-year U.S. loss as of the start of the Class Period and cumulative four-year loss as of the following fiscal year.

**(iii)   Purported Tax Planning Strategies
Were Neither "Prudent" Nor "Feasible"**

135.   In addition to projections of future income and changes to the Company's compensation structure, as described in the 2011 Form 10-K and Q1'12 Form 10-Q, MF Global was also relying on purported tax planning strategies to avoid recording a DTA valuation allowance in the face of its three-year (and four-year) cumulative U.S. loss position. As set forth above, GAAP provides that tax planning strategies must be both "prudent and feasible" and within management's control to implement in order to legitimately avoid a valuation allowance.

136.   Evidencing that these purported tax strategies were not within management's control (as required by GAAP), MF Global conceded in its SEC disclosures that: "The amount of the deferred tax assets considered realizable, however, could be significantly reduced in the near term if the Company's actual results are significantly less than forecast. If this were to occur, it is likely that the Company would record a material increase in its valuation allowance." Accordingly, the adequacy of these purported tax strategies, themselves, also were tied to the success of MF Global's forecasts which, as GAAP states (and PwC's Guide notes), are not "sufficient to overcome negative evidence that includes cumulative losses in recent years."

137.   MF Global cryptically described its purported tax planning strategies in the 2011 Form 10-K and Q1'12 Form 10-Q only as including "potential shifts in investment policies." However, for the same reasons discussed above in ¶¶ 117-21, to the extent the Company's tax planning strategies were premised on the PSG's undemonstrated success and/or unsustainable revenues from Euro sovereign debt RTM transactions, they were neither "prudent" nor "feasible" positive evidence sufficient to justify failing to record a DTA valuation allowance because MF

43

Global did not have the liquidity to carry them out over time. This was also true if the purported strategies were premised on "potential shifts in investment policies" away from the Company's Euro sovereign debt RTM transactions. Given MF Global's already concentrated exposure to Euro sovereign debt and the resulting increased liquidity demands as described herein, the Company was simply unable to engage in any "shifts in investment policies" without first incurring significant additional liquidity strains or losses necessary to unwind the transactions prior to expiration, neither of which was "prudent" or "feasible."[8]

138.   Despite the dearth of reported detail about MF Global's purported tax planning strategies, an internal MF Global document (made public only after MF Global's bankruptcy) entitled "Stress Scenario Analysis – Downgrade: Potential Impact on MF Global" (the "Break-the-Glass-Document") reveals that, whatever the Company's purported tax planning strategies entailed, they were not sufficient to justify failing to record a DTA valuation allowance. Thus, the Break-the-Glass-Document reveals that, when MF Global was forced to curtail its RTM transactions as a result of FINRA's increased capital reserve requirements and the lack of necessary liquidity discussed in Sections IV.D.-G., the Company began preparing itself for a large DTA valuation allowance in the next fiscal quarter (and for the ratings downgrades which were expected to follow). In fact, the purported tax planning strategies were not even mentioned in the Break-the-Glass-Document as a way to avoid the massive DTA valuation allowance (or the ratings downgrades or increased liquidity crisis, which were expected to follow).

139.   The Break-the-Glass-Document was created by MF Global's Finance and Treasury personnel in response to a request from the Board's Audit and Risk Committee in early September 2011 for an analysis of the potential impact of an expected Q2'12 loss (as a result of

---

[8] To the extent the Company's purported tax planning strategy involved investing in longer term securities in its Hold To Maturity investments, that also failed to qualify under GAAP as set forth in Section VII.C. below.

the expected DTA valuation allowance). It was presented to the MF Global Board on October 19, 2011, before the disclosure of MF Global's Q2'12 results. The Break-the-Glass-Document evaluated all known and expected stressors of liquidity on MF Global, and also all sources of liquidity that could be used to offset those stressors in the event of a credit rating downgrade following the reporting of MF Global's Q2'12 results (which would report, for the first time, MF Global's large DTA valuation allowance and resulting losses).

140.    The Break-the-Glass-Document specifically identified Euro sovereign debt RTM transactions as the Company's largest liquidity stressor. It also recognized that MF Global would likely be forced to unwind its Euro sovereign debt RTM portfolio prior to expiration in the event of a downgrade to help generate liquidity and, significantly, would suffer *further large losses* upon doing so:

> Immediate Decision-Making Required
>
> ***RTMs – biggest draw on cash today; loss today less the margins posted; generate liquidity with large P&L loss*** – decisions: hedge fully, hedge for a short term (2-3 months and then unwind after the storm), novate? . . . Need a clear strategy and plan for RTM portfolio. . . .
>
> Timeline . . . Impact of a Downgrade – What Happens?
>
> *        *        *
>
> ✓  Unwind European RTM book to release margin. . . .
>
> ✓  Unwind UN-matched book if repo lines are lost
>
> ✓  Move repo positions to CCPs [central counterparty clearinghouse] where possible (higher haircut[9] + financing cost) . . . .
>
> ✓  Continue unwinding reverse repos. . . .

---

[9] The term "haircut" is described in SEC Rule 15c3-1(c)(2)(v)(A)-(M) as follows: "[H]aircuts are designed to discount the firm's own positions to account for adverse market movements and other risks faced by the firms, including liquidity and operational risks. . . . [The] percentage amount of the haircut varies depending on the type of security, the maturity date, the quality, and the marketability."

141.    While the Break-the-Glass-Document contains a thorough analysis of various scenarios, nowhere is there any mention of the Company's "tax planning strategies" as a means of avoiding the DTA valuation allowance and the increased liquidity stress expected to follow in the event of a Q2'12 loss and credit rating downgrade. Moreover, the document makes clear that shifting MF Global's investment policies away from the Euro sovereign debt RTM transactions prior to expiration could only take place by incurring a "*large P&L loss*."

142.    Accordingly, none of the purported reasons eventually offered by MF Global justified the Company's failure to record a full U.S. DTA valuation allowance by the start of the Class Period, and the Company's financial results were materially misstated and presented in violation of GAAP at all relevant times.

**D.    MF Global Launches A Euro Sovereign Debt Trading Strategy Using Repo And RTM Transactions**

**1.    Background Regarding Repo And RTM Transactions**

143.    Repurchase or "repo" transactions are typically used by banks to increase leverage and involve the sale and repurchase of a security to and from a counterparty. In such a transaction, in return for selling a security, the seller receives cash and incurs an obligation to repurchase the security at a later date.

144.    These transactions can be structured as a "repo" or a "repo-to-maturity." The following example details the structure of both a repo and a repo-to-maturity transaction:

- Firm A sells Treasury notes with a face value of $1 million to Firm B. The price paid by Firm B to Firm A is called the "repo principal."

- At the same time, Firm A contracts with Firm B to buy the notes back at the same price at an agreed future date – *e.g.*, 30 or 60 days – which is earlier than the maturity date of the notes.

- On that future date, Firm B returns the notes to Firm A, and Firm A repays the repo principal and "repo interest." The repo interest is a sum negotiated along with the

repo principal at the outset of the transaction, and is based on the short-term interest rate for loans for the time period covered by the transaction.

- The extent to which the repo turns out to be financially advantageous to Firm A depends on what happens during the course of the transaction to (1) the market value of the notes, and (2) short-term interest rates.

- The repo just described terminates on a date that is earlier than the maturity date of the securities. Such a transaction is called a "repo."

- If, however, the termination date is the same as the maturity date, the transaction is called a "repo-to-maturity."

145.   Repo and repo-to-maturity transactions have different accounting treatments. While a repo is typically accounted for on a balance sheet as a collateralized financing (increasing reported balance sheet leverage), a repo-to-maturity is typically accounted for as a sale. When repo-to-maturity transactions qualify for sales accounting treatment, they are "de-recognized," *i.e.*, not recognized on a company's balance sheet.

146.   Significantly, repo-to-maturity transactions allow for the early recognition of revenue. Gains are recorded at the time of the sale, which takes place at the outset of an RTM transaction even though the underlying securities must eventually be repurchased (even at a loss) upon maturity by the seller – in this case, MF Global.

147.   Moreover, because these immediately recordable gains have no corresponding assets or liabilities on a company's balance sheet, the underlying collateral is not accounted for in any value-at-risk ("VAR") calculations. VAR is a widely used measure of the risk of loss on a portfolio of financial assets. VAR was a key metric for MF Global during the Class Period because it was used to allocate capital, assess solvency and measure profitability.

148.   In short, by investing in Euro sovereign debt using RTM transactions, MF Global was able to invest in high-risk assets while keeping them off its balance sheet, frontload gains

47

and tout misleading VAR metrics – all of which created the artificial appearance of a turnaround in the Company's ailing business.

### 2.   The Impetus For The Corzine Trade

149.   When Corzine joined MF Global in March 2010, one of the most significant threats facing the Company was the risk of a ratings downgrade. At the time, Moody's and Fitch rated MF Global just two notches above junk status (Baa2 and BBB, respectively), and Standard & Poor's ("S&P") rated MF Global just one notch above junk status (BBB-). Concerned with MF Global's lack of core profitability, according to an article entitled "The Unraveling of MF Global" published in *The Wall Street Journal* on December 31, 2011 (the "December 31 *WSJ* Article"), the rating agencies told Corzine as soon as he started in March 2010 that he needed to "rev up profits fast or face downgrades." Moody's, for example, indicated that to maintain its Baa2 rating, MF Global would need to generate $200-300 million in annual pre-tax profits *and reduce leverage*.

150.   To this end, in the early summer of 2010, according to Corzine's December 15, 2011 testimony before the Financial Services Subcommittee, Corzine met with MF Global's senior traders to discuss ways to improve profitability and address the short-term pressures from the rating agencies. One of the ways was for MF Global to purchase Euro sovereign debt using RTM transactions, which involved taking advantage of the difference in the spread between the higher coupon payment from a Euro sovereign bond, and the lower rate at which the same bond could be loaned back out as collateral. This strategy sought profits by targeting arbitrage opportunities based on yield curve fluctuations in the price of Euro sovereign debt resulting from differences in market perceptions about the risk of default, changing supply and demand, interest rate futures and foreign exchange rates.

48

151.     Corzine, according to his own December 15, 2011 testimony before the Financial Services Subcommittee, "strongly advocated" for the Euro sovereign debt RTM trading strategy, in part because of the high yield it offered. As later reported in the December 31 *WSJ* Article, Corzine told a colleague that he believed the "European bet was 'a way to answer the [rating agencies'] demands while buying time to transform the business.'" Corzine reportedly referred to the RTM transactions' "up-front profits" as a "bridge" between the Company's current problems and a glorious future. According to a *ZeroHedge* report published on March 8, 2012, Corzine's single-minded obsession with purchasing Euro sovereign debt in this fashion came to be known within MF Global as the "Corzine Trade." Indeed, in his Congressional testimony on December 15, 2011, Corzine "accept[ed] responsibility for the RTM trades that MF Global engaged in from the time that [he] arrived at MF Global until [his] departure."

### 3.     The Mechanics Of The Corzine Trade

152.     On July 1, 2010, to facilitate the Corzine Trade, MFGI and MFG-UK entered into an investment management agreement ("IMA"). In the IMA, MFG-UK, which had relationships with the London Clearing House (the "LCH"), agreed to execute the Euro sovereign debt RTM transactions for MF Global so long as they were kept on MFGI's books – not MFG-UK's books – because (according to the SIPA Report) MFG-UK was unwilling to accept the risk of issuer default or debt restructuring. The IMA further provided that MFG-UK would receive 80% of the consolidated net revenues from each RTM transaction, while MFGI would receive 20%.[10]

153.     According to the SIPA Report, the complex structure of the Corzine Trade was as follows: MFG-UK purchased Euro sovereign debt securities from counterparties in trades that settled primarily on the LCH. MFG-UK then sold the securities to MFGI, although the securities

---

[10] This allowed for more revenue to flow to MF Global's already profitable U.K. operations, and less revenue to flow to MF Global's loss-producing U.S. operations, further demonstrating MF Global's need to record a valuation allowance against its U.S. DTA.

actually remained in MFG-UK's LCH account. MFGI then recorded the sovereign debt on its books (typically classifying the bonds as securities owned in MFGI's long inventory book). Subsequently, MFGI entered into an inter-company repo transaction with MFG-UK (which showed a reverse repo to MFGI).[11] Each inter-company repo was governed by a global master repurchase agreement between MFG-UK and MFGI dated July 19, 2004, as amended (the "GMRA"). Upon completion of each RTM transaction with MFGI, MFG-UK then entered into a further RTM with another counterparty that also settled through the LCH.

154.   On a given trade date, (1) MFGI recognized a gain in the amount of the difference between the original purchase price of the underlying security and the RTM sale price of those securities to the LCH, and (2) MFG-UK recognized a gain in the amount of the mark-up for its role as intermediary between MFGI and the LCH.

155.   According to the SIPA Report, the RTM transactions between MFG-UK and the LCH were only until two days short of maturity because the LCH refused to bear the risk of default. As a result, the LCH expected MFG-UK to fund these so-called "RTM minus two" positions for the remaining two days until the securities matured so that MFG-UK (not the LCH) bore the risk of default during that period. MFG-UK, in turn, looked to MFGI to fund the two-day breaks, which (as set forth below) significantly increased the amount of liquidity that MFGI needed to maintain the RTM portfolio.

156.   Margin calls (which are sometimes called "collateral calls") were also a major component of the Corzine Trade. Margin calls from the LCH, for example, went to MFG-UK, which relayed the calls to MFGI. Under the GMRA, in anticipation of a margin call from the LCH, MFG-UK could also demand advance margin from MFGI. MFGI would transfer collateral

---

[11] According to the SIPA Report, MFGI consistently priced the securities underlying the repos and reverse repo transactions several dollars higher than quoted industry prices (*e.g.*, prices quoted by Bloomberg).

(usually U.S. Treasury bills ("T-bills")) to MFG-UK to meet the margin calls. However, MFG-UK did not provide MFGI with any cash or collateral in exchange for the T-bills, so MFGI was "out-of-pocket" for several days until MFG-UK returned the T-bills.

157.    As detailed in the SIPA Report, Defendant Corzine "was very hands-on" and communicated with MFGI and MFG-UK personnel directly to carry out these RTM transactions, "*instructing them when to enter and exit various positions*." MFG-UK traders booked these trades on the MFGI trading desk, although the MFGI traders and operations personnel typically did not learn about the trades until they appeared on MFGI's books the following day.

### 4.    After The Corzine Trade Temporarily Boosts Profits, Substantial Undisclosed Liquidity Risks Trigger Massive Margin Calls

158.    When the Corzine Trade was launched, Europe was in the midst of a spiraling debt crisis – hence, there were high yields on Euro sovereign bonds. As described in an article published at around that time (on April 29, 2010) in the *Economist*, entitled "Europe's Sovereign Debt Crisis: Acropolis Now," Europe's sovereign debt crisis was "spiral[ing] out of control":

> There comes a moment in many debt crises when events spiral out of control. As panic sets in, bond yields lurch sickeningly upwards and fear spreads to shares and currencies. In September 2008 the failure of once-stellar Lehman Brothers almost brought down the world's banking system. . . . When the unthinkable suddenly becomes the inevitable, without pausing in the realm of the improbable, then you have contagion.

> The Greek crisis – or more properly Europe's sovereign-debt crisis -- looks dangerously close to that. . . . Portugal's borrowing costs jumped. Spain's debt was downgraded, along with Portugal's and Greece's, and Italy came worryingly close to a failed debt auction. European stock markets have slumped and the euro itself fell to its lowest level in a year against the dollar.

159.    The investing community was initially most concerned with the financial stability of Portugal, Italy, Greece and Spain. But within a few months, the debts of Belgium and Ireland

were also at risk. As *The Wall Street Journal* reported on November 26, 2010 in an article entitled "Belgian Debt and Contagion":

> Belgium's borrowing costs are rising as high levels of public debt, the continuing political crisis and bailouts for Eurozone peers make investors nervous. . . . Belgian public debt will reach 100.2% of its gross domestic product this year. . . .
>
> "We're in the middle of a financial crisis which is spreading to more and more countries, and if the crisis continues due to unresolved government issues in Belgium this could create a problem," said Laurent Bilke, global head of inflation strategy at Nomura in London. . . . The sovereign debt crisis has roiled markets across Europe, with Ireland the second country to take an EU bailout after euro zone governments agreed to assist Greece in May.

160.    The Euro sovereign bonds in the most peril were the very instruments that MF Global purchased, *i.e.*, the sovereign debt of Portugal, Italy, Ireland, Spain and Belgium. Within MF Global, according to Confidential Witness 1 ("CW 1"), a Senior Vice President and the Head of Credit Derivative Trading in MF Global's New York office from November 2009 through October 2011, the sovereign bonds of Portugal, Italy, Ireland, Greece and Spain were known collectively as "PIIGS." CW 1 further noted that when "everyone was reducing their exposure to 'PIIGS,' and getting it out in the media that they were reducing exposure, *MF was not doubling down, not tripling down, but quadrupling down*."

161.    Recognizing the risks presented by the deepening debt crisis in Europe, MF Global invested only in Euro sovereign bonds maturing before June 2013 because they were guaranteed by the EFSF – which was established in May 2010 and scheduled to expire in June 2013. Specifically, all of the debt of Belgium, Italy and Spain that MF Global purchased matured no later than December 2012, and all of the Irish and Portuguese debt that MF Global purchased matured no later than June 2012. Thus, Corzine interpreted the EFSF as a license to increase off-balance sheet leverage to unmanageable levels, notwithstanding Moody's mandate to *reduce leverage* in order to avoid a credit rating downgrade.

162. But while the EFSF may have provided a safety net if the Euro sovereign bonds actually defaulted, it did not prevent MF Global's exposure to market risk, liquidity risk and capital risk – including margin calls and additional net capital reserves that were demanded by MF Global's counterparties and regulators when the transactions began to be disclosed.

163. With respect to market risk (also referred to as "credit risk"), even though the lion's share of MF Global's Euro sovereign debt purchases were off-balance sheet, the Company still retained risk that the debt securities might default or be restructured. Indeed, this is why MFG-UK did not carry the trades on its own books. Corzine admitted he was aware of this risk in his December 15, 2011 testimony before the Financial Services Subcommittee:

> MF Global retained, however, the risk that the debt securities might default or be restructured. If the debt securities defaulted or were restructured, then MF Global would not be paid in full at their maturity, even though MF Global would still have the obligation to buy back the debt securities from the Counterparty in full (at par).

164. MF Global also retained substantial capital and liquidity risks due to the possibility of additional margin requirements from counterparties and additional net capital reserve requirements from regulators. Critically, the clearing house through which an RTM transaction was executed – typically the LCH – was able to demand that MF Global increase its margin under certain circumstances. As described by Corzine in his December 15, 2011 testimony before the Financial Services Subcommittee, a clearing house could require additional margin for at least two reasons: "(a) if it determined that MF Global itself was not credit-worthy, or (b) if it determined that underlying debt security – which was the collateral for the loan from the Counterparty to MF Global -- decreased in value." Corzine also admitted that he was aware that "the possibility of such margin calls from [the] LCH meant that MF Global retained liquidity risk." Accordingly, decreases in the value of MF Global's Euro sovereign debt RTM portfolio triggered margin calls and strained liquidity. For example, in November 2010, the LCH

demanded more collateral from MFG-UK after a 15% haircut was imposed on certain Irish bonds, and MFG-UK, in turn, called for more collateral from MFGI.

165.     Indeed, as Corzine testified on December 13, 2011 before the Senate Agriculture Committee, MF Global faced massive margin calls twice a day near the end of the Class Period. For instance, on September 28, 2011, according to the SIPA Report, in response to a margin call from the LCH to MFG-UK with respect to certain maturing Irish and Portuguese securities, MFG-UK requested $440 million from MFGI to cover the default risk in the two-day period before maturity. MFGI met the call with a $440 million wire transfer that day. One month later, by the close of business on October 28, 2011, according to an internal MF Global memo produced to the Financial Services Subcommittee, MF Global was required to post approximately $945 million in margin calls. On Monday, October 31, 2011 – the same day the Company filed for bankruptcy – MF Global's London staff requested an additional $310 million to cover more margin demanded by counterparties against the RTM portfolio. But as discussed further in ¶ 317 below, Edith O'Brien ("O'Brien"), MFGI's Assistant Treasurer, responded to this last October 31 demand with an e-mail sent with high importance to MF Global staff, stating "PLEASE DO NOT RELEASE THIS COLLATERAL."

166.     A failure to post additional margin can result in a default on an RTM and obligate a party to liquidate the transaction. During times of distress, margin calls can cripple a thinly capitalized firm, and the ensuing liquidity crisis can force a company into bankruptcy – which, in fact, occurred at MF Global in the final days of October 2011, as detailed below.

167.     Equally problematic for MF Global was the risk that its regulators would demand additional capital reserves when presented with the extent of MF Global's off-balance sheet Euro sovereign debt RTM transactions. Indeed, as discussed in Section IV.F.1. below, once MF

Global's Euro sovereign debt RTM transactions were disclosed, FINRA (and the SEC) demanded additional net capital reserves which, in combination with increasing liquidity demands, quickly ended the ability to keep profiting from the Corzine Trade and triggered other grave consequences.

168.   The enormous leverage used by MF Global exposed it to risk that significantly exceeded its asset base, including costs for carrying transactions with such high leverage. As detailed in the SIPA Report:

> As the Board and management were aware, the exposure from this [RTM] portfolio was the equivalent of *14% of MF Global's assets as of September 30, 2011, and was more than four-and-a-half times MF Global's total equity, a level that was orders of magnitude greater than the relative exposure at other, larger financial institutions.*
>
> *   *   *
>
> *The size of the RTM portfolio, in comparison to MF Global's size, was staggering.*

169.   As described by CW 1, while "significantly bigger companies with access to unlimited capital [we]re reducing exposure in this region, Corzine – operating within a more highly levered and capitally constrained firm – [wa]s *betting the farm*."

170.   This phenomenon was further described in a November 10, 2011 Thomson Reuters' article, "MF Global Slayed By the Grim Repo," as follows:

> Like Wall Street cocaine, leveraging amplifies the ups and downs of an investment; increasing the returns but also amplifying the costs. With MF Global's leverage reaching *40-to-1* by the time of its collapse, it didn't need a Eurozone default to trigger its downfall – all it needed was for these amplified costs to outstrip its asset base. . . . With its balance sheet delicately teetering on the edge of a leverage cliff, all MF Global needed was a shove to fall to its financial ruin.

171.   In fact, the Company's massive leverage and exposure to Euro sovereign debt through RTM transactions did cause a liquidity crisis that depleted MF Global's already-minimal

amount of available capital and liquidity. As detailed below in Sections IV.F.1. and IV.G., contrary to repeated statements by the Officer Defendants throughout the Class Period that MF Global was amply capitalized and had sufficient liquidity, MF Global lacked adequate capital and liquidity to cover its Euro sovereign debt RTM transactions with Company resources and was forced to rely on intraday borrowings from its FCM operations, including *customer assets*.

172.   As of September 30, 2011, MF Global's net long position in short-term Euro sovereign debt had grown to approximately $6.3 billion, and the amount of margin posted exceeded $400 million. In October 2011, as reported by the SIPA Trustee, MF Global's net investment in Euro sovereign debt peaked at nearly $7 billion. Some of these positions were acquired as late as the end of July 2011 – just prior to FINRA announcing the required net capital charges discussed below – and Corzine had actually planned to continue building new positions into November 2011. Accordingly, as noted in the SIPA Report, "*as the MF Global Board and management were aware, MF Global's appetite for Euro sovereign debt had taken the Company to a precarious position*."

173.   In fact, according to the SIPA Report, MF Global risk personnel focused on these liquidity risks during the Class Period and brought several risk scenarios to the attention of CRO Stockman and other senior management. One was the possibility that the Company would be unable to execute margin-reducing reverse RTM transactions. If a counterparty refused, the Company could be faced with an 80% margin call from the LCH, which could amount to $602 million. In another scenario, if MF Global were downgraded below investment grade, that event would trigger a margin call as high as 200% under the LCH rules, and higher margin calls at other exchanges like the Eurex. Indeed, by August 2011, as reported to MF Global's Board, the Company anticipated the need for as much as $930 million in additional funding to meet margin

calls on the RTM portfolio. As the SIPA Trustee reported: "*Very simply, however, the fact was that the sovereign RTM portfolio had grown beyond even MF Global's moderate risk profile*." As further detailed in the SIPA Report, in June 2011, the Company even began to try to move the PSG out of MFGI altogether and into a non-regulated entity called MF Global Special Investor, LLC ("Special Investor"), because the PSG "use[d] too much reg[ulatory] capital and the cost of reg[ulatory] capital [wa]s more than the cost of funding capital."

174.    While these material undisclosed risks were mounting, the Corzine Trade produced revenues and mitigated losses in MF Global's core operations for a short while. For instance, as reported by Credit Suisse analysts following the filing of the Company's Form 10-Q for the third fiscal quarter of 2011 on February 3, 2011 (the "Q3'11 Form 10-Q"), MF Global's "dealer-based principal facilitation businesses continue[d] to show progress," with "total principal facilitation revenues of $67 million . . . increased 13% from last year and 4% from last quarter." As was only later reported in the December 31 *WSJ* Article, approximately $39 million of this $67 million came from the Corzine Trade.

175.    Thereafter, in the Company's 2011 Form 10-K, which was filed on May 20, 2011, MF Global announced a GAAP loss of $0.31 per share and non-GAAP adjusted earnings per share ("EPS") of $0.05 for the quarter and year (ended March 31, 2011). Again, Deutsche Bank analysts observed that MF Global's "dealer-based principal facilitation businesses continue[d] to show progress"; "total principal facilitation revenues of $109 million nearly doubled year-over-year (+97%)" and were "up sharply quarter-over-quarter as well (+67%)." As was only later reported in an October 25, 2011 Credit Suisse analyst report, the "progress" in MF Global's principal facilitation business was due almost exclusively to Euro sovereign debt RTM transactions.

176.   Consistent with the above (after-the-fact) reports of the Corzine Trade's contribution to the Company's financial results, additional profit and loss ("P&L") detail first publicly reported in Annex F of the SIPA Report shows that – unbeknownst to investors – MF Global consistently boosted reported revenue from its Euro sovereign debt RTM trading strategy in the final month of each of the fiscal quarters ended December 31, 2010, March 31, 2011 and June 30 2011.[12]

177.   As noted in the SIPA Report, the cumulative P&L impact of the RTM trades from inception to bankruptcy was over $103 million and, on a quarterly basis, amounted to as much as 16% of net revenues. However, as alleged herein, the better-than-expected revenue booked as a part of MF Global's supposedly burgeoning "dealer-based principal facilitation business" ultimately destroyed the Company and caused massive investor losses as MF Global accumulated greater and greater exposure to the Corzine Trade, ultimately to shocking and unsustainable levels.

E.    **MF Global's Ineffective Risk Management And Internal Controls**

178.   Throughout the Class Period, as detailed herein, Corzine side-lined the Company's risk officers, cancelled key projects in the risk department and systematically circumvented internal controls to increase MF Global's exposure to the Euro sovereign debt. At

---

[12] Moreover, as reported by the OFR, based on Roseman's Congressional testimony, MF Global also engaged in another form of "window dressing," "presenting the firm favorably in its public financial statements – by reducing leverage at reporting dates." That is, in direct contrast to the de-recognized RTM transactions which *increased* in the final month of each quarter, MF Global repos accounted for as collateralized financings consistently *decreased* at quarter-end. As reported in article entitled "MF Global Masked Debt Risks" published in *The Wall Street Journal* on November 4, 2011: "For the past two years, [MF Global] may have disguised its debt levels to investors by temporarily slashing the debt it was carrying before publicly reporting its finances each quarter. . . . The activity, referred to in the financial industry as 'window dressing,' suggests that the troubled financial firm was shouldering more risk and using more borrowed funds to facilitate its trading than investors could easily detect from the firm's regulatory filings." According to its analysis of seven quarters from late 2009 to mid-2011, *The Wall Street Journal* reported that MF Global's borrowings at quarter-ends were, on average, 16% lower than the quarterly averages. By contrast, as revealed by Annex F to the SIPA Report, the Euro sovereign debt RTM end-of-quarter balances were consistently higher, allowing for more revenue to flow to MF Global in the final month of each quarter while at the same time reducing reported leverage. In June 2011, the SEC inquired about these quarterly variations, as set forth below in Section IV.F.2.

the same time, MF Global failed to address repeatedly reported gaps in internal controls necessary to reliably forecast liquidity, especially in the face of the Corzine Trade's greatly increased liquidity demands. All the while, Defendants stated publicly to investors that the appropriate controls were in place.

### 1. The Board Dismisses Myriad Red Flags And Corzine Exponentially Increases Euro Sovereign Debt Trading Limits

179.    Within his first eight months at MF Global, over the repeated objections of then-CRO Roseman, Corzine overrode risk management processes to increase Euro sovereign debt trading limits *by 950%* in 2010 – from approximately $500 million in March 2010 to $4.75 billion in November 2010 – and to $6.6 billion in the first six months of 2011. As reported by the SIPA Trustee, Roseman began expressing his concerns about the RTM portfolio's liquidity risks as early as May 2010.

180.    Roseman, who served as MF Global's CRO from August 2008 until January 2011, testified before the Financial Services Subcommittee on February 2, 2012 that, by no later than July 2010, Corzine sought to materially increase MF Global's existing Euro sovereign debt trading limits. In response, Roseman "reviewed the positions and limits in detail" with Corzine and others. During these internal discussions, Roseman warned of the "potential capital risk implied by the credit default swap ('CDS') market, along with the continued political and financial uncertainty in the relevant countries." Roseman continued to caution Corzine on the potential capital risk, but in or around July/August 2010, after taking into account the EFSF established in May 2010, Corzine succeeded in convincing Roseman to set a $1 billion total gross limit across certain European countries.

181.    Despite the $1 billion limit, only one month later in mid-September 2010, MF Global's Euro sovereign positions exceeded $1 billion. *Only after making purchases in excess*

*of the new $1 billion limit* did Corzine seek another overall limit increase from the Board. This time, to meet the existing exposure, Corzine sought to increase the limit to $1.5 billion. In response, according to his February 2, 2012 testimony before the Financial Services Subcommittee, Roseman expressed "increasing concerns with regard to the potential capital risk associated with the growing positions and began to express caution on the growing liquidity risk" as well. Roseman's account is corroborated by the December 11 *NYT* Article, which reported that Roseman gave a PowerPoint presentation to MF Global's Board by late 2010 making clear that investments in Euro sovereign debt could impose "a cash squeeze" on the Company.

182.   Henri Feuga ("Feuga"), who reported directly to CRO Roseman (and later to CRO Stockman) as a Senior Vice President in the Company's Global Risk and Compliance Systems Department from October 2008 through October 2011, also corroborated this account. Feuga stated that Roseman was not comfortable with Corzine's request to increase the Euro sovereign debt trading limit from $1 billion to $1.5 billion. Feuga recalled that, in discussions with Corzine, Roseman explained that the portion of Euro sovereign debt investments already above the $1 billion limit was "excess," and should therefore be managed as excess. But Feuga stated that Corzine disagreed, and referred to the excess investment simply as a new limit. On this point, Feuga noted, "If you move the limit and at the same time you move the exposure, *there is no limit*, which is clearly the way Corzine behaved. *He was a guy with no limits*."

183.   Indeed, the new $1.5 billion limit was still not high enough for Corzine. While discussions about risk management were ongoing, he had already built positions in Euro sovereign debt up to approximately $2 billion. Again, Corzine asked Roseman to increase the overall limit *only after the fact*.

184.    Up until mid-September 2010, MF Global's Euro sovereign debt investments were conducted only through on-balance sheet transactions. But according to Roseman's testimony before the Financial Services Subcommittee on February 2, 2012, by mid-September 2010, Corzine was strategizing to add significantly to these positions through off-balance sheet RTM transactions. This worried Roseman even more.

185.    According to Roseman's Congressional testimony, he "indicated to Mr. Corzine that [they] would need to consult the Board for approval for increased sovereign limits given the increasing materiality of the risks as they related to the Board's approved risk appetite." Roseman further testified that the "decision was made to consult with the Board to discuss the strategy, the risks, and the sovereign limits, and subsequently sovereign limits were presented to, and approved by, the Board."

186.    By late October 2010, Roseman recalled that "the positions were approaching $3.5 to $4.0 billion." Around this same time, Roseman "was asked to present another request to the Board on behalf of Executive Management to increase the total sovereign limit to $4.75 billion." Roseman testified on February 2, 2012 before the Financial Services Subcommittee on this point as follows:

> At this point, not only was I concerned with the capital risk, but given the size, I was now concerned with the liquidity risk relative to the risk appetite and taking into account the liquidity risks presented by other positions held by the company. I discussed my concerns about the positions and the risk scenarios with Mr. Corzine and others. However, the risk scenarios I presented were challenged as being implausible.

187.    Consequently, at a November 2010 MF Global Board meeting, Roseman presented Corzine's new $4.75 billion Euro sovereign debt limit request. He also presented a "detailed analysis of the potential liquidity risk stress scenarios." These scenarios "included potential variation margin requirements from price changes of the securities," and "potential

initial margin calls from the repo counterparties." Roseman also provided "an analysis on the CDS market, and highlighted the significant capital risk given the sovereign default risk associated with the unresolved financial issues in Europe." Nevertheless, over Roseman's concerns and recommendation, the Board approved Corzine's $4.75 billion request.

188.    After the November 2010 Board meeting, Roseman continued to warn the Board of the increasing capital, liquidity and concentration risks associated with the Corzine Trade. Feuga stated that Roseman did everything he could to stop Corzine from further increasing risk exposure to Euro sovereign debt, but that "Corzine refused to listen to any advice given to him from the risk department," noting that "[y]ou can have the best seatbelt on a car but if you don't put your seatbelt on, it won't help you in a crash."

189.    Before Roseman had another chance to advise the Board of the mounting risks in early 2011, he was dismissed from the Company. According to Feuga, "Roseman was clearly forced out because he was not in agreement with the amount of risk that Corzine was taking." John Brady, a Senior Vice President of Interest Rate Products who worked in MF Global's Chicago office from April 2002 through October 2011 – including as Co-Head of MF Global's Chicago office from May 2011 through October 2011 – also confirmed that Roseman was fired because he warned senior management that the Company was taking on too much risk. Brady stated that Roseman "said these bets were too dangerous," so "Corzine or someone at Corzine's level" fired him. The SIPA Report provides a consistent account of Roseman's termination in January 2011.

190.    Roseman's concerns about the Euro sovereign debt portfolio exceeding previously set risk limits were shared by other employees across the MF Global enterprise, even though those concerns were dismissed as "implausible." As later reported by the December 31

*WSJ* Article, numerous MF Global employees "saw red flags that worried them as Mr. Corzine ramped up risk-taking and tried to return MF Global to profitability."

191.    For instance, Munir Javeri, who was hired in early 2011 as the Company's Global Head of Trading to oversee the new PSG, soon grew concerned that the Corzine Trade had become too important to MF Global's results. The December 31 *WSJ* Article explained:

> A Big Hire Bolts
>
> As Mr. Corzine continued to accumulate the bonds, some people inside MF Global started questioning the trade. Munir Javeri, a former Soros Fund Management official hired in early 2011 to be Mr. Corzine's global head of trading, soon grew concerned that the European bet had become too important to MF Global's results, according to people familiar with the matter.
>
> ***Mr. Javeri had little influence over Mr. Corzine's big trading bet***, even though a former UBS AG interest-rate swaps trader who reported to Mr. Javeri, Lauren Cantor, was tapped by Mr. Corzine to help execute many of the European trades, these people said.
>
> Mr. Javeri soon left the firm to return to a hedge fund, according to people familiar with the matter.

192.    CW 1 – who was employed as a Senior Vice President and the Head of Credit Derivative Trading in MF Global's New York office from November 2009 through October 2011 – further stated that a number of "smart people" within MF Global's risk and trading groups were also "concerned" about the Corzine Trade. CW 1 noted that "[i]t wasn't a big secret" within MF Global that the risk department "was very concerned with the exposures [Corzine] was amassing." There were "maybe 10 people who formally expressed concerns about the size of those [sovereign debt] positions."

193.    In particular, CW 1 stated that Stephen Hood (the Company's Head of Market Risk/Risk Monitoring during the Class Period) and Talha Chaudhry (Chief Risk Officer of the Americas and Global Head of Market Risk during the Class Period), both of whom reported directly first to CRO Roseman and later to CRO Stockman, were among the "concerned"

employees: "I knew [Hood and Chaudhry] were uncomfortable [and] very concerned with the size of the exposures that were built up." CW 1 further stated that, in approximately early 2011, Hood and Chaudhry began requesting information from him in connection with the "credit derivative market." Hood and Chaudhry asked for "spreads and credit curves in reference countries where [Corzine] had put on these RTMs." CW 1 stated that the "frequency and urgency" of these requests "increased throughout the year." He added, "[i]f you subpoenaed emails, you'd see urgency and panic in emails. I knew [Hood and Chaudhry] were concerned about the size of the positions." In addition to information about the size and scope of the Company's Euro sovereign debt positions, Hood and Chaudhry also sought information from CW 1 about the cost of hedging them.

194.    CW 1 further stated that there were "whispers going on internally" about "what [Corzine] was doing." He said, "I think the reality is that if you asked anyone at the firm what [Corzine] could or couldn't do, in terms of trading, [they would say] *he could and was doing just about anything, largely unchecked*." He added, "I don't have any reason to throw [Corzine] under the bus, but that's asinine to be taking risk in all those areas in an unchecked manner," because the "limits are there for a reason." According to CW 1, notwithstanding the Company's established risk procedures, *Corzine was not subject to any real risk management oversight*.

195.    Likewise, CW 2, who worked as an Energy Business Controller in MF Global's New York office from March 2006 through October 2011, said, "[i]f Corzine wanted it, he got it. If he didn't want it, it didn't happen." CW 2 added that he believed the "levels of risk that were being taken were exorbitant" and that "anybody getting an MBA would say, 'what, are you an idiot?' And here was a former Senator and Governor deciding this is what we are doing and this is how we are doing it."

196.    After Roseman's dismissal, on February 3, 2011, MF Global announced that Stockman, who had worked as a senior trader at Goldman Sachs with Corzine, was taking over as CRO. Unlike Roseman, as soon as Stockman joined MF Global, he publicly supported Corzine's risk-based strategy.

197.    For instance, in a *Risk Magazine* interview with Stockman published on March 31, 2011, Stockman said, "[w]e are going to be actively and aggressively seeking to take risks in a broad fashion. ***In our client-facilitating businesses*** – this is no surprise as we build out – I would suggest we are not taking enough risk." Significantly, this article went on to highlight the importance of risk management given MF Global's new strategy. The article stated that "[t]he main challenge will be ensuring the risk management is able to keep up with the expansion plans – but Stockman says this is well understood. 'If there is a relevant risk, we will have a relevant measure and limits around that risk.'"

198.    Notwithstanding Stockman's public statements about the importance of risk limits, Corzine was afforded ever more leeway with Stockman as CRO. As described by CW 1, "Roseman, the most vocal person opposed to what Corzine was doing, was removed from the firm. So you get someone in there [*i.e.*, Stockman] who's more kowtow-ish."

199.    For instance, according to Feuga, Stockman received and complied with a clear mandate from Corzine not to invest in risk management. Feuga explained that, once Stockman became CRO, all risk-related projects were stalled. The stalled projects included a new Company-wide VAR system to enhance technical infrastructure. Feuga, who presented the final VAR system project proposal to Stockman, was particularly amazed that Stockman would not lead the new project since Roseman previously advocated for it. Feuga concluded that Stockman was hired to be a "Chief Yes Officer," not a Chief Risk Officer.

200.    Feuga's account is corroborated by the December 11 *NYT* Article, which reported that, "soon after joining MF Global, Mr. Corzine torpedoed an effort to build a new risk system, a much-needed overhaul, according to former employees." While the December 11 *NYT* Article noted that a "person familiar with Mr. Corzine's thinking said that he saw the need to upgrade, but that the system being proposed was 'unduly expensive' and was focused in part on things the firm didn't trade," Feuga explained that the first phase of the project would have cost just $700,000, with the remaining phases costing only several million dollars over three years. Feuga added that, even if such a VAR system was considered relatively expensive, "if you want to take very large risks, it's the cost of doing business." In short, with Stockman in place, as described by CW 1, Corzine "operated with an immunity" that was "insane."

201.    Indeed, even though the MF Global Board directed in mid-January 2011 that the Company's Euro sovereign debt portfolio should be run down with no additional positions unless Corzine obtained further approval, shortly after Stockman became CRO, *Corzine ignored the Board's mandate*. As described in the SIPA Report, Corzine again breached and exceeded the existing limits on February 3, 2011, *and although the breach was brought to Corzine's attention, he did not inform the Board*.

202.    Thereafter, in mid-February 2011, Corzine had Stockman prepare a request to the Board to increase the Euro sovereign limit from $4.75 billion to $5 billion. The request noted that the liquidity risk associated with the RTM portfolio was the impact of an increase of 100 to 500 basis points in the spreads, a commensurate increase in funding requirements, and the fact that MFGI would have to fund any collateral calls due to the variation margin and the increased haircuts required by counterparties resulting from restructurings, downgrades and liquidity events. As described in the SIPA Report, certain Board members expressed concerns about the

level of exposure and the consequences of increased haircuts, and warned Stockman that he would face "tremendous pressure" to seek higher risk limits to compensate for the Company's declining earnings.

203.    Nonetheless, in March 2011, Stockman again supported Corzine's Euro sovereign debt limit increase request – an aggregate increase from $4.75 billion to $5.0 billion and a temporary increase to $5.8 billion until March 31, 2011. Stockman identified for the Board the market risks that, under certain scenarios of changes in yields and haircuts, could produce additional funding needs of as much as $761 million. Once again, the Board approved the limit increase.[13]

204.    By mid-March 2011, the Company's Euro sovereign debt portfolio had grown to $5.219 billion within the "temporary" limit increase. But with the temporary increase set to expire at the end of March 2011, Corzine told Stockman to prepare another Board request to increase the limit permanently to approximately $5.8 billion. In response, the Board approved the request to extend the "temporary" increase to $5.8 billion until September 2011, at which time the limit was to revert to $5.0 billion.

205.    Within one month, as shown in an April 27, 2011 portfolio report that Stockman provided to Corzine, *these limits were breached again*. According to the SIPA Report, this breach finally prompted Stockman to confront Corzine. After conferring with Corzine on the latest breach, Stockman commented to his colleagues in the Risk Department: "Good news is he is now aware of gross limits, agrees with concept. . . ."

206.    But Corzine did not agree with the concept. Just weeks later on June 5, 2011, at Corzine's direction, Stockman prepared yet another request to the Board to increase the Euro

---

[13] At one point, Corzine even threatened the MF Global Board with his resignation if the Board refused to agree to his request to increase the size of the Euro sovereign debt risk limits.

sovereign limits. This time the request sought an increase from $5.8 billion to as much as $9.75 billion, and added Belgium to the countries that comprised the global limit. To rally support for the approval of this latest limit increase request, Corzine asked Defendant Steenkamp to explain what, if any, impact the Corzine Trade would have on liquidity in the event of a credit rating downgrade. On June 6, 2011, in response to Corzine's question, Steenkamp explained the impact of a credit rating downgrade as follows:

> There would be no impact on RTM's from a ratings downgrade, as the legal analysis of sale is independent of credit rating until maturity. However, there could be an impact on the reverse RTM netting trades as these are to different maturities than the original RTM's. The potential issue is whether some counterparties will choose not to roll over transactions or the trading counterpart can't trade with us due to our rating. If this were to happen, then [MFGI] could lose its netting benefit on these reverses and thus be subject to higher margins, thereby increasing liquidity needs for the BD.

207.    Thereafter, following MF Global's addition of €200 million of Italian bonds in mid-July 2011, Stockman privately told Corzine in a July 30, 2011 email, "I am not currently supportive of buying more sovereigns" because of concerns about MF Global's ability "to comfortably post initial and variation margin in light and heavier stress scenarios."

208.    Accordingly, Corzine was informed of, but disregarded, the negative impacts that the Corzine Trade would have on the Company in the event of a credit rating downgrade given its liquidity risks, but, nonetheless, he continued to increase MF Global's overall exposure to Euro sovereign debt through RTM transactions in repeated breaches of specific Board risk limits. Against this backdrop, it is not surprising that: (1) the SIPA Report concluded that MF Global's Risk Department struggled to keep up with the changes at the Company during the Class Period, in particular in the PSG's new operations; (2) PwC's 2011 non-public audit work-papers "identified the management override of internal controls as a risk to MF Global"; and (3)

Congressman Bachus has stated there is "little doubt" Corzine ran the Company as his "alter ego" and "readily short-circuited" internal controls.

**2. Dozens Of Gaps In Risk Management Are Presented To, But Ignored By, The MF Global Board**

209.    According to the SIPA Report, by the spring of 2010, "dozens of gaps" in internal controls were apparent, identified and reported to the Board. In fact, during the Class Period, the MF Global Board received at least seven presentations and reports identifying critical "gaps" in risk management. These internal, non-public reports directly contradicted the Officer Defendants' public statements about internal controls and risk management throughout the Class Period.

210.    First, in April 2010, the Board received a presentation that, according to the SIPA Report, identified "dozens of gaps in policies, procedures, and technology" in various risk areas. Among the key gaps discussed, the presentation specifically discussed the need to have a "Global Head of Capital and Liquidity Risk" and to establish new policies in this area. As detailed in the SIPA Report, the April 2010 Board presentation also reported that "*gaps in technology made the data needed for forecasting liquidity risks inadequate and unreliable*."

211.    Second, according to the SIPA Report, in May 2010, MF Global's Internal Audit Department ("Internal Audit"), which was charged with being "a professional objective provider of risk, internal control and related advisory services," distributed an Internal Audit report to Corzine, MacDonald and PwC, among others, identifying MF Global's risk policies as "*not congruent with the changes to its broker-dealer business*." According to the SIPA Report, "*Liquidity risk reporting*" was one of the specific gaps identified.

212.    Third, according to the SIPA Report, an October 2010 follow-up report to the April 2010 Board presentation "continued to reflect *many critical or high risk gaps in risk policies*." As set forth below, a subsequent Internal Audit report noted in June 2011:

> *Existing liquidity monitoring and forecasting is manual and limited. Reporting capabilities to evaluate liquidity needs for transactions that are booked but not yet settled have not been fully developed.*

213.    Fourth, also in October 2010, an Internal Audit report on "Market and Credit Risk Management" identified "*High Risk*" areas arising from the lack of controls over risk reporting. The report emphasized that market risk policies had not been updated to reflect MF Global's then-current operating environment. According to the SIPA Report, in 2011, Internal Audit also expressed concern that the absence of reliable liquidity reporting tools and dependence on O'Brien's knowledge of liquidity issues might represent a "key man risk," because the processes supporting the composition of the liquidity forecast were not documented and mainly based on O'Brien's personal experience.

214.    Fifth, an Internal Audit report dated March 31, 2011 reported to Corzine, Steenkamp, PwC and others:

> The Regulatory Reporting group handles numerous daily, weekly and monthly reporting responsibilities. *The vast majority of the calculations underlying these reports are done via spreadsheet.* The group performs various checks and balances to ensure the information utilized is complete and accurate; however, in a variety of instances, *the controls are not in place or not all aspects of these controls are documented as evidence that they have been performed. Additionally, these spreadsheets are typically not secure and are susceptible to human error.* . . .

215.    Sixth, a May 2011 Working Capital Management Summary concluded that, in part because of the foregoing issues, risk limit breaches were systemic throughout the organization such that they were "frequent[]," "common," and "accepted," reporting that:

> Proprietary traders are granted trading limits by the Risk Department. *These limits are soft, however, and frequently breached.* Treasury has no direct line of

information regarding these breaches and there is no penalty for increased capital usage related to these breaches. . . . In certain instances (such as in the case of the Equities Desk), *breaches are common and accepted*. Much of the monitoring of the limits is based on the discretion of Risk, with Risk elevating breaches as they deem necessary to Treasury and/or Mike Stockman, CRO. There is no formal systemic process for elevating breaches [in violation of the Enterprise Risk Policy].

216.   Seventh, as follow-up to the May 2010 Internal Audit report, a June 20, 2011 Global Liquidity and Capital Management Internal Audit report noted "*numerous and significant gaps between the policy and existing practices*." Although, as noted above, the gaps had been escalated to the Board in May 2010, the control issues had still not been resolved. For example, Internal Audit noted that "*[e]xisting liquidity monitoring and forecasting is manual and limited*." The June 2011 Internal Audit report also noted that MF Global relied on "ad hoc tools" and the individual experience of key personnel (like O'Brien) to manage liquidity, but warned that "[t]he complexity of capital and liquidity demands have increased with the addition of principal trading." Yet, according to the SIPA Report, no responsibility was assigned to remediate this issue on the grounds that "*the business accepts this risk*."

217.   Furthermore, MF Global's risk policies tasked MF Global's Treasury Department with overall responsibility for monitoring liquidity, including regulatory compliance, and ensuring that investments and the use of customer segregated accounts complied with CFTC rules. However, as set forth in the SIPA Report, in August 2011 when Vinay Mahajan ("Mahajan") assumed his new position as Global Treasurer (shortly after MF Global completed two separate $325 million debt offerings of the 2018 Notes and 6.25% Senior Notes), he concluded that the Treasury Department "*needed lots of help*" and that its infrastructure "needed a 180." Nevertheless, Mahajan further reported that, by the time he was hired, it was "*too late*" to fix the Treasury Department because the focus had already shifted to "maximizing liquidity."

218.   As stated in the SIPA Report:

Notwithstanding the increased demands on global money management and liquidity, the [Company's] Treasury Department, which was involved in implementing the transfers of funds, did not expand or modernize. Likewise, the technology for recording and tracking transactions and liquidity did not materially change. These critical functions remained essentially as they had been prior to Mr. Corzine's arrival, with the [Company] often tracking liquidity and ability to transfer funds by informal means that were derived from a number of different reports, both computerized and oral.

\* \* \*

The underlying liquidity problems at MF Global . . . did not commence in the fall of 2011. Rather, liquidity had been a cause for concern before and throughout Mr. Corzine's tenure at MF Global, *yet systems and tools that would enable accurate real time monitoring of liquidity were never implemented*.

\* \* \*

The resulting gaps in record-keeping, combined with the fragmented chain of reporting and staff turnover within Treasury, Treasury Operations, and Finance described above, *contributed to the chain of events that led to the shortfall of customer property*.

\* \* \*

Had customer funds been properly protected, the customer property in Customer Accounts should have been largely if not completely unaffected by the liquidity crisis at MF Global.

219.     Similarly, the U.S. Treasury Department's OFR – which was established by the Dodd-Frank Wall Street Reform Act – reported on the "Lessons Learned From The Collapse of MF Global" in its 2012 Annual Report. The OFR's findings included:

*Compliance and Corporate Governance*. Following its failure, MF Global was unable to account for over $1.6 billion in customer funds amid allegations that the firm used customer assets to cover its losses. *The apparent failure to properly segregate customer funds followed a pattern of lapses in compliance and governance*.

According to Congressional testimony, as the firm raised its limits on European sovereign debt exposure from $1 billion to $4.75 billion between September 2010 and January 2011, the chief risk officer (CRO) voiced concerns to the chief executive and the board of directors. His concerns went unheeded and he was replaced by a new CRO in January 2011 (Roseman, 2012a). The position was effectively demoted, as the new CRO reported to the chief operating officer rather

than to the chief executive officer, and projects to enhance risk management were shelved (Stockman, 2012). *All of this should have been a red flag, signaling a culture in which the CRO position was not sufficiently independent and empowered to restrain decisions by senior management that put the firm at risk.*

\* \* \*

Taken together, these and related incidents indicate an environment with a weak culture of compliance and risk management. *A firm with better internal controls and governance could have avoided MF Global's fate and protected customer assets. Better management is a necessary element of proper risk control.*

\* \* \*

Different investors can reasonably have different views on whether to buy particular assets, in this case European bonds. *But sound risk management requires anticipating the liquidity needed to sustain an investment strategy and avoiding excessive and opaque leverage.* MF Global was ultimately undone by poor liquidity management of a concentrated bet on European sovereign debt.

220.    Most recently, in testifying before Congress on August 1, 2012, the SIPA Trustee stated that MF Global's internal controls "*were obviously ineffective or ignored,*" and that the 275-page SIPA Report "*makes clear our conclusion that there was knowledge that segregated funds were being improperly moved.*" The SIPA Trustee further testified: "*I think the preponderance of the evidence indicates that management – senior management at MF Global was aware of the liquidity crisis and was aware that customer funds, toward the end were – were being utilized to cover other costs in the firm.*"[14]

221.    Notwithstanding the (non-public) internal Board presentations and Internal Audit reports described above identifying significant gaps in risk management throughout the Class Period, Corzine and the other Officer Defendants continued to tout publicly MF Global's purportedly tightened risk management and internal controls, and did so, even as late as September 2011, just one month before MF Global collapsed.

---

[14] The Officer Defendants' awareness of the use of intraday transfers from the Company's FCM operations (including customer funds) to cover liquidity demands at non-FCM operations is detailed below in Sections IV.G.-H.

### F.   Belated, Inadequate Disclosures About The Corzine Trade Prompt Regulatory Inquiries That Help Shut Down The Corzine Trade

222.    In late 2010, Defendant PwC, asked MF Global to publicly disclose its off-balance sheet exposure to Euro sovereign debt through RTM transactions. According to the December 11 *NYT* Article, in response to PwC's request, Corzine personally met with PwC in December 2010 to discuss this issue. Corzine and PwC agreed that the transactions would be mentioned in the Company's next annual report.

223.    Five months later, on May 20, 2011, MF Global filed the 2011 Form 10-K. The 2011 Form 10-K stated that MF Global maintained exposure to the sovereign debt of Portugal, Ireland, Italy, Spain and Belgium. The Company disclosed in a footnote that, at March 31, 2011, "securities . . . sold under agreements to repurchase of $14,520,341[,000] at contract value, were de-recognized, of which 52.6% were collateralized with European sovereign debt." The Company also reported that approximately $1.5 billion of the securities purchased under agreements to resell were de-recognized.

#### 1.   The FINRA And FSA Investigations

224.    FINRA was both concerned and surprised by the footnote disclosure in the 2011 Form 10-K. According to the December 15, 2011 testimony of FINRA CEO Richard Ketchum before the Financial Services Subcommittee, MF Global had previously told FINRA in late September 2010 – in response to an informal survey – that it did *not* have any exposure to Euro sovereign debt. However, as FINRA (and the investing public) later learned, MF Global had in fact already started to build the Corzine Trade before responding to FINRA's survey.

225.    Ketchum further testified that, "[w]hile the [Company's] response was consistent with GAAP accounting rules that [RTM] transactions are treated as a sale for accounting purposes, *the lack of a complete response* delayed [FINRA] in detecting the [Company's]

exposure." Ketchum added that FINRA therefore did not know about MF Global's Euro sovereign debt RTM transactions until FINRA raised questions on May 31, 2011 about the footnote in the 2011 Form 10-K, by which time the Company's exposure had already reached massive proportions. Indeed, the footnote disclosure in the 2011 Form 10-K troubled FINRA because, as explained by Ketchum, even though RTM transactions are treated as sales under GAAP, thereby removing them from the Company's balance sheet, MF Global still "remained subject to market and credit risk throughout the life of the repo."

226.    On this point, before the Financial Services Subcommittee on March 28, 2012, FASB's Technical Director, Susan Cosper, testified as follows:

> [W]hether the transaction is a repo or a repo to maturity, companies are required under GAAP to make extensive disclosures about assets that have been transferred, including both quantitative and qualitative information about the transferor's continuing involvement, the risk that the transferor continues to be exposed to, *including credit and liquidity risk*, the amount to be recognized and gains or losses on transferred assets.

227.    Consequently, in June 2011, just days after the 2011 Form 10-K was filed, FINRA and the CBOE began to hold discussions with MF Global's senior executives about the proper capital treatment for Euro sovereign debt RTM transactions. According to Ketchum's Congressional testimony, FINRA asserted in those discussions that "not enough capital was reserved against the RTM." Ketchum further testified that, "[w]hile the SEC has issued guidance clarifying that RTM transactions collateralized by U.S. Treasury debt do not require capital to be reserved, there is *no* such relief for RTMs collateralized by debt of non-U.S. governments."

228.    Consistent with Ketchum's account, in his December 15, 2011 Congressional testimony, Corzine stated that he discussed the Company's Euro sovereign debt RTM transactions with officials from the SEC, CFTC, FINRA and perhaps other regulators at a meeting at MF Global's offices on or about June 14, 2011. Corzine further testified that he

recalled becoming aware by approximately the first week of August 2011 that FINRA officials were considering whether to require MF Global to modify the Corzine Trade's capital treatment under SEC Rule 15c3-1, which is commonly referred to as the "Net Capital Rule."

229.   In his testimony before the Financial Services Subcommittee on December 15, 2011, Ketchum explained the Net Capital Rule as follows:

> The primary purpose of the SEC's net capital rule, 15c3-1, is to protect customers and creditors of a registered broker-dealer from monetary losses and delays that can occur if that broker-dealer fails. It requires firms to maintain sufficient liquid assets to satisfy customer and creditor claims. . . . The net capital rule is intended to provide an extra buffer of protection, beyond rules requiring segregation of customer funds, so that if a firm cannot continue business and needs to liquidate, resources will be available for them to do so.

230.   Accordingly, while recording RTM transactions as "sales" was consistent with GAAP, FINRA concluded that, to comply with the Net Capital Rule, the value of those assets would have to be discounted for risk – or subject to "haircuts" – because the Euro sovereign debt RTM transactions were more analogous to long positions in sovereign debt, which are treated as non-convertible debt (that have a risk charge), than they are to RTM transactions involving U.S. Treasuries (that do not have a risk charge).

231.   Consequently, FINRA asked MF Global to provide a "Proposed Default Risk Charge" on the collateral supporting the Corzine Trade. In response, MF Global employees Mike Bolan (another MFGI Assistant Controller, like O'Brien) and Matthew Hughey (Head of MF Global's Financial Regulatory Group) assembled and circulated for internal consideration five possible computations for the Proposed Default Risk Charge, ranging from $7.6 million to $98.2 million. On August 11, 2011, MF Global sent a memo to FINRA setting forth a Proposed Default Risk Charge of $55.8 million, which was within the range calculated by Bolan and Hughey. This memo to FINRA also reiterated MF Global's objection to any such charge.

232.     Thereafter, anticipating that FINRA would assess a capital charge that would impact the Company's August 2011 net capital requirements, internal discussions about transferring the Corzine Trade to Special Investor, FINCO, MFG-UK or another third party gained traction. However, as explained in the SIPA Report, none of the transfer options were suitable because each involved posting additional capital, recognizing substantial immediate economic losses or overcoming regulatory opposition.

233.     Rather than promptly reserving this additional capital, however, MF Global initially resisted FINRA's pressure and commenced a lobbying effort. MF Global executives held more than a dozen meetings and calls with regulators, including an in-person appeal by Corzine to the SEC. On or about August 15, 2011, according to his subsequent testimony before Congress, Corzine met with an SEC official to question FINRA's interpretation of the Net Capital Rule. But the SEC sided with FINRA despite Corzine's pleas. Within days of Corzine's August 15 meeting, the SEC told MF Global that it had to reserve the requisite capital and, as a result, MF Global was forced to set aside $60 million of additional capital.

234.     Around this same time in mid-August 2011, the FSA began to express heightened concern about MFG-UK's role in the Corzine Trade and ordered MFG-UK to provide a contingency plan for liquidity stress. In response to the FSA's mandate, MF Global personnel acknowledged in internal communications cited in the SIPA Report that, if MFG-UK faced a $900 million margin call on Euro sovereign debt RTM positions, "*there is no way we could support [it]*." Despite this internal recognition, MFG-UK represented to the FSA that it had "sufficient intraday liquidity" to meet a stressed liquidity need of $841 million without disrupting its business.

235.    Back in the U.S., on August 24, 2011, FINRA informed MF Global that, by the close of business the next day, MF Global was required to take a charge of approximately $257 million on all of its Euro sovereign debt RTM transactions as "securities owned haircuts." In preparation for the impact of this capital charge on its August 2011 FOCUS report,[15] the Company took steps to increase excess net capital by $183 million to $287 million. But a few days later, FINRA advised that, rather than applying new capital charges only prospectively, MF Global would also be required to *restate* its July 2011 FOCUS report to retrospectively reflect the modified capital treatment. The retrospective application of the capital charge to the July FOCUS report resulted in a regulatory net capital deficiency of $150.6 million as of July 31, 2011 (as compared to the previously reported excess of $104.3 million).

236.    On August 31, 2011, MF Global filed an amended July FOCUS Report to disclose its $150.6 million regulatory capital deficiency. Pursuant to SEC Rule 17a-11 and CFTC Rule 1.12, the Company also notified the SEC, CBOE and FINRA of its capital deficiency. Thereafter, FINRA placed MF Global on "alert reporting," a heightened monitoring regime under which FINRA requires firms to provide weekly information on net capital, inventory and P&L and reserve formula computations.

237.    On September 1, 2011, the Company amended its previously filed Q1'12 Form 10-Q to identify the change in the Corzine Trade's net capital treatment (the "Q1'12 Form 10-Q/A"). The Q1'12 Form 10-Q/A stated in part:

> The Company was recently informed by [FINRA] that its regulated U.S. operating subsidiary, MF Global Inc., is required to modify its capital treatment of

---

[15] "FOCUS" is the acronym for a "Financial and Operational Combined Uniform Single" report. FINRA member firms are required to submit periodic FOCUS reports to FINRA under SEC Rule 17a-5. A FOCUS report consists of a balance sheet, income statement, statement of changes in ownership equity and a complete Net Capital Rule calculation. FINRA staff reviews a FOCUS report to monitor a broker-dealer's financial trends and to determine if a firm has maintained Net Capital Rule compliance. FOCUS reports are submitted quarterly or monthly, depending on the broker-dealer.

certain repurchase transactions to maturity collateralized with European sovereign debt and thus increase its required net capital pursuant to SEC Rule 15c3-1. MF Global Inc. has increased its net capital and currently has net capital sufficient to exceed both the required minimum level and FINRA's early-warning notification level. *The Company does not believe that the increase in net capital will have a material adverse impact on its business, liquidity or strategic plans*. In addition, the Company expects that its regulatory capital requirements will continue to decrease as the portfolio of these investments matures, which currently has a weighted average maturity of April 2012 and a final maturity of December 2012.

238.    Significantly, as described in the June 4, 2012 First Report of Chapter 11 Trustee Louis J. Freeh, which is based on "a review of internal documents, interviews with current and former employees, and discussions with third parties with knowledge of the situation" (the "Freeh Report"), the above-quoted disclosure in the Q1'12 Form 10-Q/A did not disclose that MF Global was only able to meet its new capital requirements by engaging in inter-company transfers. Specifically, in late August 2011, MF Global entered into what the Freeh Report calls "'back-to-back' reverse RTM" transactions with FINCO. These reverse RTM transactions effectively made FINCO the beneficial holder of €2.925 billion of Italian bonds, and allowed MF Global to transfer the economic risks from one of its regulated entities – MFGI – to one of its unregulated entities – FINCO – thereby reducing its regulatory capital requirements.

239.    But even with MF Global's representation in the Q1'12 Form 10-Q/A that it was able to meet and exceed its regulatory capital requirements, the FINRA ruling still had a devastating (but undisclosed) impact on the Company's already-existing liquidity problems (with the Company relying upon intraday transfers from its FCM, including at times *customer funds*, to meet increasing liquidity demands, which are further detailed below in Sections IV.G.-H.).

240.    As described by Corzine in his December 15, 2011 testimony before the Financial Services Subcommittee:

On October 17, 2011, *The Wall Street Journal* published an article that described the FINRA ruling that MF Global had disclosed on September 1. Other news

stories followed and some of MF Global's counterparties decided to reduce their exposure to the company, requiring some adjustment in our financing.

241.    In fact, following FINRA's ruling, other regulators and exchanges also increased their focus on MF Global's financial condition, including the following adverse developments: (1) excess margin for Company house accounts was no longer automatically returned, and margin requirements were otherwise increased; (2) the Depository Trust & Clearing Corporation ("DTCC") imposed a margin premium of 25% for ninety days; (3) FINRA limited MF Global's underwriting activities to "Best Efforts"-based transactions only, and instructed MF Global that it could not conduct any "Firm Commitment" underwritings until the perceived risk of the Euro sovereign debt collateralizing the RTM portfolio was sufficiently reduced; (4) on September 9, 2011, a representative from the Office of the Comptroller of the Currency ("OCC") asked MF Global to explain why it failed to provide the OCC with an "Early Warning Notice" about FINRA's decision to increase its net capital requirement; and (5) the New York Federal Reserve Bank raised questions about FINRA's net capital decision, the RTM positions and the Company's net capital requirement.

242.    Meanwhile, in the U.K., on September 23, 2011, MFG-UK executives met with FSA officials because, according to the SIPA Report, the FSA was still "uncomfortable with [MFG-UK's] liquidity position and . . . [its] intraday liquidity position." As noted in the SIPA Report, a key topic of discussion between the FSA and MFG-UK was the possibility of an intraday margin call from the LCH, and what would happen if MFGI failed to fund MFG-UK to meet such a margin call.

243.    Notwithstanding the chain of additional adverse events set in motion by the filing of the Q1'12 Form 10-Q/A, the disclosure therein was still materially inadequate. According to

Abelow's October 31, 2011 declaration in the U.S. Bankruptcy Court for the Southern District of New York:

> Dissatisfied with the September announcement of [MF Global's and MFGI's] position in European sovereign debt, FINRA demanded that [MF Global] announce that [MFGI] held a long position of $6.3 billion in a short-duration European sovereign portfolio financed to maturity, including Belgium, Italy, Spain, Portugal and Ireland. MF [Global] made such announcement on October 25, 2011. . . . These concerns ultimately led last week to downgrades by various ratings agencies of MF Global's ratings to "junk" status. This sparked an increase in margin calls against MFGI, threatening overall liquidity.

244. Accordingly, as set forth below in greater detail, none of MF Global's pre-October 25, 2011 disclosures was sufficient to fully inform the investing public about the substantial risks associated with the Corzine Trade, including that those risks were assumed on a purely proprietary (rather than customer-driven) basis. Moreover, once regulators required MF Global to reserve additional capital against the Corzine Trade and liquidity demands from the Corzine Trade continued to increase, the Company no longer had the ability to continue with its Euro sovereign debt RTM trading strategy, and the Company's massive DTA valuation allowance and ratings downgrades followed.

## 2. The SEC Comment Letters

245. While FINRA was pushing MF Global to disclose material information associated with the Corzine Trade, the SEC was also informally investigating MF Global's related disclosures.

246. On March 16, 2011, the SEC's Division of Corporation Finance sent a comment letter to Defendant MacDonald concerning the 2010 Form 10-K (the "First Comment Letter"). The First Comment Letter addressed the 2010 Form 10-K's footnote 2, headed "Summary Of Significant Accounting Policies, Securities Purchased Under Agreements To Resell And Securities Sold Under Agreements To Repurchase." The First Comment Letter asked MF Global

to justify its accounting for RTM transactions as "sales" and also asked MF Global to describe the reasons for structuring repo agreements as sales rather than as collateralized financings.

247.     On March 30, 2011, Defendant Steenkamp sent a letter to the SEC in response to the First Comment Letter (the "First Response"). The First Response addressed the terms that resulted in RTM transactions qualifying as sales rather than collateralized financings and explained that the "rationale for structuring repurchase agreements as off-balance sheet sales is to take advantage of opportunities in the market and lock in the return on a transaction for the duration of the security," and also to take advantage of "arbitrage opportunities."

248.     The First Comment Letter also asked MF Global to explain the extent to which the RTM transactions qualifying for off-balance sheet sales accounting were concentrated with certain counterparties or within certain countries. In the First Response, MF Global stated that "*[t]he underlying collateral for these repo-to-maturity agreements was U.S. Treasury securities, and as such we had concentration risk with the U.S. as an issuer, which we did not consider a significant exposure*." Accordingly, MF Global's First Response addressed only RTM transactions collateralized by U.S. Treasuries disclosed in the 2010 Form 10-K. The First Response therefore did not address the Corzine Trade.

249.     Dissatisfied with the Company's First Response, the SEC continued to investigate. On May 26, 2011, just six days after the 2011 Form 10-K (for the fiscal year ended March 31, 2011) was filed, the SEC's Division of Corporation Finance sent a second comment letter to Defendant MacDonald (the "Second Comment Letter"). The Second Comment Letter also concerned RTM transactions, but this time the SEC asked questions about the 2011 Form 10-K, not the 2010 Form 10-K. The Second Comment Letter specifically sought a more "robust explanation" of the "significant variations" between the average levels of MF Global's repos and

the amounts outstanding at each quarter end. The Second Comment Letter also asked for an example of future disclosure on this issue.[16]

250.    On June 10, 2011, Defendant Steenkamp responded to the SEC's May 2011 comment letter (the "Second Response"). MF Global's Second Response devoted one paragraph to repo transactions accounted for as collateralized financings (which consistently decreased near quarter-end), and another paragraph to off-balance sheet – referred to as "de-recognized" – RTM transactions (which, unreported to investors, consistently increased near quarter-end). With respect to off-balance sheet RTM transactions, the Second Response stated:

> As of March 31, 2011, the ending balance of our repurchase agreements qualifying for sales accounting was $14.5 billion, which was 28% higher than the quarterly average balance of repurchase agreements qualifying for sales accounting of $11.3 billion. This difference is principally attributable to our increased trading in repurchase agreements qualifying for sales accounting with respect to opportunities available in the European fixed income market. Credit uncertainty in the Sovereign debt markets increased the interest spread between the cash and repurchase market. During fiscal 2011, this created arbitrage opportunities in interest spreads, which increased the balances of our repurchase agreements qualifying for sales accounting.

251.    Shortly after the Second Comment Letter, and with Corzine still continuing to add to MF Global's Euro sovereign debt RTM portfolio in July 2011 – including €200 million of Italian bonds acquired in mid-July 2011 – even Stockman stopped supporting Corzine. In a July 30, 2011 email cited in the SIPA Report (and noted in ¶ 207 above), Stockman told Corzine, "I am not currently supportive of buying more sovereigns" because of concerns about MF Global's ability "to comfortably post initial and variation margin in light and heavier stress scenarios."

252.    As a result, MF Global's July Euro sovereign RTM-generated revenues plummeted by *approximately 97%*, to $1.1 million from over $39.6 million in June 2011.

---

[16] As discussed above in ¶ 176, MF Global's increased use of RTM transactions near the end of a quarter to boost reported quarterly revenue is known as "window dressing."

Shortly thereafter, in August 2011, according to Stockman's Congressional testimony, MF Global stopped adding to its long position in Euro sovereign debt and allowed its existing positions to roll off as the underlying securities matured. Because the stream of revenues from the Corzine Trade suddenly stopped flowing and therefore MF Global needed to record a massive DTA valuation allowance, MF Global could no longer avoid a credit ratings downgrade. The DTA valuation allowance, credit rating agency downgrades and expected "run on the bank" all followed, and the Individual Defendants began planning for catastrophe.

253.     For instance, according to the December 31 *WSJ* Article, MF Global's management circulated a memo to employees in September 2011 with suggestions on ways to be frugal, including a directive to print on both sides of sheets of paper. Earlier that same month, as set forth above in ¶¶ 139-40, the MF Global Board requested the Break-the-Glass-Document to plan for a "storm" of various stress scenarios following a negative market reaction to the Company's upcoming financial report. On October 13, 2011, the Break-the-Glass-Document was presented to the Board. As set forth therein, a credit rating downgrade was expected to cause "significant disruption" to the Company's ability to finance daily operations. The circumstances that triggered MF Global's collapse were thus fully anticipated by the Individual Defendants.

### G.     MF Global's Liquidity Crisis Is Masked By Intraday (And Overnight) Transfers, Including Unlawful Transfers From Customer Accounts

254.     While the liquidity crisis that led to MF Global's demise reached its fatal climax during the Company's last week of operations, MF Global had actually been suffering a severe liquidity crisis for quite some time. The risks from the Company's lack of liquidity were evident to insiders but masked – at the direction of MF Global's senior executives – by intraday transfers and the unlawful use of segregated customer funds.

### 1. Background On Segregated Customer Accounts And The Use Of Intraday Transfers At MF Global

255.    FCMs like MFGI are required to segregate and protect customer cash and may not use customer cash for their own purposes. But FCMs are permitted to, and in the ordinary course do, deposit non-customer funds into segregated customer accounts; and FCMs may use those funds for their own purposes under certain circumstances.

256.    As described in the SIPA Report, MF Global executives referred to Company funds kept in customer accounts as "Firm Invested in Excess." This Firm Invested in Excess amount acted as a cushion to prevent shortfalls in customer funds owing to changing margin requirements resulting from daily market movements. The benefit of having such Company funds as a cushion are achieved, however, only when funds removed from those accounts for proprietary use are limited to the Firm Invested in Excess, *i.e.*, the amount above the level needed to satisfy customer obligations on a net basis.

257.    The regulations for segregated customer accounts require a daily accounting of the net liquidation value of all *domestic* customer funds using the "Net Liquidating Method."[17] CFTC regulations during the Class Period, however, did not require that all customer funds necessarily be maintained on a dollar-by-dollar basis in *foreign* secured accounts. Unlike domestic segregated customer accounts, CFTC regulations during the Class Period allowed an "Alternative Method" of calculating whether foreign secured accounts were in regulatory compliance – even though less than all customer funds deposited for trading on foreign exchanges might actually be deposited in foreign secured accounts.[18] According to the SIPA

---

[17] The Net Liquidating Method is calculated from the sum of the net liquidating value of customer accounts plus any customer securities held. *See* Foreign Futures and Options Guide, The Joint Audit Committee, Dec. 2001, at 5-5.

[18] The Alternative Method is the sum of an account's risk maintenance margin requirement, open trade equity, securities and net options value. *See* 17 C.F.R. § 1.3(rr); Foreign Futures and Options Guide, The Joint Audit Committee, Dec. 2001, at 5-6.

Report, MFGI used this Alternative Method to calculate "Regulatory Excess" funds, or customer funds purportedly in excess of those required to be segregated. The SIPA Trustee has reported that using the Alternative Method, as compared to the Net Liquidating Method, resulted in a significantly lower amount of customer funds being secured – "*and contributed significantly to the eventual shortfall in customer funds*."[19]

258.   According to the SIPA Report, because the CFTC required these calculations to be performed "as of the close of business each day," there were differing views as to whether segregated customer funds had to be "locked up" for the benefit of customers on an *intraday* basis. Ultimately, MF Global's most senior executives considered Regulatory Excess funds an appropriate source for intraday transfers to fund proprietary activities, even though others were of the (correct) view that Regulatory Excess funds had to be "locked up" for the benefit of the Company's customers, even on an intraday basis.[20] The SIPA Report confirms that Regulatory Excess funds were used for intraday funding of the Company's non-FCM business (and Firm Invested in Excess funds at the FCM were used both for intraday and overnight funding of the non-FCM business).

259.   As set forth above, Corzine's efforts to make MF Global profitable by seeking to transform it into an investment bank led to dramatically increased liquidity needs as a result of increased proprietary trading, including Euro sovereign debt RTM trading. The then-existing available sources of non-customer funds included: (1) a $1.2 billion unsecured revolving credit facility with a bank syndicate, for which J.P. Morgan Chase ("JPMC") – which had multiple business relationships with MF Global, including clearing bank, custodian for segregated

---

[19] Following MF Global's collapse, on July 13, 2012, the CFTC prohibited FCMs from using the Alternative Method to calculate Regulatory Excess funds.

[20] According to the August 1, 2012 Congressional testimony of CFTC Chairman Gary Gensler, CFTC rules forbid even intraday transfers of FCM customer funds.

customer funds – was agent; (2) a $300 million secured revolving credit facility with a bank syndicate, for which JPMC was agent; (3) other sources of proprietary funds, such as debt offering proceeds; and (4) Company funds in the domestic segregated customer and foreign secured accounts, *i.e.*, Firm Invested in Excess amounts. As MF Global faced increasing pressures to generate liquidity while simultaneously experiencing a decrease in available counterparty financing, Defendants Corzine and Steenkamp increasingly looked to Regulatory Excess funds – which included customer funds – as an additional source of liquidity for its non-FCM operations, although they were advised that Regulatory Excess (or customer) funds could not be used overnight by the Company.

260.    As detailed in the SIPA Report, for at least one year before MF Global's bankruptcy – approximately the same time as the Corzine Trade was launched in the fall of 2010 – the Company's FCM operations, which operated out of Chicago, provided intraday "loans" or transfers to the Company's non-FCM operations in New York. These intraday transfers were usually in the range of $50-100 million and were typically repaid the same day, but sometimes remained outstanding overnight or longer. There were no terms or interest, but simply an expectation that the funds would be returned.

261.    When requests for intraday transfers were made from MF Global's non-FCM operations in New York to the Company's Treasury department in Chicago, O'Brien – or personnel reporting to her, including Jason Chenoweth and Joseph Cranston – would approve the transfers and then direct from which account to send them. Critically, according to the SIPA Report, despite the fact that MFGI operated in a world of fast-paced electronic transactions, the tracking of the intraday "loans" and corresponding repayments was done manually on spreadsheets and journal entries – and was not performed consistently. In addition, the members

of MF Global's Financial Regulatory Group, who were responsible for tracking regulatory balances and preparing regulatory reports, were not involved at all in the intraday transfer approval process.

262.    Moreover, while the Company's Treasury department in Chicago was responsible for funding the liquidity of the non-FCM business in New York, there was limited communication about the basis for intraday funding requests or the intended or actual use of those funds. As described in the SIPA Report, employees in MF Global's Treasury department grew increasingly frustrated that MF Global's FCM business was being used to fund its non-FCM business, and were particularly concerned that there was no transparency as to where the funds were going. Indeed, as further detailed below, documents cited in the SIPA Report reflect that O'Brien and MFGI's CFO, Christine Serwinski ("Serwinski"), were acutely aware of and concerned about regulatory compliance issues concerning customer funds. To wit, an October 26, 2011 email from O'Brien cited in the SIPA Report states: "We cannot afford a SEG issue." Another email cited in the SIPA Report sent by Serwinski on October 27, 2011 states: "I am concerned that the fcm lent the bd 200mil. Is that correct and that the firm deficit in excess is *neg 300+ mil*?"

### 2.    MF Global's Most Senior Executives Use Inter-Company Transfers To Meet Increasing Daily Liquidity Needs

263.    In July 2011, as detailed in the SIPA Report, Defendant Steenkamp asked Serwinski to review trends in customer accounts to consider whether $250 million in Regulatory Excess (or customer) funds could be "loaned" overnight on a more regular basis from FCM to non-FCM operations. This proposal was a dramatic change from the Company's then-current practice, which was limited to using Company funds (or Firm Invested in Excess amounts at the FCM) for overnight funding. On July 19, 2011, Serwinski wrote an email that is cited in the

SIPA Report, stating: "It did not sound like they were just looking for the firm invested amount in excess but more such that the *customers funds* not required from a secured regulatory computation would be tapped into."

264.    In response to Steenkamp's request, Serwinski undertook a trend analysis and reviewed the balances in domestic segregated customer accounts and foreign secured accounts from July 1, 2010 to July 18, 2011. The results showed that Regulatory Excess funds in the domestic customer accounts ranged from a low of approximately $20 million to a high of over $700 million, and that Regulatory Excess funds in foreign secured accounts, under the Alternative Method, ranged from a low of over $340 million to a high of over $800 million. When the excess was calculated using the Net Liquidating Method, however, according to the SIPA Report, "the resulting Firm Invested in Excess in the combined accounts was much lower: it ranged from a low of approximately *negative $98 million* on October 11, 2010 to a high of over $600 million on October 13, 2010." When Matthew Hughey, Head of MF Global's Financial Regulatory Group, further reviewed the records for the same one-year period, he concluded that there were actually five days when the Firm Invested in Excess amount was *negative*.

265.    On July 27, 2011, Serwinski forwarded her trend analysis to Steenkamp and others, noting her concerns that "FCM client assets may be put at risk even if for overnight. . . . Utilizing the FCM client asset [base] should not be a BD working capital source strategy to be relied upon." She also asked: "In the event of a financial crisis, are we guaranteed that we could draw down on the RCF [revolving credit facility] to meet the firm liquidity needs and return the FCM *client assets* to meet any requirements in the seg/secured environment?" After reviewing the trend data, Steenkamp responded that they should look to the "lower end of the range" of the

Regulatory Excess – which he identified as $433 million – as the maximum client excess liquidity available to the non-FCM business. According to the SIPA Report, that amount was "vastly greater than the low end or even the average range of Firm Invested in Excess."

266.   In response, Serwinski prepared a written memorandum, dated July 28, 2011, to address management's proposal to tap into Regulatory Excess funds to fund the Company's proprietary trading (the "Serwinski Memo"). The Serwinski Memo concluded that, based on FINRA's interpretations of SEC Rule 15c3-3 (which is commonly referred to as the "Customer Protection Rule"), to the extent customer balances on deposit in domestic and foreign customer accounts were less than the amount required to be secured under the Net Liquidating Method, the difference would have to be included in the lock-up requirement of the Rule 15c3-3 calculation, performed as of the close of business every Friday and at month end. The Serwinski Memo also stated that overnight "loans" needed to be limited to the amount of Firm Invested in Excess; otherwise, if the calculation of Firm Invested in Excess was negative, the deficiency amount would need to be locked up in the Company's 15c3-3 calculation the next time it was required.

267.   On August 3, 2011, Steenkamp advised Serwinski that he had "walked Jon [Corzine] through" the regulatory requirements, and confirmed that they both understood the concept of the lock-up and agreed that the Company had to comply with it. But Corzine still wanted to know how, on a daily basis, MF Global could use: (1) all of the surplus (even if it was only $50 million) to "maximize it through daily liquidity management"; and (2) other securities to fund the lock-up.

### 3.   Inter-Company Transfers Become A "Shell Game"

268.   MF Global employees have reported that, during the summer of 2011, the intraday transfers that had commenced intermittently the year before became a ***daily occurrence***.

In addition to the intraday transfers described above, the SIPA Report details other inter-company transfers from the FCM that were kept overnight or longer.

269.    For example, on July 26, 2011, after O'Brien approved a $100 million overnight transfer from FCM to non-FCM operations, she reported to Mathew Besgen (Senior Vice President in Treasury, with responsibility for short-term funding and investments) and David Dunne (Chair of the Company's Assets and Liability Committee ("ALCO"))[21] that "Christine [Serwinski] was not pleased about the late hour borrow or the size. The borrow is $100mm and the Seg excess is currently $127mm." Serwinski proceeded to ask O'Brien: "What if I say no? What if they needed $150mm and I only gave them $100mm?" O'Brien's response was that "Bob Lyons would need to go to Brad [Abelow] saying they were . . . short and . . . Brad [Abelow] would have to address with Finance." A few days later, on Friday, August 5, 2011, $226 million was transferred from the FCM accounts and only $155 million was returned, leaving a deficit balance of some $71 million owed to the FCM. This deficit remained until October 7, 2011, when it was reduced to $53 million, although it was later increased and never repaid.

270.    In addition, during the period August 1 through October 25, 2011, the FCM made transfers to clearing accounts, some of which remained unpaid overnight or for several days. For example, on October 11, 2011, a $50 million transfer from MF Global's FCM operations was not returned by its non-FCM operations, with the result that the Firm Invested in Excess was *negative* that day.

---

[21] As detailed in the SIPA Report, MF Global's ALCO consisted of MF Global senior personnel from the Finance, Treasury and Risk Departments and various product groups that were charged with "overseeing and influencing the management of capital, liquidity and investment related risks throughout the Company in accordance with the Risk Policy, Risk Appetite Statement, and Delegations of Authority." Among the liquidity responsibilities assigned to the ALCO were: "Overseeing the day-to-day activities related to the management of liquidity throughout the Treasury and related operations within the Company"; and "[c]onsidering the results of liquidity adverse scenarios, drawing conclusions and recommending appropriate action."

271.    Further, while the majority of the intraday transfers from MF Global's FCM went to support proprietary trading activities, FCM funds were also transferred on a weekly basis to fund securities customers' account withdrawals. The SIPA Report describes in detail how securities customer withdrawals were approved by the Company's Margin Department:

> Treasury Operations sent wires to securities customers from the JPM BD Wire Account, but if there were insufficient funds available, Treasury Operations would first transfer funds from the JPM Foreign Secured Trust Account to the JPM BD Wire Account. Treasury Operations was to "bill" Operations in New York via email for the advance funds. Each Tuesday, after the Rule 15c3-3 calculation was performed and excess funds could be released, funds to repay the FCM were supposed to be transferred back to [a] JPM[C] Foreign Secured Trust Account.

272.    Given the flurry of intra-company fund transfers described above, on August 11, 2011, in an email exchange between O'Brien and a Global Treasury employee at MF Global Hong Kong, O'Brien reflected on the Company's liquidity crisis as follows: "Henri [Steenkamp] says to me today . . . 'we have plenty of cash.' I was rendered speechless, and wanted to say *'Really, then why is it I need to spend hours every day shuffling cash and loans from entity to entity?'*" – a process that she described as a "*shell game.*"

### 4.    Liquidity Monitoring During The Class Period

273.    As referenced above, MF Global's Financial Regulatory Group was responsible for preparing the daily domestic customer funds "Segregation Statements," foreign customer funds "Secured Statements" and "Net Capital Reports" that MF Global was required to file with regulators. Before the finalization and filing of these reports, as explained in the SIPA Report, internal versions with additional information not included in the filed versions were widely distributed within the Company on a *daily basis*. These internal versions showed the amount of Firm Invested in Excess and calculations under both the Net Liquidating Method and the Alternative Method. Reports filed with the CFTC, however, showed only the Alternative Method

for the foreign customer funds Secured Statement and not the foreign customer funds under the Net Liquidating Method or MF Global's Firm Invested in Excess.

274.     According to the SIPA Report, these internal Segregation and Secured Statements were sent to MF Global's Treasury and Treasury Operations Departments, as well as the Financial Regulatory Group. Balances in domestic customer segregated and foreign secured accounts and Firm Invested in Excess amounts also were included on the Daily Estimated Net Capital summary that was *circulated daily* to more senior management, including Defendants Corzine and Steenkamp (and others including Abelow, Mahajan, Serwinski and O'Brien).

275.     As described above in Section IV.E.2., MF Global Internal Audit reported that formal processes, reporting, forecasting and monitoring capabilities to manage liquidity and capital globally had not been fully established during the Class Period. Instead, the Company relied on ad hoc tools and individual experience to guide liquidity management. As a result, liquidity reporting was manually performed, with limited forecasting. Indeed, the SIPA Report states that many MF Global employees "had long been requesting the IT department to automate the analysis of liquidity" because the "complexity of liquidity demands increased with the addition of principal trading across the [Company's] customer facing desks, the PSG, and other new business lines." But no such automation or monitoring solution was ever delivered. Instead, a daily (but inexact and unaudited) liquidity report was developed at some point in calendar 2010. This report was called the "Liquidity Dashboard."

276.     Liquidity Dashboards were used at MF Global to estimate daily cash needs and to identify sources and uses of liquidity. According to the SIPA Report, Liquidity Dashboards were shared with senior management, including Corzine and Steenkamp, *daily*. The Liquidity Dashboard showed Corzine and Steenkamp that, during the month of October 2011, and for

some time before, liquidity in MF Global's BD operations was *uniformly negative* before applying funding from other sources -- namely, funding from FCM operations or FINCO.

277.    On August 26, 2011, Mathew Besgen (Senior Vice President in Treasury) reported to the Financial Regulatory Group that he was "being asked on a daily basis to update Jon Corzine on the Daily Seg and Secured Excess and the drivers of the changes day over day." On September 1, 2011, Besgen emailed O'Brien to inquire about a decrease in the Firm Invested in Excess number by $50 million to $69 million, and asking for a "preliminary snapshot" as to what the excess balance may be "so he could project what funds may be available to the BD if they needed to have funds transferred (over and above the funds from FINCO)." On September 16, 2011, O'Brien advised that the FCM had identified a "lower than usual 'seg excess' which is the liquidity figure $25 million versus $70 million average."

278.    As the liquidity stress increased in October, senior MF Global executives became increasingly engaged in monitoring liquidity and remained aware of reliance on FCM funds to help fund other operations. For example, on October 6, 2011, Steenkamp addressed an email to Corzine, stating:

> *Jon . . . we need to address the sustained [liquidity] stress.* In summary, we have three pools of liquidity for Inc. - (1) finco cash which is real and permanent, (2) *FCM excess cash which is temporary and volatile,* [and] depends on how customers post margin, and (3) the situation of our broker-dealer that is currently unable to fund itself, and more worrying continues to need more cash than we have [from] finco, thereby having us dip into FCM excess every day. *This should be temporary but is becoming permanent, and the FCM cash is not reliable. Why is the BD unable to fund itself? Part of it is the permanent pool of liquidity needed for RTM's, but we also see continued haircut increases in fixed income, increased funding needed PSG and box size being permanently large.*[22]

---

[22] According to the SIPA Report, "box size" refers to the amount of securities held in the clearance box at depositories. Because of MF Global's historically weak credit rating as well as the deteriorating quality of certain fixed income securities in its inventory, those securities were harder to finance in the repo market, and so remained in inventory overnight.

279.    Following Corzine's receipt of this email, as described in the SIPA Report, Steenkamp confirmed for Corzine that the dangers of "dip[ping] into the FCM excess every day" were corroborated by the Liquidity Dashboards.

280.    Thereafter, on October 14, 2011, Mathew Besgen wrote to Steenkamp and others that liquidity was so strained that the BD would be relying upon a "$53mm FCM balance" plus $16mm of "FCM buffer," noting that this was the "[f]irst time that the B/D has relied upon the FCM buffer." The SIPA Report states that this "FCM Buffer" consisted of a portion of Regulatory Excess that was previously considered but rejected in late July 2011 as a source of liquidity per the Serwinski Memo. Accordingly, Mahajan advised Steenkamp and Stockman as follows: "[T]he B/D is leaning on FINCO and FCM's cash pool. We now require $16mm of the FCM's buffer as well. This leaves us with $24mm of liquidity, and no buffer for the U.S. going into the weekend."

281.    As of Friday, October 14, 2011, internal statements cited in the SIPA Report showed a Firm Invested in Excess *deficit* of more than $68.4 million. To cover this deficit, Serwinski advised Steenkamp and others that the Rule 15c3-3 computation being prepared as of the close of business that day would need to include a lock-up of approximately $70 million. When the calculation was made, to meet the deficit, the Company used a majority of the buffer in the Rule 15c3-3 account and locked up an additional $28 million. MF Global then did a "special" Rule 15c3-3 calculation on Tuesday, October 18, 2011 (instead of waiting to perform the calculation as of the close of business on Friday, October 21, 2011), which resulted in a decreased reserve requirement and allowed funds to be released from the account.

282.    In addition, as described in the SIPA Report, Mahajan also communicated on October 14, 2011 that "*Jon [Corzine] wants to know the details of the cash movements between*

*yesterday and today*." In response, O'Brien explained that "[i]t is critical to note that FCM liquidity is driven from the Daily Segregation calculation, not cash movements." Three days later, on October 17, 2011, Mahajan wrote to Defendant MacDonald with a copy to Defendant Steenkamp stating, "Henri [Steenkamp] gets it. He has talked to both Jon [Corzine] and Brad [Abelow] telling them that we cannot rely on FCM cash to meet our daily operational needs."

283.    Nevertheless, MF Global continued to do so.

284.    As described in the SIPA Report, when the Daily Estimated Net Capital summary as of the close of business on October 26 was shared with Corzine, Steenkamp and others, it showed Firm Invested in Excess of *negative $341 million* and excess segregated funds of $116 million. The Company had failed, however, to deduct $415 million of outgoing wires from the customer segregated assets, thus overstating the customer balances that day by $415 million. When that difference is taken into account, there was a *deficiency* of segregated customer funds in the amount of $299 million on October 26, 2011. This deficiency continued and increased throughout the week.

285.    On October 31, 2011, the date MF Global filed for bankruptcy, the deficit in the customer segregated accounts was shown to be more than *$589 million*.

**H.    The Truth Begins To Emerge In MF Global's Frenetic Final Days**

**1.    October 17, 2011-October 27, 2011**

286.    During the week of October 17, 2011, according to the March 28, 2012 testimony of MFGI's CFO Serwinski before the Financial Services Subcommittee, MF Global senior management informed all three rating agencies that the Company expected to report a substantial Q2'12 loss. As set forth above, the largest component of this loss was driven by MF Global's (belated) DTA valuation allowance.

287.    On Thursday, October 20, 2011, according to the February 2, 2012 testimony of S&P's Craig Parmalee before the Financial Services Subcommittee, S&P analysts met with MF Global management to obtain additional information about the Company's upcoming earnings release, Euro sovereign debt RTM portfolio and strategic plan of action in the event of a downgrade. During this meeting, according to Parmalee's testimony, MF Global executives stated that the Company's "*financial condition was strong.*" As a result, S&P told MF Global that it did not plan to downgrade the Company's credit rating, according to the March 28, 2012 Congressional testimony of MF Global General Counsel Laurie Ferber ("Ferber").

288.    The next day, on Friday, October 21, 2011, Corzine and other MF Global senior executives met with Moody's analytical team to discuss the Company's upcoming Q2'12 earnings release. According to the Congressional testimony of Moody's Chief Credit Officer, Richard Cantor, Moody's was told at this meeting that MF Global expected to report a significant Q2'12 loss and that gross leverage had increased. Cantor further testified that this information showed MF Global was not satisfying the criteria necessary to avoid a downgrade.

289.    Moreover, during this October 21 meeting, Moody's learned for the first time that MF Global's RTM transactions were purely proprietary, not client-driven trading positions. Cantor testified on this point as follows:

> During the meeting, MF Global made clear to Moody's for the first time that MF Global's repurchase-to-maturity transactions were not client-driven transactions, but instead were purely proprietary trading positions. Moody's had [previously] understood that MF Global was expanding its principal trading activity for the primary purpose of facilitating customer transactions, as opposed to generating trading profits. That understanding was developed over time through numerous meetings and discussions with MF Global management, and a review of information provided by the company and public filings.

> In Moody's view, MF Global's decision to assume large credit exposures that were not client-driven and represented a multiple of the company's outstanding common equity highlighted MF Global's increased risk appetite – in the absence of a parallel increase in capital.

290.    On Monday, October 24, 2011, the first business day after Moody's meeting with MF Global senior executives, Moody's downgraded the Company's long-term debt by one ratings notch to Baa3. This placed MF Global one notch above junk status, and brought Moody's rating in line with S&P's and Fitch's ratings. Moody's also announced that the Company's rating remained under review for possible further downgrade. As noted by the SIPA Report, Moody's viewed MF Global's increased Euro sovereign debt exposure and the fact that it had to inject capital as an indication of problems with the Company's risk appetite and risk governance.

291.    That same day, on October 24, 2011, to ward off fallout, Defendant Steenkamp sent an e-mail to S&P stating that MF Global's *capital and liquidity has never been stronger*," and that "MF Global is in its *strongest position ever* as [a] public entity." To the contrary, however, the Break-the-Glass-Document had already been circulated within the Company, and an internal memo dated October 24, 2011 entitled "Intraday Liquidity Issues" – which had been circulated to Corzine and other MF Global personnel – identified "the greatest liquidity concern" to be the possibility that the LCH might impose increased margin requirements on Spanish and Italian RTM positions (further noting that these requirements needed to be met on a same-day basis). The Intraday Liquidity Issues memo also explained that, "[u]nder these circumstances[,] MFGUK would have to honour its obligation to the clearing house before MFGI could fulfill its obligation to MFGUK." This memo further noted uncertainty as to whether the LCH would be able to use its automatic protected payment system to satisfy a margin call on a same-day basis and, assuming that it could do so, recommended that "some form of intercompany pre-margining" be put in place to protect MFG-UK from intraday shortfalls.

292.    The next day, in the morning on October 25, 2011, MF Global released its Q2'12 earnings report and announced a loss of $191.6 million. As discussed above, that loss was mostly

the result of the $119.4 million DTA valuation allowance. During an investor conference call later that day, Corzine stated that MF Global's Euro sovereign debt RTM positions continued to have "relatively little underlying principal risk in the timeframe of our exposure," and that "the structure of the transactions themselves *essentially eliminates* market and financing risk." An accompanying presentation similarly stated:

> *Risk is limited . . . Solid risk management* – For any relevant risk, measures and limits are set and monitored which include: stress scenarios, concentration evaluation, credit exposure and liquidity analysis.

293.   Nevertheless, analysts reacted negatively to the Company's October 25, 2011 disclosures. For instance, on October 25, 2011, a Macquarie (USA) Equities Research analyst report highlighted troubling issues with MF Global's balance sheet:

> *Severe miss of adj. EPS, GAAP loss meaningfully reduces TBV.*
>
>                 * * *
>
> *More critical to the stock story than the earnings picture is the balance sheet story, where $6.3b in Euro sovereign exposure has become a wildcard, worrying investors & rating agencies about potential losses & capital adequacy.*
>
> Capital raise risk? Mr. Corzine's "4-6 qrtr" turnaround (which is 5-qtrs old), prioritized an improved credit profile, and with MF on negative outlook at rating agencies, additional capital raises could be a near-term headwind.
>
> MF already had a weak EPS story but shares enjoyed support from TBV. *Now, Euro sovereign exposure has introduced valuation uncertainty into the balance sheet* and MF has apparently lost its best valuation support.

294.   Consequently, by the close of trading on October 25, 2011, MF Global's common stock declined by 48% from the prior day's close.

295.   The next day, on October 26, 2011, an analyst from J.P. Morgan issued a report raising the risk management implications of the Company's new disclosures:

> MF Global has re-entered the distressed zone, with its stock down nearly 50% today. . . . *Sovereign positions the focus. MF entered into a series of sovereign transactions that it describes as 'repo-to-maturity'. While the $6.4bn does not*

99

*reside on MF's balance sheet, MF does take on the credit risk and does mark-to-market gains/losses based on the financing/repo spread.*

\* \* \*

Sovereign risk, an issue of risk management and judgment, but bigger issue is the risk within FCM. The obvious risk to sovereign exposure is default and losses associated with default given limited capital at MF. *The risk management that allows such a position given MF's balance sheet is also worthy of discussion.*

296.    Furthermore, on the heels of the Moody's downgrade and the October 25, 2011 disclosure, counterparties to MF Global's Euro sovereign debt RTM transactions demanded additional margin and deeper haircuts on collateral. By the close of business on October 28, 2011, according to a document produced to the Financial Services Subcommittee, MF Global was required to post *an additional $945 million* in margin calls on RTM and other transactions. As a result of increased margin calls, according to Serwinski's testimony before the Financial Services Subcommittee, MF Global also started to receive and respond to increased inquiries about the Company's financial condition from the CME, other exchanges and regulators.

297.    Serwinski further testified that, by Wednesday, October 26, 2011, MF Global's Legal Department was responding to an increased variety and number of legal questions from regulators, and several Board update calls were held throughout the day. Serwinski also testified that an SEC representative contacted Ferber to request a meeting with Company management and the CFTC the next day to discuss various issues, including liquidity, funding and segregated customer fund calculations.

298.    In the evening of October 26, 2011, MF Global formally retained Evercore Partners, Inc. to assist with efforts to sell all or part of the Company. MF Global also spoke with outside counsel about preparing for a possible sale or bankruptcy of the Company.

299.    Also on October 26, 2011, S&P issued a report putting MF Global's BBB- rating on "CreditWatch with negative implications." The report discussed MF Global's Euro sovereign