debt RTM exposure and resulting increased risk profile, and concluded by stating that S&P could soon lower MF Global's rating to junk depending on the Company's balance sheet management, plans for future proprietary trading activity and execution of strategic plans.

300.    On Thursday, October 27, 2011, Moody's and Fitch downgraded MF Global's debt rating to junk status. In particular, Moody's stated:

> [T]he downgrade reflects our view that MF Global's weak core profitability contributed to it taking on substantial risk in the form of its exposure to European sovereign debt in peripheral countries. At the end of the second quarter, *MF Global's $6.3 billion sovereign risk exposure represented 5 times the company's tangible common equity.*

301.    These downgrades prompted negative market reaction. For instance, Deutsche Bank issued an analyst report on October 27, 2011 noting that MF Global needed to act quickly to avoid client defections:

> Moody's and S&P have downgraded MF Global to one notch from junk status, while keeping the firm on negative watch, and Fitch has gone to junk. Each firm points to the Euro sovereign exposure, the high gross leverage, and the lack of profitability as the issue. While the expanded EFSF this morning can help to contain fears on the sovereign front and gross leverage can be reduced fairly quickly (given the liquid repo book), profitability could take some time (as with most financial firms this quarter). Given the uncertainty around timing of the agencies next move, mgmt needs to move quickly in order to avoid client defections and either work on strategic options or work with the agencies to get back to stable status.

302.    Also on October 27, 2011, according to a March 23, 2012 memorandum published by the Financial Services Subcommittee (the "Subcommittee Memo"), some of MF Global's creditors moved to end their relationships with the Company altogether. In addition, JPMC terminated its customary $432 million intraday credit extension and dispatched a team to MF Global's New York headquarters to monitor and report on MF Global's liquidity.

303.    Further, as set forth in the SIPA Report, during the final week of MF Global's operations, the LCH, DTCC and the Fixed Income Clearing Corporation ("FICC"), among

others, increased their margin requirements as follows: (1) RTM margin posted at the LCH increased by $211 million to $663 million; (2) the DTCC reduced its "Debit Cap" – a credit provided to MF Global – by more than $200 million; (3) the FICC imposed additional penalties to MF Global's margin requirement by approximately $20 million, increased MF Global's clearing requirements and began withholding (*i.e.*, not returning) excess margin for MF Global accounts at its affiliated clearing corporations; and (4) the Intercontinental Exchange, Inc. put MF Global on its watch list and increased margin restrictions, limiting the return of excess margin from MFGI's customer accounts as well as its "house account."

304.    The loss of counterparties and increased haircut demands further exacerbated liquidity strains at the Company.

### 2.    October 28, 2011-November 21, 2011

305.    On Friday, October 28, 2011, there was a $175 million overdraft in one of MF Global's accounts at JPMC in London. After JPMC called Defendant Corzine and MF Global Treasurer Mahajan about the overdraft, Mahajan e-mailed that the overdrawn account must be "fully funded ASAP" because JPMC was "holding up vital business in the U.S. as a result." According to the Subcommittee Memo, MF Global transferred $200 million later that day from a segregated customer account at JPMC to cover the overdraft. In authorizing this transfer, O'Brien, MFGI's Assistant Treasurer, wrote in an October 28, 2011 e-mail that the transfer was "***Per JC's [Jon Corzine's] direct instructions***."

306.    Recognizing the liquidity stress under which MF Global was operating, JPMC sought to confirm that the above-described transfer was appropriate. According to the Subcommittee Memo, JPMC Chief Risk Officer Barry Zubrow called Corzine on October 28, 2011 to seek assurances that the funds transferred to cover the overdraft were "excess funds" belonging to MF Global, not customer funds. JPMC then sent Corzine a draft letter for O'Brien

to sign, broadly assuring that all transfers from MF Global's JPMC segregated customer accounts complied with applicable CFTC segregation rules. But Ferber thought the letter was too broad and sought to restrict it to the October 28 transfer only.

307.    As further described in the Subcommittee Memo, MF Global drafted several revised versions of the JPMC letter on Saturday, October 29, 2011, but never delivered the letter to JPMC. A series of e-mails sent by O'Brien, Ferber and others reveal that O'Brien refused to sign the letter. Tellingly, as referenced above, when the Financial Services Subcommittee subpoenaed O'Brien to testify about these issues, *she invoked her Fifth Amendment right not to testify*.

308.    Later in the day on Saturday, October 29, 2011, MF Global senior management attempted to resolve the Company's liquidity problems by trying to sell off assets, including the Euro sovereign debt RTM portfolio. At 5:30 P.M. on October 29, 2011, Corzine updated regulators about negotiations with potential purchasers, identifying Interactive Brokers and JPMC as the parties most interested in purchasing MF Global.

309.    By then, MF Global's regulators had grown increasingly concerned that the Company had a customer funds shortfall. The Subcommittee Memo describes how, throughout the afternoon and evening that Saturday, MF Global's regulators and in-house staff worked to get more information on the shortfall. E-mails sent by regulators to MF Global reveal that the Company was not forthcoming. When MF Global missed a 2:00 P.M. October 29, 2011 deadline to provide the CFTC and CME with requested customer fund information, the CFTC's Chief Counsel for Clearing and Risk e-mailed Ferber and MF Global's Treasury staff to inform them that the lack of data and supporting documentation was "driving adverse inferences."

310.    At approximately 6:00 P.M. on October 29, 2011, MF Global staff discussed the customer funds' deficiency with CFTC and CME officials and attributed it to an accounting error. But just five hours later, at approximately 11:00 P.M. on October 29, 2011, neither the CME, CFTC nor MF Global staff was able to actually identify any accounting error. Then, at 11:40 P.M., a CME audit team member e-mailed colleagues that Serwinski would "look into coming up with additional funds to transfer into segregation as a contingency" if the accounting error was not identified.

311.    The next morning, on Sunday, October 30, 2011, according to a CME timeline provided to the Financial Services Subcommittee, CFTC staff in MF Global's Chicago office saw a draft of MF Global's October 28 customer segregated funds statement that showed customer funds were, in fact, missing. Indeed, in an interview with the Financial Services Subcommittee, Serwinski explained that O'Brien had told her on Sunday evening, October 30, 2011, that the customer funds shortfall was real, not an accounting error. O'Brien also provided Serwinski with a document that showed the deficiency resulted from three types of transactions: (1) intraday loans between MF Global's FCM and non-FCM operations; (2) the funding of outgoing client funds; and (3) the above-described $200 million transfer, which included the $175 million transfer to MF Global's London office on October 28, 2011. Together, these three types of transactions totaled *$909 million*.

312.    Also on Sunday, October 30, 2011, Interactive Brokers, which was not aware of the Company's missing customer funds, reached an agreement to acquire the Company's assets for approximately $1 billion. The CME held several calls with Interactive Brokers throughout the day to discuss the prospective sale. A draft term sheet provided that: (1) MF Global would file for Chapter 11 and obtain $800 million in debtor-in-possession financing from Interactive

Brokers secured by proprietary assets; (2) MF Global customer accounts would be transferred to Interactive Brokers subject to regulatory approvals; and (3) Interactive Brokers would agree to purchase substantially all of MF Global's remaining assets for $1 billion, or approximately $6.04 per share. MF Global personnel continued to have telephone calls with Interactive Brokers' executives, and to circulate drafts of the agreements and press releases well into the night on Sunday, October 30, 2011. At 7:43 P.M. that Sunday night, MF Global circulated to the SEC, the CME and the FSA an outline of a proposed agreement with Interactive Brokers.

313.    According to Plaintiff Vrabel, at approximately 9:00 P.M. Eastern time on Sunday, October 30, 2011, the agreement with Interactive Brokers to sell the Company's assets was announced internally on an MF Global conference call with officers from the Company's New York, London and Far East offices. But the deal fell through later that night at approximately 1:00 A.M. (on Monday, October 31) as a result of the missing customer funds.

314.    Defendant Steenkamp's December 13, 2011 testimony before Congress is consistent with Plaintiff Vrabel's account. Steenkamp testified that MF Global was "about to execute a deal for an acquisition" before the missing customer funds were discovered "pretty late on Sunday night." Steenkamp similarly testified again before Congress on March 28, 2012, stating that "efforts to reconcile the segregation calculations were not successful and the deal [with Interactive Brokers] fell through." Likewise, on December 15, 2011, Corzine testified before the Financial Services Subcommittee that "[t]he sale [to Interactive Brokers] did not take place when it was discovered that customer accounts could not be reconciled at that time." In addition, on February 2, 2012, Moody's Chief Credit Officer Cantor testified before the Financial Services Subcommittee that, "[w]hen the last-minute revelation of substantial missing

customer assets appeared to derail an otherwise done deal, MF Global was forced to file for bankruptcy."

315.    At 1:00 A.M. on Monday, October 31, 2011, O'Brien and Serwinski informed the CME that there was a real deficiency in the Company's segregated customer accounts. One hour later, at approximately 2:00 A.M. on October 31, MF Global senior management, including Defendant Steenkamp, informed regulators of the customer funds shortfall. Consequently, according to the sources noted above, Interactive Brokers called off its agreement to purchase the Company's assets for $6.04 per share, and MF Global continued to search for sources of liquidity.

316.    At 6:25 A.M. on October 31, 2011, Serwinski circulated a schedule of available assets to Steenkamp. The document listed an excess of approximately $220 million in a broker-dealer customer reserve account. According to the Financial Services Subcommittee's interviews with SEC staff, the SEC expressed concern to MF Global about the calculation of excess funds in this account and cautioned MF Global against transferring the funds. Notwithstanding the SEC's admonition, MF Global transferred the funds.

317.    Later that morning on October 31, 2011, MF Global's London staff requested yet another $310 million to cover the additional margin demanded by counterparties. This time, however, as referenced above, O'Brien responded with an e-mail, "PLEASE DO NOT RELEASE THIS COLLATERAL." MF Global filed for bankruptcy later that day.

318.    Thereafter, as set forth below in Section VIII., news about missing customer funds at MF Global emerged in a series of conflicting reports. On November 21, 2011, the last day of the Class Period, the SIPA Trustee reported that he had raised a preliminary quantification of MF Global's customer funds shortfall to "*$1.2 billion or more*." As was only later revealed by

the SIPA Trustee, in total, the Company actually had a ***$1.6 billion shortfall*** in customer funds, including a deficiency of approximately ***$900 million*** in domestic customer segregated accounts and a deficiency of approximately ***$700 million*** in foreign secured accounts.

## V.    MATERIAL MISSTATEMENTS AND OMISSIONS

### A.    The Fourth Fiscal Quarter Of 2010 And Full Fiscal 2010 Year

#### 1.    Net Income And DTA

319.    Throughout the Class Period, MF Global reported material DTA in its financial statements, which the Individual Defendants repeatedly represented were prepared in accordance with GAAP. Notwithstanding those representations, and the fact that GAAP required MF Global to report a full valuation allowance against its U.S. DTA by the start of the Class Period as set forth in Section IV.C. above, MF Global did not record a full DTA valuation allowance until it reported Q2'12 financial results on October 25, 2011.

320.    On May 20, 2010, the first day of the Class Period, MF Global issued a press release announcing its financial results for the fiscal 2010 year and fourth fiscal quarter of 2010. The press release, which quoted Defendants Corzine and MacDonald, was filed with the SEC as an exhibit to a Form 8-K signed by MacDonald. In the press release, MF Global reported a net loss for the quarter of $96.5 million, or $0.78 per basic and diluted common share, and a net loss for fiscal 2010 of $167.7 million, or $1.36 per basic and diluted share. The press release also contained fiscal 2010 highlights, consolidated statements of operations and consolidated balance sheets, purporting to reflect MF Global's financial performance in accordance with GAAP.

321.    That same day, on May 20, 2010, MF Global hosted an investor conference call. During the call, Corzine and MacDonald reviewed MF Global's financial results and Defendant MacDonald specifically discussed the Company's DTA:

As we've mentioned in previous calls, since the IPO in July of 2007, we've recorded deferred tax assets on our balance sheet of approximately $61 million related to our equity awards and about half of this asset relates to the restricted stock units that were issued at the IPO and at a fair value of $30 per share. The vast majority of these rewards vest in the September quarter of fiscal year 2011, so the $60 million will accrete to $70 million by that time. Now, if for example the stock price is $10 this coming September, then about two-thirds of those deferred tax assets related to the IPO RSUs will be written off for about $22 million in a non-cash charge. ***Now, the rest of the deferred tax assets are other equity awards that have longer vesting periods and lower issuance prices and therefor[e], they are not as at risk.***

322.     Later during the May 20, 2010 conference call, a Ticonderoga Securities analyst asked whether, with respect "to the deferred tax asset, if there's anything else we need to be thinking about there," and also asked a separate question about MF Global's capital structure. Corzine responded to the analyst's question about capital, but he failed to answer the question about the Company's DTA.

323.     On May 28, 2010, MF Global filed the 2010 Form 10-K with the SEC, signed by Defendants Corzine, MacDonald, Steenkamp, Bolger, Fusco, Gelber, Glynn, Goldberg, Schamis and Sloan. In addition to reiterating the financial results reported in the Company's May 20, 2010 press release, the 2010 Form 10-K also contained consolidated balance sheets and consolidated statements of comprehensive income, which purported to reflect MF Global's financial performance and assets and liabilities for the full fiscal 2010 year. The 2010 Form 10-K stated: "The audited consolidated and combined financial statements are prepared in conformity with U.S. generally accepted accounting principles ('U.S. GAAP') and include the consolidated accounts of MF Global Holdings Ltd. and its subsidiaries."

324.     The 2010 Form 10-K reported total DTA of $171.7 million, a valuation allowance of $19.7 million and net DTA (less the valuation allowance and tax liabilities) of $117.9 million as of March 31, 2010. With respect to DTA, the 2010 Form 10-K stated:

We have recorded significant deferred tax assets reflecting our expectation of carrying certain losses forward against future income in certain jurisdictions. If we are unable to generate positive earnings in such jurisdictions, we may be forced to record valuation allowances against previously-booked deferred tax assets, which could have a significant adverse impact on our financial results. In certain jurisdictions, we have generated pre-tax losses that, in accordance with applicable tax law, we expect to be able to carry forward and offset against future profits to reduce relevant taxes going forward. *We have recorded significant deferred tax assets reflecting our expectation of using these loss carryforwards against future income.* If we are not able to generate profits in these jurisdictions in future periods, we may be required to record valuation allowances against these deferred tax assets. Recording valuation allowances against these deferred tax assets could have a significant adverse impact on our financial results.

325.    The 2010 Form 10-K further stated:

*We account for income taxes under the asset and liability method prescribed by US GAAP.* Under this method, deferred income taxes reflect the net tax effects of temporary differences between the carrying amount of assets and liabilities for financial statement and income tax purposes, as determined under applicable tax laws and rates. *A valuation allowance is provided for deferred tax assets when it is more likely than not that some portion of the deferred tax assets will not be realized.* Any increase or decrease in a valuation allowance could have a material adverse or beneficial impact on our income tax benefit or provision and net income or loss in the period in which the determination is made.

326.    Likewise, when discussing MF Global's accounting for income taxes, the 2010 Form 10-K stated that "[a] valuation allowance is provided for deferred tax assets when it is more likely than not (likelihood of greater than 50%) that the benefits of net deductible temporary differences and net operating loss carryforwards will not be realized."

327.    For the full fiscal 2010 year, MF Global recorded a total DTA valuation allowance of $19.7 million, which the 2010 Form 10-K stated "relate[d] principally to uncertainty of the utilization of tax loss carryforwards in various jurisdictions." The 2010 Form 10-K further stated that "*the valuation allowance was calculated in accordance with US GAAP*

109

*rules*, which require[] that a valuation allowance be established or maintained when it is 'more likely than not' that all or a portion of deferred tax assets will not be realized."[23]

328.    The above-referenced statements about MF Global's net income and DTA were materially misstated and omitted material facts necessary to make the statements therein not misleading, because, *inter alia*, as set forth above in Section IV.C., the Company failed to timely record a valuation allowance against its U.S. DTA in violation of GAAP given that: (1) MF Global's U.S. operations were operating at a three-year cumulative loss as of March 31, 2010; (2) MF Global did not have evidence "of sufficient quality and quantity to counteract [that] negative evidence" since it was relying on, at best, "unsettled" events dependent on future market conditions that had not yet been demonstrated; (3) MF Global's projections of income were unreliable and dependent on the undisclosed, unsustainable and high-risk Corzine Trade (and only 20% of the profits from the Corzine Trade could be recorded as revenues in connection with the Company's U.S. operations); (4) MF Global's plans to realize costs savings from changes to the Company's compensation structure were unreliable and insufficient to offset losses and benefit from the Company's U.S. DTA, especially since any costs savings were partially offset by increases in payroll expenses due to increased professional headcount; and (5) MF Global did not have "prudent" and "feasible" tax strategies that would have enabled it to avoid recording a full valuation allowance against its U.S. DTA.

### 2.    Risk Appetite, Internal Controls And Liquidity Management

329.    In the May 20, 2010 press release that was filed with the SEC as an exhibit to MF Global's Form 8-K, Defendant Corzine stated that the Company would increase its risk-taking only with a commensurate increase in risk controls: "As profitability improves ***and we ensure***

---

[23] The 2010 Form 10-K also contained a "clean" audit report from Defendant PwC as set forth in Section VII.F. below.

*the appropriate controls are in place*, we will look to enhance our revenue potential by supporting our client activities with more principal risk taking."

330.   During MF Global's May 20, 2010 conference call, Corzine also discussed extending MF Global's "client facilitation efforts" to include "principal risk taking," reassuring the public that MF Global would "enhance and reconfirm" internal controls accordingly:

> [A] natural extension of our existing approach to client services, which has traditionally been organized around an agency brokerage model, *over the near term will extend our client facilitation efforts to include principal risk taking across most product lines*. Our fixed income and U.S. Treasury businesses already incorporate this approach. It's clear to me that we can expand revenues meaningfully by this extension. We'll provide our clients with better market execution which in time will facilitate growth of client balances, derivative commissions and trading profits. *As we grow these activities, we will be mindful of the necessity to enhance and reconfirm our operational and control functions and to secure the talent necessary to manage attend[ant] market risks*.

331.   Corzine further stated during the May 20, 2010 conference call, "I want to be clear. I don't anticipate increasing our current risk appetite in the near term but we will encourage facilitation desks to operate more aggressively *within our existing limits*."

332.   Also on the May 20, 2010 conference call, a J.P. Morgan analyst asked how much risk MF Global would take and whether MF Global's risk systems would prevent significant losses: "What are the risks in the strategy? . . . [W]here would you expect VAR to go and what are the chances that you could incur some sort of loss that's big enough to cause rating agency action here, or is that really almost an impossibility given your risk systems?" In response, Defendant Corzine stated: "It's not risk systems that will determine whether we have losses. It will be mistaken judgments in the first instance *that go beyond limits* which I don't intend to allow to happen." Corzine further stated that the Company's goals and risk-taking were within the *existing* business strategy, and MF Global would not shift to "*prop trader*" activity without informing the market:

> *We have a VAR that reflects that there would not be a material impact on earnings.* That doesn't mean that we're not going to have losses because operating costs don't have revenues to match against them which should occur, in part, because we are increasing our principal risk taking activities. *But the goal here is not to be a prop trader. And if we change that view, we'll speak to it directly.* But we're of the view that I think the greatest risk is that it undermines revenues in a given quarter or given time frame but *I don't think that we will be in a risk taking position, substantial enough to have it be the kind of thing that the rating agencies would say, holy cow these guys have got a different business strategy than what we told them we had.*

333.    The next day, on May 21, 2010, J.P. Morgan issued an analyst report describing the Company as "a solid risk/reward investment," and emphasizing that MF Global's management did not "expect VAR to increase materially" and that the Company planned to enhance internal controls, stating: "We think success will necessitate getting the right people and risk systems in place, something Corzine will address."

334.    The 2010 Form 10-K also stated that MF Global's new client-driven trading strategy would be developed within the Company's "current risk appetite" and risk limits set by the Board, noting:

> On a limited basis, we may also enter into unhedged principal transactions in order to monetize our market views. *We expect to increasingly recognize trading income as part of our ongoing activity for our clients* in various markets, and to selectively increase our risk taking, generally making fuller use of our current risk appetite and *operating within the authority delegated by our board of directors.*

335.    The 2010 Form 10-K also set forth an extensive description of the Company's purported internal controls, highlighting MF Global's supposedly "robust risk-management" and "strong governance":

> *We believe that effective risk management is critical to the success of our business.* Consequently, we have established – and continue to evolve and improve – a global enterprise wide risk management framework to manage all aspects of our risks. *The risk management framework globally embeds a robust risk-management environment through a strong governance structure that (i) clearly defines roles and responsibilities, (ii) delegates authority for risk control and risk taking to specific individuals, and (iii) documents approved methodologies for the identification, measurement, control and mitigation of*

*risk*. We believe that risk management is the responsibility of all of our employees. We seek to consistently and comprehensively identify, assess, monitor and control all financial, operational, compliance and business risks across all of our businesses in a coordinated manner. ***Business areas, pursuant to delegated authority, have primary responsibility for risk management by balancing our ability to profit from our revenue-generating activities with our exposure to potential losses. Specialist teams in the risk department monitor our risk exposures globally.***

336.    The 2010 Form 10-K further stated that a global "risk management framework" was in place to mitigate operational risks:

Operational risk is defined as the risk of loss or other adverse consequence arising from inadequate or failed internal processes, people and systems or from external events. . . . ***To mitigate operational risks, the Operational Risk Department ensures the application of a globally consistent operational risk management framework***. The framework includes firm-wide policies, standards and processes for risk identification, assessment, mitigation and reporting in order to create a more transparent and accountable operational risk environment. Operational risk is inherent in each of our businesses, support and control activities; therefore, the primary day-to-day responsibility for managing operational risk rests with these areas. Each area has established processes, systems and controls to manage operational risk and is responsible for reporting incidents, issues, and control and performance metrics. These reports are summarized for senior management and governance committees. ***Additionally, we consider the inherent operational risk in new products, systems, and business activities as they are developed or modified***.

337.    The 2010 Form 10-K also stated that "[w]e generally maintain total regulatory capital in excess of the minimum requirements in order to meet our internal risk management guidelines," "[w]e currently maintain regulatory capital in excess of all applicable requirements," and "[w]e also maintain excess regulatory capital to accommodate periods of unusual or unforeseen market volatility, and we intend to continue to follow this policy."

338.    The 2010 Form 10-K further represented that, in order to manage MF Global's liquidity risk, the Company had adequate liquidity policies in place:

"We have established a liquidity policy designed to ensure that we maintain access to sufficient, readily available liquid assets and committed liquidity facilities. . . . We also evaluate the impact of adverse market conditions on our liquidity risk and adjust our liquid assets appropriately. ***Our policy requires us to***

113

*have sufficient liquidity to satisfy all of our expected cash needs for at least one year without access to the capital markets.*

339.   Attached as Exhibits to the 2010 Form 10-K were certifications signed by Defendants Corzine and MacDonald stating that the 2010 Form 10-K fairly presented, in all material respects, MF Global's financial condition and operational results and did not contain any untrue statement of material fact or omit to state a material fact necessary to make the statements made not misleading. These certifications further stated that MF Global's disclosure controls and procedures were designed to ensure that all material information was made known to the certifying Officer Defendants, and that MF Global's internal controls over financial reporting were designed to provide reasonable assurance regarding the reliability of financial reporting in accordance with GAAP. The certifying Officer Defendants further stated that they had evaluated the effectiveness of such controls and procedures, and the 2010 Form 10-K reported that these disclosure controls and procedures were effective.

340.   The above-referenced statements about MF Global's risk appetite, internal controls and liquidity management were materially misstated and omitted material facts necessary to make the statements therein not misleading for the reasons set forth in Sections IV.D.-G. above, including, *inter alia*, because: (1) the Officer Defendants' strategic plan to increase principal risk-taking also materially increased liquidity risks without the necessary corresponding increase in capital, liquidity risk management or internal controls; (2) the primary purpose of the Company's increased principal trading activity was not to facilitate customer transactions but to engage in non-client-related speculative transactions; (3) Defendants' representations about available capital and liquidity were unreliable given that: (a) the Company's liquidity monitoring systems were outdated, (b) the Company had no real-time liquidity monitoring system, and (c) the Company tracked liquidity using informal, manual

means compiled from spreadsheets and oral reports; (4) even though the Company's transformation plan did not involve increasing VAR, the plan involved materially increasing off-balance sheet liquidity risks and leverage levels in connection with investments in Euro sovereign debt through RTM transactions; and (5) MF Global exposed client funds to significant risk by relying on regular inter-company transfers from MF Global's FCM operations to meet the daily liquidity needs of non-FCM operations.

### B. The First Fiscal Quarter Of 2011

#### 1. Net Income And DTA

341.    On August 5, 2010, MF Global issued a press release announcing its Q1'11 financial results. The press release, which quoted Defendants Corzine and MacDonald, was filed with the SEC as an exhibit to a Form 8-K signed by MacDonald. In the press release, MF Global reported net income of $0.8 million, or $0.01 per basic and diluted share. The press release also contained Q1'11 highlights, consolidated statements of operations and consolidated balance sheets, which purported to reflect the Company's financial performance in accordance with GAAP.

342.    In the August 5, 2010 press release, Corzine touted the Company's purported return to GAAP profitability: "While our results this quarter reflect initial progress and *I'm pleased the company has delivered GAAP profitability*, I believe this is only a first step toward realizing MF Global's full potential."

343.    That same day, on August 5, 2010, MF Global hosted a conference call with analysts and investors to discuss the Company's Q1'11 financial performance. Defendants Corzine and MacDonald reviewed MF Global's financial results and Corzine again highlighted that the Company "*returned to profitability* for the first time in six quarters on a GAAP basis."

344.    During the August 5, 2010 conference call, Corzine and MacDonald further emphasized that the Company's DTA write-offs were limited, one-time adjustments, rather than a larger problem affecting all of MF Global's U.S. DTA. During the call, Corzine stated: "[W]e will have in the September quarter, a large one-time adjustment associated with our tender offer, as well as a significant final write-down of the deferred tax asset associated with IPO awards." Likewise, MacDonald emphasized that the write-off was an isolated incident: "In July, those options vested when the stock price was $6.22. Therefore, we wrote off approximately $27 million of the $37 million of deferred tax asset." Significantly, MacDonald also reassured investors that "[t]he rest of the deferred tax assets are other equity awards with longer vesting periods and lower issuance prices, and *therefore are not as at risk*."

345.    On August 6, 2010, MF Global filed its Form 10-Q for the first fiscal quarter of 2011 ended June 30, 2010 (the "Q1'11 Form 10-Q"), signed by Defendants Corzine and MacDonald. In addition to reiterating the financial results reported in MF Global's August 5, 2010 press release, the Q1'11 Form 10-Q contained unaudited consolidated balance sheets and consolidated statements of comprehensive income purporting to reflect MF Global's financial performance and assets and liabilities, specifically stating: "The unaudited consolidated financial statements are prepared in conformity with U.S. generally accepted accounting principles ('U.S. GAAP') and include the consolidated accounts of MF Global Holdings Ltd. and its subsidiaries."

346.    The above-referenced statements about MF Global's net income and DTA were materially misstated and omitted material facts necessary to make the statements therein not misleading, because, *inter alia*, as set forth above in Section IV.C., the Company failed to timely record a valuation allowance against its U.S. DTA in violation of GAAP given that: (1) MF Global's U.S. operations were operating at a three-year cumulative loss as of March 31, 2010;

(2) MF Global did not have evidence "of sufficient quality and quantity to counteract [that] negative evidence" since it was relying on, at best, "unsettled" events dependent on future market conditions that had not yet been demonstrated; (3) MF Global's projections of income were unreliable and dependent on the undisclosed, unsustainable and high-risk Corzine Trade (and only 20% of the profits from the Corzine Trade could be recorded as revenues in connection with the Company's U.S. operations); (4) MF Global's plans to realize costs savings from changes to the Company's compensation structure were unreliable and insufficient to offset losses and benefit from the Company's U.S. DTA, especially since any costs savings were partially offset by increases in payroll expenses due to increased professional headcount; and (5) MF Global did not have "prudent" and "feasible" tax strategies that would have enabled it to avoid recording a full valuation allowance against its U.S. DTA.

### 2.    Risk Appetite, Internal Controls And Liquidity Management

347.    On June 3, 2010, Defendant Corzine participated in Sandler O'Neill's Global Exchange and Brokerage Conference. At the conference, Corzine emphasized the Company's purported commitment to risk management, stating:

> *I want to stress risk management* because my predecessor did a good job of addressing historical rearview mirror problems, *but I think we have to implement the human element of risk management on top of the systems that have been put in place.* This is something that I've worked on most of my life and I think that we can bring both the operations, the systems, the technology to managing risk, but we need to have the right people to take that risk and manage it day to day.

348.    The written presentation accompanying Corzine's June 3, 2010 remarks also highlighted MF Global's supposedly "strong compliance and control procedures," stating:

> *Global risk management*
>
> *Integrated and centrally managed risk framework*

***Strong compliance and control procedures*** – all employees responsible for managing market, credit, liquidity, reputational and operating risks.

349.    On the Company's August 5, 2010 Q1'11 earnings conference call, Corzine again highlighted MF Global's purportedly cautious approach to MF Global's "client facilitation" risk-taking: "We also began last quarter the fundamental and incremental process of embedding ***client facilitation risk-taking*** in all of our core product lines, with emphasis on incremental. ***We've taken this initiative without a significant build-up in our measured value at risk***." Corzine also represented that risk-taking was well under authorized limits, stating that, "[o]n a day-to-day basis, ***we are generally using less than half of our Board-authorized risk authority, which remains unchanged since I joined MF Global***." Corzine further emphasized the following: "Let me repeat – we've added a revenue-generating capacity ***that serves our clients' interests without substantially increasing measured risks or use of regulatory capital or balance sheet***."

350.    MacDonald also discussed the Company's capital and liquidity management on the August 5, 2010 Q1'11 conference call, stating that MF Global would be able to generate the capital it needed to grow and expand: "Now, as I've stated in the past, when growing, ***this business generates the capital it needs to fund expansion of the business***. So, said another way, it is self-funding even at these extraordinary low levels of interest." MacDonald further stated that "***the Company maintains a strong liquidity position***."

351.    Analysts on the August 5 conference call sought to capture an accurate picture of MF Global's risk appetite and risk exposures. For instance, a Sandler O'Neill analyst asked:

> [T]his increased customer facilitation, it's amazing the results you're getting with a lower balance sheet, lower VAR, or equal VAR, let's say. And I guess my question is, are there any other risk metrics – because there are certain – are the VAR, lower balance sheet, in your opinion, capturing the risk picture, or are there any other metrics that you could offer investors?

352.    Corzine responded by emphasizing the Company's liquidity risk management and low-risk profile trading positions:

> *We are very keen at this stage to make sure that we are only operating in the most liquid markets*, foreign exchange, and actually not very much in our emerging market activities yet, in U.S. treasuries, all the exchange-traded derivatives, the commodity markets where – well, there's a lot of price volatility. There's actually fairly deep markets for entry and exit. . . . *So we're keeping a very liquid balance sheet*.

353.    When another analyst on the August 5, 2010 conference call – this time an analyst from Credit Suisse – asked how much of MF Global's quarterly progress was "improvement from the principal side," Corzine again emphasized that, though the Company planned to "move up over trading contribution to the overall revenues, . . . *we're not taking enormous market risk in executing our strategy*, and I don't see that changing dramatically in the next quarter."

354.    MF Global's Q1'11 Form 10-Q also suggested that liquidity risks were unlikely stating that MF Global's "core business, providing execution and clearing brokerage services, *does not generally present a substantial cash liquidity risk*."[24] The Q1'11 Form 10-Q further stated that, in the event of an unexpected liquidity event, the Company's liquidity policy "was designed to ensure that we maintain access to sufficient, readily available liquid assets and committed liquidity facilities." Moreover, the Q1'11 Form 10-Q explained that MF Global had "also evaluate[d] the impact of adverse market conditions on [the Company's] liquidity risk and adjust[ed] [the Company's] liquid assets appropriately." The policy "require[d] [MF Global] *to have sufficient liquidity to satisfy all of [its] expected cash needs for at least one year without access to the capital markets*."

---

[24] MF Global filed an amended Q1'11 Form 10-Q on September 2, 2010. The sole purpose of the amendment was to furnish Exhibit 101, which did not amend any of the statements alleged herein as materially misstated or omitting material information.

355.   The Q1'11 Form 10-Q also represented that MF Global would "continuously evaluate the levels of regulatory capital at each of our operating subsidiaries . . . to ensure compliance with all regulatory capital requirements," and would "maintain excess regulatory capital to accommodate periods of unusual or unforeseen market volatility," stating that the Company "intend[s] to continue to follow this policy."

356.   The Q1'11 Form 10-Q repeated the same disclosures about operational risk management that were included in the 2010 Form 10-K as set forth in ¶ 336 above.

357.   The Q1'11 Form 10-Q also contained as exhibits certifications signed by Defendants Corzine and MacDonald in the same form as those referred to in ¶ 339 above.

358.   The above-referenced statements about MF Global's risk appetite, internal controls and liquidity management were materially misstated and omitted material facts necessary to make the statements therein not misleading for the reasons set forth in Sections IV.D.-G. above, including, *inter alia*, because: (1) the Officer Defendants' strategic plan to increase principal risk-taking also materially increased liquidity risks without the necessary corresponding increase in capital, liquidity risk management or internal controls; (2) the primary purpose of the Company's increased principal trading activity was not to facilitate customer transactions but to engage in non-client-related speculative transactions; (3) Defendants' representations about available capital and liquidity were unreliable given that: (a) the Company's liquidity monitoring systems were outdated, (b) the Company had no real-time liquidity monitoring system, and (c) the Company tracked liquidity using informal, manual means compiled from spreadsheets and oral reports; (4) even though the Company's transformation plan did not involve increasing VAR, the plan involved materially increasing off-balance sheet liquidity risks and leverage levels in connection with investments in Euro

sovereign debt through RTM transactions; and (5) MF Global exposed client funds to significant risk by relying on regular inter-company transfers from MF Global's FCM operations to meet the daily liquidity needs of non-FCM operations.

### C. The Second Fiscal Quarter Of 2011

#### 1. Net Income And DTA

359.   On November 4, 2010, MF Global issued a press release announcing its financial results for the second fiscal quarter of 2011 ended September 30, 2010 ("Q2'11"). The press release, which quoted Defendants Corzine and MacDonald, was filed with the SEC as an exhibit to a Form 8-K that was signed by MacDonald. In the press release, MF Global reported a net loss of $94.3 million, or $0.59 per basic and diluted share. The press release also contained Q2'11 highlights, consolidated statements of operations and consolidated balance sheets, which purported to reflect the Company's financial performance in accordance with GAAP.

360.   On November 5, 2010, MF Global filed its Form 10-Q for the second fiscal quarter of 2011 ended September 30, 2010 (the "Q2'11 Form 10-Q"), which was signed by Defendants Corzine and MacDonald. The Q2'11 Form 10-Q contained unaudited consolidated balance sheets, consolidated statements of operations and consolidated statements of comprehensive income purporting to reflect the Company's financial performance and assets and liabilities in accordance with GAAP. The Q2'11 Form 10-Q specifically stated: "The unaudited consolidated financial statements are prepared in conformity with U.S. generally accepted accounting principles ('U.S. GAAP') and include the consolidated accounts of MF Global Holdings Ltd. and its subsidiaries."

361.   The above-referenced statements about MF Global's net income and financial performance were materially misstated and omitted material facts necessary to make the statements therein not misleading, because, *inter alia*, as set forth above in Section IV.C., the

Company failed to timely record a valuation allowance against its U.S. DTA in violation of GAAP given that: (1) MF Global's U.S. operations were operating at a three-year cumulative loss as of March 31, 2010; (2) MF Global did not have evidence "of sufficient quality and quantity to counteract [that] negative evidence" since it was relying on, at best, "unsettled" events dependent on future market conditions that had not yet been demonstrated; (3) MF Global's projections of income were unreliable and dependent on the undisclosed, unsustainable and high-risk Corzine Trade (and only 20% of the profits from the Corzine Trade could be recorded as revenues in connection with the Company's U.S. operations); (4) MF Global's plans to realize costs savings from changes to the Company's compensation structure were unreliable and insufficient to offset losses and benefit from the Company's U.S. DTA, especially since any costs savings were partially offset by increases in payroll expenses due to increased professional headcount; and (5) MF Global did not have "prudent" and "feasible" tax strategies that would have enabled it to avoid recording a full valuation allowance against its U.S. DTA.

### 2.   Risk Appetite, Internal Controls And Liquidity Management

362.   During a September 13, 2010 Barclays Capital Financial Services Conference, Defendant Corzine discussed MF Global's "client-driven" principal trading and risk appetite:

> First of all, [a] lot of folks, including me, have spoken about extending our *client-driven principal trading*. We've begun that on a step-by-step basis in the most liquid markets. It's not overwhelming our earnings at this stage *because we want to grow into that in a way that we manage the risks. It will be focused on liquid markets at least for the next 12 months*.

363.   Corzine expanded on this statement during the September 13, 2010 conference, representing that MF Global was focused on managing risks related to expanding principal trading in its "client facilitation business":

> *We are expanding our client facilitation business*, [and] I have talked about trading a number of times. It will have some volatility to it over time, but we

122

don't expect it to become such a large proportion that it will overwhelm other activities in our business.

*We intend to control and manage risk. I think I said at the last earnings call, we hadn't increased the VAR exposure nor the stress exposure, nor the regulatory capital exposure*, but we had improved 2% or 3% the amount of trading income that we have been able to produce.

364.   Corzine continued to emphasize MF Global's focus on risk management during the September 13, 2010 conference, stating: "Our strategic review is not just about our retail business, not just about how we organize our institutional sales or our trading activities, but *it's also about how we maintain proper control and compliance as we go forward*." Specifically addressing liquidity, Corzine further stated at the conference: "*We don't have credit risks. We're not carrying carried positions for purposes of finance and spread. So we have a very, very strong and liquid balance sheet, improved our capital structure*."

365.   Also during the September 13, 2010 conference, an audience member asked about MF Global's risk management systems:

Can you talk a bit about your sense . . . in terms of the risk management systems at the firm, if you're going to be dialing up a little bit of risk. *I assume everything isn't done on a spreadsheet, but you came from the best in the world, how does it compare and do you feel you need to reinvest*?

366.   In response, Corzine emphasized that MF Global would not increase risks beyond its risk management systems and would be "very disciplined" in this regard:

One of the reasons that I emphasize that we will stay in liquid markets is that I don't think we're prepared yet to be in some of the other marketplaces with the kinds of systems that we have today. I don't think they're that . . . far off from us being able to produce. But I think they're focused more on liquid markets and credit risks as focused on our clients and I think we have some work to do on stress testing and clearly on credit-related activities.

*But I think they're adequate for where we are today, they need to constantly be strengthened and the thing that I would say is the most important ingredient with regard to risk for us is to make sure that we have the people on the desks that extremely understand what it is the risks that they're taking and so until we have those people in place, we're going to grow more slowly in this principal*

123

*trading activity than I would probably like, than I'm accustomed to, given the size of our organization. So we will be very disciplined about it.*

367.    On November 4, 2010 MF Global hosted a conference call with analysts and investors to discuss the Company's Q2'11 financial performance. During the call, a Sandler O'Neill analyst asked about MF Global's trading strategy, and Corzine responded that the Company would be cautious in this regard:

> *We want to stay in high turnover mode within our proprietary activities. We will be in the - in the liquid in for the most part of our activities. Don't expect it to have dramatic impact on our earnings in the near term*. Although we do look to steadily grow the book.

368.    Defendant Corzine further stated that the Company's lack of experience with risk in trading activities required a careful approach to risk taking:

> *Believe me, we are going to go slow. I chose my words very carefully. We're going to know the people, and we're going to know the risk appetites in addition to the metrics that are necessary, and [I am] very closely involved with this myself.*

369.    During the same call, a Keefe, Bruyette & Woods analyst asked about the tension between operating an FCM and a trading desk. Corzine responded that activities would be separated and that clients' interests would "come first" in a "disciplined" approach:

> First of all, it will be – *the unit will be separated from the trading areas where client activity flows*, and we think that we have a long standing culture that is focused on client activities. *And we're enhancing all of the compliance and control activities on that*, and we feel like we can manage this. And I am very familiar with trading activities in a market making book as you interface with clients.
>
> *And so I just - I don't think there has to be as long as you're very disciplined and you make it clear to individuals that clients interests come first and they're separated from the day to day activities of what our clients are doing with our market making and brokerage activities.*

370.    With respect to potential liquidity events, the Q2'11 Form 10-Q stated that MF Global's policy of maintaining excess capital would ensure the availability of sufficient

liquidity: "As a matter of policy, we maintain excess capital to provide liquidity during periods of unusual market volatility, which has been sufficient historically to absorb the impact of volatile market events." The Q2'11 Form 10-Q also suggested that liquidity risks were unlikely because MF Global's "core business, providing execution and clearing brokerage services, *does not generally present a substantial cash liquidity risk*." The Q2'11 Form 10-Q further stated that, in the event of an unexpected event, the Company's liquidity policy was "designed to ensure that we maintain access to sufficient, readily available liquid assets and committed liquidity facilities."

371.    Further, the Q2'11 Form 10-Q explained that MF Global "also evaluate[d] the impact of adverse market conditions on [the Company's] liquidity risk and adjust[ed] [the Company's] liquid assets appropriately." The policy "require[d] [MF Global] *to have sufficient liquidity to satisfy all of [its] expected cash needs for at least one year without access to the capital markets*." The Q2'11 Form 10-Q further stated that MF Global would "continuously evaluate the levels of regulatory capital at each of our operating subsidiaries . . . to ensure compliance with all regulatory capital requirements," and that the Company "also maintain[s] excess regulatory capital to accommodate periods of unusual or unforeseen market volatility, and we intend to continue to follow this policy."

372.    MF Global's Q2'11 Form 10-Q reiterated MF Global's purported commitment to operational risk management, as set forth above in ¶ 335-6.

373.    The Q2'11 Form 10-Q also contained as exhibits certifications signed by Defendants Corzine and MacDonald in the same form as those referred to in ¶ 339 above.

374.    The above-referenced statements about MF Global's risk appetite, internal controls and liquidity management were materially misstated and omitted material facts

necessary to make the statements therein not misleading for the reasons set forth in Sections IV.D.-G. above, including, *inter alia*, because: (1) the Officer Defendants had significantly increased principal risk-taking and risk limits in connection with Defendants' strategic plan and the corresponding proprietary trading (by October 2010, net Euro sovereign debt RTM exposure was $3.5-4 billion) without the necessary corresponding increase in capital, liquidity risk management or internal controls; (2) the primary purpose of the Company's increased principal trading activity was not to facilitate customer transactions but to engage in non-client-related speculative transactions; (3) Defendants' representations about available capital and liquidity were unreliable given that: (a) the Company's liquidity monitoring systems were outdated, (b) the Company had no real-time liquidity monitoring system, and (c) the Company tracked liquidity using informal, manual means compiled from spreadsheets and oral reports; (4) even though the Company's transformation plan did not involve increasing VAR, the plan involved materially increasing off-balance sheet liquidity risks and leverage levels in connection with investments in Euro sovereign debt through RTM transactions; and (5) MF Global exposed client funds to significant risk by relying on regular inter-company transfers from MF Global's FCM operations to meet the daily liquidity needs of non-FCM operations.

**D.      The Third Fiscal Quarter Of 2011**

**1.      Net Income And DTA**

375.    On February 3, 2011, MF Global issued a press release announcing its financial results for the third fiscal quarter of 2011 ended December 31, 2010 ("Q3'11"). The press release, which quoted Defendants Corzine and MacDonald, was filed with the SEC as an exhibit to a Form 8-K that was signed by MacDonald. In the press release, the Company reported a Q3'11 net loss of $9.7 million, or $0.06 per basic and diluted share. This press release also

reported Q3'11 highlights, consolidated statements of operation and consolidated balance sheets, purporting to reflect MF Global's financial performance in accordance with GAAP.

376.   Also on February 3, 2011, MF Global filed the Q3'11 Form 10-Q signed by Defendants Corzine and MacDonald. The Q3'11 Form 10-Q contained unaudited consolidated balance sheets, consolidated statements of operations and consolidated statements of comprehensive income purporting to reflect the Company's financial performance and assets and liabilities in accordance with GAAP. The Q3'11 Form 10-Q also stated: "The unaudited consolidated financial statements are prepared in conformity with U.S. generally accepted accounting principles ('U.S. GAAP') and include the consolidated accounts of MF Global Holdings Ltd. and its subsidiaries."

377.   Additionally, the Q3'11 Form 10-Q specifically discussed the GAAP standard for assessing the need for a DTA valuation allowance and MF Global's "significant" deferred tax assets, stating:

> Realization of the Company's deferred tax assets is dependent upon multiple variables including available loss carry-backs, the timing of future earnings, the reversal of current timing differences, and planning. US GAAP requires that the Company continually assess the need for a valuation allowance against all or a portion of its deferred tax assets. *As of December 31, 2010, the Company had significant deferred tax assets that it does not have a valuation allowance against because the Company believes that it is more likely than not that these deferred tax assets will be realized in the future. Although realization is not assured, the Company anticipates that realization of these assets will occur*.

378.   The above-referenced statements about MF Global's net income and DTA were materially misstated and omitted material facts necessary to make the statements therein not misleading, because, *inter alia*, as set forth above in Section IV.C., the Company failed to timely record a valuation allowance against its U.S. DTA in violation of GAAP given that: (1) MF Global's U.S. operations were operating at a three-year cumulative loss as of March 31, 2010; (2) MF Global did not have evidence "of sufficient quality and quantity to counteract [that]

negative evidence" since it was relying on, at best, "unsettled" events dependent on future market conditions that had not yet been demonstrated; (3) MF Global's projections of income were unreliable and dependent on the undisclosed, unsustainable and high-risk Corzine Trade (and only 20% of the profits from the Corzine Trade could be recorded as revenues in connection with the Company's U.S. operations); (4) MF Global's plans to realize costs savings from changes to the Company's compensation structure were unreliable and insufficient to offset losses and benefit from the Company's U.S. DTA, especially since any costs savings were partially offset by increases in payroll expenses due to increased professional headcount; and (5) MF Global did not have "prudent" and "feasible" tax strategies that would have enabled it to avoid recording a full valuation allowance against its U.S. DTA.

### 2.    Risk Appetite, Internal Controls And Liquidity Management

379.    On February 3, 2011, MF Global hosted a conference call with analysts and investors to discuss the Company's Q3'11 financial performance. During the call, Corzine and MacDonald reviewed MF Global's Q3'11 financial results, and Corzine emphasized MF Global's purportedly cautious approach to risk-taking. Specifically, Corzine stated: "*VAR measurements have remained relatively unchanged and well below Board-delegated authorizations*." Corzine added that spikes in VAR would be of little concern because the Company's trading philosophy limited risk and ensured liquidity: "I would note that we have seen higher spikes in VAR usage in [Q3'11], and I would expect, within limits, that pattern will continue. We expect to follow a trading philosophy, however, emphasizing high turnover."

380.    During the same conference call on February 3, 2011, a J.P. Morgan analyst asked "[w]hich products and services worked particularly well this quarter." In response, Corzine emphasized purported improvements in various areas and risk management, stating "[w]e had a quarter where there was pretty good balance across our businesses. *As I noted in my remarks,*

*we have not dramatically increased – we haven't even substantially increased our VAR except on very short duration bases*."

381.    Another analyst on the February 3, 2011 conference call – this time a Barclays Capital analyst – asked about the impact of the regulatory environment on MF Global's strategy. In response, Corzine explained that, though MF Global was not yet subject to the Dodd-Frank Wall Street Reform Act or its "Volcker Rule," MF Global's internal standards purportedly prevented the taking of unwarranted risks:

> All that said, the kind of question . . . with regard to how we take on leverage, how we manage our liquidity, how we manage risk, how we look at turnover of assets, how we manage our business, we don't feel any less responsible for what is our requirement. And I think we are trying to demonstrate that to the marketplace. *While we've made very clear that we are interested in offering risk intermediation services [of] our clients, we have done that on a very measured basis and intend to continue to do that.*

382.    During the same February 3, 2011 conference call, MacDonald also touted the Company's reduced leverage ratio and liquidity, stating that "the raw calculation of gross leverage is 28 times. This is magnified by our matchbook, which grosses up our balance sheet with *very liquid low risk assets*." Additionally, offering a purportedly better picture of the Company's leverage and liquidity, MacDonald presented an alternative calculation that "excluded all government backed and centrally cleared securities from the calculation," which included "the majority of our repo book." According to MacDonald, "[c]alculated in this manner, MF Global leverage is five times, *which is consistent with how we view our balance sheet and comparable to the best capitalized banks in the industry*." The written presentation accompanying MacDonald's remarks also described MF Global's supposedly "*Strong Liquidity Position*."

383.    MF Global's Q3'11 Form 10-Q described the Company's risk appetite with respect to principal transactions, representing that a small increase was possible in the future:

"As we increase our client facilitation activities and engage in more proprietary transactions, *our risk profile may incrementally increase* as we are exposed to more market and credit risk in certain areas."

384.    With respect to potential liquidity risks, the Q3'11 Form 10-Q again explained that MF Global's capital management should ensure the availability of sufficient liquidity: "As a matter of policy, we maintain excess capital to provide liquidity during periods of unusual market volatility, which has been sufficient historically to absorb the impact of volatile market events." The Q3'11 Form 10-Q also suggested that liquidity risks were unlikely because MF Global's "core business, providing execution and clearing brokerage services, *does not generally present a substantial cash liquidity risk.*" In the event of an unexpected liquidity event, the Form 10-Q stated that the Company's liquidity policy "was designed to ensure that we maintain access to sufficient, readily available liquid assets and committed liquidity facilities."

385.    Further, the Q3'11 Form 10-Q explained that MF Global "also evaluate[d] the impact of adverse market conditions on [the Company's] liquidity risk and adjust[ed] [the Company's] liquid assets appropriately." The policy "require[d] [MF Global] *to have sufficient liquidity to satisfy all of [its] expected cash needs for at least one year without access to the capital markets.*" The Q3'11 Form 10-Q also stated that MF Global would "continuously evaluate the levels of regulatory capital at each of our operating subsidiaries . . . to ensure compliance with all regulatory capital requirements," and "[w]e also maintain excess regulatory capital to accommodate periods of unusual or unforeseen market volatility, and we intend to continue to follow this policy."

386.    The Q3'11 Form 10-Q also repeated MF Global's previously described commitment to operational risk management as set forth above in ¶ 336.

387.   The Q3'11 Form 10-Q also contained as exhibits certifications signed by Defendants Corzine and MacDonald in the same form as those referred to in ¶ 339.

388.   Following Corzine's above-described December 2010 private discussion with PwC (discussed above in ¶ 222), the Q3'11 Form 10-Q also reported for the first time that MF Global retained some (unspecified) exposure to the risk of default of underlying Euro sovereign debt through RTM transactions:

> The Company also enters into securities financing transactions that mature on the same date as the underlying collateral. The Company accounts for these transactions in accordance with the accounting standard for transfers and servicing and recognizes a gain or loss on the sale/purchase of the collateral assets, and records a forward commitment. ***The Company derecognizes the collateral assets as sold when the transactions are accounted for as sales, and recognizes the collateral assets as purchased when the transactions are accounted for as purchases. In these transactions, the Company has exposure to the risk of default of the issuer of the underlying collateral assets, such as U.S. government securities or European sovereign debt***.

389.   According to the Q3'11 Form 10-Q, as of December 31, 2010, total U.S. and European government securities sold under agreements to repurchase of $7.56 billion, at contract value, were derecognized. The Q3'11 Form 10-Q did not further detail the Company's specific Euro sovereign (versus U.S. government) debt RTM exposure. This disclosure was inadequate because it omitted what FASB Technical Director Susan Cosper described in her March 28, 2012 Congressional testimony as the "extensive disclosures" that are "required under GAAP" for RTM transactions, "including both quantitative and qualitative information about the transferor's continuing involvement, the risk that the transferor continues to be exposed to, including credit and liquidity risk, the amount to be recognized, and gains or losses on transferred assets."

390.   The above-referenced statements about MF Global's risk appetite, internal controls and liquidity management were materially misstated and omitted material facts necessary to make the statements therein not misleading for the reasons set forth in Sections

IV.D.-G. above, including, *inter alia*, because: (1) the Officer Defendants had significantly increased principal risk-taking and risk limits in connection with their strategic plan and the corresponding proprietary trading (by February 2011, net Euro sovereign debt exposure RTM was nearly $5 billion) without the necessary corresponding increase in capital, liquidity risk management or internal controls; (2) MF Global failed to maintain reliable internal controls related to Euro sovereign debt RTM transactions and repeatedly breached specific Board limits established for those transactions; (3) the primary purpose of the Company's increased principal trading activity was not to facilitate customer transactions but to engage in non-client-related speculative transactions; (4) Defendants' representations about available capital and liquidity were unreliable given that: (a) the Company's liquidity monitoring systems were outdated, (b) the Company had no real-time liquidity monitoring system, and (c) the Company tracked liquidity using informal, manual means compiled from spreadsheets and oral reports; (5) even though the Company's transformation plan did not involve increasing VAR, the plan involved materially increasing off-balance sheet liquidity risks and leverage levels in connection with investments in Euro sovereign debt through RTM transactions; and (6) MF Global exposed client funds to significant risk by relying on regular inter-company transfers from MF Global's FCM operations to meet the daily liquidity needs of non-FCM operations.

### E.   The Fourth Fiscal Quarter Of 2011 And Full Fiscal 2011 Year

#### 1.   Net Income And DTA

391.   On May 19, 2011, MF Global issued a press release reporting its financial results for the fourth fiscal quarter of 2011 and the full fiscal 2011 year (both ended March 31, 2011). The press release, which quoted Defendants Corzine and Steenkamp, was filed with the SEC as an exhibit to a Form 8-K signed by Steenkamp. In the press release, MF Global reported a quarterly net loss of $51.5 million, or $0.31 per basic and diluted share, and an annual net loss of

132

$154.4 million, or $1.00 per basic and diluted share. The press release also contained quarter and fiscal year highlights, consolidated statements of operations and consolidated balance sheets, which purported to reflect MF Global's financial performance in accordance with GAAP.

392.    On May 20, 2011, MF Global filed the 2011 Form 10-K, signed by Defendants Corzine, Steenkamp, Bolger, Fusco, Gelber, Glynn, Goldberg, Schamis and Sloan. The 2011 Form 10-K contained the financial results reported in the May 19, 2011 press release, as well as consolidated balance sheets and consolidated statements of comprehensive income purporting to reflect MF Global's financial performance and assets and liabilities for the full fiscal 2011 year. The 2011 Form 10-K specifically stated: "The audited consolidated financial statements are prepared in conformity with U.S. generally accepted accounting principles ('U.S. GAAP'") and include the consolidated accounts of MF Global Holdings Ltd. and its subsidiaries."

393.    The 2011 Form 10-K further reported total DTA of $169.2 million, a valuation allowance of $19.5 million and net DTA of $108.3 million as of March 31, 2011. The 2011 Form 10-K described the valuation allowance as "relate[d] principally to uncertainty of the utilization of tax loss carryforwards in various jurisdictions," and asserted that "[t]he valuation allowance *was calculated in accordance with U.S. GAAP rules*, which require[] that a valuation allowance be established or maintained when it is 'more likely than not' that all or a portion of the deferred tax assets will not be realized."

394.    With regard to DTA, the 2011 Form 10-K further stated:

In certain jurisdictions, we have generated pre-tax losses that, in accordance with applicable tax law, we expect to be able to carry forward and offset against future profits to reduce relevant taxes going forward. *We have recorded significant deferred tax assets reflecting our expectation of using these loss carryforwards against future income*. If we are not able to generate profits in these jurisdictions in future periods, we may be required to record valuations allowances against these deferred tax assets. Recording valuation allowances against these deferred tax assets could have a significant adverse impact on our financial results.

395.    The 2011 Form 10-K also provided a purported justification for maintaining the

DTA on the balance sheet –instead of recording a valuation allowance – despite being in a three-

year (really four-year) cumulative loss position as of March 31, 2011. The 2011 Form 10-K

stated:

> Realization of deferred tax assets is dependent upon multiple variables including available loss carrybacks, future taxable income projections, the reversal of current temporary differences, and tax planning strategies. U.S. GAAP requires that we continually assess the need for a valuation allowance against all or a portion of our deferred tax assets. *We are in a three-year cumulative pre-tax loss position at March 31, 2011 in many jurisdictions in which we do business. A cumulative loss position is considered negative evidence in assessing the realizability of deferred tax assets. We have concluded that the weight given this negative evidence is diminished due to significant non-recurring loss and expense items recognized during the prior three years, including IPO-related costs, asset impairments and costs related to exiting unprofitable business lines*.

396.    The 2011 Form 10-K also identified "positive evidence" purportedly supporting

the decision not to take a valuation allowance:

> *We have also concluded that there is sufficient positive evidence to overcome this negative evidence*. The positive evidence includes three means by which we are able to fully realize our deferred tax assets. The first is the reversal of existing taxable temporary differences. *Second, we forecast sufficient taxable income in the carry forward period. We believe that future projections of income can be relied upon because the income forecasted is based on key drivers of profitability that we began to see evidenced in fiscal 2011*. Most notable in this regard are plans and assumptions relating to the *significant changes to our compensation structure implemented in fiscal 2011*, increased trading volumes, and other macro-economic conditions. Third, in certain of our key operating jurisdictions, we have a sufficient tax planning strategy which includes potential shifts in investment policies, which should permit realization of our deferred tax assets. Management believes this strategy is both prudent and feasible.[25]

397.    The above-referenced statements about MF Global's net income and DTA were

materially misstated and omitted material facts necessary to make the statements therein not

misleading, because, *inter alia*, as set forth above in Section IV.C., the Company failed to timely

---

[25] The 2011 Form 10-K also contained a "clean" audit report from Defendant PwC as set forth in Section VII.F. below.

record a valuation allowance against its U.S. DTA in violation of GAAP given that: (1) MF Global's U.S. operations were operating at a three-year (in fact, four-year) cumulative loss as of March 31, 2011; (2) MF Global did not have evidence "of sufficient quality and quantity to counteract [that] negative evidence" since it was relying on, at best, "unsettled" events dependent on future market conditions that had not yet been demonstrated; (3) MF Global's projections of income were unreliable and dependent on the undisclosed, unsustainable and high-risk Corzine Trade (and only 20% of the profits from the Corzine Trade could be recorded as revenues in connection with the Company's U.S. operations); (4) MF Global's plans to realize costs savings from changes to the Company's compensation structure were unreliable and insufficient to offset losses and benefit from the Company's U.S. DTA, especially since any costs savings were partially offset by increases in payroll expenses due to increased professional headcount; and (5) MF Global did not have "prudent" and "feasible" tax strategies that would have enabled it to avoid recording a full valuation allowance against its U.S. DTA.

## 2. Risk Appetite, Internal Controls And Liquidity Management

398.   During the Company's May 19, 2011 quarterly earnings conference call, Defendant Corzine continued to emphasize the Company's purportedly "measured" approach to risk: "As we execute our plans and continue expanding our sales and trading operations, we would expect our capital commitments to increase. *Undoubtedly, measured risk taking will be a part of our build-out to an investment bank.*"

399.   Defendant Steenkamp also addressed MF Global's liquidity during the May 19, 2011 conference call, asserting that the Company had "$1.5 billion of required and nearly $400 million of excess capital, sitting in regulated entities," as well as additional available funds adding up "to total available liquidity of nearly $3 billion, *which is very consistent for the past*

135

*year*." The written presentation accompanying Steenkamp's remarks stated that MF Global's

"***Liquidity Position Remains Strong***."

400.    Analysts on the May 19, 2011 conference call focused on how MF Global was

increasing revenues without materially increasing the Company's risk profile. For instance, a

Sandler O'Neill analyst asked:

> My question is, revenues grew nicely and you're attributing it to the principal
> trading customer facilitation. And the question is, I'm looking at your VAR, it
> really didn't change. How were you able to accomplish it? And then going
> forward, it looks like the expenses are going to be slightly higher. Where are we
> in the process? Is there a lot more growth in revenue to be generated from
> customer facilitation principal trading?

401.    Defendant Corzine responded that growth would be controlled by the Company's

risk systems and would not change the Company's risk appetite:

> First of all . . . as it relates to the VAR, it is, on the report, relatively stable. But if
> you look at the spikes inter quarter, it's moved up and down. We have a high
> turnover philosophy with regard to our trading positions. If you look at the
> correlations within the portfolio, as we build it out, there are offsets that our risk
> metric systems and risk systems would offset. *So it is a growing book but it is not
> necessarily exposing us, at least at this point. I believe there is substantial
> ability to grow that without really changing our risk appetite, as opposed to our
> risk participation.*

402.    Also during the May 19, 2011 conference call, an analyst from Credit Agricole

asked about the costs related to trading errors, which had historically been about "1.5% of

revenue," and how MF Global was managing that risk in light of its increased trading activities.

In response, Corzine praised the Company's risk management, stating: "We spend a lot of time

on operational risk management in the firm. . . . *I think you will see that we are taking very real

steps to address this issue*." Corzine further stated:

> But we're absolutely dedicated to making sure that we minimize those numbers.
> We're not going to have perfection but [sic] minimizing those numbers. And like
> every financial institution, making certain that you don't have the kind of car
> crash that this organization experienced back 3, 4 years ago, *is essentially by
> having tight controls, tight compliance and making it part of the culture. And*

*that's the kind of people we're hiring and that's the kind of culture we're building and attendant to.*

403.   During the same May 19, 2011 conference call, Steenkamp described the purportedly "minimal" risk related to the Company's Euro sovereign debt RTM transactions:

As Jon mentioned, we saw principal trading opportunities in European sovereigns this quarter. By entering into resell and repurchase transactions to maturity, as we do in US government securities, we are able to capture arbitrage opportunities in these markets. ***We believe the market risk to these trades is minimal, as these are held to maturity.*** While we retain exposure to the underlying credit throughout the maturity period, the duration of these trades is short-term in nature. Additionally, we continue to reshape the balance sheet to capture higher margin opportunities, and as such, our matched repo and stockpile loan book continues to move lower.

404.   The 2011 Form 10-K also described MF Global's strategic plan to "selectively increase risk taking" "within" Board limits as follows:

As part of our strategic plan, we expect to significantly increase our proprietary activities and to recognize more trading income as part of our ongoing activity for our clients in various markets, ***and to selectively increase our risk taking, while operating within the authority delegated by our Board of Directors.*** Principal transactions generally yield higher profit margins than commissions that we earn by executing client trades, but also subject us to greater risk.

405.   The 2011 Form 10-K also stated that MF Global maintained exposure to the sovereign debt of Portugal, Ireland, Italy, Spain and Belgium. The 2011 Form 10-K disclosed in a footnote that, at March 31, 2011, "securities . . . sold under agreements to repurchase of $14,520,341[,000] at contract value, were de-recognized, of which 52.6% were collateralized with European sovereign debt." But even this footnote disclosure – which followed Corzine's December 2010 meeting with PwC referenced above in ¶ 222 – was inadequate, as it omitted what FASB Technical Director Susan Cosper described in her March 28, 2012 Congressional testimony as the "extensive disclosures" that are "required under GAAP" for RTM transactions, "including both quantitative and qualitative information about the transferor's continuing involvement, the risk that the transferor continues to be exposed to, including credit and liquidity

137

risk, the amount to be recognized, and gains or losses on transferred assets." Indeed, the 2011

Form 10-K failed to disclose the liquidity risk of the Euro Sovereign debt RTM transactions,

including the Company's reliance upon inadequate liquidity controls, as set forth herein.

406.    The 2011 Form 10-K also described MF Global's supposedly "comprehensive"

risk management:

> We are exposed to numerous risks in the ordinary course of our business, and effective risk management is critical to the success of our business. *We have a comprehensive risk governance structure and management processes designed to monitor, evaluate, and manage the risks we assume in conducting our business.* The principal risks we face include market risk (within which we include issuer default risk), credit risk, capital risk, liquidity risk and operational risk.

407.    Explaining the Company's approach to controlling risk, the 2011 Form 10-K

stated that the "enterprise risk governance framework" would ensure that MF Global operated

within approved "risk tolerances":

> Our enterprise risk governance framework involves the oversight of our Board of Directors together with our management committees, policies, and procedures, and defined delegation of authority. *Our Board-approved risk appetite and strategic objectives translate to defined risk tolerances and oversight processes and, subsequently, strictly enforced delegations of authority and concomitant controls to ensure our operation within those risk tolerances.*

408.    The 2011 Form 10-K further represented that the Company had "clearly define[d]

roles and responsibilities for risk taking, processing, reporting, and control":

> The enterprise risk management framework employs this governance structure to *embed a strong risk culture and clearly define roles and responsibilities for risk taking, processing, reporting, and control. The enterprise risk management framework comprises the activities and methods through which we maintain risk within acceptable risk tolerances.* Business areas, pursuant to delegated authority, have primary responsibility for risk management.

409.    In addition to tasking individual business areas with responsibility for risk

management, the Company purportedly deployed its risk department and internal auditing