procedures to ensure compliance with risk-management limits. In this regard, the 2011 Form

10-K stated:

> Working with the business areas, the Risk department seeks to identify, assess, measure, monitor and limit the risks consistently across our businesses. *The internal audit department and audit committee further provide independent control and assurance of the risk-management process.*

410.   The 2011 Form 10-K also stated that MF Global employed multiple tools to

establish and enforce risk limits and to address breaches:

> Processes and procedures are key components of our risk management. We engage in risk-taking activities to the extent of our risk appetite. *We establish limits for each of our businesses based on our risk appetite as set by the Board.* Business areas, pursuant to delegated authority, have primary responsibility for risk management by balancing our ability to profit from our revenue-generating activities with our exposure to potential losses. *Working with the business areas, the Risk department established a suite of limit techniques including, but not limited to, mandate limits applicable to specific businesses and risk types, value-at-risk, and stress scenario testing.*
>
> We have established and documented mandates for market risk assumed by our revenue-generating areas. For certain revenue-generating areas the risk mandates are supplemented with intra-day and overnight monitoring against the prescribed limits, both by the business areas and the Risk department. *The Market Risk department quantifies and assesses risks, and escalates breaches to risk limits.*

411.   With regard to operational risk, the 2011 Form 10-K stated that MF Global had an

"Operational Risk department designed to identify, assess, measure and manage operational

risk," and "[e]ach business area has established processes, systems, and controls to manage

operational risk and is responsible for escalating incidents, issues and control indicators." The

2011 Form 10-K further described MF Global's Operational Risk Management Framework as an

"effective environment" "independent of the revenue-generating areas" intended to "identify,

assess, measure, monitor and mitigate operational risk:"

> *We maintain a continuous and collaborative Operational Risk Management Framework which establishes an effective environment [that] is designed to identify, assess, measure, monitor and mitigate operational risk across all of our business areas.* The Operational Risk Committee, which is chaired by the

Global Head of Operational Risk and is a key component of the Enterprise Risk Management Governance structure, provides oversight of the Operational Risk Management Framework and provides a forum for senior management to assess the operational risk profile of the organization. The Global Head of Operational Risk reports to the Chief Risk Officer. *The Operational Risk department is a risk management and assurance function that is independent of the revenue-generating areas. The Operational Risk department's primary objective is to develop, implement, and maintain our Operational Risk Management Framework. The Operational Risk department works with all business areas to help ensure transparency, awareness, and accountability of risks.*

412.    The 2011 Form 10-K further stated that "[w]e continually seek to improve our technology and processes" and "strive to build a strong risk management team, which works closely with our management and business areas to deliver effective risk management."

413.    The 2011 Form 10-K also claimed that the Company carefully managed market exposure risks "*by limiting the size and concentration of positions held in accordance with our risk appetite and the delegated authorities, both approved by the Board.*" The risk taken by MF Global's business areas, particularly its revenue-generating segments, was purportedly "*approved in defined risk mandates as delegated by the CRO.*" The 2011 Form 10-K went on to explain: "Our business areas are responsible for these risks and are expected to operate *within these prescribed mandates*. Business areas are also responsible for managing our risk-revenue expectations in collaboration with the Risk department. *End-of-day and for certain businesses, intra-day monitoring processes mitigates risk taking in excess of our risk appetite.*"

414.    Focusing on risk assessment, the 2011 Form 10-K stated that "[o]ur assessment programs are designed to assess the current state in order to project future risks and impacts." The 2011 Form 10-K also described MF Global's risk management as a tool to detect "expected and unexpected exposures," stating:

By considering the inherent and residual operational risks, all available and relevant data, and the results of the core Operational Risk Management Framework programs, *we measure both the potential expected and unexpected exposures*. The qualitative and quantitative measures are used to establish an

operational risk profile for the organization, escalate risks that may be exceeding agreed tolerances, prioritize the remedial actions and identify other mitigating options.

415.   With respect to risk mitigation, the 2011 Form 10-K stated that, by utilizing MF Global's "top-down assessment program to identify extreme but plausible risk scenarios, we are able to extrapolate a capital measure with an expected confidence level" and that "[w]e may choose to calculate and hold economic capital to meet regulatory expectations or mitigate our potential exposure to extreme but unexpected scenarios."

416.   With respect to potential liquidity events, the 2011 Form 10-K explained that MF Global's liquidity policy should ensure the availability of sufficient liquidity: "As a matter of policy, we maintain excess capital to provide liquidity during periods of unusual market volatility, which has been sufficient historically to absorb the impact of volatile market events." The 2011 Form 10-K suggested, however, that liquidity events were unlikely because MF Global's "core business, providing execution and clearing brokerage services, *does not generally present a substantial cash liquidity risk*." In case of an unexpected event, the 2011 Form 10-K stated that the Company's liquidity policy was "designed to ensure that we maintain access to sufficient, readily available liquid assets and committed liquidity facilities." The 2011 Form 10-K also stated that the liquidity policy, "require[d] [MF Global] *to have sufficient liquidity to satisfy all of [its] expected cash needs for at least one year without access to the capital markets*."

417.   The 2011 Form 10-K further stated that MF Global would "continuously evaluate the levels of regulatory capital at each of our operating subsidiaries . . . to ensure compliance with all regulatory capital requirements," and that MF Global "also maintain[s] internal early warning levels and excess regulatory capital to accommodate periods of unusual or unforeseen market volatility, and . . . intend[s] to continue to follow this policy."

418.   The 2011 Form 10-K also contained as exhibits certifications signed by Defendants Corzine and Steenkamp in the same form as those referred to in ¶ 339 above.

419.   On May 20, 2011, J.P. Morgan issued an analyst report relying on the Individual Defendants' representations that MF Global had increased revenues without raising risk exposure, noting: "Most importantly, VAR for the quarter was rather stable at $3.3M for the quarter, meaning MF was able to generate the principal revenue without raising the risk exposure."

420.   The above-referenced statements about MF Global's risk appetite, internal controls and liquidity management were materially misstated and omitted material facts necessary to make the statements therein not misleading for the reasons set forth in Sections IV.D.-G. above, including, *inter alia*, because: (1) The Officer Defendants' strategic plan to increase principal risk-taking also materially increased liquidity risks without the necessary corresponding increase in capital, liquidity risk management or internal controls; (2) MF Global failed to maintain reliable internal controls related to Euro sovereign debt RTM transactions and repeatedly breached specific Board limits established for those transactions; (3) the primary purpose of the Company's increased principal trading activity was not to facilitate customer transactions but to engage in non-client-related speculative transactions; (4) Defendants' representations about available capital and liquidity were unreliable given that: (a) the Company's liquidity monitoring systems were outdated, (b) the Company had no real-time liquidity monitoring system, and (c) the Company tracked liquidity using informal, manual means compiled from spreadsheets and oral reports; (5) even though the Company's transformation plan did not involve increasing VAR, the plan involved materially increasing off-balance sheet liquidity risks and leverage levels in connection with investments in Euro

sovereign debt through RTM transactions; and (6) MF Global exposed client funds to significant risk by relying on regular inter-company transfers from MF Global's FCM operations to meet the daily liquidity needs of non-FCM operations.

### F.    The First Fiscal Quarter Of 2012

#### 1.    Net Income And DTA

421.    On July 28, 2011, MF Global issued a press release reporting its financial results for its first fiscal quarter of 2012 ended June 30, 2011 ("Q1'12"). The press release, which quoted Defendants Corzine and Steenkamp, was filed with the SEC as an exhibit to a Form 8-K that was signed by Steenkamp. The Company reported Q1'12 net income of $7.7 million, or $0.05 per basic and diluted share. The press release contained Q1'12 highlights, consolidated statements of operations and consolidated balance sheets, which purported to reflect MF Global's financial performance in accordance with GAAP. The press release quoted Corzine describing MF Global's "net revenue *and GAAP net income at their highest levels in nearly three years*."

422.    On August 3, 2011, MF Global filed its Q1'12 Form 10-Q, signed by Defendants Corzine and Steenkamp.[26] The Q1'12 Form 10-Q repeated the financial results announced in the July 28, 2011 press release and also contained consolidated balance sheets and consolidated statements of comprehensive income purporting to reflect MF Global's financial performance and assets and liabilities. According to this Form 10-Q, "[t]he unaudited consolidated financial statements [were] prepared in conformity with U.S. generally accepted accounting principles ('U.S. GAAP') and include[d] the consolidated accounts of MF Global Holdings Ltd. and its subsidiaries."

---

[26] MF Global's September 1, 2011 Q1'12 Form 10-Q/A did not amend any of the statements alleged herein as materially misstated or omitting material information.

423.     As to DTA, the Q1'12 Form 10-Q reported that the Company remained in a three-year cumulative loss position and stated that, "[w]hile the Company was profitable for the quarter ended June 30, 2011, the Company was nonetheless in a three-year cumulative pre-tax loss position as of June 30, 2011 in many jurisdictions in which it does business." The Q1'12 Form 10-Q further stated that "[r]ealization of deferred tax assets is dependent upon multiple variables including available loss carrybacks, future taxable income projections, the reversal of current temporary differences, and tax planning strategies. U.S. GAAP requires that the Company continually assess the need for a valuation allowance against all or a portion of its deferred tax assets." Purportedly applying the GAAP analysis, the Q1'12 Form 10-Q noted that "[a] cumulative loss position is considered negative evidence in assessing the realization of deferred tax assets," and that "[t]he Company has concluded that the weight given to this negative evidence is diminished due to significant non-recurring loss and expense items recognized during the three prior years, including IPO-related costs, asset impairments and costs related to exiting unprofitable business lines."

424.     Additionally, the Q1'12 Form 10-Q explained the purported positive evidence weighing against a valuation allowance:

> ***The Company has also concluded that there is sufficient positive evidence to overcome this negative evidence.*** The positive evidence includes three means by which the Company is able to fully realize its deferred tax assets. First is the reversal of existing taxable temporary differences. ***Second, the Company is forecasting sufficient taxable income in the carry forward period. The Company believes that future projections of income can be relied upon because the income expected is based on key drivers of profitability that it began to see evidence of in fiscal 2011.*** Most notable in this regard are plans and assumptions relating to the ***significant changes to the Company's compensation structure implemented in fiscal 2011***, increased trading volumes, and other macro-economic conditions. Third, in certain of its key operating jurisdictions, the Company has sufficient tax planning strategies, which should permit realization of its deferred tax assets. Management believes these strategies are both prudent and feasible.

144

425.    The above-referenced statements about MF Global's net income and DTA were materially misstated and omitted material facts necessary to make the statements therein not misleading, because, *inter alia*, as set forth above in Section IV.C., the Company failed to timely record a valuation allowance against its U.S. DTA in violation of GAAP given that: (1) MF Global's U.S. operations were operating at a three-year (in fact, four-year) cumulative loss as of March 31, 2011; (2) MF Global did not have evidence "of sufficient quality and quantity to counteract [that] negative evidence" since it was relying on, at best, "unsettled" events dependent on future market conditions that had not yet been demonstrated; (3) MF Global's projections of income were unreliable and dependent on the undisclosed, unsustainable and high-risk Corzine Trade (and only 20% of the profits from the Corzine Trade could be recorded as revenues in connection with the Company's U.S. operations); (4) MF Global's plans to realize costs savings from changes to the Company's compensation structure were unreliable and insufficient to offset losses and benefit from the Company's U.S. DTA, especially since any costs savings were partially offset by increases in payroll expenses due to increased professional headcount; and (5) MF Global did not have "prudent" and "feasible" tax strategies that would have enabled it to avoid recording a full valuation allowance against its U.S. DTA.

### 2.    Risk Appetite, Internal Controls And Liquidity Management

426.    On June 9, 2011, Corzine participated in Sandler O'Neill's Global Exchange & Brokerage Conference. At the conference, Corzine touted his role in risk management, stating, "*I consider one of my most important jobs is to be the Chief Risk Officer of our firm so that I wrestle with those [market concerns] as much as anybody.*" Remarkably, Corzine went on to state that MF Global's expansion into principal trading activities "*actually makes us less risky.*"

427.    On the Company's July 28, 2011 earnings conference call with analysts and investors, Corzine again highlighted risk management in MF Global's "client dealing and

principal trading" business: "[D]iversifying into client dealing and principal trading works to reduce dependence on a single line of business, and it allowed us to grow revenues even in a difficult environment. We obviously understand that trading carries attended risks, but it was also subject to diversification and focused risk management."

428.    Also during the July 28, 2011 call, Defendant Steenkamp again touted the purportedly minimal market risks related to the Company's Euro sovereign debt portfolio:

> As mentioned last quarter, we continue to enter into resell and repurchase transactions to maturity in U.S. government securities and European sovereigns. This enables us to capture arbitrage opportunities in these markets, and *we continue to believe market risk to these trades is minimal as these are held to maturity*. While we retain exposure to the underlying credit throughout the maturity period, the duration of trade is short-term in nature.

429.    A Barclays Capital analyst on the July 28, 2011 conference call inquired about the concentration of different products in principal transactions, and asked the following: "[H]ow . . . [does] the business break[] down today, maybe rough percentages, both looking at just on a principal basis and then also including really agency like riskless principal in the business?" In response, Corzine emphasized the Company's focus on maintaining liquid assets, stating: "And I would expect . . . *our overall leverage will come down or certainly not grow* . . . ."

430.    With respect to liquidity, during the same call, Steenkamp highlighted the Company's excess capital and available liquidity:

> The company has $2.2 billion in total capital. We have $1.6 billion of required and nearly $342 million of excess capital sitting in regulated entities. . . . We also have $1.6 billion of intraday liquidity in non-segregated client payables and collateral, and this adds up to total available liquidity of $3.2 billion, up significantly from March 31, 2011.

431.    The written presentation accompanying Steenkamp's remarks further stated that MF Global's "*Liquidity Position Remains Strong*."

432. Another analyst on the July 28, 2011 conference call – this time an analyst from J.P. Morgan – inquired about the impact of the U.S. "debt-ceiling debate" on MF Global. In response, Corzine assured investors that MF Global had sufficient liquidity to withstand ensuing stress on the market, stating: "*We have warehoused the liquidity and we are aware that generally in these stress periods, margin requirements change*. So you have to be prepared for that kind of event. We have sort of *more than planned and are prepared for generally those kinds of conditions*."

433. MF Global's Q1'12 Form 10-Q stated that the Company's internal controls were "strictly enforced" as follows:

> The Company's enterprise risk governance framework involves the oversight of its Board of Directors together with the Company's risk oversight committees, policies and procedures, and defined delegation of authority. *The Company's Board-approved risk appetite and strategic objectives translate to defined risk tolerances and oversight processes and, subsequently, strictly enforced delegations of authority and concomitant controls, which are designed to ensure its operation within those risk tolerances*.

434. The Q1'12 Form 10-Q again described MF Global's purported "strong risk culture:"

> The enterprise risk management framework employs this governance structure, which is intended to embed a strong risk culture and clearly define roles and responsibilities for risk taking, processing, reporting, and control. The enterprise risk management framework comprises the activities and methods through which the Company maintains risk within acceptable risk tolerances. Business areas, pursuant to delegated authority, have primary responsibility for risk management. Working with the business areas, the Risk department seeks to identify, assess, measure, monitor and limit the risks consistently across the Company's businesses. *The internal audit department and audit committee further provide independent control and assurance of the risk-management process*.

435. Addressing risk management, the Q1'12 Form 10-Q stated that MF Global employed multiple tools to establish risk limits and address breaches:

> Processes and procedures are key components of the Company's risk management. *The basis for its culture regarding risk-taking activities is the risk*

*appetite. **The Company establishes limits for each of its businesses based on its risk appetite, which is set by the Board.*** Business areas, pursuant to delegated authority, have primary responsibility for risk management by balancing their ability to profit from revenue generating activities with their exposure to potential losses. ***Working with the business areas, the Risk department established a suite of limit techniques including, but not limited to, mandate limits applicable to specific businesses and risk types, value-at-risk, and stress scenario testing.***

The Company has established and documented mandates for market risk assumed by its revenue-generating areas. For certain revenue generating areas the risk mandates are supplemented with intra-day and overnight monitoring against the prescribed limits, both by the business areas and the Risk department. ***The Market Risk department quantifies and assesses risks, and escalates breaches to risk limits.***

436.    In the Q1'12 Form 10-Q, MF Global again noted that the Company had an "Operational Risk department to identify, assess, measure and manage operational risk," and "[e]ach business area has established processes, systems, and controls to manage operational risk and is responsible for escalating incidents, issues and control indicators." The Q1'12 Form 10-Q also described MF Global's "continuous and collaborative Operational Risk Management Framework, which ensures that an effective environment is in place to identify, assess, measure, monitor and mitigate operational risk across all of its business areas." Accordingly, "[t]he Company continually seeks to improve its technology and processes," and "strives to build a strong risk management team, which works closely with its management and business areas to deliver effective risk management."

437.    Addressing market risk, the Q1'12 Form 10-Q described the Company's management of exposure "***by limiting the size and concentration of positions that it holds in accordance with its risk appetite and in accordance with [its] instructions from the delegated authorities, both approved by the Board***."

438.    The Q1'12 Form 10-Q also stated that the CRO established "defined risk mandates":

148

The risk taken by [the Company's] business areas, especially its revenue-generating areas, *is approved in defined risk mandates as delegated by the CRO. The Company's business areas are responsible for these risks and are expected to operate within these prescribed mandates*. Business areas are also responsible for managing their risk-revenue expectations in collaboration with the Risk department. *End-of-day, and for certain businesses, intra-day monitoring processes mitigate risk taking in excess of the Company's risk appetite*.

439.    With respect to risk assessment, the Q1'12 Form 10-Q reiterated MF Global's assessment and projection commitment that "[t]he Company's assessment programs are designed to assess the current state in order to project future risks and impacts," and touted risk management as a tool to detect "expected and unexpected exposures," stating:

By considering the inherent and residual operational risks, all available and relevant data, and the results of the core Operational Risk Management Framework programs, *the Company measures both the potential expected and unexpected exposures*. The qualitative and quantitative measures are used to establish an operational risk profile for the organization, escalate risks that may be exceeding agreed tolerances, prioritize the remedial actions and identify other mitigating options.

440.    The Company also addressed risk mitigation in the Q1'12 Form 10-Q, stating that MF Global utilized its "top-down assessment program to identify extreme but plausible risk scenarios . . . to extrapolate a capital measure with an expected confidence level" and that "[t]he Company may choose to calculate and hold economic capital to meet regulatory expectations or mitigate its potential exposure to extreme but unexpected scenarios."

441.    The Q1'12 Form 10-Q further stated that MF Global "continuously evaluates the levels of regulatory capital at each of its operating subsidiaries and adjusts the amounts of regulatory capital as necessary to ensure compliance with all regulatory capital requirements," and that MF Global "also maintain[s] internal early warning levels and excess regulatory capital to accommodate periods of unusual or unforeseen market volatility, and . . . intend[s] to continue to follow this policy."

442.    With respect to potential liquidity events, the Q1'12 Form 10-Q explained that MF Global's liquidity policy should ensure the availability of sufficient liquidity, noting:

> *As a matter of policy, the Company maintains excess capital to provide liquidity during periods of unusual market volatility, which has been sufficient historically to absorb the impact of volatile market events.*

443.    The Q1'12 Form 10-Q also stated that liquidity events were unlikely because MF Global's "core business, providing execution and clearing brokerage services, *does not generally present a substantial cash liquidity risk*." In the event of an unexpected event, the Q1'12 Form 10-Q stated that MF Global's "liquidity policy [was] designed to ensure that the Company maintains access to sufficient, readily available liquid assets and committed liquidity facilities." This liquidity policy, according to the Q1'12 Form 10-Q, required the Company "*to have sufficient liquidity to satisfy all of its expected cash needs for at least one year without access to the capital markets*."

444.    The Q1'12 Form 10-Q further stated that, "[a]t June 30 and March 31 2011, securities sold under agreements to repurchase of $16,548,450 and $14,520,341, respectively, at contract value, were de-recognized, of which 69.3% and 52.6%, respectively, were collateralized with European sovereign debt, consisting of Italy, Spain, Belgium, Portugal and Ireland." But this disclosure – which followed Corzine's December 2010 meeting with PwC referenced above in ¶ 222 – was still inadequate, as it omitted what FASB Technical Director Susan Cosper described in her March 28, 2012 Congressional testimony as the "extensive disclosures" that are "required under GAAP" for RTM transactions, "including both quantitative and qualitative information about the transferor's continuing involvement, the risk that the transferor continues to be exposed to, including credit and liquidity risk, the amount to be recognized, and gains or losses on transferred assets."

445.   The Q1'12 Form 10-Q also contained as exhibits certifications signed by Defendants Corzine and Steenkamp in the same form as those referred to in ¶ 339 above.

446.   On September 1, 2011, MF Global issued the Q1'12 Form 10-Q/A. The Q1'12 Form 10-Q/A provided "additional information" related to the Company's regulatory capital requirements. Specifically, the filing stated:

> As previously disclosed, the Company is required to maintain specific minimum levels of regulatory capital in its operating subsidiaries that conduct its futures and securities business, which levels its regulators monitor closely. The Company was recently informed by the Financial Industry Regulatory Authority, or FINRA, that its regulated U.S. operating subsidiary, MF Global Inc., is required to modify its capital treatment of certain repurchase transactions to maturity collateralized with European sovereign debt and thus increase its required net capital pursuant to SEC Rule 15c3-1. *MF Global Inc. has increased its net capital and currently has net capital sufficient to exceed both the required minimum level and FINRA's early-warning notification level. The Company does not believe that the increase in net capital will have a material adverse impact on its business, liquidity or strategic plans.* In addition, the Company expects that its regulatory capital requirements will continue to decrease as the portfolio of these investments matures, which currently has a weighted average maturity of April 2012 and a final maturity of December 2012.

447.   The above-referenced statements related to risk appetite, internal controls and liquidity management were materially misstated and omitted material facts necessary to make the statements therein not misleading for the reasons set forth in Sections IV.D.-G. above, including, *inter alia*, because: (1) the Officer Defendants' strategic plan to increase principal risk-taking also materially increased liquidity risks without the necessary corresponding increase in capital, liquidity risk management or internal controls; (2) MF Global failed to maintain reliable internal controls related to Euro sovereign debt RTM transactions and repeatedly breached specific Board limits established for those transactions; (3) the primary purpose of the Company's increased principal trading activity was not to facilitate customer transactions but to engage in non-client-related speculative transactions; (4) Defendants' representations about available capital and liquidity were unreliable given that: (a) the Company's liquidity monitoring systems were

151

outdated, (b) the Company had no real-time liquidity monitoring system, and (c) the Company tracked liquidity using informal, manual means compiled from spreadsheets and oral reports; (5) even though the Company's transformation plan did not involve increasing VAR, the plan involved materially increasing off-balance sheet liquidity risks and leverage levels in connection with investments in Euro sovereign debt through RTM transactions; and (6) MF Global exposed client funds to significant risk by relying on regular inter-company transfers from MF Global's FCM operations to meet the daily liquidity needs of non-FCM operations.

G.    **The Second Fiscal Quarter of 2012**

1.    **Risk Appetite, Internal Controls And Liquidity Management**

448.    On September 12, 2011, Corzine participated in the Barclays Global Financial Services Conference. At the conference, Corzine emphasized MF Global's purported focus on risk management, stating:

> *[W]e are continually assessing risk and adjusted returns on all significant positions in conjunction with risk and stress management. . . . In fact, I have to say at this point in time, this is the central focus of my day-to-day job.* Recognizing the environment is demanding is also a time filled with opportunity, however, *as long as we maintain our substantive risk capacities.*

449.    Also during the call, Corzine touted MF Global's "historically high levels" of capital and liquidity, stating "we have been working assiduously to build our capacities in both capital and liquidity. Standard historically high levels for the firm, $2.6 billion in capital and $3.7 billion in liquidity." Corzine further stated during the conference that "we've improved our capital and liquidity position. . . . *We are deeply focused on making sure our liquidity and capital positions are strong.* That was the case before we got into the hypervolatility environment we're in today, and it will continue[.]" Additionally, Corzine stated, "at the end of the day right now, as we go through this very challenging time *addressing liquidity and capital and preservation . . . is our number one priority.*"

152

450.    During the conference, an audience member asked about how MF Global was handling a market in which "there's less capital available," particularly "how you're balancing the objective of running a conservative balance sheet, apply liquidity here, and meeting those . . . less facilitation and [sic] in the meantime." Corzine responded that the firm focused on "high turnover" and also that "*we believe very seriously that we have to make sure that every position is examined in its liquidity and capital usage, so risk-adjusted basis.*"

451.    On October 24, 2011, in response to Moody's downgrade (see ¶ 290), MF Global issued a letter from Defendant Steenkamp and an accompanying presentation on its Euro sovereign debt RTM portfolio. Steenkamp's letter stated that Moody's action bore "no implications for our clients or the strategic direction of MF Global" and that MF Global remained in a "*strong liquidity position*"; operated within "*a defined risk appetite*"; and the RTMs had "*limited market risk.*" An accompanying presentation further downplayed the risk of the RTM portfolio and stated that "*[m]arket risk is limited*" and the "[o]nly risk of loss is upon default of the issuer of the underlying securities." The presentation also described "worst case scenario" write-downs related to the RTM portfolio, representing that the worst case scenario was $219 million risk and the worst case scenario potential write-down was $131 million.

452.    With respect to risk management, Steenkamp's October 24, 2011 letter and presentation further represented that MF Global had "*[s]olid risk management,*" including "*liquidity analysis,*" and noted that "*[f]or any relevant risk, measures and limits are set and monitored,*" including "[s]tress scenarios."

453.    On October 25, 2011, MF Global issued a press release reporting its Q2'12 financial results. The press release, which quoted Defendants Corzine and Steenkamp, was filed with the SEC as an exhibit to a Form 8-K signed by Steenkamp.

454.     With respect to the Corzine Trade, Corzine stated in the press release that "[o]ver the course of the past year, we have seen opportunities in short-dated European sovereign credit markets and built a fully financed, laddered maturity portfolio that we actively manage. *We remain confident that we have the resources and expertise to continue to successfully manage these exposures to what we believe will be a positive conclusion in December 2012.*"

455.     In the October 25, 2011 press release, MF Global also claimed that it was in a "*[s]trengthened capital and liquidity position*" as of September 30, 2011. Corzine was quoted as stating that, "[r]eflecting the stressed markets in the quarter, we deliberately chose to reduce overall market exposure in most principal trading activities and focused on preserving capital and liquidity." Steenkamp similarly was quoted as stating that "the steps we've taken over the past year to improve our capital and liquidity positions are of immense value in periods of uncertainty and volatility. *As a result, we are a stronger firm today with more flexibility to focus on our strategy.*"

456.     On October 25, 2011, MF Global hosted a conference call with analysts and investors to discuss the Company's Q2'12 financial performance. During the call, Corzine and Steenkamp reviewed MF Global's quarterly financial results, and Corzine also discussed the Euro sovereign debt RTM portfolio, stating that "the structure of the transaction themselves *essentially eliminates market and financing risk.*" Additionally, Corzine stated that "our judgment is that our positions have relatively little underlying principal risk in the timeframe of our exposure." An accompanying presentation similarly stated:

> *Risk is limited . . . Solid risk management* – For any relevant risk, measures and limits are set and monitored which include: stress scenarios, concentration evaluation, credit exposure and liquidity analysis.

457.     A Barclays Capital analyst on the call inquired about the "discount . . . being applied in repo transactions in these sovereign securities right now." Steenkamp responded that

154

FINRA's capital charge related to the debt was a "regulatory reinterpretation of the haircuts that they apply to these positions" and "we look at it as if the regulatory interpretation had been applied prior to July, our July position could and would have been in excess." Corzine also responded that "we were operating against a different interpretation of what those capital charges were, *not because we didn't have the capital, we just organized differently*."

458.    During the October 25, 2011 earnings call with investors and analysts, Corzine also highlighted the Company's purportedly "improved" liquidity position, stating that "*[w]e've substantially improved our capital and liquidity positions*." He continued, representing that, despite the "stressful" economic conditions, "*we've husbanded our capital and strengthened our liquidity*." With respect to the Company's liquidity, Steenkamp also stated, "[w]e have $1.5 billion of required and nearly $500 million of excess capital sitting in regulated entities. We also have over $260 million of free cash in our financial holding company. . . . [W]e have $1.3 billion in available cash funds from liquidity facilities and we also have $1.7 billion of intraday liquidity in non-segregated client payables and collateral. This adds up to total available liquidity of $3.7 billion, up significantly from June 30, 2011." Steenkamp further stated that "*we feel good about our capital structure and liquidity position*."

459.    Addressing the Company's risk management, Corzine reiterated his role in "risk mitigation" and stated, "our positions and the judgment about risk mitigation steps are my personal responsibility and a prime focus of my attention." Steenkamp also highlighted the Company's risk management during the call, stating "I can tell you with confidence that our functional areas, including risk, operations and treasury performed exceptionally well."

460.    During the call, a Keefe, Bruyette and Woods analyst asked whether MF Global would "need to raise equity." Steenkamp responded, in part, that "*[w]e felt good about having*

155

*the liquidity in these volatile times, especially going over quarter-end. And we consistently, on*

*a day-to-day basis, assess liquidity needs and sort of be more cautious in our approach. . . .*"

Corzine added, "*we're in a much, much stronger liquidity position.*"

461.    A J.P. Morgan analyst on the call also specifically asked about the Company's

capital, noting that "you reported excess capital of $342 million at the end of last quarter" and

asking "why were you not able to kind of use that capital to meet the FINRA, the change[d]

FINRA requirements? And I guess how should we interpret your concept to the concept of

excess capital going forward?" In response, Corzine said "that is actually exactly what I

suggested in my answer and how we've responded to the changed interpretation that we were

required to meet by FINRA. *We had excess capital in many different other locations.*"

Steenkamp added, "That's exactly right. It's location . . . . So FINRA was very specific to ink to

our U.S. broker-dealer. The excess is spread all around the world and in various entities . . . and

they can't go back in time and change the location back in time[.]"

462.    Corzine further stated that "I think all financial institutions will have to go

through a re-optimization of how they allocate both capital and liquidity in the new world that

we are evolving to on regulation not only within countries but across the globe. And we were

able to really quite [facilitate] to be able to move the capital within the group to meet the needs."

463.    The above-referenced statements about MF Global's risk appetite, internal

controls and liquidity management were materially misstated and omitted material facts

necessary to make the statements therein not misleading for the reasons set forth in Sections

IV.D.-G. above, including, *inter alia*, because: (1) the Officer Defendants' strategic plan to

increase principal risk-taking also materially increased liquidity risks without the necessary

corresponding increase in capital, liquidity risk management or internal controls; (2) MF Global

failed to maintain reliable internal controls related to Euro sovereign debt RTM transactions and repeatedly breached specific Board limits established for those transactions; (3) Defendants' representations about available capital and liquidity were unreliable given that: (a) the Company's liquidity monitoring systems were outdated, (b) the Company had no real-time liquidity monitoring system, and (c) the Company tracked liquidity using informal, manual means compiled from spreadsheets and oral reports; (4) even though the Company's transformation plan did not involve increasing VAR, the plan involved materially increasing off-balance sheet liquidity risks and leverage levels in connection with investments in Euro sovereign debt through RTM transactions; and (5) MF Global exposed client funds to significant risk by relying on regular inter-company transfers from MF Global's FCM operations to meet the daily liquidity needs of non-FCM operations.

## VI.   THE OFFICER DEFENDANTS ACTED WITH SCIENTER

464.   At all relevant times during the Class Period, Officer Defendants Corzine, MacDonald and Steenkamp acted with scienter in making materially false and misleading statements. Each Officer Defendant had actual knowledge that the statements made by him were materially false and misleading when made, or acted with reckless disregard for the truth or falsity of those statements. Each Officer Defendant's intent to deceive, or reckless disregard for the truth, is demonstrated by substantial direct and circumstantial facts and evidence supporting a strong inference of scienter.

### A.   The Officer Defendants Closely Monitored Core Operations

465.   The Officer Defendants were deeply involved in the daily management of all aspects of MF Global's core operations, including the Company's policies, procedures and standards for the management of capital, liquidity and market risks.

466.    Moreover, as set forth more fully above in Sections IV.B. and IV.D., Corzine "was very hands-on" in his role as Chairman and CEO. Soon after joining the Company, Corzine became a core member of MF Global's new proprietary trading unit, the PSG, which put on the enormous Euro sovereign debt RTM transactions. As such, Corzine communicated with MFGI and MFG-UK personnel directly to carry out these RTM transactions, instructing them when to enter and exit various positions. Internal emails cited in the SIPA Report and set forth above in Sections IV.D.-H. further establish that MF Global's senior management and Board, including the Officer Defendants, were consistently aware of the extent – and implications – of the Corzine Trade. The Officer Defendants therefore knew that: (1) MF Global's exposure to Euro sovereign debt through RTM transactions had grown to shocking levels beyond the Company's risk and liquidity profile; (2) by the summer of 2011, as reported to MF Global's Board, the Company anticipated the need for nearly one billion dollars' worth of additional funding to meet related margin calls; and (3) despite the risks associated with exposure to Euro sovereign debt through off-balance sheet RTM transactions, which were not included in any of the Company's VAR calculations, the Officer Defendants repeatedly touted VAR metrics to misleadingly reassure the public about MF Global's financial well-being.

467.    As a result of these regular and ongoing activities, Defendants Corzine, MacDonald and Steenkamp, at a minimum, were made aware of the facts alleged herein involving the Company's capital position, liquidity and risk management as they arose during the Class Period as well as the Company's, at best, "unsettled" attempt to turn MF Global's history of losses in its U.S. operations into profitability in the face of near-zero interest rates.

**B.**   **The Officer Defendants Were Aware Of, Or Recklessly Disregarded, The Abandonment Of Risk Management Practices**

468.   The Officer Defendants publicly described MF Global as having "solid risk management" throughout the Class Period and repeatedly emphasized publicly the importance of risk controls and limits. Indeed, Corzine held himself out as a unique type of CEO, who considered "one of [his] *most important jobs . . . to be the Chief Risk Officer*" and, as such, kept close tabs on risk management practices. Consistent with his purportedly "hands-on" approach, Corzine was well aware of the Company's risk limits, policies and procedures and the many perilous changes made to them at his insistence during the Class Period. While Corzine publicly represented and emphasized to investors that he would "ensure the appropriate controls are in place" and that "MF Global's risk management framework ha[d] been tightened considerably" since he took the reins as Chairman and CEO, he and the other Officer Defendants knew otherwise.

469.   As alleged above, the Officer Defendants were intentionally misstating the facts, or acting in a deliberately reckless manner in making their repeated public statements regarding purportedly strong risk management practices in view of what was actually happening at the Company, which, at the very least, provided no basis for – and in fact contradicted – their repeated statements. In particular, as detailed in Section IV.E. above, the Officer Defendants were aware that: (1) Corzine side-lined the Company's risk officers; (2) Corzine cancelled key projects in the risk department; (3) Corzine systematically circumvented internal controls to increase Euro sovereign debt trading limits *by 950%* in 2010 – from approximately $500 million in March 2010 to $4.75 billion in November 2010 – and to $6.6 billion in the first six months of 2011; and (4) PwC's non-public audit work-papers "identified the management override over internal controls as a risk to MF Global." In addition, as detailed above in Section IV.E.1.,

Corzine was aware that the Company was in breach of then-existing risk limits – such as they were – on more than one occasion and sought Board approval *only after the fact*.

470.   Moreover, the Company's Chief Risk Officers repeatedly warned the Officer Defendants of the increasing capital, liquidity and concentration risks associated with the Corzine Trade, but the Officer Defendants ignored the risks and fired CRO Roseman for resisting their insistence on increasing the size of the Corzine Trade. *See* Section IV.E. Numerous other MF Global employees also saw and raised red flags during the Class Period, but the Officer Defendants ignored those warnings too. *See* Section IV.E.

471.   In fact, the Officer Defendants disregarded dozens of critical gaps in internal controls that were apparent, identified and even reported to MF Global's Board. As detailed in Section IV.E.2. above, the Officer Defendants knew or recklessly disregarded that, among other things: (1) an April 2010 Board presentation identified gaps in technology that made the data needed for forecasting MF Global's liquidity risks inadequate and unreliable; (2) a May 2010 Internal Audit report noted that MF Global's risk policies, including liquidity risk reporting, were "not congruent with the changes to its broker-dealer business"; (3) an October 2010 Internal Audit report on "Market and Credit Risk Management" identified "High Risk" areas arising from the lack of controls over risk reporting and liquidity monitoring; (4) a March 31, 2011 Internal Audit report 2011 concluded that MF Global's Regulatory Reporting group did not have controls or automated systems in place to document compliance-related performance; (5) a follow-up report that was presented to the Board noted that MF Global was dependent on O'Brien's personal knowledge of liquidity issues, which threatened a "key man risk," because the processes supporting the composition of the liquidity forecast were not documented and were mainly based on O'Brien's personal experience in lieu of reliable liquidity reporting tools; and

(6) a June 20, 2011 Global Liquidity and Capital Management Internal Audit report continued to warn of the "numerous and significant gaps between the policy and existing practices" that had not been remedied for more than one year on the grounds that "*the business accepts this risk*."

472.    Accordingly, the Officer Defendants were on notice that the Company's internal controls were at risk of having significant deficiencies and were aware of, or recklessly disregarded, what the OFR describes as "a pattern of lapses in compliance and governance" during the Class Period.

473.    Moreover, the Officer Defendants closely monitored the Company's capital and liquidity positions through daily reports. As detailed above in Section IV.G.4., Liquidity Dashboards were shared with senior management, including Defendants Corzine and Steenkamp, on a daily basis starting at some point in 2010. These Liquidity Dashboards showed that, during the month of October 2011 and for some time before, liquidity in MF Global's broker-dealer operations was *uniformly negative* before applying funding from other sources -- namely, funding from FINCO or FCM funds, including customer funds. In addition, as further detailed above in Section IV.G.4., senior management, including the Officer Defendants, also received Daily Estimated Net Capital summaries, which showed the amounts of the balances in MF Global's customer segregated and foreign secured accounts and the amount of the Firm Invested in Excess on any given day during the Class Period.

**C.    The Officer Defendants Were Aware Of, Or Recklessly Disregarded, GAAP Violations And Reporting Of False Financial Statements**

474.    The Officer Defendants repeatedly signed the Company's SEC filings that described the controlling GAAP requirements for recording DTA. Thus, they were aware of those requirements, including the need to record DTA valuation allowances when required under GAAP, and MF Global's SEC filings stated that the Company had established accounting

policies that provided for the application of GAAP in the preparation of its financial statements. At the same time, the Officer Defendants repeatedly failed to follow these GAAP requirements and the Company's own accounting policies.

475.   Each of the Officer Defendants also has substantial educational, financial and industry experience, including the application of these specific GAAP requirements. Defendant MacDonald worked as an auditor for E&Y and Deloitte before joining MF Global. Defendant Steenkamp was MF Global's Chief Accounting Officer and Global Controller for four years before becoming CFO in April 2011 and, before joining MF Global, worked for eight years at PwC. Defendant Corzine, before serving as New Jersey's U.S. Senator and then Governor, was the CEO and Co-Chairman of Goldman Sachs for five years.

476.   Defendant MacDonald also specifically discussed the Company's DTA accounting on the first day of the Class Period during an investor conference call, as set forth in ¶ 321 above. Defendant Corzine also later discussed the Company's DTA accounting before Congress, as set forth in ¶ 105 above, and personally recognized in that discussion the Company's history of losses as a result of near-zero interest rates that were not expected to increase throughout the Class Period. Indeed, all of the Officer Defendants knew, at all relevant times, that the Company's return to profitability in the face of near-zero interest rates was, at best, an "unsettled" proposition.

477.   Accordingly, by virtue of their high-level positions and their prior professional experience and training, as alleged in detail above in Section IV.C.3., by the start of the Class Period, the Officer Defendants knew or recklessly disregarded that: (1) MF Global's U.S. operations were operating at a three-year cumulative loss as of March 31, 2010; (2) MF Global did not have evidence of sufficient quality and quantity to counteract that negative evidence; and

(3) MF Global did not have "prudent" and "feasible" tax strategies that would have enabled it to avoid recording a full valuation allowance against its U.S. DTA. Accordingly, the Officer Defendants knew that GAAP required MF Global to report a valuation allowance against the Company's U.S. DTA by no later than May 20, 2010, when the Company filed a Form 8-K attaching its financial results for the fiscal quarter and year ended March 31, 2010.

478.   The Officer Defendants further analyzed the need for a valuation allowance against the Company's U.S. DTA, at the very least, at the time of the Company's fiscal 2011 year-end results. However, the Company's 2011 Form 10-K purported to detail reasons why a full valuation allowance was not recorded against the Company's U.S. DTA, even though, as alleged in detail above in Section IV.C.3., the Officer Defendants knew or recklessly disregarded that: (1) MF Global's U.S. operations were operating at a four-year cumulative loss as of March 31, 2011; (2) MF Global did not have evidence of sufficient quality and quantity to counteract that negative evidence; and (3) MF Global did not have "prudent" and "feasible" tax strategies that would have enabled it to avoid recording a full valuation allowance against its U.S. DTA.

479.   The sworn certifications made by Defendants Corzine, MacDonald and Steenkamp during the Class Period also support a strong inference of scienter. These Officer Defendants repeatedly signed certifications attesting to MF Global's compliance with GAAP and the adequacy of MF Global's internal controls, and reaffirming that they had designed sufficient disclosure controls and procedures to ensure that "material information" concerning the Company was made known to them. The facts set forth herein, as well as MF Global's admissions on and after October 25, 2011, reveal the falsity of these repeated certifications. The undisclosed facts concerning MF Global's deteriorating liquidity and capital positions and inadequate risk management processes constituted "material information," the disclosure of

which would have affected, and did affect, the fair presentation of MF Global's financial statements in compliance with GAAP and which was contrary to the disclosures in MF Global's annual and quarterly reports. These Officer Defendants acted intentionally or in a deliberately reckless manner in repeatedly issuing sworn certifications attesting to the Company's compliance with GAAP, when MF Global's financial results were not presented in accordance with GAAP, and as to the adequacy of MF Global's internal controls when the Company suffered from material weaknesses in its internal controls as alleged herein.

## VII.   PWC FALSELY CERTIFIED THAT IT HAD AUDITED MF GLOBAL'S FINANCIAL STATMENTS AND INTERNAL CONTROLS FOR THE FISCAL YEARS ENDED MARCH 31, 2010 AND MARCH 31, 2011 IN ACCORDANCE WITH CONTROLLING AUDITING STANDARDS

480.    PwC's liability in this action arises from its own Class Period statements certifying that it had audited MF Global's financial statements and internal controls for the fiscal years ended March 31, 2010 and March 31, 2011 in accordance with the controlling auditing standards of the Public Company Accounting Oversight Board (United States) (the "PCAOB"), which PwC knew, or was reckless in not knowing, were false and misleading when made. PwC's statements misrepresented that it had: (i) conducted its audits in compliance with PCAOB auditing standards, when that was not the case; and (ii) a reasonable basis for its opinions that the Company's financial statements complied with GAAP and its internal controls were effective, when that was not true. Had PwC complied with controlling PCAOB auditing standards, the only reasonable conclusions PwC could have drawn would have been that: (i) the Company's DTA valuation allowance was insufficient at each fiscal year-end and, consequently, that the Company had materially overstated its U.S. DTA in violation of GAAP; and (ii) the Company's internal controls were not effective.

481.    As set forth in Section IV.C. above, MF Global's financial statements did not comply with GAAP because the Company's DTA was overstated and required a material valuation allowance by the start of the Class Period. PwC knew, or recklessly disregarded, that: (1) MF Global was in a three- and four-year cumulative loss position in its U.S. operations as of March 31, 2010 and March 31, 2011, respectively; (2) MF Global did not have evidence "of sufficient quality and quantity" required by GAAP to counteract its three- and four-year U.S. cumulative loss as of March 31, 2010 and March 31, 2011; and (3) MF Global did not have "prudent" and "feasible" tax planning strategies that would have enabled it to avoid recording a material valuation allowance against its U.S. DTA.

482.    PwC also knew, or recklessly disregarded, that MF Global's internal controls were not effective.   As set forth below, PwC received written reports documenting internal control deficiencies at MF Global and attended at least one MF Global Board meeting at which these deficiencies were discussed.   Yet, PwC's workpapers make clear that, as the Company's external auditor, PwC failed to appropriately analyze, evaluate, review, or consider these internal control deficiencies as required by GAAS. PwC's workpapers evidence that it ignored or minimized serious Company risk failures identified as "High" risk and demonstrate that, in many instances, it performed nothing more than a perfunctory review of MF Global's self-reported internal control deficiencies.

483.    For the reasons set forth below, PwC's audits of MF Global's DTA and internal controls during the Class Period amounted to no audits at all.   PwC utterly failed to carry out the independent auditor's critical role as a "public watchdog,"[27] and in generating audit reports that

---

[27] *United States v. Arthur Young & Co.*, 465 U.S. 805, 818 (1984).

improve the reliability of financial statements, enhance the credibility of those statements, and support the capital markets.

### A.    GAAS Auditing Standards

484.    The standards that auditors of public companies must follow when auditing a company are promulgated by the PCAOB which was established by the Sarbanes-Oxley Act of 2002 ("SOX"). The PCAOB adopted as "interim standards" the GAAS issued by the AICPA that were in effect as of April 16, 2003. The PCAOB has also released a limited number of its own Auditing Standards modifying or adding to the requirements of the interim standards. In this Complaint, the PCAOB's own issued standards are referenced as "AS" sections. The interim standards adopted from the AICPA are referenced as "AU" sections. All references in this Complaint to GAAS include AS and AU standards.

485.    There are ten principal GAAS provisions, which are divided into three categories: (1) general standards, which set forth guidelines for auditor training and independence; (2) standards of fieldwork, which set forth guidelines for audit planning, the collection of evidentiary verification of audit conclusions, and the evaluation of internal controls; and (3) standards of reporting, which set forth guidelines for ensuring that financial statements are presented in accordance with GAAP. These GAAS provisions "provide a measure of audit quality and the objectives to be achieved in an audit." AU 150.01.

486.    PCAOB auditing standards allow for the audit of a company's internal control over financial reporting to be integrated with the audit of the company's financial statements. An auditor may thus issue a combined report covering both issues, as PwC chose to do with its audits of MF Global.  However, the objectives of the audits are not identical and the auditor must plan and perform the work to achieve the objectives of both audits. AS 5.06. Accordingly, in an

166

integrated audit of internal controls and financial statements, the auditor must design the testing of controls to accomplish the objectives of both audits simultaneously. AS 5.07.

### 1.   GAAS Standards Pertaining To The Audit Of Financial Statements

487.   GAAS Standard of Fieldwork No. 1 requires an audit to be "adequately planned," which "involves developing an overall strategy for the expected conduct and scope of the audit." AU 311.03. This requires that the auditor develop an understanding of the audited company's business sufficiently to identify areas of risk. It also requires that particular attention be paid to matters that, if inaccurately reported in a financial statement, could materially alter the company's financial situation.

488.   GAAS General Standard No. 3, which establishes an auditor's independence, mandates that "due professional care is to be exercised in the performance of the audit and the preparation of the report." AU 150.02. Importantly, the auditor must obtain "sufficient competent evidential matter … through inspection, observation, inquiries and confirmations to afford a reasonable basis for an opinion." AU 150.02.  The exercise of due professional care includes the application of professional skepticism in lieu of mere acceptance of representations made by management. Accordingly, an auditor must investigate and obtain supporting evidentiary documentation for all assertions made by the audited company in its financial statements. While management generally makes many representations to the auditor in response to specific inquiries as well as through the financial statements, auditors are precluded from using such representations as a substitute for the application of appropriate audit procedures necessary to afford a reasonable basis for an opinion regarding the financial statements. AU 333.02. When management's representations are contradicted by other audit evidence, auditors are required to investigate the circumstances and factor in the reliability of representations when reaching an audit opinion. AU 333.04.

489.   GAAS Standard of Reporting No. 4 requires an auditor to state in its report whether the company's financial statements are presented in accordance with GAAP. AU 150.02. The presentation of financial statements in conformity with GAAP also requires disclosure of material matters. AU 431.02.  If a company's management omits information from the financial statements or accompanying notes required by GAAP, the auditor is required to determine the effect of such omissions in its audit report.  AU 431.03.  Accordingly, GAAS Standard of Reporting No. 4 requires an auditor to express an opinion on the financial statements of a company taken as a whole, or to state that an opinion cannot be expressed.  AU 150.02.  If an auditor cannot give an unqualified audit report, it may be required to give the company an adverse opinion, or to include explanatory language in the audit report to explain the company's non-compliance with GAAP.

**B.**   **PwC Knowingly Or Recklessly Issued Materially False And Misleading Statements In The 2010 Form 10-K Asserting That It Conducted Its 2010 Audit Of MF Global's Financial Statements In Accordance With PCAOB Standards When It Failed To Comply With Its GAAS Obligations**

**1.**   **PwC Conducted No Audit At All Of MF Global's DTA As Part Of Its 2010 Audit**

490.   In its 2010 audit, PwC

491.

492.

493.

That was plainly contradicted by PwC's own "Guide to Accounting for Income Taxes" which states that non-recurring items are to be *included* in the calculation of cumulative losses:

This measure generally would include discontinued operations, other comprehensive income (OCI) and extraordinary items, *as well as all other so-called "nonrecurring" items*, such as restructuring or impairment charges. That is, all items, other than the cumulative effect of accounting changes, *should be included* in the determination of cumulative losses.

*While such items may not be indicative of future results, they are part of total results, and there may be discontinued operations, OCI, extraordinary items, and other nonrecurring charges in future years*.

494.

2.   **PwC Retroactively Attempted To Justify Its Failure To Audit MF Global's Fiscal Year 2010 U.S. DTA One Year Later In 2011, After Its Unqualified Fiscal Year 2011 Audit Report Was Issued**

(a)   **PwC's Retroactive Fiscal Year 2010 DTA Analysis, Performed One Year Later In 2011, Further Demonstrates Pwc's Failure To Meet GAAS In 2010**

495.

496.

497.

---
28

**(b)     Even If PwC Could Retroactively Audit MF Global's Fiscal Year 2010 DTA, Its 2011 Retroactive Audit Of MF Global's Fiscal Year 2010 DTA Violated Auditing Standards**

498.

499.

500.

501.

502.

503.

504.

505.

506.

507.

508.    For example, the Company's Monthly Management Package dated April 23, 2010 (contained in PwC's workpapers) showed that yields on client balances in 2009 had been 1.62% in fiscal year 2009 but had fallen to 1.12% in fiscal year 2010. And the 2010 fiscal fourth quarter yields were lower than those of the 2010 fiscal third quarter. Client balances also declined from fiscal year 2009 to fiscal year 2010, and from the 2010 fiscal third quarter to the 2010 fiscal fourth quarter. Thus, there was not sufficient evidence of any improved trend in interest rates or client balances as of the time of MF Global's fiscal year ended March 31, 2010 (or even the subsequent date of PwC's retroactive 2010 audit).[29]   Rather, the trend was deteriorating, not improving.

---

[29] And, as set forth in ¶ 109 above, even well in MF Global's fiscal 2012 year, CEO Corzine continued to note that "*we may not be in a rising interest rate environment.*"

509.    Indeed, the same April 23, 2010 Management Package contained in PwC's fiscal year 2010 workpapers further noted that "the Federal Reserve pledg[ed] to keep interest rates close to zero *for the foreseeable future;*" "because of low interest rates, interest income *continues to be a non factor;*" and "we are operating with *virtually no interest income.*" And also contrary to                                                             . the Management Package concluded that the impact of lower interest rates and client balances on net revenues in 2010 had been significantly negative: "Net return on client balances *decreased $119.1m* in FY10 to $152.1m from $271.2m in FY09 *primarily related to: (i) interest rate decline* with key rates moving as follows (averages): Fed funds from 1.177% to 0.146%; 30-day yield from 0.747% to 0.068% (ii) *Avg client balances declined* from $16.8bn in FY09 to $13.6bn in FY10." This represented a dramatic *43% decline* in net return on client balances.

510.

511.

512.

513.

514.

   As set forth in Section IV.C. above, GAAP provides that "a cumulative pre-tax loss for financial reporting for the current and two preceding years" is

*significant negative evidence* that is "difficult to overcome." PwC's own tax Guide further
warns that:

> *A projection of future taxable income is inherently subjective and generally will
> not be sufficient to overcome negative evidence* that includes cumulative losses
> in recent years, *particularly if the projected future taxable income is dependent
> on an anticipated turnaround to operating profitability that has not yet been
> demonstrated.*
>
> *   *   *
>
> *An enterprise with significant negative evidence, such as a history of recent
> losses, normally will find it very difficult to demonstrate that even an
> implemented exit plan provides sufficient objective evidence that the enterprise
> will be restored to profitability, prior to the time that it actually becomes
> profitable.* In these circumstances, it would be that much more difficult to
> demonstrate that an unimplemented exit plan provides sufficient evidence to
> overcome the negative evidence present.

515.

516.

517.    As set forth in Section IV.C. above, GAAP specifies that tax planning strategies
must be actions that the entity "ordinarily might not take," but would take to utilize its DTA

(ASC 740-10-30-18).  Here, however, MF Global already began to undertake the specified actions even before PwC retroactively labeled them as "tax planning strategies," demonstrating that they were not tax planning strategies as defined by GAAP.

518.

519.

520.

---

[30] As set forth in detail in Section IV.D. above, throughout 2011, MF Global faced an increasing liquidity crisis as a result of the massive growth in its Euro sovereign RTM portfolio.

[31] Under CFTC Rule 1.25, customer funds – which were used to bankroll MF Global's HTM portfolio – could only be used to invest in certain assets. In particular, CFTC Rule 1.25 prohibits investments in corporate bonds under the circumstances at issue here. *See U.S. Commodity Futures Trading Comm'n v. MF Global Inc.*, 2013 WL 6923494, at *3 (S.D.N.Y. Nov. 8, 2013) (finding defendants "liable for having violated" CFTC Rule 1.25, among others).

[32] Additional reasons for why this purported tax planning strategy was not sufficient under GAAP are set forth below in connection with the discussion of PwC's fiscal 2011 audit. PwC's failure to audit MF Global's internal controls in accordance with its GAAS obligations in its 2010 and 2011 audits is also set forth below.

**C.     PwC Knowingly Or Recklessly Issued Materially False And Misleading Statements In The 2011 Form 10-K Asserting That It Conducted Its 2011 Audit Of MF Global's Financial Statements In Accordance With PCAOB Standards When It Failed To Comply With Its GAAS Obligations**

**1.     PwC Knowingly Or Recklessly Violated Its GAAS Obligations In Its Audit Of MF Global's Fiscal Year 2011 DTA**

521.    As set forth herein, PwC knowingly or recklessly violated its GAAS obligations in auditing the Company's U.S. DTA in its fiscal year 2011 audit.

522.    .

523.    Moreover, as set forth herein, PwC knew or recklessly disregarded that the reasons MF Global provided for not recording a valuation allowance against all of the Company's U.S. DTA as of March 31, 2011 were insufficient under GAAP, for the following reasons: (a) MF Global's U.S. operations were operating at a three-year cumulative loss as of March 31, 2010, and a four-year cumulative loss position as of March 31, 2011, which was "significant negative evidence" that a valuation allowance was required by GAAP against MF Global's U.S. DTA; (b) MF Global did not have evidence "of sufficient quality and quantity to counteract [that] negative evidence" as required by GAAP; and (c) MF Global did not have

181

"prudent" and "feasible" tax strategies sufficient to avoid recording a full valuation allowance against its U.S. DTA in accordance with GAAP.

524.    Nonetheless, PwC issued a clean audit report for the Company's fiscal 2011 financial statements in the 2011 Form 10-K, in violation of its GAAS obligations.

> (a)    **In Its 2011 Audit, PwC Knew That MF Global's U.S. Operations Were In A Three (And Four) Year Loss Position**

525.

526.

          **(b)**    **PwC Did Not Obtain Positive Evidence of Sufficient Quality And Quantity To Counteract The Significant Negative Evidence Requiring A Valuation Allowance As Of March 31, 2011, In Violation Of GAAS**

527.

          **(i)**    **PwC Improperly Under-Weighted The Significant Negative Evidence Of A Four-Year Cumulative Loss**

528.

---

33

529.   PwC's concurrence with MF Global that the presence of "objectively" "non-recurring" items could "diminish" the significant negative evidence of a cumulative three- and four-year pre-tax net loss contradicts PwC's own tax Guide.  As set forth above, the Guide specifically states that non-recurring items *should be included* in calculating cumulative pre-tax net losses because while they may not repeat, other non-recurring items may likely arise in future years:

> This measure [cumulative pretax results] generally would include discontinued operations, other comprehensive income (OCI) and extraordinary items, as well as all other so-called *"nonrecurring" items*, such as restructuring or impairment charges. That is, all items, other than the cumulative effect of accounting changes, *should be included* in the determination of cumulative losses.
>
> *While such items may not be indicative of future results, they are part of total results, and there may be discontinued operations, OCI, extraordinary items, and other nonrecurring charges in future years.*

530.

531.   Moreover, as set forth in detail in Section IV.C. above, MF Global's non-recurring losses were not the only reason it was not profitable: the Company's lost profitability was primarily caused by the low interest rate environment, which was not expected to change in the near future.  Yet, PwC failed to properly consider the lost profitability caused by the low interest rate environment, in violation of GAAS.

184

532.    Accordingly, when evaluating the profitability of MF Global's U.S. operations and the likelihood that it could realize its DTA, PwC knowingly or recklessly violated its GAAS obligations by excluding non-recurring items from MF Global's cumulative loss analysis.

533.

(ii)    **PwC Improperly Over-Weighted The Positive Evidence**

534.

185

- **Reversal Of Existing Taxable Temporary Differences**

535.

- **Forecasts Of Sufficient Taxable Income**

536.

537.   As noted in Section IV.C. above, PwC's own tax Guide observes that a history of recent losses is "*very difficult*" to overcome based on mere *forecasts* of future taxable income. It states that "[a] projection of future taxable income is inherently subjective and is generally not

sufficient…*particularly if the projected future taxable income is dependent on an anticipated turnaround to operating profitability that has not yet been demonstrated*." GAAP further provides that "[u]nsettled circumstances that, if unfavorably resolved, would adversely affect future operations and profit levels on a continuing basis in future years" is further "negative evidence." ASC 740-10-30-21.

538.    Indeed, MF Global U.S. operations were far from demonstrating profitability, and were actually incurring progressively larger losses.

539.

540.

541.

542.

543.

544.

---

[34] Subsequently, on October 25, 2011, when MF Global eventually recorded a full valuation allowance against its U.S. DTA, it cited a decrease in revenue "primarily due to the contraction of proprietary principal activities," as MF Global was forced to curtail its RTM trades.

545.

546.

547.    Accordingly, in its audit of MF Global's 2011 U.S. DTA, PwC knowingly or recklessly violated its GAAS obligations in crediting the purported positive evidence of MF Global's dramatically forecast turnaround to profitability which had not be demonstrated.

- **MF Global's Purported Tax Planning Strategies**

190

548.     The third set of positive evidence purportedly relied upon by MF Global and fully credited by PwC in auditing the Company's 2011 U.S. DTA consisted of tax planning strategies. As set forth in Section IV.C. above, tax planning strategies that validly justify avoiding a valuation allowance under GAAP are actions that: "(a) are prudent and feasible; (b) *an entity ordinarily might not take*, but would take to prevent an operating loss or tax credit carryforward from expiring unused; and (c) would result *in realization* of deferred tax assets." ASC 740-10-30-19. PwC knew or recklessly disregarded that the purported tax planning strategy set forth in the 2011 DTA PwC Memorandum did not qualify as such under GAAP.

549.

550.     However, PwC knew or recklessly disregarded that this factual justification was false.  PwC knew that the Company, in fact, had already begun to extend the duration of its HTM Portfolio in the above-described manner at the end of fiscal 2010 (and through fiscal 2011 when it continued to sustain losses). Moreover, there was no evidence that this already-implemented strategy would generate sufficient income to realize enough profitability to utilize MF Global's U.S. DTA.

551.    Specifically, in an email dated May 8, 2011, PwC Engagement Partner Gallagher wrote to PwC Tax Partner Baird asking whether the strategy of extending the maturity of MF Global's HTM government securities would qualify as a valid tax-planning strategy.  Gallagher stated: "They hold $4.2 billion in short and mid term (<1 year and 3-5 years) predominantly US Tbills/notes in the [Hold-To-Maturity] at HQ for Liquidity.  Couldn't they argue as a tax planning strategy that they could move down the yield curve to say 10 – 30 years US Bonds?"

552.    Baird first responded that the Gallagher's proposal "seems prudent and feasible." About thirty minutes later, however, Baird told Gallagher that MF Global had already begun to extend the maturities of its governmental securities, responding: "Went back to my notes – Phil indicated that *they have already started doing this*."

553.

554.    Moreover, there was no indication that MF Global's decision to "move down the yield curve" was nothing other than part of its ordinary investment decisions, and not a tax-planning strategy. Indeed, Gallagher's emails show that the idea to convert a simple investment plan to "move down the yield curve" into a tax-planning strategy was *PwC's own*, and not the Company's: "*Couldn't they argue as a tax planning strategy that*...." The Company's "independent" auditors re-labeling as a tax-planning strategy an action already taken by the Company directly contradicted GAAS and violated PwC's independence and objectivity.

555.

556.    Gallagher's proposal also did not qualify as a tax-planning strategy because it did not meet the third prong of ASC 740-10-30-19, that it "result in realization of deferred tax assets." This prong requires that the strategy result in sufficient revenue to turn prior losses into positive taxable income. Unless the strategy can generate sufficient taxable income, the Company would not be able to realize the DTA. Even Gallagher's most aggressive scenario, consisting of reinvesting the 10-year notes, however, estimated additional revenue of only $51 million. But the prior year's loss at MF Global U.S. had reached $74 million. Accordingly, $51 million in additional revenues would not result in realization of the DTA. Instead, it would

merely reduce the size of the loss. PwC's guidelines explicitly say that "it would not be appropriate to reduce a valuation allowance when it appears that the tax-planning strategy *will only reduce an expected future loss*."

557.    Nor did PwC conduct any procedures in connection with its 2011 audit to have any basis to conclude that the tax planning strategy Gallagher re-labeled was prudent and feasible as required by GAAP. PwC simply accepted management's representation that locking up capital for longer periods of time (as much as *ten years*) when investing in longer term securities would have no impact on liquidity, without even examining MF Global's liquidity needs. Yet, PwC knew that the Company had, at most, $900 million available in its $1.2 billion liquidity facility. Moreover, PwC did not even consider the additional interest cost to MF Global in accessing funds from that facility as compared to any interest income from investing the HTM funds in longer term treasury securities. Put differently, PwC only considered the gross revenue generated from the extra-yield, but did not deduct the carrying cost to arrive at the net revenue. In fact, Gallagher's May 8, 2011 email to Baird discussed above admitted that MF Global had not "moved down the yield curve" in the past because it did not have available liquidity. And, on May 9, 2011, PwC documented that, at a meeting between PwC audit partner Gallagher and newly appointed MF Global Chief Risk Officer Stockman, Stockman specifically told PwC that MF Global faced a "liquidity risk" from its large Euro sovereign RTM exposure, "i.e. to ensure the Company can make all margin calls."  MF Global's HTM portfolio also included in corporate debt in violation of CFTC Rule 1.25 as set forth in ¶ 520.

558.    Indeed, the Company faced a liquidity crisis throughout fiscal 2011 as a result of its Euro sovereign RTM trading strategy, as set forth in detail in Section IV.D. above. By the time of PwC's 2011 audit, the liquidity crisis was even worse. And, as reflected in

contemporaneous MF Global documents contained in PwC's files, MF Global's liquidity situation was deteriorating, in part, because MF Global's HTM portfolio also included over $2 billion of European sovereign debt and MF Global was being forced to post additional collateral on those holdings.  As a result, MF Global deemed its on-balance sheet liquidity risk to be high: "risk considered escalated to high with massive increase in LCH haircuts on [Euro sovereign] collateral."

559.    Accordingly, PwC knew or recklessly disregarded that it had no reasonable basis to conclude that MF Global's (or, in fact, Gallagher's) purported tax planning strategy was valid or prudent and feasible as required by GAAP.

*  *  *

560.    For all of the foregoing reasons, PwC knowingly or recklessly violated its GAAS obligations in connection with its fiscal year 2011 audit of MF Global's U.S. DTA.

**D.    PwC Knowingly Or Recklessly Issued Materially False and Misleading Statements in the 2010 and 2011 Forms 10-K, Asserting That It Conducted Its Audits of MF Global's Internal Controls in Accordance With PCAOB Standards When It Failed To Comply With Its GAAS Obligations**

**1.    GAAS Standards Specific To Internal Controls**

561.    GAAS requires that every audit of financial statements assess internal controls as part of an evaluation of whether the financial statements conform with GAAP.  GAAS defines "internal control" as "a process -- effected by an entity's board of directors, management, and other personnel – designed to provide reasonable assurance regarding the: (a) reliability of financial reporting; (b) effectiveness and efficiency of operations; and (c) compliance with applicable laws and regulations." AU 319.06.

562.    Internal controls consists of five interrelated components:

Control environment sets the tone of an organization, influencing the control consciousness of its people. It is the foundation for all other components of internal control, providing discipline and structure.

Risk assessment is the entity's identification and analysis of relevant risks to achievement of its objectives, forming a basis for determining how the risks should be managed.

Control activities are the policies and procedures that help ensure that management directives are carried out.

Information and communication systems support the identification, capture, and exchange of information in a form and time frame that enable people to carry out their responsibilities.

Monitoring is a process that assesses the quality of internal control performance over time.

AU 319.07.

563.    The auditor is required to obtain an understanding of each of the five components of internal control sufficient to plan the audit. A sufficient understanding is obtained by performing procedures to understand the design of controls relevant to an audit of financial statements and determining whether they have been placed in operation. In planning the audit, such knowledge is used to: (i) identify types of potential misstatements; (ii) consider factors that affect the risk of material misstatements; (iii) design tests of controls, when applicable; and (iv) design substantive tests. AU 319.25.

564.    For financial statement audits, internal controls serve a critical function: they "prevent or detect material misstatements in financial statement assertions." AU 319.14. "The control environment sets the tone of the organization, influencing the control consciousness of its people.  It is the foundation for all other components of internal control, providing discipline and structure."  AU 319.34.

565.    Auditors are thus required to assess the audit risk associated with ineffective internal controls under Standard of Fieldwork No. 2. "Audit risk is the risk that the auditor may

unknowingly fail to appropriately modify his or her opinion on financial statements that are materially misstated." AU 312.02. The standards provide that "[i]n all audits, the auditor should obtain an understanding of internal control sufficient to plan the audit by performing procedures to understand the design of controls relevant to an audit of financial statements and determining whether they have been placed in operation." AU 319.02.

566.    "The auditor uses the understanding of internal control and the assessed level of control risk in determining the nature, timing, and extent of substantive tests for financial statement assertions." AU 319.05. Accordingly, to obtain this understanding, Auditing Standard 5 requires the auditor to test the design and operating effectiveness of internal controls. AS 5.42, 5.44.   An auditor must test the controls that are important to the auditor's conclusion about whether the company's controls sufficiently address the risk of misstatement with regard to each relevant assertion. AS 5.39.

567.    The purpose of assessing control risk is to contribute to an auditor's evaluation of the risk that material misstatements exist in a company's financial statements. The process of assessing control risk (together with assessing inherent risk) provides evidential matter about the risk that misstatements may exist in the financial statements. As part of this process, an auditor is required to review reports issued during the year by the company's internal audit unit that address internal control over financial reporting, and the auditor must evaluate control deficiencies identified in those reports. AS 5.71. This evidential matter forms part of the reasonable basis of an auditor's opinion.

568.    If the company's internal controls are not robust, auditors must subject a company's financial statements to a higher level of scrutiny. AU 318.05-06. In addition, Item 308(a)(3) of Regulations S-B and S-K, which also requires public companies to provide

"Management's Assessment" of the design and operating effectiveness of its internal controls. That assessment is subject to audit.

569.    In assessing a company's internal controls as part of the auditor's financial statement audit, the auditor may identify deficiencies or material weakness in the company's internal control over financial reporting. AU 325.01. A "significant deficiency" is a deficiency, or a combination of deficiencies, in internal control over financial reporting that is less severe than a material weakness, yet important enough to merit attention by those responsible for oversight of the company's financial reporting. AS 5.A11.

570.    A "material weakness" is a deficiency, or a combination of deficiencies, in internal control over financial reporting, such that there is a reasonable possibility that a material misstatement of the company's annual or interim financial statements will not be prevented or detected on a timely basis. AS 5.A7.

571.    Ultimately, the auditor must evaluate the severity of each deficiency that comes to its attention to determine whether the deficiencies, individually or in combination, are material weaknesses as of the date of Management's Assessment. AS 5.62. The severity of a deficiency depends on: (1) whether there is a reasonable possibility that the company's controls will fail to prevent or detect a misstatement of an account balance or disclosure; and (2) the magnitude of the potential misstatement resulting from the deficiency or deficiencies. AS 5.63.

572.    If one or more material weaknesses exist, the company's internal control over financial reporting cannot be considered effective, and an auditor may not issue an opinion that internal controls are effective. AS 5.02.

## 2.    COSO Standards For Internal Controls

573.    Section 404 of SOX requires management at public companies to select an internal control framework and then assess and report on the design and operating effectiveness

198

of those internal controls on an annual basis. SOX 404 was "intended to bring information about material weaknesses in [internal controls] into public view." SEC Release 33-8810, *see* II.B.3, p.38. Most companies, including MF Global, adopt a framework published by the Committee of Sponsoring Organizations of the Treadway Commission ("COSO") to report on their internal controls in compliance with the SOX regulations.

574.   The COSO Framework states: "[i]nternal control is a process, effected by an entity's board of directors, management and other personnel, designed to provide reasonable assurance regarding the achievement of objectives in the following categories: (i) effectiveness and efficiency of operations; (ii) reliability of financial reporting; and (iii) compliance with applicable laws and regulations." COSO Framework, Ch. 1.

575.   COSO identifies five interrelated components of internal control: control environment, risk assessment, control activities, information and communication, and monitoring.   An ineffective control environment is often the root cause of an internal control breakdown, as it was at MF Global. COSO warns of the consequences of this type of internal control deficiency:

> Management's philosophy and operating style affect the way the enterprise is managed, including the kinds of business risks accepted…. Other elements of management's philosophy and operating style include attitudes toward financial reporting, conservative or aggressive selection from available alternative accounting principles, conscientiousness and conservatism with which accounting estimates are developed, and attitudes toward data processing and accounting functions and personnel…. ***The impact of an ineffective control environment could be far reaching, possibly resulting in a financial loss, a tarnished public image or a business failure***.

COSO Framework, Ch. 2.

3.    **PwC Knew Or Recklessly Disregarded That MF Global's Internal Controls Were Inadequate**

(a)    **PwC Received Internal Company Reports Identifying Internal Controls Weaknesses**

576.    Shortly before PwC's May 27, 2010 statement certifying the adequacy of the Company's internal controls, PwC received several reports documenting "High" risk internal control deficiencies at MF Global.

577.    In April 2010, PwC received a report whose title alone should have caused concerns. An "Enterprise Risk Policy Gap Analysis" was presented to PwC and the Audit and Risk Committee of the MF Global Board of Directors, which documented *over 30* gaps in MF Global's risk policy, by risk type, including four gaps in capital risk and another four gaps in liquidity risk (the "April 2010 Gap Analysis"). Of the 32 gaps identified, 12 of them were listed as "High" priority,[35] and 22 were described as having a "High" or "Extreme" level of complexity. These risk gaps were caused by (i) inadequate and non-existent documentation, (ii) Company practices inconsistent with risk policies, and (iii) inadequate technology resources ("*i.e.* current systems do not have capability and/or capacity to support requirement").[36]

578.    The warnings in the April 2010 Gap Analysis concerning liquidity risk were assessed to be "High" and reflected in red. Specifically, the April 2010 Gap Analysis warned, for example, of a "High" priority and "High" complexity practice gap resulting from the fact that the Company "*[c]annot measure Liquidity Risk* against Risk Appetite without liquidity scenario measurements." In fact, the liquidity scenarios were merely "under development." The Company's mitigation response team also was not expected to complete the liquidity scenarios

---

[35] "High" risk rating is "[a]ssigned where there are high or multiple moderate control issues that in *likely scenarios* could in aggregate *expose the business to high levels of risk*."

[36] According to meeting minutes, George Gallagher and Peter Messana of PwC also attended an October 27, 2010 follow-up presentation to MF Global's Audit and Risk Committee concerning the April 2010 Enterprise Risk Policy Gap Analysis.

for at least seven months, until November 2010 – long after PwC certified the adequacy of MF Global's internal controls in May 2010.

579.    The Company's liquidity risk was further exacerbated by the lack of a Global Head of Capital and Liquidity Risk, a "vacant" position normally responsible for providing an independent assessment of capital and liquidity risk. As a result, liquidity risk was not being monitored by the Company's Risk department, but instead, as a stop-gap measure, by Treasury. The April 2010 Gap Analysis further warned, with regard to liquidity forecasting, a "High" priority and "High" complexity technology gap, that the Company "[c]annot produce accurate forecasts because [the] underlying data is inadequate."

580.    The Company and PwC also were aware of systematic gaps in policies regarding Capital Risk (the risk of losing all or part of the amount invested) according to the April 2010 Gap Analysis. As of April 2010, the Company had identified, with "High" priority and "High" complexity, that it had not even developed "performance measures at the global entity and business levels, such that a return on risk-adjusted capital" could be evaluated. The Company also did not have "the capacity to identify the costs, revenues, and risks [] that apply to the individual businesses and activities." The Company even admitted that addressing those "extreme[ly]" complex Capital Risks, required a "global and comprehensive economic-capital at risk technology solution, which MF Global [did] not currently possess."

581.    With respect to Market Risk (the risk of loss due to factors that affect the overall performance of the financial markets), the April 2010 Gap Analysis further concluded that "current resources and technology do not provide capacity necessary to ensure consistent, complete, accurate, timely, and reliable measurements across the company." Again, the

201

Company identified that addressing the Market Risk gap was a "High" priority and "extreme[ly]" complex.

582.

583.    PwC's perfunctory analyses, however, led to its issuance of statements that the Company's internal controls were adequate, which lacked any reasonable basis, in violation of AS 5.42 and AS 5.44. PwC was obligated by GAAS to review the April 2010 Gap Analysis and evaluate the control deficiencies identified therein. The April 2010 Gap Analysis detailed *32 gaps* in risk policy, including four gaps in capital risk and another four gaps in liquidity risk. Yet, PwC's workpapers show that the external auditors failed to conduct any substantive auditing procedures to analyze, evaluate, or consider these gaps in its fiscal year 2010 (or the subsequent 2011) audit.

584.    PwC received another report issued in April 2010 by MF Global's Internal Audit group that found the Company's "***overall control environment has a significant manual control***

*bias, a known issue that heightens the risk of error*." This conclusion was highlighted again at an Audit and Risk Committee meeting on May 26, 2010, which PwC partners McGowan, Messana, and Gallagher all attended. Yet, once again, PwC's fiscal year 2010 (and 2011) workpapers evidence that PwC failed to conduct any substantive auditing procedures or review this particular report, in violation of GAAS. AS 5.71. While MF Global's Internal Audit group concluded that the Company's control failures "*can impact the integrity of financial data,*" and are "also a SOX issue,"

The failure to properly review Internal Audit conclusions and to thoroughly test specific internal controls in response to the highlighted concerns constituted violations of PwC's GAAS obligations under AS 5.39 and AS 5.71.

585.    PwC failed to properly respond to additional Internal Audit reports. A May 2010 report, found in PwC's workpapers, concluded that "*reporting for the liquidity risk category is yet to be developed*" and set a target date of November 30, 2010 to develop a reporting function for liquidity risk exposure. Given that an auditor is obligated to use "the understanding of internal control" to determine the auditor's "nature, timing and extent of substantive tests for financial statement assertions," PwC workpapers were required to reflect knowledge of these liquidity risks and heightened testing applied to the Company's financial statement audit process. AU 319.05.

586.    MF Global's Internal Audit group issued a second report in May 2010, also found in PwC's workpapers, which detailed three issues of "High" risk concerning the Company's UK Fixed Income (Execution Sales & Trading) desk. For each of the "High" risk factors identified, on May 24, 2010, Brian Palmieri, MF Global's Global Head of SOX Compliance, provided hand-written notes to PwC indicating that there was "no financial reporting impact" and therefore no SOX impact. Palmieri did not provide any basis for his conclusion. PwC failed to conduct any substantive auditing procedures testing the management representation by Palmieri that there was no SOX impact.

587.    That same day, on May 27, 2010, PwC issued a "clean" audit report, falsely stating that it had conducted its audit of MF Global's internal controls in accordance with PCAOB standards for the fiscal year ended March 31, 2010.

588.    Thereafter, PwC received yet another Internal Audit Report in July 2010, and PwC partner Gallagher attended an August 3, 2010 Audit and Risk Committee Meeting where the conclusions of this Report were discussed. The July 2010 report gave the Company an Assessed Control Environment Risk Rating of "High." Internal Audit's "High" Risk Rating of the Company's control environment required PwC to reassess its analysis regarding the Company's internal controls. It also required PwC to question the reliability of MF Global's financial statements, as internal controls serve the critical function of "prevent[ing] or detect[ing]

material misstatements in financial statement assertions." AU 319.14. Yet, the evidence from PwC's fiscal year 2011 workpapers shows that PwC did not take appropriate steps to address this vulnerability in compliance with its GAAS obligations, particularly those under GAAS Standard of Fieldwork 2, which required PwC to assess audit risk associated with ineffective internal controls.

589.    The "High" risk rating was partly the result of the lack of controls on trading limits. The July 2010 report stated:

> With the recent changes in the business and the supporting resources there have been challenges in providing supervisory oversight of the daily reconciliations, pricing reports, and outsourced processes. Additionally, ***there is a lack of effective controls for approving and establishing pre-execution limits within the electronic trading systems which may lead to an account being traded beyond approved levels***.

590.

591.    Also in July 2010, a separate Internal Audit Report focused on US Fixed Income and Securities Lending.  It was again copied to PwC, and found that "[t]here is a lack of controls for ensuring the completeness and accuracy of information input into MOMS [Middle Office Margining System] and margin calculations for Fixed Income accounts." This report also classified the Company's Assessed Control Environment Risk Rating as "High," and noted that the "Risk Management controls still require further improvement." Yet, there is no evidence in the PwC workpapers that the auditors conducted any substantive auditing procedures.

592.    By the fall of 2010, more risks with the Company's internal controls were identified. An October 2010 Internal Audit Report, included in PwC's workpapers, emphasized the difficulties introduced by "a transition phase underway within IT" that "may pose an increase[d] risk to the existing Risk IT control environment." The report further highlighted that the "current use [of end user computing] is pervasive and heightens the risk of monitoring and reporting errors."

593.    The October 2010 Report concluded that there were "*[i]nadequate controls in place to ensure the completeness and accuracy of risk exposure calculations and reporting*," rating this as a "High" risk issue. Warning of the danger of operating without adequate controls, the Report stated that "the EUCs [end user controls] may not maintain the integrity of the data and therefore there is an increased chance that decisions may be made on inaccurate information or that monitoring reports may be incomplete."

594.    Several other areas received a "High" risk rating in the October 2010 internal report, including risks related to "[i]nadequate controls in place to ensure the completeness and accuracy of transaction feeds into the risk monitoring systems," and "limited completeness and accuracy controls over the production of Global Credit reports." With specific reference to North America, the October 2010 Report also highlighted the "[l]ack of robust controls over the credit review process," and found that the supervisory reviews intended to ensure the quality of the credit reviews were "not operating effectively."

595.    Also in October 2010, the Company followed up on the April 2010 Gap Analysis, issuing an "Enterprise Risk Policy Gap Analysis – Remediation Status Update." It is obvious from this document that the issues identified in the April 2010 Gap Analysis had not, in fact,

206

been remediated. In fact, ***30 of the 32*** gaps in risk policy identified in the May 2010 Gap Analysis remained "open" and certain unremediated "High" priority risk gaps, those related to "Liquidity Risk Scenarios" and "Economic Capital Risk Measurement," had been upgraded in urgency by the internal Company report to "critical" priority.

596.

597.    Months later, an Internal Audit Report dated March 31, 2011 and "issued" in May 2011 (also copied to PwC) identified the following additional risk areas:

> The Regulatory Reporting group handles numerous daily, weekly and monthly reporting responsibilities. ***The vast majority of the calculations underlying these reports are done via spreadsheet.*** The group performs various checks and balances to ensure the information utilized is complete and accurate; however, in a variety of instances, ***the controls are not in place or not all aspects of these controls are documented as evidence that they have been performed. Additionally, these spreadsheets are typically not secure and are susceptible to human error.***

Echoing its concerns from the previous year, the Internal Audit Report again stated that "the EUCs [end user controls] may not maintain the integrity of the data and therefore there is an increased chance that decisions may be made on inaccurate information or that monitoring reports may be incomplete."

598.   Despite these pervasive, ongoing weaknesses across the Company's internal controls, PwC issued another "clean" audit report of MF Global's financial results and internal controls for the fiscal year ended March 31, 2011, falsely stating on May 29, 2011 that it had audited MF Global's internal controls in accordance with PCAOB standards when PwC had knowingly or recklessly failed to comply with its GAAS obligations.

      **(b)**    **PwC Certified MF Global's Internal Controls In Violation Of Its GAAS Obligations**

            **(i)**    **PwC's Failure To Audit MF Global's Internal Controls Is Evidenced By MF Global's Internal Controls Failure To Even Acknowledge Its Three-Year Loss Position**

599.

600.   PwC's internal control audit, however, ignored that MF Global's internal controls in 2010 had failed to identify the three-year cumulative loss position. PwC's GAAS obligations on internal controls require consideration of the root causes pursuant to which the Company claimed it was not in a three-year cumulative loss position. An auditor must "understand the design of controls relevant to an audit of financial statements" and must also "determin[e]

whether they have been placed in operation." AU 319.02. The severity of a control deficiency is dependent on the "possibility that the company's controls will fail to prevent or detect a misstatement" and the "magnitude of the potential misstatement." AS 5.63. The Company's failure to even identify that its tax position was in a three-year cumulative loss position in 2010 is strong evidence of a material weakness in internal control over financial reporting.

            (ii)     **PwC's Failure To Audit MF Global's Internal Controls Is Also Evidenced By MF Global Board And Internal Audit Reports That Were Ignored By PwC**

601. The Company's Internal Audit reports detailed above that were sent directly to PwC required PwC to conduct auditing procedures on internal controls in accordance with Auditing Standard 5. If any material weaknesses were found, MF Global's internal controls would not be considered effective, and PwC would not be permitted to issue a clean audit report on internal controls. AS 5.02. Yet, there is no evidence that PwC performed any serious evaluation or conducted any substantial analysis of these internal controls. PwC's workpapers for its 2010 and 2011 audit certifications do not evidence that PwC did anything more than a perfunctory review of these controls.

602.

603.

604.

**E.      Additional Evidence Of PwC's Scienter**

      **1.      PwC Had Been Warned To Focus On DTA In Its Audits**

605.     PwC had been warned of the risks involved in accounting for DTA by the PCAOB. The PCAOB was particularly attuned to the risk of accounting manipulation of DTA in the wake of the financial crisis, and issued specific alerts to ensure that independent auditors identified the risks and applied the appropriate audit procedures. In September 2010, the PCAOB issued its *Report On Observations Of PCAOB Inspectors Related To Audit Risk Areas Affected by the Economic Crisis*. PCAOB Release 2010-06. This report reiterated the need for independent auditors to focus on DTA in the current adverse economic environment:

> In an adverse economic environment, issuers might need to record valuation allowances because, for example, future taxable income might be insufficient to support the realization of the deferred tax assets. Further, estimates made by

issuers regarding the recoverability of deferred tax assets as well as the outcome of uncertain tax positions might require significant management judgment, *which increases the risk of material misstatement, particularly in times of economic distress*.

Essentially, the PCAOB reiterated that the then-current economic environment heightened the need for PwC to mitigate the risk of a material misstatement by challenging any assertions by management that valuation allowances against MF Global's DTA were not required. MF Global had been hit particularly hard by the financial crisis and near-zero interest rates as set forth in Section VI.C. above in detail.

606.    The PCAOB also warned independent auditors that it had concluded that certain auditors were failing to comply with GAAS in auditing DTA in the current adverse environment. The PCAOB warned that auditors had failed to "(a) evaluate whether issuers placed appropriate weight on forecasts of taxable income in light of the *uncertainty created by the adverse economic environment and the existence of recent losses*, [and] (b) adequately test reductions in issuers' deferred tax asset valuation allowances because, for example, the firm did not test whether there was sufficient positive evidence to outweigh substantial negative evidence..."

607.    Notwithstanding the PCAOB's specific warnings, these very failures actually took place in both of PwC's 2010 and 2011 audits of MF Global's U.S. DTA as set forth above, further demonstrating that PwC acted knowingly or recklessly.

608.    Even absent the PCAOB's explicit warning on auditing DTA, MF Global's DTA should also have been a critical area for PwC to focus its fiscal year 2010 and 2011 audits of MF Global because of its materiality and the fact that reserves such as DTAs are particularly subject to fraud. As an initial matter, the SEC requires registrants to provide additional disclosures regarding those accounting estimates that have a material impact on the entity's financial condition or operating performance. *See* SEC Financial Reporting Release No. 72. MF Global's

U.S. DTA was material as of March 31, 2010 and March 31, 2011, and qualified.

609.    Further, by carrying the DTA on its balance sheet MF Global was making an affirmative representation that it expected to be profitable in the future. In other words, because DTA generally must be written down in circumstances of ongoing unprofitability, as was the case with MF Global's U.S operations, MF Global's substantial U.S. DTA falsely represented to the market that it was more likely than not that the Company would be profitable in the upcoming years. This false statement was crucial to investors' understanding of the business as was later observed by the market and set forth in Section VI.C. above. Indeed, when MF Global was forced to take a valuation allowance in October 2011, the market immediately understood that MF Global was not expected to be profitable.

### 2.    PwC Warned MF Global That It Needed To Achieve Profitability

610.    PwC's failure to conduct appropriate auditing procedures on the DTA was also knowing or at least reckless because PwC demonstrated its true concern about MF Global's lack of profitability and DTA accounting to MF Global's Audit Committee, CEO and CFO by repeatedly warning them that the Company needed to start earning profits in the "near term" to support its DTA position.

611.

Indeed, the notes from an April 27, 2011 meeting attended by PwC audit partner Gallagher and Defendants

Corzine and Steenkamp reflected as follows regarding the Company's DTA: "*Key message –*
*make money.*   JC [Jon Corzine] and HS [Henri Steenkamp] understood." Similarly, minutes
from a May 10, 2011 PwC meeting with MF Global's CFO Steenkamp also stated: "*Given the*
*risk associated with the DTA and the need for future profitability in the near term*, Harry Baird
[PwC] tax partner and Phil O'Reilly, Director of Tax [at] MF Global joined the meeting to
discuss the analysis on the realizability of the DTA. Henri [Steenkamp] acknowledged, that the
Co. was aware that future profitability in the *near term* was necessary in order to not set up a
valuation allowance."

612.     However, PwC failed to satisfy its own GAAS obligations in the face of this
known risk as set forth herein.  Its repeated warnings to MF Global regarding the DTA and the
need to earn profits in the near term further demonstrate that it acted knowingly or at least
recklessly in failing to meet its GAAS obligations.

### 3.     PwC Feared Being Terminated As MF Global's Outside Auditor

613.

614.

615.

616.

617.

618.   '

619.

**F.     PwC's Material Misstatements And Omissions During The Class Period**

      **1.     PwC's Clean Audit Report For Fiscal Year 2010**

620.    PwC issued a "clean" audit report of MF Global's financial results and internal controls for fiscal year ended March 31, 2010, combining the results of its two engagements to audit the Company's financial statements and evaluate the Company's internal control over financial reporting.  In its report, PwC falsely stated that it had conducted its audit in accordance

216

with the requisite auditing standards.  The Company's 2010 Form 10-K, filed on May 28, 2010,

included a Report of Independent Registered Public Accounting Firm, dated May 27, 2010, by

PwC which stated:

> In our opinion, the accompanying consolidated balance sheets and the related
> consolidated and combined statements of operations, comprehensive income,
> changes in equity, and cash flows present fairly, and in all material respects, the
> financial position of MF Global Holdings Ltd. and its subsidiaries (the
> "Company") at March 31, 2010 and 2009, and the results of their operations and
> their cash flows for each of the three years in the period ending March 31, 2010 in
> conformity with accounting principles generally accepted in the United States of
> America.  Also in our opinion, the Company maintained, in all material respects,
> effective internal control over financial reporting as of March 31, 2010, based on
> criteria established in Internal Control-Integrated Framework issued by the
> Committee of Sponsoring Organizations of the Treadway Commission (COSO).
> The Company's management is responsible for these financial statements, for
> maintaining effective internal control over financial reporting and for its
> assessment of the effectiveness of internal control over financial reporting,
> included in the accompanying "Management's Report on Internal Control over
> Financial Reporting." Our responsibility is to express opinions on these financial
> statements and on the Company's internal control over financial reporting based
> on our audits (which were integrated audits in fiscal 2010 and 2009). *We
> conducted our audits in accordance with the standards of the Public Company
> Accounting Oversight Board (United States)*. Those standards require that we
> plan and perform the audits to obtain reasonable assurance about whether the
> financial statements are free of material misstatement and whether effective
> internal control over financial reporting was maintained in all material respects.
> Our audits of the financial statements included examining, on a test basis,
> evidence supporting the amounts and disclosures in the financial statements,
> assessing the accounting principles used and significant estimates made by
> management, and evaluating the overall financial statement presentation.  Our
> audit of internal control over financial reporting included obtaining an
> understanding of internal control over financial reporting, assessing risk that a
> material weakness exists, and testing and evaluating the design and operating
> effectiveness of internal control based on the assessed risk.  Our audits also
> included performing such other procedures as we considered necessary in the
> circumstances. We believe that our audits provide a reasonable basis for our
> opinions.

621.    The above-referenced statements about PwC's audit of MF Global's financial

statements and internal controls were materially misstated and omitted material facts necessary

to make the statements therein not misleading, because, as set forth above, PwC knowingly or recklessly failed to conduct its audits in accordance with the PCAOB standards.

### 2. PwC's Clean Audit Report For Fiscal Year 2011

622. PwC issued a "clean" audit report for MF Global's financial results and internal controls for the fiscal year ended March 31, 2011, again combining the results of its two engagements to audit the Company's financial statements and evaluate the Company's internal control over financial reporting. In its report, PwC falsely stated that it had conducted its audit in accordance with the requisite auditing standards. The Company's 2011 Form 10-K, filed on May 20, 2011, included a Report of Independent Registered Public Accounting Firm, dated May 19, 2011, which stated:

> In our opinion, the accompanying consolidated balance sheets and the related consolidated and combined statements of operations, comprehensive income, changes in equity, and cash flows present fairly, and in all material respects, the financial position of MF Global Holdings Ltd. and its subsidiaries (the "Company") at March 31, 2011 and 2010, and the results of their operations and their cash flows for each of the three years in the period ending March 31, 2011 in conformity with accounting principles generally accepted in the United States of America. Also in our opinion, the Company maintained, in all material respects, effective internal control over financial reporting as of March 31, 2011, based on criteria established in Internal Control-Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO). The Company's management is responsible for these financial statements, for maintaining effective internal control over financial reporting and for its assessment of the effectiveness of internal control over financial reporting, included in the accompanying Management's Report on Internal Control over Financial Reporting. Our responsibility is to express opinions on these financial statements and on the Company's internal control over financial reporting based on our integrated audits. *We conducted our audits in accordance with the standards of the Public Company Accounting Oversight Board (United States)*. Those standards require that we plan and perform the audits to obtain reasonable assurance about whether the financial statements are free of material misstatement and whether effective internal control over financial reporting was maintained in all material respects. Our audits of the financial statements included examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements, assessing the accounting principles used and significant estimates made by management, and evaluating the overall financial statement presentation. Our audit of internal control over financial reporting included obtaining an

understanding of internal control over financial reporting, assessing risk that a material weakness exists, and testing and evaluating the design and operating effectiveness of internal control based on the assessed risk. Our audits also included performing such other procedures as we considered necessary in the circumstances. We believe that our audits provide a reasonable basis for our opinions.

623.    The above-referenced statements about PwC's audit of MF Global's financial statements and internal controls were materially misstated and omitted material facts necessary to make the statements therein not misleading, because, as set forth above, PwC knowingly or recklessly failed to conduct its audits in accordance with the PCAOB standards.

## VIII.  LOSS CAUSATION

624.    The market prices of MF Global's publicly traded securities were artificially inflated by the material misstatements and omissions complained of herein, including the misstatements and omissions about MF Global's net income, DTA, Euro sovereign debt RTM transactions, risk management, internal controls and regulatory compliance.

625.    The artificial inflation in MF Global's securities prices was removed when the conditions and risks misstated and omitted by Defendants were revealed to the market. The information was disseminated through several partial disclosures that revealed the nature and extent of MF Global's financial condition, internal controls and risk exposures during the Class Period. These disclosures, more particularly described below, reduced the prices of MF Global's publicly traded securities, causing economic injury to Plaintiffs and other members of the Class.

626.    None of the disclosures was sufficient on its own to fully remove the inflation from MF Global's securities prices, because each only partially revealed the risks and conditions that had been concealed from investors.

627.    The corrective impact of the disclosures alleged herein was, however, tempered by Defendants' continued misstatements and omissions about MF Global's regulatory

compliance and the soundness of its operations.  These continued misrepresentations continued to maintain the prices of MF Global's publicly traded securities at levels that were artificially inflated, inducing members of the Class to continue purchasing MF Global securities even after the truth began to partially enter into the market. Further price declines that caused additional injury to the Class occurred upon the disclosure of additional information about the true condition of MF Global's operations, including the nature and amount of its customer funds shortfall.

628.    The disclosures that corrected the market prices to reduce the artificial inflation caused by Defendants' material misstatements and omissions are detailed below and summarized in the following chart, which identifies each corrective event, the price declines in the relevant MF Global securities resulting from the event, and, for purposes of comparison, the percentage change in the S&P 500 Index during the same time period:

| Date | Corrective Event | Stock Price | Stock Price Change | 2016 Notes Price | 2016 Notes Price Change | 2018 Notes Price | 2018 Notes Price Change | 6.25% Senior Price | 6.25% Senior Price Change | 2038 Notes Price | 2038 Notes Price Change | S&P 500 Price Change |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 10/24/11 | Moody's downgraded MF Global's rating to Baa3, citing exposure to European debt, related capital implications and increasing risk management concerns. | $3.55 | (3.53%) | $65.74 | (9.01%) | $69.75 | 3.80% | $87.40 | (2.07%) | $98.51[1] | N/A[2] | 1.29% |
| 10/25/11 | MF Global announced a quarterly loss of $191.6 million, largely the result of a $119.4 million DTA valuation allowance for U.S. and Japanese operations. | $1.86 | (47.61%) | $51.00 | (22.42%) | $48.13 | (31.00%) | $63.75 | (27.06%) | $70.00 | (28.94%)[3] | (2.00%) |
| 10/26/11 | *The Wall Street Journal* reported that MF Global hired investment bankers to explore strategic options; K&W analysts downgraded MF Global from "outperform" to "market perform." | $1.70 | (8.60%) | $58.00 | 13.73% | $51.00 | 5.97% | $65.00 | 1.96% | $58.00 | (17.14%) | 1.05% |
| 10/27/11 | Moody's and Fitch downgraded MF Global's rating to junk. The downgrade reflected Moody's "view that MF Global's weak core profitability contributed to it taking on substantial risk in the form of its exposure to European sovereign...." | $1.43 | (15.88%) | $57.50 | (0.86%) | $55.00 | 7.84% | $73.00 | 12.31% | $83.60 | 44.14% | 3.43% |
| 10/28/11 | *The Wall Street Journal* and other news outlets reported that MF Global intended to sell itself. | $1.20 | (16.08%) | $45.00 | (21.74%) | $48.00 | (12.73%) | $50.00 | (31.51%) | $52.50 | (37.20%) | 0.04% |
| 10/31/11 | MF Global filed Chapter 11 bankruptcy. | No Trading | N/A | $46.50 | 3.33% | $41.00 | (14.58%) | $50.00 | 0% | $49.13 | (6.43) | (2.47%) |
| 11/01/11 | Media reported "less than $700 million" of missing customer funds at MF Global. | No Trading | N/A | $44.00 | (5.38%) | $44.50 | 8.54% | $45.50 | (9.0%) | $40.00 | (18.58%) | (2.79%) |
| 11/02/11 | MF Global common stock resumes trading. | $0.25 | (79.18%)[4] | $48.50 | 10.23% | $48.50 | 8.99% | $48.19 | 5.91% | $48.63 | 21.56% | 1.62% |
| 11/03/11 | Media reported that a CME audit revealed a "$633 million" customer funds shortfall. | $0.28 | 11.25% | $45.00 | (7.22%) | $45.19 | (6.83%) | $45.50 | (5.58%) | $47.50 | (2.31%) | 1.90% |
| 11/04/11 | The resignation of Jon S. Corzine is announced. | $0.26 | (7.87%) | $41.50 | (7.78%) | $45.00 | (0.42%) | $41.50 | (8.79%) | $44.00 | (7.37%) | (0.63%) |
| 11/21/11 | The SIPA Trustee issued a statement quantifying MF Global's customer funds shortfall at "$1.2 billion or more." | $0.125 | (3.85%)[5] | $30.00 | (18.37%)[6] | $32.00 | (11.11%)[7] | $31.00 | (10.40%)[8] | $30.00 | (5.14%)[9] | (1.86%) |

[1] There is no available price or return data on 10/24/11; the price listed is carried forward from 10/20/11; the last reported trading price.

221

[2] There is no available price or return data on 10/24/11.

[3] The return is calculated based on the last reported trading price on 10/20/11 of $98.51.

[4] Change determined in relation to the closing price on 10/28/2011.

[5] Change determined in relation to 11/18/11 price of $0.13 for MFGLQ.

[6] Change determined in relation to 11/18/11 price of $36.75 for the 2016 Notes.

[7] Change determined in relation to 11/18/11 price of $36.00 for the 2018 Notes.

[8] Change determined in relation to 11/18/11 price of $34.60 for the 6.25% Senior Notes.

[9] Change determined in relation to 11/15/11 price of $31.625 for the 2038 Notes. There is no available price or return data from 11/16/11-11/18/11.

629.    As discussed above, on Monday, October 24, 2011, Moody's downgraded MF Global's long-term debt by one notch to Baa3. This placed MF Global one notch above junk status, and brought Moody's rating in line with the ratings by S&P and Fitch. Moody's also kept the rating under review for possible further downgrade. The Moody's report describing the "Ratings Rationale" behind the downgrade explained in part:

> The rating action reflects Moody's view that the current low interest environment and volatile capital markets conditions make it unlikely that MF Global, in the near term, will be able to achieve the financial targets that Moody's had previously specified were required for it to maintain a Baa2 rating. *These included generating $200-$300 million in annual pre-tax earnings and managing its balance sheet leverage in the 20x range, a level that would be consistent with other similarly rated broker-dealer peers.*
>
> *Moody's also said that it has become increasingly concerned with MF Global's risk management and management's ability to prudently balance risk and reward as it undergoes a substantial re-engineering of the firm.*
>
> "*MF Global's increased exposure to European sovereign debt in peripheral countries and its need to inject capital into its broker-dealer subsidiary to rectify a regulatory capital shortfall highlights the firm's increased risk appetite and raises questions about the firm's risk governance,*" said Moody's senior analyst Al Bush.

630.    Significantly, this Moody's report was based on information that Moody's received at the October 21, 2011 meeting with MF Global executives detailed above in ¶ 288-89, including the Company's need to record an enormous DTA valuation allowance for its U.S. and Japanese operations.

631.    As a result of the Moody's downgrade, the price of MF Global common stock dropped by approximately 3.5% to close at $3.55, down $0.13 from the prior day's close of $3.68, on heavy trading volume. In addition, the 2016 Notes fell 9.01% and the 6.25% Senior Notes fell 2.07%.

632.    The next day, October 25, 2011, MF Global released its Q2'12 earnings report (for the fiscal quarter ended September 30, 2011), announcing a quarterly loss of $191.6 million.

The loss was largely the result of the $119.4 million DTA valuation allowance in connection with the Company's U.S. and Japanese operations. The earnings release stated:

> Certain charges impact GAAP results. GAAP net loss applicable to common shareholders was $191.6 million, or $1.16 per basic and diluted share for the second quarter, compared with a loss of $94.3 million, or $0.59 per basic and diluted share for the same period last year.
>
> **Significant charges in the quarter included valuation allowances against deferred tax assets of $119.4 million**, restructuring charges of $10.0 million and loss on extinguishment of debt of $16.1 million from retiring a portion of the firm's 9 percent senior notes due 2038.
>
> \* \* \*
>
> As of September 30, 2011, MF Global maintained a net long position of $6.3 billion in a short-duration European sovereign portfolio financed to maturity (repo-to-maturity), including Belgium, Italy, Spain, Portugal and Ireland. The laddered portfolio has an average weighted maturity of October 2012 and an end date maturity of December 2012, well in advance of the expiration of the European Financial Stability Facility in June 2013. . . .
>
> \* \* \*
>
> Revenue, net of interest and transaction-based expenses (net revenue), was $205.9 million for the second quarter, versus $240.3 million for the same period last year. **The decrease in net revenue was primarily due to the contraction of proprietary principal activities**, particularly in equities and fixed income, as the company reduced its risk appetite amid volatile market conditions.
>
> \* \* \*
>
> . . . . Mr. Steenkamp continued, "In addition, the steps we've taken over the past year to improve our capital and liquidity positions are of immense value in periods of uncertainty and volatility. **As a result, we are a stronger firm today with more flexibility to focus on our strategy**."

633.  Analysts reacted negatively to the Company's October 25, 2011 disclosures, as set forth in ¶ 293-5 above.

634.  By the close of market trading on Tuesday, October 25, 2011, MF Global's common stock declined **by approximately 48%** to close at $1.86, down $1.69 from the prior day's close of $3.55, on extremely heavy trading volume. In addition, the prices of MF Global's

224

2016 Notes, 2018 Notes, 6.25% Senior Notes and 2038 Notes declined by approximately 22%,

31%, 27% and 29%, respectively.

635.     On October 26, 2011 at 10:15 A.M., *The Wall Street Journal* published an article

entitled "Corzine's MF Global to Explore Possible Sale." The article explained:

> Usually, when a company hires bankers to explore "strategic options" (code for: We might sell the company), the company's stock price will spike as investors bet on takeover riches. MF Global is experiencing the opposite effect.
>
> The brokerage firm's stock price was clobbered yesterday – down nearly 50% –as investors were spooked about MF Global's earnings results, exposure to European debt and a credit-rating downgrade from Moody's.
>
> This morning, our Journal colleague Aaron Lucchetti is reporting MF Global hired investment bankers to suss out a possible sale, mergers or other "strategic options." The news isn't helping the stock price.

636.     On the heels of this news, KBW analysts downgraded MF Global from

"outperform" to "market perform," and margin calls continued to substantially drain MF

Global's liquidity.

637.     As a result of this continuing adverse news, on October 26, 2011, MF Global's

common stock declined by 8.6% to close at $1.70, down $0.16 from the prior day's close of

$1.86, on extremely heavy trading volume. The price of MF Global's 2038 Notes also declined

by approximately 17%, to close at $58.00, down $12.00 from the prior day's close of $70.00, on

heavy trading volume.

638.     On Thursday, October 27, 2011, Moody's and Fitch downgraded MF Global's

rating to junk status. The Fitch report cited as the rationale for its downgrade MF Global's

"continued challenges in establishing a sustainable level of profitability and improving its

leverage profile." Fitch further noted that "volatile capital markets present MF with significant

headwinds in executing its strategic transformation from a pure broker to a broker-dealer and,

longer term, to a full investment bank without outsized incremental risk."

639.    In addition, the Moody's "Ratings Rationale" provided the following:

Moody's Investors Service downgraded the long-term ratings of [MF Global] including its senior, unsecured debt rating to Ba2 from Baa3. The ratings remain under review for possible further downgrade.

Moody's said the downgrade reflects our view that *MF Global's weak core profitability contributed to it taking on substantial risk in the form of its exposure to European sovereign debt in peripheral countries*. At the end of the second quarter, MF Global's $6.3 billion sovereign risk exposure represented 5 times the company's tangible common equity, Moody's noted.

*"The tactical decision to assume this outsized proprietary position, highlights the core profitability challenges faced by MF Global and the scope of the re-engineering challenge facing the firm's management*," said Al Bush, a Moody's senior analyst.

*Moody's believes that the risk appetite revealed by this position, in tandem with the significant quarterly loss that MF Global reported, subjects the firm to a heightened risk of loss of client and counterparty confidence – and could thus further challenge the company's franchise.*

The review for downgrade will focus on MF Global's ability to manage its franchise risk, including its success in retaining customers, counterparties and employees during the current stressed environment.

640.    In response to these further downgrades, MF Global's common stock declined by approximately 16% to close at $1.43 on October 27, 2011, down $0.27 from the prior day's close of $1.70, on heavy trading volume.

641.    On October 28, 2011, *The Wall Street Journal* published an online article entitled "Potential Suitors Emerge for MF Global," reporting that the Company intended to sell itself. The article explained:

Goldman Sachs, State Street and Macquarie are among the companies considering an acquisition of MF Global or parts of the struggling company, people familiar with the matter said. . . .

Potential buyers for MF Global and its pieces are expected to decide on any move quickly, given MF Global's loss of some customer assets and its declining stock price. On Friday the stock was trading down about 12%.

Earlier this week, MF Global fully tapped a $1.3 billion credit facility to build up its cash position, a person familiar with the matter said. The company's lenders include Bank of America Corp., J.P. Morgan Chase & Co. and Citigroup Inc., the person said.

642.   An article entitled "IFR: MF Global bonds tumble following downgrade" published by *Thompson Reuters* on October 28, 2011, further detailed the preceding days' developments:

> MF Global reported US $6.3bn of long credit exposure to shorter-term European sovereign debt, including US $3.2bn of exposure to Italy alone. ***The exposure spooked the market and regulators which have asked it to boost its capital.*** Fitch Ratings cut the firm's credit rating to junk, BB+, early Thursday and was followed by Moody's Investors Service late Thursday evening, which cut the rating two notches to Ba3. The loss of its investment grade rating will hasten the exodus of customers away from the firm. In the current environment, the knee-jerk reaction is to get away from any failing entity as fast as possible, said Dick Bove, vice president of Rochdale Securities. Bove reported that he has received calls from people asking if they should pull their money out of MF Global. "I haven't had calls like that since Lehman Brothers."

> \*          \*          \*

> ***The broker/dealer attempted to reassure the markets that its customers had not abandoned it, but the firm cannot survive the loss of its investment grade rating and will likely have to have a deal in place over the weekend said a restructuring investment banker.***

> MF Global's bonds collapsed Wednesday following a disastrous fiscal second quarter earnings report and news the firm tapped Evercore Partners to explore strategic alternatives. ***The market took the news as an admission that the firm was on the auction block.*** The names of potential buyers included an opportunistic acquisition by Goldman Sachs, Citigroup was also mentioned as a potential acquirer, as was TD Bank, or another well capitalized Canadian bank looking to expand its presence in the US.

643.   As a result of this October 28, 2011 news, the price of MF Global's common stock dropped by approximately 16% to close at $1.20, down $0.23 from the prior day's close of $1.43, on heavy trading volume. In addition, the prices of MF Global 2016 Notes, 2018 Notes, 6.25% Senior Notes and 2038 Notes declined by approximately 22%, 13%, 32% and 37%, respectively.

644.    On Sunday, October 30, 2011, the night before the Company filed for bankruptcy, *The Wall Street Journal* reported that MF Global was nearing a deal to sell its assets to Interactive Brokers. As set forth above in ¶¶ 312-14, a deal was reached to sell the Company's assets for $6.04 per MF Global share, or $ 1 billion, to Interactive Brokers, but it fell through later that night as a result of the missing customer funds. Consequently, Class members incurred significant additional losses as the true facts concerning the missing funds continued to be revealed in November 2011.

645.    Beginning on November 1, 2011, the prices of MF Global's securities continued to decline as additional news was revealed about the nature and amount of the Company's customer funds shortfall. The news emerged in a series of conflicting reports, but was confirmed by the SIPA Trustee on November 21, 2011, the last day of the Class Period.

646.    For example, according to a joint statement issued by the SEC and CFTC after the close of trading on October 31, 2011, MF Global told U.S. regulators that there were potential "deficiencies" in some customer accounts, and the media reported that the amount of missing customer funds was "less than $700 million." But after the close of trading on November 1, 2011, the media reported that MF Global's attorneys had represented that there was no such shortfall, explaining: "To the best knowledge of [MF Global's] management, *there is no shortfall*." Thereafter, after the close of trading on November 2, 2011, the media reversed course again, reporting that a CME audit had, in fact, revealed a $633 million shortfall.

647.    On November 21, 2011, the last day of the Class Period, the SIPA Trustee released a statement at approximately 11:00 A.M. noting that, "[a]t present, the Trustee believes that even if he recovers everything that is at US depositories, the apparent shortfall in what MF Global management should have segregated at US depositories *may be as much as $1.2 billion*

228

*or more*." As a result of this disclosure, the price of MF Global's common stock declined by approximately 4%, and the prices of the 2016 Notes, 2018 Notes, 6.25% Senior Notes and 2038 Notes declined by approximately 18%, 11%, 10% and 5%, respectively.

648.    As was only later revealed by the SIPA Trustee after the Class Period, in total, the Company actually had a *$1.6 billion shortfall* in customer funds, including a deficiency of approximately *$900 million* in domestic customer segregated accounts and a deficiency of approximately *$700 million* in foreign secured funds.

## IX.    CLASS ACTION ALLEGATIONS

649.    Plaintiffs bring this action on behalf of themselves and as a class action under Rules 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure on behalf of the following proposed Class:

> (1) as to claims under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act"), all persons and entities who or which purchased or otherwise acquired the publicly traded securities of MF Global Holdings Ltd. ("MF Global" or the Company") during the period from May 20, 2010 through and including November 21, 2011 ("Class Period"), and were damaged thereby – *i.e.*, those persons and entities who or which purchased or otherwise acquired:

> > (i) common stock, whether acquired on the open market or through the MF Global Ltd. Amended And Restated 2007 Long Term Incentive Plan or the MF Global Ltd. Employee Stock Purchase Plan;

> > (ii) 9% Convertible Senior Notes due June 20, 2038 ("2038 Notes");

> > (iii) 1.875% Convertible Senior Notes due February 1, 2016 ("2016 Notes");

> > (iv) 3.375% Convertible Senior Notes due August 1, 2018 ("2018 Notes"); and

> > (v) 6.25% Senior Notes due August 8, 2016 (the "Senior Notes"); and

> (2) as to claims under Sections 11, 12(a)(2), and 15 of the Securities Act of 1933 ("Securities Act"), all persons and entities who or which purchased or otherwise acquired under the Company's Post-Effective Amendment No. 1 to Registration Statement No. 333-162119, dated February 24, 2010, and prospectuses filed in connection therewith (collectively, the "Offering Documents") and were damaged thereby -- *i.e.*, those persons and entities who or which purchased or otherwise acquired:

(i) common stock in or traceable to the secondary offering on or about June 1, 2010;

(ii) the 2016 Notes issued on or about February 7, 2011;

(iii) the 2018 Notes issued on or about July 28, 2011; and

(iv) the Senior Notes issued on or about August 1, 2011.

Plaintiffs Rodriguez and Vrabel seek to represent, as part of the Class, MF Global employees who acquired MF Global securities pursuant to the above-defined LTIP and ESPP plans during the Class Period.

650.    Excluded from the Class are: (a) MF Global and its estate in bankruptcy; (b) Defendants; (c) members of the immediate families of the Individual Defendants (that is, children, stepchildren, parents, stepparents, spouses, siblings, mothers-in-law, fathers-in-law, sons-in-law, daughters-in-law, brothers-in-law, and sisters-in-law (as used herein, "spouse" shall mean a husband, a wife, or a partner in a state-recognized domestic relationship or civil union)); (d) the subsidiaries and affiliates of Defendants and MF Global; (e) any person or entity who was during the Class Period and/or is a partner, executive officer, director or controlling person of MF Global or any of its subsidiaries or affiliates or of any Defendant or any of their subsidiaries or affiliates; (f) any entity in which any Defendant or MF Global had during the Class Period and/or has a controlling interest; (g) Defendants' liability insurance carriers, and any affiliates or subsidiaries thereof; and (h) the legal representatives, heirs, successors, and assigns of any such excluded person or entity.  Should any settlements be achieved prior to the expiration of the time to request exclusion from the Class, also excluded from the Class are any persons and entities who pursuant to request were excluded from those settlement classes.

651.    The members of the Class are so numerous that joinder of all members is impracticable. As of June 30, 2011, MF Global had 164,892,596 shares of common stock issued and outstanding. Throughout the Class Period, MF Global's common stock was actively traded

on the NYSE, and MF Global's 2016 Notes, 2018 Notes, 6.25% Senior Notes and 2038 Notes were actively traded on the over-the-counter corporate bond market. While the exact number of purchasers of MF Global's common stock, 2016 Notes, 2018 Notes, 6.25% Senior Notes and 2038 Notes is unknown to Plaintiffs at this time, Plaintiffs believe that Class members number in the thousands.

652.    Plaintiffs' claims are typical of the claims of the members of the Class. Plaintiffs and the other members of the Class acquired MF Global securities in the Offerings, pursuant to the Registration Statement and prospectuses filed in connection therewith, or in the market, and sustained damages as a result of Defendants' conduct complained of herein.

653.    Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation. Plaintiffs have no interests that are adverse or antagonistic to the Class.

654.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy. Because the damages suffered by individual members of the Class may be relatively small, the expense and burden of individual litigation make it impracticable for Class members individually to seek redress for the wrongful conduct alleged herein.

655.    Common questions of law and fact exist as to all members of the Class, and predominate over any questions affecting solely individual members of the Class. Among the questions of law and fact common to the Class are:

        a.    Whether the Federal securities laws were violated by Defendants' conduct as alleged herein;

b.  Whether the Registration Statement and prospectuses for the Company's Offerings contained material misstatements or omitted to state material information;

c.  Whether Defendants' SEC filings, press releases and other public statements disseminated to the investing public during the Class Period contained material misstatements or omitted to state material information;

d.  Whether and to what extent the Company's financial statements failed to comply with GAAP during the Class Period;

e.  Whether and to what extent the market prices of MF Global securities were artificially inflated during the Class Period due to the non-disclosures and misstatements complained of herein;

f.  Whether, with respect to Plaintiffs' claims under the Securities Act, the Defendants named in those claims can sustain their burden of establishing an affirmative defense under the applicable statute;

g.  Whether, with respect to Plaintiffs' claims under the Exchange Act, the Defendants named in those claims acted with scienter;

h.  Whether, with respect to Plaintiffs' claims under Section 20(a) of the Exchange Act and Section 15 of the Securities Act, the Defendants named in those claims were controlling persons of MF Global during the Class Period;

i.  Whether, with respect to Plaintiffs' claims under the Exchange Act, reliance may be presumed under the fraud-on-the-market doctrine; and

j.  Whether the members of the Class have sustained damages as a result of the conduct complained of herein, and if so, the proper measure of damages.

656.    The names and addresses of those persons and entities that purchased or acquired MF Global's common stock and debt securities during the Class Period and in the Offerings are available from the Company's transfer agent(s) or from the Underwriter Defendants. Notice may be provided to such purchasers and record owners via first-class mail using techniques and a form of notice similar to those customarily used in securities class actions.

## X.    THE INAPPLICABILITY OF THE STATUTORY SAFE HARBOR

657.    The statutory safe harbor applicable to forward-looking statements under certain circumstances does not apply to any of the false or misleading statements pleaded in this Complaint. First, many of the statements complained of herein were historical statements or statements of current facts and conditions at the time the statements were made. Second, the statutory safe harbor does not apply to statements included in financial statements that purport to have been prepared in accordance with GAAP. Further, to the extent that any of the false or misleading statements alleged herein can be construed as forward-looking, the statements were not accompanied by any meaningful cautionary language identifying important facts that could cause actual results to differ materially from those in the statements. For example, the only cautionary language in MF Global's financial statements regarding its DTA was the generic warning that "[t]he amount of the deferred tax assets considered realizable, however, could be significantly reduced in the near term if the Company's actual results are significantly less than forecast. If this were to occur, it is likely that the Company would record a material increase in its valuation allowance." Such a generic risk disclosure was insufficient to provide meaningful cautionary language as to MF Global's materially misstated DTA.

658.    Alternatively, to the extent the statutory safe harbor otherwise would apply to any forward-looking statements pleaded herein, Defendants are liable for those false and misleading forward-looking statements because at the time each of those statements was made, the speakers

knew the statement was false or misleading, or the statement was authorized or approved by an executive officer of MF Global who knew that the statement was materially false or misleading when made and at the time of the Offerings.

## XI.   THE PRESUMPTION OF RELIANCE WITH RESPECT TO EXCHANGE ACT CLAIMS

659.   Plaintiffs are entitled to a presumption of reliance under *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the claims asserted herein against Defendants are predicated upon omissions of material fact which there was a duty to disclose.

660.   In the alternative, Plaintiffs are entitled to a presumption of reliance on Defendants' material misrepresentations and omissions pursuant to the fraud-on-the-market doctrine because:

a.   MF Global securities were actively traded on efficient markets during the Class Period, and MF Global's 2016 Notes, 2018 Notes, 6.25% Senior Notes and 2038 Notes were actively and efficiently traded on the corporate bond market;

b.   MF Global's common stock and 2016 Notes, 2018 Notes, 6.25% Senior Notes and 2038 Notes traded at high weekly volumes during the Class Period;

c.   As a regulated issuer, MF Global filed periodic public reports with the SEC;

d.   During the Class Period, MF Global was eligible to file registration statements with the SEC on Form S-3;

e.   MF Global regularly communicated with public investors by means of established market communication mechanisms, including through regular dissemination of press releases on the major news wire services and through

other wide-ranging public disclosures, such as communications with the financial press, securities analysts and other similar reporting services;

f.   The market reacted promptly to public information disseminated by MF Global;

g.   MF Global securities were covered by numerous securities analysts employed by major brokerage firms who wrote reports that were distributed to the sales force and certain customers of their respective firms. Each of these reports was publicly available and entered the public marketplace;

h.   The material misrepresentations and omissions alleged herein would tend to induce a reasonable investor to misjudge the value of MF Global's securities; and

i.   Without knowledge of the misrepresented or omitted material facts alleged herein, Plaintiffs and other members of the Class purchased or acquired MF Global securities between the time Defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed.

661.   Accordingly, Plaintiffs and other members of the Class relied, and are entitled to have relied, upon the integrity of the market prices for MF Global's common stock, 2016 Notes, 2018 Notes, 6.25% Senior Notes and 2038 Notes, and to a presumption of reliance on Defendants' materially false and misleading statements and omissions during the Class Period.

XII.    **CLAIMS FOR RELIEF UNDER THE EXCHANGE ACT**

**COUNT ONE**
**For Violations Of Section 10(b) Of The Exchange Act And**
**Rule 10b-5 Promulgated Thereunder, On Behalf Of Purchasers Of MF Global's**
**Common Stock, 2016 Notes, 2018 Notes, 6.25% Senior Notes And 2038 Notes,**
**Asserted Against The Officer Defendants**

662.    Plaintiffs repeat and reallege each of the allegations set forth above as if fully set forth herein, except Plaintiffs expressly disclaim any claim of strict liability or negligence.

663.    This claim is brought under Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, on behalf of Plaintiffs and the other members of the Class against the Officer Defendants (Corzine, MacDonald and Steenkamp).

664.    As alleged herein, throughout the Class Period, the Officer Defendants, individually and in concert, directly and indirectly, by the use of the means or instrumentalities of interstate commerce, the mails and the facilities of national securities exchanges, made untrue statements of material fact and omitted to state material facts necessary to make their statements not misleading and carried out a plan, scheme, and course of conduct, in violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder. The Officer Defendants intended to and did, as alleged herein: (1) deceive the investing public, including Plaintiffs and the other members of the Class; (2) artificially inflate and maintain the prices of MF Global securities; and (3) cause Plaintiffs and the other members of the Class to purchase or acquire MF Global securities at artificially inflated prices.

665.    The Officer Defendants were individually and collectively responsible for making the material misstatements and omissions alleged herein and engaging in a plan, scheme, and course of conduct designed to deceive Plaintiffs and the other members of the Class, by virtue of having prepared, approved, signed, and disseminated documents that contained untrue statements of material fact and omitted facts necessary to make the statements therein not misleading.

666.     As set forth above, the Officer Defendants made their false and misleading statements and omissions and engaged in the activity described herein knowingly and intentionally or in such a reckless manner as to constitute willful deceit and fraud upon Plaintiffs and the other members of the Class who purchased or acquired MF Global securities during the Class Period.

667.     In ignorance of the false and misleading nature of the Officer Defendants' statements and omissions, and relying directly or indirectly on those statements and omissions or upon the integrity of the market prices for MF Global securities, Plaintiffs and the other members of the Class purchased or acquired MF Global securities at artificially inflated prices during the Class Period. But for the material misstatements and omissions, Plaintiffs and the other members of the Class would not have purchased or acquired MF Global securities at artificially inflated prices. As set forth herein, when the true facts were subsequently disclosed, the prices of MF Global securities declined precipitously. Plaintiffs and the other members of the Class were harmed and damaged as a direct and proximate result of their purchases of MF Global securities at artificially inflated prices and the subsequent decline in the prices of MF Global securities when the truth was disclosed.

668.     By reason of the foregoing, the Officer Defendants are liable to Plaintiffs and the other members of the Class for violations of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

**COUNT TWO**
**For Violations Of Section 20(a) Of The Exchange Act,**
**Asserted Against The Officer Defendants**

669.     Plaintiffs repeat and reallege each of the allegations set forth above as if fully set forth herein, except Plaintiffs expressly disclaim any claim of strict liability or negligence.

670.    This claim is brought under Section 20(a) of the Exchange Act against the Officer Defendants (Corzine, MacDonald and Steenkamp) on behalf of Plaintiffs and the other members of the Class.

671.    As alleged herein, the Officer Defendants caused MF Global to violate Section 10(b) and Rule 10b-5 promulgated thereunder by making material misstatements and omissions in connection with the purchase and sale of securities and by participating in a scheme and course of business or conduct throughout the Class Period. This conduct was undertaken with the scienter of the Officer Defendants who knew of or recklessly disregarded the falsity of the Company's statements and the nature of its scheme during the Class Period. The Company is not named as a defendant only because of its bankruptcy.

672.    The Officer Defendants were controlling persons of MF Global during the Class Period, due to their senior executive positions, direct involvement in its day-to-day operations, financial reporting, and accounting, and signatures on and participation in the preparation and dissemination of its public statements.

673.    By virtue of the foregoing, the Officer Defendants each had the power to influence and control, and did influence and control, directly or indirectly, the decision-making of MF Global, including the content of its financial statements and other public statements.

674.    As set forth above, the Officer Defendants acted knowingly and intentionally, or in such a reckless manner as to constitute willful deceit and fraud upon Plaintiffs and the other members of the Class who purchased or acquired MF Global securities during the Class Period.

675.    In ignorance of the false and misleading nature of the Company's statements and omissions, and relying directly or indirectly on those statements and omissions or upon the integrity of the market prices for MF Global securities, Plaintiffs and the other members of the

Class purchased or acquired MF Global securities at artificially inflated prices during the Class Period. But for the material misstatements and omissions, Plaintiffs and the other members of the Class would not have purchased or acquired MF Global securities at artificially inflated prices. As set forth herein, when the true facts were subsequently disclosed, the prices of MF Global securities declined precipitously. Plaintiffs and the other members of the Class were harmed and damaged as a direct and proximate result of their purchases of MF Global securities at artificially inflated prices and the subsequent decline in the prices of those securities when the truth was disclosed.

676.     By reason of the foregoing, the Officer Defendants are liable to Plaintiffs and the other members of the Class for violations of Section 20(a) of the Exchange Act.

**COUNT THREE**
**For Violations Of Section 10(b) Of The Exchange Act And**
**Rule 10b-5 Promulgated Thereunder, On Behalf Of Purchasers Of MF Global's**
**Common Stock, 2016 Notes, 2018 Notes, 6.25% Senior Notes And 2038 Notes,**
**Asserted Against PwC**

677.     Plaintiffs repeat and reallege each of the allegations set forth above as if fully set forth herein.

678.     As alleged herein, throughout the Class Period, PwC, individually and in concert with MF Global, directly and indirectly, by the use of the means or instrumentalities of interstate commerce, the mails and the facilities of national securities exchanges, made untrue statements of material fact and omitted to state material facts necessary to make their statements not misleading and carried out a plan, scheme, and course of conduct, in violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.  PwC intended to and did, as alleged herein: (1) deceive the investing public, including Plaintiffs and the other members of the Class; (2) artificially inflate and maintain the prices of MF Global securities; and (3) cause

Plaintiffs and the other members of the Class to purchase or acquire MF Global securities at artificially inflated prices.

679.    PwC was responsible for making the material misstatements and omissions alleged herein and engaging in a plan, scheme, and course of conduct designed to deceive Plaintiffs and the other members of the Class, by virtue of having prepared, approved, signed, and disseminated documents that contained untrue statements of material fact and omitted facts necessary to make the statements therein not misleading.

680.    As set forth above, PwC made its false and misleading statements and omissions and engaged in the activity described herein knowingly and intentionally or in such a reckless manner as to constitute willful deceit and fraud upon Plaintiffs and the other members of the Class who purchased or acquired MF Global securities during the Class Period.

681.    In ignorance of the false and misleading nature of PwC's statements and omissions, and relying directly or indirectly on those statements and omissions or upon the integrity of the market prices for MF Global securities, Plaintiffs and the other members of the Class purchased or acquired MF Global securities at artificially inflated prices during the Class Period.  But for the material misstatements and omissions, Plaintiffs and the other members of the Class would not have purchased or acquired MF Global securities at artificially inflated prices.  As set forth herein, when the true facts were subsequently disclosed, the prices of MF Global securities declined precipitously.  Plaintiffs and the other members of the Class were harmed and damaged as a direct and proximate result of their purchases of MF Global securities at artificially inflated prices and the subsequent decline in the prices of MF Global securities when the truth was disclosed.

682.     By reason of the foregoing, PwC is liable to Plaintiffs and the other members of the Class for violations of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

## XIII.   ADDITIONAL ALLEGATIONS RELATING TO SECURITIES ACT CLAIMS

683.     In the allegations and claims set forth in this part of the Complaint, Plaintiffs assert claims under the Securities Act. These claims are asserted against the Individual Defendants who signed MF Global's Registration Statement; Defendant Corzine, who was a Director of MF Global at the time of the filing of the documents incorporated by reference in the Registration Statement and prospectuses for the Offerings; PwC; and the Underwriter Defendants.

684.     Each of these Defendants is statutorily liable under Section 11 of the Securities Act for the materially inaccurate statements contained in MF Global's Registration Statement and prospectuses for the Offerings, including MF Global's materially misstated financial statements incorporated therein. (MF Global also violated Section 11 and is not named as a defendant only because of its bankruptcy.)

685.     Plaintiffs also assert claims under Section 12(a)(2) of the Securities Act against the Underwriter Defendants and control person liability claims under Section 15(a) of the Securities Act against the Individual Defendants.

686.     Plaintiffs expressly disclaim any allegations of scienter in these non-fraud claims, which are pleaded separately in this Complaint from Plaintiffs' Exchange Act claims except that any challenged statements of opinion or belief made in connection with the Offerings are alleged to have been materially misstated statements of opinion or belief when made.

A.     **The Secondary Offering**

687.    On June 1, 2010, MF Global announced the public Secondary Offering of common stock for gross proceeds of $150 million. MF Global's common stock was issued in the Secondary Offering at a price of $7.10 per share.

688.    The Secondary Offering was conducted pursuant to Post-Effective Amendment No. 1 to Registration Statement No. 333-162119, dated February 24, 2010 (the "Registration Statement," as defined in ¶ 30), a Preliminary Prospectus Supplement dated June 1, 2010, and a Final Prospectus Supplement dated June 3, 2010 (collectively, the "Secondary Offering Materials").

689.    The Secondary Offering was underwritten by J.P. Morgan, Citigroup and Deutsche Bank. These Underwriter Defendants were "underwriters," as defined in Section 2(11) of the Securities Act, of the Secondary Offering.

690.    The Registration Statement was signed by Defendants MacDonald, Steenkamp, Bolger, Fusco, Gelber, Glynn, Goldberg, Schamis and Sloan. Defendant Corzine was a director of MF Global at the times of the filing of the documents incorporated by reference in the Secondary Offering Materials.

691.    The Secondary Offering Materials specifically incorporated by reference MF Global's 2010 Form 10-K. The 2010 Form 10-K that was incorporated by reference, by which Plaintiff WV Laborers and other members of the Class were induced to purchase MF Global common stock in the Secondary Offering, contained untrue statements of material fact and omitted to state material facts required therein or necessary to make the statements therein not misleading, as set forth above in Section V.A., including a "report of Independent Registered Public Accounting Firm" signed by Defendant PwC described in Section VII.F. above.

**B.**     **The 2016 Notes Offering**

692.    On February 11, 2011, MF Global completed a $287.5 million offering of the 2016 Notes, which included $37.5 million of notes sold pursuant to an overallotment option granted by the Company to certain underwriters (the "2016 Notes Offering").

693.    The 2016 Notes Offering was conducted pursuant to the Registration Statement, a Preliminary Prospectus Supplement and Pricing Term Sheet dated February 7, 2011, and a Final Prospectus Supplement dated February 7, 2011 (collectively, the "2016 Notes Offering Materials").

694.    The 2016 Notes Offering was underwritten by Goldman, Citigroup, Deutsche Bank, Merrill Lynch, J.P. Morgan, RBS and Sandler O'Neill. These Underwriter Defendants were "underwriters," as defined in Section 2(11) of the Securities Act, of the 2016 Notes Offering.

695.    The Registration Statement was signed by Defendants MacDonald, Steenkamp, Bolger, Fusco, Gelber, Glynn, Goldberg, Schamis and Sloan. Defendant Corzine was a director of MF Global at the times of the filing of the documents incorporated by reference in the 2016 Notes Offering Materials.

696.    The 2016 Notes Offering Materials specifically incorporated by reference MF Global's 2010 Form 10-K and Q1'11 Form 10-Q, Q2'11 Form 10-Q and Q3'11 Form 10-Q. These documents, by which Lead Plaintiff VRS, Plaintiff LRI Invest and other members of the Class were induced to purchase MF Global's 2016 Notes, contained untrue statements of material fact and omitted to state material facts required therein or necessary to make the statements therein not misleading, as set forth above in Section V.A.-D., including a "report of Independent Registered Public Accounting Firm" signed by Defendant PwC described in Section VII.F. above.

**C.** **The 2018 Notes Offering**

697.    On July 28, 2011, MF Global announced a $325 million offering of the 2018 Notes (the "2018 Notes Offering").

698.    The 2018 Notes Offering was underwritten by Goldman, Citigroup, Merrill, J.P. Morgan, Deutsche Bank and RBS. These Underwriter Defendants were "underwriters," as defined in Section 2(11) of the Securities Act, of the 2018 Notes Offering.

699.    The 2018 Notes Offering was conducted pursuant to the Registration Statement, a Preliminary Prospectus Supplement and Pricing Term Sheet dated July 28, 2011, and a Final Prospectus Supplement, dated August 1, 2011 (collectively, the "2018 Notes Offering Materials").

700.    The Registration Statement was signed by Defendants MacDonald, Steenkamp, Bolger, Fusco, Gelber, Glynn, Goldberg, Schamis and Sloan. Defendant Corzine was a director of MF Global at the times of the filing of the documents incorporated by reference in the 2018 Notes Offering Materials.

701.    The 2018 Notes Offering Materials specifically incorporated by reference MF Global's 2011 Form 10-K. The 2011 Form 10-K, by which Lead Plaintiff VRS, Plaintiff LRI Invest and other members of the Class were induced to purchase MF Global's 2018 Notes, contained untrue statements of material fact and omitted to state material facts required therein or necessary to make the statements therein not misleading, as set forth above in Section V.E.-F., including a "report of Independent Registered Public Accounting Firm" signed by Defendant PwC described in Section VII.F. above.

**D.** **The 6.25% Senior Notes Offering**

702.    On August 3, 2011, MF Global issued approximately $325 million of 6.250% Senior Notes (the "6.25% Senior Notes Offering").

244

703.    The 6.25% Senior Notes Offering was underwritten by Jefferies, Merrill, BMO Capital Markets, Commerz, Natixis, Lebenthal, Sandler O'Neill, and U.S. Bancorp. These Underwriter Defendants were "underwriters," as defined in Section 2(11) of the Securities Act, of the 6.25% Senior Notes Offering.

704.    The 6.25% Senior Notes Offering was conducted pursuant to the Registration Statement and a Prospectus Supplement and Free Writing Prospectus dated August 3, 2011 (collectively, the "6.25% Senior Notes Offering Materials").

705.    The Registration Statement was signed by Defendants MacDonald, Steenkamp, Bolger, Fusco, Gelber, Glynn, Goldberg, Schamis and Sloan. Defendant Corzine was a director of MF Global at the times of the filing of the documents incorporated by reference in the 6.25% Senior Notes Offering Materials.

706.    The 6.25% Senior Notes Offering Materials specifically incorporated by reference MF Global's 2011 Form 10-K and MF Global's Q1'12 Form 10-Q. These documents, by which Plaintiff Guam and other members of the Class were induced to purchase MF Global's 6.25% Senior Notes, contained untrue statements of material fact and omitted to state material facts required therein or necessary to make the statements therein not misleading, as set forth above in Section V.E.-F., including a "report of Independent Registered Public Accounting Firm" signed by Defendant PwC described in Section VII.F. above.

### E.    The Defendants' Failure To Exercise Reasonable Care Or To Conduct A Reasonable Investigation In Connection With The Offerings

707.    None of the Securities Act Defendants made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Offering Materials were accurate and complete and not misstated in all material respects.

708.    Due diligence is a critical component of the issuing and underwriting process. Directors, officers, accountants and underwriters are able to perform due diligence because of their expertise and access to the Company's non-public information. Underwriters must not rely on management statements; instead, they should play a devil's advocate role and conduct a verification process. At a minimum, due diligence for every public offering should involve: (1) interviews of upper and mid-level management; (2) a review of the auditor's management letters; (3) a review of items identified therein; (4) a review of the company's SEC filings (particularly those incorporated by reference); (5) a critical review of the company's financial statements, including an understanding of the company's accounting and conversations with the company's auditors without management present; (6) a review of the company's internal controls; (7) a review of negative facts and concerns within each underwriter's organization and within the underwriter syndicate; and (8) a review of critical non-public documents forming the basis for the company's assets, liabilities and earnings. Red flags uncovered through this process must be investigated. Officers and auditors must participate in the underwriters' due diligence, and non-officer directors are responsible for the integrity of the due diligence process in their capacity as the ultimate governing body of the issuer.

709.    Had Defendants exercised reasonable care, they would have known of the material misstatements and omissions alleged herein.

710.    The Underwriter Defendants did not conduct a reasonable investigation of the statements contained in and incorporated by reference in the Offering Materials and did not possess reasonable grounds for believing that the statements therein were true and not materially misstated. In particular, the Underwriter Defendants did not conduct a reasonable investigation into the accuracy of the statements regarding the Company's DTA and internal controls specified

herein. The Underwriter Defendants could not simply rely on the work of MF Global's outside auditors because the investing public relies on the underwriters to obtain and verify relevant information and then make sure that essential facts are disclosed. Thus, the Underwriter Defendants must conduct their own, independent (and reasonable) investigation into the accuracy of the Company's financial statements and assessments of internal controls. Had the Underwriter Defendants conducted a reasonable investigation, they would have learned that the Company's disclosed justifications for maintaining its large U.S. DTA did not comply with GAAP; a valuation allowance was required; and the Offering Materials contained material misstatements and omissions about the Company's internal controls as specified herein. Indeed, even a cursory review of the Company's Internal Audit reports regarding MF Global's internal control deficiencies dating back to April 2010 and described above in Section IV.E.2. would have revealed the material misstatements and omissions alleged herein regarding MF Global's internal controls. Similarly, the Company's ability to turn around its three-year history of losses in the U.S. in the face of near-zero interest rates dating back to the fall of 2008 was understood by Company insiders to be, at best, an "unsettled" proposition, yet the Underwriter Defendants, which had special access to MF Global's purported justification for maintaining its U.S. DTA without a valuation allowance, failed to reasonably investigate the Company's DTA accounting under GAAP.

711. Similarly, the Individual Defendants who signed the Registration Statement and Corzine failed to conduct a reasonable investigation of the statements contained in the Registration Statement and documents incorporated therein by reference and did not possess reasonable grounds for believing that the statements therein were true and not materially misstated. Had these Individual Defendants conducted a reasonable investigation, they would

247

have learned that the Company's disclosed justifications for maintaining its large U.S. DTA did not comply with GAAP and a valuation allowance was required as set forth in Section IV.C. above, and the Offering Materials contained material misstatements and omissions about the Company's internal controls as set forth in Section V. above.

712.    These Individual Defendants were sophisticated in accounting and internal control issues given their collective industry experience and yet failed to reasonably inquire as to the Company's DTA accounting or internal controls notwithstanding numerous "red flags," including repeated Internal Audit reports made to them (dating back to April 2010) regarding weaknesses in the Company's internal controls (set forth in Section IV.E.2. above), as well as the Company's history of losses in its U.S. operations and, at best, "unsettled" attempt to return to profitability in the face of near-zero interest rates (dating back to the fall of 2008) through the Euro sovereign debt RTM trading strategy, whose risks they repeatedly discussed with the Board throughout the Class Period (as set forth in Section IV.E.1. above). These Individual Defendants were sophisticated in accounting and internal control issues given their collective industry experience and yet failed to reasonably inquire as to the Company's DTA accounting or internal controls notwithstanding numerous "red flags," including repeated Internal Audit reports made to them (dating back to April 2010) regarding weaknesses in the Company's internal controls (set forth in Section IV.E.2. above), as well as the Company's history of losses in its U.S. operations and, at best, "unsettled" attempt to return to profitability in the face of near-zero interest rates (dating back to the fall of 2008) through the Euro sovereign debt RTM trading strategy, whose risks they repeatedly discussed with the Board throughout the Class Period (as set forth in Section IV.E.1. above).

713.    Finally, PwC failed to comply with PCAOB auditing standards and did not possess reasonable grounds for believing that its statements regarding its audits of the Company's financial statements and internal controls were true and not materially misstated. Had PwC conducted a reasonable investigation, it would have learned that the Company's disclosed justifications for maintaining its large U.S. DTA did not comply with GAAP and a valuation allowance was required and that its internal controls over financial reporting were not effective as set forth in Section VII above.

714.    Moreover, any challenged statements of opinion or belief made by any of the Officer Defendants or PwC in connection with the Offerings are alleged to have been materially misstated statements of opinion or belief when made and at the time of the Offerings, as set forth above.

## XIV.   CLAIMS FOR RELIEF UNDER THE SECURITIES ACT

### COUNT FOUR
**For Violations Of Section 11 Of The Securities Act, On Behalf Of Purchasers Of MF Global's Common Stock In The Secondary Offering, Asserted Against Defendants Corzine, MacDonald, Steenkamp, Bolger, Fusco, Gelber, Glynn, Goldberg, Schamis, Sloan, J.P. Morgan, Citigroup, Deutsche Bank and PwC**

715.    Plaintiffs repeat and reallege each and every allegation above as if fully set forth herein, except that for purposes of this Count, Plaintiffs assert strict liability and negligence claims and expressly disclaim any allegation of fraud or intentional misconduct except that any challenged statements of opinion or belief made in connection with the Secondary Offering are alleged to have been materially misstated statements of opinion or belief when made and at the time of the Secondary Offering.

716.    This Count is brought under Section 11 of the Securities Act against Defendants Corzine, MacDonald, Steenkamp, Bolger, Fusco, Gelber, Glynn, Goldberg, Schamis, Sloan, J.P. Morgan, Citigroup, Deutsche Bank and PwC.

717.   This claim is brought on behalf of Plaintiff WV Laborers and other members of the Class who, during the Class Period, purchased or otherwise acquired MF Global's common stock issued pursuant to the Secondary Offering Materials.

718.   Individual Defendants MacDonald, Steenkamp, Bolger, Fusco, Gelber, Glynn, Goldberg, Schamis and Sloan each signed the Registration Statement.

719.   At the time the documents incorporated by reference in the Secondary Offering Materials were filed, Corzine was a director of MF Global.

720.   Underwriter Defendants J.P. Morgan, Citigroup and Deutsche Bank underwrote the Secondary Offering.

721.   PwC consented to the incorporation of its audit report in the Secondary Offering Materials.

722.   As set forth above, the Secondary Offering Materials contained untrue statements of material fact, including the financial statements and internal controls of MF Global and PwC's audits thereof. In addition, the Secondary Offering Materials omitted to state other facts required to be stated therein or necessary to make the statements therein not misleading, including MF Global's violations of GAAP and internal control deficiencies. The misstated and omitted facts would have been material to a reasonable person reviewing the Secondary Offering Materials.

723.   The Defendants named in this Count owed to Plaintiff WV Laborers and the other members of the Class the duty to make a reasonable and diligent investigation of the statements contained or incorporated by reference in the Secondary Offering Materials, to ensure that the statements contained or incorporated by reference therein were true and that there was no omission to state a material fact required to be stated therein or necessary to make the statements therein not misleading.

724.     These Defendants did not make a reasonable and diligent investigation of the statements contained or incorporated by reference in the Secondary Offering Materials, and did not possess reasonable grounds for believing that the Secondary Offering Materials did not contain an untrue statement or omit to state a material fact required to be stated therein or necessary to make the statements therein not misleading.

725.     The Underwriter Defendants named in this Count did not conduct a reasonable investigation of the statements contained in and incorporated by reference in the Secondary Offering Materials and did not possess reasonable grounds for believing that the statements therein were true and not materially misstated. In particular, these Underwriter Defendants did not conduct a reasonable investigation into the accuracy of the statements regarding MF Global's reported Deferred Tax Assets, financial performance, operations, or internal controls. These Underwriter Defendants could not simply rely on the work of MF Global's auditor because the investing public relies on the underwriters to obtain and verify relevant information and then make sure that important facts are accurately disclosed. Thus, these Underwriter Defendants had a duty to conduct their own, independent and reasonable investigation into the accuracy of the Company's financial statements and assessments of internal controls, and they were negligent in failing to do so sufficiently in connection with the Secondary Offering.

726.     Similarly, the Individual Defendants named in this Count were negligent in failing to conduct a reasonable investigation of the statements contained or incorporated by reference in the Secondary Offering Materials regarding MF Global's financial performance, operations, and internal controls, and did not possess reasonable grounds for believing that the statements therein were true and not materially misstated.

727.   PwC did not conduct a reasonable audit of MF Global in compliance with GAAS and did not have a reasonable ground to state that PwC's audit report included or incorporated by reference in the Secondary Offering Materials was true and that there was no omission to state a material fact required to be stated therein or necessary to make the statements therein not misleading.

728.   Plaintiffs WV Laborers and members of the Class purchased common stock in the Secondary Offering issued pursuant to the Secondary Offering Materials, and were damaged thereby.

729.   Plaintiffs WV Laborers and the Class did not know, nor in the exercise of reasonable diligence could they have known, of the untrue statements of material fact and omissions of material facts in the Secondary Offering Materials when they purchased or acquired their securities. Less than one year has elapsed between the time they discovered or reasonably could have discovered the facts upon which this Count is based and the time this claim was brought. Less than three years have elapsed between the time that the securities upon which this Count is brought were bona fide offered to the public and the time this action was commenced.

730.   By reason of the foregoing, the Defendants named in this Count are liable to Plaintiffs WV Laborers and Class members for violations of Section 11 of the Securities Act.

## COUNT FIVE
### For Violations Of Section 12(a)(2) Of The Securities Act, On Behalf Of Purchasers In The Secondary Offering, Asserted Against Underwriter Defendants J.P. Morgan, Citigroup And Deutsche Bank

731.   Plaintiffs repeat and reallege each and every allegation above as if fully set forth herein, except that for purposes of this Count Plaintiffs assert only strict liability and negligence claims and expressly disclaim any allegation of fraud or intentional misconduct except that any challenged statements of opinion or belief made in connection with the Secondary Offering are

alleged to have been materially misstated statements of opinion or belief when made and at the time of the Secondary Offering.

732.    This Count is brought under Section 12(a)(2) of the Securities Act against Underwriter Defendants J.P. Morgan, Citigroup and Deutsche Bank.

733.    This claim is brought on behalf of Plaintiffs WV Laborers and other members of the Class who, during the Class Period, purchased or otherwise acquired MF Global common stock from Underwriter Defendants J.P. Morgan, Citigroup or Deutsche Bank pursuant to the Secondary Offering Materials.

734.    Underwriter Defendants J.P. Morgan, Citigroup and Deutsche Bank are sellers within the meaning of the Securities Act because they transferred title to Plaintiffs WV Laborers and other purchasers of MF Global Common Stock in the Secondary Offering. In particular, Deutsche Bank directly sold MF Global common stock in the Secondary Offering to Plaintiffs WV Laborers.

735.    As alleged herein, the Secondary Offering Materials contained untrue statements of material fact, including the financial statements and internal controls of MF Global. In addition, the Secondary Offering Materials omitted to state material facts required to be stated therein or necessary to make the statements therein not misleading, including MF Global's violations of GAAP and internal control deficiencies.

736.    The misstated and omitted facts would have been material to a reasonable person reviewing the Secondary Offering Materials.

737.    Underwriter Defendants J.P. Morgan, Citigroup and Deutsche Bank owed to Plaintiffs WV Laborers and the Class the duty to make a reasonable and diligent investigation of the statements contained in the Secondary Offering Materials to ensure that the statements

contained or incorporated by reference therein were true and that there was no omission to state a material fact required to be stated therein or necessary in order to make the statements therein not misleading.

738.    Underwriter Defendants J.P. Morgan, Citigroup and Deutsche Bank did not make a reasonable and diligent investigation of the statements contained or incorporated by reference in the Secondary Offering Materials and did not possess reasonable grounds for believing that the Secondary Offering Materials did not contain an untrue statement of material fact or omit to state a material fact required to be stated therein or necessary to make the statements therein not misleading.

739.    Plaintiffs WV Laborers and members of the Class purchased MF Global common stock in the Secondary Offering pursuant to the Secondary Offering Materials, and were damaged thereby.

740.    Plaintiffs WV Laborers and the Class did not know, nor in the exercise of reasonable diligence could they have known, of the untrue statements of material fact or omissions of material facts in the Secondary Offering Materials when they purchased or acquired the securities. Less than one year has elapsed between the time they discovered or reasonably could have discovered the facts upon which this Count is based and the time this claim was brought. Less than three years have elapsed between the time that the securities upon which this Count is brought were bona fide offered to the public and the time this action was commenced.

741.    By reason of the foregoing, Underwriter Defendants J.P. Morgan, Citigroup and Deutsche Bank are liable to Plaintiffs WV Laborers and members of the Class for violations of Section 12(a)(2) of the Securities Act. Plaintiffs WV Laborers United and Class members hereby

tender their securities to their respective sellers and seek rescission of their purchases to the extent that they continue to own such securities.

**COUNT SIX**
**For Violations Of Section 15(a) Of The Securities Act,**
**On Behalf Of Purchasers In The Secondary Offering,**
**Asserted Against The Officer Defendants**

742.    Plaintiffs repeat and reallege each and every allegation above as if fully set forth herein, except that for purposes of this Count, Plaintiffs assert only strict liability and negligence claims and expressly disclaim any allegation of fraud or intentional misconduct except that any challenged statements of opinion or belief made in connection with the Secondary Offering are alleged to have been materially misstated statements of opinion or belief when made and at the time of the Secondary Offering.

743.    This Count is brought under Section 15(a) of the Securities Act against the Officer Defendants, on behalf of Plaintiffs WV Laborers and members of the Class who purchased or acquired MF Global Common Stock in the Secondary Offering pursuant to the Secondary Offering Materials.

744.    MF Global violated Section 11 of the Securities Act by issuing the Secondary Offering Materials, which contained untrue statements of material fact and omitted to state material facts required to be stated therein or necessary to make the statements therein not misleading. The misstated and omitted facts would have been material to a reasonable person reviewing the Secondary Offering Materials. MF Global is not named as a defendant only because of its bankruptcy.

745.    The Officer Defendants were controlling persons of MF Global when the Secondary Offering Materials and documents incorporated therein by reference were filed and became effective, because of their senior executive positions with MF Global and direct

255

involvement in the Company's day-to-day operations, including its financial reporting and accounting.

746.   By virtue of the foregoing, the Officer Defendants each had the power to influence and control, and did influence and control, directly or indirectly, the decision-making of MF Global, including the content of its financial statements and the Secondary Offering Materials.

747.   The Officer Defendants acted negligently and without reasonable care regarding the accuracy of the information contained and incorporated by reference in the Secondary Offering Materials and lacked reasonable grounds to believe that such information was accurate and complete in all material respects.

748.   Plaintiffs WV Laborers and members of the Class purchased MF Global Common Stock in the Secondary Offering pursuant to the Secondary Offering Materials, and were damaged thereby.

749.   By reason of the foregoing, the Officer Defendants are liable to Plaintiffs WV Laborers and members of the Class for violations of Section 15(a) of the Securities Act.

**COUNT SEVEN**
**For Violations Of Section 11 Of The Securities Act,**
**On Behalf Of Purchasers Of The 2016 Notes,**
**Asserted Against Defendants Corzine, MacDonald, Steenkamp, Bolger, Fusco,**
**Gelber, Glynn, Goldberg, Schamis, Sloan, Goldman, Citigroup, Deutsche Bank,**
**Merrill Lynch, J.P. Morgan, RBS, Sandler O'Neill and PwC**

750.   Plaintiffs repeat and reallege each and every allegation above as if fully set forth herein, except that for purposes of this Count, Plaintiffs assert only strict liability and negligence claims and expressly disclaim any allegation of fraud or intentional misconduct except that any challenged statements of opinion or belief made in connection with the 2016 Notes Offering are

alleged to have been materially misstated statements of opinion or belief when made and at the time of the 2016 Notes Offering.

751.   This Count is brought under Section 11 of the Securities Act against Defendants Corzine, MacDonald, Steenkamp, Bolger, Fusco, Gelber, Glynn, Goldberg, Schamis, Sloan, Goldman, Citigroup, Deutsche Bank, Merrill Lynch, J.P. Morgan, RBS, Sandler O'Neill and PwC.

752.   This claim is brought on behalf of Lead Plaintiff VRS, Plaintiff LRI Invest and other members of the Class who, during the Class Period, purchased or otherwise acquired MF Global's 2016 Notes issued pursuant or traceable to the 2016 Notes Offering Materials.

753.   Individual Defendants MacDonald, Steenkamp, Bolger, Fusco, Gelber, Glynn, Goldberg, Schamis and Sloan each signed the Registration Statement.

754.   At the time the documents incorporated by reference in the 2016 Notes Offering Materials were filed, Corzine was a director of MF Global.

755.   Underwriter Defendants Goldman, Citigroup, Deutsche Bank, Merrill Lynch, J.P. Morgan, RBS and Sandler O'Neill underwrote the 2016 Notes Offering.

756.   PwC consented to the inclusion or incorporation by reference of its audit report in the 2016 Notes Offering Materials.

757.   As set forth above, the 2016 Notes Offering Materials contained untrue statements of material fact, including the financial statements and internal controls of MF Global and PwC's audits thereof. In addition, the 2016 Notes Offering Materials omitted to state other facts required to be stated therein or necessary to make the statements therein not misleading, including MF Global's violations of GAAP and internal control deficiencies. The misstated and

omitted facts would have been material to a reasonable person reviewing the 2016 Notes Offering Materials.

758.    The Defendants named in this Count owed to Lead Plaintiff VRS, Plaintiff LRI Invest and the Class the duty to make a reasonable and diligent investigation of the statements contained in the 2016 Notes Offering Materials, to ensure that the statements contained or incorporated by reference therein were true and that there was no omission to state a material fact required to be stated therein or necessary to make the statements therein not misleading.

759.    These Defendants did not make a reasonable and diligent investigation of the statements contained or incorporated by reference in the 2016 Notes Offering Materials, and did not possess reasonable grounds for believing that the 2016 Notes Offering Materials did not contain an untrue statement or omit to state a material fact required to be stated therein or necessary to make the statements therein not misleading.

760.    The Underwriter Defendants named in this Count did not conduct a reasonable investigation of the statements contained in and incorporated by reference in the 2016 Notes Offering Materials and did not possess reasonable grounds for believing that the statements therein were true and not materially misstated. In particular, these Underwriter Defendants did not conduct a reasonable investigation into the accuracy of the statements regarding MF Global's reported Deferred Tax Assets, financial performance, operations or internal controls. These Underwriter Defendants could not simply rely on the work of MF Global's auditor because the investing public relies on the underwriters to obtain and verify relevant information and then make sure that important facts are accurately disclosed. Thus, the Underwriter Defendants must conduct their own, independent and reasonable investigation into the accuracy of the Company's

financial statements, assessments of internal controls, and other disclosures, and they were negligent in failing to do so sufficiently in connection with the 2016 Notes Offering.

761.   Similarly, the Individual Defendants named in this Count were negligent in failing to conduct a reasonable investigation of the statements contained in the 2016 Notes Offering Materials regarding MF Global's financial performance, operations, and internal controls, and did not possess reasonable grounds for believing that the statements therein were true and not materially misstated.

762.   PwC did not conduct a reasonable audit of MF Global in compliance with GAAS and did not have a reasonable ground to state that PwC's audit report included or incorporated by reference in the 2016 Notes Offering Materials was true and that there was no omission to state a material fact required to be stated therein or necessary to make the statements therein not misleading.

763.   Lead Plaintiff VRS, Plaintiff LRI Invest and members of the Class purchased the 2016 Notes issued pursuant or traceable to the 2016 Notes Offering Materials, and were damaged thereby.

764.   Lead Plaintiff VRS, Plaintiff LRI Invest and the Class did not know, nor in the exercise of reasonable diligence could they have known, of the untrue statements of material fact or omissions of material facts in the 2016 Notes Offering Materials when they purchased or acquired their securities. Less than one year has elapsed between the time they discovered or reasonably could have discovered the facts upon which this Count is based and the time this claim was brought. Less than three years have elapsed between the time that the securities upon which this Count is brought were bona fide offered to the public and the time this action was commenced.

765.     By reason of the foregoing, the Defendants named in this Count are liable to Lead Plaintiff VRS, Plaintiff LRI Invest and members of the Class for violations of Section 11 of the Securities Act.

**COUNT EIGHT**
**For Violations Of Section 12(a)(2) Of The Securities Act,**
**On Behalf Of Purchasers In The 2016 Notes Offering, Asserted Against**
**Underwriter Defendants Goldman, Citigroup, Deutsche Bank, Merrill Lynch,**
**J.P. Morgan, RBS And Sandler O'Neill**

766.     Plaintiffs repeat and reallege each and every allegation above as if fully set forth herein, except that for purposes of this Count, Plaintiffs assert only strict liability and negligence claims and expressly disclaim any allegation of fraud or intentional misconduct except that any challenged statements of opinion or belief made in connection with the 2016 Notes Offering are alleged to have been materially misstated statements of opinion or belief when made and at the time of the 2016 Notes Offering.

767.     This Count is brought under Section 12(a)(2) of the Securities Act against Underwriter Defendants Goldman, Citigroup, Deutsche Bank, Merrill Lynch, J.P. Morgan, RBS and Sandler O'Neill.

768.     This claim is brought on behalf of Lead Plaintiff VRS and other members of the Class who, during the Class Period, purchased or otherwise acquired MF Global's 2016 Notes in the 2016 Notes Offering.

769.     Underwriter Defendants Goldman, Citigroup, Deutsche Bank, Merrill Lynch, J.P. Morgan, RBS and Sandler O'Neill are sellers within the meaning of the Securities Act because they transferred title to Lead Plaintiff VRS and other purchasers of MF Global's 2016 Notes in the 2016 Notes Offering. In particular, Underwriter Defendant Merrill Lynch directly sold the 2016 Notes in the 2016 Notes Offering to Lead Plaintiff VRS.

770.   As alleged herein, the 2016 Notes Offering Materials contained untrue statements of material fact, including the financial statements and internal controls of MF Global and PwC's audits thereof. In addition, the 2016 Notes Offering Materials omitted to state material facts required to be stated therein or necessary to make the statements therein not misleading, including MF Global's violations of GAAP and internal control deficiencies.

771.   The misstated and omitted facts would have been material to a reasonable person reviewing the 2016 Notes Offering Materials.

772.   Underwriter Defendants Goldman, Citigroup, Deutsche Bank, Merrill Lynch, J.P. Morgan, RBS and Sandler O'Neill owed to Lead Plaintiff VRS and the Class the duty to make a reasonable and diligent investigation of the statements contained in the 2016 Notes Offering Materials, to ensure that the statements contained or incorporated by reference therein were true and that there was no omission to state a material fact required to be stated therein or necessary to make the statements therein not misleading.

773.   Underwriter Defendants Goldman, Citigroup, Deutsche Bank, Merrill Lynch, J.P. Morgan, RBS and Sandler O'Neill did not make a reasonable and diligent investigation of the statements contained or incorporated by reference in the 2016 Notes Offering Materials and did not possess reasonable grounds for believing that the 2016 Notes Offering Materials did not contain an untrue statement of material fact or omit to state a material fact required to be stated therein or necessary to make the statements therein not misleading.

774.   Lead Plaintiff VRS and members of the Class purchased MF Global's 2016 Notes in the 2016 Notes Offering, and were damaged thereby.

775.   Lead Plaintiff VRS and the Class did not know, nor in the exercise of reasonable diligence could they have known, of the untrue statements of material fact or omissions of

material facts in the 2016 Notes Offering Materials when they purchased or acquired the securities. Less than one year has elapsed between the time they discovered or reasonably could have discovered the facts upon which this Count is based and the time this claim was brought. Less than three years have elapsed between the time that the securities upon which this Count is brought were bona fide offered to the public and the time this action was commenced.

776.    By reason of the foregoing, Underwriter Defendants Goldman, Citigroup, Deutsche Bank, Merrill Lynch, J.P. Morgan, RBS and Sandler O'Neill are liable to Lead Plaintiff VRS and members of the Class for violations of Section 12(a)(2) of the Securities Act. Lead Plaintiff VRS, Plaintiff LRI Invest and Class members hereby tender their 2016 Notes to their respective sellers and seek rescission of their purchases to the extent that they continue to own such securities.

**COUNT NINE**
**For Violations Of Section 15(a) Of The Securities Act,**
**On Behalf Of Purchasers Of The 2016 Notes,**
**Asserted Against The Officer Defendants**

777.    Plaintiffs repeat and reallege each and every allegation above as if fully set forth herein, except that for purposes of this Count Plaintiffs assert only strict liability and negligence claims and expressly disclaim any allegation of fraud or intentional misconduct, except that any challenged statements of opinion or belief made in connection with the 2016 Notes Offering are alleged to have been materially misstated statements of opinion or belief when made and at the time of the 2016 Notes Offering.

778.    This Count is brought under Section 15(a) of the Securities Act against the Officer Defendants, on behalf of Lead Plaintiff VRS, Plaintiff LRI Invest and members of the Class who purchased or acquired the 2016 Notes pursuant or traceable to the 2016 Notes Offering Materials.

779.    MF Global violated Section 11 of the Securities Act by issuing the 2016 Notes Offering Materials, which contained untrue statements of material fact and omitted to state material facts required to be stated therein or necessary to make the statements therein not misleading. The misstated and omitted facts would have been material to a reasonable person reviewing the 2016 Notes Offering Materials. MF Global is not named as a defendant only because of its bankruptcy.

780.    The Officer Defendants were controlling persons of MF Global when the 2016 Notes Offering Materials were filed and became effective, because of their senior executive positions with MF Global and their direct involvement in the Company's day-to-day operations, including its financial reporting and accounting functions.

781.    By virtue of the foregoing, the Officer Defendants each had the power to influence and control, and did influence and control, directly or indirectly, the decision-making of MF Global, including the content of its financial statements and the 2016 Notes Offering Materials.

782.    The Officer Defendants acted negligently and without reasonable care regarding the accuracy of the information contained and incorporated by reference in the 2016 Notes Offering Materials and lacked reasonable grounds to believe that such information was accurate and complete in all material respects.

783.    Lead Plaintiff VRS, Plaintiff LRI Invest and members of the Class purchased MF Global's 2016 Notes pursuant or traceable to the 2016 Notes Offering Materials, and were damaged thereby.

784.    Lead Plaintiff VRS, Plaintiff LRI Invest and the Class did not know, nor in the exercise of reasonable diligence could they have known, of the untrue statements of material fact

or omissions of material facts in the 2016 Notes Offering Materials when they purchased or acquired 2016 Notes. Less than one year has elapsed between the time they discovered or reasonably could have discovered the facts upon which this Count is based and the time this claim was brought. Less than three years have elapsed between the time that the securities upon which this Count is brought were bona fide offered to the public and the time this action was commenced.

785.    By reason of the foregoing, the Officer Defendants are liable to Lead Plaintiff VRS, Plaintiff LRI Invest and members of the Class for violations of Section 15(a) of the Securities Act.

**COUNT TEN**
**For Violations Of Section 11 Of The Securities Act, On Behalf Of**
**Purchasers Of The 2018 Notes, Asserted Against Defendants**
**Corzine, MacDonald, Steenkamp, Bolger, Fusco, Gelber, Glynn,**
**Goldberg, Schamis, Sloan, Goldman, Citigroup, Merrill,**
**J.P. Morgan, Deutsche Bank, RBS and PwC**

786.    Plaintiffs repeat and reallege each and every allegation above as if fully set forth herein, except that for purposes of this Count, Plaintiffs assert only strict-liability and negligence claims and expressly disclaim any allegation of fraud or intentional misconduct, except that any challenged statements of opinion or belief made in connection with the 2018 Notes Offering are alleged to have been materially misstated statements of opinion or belief when made and at the time of the 2018 Notes Offering.

787.    This Count is brought under Section 11 of the Securities Act against Defendants Corzine, MacDonald, Steenkamp, Bolger, Fusco, Gelber, Glynn, Goldberg, Schamis, Sloan, Goldman, Citigroup, Merrill, J.P. Morgan, Deutsche Bank, RBS and PwC.

788.   This claim is brought on behalf of Lead Plaintiff VRS, Plaintiff LRI Invest and other members of the Class who, during the Class Period, purchased or otherwise acquired MF Global's 2018 Notes issued pursuant or traceable to the 2018 Notes Offering Materials.

789.   Individual Defendants MacDonald, Steenkamp, Bolger, Fusco, Gelber, Glynn, Goldberg, Schamis and Sloan each signed the Registration Statement.

790.   At the time the documents incorporated by reference in the 2018 Notes Offering Materials were filed, Corzine was a director of MF Global.

791.   Underwriter Defendants Goldman, Citigroup, Merrill, J.P. Morgan, Deutsche Bank and RBS underwrote the 2018 Notes Offering.

792.   PwC consented to the inclusion or incorporation by reference of its audit report in the 2018 Notes Offering Materials.

793.   As set forth above, the 2018 Notes Offering Materials contained untrue statements of material fact, including the financial statements and internal controls of MF Global and PwC's audits thereof. In addition, the 2018 Notes Offering Materials omitted to state other facts required to be stated therein or necessary to make the statements therein not misleading, including MF Global's violations of GAAP and internal control deficiencies. The misstated and omitted facts would have been material to a reasonable person reviewing the 2018 Notes Offering Materials.

794.   The Defendants named in this Count owed to Lead Plaintiff VRS, Plaintiff LRI Invest and the Class the duty to make a reasonable and diligent investigation of the statements contained in the 2018 Notes Offering Materials, to ensure that the statements contained or incorporated by reference therein were true and that there was no omission to state a material fact required to be stated therein or necessary to make the statements therein not misleading.

795.   These Defendants did not make a reasonable and diligent investigation of the statements contained or incorporated by reference in the 2018 Notes Offering Materials, and did not possess reasonable grounds for believing that the 2018 Notes Offering Materials did not contain an untrue statement of material fact or omit to state a material fact required to be stated therein or necessary to make the statements therein not misleading.

796.   The Underwriter Defendants named in this Count did not conduct a reasonable investigation of the statements contained in and incorporated by reference in the 2018 Notes Offering Materials and did not possess reasonable grounds for believing that the statements therein were true and not materially misstated. In particular, these Underwriter Defendants did not conduct a reasonable investigation into the accuracy of the statements regarding MF Global's reported Deferred Tax Assets, financial performance, operations or internal controls. These Underwriter Defendants could not simply rely on the work of MF Global's auditor because the investing public relies on the underwriters to obtain and verify relevant information and then make sure that important facts are accurately disclosed. Thus, the Underwriter Defendants must conduct their own independent and reasonable investigation into the accuracy of the Company's financial statements and assessments of internal controls, and they were negligent in failing to do so sufficiently in connection with the 2018 Notes Offering.

797.   Similarly, the Individual Defendants named in this Count were negligent in failing to conduct a reasonable investigation of the statements contained in the 2018 Notes Offering Materials regarding MF Global's financial performance, operations, and internal controls, and did not possess reasonable grounds for believing that the statements therein were true and not materially misstated.

798.   PwC did not conduct a reasonable audit of MF Global in compliance with GAAS and did not have a reasonable ground to state that PwC's audit report included or incorporated by reference in the 2018 Notes Offering Materials was true and that there was no omission to state a material fact required to be stated therein or necessary to make the statements therein not misleading.

799.   Lead Plaintiff VRS, Plaintiff LRI Invest and members of the Class purchased the 2018 Notes issued pursuant or traceable to the 2018 Notes Offering Materials, and were damaged thereby.

800.   Lead Plaintiff VRS, Plaintiff LRI Invest and the Class did not know, nor in the exercise of reasonable diligence could they have known, of the untrue statements of material fact or omissions of material facts in the 2018 Notes Offering Materials when they purchased or acquired their securities. Less than one year has elapsed between the time they discovered or reasonably could have discovered the facts upon which this Count is based and the time this claim was brought. Less than three years have elapsed between the time that the securities upon which this Count is brought were bona fide offered to the public and the time this action was commenced.

801.   By reason of the foregoing, the Defendants named in this Count are liable to Lead Plaintiff VRS, Plaintiff LRI Invest and members of the Class for violations of Section 11 of the Securities Act.

### COUNT ELEVEN
### For Violations Of Section 12(a)(2) Of The Securities Act,
### On Behalf Of Purchasers In The 2018 Notes Offering,
### Asserted Against Underwriter Defendants Goldman,
### Citigroup, Merrill, J.P. Morgan, Deutsche Bank And RBS

802.   Plaintiffs repeat and reallege each and every allegation above as if fully set forth herein, except that for purposes of this Count, Plaintiffs assert only strict-liability and negligence

claims and expressly disclaim any allegation of fraud or intentional misconduct except that any challenged statements of opinion or belief made in connection with the 2018 Notes Offering are alleged to have been materially misstated statements of opinion or belief when made and at the time of the 2018 Notes Offering.

803.   This Count is brought under Section 12(a)(2) of the Securities Act against Underwriter Defendants Goldman, Citigroup, Merrill, J.P. Morgan, Deutsche Bank and RBS.

804.   This claim is brought on behalf of Lead Plaintiff VRS, Plaintiff LRI Invest and other members of the Class who, during the Class Period, purchased or otherwise acquired MF Global's 2018 Notes in the 2018 Notes Offering.

805.   Underwriter Defendants Goldman, Citigroup, Merrill, J.P. Morgan, Deutsche Bank and RBS are sellers within the meaning of the Securities Act because they transferred title to Lead Plaintiff VRS, Plaintiff LRI Invest and other purchasers of MF Global's 2018 Notes in the 2018 Notes Offering. In particular, Underwriter Defendant Citigroup directly sold the 2018 Notes in the 2018 Notes Offering to Lead Plaintiff VRS and Plaintiff LRI Invest.

806.   As alleged herein, the 2018 Notes Offering Materials contained untrue statements of material fact, including the financial statements and internal controls of MF Global. In addition, the 2018 Notes Offering Materials omitted to state material facts required to be stated therein or necessary to make the statements therein not misleading, including MF Global's violations of GAAP and internal control deficiencies.

807.   The misstated and omitted facts would have been material to a reasonable person reviewing the 2018 Notes Offering Materials.

808.   Underwriter Defendants Goldman, Citigroup, Merrill, J.P. Morgan, Deutsche Bank and RBS owed to Lead Plaintiff VRS, Plaintiff LRI Invest and the Class the duty to make a

reasonable and diligent investigation of the statements contained in the 2018 Notes Offering Materials, to ensure that the statements contained or incorporated by reference therein were true and that there was no omission to state a material fact required to be stated therein or necessary to make the statements therein not misleading.

809.    Underwriter Defendants Goldman, Citigroup, Merrill, J.P. Morgan, Deutsche Bank and RBS did not make a reasonable and diligent investigation of the statements contained or incorporated by reference in the 2018 Notes Offering Materials and did not possess reasonable grounds for believing that the 2018 Notes Offering Materials did not contain an untrue statement of material fact or omit to state a material fact required to be stated therein or necessary to make the statements therein not misleading.

810.    Lead Plaintiff VRS, Plaintiff LRI Invest and members of the Class purchased the 2018 Notes in the 2018 Notes Offering, and were damaged thereby.

811.    Lead Plaintiff VRS, Plaintiff LRI Invest and the Class did not know, nor in the exercise of reasonable diligence could they have known, of the untrue statements of material fact or omissions of material facts in the 2018 Notes Offering Materials when they purchased or acquired the securities. Less than one year has elapsed between the time they discovered or reasonably could have discovered the facts upon which this Count is based and the time this claim was brought. Less than three years have elapsed between the time that the securities upon which this Count is brought were bona fide offered to the public and the time this action was commenced.

812.    By reason of the foregoing, Underwriter Defendants Goldman, Citigroup, Merrill, J.P. Morgan, Deutsche Bank and RBS are liable to Lead Plaintiff VRS, Plaintiff LRI Invest and members of the Class for violations of Section 12(a)(2) of the Securities Act. Lead Plaintiff

VRS, Plaintiff LRI Invest and Class members hereby tender their 2018 Notes to their respective

sellers and seek rescission of their purchases to the extent that they continue to own such

securities.

**COUNT TWELVE**
**For Violations Of Section 15(a) Of The Securities Act,**
**On Behalf Of Purchasers Of The 2018 Notes,**
**Asserted Against The Officer Defendants**

813.    Plaintiffs repeat and reallege each and every allegation above as if fully set forth

herein, except that for purposes of this Count Plaintiffs assert only strict-liability and negligence

claims and expressly disclaim any allegation of fraud or intentional misconduct except that any

challenged statements of opinion or belief made in connection with the 2018 Notes Offering are

alleged to have been materially misstated statements of opinion or belief when made and at the

time of the 2018 Notes Offering.

814.    This Count is brought under Section 15(a) of the Securities Act against the

Officer Defendants, on behalf of Lead Plaintiff VRS, Plaintiff LRI Invest and members of the

Class who purchased or acquired the 2018 Notes pursuant or traceable to the 2018 Notes

Offering Materials, and were damaged thereby.

815.    MF Global violated Section 11 of the Securities Act by issuing the 2018 Notes

Offering Materials, which contained untrue statements of material fact and omitted to state

material facts required to be stated therein or necessary in order to make the statements therein

not misleading. The misstated and omitted facts would have been material to a reasonable person

reviewing the 2018 Notes Offering Materials. MF Global is not named as a defendant only

because of its bankruptcy.

816.    The Officer Defendants were controlling persons of MF Global when the 2018

Notes Offering Materials were filed and became effective, because of their senior executive

270

positions with MF Global and their direct involvement in the Company's day-to-day operations, including its financial reporting and accounting functions.

817.    By virtue of the foregoing, the Officer Defendants each had the power to influence and control, and did influence and control, directly or indirectly, the decision-making of MF Global, including the content of its financial statements and the 2018 Notes Offering Materials.

818.    The Officer Defendants acted negligently and without reasonable care regarding the accuracy of the information contained and incorporated by reference in the 2018 Notes Offering Materials and lacked reasonable grounds to believe that such information was accurate and complete in all material respects.

819.    Lead Plaintiff VRS, Plaintiff LRI Invest and members of the Class purchased MF Global's 2018 Notes Offering pursuant or traceable to the 2018 Notes Offering Materials, and were damaged thereby.

820.    Lead Plaintiff VRS, Plaintiff LRI Invest and the Class did not know, nor in the exercise of reasonable diligence could they have known, of the untrue statements of material fact or omissions of material facts in the 2018 Notes Offering Materials when they purchased or acquired 2018 Notes. Less than one year has elapsed between the time they discovered or reasonably could have discovered the facts upon which this Count is based and the time this claim was brought. Less than three years have elapsed between the time that the securities upon which this Count is brought were bona fide offered to the public and the time this action was commenced.

821.   By reason of the foregoing, Defendants Corzine, MacDonald and Steenkamp and are liable to Lead Plaintiff VRS, Plaintiff LRI Invest and members of the Class for violations of Section 15(a) of the Securities Act.

## COUNT THIRTEEN
**For Violations Of Section 11 Of The Securities Act, On Behalf Of Purchasers Of The 6.25% Senior Notes, Asserted Against Defendants Corzine, MacDonald, Steenkamp, Bolger, Fusco, Gelber, Glynn, Goldberg, Schamis, Sloan, Jefferies, Merrill, BMO Capital Markets, Commerz, Natixis, Lebenthal, Sandler O'Neill, U.S. Bancorp and PwC**

822.   Plaintiffs repeat and reallege each and every allegation above as if fully set forth herein, except that for purposes of this Count, Plaintiffs assert only strict-liability and negligence claims and expressly disclaim any allegation of fraud or intentional misconduct except that any challenged statements of opinion or belief made in connection with the 6.25% Senior Notes Offering are alleged to have been materially misstated statements of opinion or belief when made and at the time of the 6.25% Senior Notes Offering.

823.   This Count is brought under Section 11 of the Securities Act against Defendants Corzine, MacDonald, Steenkamp, Bolger, Fusco, Gelber, Glynn, Goldberg, Schamis, Sloan, Jefferies, Merrill, BMO Capital Markets, Commerz, Natixis, Lebenthal, Sandler O'Neill, U.S. Bancorp and PwC.

824.   This claim is brought on behalf of Plaintiff Guam and other members of the Class who, during the Class Period, purchased or otherwise acquired MF Global's 6.25% Senior Notes issued pursuant to the 6.25% Senior Notes Offering Materials.

825.   Individual Defendants MacDonald, Steenkamp, Bolger, Fusco, Gelber, Glynn, Goldberg, Schamis and Sloan each signed the Registration Statement.

826.   At the time documents incorporated by reference in the 6.25% Senior Notes Offering Materials were filed, Corzine was a director of MF Global.

827.    Underwriter Defendants Jefferies, Merrill, BMO Capital Markets, Commerz, Natixis, Lebenthal, Sandler O'Neill and U.S. Bancorp underwrote the 6.25% Senior Notes Offering.

828.    PwC consented to the inclusion or incorporation by reference of its audit report in the 6.25% Senior Notes Offering Materials.

829.    As set forth above, the 6.25% Senior Notes Offering Materials contained untrue statements of material fact, including the financial statements and internal controls of MF Global and PwC's audits thereof. In addition, the 6.25% Senior Notes Offering Materials omitted to state other facts required to be stated therein or necessary to make the statements therein not misleading, including MF Global's violations of GAAP and internal control deficiencies. The misstated and omitted facts would have been material to a reasonable person reviewing the 6.25% Senior Notes Offering Materials.

830.    The Defendants named in this Count owed to Plaintiff Guam and the Class the duty to make a reasonable and diligent investigation of the statements contained in the 6.25% Senior Notes Offering Materials, to ensure that the statements contained or incorporated by reference therein were true and that there was no omission to state a material fact required to be stated therein or necessary to make the statements therein not misleading.

831.    These Defendants did not make a reasonable and diligent investigation of the statements contained or incorporated by reference in the 6.25% Senior Notes Offering Materials, and did not possess reasonable grounds for believing that the 6.25% Senior Notes Offering Materials did not contain an untrue statement or omit to state a material fact required to be stated therein or necessary to make the statements therein not misleading.

832.    The Underwriter Defendants named in this Count did not conduct a reasonable investigation of the statements contained in and incorporated by reference in the 6.25% Senior Notes Offering Materials and did not possess reasonable grounds for believing that the statements therein were true and not materially misstated. In particular, these Underwriter Defendants did not conduct a reasonable investigation into the accuracy of the statements regarding MF Global's reported Deferred Tax Assets, financial performance, operations or internal controls. These Underwriter Defendants could not simply rely on the work of MF Global's auditor because the investing public relies on the underwriters to obtain and verify relevant information and then make sure that important facts are accurately disclosed. Thus, the Underwriter Defendants must conduct their own independent and reasonable investigation into the accuracy of the Company's financial statements and assessments of internal controls, and they were negligent in failing to do so sufficiently in connection with the 6.25% Senior Notes Offering.

833.    Similarly, the Individual Defendants named in this Count were negligent in failing to conduct a reasonable investigation of the statements contained in the 6.25% Senior Notes Offering Materials regarding MF Global's financial performance, operations, and internal controls, and did not possess reasonable grounds for believing that the statements therein were true and not materially misstated.

834.    PwC did not conduct a reasonable audit of MF Global in compliance with GAAS and did not have a reasonable ground to state that PwC's audit report included or incorporated by reference in the 6.25% Senior Notes Offering Materials was true and that there was no omission to state a material fact required to be stated therein or necessary to make the statements therein not misleading.

835.    Plaintiff Guam and members of the Class purchased the 6.25% Senior Notes issued in the 6.25% Senior Notes Offering, and were damaged thereby.

836.    Plaintiff Guam and the Class did not know, nor in the exercise of reasonable diligence could they have known, of the untrue statements of material fact or omissions of material facts in the 6.25% Senior Notes Offering Materials when they purchased or acquired their securities. Less than one year has elapsed between the time they discovered or reasonably could have discovered the facts upon which this Count is based and the time this claim was brought. Less than three years have elapsed between the time that the securities upon which this Count is brought were bona fide offered to the public and the time this action was commenced.

837.    By reason of the foregoing, the Defendants named in this Count are liable to Plaintiff Guam and members of the Class for violations of Section 11 of the Securities Act.

### COUNT FOURTEEN
### For Violations Of Section 12(a)(2) of the Securities Act, On Behalf Of Purchasers In The 6.25% Senior Notes Offering, Asserted Against Defendants Jefferies, Merrill, BMO Capital Markets, Commerz, Natixis, Lebenthal, Sandler O'Neill And U.S. Bancorp

838.    Plaintiffs repeat and reallege each and every allegation above as if fully set forth herein, except that for purposes of this Count, Plaintiffs assert only strict-liability and negligence claims and expressly disclaim any allegation of fraud or intentional misconduct, except that any challenged statements of opinion or belief made in connection with the 6.25% Senior Notes Offering are alleged to have been materially misstated statements of opinion or belief when made and at the time of the 6.25% Senior Notes Offering.

839.    This Count is brought under Section 12(a)(2) of the Securities Act against Underwriter Defendants Jefferies, Merrill, BMO Capital Markets, Commerz, Natixis, Lebenthal, Sandler O'Neill and U.S. Bancorp.

275

840.    This claim is brought on behalf of Plaintiff Guam and other members of the Class who, during the Class Period, purchased or otherwise acquired MF Global's 6.25% Senior Notes issued in the 6.25% Senior Notes Offering.

841.    Underwriter Defendants Jefferies, Merrill, BMO Capital Markets, Commerz, Natixis, Lebenthal, Sandler O'Neill, and U.S. Bancorp are sellers within the meaning of the Securities Act because they transferred title to Plaintiff Guam and other purchasers of MF Global's 6.25% Senior Notes in the 6.25% Senior Notes Offering. In particular, Underwriter Defendant Jeffries directly sold the 6.25% Senior Notes to Plaintiff Guam.

842.    As alleged herein, the 6.25% Senior Notes Offering Materials contained untrue statements of material fact, including the financial statements and internal controls of MF Global. In addition, the 6.25% Senior Notes Offering Materials omitted to state material facts required to be stated therein or necessary to make the statements therein not misleading, including MF Global's violations of GAAP and internal control deficiencies.

843.    The misstated and omitted facts would have been material to a reasonable person reviewing the 6.25% Senior Notes Offering Materials.

844.    Underwriter Defendants Jefferies, Merrill, BMO Capital Markets, Commerz, Natixis, Lebenthal, Sandler O'Neill and U.S. Bancorp owed to Plaintiff Guam and the Class the duty to make a reasonable and diligent investigation of the statements contained in the 6.25% Senior Notes Offering Materials, to ensure that the statements contained or incorporated by reference therein were true and that there was no omission to state a material fact required to be stated therein or necessary to make the statements therein not misleading.

845.    Underwriter Defendants Jefferies, Merrill, BMO Capital Markets, Commerz, Natixis, Lebenthal, Sandler O'Neill and U.S. Bancorp did not make a reasonable and diligent

investigation of the statements contained or incorporated by reference in the 6.25% Senior Notes Offering Materials and did not possess reasonable grounds for believing that the 6.25% Senior Notes Offering Materials did not contain an untrue statement of material fact or omit to state a material fact required to be stated therein or necessary to make the statements therein not misleading.

846.    Plaintiff Guam and members of the Class purchased MF Global's 6.25% Senior Notes in the 6.25% Senior Notes Offering in the 6.25% Senior Notes Offering, and were damaged thereby.

847.    Plaintiff Guam and the Class did not know, nor in the exercise of reasonable diligence could they have known, of the untrue statements of material fact or omissions of material facts in the 6.25% Senior Notes Offering Materials when they purchased or acquired the securities. Less than one year has elapsed between the time they discovered or reasonably could have discovered the facts upon which this Count is based and the time this claim was brought. Less than three years have elapsed between the time that the securities upon which this Count is brought were bona fide offered to the public and the time this action was commenced.

848.    By reason of the foregoing, Underwriter Defendants Jefferies, Merrill, BMO Capital Markets, Commerz, Natixis, Lebenthal, Sandler O'Neill and U.S. Bancorp are liable to Plaintiff Guam and members of the Class for violations of Section 12(a)(2) of the Securities Act. Plaintiff Guam and Class members hereby tender their 6.25% Senior Notes to their respective sellers and seek rescission of their purchases to the extent that they continue to own such securities.

**COUNT FIFTEEN**
**For Violations Of Section 15(a) Of The Securities Act,**
**On Behalf Of Purchasers Of The 6.25% Senior Notes,**
**Asserted Against The Officer Defendants**

849.    Plaintiffs repeat and reallege each and every allegation above as if fully set forth herein, except that for purposes of this Count, Plaintiffs assert only strict-liability and negligence claims and expressly disclaim any allegation of fraud or intentional misconduct except that any challenged statements of opinion or belief made in connection with the 6.25% Senior Notes Offering are alleged to have been materially misstated statements of opinion or belief when made and at the time of the 6.25% Senior Notes Offering.

850.    This Count is brought under Section 15 of the Securities Act against the Officer Defendants, on behalf of Plaintiff Guam and members of the Class who purchased or acquired the 6.25% Senior Notes pursuant or traceable to the 6.25% Senior Notes Offering Materials.

851.    MF Global violated Section 11 of the Securities Act by issuing the 6.25% Senior Notes Offering Materials, which contained untrue statements of material fact and omitted to state material facts required to be stated therein or necessary to make the statements therein not misleading. The misstated and omitted facts would have been material to a reasonable person reviewing the 6.25% Senior Notes Offering Materials. MF Global is not named as a defendant only because of its bankruptcy.

852.    The Officer Defendants were controlling persons of MF Global when the 6.25% Senior Notes Offering Materials were filed and became effective, because of their senior executive positions with MF Global and their direct involvement in the Company's day-to-day operations, including its financial reporting and accounting functions.

853.    By virtue of the foregoing, Defendants Corzine, MacDonald and Steenkamp each had the power to influence and control, and did influence and control, directly or indirectly, the

278

decision-making of MF Global, including the content of its financial statements and the 6.25% Senior Notes Offering Materials.

854.   The Officer Defendants acted negligently and without reasonable care regarding the accuracy of the information contained and incorporated by reference in the 6.25% Senior Notes Offering Materials and lacked reasonable grounds to believe that such information was accurate and complete in all material respects.

855.   Plaintiff Guam and members of the Class purchased the 6.25% Senior Notes pursuant or traceable to the 6.25% Senior Notes Offering Materials, and were damaged thereby.

856.   Plaintiff Guam and the Class did not know, nor in the exercise of reasonable diligence could they have known, of the untrue statements of material fact or omissions of material facts in the 6.25% Senior Notes Offering Materials when they purchased or acquired 6.25% Senior Notes. Less than one year has elapsed between the time they discovered or reasonably could have discovered the facts upon which this Count is based and the time this claim was brought. Less than three years have elapsed between the time that the securities upon which this Count is brought were bona fide offered to the public and the time this action was commenced.

857.   By reason of the foregoing, Defendants Corzine, MacDonald and Steenkamp are liable to Plaintiff Guam and members of the Class for violations of Section 15(a) of the Securities Act.

**XV.   JURY DEMAND**

858.   Plaintiffs, on behalf of themselves and the Class, hereby demand a trial by jury.

**XVI.   PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, on behalf of themselves and the Class, pray for relief and judgment as follows:

a.  Determining that this action is a proper class action and certifying Plaintiffs as class representatives under Rule 23 of the Federal Rules of Civil Procedure;

b.  Awarding compensatory damages in favor of Plaintiffs and the other members of the Class against all Defendants for all damages sustained as a result of Defendants' violations in an amount to be proven at trial, together with interest thereon;

c.  Awarding rescission or rescissory damages in favor of Plaintiffs and the other members of the Class;

d.  Awarding prejudgment interest or opportunity-cost damages in favor of Plaintiffs and the other members of the Class;

e.  Awarding Plaintiffs and the Class the fees and expenses incurred in the prosecution of this action, including attorneys' fees and expert fees; and

f.  Granting such other and further relief as the Court may deem just and proper.

Dated: December 31, 2014

**BERNSTEIN LITOWITZ BERGER & GROSSMANN LLP**

**By:** _____

Salvatore J. Graziano
Hannah G. Ross
Jai Chandrasekhar
Stefanie J. Sundel
1285 Avenue of the Americas
New York, NY 10019
(212) 554-1538
(212) 554-1444 (fax)

*Co-Lead Counsel For Lead Plaintiffs The Virginia Retirement System And Her Majesty The Queen In Right Of Alberta And The Proposed Class, And Counsel For Named Plaintiffs Government Of Guam Retirement Fund And West Virginia Laborers' Pension Trust Fund*

**BLEICHMAR FONTI TOUNTAS & AULD LLP**
Javier Bleichmar
Dominic J. Auld
Cynthia Hanawalt
Jeffrey R. Alexander
7 Times Square, 27th Floor
New York, New York 10036
(212) 789-1340
(212) 205-3960 (fax)

*Co-Lead Counsel For Lead Plaintiffs Her Majesty The Queen In Right Of Alberta, The Virginia Retirement System And The Proposed Class*

**MOTLEY RICE LLC**
Ann Ritter
28 Bridgeside Boulevard
Mount Pleasant, SC 29464
(843) 216-9000
(843) 216-9450 (fax)

**ROBBINS GELLER RUDMAN
& DOWD LLP**
Darren J. Robbins
655 West Broadway
San Diego, CA 92101
(619) 231-1058
(619) 231-7423 (fax)

*Additional Counsel For
Named Plaintiff LRI Invest, S.A.*

**GIRARD GIBBS LLP**
Daniel C. Girard
601 California Street, Suite 1400
San Francisco, CA 94108
(415) 981-4800
(415) 981-4846 (fax)

**ZAMANSKY & ASSOCIATES, LLC**
Jacob H. Zamansky
Kevin D. Galbraith
50 Broadway
New York, NY 10004
(212) 742-1414
(212) 742-1177 (fax)

*Additional Counsel For Named Plaintiffs
Monica Rodriguez And Jerome Vrabel*

282